**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AUGUST CABRERA, M.G.C., by and through his next friend August Cabrera, R.X.C., by and through his next friend August Cabrera, CORBIN CABRERA, GILLIAN LEIGH CABRERA, ROBERT CABRERA, SUZANNE RENAE MARTINEZ, JD PROSSER, ALMA MURPHY, LUCAS GONZALES, PAUL MURPHY, GINNY LAMB, SHERRY LOAN, LINDA PHANEUF, CAITLIN ELIZABETH ANDERSON, L.G.A., by and through her next friend Caitlin Elizabeth Anderson, BOBBY GENE ANDERSON, PATRICIA MARLENE GOODWIN, APRIL LYNN ANDERSON, BOBBY JOE ANDERSON, JOHN DAVID ANDERSON, MARGARET ANDERSON, ROSA IRMA HALLIDAY, ARMANDO OCHOA, EDUARDO OCHOA, BRAD JOSEPH HALLIDAY, CHERYL ATWELL, ERIN RIEDEL, CHRISTOPHER BALDRIDGE, E.B., by and through his next friend Christopher Baldridge, L.B., by and through his next friend Christopher Baldridge, S.B., by and through her next friend Christopher Baldridge, JESSIE BALDRIDGE, VIRGINIA NEWSOM, KYLE BALDUF, BRETT BARRETT, APRIL ANGEL BAYS, TIMOTHY LEE BAYS, BRENDA GRINER, LINDSAY REDOUTEY, ANGELA FRITZGES, JAMES BELL, PAMELA E. ALEXANDER BELL, LONDON JACINDA BELL, ANDREA ROE, FREDERICK C. BENSON, BEVERLY MILLS, BETHANY ANN BENTON, JAMES MICHAEL BOUCHER JR., JAMES BOUCHER SR., KIMBERLEY BOUCHER, BRITANY BOUCHER, LUIS BRISEÑO, SUSAN BRODEUR, D.L.B., by and through his next friend Susan Brodeur, E.L.B., by and through her next friend Susan Brodeur, JOYCE A. BRODEUR, LAWRENCE A. BRODEUR, BARBARA BROWN, HAROLD BROWN SR., REGINA BROWN, PAULA RICH, RICHARD G. BRUNKHORST, WILLIAM MICHAEL BURLEY, TAMMY OLMSTEAD, MICHAEL COLLINS, DAN OLMSTEAD, JAMES

Case No.: ______________

JURY TRIAL DEMANDED

REGINALD CAMPBELL, MARIA CARDOZA, RAMIRO CARDOZA SR., RAMIRO CARDOZA JR., JEFF CARON, CASSANDRA CARON, KAREN CARON, SUMER J. ROBERTS, JON CENTANNI, GLENN CHISHOLM, KARMA CHISHOLM, DONNA BALL, MICHAEL CHRISTIAN, MICHAEL AARON CHRISTIAN, KEYKO D. CLARK, CORTEIZE CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, JONATHAN CLEARY, HOLLY CONRAD, B.C., by and through his next friend Holly Conrad, KENNETH COTTLE, ROSS COX, NICOLE COX, A.C., by and through his next friend Ross Cox, B.C., by and through his next friend Ross Cox, H.C., by and through her next friend Ross Cox, PEYTON COONEY, DAVID AARON CROW, CHERYL A. CULBRETH, WALTER L. CULBRETH, JAMES FARRIS CULLINS JR., COOPER HENRY PIKE CULLINS, DONAVAN KURT SCHILLING CULLINS, BARBARA SCHILLING, MARCUS DANDREA, N.D., by and through her next friend Marcus Dandrea, LEANORA DANDREA, MARK WILLIAM DANDREA, H.D., by and through her next friend Leanora Dandrea, I.D., by and through his next friend Leanora Dandrea, BENJAMIN DANDREA, GABRIEL DANDREA, HANNAH DANDREA, JOSHUA DANDREA, SAMUEL DANDREA, JAMES L. DANIELS, LUCAS DANIELS, SOPHIE DANIELS, HELENA DAVIS, C.D., by and through his next friend Helena Davis, DON DAY, KATHY DAY, TEDDI DEYOUNG, PATRICIA ELSNER, KELSEY THOMAS, MARK ELSNER, JACKIE ALLEN, MARK ANTHONY ELSNER, KELLI DODGE, B.C.D., by and through his next friend Kelli Dodge, P.A.D., by and through her next friend Kelli Dodge, JULIE SCHROCK, RYAN DONAHUE, CHANDLER SCHROCK, TAYLOR SCHROCK, ROBERT L. DUNNING, TOMOE DUNNING, JOY COY, ERICH ELLIS, KRISTEN A. ELWELL, E.M.E., by and through her next friend Kristen A. Elwell, N.B.E., by and through his next friend Kristen A. Elwell, SUSAN BURKHARD, CHARLES ESSEX, JOHN EWY, JOHN L. FANT, DAVID FINGAR, RHONDA G. FINGAR, ANDREA

DIETZ, BUFORD JEREMIAH FINGAR, DONALD JOSHUA FINGAR, STEPHANIE FREEMAN, KATIE C. FREEMAN, K.M.F., by and through her next friend Katie C. Freeman, W.D.F., by and through his next friend Katie C. Freeman, JOSEPH D. GARRISON, KENDRA GARZA, DAVID PIEPER, GAYLE MARIE PIEPER, KAILA CARRIER, TROY M.W. PIEPER, JOANNA GILBERT, PATRICIA GOINS, PAUL EDWARD GOINS III, EMMITT DWAYNE BURNS, JANICE CARUSO, DANA RAINEY, JOHN WAYNE GOLDSMITH, LORIE GOLDSMITH, ANN L. GOULD, JAMES A. GOULD, JULIANNA SYMKOWIAK, SUNI CHABROW, KRISTIN CARACCIOLO, PAIGE ERLANGER, LOWELL HANSON, MEGAN KATHLEEN DOHN, CYNTHIA HANSON, BRIAN HARPER, SORAINYA HARRIS, TENNYSON CHARLES HARRIS, TIFFANY DOTSON, ASHLEY MICHELLE HARRIS, CHRISTOPHER WAYNE JOHNSON, DAVID L. PARKER, FELICIA ANN HARRIS, MICHAEL RUFUS II, STEPHANIE RUFUS, RUTH M. HARTON, EVANGELINE FERRERA, EDUARDO FERRERA, ANDREA HIDALGO, JORGE HIDALGO, DOMINIC GIACCHI, KEVIN HONAKER, BART LARUE HOWARD, CONSTANCE LOUISE HOWARD, ALEXANDER JAMES HOWARD, OLIVIA MARIE HOWARD, KRISTINE ANNE ZITNY, ERIC M. HUNTER, KENNA HUNTER, J.H., by and through his next friend Kenna Hunter, K.H., by and through her next friend Kenna Hunter, JESUS INFANTE, JESSICA INFANTE, JUAN INFANTE, MICHAEL K. INGRAM SR., JULIE INGRAM, PAUL ELMER JAYNE, CHERYL JOHNSON, MICHAEL KISSELOFF, MILAGROS KISSELOFF, EDWARD KLEIN, BRANDON KORONA, MIRANDA LANDRUM, B.R.L., by and through her next friend Miranda Landrum, G.B.L., by and through his next friend Miranda Landrum, JAMES R. LANDRUM, JANET LANDRUM, CRAIG LEICHT, SHIRLY A. LEICHT, ELIZABETH C. LEICHT, JESSE H. LEICHT, JONATHAN LEICHT, MARY ROSE LEICHT, SARAH GRACE LEICHT, JARED

SATOSHI LEMON, K.E.L., by and through her next friend Jared Satoshi Lemon, FRANK L. LEMON, JACKIE L. LEMON, BENJAMIN LEMON, MATTHEW C. S. LEMON, NATHAN KENJI LEMON, C. RICHARD LOONEY, MARTHA LOONEY, MICHAEL DAVITT, KYLE MALIN, ALICIA MALIN, C.M., by and through his next friend Alicia Malin, K.M., by and through his next friend Alicia Malin, TAYLOR MARTA, KRISTIE SURPRENANT, BOB SURPRENANT, BRIAN M. MARTIN, JULIE K. MARTIN, CATHERINE G. MARTIN, ELIZABETH A. MARTIN, THOMAS PIERCE MAYS, ALYSON OVERMAN RODGERS, CODY CHEYENNE MAYS, TAMMY RENEE MAYS, SONJA MCDANIEL, M.M., by and through his next friend Sonja McDaniel, J.G., by and through his next friend Sonja McDaniel, CHARLETTE GILBERT, CHARMAINE RENEE GILBERT, JASMINE THOMAS, KATHLEEN MCEVOY, MICHELLE ROSE MCEVOY, PATRICK CHARLES MCEVOY, JANICE H. PROCTOR, SHANNON K. MCNULTY, JOHN MEANS, NICHOLAS D. MENDES, SARAH BETH MILLER MORGAN, TERRY MITTLER, ANDREA KESSLER, JOSE ALBERTO MORGADO, SUSAN MORRISON, CATHERINE MULLINS, THOMAS MULLINS, BETHANY ROSE MULLINS RANDALL, CHET MURACH, AMANDA NEWMAN, DERRICK ANTHONY DAVIS, CYNTHIA NICHOLS, DOUGLAS NICHOLS, PATRICIA A. NICOL, ROLAND N. NICOL, ALAINA NICOL, ROLAND J. NICOL, SUSAN NOVAK, JULIA OTT, MINDYLOU PARESI, ELIZABETH SANTINA PARESI, JANET G. PARESI, SANTINA CARTISSER, TERRY PARESI, ALEXANDRA VANDENBROEK, ASHLEY PETERS, G.R.P., by and through his next friend Ashley Peters, DEBORAH JEAN PETERS, DENNIS W. PETERS, GLENDA WILLARD, RANEE MASSONI, JORDAN PLUNK, JUSTIN T. PLUNK, AARON WILLIAM PRESCOTT, JACOB RICHARD PRESCOTT, JOSHUA MICHAEL PRESCOTT, CYNTHIA L. PYEATT, LON SCOTT PYEATT, EMILY SMALLEY,

ANDREA N. RATZLAFF, HEATHER L. REED, DOLORES A. REED, RANDY RISTAU, H.R., by and through her next friend Randy Ristau, SUZANNE RISTAU, CHRISTOPHER POWERS, JANNETT CECILIA ROBERTS, E.N.R., by and through his next friend Jannett Cecilia Roberts, MIGUEL ANGEL NATHANIEL ROBERTS, MIRIATLIZ ROBERTS, LESLIE RODRIGUEZ, R.G., by and through her next friend Leslie Rodriguez, ANGELA RITA MARIE ROGERS, BARBARA A. ROLAND, MARK K. ROLAND, ERICA M. ROLAND, LIESELOTTE R. ROLDAN, ANGEL R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN, ALEX JASON ROZANSKI, COLLEEN WHIPPLE, THOMAS SCHWALLIE, DAVID SHANFIELD, PAMELA SHANFIELD, SYDNEY SHANFIELD, JACQUELINE B. THOMPSON, RANDOLPH D. THOMPSON, BRITTNEY BULLOCK, ANDREW SLACK, JESSE SLACK, JONATHAN H. SLACK, LAUREN SLACK, ROSE ANN CROSSMAN, JESSICA COOK, DELORIS SNOW, M.B., by and through her next friend Deloris Snow, DAMEN SNOW, LARRY MICHAEL SOLESBEE, GARRY LEE SPARKS, JAN MARIE HURNBLAD SPARKS, ERIK SPARKS, ZACHARY DOUGLAS SPARKS, JANE SPARKS, TINA LYNN SEEKINS, BILLY MICHAEL STOUT, ROBIN STOUT, MELISSA STOUT, GARRETT LAYNE FUNK, HARRIET SUTTON, EVELYN TAYLOR, DANICA THOMAS, L.T., by and through her next friend Danica Thomas, JULIE MAGANA, RYAN GREGORY TIMONEY, DIANE TIMONEY, GREGORY TIMONEY, ESTA SMITH, JOE TORIAN, EMILY TORIAN, NATHAN EWELL TORIAN, JIMMY SMITH, KEVIN TRIMBLE, MICHAEL VERARDO, BARRY WELCH, LORRIA WELCH, JOHN M. WEST, MARCIA M. WEST, KRISTINE WILLIS, CHERYL SPIVEY, CORBIN WAYNE HUNT, DANA MARIE BERNHARDT, MARY LEE WISE, MARY HEATHER WISE, E.P., by and through his next friend Dana Marie Bernhardt, F.S., by and through her next friend Ashley Rose Serocki, DAWN MARIE PATTEE, JALISA MARIE HAMMOND,

KRISTEN COLLEEN WRIGHT, MICHELLE MARIE FISCHBACH, CHRIS LEE ZIMMERMAN, BAILY ZIMMERMAN,

Plaintiffs,

v.

BLACK & VEATCH SPECIAL PROJECTS CORPORATION, CENTERRA GROUP, LLC, DAI GLOBAL LLC, ENVIRONMENTAL CHEMICAL CORPORATION, G4S HOLDINGS INTERNATIONAL (AG) LIMITED, G4S RISK MANAGEMENT LIMITED, JANUS GLOBAL OPERATIONS LLC, LOUIS BERGER GROUP, INC., LOUIS BERGER INTERNATIONAL, INC., LOUIS BERGER GROUP, INC. / BLACK & VEATCH SPECIAL PROJECTS CORPORATION JOINT VENTURE, MTN GROUP LIMITED, MTN (DUBAI) LIMITED, MTN AFGHANISTAN,

Defendants.

**COMPLAINT FOR VIOLATION OF THE ANTI-TERRORISM ACT**

**TABLE OF CONTENTS**

Page


INTRODUCTION ........................................................................................................ 1

THE DEFENDANTS........................................................................................................ 9

A. The ArmorGroup Defendants ........................................................................ 9

B. The DAI Defendant........................................................................................ 10

C. The EOD Technology Defendant ................................................................. 10

D. The LBG/Black & Veatch Defendants ......................................................... 10

E. The MTN Defendants ................................................................................... 11

JURISDICTION AND VENUE ........................................................................................ 12

FACTUAL ALLEGATIONS ............................................................................................ 13

I. IN THE WAKE OF THE SEPTEMBER 11 ATTACKS, THE AL-QAEDA-BACKED AFGHAN TALIBAN LAUNCHED A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN AFGHANISTAN ................................ 13

II. DEFENDANTS KNOWINGLY OR RECKLESSLY FINANCED TERRORISM BY PAYING PROTECTION MONEY TO THE TALIBAN............ 16

A. Defendants Operated In A Corrupt Afghan Contracting Environment That Encouraged Protection Payments ........................................................ 17

B. Western Contractors Commonly Structured Their Operations In Afghanistan To Funnel Protection Payments To The Taliban.............................. 21

III. DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR PAYMENTS FINANCED TALIBAN ATTACKS ON AMERICANS .................... 35

A. Defendants' Protection Payments Directly Funded The Taliban's Terrorist Campaign Against Americans In Afghanistan .................................................... 35

B. Defendants Knew Or Recklessly Disregarded That Their Payments Financed Anti-American Terrorism.............................................................. 40

C. The U.S. Government Opposed Defendants' Payment Of Protection Money To The Taliban ........................................................................... 51

IV. EACH DEFENDANT MADE PROTECTION PAYMENTS THAT IT KNEW OR RECKLESSLY DISREGARDED WOULD BENEFIT THE TALIBAN.............................................................................................. 58

A. The ArmorGroup Defendants ........................................................ 58

1. The ArmorGroup Defendants Made Protection Payments To The Taliban ........................................................ 58

2. ArmorGroup's Protection Payments Comport With Its Other Conduct In Afghanistan ........................................................ 69

3. The ArmorGroup Defendants' Payments Had A Substantial Nexus To The United States ........................................................ 70

B. The DAI Defendant ........................................................ 72

1. DAI Paid Protection Money To The Taliban ........................................................ 72

2. DAI's Protection Payments Comport With Its Other Conduct In Afghanistan ........................................................ 78

C. The EOD Technology Defendant ........................................................ 80

D. The LBG/BV Defendants ........................................................ 85

1. The LBG/BV Defendants Made Protection Payments To The Taliban ......... 85

2. The LBG/BV Defendants' Protection Payments Comport With Their Other Conduct In Afghanistan And Similar Markets ........................................................ 96

E. The MTN Defendants ........................................................ 99

1. MTN Made Protection Payments To The Taliban ........................................................ 99

2. MTN Supported The Taliban By Deactivating Its Cellular Towers At Night ........................................................ 105

3. MTN's Protection Payments Comport With Its Conduct In Other Markets ........................................................ 109

4. MTN's Conduct Had A Substantial Nexus To The United States ................ 112

V. THE TALIBAN, WITH SUBSTANTIAL SUPPORT FROM AL-QAEDA, USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS IN AFGHANISTAN ........................................................ 121

A. The Taliban Was Part Of A Terrorist Syndicate That Waged A Deadly Insurgency Against Americans In Afghanistan ........................................................ 121

1. The Taliban ........................................................ 122

2. The Haqqani Network ........ 125

3. The Kabul Attack Network ........ 131

B. Al-Qaeda Committed, Planned, And Authorized The Terrorist Attacks That Killed And Injured Plaintiffs ........ 133

VI. THE TALIBAN KILLED AND INJURED PLAINTIFFS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK ........ 144

The David E. Cabrera Family ........ 144

The Raymond C. Alcaraz Family ........ 146

The William Allen Family ........ 147

The Billy G. Anderson Family ........ 147

The Brian M. Anderson Family ........ 149

The Carlos A. Aragon Family ........ 149

The Bradley W. Atwell Family ........ 150

The Dillon C. Baldridge Family ........ 151

The Kevin B. Balduf Family ........ 152

The Brandon A. Barrett Family ........ 153

The William M. Bays Family ........ 154

The Thomas A. Baysore Jr. Family ........ 155

The Vincent J. Bell Family ........ 155

The Darrik C. Benson Family ........ 156

The Brett Benton Family ........ 157

The James Michael Boucher Jr. Family ........ 158

The Francisco J. Briseño-Alvarez Jr. Family ........ 159

The David L. Brodeur Family ........ 159

The Harold Brown Jr. Family ........ 160

The Scott W. Brunkhorst Family ........ 162

The Nicholas B. Burley Family ........ 162

The Joshua R. Campbell Family ........ 163

The Kevin Cardoza Family ........ 164

The Joseph T. Caron Family ........ 165

The Patrick R. Carroll Family ........ 166

The Rick J. Centanni Family ........ 167

The Benjamen G. Chisholm Family ........ 167

The Rusty H. Christian Family ........ 168
The Chazray C. Clark Family ........ 169
Jonathan Cleary ........ 170
The Timothy J. Conrad Jr. Family ........ 170
The Robert J. Cottle Family ........ 171
The Ross Cox Family ........ 172
The Robert W. Crow Family ........ 173
The Justin E. Culbreth Family ........ 173
The Joshua J. Cullins Family ........ 174
The Marcus Dandrea Family ........ 175
The Devin J. Daniels Family ........ 177
The Jonathan D. Davis Family ........ 178
The David P. Day Family ........ 178
The Matthew J. DeYoung Family ........ 179
The John P. Dion Family ........ 180
The Corey J. Dodge Family ........ 181
The Max W. Donahue Family ........ 182
The Stephen J. Dunning Family ........ 183
Erich Ellis ........ 184
The Kenneth B. Elwell Family ........ 184
The Richard A. Essex Family ........ 185
The Jered W. Ewy Family ........ 186
The Garrett A. Fant Family ........ 186
The Jason D. Fingar Family ........ 187
The Michael L. Freeman Jr. Family ........ 188
The Ronald D. Freeman Family ........ 189
The Joseph M. Garrison Family ........ 190
The Kendra Garza Family ........ 190
The William Joseph Gilbert Family ........ 191
The Paul Goins Jr. Family ........ 192
The Wyatt A. Goldsmith Family ........ 193
The Kristopher J. Gould Family ........ 194
The Douglas J. Green Family ........ 195
The Matthias N. Hanson Family ........ 195

The Scott D. Harper Family ..... 196
The Devon J. Harris Family ..... 197
The Joshua A. Harton Family ..... 199
The Jose A. Hernandez Family ..... 199
The Daren M. Hidalgo Family ..... 200
The Floyd E.C. Holley Family ..... 201
Kevin Honaker ..... 201
The Abram L. Howard Family ..... 202
The Michael A. Hughes Family ..... 203
The Eric M. Hunter Family ..... 203
The Jesse Infante Family ..... 204
The Michael K. Ingram Jr. Family ..... 205
The Ryan P. Jayne Family ..... 206
The Timothy L. Johnson Family ..... 207
The Denis D. Kisseloff Family ..... 207
Edward Klein ..... 208
Brandon Korona ..... 209
The Brandon J. Landrum Family ..... 209
The Jacob C. Leicht Family ..... 210
The Jared Satoshi Lemon Family ..... 211
The Andrew R. Looney Family ..... 212
The Russell E. Madden Family ..... 213
The Kyle Malin Family ..... 214
The Chase S. Marta Family ..... 215
The Ethan J. Martin Family ..... 215
The Wyatt J. Martin Family ..... 216
The Chauncy R. Mays Family ..... 217
The Mecolus C. McDaniel Family ..... 218
The Richard P. McEvoy Family ..... 219
The Richard L. McNulty III Family ..... 220
The Dale W. Means Family ..... 221
Nicholas D. Mendes ..... 222
The Paul J. Miller Family ..... 222
The Shaun M. Mittler Family ..... 223

The Travis A. Morgado Family ........ 223
The Donald S. Morrison Family ........ 224
The Brandon S. Mullins Family ........ 225
The Thomas Paige Murach Family ........ 226
The Christopher R. Newman Family ........ 226
The Bryan J. Nichols Family ........ 227
The Andrew C. Nicol Family ........ 228
The Adam J. Novak Family ........ 229
The Nicholas S. Ott Family ........ 229
The Dane Clark Paresi Family ........ 230
The Joseph Michael Peters Family ........ 231
The Jared C. Plunk Family ........ 232
The Brandon Joseph Prescott Family ........ 233
The Lucas Todd Pyeatt Family ........ 234
The Thomas A. Ratzlaff Family ........ 235
The Jesse D. Reed Family ........ 235
The Michael E. Ristau Family ........ 236
The Edgar N. Roberts III Family ........ 237
The Mario Rodriguez Jr. Family ........ 238
The Jason A. Rogers Family ........ 239
The Matthew D. Roland Family ........ 240
The Angel Roldan Jr. Family ........ 241
The Nicholas J. Rozanski Family ........ 242
The Rex L. Schad Family ........ 242
The Jacob M. Schwallie Family ........ 243
The Derek L. Shanfield Family ........ 244
The Amy R. Sinkler Family ........ 245
The Wade A. Slack Family ........ 246
The Deangelo B. Snow Family ........ 247
The Kristoffer M. Solesbee Family ........ 248
The Orion N. Sparks Family ........ 248
The Tyler M. Springmann Family ........ 249
The Kyle Brandon Stout Family ........ 250
The Joshua J. Strickland Family ........ 251

The Barry Sutton Family ... 252

The James E. Thode Family ... 252

The Allen R. Thomas Family ... 253

The Jesse R. Tilton Family ... 254

The Ryan Gregory Timoney Family ... 255

The Aaron C. Torian Family ... 255

Kevin Trimble ... 257

Michael Verardo ... 257

The Nickolas S. Welch Family ... 257

The Matthew J. West Family ... 258

The Leston M. Winters Family ... 259

The Jeremy Jason Wise Family ... 260

The Randal P. Wright Family ... 261

The Sonny C. Zimmerman Family ... 262

CLAIMS FOR RELIEF ... 263

COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [Primary Liability, 18 U.S.C. § 2339A Predicate] ... 263

COUNT TWO: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [Primary Liability, 18 U.S.C. § 2339B Predicate] ... 265

COUNT THREE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [Primary Liability, 18 U.S.C. § 2339C Predicate] ... 266

COUNT FOUR: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [Primary Liability, 50 U.S.C. § 1705(a) Predicate] ... 268

COUNT FIVE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [Aiding-And-Abetting Liability, Attack Predicate] ... 269

COUNT SIX: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [Aiding-and-Abetting Liability, RICO predicate] ... 271

JURY DEMAND ... 273

PRAYER FOR RELIEF ... 274

## INTRODUCTION

1. This lawsuit seeks damages under the federal Anti-Terrorism Act on behalf of American service members and civilians, and their families, who were killed or wounded while serving their country in Afghanistan between 2009 and 2017. While these men and women worked to rebuild post-invasion Afghanistan, they were attacked by a Taliban-led terrorist insurgency that Defendants helped finance. Defendants supported the Taliban for a simple reason: Defendants were all large Western companies with lucrative businesses in post-9/11 Afghanistan, and they all paid the Taliban to refrain from attacking their business interests. Those protection payments aided and abetted terrorism by directly funding an al-Qaeda-backed Taliban insurgency that killed and injured thousands of Americans. The allegations below are based on several confidential witnesses with direct and indirect knowledge of the alleged facts; internal company documents; declassified government-intelligence reporting; congressional testimony, reports, and investigations; press accounts; and Plaintiffs' own recollections.

2. After the Taliban's initial losses in the wake of the U.S. military's post-9/11 invasion, it regenerated as a deadly terrorist insurgency intent on expelling Coalition forces from Afghanistan and re-establishing nationwide Islamic rule. Reliable funding was essential to that goal. Thus, in 2005, the Taliban's leadership council (called the "Quetta Shura") began prescribing regulations for extracting protection money from international businesses operating in Afghanistan. To that end, the Taliban systematically approached companies operating in its areas of influence and demanded a percentage of their revenues. The Taliban motivated companies to make the payments by presenting them with a choice: either meet the Taliban's monetary demands and help fund its insurgency, or face the risk of future terrorist attack.

3. Defendants agreed to the Taliban's demands. The details varied – some Defendants worked on development projects, others provided private-security services, while another operated a cellular-telephone network – but each owned valuable business assets in areas vulnerable to Taliban attack. To protect those businesses and grow their profits, Defendants paid the Taliban to leave them alone. The payments saved Defendants money: it was cheaper to buy off the Taliban than it would have been to invest in the security necessary to mitigate the terrorists' threats. And, generally speaking, the payments worked as intended. Paying the Taliban reduced the frequency with which Defendants themselves faced the threat of terrorist attack, and it allowed them to cut corners on security too. One American business owner who paid protection money described the typical mindset in slightly hyperbolic (yet no less revealing) terms: "We don't need any security if the payments are made. Nobody f---s with us."

4. Defendants' protection payments adhered to common practice by certain corrupt contractors in post-9/11 Afghanistan. Many contractors viewed terrorist protection payments as the cost of doing business, and they openly admitted as much. Typical statements by companies operating in Taliban areas included: "I pay the Taliban not to attack my goods, and I don't care what they do with the money"; "You have to [pay the Taliban]. Everybody does"; and "We assume that our people are paying off the Taliban." Investigations by U.S. military-intelligence agencies, USAID, Congress, and investigative journalists also documented similar payments. As one Kabul-based reporter summarized the evidence in 2009, "virtually every major project includes a healthy cut for the insurgents." It was accepted wisdom on the ground that, to maximize profits in Afghanistan, companies commonly paid protection money to the Taliban in amounts worth between 20 and 40 percent of the value of the project being "protected."

5. Defendants often paid the Taliban through their local subcontractors. Many projects in Afghanistan involved chains of subcontractors – in which a prime contractor funneled both the work and the money through layers of additional corporate entities – and Defendants exploited that structure to enable payments to insurgents. Indeed, Defendants often hired private-security subcontractors with the knowledge that those companies would deliver "security" by paying off the Taliban. Those protection payments were typically structured in one of two ways. The payments often took the form of cash transfers – routed through Afghanistan's hard-to-trace *hawala* system – to Taliban agents. Alternatively, the payments sometimes took the form of salary disbursements to Taliban "guards" that Defendants (or their subcontractors) hired directly onto their payroll. Either way, the logic was the same. Defendants decided that buying off the terrorists was the most efficient way to operate their businesses while managing their own security risks – even though doing so jeopardized other American lives.

6. Defendants financed the Taliban through protection payments from at least 2006 until 2014. The allegations of such payments below include (but are not limited to) the contract numbers on which Defendants made the payments; the identities of the corrupt subcontractors they used to facilitate the flow of money; indications of how they concealed the payments on their books; and examples of specific payments made by each. The details varied by Defendant. Some relied on corrupt security companies to deliver protection money to secure their expensive development projects. Another made cash payments to discourage the Taliban from attacking its cellular towers. Yet another hired a subcontractor that the U.S. government determined was "supporting the insurgency" and, after learning of it, agreed to pay the subcontractor $1.5 million anyway. And others sourced their security guards from Taliban cutouts with colorful, *Reservoir Dogs*-inspired nicknames like "Mr. Pink," "Mr. White," or "Commander Blue." A Taliban

warlord employed by the ArmorGroup Defendants even engaged in a literal firefight with Coalition forces, after the U.S. military raided the Taliban meeting he was hosting.

7. The MTN Defendants went beyond financing Taliban operations and ventured into active coordination. Not only did MTN make payments that financed terrorism; it also deactivated its cellular network at night because the Taliban told it to. Nighttime cellular service was important to Coalition intelligence-collection efforts: it allowed human sources to call Coalition tip lines inconspicuously, and active phone signals allowed U.S. special operators to track high-value terrorists for nighttime capture-or-kill raids. For those reasons, the Taliban demanded that cellular-network operators switch off their signals at night. MTN, in response, openly admitted to "obey[ing] the [Taliban's] orders." It did so even though the Taliban's stated reason for issuing them was to interfere with Coalition intelligence activities. When asked why it complied, MTN stated it could not "'afford to be seen as siding with the Afghan government against the Taliban . . . [Y]ou have to prove in words and in deeds that you are neutral.'"

8. Defendants' conduct supported the Taliban's terrorist campaign against Americans in Afghanistan. When Defendants paid the Taliban not to attack them, they were not reducing the overall threat of terrorist attack. Instead, they were simply redirecting attacks to other targets while supplying the Taliban with funding to cover the costs of its escalating insurgency. Protection money was quantitatively significant – by most accounts the Taliban's first-or-second-largest funding source overall – and the Taliban's highly disciplined process for extracting it made for an especially potent form of terrorist finance. Indeed, even relatively small-dollar protection payments had an outsized effect on the Taliban's terrorist capabilities and could subsidize salaries and weapons for multiple terrorists. Defendants' decision to make much larger payments – running into the millions of dollars – had an even greater effect: it translated

directly into substantial numbers of fighters, weapons, and bombs that the Taliban used to kill and injure U.S. troops. Plaintiffs bore the consequences of that tragic decision.

9. Defendants knew or recklessly disregarded that their subcontractors used Defendants' money to make protection payments. That practice was an open secret in Afghanistan and communicated repeatedly to firms operating there. For example, in a 2009 *Time Magazine* cover story, the author observed that "protection payments are so widespread that one contractor I interviewed responded incredulously to questions about how the system worked. 'You must be the only person in Afghanistan who doesn't know this is going on,' he said." When Defendants paid their crooked local subcontractors for "security" in that environment, they knew full well where the money was going. That is why the lead forensic accountant for a U.S.-military-led interagency task force blamed Western contractors like Defendants for funding terrorism. As he explained, based on U.S. intelligence reporting: "U.S. taxpayer dollars reached the insurgents through a layer of intermediaries that began with the contractors. 'I always viewed them as an aider and abettor of terrorist acts.'"

10. Defendants similarly knew or recklessly disregarded that their payments (including the ones their subcontractors made) helped finance the Taliban's terrorist campaign in particular. Defendants or their agents often negotiated those payments at meetings with Taliban officials, representing the centralized Taliban Financial Commission, leaving no doubt that the payments were for the Taliban's benefit. The Taliban also generated documents on official Taliban letterhead – including so-called "Night Letters" and tax receipts – that memorialized the protection racket and further notified Defendants about whom their payments were helping. And the Taliban openly identified anti-American terrorism as the reason it sought such payments. Given the Taliban's own conduct, companies that chose to comply with its demands understood

the consequences. They knew their payments would strengthen the Taliban's terrorist insurgency, but they decided that their own personal interests were more important.

11. Widespread media coverage also notified Defendants of the link between their protection payments and anti-American terrorism. Throughout the relevant period, major media outlets reported (for example) that American-backed projects in Afghanistan involved "protection money"; that contractors made "payments to insurgents"; that private-security companies made payments that "helped to fund the Taliban"; that contractors paid a "20% 'protection tax' " levied by the Taliban; and that Western aid funneled through such contractors "winds up subsidizing the enemy." As Secretary of State Hillary Clinton testified to Congress in 2009: "one of the major sources of funding for the Taliban is the protection money." All of this was high-profile, international news that Defendants could not have overlooked in good faith.

12. Defendants made several public admissions manifesting their view that protection money was an acceptable cost of doing business. An LBG project manager, for example, justified the company's protection payments by saying of the Taliban: "They're not all bad. . . . [I]f they're not disrupting my project, they are moderate Talibs." LBG's security subcontractor similarly admitted that the guards the company hired " 'were ex-Taliban, or even current Taliban, but the fact that they weren't attacking us along the way – whatever worked for us worked.' " The theme throughout was Defendants' belief that their own profits and their own perceived security interests outweighed the downsides of funding terrorists. As one subcontractor who worked for several Defendants summarized the mentality: " 'We don't get involved in any politics, we just finish the work and move on,' he said. 'As long as we are safe, we don't care.' "

13. The U.S. government publicly opposed protection payments and attempted to stop them. Multiple agencies set up task forces designed to interrupt the flow of protection money to

terrorists, and U.S. officials stated repeatedly that such payments were illegal and counterproductive. Federal regulations also required prime contractors to ensure that their contracting practices – including the money spent downstream by their subcontractors – did not finance terrorism. Defendants violated those requirements and concealed their payments, in part because they knew the U.S. government considered such payments to be illegal. As an Assistant Attorney General stated in announcing a 2007 guilty plea concerning similar conduct in Colombia: "corporations are on notice that they cannot make protection payments to terrorists."

14. Defendants paid the Taliban by relying on systems of deficient internal controls that also enabled related misconduct. Defendant LBG's then-CEO, CFO, and Controller all pleaded guilty to wire fraud based on misconduct in connection with the same Afghanistan contracts under which the company paid protection money. The two co-founders of LBG's principal security subcontractor did the same. Two more LBG executives pleaded guilty to a global bribery scheme that employed the same accounting tricks LBG used to conceal its protection payments in Afghanistan. Defendant DAI, for its part, fired more than 10 employees after USAID found out it had committed "pervasive fraud" in Afghanistan. Defendant ArmorGroup resolved allegations that it had fraudulently overbilled the U.S. government on its largest Afghanistan contract. And Defendant MTN made corrupt payments to win business from the Iranian government. Such conduct reflected a common theme. Defendants used deficient controls to engage in criminal activity in Afghanistan (and nearby markets) so that they could grow their profits. The same approach led them to pay money to the Taliban.

15. The Taliban attacks that Defendants helped finance were acts of "international terrorism." 18 U.S.C. § 2333(a). At all relevant times, the United States designated the Taliban as a Specially Designated Global Terrorist, which reflected the Taliban's status as one of the

world's deadliest terrorist groups. Indeed, since the U.S.-led invasion following 9/11, the Taliban's core purpose has been to expel Americans from Afghanistan. In furtherance of that goal, the Taliban waged a violent campaign that involved an array of terrorist tactics: its fighters attacked civilians indiscriminately; conducted kidnappings, torture, and executions; and refused to wear uniforms or otherwise comply with the Geneva Conventions. To date, the Taliban-led insurgency has killed well more than 1,500 U.S. service members and wounded roughly 20,000 more. Defendants' protection payments helped finance those heinous acts of terrorism.

16. The Taliban's terrorist attacks against Americans in Afghanistan were "planned," "authorized," and in many instances jointly "committed" by al-Qaeda, 18 U.S.C. § 2333(d)(2), the Islamic terrorist group that the United States has designated as a Foreign Terrorist Organization since 1999. The al-Qaeda and Taliban organizations have long been fused together: each pledged allegiance to the other; the two shared money, weapons, and personnel; and they jointly devised attacks at meetings involving a collection of anti-American terrorists that one former U.S. government antiterrorism expert termed a "syndicate." Al-Qaeda's role in the syndicate was pivotal. Al-Qaeda supplied the Taliban with technical and tactical expertise that helped the Taliban conduct sophisticated terrorist operations, and it offered the Taliban vital religious justifications for carrying them out. As a U.S. military-intelligence official said in 2009 in describing the Taliban's close relationship with al-Qaeda: "The line between the Taliban and al Qaeda is increasingly blurred, especially from a command and control perspective."

17. Plaintiffs are U.S. citizens, and their family members, who served in Afghanistan between 2009 and 2017 and who were killed or wounded in Taliban terrorist attacks. As alleged below, Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism Act ("ATA"). Defendants violated the ATA, 18 U.S.C. § 2333(a), by providing material support to

the Taliban in violation of U.S. criminal law. They are also secondarily liable under the ATA, 18 U.S.C. § 2333(d)(2), because they aided and abetted the Taliban's campaign to commit terrorist attacks in Afghanistan that were committed, planned, or authorized by al-Qaeda.

## THE DEFENDANTS

### A. The ArmorGroup Defendants

18. Defendant Centerra Group, LLC is a privately held Delaware company whose principal place of business is in Palm Beach Gardens, Florida. Centerra Group, LLC is the successor to ArmorGroup North America, Inc. (together with its parent and affiliates, "ArmorGroup"), which was a Delaware company with its principal place of business in McLean, Virginia. In 2008, ArmorGroup North America, Inc. was merged into Wackenhut Services, Inc. as part of G4S's acquisition of ArmorGroup. Wackenhut Services, Inc. was later renamed G4S Government Solutions, Inc. In 2014, after G4S sold G4S Government Solutions, Inc. to a private buyer, G4S Government Solutions, Inc. was renamed Centerra Group, LLC.

19. Defendant Environmental Chemical Corporation is a privately held Kentucky corporation, and its principal place of business is in Burlingame, California.

20. Defendant G4S Holdings International (AG) Limited is a wholly owned subsidiary of G4S plc (collectively with its subsidiaries and affiliates, "G4S"), which is headquartered in the United Kingdom and whose stock trades publicly under the ticker symbol GFSZY. G4S Holdings International (AG) Limited is incorporated in the United Kingdom, and its principal place of business is in London, England. G4S Holdings International (AG) Limited is the successor to ArmorGroup International plc. On September 15, 2008, in connection with G4S's acquisition of ArmorGroup, ArmorGroup International plc was renamed ArmorGroup International Limited. On September 21, 2010, ArmorGroup International Limited was then renamed again as G4S Holdings International (AG) Limited.

21. Defendant G4S Risk Management Limited is a wholly owned subsidiary of G4S plc. G4S Risk Management Limited is incorporated in the United Kingdom, and its principal place of business is in London, England. G4S Holdings International (AG) Limited is the successor to ArmorGroup Services Limited, which was an affiliate of ArmorGroup North America, Inc. On or about July 9, 2009, after G4S's acquisition of ArmorGroup, ArmorGroup Services Limited was renamed G4S Risk Management Limited.

**B. The DAI Defendant**

22. Defendant DAI Global LLC is a privately held Delaware company, and its principal place of business is in Bethesda, Maryland. DAI Global LLC is the successor to Development Alternatives, Inc. (together with DAI Global LLC, "DAI"), because on April 21, 2016, Development Alternatives, Inc. converted itself into a Limited Liability Corporation and renamed itself as DAI Global, LLC.

**C. The EOD Technology Defendant**

23. Defendant Janus Global Operations LLC is a privately held Delaware company, and its principal place of business is in Lenoir City, Tennessee. It is the successor to EOD Technology, Inc. On March 25, 2013, EOD Technology, Inc. changed its name to Sterling Operations, Inc.; on June 29, 2016, Sterling Operations, Inc. converted itself into a Limited Liability Corporation and renamed itself as Janus Global Operations LLC.

**D. The LBG/Black & Veatch Defendants**

24. Defendant Black & Veatch Special Projects Corporation is a wholly owned subsidiary of Black & Veatch Holding Company (together with its subsidiaries, "Black & Veatch"), which is a privately held Delaware company with its principal place of business in Overland Park, Kansas. Black & Veatch Special Projects Corporation is a Missouri company, and its principal place of business is in Overland Park, Kansas.

25. Defendant Louis Berger Group, Inc. (together with its subsidiaries and affiliates, "LBG") is a wholly owned subsidiary of WSP Global Inc., which is headquartered in Canada and whose stock trades publicly over the counter under the ticker symbol WSPOF. Louis Berger Group, Inc. is a New Jersey company, and its principal place of business is in Morristown, New Jersey. Louis Berger Group, Inc. has an agent in this District.

26. Defendant Louis Berger International, Inc. is a wholly owned subsidiary of Louis Berger Group, Inc. Louis Berger International, Inc. is a Delaware company, and its principal place of business is in Morristown, New Jersey. In a Deferred Prosecution Agreement resolving a U.S. Department of Justice investigation, Louis Berger International, Inc. stated that, as part of a corporate restructuring in or about 2015, the company assumed responsibility for LBG's international operations and liabilities previously held by other LBG affiliates.[1]

27. Defendant The Louis Berger Group Inc. / Black & Veatch Special Projects Corporation Joint Venture ("LBG/BV Joint Venture," or "Joint Venture") is a joint venture of Louis Berger Group, Inc. and Black & Veatch Special Projects Corporation. It is not separately incorporated from its two partners, and its principal place of business is in Washington, D.C.

**E. The MTN Defendants**

28. Defendant MTN Group Limited ("MTN Group," together with its subsidiaries, "MTN") is a South African telecommunications company whose stock trades publicly on the Johannesburg Stock Exchange under the ticker symbol MTN:SJ. Its principal place of business is in Roodepoort, South Africa.

---

[1] Order for Continuance, Deferred Prosecution Agreement at Attach. A ¶ 2, *United States v. Louis Berger International, Inc.*, Mag. No. 15-mj-3624-MF (D.N.J. filed July 7, 2015), Dkt. 1 ("*LBG FCPA DPA*").

29. Defendant MTN (Dubai) Limited ("MTN Dubai") is a wholly owned subsidiary of MTN Group Limited. It is a Dubai company, and its principal place of business is in Dubai.

30. Defendant MTN Afghanistan is a wholly owned subsidiary of MTN Dubai. It is an Afghan company, and its principal place of business is in Kabul, Afghanistan.

**JURISDICTION AND VENUE**

31. This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 2331.

32. This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

33. Venue is proper in this District under 18 U.S.C. § 2334(a) because Defendant LBG/BV Joint Venture resides in this District and because Defendant Louis Berger Group, Inc. has an agent in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. IN THE WAKE OF THE SEPTEMBER 11 ATTACKS, THE AL-QAEDA-BACKED AFGHAN TALIBAN LAUNCHED A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN AFGHANISTAN

34. Defendants' conduct occurred against the backdrop of several decades of Afghan history, in which the Taliban emerged, rose to power, suffered defeat on the battlefield, and was then reborn as a terrorist insurgency that needed Defendants' money to kill and injure Americans in Afghanistan. The following 12 paragraphs of this Complaint describe that background.

35. In December 1979, the Soviet Union invaded Afghanistan to shore up the country's Communist regime. Armed Afghan groups known as the "mujahedin" – Arabic for a Muslim engaged in Jihad – rose up to resist the invading Soviet forces. The mujahedin forced the Soviet army to withdraw in 1989. Three years later, the mujahedin defeated the Soviet-backed ruling regime in Kabul and overthrew the government.

36. In the early 1990's, the Taliban emerged as a particularly radical faction of the mujahedin. The Taliban was a predominantly Pashtun movement led by Mullah Mohammad Omar – who gave himself the title Amir Ul-Mumineen, or "leader of the faithful" – and it consisted mostly of former mujahedin fighters intent on imposing a severe form of Islamic law throughout Afghanistan. The Taliban began its rise to power in 1994, when it seized control of Kandahar, the country's most populous city in southern Afghanistan. In 1996, the Taliban captured Kabul, and it ruled Afghanistan as its de-facto government for the next five years.

37. From 1996 to 2001, the Taliban provided safe harbor to al-Qaeda, the Islamic terrorist group founded by Osama bin Laden. From its headquarters in Afghanistan, al-Qaeda planned and executed the September 11, 2001 terrorist attacks against the United States.

38. In the wake of the 9/11 attacks, the United States demanded that the Taliban stop harboring al-Qaeda and turn Osama bin Laden over to U.S. custody. The Taliban refused.

Instead, eight days after 9/11, Mullah Omar issued an "Order" decreeing that "[a]ll the infidel powers of the world have united against the [Taliban]" and instructing Taliban mujahedin to be "ready" to "mak[e] sacrifices" to "defeat" the "infidel powers."[2] On October 7, 2001, the United States initiated Operation Enduring Freedom and invaded Afghanistan. The operation's purpose was to depose the Taliban regime and degrade Afghanistan's utility as a base of operations for anti-American terrorists.

39. U.S. forces quickly toppled the ruling Taliban regime. By November 2001, the Taliban fled Kabul, and the following month it abandoned Kandahar, its historical stronghold in southern Afghanistan. While rank-and-file Taliban fighters dispersed back into the countryside, the Taliban leadership – including Mullah Omar – took refuge in Pakistan.

40. In December 2001, the United Nations passed Resolution 1386 authorizing the International Security Assistance Force ("ISAF," often called the "Coalition"), whose mandate was to maintain stability and assist the Afghan government in rebuilding the country.

41. Meanwhile, from Pakistan, the remnants of the Taliban regime began plotting its return. In 2003, Mullah Omar formed the Quetta Shura, a leadership council that functioned as the group's governing body. Under the Quetta Shura's leadership, the Taliban regenerated as a deadly terrorist group intent on expelling the United States from Afghanistan and re-establishing Islamic rule. To that end, in 2005 and early 2006, a rebuilt Taliban began staging terrorist attacks on Coalition forces, Afghan government personnel, and civilians with increasing frequency. Through this terrorist offensive, the Taliban was able to obtain de-facto control of key provinces – including (but not limited to) Kandahar, Helmand, Herat, and Khost Provinces.

---

[2] Mullah Mohammad Omar, *His Excellency's Amir Ul-Mumineen's Order*, Anis (Sept. 19, 2001).

42. The Taliban insurgency included the Haqqani Network, an especially violent part of the Taliban concentrated in southeastern and eastern Afghanistan. *See infra* Part V.A.2.

43. The Taliban organized itself through "shuras," which resembled traditional mafia commissions and which engaged in criminal tactics to raise money for the Taliban's terrorist enterprise. The Taliban extracted money to fund terrorism not only through district and provincial institutions – set up to resemble a "shadow" local government in each key province and district – but also via the Taliban Financial Commission, a centralized fundraising arm that reported to the Quetta Shura. As with traditional organized-crime syndicates, Taliban leadership established procedures governing both how money should be raised and how it should be spent. For example, it promulgated a Code of Conduct that set forth "strict instructions" for "money matters, literally institutionalizing how profits earned from organized crime are to be distributed within the command chain."[3] Those instructions helped ensure that the Taliban raised money effectively, and that it spent the money efficiently in service of its Islamic terrorist agenda.

44. Due in large part to its fundraising prowess, the Taliban insurgency grew more lethal each month and year, as it mastered terrorist tactics such as the use of improvised explosive devices ("IEDs") and suicide bombings. By the first quarter of 2009, the U.S. Department of Defense observed that Afghanistan had seen the "highest levels of violence" since the inception of Operation Enduring Freedom.[4] The escalating violence prompted President Obama, on December 1, 2009, to announce a "surge" of additional U.S. troops to Afghanistan. The surge deployed roughly 30,000 additional troops. In June 2011, President Obama announced that the additional troops would be withdrawn over the course of the next year.

[3] Gretchen Peters, *Crime & Insurgency In The Tribal Areas Of Afghanistan & Pakistan* at 16-17, Combatting Terrorism Ctr. (Oct. 15, 2010) ("*Crime & Insurgency*").

[4] U.S. Dep't of Def., *Report on Progress Toward Security & Stability in Afghanistan* at 7 (Jan. 2009).

45. From 2009 forward, while the United States was surging additional troops into Afghanistan, Coalition forces faced intense attack from Taliban terrorists intent on expelling them from the country. The Taliban's "kinetic capabilities" reached their peak in or about 2010, and its fighters continued to inflict substantial casualties on Americans in the years that followed.[5] All told, since Operation Enduring Freedom began, the Taliban-led insurgency has killed well more than 1,500 U.S. service members and wounded approximately 20,000 more.

46. The Taliban has become perhaps the most lethal terrorist group in the world. According to the Global Terrorism Index, terrorism-related deaths in Afghanistan soared in 2018 to more than 7,300 – with the Taliban responsible for most of them. The Taliban's tactical sophistication, close relationship with al-Qaeda, hatred of America, and commitment to violence has enabled it to kill and injure untold thousands of people, including Americans and Afghans alike. Today, as reported in the Global Terrorism Index study, the Taliban has "overt[aken] the Islamic State group to become the deadliest terrorist organization in the world."[6]

## II. DEFENDANTS KNOWINGLY OR RECKLESSLY FINANCED TERRORISM BY PAYING PROTECTION MONEY TO THE TALIBAN

47. Defendants each operated lucrative businesses in post-invasion Afghanistan. MTN was Afghanistan's largest provider of cellular-telephone service; the other Defendants each obtained U.S. government contracts to engage in development projects or to provide private-security services in Afghanistan. To increase their profit margins and redirect attacks away from their business interests, Defendants knowingly paid protection money to the Taliban.

[5] U.S. Dep't of Def., *Report on Progress Toward Security & Stability in Afghanistan* at 2 (Dec. 2012).

[6] J.P. Lawrence, *US, Allies' Military Successes Drove Down Terrorism Deaths Almost Everywhere Except Afghanistan, Report Says*, Stars & Stripes (Nov. 21, 2019), 2019 WLNR 35166439.

48. The specifics of each Defendants' payments are discussed in Part IV below. To lay the groundwork for those allegations, the next two sections describe the post-invasion Afghanistan contracting environment and survey the evidence that large Western contractors like Defendants commonly and openly made protection payments to the Taliban.

### A. Defendants Operated In A Corrupt Afghan Contracting Environment That Encouraged Protection Payments

49. Defendants' protection payments occurred in a contracting environment marked by pervasive corruption. From 2007-2014, Afghanistan was one of the most corrupt countries in the world. In the Transparency International corruption perceptions index – widely considered the most authoritative measure of country-level corruption – Afghanistan ranked near the very bottom each year. Those rankings reflected longstanding traditions of corruption that affected virtually every level of Afghan civil society. A 2009 study co-authored by Defendant Louis Berger Group, Inc. for the United States Agency for International Development ("USAID") found that corruption in Afghanistan was "more than the standard issue bribery"; it "ha[d] become a system, through which networks of corrupt practices and people . . . reach[ed] across the whole of government to subvert governance."[7] Similarly, Douglas Wissing, an investigative journalist studying the connection between Afghan corruption and terrorist financing, observed that "[e]ndemic payoffs began to pervade every aspect of Afghan life."[8]

50. International contractors looking to profit off the Afghan market faced an equally corrupt business environment. The Afghan government recognized as much in a highly publicized white paper, explaining that the "large informal economy" in Afghanistan, "as well as

[7] Checchi & Company Consulting, Inc. and Louis Berger Group, Inc., *Assessment of Corruption in Afghanistan* at 4, USAID Contract No. GS-10F-0425M (2009) ("*LBG USAID Report*").

[8] Douglas Wissing, *Funding The Enemy: How U.S. Taxpayers Bankroll The Taliban* at 87 (Prometheus Books 2012) ("*Funding The Enemy*").

the unprecedented large inflows of international assistance and the pressures to commit development aid quickly, carry associated vulnerabilities to corruption."[9] Contractors spending Western aid in this environment – and companies (like MTN) seeking to profit off the Afghan people – therefore faced unusually high corruption risks. As a Georgetown University security-studies professor put it, "Virtually every transaction in Afghanistan involves some degree of payoff . . . Everyone is getting a piece of the money."[10]

51. Western contractors operating in Afghanistan often structured their transactions to exploit that corrupt business environment. They did so by laundering aid money through a web of crooked local subcontractors – hired for tasks such as security, construction, and logistics – that could make corrupt payoffs downstream while (in theory) maintaining a degree of plausible deniability for the prime contractor whose money they were spending. Some projects had as many as five different companies in the contracting chain: a prime contractor would interface with the U.S. government (or similar Western institution); the prime contractor would then outsource performance to a subcontractor; the subcontractor would hire another subcontractor, which would hire another in turn; and eventually some local company would perform the work on the ground on the prime contractor's behalf. Not only did this structure permit the final subcontractor to make corrupt payments with virtually no accountability, but it also ensured that the "funds available for project work [we]re quickly and significantly depleted" by the

[9] *LBG USAID Report* at 5 (citing Islamic Republic of Afghanistan, *Afghanistan National Development Strategy 1387–1391* (2008–2013) at 9 (June 2008), https://www.wto.org/english/thewto_e/acc_e/afg_e/WTACCAFG18_CD_1.pdf).

[10] Hindustan Times, *About A Billion Dollars Worth of US Aid Diverted To Taliban Coffers* (Oct. 2, 2010), 2010 WLNR 21539943 ("*About A Billion Dollars Worth of US Aid Diverted*").

contracting fees charged by each entity along the way.[11] As described below, Defendants also frequently relied on their subcontractors to funnel money to the Taliban.

52. These same contracting practices typically led to poor-quality work that undermined U.S. reconstruction and security objectives. The *Australian* newspaper, reporting on that phenomenon in 2010, described the typical arrangement:

> With little oversight of contracts, a corrosive and lucrative war economy has been nurtured, which the US government is now struggling to undo. Reports of corruption and incompetence are legion. Roads and buildings have been contracted to favoured Western companies which cream off profits, then sub-contract to local businesses to do the work. These then sub-sub-contract again to even cheaper local firms, which cut wages. The resulting infrastructure often falls apart within months.[12]

Defendants, like many companies entering the Afghan market, used a similar approach. The result was a contracting model in which American resources were "lost in corporate profits of contractors and sub-contractors" – or, as explained below, funneled to terrorists – rather than supporting the Afghan economy.[13]

53. Vast sums of money disappeared into this web of corrupt contractors and subcontractors. Defendants' conscious refusal to take responsibility for their subcontractors exacerbated the problem. As Mr. Wissing summarized a statement by a former consultant for a large USAID contractor, "U.S. private development contractors were far more interested in their margins than in recruiting competent employees. 'They can put in any bozo,' [the consultant] said. 'Pay them what they want and make their profit.' "[14] With prime contractors deliberately abdicating their oversight role, subcontractors rarely spent Western contract money for its

[11] Matt Waldman, *Falling Short: Aid Effectiveness In Afghanistan* at 18 (Oxfam Int'l, Mar. 2008) ("*Oxfam Report*"), https://www-cdn.oxfam.org/s3fs-public/file_attachments/ACBAR_aid_effectiveness_paper_0803_3.pdf.

[12] Tom Coghlan, *Aid Robs Afghan & Iraqi Poor, Helps Rich*, Australian (Dec. 29, 2010), 2010 WLNR 25517589.

[13] *Oxfam Report* at 3.

[14] *Funding the Enemy* at 99.

intended purpose. One contemporaneous assessment by Kabul Group Consulting estimated that as much as 75% of "aid money pumped into the country" was diverted for illegitimate purposes.[15] A 2010 U.S. government audit was even bleaker: analysts estimated that "only about 10 percent of the aid budget actually reaches the people in Afghanistan who need it."[16] Of the remaining 90 percent, a substantial portion went to the Taliban, and some went to more garden-variety corruption – but very little benefited Afghan reconstruction efforts.

54. Defendant LBG well illustrates the point. In 2005, LBG received a U.S. government contract to build a road between Kabul and the nearby airport. LBG subcontracted out the project, and the downstream subcontractors ultimately built the road at a total cost of over $2.4 million per kilometer – at least quadruple the average cost for comparable work.[17] LBG's overpriced road, as was typical of LBG road-construction projects at the time, quickly began to fall apart due to shoddy construction quality. But the problem was not confined to LBG: many contractors, similarly outsourcing their work to unaccountable and unreliable subcontractors, regularly sponsored expensive projects "using substandard materials and methods."[18] As a result, 2010-era Afghanistan was "littered with abandoned or half-built structures" that reflected the inept and corrupt contracting practices employed by companies like Defendants.[19]

55. Western contractors' reliance on chains of unscrupulous subcontractors was widely understood to be corrupt. LBG's 2009 study for USAID documented that "Afghan perceptions of rampant corruption include corruption in the donor community, due to the high

---

[15] Jonathan Owen, *Army Launches Investigation: Corrupt Afghans Stealing Millions From Aid Funds*, The Independent (Mar. 7, 2010) ("*Army Launches Investigation*").

[16] *About A Billion Dollars Worth of U.S. Aid Diverted*.

[17] *Oxfam Report* at 19.

[18] U.S. Senate Committee on Foreign Relations, Majority Staff Report, *Evaluating U.S. Foreign Assistance To Afghanistan* at 16 (June 8, 2011) ("*Kerry Report*").

[19] *Id*.

costs, bureaucratic procedures, and layers of contracting and subcontracting in many projects."[20] A 2011 report by the U.S. Senate Committee on Foreign Relations likewise criticized the widespread "use of large numbers of contractors" as inviting "corruption through multiple subcontractors."[21] The prevailing criticism of such practices led General Petraeus to issue formal contracting guidance in 2010 that emphasized the importance of "contract[ing] with vendors that have fewer sub-contractors. Excessive sub-contracting tiers provide opportunities for criminal networks and insurgents to divert contract money from its intended purpose."[22] Although not the only cause, Defendants' use of such contracting tiers enabled them to make enormous profits while delivering substandard work. It also, as alleged below, helped them fund the Taliban.

**B. Western Contractors Commonly Structured Their Operations In Afghanistan To Funnel Protection Payments To The Taliban**

56. Defendants employed the same contracting process to funnel money to the Taliban. Defendants paid the money as protection: they decided that the cheapest way to shield their projects from the risk of attack was to pay the Taliban to leave them alone and instead attack other targets – like Plaintiffs. As detailed in this section, those payments were pervasive throughout Afghanistan and supplied the Taliban with an important stream of financing.

57. At all relevant times, the Taliban used threats of terrorist violence to extract protection money from international companies doing business in Afghanistan. Such threats were particularly frequent in (though not limited to) geographic areas of Taliban control. By 2006, the Taliban had achieved control of wide swaths of southern and eastern Afghanistan, and by 2009 it had installed "shadow" governments in 33 of Afghanistan's 34 provinces. It

[20] *LBG USAID Report* at 51.

[21] *Kerry Report* at 16.

[22] General David Petraeus, *COMISAF's Counterinsurgency (COIN) Contracting Guidance* at 1 (Sept. 8, 2010) ("*COMISAF's Contracting Guidance*").

leveraged that control into protection payments. As an anticorruption investigator working for the U.S. House of Representatives explained, it was "long-standing business practice within Afghanistan to use your control of the security environment in order to extort payment from those who want to operate within your space, whether it's construction of a cellphone tower, a dam, or running trucks."[23] The Taliban perfected that practice by threatening contractors' businesses unless they met the terrorists' financial demands.

58. The Taliban presented companies with a choice: alert the government and seek the U.S. military's assistance, invest in legitimate security to protect their projects against attack, or instead save time and money and simply pay the Taliban what it asked. One American executive whose company conducted business in Afghanistan described the decision as " 'whether you'd rather pay $1,000' for Afghans to safely deliver a truck, even if part of the money goes to the insurgents, or pay 10 times that much for security provided by the U.S. military or contractors."[24] To maximize profits, contractors (including Defendants) often chose that former option. The owner of one logistics subcontractor described the prevailing mentality: " 'I pay the Taliban not to attack my goods, and I don't care what they do with the money,' he said laughing. 'If you don't, the next day your property is attacked and destroyed.' "[25]

59. Companies rationalized their payments to the Taliban by framing them as a necessary cost of business. But the payments were unnecessary – even from the standpoint of Defendants' own security needs – and counterproductive. In reality, companies chose to pay not because of any reconstruction imperative, but because it served their financial interests. As an adviser to the Afghan Interior Ministry explained, "the costs of enabling the Taliban's protection

---

[23] Karen DeYoung, *Afghan Corruption: How To Follow The Money?*, Wash. Post (Mar. 29, 2010), 2010 WLNR 26719956 ("*Afghan Corruption*").

[24] *Afghan Corruption*.

[25] *Afghan Firms Pay Off Taliban.*

racket outweigh the benefits of any reconstruction that might come out of it."[26] He noted that "it might be more convenient to pay off the Taliban, and it might be faster," but it "both prolongs the war and feeds criminality, which in turn turns more people against the government."[27]

60. Although protection payments may have offered one way to decrease the odds that a contractor would face attack, they offered no guarantee. The Taliban often insisted on renegotiating payment terms midstream and would stage attacks as a bargaining tactic, or it would attack paying companies to send a message to the broader industry. For those reasons, terrorists would occasionally threaten or even attack contractors that were paying protection money. On balance, though, contractors who paid the Taliban terrorists bought themselves relative security at a lower price than legitimate security measures. At the same time, the payments strengthened the Taliban's ability to commit attacks against others. When Defendants paid the Taliban protection money, then, they were not lessening the overall risk of terrorist violence; they were simply redirecting the violence to other targets – such as Plaintiffs.

61. Companies often routed money to the Taliban through their subcontractor networks. Just as delegating contract performance to corrupt subcontractors worsened the quality of the services provided, *see supra* ¶¶ 51-53, so too did it create opaque pools of money from which to pay off the Taliban. As one journalist observed in 2009, there was a "web of financial connections between major international contractors and the Taliban" through "which the insurgents provide protection . . . in return for a healthy cut of the proceeds."[28] Western contractors like Defendants used their subcontractors to "pay bribes to Taliban representatives

---

[26] Aryn Baker, *How The Taliban Thrives* at 51, Time Magazine (Sept. 7, 2009) ("*How The Taliban Thrives*").

[27] *Id.* at 51.

[28] Jean MacKenzie, *Charge Probed That U.S. Aid Helps Fund Taliban*, Star-Ledger (Sept. 5, 2009), 2009 WLNR 17449038 ("*U.S. Aid Helps Fund Taliban*").

and even [to] seek written authorisation to work in an area from Taliban leaders."[29] As explained below, Defendants both actively facilitated and benefited from such payments that their subcontractors delivered on their behalf. *See infra* ¶¶ 79, 83.

62. Watan Risk Management (together with its affiliates, "Watan"), a now-infamous Afghan security subcontractor, offers a particularly egregious example. Watan was one of the largest private-security companies in Afghanistan, and it made its money on subcontracts to protect convoys ferrying goods and fuel around the country. In that capacity, Watan worked for many of the largest Western contractors in Afghanistan, including, on information and belief, most of the Defendants. "There were so many contracts out there," Watan's managing director stated later, "that you could win anything you wanted . . . The margins were insane."[30] In 18 months, Watan's revenues ballooned from $500,000 to $58 million.

63. Watan was profitable because it cheaply sourced its supply of "security guards" from the ranks of the Taliban, including the Haqqani Network. Contractors and subcontractors that outsourced security to Watan were, in effect, knowingly hiring the Taliban to provide security. Indeed, decisions to pay Watan for security supplied the Taliban, including the Haqqanis, with money and intelligence that undermined American interests. For example, according to a declassified intelligence report released by the Defense Intelligence Agency:

> As of 29 August 2010, Qabool ((Khan)), who is ***a manager for Watan*** private security company in Khowst Province, Afghanistan, ***is secretly providing information on U.S. bases to Siraj ((Haqqani))'s intelligence section*** in Miram Shah, Pakistan . . . . Khan is currently a manager with Watan security, and has private security guards posted on U.S. bases Salerno and Chapman. ***Khan receives $800.00 U.S. Dollars per guard, per month, in which*** $200.00 U.S. Dollars goes to the guard, $300.00 U.S. Dollars to Khan, and ***$300.00 U.S. Dollars is given to the Haqqani Network***. Khan also provides the Haqqani

[29] International Crisis Group, *Aid & Conflict In Afghanistan* at 20, Asia Report No. 210 (Aug. 4, 2011).

[30] Matthieu Aikins, *The Bidding War*, New Yorker (Feb. 28, 2016).

Network with license plate numbers of the vehicles on the base, plus the names and physical descriptions of U.S. military and contractors on the base.[31]

64. In December 2010, the U.S. military debarred Watan from government contracting, as part of its efforts to "clean up a contracting process in Afghanistan that has been riddled with corruption and allowed U.S. funds to pass to insurgents."[32] Before the debarment, however, Western companies like Defendants commonly hired Watan despite proliferating allegations that it was "bribing both government officials and Taliban commanders."[33]

65. Watan illustrates a broader pattern in which companies like Defendants knowingly (or recklessly) paid protection money to the Taliban. The widespread existence of such protection-money payments has been confirmed by U.S. reconstruction agencies, U.S. military officials, congressional investigators, industry participants, and journalists. To begin, USAID itself recognized that a "main challenge[]" facing U.S. development efforts in Afghanistan was "ensuring that USAID resources do not benefit the Taliban or other malign groups."[34] The agency documented those risks in a 2009 "investigation into allegations that its funds for road and bridge construction in Afghanistan are ending up in the hands of the Taliban, through a protection racket for contractors."[35] An employee of the U.S. Embassy in Kabul described the typical "arrangement as 'organized crime,' " in which "the Taliban takes as much

---

[31] Defense Intelligence Agency, *Qabool Khan Providing Secret Information To The Haqqani Network On U.S. Bases In Salerno & Chapman*, Intelligence Information Report (Aug. 31, 2010) (emphasis added), https://www.dia.mil/FOIA/FOIA-Electronic-Reading-Room/FOIA-Reading-Room-Afghanistan/FileId/114000/.

[32] Heidi Vogt, *U.S. Blacklists Afghan Security Firm Tied To Karzai*, Associated Press (Dec. 9, 2010).

[33] *Id*.

[34] USAID, *Fact Sheet on Accountable Assistance for Afghanistan ($A^3$)* (June 2011).

[35] *U.S. Aid Helps Fund Taliban*.

as 20 percent of development aid awarded to contractors."[36] Summing up the results of that and similar investigations, a Congressional Research Service analyst wrote in 2011 that, "[a]ccording to numerous government officials, intelligence sources, and contractor reports, significant amounts of contracting funds flow to criminal networks and insurgents."[37]

66. U.S. military officials documented the same pattern. Several ISAF officials confirmed to the *New York Times* in 2010 that prominent Afghan security subcontractors hired by companies like Defendants were suspected of "using American money to bribe the Taliban."[38] A 2014 Pentagon study similarly found that, "[b]y the time the US started the surge, 'Convoy protection money . . . was simply a cost of doing business.' "[39] The "complex and arduous logistics chain" overseen by companies like Defendants, the study continued, "fuel[ed] corruption" and "provid[ed] a financial windfall to the Taliban."[40] As the lead forensic accountant for Task Force 2010 – an interagency group that studied the relationship between counterinsurgency and contracting practices in Afghanistan – summarized the evidence: "U.S. taxpayer dollars reached the insurgents through a layer of intermediaries that began with the contractors. 'I always viewed them as an aider and abettor of terrorist acts.' "[41]

67. Task Force 2010 gathered additional evidence that Western contractors in Afghanistan financed the insurgency. The "big companies we found," the Task Force's first

[36] Dana Chivvis, *Is The Taliban Getting A Cut Of U.S. Aid*, CBS News (Sept. 3, 2009).

[37] Moshe Schwartz, *Wartime Contracting in Afghanistan: Analysis & Issues For Congress* at 5-6, Congressional Research Service (Nov. 14, 2011), https://fas.org/sgp/crs/natsec/R42084.pdf.

[38] Dexter Filkins, *Convoy Guards In Afghanistan Face An Inquiry*, N.Y. Times (June 6, 2010).

[39] Joint & Coalition Operational Analysis (JCOA), *Operationalizing Counter/Anti-Corruption Study* § 2.2 (Feb. 28, 2014) (ellipses in original), https://www.hsdl.org/?view&did=756004.

[40] *Id*.

[41] Matthieu Aikins, *The Bidding War*, The New Yorker (Feb. 28, 2016).

director stated, "they're all corrupt."[42] In the Task Force's review of roughly 3,000 contracts in the theater, it estimated that on average "18% of contract money went to the Taliban, Haqqani, [and] other insurgent groups. And it was often a higher percent."[43] Another counterterrorism investigator, working for the U.S. Treasury Department with Task Force 2010, stated that his investigation "found that 25% of the money went to the wrong hands."[44] An Assistant Secretary of State, relaying the intelligence community's concerns at the time, agreed with that assessment. "We didn't intentionally go and say, here is [a] bullet, please shoot an American, but the fact that some of our stuff [went] to the Taliban through fairly direct means was probably true."[45]

68. Congressional investigations reached similar conclusions. Most prominently, the bipartisan Commission on Wartime Contracting in Iraq and Afghanistan, after a lengthy investigation, found in 2011 that "U.S. funds have been diverted to insurgents and warlords as a cost of doing business in Afghanistan . . . The Commission finds it particularly alarming that Afghan subcontractors on U.S.-funded convoys, road construction, and development projects pay insurgent groups for protection."[46] Representative John Tierney echoed that message at a congressional hearing, observing that "the extortion of international contractors is a booming industry" in Afghanistan.[47] And at the same hearing, Brigadier General Stephen Townsend said

---

[42] SIGAR Interview with Gert Berthold, *Lessons Learned Record of Interview* at 2 (Oct. 6, 2015) ("*SIGAR Interview with Gert Berthold*").

[43] *SIGAR Interview with Gert Berthold* at 5.

[44] SIGAR Interview with Thomas Creal, *Lessons Learned Record of* Interview at 3 (Mar. 23, 2016).

[45] SIGAR Interview with Amb. Richard Boucher, *Lessons Learned Record of Interview* at 6 (Oct. 15, 2015).

[46] Commission on Wartime Contracting in Iraq and Afghanistan, *Transforming Wartime Contracting* at 73 (Aug. 2011) ("*CWC Report*").

[47] *Corruption in Afghanistan Defense Contracting*, Hr'g Before the H. Comm. On Oversight and Government Reform (Sept. 16, 2011) (statement of Rep. John Tierney), 2011 WLNR 29411184 ("*Hearing on Corruption in Afghanistan Defense Contracting*").

of Western security and development spending in Afghanistan: "It's clear to us some of that money is going in the insurgency and we've got to do whatever we can to stop that."[48]

69. Business owners operating in Afghanistan confirmed the frequent practice of paying protection money to the Taliban. An owner of one telecommunications firm operating in southern Afghanistan admitted to a reporter in 2009 that his firm "pays 2,000 dollars in protection money per month [to the Taliban] for each of his transmission masts. 'You have to do it. Everybody does.' "[49] The vice president of a Kabul-based logistics subcontractor called such protection-money payments "a big source of money for the insurgents."[50] The owner of another road-repair contractor similarly told the media that he paid "insurgents a substantial part of a $1.2 million contract" as protection money, after Taliban terrorists told him, "You know we need this American money to help us fund our Jihad."[51] And another subcontractor working on a bridge project in Helmand "admitted he agreed to add 20 percent to the budget for the project and to kickback that amount to the Taliban as protection money."[52] That subcontractor, like several others, "confirm[ed] that it was standard practice to build in a kick back to the Taliban to ensure that militants did not attack or disrupt a construction project."[53]

70. Journalists and other experts likewise documented widespread protection payments to the Taliban. One Kabul-based investigative journalist gathered evidence in 2009

---

[48] *Id.* (statement of Brig. Gen. Stephen Townsend).

[49] Can Merey, *How The Taliban Has Turned Extortion Into A Gold Mine*, Deutsche Presse-Agentur GmbH (June 4, 2009) ("*Taliban Has Turned Extortion Into A Gold Mine*").

[50] Matthew Green & Farhan Bokhari, *High Costs To Get NATO Supplies Past Taliban*, Financial Times (Nov. 13, 2009).

[51] *Afghan Firms Pay Off Taliban*.

[52] Joseph V. Micallef, *Follow The Money: The Taliban's Growing Criminal Empire* (2011), https://www.military.com/daily-news/2017/04/03/follow-the-money-the-talibans-growing-criminal-empire.html ("*Follow The Money*").

[53] *Id*.

that "[v]irtually every major project includes a healthy cut for the insurgents."[54] Around the same time, *CBS News* reported on claims that "U.S.-funded contractors have been spending a hefty chunk of [their] funding on protection payments to the Taliban – for years."[55] *Sydney Morning Herald* journalists, after a fact-finding trip to southeast Afghanistan, detailed how "[i]t is effectively the Taliban who decide which local contractors will work on a project," often by "setting a level of protection money that the contractor can afford to pay."[56] And Mr. Wissing, in an exhaustively researched book, surveyed comparable reports that "insurgents used extortion of US development money for their funding."[57] The Taliban's funding, he explained, came from "supply-convoy shakedowns, construction-protection rackets, Taliban 'taxes' on corrupt officials, payoffs from NGOs[,] and major Afghan businesses," including "cell phones."[58]

71. Those protection payments continued despite mounting concerns raised by U.S. and British military leaders that Western companies were financing terrorism in Afghanistan. In early 2010, a British Major General ordered a "probe into construction and logistics contracts" as part of ISAF's "wider crackdown," in which General Stanley McChrystal likewise "declared war on those making millions out of what has become a billion-dollar black hole for aid funds."[59] While those probes went forward, local Afghan experts estimated that large portions of Western contracting dollars in Afghanistan continued flowing to the Taliban as protection money. As one journalist reporting on those developments observed, the probes manifested a widespread

---

[54] Jean MacKenzie, *Funding The Afghan Taliban*, GlobalPost (Aug. 7, 2009) ("*Funding The Afghan Taliban*").

[55] Nancy Cordes, *Is Taxpayer Money Funding The Taliban?*, CBS News (Sept. 3, 2009).

[56] Paul McGeough & David Brill, *Insurgents Play A Perilous Mountain Game*, Sydney Morning Herald (Sept. 27, 2009) ("*Insurgents Play A Perilous Mountain Game*"), https://www.smh.com.au/world/insurgents-play-a-perilous-mountain-game-20090926-g73f.html.

[57] *Funding The Enemy* at 234.

[58] *Id*.

[59] *Army Launches Investigation*.

realization that, due to unscrupulous contractors like Defendants, "the very money supposed to win over the hearts and minds of Afghans is ending up in the hands of the Taliban."[60]

72. Companies like Defendants routed their payments to the Taliban through two primary channels. *First*, for especially high-value payments, they negotiated the payments with a senior Taliban "contracts officer" in Kabul or Quetta, Pakistan. For such larger projects, the Taliban followed an organized, highly regulated process in negotiating an appropriate level of protection money with the contractor. As part of that process, Taliban auditors and engineers inspected the project paperwork and used the estimated value to calibrate the amount of protection money demanded. The Taliban Financial Commission supervised the resulting payments. As the U.N. Security Council explained after a lengthy analysis, the Commission oversaw the process of extracting payments from "construction and trucking companies, mobile telephone operators, mining companies[,] and aid and development projects."[61]

73. The procedure through which the Taliban extracted those payments was straightforward. At in-person meetings conducted either directly with the Western contractor or through an intermediary, the Taliban contracts officer did due diligence on the proposed project and then either "agree[d] [to] protection money with the contractor," or simply "demand[ed] a cut" of the proceeds.[62] Defendants virtually always agreed to pay.

74. The Taliban's Code of Conduct further confirms the group's systematic practice of extracting protection payments from large firms doing business in Afghanistan. Section 5 of the Code set forth regulations requiring Taliban fighters to kickback 20 percent of any money seized in terrorist attacks as "*khoms*" (an Islamic tax) to the Taliban's "provincial official"; the

---

[60] *Id*.

[61] U.N. Security Council, *First Report of the Analytical Support & Sanctions Implementation Monitoring Team* ¶ 35 (Sept. 5, 2012) ("*U.N. Financing Report*").

[62] *Id*. ¶ 39.

remaining four-fifths was given to those on the frontline. However, any money or property "seized without fighting" from Western projects – such as the fruits of successful extortion from companies like Defendants – was sent to leadership to "be spent on the mujahedeen's needs."[63]

75. Section 9 of the Taliban's Code further prescribed regulations for "control and arrangement of the affairs of [private] companies and [non-governmental] organisations" and entrusted authority over those affairs to the "Organisations and Companies Commission" reporting to the Quetta Shura.[64] In an interview published on the Taliban's official website, the head of that Commission described that decision to "constitute a separate commission for the control of NGOs and companies and for the effective organisation and coordination of their activities and expenditures."[65] Proper "expenditures" by Defendants, he explained, were crucial for them to obtain "permission letters" from the Taliban to fulfill their contracts.[66] If companies refused, he warned, the "mujahedeen of the Islamic Emirate can halt these kinds of violators."[67]

76. Gretchen Peters, a recognized expert on Afghan terrorist financing who has written extensively about and testified to Congress on the topic, likewise documented high-level protection-money negotiations between Western contractors like Defendants and Taliban leadership. "The Quetta Shura," she explained, "collects protection money from larger businesses, notably the telecommunications sector and construction projects funded by international aid organizations and the Coalition."[68] Such payments were neither *ad hoc* nor the function of individual rogue insurgents; they occurred in an environment in which the Taliban

---

[63] Code of Conduct For The Mujahadeen § 5 (2010 Edition).

[64] *Id*. § 9.

[65] Interview with Mawlawi Ahmad Bilal, Al-Emera (Mar. 20, 2014).

[66] *Id*.

[67] *Id*.

[68] *Crime & Insurgency* at 31.

leadership had "moved to regulate how protection money is collected from larger businesses, aid and development projects."[69] Those Taliban regulations – ensuring a predictable set of payments from contractors to the Taliban Financial Commission – were designed to bring a degree of regularity to the protection rackets on which the Taliban relied to finance its insurgency.

77. Industry participants confirmed the existence of such "high-level negotiations" between "the Taliban and major contractors."[70] For example, an owner of a telecommunications firm admitted negotiating with the Taliban's "so-called commission, a kind of shadow economics ministry of the militants, headed by Mullah Brader, a deputy of Taliban leader Mullah Omar."[71] As the executive explained, buying "commission approval" for an economic project was one way to " 'make sure that your business is not being attacked.' "[72] Contractors operating in Afghanistan typically "regard[ed] these overheads as a cost of doing business," even though they knew the payments allowed "the insurgency [to] benefit[] financially."[73]

78. *Second*, in addition to high-level negotiations with senior Taliban officials, companies like Defendants also paid protection money to local Taliban commanders in the areas where they were operating. They negotiated those payments not directly with the Taliban Financial Commission, but with lower-level Taliban officials operating at the provincial or district level. The Taliban set up shadow governments – including a so-called "governor" – in most areas, and contractors frequently sought to obtain the Taliban governor's approval before building in a given area. A *Le Monde* journalist reported on a typical example in 2010: the

[69] *Id.* at 29.

[70] *Funding The Afghan Taliban*.

[71] *How The Taliban Has Turned Extortion Into A Gold Mine*.

[72] *Id.*

[73] *U.N. Financing Report* ¶ 40.

Taliban "governor" of Kunduz, a northern province, took "a percentage of almost all construction work in the area, including roads, bridges, schools and clinics."[74]

79. Companies typically routed these more-localized payments through their subcontractors. Most often, private-security firms arranged payment on their clients' behalf. The security firms paid the Taliban either by making cash payments through the Afghan *hawala* system – the country's historic informal money exchange and transfer network – or by directly hiring Taliban members and putting them on the payroll as "security guards." Either way, the logic of the payments was simple: they reduced the threat of attacks on the contractors' own projects at an attractive price. As one American executive with business in Afghanistan put it in slightly overstated terms, "No matter how bad things get out there, the trucks always get through. . . We don't need any security if the payments are made. Nobody f---s with us."

80. Companies paid the Taliban protection money in relatively predictable percentages on each project they undertook in Afghanistan. The percentages could vary based on several factors, including contract size, location, and the particular Taliban officials involved. But overall, many analysts estimated a largely consistent 20% across-the-board "tax" that the Taliban levied on every meaningful economic project. The percentage could vary upwards on occasion: one supplier operating in Helmand admitted to "tack[ing] on about 30 percent extra for the Taliban,"[75] while officials in Farah Province estimated that the Taliban was extracting "up to 40 percent of the money coming in" for development.[76] Moreover, contractors often made payments at multiple stages: they would negotiate one percentage with the Taliban

[74] Louis Imbert, *The Taliban's Secret Weapon: Security*, Le Monde Diplomatique (Oct. 2010).

[75] *Funding The Afghan Taliban*.

[76] Jean MacKenzie, *Who Is Funding The Afghan Taliban? You Don't Want To Know*, Reuters Global News Journal (Aug. 13, 2009) ("*Who Is Funding The Afghan Taliban?*").

Financial Commission, but then allow a local Taliban commander to take another cut on top. Those payments together could deliver extraordinary sums to the Taliban. One Afghan intelligence official noted examples of private-security companies "paying as much as 60 percent of their gross profits" to Taliban insurgents for so-called "convoy security."[77]

81. The same scheme delivered protection payments to the Haqqani Network, which was the part of the Taliban concentrated in eastern and southeastern Afghanistan. The Haqqani Network ran especially potent protection rackets that extracted revenues from large companies like Defendants conducting business in its territory. As Ms. Peters testified to Congress, the Haqqanis "systematically extort all business that takes place in their areas of operations."[78] That conclusion echoed the statements of the Haqqani Network's own members. This "protection racket for construction firms," a former Haqqani commander told the *New York Times*, was " 'the most important source of funding for the Haqqanis.' "[79]

82. Contractors (and their subcontractors) typically concealed their protection payments from the U.S. government by inflating their costs and misrepresenting protection money as a legitimate security expense. For example, one Afghan construction subcontractor stated that he "builds in a minimum of 20 percent for the Taliban in his cost estimates" – so that of every $1 million he received, "$200,000 is siphoned off for the insurgents."[80] Similarly, the criminal-run security subcontractor U.S. Protection and Investigation ("USPI"), *see infra* ¶¶ 164, 196-201, added fictitious security guards to its payroll and concealed the protection payments as

[77] Jake Sherman and Victoria DiDomenico, *The Public Cost Of Private Security In Afghanistan* at 8, NYU Center on Int'l Cooperation Briefing Paper (Sept. 2009).

[78] *Combatting The Haqqani Terrorist Network*, Hr'g Before the U.S. House Committee on Foreign Relations, Subcommittee on Terrorism, Nonproliferation, and Trade, 112 Cong. 177 (Sept. 13, 2012) (statement of Gretchen Peters, author, *Haqqani Network Financing*).

[79] Mark Mazzetti et al., *Brutal Haqqani Crime Clan Bedevils U.S. In Afghanistan*, N.Y. Times (Sept. 24, 2011) ("*Brutal Haqqani Crime Clan*").

[80] *Who Is Funding The Afghan Taliban?*.

"salaries" for the ghost employees. It then passed the costs of those protection payments up the chain for reimbursement by the prime contractor. Alternatively, the ArmorGroup Defendants hired Taliban cut-outs as security personnel – and so paid protection money in the form of real (yet no less unlawful) salaries they knew would benefit the insurgency. *See infra* ¶¶ 137-50.

83. As explained below, Defendants each followed this common practice and paid protection money to the Taliban, including through their subcontractors. *See infra* Part IV. In doing so, they both facilitated and benefited from their subcontractors' payments. Defendants actively facilitated such payments by obtaining the underlying government contracts to pay for the work that needed "protection" from the Taliban; by retaining and then outsourcing security to the corrupt subcontractors they knew would pay money to terrorists; by encouraging their subcontractors to make the payments, either explicitly or implicitly; and by supplying the actual financing that the subcontractors then used to make the payments. When the subcontractors charged their security "costs" (including the protection money) under their contracts, Defendants would either reimburse those costs directly or transmit them to the U.S. government for reimbursement. Either way, Defendants benefited from the contracting arrangement. They orchestrated illegal payments that protected their own revenues while pushing nominal responsibility for the mechanics of those payments onto their chosen partners.

## III. DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR PAYMENTS FINANCED TALIBAN ATTACKS ON AMERICANS

### A. Defendants' Protection Payments Directly Funded The Taliban's Terrorist Campaign Against Americans In Afghanistan

84. Money supplied the lifeblood of the Taliban insurgency. Financing gave the Taliban the means to recruit and pay terrorist fighters; to acquire weapons and explosives with which to attack Coalition forces; and to maintain the vast operational infrastructure needed to sustain the insurgency. In 2011, it cost the Taliban an estimated $100-155 million overall to

launch attacks, and up to $300 million to "maintain[] the insurgency" generally.[81] Those costs ballooned as the insurgency intensified. As a U.N. Security Council report documented, from 2006-2012 the Taliban "managed to finance an ever-increasing number of attacks, reflecting a year-on-year increase in income."[82] The Taliban's access to financing sufficient to cover those costs was vital to its ability to sustain its campaign of terrorism against the United States. As one military historian observed in 2011, "the Taliban's most significant weapon is not its arms or its ability to mobilize jihadists but the vast sums of money that it seems to have at its disposal."[83]

85. Defendants' protection payments supplied the Taliban with an important stream of revenue it used to finance terrorist attacks against Americans in Afghanistan. The very nature of the protection-money demands themselves – backed by threats of future violence conveyed by the same Taliban fighters who were waging an insurgency against the United States – ensured a close connection between the payments and Taliban attacks on American forces.

86. The Taliban institutionalized control of its protection-money revenue. The extraction of protection payments occurred via a highly regulated process designed to ensure that such payments would benefit the broader insurgency. The Taliban's 2009 Code of Conduct, for example, contained extensive regulations dictating to local field commanders how to collect (and spend) protection money from foreign businesses. As Ms. Peters explained, those regulations "literally institutional[ized] how profits earned from organized crime are to be distributed within the command chain."[84] The money flowed both ways – from local commanders up to the Financial Commission for use by the Taliban's central leadership, and conversely from the leadership back down to local commanders for use in the field. In all cases, the Quetta Shura

---

[81] *U.N. Financing Report* ¶ 34.

[82] *Id*.

[83] *Follow The Money*.

[84] *Crime & Insurgency* at 16.

maintained "final say in all matters of collecting protection money."[85] That discipline allowed protection money collected from all over the country to finance the Taliban's terrorist machine.

87. The Taliban's oversight of protection money ensured that Defendants' payments directly supported terrorism. Defendants' protection payments gave the Taliban fungible resources that were vital to the Taliban's ability to sustain its terrorist enterprise. For that reason, the Commission on Wartime Contracting observed that "diverted funds," channeled from Western contractors to the Taliban, "directly strengthen the insurgency."[86]

88. Protection payments supplied the Taliban with the means to buy weapons and explosives for use in terrorist attacks. Weapons capable of killing and injuring Americans cost money, and Defendants' protection payments provided the Taliban with a potent source of funding to cover the cost of its escalating insurgency. As Ms. Peters explained, once companies like Defendants decided to "pay off insurgents to avoid having [their] projects attacked," the "insurgents then spen[t] the money they raise[d] to purchase weapons and explosives, which in turn get used to kill American soldiers."[87] Congressman Bill Delahunt was even more succinct. Responding to reports that "U.S.-funded contractors" made "protection payments to the Taliban," he observed: " 'That translates into money that the Taliban are using to attack and kill American military personnel, and that's just simply outrageous.' "[88]

89. Even relatively small protection payments had an outsized effect on the Taliban's terrorist capabilities. Although estimates vary, the Taliban paid many of its rank-and-file fighters about $100 per month, while mid-level commanders made upwards of $350 per month. As for many of the IEDs that the Taliban used against Coalition troops, a Pakistani security

[85] *Id.* at 17.

[86] *CWC Report* at 74.

[87] *Crime & Insurgency* at 31.

[88] Nancy Cordes, *Is Taxpayer Money Funding The Taliban?*, CBS News (Sept. 3, 2009).

official estimated that they cost a mere $100 to make.[89] At those rates, even a single protection payment of $2,000 could finance substantial insurgent violence: it could put ten fighters and a commander in the field for a month, and supply them with five IEDs. And the Defendants each paid protection money that was many orders of magnitude higher. Those payments materially strengthened the Taliban's ability to finance the types of attacks that killed and injured Plaintiffs.

90. Protection payments supplied one of the most quantitatively significant sources of funding for the Taliban. As Secretary of State Hillary Clinton testified to the U.S. Senate Committee on Foreign Relations in 2009: "[O]ne of the major sources of funding for the Taliban is the protection money."[90] The systematic payments effected by large international companies swamped other, smaller-scale protection rackets. "A far larger source of Taliban income" as compared to other extortion schemes, the *Sunday Telegraph* reported in September 2009, was the money the Taliban extracted from companies providing security or "provid[ing] new infrastructure, such as schools and roads."[91] The Commission on Wartime Contracting thus concluded that "[e]xtortion of funds from U.S. construction projects and transportation contracts is the insurgents' second-largest funding source," behind only drug trafficking.[92]

91. In many areas of the country, protection payments supplied the single most significant source of funding for insurgent violence. In areas where "there [wa]s little or no poppy grown," protection rackets were "believed to be the largest source of income for the

---

[89] *See* Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

[90] *Afghanistan: Assessing The Road Ahead*, Hr'g before the U.S. Senate Committee on Foreign Relations, S. Hr'g 111-479 at 48 (Dec. 3, 2009) (statement of Hillary Rodham Clinton, Sec'y of State, U.S. State Dep't), https://www.foreign.senate.gov/imo/media/doc/120309_Transcript_Afghanistan%20Assessing%20the%20Road%20Ahead.pdf.

[91] Christopher Booker, *How We Help To Arm The Taliban*, Sunday Telegraph (Sept. 13, 2009).

[92] *CWC Report* at 74.

insurgents."[93] That was nowhere more true than in the areas where the Taliban acted through the Haqqani Network. In the areas of Haqqani influence – including eastern and southeastern provinces where many Defendants did business – protection money accounted for "the network's largest source of income."[94] As one local businessman with experience in the area reported of the Haqqanis, "Compared to extortion, . . . everything else is peanuts."[95]

92. Drug trafficking in Afghanistan was not enough by itself to finance the Taliban's nationwide terrorist campaign. As the U.N. Security Council concluded in its report on Taliban financing, "the amount of money raised from the drug trade is insufficient to meet the cost of insurgent activity" throughout Afghanistan.[96] Protection rackets were essential to the Taliban's ability to make up that shortfall. While the Taliban placed increasing emphasis on the "lucrative source . . . [of] foreign funding of development projects," its relative share of Afghanistan's drug economy remained "not particularly large in percentage terms."[97] Compared to protection payments from companies like Defendants, the U.N. Security Council observed, the Taliban's comparatively small share of the country's drug money "suggests that the Taliban do not make great efforts to exploit this potential source of revenue."[98]

93. Protection payments also strengthened the Taliban by allowing it to diversify its income. For an insurgent group subject to crippling international sanctions, diversification was critical: it offered the Taliban a degree of financial resiliency that made it less susceptible to American counterinsurgency efforts. That is why, as the U.S. military began to successfully

---

[93] *Crime & Insurgency* at 31.

[94] Gretchen Peters, *Haqqani Network Financing: The Evolution Of An Industry* at 40 (July 2012) ("*Haqqani Network Financing*").

[95] *Id.* at 40.

[96] *U.N. Financing Report* ¶ 38.

[97] *Id.* ¶¶ 38, 39.

[98] *Id.* ¶ 38.

interdict the Taliban's other revenue sources (such as narcotics), the Taliban relied increasingly on its protection rackets. That stream of protection money – particularly from larger, well-financed contractors like Defendants – supplied reliable funding for the insurgency and, almost as importantly, offered insurance against the risk of other funding sources drying up.

94. Protection payments were also qualitatively material to the Taliban's terrorist enterprise because of their unique link to the Taliban's leadership. Unlike other more locally spent funding sources – such as extortion of smaller Afghan businesses – Defendants' protection payments generally flowed up the Taliban's organizational chain (or were made directly to top-level Taliban institutions) and supplied fungible U.S. dollars available for use by leadership. As the U.N. Security Council documented, the money flowing from firms like "construction and trucking companies, mobile telephone operators, mining companies[,] and aid and development projects goes to the Taliban Financial Commission[,] which answers to the Taliban leadership."[99] The Taliban's high-level commanders then used those fungible dollars supplied by Defendants to finance their nationwide terrorist campaign against Americans in Afghanistan.

### B. Defendants Knew Or Recklessly Disregarded That Their Payments Financed Anti-American Terrorism

95. Defendants knew (or recklessly disregarded) that they were supplying funding to Taliban terrorists intent on attacking Americans in Afghanistan. The Taliban openly proclaimed that the money was for terrorism: as the Taliban told one subcontractor in a typical example, "You know we need this American money to help us fund our Jihad."[100] The demands for payments themselves, which the Taliban tied to the insurgency, alerted Defendants to the connection between the payments and insurgent violence. When Defendants complied with

[99] *Id.* ¶ 35.

[100] Hamid Shalizi, *Afghan Firms "Pay Off Taliban With Foreign Cash*," Reuters (Oct. 13, 2010) ("*Afghan Firms Pay Off Taliban*").

those demands and structured their operations to facilitate protection payments to the Taliban, they were under no illusion about where their payments were going.

96. The violent nature of the Taliban's protection racket further informed Defendants that they were funding terrorism. Indeed, the Taliban motivated Defendants to pay protection money by threatening their projects with violence similar to the type it wanted Defendants' money to fund. And the core reason Defendants agreed to pay was to discourage the terrorists (in a cost-effective, efficient way) from threatening them with future attack. Defendants could not have made the decision to pay without understanding and accepting that the terrorists were ready, able, and willing to stage attacks on Western interests in Afghanistan. Simply put, when Defendants agreed to the Taliban's financial terms, they were knowingly paying violent terrorists to attack someone else – usually U.S. troops – rather than Defendants' own projects.

97. Defendants also negotiated their payments in circumstances that left no doubt about whom they were financing. With respect to the large-scale payments negotiated directly with the Quetta Shura, Defendants (or their agents) met with high-level Taliban representatives who openly represented the Taliban's Financial Commission. *See supra* ¶¶ 72-77. The payments to local Taliban officials likewise occurred via negotiations with commanders or shadow "governors" who openly identified as Taliban members. *See supra* ¶¶ 78-79. Given the Taliban-controlled geographies in which the Defendants operated, Defendants assuredly knew (or recklessly disregarded) that the officials they were paying off worked for the Taliban.

98. The Taliban memorialized its protection racket in documents that further notified Defendants that they were financing terrorists. Most prominently, the Taliban often conveyed its demands for protection payments in so-called "Night Letters." Night Letters – whose name comes from their frequent delivery during the night – were documents on official Taliban

letterhead bearing the Taliban's insignia. Although Night Letters could convey a variety of threats, the Taliban commonly sent them to companies to demand protection payments. One typical example, delivered to phone companies in Wardak Province, stated that "we are expecting you to provide financial support for the Taliban stationed in Saidabad district. If you cannot, then you should stop your work. Otherwise you have no right to complain in the future (we are warning you of future incidents)." Another, authored by the "Islamic [Emirate] of Afghanistan" (the Taliban's formal name for itself), informed a local construction company that it "cannot continue to work unless it does obtain permission from the Mojahedeen. Or else, it does not have the right to complain." Night Letters were widespread in Afghanistan, particularly in areas of Taliban control, and were one of the principal means through which the Taliban communicated its demands for protection money to companies like Defendants.

99. Similarly, after effecting the payments, companies regularly received so-called "tax receipts" from the Taliban, providing them with documentation proving they had paid their dues to the insurgents. The Taliban Financial Commission encouraged the provision of tax receipts as a way of further standardizing and accounting for the revenue raised through the insurgents' protection rackets. And those tax receipts – like the Night Letters – appeared on Taliban letterhead and made clear on their face that protection money was intended for the Taliban's benefit. On information and belief, Defendants and their agents received Night Letters and Taliban tax receipts in connection with some or all of their projects in Afghanistan.

100. Defendants did not believe – nor was it true – that their payments were necessary for them to avoid imminent death or serious bodily injury. The Taliban typically did not extract protection payments by physically confronting companies and threatening immediate violence; rather, the threats were often vaguer and futuristic – as in the Night Letters mentioned above.

Many times, those threats were directed at Defendants' equipment or projects, rather than their personnel. And Defendants had an opportunity to formally notify the U.S. government of the Taliban's protection racket and try to enlist the military's assistance in responding. But rather than avail themselves of such options, Defendants decided that the simplest (and most profitable) option was to make the payments the Taliban was demanding.

101. Defendants' practice of funneling many (though far from all) of their payments through subcontractors, *see supra* ¶¶ 61, 83, only heightens their culpability. Defendants used the contracting process to insulate themselves from the payments on paper, and that process – intentionally offloading responsibility to unaccountable local subcontractors at several layers of remove – was a major factor in allowing the payments to continue unabated. Defendants sought to protect their projects at minimal cost, and an efficient way to obtain the protection they wanted was to hire subcontractors to deliver the protection money that everyone knew the Taliban was demanding. The payments may have been physically delivered by an intermediary downstream, but Defendants knew they were occurring and purposefully orchestrated them.

102. Western contractors have confirmed their understanding that, during the relevant timeframe, local intermediaries were routing contract money to the Taliban. The head of one private-security company admitted that his "boss wouldn't appreciate it if I went to negotiate face to face with the tribal leaders of Helmand" – historically a key part of Taliban leadership – so he instead used "intermediaries who recruit our security guards locally."[101] Exemplifying the no-questions-asked, purposefully-ignore-the-details mentality typical of many contractors, the executive stated, "You just hope they're not linked too closely with the Taliban."[102]

[101] Louis Imbert, *The Taliban's Secret Weapon: Security*, Le Monde Diplomatique (Oct. 2010).

[102] *Id*.

103. Another contractor negotiating a shipment of pipes through Helmand confirmed to a reporter that he typically "tacked on about 30 percent extra for the Taliban," which he accounted for as "transportation costs" charged back to the prime contractor running the project.[103] When the "foreign contractor in charge of the project" was asked about it, the contractor admitted, "We assume that our people are paying off the Taliban."[104]

104. Yet another American contractor admitted that his protection payments – amounting to 16% of his gross revenues – were "'all revenue that will ultimately be shared by the Taliban.'"[105] This contractor was well aware of the consequences: "'All of this could be seen as material support for enemy forces,' he muse[d]. 'But you have to weigh that against everything that is being done in that project. Are you aiding and abetting the enemy if you have to pay to get a school built? It's the cost of doing business here.'"[106]

105. At all relevant times, it was common knowledge among businesses operating in Afghanistan that Western contracting dollars were flowing to the Taliban in the form of protection money. Because the Taliban openly demanded the money – and because local subcontractors openly paid it – companies on the ground in Afghanistan were widely aware of the practice. One journalist referred to such payments as an "open secret"[107]; another called protection payments a "widely known practice in Afghanistan"[108]; and experts described it to *CBS News* as an "open secret on the streets."[109] Defendants were sophisticated companies with

---

[103] *Funding The Afghan Taliban*.
[104] *Id*.
[105] *How The Taliban Thrives* at 50.
[106] *Id.* at 50.
[107] *Funding The Afghan Taliban*.
[108] Dana Chivvis, *Is The Taliban Getting A Cut Of U.S. Aid*, CBS News (Sept. 3, 2009).
[109] Nancy Cordes, *Is Taxpayer Money Funding The Taliban?*, CBS News (Sept. 3, 2009).

millions of dollars in revenues on the line in Afghanistan. They were aware of this prevailing understanding that their "security" payments were flowing to the Taliban.

106. A *Time Magazine* cover story on September 7, 2009, entitled "Taliban Inc. – How Drugs, Extortion, Protection Rackets And Foreign Aid Fuel The Afghan Insurgency," accompanied a full-page cover graphic depicting an AK-47 lying on top of a box full of $100 bills. In the article, the author noted that "protection payments are so widespread that one contractor I interviewed responded incredulously to questions about how the system worked. 'You must be the only person in Afghanistan who doesn't know this is going on,' he said."[110]

107. Throughout the relevant timeframe, accounts from prominent media sources also reported that contractors and subcontractors were redirecting Western contract funds to the Taliban. Those widespread reports further informed Defendants that their expenditures in Afghanistan were delivering protection money to the Taliban. Examples include:

- *BBC International Reports (Europe)*, October 2004: "[T]he merging of organized crime and terrorism is a new phenomenon. BND President Hanning assumes 'that terrorist structures, such as ***the Taleban and Al-Qa'idah, finance their fight through the extortion of protection money*** as well as direct involvement in drug-trafficking.' "[111]
- *National Post (Canada)*, September 2006: "The Taliban still have a partnership with al-Qaeda, which provides them training and foreign fighters. If they have it their way, Afghanistan would once again be a hot-house of terrorism. Today, ***the Taliban is*** also in league with drug lords, protecting the group, ***taking protection money like any mafia***, and using that money to fund their insurgency."[112]
- *Times Record News*, August 2008: "The Taliban tried a similar cell phone tower extortion racket, but it backfired. StrategyPage reported on June 15 that ***the Taliban were expanding 'their extortion campaign, demanding that businesses pay "protection money" to avoid being attacked'*** and an effort by the Taliban 'to control cell phone use has quickly evolved into just another extortion campaign.' . . . 'But then, noting that there were several cell

[110] *How The Taliban Thrives* at 50.

[111] BBC International Reports (Europe), *German Intelligence Chief Says Bin-Ladin Still Alive* (Oct. 10, 2004). All emphases in this paragraph are added.

[112] Jaap de Hoop Scheffer, *The World Can Do More: NATO's Secretary-General On What Afghanistan Needs*, National Post (Sept. 13, 2006), 2006 WLNR 26238821.

phone companies operating in southern Afghanistan, ***the Taliban went to the different companies and offered not only "protection," but damage to a competitor, for a price***.' "[113]

- *Inter Press Service*, September 2008: "Often petrol delivery and logistics companies have to pay protection money to various tribal elders. In one route, between the capitals of Kandahar and Urozgan provinces, ***contractors pay millions in protection money, some of which may end up in the hands of the Taliban***, [Matthew] Leeming says."[114]

- *Hindustan Times*, December 2008: "NATO convoys carrying military supplies for NATO bases in South Afghanistan, are reported ***paying Taleban commanders protection money to ensure safe passage***. . . . The Times has learnt that it is the outsourcing of convoys that [leads to] payoffs amounting to millions of pounds, including money from British taxpayers, are given to the Taleban. Several fuel importers, trucking and security company owners confirmed the controversial payments."[115]

- *Deutsche Presse Agentur*, June 2009: "Afghanistan's private sector does its share to finance the insurgency – albeit not entirely voluntarily. ***Those who want to do business in the south have to pay protection money to the Taliban***. According to businessmen, even the international troops indirectly put money in the insurgents' war chest . . . 'Everything has to do with money,' said Naderi, who co-owns a telecommunications firm that operates in the restive south, where he pays $2,000 in protection money per month for each of his transmission masts. 'You have to do it. Everybody does.' "[116]

- *Frankfurter Rundschau* (Germany), July 2009: "***In the cases of major projects***, contractors have to have the construction plans and bidding documents scrutinized by Taleban engineers after which ***the amount of the charge is fixed***."[117]

- *Time Magazine*, September 2009: "[Sargon] Heinrich says some 16% of his gross revenue goes to 'facilitation fees,' mostly to protect shipments of valuable equipment coming from the border. '***That is all revenue that will ultimately be shared by the Taliban***.' . . . In fact, ***protection payments are so widespread*** that one contractor I interviewed responded incredulously to questions about how the system worked. '***You must be the only person in Afghanistan who doesn't know this is going on***,' he said."[118]

- *Star-Ledger*, September 2009: "The United States Agency for International Development has opened an investigation into allegations that its ***funds for road and bridge construction in Afghanistan are ending up in the hands of the Taliban, through a protection racket*** for contractors. And a House Foreign Affairs Committee member, Rep. Bill Delahunt (D-

---

[113] Times Record News, *Anatomy Of Terror* (Aug. 21, 2008), 2008 WLNR 31329261.

[114] Anand Gopal, *Afghanistan: Subsidised Fuel Trail Winds Back To Pakistan*, Inter Press Service (Sept. 30, 2008).

[115] Hindustan Times, *NATO Convoys Paying Taleban Protection Money For Safe Passage In Afghanistan* (Dec. 12, 2008), 2008 WLNR 23872308.

[116] *How The Taliban Has Turned Extortion Into A Gold Mine*.

[117] Willi Germund, *Steuergeld für Taliban*, Frankfurther Rundschau (July 1, 2009) (quoted by Thomas Ruttig, *The Other Side* at 20-21, Afghanistan Analysts Network (July 2009)).

[118] *How The Taliban Thrives* at 50.

Mass.), vowed to hold hearings on the issue in the fall, saying: 'The idea that American taxpayer dollars are ending up with the Taliban is a cause for grave concern.' "[119]

- Sunday Telegraph, September 2009: "**A far larger source of Taliban income**, however, are the **protection rackets by which they siphon off a significant part of the billions of dollars** we and other Western countries pour into Afghanistan to keep troops supplied and to provide new infrastructure, such as schools and roads, under a multiplicity of aid programmes."[120]
- *Sydney Morning Herald*, September 2009: "The Taliban also keep an eye on local individuals who get work on the project – especially those doing the all-important security jobs. . . . ***Deals in which the Taliban top up their coffers by demanding as much as 30 per cent of the value of a contract as protection money are rife***."[121]
- *The Independent*, March 2010: "[The investigation] is prompted by mounting concerns that ***the very money supposed to win over the hearts and minds of Afghans is ending up in the hands of the Taliban***, drug lords or profiteers. The British commander's concern is part of a wider crackdown on corruption, with General Stanley McChrystal having declared war on those making millions out of what has become a billion-dollar black hole for aid funds, in an anti-corruption directive issued last month. A third of the costs of supplying the armed forces in Afghanistan is spent on paying protection, bribery and safe passage."[122]
- *Washington Post*, March 2010: "According to senior Obama administration officials, ***some of [the money] may be going to the Taliban, as part of a protection racket*** in which insurgents and local warlords are paid to allow the trucks unimpeded passage, often sending their own vehicles to accompany the convoys through their areas of control. The essential question, said an American executive whose company does significant work in Afghanistan, is 'whether ***you'd rather pay $1,000' for Afghans to safely deliver a truck, even if part of the money goes to the insurgents***, or pay 10 times that much for security provided by the U.S. military or contractors."[123]
- *New York Times*, June 2010: "For months, ***reports have abounded here that the Afghan mercenaries*** who escort American and other NATO convoys through the badlands ***have been bribing Taliban insurgents*** to let them pass. . . . Although the investigation is not complete, the officials suspect that at least some of these security companies – many of which have ties to top Afghan officials – are ***using American money to bribe the Taliban***."[124]

---

[119] *U.S. Aid Helps Fund Taliban*.

[120] Christopher Booker, *How We Help To Arm The Taliban*, Sunday Telegraph (Sept. 13, 2009), 2009 WLNR 17968375.

[121] *Insurgents Play A Perilous Mountain Game*.

[122] *Army Launches Investigation*.

[123] *Afghan Corruption*.

[124] Dexter Filkins, *Convoy Guards In Afghanistan Face An Inquiry*, N.Y. Times (June 6, 2010).

- The Guardian, June 2010: "Private haulage companies that carry vital supplies to American soldiers in Afghanistan have ***helped to fund the Taliban and fuel 'a vast protection racket*** run by a shadowy network of warlords,' according to a US congressional report."[125]

- NPR, June 2010: "In fact, a lot of the money is already being wasted because we, the international community, is donating tens of billions of dollars to aid Afghanistan. But what happens when contractors go out to build hospitals or other projects? ***They wind up paying off the Taliban protection money. So in effect, the international aid winds up subsidizing the enemy***. That is what's going on right now."[126]

- Washington Post, July 2010: "Contracting officials, under heavy pressure to produce results, often favor efficiency over all other factors, military officials said. A recent report by a House oversight subcommittee concluded that ***tens of millions of dollars*** spent to protect U.S. military supply convoys traveling through dangerous parts of the country ***went to local warlords, listed as 'subcontractors,' in the form of protection money. Some of the funds***, the report concluded, ***likely went to the Taliban***."[127]

- Los Angeles Times, October 2010: "The report, released Thursday by the inspector general of the U.S. Agency for International Development, says ***subcontractors*** hired to protect a development project near Jalalabad ***may have paid more than $5 million to the militants*** through local authorities. . . . The report says local ***authorities often demand a 20% 'protection tax'*** in such circumstances. Under those deals – along the lines of extortionist protection rackets in the U.S. – ***the Taliban sends security guards with promises that they won't attack the subcontractors*** or their equipment and won't try to halt the contract work, the report says."[128]

- Hindustan Times, October 2010: "About one billion dollars worth of ***U.S. aid has wound up in the hands of the Taliban*** and other insurgency groups, war analysts and government auditors say. ***Sub-contractors have reportedly diverted the funds*** from programs meant to stabilize Afghanistan. In fact, the auditors say, graft has gotten so bad that the U.S. government estimates that only about 10 percent of the aid budget actually reaches the people in Afghanistan who need it."[129]

- Christian Science Monitor, October 2010: "The Senate investigation also turned up mounting evidence to suggest that largely unmonitored Pentagon ***contracts with private security companies*** – half of which are Afghan-owned – ***may also be lining the pockets of Taliban insurgents*** who agree not to attack convoys in exchange for cash. '***If you want to***

---

[125] Jon Boone, *Afghanistan Haulage Contract Helping To Fund Taliban, Says US Report*, The Guardian (June 22, 2010).

[126] *The Way Forward In Afghanistan Post-McChrystal*, National Public Radio, Talk of the Nation (June 24, 2010) (statement of Max Boot), 2010 WLNR 12796179.

[127] Karen DeYoung, *Afghan War Funds Face New Scrutiny Program To Spur Local Businesses May Instead Benefit Power Brokers*, Wash. Post (July 30, 2010), 2010 WLNR 26709005.

[128] Paul Richter, *Audit: U.S. Government Funds May Have Gone To Taliban*, L.A. Times (Sept. 30, 2010).

[129] *About A Billion Dollars Worth of US Aid Diverted*.

***know the driving force of corruption*** in Afghanistan, it's not Afghan culture,' warns Anthony Cordesman, a security specialist at the Center for Strategic and International Studies in Washington. '***It's American contracting***.' "[130]

- *The Australian*, December 2010: "Roads and buildings have been contracted to favoured Western companies which cream off profits, then sub-contract to local businesses to do the work. These then sub-sub-contract again to even cheaper local firms . . . To protect themselves, the convoy owners hire local security companies. In many instances ***the security firms then pay off the Taliban not to attack. In such situations, Western taxpayers are effectively funding the Taliban***."[131]
- *New York Times*, May 2011: "Critics say that ***payoffs to insurgent groups***, either directly or indirectly, ***by contractors*** working on highways and other large projects in Afghanistan ***are routine***. Some ***officials say they are widely accepted in the field as a cost of doing business***, especially in areas not fully under the control of the United States military or the Afghan government."[132]
- *Washington Post*, August 2011: "The U.S. military has moved to ***stem the flow of contract money to Afghan insurgents***, awarding at least 20 companies new contracts worth about $1 billion for military supply transport and suspending seven current subcontractors it found lacking in 'integrity and business ethics.' . . . Congressional investigators determined last year that ***much of the transport and security money went to the Taliban*** and Afghan warlords as part of a protection racket to ensure the safe arrival of the convoys, conclusions that were confirmed this spring by military and intelligence inquiries."[133]
- *The Oregonian*, September 2011: "Most galling of all is that after the illegal drug trade, the ***single largest source of funding*** to Afghan insurgents – our enemy – is the ***extortion of 'protection' money*** from U.S.-backed transportation and construction contractors."[134]
- *Agence France Presse*, September 2012: " '***Revenue extorted from nationwide enterprises*** such as narcotics producers and traffickers, construction and trucking companies, mobile telephone operators, mining companies[,] and aid and development projects ***goes to the Taliban Financial Commission*** which answers to the Taliban leadership,' said the report. …The sanctions experts said the Taliban have made foreign development funds a 'lucrative source'. '***Estimates of Taliban income from contracts funded by the United States and***

---

130 Anna Mulrine, *Rogue Security Companies Threaten US Gains In Afghanistan War*, Christian Sci. Monitor (Oct. 21, 2010),

131 Tom Coghlan, *Aid Robs Afghan & Iraqi Poor, Helps Rich*, The Australian (Dec. 29, 2010), 2010 WLNR 25517589.

132 Alissa J. Rubin & James Risen, *Costly Afghanistan Road Project Is Marred By Unsavory Alliances*, N.Y. Times (May 1, 2011) ("*Afghanistan Road Project Marred By Unsavory Alliances*").

133 Karen DeYoung, *U.S. Awards Contracts In Afghanistan*, Wash. Post (Aug. 16, 2011), 2011 WLNR 16187412.

134 The Oregonian, *Losing $60 Billion To Fraud & Waste* (Sept. 7, 2011), 2011 WLNR 17729205.

***other overseas donors range from 10 percent to 20 percent*** of the total, usually by the Taliban agreeing protection money with the contractor or demanding a cut.' "[135]

- The Hindu, September 2012: "***[C]ontractors*** in Afghanistan often ***say they have to make payoffs of between 10 and 20 percent to ensure work can go ahead***. In Farah, local officials have claimed that the payoffs are as high as 40 per cent."[136]

108. On information and belief, Defendants were aware of reports like these, and their substance, which documented how protection payments made by Western contractors and subcontractors financed the Taliban. Defendants are sophisticated companies, all of which specialize in performing work in high-risk countries like Afghanistan. Given their business models, and the contractual role they undertook to monitor the local security environment, Defendants each maintained departments tasked with staying abreast of open-source reporting on the risks of operating in countries like Afghanistan. As part of those efforts, Defendants' standard practice would have been to conduct basic research on the Afghan market and the mechanics of local subcontracting. Even cursory research of that nature would have uncovered the press reports discussing protection payments set forth above, or other similar reports.

109. Defendants subscribed to intelligence-reporting services that further alerted them to the link between their contracting practices and terrorist finance. For example, Strategic Forecasting Inc., popularly known as Stratfor, is a global strategic-intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world. Stratfor regularly reported on protection payments in Afghanistan, including by directly emailing Defendants copies of media reports. Examples of such reports included a *Wall Street Journal* article reporting that "cellphone company executives in Afghanistan say operators or their

---

[135] Agence France Presse, *Taliban Made $400mn In 2011 From Taxes, Extortion: UN* (Sept. 11, 2012), https://www.nation.co.ke/news/world/Taliban-made--400-mn/1068-1504748-w0sl0a/index.html.

[136] Praveen Swami, *Why Terrorists Aren't Scared of Sanctions*, The Hindu (Sept. 12, 2019).

contractors routinely disburse protection money to Taliban commanders,"[137] and a local Afghan media interview reporting that "contractors have links with the Taliban and other extremist groups and pay them //protection money// for the safe passage of the supplies."[138]

110. On information and belief, based on purported Stratfor's subscription lists (as published online), executives of the ArmorGroup, DAI, LBG, Black & Veatch, and MTN Defendants had access to Stratfor's intelligence services when those messages were transmitted. The recipient list included at least fifteen employees of ArmorGroup, Black & Veatch, DAI, LBG, and MTN who regularly received the type of updates alleged above.

### C. The U.S. Government Opposed Defendants' Payment Of Protection Money To The Taliban

111. The U.S. government did not approve, publicly or privately, of Defendants' protection payments. The government relied on its chosen Western contractors – including Defendants – to take responsibility for ensuring the financial integrity of their contracting practices in Afghanistan. At all times, the government conveyed the message that protection payments violated U.S. law and undermined U.S. foreign-policy objectives in Afghanistan.

112. The U.S. government has long been on record that protection payments to terrorists are unlawful – no matter their motivation. On March 19, 2007, Chiquita Brands International, Inc. ("Chiquita"), a multinational banana supplier, pleaded guilty in this District to having provided material support to the United Self-Defense Forces of Colombia ("AUC") in Colombia.[139] Chiquita had routed protection payments to the AUC – then designated as a

[137] Strategic Forecasting, Inc., zac.colvin@stratfor.com to ct@stratfor.com & military@stratfor.com & mesa@stratfor.com, *Af/Pak Sweep* (Mar. 24, 2010).

[138] Strategic Forecasting, Inc., dialogbot@smtp.stratfor.com to translations@stratfor.com, *Pak/Pakistan/South Asia* (June 11, 2010) (marks in original).

[139] *See* Plea Agreement, *United States v. Chiquita Brands Int'l, Inc.*, No. 07-cr-00055-RCL (D.D.C. filed Mar. 19, 2007), Dkt. 11.

Specially Designated Global Terrorist – "through various intermediaries," and had falsely accounted for them as "security payments."[140] Chiquita later argued that it paid AUC protection money "under threat of violence," but the U.S. Department of Justice responded that the "payments were illegal and could not continue."[141] It thus charged Chiquita with (and Chiquita pleaded to) the federal crime of transacting with a Specially Designated Global Terrorist.[142]

113. In the public press release announcing the plea deal, an Assistant Attorney General stated: "Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations. . . . Thanks to Chiquita's cooperation and this prosecution, that funding stream is now dry and corporations are on notice that they cannot make protection payments to terrorists."[143] A U.S. Attorney further emphasized: "Funding a terrorist organization can never be treated as a cost of doing business. . . . American businesses must take note that payments to terrorists are of a whole different category. They are crimes."[144]

114. On information and belief, Defendants were aware of the *Chiquita* settlement and its clear message that the U.S. government considered protection payments illegal. The settlement received extensive scrutiny among the international business community and was the subject of recurring media coverage after its announcement. Media outlets describing the report

---

[140] Press Release, U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty To Making Payments To A Designated Terrorist Organization & Agrees To Pay $25 Million Fine* (Mar. 19, 2007).

[141] *Id*.

[142] *See* 50 U.S.C. §§ 1701, 1705; 31 C.F.R. §§ 594.201(a), 594.701(c); Executive Order 13224.

[143] Press Release, U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty To Making Payments To A Designated Terrorist Organization & Agrees To Pay $25 Million Fine* (Mar. 19, 2007).

[144] *Id*.

included *United Press International* on March 14, 2007; the *Washington Times* on March 19, 2007; the *Associated Press* on the next day; and the *Washington Post* on August 2, 2007.[145]

115. The U.S. government took the same approach in Afghanistan. Government officials stated repeatedly that, as with Chiquita's payments to terrorists in Colombia, protection payments to the Taliban were unlawful and undermined U.S. reconstruction objectives. For example, at a House Subcommittee hearing, an Assistant Deputy Defense Undersecretary For Program Support was asked whether "facilitation payments . . . to provincial governors, to local police or warlords in order to ensure that trucks aren't bothered [are] legal under United States law?"[146] He responded: "Clearly, it's not . . . and it's counterproductive to what we're trying to do."[147] The U.S. Special Inspector General for Afghanistan Reconstruction ("SIGAR") similarly opined that "I don't think that there should ever be or ever condone paying off a Taliban entity for anything . . . Obviously that's wrong; it's against the law and counter to any counterinsurgency or reconstruction initiative that we would like to see put in place."[148]

116. The congressional Commission on Wartime Contracting found it "particularly alarming" that "subcontractors on U.S.-funded convoys, road construction, and development projects pay insurgent groups for protection."[149] Based on such statements, Defendants knew that the U.S. government was institutionally opposed to protection-money payments.

---

[145] *See* United Press International, *Chiquita To Pay $25M For Terrorist Payoffs* (Mar. 14, 2007); Matt Apuzzo, *Chiquita Pleads Guilty To Doing Business With Terrorists*, Assoc. Press (Mar. 20, 2007); *Chiquita Pleads To Protection Payoffs*, Wash. Times (Mar. 19, 2007); Carol D. Leonnig, *In Terrorism-Law Case, Chiquita Points to U.S.*, Wash. Post (Aug. 2, 2007).

[146] *Hearing on Corruption in Afghanistan Defense Contracting* (statement by Rep. John F. Tierney (D. Mass.)).

[147] *Id.* (statement of Assistant Deputy Undersecretary Gary Motsek).

[148] *Funding The Enemy* at 196.

[149] *CWC Report* at 73.

117. Protection payments also violated express U.S. government contracting requirements and regulations. Under the terms of their contracts, prime contractors bore responsibility for ensuring the integrity of U.S. spending in Afghanistan. The government further imposed requirements designed to ensure that private contractors lived up to that responsibility. For example, USAID's contracts contained a "standard clause" reminding its contractors that "U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism. It is the legal responsibility of the contractor/recipient to ensure compliance with these Executive Orders and laws."[150] U.S. Central Command ("CENTCOM") contracts similarly were required to contain a standard clause requiring government contractors to comply with all U.S. and Afghan laws, which included a prohibition on providing material support to terrorists.[151]

118. Prime contractors were required to include those same clauses in their contracts with – and ensure compliance by – their subcontractors. The "vetting" requirements were especially strict for any subcontractors that were to be armed under the contracts. Moreover, the Defense Contract Audit Agency's audit manual promulgated guidance instructing that "prime contractor oversight of subcontractors" should, among other things, "include technical and financial performance monitoring" and "ensure that payment to the subcontractor for the work accomplished was in accordance with the subcontract terms and based on allowability,

[150] Memorandum from Bruce N. Bower, USAID Regional Inspector General to Earl W. Gast, USAID Afghanistan Director, *Review Of Security Costs Charged To USAID's Projects In Afghanistan* (Review Report No. 5-306-10-002-S) at 11 (Sept. 29, 2010) ("*2010 USAID OIG Report*"), https://oig.usaid.gov/sites/default/files/2018-06/5-306-10-002-s.pdf..

[151] *See* Office of Under Secretary of Defense, *Class Deviation – Implementation Of The Synchronized Predeployment & Operational Tracker (SPOT) To Account For Contractor Personnel Performing In The United States Central Command Area Of Responsibility*, Memorandum for Directors Of Defense Agencies (Oct. 17, 2007).

allocability and reasonableness principles."[152] Defendants' protection payments – whether made directly, or through their subcontractors – violated those requirements and reflected a failure to live up to their responsibility to ensure the legality of their contract spending in Afghanistan.

119. Contractors typically concealed their individual payments from the U.S. government by funneling the money through networks of subcontractors and mischaracterizing the payments in their books and records as "security" costs. For that reason, the U.S. government was unaware of the specific illegal payments that Defendants made.

120. As the U.S. government became aware of broader patterns of protection payments in Afghanistan, it implemented a number of programs to curtail them. For example, it created Task Force 2010 and the Afghanistan Threat Finance Cell, both of which were interagency groups that drew on intelligence assets to identify and interrupt flows of contracting money to the insurgency. Congress also created the Special Inspector General for Afghan Reconstruction, which scrutinized government contracting as part of a broader anti-corruption mandate. And USAID implemented several programs – including Accountable Assistance for Afghanistan – to "ensure the proper procedures are in place to help protect assistance dollars from being diverted from their development purpose by extortion or corruption."[153]

121. The U.S. government also implemented a broader array of programs designed to combat corruption in Afghanistan. Those programs, which included SIGAR audits and a variety of initiatives carried out under the auspices of Task Force Shafifyat, reflected the U.S. policy imperative of reducing corruption throughout Afghanistan. Those programs, led by then-Brigadier General H.R. McMaster, evinced a vigorous commitment by the U.S. military in 2009

[152] SIGAR, *Progress Made Toward Increased Stability Under USAID's Afghanistan Stabilization Initiative-East Program But Transition To Long Term Development Efforts Not Yet Achieved* at 9, SIGAR Audit No. 12-11 (June 29, 2012).

[153] USAID, *Fact Sheet On Accountable Assistance for Afghanistan* (June 2011).

to stamp out corruption in Afghanistan. The outgoing ISAF Commander underscored the importance of those measures to U.S. policy: as he briefed President Obama in 2013, "corruption is **the** existential, strategic threat to Afghanistan."[154] Defendants' payments fueled the type of corruption that U.S. agencies were attempting to eradicate.

122. In September 2010, General Petraeus issued formal contracting guidance designed to further discourage protection payments to the Taliban. In the guidance document, General Petraeus emphasized that "[w]here our money goes is as important as the service provided or the product delivered."[155] He thus instructed contracting officers to "[h]old prime contractors responsible for the behavior and performance of their sub-contractors," with an understanding that "[e]xcessive sub-contracting tiers provide opportunities for criminal networks and insurgents to divert contract money from its intended purpose."[156] At bottom, the U.S. government's goal was to improve its systems and ensure that its "vendors and contractors" did not "empower the wrong people or allow the diversion of funds" to insurgents.[157] The government took a number of steps to implement that guidance, including by ramping up its vetting efforts and affirmatively suspending or debarring certain contractors with suspected links to insurgents.

123. Defendants nonetheless remained able to execute their payments to insurgents despite the U.S. government's efforts to stop them, for several reasons. *First*, the government often lacked visibility into the subcontracting networks through which the payments flowed and

[154] Joint & Coalition Operational Analysis (JCOA), *Operationalizing Counter/Anti-Corruption Study* at 1 (Feb. 28, 2014) (emphasis in original), https://www.hsdl.org/?view&did=756004.

[155] *COMISAF's Contracting Guidance* at 1.

[156] *Id.* at 1.

[157] *Id.*

so had to "rely exclusively on prime contractors" to vet and supervise the subcontractors.[158] When Defendants knowingly (or recklessly) funneled protection money through those subcontractors, the structure of the transactions made it difficult for the government to trace the money with enough precision to take corrective action. Such payments frustrated the U.S. military's policy of identifying and terminating "contracts with supporters of the insurgency."[159]

124. *Second*, the U.S. government faced staffing shortages that impeded its efforts to fully monitor the large number of contractors and subcontractors operating in Afghanistan. With a limited number of qualified contracting officers available – and a vast network of contracts to supervise – the government lacked the resources to investigate every payment made by Defendants or their subcontractors. Defendants were able to exploit those resource constraints to conceal their protection payments from U.S. government personnel.

125. *Third*, the U.S. government relied on the good faith of its contractors to prevent payments to the insurgents, because the contractors often had access to better on-the-ground information than did the government. Due to Defendants' business ties – and the long in-country tenures of many of their personnel, as compared to the typically short rotations of U.S. government deployments – Defendants had unique real-time visibility into where their money was going. That made it even easier to conceal their payments from U.S. regulators.

126. As one senior terror-finance investigator for the U.S. government explained in an interview with SIGAR, for a government investigator in Afghanistan:

> [I]t takes 6-9 months to understand what's going on, become cognizant. You hit your stride at 12 to 15 months. It's that base of knowledge to know who, what, to follow

---

[158] U.S. Special Inspector General for Afghanistan Reconstruction, *Contracting With The Enemy: DOD Has Limited Assurance That Contractors With Links To Enemy Groups Are Identified And Their Contracts Terminated* at 8, Audit No. 13-6 (Apr. 2013).

[159] *Id*.

> threats, say oh this is a problem. To get access to records (for forensic accounting), you need demonstrated suspicious behavior.
>
> Therefore *continuity* is critical. It was typically *contractors*, not government, who provided continuity – [Subject Matter Experts] who eat, live and breathe this stuff. In contrast, the military is assigned, but does not have specialization in these areas.[160]

Given those constraints, it was Defendants (not the U.S. government) that had the resources, expertise, and obligation to ensure that their practices did not materially support the Taliban.

127. In sum, the U.S. government clearly stated its opposition to protection payments and attempted to curtail them. But those efforts were imperfect, and, at all times, the U.S. government's principal tool against terrorist financing was the good faith of Western prime contractors, on whom the United States relied to fulfill their legal obligations and avoid contracting practices that funneled money to the Taliban. But Defendants abused that trust to pay off the Taliban and increase their profit margins. That conduct forms the basis of this lawsuit; Plaintiffs expressly disclaim any challenge to the U.S. government's policy decisions.

## IV. EACH DEFENDANT MADE PROTECTION PAYMENTS THAT IT KNEW OR RECKLESSLY DISREGARDED WOULD BENEFIT THE TALIBAN

### A. The ArmorGroup Defendants

#### 1. The ArmorGroup Defendants Made Protection Payments To The Taliban

128. The ArmorGroup Defendants consist of several companies that made protection payments to the Taliban in connection with various projects from at least 2007 until 2015. Defendant Centerra Group LLC is the successor to ArmorGroup North America, Inc. ("AGNA"), which held multiple security contracts in Afghanistan from 2007 until at least 2009. Defendant G4S Holdings International (AG) Ltd. is the successor to ArmorGroup International plc ("AGI"), which oversaw and directed AGNA's conduct. Defendant G4S Risk Management

[160] *SIGAR Interview with Gert Berthold* at 4 (emphasis in original).

Ltd. is the successor to ArmorGroup Services Limited, which also held multiple security contracts in Afghanistan from 2007 onward under the trade name Armor Group Mine Action ("AGMA"). Defendant Environmental Chemical Corporation ("ECC") is a construction and engineering company that worked on multiple projects in Afghanistan from at least 2007 until 2014, and it was a prime contractor that hired AGNA as a security subcontractor.

129. AGNA provided a Washington-area hub through which ArmorGroup bid for and executed its U.S.-government contracts. But London-based AGI was also involved in and supervised ArmorGroup's performance under those contracts. As AGI's regional director wrote in an October 21, 2007 email, AGI "manages and executes the delivery piece of our contracts" because "AGNA is neither structured nor able to execute . . . follow on phases after contract bid compilation." AGI's role in implementing ArmorGroup's Afghanistan contracts was thus equal to, if not even more significant than, AGNA's. According to the former head of AGNA contracting, AGNA functioned essentially as a "shell company set up by AGI to bid for and obtain U.S. contracts that could only be awarded to American companies."[161] AGI thus exercised control over, and was jointly responsible for, the AGNA conduct set forth below.

130. The ArmorGroup Defendants executed multiple government contracts in Afghanistan during the relevant timeframe. Those contracts include, but are not limited to:

**a.** **2007 Shindand Airbase Contract:** In March 2007, pursuant to Contract No. FA-8903-06-D-8511, Task Order 18, the U.S. Air Force hired ECC as the prime contractor supervising an expansion of the Shindand Airbase in Herat Province, Afghanistan. The prime contract was valued at $42.5 million. On April 27, 2007, pursuant to Continuing Services Agreement No. Armor.CSA.HERC.4500, ECC hired AGNA as its security subcontractor for the project. AGNA provided security under that contract for the next twenty months and generated about $5.1 million in revenue.

[161] Compl. ¶ 53, *United States ex rel. Gordon v. ArmorGroup North America, Inc.*, No. 09-cv-01547-RCL (D.D.C. filed Aug. 17, 2009), Dkt. 1.

b. **2007 Kabul Embassy Contract:** In July 2007, pursuant to Contract No. S-AQMPD-07-C0054, the U.S. State Department hired AGNA to provide security in and around the U.S. Embassy in Kabul, Afghanistan. The contract had a 5-year term and was valued at approximately $189 million.

c. **2008 UNOPS Mine Clearance Contract:** In or about the summer of 2008, the United Nations Office For Project Services ("UNOPS") retained AGMA to perform mine clearance in Herat Province, including the area in and around Shindand. The contract was valued at approximately $15 million.

d. **2008-2009 PRT Security Contract:** In or about 2008-2009, AGNA and AGI obtained a contract to provide security for a Coalition Provincial Reconstruction Team's ("PRT") personnel in and around Helmand Province. On information and belief, this was a multiyear contract on which ArmorGroup generated millions of dollars in revenue.

e. **2010 Kunduz Police Contract:** On March 8, 2010, the U.S. Army Corps of Engineers, pursuant to Contract No. W5J9JE-10-D-0007, awarded a multiyear design and construction contract to a joint venture that ECC controlled and directed. On September 16, 2010, pursuant to Task Order 3 under that contract, ECC received a $12 million award to design and build facilities for the Afghan police headquarters in Kunduz Province, Afghanistan.

f. **2011 Kandahar Airfield Contract:** On February 28, 2011, ECC obtained a Task Order under Contract Number FA8903-06-D-8511-0074 to construct infrastructure for an airfield in Kandahar, Afghanistan. The contract called for performance through April 23, 2014 and provided for payment of roughly $21 million in cost reimbursement and $560,000 in fees.

g. **2012 Ring Road Contract:** On January 17, 2012, the Asian Development Bank awarded a multiyear, $477 million contract to a joint venture that ECC controlled and directed, under which ECC was to construct a 233-kilometer portion of Afghanistan's Ring Road.

h. **2015 British Embassy Contract:** In 2015, G4S Holdings International (AG) Limited and/or G4S Risk Management Limited signed a 5-year, GBP 100 million contract to provide security in and around the British Embassy in Afghanistan.

131. On information and belief, the ArmorGroup Defendants paid protection money to the Taliban in connection with each of these (and other) contracts. Each contract required work in geographic areas under Taliban control or influence, and contractors' standard practice in such circumstances was to pay protection money to discourage the Taliban from attacking their projects. *See supra* ¶¶ 65-82. The ArmorGroup Defendants followed that standard practice, which was especially prevalent among contractors working in comparable factual circumstances:

on (i) Western-backed and (ii) financially lucrative projects, with (iii) a track record of hiring unscrupulous subcontractors to (iv) perform work in insecure, insurgent-influenced areas. On information and belief, the ArmorGroup Defendants' protection payments were worth at least 20 to 40 percent of their contracts' value. *See supra* ¶ 80. As a result, each ArmorGroup Defendant made payments to the Taliban worth at least several million dollars.

132. Several of the ArmorGroup Defendants' projects contained additional indicia of protection payments. For example, Afghanistan's Ring Road was well-known in Afghanistan as a frequent target of Taliban[162] extortion efforts, and contractors regularly paid protection money to secure their sections of the road. *See, e.g., infra* ¶ 194. ECC and ArmorGroup likewise both have a history of funneling money to the Taliban in connection with airfield contracts specifically. *See infra* ¶¶ 137-43. And ECC's Kandahar Airfield Contract required work in a historical Taliban stronghold, which typically involved especially high-dollar payments.

133. A 2016 outside audit found that ECC's expenditures under the Kandahar Airfield Contract included nearly $200,000 in cash payments for which ECC lacked real documentation. ECC claimed that the payments were for "Afghan national laborers," but there was "insufficient documentation to support the work completed by the laborers under the Task Order, such as labor agreements and/or work products."[163] ECC defended its payments – made from petty cash rather than through the banking system – because its workers "simply do not have personal bank accounts," and because the "payment of general construction labor costs without formal labor

[162] Throughout this Part IV, unless otherwise specified, references to the "Taliban" are inclusive of the Haqqani Network. *See infra* Part V.A.2.

[163] Special Insp. Gen. For Afghanistan Reconstr., *Construction Of The Special Forces Kandak In Kandahar: Audit Of Costs Incurred By Environmental Chemical Corp.* at 16, Financial Audit No. 16-30 (Apr. 2016)

agreements or contracts is the local industry practice."[164] The auditors rejected ECC's defense, in a finding that SIGAR endorsed.[165] Such unexplained cash expenditures in a Taliban stronghold are an indication of protection payments.

134. As for the Kunduz Police Contract, ECC hired the Afghan firm Arvin Kam Construction Company ("Arvin Kam") as one of its subcontractors on the project. After ECC had retained Arvin Kam and begun work on the project, CENTCOM determined that Arvin Kam had been "actively supporting an insurgency" and instructed ECC to terminate its subcontract.[166] ECC eventually complied only after the government sent ECC a Cure Notice and threatened to hold it in default. ECC then initiated administrative proceedings against the U.S. Army Corps of Engineers, claiming that the termination notice was unlawful. It did not contest CENTCOM's determination that ECC's subcontractor was supporting the insurgency; it argued instead that the government "cannot direct termination of a subcontractor based upon [such a] finding."[167] ECC thus maintained that it should have been able to continue using its subcontractor even if doing so supported the insurgency – and that the government lacked authority to stop it.

135. After belatedly terminating its subcontractor, ECC agreed to "settle" with Arvin Kam by agreeing to pay the subcontractor $1.5 million. ECC agreed to make that payment (and did make it, according to Arvin Kam) *after* it knew CENTCOM had determined that Arvin Kam was "actively supporting" the insurgency in Afghanistan. In its administrative claims against the government, ECC sought reimbursement for its costs related to terminating Arvin Kam.

---

[164] *Id*. at 27-28.

[165] *See id*. at 31.

[166] General James N. Mattis, *FY2012 National Defense Authorization Act, § 841 Notification* (July 24, 2012); Kerment L. Goss, *Contract No. W5J9JE-10-D-0007, Task Orders 0003, 0006, 0007 and 0009, Afghanistan – Cure Notice* (Aug. 16, 2012).

[167] Appellant's Motion for Summary Judgment at 7, *Appeal of ECCI-Metag, JV*, ASBCA No. 59031.

136. In moving for summary judgment on ECC's claims, the government described what ECC had done:

> ***ECCI employed Arvin Kam which, it turned out, was engaged in supporting the insurgency***, a violation of the laws of Afghanistan. ***ECCI was the party to the Contract responsible for ensuring that its own subcontractors did not violate the laws of Afghanistan***, not Respondent. It was ECCI's failure to fulfill this provision of the Contract that led to the need to terminate Arvin Kam. Arvin Kam's termination was not caused by any failure on the part of Respondent; instead, it was necessitated entirely by ECCI's failure to ensure that its subcontractor was not violating the laws of Afghanistan. In bringing this action, ***ECCI is attempting to shift the consequences of its own action, in hiring a subcontractor who was supporting the insurgency***, to Respondent. Those consequences rightly should be borne by ECCI, as the party at fault.[168]

After the Armed Services Board of Contract Appeals denied both parties' cross-motions for summary judgment, they reached a confidential settlement.

137. With respect to the Shindand Airbase Contract, AGNA – acting as subcontractor for ECC, with ECC's approval – sourced its guards from two local Taliban cutouts: Nadir Khan and Timor Shah. AGNA nicknamed them "Mr. Pink" and "Mr. White," respectively, in homage to the criminal bank robbers from the Quentin Tarantino movie *Reservoir Dogs*. U.S. military personnel stationed nearby considered Mr. Pink to be a "mid-level Taliban manager."[169] Even so, AGNA retained Mr. Pink and his men and paid them substantial sums of money under its contract with ECC. Those payments were, in effect, protection payments directly to the Taliban.

138. On December 12, 2007, Mr. Pink shot Mr. White and killed him. ECC's Security Manager later described the shooting as "kind of like a mafia thing. If you rub somebody out, you'll get a bigger piece of the pie."[170] Shortly thereafter, Mr. Pink fled to a nearby village and

---

[168] Respondent's Cross Motion For Summary Judgment at 10, *Appeal of ECCI-Metag, JV*, ASBCA No. 59031 (filed Oct. 6, 2014) (emphasis added).

[169] U.S. Senate Committee on Armed Services, Report, *Inquiry Into The Role & Oversight Of Private Security Contractors In Afghanistan* at ii (Oct. 26, 2010) ("*Senate Contractors Report*").

[170] *Id.* at ii.

took refuge "with a number of Taliban fighters and a Taliban commander."[171] Yet despite Mr. Pink's execution of Mr. White, and despite reports that he was working with the Taliban, ECC and AGNA kept using his men to provide security for the project. As the Senate Armed Services Committee found after an extensive investigation, "there is little evidence that Pink's men were, in fact, 'phased out' at that time."[172] On the contrary: on January 3, 2008, more than three weeks after the shooting, an ArmorGroup document indicated that AGNA had "issued thousands of rounds of ammunition for training" Mr. Pink's Taliban subordinates.[173] ArmorGroup's decision to provide literal ammunition to Mr. Pink's men mere weeks after their Taliban-affiliated boss had conducted a public mafia-style execution of another Taliban manager typified ArmorGroup's approach to providing "security" in Afghanistan.

139. Throughout this time period, ArmorGroup supplied Mr. Pink's and Mr. White's men with AK-47s and paid them regular wages. When later asked what happened to the money that ECC and ArmorGroup supplied to these Taliban-affiliated commanders, an ArmorGroup employee responded: "I pay the guy direct, he signs for the amount that I gave him. And what he does with his money outside and thereafter . . . I can't control that."[174]

140. With Mr. Pink in hiding after Mr. White's execution, ECC and ArmorGroup were forced to find a new commander for their contingent of security guards. They turned to the deceased Mr. White's brother – named Reza Khan – whom they nicknamed "Mr. White II." ECC and AGNA hired Mr. White II and his men even though Mr. White II lacked a bona fide registered security company, as required under Afghan law.

---

[171] *Id.* at 16.

[172] *Id.* at 16-17.

[173] *Id.* at 17.

[174] *Id.* at 11 (ellipses in original).

141. Mr. White II's terrorist ties eventually precipitated an armed confrontation with the U.S. military. On August 21, 2008, Mr. White II hosted a "Taliban meeting held in the village of Azizabad that was raided by U.S. and Afghan military forces."[175] The raid was part of an operation to "capture or kill Mullah Sadeq, a high value Taliban commander," and was premised on intelligence that "20 to 30 anti-coalition fighters would be attending a shura that night" to be "held at the home of Mr. White's brother, Mr. White II."[176] The Taliban planned its shura to occur simultaneously with a "ceremony to commemorate the death of Mr. White."[177]

142. During the Azizabad raid, Taliban fighters opened fire on U.S. forces. The resulting firefight required U.S. air support from an AC-130 gunship, and the U.S. military Team Leader later called it "the most kinetic engagement" of his tour in Afghanistan.[178] Mr. White II, who was Mullah Sadeq's uncle and the host of the Taliban meeting, was among the casualties. So too were at least six other fighters working for ArmorGroup. U.S. military investigators later found ArmorGroup uniforms, sensitive intelligence materials, advanced munitions, and IED-making materials on site. Ultimately, the U.S. military concluded that the Mr. White II-hosted meeting involved many people "associated with the insurgency," and that "most likely, some of the anti-coalition militia in Azizabad were also security contractors for ArmorGroup."[179]

143. After the Azizabad raid, as documented by the Senate Armed Services Committee, ArmorGroup "authorized a $1,000 discretionary payment to White II's family."[180]

[175] *Id.* at 5.
[176] *Id.* at 6.
[177] *Id.*
[178] *Id.*
[179] *Id.* at 7 (internal brackets omitted).
[180] *Id.* at 31.

144. ArmorGroup's conduct in connection with the UNOPS Mine Clearance contract was similar. Under that contract, at AGNA's recommendation, AGMA too selected Mr. White II as its local security provider. AGMA paid Mr. White II $12,350 per month and stated that it had "no idea what" he "did with the money."[181] On top of that, AGMA also paid $180 per month directly to each of Mr. White II's fighters. It made those payments despite Mr. White II's known financial associations with the Taliban. According to an Army Sergeant operating in the area, Mr. White II "was a supporter of Taliban operations" and would "help the Taliban with money."[182] Mr. White II, the Army Sergeant continued, "would provide money because of his contracting jobs with ArmorGroup. He had a lot of money from that and he would give that money to Taliban commanders, and they in turn would buy weapons and ammo."[183]

145. On June 9, 2008, AGMA hired a consultant – identified in the Senate Armed Services Committee's report only as "Tony" – to assess AGMA's work on the UNOPS contract. "Tony" traveled to the site and stayed until mid-July.

146. On July 19, 2008, "Tony" issued a report that was circulated to AGMA's senior leadership. The report noted that Mr. White II's weapons had recently been confiscated by the Afghan government in a "crack down by the government to collect all militia's unregistered weapons and vehicles."[184] Further, according to Senate investigators, "media accounts from this time linked weapons confiscated in the Shindand area to those belonging to the Taliban for their

[181] *Id.* at 23.
[182] *Id.* at 23-24 (internal brackets omitted).
[183] *Id.* at 24.
[184] *Id.* at 26.

expected use in 'terrorist attacks.' "[185] The weapons seized from Mr. White II, a Marine officer reported, included landmines and other "pretty significant stuff."[186]

147. The August 21, 2008 firefight between Mr. White II's men and Coalition forces received worldwide media attention and took on a high profile within Afghanistan. Even after Coalition forces killed Mr. White II in a raid on a Taliban shura, however, AGMA turned to his younger brother, Gul Mohammed, to replace him. AGMA nicknamed the younger brother of the slain Taliban commander "Mr. White III." In an email responding to the news that Mr. White III had "taken over the family security business," AGMA called it "great news" and remarked: "strange how business goes on."[187]

148. AGMA decided to keep the rest of Mr. White II's men on the payroll and place them under Mr. White III's command. As for the six other ArmorGroup employees killed in the Azizabad raid, Mr. White III requested – and AGMA agreed – that they "be replaced by their brothers."[188] AGMA agreed to that request even though the Taliban was widely understood in Afghanistan as a familial organization, such that if one family member was loyal to the Taliban, it was highly likely that his immediate relatives were too. Indeed, when an Army intelligence officer later learned that AGMA had hired Mr. White III and his men, he explained that he " 'absolutely' would have had concerns" and considered it "a counterintelligence threat."[189]

149. Both ArmorGroup and ECC knew or recklessly disregarded that their security guards were associated with the Taliban. Internal company documents described Mr. White and Mr. Pink as "warlords" and "clan leaders," and an ArmorGroup document asserted that both had

---

[185] *Id.*
[186] *Id.* at 27.
[187] *Id.* at 33.
[188] *Id.*
[189] *Id.* at 34.

fled Afghanistan for Iran but that Mr. White returned to the country in 2003 "on the side of the Taliban."[190] ArmorGroup's intelligence reporting later suggested that Mr. Pink, for his part, was "now known Taliban and has gone into the kidnapping game for ransom."[191] As for Mr. Pink's men, ECC's own Monthly Security Report from December 2007 – at which point ECC and ArmorGroup were still paying and arming fighters loyal to Mr. Pink – reported that Mr. Pink had taken refuge "with a number of Taliban fighters and a Taliban commander."[192] And even after the highly publicized Azizabad raid, which finally prompted AGNA and ECC to sever ties with Mr. White II's men because "they could 'no longer be trusted,' " AGMA kept paying them and even added Mr. White III and his fighters to the payroll.[193] When interviewed by Senate staff, AGMA's Project Leader for the Shindand Airbase security project "said that there were options other than using Mr. White II for security but that they were 'more expensive.' "[194]

150. Despite the indications that ECC and ArmorGroup were paying known Taliban associates, the ArmorGroup Defendants declined to perform any credible diligence on the fighters they retained. Nor did they seek the requisite authority from the U.S. military to arm those fighters. In fact, when Senate investigators later interviewed ArmorGroup and ECC about Mr. Pink and Mr. White, the companies were able "to provide little personal information about the two men."[195] Nonetheless, the companies armed and paid substantial sums of money to both men, their fighters, and their Taliban-loyalist brothers. And throughout it all, the companies

---

[190] *Id.* at 8 (internal brackets omitted).
[191] *Id.* at 21 (internal brackets omitted).
[192] *Id.* at 16.
[193] *Id.* at 33.
[194] *Id.* at 26.
[195] *Id.* at 8.

claimed that they simply had “no idea what” the fighters “did with the money.”[196] They made that claim despite widely reported facts that the Taliban used funds funneled up from their on-the-ground operatives to carry out terrorist attacks against Americans, such as Plaintiffs.

151. In the wake of the Senate Armed Services Committee’s extensive report on all this misconduct, Senator Carl Levin summarized its findings as showing that contractors like the ArmorGroup Defendants “helped play into the hands of the enemy” and were “creating the very threat they are hired to combat.”[197] ArmorGroup took a different perspective. In response to the evidence arrayed against Mr. White and his brothers, an AGMA Director told the Committee, “I would like to put on the record recognition of the services that the Whites provided us . . . we are forever grateful to Mr. White’s family . . . because they kept our people safe.”[198]

#### 2. ArmorGroup’s Protection Payments Comport With Its Other Conduct In Afghanistan

152. ArmorGroup’s protection payments reflected a system of deficient internal controls that also manifested itself in related misconduct. According to two ex-Marines who used to work for ArmorGroup, AGNA “materially misrepresented” its own “capabilities in winning the contract award” to protect the U.S. Embassy in Kabul.[199] ArmorGroup’s management, the employees alleged, “ha[d] no regard for the security of the United States Embassy, and [was] interested in only their stocks.”[200] The executive director of the Project on Government Oversight later testified about related misconduct to the Commission on Wartime Contracting. Summarizing witness interviews and documents, she testified: “practically from

[196] *Id.* at 23.

[197] Karen DeYoung, *Senate Report: Mismanaged U.S. Contractor Money Aids Enemy In Afghanistan*, Wash. Post (Oct. 8, 2010).

[198] *Senate Contractors Report* at 37 (ellipses in original).

[199] Compl. ¶ 2, *United States ex rel. Sauer v. ArmorGroup North America, Inc.*, No. 08-cv-00698-RCL (D.D.C. filed Apr. 24, 2008).

[200] *Id*. ¶ 3.

Day One, ArmorGroup North America knowingly underperformed in its mission in order to maximize its profits."[201] Consistent with that statement, the U.S. State Department eventually fired ArmorGroup from the contract, after an internal U.S. State Department security evaluation found a slew of contract violations and performance deficiencies.

153. Similarly, a former Director of Business Development for AGNA alleged that AGNA submitted false claims in connection with its Kabul Embassy contract, including by misrepresenting the qualifications of its guards.[202] After the U.S. Department of Justice intervened in the case, ArmorGroup resolved the claims for $7.5 million.[203] Those allegations revealed ArmorGroup's knowledge that its failure to properly vet its guards risked American lives. Such misconduct, like hiring Taliban fighters as security guards, reflected ArmorGroup's devotion to its own profit margins at the expense of U.S. national security.

**3. The ArmorGroup Defendants' Payments Had A Substantial Nexus To The United States**

154. The ArmorGroup Defendants' protection payments were closely tied to the United States. All of the ECC contracts were executed and overseen by an American company and required the extensive involvement of U.S.-based personnel and resources. Similarly, the AGNA contracts required a substantial connection to the United States: AGNA's Virginia office acted as the contracting entity and was responsible for submitting claims to the U.S. government or the other contractors working on the project. The involvement of an American entity like AGNA was material to ArmorGroup's ability to obtain contracts involving U.S. government

[201] Testimony of Danielle Brian Before The Commission on Wartime Contracting In Iraq & Afghanistan (Sept. 14, 2009), https://www.pogo.org/testimony/2009/09/testimony-of-danielle-brian-before-commission-on-wartime-contracting-in-iraq-and-afghanistan/.

[202] Compl. ¶¶ 51-62, *United States ex rel. Gordon v. ArmorGroup North America, Inc.*, No. 09-cv-01547-RCL (D.D.C. filed Aug. 17, 2009), Dkt. 1.

[203] Press Release, U.S. Dep't of Justice, *ArmorGroup North America & Its Affiliates Pay $7.5 Million To Resolve False Claims Act Allegations* (July 7, 2011).

funding. For that reason, ArmorGroup characterized AGNA's "Washington office" as the "hub for the Group's bidding for and management of major US Government contracts overseas while coordinating the Group's relationships with the larger US defence integrators."[204]

155. AGI also cooperated extensively with AGNA in effectuating its protection payments. AGI, as noted above, closely supervised AGNA and involved itself in implementing AGNA's contracts. *See supra* ¶ 129. But AGI could not have obtained U.S. government business alone; it needed AGNA's U.S. presence to bid for and obtain sensitive contracts like the one to protect the U.S. Embassy in Kabul. That is why AGI created AGNA and routed many of its Afghanistan contracts through an American entity: AGNA, as alleged by its former Director of Business Development, functioned as a "shell company set up by AGI to bid for and obtain U.S. contracts that could only be awarded to American companies."[205]

156. ArmorGroup's U.S. government contracts required extensive contact with the United States. To obtain those contracts, ArmorGroup negotiated with, and made continuous communications to, U.S. government personnel located in the United States and/or ECC personnel located in the United States. ArmorGroup's performance under those contracts likewise required regular communications with U.S.-based personnel. And ArmorGroup received payment for those contracts from U.S. government accounts located in the United States – either directly from the U.S. government or routed through ECC, an American company.

157. AGMA similarly relied on contacts with the United States to perform under its UNOPS contract. For example, AGNA personnel – working for an American entity on a contract available only to American companies – recommended Mr. White II to AGMA, and

[204] ArmorGroup International plc & G4S Limited, *Recommended Cash Offer* at 53 (Mar. 31, 2008).

[205] Compl. ¶ 53, *United States ex rel. Gordon v. ArmorGroup North America, Inc.*, No. 09-cv-01547-RCL (D.D.C. filed Aug. 17, 2009), Dkt. 1.

American AGNA employees brokered the critical meeting where AGMA decided to retain Mr. White II and his men to provide security for the UNOPS contract. On information and belief, AGMA regularly relied on such cooperation with its American affiliate in implementing the UNOPS contract. Indeed, both AGNA and AGMA were subsidiaries of AGI, and on information and belief, AGI was involved in orchestrating ArmorGroup's conduct under both its U.S. government contracts and its UNOPS contract.

158. ArmorGroup's decision to pay protection money to the Taliban also targeted the United States by directly undermining U.S. foreign-policy interests in Afghanistan and jeopardizing the safety of American service members deployed there. *See supra* Part III.A. When making those payments, ArmorGroup knew it was helping the Taliban conduct attacks designed specifically to influence U.S. policy by killing and injuring American personnel.

### B. The DAI Defendant

#### 1. DAI Paid Protection Money To The Taliban

159. Defendant DAI likewise made protection payments to the Taliban in connection with several different projects in Afghanistan between 2006 and 2012. Those projects were implemented by DAI Global LLC's predecessor, Development Alternatives, Inc.

160. DAI was USAID's second-largest development contractor in Afghanistan, behind only LBG. From FY2007 until FY2009, LBG and DAI together accounted for about $1 billion in development aid, or about one-half the value of USAID's total contracts with all of its partners in Afghanistan.[206] Overall, through June 2013, DAI remained the second-largest USAID implementing partner in Afghanistan, with contract obligations valued at $886 million.

161. DAI executed multiple government contracts in Afghanistan and Pakistan during the relevant timeframe. Those contracts include, but are not limited to:

---

[206] *See Kerry Report* at 15.

a. **The LGCD Contract:** On October 1, 2006, USAID awarded to DAI Contract No. DFD-I-00-05-00250, Task Order 2, under its Local Governance and Community Development ("LGCD") program. The contract was originally for 3 years and $95 million, but USAID later increased the funding to $349 million and extended the term through April 30, 2011.

b. **The ASMED Contract:** On February 15, 2007, USAID awarded to DAI Contract No. 306-C-00-07-00503-00 under USAID's Afghanistan Small and Medium Enterprises Development ("ASMED") program. The contract was originally scheduled to last through October 31, 2011 and involve expenditures of $55 million, but USAID later increased the funding to $113 million and extended the term through November 30, 2012.

c. **The FATA Contract:** In January 2008, USAID awarded to DAI a 3-year, $43.4 million contract under the agency's Federal Administered Tribal Areas Development Program ("FATA") program. The agency later increased the contract amount by $2.2 million.

d. **The ASI Contract:** On June 25, 2009, USAID awarded to DAI Contract No. DOT-I-02-08-0035-0, Task Order 2 under the USAID's Afghanistan Stabilization Initiative ("ASI") program. The contract called for DAI to perform work between November 1, 2011 and September 25, 2012. The contract was originally valued at approximately $151 million, but subsequent modifications reduced the value to approximately $83 million.

e. **The RAMP UP East Contract:** On June 10, 2010, USAID awarded to DAI Contract No. 306-C-00-10-00526-00 under USAID's regional Afghan municipalities for urban populations / regional command east ("RAMP UP East") program.

f. **The RAISE Contract:** On July 15, 2010, USAID awarded to DAI Task Order EDH-I-14-05-00004 under prime contract EDH-I-00-05-00004. The agency awarded this contract to DAI under its Rural Agricultural Income and Sustainable Environment ("RAISE") program.

162. On information and belief, DAI paid protection money to the Taliban in connection with each of these (and other) contracts. Each contract required work in geographic areas under Taliban control or influence, and contractors' standard practice in such circumstances was to pay protection money to discourage the Taliban from attacking their projects. *See supra* ¶¶ 65-82. DAI followed that standard practice, which was especially prevalent among contractors working in comparable factual circumstances: on (i) Western-backed and (ii) financially lucrative projects, with (iii) a track record of hiring unscrupulous

subcontractors to (iv) perform work in insecure, insurgent-influenced areas. On information and belief, DAI's payments were worth at least 20 to 40 percent of its contracts' value. *See supra* ¶ 80. As a result, DAI made payments to the Taliban worth at least several million dollars.

163. DAI concealed its payments to the Taliban by creating an environment of lax oversight and internal controls. In 2009-era Afghanistan, protection payments were common in part because the corrupt environment made them easy to hide. *See supra* Part II.A.[207] DAI's contracting practices fit that pattern and raised indications that DAI hid protection payments within inflated and unsubstantiated expenditures. For example, one audit of DAI's LGCD project found that DAI was "unable to locate the contract file, payment vouchers, or project receipts for fuel purchases totaling $3,424,400" and that "DAI staff had no explanation."[208] The same audit also found "rental payments . . . made to the project cashier, instead of to the lessors identified in the lease agreements," with "no documentation showing that the lessors had signed for receipt of their monthly rents."[209] Such unexplained and unverified expenditures, made to implement a project in Taliban-controlled geographies, are an indication of protection payments.

164. On information and belief, DAI subcontracted some of its security work to USPI or its successors, the discredited and now-debarred private-security company that also worked for LBG and was a particularly notorious font of protection money for the Taliban. *See infra* ¶¶ 196-201. On information and belief, DAI even hired many of the same security personnel from USPI after their disastrous tenure with LBG. In light of the areas in which DAI operated,

---

[207] *See also* Jean MacKenzie, *U.S. Funding For The Taliban: Can It Be Stopped?,* GlobalPost (Oct. 12, 2010) ("*U.S. Funding For The Taliban*") (observing that protection payments for development projects could be "hidden in a variety of ways," including through "inflated estimates for equipment, padded transportation costs, [and] substituting inferior materials for the top-grade ones billed").

[208] USAID OIG Afghanistan & Pakistan Oversight Report at 66 (January – March 2012).

[209] *Id.*

the USPI-type security subcontractors it used, and the type of projects it worked on, DAI is widely considered in Afghanistan to have been one of the most significant sources of protection money among all the Western contractors operating in the country.

165. DAI's FATA contract provides a case in point. Under that contract, DAI implemented a series of projects to increase the capacity of FATA governmental institutions and NGOs. The FATA – a semi-autonomous tribal region in northwestern Pakistan along the Afghanistan border – was a notoriously insecure, Haqqani-controlled area in which protection payments were routine. As Ms. Peters documented in 2012:

> "Local sources report large and rising security payments made by contractors for USAID-funded projects in the FATA appearing in Haqqani coffers. 'A contractor receiving a contract in the millions of rupees will normally have to pay up to 15 percent of the value of that contract in tax to the Taliban,' said a local tribal elder who is involved in the construction business. 'This has become a rich source of income for the Taliban in recent years.' "[210]

DAI followed the same pattern. As one of the two largest USAID contractors operating in the FATA, DAI made particularly large protection payments to the Haqqani Network in those areas.

166. In September 2010, the USAID Office of Inspector General ("OIG") conducted an audit of DAI's performance under the LGCD project and found "indications that Afghan subcontractors" working for DAI "had paid insurgents for protection in remote and insecure areas of Afghanistan."[211] The OIG's inquiry "was triggered after a series of online and newspaper articles . . . documented the diversion of millions of dollars in U.S. aid money to the Taliban."[212] In investigating those reports, the OIG reviewed documents and interviewed over 43 witnesses from USAID, DAI, the intelligence community, and a DAI security subcontractor.

---

[210] *Haqqani Network Financing* at 44.

[211] *2010 USAID OIG Report* at 2.

[212] Colum Lynch, *U.S. Tax Money Goes To Taliban*, Foreign Policy (Sept. 30, 2010).

167. The OIG's investigation surfaced evidence that DAI's subcontractors had "negotiate[d] security terms with insurgents either directly or indirectly through community leaders. Insurgents could demand from the subcontractor a 'protection tax' of up to 20 percent of the total subcontract value in exchange for protection." [213] Applying that metric to the value of DAI LGCD projects implemented in 2009 alone, the OIG estimated that "$5.2 million of USAID funds were at risk of falling into the hands of insurgents" on those projects.[214]

168. The "protection" that the Taliban sold to DAI and its subcontractors "include[d] Taliban-provided security guards for the activity site and a promise not to attack the subcontractor's personnel and equipment."[215] The Taliban often would further "try to renegotiate the terms of the security arrangement" midstream by "extort[ing] more money from the subcontractor" and "threaten[ing] violence if the subcontractor did not comply."[216] As U.S. intelligence officials confirmed, the Taliban's extraction of protection money from DAI's project "fit[] the pattern" evident throughout Afghanistan and especially "endemic in Taliban stronghold areas" like Kunar Province, where DAI implemented the LGCD project.[217]

169. The OIG also explained how DAI and its subcontractors recouped the payments. "The most common method," the OIG found, "was to include the amount in the total cost of the subcontract up front, because subcontractors knew that the tax would have to be paid before implementation."[218] The subcontractors then classified the protection money as " 'mobilization

[213] *2010 USAID OIG Report* at 4.
[214] *Id.* at 6.
[215] *Id.* at 4.
[216] *Id.*
[217] *Id.*
[218] *Id.*

costs' " and "billed them to DAI through normal invoicing procedures."[219] DAI, in turn, passed those so-called "costs" on to USAID for reimbursement. On occasion, "line items in the project budget might be inflated, or subcontractors might recoup costs by substituting low-quality, cheap materials for promised high-quality materials."[220] Either way, DAI enabled its subcontractors to obtain U.S. government money and helped reimburse them for payments made to the Taliban.

170. DAI knew (or recklessly disregarded) that its LGCD subcontractors were paying protection money to the Taliban. DAI's security team was aware of several Taliban attacks (or threatened attacks) on its project that matched well-known techniques through which the Taliban extracted protection money.[221] DAI was also aware of the prevailing practice – known to virtually everyone in Afghanistan – that its subcontractors' "security" expenditures included pay-offs to Taliban. *See supra* Part III.B. Indeed, the OIG's sourcing for the conclusion that protection payments were made included DAI's own personnel.[222] And most of the "DAI personnel" the OIG interviewed admitted that DAI could not "provide reasonable assurance of preventing USAID funds from going to the Taliban or others in exchange for protection" of the LGCD project.[223] Yet DAI nonetheless chose to "pay[] the full amount of the subcontract" and passed on the resulting costs – including the protection money – to USAID.[224]

171. DAI's CEO issued an internal memo in response to the OIG report, dismissing it as "largely circumstantial, speculative, and unsubstantiated." But the CEO could not dispute the OIG's specific findings – based on DAI witnesses and documents – that protection money was

---

[219] *Id.*

[220] *Id.*

[221] *See id.*

[222] *See id.* (basing findings about protection money on "[i]nterviews with personnel from USAID, U.S. intelligence, and DAI").

[223] *Id.* at 6.

[224] *Id.* at 4.

likely paid. According to a journalist who obtained the memo, the CEO "was forced to admit that there were areas in which DAI could not adequately monitor its projects, nor ensure that U.S. funds did not find their way into insurgent coffers."[225] He thus mounted a different defense of DAI's work, saying its projects were worthwhile even though "we cannot provide assurance – to an auditor's satisfaction – that not a penny of U.S. funds is reaching undesirable elements."[226]

172. Contrary to its CEO's assertion, DAI's protection payments undermined its own development efforts. In the wake of the OIG investigation, DAI belatedly acknowledged that illegal and corrupt contracting practices could not be counted as a "cost of doing business" or weighed against the benefits of its projects, but rather hindered development. As the company's website has represented since March 2012: "Accomplishing development results in challenging circumstances while complying with funding partner and host nation laws and policies requires disciplined performance. DAI professionals recognize that meeting these high standards will model effective and compliant management to their beneficiaries and establish trusting relationships ***essential to successful development***." When DAI corruptly directed development funds to terrorists in Afghanistan, it undermined its own putative objectives.

**2. DAI's Protection Payments Comport With Its Other Conduct In Afghanistan**

173. DAI's protection payments reflected a system of deficient internal controls that also manifested itself in related misconduct. For example, the OIG "found indications of pervasive fraud in DAI's LGCD office in Jalalabad and indications of endemic corruption in Nangarhar Province."[227] The fraud involved DAI employees receiving kickbacks from favored subcontractors in exchange for leaking inside information about "how much the project was

---

[225] *U.S. Funding For The Taliban*.
[226] *Id*.
[227] *2010 USAID OIG Report* at 2.

worth, how much to bid on the project, what the project entailed, and where to inflate the prices in the bids."[228] The OIG's examination "showed inflated prices" submitted by "several approved subcontractor[s]."[229] In addition, the OIG found "indications that these same employees were working in collusion to fabricate monitoring reports" that falsely depicted "progress on existing LGCD subprojects when little or no progress had actually been made."[230]

174. In June 2010, after USAID expanded its investigation of the LGCD fraud and brought in members of SIGAR and the FBI, as well as local Afghan prosecutors, DAI belatedly terminated ten of its employees who had been involved in the fraud. The firings came on the heels of another DAI internal audit that had uncovered "similar instances of pervasive fraud" in DAI's regional office in Herat.[231] The internal audit, as summarized by the OIG, revealed "double billing, inflated costs, missing receipts, and suspicious invoices."[232] As a result, DAI fired three more employees and caused several more to resign.

175. According to an April 14, 2014 USAID press release, another former DAI employee working on USAID projects in Afghanistan "allegedly embezzled funds" from an USAID program by making a $539,000 wire transfer to a fictitious bank account.[233] The DAI employee was arrested in Kabul and, as of 2014, faced three years in prison.

176. The widespread fraud occurring in DAI's regional offices reinforced DAI's protection-payment scheme. The culture of fraud spawned crooked local employees willing to pay insurgents and created corrupt payment streams in which to hide the money. On occasion,

[228] *Id.* at 6.
[229] *Id.*
[230] *Id.* at 7.
[231] *Id.*
[232] *Id.*
[233] USAID Press Release, *USAID Contractor Ex-Employee Arrested On Embezzlement Charges* (Apr. 14, 2014).

DAI belatedly reported the fraud to USAID, after an internal audit discovered it – as with the Herat fraud. On other occasions, as with the LGCD fraud, DAI did not self-report. And on at least one other occasion, a DAI internal audit discovered suspicious payments that DAI chose not to share with USAID.[234] But either way, DAI had a track record of employing people who were willing to commit fraud and steal from the government. That same culture enabled DAI employees in the same offices to facilitate payments to anti-American insurgents.

### C. The EOD Technology Defendant

177. Defendant Janus Global Operations LLC is the successor to EOD Technology, Inc. ("EODT"). EODT specialized in explosive-ordnance disposal but also provided a variety of other private-security services in Afghanistan. EODT paid protection money to the Taliban in connection with several contracts in Afghanistan from at least 2008 until 2012.

178. EODT executed multiple security contracts in Afghanistan during the relevant timeframe. Those contracts include, but are not limited to:

a. **Adraskan Training Center Contract:** On January 5, 2008, via Contract No. W91B4M-08-C-0014, the U.S. Army awarded EODT a contract to provide security in and around the Adraskan National Training Center, near Shindand. The Army paid EODT nearly $7 million under the contract.

b. **Task Force Duke Contract:** In or about June 2009, the U.S. military awarded EODT a multiple-task-order contract, worth a total of $99.9 million, to provide security services in the Task Force Duke area of operations in northeastern Afghanistan.

c. **USAESCH Mine Clearance Contract:** In or about February 1, 2010, the U.S. Army Engineering and Support Center, Huntsville ("USAESCH") awarded EODT a $60 million security contract to provide mine-clearance services throughout Afghanistan.

d. **Kabul Embassy Contract:** In or about October 2010, the U.S. State Department awarded EODT a $274 million contract to provide security services in and around the U.S. Embassy in Kabul. EODT obtained that contract after the U.S. State Department fired ArmorGroup. The U.S. State Department fired EODT from that same contract in March 2011.

---

[234] *See* USAID OIG Afghanistan & Pakistan Oversight Report at 66 (January – March 2012).

**e.** **UAE Kandahar Contract:** In or about December 2011, the United Arab Emirates ("UAE") awarded EODT a contract to provide mine-action services in Kandahar Province. The contract was worth more than $25 million.

179. On information and belief, EODT paid protection money to the Taliban in connection with each of these (and other) contracts. Each contract required work in geographic areas under Taliban control or influence, and contractors' standard practice in such circumstances was to pay protection money to discourage the Taliban from attacking their projects. *See supra* ¶¶ 65-82. EODT followed that standard practice, which was especially prevalent among contractors working in comparable factual circumstances: on (i) Western-backed and (ii) financially lucrative projects, with (iii) a track record of hiring unscrupulous subcontractors to (iv) perform work in insecure, insurgent-influenced areas. On information and belief, EODT's payments were worth at least 20 to 40 percent of its contracts' value. *See supra* ¶ 80. As a result, EODT made payments to the Taliban worth at least several million dollars.

180. In an interview with Senate staff, EODT's Deputy Country Manager all but admitted that EODT facilitated the payment of protection money. Asked about EODT's practice of sourcing guards in deference to "tribal sensitivities," the Deputy Country Manager stated, "In the scope of Afghanistan, there's a lot of tribal lines, commander lines. And those lines – you're not supposed to cross them, okay?" EODT's logic in navigating those issues was simple: it "need[ed] the cooperation of all of [the commanders] to make sure that you don't cross a tribal line or you don't cross a commander line and step on their toes, which could be detrimental for [] well-being. You know, I mean, if you're going to travel, you need to be safe."[235]

181. When EODT operated in areas controlled by Taliban commanders, its philosophy of securing the "cooperation of all of them" and avoiding "step[ping] on their toes" meant that

[235] *Senate Contractors Report* at 39.

EODT chose to pay protection money to the insurgents – either by making cash payoffs to insurgents or by placing Taliban cutouts directly on EODT's payroll. *See supra* Part II.B.

182. In early 2008, shortly after obtaining the Adraskan Training Center Contract, EODT turned to a man named "General Wahab" to source guards for its 350-person private security force. General Wahab was not part of the Afghan military, but derived his name from his tenure as a former mujahedeen commander fighting against the Soviets. General Wahab commanded 300 fighters near Shindand and answered directly to the leader of a local Taliban chapter called the "Jihadi Order Regiment of Herat." An Army contracting officer characterized General Wahab as follows: "If Afghan[s] – and they do – if they have a mafia, he's part of their mafia. . . . [H]e's like the Godfather. He would have a piece of everything. Almost every contract that was run north of Adraskan."[236] General Wahab was "influential in getting people contracts," the officer continued, "but he would also expect kickbacks."[237]

183. EODT discovered General Wahab through its Deputy Country Manager, who had previously worked for USPI, the disgraced criminal-run security firm working in Afghanistan for LBG and DAI. *See infra* ¶¶ 197-201. EODT's rationale for using General Wahab reflected the classic motivation for paying protection money. As the Deputy Country Manager explained: "Now, if [Wahab is] mad at me, or upset with me, you know, the – I'm not saying that he would have ambushed us, but the potential for something happening on the road, without his protection, certainly has increased."[238] That led EODT to pay General Wahab – both to source guards and to supply them with weapons – despite his role in a local insurgent militia. Indeed, when an EODT employee asked U.S. military representatives about General Wahab, EODT received a

[236] *Id.* at 50.
[237] *Id.*
[238] *Id.* at 42.

"spew of how Wahab was such a bad guy."[239] The EODT employee then reported to his boss that "the Army hates General Wahab."[240] EODT chose to pay him anyway.

184. Many of the guards whom EODT sourced through General Wahab came from ArmorGroup. Several were fighters who reported to Mr. Pink, the "mid-level Taliban manager" who had murdered Mr. White and had taken refuge in a Taliban stronghold. *See supra* ¶ 138. Almost immediately after ArmorGroup belatedly fired Mr. Pink's men – for having passed sensitive security information to Mr. Pink – EODT hired them.

185. When EODT decided to hire Mr. Pink's fighters, it "maintained an informal liaison with ArmorGroup's Senior Team Leader at Shindand."[241] Yet EODT told the Senate Armed Services Committee that it declined to contact ArmorGroup about Mr. Pink's fired Taliban fighters that EODT then retained.[242] EODT justified that decision by appealing to the competitive business environment, claiming, "Every company is bidding on the same contract, and they're – not everybody is inclined to help each other out."[243] At the same time, however, EODT's Country Security Manager acknowledged that, because "Shindand had been infested by Taliban," he "didn't have a good feeling about recruiting out of the south."[244] Given the surrounding circumstances, EODT knew (or recklessly disregarded) that Mr. Pink's men were Taliban members. The decision to not even ask ArmorGroup about its belated firing of Mr. Pink's fighters reflected a conscious desire to avoid documenting that fact.

---

[239] *Id.* at 49.
[240] *Id.*
[241] *Id.* at 45.
[242] *Id.*
[243] *Id.* at 46.
[244] *Id.* at 45.

186. EODT also sourced security guards from a second known Taliban cutout named Haji Dawoud. EODT paid Dawoud even though U.S. military reporting in the area identified him as a Taliban member who was collaborating with Mullah Sadeq – the Taliban regional commander and target of the famous August 21, 2008 U.S. military raid in Azizabad. A military-intelligence report "identified Dawoud as one of the village's Taliban and said he was responsible for the kidnapping of an Afghan National Directorate of Security officer and his son twenty days earlier."[245] An ArmorGroup security report (based on the type of information also available to EODT) likewise described Dawoud as the "main influence" at a "high profile [Taliban] meeting" who had been "responsible for the recent kidnappings" in the area.[246] Despite those indications of Haji Dawoud's Taliban affiliations, which EODT knew or recklessly disregarded, EODT chose to hire and pay him anyway.

187. EODT also sourced security guards from a third insurgent named Mirza Khan, whom EODT called "Commander Blue." As with General Wahab, EODT hired Commander Blue based on its Deputy Country Manager's experience with him at USPI. According to U.S. military reporting, Commander Blue was a former police officer who worked with the Iranian Revolutionary Guard Corps' Qods Force.[247] On information and belief, Commander Blue was a Qods Force asset who assisted the Iranian government in promoting anti-American terrorism in Afghanistan. The Qods Force is a designated Foreign Terrorist Organization ("FTO") that has long fomented anti-American terrorism on behalf of the Iranian regime.[248] At all relevant times, the Qods Force "provide[d] material support to terrorist or militant groups such as . . . the

[245] *Id.* at 47.

[246] *Id.* at 46.

[247] *See id.* at 48.

[248] *See* Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

Taliban" as part of its strategy to "undermin[e] U.S. and [NATO] objectives by fomenting violence" in Afghanistan.[249] Yet despite Commander Blue's relationship with the Qods Force, EODT purposefully "knew little about whom [he] was interacting with," because EODT believed that an investigation would have "blow[n] his cover."[250] EODT's willingness to pay a "Commander" whom it recklessly disregarded was a Qods Force asset was consistent with its broader strategy of attempting to purchase security from insurgent-affiliated warlords.

### D. The LBG/BV Defendants

#### 1. The LBG/BV Defendants Made Protection Payments To The Taliban

188. The LBG/BV Defendants consist of several companies that made protection payments to the Taliban in connection with various projects at least from 2006 until 2013. The two LBG Defendants – Louis Berger Group, Inc. and Louis Berger International, Inc. (described collectively as "LBG" in this section) – together held several government contracts on which they paid protection money. The Black & Veatch Defendant – Black & Veatch Special Projects Corporation – likewise held several government contracts on which it paid protection money. The LBG/BV Joint Venture was a joint venture of Louis Berger Group, Inc. and Black & Veatch Special Projects Corporation, and itself held several government contracts on which it paid protection money. As joint venturers, the LBG Defendants and Black & Veatch are jointly and severally liable for the tortious conduct of their Joint Venture.

189. Through June 2013, the LBG/BV Joint Venture was the single largest USAID implementing partner in Afghanistan, with total contract obligations valued at $1.05 billion. LBG by itself – leaving aside its interest in the joint venture – was the fourth largest USAID

[249] U.S. Department of Defense, *Annual Report on Military Power of Iran* at 3 (Apr. 2012).
[250] *Senate Contractors Report* at 48.

contractor in Afghanistan, with contract obligations valued at $699 million. Black & Veatch, for its part, was the seventh largest contractor, with contract obligations valued at $230 million.

190. The LBG/BV Defendants executed multiple government contracts in Afghanistan during the relevant timeframe. Those contracts include, but are not limited to:

**a.** **USAID REFS Program:** In September 2002, USAID awarded LBG Contract No. 306-C-00-02-00500-00 under its Rehabilitation of Economic Facilities and Services ("REFS") program. The REFS program award was a multiple-task-order contract that covered work on a variety of projects, which were governed by individual task orders. The contract originally contemplated $155 million of work through December 31, 2005, but as of 2007, its completion date was extended to June 30, 2007 and its estimated cost had ballooned to $730 million.

**b.** **USAID AIRP:** In August 2006, USAID awarded the LBG/JV Joint Venture Contract No. 306-I-00-06-00517-00 under its Afghanistan Infrastructure and Reconstruction Program ("AIRP"). The AIRP award was a multiple-task-order contract that covered work on a variety of projects, which were governed by individual task orders. Many of the AIRP task orders called for continuing work on the same projects that had been funded by the REFS program. The USAID AIRP award to the Joint Venture was worth $1.4 billion.

**c.** **Individual Task Orders:** Individual task orders issued under these two contracts included, but were not limited to:

- **Ring Road – REFS:** LBG received a task order under the REFS contract to construct portions of the Ring Road between Kabul, Kandahar, and Herat.
- **Kajaki Dam – REFS:** LBG received a task order under the REFS contract to rebuild parts of the Kajaki Dam hydropower plant in Helmand Province.
- **Schools and Clinics:** LBG received a task order under the REFS contract to build schools and clinics throughout Afghanistan.
- **Ring Road – AIRP:** The LBG/BV Joint Venture received task orders under the AIRP contract to manage construction of new roads throughout Afghanistan, including the 101-km Gardez-Khost Highway, the 103-km Keshim-Faizabad Road, and the Southern Strategy Road in Kandahar Province.
- **Kajaki Dam – AIRP:** The LBG/BV Joint Venture received a task order under the AIRP contract to refurbish a hydroelectric turbine at the Kajaki Dam.
- **Kabul Power Plant – AIRP:** The LBG/BV Joint Venture received at least two task orders under the AIRP contract to perform construction and rehabilitation work at the Kabul Power Plant.
- **Helmand Power Project – AIRP:** In December 2010, after USAID terminated LBG's work on the Kajaki Dam, it awarded a $266 million contract to Black &

Veatch to perform a variety of energy-related projects in Helmand, including continuing work on the Kajaki Dam.

191. The LBG/BV Defendants managed these contracts out of their Washington, D.C. offices and made regular communications between their Washington, D.C. offices and USAID's Washington, D.C. offices. Ultimate decision-making authority over the contracts, including over whether and how to pay protection money, rested with personnel in Washington, D.C.

192. On information and belief, the LBG/BV Defendants paid protection money to the Taliban in connection with each of these (and other) contracts. Each contract required work in geographic areas under Taliban control or influence, and contractors' standard practice in such circumstances was to pay protection money to discourage the Taliban from attacking their projects. *See supra* ¶¶ 65-82. The LBG/BV Defendants followed that standard practice, which was especially prevalent among contractors working in comparable factual circumstances: on (i) Western-backed and (ii) financially lucrative projects, with (iii) a track record of hiring unscrupulous subcontractors to (iv) perform work in insecure, insurgent-influenced areas. On information and belief, the LBG/BV Defendants' payments were worth at least 20 to 40 percent of their contracts' value. *See supra* ¶ 80. As a result, each of the LBG/BV Defendants made protection payments to the Taliban worth at least several million dollars.

193. The LBG/BV Defendants made those payments despite a clause in their USAID contracts entitled "Implementation of E.O. 13224 – Executive Order On Terrorist Financing," which stated: "The contractor is reminded that U.S. Executive Orders and U.S. law prohibits transactions with, the provision of resources and support to, individuals and organizations associated with terrorism. It is the legal responsibility of the contractor to ensure compliance with these Executive Orders and laws. This provision must be included in all

subcontracts/subawards issued under this contract." On information and belief, DAI's contracts contained the same standard clause.

194. Several of the LBG/BV Defendants' projects contained additional indicia of protection payments. Much of their work focused on Afghanistan's Ring Road, which was a two-lane highway encircling the entire country. Road-construction projects in Afghanistan have long been attractive targets for insurgent extortion, and the roads Defendants built provided the Taliban with a particularly well-known source of protection money. As Mr. Wissing summarized the evidence, "Afghan road construction became the great American boondoggle – and also an important source of financing for the Taliban."[251]

195. LBG's construction of the Kabul-Kandahar highway, which formed one key part of the Ring Road, provides a case in point. In building that highway, LBG openly worked with local militiamen, including Watan, who were well-known insurgent fundraisers. *See supra* ¶¶ 62-64. Referring to the Watan-sourced anti-Coalition fighters whom LBG agreed to pay, a LBG official described it as a "catch-22. 'If you don't pay them off, they kill your security staff and your contractors,' he sa[id]. 'If you do pay them off, it exacerbates the problem for the future.' "[252] LBG repeatedly chose to pay and "exacerbate the problem," strengthening insurgents who were killing American service members and civilians, rather than pursue alternatives that would have kept money out of the hands of the Taliban.

196. From 2003 until at least 2008, LBG relied on USPI as its lead security subcontractor in Afghanistan. Early examples of LBG-USPI subcontracts include subcontract Nos. REFS 03-02-GG451-RD-0010 (executed in June 2003) and REFS 02-04-GG451AF-017

[251] *Funding The Enemy* at 92.

[252] Daniel Schulman, *The Cowboys Of Kabul*, Mother Jones (July 27, 2009) ("*The Cowboys Of Kabul*"), https://www.motherjones.com/politics/2009/07/cowboys-of-kabul/.

(executed in September 2004). The subcontracts gave LBG express authority to veto USPI's hiring of personnel and to supervise the terms under which USPI entered into further subcontracts. They also made LBG responsible for effecting payment to USPI, and gave LBG the right to terminate USPI if LBG determined that USPI had executed its duties in an "unprofessional" manner. LBG was USPI's single most important client.

197. USPI had, in the words of one watchdog group monitoring them, a "spotty reputation in Afghanistan from the beginning."[253] As early as 2005, it was reportedly paying high "wages" to local warlords "without imposing any apparent accountability on them."[254] It also "routinely collaborate[d] with local militia commanders" and did not deny doing so when interviewed about it.[255] For that reason, reports circulated in 2006 that USPI's "deliberate use of warlords and militias" had "fuel[ed] a Taliban-led insurgency that continues to gain power."[256] LBG was aware of such criticisms of USPI's practices but resisted terminating the subcontractor, noting concerns in an internal memorandum about "cutting off the warlords that USPI was dealing with."[257] In LBG's view, "'Considering the probable flow of the money, it would be a security risk to the project . . . if they did anything that disrupted that flow of money[.]'"[258] LBG thus retained USPI not in spite of its payments to the Taliban, but because of them.

198. USPI also regularly made protection payments on LBG's behalf to secure projects implemented under the USAID's REFS program. USPI negotiated those payments with local

---

[253] Fariba Nawa, *Afghanistan, Inc.: A CorpWatch Investigative Report* at 15 (Oct. 6, 2006) ("*Afghanistan, Inc.*").

[254] International Crisis Group, *Afghanistan: Getting Disarmament Back On Track* at 1, Asia Briefing N˚35 (Feb. 23, 2005).

[255] *Afghanistan, Inc.* at 16; *see id.* at 17 ("Bill Dupre, the operations manager at the firm in Kabul, did not deny that USPI worked with commanders.").

[256] *Afghanistan, Inc.* at 29.

[257] *The Cowboys Of Kabul*.

[258] *Id.*

Taliban commanders or governors and paid the agreed-upon money (reimbursed by LBG) to discourage the Taliban from attacking LBG's projects. USPI made the payments on a monthly basis, and the standard percentages ranged from 10-20% of the value of the contracts being secured. USPI did not make these payments solely on LBG's behalf; it often made lump-sum protection payments to secure all of its clients' projects. But LBG was USPI's most important, highest-dollar client, and a substantial portion of USPI's payments consisted of LBG's money and were made on LBG's behalf. USPI delivered these payments in cash – which it obtained from LBG – and routed them to the Taliban through the Afghan *hawala* system.

199. In September 2008, the U.S. Department of Justice indicted USPI and its senior management for fraud.[259] The indictment alleged that USPI had, from 2005-2007, systematically inflated its charged expenses under its LBG-USAID subcontracts in Afghanistan. Under that scheme, USPI billed USAID (through LBG) for a significant number of fictitious costs, including inflated fuel purchases and salaries for "ghost" security guards who did not exist. On September 9, 2009, USPI's co-founders pleaded guilty and admitted that the facts alleged in the indictment were true.[260] Shortly thereafter, USAID debarred USPI (and its two co-founders) and prohibited it (and them) from participating in any additional USAID contracts.

200. As late as November 2008 – after USPI had been indicted for defrauding the government – LBG was still using USPI to provide security services in connection with LBG's government contracts. Then, after USAID finally debarred USPI in 2009 because its executives had pleaded guilty to fraud, USPI's founders started a new security company re-branded as

[259] *See* Indictment, *United States v. United States Protection & Investigations, LLC*, No. 08-cr-00306-RMC-1 (D.D.C. filed Sept. 30, 2008), Dkt. 3.

[260] *See, e.g.*, Plea Agreement, *United States v. Spier*, No. 08-cr-00306-RMC-2 (D.D.C. filed Sept. 9, 2009), Dkt. 76.

"Servcor." The re-brand was publicly reported at the time in 2009.[261] Yet Servcor continued to work on LBG's projects for USAID – this time as a second-level subcontractor – even though LBG knew that the people controlling it had been debarred and convicted of fraud. That arrangement lasted until 2012, when USAID discovered it and debarred Servcor too.

201. USPI effectuated its protection payments using the same accounting techniques it used to defraud USAID. USPI often claimed that the protection payments were for "security," and it invented fictitious guards to whom it was supposedly paying cash "salaries." Those so-called salary payments – which corresponded to no legitimate expense – created a slush fund that USPI could use for extra-legal purposes. LBG knowingly supplied the money for the slush fund and in turn obtained reimbursement from USAID for the costs involved. USPI's founders have admitted that they used some of the resulting slush fund to enrich themselves personally. But they also used the same slush fund to make *hawala* protection payments to the Taliban.

202. LBG knew (or recklessly disregarded) that USPI – like many of its other subcontractors – paid protection money on LBG's behalf. LBG's subcontractors regularly informed LBG at in-person meetings, held either in the Kabul office or the local project offices in Taliban strongholds like Kandahar, that the Taliban was demanding money as the price of allowing projects to move forward. LBG's response, in sum and substance, was "that's your problem." LBG conveyed to its subcontractors that they should pay the money if necessary, but

---

[261] *See* Daniel Schulman, *Cowboys Of Kabul Plead Guilty, But The Ride Ain't Over*, Mother Jones (Sept. 16, 2009) ("In July, control of the company was handed over to a USPI employee and longtime associate of Del's named Daniel Leitner, who promptly changed the company's name to SERVCOR. A person familiar with USPI's operations tells me that this plan of action had been in the works since USPI's offices were raided in 2007. 'The game is change the name of the company, change the owner, and keep the contracts in A-Stan,' he said. He suggested that it may have been the Spiers' intention to act as 'silent partners.' (Both Servcor and USPI list nearly identical addresses). An ex-USPI employee also told me he thought the idea might be to keep the company, at least partially, in the Spiers' family, while stripping the company of its scandal-tainted name in order to potentially win more federal contracts.").

that LBG "[didn't] want to know" the details and that any payments should be classified as legitimate security expenses. The message was clear: LBG did not want to receive separate bills from its subcontractors for protection payments, to which USAID would object; it wanted the payments lumped in with the legitimate expenditures that the subcontractor had incurred. This, in turn, allowed LBG to facilitate payments to the Taliban, thereby maximizing profits.

203. LBG and USPI both effectively admitted this practice. One LBG project manager acknowledged being "aware of the Taliban pressure on his local contractors" and of the financial conditions the Taliban placed on LBG's projects.[262] After comparing the Taliban's protection rackets to those run by the Mafia, he opined: " 'They're not all bad. . . . [I]f they're not disrupting my project, they are moderate Talibs.' "[263] As for USPI, its former security coordinator conceded that some of its guards " 'were ex-Taliban, or even current Taliban, but the fact that they weren't attacking us along the way – whatever worked for us worked.' "[264]

204. The LBG/BV Joint Venture and Black & Veatch also paid protection money to the Taliban to secure their work on the Kajaki Dam. From 2006 onward, the Taliban repeatedly threatened the Kajaki Dam with the intent of extracting protection money. For example, in October 2008, according to a purported U.S. State Department cable (as published online), the Taliban threatened one Chinese subcontractor with kidnapping, causing the subcontractor to withdraw its personnel.[265] Similar threats – which usually succeeded in eliciting payment – recurred frequently. By 2011, "[t]o anyone who lives near the dam or officials who have

---

[262] *Insurgents Play A Perilous Mountain Game*.
[263] *Id.*
[264] *The Cowboys Of Kabul*.
[265] U.S. State Dep't Cable, *Afghanistan: Update On Energy Projects* (Nov. 30, 2008).

traveled there, it is clear the Taliban is in control of Kajaki."[266] Thus, as an on-the-ground journalist observed in 2011, any security deal that Black & Veatch or its subcontractors struck to finish the dam "will almost certainly involve massive payments to the insurgents. . . . Any contractor working in the area will be forced to pay some sort of premium for protection, which will likely go to the Taliban. Otherwise, the work simply will not get done."[267]

205. Other LBG/BV Joint Venture projects were similar. For example, the Joint Venture operated extensively in the Haqqani-controlled "P2K" (Paktia, Paktika, and Khost, also known collectively as Loya Paktia) region, where protection payments were the norm. As a matter of local custom and practice, the Joint Venture and Black & Veatch paid "hefty fees" to the Haqqanis to secure their projects throughout the region.[268] Given the extraordinary sums of money that the Joint Venture spent, and LBG's role in orchestrating its projects, the Joint Venture made especially large payments to the Haqqani Network.

206. Specifically, the LBG/BV Joint Venture made documented protection payments to the Haqqani Network in connection with the Gardez-Khost Highway. That highway, running 101 kilometers from Gardez to Khost in southeastern Afghanistan, traversed the heart of Haqqani-controlled territory. USAID funded construction of the Gardez-Khost Highway under Task Order 8 to the AIRP contract; the contract called for four phases of work to begin in May 2007 and end by October 2014. USAID paid the Joint Venture $175 million to perform Phase 1, from May 2007 until March 2012. By the end of that first phase, USAID lost confidence in the Joint Venture and did not renew its contract to work on the subsequent phases.

---

[266] Jean MacKenzie, *Watershed Of Waste: Afghanistan's Kajaki Dam & USAID*, GlobalPost (Oct. 11, 2011).

[267] *Id.*

[268] *Haqqani Network Financing* at 41-42.

207. The LBG/BV Joint Venture purchased security for the Gardez-Khost Highway by routing protection payments to the Haqqani Network. Those payments included at least $1 million a year to a Haqqani cutout known as "Mr. Arafat." According to a contractor who worked on the project, Mr. Arafat's monthly retainer "was grossly inflated above the legitimate costs of security."[269] Meanwhile, Mr. Arafat's "insurgent connections," the *New York Times* reported, "appear to have been known to virtually everyone."[270] And several contractors and officials involved believed that a portion of the payments to Mr. Arafat were flowing to the Haqqanis. Yet the LBG/BV Joint Venture was willing to pay Mr. Arafat because "payoffs to insurgent groups" were "widely accepted in the field as a cost of doing business."[271] Indeed, a LBG engineer openly worried about what would happen to the lucrative project without Mr. Arafat. As he told the *New York Times*, "[Arafat is] keeping relative peace, and if he's killed we are worried that there will be infighting and there will be more problems."[272]

208. The LBG/BV Joint Venture paid Mr. Arafat through another security subcontractor, ISS-Safenet. The payments were part of a calibrated plan, orchestrated by the Joint Venture and implemented by ISS-Safenet, to reduce security risks by buying good will with the Haqqanis. ISS-Safenet's security "plan . . . emphasized the criticality of good relations with the local communities," while at the same time acknowledging that "the Haqqani Network[] was particularly well-embedded due to many family ties in villages occupying key terrain."[273] The

[269] *Afghanistan Road Project Marred By Unsavory Alliances*.

[270] *Id*.

[271] *Id*.

[272] *Id*.

[273] Ltr. from R. Rademeyer, Country Security Manager for the LBG/BV JV, to M. Le Roux, ISS-Safenet JV, *Letter of Commendation for ISS-Safenet* (June 25, 2012).

Joint Venture's reference to "good relations" with the Haqqani-controlled community was a euphemism for ISS-Safenet's payment of protection money to insurgents.

209. In early 2011, as the *New York Times* was reporting on the LBG/BV Joint Venture's payments to Mr. Arafat, USAID disqualified him as a subcontractor and rendered him ineligible to receive any future USAID funds. Around the same time, Task Force 2010 disqualified another one of the LBG/BV Joint Venture's construction subcontractors based on "derogatory information," which, according to the *New York Times*, "referred to evidence that the local construction company had ties to the Haqqani group and was paying it off."[274]

210. The LBG/BV Joint Venture and its subcontractors followed a common strategy: they thought it better to pay money to the Haqqani Network than to pay for appropriate security, enlist the U.S. military's assistance, or face a threat of attack themselves. Even in public, they effectively embraced this approach. A journalist reporting a story for the Indian magazine *Caravan* noted that, in light of common practice in the region, "it should come as no surprise that . . . Commander Arafat, who was hired to provide security for the project, ended up being a conduit for payoffs to the Haqqanis."[275] When asked about the link, the country manager for a subcontractor on the project said his company regularly hired security "from local actors they knew little about. 'We don't get involved in any politics, we just finish the work and move on,' he said. 'As long as we are safe, we don't care.' "[276]

211. Haqqani officials have corroborated the importance of protection payments like the ones that the LBG/BV Joint Venture made to secure the Gardez-Khost Highway. In an interview with the *New York Times*, a former Haqqani commander called "extortion 'the most

---

[274] *Afghanistan Road Project Marred By Unsavory Alliances*.

[275] Matthieu Aikins, *India's $2 Billion Aid Package May Be Feeding The Insurgency As Well*, Caravan Magazine (Sept. 2011), https://marinekslee.tistory.com/m/47.

[276] *Id.*

important source of funding for the Haqqanis' " and "point[ed] out that a multiyear road project linking Khost to Gardez in southeastern Afghanistan was rarely attacked by insurgent forces because a Haqqani commander was its paid protector."[277] He concluded: "The Haqqanis know that the contractors make thousands and millions of dollars, so these contractors are very good sources of income for them."[278] And because the LBG/BV Joint Venture was willing to pay, American money meant for development instead financed the Haqqani terrorist enterprise.

212. In the end, the Joint Venture's protection payments may have bought them relative peace, but they did not deliver a functional road. The final estimated cost was $176 million – nearly triple the original estimate – which worked out to roughly $2.8 million per mile. Despite the astronomical cost, the *New York Times* reported in 2011, the "stretch of the highway completed just six months ago is already falling apart."[279] That result – massive expense, healthy profits for LBG and Black & Veatch, illegal payments to insurgents, and ultimately a non-functional road – was typical of Defendants' work in Afghanistan. As Mr. Wissing concluded after surveying the greed, corruption, and incompetence that plagued the project from start to finish, the "Gardez-Khost Highway seemed to encompass the whole mess."[280]

### 2. The LBG/BV Defendants' Protection Payments Comport With Their Other Conduct In Afghanistan And Similar Markets

213. The LBG/BV Defendants' protection payments reflected a system of deficient internal controls that also manifested itself in related misconduct. For example, on November 5, 2010, LBG entered a Deferred Prosecution Agreement in which it admitted to criminally defrauding the government in connection with its work in Afghanistan. As LBG admitted, it

[277] *Brutal Haqqani Crime Clan*.

[278] *Id.*

[279] *Afghanistan Road Project Marred By Unsavory Alliances*.

[280] *Funding The Enemy* at 248.

systematically manipulated its books to inflate the "indirect costs" it sought from USAID for reimbursement. Because of that conduct, LBG was forced to resolve criminal charges brought by the U.S. Attorney's Office for the District of New Jersey; civil allegations brought by the DOJ's Fraud Section; and administrative claims asserted by USAID. In connection with that resolution, LBG's Chairman and CEO, CFO, and Controller all pleaded guilty to wire fraud.

214. In total, LBG paid $69.3 million in criminal and civil penalties to resolve those claims, which represented an "apparent record war-zone settlement."[281] In announcing the resolution, the U.S. Attorney stated: "This fraud is about more than playing with the numbers to rip off the government. Funds that could have raised hope from the rubble instead padded the bottom line. This criminal conduct sends the wrong message to the world about what we stand for as a nation."[282] So did LBG's payments to the insurgents who were killing American troops.

215. Similarly, from 1998 until 2010, LBG engaged in a scheme to pay bribes to foreign officials in various countries in the Middle East and Southeast Asia. In 2015, LBG and the U.S. Attorney's Office for the District of New Jersey entered another Deferred Prosecution Agreement in which LBG admitted to having orchestrated that criminal-bribery scheme. LBG admitted it made the payments to secure lucrative government contracts and that it orchestrated ways to "conceal the corrupt payments" through accounting euphemisms like "commitment fee," "counterpart per diem," "marketing fee," and "field operation expenses."[283] To effectuate the

---

[281] Marisa Taylor & Warren P. Strobel, *$69.3 Million Afghan-Contracting Fine May Be A Record*, McClatchy Newspapers (D.C.) (Nov. 6, 2010).

[282] U.S. Attorney's Office, District of New Jersey, *Scheme To Defraud Government On Reconstruction Contracts Leads To Criminal Charges & Civil Penalties For Louis Berger Group, Inc.* at 2-3 (Nov. 5, 2010).

[283] *LBG FCPA DPA* at Attach. A ¶ 8

payments, LBG had agents "submit[] inflated and fictitious invoices to generate cash that was then used later for the payment of bribes through intermediaries."[284]

216. LBG often structured its corrupt payments to flow through intermediaries with which it had a subcontracting relationship. For example, LBG contracted with the Indonesian government "by interposing a one-man consulting company as the prime contractor in order to avoid directly paying bribes to foreign officials even though [LBG] was well aware that the prime contractor was paying bribes."[285] LBG also often routed corrupt payments through "the accounts of sub-contractors who had provided no legitimate services."[286] LBG relied on similar transaction structures to route its protection payments to the Taliban. *See supra* ¶¶ 198-203.

217. In resolving these criminal bribery charges under the Foreign Corrupt Practices Act, LBG paid a $17.1 million criminal penalty. Two of its Senior Vice Presidents also pleaded guilty to conspiracy and bribery charges.

218. Black & Veatch also engaged in similar conduct in Afghanistan. In 2009, a Black & Veatch employee acted as the Country Security Manager for the LBG/BV Joint Venture's projects under the AIRP. From at least February to May 2009, the Country Security Manager "solicit[ed] kickbacks from private security vendors in return for favorable treatment for those potential bidders in connection with one or more subcontracts to provide private security services to protect USAID personnel and contractors in Afghanistan operating under the AIRP prime contract."[287] On November 16, 2009, based on that conduct, he pleaded guilty to conspiring to solicit kickbacks. He was sentenced to nine months' imprisonment.

---

[284] *Id.* at Attach. A ¶ 9.

[285] *Id.* at Attach. A ¶ 12.

[286] *Id.* at Attach. A ¶ 11.

[287] Statement of Facts ¶ 7, *United States v. Walker*, No. 09-cr-00478-GBL-1 (E.D. Va. filed Nov. 16, 2009), Dkt. 27.

## E. The MTN Defendants

### 1. MTN Made Protection Payments To The Taliban

219. The MTN Defendants made protection payments to the Taliban at least from 2006 through the present. MTN Afghanistan is an Afghan company that has operated cellular towers in Afghanistan continuously since 2006. MTN Group and MTN Dubai are MTN Afghanistan's parent companies that assumed contractual responsibility for MTN Afghanistan's operations and orchestrated its policy of providing material support to the Taliban. *See infra* ¶¶ 252-56, 267-68.

220. MTN has become one of the world's most valuable telephone companies by "wading into nations dealing with war, sanctions and strife."[288] Success in unstable markets like Afghanistan has yielded profits. MTN is now, due to its business model of operating in places like Afghanistan, "bigger by some measures than its U.S. counterparts."[289]

221. MTN followed that model in Afghanistan. In 2006, MTN bought Areeba, a Lebanese telephone company that had recently won a license to provide cellular-telephone service in Afghanistan. MTN entered the Afghan market shortly thereafter and began as the country's third-largest provider (consistent with its status as the third entrant), well behind the two incumbents. But MTN grew quickly, and by late 2010 it had obtained an estimated 32% market share – the largest of Afghanistan's then-four cellular-phone providers. As MTN grew, it rebranded Areeba as MTN Afghanistan, and it expanded its geographical footprint throughout the country. By 2012, MTN had a presence in virtually every province in Afghanistan, including many that were under Taliban control or influence.

[288] Alexandra Wexler, *Telecom Giant Pushes Into Dangerous Areas*, Wall St. J. (Aug. 10, 2019).

[289] *Id*.

222. While MTN was achieving rapid growth in Afghanistan, the cellular-telephone sector provided a critical source of financing for the Taliban. As reported by the *Wall Street Journal* in 2010, telephone industry executives themselves "say operators or their contractors routinely disburse protection money to Taliban commanders in dangerous districts. That's usually in addition to cash that's openly passed to local tribal elders to protect a cell-tower site – cash that often also ends up in Taliban pockets."[290] "Coalition officers," the article continued, "confirm that carriers make payments to the Taliban."[291] Those payments mirrored the protection money delivered by other Defendants. As terrorist-financing expert Thomas Ruttig documented, just as the Taliban raised "taxes" from international contractors doing business in Afghanistan, so too did it levy similar "taxes" on "the big telecom companies" like MTN.[292]

223. The logic behind MTN's protection payments matched the logic motivating the other Defendants. Specifically, the Taliban asked MTN and its competitors to "pay monthly protection fees in each province, or face having their transmission towers attacked."[293] The going rate was "usually in the range of $2,000 per tower, per month, but it depends on who controls the zone around each tower."[294] In some areas, MTN made payments to local Taliban commanders in exchange for protection from its fighters. In others – such as Helmand and Kandahar – MTN operated in a Taliban-controlled environment in which protection "payments must go directly to Quetta."[295] One local company that built transmission towers admitted that it

---

[290] Yaroslav Trofimov, *Cell Carriers Bow To Taliban Threat*, Wall St. J. (Mar. 22, 2010) ("*Cell Carriers Bow To Taliban Threat*").

[291] *Id*.

[292] Thomas Ruttig, *The Other Side* at 20, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

[293] *Crime & Insurgency* at 32.

[294] *Id*.

[295] *Id*.

"routinely sen[t] a representative to Pakistan to pay off the Taliban leadership."[296] Another confirmed to *Deutsche Presse Agentur* that it made $2,000-per-mast monthly payments to the Taliban. The company's owner said: "You have to do it. Everybody does."[297]

224. The Taliban conveyed its protection-money demands to MTN and other large cellular-phone providers via Night Letters. Dr. Barnett Rubin, an Afghanistan policy expert, obtained a copy of one such letter in 2008 from an industry source and explained why "[s]etting up a cell phone tower anywhere in Afghanistan requires the consent of whoever 'controls' the territory, or at least has the power to blow [it] up."[298] As a result, cellular-phone companies in southern Afghanistan – where MTN had a heavy presence – typically "ha[d] to pay the Taliban."[299] The *Financial Times* likewise reported in 2008 that Taliban commanders in Wardak Province had "sent letters to mobile phone companies demanding 'financial support' in return for operating" in Taliban-run areas.[300] Those tactics were successful. One industry source estimated in 2009 that "every single one of the shadow provincial governors set up by the Taliban leadership council receives $50,000 to $60,000 in protection money each month alone from the telecommunications sector, the largest legal growth market in Afghanistan."[301]

225. The Taliban itself confirmed that practice. After the *Financial Times* obtained a copy of a Taliban Night Letter demanding protection payments from cellular-phone companies in Wardak Province, the reporter called the telephone number listed as the point of contact in the

---

[296] *Id*.

[297] *How The Taliban Has Turned Extortion Into A Gold Mine*.

[298] Barnett Rubin, *Taliban & Telecoms – Secret Negotiations Just Got Easier, And At A Price You Can Afford!* (Mar. 31, 2008), icga.blogspot.com/2008/03/rubin-taliban-and-telecoms-secret.html.

[299] *Id*.

[300] Jon Boone, *Telecom Chief Says Rivals Pay Taliban Protection*, Fin. Times (June 9, 2008) ("*Rivals Pay Taliban Protection*").

[301] *How The Taliban Has Turned Extortion Into A Gold Mine*.

Taliban's letter. A "local Taliban official" answered and confirmed that "two companies had responded to their demands" by agreeing to pay. On information and belief, MTN was one of them. The Taliban official explained: "When a company sets up they have to pay tax to the government of Afghanistan. . . . We are the government here and they must pay tax to us."[302]

226. MTN was a particularly aggressive practitioner of protection payments. Rather than invest in expensive security for its transmission masts, MTN purchased security by buying it from the Taliban. Indeed, MTN declined to use armed guards to protect its towers. Without paying for physical security, MTN both had the free cash flow and the incentive to buy peace with the Taliban. The CEO of one of MTN's largest competitors, Roshan, alleged as much in 2008. According to an interview the CEO gave to the *Financial Times*, other "phone companies in Afghanistan [were] bowing to criminal and Taliban demands to pay protection money to avoid the destruction of their transmission masts."[303] In the interview, Roshan's CEO continued: "I believe the competition is paying money, but we don't do that."[304] Of Roshan's four largest competitors, three of them denied the accusation on the record. Only "MTN, the South African based multinational phone company, was not available for comment."[305]

227. MTN's public statements reflect its practice of paying protection money. Because MTN paid the Taliban, it was, in its own words, " 'not a target.' "[306] According to an MTN executive, "it's enough for a driver to show at a Taliban checkpoint a company letter stating that equipment aboard the truck belongs to MTN and not to the U.S. forces."[307]

---

[302] *Rivals Pay Taliban Protection*.
[303] *Id.*
[304] *Id.*
[305] *Id.*
[306] *Cell Carriers Bow To Taliban Threat*.
[307] *Id.*

228. A review of available cell-tower attack data supports the same conclusion. Plaintiffs have analyzed all of the available purported U.S. military Significant Activities reports, as published online, that describe attacks between 2004 and 2010 against or in the immediate vicinity of a cellular tower in Afghanistan. The data shows a clear disparity between MTN and its two main competitors, Roshan and Afghan Wireless Communication Company ("AWCC"). From 2004 to 2009, AWCC and Roshan suffered at least 6 and 7 attacks on its towers, respectively, whereas MTN – which did not even pay guards to protect its towers – faced only 1 (non-lethal) attack. The disparity is consistent with Roshan's accusation that MTN paid protection money to the Taliban to head off attacks on its business infrastructure.

229. That attack disparity existed despite MTN's and Roshan's deployment of transmission masts at similar times in similar locations. For example, Roshan's CEO cited to the *Financial Times* an instance on May 14, 2008, in which the Taliban attacked one of Roshan's towers in Wardak Province, yet two similar nearby towers (including one belonging to MTN) were not attacked.[308] The most likely explanation for the difference is that MTN had paid protection money, whereas Roshan had not. Indeed, in 2009, Roshan maintained company rules that prohibited it from paying protection money to terrorists. Because Roshan refused to pay, the Taliban destroyed 18 of Roshan's towers in and around the 2009 Afghan elections.

230. MTN's 2006 entry into Afghanistan set the stage for the Taliban's cellular-tower rackets by adding another participant to Afghan cellular marketplace. Once MTN joined the market in 2006, it became the third cellular company operating in Afghanistan, which made the Taliban's protection racket more attractive. With MTN agreeing to pay, the Taliban was free to carry out its threats against other companies without the risk that doing so would cut off all

[308] *Rivals Pay Taliban Protection*.

cellular service in Afghanistan – service on which the Taliban itself relied. Indeed, Taliban fighters commonly preferred to use MTN's network for their own communications.

231. The timing of the Taliban's extortion activities supports that conclusion. Given MTN's emergence, Taliban extortion of (and violence against) cellular companies would be expected to significantly increase at the same time. It did. As the *Wall Street Journal* reported, the "Taliban first turned their attention to the mobile industry around 2006."[309]

232. Recent government statements have confirmed those payments. Afghanistan's Ministry of Telecommunications and Information Technology acknowledged, as recently as 2016, that "telecommunication companies used to pay protection money to the insurgent group so as to prevent them from destroying property and attacking staff."[310] The Ministry's spokesman identified an "unwritten agreement between telecommunication companies and militants . . . to pay them money," and that "some of the companies have paid a type of protection fee to the Taliban."[311] In 2016, the Taliban upped its demands for a new, additional protection tax from all cell-service providers. On information and belief, MTN agreed to pay.

233. MTN's overall payments to the Taliban reached tens, if not hundreds, of millions of dollars. Applying the standard rate of $2,000 per tower per month to MTN's collection of roughly 1,300 towers yields an estimated payment of $2.6 million per month. At that rate, MTN's payments from 2007 through 2016 well surpassed $100 million.

---

[309] *Cell Carriers Bow To Taliban Threat.*

[310] TOLO News, *Taliban 'Tax' Phone Companies* (Jan. 19, 2016), prod.tolonews.com/node/12610.

[311] *Id.*

### 2. MTN Supported The Taliban By Deactivating Its Cellular Towers At Night

234. MTN also provided material support to the Taliban by deactivating its cell towers at the Taliban's request. In or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night. The Taliban justified that demand by arguing that Coalition forces were "using the cellular networks to track its insurgents throughout the war-torn country."[312] Coalition forces, a Taliban spokesman stated, were "misusing the cell towers for their intelligence works."[313] Because the Taliban believed that shutting down nighttime service would impede Coalition intelligence efforts, it demanded that the cellular-phone companies deactivate their transmission masts from 5 p.m. until 3 a.m. Later, the Taliban insisted that the companies keep their masts deactivated until 6:30 a.m.

235. MTN granted the Taliban's requests. In early 2008, MTN issued a statement that it was "aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas. We are evaluating the situation and liaising with our executives and the relevant authorities in Afghanistan."[314] The "executives" apparently decided to accommodate the Taliban's "need" and shut down MTN's transmission masts at night. MTN and others, the *Wall Street Journal* reported in 2010, "strictly abide[d] by Taliban hours in several provinces, going off air precisely at 5 p.m. and going back on at 6:30 a.m."[315] And when the Taliban ordered cellular-phone companies in Helmand to "switch off the signal," MTN's head of legal and government affairs told the media: "We

[312] Paul Vecchiatto, *MTN Concerned By Afghanistan Threats*, ITWeb Cape Town (Feb. 28, 2008) ("*MTN Concerned By Afghanistan Threats*"), https://www.itweb.co.za/content/dgp45MaYRYZMX9l8.

[313] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

[314] *MTN Concerned By Afghanistan Threats*.

[315] *Cell Carriers Bow To Taliban Threat*.

decided to obey the orders and we have been shut down since yesterday."[316] Since 2008, MTN's policy has remained consistent: it has followed the Taliban's directives and switched off its transmission masts for the Taliban's benefit – typically at night.

236. MTN shut down its towers for the same reason it paid protection money: to maintain good relations with the Taliban. MTN made no effort to hide its motivation in that regard. When asked about shutting down its network, its head of legal and government affairs explained that it could not "afford to be seen as siding with the Afghan government against the Taliban . . . 'You should not give a justification to the others that you are favoring the government – and you have to prove in words and in deeds that you are neutral."[317]

237. MTN went to great lengths to maintain its "neutrality" and do what the Taliban asked of it. Even in 2011, after President Karzai issued a decree formally demanding that MTN (and its competitors) reactivate their towers at night, MTN refused the recognized government's directive and continued to follow the Taliban's orders. One executive summed up MTN's refusal to follow President Karzai's directive: "We're not going to turn on our masts and become part of the army of the Afghan government."[318] By shutting down its towers on request, MTN decided, it could reduce the risk that MTN's equipment would face Taliban attack.

238. MTN's conduct strengthened the Taliban and undermined U.S. counterinsurgency efforts. By 2010, the Taliban was "using the cellphone system as an instrument of war against the Afghan government and the U.S.-led coalition."[319] The insurgents, one Army officer told the

[316] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011).

[317] *Cell Carriers Bow To Taliban Threat*.

[318] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

[319] *Cell Carriers Bow To Taliban Threat*.

*New York Times*, used MTN's cell towers "as a weapons system" against Coalition forces.[320] Indeed, cell phones were crucial to the Taliban – they provided a convenient form of communication and helped insurgents coordinate attacks – but they also came with two major downsides. First, U.S. intelligence tracked the Taliban's phone signals and used them to locate high-level targets for capture-or-kill missions. Second, cell phones provided Afghan civilians with the ability to call Coalition tip lines and provide valuable human intelligence.

239. Nighttime deactivation was the Taliban's solution to both problems. U.S. Special Forces typically execute high-value raids at night, and deactivated cell signals impeded those missions by making the insurgent targets harder to track. That was the Taliban's stated rationale for demanding nighttime signal deactivation: its spokesman argued that Taliban fighters had "been increasingly targeted by foreigners recently and we know they are using the services of these phone companies against us.' "[321] Consistent with that statement, *AFP* reported that "Taliban militants regularly demand that mobile phone companies switch off their networks at night, fearing that NATO-led forces can track them through phone signals."[322]

240. Similarly, nighttime deactivation obstructed Coalition efforts to gather human intelligence. Cell phones provided a key conduit for Afghan civilians to pass intelligence to Coalition personnel. But as the U.S. military director of the Telecommunication Advisory Team explained, "[i]f the masts are off Afghans can't report anything . . . If you see an insurgent you can't call the police to say check this out."[323] And Afghan informants were "usually reluctant to

[320] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

[321] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011).

[322] *Id.*

[323] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

call in tips during daytime, when they can be spotted by Taliban sympathizers."[324] Human intelligence thus typically flowed to the Coalition at night. By agreeing to shut down its transmission masts, MTN knowingly deprived Coalition forces of that vital intelligence.

241. In 2010, *CBS News* reported on this so-called "détente" between the Taliban and large mobile-phone companies like MTN. "The phone companies shut down their cell towers at night, preventing local residents from discreetly calling coalition military tip lines. In exchange, Taliban militants don't target the costly cell towers with explosives."[325] The trade was a major strategic victory for the Taliban. As Roshan's COO explained in trying to justify a similar decision: "We play by their rules; we don't like to play around when people's lives are at stake. . . . From a political perspective, it's quite a coup for them."[326]

242. The U.S. government tried to address those problems by encouraging Afghanistan's cellular-phone providers to move their transmission masts onto secure U.S. bases. As the U.S. government explained in proposing the idea, securely located transmission masts would be difficult for the Taliban to attack – and could thus eliminate the putative reason MTN was deactivating its cell towers when the Taliban told it to. Roshan, according to a purported 2009 U.S. State Department cable (as published online), was "keen to develop this partnership with the USG and sees it as a way to promote mutual security, communications, and commercial strategies for Afghanistan."[327] MTN, by contrast, refused to participate and declined even to join Roshan and AWCC at the U.S. government-brokered meeting to discuss the idea.

---

[324] *Cell Carriers Bow To Taliban Threat*.

[325] Alex Sundby, *Afghan Cell Carriers Follow Taliban Rules*, CBS News (Mar. 24, 2010).

[326] *Id.*

[327] U.S. State Dep't Cable ¶ 11, *Using Connection Technologies To Promote US Strategic Interests In Afghanistan* (July 23, 2009).

### 3. MTN's Protection Payments Comport With Its Conduct In Other Markets

243. MTN's conduct above reflected a willingness to support America's enemies as a way to increase profits in Afghanistan. The same calculation pervaded MTN's other conduct in the region. While MTN was devising a plan to enter the Afghanistan market, the same MTN Group management team was working to obtain business from Iran. In 2004, Iran had awarded a cellular-phone license to MTN's competitor, Turkcell. But MTN then engaged in a corrupt scheme to take the license away from Turkcell and enter the Iranian market itself. MTN's efforts were successful and led it to acquire a 49% stake in Irancell – a joint venture with an Iranian government-controlled consortium. MTN internally called its corrupt scheme to enter the Iranian market "Project Snooker."[328]

244. Project Snooker required close cooperation between MTN and the Iranian government. In a July 5, 2005 letter to the former Iranian Deputy Minister of Defense, MTN Group's CEO invited Iranian officials to an in-person meeting – building on a prior meeting MTN Group had attended in Tehran – to discuss the "nature and extent of financial assistance that the MTN Group could provide to [its] Iranian partners."[329] The negotiations were successful. On September 18, 2005, MTN Group signed a Letter Agreement giving it the right to acquire 49% of Irancell. Even though MTN is a telecommunications company and is not in the weapons or security business, Section 8 of the Letter Agreement also pledged broader cooperation between the MTN Group and its Iranian partners: "The cooperation between MTN

[328] *See* Memorandum from Phuthuma Nhleko to Sifiso Dabengwa *et al.*, *Overview & Way Forward – Project Snooker* (Sept. 21, 2005) ("*Project Snooker Mem.*").

[329] Ltr. from P. Nhleko to Mr. Foruzandeh & Dr. Mahmoudzadeh, *Invitation To Visit The MTN Group In South Africa* (July 5, 2005).

and Iranian shareholders should be in the line of defensive, security and political cooperation. MTN shall fully support cooperation regarding the aforementioned issues in South Africa."[330]

245. MTN thereafter became the Iranian government's chief outside telecommunications partner. In that capacity, MTN helped Iran grow its cellular-phone sector and evade American sanctions, particularly by helping Iran acquire embargoed U.S.-made communications technology. According to "documents and numerous interviews conducted by Reuters," MTN specifically focused on "acquiring embargoed products" for Iran's benefit.[331]

246. All of the above took place while Iran was a designated State Sponsor of Terrorism.[332] In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[333] Iran's support for terrorism extended to the Taliban. As the U.S. Treasury Department explained:

> Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban. . . . Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.[334]

By supplying cellular technology to the Iranian government and assisting Iran in acquiring embargoed products, MTN knowingly frustrated U.S. sanctions policy designed to combat Iran's

---

[330] MTN-Irancell Consortium Letter Agreement § 8 (Sept. 18, 2005).

[331] Steve Stecklow, *Exclusive: Iranian Cell-Phone Carrier Obtained Banned U.S. Tech*, Reuters (June 4, 2012).

[332] *See* Statement of Sec'y of State George P. Shultz designating Iran, 49 Fed. Reg. 2836–02 (Jan. 23, 1984); U.S. State Dep't, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm.

[333] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

[334] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

sponsorship of terrorism abroad – including the very type of Afghan Taliban terrorist attacks that MTN was already supporting through protection money and cell-tower deactivation.

247. Project Snooker was successful not only because MTN pledged strategic cooperation with the Iranian government, but also because MTN made at least two corrupt payments to government officials. Indeed, MTN's internal strategy memo recognized that "Snooker is 'no normal country.' "[335] Because the Iranian government "control[s] all commercial activity" in the country, MTN believed, "a conventional mindset, orthodox financial and operational approach to this project is unlikely" to succeed.[336] One of the memo's action items thus called for "[a]ppropriate security arrangements for funding of local partners."[337]

248. MTN's funding of its so-called "local partners" included at least two corrupt payments to government officials, one of which it structured as a consultancy payment. On December 11, 2006, MTN Group's CEO instructed MTN Group's CFO to "finalise all agreements with the consultants" that had "assisted the Company" in obtaining the Iran deal.[338] The first agreement called for MTN Group to make a $400,000 payment for the benefit of an Iranian government operative. The payment was effectuated through an MTN Group subsidiary, MTN International (Mauritius) Limited, and sent to a consulting firm owned by the Iranian operative's associate. On April 4, 2007, MTN wired the $400,000 to the putative "consultant." MTN has never proffered a legitimate explanation for that payment.

---

[335] *Project Snooker Mem.* at 1.

[336] *Id*. at 1-2.

[337] *Id*. at 3.

[338] Memorandum from Phuthuma Nhleko to Irene Charnley, *Consultancy Agreements* (Dec. 11, 2006).

249. MTN's second corrupt payment was to South Africa's ambassador to Iran. MTN's Iran Director has admitted to paying the Ambassador $200,000 in cash out of his own funds, which he tied to cooperation in helping MTN to secure its equity interest in Irancell.

250. In June 2018, South Africa's anti-corruption police – called the "Hawks" – raided the offices of MTN and its outside counsel as part of an investigation into Irancell-connected bribery.[339] Roughly eight months later, the Hawks also arrested the former Ambassador whom MTN had bribed. On information and belief, the investigation remains ongoing.

251. Similarly, on or about October 26, 2015, the Nigerian Communication Commission fined MTN Group $5.2 billion for failing to meet a deadline to disconnect 5.1 million unregistered subscribers in Nigeria. Nigeria imposed the deadline on all cellular operators in the country due to evidence that unregistered phones were facilitating the activities of criminal gangs and terrorists, including Boko Haram. The requirements that MTN violated, the *Wall Street Journal* reported, were "meant to combat terrorism."[340] MTN eventually negotiated the criminal fine down to $1.67 billion and agreed to pay it in seven installments.

**4. MTN's Conduct Had A Substantial Nexus To The United States**

252. MTN's support for the Taliban relied on significant contacts with the United States. MTN Group was a key player in orchestrating both those U.S. contacts and MTN's material support to the Taliban. At a high level, MTN employs a top-down management structure in which MTN Group centralizes operational control over the functions performed by its various subsidiaries. During the relevant timeframe, MTN Group divided responsibility for

[339] *See* Kyle Cowan, *Hawks Raid MTN, Top Law Firm In Decade-Long Turkcell Battle*, Fin24 (June 5, 2018), https://www.fin24.com/Companies/ICT/hawks-raid-mtn-top-law-firm-in-decade-long-turkcell-battle-20180605.

[340] Alexandra Wexler, *Nigeria Reduces MTN Group Fine By $1.8 Billion*, Wall St. J. (Dec. 3, 2015).

its subsidiaries into six business groups; MTN Afghanistan (and Irancell) fell under the purview of the Middle East and North Africa ("MENA") group. The MENA group's functional units resided in Dubai and reported to senior management in South Africa.

253. MTN Group made the decision to enter the Afghanistan market in 2006, when it completed the Areeba acquisition. As part of the merger – negotiated and executed by MTN Group's senior management – MTN took control of Areeba Afghanistan LLC. MTN Group later rebranded Areeba Afghanistan LLC and changed its name to MTN Afghanistan.

254. Because MTN's business model depends on doing business in unstable countries like Afghanistan, one of MTN Group's core management responsibilities is to manage operational and political risk in the countries MTN enters. Those assessments occur both before the decision to enter a market – here, as MTN entered Afghanistan in 2006 – and on an ongoing basis. As MTN Group explained in its 2007 Annual Report, "active mitigation of [country] risk is a priority. . . In Afghanistan, continued political instability has made operating conditions challenging. MTN and other mobile operators have suffered minor losses as a result of political violence."[341] In mitigating those risks – which here included designing a strategy for dealing with the Taliban – MTN Group implemented a number of measures, including the "appointment of a Group crisis manager"; the implementation of "physical and staff security measures"; and"[c]ontinual monitoring of the political environment in operating countries."[342]

255. Those policies required MTN Group's close supervision of MTN Afghanistan's payments to the Taliban and deactivation of its towers. According to a statement released by MTN Group in 2008, the "MTN Group" was "monitoring threats to its Afghanistan operation

[341] MTN Group Limited, *Integrated Business Report For The Year Ended 31 December 2007*, Risk Management, www.mtn-investor.com/mtn_ar07/corp_risk.html.

[342] *Id.*

closely."[343] When the Taliban first demanded that MTN shut down its towers at night, the MTN Group responded:

> The MTN Group is aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas. We are evaluating the situation and liaising with our executives and relevant authorities in Afghanistan. The MTN Group does not expect this to have a material impact on its operations in Afghanistan. No further details can be made available at this stage.[344]

As explained above, MTN Group made the decision – and instructed its subsidiary – to comply with the Taliban's demands. *See supra* Part IV.E.2. When MTN Afghanistan paid protection money to the Taliban or shut down its transmission masts, it was acting pursuant to a policy that had been knowingly approved and encouraged by MTN Group management.

256. MTN's decision to shut down its transmission masts at the Taliban's request targeted the United States by directly interfering with U.S. intelligence activities. The same was true of its decision to pay protection money to the Taliban. Both decisions reflected MTN's stated desire to maintain its so-called "neutrality" and protect its relationship with the Taliban. *See supra* ¶ 236. When doing so, MTN knew it was helping the Taliban conduct terrorist attacks designed specifically to influence U.S. policy by killing and injuring American personnel.

257. MTN Group also obtained the financing used to build MTN's transmission masts in Afghanistan and to pay off the Taliban, and it did so by relying on U.S. contacts. MTN Group supplied such financing through several capital investments in MTN Afghanistan. In doing so, MTN Group tied MTN's unlawful conduct to the United States in two ways: by (1) obtaining U.S.-supplied debt financing that it used to fund MTN Afghanistan's cash payments to the Taliban; and (2) obtaining political-risk insurance from a U.S.-based entity – which was material

---

[343] *MTN Concerned By Afghanistan Threats*.

[344] *Id.*

to MTN's Afghan operations – expressly conditioned on a promise to refrain from engaging in terrorist finance. Both U.S. contacts were closely related to MTN's support for the Taliban.

258. **IFC Financing.** In June 2009, MTN Group obtained $75 million in financing from the International Finance Corporation ("IFC") – a Washington, D.C.-based arm of the World Bank – to fund MTN Afghanistan's operations. That financing deal followed an earlier, smaller investment that IFC had made in 2006 to support MTN Afghanistan's predecessor, Areeba. IFC's $75 million facility consisted of $65 million of debt and $10 million in equity – the latter of which bought IFC a 9.1% stake in MTN Afghanistan. IFC held the equity until July 2013, when it exercised a put option and sold its shares to MTN Dubai.

259. On information and belief, IFC disbursed its financing to MTN Afghanistan out of bank accounts held in New York, and its contracts with MTN likewise required MTN to repay the loans to IFC by making regular payments into a designated New York-based account. The IFC disbursed the money directly to MTN Afghanistan, and MTN Afghanistan used that same financing both to fund its protection payments and to build the cellular towers that it then deactivated at the Taliban's request. As a result, MTN Afghanistan directly used American-sourced money to finance MTN's support for the Taliban.

260. On information and belief, MTN's contracts with IFC contained prohibitions on providing material support to terrorists and required MTN to make regular reports to IFC about any terrorism-related security incidents. MTN's conduct violated those covenants. Had MTN disclosed to IFC that it was making payments to the Taliban, the IFC would have, on information and belief, canceled its funding and jeopardized MTN's ability to access capital from any other source. MTN thus was able to support the Taliban only by breaching the IFC agreements and failing to make the required contractual disclosures to its U.S.-based financer.

261. **MIGA Guarantees.** MTN Group also obtained coverage guarantees from the Multilateral Investment Guarantee Agency ("MIGA") – another Washington, D.C.-based arm of the World Bank – to facilitate MTN Afghanistan's operations. MIGA guarantees operate as a form of political-risk insurance and protect the guarantee holder against common risks that might otherwise deter a multinational company from investing in unstable regions. Under MIGA coverage guarantees, the "guarantee holder" obtains the insurance, executes a contract with MIGA, and assumes responsibility for ensuring that the contractual terms are met. The "project enterprise," in turn, forms the underlying business – which must be supervised and controlled by the guarantee holder – that MIGA's coverage is intended to finance. In this case, MTN Group and MTN Dubai were the guarantee holders; MTN Afghanistan was the project enterprise.

262. On July 3, 2007, MTN Group obtained its first MIGA facility, which provided a $76.5 million guarantee covering its investment in MTN Afghanistan. MTN Group itself was the guarantee holder, and MIGA announced that, through its coverage, "MTN Group of South Africa[] will install, operate, and maintain a 100 percent digital GSM technology network via its Afghan subsidiary, Areeba Afghanistan LLC [later rebranded to MTN Afghanistan]."[345] In 2011, MTN Group replaced that facility with an $80.4 million MIGA guarantee to cover MTN Afghanistan's expansion of operations. MTN Group remained the guarantee holder, and MTN Group "financed" MTN Afghanistan's expansion "through a shareholder loan and an equity investment" via its intermediate subsidiary, MTN Dubai.[346]

[345] MIGA Press Release, *MIGA Supports Critical Telecommunications Investment In Afghanistan* (July 3, 2007), https://www.miga.org/press-release/miga-supports-critical-telecommunications-investment-afghanistan.

[346] MIGA Project Brief, *MTN Afghanistan* (July 7, 2011), https://www.miga.org/project/mtn-afghanistan.

263. Also in or about June 2011, MTN Group obtained a second MIGA guarantee to cover MTN Afghanistan's operations. This guarantee was for $82.1 million and provided coverage against the risks of transfer restriction, expropriation, and war and civil disturbance. For purposes of this second guarantee, MTN Dubai Limited served as the guarantee holder.[347]

264. IFC and MIGA both oversaw their financing deals from their Washington, D.C. offices. On information and belief, MTN's financing required MTN to send regular communications to, and negotiate with World Bank employees located in, Washington, D.C.

265. On information and belief, MTN's contracts with MIGA stated that they were "deemed made in Washington, DC, United States of America,"[348] and set MIGA's "Notice Address" at 1818 H Street N.W., Washington, D.C. 20433.[349] Those contracts further required MTN regularly to deliver written notice about its work to MIGA's Washington, D.C. office. MTN also agreed that any disputes with MIGA would be resolved through arbitration proceedings to be "held in Washington, DC, United States."[350]

266. MTN's contacts with the United States arising from its World Bank financing bore a close relationship to its support of the Taliban. The financing was pivotal to MTN's decision to enter the Afghan market and to expand its footprint throughout the country. And given MTN's approach to security – including its decision to not pay armed guards to protect its towers – MTN's protection payments to the Taliban were a natural consequence of its expansion into Afghanistan. Indeed, the threat of insurgent attack was one of the principal country risks

---

[347] *See* MIGA Project Brief, *MTN Afghanistan* (June 2011), https://www.miga.org/project/mtn-afghanistan-0.

[348] MIGA, Template Contract of Guarantee for Non-Shareholder Loans at 5 (Nov. 2016), https://www.miga.org/sites/default/files/archive/Documents/Contract%20of%20Guarantee%20for%20Non-Shareholder%20Loans.pdf.

[349] *Id.* at 4.

[350] *Id*. pt. II, art. 14.2.

that MTN faced and had to overcome in Afghanistan, and its strategy for alleviating that risk – paying money to the Taliban and deactivating its transmission masts at night – was part and parcel of its U.S.-connected decision to grow its operations in the country.

267. MTN Group and MTN Dubai also undertook several U.S.-based obligations in connection with their Afghanistan operations. Both entities contracted directly with MIGA and assumed affirmative contractual obligations with respect to MTN Afghanistan's conduct. For example, MTN Group and MTN Dubai assumed disclosure obligations requiring them to report to MIGA in Washington, D.C. any security incident (like a Taliban threat) that could materially affect MIGA's investment. MTN Group and MTN Dubai also took on a duty to report MTN Afghanistan's plan for handling security and addressing the risk of insurgent attack. MTN was able to provide material support to the Taliban only because it breached those obligations and failed to inform its American financers of its illegal payments. On information and belief, had MTN disclosed to MIGA that it was paying protection money to the Taliban, MIGA would not have continued to back MTN's operations. The same was true of MTN's failure to report the Taliban's demands that it shut down its cellular towers.

268. MTN Group and MTN Dubai also assumed affirmative U.S.-connected contractual obligations to supervise MTN Afghanistan and ensure that MTN: (a) refrained from making corrupt payments; and (b) complied with Afghanistan law. MTN breached both obligations. MTN's protection payments qualified as a "corrupt practice" under MIGA's standard definition, and its support for the Taliban violated Afghanistan's legal prohibitions on both terrorist financing and money laundering. Under the terms of MTN's contracts with MIGA, the guarantee holder – not the project enterprise – took on responsibility for preventing such conduct. Thus, as a condition of their American financing deals, MTN Group and MTN Dubai

took responsibility for MTN Afghanistan's conduct and agreed to prevent MTN Afghanistan from providing material support to terrorists. The breach of those obligations by MTN Group and MTN Dubai was a key factor in enabling MTN's support for the Taliban.

269. Those U.S. contacts were important. The existence of U.S.-backed financing sent a critical signal to investors and bolstered the public credibility of MTN's investment in Afghanistan. As MIGA has explained, its financing "play[s] an important role in conflict-affected and fragile economies" by mitigating the "perceived risks" that commonly deprive projects of access to capital.[351] Especially in the telecommunications sector, "the presence of MIGA guarantees [often] makes the difference between a go and a no-go decision for investors concerned about country risk."[352] That was nowhere more evident than in Afghanistan, where MIGA's and IFC's involvement supplied needed credibility that allowed MTN to build transmission masts in the face of political uncertainty and terrorism. As a result of IFC's and MIGA's support, MTN Afghanistan's "[p]rofitability margins [were] higher than expected despite very real and grave risks, including security threats from insurgent forces."[353] Without IFC and MIGA financing tied to the United States, MTN would not have been able to build out its network in Afghanistan and correspondingly provide material support to the Taliban.

270. MTN Group's Regional Vice President for Middle East and North Africa confirmed the importance of such U.S. financing. After MTN obtained the $75 million facility from IFC, its Regional VP stated that "MTN Group places high importance on its operation in Afghanistan . . . IFC is providing long-term funding, which is a great vote of confidence for this frontier market. It will enable us to serve the people of Afghanistan by enhancing network

---

[351] MIGA Brief, *MIGA: Mobilizing Investments, Rebuilding Confidence* (Jan. 2015).

[352] MIGA Telecommunications Brief, *MIGA: Connecting Telecommunications Investments* (Apr. 2013).

[353] MIGA Brief, *MIGA: Mobilizing Investments, Rebuilding Confidence* (Jan. 2015).

coverage and expanding high-quality services to a greater number of customers."[354] The World Bank offered a similar analysis. In 2015, it explained that, "With MIGA guarantee coverage and IFC's investment and advisory support, MTN has been able to exceed expectations and reach over five million subscribers, close to a one-third market share."[355]

271. MTN's reliance on U.S.-based financing was no coincidence. Given the extreme risks facing businesses considering investing in 2007-era Afghanistan, U.S.-backed investment provided vital institutional credibility to MTN Afghanistan and offered needed reassurance to MTN Group's shareholders. The signal sent by U.S.-backed investment – in light of the United States' position at the head of the global economic order – provided benefits to MTN Group that financing sourced elsewhere could not have replicated. That is one reason IFC and MIGA are based in Washington, D.C.: the U.S. location enhanced their ability to "make an investment more attractive to potential investors and lenders by lowering its overall risk profile."[356]

272. From 2007 to 2011, only IFC and MIGA were willing and able to provide the type of financing that MTN needed. The 2008 financial crisis precipitated a global economic downturn and significantly constrained the type of financing available to cover investments like the one MTN made in Afghanistan. On information and belief, given the global liquidity crunch, MTN's 2009 IFC loan facility and equity investment offered the only substantial financing available to MTN at the time. IFC's use of New York banks to provide funding was likewise no coincidence: New York's role as the hub of the global credit system – particularly with respect

---

[354] Press Release, IFC, *IFC Invests $75 Million To Expand Mobile Communications Access In Afghanistan* (June 22, 2009), https://ifcextapps.ifc.org/ifcext/pressroom/ifcpressroom.nsf/1f70cd9a07d692d685256ee1001cdd37/9b9783b665eff8ad852575dd0055abc1.

[355] World Bank Grp., *Afghanistan Country Snapshot* at 53 (Oct. 2015), http://documents.worldbank.org/curated/en/307891467998464206/pdf/100112-WP-PUBLIC-Box393225B-Afghanistan-Country-Snapshot.pdf.

[356] MIGA Brief, *MIGA: Mobilizing Investments, Rebuilding Confidence* at 1 (Jan. 2015), https://www.miga.org/sites/default/files/archive/Documents/conflict.pdf.

to investments in risky countries like Afghanistan – made New York financing an important part of supplying liquidity to MTN's Afghanistan operations. Simply put, other financing at the scale MTN needed was unavailable, which led MTN to assume contacts with the United States. And as alleged above, MTN used those U.S. contacts to finance operations that it structured to funnel material support to the very insurgents the United States was fighting.

## V. THE TALIBAN, WITH SUBSTANTIAL SUPPORT FROM AL-QAEDA, USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS IN AFGHANISTAN

### A. The Taliban Was Part Of A Terrorist Syndicate That Waged A Deadly Insurgency Against Americans In Afghanistan

273. After the United States-led overthrow of the Taliban-controlled government in 2001, terrorists repeatedly attacked American service members and civilians there. As alleged above, Defendants financed those attacks. *See supra* Parts II-IV. In this section, Plaintiffs identify the terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them. Each worked in concert and shared resources, personnel, and operational plans. Given such coordination, a former CIA official and senior White House antiterrorism advisor called the resulting terrorist superstructure a "syndicate," composed of al-Qaeda, the Taliban, and several other allied FTOs.[357] In fact, bin Laden himself conceived of al-Qaeda as the leader of a broader coalition of terrorists across Pakistan and Afghanistan.[358]

274. Due to the mutually reinforcing ties between the Taliban and al-Qaeda in Afghanistan, support for the one benefited the other. Defendants' protection payments to the Taliban thus had crosscutting effects: they enabled wide-ranging terrorist attacks against

---

[357] Bruce Riedel, *Deadly Embrace: Pakistan, America, And The Future Of The Global Jihad* at 1 (Brookings Inst. Press 2d ed. 2011) ("Riedel, *Deadly Embrace*").

[358] *See* Bill Roggio and Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Weekly Standard (Jul. 4, 2011) ("*The al Qaeda – Taliban Connection*"), archived at https://www.washingtonexaminer.com/weekly-standard/the-al-qaeda-taliban-connection.

Americans in Afghanistan, executed mostly by the Taliban but supported by (and sometimes jointly committed with) al-Qaeda and the other components of the overarching syndicate.

275. Each of the terrorist entities below used indiscriminate violence against American service members and civilians to achieve political ends. Their primary goal was to intimidate and coerce the U.S. government (and the governments in other Coalition countries) to withdraw Coalition personnel from Afghanistan, and to affect the conduct of those governments by mass destruction, assassination, and kidnapping. The insurgency also used violence to intimidate and coerce the civilian population of Afghanistan to abide by a severe form of Islamic Sharia law.

276. At all relevant times, Defendants knew that the entities below were terrorist organizations targeting both American service members and American and Afghan civilians. They knew this not only because it was common knowledge in Afghanistan – a prevailing understanding of which Defendants or their agents were aware – but also because it was reported by both the U.S. government and the Western press. *See supra* Parts I, III.B, III.C.

277. None of the terrorist entities identified below adhered to the Geneva Conventions or the laws of war. Among other violations, they refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons. None was associated with a recognized government. And none was waging a civil war, nor did any have a legitimate claim to sovereignty over Afghan territory.

**1. The Taliban**

278. The Taliban is a Sunni Islamic terrorist organization composed originally of former mujahideen fighters who had expelled the Soviet Union from Afghanistan. In July 2002,

President George W. Bush amended Executive Order 13224 to designate the Taliban and its leader Mohammed Omar as Specially Designated Global Terrorists.[359]

279. The U.S. military quickly toppled the Taliban-led government after launching Operation Enduring Freedom. *See supra* Part I. In May 2003, the United States declared an end to major combat operations in Afghanistan. Afghanistan ratified a new Constitution in December 2003, and the Taliban was not invited to participate in the new government.

280. The Taliban's principal goal has long been to expel Coalition forces from the country and undermine the democratically elected government of Afghanistan. To that end, the Taliban began ramping up attacks on U.S. forces during the mid-2000s. The Taliban also began to use new attack types during this timeframe, including suicide bombings. For example, the Taliban committed six suicide bombings in Afghanistan in 2004, and 141 in 2006. Remotely detonated bombings also more than doubled between 2005 and 2006.

281. In 2008 and 2009, the growing Taliban-led insurgency attacked U.S. forces throughout Afghanistan, with a particular emphasis on the southern provinces, especially Helmand and Kandahar. By 2010, the Taliban's power and influence was growing, and it had regained much of the territory it had lost after 9/11. In 2009, responding to the Taliban's growing threat, U.S. Marines launched counterinsurgency operations focused on "restoring government services, bolstering local police forces, and protecting civilians from Taliban incursion."[360] The Taliban, in turn, responded with escalating violence.

282. The Taliban often attacked American military forces, contractors, and Afghan forces. But it also targeted civilian aid workers and non-governmental organizations. In recent

[359] *See* Exec. Order No. 13268, 67 Fed. Reg. 44751 (July 2, 2002).

[360] *Timeline: The U.S War in Afghanistan: 1999 – 2019*, Council on Foreign Rel., https://www.cfr.org/timeline/us-war-afghanistan.

years, the Taliban has increased attacks on civilians by placing explosives in public locations and using suicide bombers. It has also used civilians to attract Coalition forces before detonating a bomb, frequently killing more civilians than Coalition forces. In doing so, the Taliban routinely violated the laws of war and did not comply with the Geneva Conventions. It neither wore uniforms nor distinguished its fighters from civilians. It conscripted children into committing attacks. The Taliban also regularly targeted teachers, children, doctors, and clerics. And it engaged in widespread kidnapping and torture in an effort to intimidate its enemies.

283. In addition, the Taliban summarily executed Afghan civilians without a trial if they were suspected of aiding the Coalition. According to a Taliban *fatwa* (an authoritative religious decree), "[d]uring the attack by America, if any Muslim – regardless of whether they are Afghan or non-Afghan – cooperates with the infidels, or if he helps and spies for them, then that person will be just like the foreign invaders and killing him becomes mandatory."[361]

284. The Taliban carried out the terrorist attacks that killed or injured the Plaintiffs in this case. To effectuate those attacks, it employed a number of different terrorist tactics. Most prominently, the Taliban relied heavily on IEDs, including Explosively Formed Penetrators ("EFPs"), designed to destroy American armored vehicles and inflict heavy casualties. Many Plaintiffs, or their family members, were killed or injured by a Taliban-planted IED or EFP.

285. The Taliban also has attacked U.S. forces and U.S. government contractors using suicide bombers with increased frequency. Many Plaintiffs, or their family members, were killed or injured in Taliban suicide-bomber attacks. For example, Army SGT Andrew R. Looney, whose family members are Plaintiffs, was killed on June 21, 2010, when a Taliban suicide bomber detonated his bomb at a checkpoint SGT Looney was manning. *See infra* ¶¶ 874-879.

[361] *Resolution & Fatwa Of A Big Gathering Of Clerics*, Anis (Sept. 23, 2001).

286. The Taliban (often through the Haqqani Network, *see infra* Part V.A.2), also employed insider attacks carried out by members of the Afghan Army. According to an August 2012 statement by Mullah Omar, Taliban terrorists "cleverly infiltrated in the ranks of the enemy according to the plan given to them last year."[362] And he expressly encouraged Afghan officers to "defect and join the Taliban."[363] These attacks took place in all areas of Afghanistan, and the Taliban regularly claimed responsibility for them.[364] Many Plaintiffs in this case, or their family members, were killed or injured in Taliban-insider attacks. For example, Army SGT Dillon C. Baldridge and Army SGT William M. Bays, whose family members are Plaintiffs, were killed in an insider attack for which the Taliban claimed responsibility. *See infra* ¶¶ 388-396, 408-415.

### 2. The Haqqani Network

287. The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s. It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani. The Haqqani Network is part of the Taliban.

288. On September 19, 2012, the U.S. State Department designated the Haqqani Network as an FTO.[365]

289. The United States also designated other Haqqani leaders as Specially Designated Global Terrorists. On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani for "acts of terrorism that threaten the security of U.S. nationals or the national security,

---

[362] Bill Roggio, *Mullah Omar Addresses Green-on-Blue Attacks*, Long War J. (Aug. 16, 2012).

[363] *Id.*

[364] *See* Bill Roggio, *2 More ISAF Troops Wounded In Latest Green-On-Blue Attack*, Long War J. (Aug. 13, 2012).

[365] U.S. State Dep't, *Country Reports on Terrorism 2017* at 294 (Sept. 2018).

foreign policy, or economy of the United States."[366] In 2010 and 2011, the U.S. Treasury Department designated three other members of the Haqqani family – Nasiruddin Haqqani, Khalil Al-Rahman Haqqani, and Badruddin Haqqani – as fundraisers and commanders of the Haqqani Network. By February 2014, the U.S. State Department and the U.S. Treasury Department had designated fourteen leaders in the Haqqani Network under Executive Order 13224.

290. The Haqqani Network began supplying weapons to the Taliban in the mid-1990s, when the Taliban was in its infancy. It has operated as part of the Taliban since approximately 1995, when its founder Jalaluddin Haqqani swore allegiance to the Taliban. Jalaluddin Haqqani was the Minister of Tribal Affairs in the Taliban government until the U.S. invasion.

291. The Haqqani Network is especially active in the southeastern parts of Afghanistan, particularly the Provinces of Paktia, Paktika, and Khost, collectively called "P2K" or "Loya Paktia." It also developed a significant presence in the surrounding Provinces of Kabul, Logar, Wardak, Ghazni, and Zabul. Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in those areas. Sirajuddin Haqqani explained in 2010 that the Haqqani Network is "assigned by the Islamic Emirate in the southeastern front of Afghanistan (Paktia, Khost, Paktika) and we have mujahideen members who are carrying out jihad in the north (provinces in northern Afghanistan) and in the south (provinces in southern Afghanistan), and they are operating under the Amirs of the provinces they are under."[367]

---

[366] Notice, U.S. State Dep't, *In the Matter of the Designation of Sirajuddin Haqqani, aka Siraj Haqqani, aka Siraj Haqani, aka Sarj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended* at 12499 (March 7, 2008), https://www.federalregister.gov/documents/2008/03/07/E8-4527/in-the-matter-of-the-designation-of-sirajuddin-haqqani-aka-sirajuddin-haqani-aka-siraj-haqqani-aka.

[367] Bill Roggio, *Taliban Cooperation With al Qaeda 'Is At The Highest Limits' – Siraj Haqqani*, Long War J. (Apr. 15, 2010) ("*Taliban Cooperation*")

292. The Taliban's terrorist commanders and shadow governors in the Loya Paktia area are often members of the Haqqani Network. As the U.S. State Department explained when it announced the designation of Mullah Sangeen Zadran as a Specially Designated Global Terrorist, Sangeen Zadran served as the "Shadow Governor for Paktika province, Afghanistan and a commander of the Haqqani Network, a Taliban-affiliated group."[368] Similarly, Abdul Aziz Abbasian is a "key commander in the Haqqani Network" who simultaneously functions as the broader Taliban organization's shadow governor for the Orgun District in Paktika Province.[369]

293. The Haqqani's influence is not limited to the southeastern provinces. There is also significant overlap between the broader leadership of the Taliban and the Haqqani Network. Sirajuddin Haqqani (Jalaluddin's son and successor) has been a member of the Taliban's governing council since at least 2010. Since 2015, he has been the Deputy Emir of the Taliban, which is the second in command in the Taliban's leadership.

294. In particular, the Haqqani Network has overseen the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan. After 9/11, Jalaluddin Haqqani effectively served as the Taliban's secretary of terrorism and planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government. In October 2001, a purported Jihadist publication (as published online) described Jalaluddin as the "chief of the Taliban army."[370] Indeed, in an interview with Sirajuddin published by Gulf News UAE, the interviewer identified Jalaluddin as "the commander-in-chief of the Taliban's southern military command" – akin to the Taliban combat chief – "[and] Mullah Omar's top military strategist and

[368] Press Release, U.S. State Dep't, Office of the Spokesperson, *Designation Of Haqqani Network Commander Sangeen Zadran* (Aug. 16, 2011), https://2009-2017.state.gov/r/pa/prs/ps/2011/08/170582.htm.

[369] Bill Roggio, US Adds 5 Al Qaeda, Taliban, Haqqani Network, And IMU Facilitators To Terrorist List (Sept. 29, 2011).

[370] Karachi Jasarat, *Chief of Taliban Army Contacts Jamaat-i-Islami Chief* (Oct. 11, 2001).

commander."[371] As for his son, Sirajuddin is now Deputy Emir of the Taliban and oversees its terrorist operations throughout the country.

295. Similarly, according to Brigadier General Charles H. Cleveland, the chief spokesman for U.S. and NATO forces in Afghanistan, as of 2016 Sirajuddin Haqqani "increasingly runs the day-to-day military operations for the Taliban, and, we believe, is likely involved in appointing shadow governors."[372]

296. In 2016, *the New York Times* reported that, according to a senior Taliban commander in southern Afghanistan, Sirajuddin Haqqani was in "constant contact" with Taliban field commanders throughout Afghanistan, including outside the Haqqani Network's area of particular influence in the southeast.[373] According to the commander, all field commanders had to contact Sirajuddin Haqqani for permission before launching a terrorist offensive.

297. The Haqqani Network also influenced Taliban strategic decisions about which types of attacks to employ. The Haqqani Network was the first to use suicide bombings in Afghanistan, an innovation that al-Qaeda taught it. The Haqqani Network also was involved in the rising number of Taliban-insider attacks – which strategically undermined relations between U.S. and Afghan forces. By 2007, Army Lieutenant Colonel Dave Anders, the director of operations for Combined Joint Task Force-82, explained that "Siraj[uddin Haqqani] is the one dictating the new parameters of brutality associated with Taliban senior leadership" employing

---

[371] Aslam Khan, *Taliban Leader Warns Of Long Guerilla War*, Gulf News UAE (Oct. 20, 2001).

[372] Mujib Mashal, *Haqqanis Steering Deadlier Taliban In Afghanistan, Officials Say*, N.Y. Times (May 7, 2016).

[373] *Id*.

"[k]idnappings, assassinations, beheading women, indiscriminate killings and suicide bombers."[374]

298. The Haqqani Network's influence within the broader Taliban organization is not limited to planning and authorizing attacks. Even outside of the Haqqani's traditional stronghold, its members often commit attacks alongside other Taliban terrorists. For example, in early 2009 the Haqqani Network was operating in the southern Provinces of Helmand and Kandahar. A spokesman for the Taliban reportedly confirmed that the Haqqani Network was operating in "Kandahar as well as nearby Helmand province to provide training, support – particularly in bomb-making – and to carry out attacks."[375]

299. In 2013, "[a] combined force in … Kandahar [] arrested a Haqqani network facilitator who managed supply routes from [Kandahar City] to other provinces" and was "also [] believed to have been instrumental in the acquisition and distribution of lethal aid to Haqqani fighters for attacks against Afghan and coalition forces."[376] And a successful 2017 Taliban attack in Kandahar against the United Arab Emirates ambassador to Afghanistan was attributed to the Haqqani Network.

300. Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban.[377] The Taliban, for its part, has rejected claims that the Haqqani Network is a separate entity from the Taliban.[378]

---

[374] Bill Roggio, *Targeting Taliban Commander Siraj Haqqani*, Long War J. (Oct. 20, 2007).

[375] Murray Brewster, Canadian Press, *Fanatical Taliban Wing Moves Into Kandahar*, The Star (Feb. 8, 2009).

[376] U.S. Dep't of Defense News, *Afghan, Coalition Forces Kill Insurgents in Logar Province* (Feb. 20, 2013), https://archive.defense.gov/news/newsarticle.aspx?id=119329.

[377] *See* Bill Roggio, *US Military Searches For Kabul Attack Network Members*, Long War J. (Apr. 27, 2016).

[378] *See* Bill Roggio, *Taliban Call Haqqani Network A 'Conjured Entity'*, Long War J. (Sept. 9, 2012).

301. The Haqqani Network also has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory. After 9/11, the Haqqanis provided sanctuary to bin Laden after he fled Afghanistan; Jalaluddin Haqqani himself announced that the Taliban would "retreat to the mountains and begin a long guerrilla war to reclaim our pure land from infidels" and stated that "Osama bin Laden . . . [is] safe and sound and carrying out [his] duties."[379]

302. The Haqqani Network's close relationship with other terrorist groups has helped to develop the modern terrorist syndicate operating in Afghanistan. In furtherance of that goal, the Haqqani Network provides protection to al-Qaeda so that it can launch attacks in Afghanistan and plan acts of international terrorism abroad. Senior Haqqani Network officials also have publicly indicated that the Haqqani Network and al-Qaeda are one.[380] And in July 2008, Jalaluddin Haqqani's son – 18 year old Muhamman Omar Haqqani – was killed alongside a top al-Qaeda commander in southeast Afghanistan. The Haqqani Network also maintains training camps and safe houses that have been used by al-Qaeda and Taliban operatives.

303. More recently, Sirajuddin Haqqani has welcomed al-Qaeda members to join and fight with the Haqqani Network and the rest of the Taliban.[381] According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council.[382] U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.[383] And when the U.S. Treasury

---

[379] Aslam Khan, *Taliban Leader Warns Of Long Guerilla War*, Gulf News UAE (Oct. 21, 2001), https://gulfnews.com/uae/taliban-leader-warns-of-long-guerrilla-war-1.427860.

[380] *See* Bill Roggio, *An Interview With Mullah Sangeen*, Long War J. (Sept. 17, 2009), https://www.longwarjournal.org/archives/2009/09/an_interview_with_mullah_sange.php.

[381] *Taliban Cooperation*.

[382] *Id*.

[383] Hindustan Times, *Al Qaeda Very Active In Afghanistan, Preparing For Attacks* (Apr. 14, 2016) ("The Taliban's current deputy commander, Siraj Haqqani, is head of the Haqqani Network and al Qaeda's top facilitator in Afghanistan, according to US officials.")

Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a Specially Designated Global Terrorist, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations."[384] The U.S. Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.[385]

304. The Haqqani Network is often considered the most radical part of the Taliban. Like the Taliban, it relies on terrorist attacks – including suicide bombings, IED and EFP attacks, insider attacks, and complex attacks – rather than open combat.[386] The Haqqani Network routinely violates the laws of war and does not comply with the Geneva Conventions.

305. Many Plaintiffs, or their family members, were killed or injured in attacks by the Haqqani Network. For example, the Haqqani Network conducted terrorist attacks in the Loya Paktia area of Afghanistan, including the May 6, 2012 IED attack that severely injured Plaintiff Army CPL Jonathan Cleary. *See infra* ¶¶ 544-45.

306. The Haqqani Network also participated in the attack on Forward Operating Base Chapman that killed seven Americans on December 30, 2009, including Harold Brown, Jr., Dane Clark Paresi, and Jeremy Jason Wise, whose family members are Plaintiffs in this case. *See infra* ¶¶ 460-68, 1011-1020, 1239-1246.

**3. The Kabul Attack Network**

307. The Kabul Attack Network is the operational manifestation of the terrorist syndicate led by al-Qaeda and the Taliban, including the Haqqani Network. Specifically, the

---

[384] Press Release, U.S. Treasury Dep't, *Treasury Targets the Financial And Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011), https://www.treasury.gov/press-center/press-releases/Pages/tg1055.aspx.

[385] *See, e.g.*, Press Release, U.S. Treasury Dep't, *Treasury Department Targets Key Haqqani Network Leaders* (Feb. 5, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2284.aspx.

[386] Bill Roggio, *Haqqani Network Promotes Suicide, IED Attacks, And Ambushes In 'Caravan of Heroes'*, Long War J. (Apr. 10, 2015).

Kabul Attack Network is a set of terrorist cells focused on attacks against targets in Kabul and extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Ghazni, and Zabul.[387] It is active around key waypoints and transit routes on the way to Kabul, including Wardak, Ghazni City, and areas of Logar Province. The Kabul Attack Network was responsible for suicide bombings and other attacks on Americans in Kabul and the surrounding areas.[388]

308. The Kabul Attack Network's members include the Taliban (including the Haqqani Network), as well as al-Qaeda, Lashkar-e-Taiba, and other terrorist organizations active in the Kabul area. Attacks committed by the Kabul Attack Network definitionally involved al-Qaeda personnel – and often personnel from other designated FTOs as well.

309. The Kabul Attack Network is led by Mullah Dawood, the Taliban's shadow governor for Kabul who is also a Taliban and Haqqani Network commander, and Taj Mir Jawad, a top commander in the Haqqani Network with a long history of high-profile attacks.

310. According to an ISAF public affairs officer, the "Haqqani Network is deeply entrenched in the Kabul Attack Network, specifically with the facilitation of weapons and fighters into the area south of Kabul in Logar and Wardak."[389] Senior Haqqani leaders often planned and executed terrorist attacks by the Kabul Attack Network, sometimes even giving tactical advice during attacks.

311. Many Plaintiffs, or their family members, were killed or injured in attacks by the Kabul Attack Network. For example, on October 29, 2011, the Kabul Attack Network executed a suicide-bombing attack that destroyed a large armored bus transporting U.S. forces around

[387] Bill Roggio, *Karzai Assassination Plotters Part of Kabul Attack Network*, Long War J. (Oct. 5, 2011).

[388] Bill Roggio, *Afghan Intel Captures Taliban Commander Involved In Targeting 'Foreigners' In Kabul*, Long War J. (Mar. 31, 2015).

[389] Bill Roggio, *Senior Taliban Commander Killed in Eastern Afghanistan*, Long War J. (Aug. 20, 2010).

Kabul and killed LTC David E. Cabrera and SSG Christopher R. Newman, whose family members are Plaintiffs in this case, and 16 others. *See infra* ¶¶ 482-493, 981-86. Almost four years later, on August 22, 2015, the Kabul Attack Network murdered U.S. government contractors (and Army veterans) Richard P. McEvoy and Corey J. Dodge, whose family members are also Plaintiffs in this case, in a suicide-bombing attack against a NATO convoy in Kabul. *See infra* ¶¶ 630-36, 928-35.

**B. Al-Qaeda Committed, Planned, And Authorized The Terrorist Attacks That Killed And Injured Plaintiffs**

312. Osama bin Laden formed al-Qaeda in the 1980s in response to the Soviet occupation of Afghanistan. For decades, al-Qaeda has been a Sunni Islamic terrorist organization intent on destroying the United States. Al-Qaeda jointly committed, planned, or authorized each of the Taliban attacks that killed or injured Plaintiffs or their family members.

313. Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group capable of launching attacks around the world. After moving to Sudan in the early 1990s, al-Qaeda's leadership returned to Afghanistan in approximately 1996, where it was sheltered by the Taliban for the next five years. Osama bin Laden declared war on the United States in a published *fatwa* (an authoritative religious decree) in 1996.[390] One scholar who surveyed first-hand accounts of the initial meeting between bin Laden and the Taliban during this period reported that it "emphasize[d] the Taliban's humble attitude toward the Saudi guest and their immediate readiness to serve him."[391]

[390] Anne Stenersen, *Al-Qaida in Afghanistan* at 62-63 (Cambridge Univ. Press, 2017) ("Stenersen, *Al-Qaida in Afghanistan*"); *Osama bin Laden*, Counter Extremism Project, https://www.counterextremism.com/extremists/osama-bin-laden; *The 9/11 Commission Report* at 47-48, National Commission on Terrorist Attacks Upon the United States, https://govinfo.library.unt.edu/911/report/911Report.pdf ("*The 9/11 Commission Report*").

[391] Stenersen, *Al-Qaida in Afghanistan* at 58.

314. In return for the Taliban's safe harbor, al-Qaeda provided substantial resources to the Taliban. By March 1997, bin Laden had met with Mullah Mohammed Omar personally and offered to lend his fighters to the Taliban in its fight against the northern factions that were still resisting Taliban rule. As bin Laden's deputy, Abu Hafs al-Masri, wrote at the time, the Taliban "movement is a capable Islamic entity and it is possible that it can be a turning point for the betterment of the Islamic world. The movement needs a vision and it needs support. It needs someone who will give it a military strategy. And it needs to build a military force which is suitable for the situation in Afghanistan."[392] To that end, during this time period, al-Qaeda shared technical knowledge with the Taliban and paid the Taliban between $10 million to $20 million a year for shelter. In doing so, Al-Qaeda supplied the strategy and support the Taliban needed to morph into a deadly terrorist group capable of inflicting mass casualties on Americans.

315. At the same time that Osama bin Laden was cementing his ties with the Taliban, he was escalating his attacks on the United States. In 1998, while under the Taliban's protection, bin Laden declared a global jihad against the United States, calling on all Muslims to kill Americans at any opportunity. On August 7, 1998, al-Qaeda suicide bombers in explosive-laden trucks attacked U.S. embassies in Kenya and Tanzania, killing more than 200 people. The United States responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan and demanded that Mullah Omar turn over Osama bin Laden. He refused.

316. On October 8, 1999, the U.S. State Department designated al-Qaeda as an FTO, and a week later the United Nations called for sanctions against the Taliban unless it expelled bin Laden from Afghanistan. Again, the Taliban refused.

---

[392] Stenersen, *Al-Qaida in Afghanistan* at 67-68.

317. In the spring of 2001, Osama bin Laden, on behalf of al-Qaeda, pledged an oath of allegiance to Mullah Omar and the Taliban. A few months later, on September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands. A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93. The United States demanded once again that the Taliban turn over bin Laden, and once again the Taliban refused. The Coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.

318. Al-Qaeda's and the Taliban's close relationship continued long after 9/11. In May 2007, Taliban official Mullah Dadullah said, "[W]e and al-Qaeda are as one."[393] In early 2009, a military-intelligence official was quoted as saying, "The line between the Taliban and al Qaeda is increasingly blurred, especially from a command and control perspective."[394] By the end of that year, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly. "We are deeply concerned about the growing level of collusion between the Taliban and al Qaeda," he told *The Wall Street Journal*.[395] And as Lieutenant General Ronald L. Burgess, Jr. testified to the Senate Select Committee on Intelligence, "al Qaeda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."[396]

319. The Taliban and al-Qaeda have remained intimately intertwined in the years since. For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who

---

[393] Thomas Ruttig, *The Other Side* at 23, Afghanistan Analysts Network (July 2009).

[394] Bill Roggio, *Al Qaeda Builds A 'Shadow Army'*, Wash. Times (Feb. 13, 2009).

[395] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).

[396] Transcript, Hr'g Of The Senate Select Committee On Intelligence, *Current And Projected Threats To The United States*, Fed. News Serv. (Feb. 2, 2010), 2010 WLNR 27828348.

publicly announced his acceptance of the pledge the following day.[397] When Mansour was killed in May 2016, Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada.

320. In 2015, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province – both reportedly "hosted by the Taliban."[398] One camp was the largest al-Qaeda facility discovered since the 9/11 attacks: nearly 30 square miles.

321. In December 2018, a U.N. Security Council committee noted that that "the Taliban leadership have repeatedly, in public statements, emphasized the importance of the alliance between Al-Qaida and the Taliban. . . . Al-Qaida members act as instructors and religious teachers for Taliban personnel and their family members."[399]

322. The resulting overlap between the organizations meant that al-Qaeda routinely played an important role in Taliban and Haqqani terrorist attacks. As terrorism scholars Bill Roggio and Thomas Joscelyn observed, "[i]t is not clear where, say, al Qaeda ends and the Taliban and other terrorist groups begin. This is by design. Bin Laden envisioned al Qaeda as the vanguard of a broader jihadist coalition. Al Qaeda was always a joint venture."[400]

323. Since at least the mid-2000s, al-Qaeda supported the Taliban's attacks on U.S. forces in Afghanistan in several ways.

324. **Authorization.** Al-Qaeda provided critical religious authorization for Taliban attacks on U.S. forces. As noted above, in 1998 Osama bin Laden himself directed all Muslims

[397] Thomas Joscelyn and Bill Roggio, *New Taliban Emir Accepts al Qaeda's Oath Of Allegiance*, Long War J. (Aug. 14, 2015).

[398] Thomas Joscelyn and Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

[399] U.N. Security Council, *Twenty-third report of the Analytical Support and Sanctions Monitoring Team submitted pursuant to resolution 2368 (2017) concerning ISIL (Da'esh), Al-Qaida and associated individuals and entities, S/2019/50*, ¶ 65 (submitted to applicable Security Council Committee Dec. 27, 2018).

[400] *The al Qaeda – Taliban Connection*.

to kill Americans at every opportunity. In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq. The Taliban had previously viewed suicide attacks as taboo, but al-Qaeda convinced it that such attacks were religiously permissible. Al-Qaeda trumpeted that success online, announcing, "While suicide attacks were not accepted in the Afghan culture in the past, they have now become a regular phenomenon!"[401] With al-Qaeda's encouragement, the number of suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005, and more than 100 in 2006. Al-Qaeda also paid the families of suicide bombers in Afghanistan.

325. Al-Qaeda's role in that suicide-bombing trend was pivotal. As Islamic history scholar Bryan Glyn Williams explained, "Al Qaeda operatives carried out two to three [suicide] bombings per year on the Afghan government and NATO troops from 2002 to 2004 that were meant to demonstrate the effectiveness of this alien tactic to the local Taliban. These demonstrative acts and videos of successful [al-Qaeda] suicide bombings in Iraq seem to have convinced the Taliban to condone the previously taboo tactic of suicide bombing."[402]

326. Al-Qaeda also authorized the Taliban's terrorist attacks through its participation in the Afghan-Pakistani terrorist "syndicate" described above. *See supra* ¶ 273. That multi-group syndicate involved periodic mafia-style meetings in which al-Qaeda, the Taliban, and other members of the al-Qaeda-Taliban syndicate (such as Lashkar-e-Taiba) would confer about geographies and targets to attack.[403] The syndicate jointly authorized particular types of terrorist attacks in particular geographies to be carried out by the syndicate's individual members.

---

[401] Brian Glyn Williams, *Suicide Bombings in Afghanistan*, *Jane's Islamic Affairs Analyst* at 5 (Sept. 2007), https://www.brianglynwilliams.com/IAA%20suicide.pdf.

[402] Bryan Glyn Williams, *Afghanistan Declassified: A Guide to America's Longest War* at 202 (Univ. Penn. Press 2012).

[403] *See The al Qaeda – Taliban Connection*.

327. The close operational coordination not only manifested itself in the Kabul Attack Network, but also provided a broader terrorist superstructure that organized the insurgency throughout Afghanistan. In observing that this superstructure formed an Afghan-Pakistani "syndicate" of sorts, a former CIA analyst and White House observer documented several notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the intricate connections between al Qaeda and its allies in Pakistan and Afghanistan."[404] Those connections – intimate as they were – enhanced the lethality of the overall anti-American insurgency.

328. Consistent with all these activities, al-Qaeda operatives often assumed a position of moral, religious, and tactical authority over Taliban members. Al-Qaeda members, for example, often "act[ed] as instructors and religious teachers for Taliban personnel and their family members."[405]

329. Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates the authorization activities of the al-Qaeda-Taliban syndicate. For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was "a high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG")] and Taliban forces within Afghanistan," which the leaders of the respective terrorist groups "envisioned [as a] new coalition of HIG, Al Qaeda, and Taliban during a meeting in Pakistan in early spring 2003."[406] Another purported Gitmo detainee file as quoted by Messrs. Roggio and Joscelyn concerning Haroon al Afghani, a dual-hatted al-Qaeda/HIG terrorist, stated as follows:

---

[404] Riedel, *Deadly Embrace* at 100.

[405] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds,* Long War J. (June 23, 2019).

[406] *The al Qaeda – Taliban Connection*.

> [Afghani] is assessed to have attended a joint operations meeting among extremist elements in mid-2006. A letter describing an 11 August 2006 meeting between commanders of the Taliban, al Qaeda, [Lashkar e Taiba], . . . and the Islamic Party (probably a reference to the HIG), disclosed that the groups decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations.[407]

Taken together, these reports "demonstrate a high degree of collusion between al Qaeda and other terrorist groups" as part of a "jihadist hydra" that shared the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."[408]

330. **Planning.** Al-Qaeda also planned the Taliban's and the Haqqani Network's terrorist attacks against Americans in Afghanistan. Al-Qaeda training provided one key mechanism through which that planning occurred. Before the 9/11 attacks, al-Qaeda operated training camps in eastern Afghanistan at the Taliban's request. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans. For example, al-Qaeda members trained Taliban commanders in sophisticated bomb-making techniques.

331. By the mid-2000's, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network al-Qaeda training camps in North Waziristan. According to a declassified 2008 Defense Intelligence Agency intelligence report:

> [Sirajuddin] Haqqani is also affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda (AQ) in North Waziristan. … A list and brief description of each facility follows.
> A. Mohammad Taher ((Yuldashov)), leader of the Islamic Movement of Uzbekistan (IMU), and his 60 bodyguards are staying at an AQ training center in Miram Shah Dand.
> B. There is an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah. Approximately 45 U/I Arabs and Uzbeks receive training there.
> C. An AQ training facility called "Shaki Masood" is located in Miram Shah and over 200 AQ members (NFI) reside there; Usama bin Laden has been seen in this center (NFI).

---

[407] *The al Qaeda – Taliban Connection.*

[408] *The al Qaeda – Taliban Connection.*

D. Another AQ training facility is located at Spin-Qamar in Masood District of Northern Waziristan. Over 80 Arabs receive training there (NFI).[409]

332. Al-Qaeda also planned Taliban attacks by encouraging the Taliban to attack Coalition personnel and providing the Taliban with the financing needed to carry out those attacks. For example, in July 2010, the U.S. Treasury Department designated Nasiruddin Haqqani, the brother of Sirajuddin, a Specially Designated Global Terrorist pursuant to Executive Order 13224.[410] The designation noted that Nasiruddin had received terrorist funding via payments from al-Qaeda.[411] More broadly, al-Qaeda has long provided substantial and valuable financial assistance to the Taliban, with the aim of increasing the frequency of its terrorist attacks against Americans in Afghanistan. Al-Qaeda not only provided direct aid, but also helped the Taliban raise additional funds from Arabs around the world – all of which was important to the Taliban's anti-American campaign of terrorism in Afghanistan.

333. All of these activities were part of al-Qaeda's planning of the Taliban's terrorist attacks in Afghanistan. By providing an array of advice, direction, and material support to the Taliban, al-Qaeda was able to use the Taliban movement for its own jihadist ends. In so doing, al-Qaeda followed its more general practice of planning terrorist attacks whose details it would delegate to local Islamic proxies. As terrorism scholar Thomas Ruttig observed: "Both in

---

[409] Defense Intelligence Agency, *Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))*, Intelligence Information Report (Apr. 16, 2008) (emphasis omitted), https://www.dia.mil/FOIA/FOIA-Electronic-Reading-Room/FOIA-Reading-Room-Other-Available-Records/FileId/155424/.

[410] Press Release, U.S. Treasury Dep't, *Treasury Targets Taliban and Haqqani Network Leadership* (July 22, 2010).

[411] *Id*.

Afghanistan and Pakistan, al-Qaeda exploits local conditions by co-opting militant groups with local battle experience."[412] Here, its "cooptation" of the Taliban was especially effective.

334. Al-Qaeda also invited Taliban commanders to Iraq, where it learned how to make armor-penetrating "shaped" charges,[413] a type of IED later known as an EFP. Taliban trainees also learned from al-Qaeda how to use remote controls and timers, and urban warfare tactics.

335. Al-Qaeda's planning efforts were significant and amplified the lethality of the Taliban insurgency. Indeed, al-Qaeda's ability to export its terrorism expertise to local groups like the Taliban is what "renders al-Qaeda effective in the first place."[414] In the case of the Taliban, al-Qaeda executed the "transfer of technical knowhow, devices, and training for IED use, truck and suicide bombings as well as the channel[]ing of what some observer[s] call 'strategic-level funding.' "[415] Those activities were material to the Taliban's ability to execute the type of attacks that killed and injured Plaintiffs. As Mr. Ruttig concluded, al-Qaeda's activities "raise[d] the level of sophistication of Taleban and associated networks' operations."[416]

336. In particular, al-Qaeda not only authorized suicide bombings as a religious matter, as discussed above; it also trained Taliban operatives in how to carry out the tactic. Some of this training occurred in al-Qaeda-affiliated camps in Pakistan.

337. As one writer put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do

[412] Ruttig, *The Other Side* at 22.

[413] Sami Yousafzai and Ron Moreau, *Unholy Allies: The Taliban Haven't Quit, And Some Are Getting Help And Inspiration From Iraq*, Newsweek (Sept. 26, 2005) ("*Unholy Allies*").

[414] Ruttig, *The Other Side* at 22.

[415] *Id*.

[416] *Id*.

– as trainers and force multipliers."[417] Al-Qaeda's sophistication and support was important to the Taliban's terrorist enterprise. And al-Qaeda's involvement went beyond technical support; it also worked actively with Taliban leadership to set strategy and orchestrate attacks. For that reason, "Al Qaeda leader Ayman al-Zawahiri, Hamza bin Laden and the Taliban leadership 'have repeatedly emphasized the importance of the alliance between' the two groups."[418]

338. One al-Qaeda operative, whom U.S. officials characterized as "an important al-Qaida planner and explosives expert," Ghazwan al-Yemeni, trained Taliban members in Miran Shah, in Pakistan.[419] He eventually helped plan the December 30, 2009 attack on Camp Chapman that killed Harold Brown, Jr., Dane Clark Paresi, and Jeremy Jason Wise, whose family members are Plaintiffs in this case. *See infra* ¶¶ 460-68, 1011-1020, 1239-1246.

339. **Direct Participation.** Al-Qaeda members also committed attacks alongside the Taliban, including some of the attacks that killed or injured Plaintiffs or their family members. Indeed, in 2007 the Taliban announced, "[W]e and al-Qaeda are as one."[420]

340. Several examples bear that out. In the early 2000s, al-Qaeda's third-ranking member, Abu Layth-al Libi, participated in attacks on Americans in Afghanistan alongside Taliban members under the command of Sirajuddin Haqqani. On July 13, 2008, Taliban and al-Qaeda members jointly attacked a U.S.-Afghan outpost in Wanat in Nuristan Province, killing nine U.S. soldiers. In May 2010, Taliban and al-Qaeda members participated in an attack on the United States airbase in Bagram, killing an American contractor.

---

[417] Peter Bergen, *The Front*, The New Republic (Oct. 19, 2009).

[418] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds,* Long War J. (June 23, 2019).

[419] Evan F. Kohlmann, *Al-Qa'ida's Yemeni Expatriate Faction in Pakistan*, CTC Sentinel at 11-12 (Jan. 2011), https://ctc.usma.edu/app/uploads/2011/05/CTCSentinel-Vol4Iss14.pdf.

[420] Ruttig, *The Other Side* at 23.

341. In fact, many terrorist operatives were "dual-hatted," meaning that they were both Taliban and al-Qaeda members. Attacks involving such individuals were committed by both the Taliban and al-Qaeda. For example, in late 2011 or early 2012, the Taliban appointed Sheikh Mohammed Aminullah, who has close ties to al-Qaeda, as the head of its Peshawar Regional Military shura, which was responsible for attacks in northern and eastern Afghanistan.

342. Defendants knew about or recklessly disregarded al-Qaeda's support for the Taliban, given the topic's wide coverage in mainstream media outlets. For example:

- On September 26, 2005, *Newsweek* reported that al-Qaeda was bringing instructors from Iraq to train the Taliban how to commit terrorist attacks against Americans.[421]
- On November 29, 2009, the *Associated Press* reported that a Pakistani official believed that al-Qaeda was likely providing the Taliban with "[t]he training to make, place and detonate" IEDs being used to kill U.S. troops.[422]
- On December 15, 2009, the *Wall Street Journal* quoted Adm. Mullen as saying that U.S. officials were "deeply concerned about the growing level of collusion between the Taliban and al Qaeda."[423]
- On January 5, 2010, the *Wall Street Journal* reported in a front-page article that the December 30, 2009 attack on Camp Chapman was carried out by a bomber working with al-Qaeda, and that the Taliban had claimed responsibility for it.[424]
- On May 28, 2011, the *Washington Post* reported that Secretary Clinton said the goal of United States talks with the Taliban was "to split the Taliban from al-Qaeda."[425]
- On April 30, 2012, the *Guardian* reported: "Anyone who follows the wars in Afghanistan and Pakistan closely knows that, despite the talk of diminished al-Qaida numbers on the ground, its activists and affiliates are heavily involved in the Taliban military campaign. In particular, it contributes military expertise to the spectacular

---

421 *Unholy Allies*.

422 Kathy Gannon, *Taliban Gains Money, al-Qaeda Finances Recovering,* Assoc. Press (June 20, 2009).

423 Anand Gopal, *Afghan Police Killings Highlight Holes in Security,* Wall St. J. (Dec. 15, 2009).

424 Siobhan Gorman et al., *CIA Blast Blamed on Double Agent*, Wall St. J. (Jan. 5, 2010).

425 Karen DeYoung, *Clinton Sees 'Turning Point' After Brief Visit to Pakistan*, Wash. Post (May 28, 2011), 2011 WLNR 10685527.

attacks organised out of Waziristan, it sends groups of fighters from there to the front lines and it inspires."[426]

- On October 21, 2015, an opinion piece in the *New York Times* described Zawahiri's "oath of fealty" to Mullah Mansour.[427]

Given Defendants' sophistication and on-the-ground experience in Afghanistan, they were aware of reports like these, and their substance, which documented that the Taliban insurgency Defendants were funding was supported in substantial part by al-Qaeda.

## VI. THE TALIBAN KILLED AND INJURED PLAINTIFFS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK

343. The Taliban's terrorist campaign, for which Defendants provided material support, killed and injured Plaintiffs and their family members. Each of the acts of international terrorism described below was committed by the Taliban and/or the Haqqani Network and was planned, authorized, and/or jointly committed by al-Qaeda. The attacks that injured or killed Plaintiffs would have violated the laws of war if these terrorist groups were subject to it. The terrorists did not wear uniforms or otherwise distinguish themselves from civilians, conscripted children into committing attacks, targeted humanitarian workers, and engaged in widespread kidnapping and torture in order to intimidate their enemies.

**The David E. Cabrera Family**

344. Lieutenant Colonel David E. Cabrera served in Afghanistan as a member of the U.S. Army. On October 29, 2011, LTC Cabrera was injured in a suicide bombing attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. LTC Cabrera died on October 29, 2011 as a result of injuries sustained during the attack.

[426] Michael Semple, *The Taliban Need Help to Break Their Al-Qaida Ties*, Guardian (Apr. 30, 2012).

[427] Thomas Joscelyn and Bill Roggio, *Are We Losing Afghanistan Again?*, N.Y. Times (Oct. 21, 2015).

345. LTC Cabrera was a national of the United States at the time of the attack and his death.

346. As a result of the attack, LTC Cabrera was injured in his person and/or property. The Plaintiff members of the Cabrera Family are the survivors and/or heirs of LTC Cabrera and are entitled to recover for the damages LTC Cabrera sustained.

347. Plaintiff August Cabrera is the widow of LTC Cabrera. She is a national of the United States.

348. Plaintiff M.G.C., by and through his next friend August Cabrera, is the minor son of LTC Cabrera. He is a national of the United States.

349. Plaintiff R.X.C., by and through his next friend August Cabrera, is the minor son of LTC Cabrera. He is a national of the United States.

350. Plaintiff Corbin Cabrera is the son of LTC Cabrera. He is a national of the United States.

351. Plaintiff Gillian Leigh Cabrera is the daughter of LTC Cabrera. She is a national of the United States.

352. Plaintiff Robert Cabrera is the father of LTC Cabrera. He is a national of the United States.

353. Plaintiff Suzanne Renae Martinez is the sister of LTC Cabrera. She is a national of the United States.

354. Plaintiff JD Prosser is the sister of LTC Cabrera. She is a national of the United States.

355. As a result of the death of LTC Cabrera, each member of the Cabrera Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Cabrera's society, companionship, and counsel.

**The Raymond C. Alcaraz Family**

356. Sergeant Raymond C. Alcaraz served in Afghanistan as a member of the U.S. Army. On August 31, 2010, SGT Alcaraz was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Logar Province, Afghanistan. SGT Alcaraz died on August 31, 2010 as a result of injuries sustained during the attack.

357. SGT Alcaraz was a national of the United States at the time of the attack and his death.

358. As a result of the attack, SGT Alcaraz was injured in his person and/or property. The Plaintiff members of the Alcaraz Family are the survivors and/or heirs of SGT Alcaraz and are entitled to recover for the damages SGT Alcaraz sustained.

359. Plaintiff Alma Murphy is the mother of SGT Alcaraz. She is a national of the United States.

360. Plaintiff Lucas Gonzales is the brother of SGT Alcaraz. He is a national of the United States.

361. Plaintiff Paul Murphy is the step-father of SGT Alcaraz. He is a national of the United States. Paul Murphy lived in the same household as SGT Alcaraz for a substantial period of time and considered SGT Alcaraz the functional equivalent of a biological son.

362. As a result of the death of SGT Alcaraz, each member of the Alcaraz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Alcaraz's society, companionship, and counsel.

**The William Allen Family**

363. William Allen served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On September 6, 2010, Mr. Allen was injured in an insider attack committed by the Taliban in Kandahar Province, Afghanistan. Mr. Allen died on September 6, 2010 as a result of injuries sustained during the attack.

364. Mr. Allen was a national of the United States at the time of the attack and his death.

365. As a result of the attack, Mr. Allen was injured in his person and/or property. The Plaintiff members of the Allen Family are the survivors and/or heirs of Mr. Allen and are entitled to recover for the damages Mr. Allen sustained.

366. Plaintiff Ginny Lamb is the sister of Mr. Allen. She is a national of the United States.

367. Plaintiff Sherry Loan is the sister of Mr. Allen. She is a national of the United States.

368. Plaintiff Linda Phaneuf is the sister of Mr. Allen. She is a national of the United States.

369. As a result of the death of Mr. Allen, each member of the Allen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Allen's society, companionship, and counsel.

**The Billy G. Anderson Family**

370. Private First Class Billy G. Anderson served in Afghanistan as a member of the U.S. Army. On May 17, 2010, PFC Anderson was injured in an IED attack committed by the

Taliban in Badghis Province, Afghanistan. PFC Anderson died on May 17, 2010 as a result of injuries sustained during the attack.

371. PFC Anderson was a national of the United States at the time of the attack and his death.

372. As a result of the attack, PFC Anderson was injured in his person and/or property. The Plaintiff members of the Anderson Family are the survivors and/or heirs of PFC Anderson and are entitled to recover for the damages PFC Anderson sustained.

373. Plaintiff Caitlin Elizabeth Anderson is the widow of PFC Anderson. She is a national of the United States.

374. Plaintiff L.G.A., by and through her next friend Caitlin Elizabeth Anderson, is the minor daughter of PFC Anderson. She is a national of the United States.

375. Plaintiff Bobby Gene Anderson is the father of PFC Anderson. He is a national of the United States.

376. Plaintiff Patricia Marlene Goodwin is the mother of PFC Anderson. She is a national of the United States.

377. Plaintiff April Lynn Anderson is the sister of PFC Anderson. She is a national of the United States.

378. Plaintiff Bobby Joe Anderson is the brother of PFC Anderson. He is a national of the United States.

379. Plaintiff John David Anderson is the brother of PFC Anderson. He is a national of the United States.

380. As a result of the death of PFC Anderson, each member of the Anderson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Anderson's society, companionship, and counsel.

**The Brian M. Anderson Family**

381. Specialist Brian M. Anderson served in Afghanistan as a member of the U.S. Army. On June 12, 2010, SPC Anderson was injured in an IED attack committed by the Taliban in Kunduz Province, Afghanistan. SPC Anderson died on June 12, 2010 as a result of injuries sustained during the attack.

382. SPC Anderson was a national of the United States at the time of the attack and his death.

383. As a result of the attack, SPC Anderson was injured in his person and/or property. The Plaintiff members of the Anderson Family are the survivors and/or heirs of SPC Anderson and are entitled to recover for the damages SPC Anderson sustained.

384. Plaintiff Margaret Anderson is the mother of SPC Anderson. She is a national of the United States.

385. As a result of the death of SPC Anderson, each member of the Anderson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Anderson's society, companionship, and counsel.

**The Carlos A. Aragon Family**

386. Lance Corporal Carlos A. Aragon served in Afghanistan as a member of the U.S. Marine Corps Reserves. On March 1, 2010, LCpl Aragon was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. LCpl Aragon died on March 1, 2010 as a result of injuries sustained during the attack.

387. LCpl Aragon was a national of the United States at the time of the attack and his death.

388. As a result of the attack, LCpl Aragon was injured in his person and/or property. The Plaintiff members of the Aragon Family are the survivors and/or heirs of LCpl Aragon and are entitled to recover for the damages LCpl Aragon sustained.

389. Plaintiff Rosa Irma Halliday is the mother of LCpl Aragon. She is a national of the United States.

390. Plaintiff Armando Ochoa is the brother of LCpl Aragon. He is a national of the United States.

391. Plaintiff Eduardo Ochoa is the brother of LCpl Aragon. He is a national of the United States.

392. Plaintiff Brad Joseph Halliday is the step-father of LCpl Aragon. He is a national of the United States. Brad Joseph Halliday lived in the same household as LCpl Aragon for a substantial period of time and considered LCpl Aragon the functional equivalent of a biological son.

393. As a result of the death of LCpl Aragon, each member of the Aragon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Aragon's society, companionship, and counsel.

**The Bradley W. Atwell Family**

394. Sergeant Bradley W. Atwell served in Afghanistan as a member of the U.S. Marine Corps. On September 15, 2012, Sgt Atwell was injured in an insider attack committed by the Taliban in Helmand Province, Afghanistan. Sgt Atwell died on September 15, 2012 as a result of injuries sustained during the attack.

395. Sgt Atwell was a national of the United States at the time of the attack and his death.

396. As a result of the attack, Sgt Atwell was injured in his person and/or property. The Plaintiff members of the Atwell Family are the survivors and/or heirs of Sgt Atwell and are entitled to recover for the damages Sgt Atwell sustained.

397. Plaintiff Cheryl Atwell is the mother of Sgt Atwell. She is a national of the United States.

398. Plaintiff Erin Riedel is the sister of Sgt Atwell. She is a national of the United States.

399. As a result of the death of Sgt Atwell, each member of the Atwell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Atwell's society, companionship, and counsel.

**The Dillon C. Baldridge Family**

400. Sergeant Dillon C. Baldridge served in Afghanistan as a member of the U.S. Army. On June 10, 2017, SGT Baldridge was injured in an insider attack committed by the Taliban in Nangarhar Province, Afghanistan. SGT Baldridge died on June 10, 2017 as a result of injuries sustained during the attack.

401. SGT Baldridge was a national of the United States at the time of the attack and his death.

402. As a result of the attack, SGT Baldridge was injured in his person and/or property. The Plaintiff members of the Baldridge Family are the survivors and/or heirs of SGT Baldridge and are entitled to recover for the damages SGT Baldridge sustained.

403. Plaintiff Christopher Baldridge is the father of SGT Baldridge. He is a national of the United States.

404. Plaintiff E.B., by and through his next friend Christopher Baldridge, is the minor brother of SGT Baldridge. He is a national of the United States.

405. Plaintiff L.B., by and through his next friend Christopher Baldridge, is the minor brother of SGT Baldridge. He is a national of the United States.

406. Plaintiff S.B., by and through her next friend Christopher Baldridge, is the minor sister of SGT Baldridge. She is a national of the United States.

407. Plaintiff Jessie Baldridge is the step-mother of SGT Baldridge. She is a national of the United States. Jessie Baldridge lived in the same household as SGT Baldridge for a substantial period of time and considered SGT Baldridge the functional equivalent of a biological son.

408. As a result of the death of SGT Baldridge, each member of the Baldridge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Baldridge's society, companionship, and counsel.

**The Kevin B. Balduf Family**

409. Sergeant Kevin B. Balduf served in Afghanistan as a member of the U.S. Marine Corps. On May 12, 2011, Sgt Balduf was injured in an insider attack committed by the Taliban in Helmand Province, Afghanistan. Sgt Balduf died on May 12, 2011 as a result of injuries sustained during the attack.

410. Sgt Balduf was a national of the United States at the time of the attack and his death.

411. As a result of the attack, Sgt Balduf was injured in his person and/or property. The Plaintiff members of the Balduf Family are the survivors and/or heirs of Sgt Balduf and are entitled to recover for the damages Sgt Balduf sustained.

412. Plaintiff Virginia Newsom is the mother of Sgt Balduf. She is a national of the United States.

413. Plaintiff Kyle Balduf is the brother of Sgt Balduf. He is a national of the United States.

414. As a result of the death of Sgt Balduf, each member of the Balduf Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Balduf's society, companionship, and counsel.

**The Brandon A. Barrett Family**

415. Captain Brandon A. Barrett served in Afghanistan as a member of the U.S. Marine Corps. On May 5, 2010, Capt Barrett was injured in a sniper attack committed by the Taliban in Helmand Province, Afghanistan. Capt Barrett died on May 5, 2010 as a result of injuries sustained during the attack.

416. Capt Barrett was a national of the United States at the time of the attack and his death.

417. As a result of the attack, Capt Barrett was injured in his person and/or property. The Plaintiff members of the Barrett Family are the survivors and/or heirs of Capt Barrett and are entitled to recover for the damages Capt Barrett sustained.

418. Plaintiff Brett Barrett is the father of Capt Barrett. He is a national of the United States.

419. As a result of the death of Capt Barrett, each member of the Barrett Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Barrett's society, companionship, and counsel.

**The William M. Bays Family**

420. Sergeant William M. Bays served in Afghanistan as a member of the U.S. Army. On June 10, 2017, SGT Bays was injured in an insider attack committed by the Taliban in Nangarhar Province, Afghanistan. SGT Bays died on June 10, 2017 as a result of injuries sustained during the attack.

421. SGT Bays was a national of the United States at the time of the attack and his death.

422. As a result of the attack, SGT Bays was injured in his person and/or property. The Plaintiff members of the Bays Family are the survivors and/or heirs of SGT Bays and are entitled to recover for the damages SGT Bays sustained.

423. Plaintiff April Angel Bays is the mother of SGT Bays. She is a national of the United States.

424. Plaintiff Timothy Lee Bays is the father of SGT Bays. He is a national of the United States.

425. Plaintiff Brenda Griner is the sister of SGT Bays. She is a national of the United States.

426. Plaintiff Lindsay Redoutey is the sister of SGT Bays. She is a national of the United States.

427. As a result of the death of SGT Bays, each member of the Bays Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Bays's society, companionship, and counsel.

**The Thomas A. Baysore Jr. Family**

428. Staff Sergeant Thomas A. Baysore Jr. served in Afghanistan as a member of the U.S. Army. On September 26, 2013, SSG Baysore was injured in an insider attack involving small arms fire committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Paktia Province, Afghanistan. SSG Baysore died on September 26, 2013 as a result of injuries sustained during the attack.

429. SSG Baysore was a national of the United States at the time of the attack and his death.

430. As a result of the attack, SSG Baysore was injured in his person and/or property. The Plaintiff members of the Baysore Family are the survivors and/or heirs of SSG Baysore and are entitled to recover for the damages SSG Baysore sustained.

431. Plaintiff Angela Fritzges is the sister of SSG Baysore. She is a national of the United States.

432. As a result of the death of SSG Baysore, each member of the Baysore Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Baysore's society, companionship, and counsel.

**The Vincent J. Bell Family**

433. Staff Sergeant Vincent J. Bell served in Afghanistan as a member of the U.S. Marine Corps. On November 30, 2011, SSgt Bell was injured in an IED attack committed by the

Taliban in Helmand Province, Afghanistan. SSgt Bell died on November 30, 2011 as a result of injuries sustained during the attack.

434. SSgt Bell was a national of the United States at the time of the attack and his death.

435. As a result of the attack, SSgt Bell was injured in his person and/or property. The Plaintiff members of the Bell Family are the survivors and/or heirs of SSgt Bell and are entitled to recover for the damages SSgt Bell sustained.

436. Plaintiff James Bell is the father of SSgt Bell. He is a national of the United States.

437. Plaintiff Pamela E. Alexander Bell is the mother of SSgt Bell. She is a national of the United States.

438. Plaintiff London Jacinda Bell is the sister of SSgt Bell. She is a national of the United States.

439. Plaintiff Andrea Roe is the sister of SSgt Bell. She is a national of the United States.

440. As a result of the death of SSgt Bell, each member of the Bell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Bell's society, companionship, and counsel.

**The Darrik C. Benson Family**

441. Special Warfare Operator Petty Officer 1st Class Darrik C. Benson served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SO1 (SEAL) Benson was injured in an attack on a Chinook helicopter committed by the Haqqani Network, a part of the

Taliban, in Wardak Province, Afghanistan. SO1 (SEAL) Benson died on August 6, 2011 as a result of injuries sustained during the attack.

442. SO1 (SEAL) Benson was a national of the United States at the time of the attack and his death.

443. As a result of the attack, SO1 (SEAL) Benson was injured in his person and/or property. The Plaintiff members of the Benson Family are the survivors and/or heirs of SO1 (SEAL) Benson and are entitled to recover for the damages SO1 (SEAL) Benson sustained.

444. Plaintiff Frederick C. Benson is the father of SO1 (SEAL) Benson. He is a national of the United States.

445. Plaintiff Beverly Mills is the mother of SO1 (SEAL) Benson. She is a national of the United States.

446. As a result of the death of SO1 (SEAL) Benson, each member of the Benson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SO1 (SEAL) Benson's society, companionship, and counsel.

**The Brett Benton Family**

447. Brett Benton served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On June 4, 2011, Mr. Benton was injured in an IED attack committed by the Taliban in Laghman Province, Afghanistan. Mr. Benton died on June 4, 2011 as a result of injuries sustained during the attack.

448. Mr. Benton was a national of the United States at the time of the attack and his death.

449. As a result of the attack, Mr. Benton was injured in his person and/or property. The Plaintiff members of the Benton Family are the survivors and/or heirs of Mr. Benton and are entitled to recover for the damages Mr. Benton sustained.

450. Plaintiff Bethany Ann Benton is the widow of Mr. Benton. She is a national of the United States.

451. As a result of the death of Mr. Benton, each member of the Benton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Benton's society, companionship, and counsel.

**The James Michael Boucher Jr. Family**

452. Plaintiff Corporal James Michael Boucher Jr. served in Afghanistan as a member of the U.S. Marine Corps. On June 12, 2011, Cpl Boucher was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. The attack severely wounded Cpl Boucher, who lost both of his legs above the knee and suffered from serious injuries to his left-hand and left buttocks. As a result of the June 12, 2011 attack and his injuries, Cpl Boucher has experienced severe physical and emotional pain and suffering.

453. Cpl Boucher was a national of the United States at the time of the attack, and remains one to this day.

454. Plaintiff James Boucher Sr. is the father of Cpl Boucher. He is a national of the United States.

455. Plaintiff Kimberley Boucher is the mother of Cpl Boucher. She is a national of the United States.

456. Plaintiff Britany Boucher is the sister of Cpl Boucher. She is a national of the United States.

457. As a result of the June 12, 2011 attack and Cpl Boucher's injuries, each member of the Boucher Family has experienced severe mental anguish, emotional pain and suffering.

**The Francisco J. Briseño-Alvarez Jr. Family**

458. Specialist Francisco J. Briseño-Alvarez Jr. served in Afghanistan as a member of the U.S. Army National Guard. On September 25, 2011, SPC Briseño-Alvarez was injured in an IED attack committed by the Taliban in Laghman Province, Afghanistan. SPC Briseño-Alvarez died on September 25, 2011 as a result of injuries sustained during the attack.

459. SPC Briseño-Alvarez was a member of the armed forces at the time of the attack and his death.

460. As a result of the attack, SPC Briseño-Alvarez was injured in his person and/or property. The Plaintiff members of the Briseño-Alvarez Family are the survivors and/or heirs of SPC Briseño-Alvarez and are entitled to recover for the damages SPC Briseño-Alvarez sustained.

461. Plaintiff Luis Briseño is the brother of SPC Briseño-Alvarez. He is a national of the United States.

462. As a result of the death of SPC Briseño-Alvarez, each member of the Briseño-Alvarez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Briseño-Alvarez's society, companionship, and counsel.

**The David L. Brodeur Family**

463. Major David L. Brodeur served in Afghanistan as a member of the U.S. Air Force. On April 27, 2011, Maj Brodeur was injured in an insider attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. Maj Brodeur died on April 27, 2011 as a result of injuries sustained during the attack.

464. Maj Brodeur was a national of the United States at the time of the attack and his death.

465. As a result of the attack, Maj Brodeur was injured in his person and/or property. The Plaintiff members of the Brodeur Family are the survivors and/or heirs of Maj Brodeur and are entitled to recover for the damages Maj Brodeur sustained.

466. Plaintiff Susan Brodeur is the widow of Maj Brodeur. She is a national of the United States.

467. Plaintiff D.L.B., by and through his next friend Susan Brodeur, is the minor son of Maj Brodeur. He is a national of the United States.

468. Plaintiff E.L.B., by and through her next friend Susan Brodeur, is the minor daughter of Maj Brodeur. She is a national of the United States.

469. Plaintiff Joyce A. Brodeur is the mother of Maj Brodeur. She is a national of the United States.

470. Plaintiff Lawrence A. Brodeur is the father of Maj Brodeur. He is a national of the United States.

471. As a result of the death of Maj Brodeur, each member of the Brodeur Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Maj Brodeur's society, companionship, and counsel.

**The Harold Brown Jr. Family**

472. Harold Brown Jr. served in Afghanistan as a U.S. government employee serving in the Central Intelligence Agency. On December 30, 2009, Mr. Brown was injured in a suicide bombing attack conducted on Camp Chapman, in Khost Province, Afghanistan ("Camp

Chapman Attack”). Mr. Brown died on December 30, 2009 as a result of injuries sustained during the Camp Chapman Attack.

473. The Camp Chapman Attack was planned and authorized by al-Qaeda, and jointly committed by al-Qaeda, the Pakistani Taliban, and the Haqqani Network, a part of the Taliban. For its part, the Haqqani Network provided substantial assistance to its al-Qaeda and Pakistani Taliban terrorist partners in the Camp Chapman Attack, including the al-Qaeda suicide bomber who triggered the suicide vest. On information and belief, the Haqqani Network provided key support for the Camp Chapman Attack, including but not limited to, intelligence and logistical support. The Taliban has publicly taken responsibility for the attack.

474. Mr. Brown was a national of the United States at the time of the attack and his death.

475. As a result of the attack, Mr. Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of Mr. Brown and are entitled to recover for the damages Mr. Brown sustained.

476. Plaintiff Barbara Brown is the mother of Mr. Brown. She is a national of the United States.

477. Plaintiff Harold Brown Sr. is the father of Mr. Brown. He is a national of the United States.

478. Plaintiff Regina Brown is the sister of Mr. Brown. She is a national of the United States.

479. Plaintiff Paula Rich is the sister of Mr. Brown. She is a national of the United States.

480. As a result of the death of Mr. Brown, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Brown's society, companionship, and counsel.

**The Scott W. Brunkhorst Family**

481. Staff Sergeant Scott W. Brunkhorst served in Afghanistan as a member of the U.S. Army. On March 30, 2010, SSG Brunkhorst was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SSG Brunkhorst died on March 30, 2010 as a result of injuries sustained during the attack.

482. SSG Brunkhorst was a national of the United States at the time of the attack and his death.

483. As a result of the attack, SSG Brunkhorst was injured in his person and/or property. The Plaintiff members of the Brunkhorst Family are the survivors and/or heirs of SSG Brunkhorst and are entitled to recover for the damages SSG Brunkhorst sustained.

484. Plaintiff Richard G. Brunkhorst is the father of SSG Brunkhorst. He is a national of the United States.

485. As a result of the death of SSG Brunkhorst, each member of the Brunkhorst Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Brunkhorst's society, companionship, and counsel.

**The Nicholas B. Burley Family**

486. Specialist Nicholas B. Burley served in Afghanistan as a member of the U.S. Army. On July 30, 2013, SPC Burley was injured in an indirect fire attack committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Logar

Province, Afghanistan. SPC Burley died on July 30, 2013 as a result of injuries sustained during the attack.

487. SPC Burley was a national of the United States at the time of the attack and his death.

488. As a result of the attack, SPC Burley was injured in his person and/or property. The Plaintiff members of the Burley Family are the survivors and/or heirs of SPC Burley and are entitled to recover for the damages SPC Burley sustained.

489. Plaintiff William Michael Burley is the father of SPC Burley. He is a national of the United States.

490. Plaintiff Tammy Olmstead is the mother of SPC Burley. She is a national of the United States.

491. Plaintiff Michael Collins is the brother of SPC Burley. He is a national of the United States.

492. Plaintiff Dan Olmstead is the step-father of SPC Burley. He is a national of the United States. Dan Olmstead lived in the same household as SPC Burley for a substantial period of time and considered SPC Burley the functional equivalent of a biological son.

493. As a result of the death of SPC Burley, each member of the Burley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Burley's society, companionship, and counsel.

**The Joshua R. Campbell Family**

494. Specialist Joshua R. Campbell served in Afghanistan as a member of the U.S. Army. On January 29, 2011, SPC Campbell was injured in an IED attack committed by the

Taliban in Helmand Province, Afghanistan. SPC Campbell died on January 29, 2011 as a result of injuries sustained during the attack.

495. SPC Campbell was a national of the United States at the time of the attack and his death.

496. As a result of the attack, SPC Campbell was injured in his person and/or property. The Plaintiff members of the Campbell Family are the survivors and/or heirs of SPC Campbell and are entitled to recover for the damages SPC Campbell sustained.

497. Plaintiff James Reginald Campbell is the father of SPC Campbell. He is a national of the United States.

498. As a result of the death of SPC Campbell, each member of the Campbell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Campbell's society, companionship, and counsel.

**The Kevin Cardoza Family**

499. Specialist Kevin Cardoza served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Cardoza was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Cardoza died on May 4, 2013 as a result of injuries sustained during the attack.

500. SPC Cardoza was a national of the United States at the time of the attack and his death.

501. As a result of the attack, SPC Cardoza was injured in his person and/or property. The Plaintiff members of the Cardoza Family are the survivors and/or heirs of SPC Cardoza and are entitled to recover for the damages SPC Cardoza sustained.

502. Plaintiff Maria Cardoza is the mother of SPC Cardoza. She is a national of the United States.

503. Plaintiff Ramiro Cardoza Sr. is the father of SPC Cardoza. He is a national of the United States.

504. Plaintiff Ramiro Cardoza Jr. is the brother of SPC Cardoza. He is a national of the United States.

505. As a result of the death of SPC Cardoza, each member of the Cardoza Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Cardoza's society, companionship, and counsel.

**The Joseph T. Caron Family**

506. Specialist Joseph T. Caron served in Afghanistan as a member of the U.S. Army. On April 11, 2010, SPC Caron was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SPC Caron died on April 11, 2010 as a result of injuries sustained during the attack.

507. SPC Caron was a national of the United States at the time of the attack and his death.

508. As a result of the attack, SPC Caron was injured in his person and/or property. The Plaintiff members of the Caron Family are the survivors and/or heirs of SPC Caron and are entitled to recover for the damages SPC Caron sustained.

509. Plaintiff Jeff Caron is the father of SPC Caron. He is a national of the United States.

510. Plaintiff Cassandra Caron is the sister of SPC Caron. She is a national of the United States.

511. Plaintiff Karen Caron is the step-mother of SPC Caron. She is a national of the United States. Karen Caron lived in the same household as SPC Caron for a substantial period of time and considered SPC Caron the functional equivalent of a biological son.

512. As a result of the death of SPC Caron, each member of the Caron Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Caron's society, companionship, and counsel.

**The Patrick R. Carroll Family**

513. Sergeant Patrick R. Carroll served in Afghanistan as a member of the U.S. Army. On February 7, 2011, SGT Carroll was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SGT Carroll died on February 7, 2011 as a result of injuries sustained during the attack.

514. SGT Carroll was a national of the United States at the time of the attack and his death.

515. As a result of the attack, SGT Carroll was injured in his person and/or property. The Plaintiff members of the Carroll Family are the survivors and/or heirs of SGT Carroll and are entitled to recover for the damages SGT Carroll sustained.

516. Plaintiff Sumer J. Roberts is the sister of SGT Carroll. She is a national of the United States.

517. As a result of the death of SGT Carroll, each member of the Carroll Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Carroll's society, companionship, and counsel.

**The Rick J. Centanni Family**

518. Lance Corporal Rick J. Centanni served in Afghanistan as a member of the U.S. Marine Corps. On March 24, 2010, LCpl Centanni was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. LCpl Centanni died on March 24, 2010 as a result of injuries sustained during the attack.

519. LCpl Centanni was a national of the United States at the time of the attack and his death.

520. As a result of the attack, LCpl Centanni was injured in his person and/or property. The Plaintiff members of the Centanni Family are the survivors and/or heirs of LCpl Centanni and are entitled to recover for the damages LCpl Centanni sustained.

521. Plaintiff Jon Centanni is the father of LCpl Centanni. He is a national of the United States.

522. As a result of the death of LCpl Centanni, each member of the Centanni Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Centanni's society, companionship, and counsel.

**The Benjamen G. Chisholm Family**

523. Private First Class Benjamen G. Chisholm served in Afghanistan as a member of the U.S. Army. On August 17, 2010, PFC Chisholm was injured in an IED attack committed by the Taliban in Kunar Province, Afghanistan. PFC Chisholm died on August 17, 2010 as a result of injuries sustained during the attack.

524. PFC Chisholm was a national of the United States at the time of the attack and his death.

525. As a result of the attack, PFC Chisholm was injured in his person and/or property. The Plaintiff members of the Chisholm Family are the survivors and/or heirs of PFC Chisholm and are entitled to recover for the damages PFC Chisholm sustained.

526. Plaintiff Glenn Chisholm is the father of PFC Chisholm. He is a national of the United States.

527. Plaintiff Karma Chisholm is the step-mother of PFC Chisholm. She is a national of the United States. Karma Chisholm lived in the same household as PFC Chisholm for a substantial period of time and considered PFC Chisholm the functional equivalent of a biological son.

528. As a result of the death of PFC Chisholm, each member of the Chisholm Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Chisholm's society, companionship, and counsel.

**The Rusty H. Christian Family**

529. Staff Sergeant Rusty H. Christian served in Afghanistan as a member of the U.S. Army. On January 28, 2010, SSG Christian was injured in an IED attack committed by the Taliban in Uruzgan Province, Afghanistan. SSG Christian died on January 28, 2010 as a result of injuries sustained during the attack.

530. SSG Christian was a national of the United States at the time of the attack and his death.

531. As a result of the attack, SSG Christian was injured in his person and/or property. The Plaintiff members of the Christian Family are the survivors and/or heirs of SSG Christian and are entitled to recover for the damages SSG Christian sustained.

532. Plaintiff Donna Ball is the mother of SSG Christian. She is a national of the United States.

533. Plaintiff Michael Christian is the father of SSG Christian. He is a national of the United States.

534. Plaintiff Michael Aaron Christian is the brother of SSG Christian. He is a national of the United States.

535. As a result of the death of SSG Christian, each member of the Christian Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Christian's society, companionship, and counsel.

**The Chazray C. Clark Family**

536. Specialist Chazray C. Clark served in Afghanistan as a member of the U.S. Army. On September 18, 2011, SPC Clark was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Clark died on September 18, 2011 as a result of injuries sustained during the attack.

537. SPC Clark was a national of the United States at the time of the attack and his death.

538. As a result of the attack, SPC Clark was injured in his person and/or property. The Plaintiff members of the Clark Family are the survivors and/or heirs of SPC Clark and are entitled to recover for the damages SPC Clark sustained.

539. Plaintiff Keyko D. Clark is the mother of SPC Clark. She is a national of the United States.

540. Plaintiff Corteize Clark is the brother of SPC Clark. He is a national of the United States.

541. Plaintiff Precious Clark is the sister of SPC Clark. She is a national of the United States.

542. Plaintiff Cleveland Davis is the brother of SPC Clark. He is a national of the United States.

543. As a result of the death of SPC Clark, each member of the Clark Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Clark's society, companionship, and counsel.

**Jonathan Cleary**

544. Plaintiff Corporal Jonathan Cleary served in Afghanistan as a member of the U.S. Army. On May 6, 2012, CPL Cleary was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Paktia Province, Afghanistan. The attack severely wounded CPL Cleary, who lost his right leg below the knee and suffered from head trauma, two collapsed lungs, and numerous broken bones resulting in a number of weeks in a coma. As a result of the May 6, 2012 attack and his injuries, CPL Cleary has experienced severe physical and emotional pain and suffering.

545. CPL Cleary was a national of the United States at the time of the attack and remains one to this day.

**The Timothy J. Conrad Jr. Family**

546. Sergeant Timothy J. Conrad Jr. served in Afghanistan as a member of the U.S. Army. On February 23, 2012, SGT Conrad was injured in an insider attack committed by the Taliban in Nangarhar Province, Afghanistan. SGT Conrad died on February 23, 2012 as a result of injuries sustained during the attack.

547. SGT Conrad was a national of the United States at the time of the attack and his death.

548. As a result of the attack, SGT Conrad was injured in his person and/or property. The Plaintiff members of the Conrad Family are the survivors and/or heirs of SGT Conrad and are entitled to recover for the damages SGT Conrad sustained.

549. Plaintiff Holly Conrad is the widow of SGT Conrad. She is a national of the United States.

550. Plaintiff B.C., by and through his next friend Holly Conrad, is the minor son of SGT Conrad. He is a national of the United States.

551. As a result of the death of SGT Conrad, each member of the Conrad Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Conrad's society, companionship, and counsel.

**The Robert J. Cottle Family**

552. Sergeant Major Robert J. Cottle served in Afghanistan as a member of the U.S. Marine Corps Reserves. On March 24, 2010, SgtMa Cottle was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SgtMa Cottle died on March 24, 2010 as a result of injuries sustained during the attack.

553. SgtMa Cottle was a national of the United States at the time of the attack and his death.

554. As a result of the attack, SgtMa Cottle was injured in his person and/or property. The Plaintiff members of the Cottle Family are the survivors and/or heirs of SgtMa Cottle and are entitled to recover for the damages SgtMa Cottle sustained.

555. Plaintiff Kenneth Cottle is the father of SgtMa Cottle. He is a national of the United States.

556. As a result of the death of SgtMa Cottle, each member of the Cottle Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SgtMa Cottle's society, companionship, and counsel.

**The Ross Cox Family**

557. Plaintiff Staff Sergeant Ross Cox served in Afghanistan as a member of the U.S. the Army. On November 15, 2011, SSG Cox was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. The attack severely wounded SSG Cox, who lost his left leg and suffered from a serious right leg injury, left arm nerve damage, and hearing loss. As a result of the November 15, 2011 attack and his injuries, SSG Cox has experienced severe physical and emotional pain and suffering.

558. SSG Cox was a national of the United States at the time of the attack, and remains one to this day.

559. Plaintiff Nicole Cox is the wife of SSG Cox. She is a national of the United States.

560. Plaintiff A.C., by and through his next friend Ross Cox, is the minor son of SSG Cox. He is a national of the United States.

561. Plaintiff B.C., by and through his next friend Ross Cox, is the minor son of SSG Cox. He is a national of the United States.

562. Plaintiff H.C., by and through her next friend Ross Cox, is the minor daughter of SSG Cox. She is a national of the United States.

563. Plaintiff Peyton Cooney is the daughter of SSG Cox. She is a national of the United States.

564. As a result of the November 15, 2011 attack and SSG Cox's injuries, each member of the Cox Family has experienced severe mental anguish, emotional pain and suffering.

**The Robert W. Crow Family**

565. Specialist Robert W. Crow served in Afghanistan as a member of the U.S. Army National Guard. On July 10, 2010, SPC Crow was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Paktika Province, Afghanistan. SPC Crow died on July 10, 2010 as a result of injuries sustained during the attack.

566. SPC Crow was a national of the United States at the time of the attack and his death.

567. As a result of the attack, SPC Crow was injured in his person and/or property. The Plaintiff members of the Crow Family are the survivors and/or heirs of SPC Crow and are entitled to recover for the damages SPC Crow sustained.

568. Plaintiff David Aaron Crow is the son of SPC Crow. He is a national of the United States.

569. As a result of the death of SPC Crow, each member of the Crow Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Crow's society, companionship, and counsel.

**The Justin E. Culbreth Family**

570. Specialist Justin E. Culbreth served in Afghanistan as a member of the U.S. Army. On November 17, 2010, SPC Culbreth was injured in an IED attack committed by the

Taliban in Kandahar Province, Afghanistan. SPC Culbreth died on November 17, 2010 as a result of injuries sustained during the attack.

571. SPC Culbreth was a national of the United States at the time of the attack and his death.

572. As a result of the attack, SPC Culbreth was injured in his person and/or property. The Plaintiff members of the Culbreth Family are the survivors and/or heirs of SPC Culbreth and are entitled to recover for the damages SPC Culbreth sustained.

573. Plaintiff Cheryl A. Culbreth is the mother of SPC Culbreth. She is a national of the United States.

574. Plaintiff Walter L. Culbreth is the father of SPC Culbreth. He is a national of the United States.

575. As a result of the death of SPC Culbreth, each member of the Culbreth Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Culbreth's society, companionship, and counsel.

**The Joshua J. Cullins Family**

576. Staff Sergeant Joshua J. Cullins served in Afghanistan as a member of the U.S. Marine Corps. On October 19, 2010, SSgt Cullins was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SSgt Cullins died on October 19, 2010 as a result of injuries sustained during the attack.

577. SSgt Cullins was a national of the United States at the time of the attack and his death.

578. As a result of the attack, SSgt Cullins was injured in his person and/or property. The Plaintiff members of the Cullins Family are the survivors and/or heirs of SSgt Cullins and are entitled to recover for the damages SSgt Cullins sustained.

579. Plaintiff James Farris Cullins Jr. is the father of SSgt Cullins. He is a national of the United States.

580. Plaintiff Cooper Henry Pike Cullins is the brother of SSgt Cullins. He is a national of the United States.

581. Plaintiff Donavan Kurt Schilling Cullins is the brother of SSgt Cullins. He is a national of the United States.

582. Plaintiff Barbara Schilling is the step-mother of SSgt Cullins. She is a national of the United States. Barbara Schilling lived in the same household as SSgt Cullins for a substantial period of time and considered SSgt Cullins the functional equivalent of a biological son.

583. As a result of the death of SSgt Cullins, each member of the Cullins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Cullins's society, companionship, and counsel.

**The Marcus Dandrea Family**

584. Plaintiff Sergeant Marcus Dandrea served in Afghanistan as a member of the U.S. Marine Corps. On February 24, 2011, Sgt Dandrea was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. The attack severely wounded Sgt Dandrea, who lost both legs above the knee and suffered from injuries to his right hand and arm and a traumatic brain injury. As a result of the February 24, 2011 attack and his injuries, Sgt Dandrea has experienced severe physical and emotional pain and suffering.

585. Sgt Dandrea was a national of the United States at the time of the attack, and remains one to this day.

586. Plaintiff N.D., by and through her next friend Marcus Dandrea, is the minor daughter of Sgt Dandrea. She is a national of the United States.

587. Plaintiff Leanora Dandrea is the mother of Sgt Dandrea. She is a national of the United States.

588. Plaintiff Mark William Dandrea is the father of Sgt Dandrea. He is a national of the United States.

589. Plaintiff H.D., by and through her next friend Leanora Dandrea, is the minor sister of Sgt Dandrea. She is a national of the United States.

590. Plaintiff I.D., by and through his next friend Leanora Dandrea, is the minor brother of Sgt Dandrea. He is a national of the United States.

591. Plaintiff Benjamin Dandrea is the brother of Sgt Dandrea. He is a national of the United States.

592. Plaintiff Gabriel Dandrea is the brother of Sgt Dandrea. He is a national of the United States.

593. Plaintiff Hannah Dandrea is the sister of Sgt Dandrea. She is a national of the United States.

594. Plaintiff Joshua Dandrea is the brother of Sgt Dandrea. He is a national of the United States.

595. Plaintiff Samuel Dandrea is the brother of Sgt Dandrea. He is a national of the United States.

596. As a result of the February 24, 2011 attack and Sgt Dandrea's injuries, each member of the Dandrea Family has experienced severe mental anguish, emotional pain and suffering.

**The Devin J. Daniels Family**

597. Sergeant Devin J. Daniels served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SGT Daniels was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SGT Daniels died on August 25, 2011 as a result of injuries sustained during the attack.

598. SGT Daniels was a national of the United States at the time of the attack and his death.

599. As a result of the attack, SGT Daniels was injured in his person and/or property. The Plaintiff members of the Daniels Family are the survivors and/or heirs of SGT Daniels and are entitled to recover for the damages SGT Daniels sustained.

600. Plaintiff James L. Daniels is the father of SGT Daniels. He is a national of the United States.

601. Plaintiff Lucas Daniels is the brother of SGT Daniels. He is a national of the United States.

602. Plaintiff Sophie Daniels is the sister of SGT Daniels. She is a national of the United States.

603. As a result of the death of SGT Daniels, each member of the Daniels Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Daniels's society, companionship, and counsel.

**The Jonathan D. Davis Family**

604. Staff Sergeant Jonathan D. Davis served in Afghanistan as a member of the U.S. Marine Corps. On February 22, 2013, SSgt Davis was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SSgt Davis died on February 22, 2013 as a result of injuries sustained during the attack.

605. SSgt Davis was a national of the United States at the time of the attack and his death.

606. As a result of the attack, SSgt Davis was injured in his person and/or property. The Plaintiff members of the Davis Family are the survivors and/or heirs of SSgt Davis and are entitled to recover for the damages SSgt Davis sustained.

607. Plaintiff Helena Davis is the widow of SSgt Davis. She is a national of the United States.

608. Plaintiff C.D., by and through his next friend Helena Davis, is the minor son of SSgt Davis. He is a national of the United States.

609. As a result of the death of SSgt Davis, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Davis's society, companionship, and counsel.

**The David P. Day Family**

610. Staff Sergeant David P. Day served in Afghanistan as a member of the U.S. Marine Corps. On April 24, 2011, SSgt Day was injured in an IED attack committed by the Taliban in Badghis Province, Afghanistan. SSgt Day died on April 24, 2011 as a result of injuries sustained during the attack.

611. SSgt Day was a national of the United States at the time of the attack and his death.

612. As a result of the attack, SSgt Day was injured in his person and/or property. The Plaintiff members of the Day Family are the survivors and/or heirs of SSgt Day and are entitled to recover for the damages SSgt Day sustained.

613. Plaintiff Don Day is the father of SSgt Day. He is a national of the United States.

614. Plaintiff Kathy Day is the mother of SSgt Day. She is a national of the United States.

615. As a result of the death of SSgt Day, each member of the Day Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Day's society, companionship, and counsel.

**The Matthew J. DeYoung Family**

616. Sergeant Matthew J. DeYoung served in Afghanistan as a member of the U.S. Marine Corps. On February 18, 2011, Sgt DeYoung was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. Sgt DeYoung died on February 18, 2011 as a result of injuries sustained during the attack.

617. Sgt DeYoung was a national of the United States at the time of the attack and her death.

618. As a result of the attack, Sgt DeYoung was injured in her person and/or property. The Plaintiff members of the DeYoung Family are the survivors and/or heirs of Sgt DeYoung and are entitled to recover for the damages Sgt DeYoung sustained.

619. Plaintiff Teddi DeYoung is the mother of Sgt DeYoung. She is a national of the United States.

620. As a result of the death of Sgt DeYoung, each member of the DeYoung Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt DeYoung's society, companionship, and counsel.

**The John P. Dion Family**

621. Private First Class John P. Dion served in Afghanistan as a member of the U.S. Army. On January 3, 2010, PFC Dion was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. PFC Dion died on January 3, 2010 as a result of injuries sustained during the attack.

622. PFC Dion was a national of the United States at the time of the attack and his death.

623. As a result of the attack, PFC Dion was injured in his person and/or property. The Plaintiff members of the Dion Family are the survivors and/or heirs of PFC Dion and are entitled to recover for the damages PFC Dion sustained.

624. Plaintiff Patricia Elsner is the mother of PFC Dion. She is a national of the United States.

625. Plaintiff Kelsey Thomas is the sister of PFC Dion. She is a national of the United States.

626. Plaintiff Mark Elsner is the step-father of PFC Dion. He is a national of the United States. Mark Elsner lived in the same household as PFC Dion for a substantial period of time and considered PFC Dion the functional equivalent of a biological son.

627. Plaintiff Jackie Allen is the step-sister of PFC Dion. She is a national of the United States. Jackie Allen lived in the same household as PFC Dion for a substantial period of time and considered PFC Dion the functional equivalent of a biological brother.

628. Plaintiff Mark Anthony Elsner is the step-brother of PFC Dion. He is a national of the United States. Mark Anthony Elsner lived in the same household as PFC Dion for a substantial period of time and considered PFC Dion the functional equivalent of a biological brother.

629. As a result of the death of PFC Dion, each member of the Dion Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Dion's society, companionship, and counsel.

**The Corey J. Dodge Family**

630. Corey J. Dodge served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. Dodge was injured in a suicide bombing attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. Mr. Dodge died on August 22, 2015 as a result of injuries sustained during the attack.

631. Mr. Dodge was a national of the United States at the time of the attack and his death.

632. As a result of the attack, Mr. Dodge was injured in his person and/or property. The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

633. Plaintiff Kelli Dodge is the widow of Mr. Dodge. She is a national of the United States.

634. Plaintiff B.C.D., by and through his next friend Kelli Dodge, is the minor son of Mr. Dodge. He is a national of the United States.

635. Plaintiff P.A.D., by and through her next friend Kelli Dodge, is the minor daughter of Mr. Dodge. She is a national of the United States.

636. As a result of the death of Mr. Dodge, each member of the Dodge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Dodge's society, companionship, and counsel.

**The Max W. Donahue Family**

637. Corporal Max W. Donahue served in Afghanistan as a member of the U.S. Marine Corps. On August 4, 2010, Cpl Donahue was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. Cpl Donahue died on August 7, 2010 as a result of injuries sustained during the attack.

638. Cpl Donahue was a national of the United States at the time of the attack and his death.

639. As a result of the attack, Cpl Donahue was injured in his person and/or property. The Plaintiff members of the Donahue Family are the survivors and/or heirs of Cpl Donahue and are entitled to recover for the damages Cpl Donahue sustained.

640. Plaintiff Julie Schrock is the mother of Cpl Donahue. She is a national of the United States.

641. Plaintiff Ryan Donahue is the brother of Cpl Donahue. He is a national of the United States.

642. Plaintiff Chandler Schrock is the step-father of Cpl Donahue. He is a national of the United States. Chandler Schrock lived in the same household as Cpl Donahue for a substantial period of time and considered Cpl Donahue the functional equivalent of a biological son.

643. Plaintiff Taylor Schrock is the step-brother of Cpl Donahue. He is a national of the United States. Taylor Schrock lived in the same household as Cpl Donahue for a substantial period of time and considered Cpl Donahue the functional equivalent of a biological brother.

644. As a result of the death of Cpl Donahue, each member of the Donahue Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Donahue's society, companionship, and counsel.

**The Stephen J. Dunning Family**

645. Staff Sergeant Stephen J. Dunning served in Afghanistan as a member of the U.S. Marine Corps. On October 27, 2011, SSgt Dunning was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SSgt Dunning died on October 27, 2011 as a result of injuries sustained during the attack.

646. SSgt Dunning was a national of the United States at the time of the attack and his death.

647. As a result of the attack, SSgt Dunning was injured in his person and/or property. The Plaintiff members of the Dunning Family are the survivors and/or heirs of SSgt Dunning and are entitled to recover for the damages SSgt Dunning sustained.

648. Plaintiff Robert L. Dunning is the father of SSgt Dunning. He is a national of the United States.

649. Plaintiff Tomoe Dunning is the mother of SSgt Dunning. She is a national of the United States.

650. Plaintiff Joy Coy is the sister of SSgt Dunning. She is a national of the United States.

651. As a result of the death of SSgt Dunning, each member of the Dunning Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Dunning's society, companionship, and counsel.

**Erich Ellis**

652. Plaintiff Sergeant Erich Ellis served in Afghanistan as a member of the U.S. Marine Corps. On June 12, 2019, Sgt Ellis was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. The attack severely wounded Sgt Ellis, who lost his right leg and suffered from extensive, permanent damage to his left leg, right arm, and upper right leg as well as a traumatic brain injury. As a result of the June 12, 2019 attack and his injuries, Sgt Ellis has experienced severe physical and emotional pain and suffering.

653. Sgt Ellis was a national of the United States at the time of the attack and remains one to this day.

**The Kenneth B. Elwell Family**

654. Sergeant First Class Kenneth B. Elwell served in Afghanistan as a member of the U.S. Army. On July 17, 2011, SFC Elwell was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SFC Elwell died on July 17, 2011 as a result of injuries sustained during the attack.

655. SFC Elwell was a national of the United States at the time of the attack and his death.

656. As a result of the attack, SFC Elwell was injured in his person and/or property. The Plaintiff members of the Elwell Family are the survivors and/or heirs of SFC Elwell and are entitled to recover for the damages SFC Elwell sustained.

657. Plaintiff Kristen A. Elwell is the widow of SFC Elwell. She is a national of the United States.

658. Plaintiff E.M.E., by and through her next friend Kristen A. Elwell, is the minor daughter of SFC Elwell. She is a national of the United States.

659. Plaintiff N.B.E., by and through his next friend Kristen A. Elwell, is the minor son of SFC Elwell. He is a national of the United States.

660. Plaintiff Susan Burkhard is the sister of SFC Elwell. She is a national of the United States.

661. As a result of the death of SFC Elwell, each member of the Elwell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Elwell's society, companionship, and counsel.

**The Richard A. Essex Family**

662. Sergeant Richard A. Essex served in Afghanistan as a member of the U.S. Army. On August 16, 2012, SGT Essex was injured in an attack on a Chinook helicopter committed by the Taliban in Kandahar Province, Afghanistan. SGT Essex died on August 16, 2012 as a result of injuries sustained during the attack.

663. SGT Essex was a national of the United States at the time of the attack and his death.

664. As a result of the attack, SGT Essex was injured in his person and/or property. The Plaintiff members of the Essex Family are the survivors and/or heirs of SGT Essex and are entitled to recover for the damages SGT Essex sustained.

665. Plaintiff Charles Essex is the father of SGT Essex. He is a national of the United States.

666. As a result of the death of SGT Essex, each member of the Essex Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Essex's society, companionship, and counsel.

**The Jered W. Ewy Family**

667. Second Lieutenant Jered W. Ewy served in Afghanistan as a member of the U.S. Army National Guard. On July 29, 2011, 2LT Ewy was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Paktia Province, Afghanistan. 2LT Ewy died on July 29, 2011 as a result of injuries sustained during the attack.

668. 2LT Ewy was a national of the United States at the time of the attack and his death.

669. As a result of the attack, 2LT Ewy was injured in his person and/or property. The Plaintiff members of the Ewy Family are the survivors and/or heirs of 2LT Ewy and are entitled to recover for the damages 2LT Ewy sustained.

670. Plaintiff John Ewy is the father of 2LT Ewy. He is a national of the United States.

671. As a result of the death of 2LT Ewy, each member of the Ewy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 2LT Ewy's society, companionship, and counsel.

**The Garrett A. Fant Family**

672. Specialist Garrett A. Fant served in Afghanistan as a member of the U.S. Army. On September 26, 2011, SPC Fant was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SPC Fant died on September 26, 2011 as a result of injuries sustained during the attack.

673. SPC Fant was a national of the United States at the time of the attack and his death.

674. As a result of the attack, SPC Fant was injured in his person and/or property. The Plaintiff members of the Fant Family are the survivors and/or heirs of SPC Fant and are entitled to recover for the damages SPC Fant sustained.

675. Plaintiff John L. Fant is the father of SPC Fant. He is a national of the United States.

676. As a result of the death of SPC Fant, each member of the Fant Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Fant's society, companionship, and counsel.

**The Jason D. Fingar Family**

677. Specialist Jason D. Fingar served in Afghanistan as a member of the U.S. Army. On May 22, 2010, SPC Fingar was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SPC Fingar died on May 22, 2010 as a result of injuries sustained during the attack.

678. SPC Fingar was a national of the United States at the time of the attack and his death.

679. As a result of the attack, SPC Fingar was injured in his person and/or property. The Plaintiff members of the Fingar Family are the survivors and/or heirs of SPC Fingar and are entitled to recover for the damages SPC Fingar sustained.

680. Plaintiff David Fingar is the father of SPC Fingar. He is a national of the United States.

681. Plaintiff Rhonda G. Fingar is the mother of SPC Fingar. She is a national of the United States.

682. Plaintiff Andrea Dietz is the sister of SPC Fingar. She is a national of the United States.

683. Plaintiff Buford Jeremiah Fingar is the brother of SPC Fingar. He is a national of the United States.

684. Plaintiff Donald Joshua Fingar is the brother of SPC Fingar. He is a national of the United States.

685. As a result of the death of SPC Fingar, each member of the Fingar Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Fingar's society, companionship, and counsel.

**The Michael L. Freeman Jr. Family**

686. Lance Corporal Michael L. Freeman Jr. served in Afghanistan as a member of the U.S. Marine Corps. On February 1, 2010, LCpl Freeman was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. LCpl Freeman died on February 1, 2010 as a result of injuries sustained during the attack.

687. LCpl Freeman was a national of the United States at the time of the attack and his death.

688. As a result of the attack, LCpl Freeman was injured in his person and/or property. The Plaintiff members of the Freeman Family are the survivors and/or heirs of LCpl Freeman and are entitled to recover for the damages LCpl Freeman sustained.

689. Plaintiff Stephanie Freeman is the widow of LCpl Freeman. She is a national of the United States.

690. As a result of the death of LCpl Freeman, each member of the Freeman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Freeman's society, companionship, and counsel.

**The Ronald D. Freeman Family**

691. Lance Corporal Ronald D. Freeman served in Afghanistan as a member of the U.S. Marine Corps. On April 28, 2011, LCpl Freeman was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. LCpl Freeman died on April 28, 2011 as a result of injuries sustained during the attack.

692. LCpl Freeman was a national of the United States at the time of the attack and his death.

693. As a result of the attack, LCpl Freeman was injured in his person and/or property. The Plaintiff members of the Freeman Family are the survivors and/or heirs of LCpl Freeman and are entitled to recover for the damages LCpl Freeman sustained.

694. Plaintiff Katie C. Freeman is the widow of LCpl Freeman. She is a national of the United States.

695. Plaintiff K.M.F., by and through her next friend Katie C. Freeman, is the minor daughter of LCpl Freeman. She is a national of the United States.

696. Plaintiff W.D.F., by and through his next friend Katie C. Freeman, is the minor son of LCpl Freeman. He is a national of the United States.

697. As a result of the death of LCpl Freeman, each member of the Freeman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Freeman's society, companionship, and counsel.

**The Joseph M. Garrison Family**

698. Sergeant Joseph M. Garrison served in Afghanistan as a member of the U.S. Marine Corps. On June 6, 2011, Sgt Garrison was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. Sgt Garrison died on June 6, 2011 as a result of injuries sustained during the attack.

699. Sgt Garrison was a national of the United States at the time of the attack and his death.

700. As a result of the attack, Sgt Garrison was injured in his person and/or property. The Plaintiff members of the Garrison Family are the survivors and/or heirs of Sgt Garrison and are entitled to recover for the damages Sgt Garrison sustained.

701. Plaintiff Joseph D. Garrison is the father of Sgt Garrison. He is a national of the United States.

702. As a result of the death of Sgt Garrison, each member of the Garrison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Garrison's society, companionship, and counsel.

**The Kendra Garza Family**

703. Plaintiff Sergeant Kendra Garza served in Afghanistan as a member of the U.S. Army. On May 11, 2010, SGT Garza was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Logar Province, Afghanistan. The attack severely wounded SGT Garza, who lost her left leg and suffered from multiple pelvic fractures and post-traumatic stress disorder. As a result of the May 11, 2010 attack and her injuries, SGT Garza has experienced severe physical and emotional pain and suffering.

704. SGT Garza was a national of the United States at the time of the attack, and remains one to this day.

705. Plaintiff David Pieper is the father of SGT Garza. He is a national of the United States.

706. Plaintiff Gayle Marie Pieper is the mother of SGT Garza. She is a national of the United States.

707. Plaintiff Kaila Carrier is the sister of SGT Garza. She is a national of the United States.

708. Plaintiff Troy M.W. Pieper is the brother of SGT Garza. He is a national of the United States.

709. As a result of the May 11, 2010 attack and SGT Garza's injuries, each member of the Garza Family has experienced severe mental anguish, emotional pain and suffering.

**The William Joseph Gilbert Family**

710. Specialist William Joseph Gilbert served in Afghanistan as a member of the U.S. Army. On May 14, 2013, SPC Gilbert was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Gilbert died on May 14, 2013 as a result of injuries sustained during the attack.

711. SPC Gilbert was a national of the United States at the time of the attack and his death.

712. As a result of the attack, SPC Gilbert was injured in his person and/or property. The Plaintiff members of the Gilbert Family are the survivors and/or heirs of SPC Gilbert and are entitled to recover for the damages SPC Gilbert sustained.

713. Plaintiff Joanna Gilbert is the mother of SPC Gilbert. She is a national of the United States.

714. As a result of the death of SPC Gilbert, each member of the Gilbert Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gilbert's society, companionship, and counsel.

**The Paul Goins Jr. Family**

715. Paul Goins Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Goins was injured in an IED attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. Mr. Goins died on February 10, 2014 as a result of injuries sustained during the attack.

716. Mr. Goins was a national of the United States at the time of the attack and his death.

717. As a result of the attack, Mr. Goins was injured in his person and/or property. The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

718. Plaintiff Patricia Goins is the widow of Mr. Goins. She is a national of the United States.

719. Plaintiff Paul Edward Goins III is the son of Mr. Goins. He is a national of the United States.

720. Plaintiff Emmitt Dwayne Burns is the step-son of Mr. Goins. He is a national of the United States. Emmitt Dwayne Burns lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

721. Plaintiff Janice Caruso is the step-daughter of Mr. Goins. She is a national of the United States. Janice Caruso lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

722. Plaintiff Dana Rainey is the step-daughter of Mr. Goins. She is a national of the United States. Dana Rainey lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

723. As a result of the death of Mr. Goins, each member of the Goins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Goins's society, companionship, and counsel.

**The Wyatt A. Goldsmith Family**

724. Sergeant First Class Wyatt A. Goldsmith served in Afghanistan as a member of the U.S. Army. On July 15, 2011, SFC Goldsmith was injured in a rocket propelled grenade attack committed by the Taliban in Helmand Province, Afghanistan. SFC Goldsmith died on July 15, 2011 as a result of injuries sustained during the attack.

725. SFC Goldsmith was a national of the United States at the time of the attack and his death.

726. As a result of the attack, SFC Goldsmith was injured in his person and/or property. The Plaintiff members of the Goldsmith Family are the survivors and/or heirs of SFC Goldsmith and are entitled to recover for the damages SFC Goldsmith sustained.

727. Plaintiff John Wayne Goldsmith is the father of SFC Goldsmith. He is a national of the United States.

728. Plaintiff Lorie Goldsmith is the mother of SFC Goldsmith. She is a national of the United States.

729. As a result of the death of SFC Goldsmith, each member of the Goldsmith Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Goldsmith's society, companionship, and counsel.

**The Kristopher J. Gould Family**

730. Sergeant Kristopher J. Gould served in Afghanistan as a member of the U.S. Army. On February 27, 2011, SGT Gould was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Ghazni Province, Afghanistan. SGT Gould died on February 27, 2011 as a result of injuries sustained during the attack.

731. SGT Gould was a national of the United States at the time of the attack and his death.

732. As a result of the attack, SGT Gould was injured in his person and/or property. The Plaintiff members of the Gould Family are the survivors and/or heirs of SGT Gould and are entitled to recover for the damages SGT Gould sustained.

733. Plaintiff Ann L. Gould is the mother of SGT Gould. She is a national of the United States.

734. Plaintiff James A. Gould is the father of SGT Gould. He is a national of the United States.

735. Plaintiff Julianna Symkowiak is the sister of SGT Gould. She is a national of the United States.

736. As a result of the death of SGT Gould, each member of the Gould Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gould's society, companionship, and counsel.

**The Douglas J. Green Family**

737. Specialist Douglas J. Green served in Afghanistan as a member of the U.S. Army. On August 28, 2011, SPC Green was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Green died on August 28, 2011 as a result of injuries sustained during the attack.

738. SPC Green was a national of the United States at the time of the attack and his death.

739. As a result of the attack, SPC Green was injured in his person and/or property. The Plaintiff members of the Green Family are the survivors and/or heirs of SPC Green and are entitled to recover for the damages SPC Green sustained.

740. Plaintiff Suni Chabrow is the mother of SPC Green. She is a national of the United States.

741. Plaintiff Kristin Caracciolo is the sister of SPC Green. She is a national of the United States.

742. Plaintiff Paige Erlanger is the sister of SPC Green. She is a national of the United States.

743. As a result of the death of SPC Green, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Green's society, companionship, and counsel.

**The Matthias N. Hanson Family**

744. Lance Corporal Matthias N. Hanson served in Afghanistan as a member of the U.S. Marine Corps. On February 21, 2010, LCpl Hanson was injured in an IED attack

committed by the Taliban in Helmand Province, Afghanistan. LCpl Hanson died on February 21, 2010 as a result of injuries sustained during the attack.

745. LCpl Hanson was a national of the United States at the time of the attack and his death.

746. As a result of the attack, LCpl Hanson was injured in his person and/or property. The Plaintiff members of the Hanson Family are the survivors and/or heirs of LCpl Hanson and are entitled to recover for the damages LCpl Hanson sustained.

747. Plaintiff Lowell Hanson is the father of LCpl Hanson. He is a national of the United States.

748. Plaintiff Megan Kathleen Dohn is the sister of LCpl Hanson. She is a national of the United States.

749. Plaintiff Cynthia Hanson is the step-mother of LCpl Hanson. She is a national of the United States. Cynthia Hanson lived in the same household as LCpl Hanson for a substantial period of time and considered LCpl Hanson the functional equivalent of a biological son.

750. As a result of the death of LCpl Hanson, each member of the Hanson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Hanson's society, companionship, and counsel.

**The Scott D. Harper Family**

751. Lance Corporal Scott D. Harper served in Afghanistan as a member of the U.S. Marine Corps. On October 13, 2011, LCpl Harper was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. LCpl Harper died on October 13, 2011 as a result of injuries sustained during the attack.

752. LCpl Harper was a national of the United States at the time of the attack and his death.

753. As a result of the attack, LCpl Harper was injured in his person and/or property. The Plaintiff members of the Harper Family are the survivors and/or heirs of LCpl Harper and are entitled to recover for the damages LCpl Harper sustained.

754. Plaintiff Brian Harper is the father of LCpl Harper. He is a national of the United States.

755. As a result of the death of LCpl Harper, each member of the Harper Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Harper's society, companionship, and counsel.

**The Devon J. Harris Family**

756. Private First Class Devon J. Harris served in Afghanistan as a member of the U.S. Army. On November 27, 2010, PFC Harris was injured in a rocket propelled grenade attack committed by the Haqqani Network, a part of the Taliban, in Wardak Province, Afghanistan. PFC Harris died on November 27, 2010 as a result of injuries sustained during the attack.

757. PFC Harris was a national of the United States at the time of the attack and his death.

758. As a result of the attack, PFC Harris was injured in his person and/or property. The Plaintiff members of the Harris Family are the survivors and/or heirs of PFC Harris and are entitled to recover for the damages PFC Harris sustained.

759. Plaintiff Sorainya Harris is the mother of PFC Harris. She is a national of the United States.

760. Plaintiff Tennyson Charles Harris is the father of PFC Harris. He is a national of the United States.

761. Plaintiff Tiffany Dotson is the sister of PFC Harris. She is a national of the United States.

762. Plaintiff Ashley Michelle Harris is the sister of PFC Harris. She is a national of the United States.

763. Plaintiff Christopher Wayne Johnson is the brother of PFC Harris. He is a national of the United States.

764. Plaintiff David L. Parker is the brother of PFC Harris. He is a national of the United States.

765. Plaintiff Felicia Ann Harris is the step-mother of PFC Harris. She is a national of the United States. Felicia Ann Harris lived in the same household as PFC Harris for a substantial period of time and considered PFC Harris the functional equivalent of a biological son.

766. Plaintiff Michael Rufus II is the step-brother of PFC Harris. He is a national of the United States. Michael Rufus II lived in the same household as PFC Harris for a substantial period of time and considered PFC Harris the functional equivalent of a biological brother.

767. Plaintiff Stephanie Rufus is the step-sister of PFC Harris. She is a national of the United States. Stephanie Rufus lived in the same household as PFC Harris for a substantial period of time and considered PFC Harris the functional equivalent of a biological brother.

768. As a result of the death of PFC Harris, each member of the Harris Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Harris's society, companionship, and counsel.

**The Joshua A. Harton Family**

769. Corporal Joshua A. Harton served in Afghanistan as a member of the U.S. Army. On September 18, 2010, CPL Harton was injured in a rocket propelled grenade attack committed by the Taliban in Faryab Province, Afghanistan. CPL Harton died on September 18, 2010 as a result of injuries sustained during the attack.

770. CPL Harton was a national of the United States at the time of the attack and his death.

771. As a result of the attack, CPL Harton was injured in his person and/or property. The Plaintiff members of the Harton Family are the survivors and/or heirs of CPL Harton and are entitled to recover for the damages CPL Harton sustained.

772. Plaintiff Ruth M. Harton is the mother of CPL Harton. She is a national of the United States.

773. As a result of the death of CPL Harton, each member of the Harton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Harton's society, companionship, and counsel.

**The Jose A. Hernandez Family**

774. Lance Corporal Jose A. Hernandez served in Afghanistan as a member of the U.S. Marine Corps. On December 14, 2010, LCpl Hernandez was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. LCpl Hernandez died on December 14, 2010 as a result of injuries sustained during the attack.

775. LCpl Hernandez was a national of the United States at the time of the attack and his death.

776. As a result of the attack, LCpl Hernandez was injured in his person and/or property. The Plaintiff members of the Hernandez Family are the survivors and/or heirs of LCpl Hernandez and are entitled to recover for the damages LCpl Hernandez sustained.

777. Plaintiff Evangeline Ferrera is the mother of LCpl Hernandez. She is a national of the United States.

778. Plaintiff Eduardo Ferrera is the step-father of LCpl Hernandez and is his survivor and/or heir. Eduardo Ferrera lived in the same household as LCpl Hernandez for a substantial period of time and considered LCpl Hernandez the functional equivalent of a biological son.

779. As a result of the death of LCpl Hernandez, each member of the Hernandez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Hernandez's society, companionship, and counsel.

**The Daren M. Hidalgo Family**

780. First Lieutenant Daren M. Hidalgo served in Afghanistan as a member of the U.S. Army. On February 20, 2011, 1LT Hidalgo was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. 1LT Hidalgo died on February 20, 2011 as a result of injuries sustained during the attack.

781. 1LT Hidalgo was a national of the United States at the time of the attack and his death.

782. As a result of the attack, 1LT Hidalgo was injured in his person and/or property. The Plaintiff members of the Hidalgo Family are the survivors and/or heirs of 1LT Hidalgo and are entitled to recover for the damages 1LT Hidalgo sustained.

783. Plaintiff Andrea Hidalgo is the mother of 1LT Hidalgo. She is a national of the United States.

784. Plaintiff Jorge Hidalgo is the father of 1LT Hidalgo. He is a national of the United States.

785. As a result of the death of 1LT Hidalgo, each member of the Hidalgo Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Hidalgo's society, companionship, and counsel.

**The Floyd E.C. Holley Family**

786. Gunnery Sergeant Floyd E.C. Holley served in Afghanistan as a member of the U.S. Marine Corps. On August 29, 2010, GySgt Holley was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. GySgt Holley died on August 29, 2010 as a result of injuries sustained during the attack.

787. GySgt Holley was a national of the United States at the time of the attack and his death.

788. As a result of the attack, GySgt Holley was injured in his person and/or property. The Plaintiff members of the Holley Family are the survivors and/or heirs of GySgt Holley and are entitled to recover for the damages GySgt Holley sustained.

789. Plaintiff Dominic Giacchi is the brother of GySgt Holley. He is a national of the United States.

790. As a result of the death of GySgt Holley, each member of the Holley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of GySgt Holley's society, companionship, and counsel.

**Kevin Honaker**

791. Plaintiff Lance Corporal Kevin Honaker served in Afghanistan as a member of the U.S. military Marine Corps. On September 13, 2011, LCpl. Honaker was injured in an IED

attack committed by the Taliban in Helmand Province, Afghanistan. The attack severely wounded LCpl. Honaker, who lost his left leg above the knee, his right leg below the knee, and a finger on his left hand. As a result of the September 13, 2011 attack and his injuries, LCpl. Honaker has experienced severe physical and emotional pain and suffering.

792. LCpl. Honaker was a national of the United States at the time of the attack and remains one to this day.

**The Abram L. Howard Family**

793. Lance Corporal Abram L. Howard served in Afghanistan as a member of the U.S. Marine Corps Reserves. On July 27, 2010, LCpl Howard was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. LCpl Howard died on July 27, 2010 as a result of injuries sustained during the attack.

794. LCpl Howard was a national of the United States at the time of the attack and his death.

795. As a result of the attack, LCpl Howard was injured in his person and/or property. The Plaintiff members of the Howard Family are the survivors and/or heirs of LCpl Howard and are entitled to recover for the damages LCpl Howard sustained.

796. Plaintiff Bart LaRue Howard is the father of LCpl Howard. He is a national of the United States.

797. Plaintiff Constance Louise Howard is the mother of LCpl Howard. She is a national of the United States.

798. Plaintiff Alexander James Howard is the brother of LCpl Howard. He is a national of the United States.

799. Plaintiff Olivia Marie Howard is the sister of LCpl Howard. She is a national of the United States.

800. As a result of the death of LCpl Howard, each member of the Howard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Howard's society, companionship, and counsel.

**The Michael A. Hughes Family**

801. Michael A. Hughes served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Hughes was injured in an IED attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. Mr. Hughes died on February 10, 2014 as a result of injuries sustained during the attack.

802. Mr. Hughes was a national of the United States at the time of the attack and his death.

803. As a result of the attack, Mr. Hughes was injured in his person and/or property. The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover for the damages Mr. Hughes sustained.

804. Plaintiff Kristine Anne Zitny is the sister of Mr. Hughes. She is a national of the United States.

805. As a result of the death of Mr. Hughes, each member of the Hughes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Hughes's society, companionship, and counsel.

**The Eric M. Hunter Family**

806. Plaintiff Sergeant Eric M. Hunter served in Afghanistan as a member of the U.S. military Army. On May 31, 2012, SGT Hunter was injured in an IED attack committed by the

Taliban in Helmand Province, Afghanistan. The attack severely wounded SGT Hunter, who lost his right leg and suffered from a severely injured left leg, post-traumatic stress disorder, and a traumatic brain injury. As a result of the May 31, 2012 attack and his injuries, SGT Hunter has experienced severe physical and emotional pain and suffering.

807. SGT Hunter was a national of the United States at the time of the attack, and remains one to this day.

808. Plaintiff Kenna Hunter is the wife of SGT Hunter. She is a national of the United States.

809. Plaintiff J.H., by and through his next friend Kenna Hunter, is the minor son of SGT Hunter. He is a national of the United States.

810. Plaintiff K.H., by and through her next friend Kenna Hunter, is the minor daughter of SGT Hunter. She is a national of the United States.

811. As a result of the May 31, 2012 attack and SGT Hunter's injuries, each member of the Hunter Family has experienced severe mental anguish, emotional pain and suffering.

**The Jesse Infante Family**

812. Staff Sergeant Jesse Infante served in Afghanistan as a member of the U.S. Army. On August 30, 2010, SSG Infante was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SSG Infante died on August 30, 2010 as a result of injuries sustained during the attack.

813. SSG Infante was a national of the United States at the time of the attack and his death.

814. As a result of the attack, SSG Infante was injured in his person and/or property. The Plaintiff members of the Infante Family are the survivors and/or heirs of SSG Infante and are entitled to recover for the damages SSG Infante sustained.

815. Plaintiff Jesus Infante is the father of SSG Infante. He is a national of the United States.

816. Plaintiff Jessica Infante is the sister of SSG Infante. She is a national of the United States.

817. Plaintiff Juan Infante is the brother of SSG Infante. He is a national of the United States.

818. As a result of the death of SSG Infante, each member of the Infante Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Infante's society, companionship, and counsel.

**The Michael K. Ingram Jr. Family**

819. Sergeant Michael K. Ingram Jr. served in Afghanistan as a member of the U.S. Army. On April 17, 2010, SGT Ingram was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SGT Ingram died on April 17, 2010 as a result of injuries sustained during the attack.

820. SGT Ingram was a national of the United States at the time of the attack and his death.

821. As a result of the attack, SGT Ingram was injured in his person and/or property. The Plaintiff members of the Ingram Family are the survivors and/or heirs of SGT Ingram and are entitled to recover for the damages SGT Ingram sustained.

822. Plaintiff Michael K. Ingram Sr. is the father of SGT Ingram. He is a national of the United States.

823. Plaintiff Julie Ingram is the step-mother of SGT Ingram. She is a national of the United States. Julie Ingram lived in the same household as SGT Ingram for a substantial period of time and considered SGT Ingram the functional equivalent of a biological son.

824. As a result of the death of SGT Ingram, each member of the Ingram Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ingram's society, companionship, and counsel.

**The Ryan P. Jayne Family**

825. Specialist Ryan P. Jayne served in Afghanistan as a member of the U.S. Army Reserve. On November 3, 2012, SPC Jayne was injured in an IED attack committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Paktia Province, Afghanistan. SPC Jayne died on November 3, 2012 as a result of injuries sustained during the attack.

826. SPC Jayne was a national of the United States at the time of the attack and his death.

827. As a result of the attack, SPC Jayne was injured in his person and/or property. The Plaintiff members of the Jayne Family are the survivors and/or heirs of SPC Jayne and are entitled to recover for the damages SPC Jayne sustained.

828. Plaintiff Paul Elmer Jayne is the father of SPC Jayne. He is a national of the United States.

829. As a result of the death of SPC Jayne, each member of the Jayne Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Jayne's society, companionship, and counsel.

**The Timothy L. Johnson Family**

830. Specialist Timothy L. Johnson served in Afghanistan as a member of the U.S. Army. On September 16, 2010, SPC Johnson was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SPC Johnson died on September 16, 2010 as a result of injuries sustained during the attack.

831. SPC Johnson was a national of the United States at the time of the attack and his death.

832. As a result of the attack, SPC Johnson was injured in his person and/or property. The Plaintiff members of the Johnson Family are the survivors and/or heirs of SPC Johnson and are entitled to recover for the damages SPC Johnson sustained.

833. Plaintiff Cheryl Johnson is the mother of SPC Johnson. She is a national of the United States.

834. As a result of the death of SPC Johnson, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Johnson's society, companionship, and counsel.

**The Denis D. Kisseloff Family**

835. Sergeant Denis D. Kisseloff served in Afghanistan as a member of the U.S. Army National Guard. On May 14, 2010, SGT Kisseloff was injured in a rocket propelled grenade attack committed by the Haqqani Network, a part of the Taliban, in Logar Province, Afghanistan. SGT Kisseloff died on May 14, 2010 as a result of injuries sustained during the attack.

836. SGT Kisseloff was a national of the United States at the time of the attack and his death.

837. As a result of the attack, SGT Kisseloff was injured in his person and/or property. The Plaintiff members of the Kisseloff Family are the survivors and/or heirs of SGT Kisseloff and are entitled to recover for the damages SGT Kisseloff sustained.

838. Plaintiff Michael Kisseloff is the father of SGT Kisseloff. He is a national of the United States.

839. Plaintiff Milagros Kisseloff is the mother of SGT Kisseloff. She is a national of the United States.

840. As a result of the death of SGT Kisseloff, each member of the Kisseloff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Kisseloff's society, companionship, and counsel.

**Edward Klein**

841. Plaintiff Major Edward Klein served in Afghanistan as a member of the U.S. Army. On October 22, 2012, MAJ Klein was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. The attack severely wounded MAJ Klein, who lost both legs above the knee, his right arm, and three fingers on his left hand. As a result of the October 22, 2012 attack and his injuries, MAJ Klein has experienced severe physical and emotional pain and suffering.

842. MAJ Klein was a national of the United States at the time of the attack and remains one to this day.

**Brandon Korona**

843. Plaintiff Sergeant Brandon Korona served in Afghanistan as a member of the U.S. Army. On June 23, 2013, SGT Korona was injured in an IED attack committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Paktika Province, Afghanistan. The attack severely wounded SGT Korona, who suffered from significant injuries to his left leg requiring a below knee amputation in 2017, a fractured right ankle, and a traumatic brain injury. As a result of the June 23, 2013 attack and his injuries, SGT Korona has experienced severe physical and emotional pain and suffering.

844. SGT Korona was a national of the United States at the time of the attack and remains one to this day.

**The Brandon J. Landrum Family**

845. First Lieutenant Brandon J. Landrum served in Afghanistan as a member of the U.S. Army. On May 4, 2013, 1LT Landrum was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. 1LT Landrum died on May 4, 2013 as a result of injuries sustained during the attack.

846. 1LT Landrum was a national of the United States at the time of the attack and his death.

847. As a result of the attack, 1LT Landrum was injured in his person and/or property. The Plaintiff members of the Landrum Family are the survivors and/or heirs of 1LT Landrum and are entitled to recover for the damages 1LT Landrum sustained.

848. Plaintiff Miranda Landrum is the widow of 1LT Landrum. She is a national of the United States.

849. Plaintiff B.R.L., by and through her next friend Miranda Landrum, is the minor daughter of 1LT Landrum. She is a national of the United States.

850. Plaintiff G.B.L., by and through his next friend Miranda Landrum, is the minor son of 1LT Landrum. He is a national of the United States.

851. Plaintiff James R. Landrum is the father of 1LT Landrum. He is a national of the United States.

852. Plaintiff Janet Landrum is the mother of 1LT Landrum. She is a national of the United States.

853. As a result of the death of 1LT Landrum, each member of the Landrum Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Landrum's society, companionship, and counsel.

**The Jacob C. Leicht Family**

854. Corporal Jacob C. Leicht served in Afghanistan as a member of the U.S. Marine Corps. On May 27, 2010, Cpl Leicht was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. Cpl Leicht died on May 27, 2010 as a result of injuries sustained during the attack.

855. Cpl Leicht was a national of the United States at the time of the attack and his death.

856. As a result of the attack, Cpl Leicht was injured in his person and/or property. The Plaintiff members of the Leicht Family are the survivors and/or heirs of Cpl Leicht and are entitled to recover for the damages Cpl Leicht sustained.

857. Plaintiff Craig Leicht is the father of Cpl Leicht. He is a national of the United States.

858. Plaintiff Shirly A. Leicht is the mother of Cpl Leicht. She is a national of the United States.

859. Plaintiff Elizabeth C. Leicht is the sister of Cpl Leicht. She is a national of the United States.

860. Plaintiff Jesse H. Leicht is the brother of Cpl Leicht. He is a national of the United States.

861. Plaintiff Jonathan Leicht is the brother of Cpl Leicht. He is a national of the United States.

862. Plaintiff Mary Rose Leicht is the sister of Cpl Leicht. She is a national of the United States.

863. Plaintiff Sarah Grace Leicht is the sister of Cpl Leicht. She is a national of the United States.

864. As a result of the death of Cpl Leicht, each member of the Leicht Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Leicht's society, companionship, and counsel.

**The Jared Satoshi Lemon Family**

865. Plaintiff Sergeant Jared Satoshi Lemon served in Afghanistan as a member of the U.S. Army. On April 11, 2010, SGT Lemon was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. The attack severely wounded SGT Lemon, who suffered from a compound fracture of his right arm, requiring amputation, shrapnel injuries to his head and back, post traumatic stress disorder, and a traumatic brain injury. As a result of the April 11, 2010 attack and his injuries, SGT Lemon has experienced severe physical and emotional pain and suffering.

866. SGT Lemon was a national of the United States at the time of the attack, and remains one to this day.

867. Plaintiff K.E.L., by and through her next friend Jared Satoshi Lemon, is the minor daughter of SGT Lemon. She is a national of the United States.

868. Plaintiff Frank L. Lemon is the father of SGT Lemon. He is a national of the United States.

869. Plaintiff Jackie L. Lemon is the mother of SGT Lemon. She is a national of the United States.

870. Plaintiff Benjamin Lemon is the brother of SGT Lemon. He is a national of the United States.

871. Plaintiff Matthew C. S. Lemon is the brother of SGT Lemon. He is a national of the United States.

872. Plaintiff Nathan Kenji Lemon is the brother of SGT Lemon. He is a national of the United States.

873. As a result of the April 11, 2010 attack and SGT Lemon's injuries, each member of the Lemon Family has experienced severe mental anguish, emotional pain and suffering.

**The Andrew R. Looney Family**

874. Sergeant Andrew R. Looney served in Afghanistan as a member of the U.S. Army. On June 21, 2010, SGT Looney was injured in a suicide bombing attack committed by the Taliban in Kunar Province, Afghanistan. SGT Looney died on June 21, 2010 as a result of injuries sustained during the attack.

875. SGT Looney was a national of the United States at the time of the attack and his death.

876. As a result of the attack, SGT Looney was injured in his person and/or property. The Plaintiff members of the Looney Family are the survivors and/or heirs of SGT Looney and are entitled to recover for the damages SGT Looney sustained.

877. Plaintiff C. Richard Looney is the father of SGT Looney. He is a national of the United States.

878. Plaintiff Martha Looney is the mother of SGT Looney. She is a national of the United States.

879. As a result of the death of SGT Looney, each member of the Looney Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Looney's society, companionship, and counsel.

**The Russell E. Madden Family**

880. Specialist Russell E. Madden served in Afghanistan as a member of the U.S. Army. On June 23, 2010, SPC Madden was injured in a rocket attack committed by the Taliban in Kunar Province, Afghanistan. SPC Madden died on June 23, 2010 as a result of injuries sustained during the attack.

881. SPC Madden was a national of the United States at the time of the attack and his death.

882. As a result of the attack, SPC Madden was injured in his person and/or property. The Plaintiff members of the Madden Family are the survivors and/or heirs of SPC Madden and are entitled to recover for the damages SPC Madden sustained.

883. Plaintiff Michael Davitt is the step-father of SPC Madden. He is a national of the United States. Michael Davitt lived in the same household as SPC Madden for a substantial period of time and considered SPC Madden the functional equivalent of a biological son.

884. As a result of the death of SPC Madden, each member of the Madden Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Madden's society, companionship, and counsel.

**The Kyle Malin Family**

885. Plaintiff Staff Sergeant Kyle Malin served in Afghanistan as a member of the U.S. Army. On July 12, 2010, SSG Malin was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. The attack severely wounded SSG Malin, who lost both his legs above the knee and suffered from hearing loss, traumatic brain injury, post-traumatic stress disorder, injuries to the buttocks, and a reversed colostomy. As a result of the July 12, 2010 attack and his injuries, SSG Malin has experienced severe physical and emotional pain and suffering.

886. SSG Malin was a national of the United States at the time of the attack, and remains one to this day.

887. Plaintiff Alicia Malin is the wife of SSG Malin. She is a national of the United States.

888. Plaintiff C.M., by and through his next friend Alicia Malin, is the minor son of SSG Malin. He is a national of the United States.

889. Plaintiff K.M., by and through his next friend Alicia Malin, is the minor son of SSG Malin. He is a national of the United States.

890. As a result of the July 12, 2010 attack and SSG Malin's injuries, each member of the Malin Family has experienced severe mental anguish, emotional pain and suffering.

**The Chase S. Marta Family**

891. Specialist Chase S. Marta served in Afghanistan as a member of the U.S. Army. On May 7, 2012, SPC Marta was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Ghazni Province, Afghanistan. SPC Marta died on May 7, 2012 as a result of injuries sustained during the attack.

892. SPC Marta was a national of the United States at the time of the attack and his death.

893. As a result of the attack, SPC Marta was injured in his person and/or property. The Plaintiff members of the Marta Family are the survivors and/or heirs of SPC Marta and are entitled to recover for the damages SPC Marta sustained.

894. Plaintiff Taylor Marta is the sister of SPC Marta. She is a national of the United States.

895. As a result of the death of SPC Marta, each member of the Marta Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Marta's society, companionship, and counsel.

**The Ethan J. Martin Family**

896. Corporal Ethan J. Martin served in Afghanistan as a member of the U.S. Army. On August 7, 2012, CPL Martin was injured in an insider attack committed by the Haqqani Network, a part of the Taliban, in Paktia Province, Afghanistan. CPL Martin died on August 7, 2012 as a result of injuries sustained during the attack.

897. CPL Martin was a national of the United States at the time of the attack and his death.

898. As a result of the attack, CPL Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of CPL Martin and are entitled to recover for the damages CPL Martin sustained.

899. Plaintiff Kristie Surprenant is the mother of CPL Martin. She is a national of the United States.

900. Plaintiff Bob Surprenant is the step-father of CPL Martin. He is a national of the United States. Bob Surprenant lived in the same household as CPL Martin for a substantial period of time and considered CPL Martin the functional equivalent of a biological son.

901. As a result of the death of CPL Martin, each member of the Martin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Martin's society, companionship, and counsel.

**The Wyatt J. Martin Family**

902. Specialist Wyatt J. Martin served in Afghanistan as a member of the U.S. Army. On December 12, 2014, SPC Martin was injured in a command wire-detonated IED attack committed by the Taliban in Parwan Province, Afghanistan. SPC Martin died on December 12, 2014 as a result of injuries sustained during the attack.

903. SPC Martin was a national of the United States at the time of the attack and his death.

904. As a result of the attack, SPC Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of SPC Martin and are entitled to recover for the damages SPC Martin sustained.

905. Plaintiff Brian M. Martin is the father of SPC Martin. He is a national of the United States.

906. Plaintiff Julie K. Martin is the mother of SPC Martin. She is a national of the United States.

907. Plaintiff Catherine G. Martin is the sister of SPC Martin. She is a national of the United States.

908. Plaintiff Elizabeth A. Martin is the sister of SPC Martin. She is a national of the United States.

909. As a result of the death of SPC Martin, each member of the Martin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Martin's society, companionship, and counsel.

**The Chauncy R. Mays Family**

910. Staff Sergeant Chauncy R. Mays served in Afghanistan as a member of the U.S. Army. On February 28, 2011, SSG Mays was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Wardak Province, Afghanistan. SSG Mays died on February 28, 2011 as a result of injuries sustained during the attack.

911. SSG Mays was a national of the United States at the time of the attack and his death.

912. As a result of the attack, SSG Mays was injured in his person and/or property. The Plaintiff members of the Mays Family are the survivors and/or heirs of SSG Mays and are entitled to recover for the damages SSG Mays sustained.

913. Plaintiff Thomas Pierce Mays is the father of SSG Mays. He is a national of the United States.

914. Plaintiff Alyson Overman Rodgers is the mother of SSG Mays. She is a national of the United States.

915. Plaintiff Cody Cheyenne Mays is the brother of SSG Mays. He is a national of the United States.

916. Plaintiff Tammy Renee Mays is the step-mother of SSG Mays. She is a national of the United States. Tammy Renee Mays lived in the same household as SSG Mays for a substantial period of time and considered SSG Mays the functional equivalent of a biological son.

917. As a result of the death of SSG Mays, each member of the Mays Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mays's society, companionship, and counsel.

**The Mecolus C. McDaniel Family**

918. Staff Sergeant Mecolus C. McDaniel served in Afghanistan as a member of the U.S. Army. On March 19, 2011, SSG McDaniel was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Khost Province, Afghanistan. SSG McDaniel died on March 19, 2011 as a result of injuries sustained during the attack.

919. SSG McDaniel was a national of the United States at the time of the attack and his death.

920. As a result of the attack, SSG McDaniel was injured in his person and/or property. The Plaintiff members of the McDaniel Family are the survivors and/or heirs of SSG McDaniel and are entitled to recover for the damages SSG McDaniel sustained.

921. Plaintiff Sonja McDaniel is the widow of SSG McDaniel. She is a national of the United States.

922. Plaintiff M.M., by and through his next friend Sonja McDaniel, is the minor son of SSG McDaniel. He is a national of the United States.

923. Plaintiff J.G., by and through his next friend Sonja McDaniel, is the minor step-son of SSG McDaniel. He is a national of the United States. J.G. lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

924. Plaintiff Charlette Gilbert is the step-daughter of SSG McDaniel. She is a national of the United States. Charlette Gilbert lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

925. Plaintiff Charmaine Renee Gilbert is the step-daughter of SSG McDaniel. She is a national of the United States. Charmaine Renee Gilbert lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

926. Plaintiff Jasmine Thomas is the step-daughter of SSG McDaniel. She is a national of the United States. Jasmine Thomas lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

927. As a result of the death of SSG McDaniel, each member of the McDaniel Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG McDaniel's society, companionship, and counsel.

**The Richard P. McEvoy Family**

928. Richard P. McEvoy served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. McEvoy was injured in a suicide bombing

attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. Mr. McEvoy died on August 22, 2015 as a result of injuries sustained during the attack.

929. Mr. McEvoy was a national of the United States at the time of the attack and his death.

930. As a result of the attack, Mr. McEvoy was injured in his person and/or property. The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

931. Plaintiff Kathleen McEvoy is the widow of Mr. McEvoy. She is a national of the United States.

932. Plaintiff Michelle Rose McEvoy is the daughter of Mr. McEvoy. She is a national of the United States.

933. Plaintiff Patrick Charles McEvoy is the son of Mr. McEvoy. He is a national of the United States.

934. Plaintiff Janice H. Proctor is the mother of Mr. McEvoy. She is a national of the United States.

935. As a result of the death of Mr. McEvoy, each member of the McEvoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. McEvoy's society, companionship, and counsel.

**The Richard L. McNulty III Family**

936. Private First Class Richard L. McNulty III served in Afghanistan as a member of the U.S. Army. On May 13, 2012, PFC McNulty was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Khost Province, Afghanistan. PFC McNulty died on May 13, 2012 as a result of injuries sustained during the attack.

937. PFC McNulty was a national of the United States at the time of the attack and his death.

938. As a result of the attack, PFC McNulty was injured in his person and/or property. The Plaintiff members of the McNulty Family are the survivors and/or heirs of PFC McNulty and are entitled to recover for the damages PFC McNulty sustained.

939. Plaintiff Shannon K. McNulty is the sister of PFC McNulty. She is a national of the United States.

940. As a result of the death of PFC McNulty, each member of the McNulty Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McNulty's society, companionship, and counsel.

**The Dale W. Means Family**

941. Lance Corporal Dale W. Means served in Afghanistan as a member of the U.S. Marine Corps. On November 18, 2012, LCpl Means was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. LCpl Means died on November 18, 2012 as a result of injuries sustained during the attack.

942. LCpl Means was a national of the United States at the time of the attack and his death.

943. As a result of the attack, LCpl Means was injured in his person and/or property. The Plaintiff members of the Means Family are the survivors and/or heirs of LCpl Means and are entitled to recover for the damages LCpl Means sustained.

944. Plaintiff John Means is the father of LCpl Means. He is a national of the United States.

945. As a result of the death of LCpl Means, each member of the Means Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Means's society, companionship, and counsel.

**Nicholas D. Mendes**

946. Plaintiff Sergeant Nicholas D. Mendes served in Afghanistan as a member of the U.S. Army. On April 30, 2011, SGT Mendes was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. The attack severely wounded SGT Mendes, who was paralyzed from neck down. As a result of the April 30, 2011 attack and his injuries, SGT Mendes has experienced severe physical and emotional pain and suffering.

947. SGT Mendes was a national of the United States at the time of the attack and remains one to this day.

**The Paul J. Miller Family**

948. Corporal Paul J. Miller served in Afghanistan as a member of the U.S. Marine Corps. On July 19, 2010, Cpl Miller was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. Cpl Miller died on July 19, 2010 as a result of injuries sustained during the attack.

949. Cpl Miller was a national of the United States at the time of the attack and his death.

950. As a result of the attack, Cpl Miller was injured in his person and/or property. The Plaintiff members of the Miller Family are the survivors and/or heirs of Cpl Miller and are entitled to recover for the damages Cpl Miller sustained.

951. Plaintiff Sarah Beth Miller Morgan is the widow of Cpl Miller. She is a national of the United States.

952. As a result of the death of Cpl Miller, each member of the Miller Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Miller's society, companionship, and counsel.

**The Shaun M. Mittler Family**

953. Staff Sergeant Shaun M. Mittler served in Afghanistan as a member of the U.S. Army. On July 10, 2010, SSG Mittler was injured in a complex attack involving small arms fire and rocket propelled grenades committed by the Taliban in Kunar Province, Afghanistan. SSG Mittler died on July 10, 2010 as a result of injuries sustained during the attack.

954. SSG Mittler was a national of the United States at the time of the attack and his death.

955. As a result of the attack, SSG Mittler was injured in his person and/or property. The Plaintiff members of the Mittler Family are the survivors and/or heirs of SSG Mittler and are entitled to recover for the damages SSG Mittler sustained.

956. Plaintiff Terry Mittler is the father of SSG Mittler. He is a national of the United States.

957. As a result of the death of SSG Mittler, each member of the Mittler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mittler's society, companionship, and counsel.

**The Travis A. Morgado Family**

958. Second Lieutenant Travis A. Morgado served in Afghanistan as a member of the U.S. Army. On May 23, 2012, 2LT Morgado was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. 2LT Morgado died on May 23, 2012 as a result of injuries sustained during the attack.

959. 2LT Morgado was a national of the United States at the time of the attack and his death.

960. As a result of the attack, 2LT Morgado was injured in his person and/or property. The Plaintiff members of the Morgado Family are the survivors and/or heirs of 2LT Morgado and are entitled to recover for the damages 2LT Morgado sustained.

961. Plaintiff Andrea Kessler is the mother of 2LT Morgado. She is a national of the United States.

962. Plaintiff Jose Alberto Morgado is the father of 2LT Morgado. He is a national of the United States.

963. As a result of the death of 2LT Morgado, each member of the Morgado Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 2LT Morgado's society, companionship, and counsel.

**The Donald S. Morrison Family**

964. Specialist Donald S. Morrison served in Afghanistan as a member of the U.S. Army. On September 26, 2010, SPC Morrison was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Morrison died on September 26, 2010 as a result of injuries sustained during the attack.

965. SPC Morrison was a national of the United States at the time of the attack and his death.

966. As a result of the attack, SPC Morrison was injured in his person and/or property. The Plaintiff members of the Morrison Family are the survivors and/or heirs of SPC Morrison and are entitled to recover for the damages SPC Morrison sustained.

967. Plaintiff Susan Morrison is the mother of SPC Morrison. She is a national of the United States.

968. As a result of the death of SPC Morrison, each member of the Morrison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Morrison's society, companionship, and counsel.

**The Brandon S. Mullins Family**

969. Specialist Brandon S. Mullins served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SPC Mullins was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Mullins died on August 25, 2011 as a result of injuries sustained during the attack.

970. SPC Mullins was a national of the United States at the time of the attack and his death.

971. As a result of the attack, SPC Mullins was injured in his person and/or property. The Plaintiff members of the Mullins Family are the survivors and/or heirs of SPC Mullins and are entitled to recover for the damages SPC Mullins sustained.

972. Plaintiff Catherine Mullins is the mother of SPC Mullins. She is a national of the United States.

973. Plaintiff Thomas Mullins is the father of SPC Mullins. He is a national of the United States.

974. Plaintiff Bethany Rose Mullins Randall is the sister of SPC Mullins. She is a national of the United States.

975. As a result of the death of SPC Mullins, each member of the Mullins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Mullins's society, companionship, and counsel.

**The Thomas Paige Murach Family**

976. Specialist Thomas Paige Murach served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Murach was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Murach died on May 4, 2013 as a result of injuries sustained during the attack.

977. SPC Murach was a national of the United States at the time of the attack and his death.

978. As a result of the attack, SPC Murach was injured in his person and/or property. The Plaintiff members of the Murach Family are the survivors and/or heirs of SPC Murach and are entitled to recover for the damages SPC Murach sustained.

979. Plaintiff Chet Murach is the father of SPC Murach. He is a national of the United States.

980. As a result of the death of SPC Murach, each member of the Murach Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Murach's society, companionship, and counsel.

**The Christopher R. Newman Family**

981. Staff Sergeant Christopher R. Newman served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SSG Newman was injured in a suicide bombing attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. SSG Newman died on October 29, 2011 as a result of injuries sustained during the attack.

982. SSG Newman was a national of the United States at the time of the attack and his death.

983. As a result of the attack, SSG Newman was injured in his person and/or property. The Plaintiff members of the Newman Family are the survivors and/or heirs of SSG Newman and are entitled to recover for the damages SSG Newman sustained.

984. Plaintiff Amanda Newman is the widow of SSG Newman. She is a national of the United States.

985. Plaintiff Derrick Anthony Davis is the brother of SSG Newman. He is a national of the United States.

986. As a result of the death of SSG Newman, each member of the Newman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Newman's society, companionship, and counsel.

**The Bryan J. Nichols Family**

987. Chief Warrant Officer 2 Bryan J. Nichols served in Afghanistan as a member of the U.S. Army National Guard. On August 6, 2011, CW2 Nichols was injured in an attack on a Chinook helicopter committed by the Haqqani Network, a part of the Taliban, in Wardak Province, Afghanistan. CW2 Nichols died on August 6, 2011 as a result of injuries sustained during the attack.

988. CW2 Nichols was a national of the United States at the time of the attack and his death.

989. As a result of the attack, CW2 Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of CW2 Nichols and are entitled to recover for the damages CW2 Nichols sustained.

990. Plaintiff Cynthia Nichols is the mother of CW2 Nichols. She is a national of the United States.

991. Plaintiff Douglas Nichols is the father of CW2 Nichols. He is a national of the United States.

992. As a result of the death of CW2 Nichols, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW2 Nichols's society, companionship, and counsel.

**The Andrew C. Nicol Family**

993. Sergeant Andrew C. Nicol served in Afghanistan as a member of the U.S. Army. On August 8, 2010, SGT Nicol was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SGT Nicol died on August 8, 2010 as a result of injuries sustained during the attack.

994. SGT Nicol was a national of the United States at the time of the attack and his death.

995. As a result of the attack, SGT Nicol was injured in his person and/or property. The Plaintiff members of the Nicol Family are the survivors and/or heirs of SGT Nicol and are entitled to recover for the damages SGT Nicol sustained.

996. Plaintiff Patricia A. Nicol is the mother of SGT Nicol. She is a national of the United States.

997. Plaintiff Roland N. Nicol is the father of SGT Nicol. He is a national of the United States.

998. Plaintiff Alaina Nicol is the sister of SGT Nicol. She is a national of the United States.

999. Plaintiff Roland J. Nicol is the brother of SGT Nicol. He is a national of the United States.

1000. As a result of the death of SGT Nicol, each member of the Nicol Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Nicol's society, companionship, and counsel.

**The Adam J. Novak Family**

1001. Private Adam J. Novak served in Afghanistan as a member of the U.S. Army. On August 27, 2010, PVT Novak was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Paktia Province, Afghanistan. PVT Novak died on August 27, 2010 as a result of injuries sustained during the attack.

1002. PVT Novak was a national of the United States at the time of the attack and his death.

1003. As a result of the attack, PVT Novak was injured in his person and/or property. The Plaintiff members of the Novak Family are the survivors and/or heirs of PVT Novak and are entitled to recover for the damages PVT Novak sustained.

1004. Plaintiff Susan Novak is the mother of PVT Novak. She is a national of the United States.

1005. As a result of the death of PVT Novak, each member of the Novak Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PVT Novak's society, companionship, and counsel.

**The Nicholas S. Ott Family**

1006. Corporal Nicholas S. Ott served in Afghanistan as a member of the U.S. Marine Corps. On August 10, 2011, Cpl Ott was injured in an IED attack committed by the Taliban in

Helmand Province, Afghanistan. Cpl Ott died on August 10, 2011 as a result of injuries sustained during the attack.

1007. Cpl Ott was a national of the United States at the time of the attack and his death.

1008. As a result of the attack, Cpl Ott was injured in his person and/or property. The Plaintiff members of the Ott Family are the survivors and/or heirs of Cpl Ott and are entitled to recover for the damages Cpl Ott sustained.

1009. Plaintiff Julia Ott is the sister of Cpl Ott. She is a national of the United States.

1010. As a result of the death of Cpl Ott, each member of the Ott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Ott's society, companionship, and counsel.

**The Dane Clark Paresi Family**

1011. Dane Clark Paresi served in Afghanistan as a civilian government contractor working for Xe Services. On December 30, 2009, Mr. Paresi was injured in the Camp Chapman Attack. Mr. Paresi died on December 30, 2009 as a result of injuries sustained during the attack.

1012. Mr. Paresi was a national of the United States at the time of the attack and his death.

1013. As a result of the attack, Mr. Paresi was injured in his person and/or property. The Plaintiff members of the Paresi Family are the survivors and/or heirs of Mr. Paresi and are entitled to recover for the damages Mr. Paresi sustained.

1014. Plaintiff Mindylou Paresi is the widow of Mr. Paresi. She is a national of the United States.

1015. Plaintiff Elizabeth Santina Paresi is the daughter of Mr. Paresi. She is a national of the United States.

1016. Plaintiff Janet G. Paresi is the mother of Mr. Paresi. She is a national of the United States.

1017. Plaintiff Santina Cartisser is the sister of Mr. Paresi. She is a national of the United States.

1018. Plaintiff Terry Paresi is the brother of Mr. Paresi. He is a national of the United States.

1019. Plaintiff Alexandra VandenBroek is the step-daughter of Mr. Paresi. She is a national of the United States. Alexandra VandenBroek lived in the same household as Mr. Paresi for a substantial period of time and considered Mr. Paresi the functional equivalent of a biological father.

1020. As a result of the death of Mr. Paresi, each member of the Paresi Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Paresi's society, companionship, and counsel.

**The Joseph Michael Peters Family**

1021. Sergeant Joseph Michael Peters served in Afghanistan as a member of the U.S. Army. On October 6, 2013, SGT Peters was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SGT Peters died on October 6, 2013 as a result of injuries sustained during the attack.

1022. SGT Peters was a national of the United States at the time of the attack and his death.

1023. As a result of the attack, SGT Peters was injured in his person and/or property. The Plaintiff members of the Peters Family are the survivors and/or heirs of SGT Peters and are entitled to recover for the damages SGT Peters sustained.

1024. Plaintiff Ashley Peters is the widow of SGT Peters. She is a national of the United States.

1025. Plaintiff G.R.P., by and through his next friend Ashley Peters, is the minor son of SGT Peters. He is a national of the United States.

1026. Plaintiff Deborah Jean Peters is the mother of SGT Peters. She is a national of the United States.

1027. Plaintiff Dennis W. Peters is the father of SGT Peters. He is a national of the United States.

1028. As a result of the death of SGT Peters, each member of the Peters Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Peters's society, companionship, and counsel.

**The Jared C. Plunk Family**

1029. Specialist Jared C. Plunk served in Afghanistan as a member of the U.S. Army. On June 25, 2010, SPC Plunk was injured in a complex attack involving rocket propelled grenades and small-arms fire committed by the Taliban in Kunar Province, Afghanistan. SPC Plunk died on June 25, 2010 as a result of injuries sustained during the attack.

1030. SPC Plunk was a national of the United States at the time of the attack and his death.

1031. As a result of the attack, SPC Plunk was injured in his person and/or property. The Plaintiff members of the Plunk Family are the survivors and/or heirs of SPC Plunk and are entitled to recover for the damages SPC Plunk sustained.

1032. Plaintiff Glenda Willard is the mother of SPC Plunk. She is a national of the United States.

1033. Plaintiff Ranee Massoni is the sister of SPC Plunk. She is a national of the United States.

1034. Plaintiff Jordan Plunk is the brother of SPC Plunk. He is a national of the United States.

1035. Plaintiff Justin T. Plunk is the brother of SPC Plunk. He is a national of the United States.

1036. As a result of the death of SPC Plunk, each member of the Plunk Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Plunk's society, companionship, and counsel.

**The Brandon Joseph Prescott Family**

1037. Specialist Brandon Joseph Prescott served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Prescott was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Prescott died on May 4, 2013 as a result of injuries sustained during the attack.

1038. SPC Prescott was a national of the United States at the time of the attack and his death.

1039. As a result of the attack, SPC Prescott was injured in his person and/or property. The Plaintiff members of the Prescott Family are the survivors and/or heirs of SPC Prescott and are entitled to recover for the damages SPC Prescott sustained.

1040. Plaintiff Aaron William Prescott is the brother of SPC Prescott. He is a national of the United States.

1041. Plaintiff Jacob Richard Prescott is the brother of SPC Prescott. He is a national of the United States.

1042. Plaintiff Joshua Michael Prescott is the brother of SPC Prescott. He is a national of the United States.

1043. As a result of the death of SPC Prescott, each member of the Prescott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Prescott's society, companionship, and counsel.

**The Lucas Todd Pyeatt Family**

1044. Corporal Lucas Todd Pyeatt served in Afghanistan as a member of the U.S. Marine Corps. On February 5, 2011, Cpl Pyeatt was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. Cpl Pyeatt died on February 5, 2011 as a result of injuries sustained during the attack.

1045. Cpl Pyeatt was a national of the United States at the time of the attack and his death.

1046. As a result of the attack, Cpl Pyeatt was injured in his person and/or property. The Plaintiff members of the Pyeatt Family are the survivors and/or heirs of Cpl Pyeatt and are entitled to recover for the damages Cpl Pyeatt sustained.

1047. Plaintiff Cynthia L. Pyeatt is the mother of Cpl Pyeatt. She is a national of the United States.

1048. Plaintiff Lon Scott Pyeatt is the father of Cpl Pyeatt. He is a national of the United States.

1049. Plaintiff Emily Smalley is the sister of Cpl Pyeatt. She is a national of the United States.

1050. As a result of the death of Cpl Pyeatt, each member of the Pyeatt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Pyeatt's society, companionship, and counsel.

**The Thomas A. Ratzlaff Family**

1051. Special Warfare Operator Senior Chief Petty Officer (SEAL) Thomas A. Ratzlaff served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO (SEAL) Ratzlaff was injured in an attack on a Chinook helicopter committed by the Haqqani Network, a part of the Taliban, in Wardak Province, Afghanistan. CPO (SEAL) Ratzlaff died on August 6, 2011 as a result of injuries sustained during the attack.

1052. CPO (SEAL) Ratzlaff was a national of the United States at the time of the attack and his death.

1053. As a result of the attack, CPO (SEAL) Ratzlaff was injured in his person and/or property. The Plaintiff members of the Ratzlaff Family are the survivors and/or heirs of CPO (SEAL) Ratzlaff and are entitled to recover for the damages CPO (SEAL) Ratzlaff sustained.

1054. Plaintiff Andrea N. Ratzlaff is the widow of CPO (SEAL) Ratzlaff. She is a national of the United States.

1055. As a result of the death of CPO (SEAL) Ratzlaff, each member of the Ratzlaff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO (SEAL) Ratzlaff's society, companionship, and counsel.

**The Jesse D. Reed Family**

1056. Specialist Jesse D. Reed served in Afghanistan as a member of the U.S. Army. On July 14, 2010, SPC Reed was injured in an IED attack committed by the Haqqani Network, a

part of the Taliban, in Zabul Province, Afghanistan. SPC Reed died on July 14, 2010 as a result of injuries sustained during the attack.

1057. SPC Reed was a national of the United States at the time of the attack and his death.

1058. As a result of the attack, SPC Reed was injured in his person and/or property. The Plaintiff members of the Reed Family are the survivors and/or heirs of SPC Reed and are entitled to recover for the damages SPC Reed sustained.

1059. Plaintiff Heather L. Reed is the widow of SPC Reed. She is a national of the United States.

1060. Plaintiff Dolores A. Reed is the mother of SPC Reed. She is a national of the United States.

1061. As a result of the death of SPC Reed, each member of the Reed Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Reed's society, companionship, and counsel.

**The Michael E. Ristau Family**

1062. Sergeant Michael E. Ristau served in Afghanistan as a member of the U.S. Army. On July 13, 2012, SGT Ristau was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Zabul Province, Afghanistan. SGT Ristau died on July 13, 2012 as a result of injuries sustained during the attack.

1063. SGT Ristau was a national of the United States at the time of the attack and his death.

1064. As a result of the attack, SGT Ristau was injured in his person and/or property. The Plaintiff members of the Ristau Family are the survivors and/or heirs of SGT Ristau and are entitled to recover for the damages SGT Ristau sustained.

1065. Plaintiff Randy Ristau is the father of SGT Ristau. He is a national of the United States.

1066. Plaintiff H.R., by and through her next friend Randy Ristau, is the minor sister of SGT Ristau. She is a national of the United States.

1067. Plaintiff Suzanne Ristau is the step-mother of SGT Ristau. She is a national of the United States. Suzanne Ristau lived in the same household as SGT Ristau for a substantial period of time and considered SGT Ristau the functional equivalent of a biological son.

1068. Plaintiff Christopher Powers is the step-brother of SGT Ristau. He is a national of the United States. Christopher Powers lived in the same household as SGT Ristau for a substantial period of time and considered SGT Ristau the functional equivalent of a biological brother.

1069. As a result of the death of SGT Ristau, each member of the Ristau Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ristau's society, companionship, and counsel.

**The Edgar N. Roberts III Family**

1070. Sergeant First Class Edgar N. Roberts III served in Afghanistan as a member of the U.S. Army National Guard. On June 26, 2010, SFC Roberts was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Wardak Province, Afghanistan. SFC Roberts died on August 17, 2010 as a result of injuries sustained during the attack.

1071. SFC Roberts was a national of the United States at the time of the attack and his death.

1072. As a result of the attack, SFC Roberts was injured in his person and/or property. The Plaintiff members of the Roberts Family are the survivors and/or heirs of SFC Roberts and are entitled to recover for the damages SFC Roberts sustained.

1073. Plaintiff Jannett Cecilia Roberts is the widow of SFC Roberts and is his survivor and/or heir.

1074. Plaintiff E.N.R., by and through his next friend Jannett Cecilia Roberts, is the minor son of SFC Roberts. He is a national of the United States.

1075. Plaintiff Miguel Angel Nathaniel Roberts is the son of SFC Roberts. He is a national of the United States.

1076. Plaintiff Miriatliz Roberts is the daughter of SFC Roberts. She is a national of the United States.

1077. As a result of the death of SFC Roberts, each member of the Roberts Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Roberts's society, companionship, and counsel.

**The Mario Rodriguez Jr. Family**

1078. Sergeant Mario Rodriguez Jr. served in Afghanistan as a member of the U.S. Army. On June 11, 2010, SGT Rodriguez was injured in a complex attack involving small arms fire and rocket propelled grenades committed by the Haqqani Network, a part of the Taliban, in Logar Province, Afghanistan. SGT Rodriguez died on June 11, 2010 as a result of injuries sustained during the attack.

1079. SGT Rodriguez was a national of the United States at the time of the attack and his death.

1080. As a result of the attack, SGT Rodriguez was injured in his person and/or property. The Plaintiff members of the Rodriguez Family are the survivors and/or heirs of SGT Rodriguez and are entitled to recover for the damages SGT Rodriguez sustained.

1081. Plaintiff Leslie Rodriguez is the widow of SGT Rodriguez. She is a national of the United States.

1082. Plaintiff R.G., by and through her next friend Leslie Rodriguez, is the minor step-daughter of SGT Rodriguez. She is a national of the United States. R.G. lived in the same household as SGT Rodriguez for a substantial period of time and considered SGT Rodriguez the functional equivalent of a biological father.

1083. As a result of the death of SGT Rodriguez, each member of the Rodriguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Rodriguez's society, companionship, and counsel.

**The Jason A. Rogers Family**

1084. Staff Sergeant Jason A. Rogers served in Afghanistan as a member of the U.S. Marine Corps. On April 7, 2011, SSgt Rogers was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SSgt Rogers died on April 7, 2011 as a result of injuries sustained during the attack.

1085. SSgt Rogers was a national of the United States at the time of the attack and his death.

1086. As a result of the attack, SSgt Rogers was injured in his person and/or property. The Plaintiff members of the Rogers Family are the survivors and/or heirs of SSgt Rogers and are entitled to recover for the damages SSgt Rogers sustained.

1087. Plaintiff Angela Rita Marie Rogers is the widow of SSgt Rogers. She is a national of the United States.

1088. As a result of the death of SSgt Rogers, each member of the Rogers Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Rogers's society, companionship, and counsel.

**The Matthew D. Roland Family**

1089. Captain Matthew D. Roland served in Afghanistan as a member of the U.S. Air Force. On August 26, 2015, Capt Roland was injured in an insider attack committed by the Taliban in Helmand Province, Afghanistan. Capt Roland died on August 26, 2015 as a result of injuries sustained during the attack.

1090. Capt Roland was a national of the United States at the time of the attack and his death.

1091. As a result of the attack, Capt Roland was injured in his person and/or property. The Plaintiff members of the Roland Family are the survivors and/or heirs of Capt Roland and are entitled to recover for the damages Capt Roland sustained.

1092. Plaintiff Barbara A. Roland is the mother of Capt Roland. She is a national of the United States.

1093. Plaintiff Mark K. Roland is the father of Capt Roland. He is a national of the United States.

1094. Plaintiff Erica M. Roland is the sister of Capt Roland. She is a national of the United States.

1095. As a result of the death of Capt Roland, each member of the Roland Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Roland's society, companionship, and counsel.

**The Angel Roldan Jr. Family**

1096. Angel Roldan Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On May 16, 2013, Mr. Roldan was injured in a suicide bombing attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. Mr. Roldan died on May 16, 2013 as a result of injuries sustained during the attack.

1097. Mr. Roldan was a national of the United States at the time of the attack and his death.

1098. As a result of the attack, Mr. Roldan was injured in his person and/or property. The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

1099. Plaintiff Lieselotte R. Roldan is the widow of Mr. Roldan. She is a national of the United States.

1100. Plaintiff Angel R. Roldan is the son of Mr. Roldan. He is a national of the United States.

1101. Plaintiff Matthias P. Roldan is the son of Mr. Roldan. He is a national of the United States.

1102. Plaintiff Samantha G. Roldan is the daughter of Mr. Roldan. She is a national of the United States.

1103. As a result of the death of Mr. Roldan, each member of the Roldan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Roldan's society, companionship, and counsel.

**The Nicholas J. Rozanski Family**

1104. Captain Nicholas J. Rozanski served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rozanski was injured in a suicide bombing attack committed by the Taliban in Faryab Province, Afghanistan. CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the attack.

1105. CPT Rozanski was a national of the United States at the time of the attack and his death.

1106. As a result of the attack, CPT Rozanski was injured in his person and/or property. The Plaintiff members of the Rozanski Family are the survivors and/or heirs of CPT Rozanski and are entitled to recover for the damages CPT Rozanski sustained.

1107. Plaintiff Alex Jason Rozanski is the brother of CPT Rozanski. He is a national of the United States.

1108. As a result of the death of CPT Rozanski, each member of the Rozanski Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Rozanski's society, companionship, and counsel.

**The Rex L. Schad Family**

1109. Staff Sergeant Rex L. Schad served in Afghanistan as a member of the U.S. Army. On March 11, 2013, SSG Schad was injured in an insider attack committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Wardak

Province, Afghanistan. SSG Schad died on March 11, 2013 as a result of injuries sustained during the attack.

1110. SSG Schad was a national of the United States at the time of the attack and his death.

1111. As a result of the attack, SSG Schad was injured in his person and/or property. The Plaintiff members of the Schad Family are the survivors and/or heirs of SSG Schad and are entitled to recover for the damages SSG Schad sustained.

1112. Plaintiff Colleen Whipple is the mother of SSG Schad. She is a national of the United States.

1113. As a result of the death of SSG Schad, each member of the Schad Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Schad's society, companionship, and counsel.

**The Jacob M. Schwallie Family**

1114. Sergeant Jacob M. Schwallie served in Afghanistan as a member of the U.S. Army. On May 7, 2012, SGT Schwallie was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Ghazni Province, Afghanistan. SGT Schwallie died on May 7, 2012 as a result of injuries sustained during the attack.

1115. SGT Schwallie was a national of the United States at the time of the attack and his death.

1116. As a result of the attack, SGT Schwallie was injured in his person and/or property. The Plaintiff members of the Schwallie Family are the survivors and/or heirs of SGT Schwallie and are entitled to recover for the damages SGT Schwallie sustained.

1117. Plaintiff Thomas Schwallie is the father of SGT Schwallie. He is a national of the United States.

1118. As a result of the death of SGT Schwallie, each member of the Schwallie Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schwallie's society, companionship, and counsel.

**The Derek L. Shanfield Family**

1119. Sergeant Derek L. Shanfield served in Afghanistan as a member of the U.S. Marine Corps. On June 8, 2010, Sgt Shanfield was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. Sgt Shanfield died on June 8, 2010 as a result of injuries sustained during the attack.

1120. Sgt Shanfield was a national of the United States at the time of the attack and his death.

1121. As a result of the attack, Sgt Shanfield was injured in his person and/or property. The Plaintiff members of the Shanfield Family are the survivors and/or heirs of Sgt Shanfield and are entitled to recover for the damages Sgt Shanfield sustained.

1122. Plaintiff David Shanfield is the father of Sgt Shanfield. He is a national of the United States.

1123. Plaintiff Pamela Shanfield is the mother of Sgt Shanfield. She is a national of the United States.

1124. Plaintiff Sydney Shanfield is the brother of Sgt Shanfield. He is a national of the United States.

1125. As a result of the death of Sgt Shanfield, each member of the Shanfield Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Shanfield's society, companionship, and counsel.

**The Amy R. Sinkler Family**

1126. Private First Class Amy R. Sinkler served in Afghanistan as a member of the U.S. Army. On January 20, 2011, PFC Sinkler was injured in a rocket propelled grenade attack committed by the Taliban in Baghlan Province, Afghanistan. PFC Sinkler died on January 20, 2011 as a result of injuries sustained during the attack.

1127. PFC Sinkler was a national of the United States at the time of the attack and her death.

1128. As a result of the attack, PFC Sinkler was injured in her person and/or property. The Plaintiff members of the Sinkler Family are the survivors and/or heirs of PFC Sinkler and are entitled to recover for the damages PFC Sinkler sustained.

1129. Plaintiff Jacqueline B. Thompson is the mother of PFC Sinkler. She is a national of the United States.

1130. Plaintiff Randolph D. Thompson is the father of PFC Sinkler. He is a national of the United States.

1131. Plaintiff Brittney Bullock is the sister of PFC Sinkler. She is a national of the United States.

1132. As a result of the death of PFC Sinkler, each member of the Sinkler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Sinkler's society, companionship, and counsel.

**The Wade A. Slack Family**

1133. Specialist Wade A. Slack served in Afghanistan as a member of the U.S. Army. On May 6, 2010, SPC Slack was injured in an indirect fire attack committed by the Haqqani Network, a part of the Taliban, in Wardak Province, Afghanistan. SPC Slack died on May 6, 2010 as a result of injuries sustained during the attack.

1134. SPC Slack was a national of the United States at the time of the attack and his death.

1135. As a result of the attack, SPC Slack was injured in his person and/or property. The Plaintiff members of the Slack Family are the survivors and/or heirs of SPC Slack and are entitled to recover for the damages SPC Slack sustained.

1136. Plaintiff Andrew Slack is the brother of SPC Slack. He is a national of the United States.

1137. Plaintiff Jesse Slack is the brother of SPC Slack. He is a national of the United States.

1138. Plaintiff Jonathan H. Slack is the brother of SPC Slack. He is a national of the United States.

1139. Plaintiff Lauren Slack is the sister of SPC Slack. She is a national of the United States.

1140. Plaintiff Rose Ann Crossman is the step-mother of SPC Slack. She is a national of the United States. Rose Ann Crossman lived in the same household as SPC Slack for a substantial period of time and considered SPC Slack the functional equivalent of a biological son.

1141. Plaintiff Jessica Cook is the step-sister of SPC Slack. She is a national of the United States. Jessica Cook lived in the same household as SPC Slack for a substantial period of time and considered SPC Slack the functional equivalent of a biological brother.

1142. As a result of the death of SPC Slack, each member of the Slack Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Slack's society, companionship, and counsel.

**The Deangelo B. Snow Family**

1143. Specialist Deangelo B. Snow served in Afghanistan as a member of the U.S. Army. On September 17, 2010, SPC Snow was injured in a rocket propelled grenade attack committed by the Taliban in Kandahar Province, Afghanistan. SPC Snow died on September 17, 2010 as a result of injuries sustained during the attack.

1144. SPC Snow was a national of the United States at the time of the attack and his death.

1145. As a result of the attack, SPC Snow was injured in his person and/or property. The Plaintiff members of the Snow Family are the survivors and/or heirs of SPC Snow and are entitled to recover for the damages SPC Snow sustained.

1146. Plaintiff Deloris Snow is the mother of SPC Snow. She is a national of the United States.

1147. Plaintiff M.B., by and through her next friend Deloris Snow, is the minor sister of SPC Snow. She is a national of the United States.

1148. Plaintiff Damen Snow is the brother of SPC Snow. He is a national of the United States.

1149. As a result of the death of SPC Snow, each member of the Snow Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Snow's society, companionship, and counsel.

**The Kristoffer M. Solesbee Family**

1150. Technical Sergeant Kristoffer M. Solesbee served in Afghanistan as a member of the U.S. Air Force. On May 26, 2011, TSgt Solesbee was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. TSgt Solesbee died on May 26, 2011 as a result of injuries sustained during the attack.

1151. TSgt Solesbee was a national of the United States at the time of the attack and his death.

1152. As a result of the attack, TSgt Solesbee was injured in his person and/or property. The Plaintiff members of the Solesbee Family are the survivors and/or heirs of TSgt Solesbee and are entitled to recover for the damages TSgt Solesbee sustained.

1153. Plaintiff Larry Michael Solesbee is the father of TSgt Solesbee. He is a national of the United States.

1154. As a result of the death of TSgt Solesbee, each member of the Solesbee Family has experienced severe mental anguish, emotional pain and suffering, and the loss of TSgt Solesbee's society, companionship, and counsel.

**The Orion N. Sparks Family**

1155. Staff Sergeant Orion N. Sparks served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SSG Sparks was injured in a suicide bombing attack committed by the Kabul Attack Network in Logar Province, Afghanistan. SSG Sparks died on September 26, 2012 as a result of injuries sustained during the attack.

1156. SSG Sparks was a national of the United States at the time of the attack and his death.

1157. As a result of the attack, SSG Sparks was injured in his person and/or property. The Plaintiff members of the Sparks Family are the survivors and/or heirs of SSG Sparks and are entitled to recover for the damages SSG Sparks sustained.

1158. Plaintiff Garry Lee Sparks is the father of SSG Sparks. He is a national of the United States.

1159. Plaintiff Jan Marie Hurnblad Sparks is the mother of SSG Sparks. She is a national of the United States.

1160. Plaintiff Erik Sparks is the brother of SSG Sparks. He is a national of the United States.

1161. Plaintiff Zachary Douglas Sparks is the brother of SSG Sparks. He is a national of the United States.

1162. Plaintiff Jane Sparks is the step-mother of SSG Sparks. She is a national of the United States. Jane Sparks lived in the same household as SSG Sparks for a substantial period of time and considered SSG Sparks the functional equivalent of a biological son.

1163. As a result of the death of SSG Sparks, each member of the Sparks Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Sparks's society, companionship, and counsel.

**The Tyler M. Springmann Family**

1164. Private First Class Tyler M. Springmann served in Afghanistan as a member of the U.S. Army. On July 17, 2011, PFC Springmann was injured in an IED attack committed by

the Taliban in Kandahar Province, Afghanistan. PFC Springmann died on July 17, 2011 as a result of injuries sustained during the attack.

1165. PFC Springmann was a national of the United States at the time of the attack and his death.

1166. As a result of the attack, PFC Springmann was injured in his person and/or property. The Plaintiff members of the Springmann Family are the survivors and/or heirs of PFC Springmann and are entitled to recover for the damages PFC Springmann sustained.

1167. Plaintiff Tina Lynn Seekins is the mother of PFC Springmann. She is a national of the United States.

1168. As a result of the death of PFC Springmann, each member of the Springmann Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Springmann's society, companionship, and counsel.

**The Kyle Brandon Stout Family**

1169. Sergeant Kyle Brandon Stout served in Afghanistan as a member of the U.S. Army. On July 30, 2010, SGT Stout was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SGT Stout died on July 30, 2010 as a result of injuries sustained during the attack.

1170. SGT Stout was a national of the United States at the time of the attack and his death.

1171. As a result of the attack, SGT Stout was injured in his person and/or property. The Plaintiff members of the Stout Family are the survivors and/or heirs of SGT Stout and are entitled to recover for the damages SGT Stout sustained.

1172. Plaintiff Billy Michael Stout is the father of SGT Stout. He is a national of the United States.

1173. Plaintiff Robin Stout is the mother of SGT Stout. She is a national of the United States.

1174. Plaintiff Melissa Stout is the sister of SGT Stout. She is a national of the United States.

1175. As a result of the death of SGT Stout, each member of the Stout Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Stout's society, companionship, and counsel.

**The Joshua J. Strickland Family**

1176. Sergeant Joshua J. Strickland served in Afghanistan as a member of the U.S. Army. On September 21, 2013, SGT Strickland was injured in an insider attack committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Paktia Province, Afghanistan. SGT Strickland died on September 21, 2013 as a result of injuries sustained during the attack.

1177. SGT Strickland was a national of the United States at the time of the attack and his death.

1178. As a result of the attack, SGT Strickland was injured in his person and/or property. The Plaintiff members of the Strickland Family are the survivors and/or heirs of SGT Strickland and are entitled to recover for the damages SGT Strickland sustained.

1179. Plaintiff Garrett Layne Funk is the brother of SGT Strickland. He is a national of the United States.

1180. As a result of the death of SGT Strickland, each member of the Strickland Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Strickland's society, companionship, and counsel.

**The Barry Sutton Family**

1181. Barry Sutton served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. Sutton was injured in a suicide bombing attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the attack.

1182. Mr. Sutton was a national of the United States at the time of the attack and his death.

1183. As a result of the attack, Mr. Sutton was injured in his person and/or property. The Plaintiff members of the Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

1184. Plaintiff Harriet Sutton is the mother of Mr. Sutton. She is a national of the United States.

1185. As a result of the death of Mr. Sutton, each member of the Sutton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sutton's society, companionship, and counsel.

**The James E. Thode Family**

1186. Sergeant First Class James E. Thode served in Afghanistan as a member of the U.S. Army National Guard. On December 2, 2010, SFC Thode was injured in an IED attack committed by the Haqqani Network, a part of the Taliban, in Khost Province, Afghanistan. SFC Thode died on December 2, 2010 as a result of injuries sustained during the attack.

1187. SFC Thode was a national of the United States at the time of the attack and his death.

1188. As a result of the attack, SFC Thode was injured in his person and/or property. The Plaintiff members of the Thode Family are the survivors and/or heirs of SFC Thode and are entitled to recover for the damages SFC Thode sustained.

1189. Plaintiff Evelyn Taylor is the mother of SFC Thode. She is a national of the United States.

1190. As a result of the death of SFC Thode, each member of the Thode Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Thode's society, companionship, and counsel.

**The Allen R. Thomas Family**

1191. Staff Sergeant Allen R. Thomas served in Afghanistan as a member of the U.S. Army. On March 16, 2010, SSG Thomas was injured in a suicide bombing attack committed by the Taliban in Helmand Province, Afghanistan. The attack severely wounded SSG Thomas, who suffered from a traumatic brain injury with post-concussive syndrome, a restrictive ventilatory defect, thoracic neuritis with chronic pain syndrome, post-traumatic stress disorder, left lateral thorax scars, and right back scars. As a result of the March 16, 2010 attack and his injuries, SSG Thomas experienced severe physical and emotional pain and suffering. SSG Thomas died on September 29, 2013 as a result of injuries sustained during the attack.

1192. SSG Thomas was a national of the United States at the time of the attack and his death.

1193. As a result of the attack, SSG Thomas was injured in his person and/or property. The Plaintiff members of the Thomas Family are the survivors and/or heirs of SSG Thomas and are entitled to recover for the damages SSG Thomas sustained.

1194. Plaintiff Danica Thomas is the widow of SSG Thomas. She is a national of the United States.

1195. Plaintiff L.T., by and through her next friend Danica Thomas, is the minor daughter of SSG Thomas. She is a national of the United States.

1196. As a result of the March 16, 2010 attack and SSG Thomas's injuries and death, each member of the Thomas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Thomas's society, companionship, and counsel.

**The Jesse R. Tilton Family**

1197. Sergeant Jesse R. Tilton served in Afghanistan as a member of the U.S. Army. On July 13, 2010, SGT Tilton was injured in a complex attack involving rocket propelled grenades and small-arms fire committed by the Taliban in Kandahar Province, Afghanistan. SGT Tilton died on July 16, 2010 as a result of injuries sustained during the attack.

1198. SGT Tilton was a national of the United States at the time of the attack and his death.

1199. As a result of the attack, SGT Tilton was injured in his person and/or property. The Plaintiff members of the Tilton Family are the survivors and/or heirs of SGT Tilton and are entitled to recover for the damages SGT Tilton sustained.

1200. Plaintiff Julie Magana is the mother of SGT Tilton. She is a national of the United States.

1201. As a result of the death of SGT Tilton, each member of the Tilton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Tilton's society, companionship, and counsel.

**The Ryan Gregory Timoney Family**

1202. Plaintiff Captain Ryan Gregory Timoney served in Afghanistan as a member of the U.S. Army. On May 20, 2012, CPT Timoney was injured in a suicide bomber attack committed by the Taliban in Uruzgan Province, Afghanistan. The attack severely wounded CPT Timoney, who lost his left leg, suffered shrapnel injuries to his left arm, left chest, left abdomen, and left side of his skull, and also suffers from spinal pain, seizures, physical limitations, and speech, reading and vision difficulty. As a result of the May 20, 2012 attack and his injuries, CPT Timoney has experienced severe physical and emotional pain and suffering.

1203. CPT Timoney was a national of the United States at the time of the attack, and remains one to this day.

1204. Plaintiff Diane Timoney is the mother of CPT Timoney. She is a national of the United States.

1205. Plaintiff Gregory Timoney is the father of CPT Timoney. He is a national of the United States.

1206. As a result of the May 20, 2012 attack and CPT Timoney's injuries, each member of the Timoney Family has experienced severe mental anguish, emotional pain and suffering.

**The Aaron C. Torian Family**

1207. Master Sergeant Aaron C. Torian served in Afghanistan as a member of the U.S. Marine Corps. On February 15, 2014, MSgt Torian was injured in an IED attack committed by

the Taliban in Helmand Province, Afghanistan. MSgt Torian died on February 15, 2014 as a result of injuries sustained during the attack.

1208. MSgt Torian was a national of the United States at the time of the attack and his death.

1209. As a result of the attack, MSgt Torian was injured in his person and/or property. The Plaintiff members of the Torian Family are the survivors and/or heirs of MSgt Torian and are entitled to recover for the damages MSgt Torian sustained.

1210. Plaintiff Esta Smith is the mother of MSgt Torian. She is a national of the United States.

1211. Plaintiff Joe Torian is the father of MSgt Torian. He is a national of the United States.

1212. Plaintiff Emily Torian is the sister of MSgt Torian. She is a national of the United States.

1213. Plaintiff Nathan Ewell Torian is the brother of MSgt Torian. He is a national of the United States.

1214. Plaintiff Jimmy Smith is the step-father of MSgt Torian. He is a national of the United States. Jimmy Smith lived in the same household as MSgt Torian for a substantial period of time and considered MSgt Torian the functional equivalent of a biological son.

1215. As a result of the death of MSgt Torian, each member of the Torian Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSgt Torian's society, companionship, and counsel.

**Kevin Trimble**

1216. Plaintiff Private First Class Kevin Trimble served in Afghanistan as a member of the U.S. Army. On September 17, 2012, PFC Trimble was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. The attack severely wounded PFC Trimble, who lost both legs above the knee, lost his left arm above the elbow, and also suffered from post-traumatic stress disorder and partial hearing loss. As a result of the September 17, 2012 attack and his injuries, PFC Trimble has experienced severe physical and emotional pain and suffering.

1217. PFC Trimble was a national of the United States at the time of the attack and remains one to this day.

**Michael Verardo**

1218. Plaintiff Sergeant Michael Verardo served in Afghanistan as a member of the U.S. Army. On April 24, 2010, SGT Verardo was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. The attack severely wounded SGT Verardo, who lost one leg and part of his left arm and suffered from significant burns, a traumatic brain injury, eardrum injury, and injuries to his face and airways. As a result of the April 24, 2010 attack and his injuries, SGT Verardo has experienced severe physical and emotional pain and suffering.

1219. SGT Verardo was a national of the United States at the time of the attack and remains one to this day.

**The Nickolas S. Welch Family**

1220. Specialist Nickolas S. Welch served in Afghanistan as a member of the U.S. Army. On July 23, 2013, SPC Welch was injured in an IED attack committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Wardak Province,

Afghanistan. SPC Welch died on August 6, 2013 as a result of injuries sustained during the attack.

1221. SPC Welch was a national of the United States at the time of the attack and his death.

1222. As a result of the attack, SPC Welch was injured in his person and/or property. The Plaintiff members of the Welch Family are the survivors and/or heirs of SPC Welch and are entitled to recover for the damages SPC Welch sustained.

1223. Plaintiff Barry Welch is the father of SPC Welch. He is a national of the United States.

1224. Plaintiff Lorria Welch is the mother of SPC Welch. She is a national of the United States.

1225. As a result of the death of SPC Welch, each member of the Welch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Welch's society, companionship, and counsel.

**The Matthew J. West Family**

1226. Staff Sergeant Matthew J. West served in Afghanistan as a member of the U.S. Army. On August 30, 2010, SSG West was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. SSG West died on August 30, 2010 as a result of injuries sustained during the attack.

1227. SSG West was a national of the United States at the time of the attack and his death.

1228. As a result of the attack, SSG West was injured in his person and/or property. The Plaintiff members of the West Family are the survivors and/or heirs of SSG West and are entitled to recover for the damages SSG West sustained.

1229. Plaintiff John M. West is the father of SSG West. He is a national of the United States.

1230. Plaintiff Marcia M. West is the mother of SSG West. She is a national of the United States.

1231. Plaintiff Kristine Willis is the sister of SSG West. She is a national of the United States.

1232. As a result of the death of SSG West, each member of the West Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG West's society, companionship, and counsel.

**The Leston M. Winters Family**

1233. Staff Sergeant Leston M. Winters served in Afghanistan as a member of the U.S. Army. On July 15, 2010, SSG Winters was injured in an IED attack committed by the Taliban in Kandahar Province, Afghanistan. SSG Winters died on July 15, 2010 as a result of injuries sustained during the attack.

1234. SSG Winters was a national of the United States at the time of the attack and his death.

1235. As a result of the attack, SSG Winters was injured in his person and/or property. The Plaintiff members of the Winters Family are the survivors and/or heirs of SSG Winters and are entitled to recover for the damages SSG Winters sustained.

1236. Plaintiff Cheryl Spivey is the mother of SSG Winters. She is a national of the United States.

1237. Plaintiff Corbin Wayne Hunt is the brother of SSG Winters. He is a national of the United States.

1238. As a result of the death of SSG Winters, each member of the Winters Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Winters's society, companionship, and counsel.

**The Jeremy Jason Wise Family**

1239. Jeremy Jason Wise served in Afghanistan as a civilian government contractor working for Xe Services. On December 30, 2009, Mr. Wise was injured in the Camp Chapman Attack. Mr. Wise died on December 30, 2009 as a result of injuries sustained during the attack.

1240. Mr. Wise was a national of the United States at the time of the attack and his death.

1241. As a result of the attack, Mr. Wise was injured in his person and/or property. The Plaintiff members of the Wise Family are the survivors and/or heirs of Mr. Wise and are entitled to recover for the damages Mr. Wise sustained.

1242. Plaintiff Dana Marie Bernhardt is the widow of Mr. Wise. She is a national of the United States.

1243. Plaintiff Mary Lee Wise is the mother of Mr. Wise. She is a national of the United States.

1244. Plaintiff Mary Heather Wise is the sister of Mr. Wise. She is a national of the United States.

1245. Plaintiff E.P., by and through his next friend Dana Marie Bernhardt, is the minor step-son of Mr. Wise. He is a national of the United States. E.P. lived in the same household as Mr. Wise for a substantial period of time and considered Mr. Wise the functional equivalent of a biological father.

1246. As a result of the death of Mr. Wise, each member of the Wise Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Wise's society, companionship, and counsel.

**The Randal P. Wright Family**

1247. Lance Corporal Randal P. Wright served in Afghanistan as a member of the U.S. Marine Corps. On May 7, 2010, LCpl. Wright was injured in an IED attack committed by the Taliban in Helmand Province, Afghanistan. The attack severely wounded LCpl. Wright, who lost both legs above the knee, lost his left hand, and also suffered from blown out ear drums, a traumatic brain injury, and numerous tissue and bone injuries. As a result of the May 7, 2010 attack and his injuries, LCpl. Wright experienced severe physical and emotional pain and suffering. LCpl. Wright died on March 9, 2017 as a result of injuries sustained during the attack.

1248. LCpl. Wright was a national of the United States at the time of the attack and his death.

1249. As a result of the attack, LCpl. Wright was injured in his person and/or property. The Plaintiff members of the Wright Family are the survivors and/or heirs of LCpl. Wright and are entitled to recover for the damages LCpl. Wright sustained.

1250. Plaintiff F.S., by and through her next friend Ashley Rose Serocki, is the minor daughter of LCpl. Wright. She is a national of the United States.

1251. Plaintiff Dawn Marie Pattee is the mother of LCpl. Wright. She is a national of the United States.

1252. Plaintiff Jalisa Marie Hammond is the sister of LCpl. Wright. She is a national of the United States.

1253. Plaintiff Kristen Colleen Wright is the sister of LCpl. Wright. She is a national of the United States.

1254. As a result of the May 7, 2010 attack and LCpl. Wright's injuries and death, each member of the Wright Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl. Wright's society, companionship, and counsel.

**The Sonny C. Zimmerman Family**

1255. Staff Sergeant Sonny C. Zimmerman served in Afghanistan as a member of the U.S. Army. On July 16, 2013, SSG Zimmerman was injured in an attack involving a recoiless rifle committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban, in Paktia Province, Afghanistan. SSG Zimmerman died on July 16, 2013 as a result of injuries sustained during the attack.

1256. SSG Zimmerman was a national of the United States at the time of the attack and his death.

1257. As a result of the attack, SSG Zimmerman was injured in his person and/or property. The Plaintiff members of the Zimmerman Family are the survivors and/or heirs of SSG Zimmerman and are entitled to recover for the damages SSG Zimmerman sustained.

1258. Plaintiff Michelle Marie Fischbach is the mother of SSG Zimmerman. She is a national of the United States.

1259. Plaintiff Chris Lee Zimmerman is the father of SSG Zimmerman. He is a national of the United States.

1260. Plaintiff Baily Zimmerman is the sister of SSG Zimmerman. She is a national of the United States.

1261. As a result of the death of SSG Zimmerman, each member of the Zimmerman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Zimmerman's society, companionship, and counsel.

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [Primary Liability, 18 U.S.C. § 2339A Predicate]

1262. Plaintiffs incorporate their allegations above.

1263. Defendants provided material support to the Taliban and/or the Haqqani Network[428] in violation of 18 U.S.C. § 2339A. They did so by making payments to the Taliban that financed the Taliban's terrorist attacks, and, in the case of MTN, by deactivating its transmission masts to assist the Taliban's counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan. Defendants' payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1). MTN's manipulation of its cellular signals for the Taliban's benefit also provided a service; assistance derived from scientific, technical, or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the deactivation requests), which likewise qualified as material support.

[428] All references to the Taliban in the Counts below are inclusive of the Haqqani Network, unless otherwise specified. *See supra* Part V.A.2 (explaining that the Haqqani Network is part of the Taliban).

1264. Defendants knew or recklessly disregarded that their material support would be used by the Taliban in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from FTOs. Those acts by the Taliban, in turn, violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. Defendants also disguised the nature of their support, in further violation of 18 U.S.C. § 2339A.

1265. Defendants' conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).[429] Defendants' support for the Taliban appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

[429] *See*, *e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010) (violation of material-support statutes, even without any "subjective intent" to further terrorist objectives, meets statutory definition of "international terrorism" based on such support's "objective 'external appearance' "); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106-07 (D.D.C. 2003) (similar).

1266. Defendants' provision of material support to the Taliban occurred primarily outside the territorial jurisdiction of the United States.

1267. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1268. As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339A, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT TWO: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [Primary Liability, 18 U.S.C. § 2339B Predicate]

1269. Plaintiffs incorporate their allegations above.

1270. Defendants provided material support to the Haqqani Network in violation of 18 U.S.C. § 2339B. They did so by making payments to the Haqqani Network that financed the Haqqani Network's terrorist attacks, and, in the case of MTN, by deactivating its transmission masts to assist the Haqqani Network's counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan. Defendants' protection payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1). MTN's manipulation of its cellular signals for the Haqqani Network's benefit also provided the Haqqani Network with a service; assistance derived from scientific, technical or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the deactivation requests), all of which likewise qualified as material support. Defendants disguised the nature of their support, in further violation of 18 U.S.C. § 2339B.

1271. The United States has designated the Haqqani Network as an FTO under 8 U.S.C. § 1189 since September 7, 2012. At all times since that designation, Defendants knew or recklessly disregarded that the Haqqani Network was a designated FTO and/or that the Haqqani Network had engaged in acts of terrorism against the United States.

1272. Defendants' conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for the Haqqani Network appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1273. Defendants' provision of material support to the Haqqani Network occurred primarily outside the territorial jurisdiction of the United States.

1274. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1275. As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339B, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT THREE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [Primary Liability, 18 U.S.C. § 2339C Predicate]**

1276. Plaintiffs incorporate their allegations above.

1277. Defendants, by making payments to the Taliban that financed the Taliban's terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A). Defendants knew or recklessly disregarded that the Taliban would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

1278. Defendants, by making payments to the Taliban that financed the Taliban's terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B). Defendants knew or recklessly disregarded that the Taliban would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the Taliban's purpose was to intimidate the U.S. and Afghan populations and to compel the U.S. and Afghan governments to effect a withdrawal of U.S. forces from Afghanistan.

1279. Defendants' provision of funds to the Taliban involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for the Taliban appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1280. Defendants' provision of funds to the Taliban occurred primarily outside the territorial jurisdiction of the United States.

1281. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1282. As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT FOUR: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [Primary Liability, 50 U.S.C. § 1705(a) Predicate]**

1283. Plaintiffs incorporate the allegations above.

1284. On July 2, 2002, the United States designated the Taliban as a Specially Designated Global Terrorist under Executive Order 13224. Because of that designation, 31 C.F.R. § 594.201(a) prohibited transfer, payment, export, withdrawal, or otherwise dealing in the property of the Taliban that was in the United States or that came within the possession or control of U.S. persons without authorization, and 31 C.F.R. § 594.204(a) prohibited U.S. persons from contributing funds, goods, or services to the Taliban without authorization. After the Taliban's designation, the Defendants willfully violated 31 C.F.R. § 594.201(a) by engaging in the transfer, payment, export, withdrawal, or otherwise dealing in the property of the Taliban that was in the United States or that came within the possession or control of U.S. persons; willfully violated § 594.204(a) by engaging in transactions with the Taliban, including by making contributions and provisions of funds, goods, or services to and for the benefit of the Taliban; or both. On information and belief, Defendants were not authorized to engage in any of this conduct. Defendants' conduct therefore violated 50 U.S.C. § 1705(a) and (c).

1285. Defendants' unlawful transactions with the Taliban involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' transactions with the Taliban appear, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1286. Defendants' transactions with the Taliban occurred primarily outside the territorial jurisdiction of the United States.

1287. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1288. As a result of Defendants' violation of 18 U.S.C. § 2333(a) and 50 U.S.C. § 1705(a) & (c), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT FIVE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [Aiding-And-Abetting Liability, Attack Predicate]**

1289. Plaintiffs incorporate their allegations above.

1290. The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by the Taliban.

1291. The terrorist attacks committed by the Taliban, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they

been committed within the jurisdiction of the United States or of the States. In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

1292. The Taliban's terrorist attacks appear to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1293. The Taliban's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

1294. Defendants aided and abetted and knowingly provided substantial assistance to the Taliban – and aided and abetted and knowingly provided substantial assistance to the Taliban's attacks on Plaintiffs – by making payments to the Taliban that financed those attacks, and, in the case of MTN, by deactivating its transmission masts to assist the Taliban's counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan.

1295. The Taliban attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an

FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

1296. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by the Taliban. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1297. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT SIX: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)**
**[Aiding-and-Abetting Liability, RICO predicate]**

1298. Plaintiffs incorporate their allegations above.

1299. From at least 2007 through 2016, terrorists from al-Qaeda conspired with Mullah Omar and others to conduct and maintain the Taliban as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Afghanistan. Throughout that time, the Taliban was a group of associated individuals that functioned as a continuing unit, and the Taliban's express purpose at all times included violence against, and the expulsion of, Americans in Afghanistan. The Taliban engaged in, and its activities affected, foreign commerce.

1300. From at least 2007 through 2016, Mullah Omar and other terrorists employed by or associated with the Taliban and al-Qaeda (including without limitation Sirajuddin Haqqani, Jalaluddin Haqqani, Mullah Brader, Mawlawi Ahmad Bilal, and other terrorists described in this Complaint) have maintained interests in and conducted the affairs of the Taliban as an enterprise by engaging in a campaign to expel Americans from Afghanistan through crime and anti-American violence (the "Taliban-al-Qaeda Campaign").

1301. Specifically, Mullah Omar and other terrorists employed by or associated with the Taliban and al-Qaeda conducted and participated in the conduct of the Taliban's affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. The same terrorists also maintained interests in and control of the Taliban (and conspired to do so) through this pattern of racketeering activity.

1302. The Taliban-al-Qaeda Campaign was an act of international terrorism. It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States. The Taliban-al-Qaeda Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of

the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1303. The Taliban-al-Qaeda Campaign occurred primarily outside the territorial jurisdiction of the United States.

1304. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Taliban-al-Qaeda Campaign. Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Mullah Omar and other terrorists associated with the Taliban conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of the Taliban. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Taliban-al-Qaeda Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1305. Defendants aided and abetted and knowingly provided substantial assistance to the Taliban, its members, and the Taliban-al-Qaeda Campaign. Defendants did so by making payments to the Taliban that financed the Taliban's terrorist attacks, and, in the case of MTN, by deactivating its transmission masts to assist the Taliban's counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan.

1306. The Taliban-al-Qaeda Campaign was committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

1307. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

1308. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

1309. Plaintiffs request that the Court:

(a) Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b) Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c) Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d) Award Plaintiffs prejudgment interest; and

(e) Award Plaintiffs any such further relief the Court deems just and proper.

Dated: December 27, 2019

Respectfully submitted,

*<u>/s/ Joshua D. Branson</u>*

Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Grace W. Knofczynski (D.C. Bar No. 15000407)
Kellogg, Hansen, Todd,
Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com

Michael J. Gottlieb (D.C. Bar No. 974960)
Randall Jackson (D.C. Bar No. 490798)
Nicholas Reddick[*]
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
Tel: (202) 303-1000
Fax: (202) 303-2000
MGottlieb@willkie.com
RJackson@willkie.com
NReddick@willkie.com

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com

Randy D. Singer (D.C.D. Bar No. VA057)[†]
Rosalyn K. Singer (D.C.D. Bar No. VA063)
Kevin A. Hoffman (D.C. Bar No. 1044559)
Singer Davis, LLC
1209 Laskin Road
Virginia Beach, VA 23451
Tel: (757) 301-9995
Fax: (757) 233-1084
randy.singer@singerdavis.law
rosalyn.singer@singerdavis.law
kevin.hoffman@singerdavis.law

*Counsel for Plaintiffs*

[*] D.C. Bar admission pending; California Bar No. 288779. Practicing under the supervision of members of the D.C. Bar.

[†] Singer Davis, LLC is co-counsel for the Paresi and Wise Families. *See supra* ¶¶ 1011-1020, 1239-46. Other counsel represent all Plaintiffs, including the Paresi and Wise Families.