**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AUGUST CABRERA, *et al.*,

               *Plaintiffs*,

      v.

BLACK & VEATCH SPECIAL
PROJECTS CORPORATION, *et al.*,

               *Defendants*.

Case No. 19-cv-03833 (EGS)

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE MTN DEFENDANTS' MOTION TO DISMISS**
**FOR LACK OF PERSONAL JURISDICTION AND**
**FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 4

    A.  The MTN Defendants Are Foreign Telecommunications Companies That Operate Exclusively Outside the United States. ................................................................. 4

    B.  This Suit Is Based on MTN Afghanistan's Alleged Conduct in Afghanistan. ................... 5

    C.  Separate from the Subject-Matter of This Lawsuit, Plaintiffs Allege That MTN Group Transacted with International Development Agencies. ........................................... 9

LEGAL STANDARD ............................................................................................................ 11

ARGUMENT ........................................................................................................................ 12

I.    The Court Should Dismiss the Claims Against the MTN Defendants for Lack of Personal Jurisdiction. ................................................................................................... 12

    A.  The MTN Defendants' Alleged Suit-Related Conduct Occurred Outside the United States and Was Not Purposefully Directed at the United States. ........................... 13

    B.  The IFC and MIGA Contracts Are Not a Basis for Asserting Personal Jurisdiction over the MTN Defendants for Plaintiffs' Unrelated Claims. ........................... 16

        1.  Plaintiffs' claims do not arise out of the IFC or MIGA contracts. ............................. 17

        2.  The MTN Defendants did not purposefully avail themselves of the privilege of conducting business in the United States. .............................................. 21

    C.  Exercising Jurisdiction over the MTN Defendants Would Be Unreasonable. ................. 29

II.   The Complaint Fails to State a Claim Against the MTN Defendants ...................................... 31

    A.  Plaintiffs' Direct-Liability Claims Against the MTN Defendants Fail. ........................... 31

        1.  Plaintiffs' own allegations demonstrate that the MTN Defendants had no apparent intent to intimidate or coerce ........................................................ 32

        2.  Plaintiffs do not and cannot allege facts necessary to plead key elements of the predicate crimes underlying their direct-liability claims. ............................. 36

3.  MTN Afghanistan's alleged compliance with the Taliban's shutdown orders
    did not proximately cause the attacks that injured Plaintiffs. ......................................37

B.  Plaintiffs' Aiding-and-Abetting Claims Against the MTN Defendants Fail. ....................38

1.  Plaintiffs fail to plead that the MTN Defendants aided and abetted the persons
    who carried out the alleged acts of international terrorism..........................................38

2.  Plaintiffs fail to plead that a designated FTO "committed, planned, or
    authorized" each "act of international terrorism" at issue. ..........................................43

CONCLUSION...................................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.*,
   346 F. Supp. 2d 64 (D.D.C. 2004) ........................................................................27, 28, 30, 31

*Alkanani v. Aegis Def. Servs., LLC*,
   976 F. Supp. 2d 13 (D.D.C. 2014) ........................................................................................12

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006).............................................................................................................37

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
   480 U.S. 102 (1987).......................................................................................................29, 30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................................12

*Averbach v. Cairo Amman Bank*,
   2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ....................................................................40, 42

*Bank of Cape Verde v. Bronson*,
   869 F. Supp. 21 (D.D.C. 1994)............................................................................................26

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................................33

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
   137 S. Ct. 1773 (2017)................................................................................................. *passim*

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985).................................................................................................14, 27, 29

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
   292 F. Supp. 2d 9 (D.D.C. 2003).........................................................................................15

*Cellutech, Inc. v. Centennial Cellular Corp.*,
   871 F. Supp. 46 (D.D.C. 1994).......................................................................................24, 28

*In re Chiquita Brands Int'l, Inc.*,
   284 F. Supp. 3d 1284 (S.D. Fla. 2018) ................................................................................35

*Clayborn v. Twitter, Inc.*,
   2018 WL 6839754 (N.D. Cal. Dec. 31, 2018)......................................................................44

*Cockrum v. Donald J. Trump for President, Inc.*,
   319 F. Supp. 3d 158 (D.D.C. 2018) ....................................................17, 20, 21, 25

*COMSAT Corp. v. Finshipyards S.A.M.*,
   900 F. Supp. 515 (D.D.C. 1995) ........................................................................25, 26

*Copeland v. Twitter, Inc.*,
   352 F. Supp. 3d 965 (N.D. Cal. 2018) ..............................................................42, 43

*Creighton Ltd. v. Gov't of State of Qatar*,
   181 F.3d 118 (D.C. Cir. 1999) ..........................................................................22, 23

*Crosby v. Twitter, Inc.*,
   303 F. Supp. 3d 564 (E.D. Mich. 2018)....................................................................43

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019) ....................................................................................44

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)..................................................................................................13

*Estate of Klieman ex rel. Kesner v. Palestinian Auth.*,
   923 F.3d 1115 (D.C. Cir. 2019) ................................................................................16

*Estate of Klieman v. Palestinian Auth.*,
   __ S. Ct. __, 2020 WL 1978929 (Apr. 27, 2020) ..................................................16

*Fields v. Twitter, Inc.*,
   881 F.3d 739 (9th Cir. 2018) ..............................................................................37, 38

*Foster v. Arletty 3 Sarl*,
   278 F.3d 409 (4th Cir. 2002) ....................................................................................17

*Freeman v. HSBC Holdings PLC*,
   413 F. Supp. 3d 67 (E.D.N.Y. 2019) ........................................................................34

*Gonzalez v. Google, Inc.*,
   335 F. Supp. 3d 1156 (N.D. Cal. 2018) ....................................................................37

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)............................................................................................12, 13

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ......................................................38, 40, 42, 43

*Hanson v. Denckla*,
   357 U.S. 235 (1958)..................................................................................................22

*Hayes v. FM Broad. Station WETT*,
    930 F. Supp. 2d 145 (D.D.C. 2013) ..................................................................28

*Health Commc'ns, Inc. v. Mariner Corp.*,
    860 F.2d 460 (D.C. Cir. 1988) ..................................................................23, 24

*Int'l Fin. Corp. v. Kaiser Grp. Int'l Inc. (In re Kaiser Grp. Int'l Inc.)*,
    399 F.3d 558 (3d Cir. 2005) ..................................................................29

*Inv. Co. Inst. v. United States*,
    550 F. Supp. 1213 (D.D.C. 1982) ..................................................................28

*J. McIntyre Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011) ..................................................................27

*Jam v. Int'l Fin. Corp.*,
    139 S. Ct. 759 (2019) ..................................................................10, 29

*In re Kaiser Grp. Int'l, Inc.*,
    730 F. Supp. 2d 247 (D.D.C. 2010) ..................................................................10

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ..................................................................18, 33, 34, 35

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991) ..................................................................27, 28

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ..................................................................3, 35, 39, 42

*Livnat v. Palestinian Auth.*,
    851 F.3d 45 (D.C. Cir. 2017) ..................................................................12, 16, 20

*Md. Digital Copier v. Litig. Logistics, Inc.*,
    394 F. Supp. 3d 80 (D.D.C. 2019) ..................................................................20

*Midland v. F. Hoffman-Laroche, Ltd. (In re Vitamins Antitrust Litig.)*,
    270 F. Supp. 2d 15 (D.D.C. 2003) ..................................................................29

*Monge v. RG Petro-Mach. (Grp.) Co.*,
    701 F.3d 598 (10th Cir. 2012) ..................................................................17

*Mueller Brass Co. v. Alexander Milburn Co.*,
    152 F.2d 142 (D.C. Cir. 1945) ..................................................................28

*Nuevos Destinos, LLC v. Peck*,
    2019 WL 78780 (D.D.C. Jan. 2, 2019) ..................................................................15

v

*Okolie v. Future Servs. Gen. Trading & Contracting Co.*,
   102 F. Supp. 3d 172 (D.D.C. 2015) ...................................................................18

*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (D.C. Cir. 2018) ................................................................... *passim*

*Rush v. Savchuk*,
   444 U.S. 320 (1980)...........................................................................................12

*Russello v. United States*,
   464 U.S. 16 (1983)............................................................................................45

*Shaheen v. Smith*,
   994 F. Supp. 2d 77 (D.D.C. 2013) ..............................................................17, 28

*Shatsky v. Palestine Liberation Org.*,
   __ F.3d __, 2020 WL 1856490 (D.C. Cir. Apr. 14, 2020).....................................13

*Siam Kraft Paper Co. v. Parsons & Whittemore, Inc.*,
   400 F. Supp. 810 (D.D.C. 1975)........................................................................23

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019)....................................................................38, 39, 41

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018)...............................................................................20

*Stansell v. BGP, Inc.*,
   2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ..............................................34, 35

*Taamneh v. Twitter, Inc.*,
   343 F. Supp. 3d 904 (N.D. Cal. 2018) ...................................................... *passim*

*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*,
   113 F.3d 1484 (8th Cir. 1997) ......................................................................42, 43

*In re Terrorist Attacks on Sept. 11, 2001*,
   538 F.3d 71 (2d Cir. 2008)..................................................................................15

*Thompson Hine, LLP v. Taieb*,
   734 F.3d 1187 (D.C. Cir. 2013) ................................................................ *passim*

*Toumazou v. Turkish Republic of N. Cyprus*,
   71 F. Supp. 3d 7 (D.D.C. 2014)..........................................................................32

*Triple Up Ltd. v. Youku Tudou Inc.*,
   235 F. Supp. 3d 15 (D.D.C. 2017) .................................................................18, 19

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) (per curiam) ......................................................45

*Walden v. Fiore*,
571 U.S. 277 (2014)................................................................................... *passim*

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016)...............................................................................17, 18

*Weiss v. Nat'l Westminster Bank PLC*,
768 F.3d 202 (2d Cir. 2014)...............................................................................33

*World Wide Minerals Ltd. v. Republic of Kazakhstan*,
116 F. Supp. 2d 98 (D.D.C. 2000) .....................................................................28

*World Wide Travel Inc. v. Travelmate US, Inc.*,
6 F. Supp. 3d 1 (D.D.C. 2013)....................................................................23, 25, 26

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980)...........................................................................................22, 29

*Wultz v. Islamic Republic of Iran*,
755 F. Supp. 2d 1 (D.D.C. 2010) .......................................................................35

*Zapata v. HSBC Holdings PLC*,
414 F. Supp. 3d 342 (E.D.N.Y. 2019) ...............................................................34

**Statutes**

8 U.S.C. § 1189................................................................................................6

18 U.S.C. § 2331(1)(A)....................................................................................31, 36

18 U.S.C. § 2331(1)(B)....................................................................................31, 33, 35

18 U.S.C. § 2333(a) .......................................................................................8, 31, 37

18 U.S.C. § 2333(d)(2) ...................................................................................9, 38, 44, 45

18 U.S.C. § 2339A..........................................................................................45

18 U.S.C. § 2339B..........................................................................................36

50 U.S.C. § 1705(a) ........................................................................................36

*Justice Against Sponsors of Terrorism Act*,
Pub. L. No. 114-222, 130 Stat. 852 (2016)........................................................38

**Regulations**

31 C.F.R. § 594.204 ...................................................................................................36

31 C.F.R. § 594.201(a) .............................................................................................36

**Executive Orders**

Exec. Order No. 12,647, 53 Fed. Reg. 29,323 (Aug. 2, 1988) ....................................10

**Rules**

Fed. R. Civ. P. 4(k)(2) ...............................................................................................12

Fed. R. Civ. P. 12(b)(2) .............................................................................................11

Fed. R. Civ. P. 12(b)(6) .............................................................................................11

**International Agreements**

Articles of Agreement of the Int'l Fin. Corp.,
    May 25, 1955, 264 U.N.T.S. 117 ........................................................................10

Convention Establishing the Multilateral Inv. Guarantee Agency,
    Oct. 11, 1985, 150 U.N.T.S. 99 ..........................................................................10

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ....................................................................24

Gary Born, *International Commercial Arbitration*  (2014) ...........................................26

Complaint, *Doe v. IFC Asset Mgmt. Co.*,
    No. 1:17-cv-01494-UNA (D. Del. Oct. 24, 2017) ................................................29

*IFC Summary: Board Approved Investments by Product Line*, World Bank Grp.,
    https://tinyurl.com/seredyt (last visited Apr. 29, 2020) ........................................22

*Loans*, Int'l Fin. Corp.,
    https://tinyurl.com/vmay85h (last visited Apr. 29, 2020) ......................................27

*New Oxford American Dictionary* (3d ed. 2010) .......................................................44

## PRELIMINARY STATEMENT

The MTN Defendants are three foreign telecommunications companies with wholly foreign operations, accused by Plaintiffs of conduct that allegedly occurred entirely outside the United States.[1] Plaintiffs, service members and contractors injured in Afghanistan, or their family members, claim that the Taliban "extort[ed]" one of those companies, MTN Afghanistan, in Afghanistan. Compl. ¶ 231. Plaintiffs allege that the Taliban threatened MTN Afghanistan with violence unless it paid the Taliban's "taxes" or shut down cell towers at night in Taliban-controlled territories, *see, e.g.*, *id.*, and that alleged compliance with these threats subjects the MTN Defendants to liability under the Anti-Terrorism Act ("ATA"), *see id.* ¶¶ 1262-1307.

This claim suffers from two overarching and irredeemable flaws. *First*, Plaintiffs are attempting to sue *foreign* defendants in the United States over conduct that allegedly occurred *in Afghanistan*. Under settled constitutional principles, the Court lacks personal jurisdiction over the MTN Defendants. *Second*, none of Plaintiffs' factual allegations supports the farfetched notion that three leading telecommunications companies committed acts of international terrorism, or knowingly assumed a role in the Taliban's acts of international terrorism. Plaintiffs' theory of liability therefore does not state a claim under the ATA.

The threshold defect in the Complaint is that the Court lacks personal jurisdiction over the MTN Defendants. The Complaint does not, and could not, contend that the MTN Defendants, all of which are foreign companies without U.S. operations, are subject to general jurisdiction in the United States. Plaintiffs also fail to plead any basis for specific jurisdiction. The conduct that forms the basis of Plaintiffs' claims—MTN Afghanistan's alleged compliance with the Taliban's

---

[1] The MTN Defendants are MTN Group Limited ("MTN Group"), MTN (Dubai) Limited ("MTN Dubai"), and MTN Afghanistan.

1

extortionate demands—allegedly occurred entirely outside the United States. Plaintiffs tacitly recognize that they cannot establish jurisdiction in a U.S. court simply by alleging that the Taliban shook down a company in Afghanistan—an experience they contend was shared by innumerable individuals and businesses in that country, *see, e.g.*, Compl. ¶¶ 74, 107. So they devote a section of their Complaint to describing irrelevant financing and political-risk contracts that two separate companies, MTN Group and MTN Dubai, signed with international organizations that are part of the World Bank Group and that happen to be headquartered in Washington, D.C.

These allegations fail as a matter of law to support jurisdiction over any MTN Defendant for a simple reason: the World Bank's financial support for the expansion of mobile-telephone service in Afghanistan has nothing to do with the subject of this lawsuit. The logical endpoint of Plaintiffs' strained theory of jurisdiction is startling: *any* foreign entity that receives World Bank financing would thereby subject itself to U.S. jurisdiction for *any* claim, by *any* party, that later arises in *any* country where this financing is used to spur development. That is not the law. Instead, a plaintiff's claim must arise from the defendant's contacts with the forum. And because Plaintiffs have not pleaded any claim that arises from purposeful availment by the MTN Defendants of the privilege of conducting business in the United States, the Court lacks personal jurisdiction.

Even if this Court had jurisdiction to hear Plaintiffs' claims against the MTN Defendants, all of those claims would still have to be dismissed for failure to state a claim under the ATA. Counts 1-4 allege that the MTN Defendants themselves perpetrated acts of international terrorism. That remarkable assertion fails. Under the ATA, a defendant is responsible for committing "international terrorism" only if it appears to act with the motives of a terrorist, such as intimidating a civilian population. Here, Plaintiffs' own allegations show the opposite. MTN Afghanistan was the *target* of terrorist attacks and threats, and it allegedly complied with the Taliban's demands for

one reason and one reason only: to protect its employees and network from violent reprisal. Counts 5 and 6, which claim the MTN Defendants aided and abetted terrorism, are equally baseless. To plead such a claim, Plaintiffs must allege that the MTN Defendants knowingly "assum[ed] a role in terrorist activities." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018). Again, Plaintiffs' own allegations—that MTN Afghanistan allegedly acted to protect its staff and network from violent threats—refute any notion that the MTN Defendants willingly assumed a role in any terrorist activities, let alone a role in the specific attacks that injured Plaintiffs. At most, Plaintiffs allege that MTN Afghanistan faced a difficult choice in an impossible situation. As a matter of law, those allegations cannot support a claim against any of the MTN Defendants under the ATA.

Plaintiffs and their family members made tremendous sacrifices on behalf of the United States and the people of Afghanistan. They are entitled to deep sympathy. But the MTN Defendants are not the extremists that caused Plaintiffs' tragic losses and injuries. To the contrary, MTN Afghanistan has been lauded by the World Bank for expanding telecommunications services to the impoverished people of Afghanistan, and has itself been a *target* of violence in the devastating conflict in that war-torn country. Put simply, Plaintiffs have sued the wrong defendants in the wrong court based on insufficient allegations.

# BACKGROUND

The background recited below is based on the non-conclusory factual allegations in the

Complaint, which the MTN Defendants treat as true only for purposes of this motion to dismiss.[2]

### A.    The MTN Defendants Are Foreign Telecommunications Companies That Operate Exclusively Outside the United States.

What Plaintiffs label as "MTN" throughout the Complaint are actually three separate

companies. Founded at the dawn of South African democracy in 1994, MTN Group is a South

African company listed on the Johannesburg Stock Exchange. It has become one of the world's

leading mobile-telephone-service providers with more than 250 million subscribers in Africa and

the Middle East, and more subscribers than any other operator in Africa. MTN Group has no

operations in the United States. *See* Compl. ¶ 28. Unlike other major telecommunications

companies that focus on the developed world, MTN Group is devoted to bringing mobile phone

services to underserved populations in emerging economies. MTN Group and its affiliates have

"wad[ed] into nations dealing with war, sanctions and strife," *id.* ¶ 220, to bring cellular-

communications technology to nations where "no one else [will] go[]," Alexandra Wexler,

*Telecom Giant Pushes into Dangerous Areas*, Wall St. J., Aug. 10, 2019 ("*Telecom Giant Pushes*

*into Dangerous Areas*") (Ex. A), *cited at* Compl. ¶ 220 n.288.

Afghanistan is one such nation. MTN Afghanistan, a company incorporated and

headquartered in Afghanistan, was formed in 2006 when MTN Group purchased a Lebanese

"company that had recently won a license to provide cellular-telephone service in Afghanistan."

Compl. ¶¶ 30, 221, 253. Like MTN Group, MTN Afghanistan has no operations in the United

---

[2] The background recitation disregards, however, all unsupported inferences, legal conclusions, and allegations contradicted by documents the Complaint incorporates by reference. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272-73 (D.C. Cir. 2018). Unless otherwise noted, internal quotation marks have been omitted from all citations in this memorandum of law.

States. By 2010, MTN Afghanistan had grown from the third-largest to the largest cellular-phone provider in Afghanistan. *Id.* ¶ 221. Two years later, it "had a presence in virtually every [Afghan] province." *Id.* This expansion has proved enormously beneficial for the people of Afghanistan: MTN Afghanistan's operations helped "expan[d]" the "telecommunications infrastructure in a conflict-affected country, increasing the availability and affordability of communications services in Afghanistan," and in particular "supporting the expansion of telecom services into semi-urban and rural areas." World Bank Grp., *Afghanistan Country Snapshot* 53 (2015) ("*World Bank Snapshot*"), (Ex. B), *cited at* Compl. ¶ 270 n.355.

### B. This Suit Is Based on MTN Afghanistan's Alleged Conduct in Afghanistan.

As one report incorporated into the Complaint explains, "[w]orking in some of the world's most dangerous countries" poses tremendous challenges for telecommunications providers. *Telecom Giant Pushes into Dangerous Areas*, *cited at* Compl. ¶ 220 n.288. Employees of MTN Group's partners and affiliates in these regions face the threat of personal and political violence, theft, and property damage. *See id.* Afghanistan is no exception. As Plaintiffs' acknowledge, Afghanistan's "political instability" has made "operating conditions challenging." Compl. ¶ 254.

Plaintiffs identify the Taliban as MTN Afghanistan's toughest challenge. The Taliban is a Sunni Islamist group, composed of former mujahedin (holy warriors), that ruled as Afghanistan's "de facto government" from 1996 to 2001. *Id.* ¶¶ 35-36, 278. The Complaint describes that after a U.S.-led coalition overthrew the Taliban-led government following the attacks of September 11, 2001, the Taliban slowly "regenerated" as an insurgent militia "intent on expelling the United States from Afghanistan and re-establishing Islamic rule." *Id.* ¶ 41. Over the next two decades, the Taliban waged a deadly insurgency against Coalition and Afghan national forces. *Id.* ¶¶ 41, 44-45.

Plaintiffs are U.S. service members or contractors, or family members of service members or contractors, who were injured or killed in Afghanistan between 2009 and 2017. *Id.* ¶¶ 1, 17. The

Complaint attributes these attacks to the Taliban, *id.*, or to the Haqqani Network, a terror group that Plaintiffs allege operated primarily in southeast Afghanistan and cooperated with the Taliban, *see, e.g., id.* ¶¶ 287, 291-300, 343. The United States designated the Haqqani Network as a Foreign Terrorist Organization ("FTO") under 8 U.S.C. § 1189 in September 2012. *Id.* ¶ 288. While the Taliban has been subject to U.S. sanctions as a Specially Designated Global Terrorist since 2002, *see* Compl. ¶ 278 n.359, the Secretary of State has never designated the Taliban as an FTO.

Plaintiffs allege that "[b]y 2006, the Taliban had achieved control of wide swaths of southern and eastern Afghanistan," Compl. ¶ 57, establishing "de-facto control of key provinces," *id.* ¶ 41. Everywhere it went, the Taliban allegedly erected the trappings of a bureaucracy, "set[ting] up . . . 'shadow' local governments in each key province and district." *Id.* ¶ 43. "[B]y 2009, it had installed 'shadow' governments in 33 of Afghanistan's 34 provinces." *Id.* ¶ 57.

Plaintiffs allege that when the Taliban reemerged in 2005, it began to "systematically" target "international businesses operating in Afghanistan" in an "extortion" scheme. *Id.* ¶¶ 2, 231. The Taliban allegedly "presented them with a choice": either pay "protection money" or "face the risk of future terrorist attack." *Id.*; *see also id.* ¶ 57 ("At all relevant times," according to the Complaint, "the Taliban used threats of terrorist violence to extract protection money from international companies doing business in Afghanistan."). To make its intentions clear, the Taliban would allegedly "stage attacks as a bargaining tactic" or "attack [even] paying companies to send a message to the broader industry." *Id.* ¶ 60. Taliban officials allegedly termed this extortion racket a "tax" for operating in regions they claimed as their territory—a tax it enforced through threats and acts of violence against person and property alike. *See id.* ¶¶ 99, 222. Plaintiffs quote one Taliban official as saying, "We are the government here and they must pay tax to us." *Id.* ¶ 225.

According to the Complaint, the Afghan telecommunications industry was a target of the

Taliban's violence. Plaintiffs allege that the Taliban began to extort "big telecom companies" just as MTN Afghanistan established itself in the market. *Id.* ¶ 222; *see also id.* ¶ 231 ("Taliban extortion of (and violence against) cellular companies . . . significantly increase[d]" around this time). The Taliban allegedly warned "MTN and its competitors to pay monthly protection fees in each province, or face having their transmission towers attacked." *Id.* ¶ 223 (citation omitted). And it allegedly made good on those threats, attacking towers owned by the country's three largest mobile-service providers, including MTN Afghanistan. *Id.* ¶¶ 228-229. The message, according to Plaintiffs, was that companies who operated "cell phone tower[s] anywhere in Afghanistan" must buy their safety or else answer to "whoever . . . has the power to blow [them] up." *Id.* ¶ 224.

Despite claiming that the MTN Defendants "aided and abetted" the Taliban, *id.* ¶¶ 1294, 1305, Plaintiffs expressly allege that MTN Afghanistan and other cellular-phone companies complied with the Taliban's demands only because it violently extorted them, *id.* ¶¶ 223, 232. The Complaint does not describe a single payment allegedly made by MTN Afghanistan, in date, amount, or recipient. *See generally id.* ¶¶ 219-233. Instead, it alleges only in general terms that the "going rate" for protection from attack was "$2,000 per tower, per month," and that in some areas, MTN Afghanistan made these payments to local Taliban officials, while in others they were routed to a Taliban council in Quetta, Pakistan. *Id.* ¶ 223. In each instance, however, Plaintiffs allege that "[t]he logic behind [MTN Afghanistan's] protection payments" was the same: "to buy protection from [the Taliban's] fighters" and "to prevent them from destroying property and attacking staff." *Id.* ¶¶ 223, 232. Plaintiffs' position, in other words, is that MTN Afghanistan must have acceded to the Taliban's threats because every cellular-phone company had to, and that it did so not to help the Taliban, but to protect its employees and network by "reduc[ing] the frequency with which [they] faced the threat of terrorist attack." *Id.* ¶¶ 3, 224.

7

In addition to this alleged extortion of "tax" payments, Plaintiffs allege that "[i]n or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night." *Id.* ¶ 234. "[T]he Taliban believed that shutting down nighttime service would impede Coalition intelligence efforts," so it allegedly threatened to "target the costly cell towers with explosives" if providers did not switch them off upon demand. *Id.* ¶¶ 234, 241. According to reporting cited in the Complaint, "[w]hen carriers tried to defy the edict," the Taliban "killed staff in response" and destroyed "some 40 base towers—costing as much as $400,000 each." Yaroslav Trofimov, *Cell Carriers Bow to Taliban Threat*, Wall. St. J., Mar. 22, 2010 ("*Cell Carriers Bow to Taliban Threat*") (Ex. C), *cited at* Compl. ¶ 222 n.290. "Chastened by the experience, the [Afghan] government" concluded that "in some areas, unfortunately," companies had "no other" option but to comply with the Taliban's orders. *Id.* Afghanistan's Communications Minister is quoted in 2010 as recognizing that "[w]e don't have security to protect the towers." *Id.* The same report states that with "people's lives . . . at stake," "all of Afghanistan's national cellphone carriers . . . made a joint decision to shut down their networks at night in areas where the insurgents [were] active." *Id.* As with their alleged response to the Taliban's other threats, the companies' only alleged aim was to "reduce the risk" of "Taliban attack." Compl. ¶¶ 237, 241.

Based on these allegations, Plaintiffs bring claims against the MTN Defendants under the ATA. Plaintiffs allege that, by acceding to the Taliban's threats, MTN Afghanistan provided the group with "material support," *id.* ¶ 219—the theory being that the protection payments and cell-tower deactivation "strengthen[ed] the Taliban" by supplying it with "fungible U.S. dollars" and hindering Coalition intelligence-gathering activities, *id.* ¶¶ 10, 93, 238. Plaintiffs claim that MTN Afghanistan directly committed "acts of international terrorism" that injured the Plaintiffs (Counts 1-4), *see* 18 U.S.C. § 2333(a); Compl. ¶¶ 1262-1288, and that it "aided and abetted" acts of

international terrorism that were "committed" by the Taliban or Haqqani Network and "planned" or "authorized" by al-Qaeda (Counts 5-6), *see* 18 U.S.C. § 2333(d)(2); Compl. ¶¶ 1289-1307.

Plaintiffs advance the same claims against MTN Group and MTN Dubai. MTN Dubai is "a Dubai company" with "its principal place of business in Dubai" and (like MTN Group and MTN Afghanistan) has no U.S. operations. Compl. ¶ 29. The Complaint does not allege that MTN Group itself made payments to the Taliban or shut down cell towers. Instead, Plaintiffs allege that it had responsibility for "manag[ing] operational and political risk in the countries MTN enters," and that when the Taliban "first demanded that MTN [Afghanistan] shut down its towers at night" in 2008, MTN Group authorized MTN Afghanistan to comply. *Id.* ¶ 254. The Complaint includes no non-conclusory allegations that MTN Group played any role in the alleged protection payments, or that MTN Dubai played any role in any of the alleged actions of MTN Afghanistan.[3]

### C. Separate from the Subject-Matter of This Lawsuit, Plaintiffs Allege That MTN Group Transacted with International Development Agencies.

None of the alleged conduct described above occurred in, or intentionally targeted, the United States. Seeking to avoid the jurisdictional implications of that reality, Plaintiffs devote a portion of their Complaint to describing financing and insurance that MTN Group obtained for its Afghan investment from two international development organizations headquartered in the United States. Years after MTN Afghanistan began providing mobile-phone services in Afghanistan, the World Bank Group (1) provided MTN Group with financing from the International Finance Corporation ("IFC"), and (2) issued political-risk guarantees from the Multilateral Investment Guarantee Agency ("MIGA") to MTN Group and MTN Dubai. Compl. ¶¶ 258, 261.

---

[3] The Complaint makes the brief and conclusory assertion that MTN Group and MTN Dubai "orchestrated [MTN Afghanistan's] policy of providing material support to the Taliban," including complying with the Taliban's demands for protection payments. Compl. ¶¶ 219, 255. This conclusory assertion is made without supporting factual allegations and need not be treated as true.

The IFC, an arm of the World Bank Group headquartered in Washington, D.C., *id.* ¶ 258, is an "international development bank," designated as an international organization by Executive Order and entitled to the same immunities in the United States as foreign sovereigns. *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 766 (2019). Its members are countries around the world—now totaling 184, *id.*—which finance the bank's operations by buying IFC shares. *See* Articles of Agreement of the Int'l Fin. Corp., Art. II, § 2, May 25, 1955, 264 U.N.T.S. 117, 120. The IFC's mission is "to further economic development by encouraging the growth of productive private enterprise in member countries, particularly in the less developed areas." *In re Kaiser Grp. Int'l, Inc.*, 730 F. Supp. 2d 247, 250 (D.D.C. 2010), *aff'd sub nom. Kaiser Grp., Int'l, Inc. v. World Bank*, 420 F. App'x 2 (D.C. Cir. 2011).

The Complaint alleges that MTN Group secured $75 million in IFC financing in June 2009. Compl. ¶ 258. The "IFC's $75 million facility consisted of $65 million of debt and $10 million in equity—the latter of which bought IFC a 9.1% stake in MTN Afghanistan." *Id.* Although the contract was signed in 2009, *id.*, the IFC did not disburse the $65 million loan until 2011, *see World Bank Snapshot* 53, when it sent the money to MTN Afghanistan, Compl. ¶ 259.

MIGA, another arm of the World Bank Group headquartered in Washington, D.C., "supplement[s]" the work of the IFC by providing political-risk insurance ("guarantees") for companies operating in the developing world. Convention Establishing the Multilateral Inv. Guarantee Agency ("MIGA Convention"), Art. 2(a), Oct. 11, 1985, 1508 U.N.T.S. 99, 102. Like the IFC, MIGA is established by treaty, designated an international organization by Executive Order, and entitled to the same immunities as a foreign sovereign. *See* Exec. Order No. 12,647, 53 Fed. Reg. 29,323 (Aug. 2, 1988). MIGA's guarantees "encourage the flow of investments for productive purposes among member countries, and in particular to developing member countries."

10

MIGA Convention, Art. 2(a), 1508 U.N.T.S. at 102.

Consistent with this mission, MIGA issued two guarantees that provided coverage related to MTN Afghanistan. Plaintiffs allege that MTN Group obtained the first guarantee in 2007 and served as the "guarantee holder," meaning it signed the contract with MIGA. Compl. ¶¶ 261-262. MTN Group allegedly replaced this first guarantee in 2011 and subsequently financed MTN Afghanistan's expansion "through a shareholder loan and an equity investment." *Id.* ¶ 262. Plaintiffs further allege that MTN Group that same year obtained a second guarantee, for which MTN Dubai served as the guarantee holder. *Id.* ¶ 263. According to the Complaint, these guarantees insured the respective holder's investment in MTN Afghanistan "against the risks of transfer restriction, expropriation, and war and civil disturbance." *Id.* ¶¶ 262-263; *see* MIGA, Project Brief, *MTN Afghanistan* (2011) (Ex. D) (explaining that the 2011 guarantee insured "against the risks of transfer restriction and expropriation"), *cited at* Compl. ¶ 262 n.345.

The Complaint does not allege that any MTN Defendant negotiated any part of the IFC financing agreement or the MIGA contracts in the United States, that any contracts were signed in the United States, that any of the contracts are governed by U.S. law, or that they suggest any intent by the MTN Defendants to target the United States with terrorism. *See* Compl. ¶¶ 258-272.

## LEGAL STANDARD

Because the MTN Defendants move to dismiss for lack of personal jurisdiction on the pleadings, the same general standard of review governs their motions to dismiss under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). While the Court must "accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs," it "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018). "Nor must [it] accept as true the complaint's factual allegations insofar as they contradict exhibits to the

complaint or matters subject to judicial notice," including documents "referred to in the complaint and integral to the plaintiff's claim." *Id.* at 272-73. Instead, the Court considers only Plaintiffs' well-pleaded factual allegations to determine whether they plausibly support jurisdiction and state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

As to personal jurisdiction, Plaintiffs bear the burden of "mak[ing] a *prima facie* showing of the pertinent jurisdictional facts." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017). "Conclusory statements" and "bare allegation[s]" will not suffice. *Id.* at 57. Moreover, Plaintiffs "must demonstrate that each defendant is subject to personal jurisdiction in the forum." *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 22 (D.D.C. 2014) (citation omitted). Indeed, "considering the 'defending parties' together and aggregating their forum contacts" to establish jurisdiction "is plainly unconstitutional." *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980).

Because Plaintiffs have not met their burden to plead either personal jurisdiction or any plausible claim for relief, the Court should dismiss all claims against the MTN Defendants.

## ARGUMENT

### I.     The Court Should Dismiss the Claims Against the MTN Defendants for Lack of Personal Jurisdiction.

The Complaint fails to establish personal jurisdiction over the MTN Defendants under Federal Rule of Civil Procedure 4(k)(2), the sole basis for jurisdiction it invokes. Rule 4(k)(2) acts as a federal long-arm statute, *Livnat*, 851 F.3d at 47, and requires that "exercising jurisdiction [be] consistent with the United States Constitution and laws," Fed. R. Civ. P. 4(k)(2)(B). To be consistent with the Constitution, the exercise of jurisdiction must "comport[] with the limits imposed by federal due process," *Walden v. Fiore*, 571 U.S. 277, 283 (2014), given the defendant's "contacts with the United States" as a whole, *Livnat*, 851 F.3d at 54-56. To satisfy due process, Plaintiffs must establish either general or specific jurisdiction over each defendant. *Goodyear*

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  They cannot establish either.

The MTN Defendants are not subject to general jurisdiction. Each is incorporated and has its principal place of business outside the United States, Compl. ¶¶ 28-30, and none operates in the United States, much less is "at home" here. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

That leaves only specific jurisdiction, which Plaintiffs again fail to establish or support. Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation," *Walden*, 571 U.S. at 283-84, and is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction," *Goodyear*, 564 U.S. at 919. To demonstrate specific jurisdiction, a plaintiff must plead (1) that the defendant has "minimum contacts" with the forum, (2) that those contacts are suit-related (meaning plaintiff's claims arise from or relate to those contacts), and (3) that the exercise of jurisdiction would "not offend traditional notions of fair play and substantial justice." *Id.* at 923.

The harms that Plaintiffs and their family members suffered at the hands of the Taliban are undoubtedly tragic. But even as alleged, their claims do not arise out of conduct that occurred in the United States or out of any "minimum contacts" that the MTN Defendants themselves purposefully created with the United States. Faced with "the narrow question of where those claims should be litigated," the Court should conclude that the MTN Defendants cannot be sued in this forum. *Shatsky v. Palestine Liberation Org.*, __ F.3d __, 2020 WL 1856490, at *1 (D.C. Cir. Apr. 14, 2020) (dismissing claims of terror victims for lack of personal jurisdiction).

A.      **The MTN Defendants' Alleged Suit-Related Conduct Occurred Outside the United States and Was Not Purposefully Directed at the United States.**

The most striking aspect of the Complaint from a jurisdictional perspective is what Plaintiffs do not allege—a single misdeed by any MTN Defendant in the United States. Nor could they. The MTN Defendants operate entirely outside the United States, as one of the largest cellular-

service providers in Africa and the Middle East. Unsurprisingly, then, the only wrongdoing Plaintiffs even allege purportedly occurred outside the United States. The Complaint contends that MTN Afghanistan violated the ATA "by making payments to the Taliban" and "deactivating [MTN Afghanistan's] transmission masts . . . *in Afghanistan*." Compl. ¶ 1263 (emphasis added); *accord id.* ¶¶ 1270, 1294, 1305 (using similar language). It implies that MTN Group authorized MTN Afghanistan to comply with the Taliban's shutdown orders from its South Africa headquarters. *See id.* ¶¶ 28, 252, 254-255. And it fails to allege that MTN Dubai did anything, anywhere, related to the Taliban. *See supra* at 9 & n.3. Plaintiffs' claims are thus based on alleged acts in Afghanistan—not acts that took place in the United States.

The Complaint also contains no allegation that the MTN Defendants directed their conduct at the United States. As the Supreme Court has emphasized, due process requires that specific jurisdiction rest on "contacts that the 'defendant *himself*' creates with the forum." *Walden*, 571 U.S. at 284 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Contradicting this settled principle, Plaintiffs improperly attempt to ground personal jurisdiction on a claim that the Taliban—not the MTN Defendants themselves—purposefully directed their activities at the United States. The Complaint contends that MTN Afghanistan's deactivation of "its transmission masts at the Taliban's request targeted the United States by directly interfering with U.S. intelligence activities." Compl. ¶ 256. Even if that were sufficient to show that *the Taliban* "targeted the United States," under *Walden* that is irrelevant and is insufficient to establish personal jurisdiction. Plaintiffs allege that MTN Afghanistan complied with the Taliban's demands only because otherwise it would have been attacked—not in order to disrupt U.S. intelligence or cause any harm to the United States. *See id.* ¶¶ 223, 225, 231, 235. Moreover, even if the Taliban's targeting of U.S. intelligence activities could somehow be imputed to any MTN Defendant, those

activities—"human sources . . . call[ing] Coalition tip lines" and Coalition forces "track[ing] high-value terrorists for nighttime capture-or-kill raids," *id.* ¶ 7—occurred in Afghanistan. They are not contacts with the United States.

*Walden* similarly establishes that a defendant's "knowledge" of someone else's "strong forum connections" does not create personal jurisdiction. 571 U.S. at 289; *see also Nuevos Destinos, LLC v. Peck*, 2019 WL 78780, at *8 (D.D.C. Jan. 2, 2019) (Sullivan, J.) (holding that "[t]he Court cannot assert personal jurisdiction over the nine defendants based on [other defendants'] alleged connection to the United States," despite allegation that the nine defendants had "fair warning" of the other entities' U.S.-targeted activities). This principle squarely forecloses Plaintiffs' reliance on allegations that the MTN Defendants "knew [they were] helping the Taliban conduct terrorist attacks designed specifically to influence U.S. policy." Compl. ¶ 256. Again, even if *the Taliban's* general aim of influencing U.S. policy is a basis to plead a substantial connection between *the Taliban* and the United States, knowledge that *someone else* has a connection to the forum is an improper and unlawful basis for exercising jurisdiction over the MTN Defendants.

In prior ATA cases, courts have recognized that they lacked jurisdiction even where a defendant allegedly "intended to fund al Qaeda," and attacks on Americans "were a foreseeable consequence," because "foreseeability is not the standard for recognizing personal jurisdiction." *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 95 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *see also Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 22-23 (D.D.C. 2003) (allegations that Saudi prince donated to charities "knowing that those foundations funded terrorist organizations including Al Qaeda . . . stop[] well short of alleging" purposeful direction). Plaintiffs' allegations against the MTN Defendants are even more tenuous: they claim that the Taliban was *extorting* MTN Afghanistan as part of its own

effort to influence U.S. policy. That allegation, even if true, would not establish that any MTN Defendant "intentional[ly] target[ed]" the United States. *Estate of Klieman ex rel. Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1126 (D.C. Cir. 2019); *accord Livnat*, 851 F.3d at 57.[4] Indeed, Plaintiffs nowhere allege that the MTN Defendants intended to help the Taliban at all, much less that they intended to help the Taliban influence U.S. policy. *See infra* at 32-36, 39-43.

**B.      The IFC and MIGA Contracts Are Not a Basis for Asserting Personal Jurisdiction over the MTN Defendants for Plaintiffs' Unrelated Claims.**

All of the conduct that Plaintiffs claim violated the ATA, and caused their injuries, allegedly occurred outside the United States. Plaintiffs nonetheless insist that "MTN's conduct had a substantial nexus to the United States." Compl. at 112 (capitalization altered). Apart from the *Taliban's* targeting of U.S. policy, *see supra* at 14-15, this purported "substantial nexus" turns out to be one loan and two insurance policies that MTN Group or MTN Dubai obtained from organs of the World Bank Group that happen to be headquartered in the United States. *See* Compl. ¶¶ 257-272.[5] Plaintiffs' theory is that because the IFC and MIGA are headquartered here, and these transactions supported their investments in MTN Afghanistan, Plaintiffs can sue each of the MTN Defendants in the United States for injuries that the Taliban caused in Afghanistan.

This theory is legally untenable and cannot succeed for a host of reasons. The most basic

---

[4] The Supreme Court recently vacated the judgment in *Klieman* and remanded "for further consideration in light of" a recent statute providing that making so-called "martyr payments" to convicted terrorists is deemed consent to jurisdiction for ATA claims. *Estate of Klieman v. Palestinian Auth.*, __ S. Ct. __, 2020 WL 1978929 (Apr. 27, 2020). That vacatur did not call into question the D.C. Circuit's reasoning, grounded in prior precedent such as *Livnat*, that the plaintiffs in *Klieman* failed to demonstrate minimum suit-related contacts giving rise to specific jurisdiction.

[5] Plaintiffs fail altogether to allege that one of the MTN Defendants—MTN Afghanistan—entered into these contracts. *See supra* at 9-11. And binding case law bars any attempt to impute the other MTN Defendants' acts to MTN Afghanistan for jurisdictional purposes. *See Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1783 (2017) (jurisdictional requirements "must be met as to each defendant"); *supra* at 12.

problem is that Plaintiffs' terrorism claims do not arise from the procurement of development financing and political-risk insurance from the World Bank. Since the IFC and MIGA transactions are not "suit-related conduct," they count for nothing in the jurisdictional calculus. But even if considered, entering into financing and insurance agreements with international organizations that happen to be headquartered in the United States is not "purposeful availment" of the U.S. forum. To hold otherwise would subject a random collection of foreign entities to U.S. jurisdiction based upon wholly foreign conduct simply because they receive World Bank financing.

**1.      *Plaintiffs' claims do not arise out of the IFC or MIGA contracts.***

This Court may exercise specific jurisdiction over the MTN Defendants only if their individual forum contacts "deriv[e] from, or connect[] with," the conduct that allegedly gives rise to liability. *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017); *accord Cockrum v. Donald J. Trump for President, Inc*., 319 F. Supp. 3d 158, 175 (D.D.C. 2018). "The relevant suit-related conduct by the defendants [i]s the conduct that could have subjected them to liability under the ATA." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016). Personal jurisdiction cannot be founded on contacts that are "tangential, at best, to [Plaintiffs'] injuries." *Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 618 (10th Cir. 2012); *accord Foster v. Arletty 3 Sarl*, 278 F.3d 409, 415-16 (4th Cir. 2002).

This lawsuit is simply not about MTN Group's procurement of development financing and insurance to support the expansion of cell phone service in Afghanistan. It does not involve claims by the IFC or MIGA that any MTN Defendant breached any contract with them.[6] Nor is this suit

---

[6] MTN's alleged failure to provide contractually mandated notice to MIGA of Taliban threats, Compl. ¶ 267, is therefore remote from the core of this lawsuit. Plaintiffs' attempt to cast the alleged failure to give notice as suit-related because MIGA would somehow have prevented the underlying conduct, *id.* ¶ 268, is "[m]ere speculation" that cannot "establish personal jurisdiction over" the MTN Defendants. *Shaheen v. Smith*, 994 F. Supp. 2d 77, 85 (D.D.C. 2013). And in any

about the financing of cell towers or their construction—actions that benefited millions of people and had nothing to do with Plaintiffs' injuries. Rather, Plaintiffs' case is about MTN Afghanistan's alleged deactivation of cell towers after they were built, and alleged extortion payments made to ensure their protection. That is the conduct Plaintiffs maintain "subject[s] the [MTN Defendants] to liability under the ATA." *Waldman*, 835 F.3d at 335. But none of the forum contacts Plaintiffs proffer—World Bank financing and insurance contracts—derives from or is connected to that alleged conduct. Nowhere in the description of Plaintiffs' six counts does the Complaint even mention the World Bank entities. *See* Compl. ¶¶ 1262-1307.[7] That fact is hardly surprising, since "the ATA ultimately is a tort statute," *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018), and "an injury sounding in tort does not arise from a contract . . . for the purpose of specific jurisdiction." *Okolie v. Future Servs. Gen. Trading & Contracting Co.*, 102 F. Supp. 3d 172, 177 (D.D.C. 2015) (Sullivan, J.).

The Supreme Court's decision in *Bristol-Myers* confirms that the forum contacts Plaintiffs have mustered are far too tangential and attenuated from the actual subject of this lawsuit to support personal jurisdiction. The suit there concerned Bristol-Myers's sale of Plavix, an allegedly harmful drug, to non-Californians. Plaintiffs argued that California courts could exercise jurisdiction over Bristol-Myers because it "contracted with a California distributor" to help distribute Plavix around the country. 137 S. Ct. at 1783. After addressing more substantial arguments, the Supreme Court rejected this "last ditch contention." *Id.* Because a "defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction," Bristol-Myers's contract with the

---

event, a "failure to act" does not "constitute purposeful availment." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 25 (D.D.C. 2017), *aff'd*, 2018 WL 4440459 (D.C. Cir. July 17, 2018).

[7] The Complaint also fails to allege that MTN Dubai played any role in MTN Afghanistan's alleged conduct in Afghanistan. *See supra* at 9 & n.3. So MTN Dubai engaged in no suit-related conduct at all, and any U.S. contacts are beside the point.

California-based distributor would be jurisdictionally relevant only if the plaintiffs could show the California company had "distributed [Plavix] to the pharmacies that dispensed it to [the plaintiffs]." *Id.* And because the plaintiffs failed to do so, they did not plead that "the suit . . . ar[ose] out of or relat[ed] to the defendant's contact with the forum." *Id.* at 1780 (emphasis omitted). Here, the absence of jurisdiction is even clearer than in *Bristol-Myers*, where at least the plaintiffs had alleged that they were injured by Plavix. Plaintiffs here do not allege that they were injured by IFC loans, MIGA guarantees, or even MTN Afghanistan's provision of cell service, but rather by the Taliban's extortion of companies through violence.

Plaintiffs' failure to trace their injury to the MTN Defendants' World Bank contacts is irrefutable and dispositive. As courts in this District have repeatedly held, a plaintiff must "show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit" to justify personal jurisdiction. *E.g.*, *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 27 (D.D.C. 2017), *aff'd on other grounds*, 2018 WL 4440459 (D.C. Cir. 2018). Yet the Complaint fails to link the IFC funds and MIGA guarantees to the alleged deactivation of cell towers. It alleges generically that the funds and guarantees allowed MTN Afghanistan to enter the Afghan market. Compl. ¶¶ 266, 269. But the alleged wrongdoing in this case—the "suit-related conduct"—is not market entry or providing cell service to the Afghan people. It is MTN Afghanistan's alleged protection payments and deactivation of its cell towers in response to threats of violence.

The breathtaking implications of Plaintiffs' theory underscore why this Court should reject it and dismiss the claims against the MTN Defendants. It would mean that any party that accepts IFC funding or MIGA guarantees could be sued in the United States for *any* claims related to the operations that funding or insurance supported, no matter what the allegations concern. Due process requires a far stronger link between the forum contacts *and the alleged misconduct*—not

19

with a defendant's operations generally. *See Md. Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 94 (D.D.C. 2019) (refusing to exercise personal jurisdiction where the contract allegedly providing minimum contacts with D.C. "was a separate agreement, negotiated and formed apart" from the contract defendant supposedly breached); *Cockrum*, 319 F. Supp. 3d at 177-83 (refusing to exercise personal jurisdiction where the defendant's claimed contacts with the forum "d[id] not constitute activities related to the conspiracies alleged in the complaint").

The Complaint likewise fails to connect its allegations about protection payments to the World Bank arrangements. For starters, the only MTN Defendant alleged to have played any role in making those payments was MTN Afghanistan, which was not a party to the IFC transaction. Only MTN Group is alleged to be a party to the IFC transaction, but there are no non-conclusory allegations that it approved the making of protection payments. *See supra* at 9-10. Even if that were the case, Plaintiffs allege no facts tracing the IFC funds to any payment to the Taliban, and they offer no other facts suggesting that they are so linked. Plaintiffs therefore make no connection at all between the IFC transaction and any alleged payment by MTN Afghanistan to the Taliban. All they do is make a blanket assertion that MTN Afghanistan used the money "IFC disbursed" to "fund its protection payments." Compl. ¶ 259. This bare, "conclusory" assertion is inadequate and cannot support jurisdiction. *Livnat*, 851 F.3d at 57. Plaintiffs' theory appears to be that because money is fungible, they can assume a link between any money MTN Afghanistan ever received and the alleged payments to the Taliban. But the Supreme Court in *Bristol-Myers* held the opposite, finding no link between the plaintiffs' injuries and a California distributor, in part because particular pills were "impossible to trace." 137 S. Ct. at 1783.

The problems in Plaintiffs' theory run deeper still. A claim cannot arise out of forum contacts that *post-date* the challenged acts. *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344-45

(2d Cir. 2018) (rejecting specific jurisdiction and observing that the defendants' contacts postdated the initiation of the suit-related injury); *Cockrum*, 319 F. Supp. 3d at 183-84 (same). Plaintiffs speculate without any apparent basis that the IFC financing was necessary to build the towers that MTN Afghanistan allegedly shut down, or to make the alleged protection payments. *See* Compl. ¶ 259. That is flatly and substantively contradicted by a document Plaintiffs incorporate by reference into the Complaint, which shows that funds from the IFC loan were not disbursed to MTN Afghanistan *until 2011*. *World Bank Snapshot* 53. Yet the Taliban's alleged demands that providers shut down cell towers long predate 2011, *see, e.g.*, Compl. ¶ 235 (describing incidents in 2008 and 2010); *id.* ¶ 241 (relying on 2010 report in describing tower deactivation); *id.* ¶ 242 (relying on 2009 report), as do many of the protection-payment allegations, *see, e.g.*, *id.* ¶ 222 (basing allegations of protection payments on 2009 and 2010 sources); *id.* ¶ 228 (basing allegation of protection payments on reports describing "attacks between 2004 and 2010"); *id.* ¶ 229 (describing incident in 2008 in which MTN's towers were allegedly spared). Moreover, the only non-conclusory allegation about MTN Group—the sole party to the IFC transaction—is that it "made the decision" that MTN Afghanistan should "comply with the Taliban's demands" "[w]hen the Taliban first demanded that MTN [Afghanistan] shut down its towers at night," which was in 2008. *Id.* ¶ 255. That alleged decision, which is the sole basis the Complaint identifies to hold MTN Group liable, long predates even the closing of the IFC transaction in 2009.

### 2. *The MTN Defendants did not purposefully avail themselves of the privilege of conducting business in the United States.*

Even if Plaintiffs could somehow establish that receipt of development financing was "suit-related conduct" in a case about coerced support for the Taliban, personal jurisdiction would still be lacking for the critical, and independent, reason that Plaintiffs fail to show that the MTN Defendants purposefully availed themselves of the U.S. forum, in addition to the Complaint's

many other failings. To reach a contrary conclusion based on one IFC financing deal and two MIGA guarantees—just because those two international organizations happen to be headquartered in Washington, D.C.—would require a conception of purposeful availment that is as sweeping as it is baseless and unprecedented. It would mean that U.S. courts have jurisdiction to hear any case, by any Plaintiff, that relates even tangentially to any foreign project supported by the IFC or MIGA. The volume of such potential cases is staggering—in the last decade alone, the IFC issued 1,253 loans funding projects in nearly 100 countries. *IFC Summary: Board Approved Investments by Product Line*, World Bank Grp., https://tinyurl.com/seredyt (last visited Apr. 29, 2020).

Plaintiffs' jurisdictional theory is not, and cannot be, the law. A defendant purposefully avails itself of a forum only when it seeks "the privilege of conducting activities within the forum, thus invoking [the forum's] benefits and protections." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *accord Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013). The basic premise of purposeful availment is that a party should not be held to answer in a forum unless that party can "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *accord Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 127-28 (D.C. Cir. 1999). The "clear notice" that it may be sued in the forum allows a defendant to "alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the [forum]." *World-Wide Volkswagen*, 444 U.S. at 297. Absent such notice, a defendant cannot fairly be subjected to a forum's "coercive power" by being forced to defend itself in the forum's courts. *Bristol-Myers*, 137 S. Ct. at 1779.

These cardinal precepts doom Plaintiffs' case because the Complaint fails to allege that the MTN Defendants purposefully sought to avail themselves of the privileges and protections of

doing business in the United States. On the contrary, the Complaint alleges that MTN Group and MTN Dubai contracted with the IFC and MIGA to spur development *in Afghanistan*. Compl. ¶¶ 258, 261-263. Plaintiffs' theory of purposeful availment fails many times over.

a. "[E]ntry into a[] jurisdiction for the purpose of securing a loan or an insurance guaranty, with accompanying negotiations among the parties," does not "confer jurisdiction on" the courts in that forum. *Siam Kraft Paper Co. v. Parsons & Whittemore, Inc.*, 400 F. Supp. 810, 812 (D.D.C.), *aff'd without op.*, 521 F.2d 324 (D.C. Cir. 1975). Purposeful availment requires more than just buying, or negotiating to buy, services from within a forum. As the D.C. Circuit has repeatedly held, "a purchaser who selects an out-of-[forum] seller's goods or services based on their economic merit does not thereby purposefully avail itself of the seller's [forum] law, and does not merely by purchasing from the seller submit to the laws of the jurisdiction in which the seller is located or from which it ships merchandise." *Creighton*, 181 F.3d at 128 (quoting *Health Commc'ns, Inc. v. Mariner Corp.*, 860 F.2d 460, 465 (D.C. Cir. 1988)). Rather, contracting with a party located in the forum constitutes purposeful availment only when the arrangement entails "continuing and wide-reaching contacts" with the forum. *Thompson Hine*, 734 F.3d 1192.

Plaintiffs' theory of jurisdiction-by-receipt-of-financing is exactly what courts have long held does not suffice: "entry into a jurisdiction for the purpose of securing a loan or an insurance guaranty." *Siam Kraft Paper*, 400 F. Supp. 810 at 812. Jurisdiction would thus be improper even if an officer of MTN Group had flown to Washington, D.C., negotiated with the IFC and MIGA at their headquarters, and returned with a check, if the purpose of that fleeting forum contact was to finance operations located entirely outside the United States.

b. Plaintiffs do not, however, allege even that much—they allege only that the World Bank contracts exist, which falls far short of establishing purposeful availment. *See World Wide Travel*

23

*Inc. v. Travelmate US, Inc.*, 6 F. Supp. 3d 1, 8 (D.D.C. 2013) ("[N]o decision of which the Court is aware has found personal jurisdiction here based *solely* on the fact that a defendant initiated contract negotiations (and subsequently entered into a contract) with a D.C. counterparty."); *Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 50 (D.D.C. 1994) ("long-distance contract negotiations" with "attorney who happened to have offices in the District" does not suffice). Plaintiffs do not allege that the IFC and MIGA contracts were signed in the United States or performed in the United States. They do not allege that the contracts were governed by U.S. law. Nor do Plaintiffs allege that any MTN Defendant sought any other U.S. benefit, such as a loan from any *U.S.* financial institution or effort to access *U.S.* capital markets. The absence of allegations that any MTN Defendant purposefully secured the benefits of U.S. law is yet another flaw in the Complaint's attempt to plead personal jurisdiction. *See, e.g.*, *Health Commc'ns*, 860 F.2d at 464-65 (holding that defendant did not purposefully avail itself of the forum, because it did not seek to benefit from a relationship with the forum).[8]

To try to escape this problem, the Complaint seizes on inconsequential aspects of the World Bank contracts, which only underscore the defect in their theory.

*First*, Plaintiffs allege that MTN Group and MTN Dubai had an obligation to notify MIGA, at a Washington, D.C. address, of "any security incident . . . that could materially affect MIGA's

---

[8] Plaintiffs' allegations that some *IFC employees* were located in the United States, Compl. ¶ 264, are irrelevant. Allegations that MTN Group "interact[ed] with persons affiliated with the [United States]," which is all Plaintiffs offer, are not enough to show that it purposefully availed itself of the United States. *Walden*, 571 U.S. at 286; *see Thompson Hine*, 734 F.3d at 1194 ("[Defendant's] mere retention of attorneys in the [forum] is insufficient.").

Similarly, Plaintiffs' allegation that one contract with MIGA was "deemed made in Washington, DC," Compl. ¶ 265, only confirms that the parties did not actually negotiate and enter into the contract in the United States. *See Black's Law Dictionary* (11th ed. 2019) (defining *deem*: "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have"). And Plaintiffs cannot even allege that much about any of the other contracts—including any transaction with the IFC that led to the MTN Defendants receiving funds.

24

investment." Compl. ¶ 267. Such a clause would impose obligations on MTN Group and MTN Dubai in their South Africa and Dubai headquarters—not in the United States. *Id.* ¶¶ 28-29. Plaintiffs do not allege that any MTN Defendant performed or declined to perform any part of its notice obligation in the United States. And regardless, a mere contractual notice requirement is not enough to trigger jurisdiction, because it shows only an agreement to provide notice wherever the counterparty may be located, rather than a "desire . . . to do business . . . in Washington, D.C." *COMSAT Corp. v. Finshipyards S.A.M.*, 900 F. Supp. 515, 523 (D.D.C. 1995); *see World Wide Travel*, 6 F. Supp. 3d at 7 (defendants' mailing of invoices to D.C. and charging the credit card of a D.C. resident were "trifling contacts" that could not constitute purposeful availment). In other words, this alleged forum contact is fortuitous at best—based solely on MIGA's decision to request notice in Washington, D.C., not on any MTN Defendant's purposeful availment "of the benefits of conducting business in the forum." *Thompson Hine*, 734 F.3d at 1192.

*Second*, the Complaint's allegations that the IFC wired payments to MTN Afghanistan through New York and requested that repayment be sent there, and that the IFC and MIGA "oversaw" these contracts from the United States, are beside the point. Compl. ¶¶ 259, 264. "[T]hat is precisely the sort of unilateral activity of a third party that cannot satisfy the requirement of contact with the forum . . . ." *Walden*, 571 U.S. at 291; *see World Wide Travel*, 6 F. Supp. 3d at 7 (mailing of invoices to plaintiff in the forum is not purposeful availment). The IFC's choice to "disburs[e] its financing" out of New York and to "require[]" repayment to an account located there, Compl. ¶ 259, and the IFC's and MIGA's choice to "overs[ee]" the arrangements from Washington, *id.* ¶ 264, cannot establish jurisdiction in the United States. Again, "it is the *defendant* . . . who must create contacts with the forum." *Walden*, 571 U.S. at 291 (emphasis added); *accord Cockrum*, 319 F. Supp. 3d at 177. And Plaintiffs have not alleged that any MTN

Defendant created these contacts or that they reflected a "desire . . . to do business" in the United States. *COMSAT*, 900 F. Supp. at 523; *see Bank of Cape Verde v. Bronson*, 869 F. Supp. 21, 23 (D.D.C. 1994) (mailing of materials to D.C. "solely because [a third party] requested that the materials be sent here" does not show "a deliberate and voluntary association with the District").

*Third*, Plaintiffs fail to tie MTN Group and MTN Dubai to the United States by alleging that their contracts with MIGA required arbitration of any dispute with MIGA to be held in Washington, D.C. Such an arbitration would be another "trifling contact[]," *World Wide Travel*, 6 F. Supp. 3d at 7, and a hypothetical future one at that. But there is even less to this allegation than meets the eye. Plaintiffs support this allegation by citing a template contract. Compl. ¶ 265 n.348. Although that template calls for proceedings to be physically held in Washington, D.C., it specifies that the "seat of arbitration" would be *The Hague*,[9] which makes the "legal domicile" of such an arbitration the Netherlands. Gary Born, *International Commercial Arbitration* § 11.03, at 1536 (2014). The template contract also provides that such an arbitration would be governed by "general law" and the treaty establishing MIGA. To put it mildly, an agreement to resolve future disputes with MIGA in a Dutch-seated arbitration according to international and general law does not "invok[e] the benefits and protections of [U.S.] law[]." *Thompson Hine*, 734 F.3d at 1189.

In sum, the motley assortment of meaningless U.S. "contacts" Plaintiffs allege—the mere receipt of financing and insurance from U.S.-headquartered international organizations, without even any allegation that any MTN Defendant negotiated or performed those contracts in the United States—come nowhere close to establishing the "substantial connection" between the MTN Defendants and this forum that is required for personal jurisdiction. *Walden*, 571 U.S. at 284.

---

[9] *See* MIGA, Template Contract of Guarantee for Non-Shareholder Loans pt. II, art. 14.2 (Nov. 2016) (Ex. E).

c. Yet another problem with Plaintiffs' theory is that the IFC and MIGA are not commercial U.S. entities—they are international organizations that are part of the World Bank, a global financial institution created after World War II by the member states of the United Nations to support capital projects in developing countries. Contacts with *international organizations* that happen to have headquarters in this country (but are immune from U.S. jurisdiction on the same terms as foreign sovereigns) are particularly ill-suited to create the required "substantial connection with the forum." *Burger King*, 471 U.S. at 475. Put differently, contacts with the IFC and MIGA do not show that any MTN Defendant "followed a course of conduct directed at the society or economy existing within the [United States], so that the [United States] has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality op.).

The novelty of Plaintiffs' theory reflects this fact. Although the IFC has existed for more than half a century and now loans out more than $7 billion per year,[10] there does not appear to be a single case in which receipt of IFC financing has been used to support personal jurisdiction in U.S. courts. One court in this District has specifically rejected such an argument, holding that an exercise of personal jurisdiction "would not comport with due process because non-forum companies who have contacts with the IFC in the District to secure loans for non-District projects cannot reasonably foresee being haled into this jurisdiction's courts as a result of such activity." *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 82 (D.D.C. 2004), *abrogated on other grounds by Daimler AG v. Bauman*, 571 U.S. 117 (2014).

*AGS* is part of a long line of cases reflecting "the Judiciary's reluctance to interfere with the smooth functioning of other governmental entities." *Klinghoffer v. S.N.C. Achille Lauro*,

---

[10] *See Loans*, Int'l Fin. Corp., https://tinyurl.com/vmay85h (last visited Apr. 29, 2020).

27

937 F.2d 44, 51 (2d Cir. 1991). In *Klinghoffer*, for example, the Second Circuit rejected "basing jurisdiction over the PLO on its UN-related activities." *Id.* D.C. courts, federal and local, disregard contacts with the government and similar entities, *Inv. Co. Inst. v. United States*, 550 F. Supp. 1213, 1216-17 (D.D.C. 1982), so as not to chill government contacts that are "desirable in the public interest," *Mueller Brass Co. v. Alexander Milburn Co.*, 152 F.2d 142, 143-44 (D.C. Cir. 1945); *see also Shaheen*, 994 F. Supp. 2d at 87; *World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d 98, 106 (D.D.C. 2000), *aff'd in part, vacated in part on other grounds*, 296 F.3d 1154 (D.C. Cir. 2002); *Cellutech*, 871 F. Supp. at 50.[11]

Just as "contact with the Government" is "desirable in the public interest," *Mueller Brass Co.*, 152 F.2d at 143-44, so too is contact with the World Bank Group. The World Bank Group and its constituent entities, including the IFC and MIGA, are international organizations comprising most of the world's sovereign states. As explained above (at 10-11), they support vital investment in conflict-ridden and underserved countries. And as Plaintiffs allege, IFC and MIGA support is sometimes the only means for private-sector investment in the developing world. *See* Compl. ¶¶ 269-270. If obtaining such support were enough to expose the recipient to all manner of suits in the United States (and the unique burdens of U.S.-style discovery and litigation), some prospective recipients might be deterred, hindering the valuable development work these international organizations support. U.S. courts, meanwhile, could become a hotbed of litigation related to the billions of dollars in World Bank financing wholly unrelated to this country. To draw

---

[11] In rejecting jurisdiction based on contacts with the IFC, the court in *AGS* relied on both constitutional due process, 346 F. Supp. 2d at 82, and what is referred to as the "government contacts exception" to the D.C. long-arm statute, *id.* at 79-82. The precise nature of the government contacts exception is debated, with some courts considering it simply "a gloss on due process." *Hayes v. FM Broad. Station WETT*, 930 F. Supp. 2d 145, 149 n.1 (D.D.C. 2013). At a minimum, the long line of cases recognizing the practical dangers of basing jurisdiction in D.C. on governmental contacts present an instructive analogy here.

from real-world IFC projects, courts in the United States could be called on to resolve disputes between an Indian villager and the owner of a coal-fired power plant in the Indian state of Gujarat, *cf. Jam*, 139 S. Ct. at 767, between a Dutch engineering company and a Czech steel manufacturer regarding mini-mills in the Czech Republic, *cf. Int'l Fin. Corp. v. Kaiser Grp. Int'l Inc. (In re Kaiser Grp. Int'l Inc.)*, 399 F.3d 558, 561-62 (3d Cir. 2005), or between Honduran farmers and a local millionaire in the palm oil business, *cf.* Compl., *Doe v. IFC Asset Mgmt. Co.*, No. 1:17-cv-01494-UNA (D. Del. Oct. 24, 2017)—merely because the IFC helped finance these projects.

In short, such contacts do not create the "substantial connection" between a defendant and a proposed forum that due process requires. *Burger King*, 471 U.S. at 475. For this further reason, the Court should reject Plaintiffs' reliance on receipt of World Bank financing and guarantees for an investment in Afghanistan as a basis for exercising personal jurisdiction in the United States.

## C.      Exercising Jurisdiction over the MTN Defendants Would Be Unreasonable.

Even if Plaintiffs could plead that their claims arise out of contacts creating a substantial connection with the United States (which they have failed to do), they still could not show that it would be just and reasonable to exercise personal jurisdiction in the United States over three foreign companies, who have no presence in this country, concerning conduct that allegedly occurred in Afghanistan. *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987); *Midland v. F. Hoffman-Laroche, Ltd. (In re Vitamins Antitrust Litig.)*, 270 F. Supp. 2d 15, 34 (D.D.C. 2003). The five factors that courts consider in determining whether a particular exercise of personal jurisdiction meets this additional hurdle are (1) the burden on the defendant, (2) interstate or international interests in judicial efficiency, (3) interstate or international interests in "furthering fundamental substantive social policies," (4) the interests of the forum, and (5) the plaintiff's interest in obtaining relief. *Asahi*, 480 U.S. at 113 (quoting *World-Wide Volkswagen*, 444 U.S. at 292). The MTN Defendants certainly respect Plaintiffs' interest in litigating in the

United States, but all four other fairness factors weigh strongly against the exercise of jurisdiction. That is an independent reason why jurisdiction is lacking.

*First*, litigating in the United States would place a substantial burden on the MTN Defendants, all of which are located outside the United States. Plaintiffs do not and cannot allege that any MTN Defendant has a U.S. presence. And because all of the alleged conduct occurred outside the United States, the documents and witnesses that the MTN Defendants would likely have to produce in litigation would all be located thousands of miles away. *See id.* at 114 (recognizing the burden on a Japanese defendant in defending claims based on a transaction that "took place in Taiwan" and involved "components . . . shipped from Japan to Taiwan").

*Second*, international interests in judicial efficiency weigh against subjecting the MTN Defendants to U.S. jurisdiction. It would be unfair to require the MTN Defendants to litigate in a U.S. court when they have made no effort to avail themselves of the privileges or benefits of doing business here, *see supra* at 21-29, and Plaintiffs' claims arise out of conduct that occurred outside the United States, *see supra* at 5-9, 13-16. *See also AGS*, 346 F. Supp. 2d at 82 (unfair to make foreign defendant litigate in U.S. court based on IFC funding for foreign project). Especially given the "[g]reat care and reserve" courts must "exercise[] when extending our notions of personal jurisdiction into the international field," *Asahi*, 480 U.S. at 115, this Court should hesitate to conclude that South Africa, the United Arab Emirates, and Afghanistan could reasonably expect their citizens to be subjected to a U.S. suit based on such remote contacts with the United States.

*Third*, exercising personal jurisdiction over the MTN Defendants would harm substantive social policies. *See id.* If the Court were to accept Plaintiffs' jurisdictional theory, it would set a precedent that any foreign entity that contracts with the IFC or MIGA to finance a project outside the United States could be haled into a U.S. court on any future claim that relates to that project.

Many entities might choose to avoid that risk by forgoing World Bank financing and declining to invest in developing countries, an undesirable outcome by any measure. *See supra* at 10, 19.

*Fourth*, although the United States has an interest in adjudicating Americans' claims under the ATA, it also has an interest in ensuring that this country does not become an international "judicial forum whose courts would rapidly be inundated with lawsuits" relating to any foreign investment that happened to receive World Bank support. *AGS*, 346 F. Supp. 2d at 80; *see supra* at 19. Endorsing Plaintiffs' theory would open the floodgates to U.S. litigation and could even cause unnecessary friction with the international organizations this country hosts.

Considered together, these factors demonstrate that it would be unreasonable to subject the MTN Defendants to suit in the United States. For this reason and the reasons explained above, all claims against the MTN Defendants should be dismissed for lack of personal jurisdiction.

## II. The Complaint Fails to State a Claim Against the MTN Defendants.

### A. Plaintiffs' Direct-Liability Claims Against the MTN Defendants Fail.

The Court should dismiss Counts 1 through 4, Compl. ¶¶ 1262-1288, because Plaintiffs fail to plead that the MTN Defendants directly committed "acts of international terrorism" that injured the Plaintiffs. 18 U.S.C. § 2333(a). To plead that a defendant directly committed "international terrorism," a plaintiff must allege facts plausibly showing (among other things) that the defendant's own actions (1) appear to have been intended to achieve one of three specific terroristic objectives, and (2) violated a federal or state criminal law. *Id.* § 2331(1)(A), (B). And to plead that she was injured "by reason of" that act, the plaintiff must allege (3) that the defendant proximately caused her injuries. *Owens*, 897 F.3d at 273.

Plaintiffs' allegations fall short on each requirement. *First*, according to Plaintiffs' own allegations, the MTN Defendants appear to have acted to protect their staff and network, not out of any terroristic motive. *Second*, the Complaint fails to plead key elements of certain predicate

crimes that Plaintiffs allege. *Third*, Plaintiffs do not articulate any direct connection between MTN Afghanistan's alleged compliance with the Taliban's order to switch off cell towers at night and the particular attacks that injured Plaintiffs. Counts 1 through 4 do not come close to stating a plausible claim and should be dismissed.

These deficiencies are compounded by another basic error Plaintiffs make. Throughout their Complaint, Plaintiffs improperly blur together the three MTN Defendants. *See supra* at 4-11. For example, Plaintiffs quote what they refer to as "MTN's head of legal and government affairs," Compl. ¶ 235, which according to the source they cite, is actually an officer of MTN Afghanistan.[12] Contrary to Plaintiffs' approach, the allegations against each MTN Defendant must be taken on their own. *See Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (dismissing claim because plaintiff improperly "lump[ed] all the defendants together"). And only MTN Afghanistan is alleged to have made protection payments and shut off cell towers. The most MTN Group is alleged to have done is approve MTN Afghanistan's compliance with the shut-off orders. Any assertions that MTN Group approved protection payments are conclusory, *see supra* at 9 & n.3, so Plaintiffs' claims against MTN Group fail at the outset insofar as they concern protection payments. MTN Dubai, meanwhile, is not alleged to have done anything at all in relation to the Taliban, so Plaintiffs cannot possibly state a claim against that entity. *See id.*

### 1.   *Plaintiffs' own allegations demonstrate that the MTN Defendants had no apparent intent to intimidate or coerce.*

Judged against the unambiguous requirements of the ATA and relevant precedent, Plaintiffs' direct-liability claims do not come close to pleading the astounding assertion on which their claims depend: that the MTN Defendants, a leading African telecommunications company

---

[12] *See Cell Carriers Bow to Taliban Threat*, *supra*.

and two of its subsidiaries, directly committed acts of international terrorism.

Under the plain statutory text, an act is not "international terrorism" unless it "appear[s] to be intended" to achieve one of three aims: "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B). Plaintiffs must allege facts that would lead an "objective observer" to conclude that the MTN Defendants "desire[d] to intimidate or coerce" a civilian population or government. *Kemper*, 911 F.3d at 390; *see Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (§ 2331(1)(B) imposes "an objective standard"). No objective observer could reasonably conclude that the MTN Defendants' alleged response to the Taliban's extortionate threats was intended to achieve any of these terroristic goals.

Plaintiffs' own characterization of MTN Afghanistan's conduct forecloses such a conclusion. As Plaintiffs themselves concede, MTN Afghanistan allegedly faced "extortion," having to pay "taxes" to the Taliban and "obey the orders" to shut down cell towers, or else "face having [its] transmission towers attacked." Compl. ¶¶ 223, 225, 231, 235. According to a source incorporated into the Complaint, the Communications Minister of Afghanistan acknowledged that "[w]e don't have security to protect the towers," so the government "understands that in some areas, unfortunately, there is no other way" but to comply with the shutdown demands. *Cell Carriers Bow to Taliban Threat*, *supra*. Plaintiffs offer a specific reason why MTN Afghanistan allegedly complied with the Taliban's threats—and it is not that MTN Afghanistan shared the Taliban's goals of intimidating civilians and coercing changes to U.S. government policy. Rather, Plaintiffs embrace the "obvious alternative explanation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007): that MTN Afghanistan, as a target of violent extortion, allegedly acquiesced because

it wanted to "prevent [the Taliban] from destroying property and attacking staff," Compl. ¶ 232, and "decided[] it could reduce the risk that MTN's equipment would face Taliban attack," *id.* ¶ 237. An act done with an apparent intent of avoiding attacks, protecting employees, and preserving the ability to serve customers lacks any "objective" indicia of a "desire to intimidate or coerce," *Kemper*, 911 F.3d at 390, and so cannot be "international terrorism" under the ATA.

Consistent with this straightforward application of the statutory text, courts have repeatedly dismissed ATA claims when the defendant does not appear to harbor terrorist goals, and especially when the complaint itself suggests a different motivation. In *Kemper*, for example, the plaintiffs sued a bank for "wrongful[ly]" helping Iranian state-owned banks "evade" U.S. sanctions, which allegedly helped fund the violent activities of anti-American militias in Iraq. *Id.* at 390, 393. But the Seventh Circuit concluded that "[t]o the objective observer," this conduct was "motivated by economics, not by a desire to 'intimidate or coerce.'" *Id.* at 390. This holding was "bolstered" by a consent decree that plaintiffs had incorporated into the complaint, which stated that the bank committed these acts "because it was 'lucrative.'" *Id.* Another court recently considered allegations that a bank laundered money for Mexican drug cartels and held that this did not give rise to an appearance that the bank shared the cartels' intent to intimidate or coerce a civilian population or government. *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 358 (E.D.N.Y. 2019). As the court observed, "Plaintiffs' complaint unmistakably sets forth . . . a plausible alternative explanation for [the bank's] conduct: greed." *Id.*; *accord Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 92 (E.D.N.Y. 2019).

An earlier decision, which accords with the reasoning of *Kemper* and other recent precedent, is closely analogous to this case. In *Stansell v. BGP, Inc.*, the defendants allegedly "made payments to the FARC," a Colombian organization which (unlike the Taliban) was a

designated FTO. 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011). While the plaintiffs "simply state[d], in conclusory fashion, that Defendants['] actions appear[ed] to be intended" to intimidate or coerce, "Plaintiffs' factual allegations . . . contradict[ed] that assertion." *Id.* "Plaintiffs allege[d] Defendants made payments to the FARC 'in exchange for the FARC's agreement to allow [Defendants] to conduct [their] oil exploration activities without fear of terrorist acts.'" *Id.* (alterations in original). "This allegation," the court held, "would not lead an objective observer to conclude Defendants intended to achieve any one of the results listed in § 2331(1)(B)." *Id.*[13]

Plaintiffs allege in unmistakable terms that MTN Afghanistan paid "taxes" to the Taliban and shut down towers not to further terroristic goals but for a different reason—to avoid Taliban reprisals. To an objective observer, such a response to violent extortion would not "appear to be intended to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B). The implausible claim that a telecommunications company perpetrated acts of international terrorism fails as a matter of law,

---

[13] In 2010, a court in this District found the apparent intent requirement adequately pleaded where the Bank of China facilitated transactions that were specifically "used for . . . executing terrorist attacks." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 18, 48-49 (D.D.C. 2010). Despite recognizing that "mere financial support" of a terrorist organization does not establish the requisite apparent intent, the court ruled that plaintiffs met the pleading requirement by alleging the bank had been "expressly warned" that its actions were facilitating terrorist attacks. *Id.* at 49. Another decision held that alleged protection payments made to the FARC could satisfy the apparent intent requirement if it was "reasonably foreseeable" that the payments would enhance its terror capabilities. *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1319 (S.D. Fla. 2018). If these cases suggest that merely providing funds to a terrorist organization meets the apparent-intent requirement when it is foreseeable that doing so will help terrorists, they are inconsistent with § 2331(1)(B)'s text and two more recent court of appeals decisions. *See Linde*, 882 F.3d at 328 ("[T]he provision of material support to a terrorist organization does not invariably equate to an act of international terrorism," because it may not "manifest the apparent intent required by § 2331(1)(B)."); *Kemper*, 911 F.3d at 390 (focusing on the actual alleged motive of even "wrongful actions" by the defendant).

and Counts 1 through 4 should be dismissed.

> **2.** ***Plaintiffs do not and cannot allege facts necessary to plead key elements of the predicate crimes underlying their direct-liability claims.***

To establish that the MTN Defendants engaged in "international terrorism," Plaintiffs must also allege that the MTN Defendants' actions violated a federal or state criminal law (or would have done so if committed in the United States). 18 U.S.C. § 2331(1)(A). Two of Plaintiffs' claims have obvious holes, illustrating more broadly how Plaintiffs' attempt to accuse international telecommunications companies of directly perpetrating terrorism is a bridge too far.

Count 4, for example, is based on 50 U.S.C. § 1705(a), which makes it unlawful to violate sanctions regulations enacted under the International Emergency Economic Powers Act—and Plaintiffs identify two regulations that do not apply to the MTN Defendants. *See* Compl. ¶ 1284. One regulation Plaintiffs cite prohibits only a "U.S. person" from engaging in transactions with the Taliban. 31 C.F.R. § 594.204. The other bars dealing in Taliban property that is "in the United States" or "come[s] within the possession or control of U.S. persons." *Id.* § 594.201(a). Plaintiffs do not and cannot allege that any MTN Defendant is a "U.S. person"—they are South African, Emirati, and Afghan companies. *See supra* at 4-5, 9. Nor does the Complaint allege that the MTN Defendants "deal[t] in Taliban property," much less explain how such property was "in the United States." Count 4 highlights the stark mismatch between Plaintiffs' outlandish legal theories and the facts they allege about the MTN Defendants.

Count 2 reveals a similar disjuncture. That count relies on 18 U.S.C. § 2339B, which criminalizes knowing support for a designated FTO. But the Afghan Taliban is not, and has never been, designated as an FTO. Attempting to evade this explicit statutory requirement, Count 2 alleges in conclusory terms that the MTN Defendants provided material support to the Haqqani Network, which the United States designated as an FTO late in 2012. Compl. ¶ 1270. Yet the

section of the Complaint making factual allegations about the conduct of the MTN Defendants does not once mention the Haqqani Network. *See id.* ¶¶ 219-272. Again, Plaintiffs asserted this count against the MTN Defendants without even trying to make factual allegations to support it.

### 3. *MTN Afghanistan's alleged compliance with the Taliban's shutdown orders did not proximately cause the attacks that injured Plaintiffs.*

Even if Plaintiffs could establish that the MTN Defendants committed an act of international terrorism, they could not show that their injuries occurred "by reason of" that act. 18 U.S.C. § 2333(a). The D.C. Circuit has held that "the ATA's 'by reason of' language demands a showing of proximate causation." *Owens*, 897 F.3d at 273. An ATA plaintiff must therefore allege facts plausibly showing that the defendant's actions were a "substantial factor" in causing the plaintiff's injuries, and that those injuries were "foreseeable or anticipated as a natural consequence of defendant's conduct." *Id.* An action is a "substantial factor" only if there is "sufficient directness" between the defendant's conduct and the plaintiff's injuries. *Id.* at 273 n.8. Indeed, the "central question" for proximate causation is whether a defendant's actions "led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

The Complaint fails to "articulate any connection" between Plaintiffs' injuries and the allegations that MTN Afghanistan shut down its towers at night in certain Taliban-controlled regions. *Fields v. Twitter, Inc.*, 881 F.3d 739, 749-50 (9th Cir. 2018); *Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1178 (N.D. Cal. 2018). Plaintiffs do not even attempt to connect these shutdowns to specific attacks, or even patterns of attacks. They allege only that the shutdowns generally impeded Coalition intelligence-gathering and complicated its counterinsurgency efforts. *See, e.g.*, Compl. ¶ 7 ("Nighttime cellular service was important to Coalition intelligence-collection efforts"); *id.* ¶ 240 ("[N]ighttime deactivation obstructed Coalition efforts to gather human intelligence"); *id.* ¶ 1263 (similar). At most, this is an allegation that MTN Afghanistan

"facilitated [the Taliban's] growth and ability to plan and execute terrorist attacks," the type of attenuated theory of causation that the Ninth Circuit recently rejected. *Fields*, 881 F.3d at 749-50.

## B. Plaintiffs' Aiding-and-Abetting Claims Against the MTN Defendants Fail.

Plaintiffs' claims in Counts 5 and 6 that the MTN Defendants aided and abetted terrorist acts committed by the Taliban and the Haqqani Network, Compl. ¶¶ 1289-1307, are equally unmoored from the text and purpose of the ATA. When Congress amended the ATA in 2016, it strictly confined aiding-and-abetting liability to cases where the defendant "knowingly provid[ed] substantial assistance" to the "person who committed [the] act of international terrorism." 18 U.S.C. § 2333(d)(2). It then further limited the scope of such liability to only those acts of international terrorism that are "committed, planned, or authorized" by a designated FTO. *Id.* Plaintiffs do not allege facts that plausibly support either element.

### 1. *Plaintiffs fail to plead that the MTN Defendants aided and abetted the persons who carried out the alleged acts of international terrorism.*

Congress has specified that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), provides "the proper legal framework" for assessing such aiding-and-abetting claims under the ATA, Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016), which sets a high bar for aiding-and-abetting liability. To state such a claim, a plaintiff must plausibly allege that (1) the principal committed "a wrongful act" that injured the plaintiff, (2) the defendant was "generally aware" that he was playing a "role as part of an overall illegal or tortious activity," and yet (3) the defendant "knowingly and substantially assist[ed]" the principal's wrongful act. *Halberstam*, 705 F.2d at 477; *see also Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 (2d Cir. 2019) (applying these elements in ATA context). While Plaintiffs plead that the Taliban engaged in terrorist acts causing injuries (the first element), they fall well short of pleading facts to support the second and third elements.

a. Applied to the ATA, the second element requires factual allegations sufficient to make it plausible that the defendant "knowingly assumed a role in the [a]ttacks" that injured the plaintiffs. *Siegel*, 933 F.3d at 224. While courts have not yet attempted to define what allegations suffice to plead that a defendant knowingly assumed a role in terrorist attacks, it is clear what does *not* suffice: mere allegations that the defendant provided material support to a terrorist group. Courts have held that "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*." *Linde*, 882 F.3d at 329; *see also, e.g.*, *Siegel*, 933 F.3d at 224 (same); *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018) ("playing a role in a foreign terrorist organization's activities is more than just providing material support"). Thus, whatever is necessary to plead an aiding-and-abetting claim under the ATA, the statute requires more than just material support for a terrorist organization.

Yet that is the most Plaintiffs allege: that the MTN Defendants "provid[ed] material support to the Taliban." Compl. ¶ 219. Their theory concerning the Taliban's protection racket is just that the alleged payments were a source of "fungible U.S. dollars" that "strengthen[ed]" the Taliban generally—a generic assertion unsupported by any factual allegations. *Id.* ¶¶ 10, 94. Plaintiffs' cell-tower allegations are even further removed from any of the alleged attacks. All that Plaintiffs allege is that "nighttime deactivation [of towers] obstructed Coalition efforts to gather human intelligence," and that this "undermine[d] U.S. counterinsurgency efforts." *Id.* ¶¶ 240, 1263. Plaintiffs make no effort to connect these alleged general impediments to Coalition intelligence-gathering to any specific operations by the Taliban, much less establish that the MTN Defendants knew they were assuming an affirmative role in terrorist *acts*. *See id.* ¶¶ 10, 238.

Any suggestion that the MTN Defendants "knowingly assumed a role" in the Taliban's terrorist attacks is weaker still considering "the *context*" in which MTN Afghanistan allegedly

made protection payments and shut down its cell towers. *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *15 (S.D.N.Y. Jan. 21, 2020). In *Halberstam*, the court could infer that the principal's live-in girlfriend was a tortious "joint venturer" who "knowingly and willingly assisted" in his "burglary enterprise," because she "not only" gave "her time and talents" to laundering the proceeds over several years, but "inten[ded] and desire[d] to make the venture succeed." 705 F.2d at 486, 488. Here, nothing in the Complaint supports the bizarre notion that the MTN Defendants became willing "joint venturers" in a terrorist enterprise that, according to Plaintiffs, continually threatened MTN Afghanistan's *own* employees and operations.

To the contrary, the Complaint depicts that the Taliban engaged in a pervasive campaign of violence *against* MTN Afghanistan and others. As Plaintiffs allege, "[a]t all relevant times, the Taliban used threats of terrorist violence to extract protection money from international companies doing business in Afghanistan." Compl. ¶ 57. Plaintiffs assert in conclusory fashion that these payments were not "necessary for [companies] to avoid imminent death or serious bodily injury." *Id.* ¶ 100. But they also allege that, when threats were not enough, the Taliban "would stage attacks as a bargaining tactic" or attack "companies to send a message to the broader industry," *id.* ¶ 60, including MTN Afghanistan and its competitors, *id.* ¶¶ 228-229. Together, Plaintiffs' allegations describe a years-long effort by Taliban "shadow governments" to use violence to extort "taxes" from MTN Afghanistan and other international companies. *Id.* ¶¶ 57, 222.

Again, Plaintiffs' own characterization of MTN Afghanistan's actions eviscerates their claim. The Complaint alleges that MTN Afghanistan acceded to the Taliban's threats—not to assume a role in the Taliban's terrorist campaign, but to avoid becoming its victim. MTN Afghanistan allegedly made payments "to prevent [the Taliban] from destroying property and attacking staff." *Id.* ¶ 232; *see id.* ¶ 228 ("MTN paid protection money to the Taliban to head off

attacks"). And MTN Afghanistan allegedly shut down its towers to "reduce the risk" of "Taliban attack," *id.* ¶ 237, which at times the Afghan government publicly acknowledged was an unfortunate necessity. *Cell Carriers Bow to Taliban Threat*, *supra*. MTN Group, meanwhile, is even further removed from the Taliban's terrorist violence—it is alleged only to have approved its subsidiary's compliance with the Taliban's cell-tower demands. Compl. ¶ 255.

Far from assuming a role in the Taliban attacks that injured Plaintiffs, *see Siegel*, 933 F.3d at 224, the MTN Defendants, according to the Complaint, "went to great lengths" to appear "neutral" in the war in Afghanistan, to "reduce the risk" that MTN Afghanistan's personnel or equipment "would face Taliban attack." Compl. ¶¶ 232, 236-237. Whether or not this alleged neutrality was the correct way to navigate a violent civil war, standing down in the face of terrorist violence is not the same as knowingly assuming a role and becoming a "joint venturer" in it.

b. Nor does the Complaint plausibly plead that the MTN Defendants knowingly provided "substantial assistance" to the Taliban. Plaintiffs claim that each Defendant should have known that its protection "payments would strengthen the Taliban[],"*id.* ¶ 10, including by allowing it to "diversify its income," *id.* ¶ 93, and they allege that switching off MTN Afghanistan's towers at night "strengthened the Taliban" by hindering U.S. intelligence. *Id.* ¶¶ 238-240.

But once again, aiding-and-abetting liability under the ATA requires more than allegations that a defendant provided material support to a terrorist group—a claim that is all the weaker when that support was allegedly coerced. The statute "does not refer to assisting a foreign terrorist organization generally or such an organization's general course of conduct." *Taamneh*, 343 F. Supp. 3d at 916. Rather, a plaintiff must establish that the defendant substantially assisted the "principal tortfeasor in committing '[the] act of international terrorism'" that caused the plaintiff's injury. *Id.* Yet Plaintiffs cannot "connect[]" the MTN Defendants to any "specific crime" the

41

Taliban committed in Afghanistan. *Id.* So Plaintiffs claim instead that, because *the Taliban* allegedly used threats and violence to force MTN Afghanistan to make protection payments and switch off its towers, *MTN Afghanistan* can be said to have substantially assisted the Taliban's "general course of conduct." *Id.* In Plaintiffs' book, that means that the MTN Defendants should be on the hook for aiding and abetting every attack the Taliban committed in Afghanistan over several years. That theory knows no limit and finds no support in the ATA or common sense.

Indeed, applying the factors that the D.C. Circuit used to assess whether the defendant in *Halberstam* "substantially assisted" the principal's illegal activity confirms the inadequacy of Plaintiffs' allegations. The *Halberstam* "substantial assistance" factors include "(1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, [and] (5) defendant's state of mind." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84).[14]

The first, third, and fourth *Halberstam* factors each strongly favor dismissal. The notion that the MTN Defendants—by allegedly acting to protect their staff and property from Taliban violence—knowingly "encouraged" attacks on U.S. forces (first factor) is nonsensical. *See Averbach*, 2020 WL 486860, at *16; *Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 976 (N.D. Cal. 2018). And the Complaint certainly does not allege that the MTN Defendants were present at any attack that injured any Plaintiff (third factor), or that they had a special relationship, such as a "position of authority," with the Taliban—the group that allegedly used violence to extort *them* (fourth factor). *See Halberstam*, 705 F.2d at 484; *Taamneh*, 343 F. Supp. 3d at 917-18.

---

[14] A sixth factor, the duration of the aid provided, cannot override the other factors. *See, e.g.*, *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1496 (8th Cir. 1997) (aid was not substantial despite "extending over four decades"). *Halberstam* considered duration as potentially bearing on other factors, for example as "evidence of the defendant's state of mind," 705 F.2d at 484, but no similar inference would be reasonable here.

*Halberstam*'s fifth factor, state of mind, also strongly favors dismissal. This factor requires a showing that the defendant "was one in spirit with the [principal wrongdoer]." 705 F.2d at 484; *see In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1496 (8th Cir. 1997). It demands factual allegations that the defendant shared the principal's unlawful objective and desired to help the principal achieve it. *See, e.g.*, *Halberstam*, 705 F.2d at 488 (assessing whether the defendant "inten[ded] and desire[d] to make the venture succeed"); *Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 574 (E.D. Mich. 2018) (no allegation that defendant acted "in concert with" the attacker "pursuant to a common design"), *aff'd*, 921 F.3d 617 (6th Cir. 2019); *Taamneh*, 343 F. Supp. 3d at 918 ("there is no allegation that Defendants have any intent to further terrorism"); *Copeland*, 352 F. Supp. 3d at 976 (defendants did not "intend[] ISIS to carry out the attacks"). Here, Plaintiffs cannot seriously advance the absurd notion that the MTN Defendants were "one in spirit" with the terrorist militia that allegedly extorted them, or that they harbored "any intent to further [the Taliban's]" attacks on American soldiers. *Taamneh*, 343 F. Supp. 3d at 918. The *only* motivation that Plaintiffs ascribe to any MTN Defendant is the desire to protect their staff and network from Taliban attack. *See supra* at 6-8, 32-36.[15]

Because the Complaint does not, and cannot, plausibly allege that the MTN Defendants knowingly assumed a role in terrorist acts, or "substantially assisted" the Taliban's attacks on U.S. forces in Afghanistan, Plaintiffs' aiding-and-abetting claims (Counts 5-6) fail as a matter of law.

### 2. *Plaintiffs fail to plead that a designated FTO "committed, planned, or authorized" each "act of international terrorism" at issue.*

To further narrow aiding-and-abetting liability, Congress required plaintiffs to establish that they were injured by "an act of international terrorism committed, planned, or authorized" by

---

[15] Plaintiffs' claims that the MTN Defendants aided and abetted attacks by the Haqqani Network fail for the added reason that Plaintiffs allege no assistance to that group. *See supra* at 36-37.

a group that was designated an FTO at the time of the attack. 18 U.S.C. § 2333(d)(2). Plaintiffs allege that they were injured by attacks committed by the Taliban or, in some cases, by the Haqqani Network. Compl. ¶¶ 1, 343. But the United States never designated the Taliban as an FTO, *see id.* ¶ 278, and it did not designate the Haqqani Network as an FTO until September 2012, *id.* ¶ 288. In fact, the Complaint alleges that a designated FTO played a direct role in only a tiny fraction of the 127 attacks at issue.[16] For the remaining attacks, Plaintiffs attempt to shoehorn their claims into the statute by claiming that al-Qaeda "planned" or "authorized" them. That effort fails.

To "plan" something is to "design" it or "decide on and arrange [it] in advance," and to "authorize" means to "give official permission" or "approval," in the context of a relationship of control or authority. *New Oxford American Dictionary* (3d ed. 2010). Plaintiffs do not plead any non-conclusory allegations showing that al-Qaeda decided on and arranged in advance, or gave official permission or approval for, any of the attacks in which an FTO is not alleged to have participated directly. Instead, they allege that al-Qaeda generally "encourag[ed]" and religiously inspired the Taliban and provided it with financing and training. *See* Compl. ¶¶ 328, 332, 334.

That is not the same as "planning" or "authorizing" an attack. Serving as a source of political or religious inspiration for a terror group does not entail operational control over it. *See Crosby*, 921 F.3d at 626 (rejecting theory that ISIS "authorized" an attack by "virtually recruit[ing]" and inspiring the attacker); *Clayborn v. Twitter, Inc.*, 2018 WL 6839754, at *8 (N.D. Cal. Dec. 31, 2018) (allegations that an FTO "sought to 'generally radicalize' individuals and promoted terrorist[] attacks" are insufficient to show that it "authorized" a particular attack).

Plaintiffs' financing and training allegations also fall short of what the ATA requires. The

---

[16] Plaintiffs attribute eight attacks to the Haqqani Network after its designation, *see* Compl. ¶¶ 428-432, 486-493, 825-829, 843-844, 1109-1113, 1176-1180, 1220-1225, 1255-1261, and allege that al-Qaeda played an operational role in a ninth attack, *see id.* ¶¶ 472-480, 1011-1020, 1239-1246.

statute expressly defines "training" and "weapons" as "material support or resources," a distinct concept under the ATA. *See* 18 U.S.C. § 2339A(a), (b)(1). Given Congress's use of "material support" elsewhere, something more must be required for the planning and authorization necessary to trigger aiding-and-abetting liability. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

Unable to connect an FTO to each attack in the Complaint, Plaintiffs attempt a last-ditch workaround. In Count 6, they claim that al-Qaeda "committed, planned, or authorized" a ten-year "campaign" with the Taliban to "expel Americans from Afghanistan." Compl. ¶¶ 1299-1300. In a convoluted chain, they theorize that al-Qaeda conspired to run the Taliban as a racketeering "enterprise," that unnamed Taliban fighters violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and that the ten-year "Taliban-al-Qaeda Campaign" was one "act" of international terrorism that caused every Plaintiff's injuries. *See id.* ¶¶ 1298-1307.

This is a spurious attempt to plead around the ATA's strict limits on aiding-and-abetting liability. The ATA requires plaintiffs to establish that they were injured by "*an act* of international terrorism." 18 U.S.C. § 2333(d)(2) (emphasis added). A decade-long campaign of violence stretching across all of Afghanistan cannot naturally be referred to as a single "act" of terrorism. *See Taamneh*, 343 F. Supp. 3d at 916 (emphasizing that use of the singular "act" requires a "connect[ion] with a specific crime," not a terror group's "general course of conduct").[17]

## CONCLUSION

The Court should dismiss the claims against the MTN Defendants.

---

[17] Plaintiffs also fail to plead that the MTN Defendants provided "substantial assistance" to the "person who committed" this supposed "act." Plaintiffs claim that the MTN Defendants assisted the Taliban, but the Taliban is the alleged "enterprise" in their theory, and RICO requires a perpetrator "distinct from the RICO enterprise." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1113 (D.C. Cir. 2009) (per curiam).

Dated:  April 29, 2020                                   Respectfully submitted,


/s/ John E. Hall                                        /s/ Kimberly H. Zelnick
John E. Hall (D.C. Bar No. 415364)                      Timothy P. Harkness[*]
David M. Zionts (D.C. Bar No. 995170)                   Kimberly H. Zelnick (D.D.C. Bar No. NY0325)
Jordan L. Moran (D.C. Bar No. 888273537)[*]             Scott A. Eisman (D.D.C. Bar No. NY0326)
Covington & Burling LLP                                 Freshfields Bruckhaus Deringer US LLP
One CityCenter                                          601 Lexington Avenue, 31st Floor
850 Tenth Street N.W.                                   New York, NY 10022
Washington, DC 20001                                    Telephone: (212) 277-4000
Telephone: (202) 662-5987                               Facsimile: (212) 277-4001
Facsimile: (202) 778-5987                               timothy.harkness@freshfields.com
jhall@cov.com                                           kimberly.zelnick@freshfields.com
dzionts@cov.com                                         scott.eisman@freshfields.com
jmoran@cov.com


                                                        *Counsel for Defendants MTN Group Limited,*
                                                        *MTN (Dubai) Limited, and MTN Afghanistan*

---

[*] Application for admission pending.