IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AUGUST CABRERA *et al.*,                  )
                                          )
                    Plaintiffs,           )
                                          )     Case No. 1:19-cv-03833 (EGS)
          v.                              )
                                          )
BLACK & VEATCH SPECIAL                    )
PRODUCTS CORPORATION *et al.*,            )
                                          )
                    Defendants.           )

MEMORANDUM IN SUPPORT OF
DEFENDANT JANUS GLOBAL OPERATIONS LLC'S
**<u>MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

      A.     Plaintiffs' Allegations Regarding Janus .................................................. 3

           1.     The Adraskan Contract ............................................................. 4

      B.     The Armed Attacks at Issue .................................................................... 7

STATUTORY FRAMEWORK ................................................................................. 8

PLAINTIFFS' CLAIMS ........................................................................................... 9

LEGAL STANDARD .............................................................................................. 10

ARGUMENT ........................................................................................................... 10

I.     THE COMPLAINT SHOULD BE DISMISSED AGAINST JANUS IN ITS ENTIRETY BECAUSE PLAINTIFFS DO NOT ALLEGE JANUS KNOWINGLY MADE PAYMENTS TO THE TALIBAN ................................. 10

      A.     Plaintiffs Engage in Impermissible Group Pleading ............................. 11

      B.     Plaintiffs Offer Only the Barest of Conclusory Allegations Regarding Four of the Five Janus Contracts Listed in the Complaint ......................... 13

      C.     Plaintiffs Do Not Plausibly Allege that Janus Knowingly Made Payments to the Taliban in Connection with the Adraskan Contract ........ 15

II.    PLAINTIFFS' DIRECT LIABILITY CLAIMS FAIL FOR SEVERAL ADDITIONAL REASONS ................................................................................. 18

      A.     The Complaint Fails to Plead that Janus Committed Acts of International Terrorism Under the ATA ...................................................... 19

           1.     The Complaint Fails to Plead that Janus Acted with Objective Terrorist Intent .............................................................. 19

           2.     The Complaint Fails to Plead that Janus's Alleged Actions Were Violent or Dangerous to Human Life ................................. 22

i

B.      Plaintiffs' Claims Do Not Satisfy the ATA's Proximate Causation
        Requirement ....................................................................................22

C.      Plaintiffs Do Not Adequately Plead a Predicate Crime to Support
        Direct ATA Liability........................................................................26

        1.      Plaintiffs Do Not Allege that Janus Knowingly Paid an FTO
                (Count Two, 18 U.S.C. § 2339B) ..................................27

        2.      Plaintiffs' ATA Claim Predicated on Financing Terrorism
                Should Be Dismissed (Count Three, 18 U.S.C. § 2339C)............27

III.    PLAINTIFFS' AIDING-AND-ABETTING CLAIMS ALSO FAIL FOR
        SEVERAL ADDITIONAL REASONS ...............................................29

A.      Plaintiffs Fail to Plead that Janus Substantially Assisted the Taliban in
        Carrying Out Alleged Acts of International Terrorism............................29

B.      The Complaint Does Not Satisfy § 2333(d)'s Requirement that an FTO
        "Committed, Planned, or Authorized" the Attacks that Janus Allegedly
        Aided................................................................................................33

        1.      The Complaint Does Not Adequately Plead that an FTO
                Committed, Planned, or Authorized the Vast Majority of
                Attacks at Issue ..............................................................33

        2.      The Complaint Cannot Invoke RICO to Evade the Statutory
                FTO Requirement ...........................................................35

C.      The Complaint Fails to Plead Knowledge of Attacks "Committed,
        Planned, or Authorized" by an FTO ...............................................38

CONCLUSION..............................................................................................39

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ...................................................................23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..............................................................10, 13

*Atuahene v. City of Hartford*,
  10 F. App'x 33 (2d Cir. 2001) ...................................................11

*Averbach v. Cairo Amman Bank*,
  No. 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020)..................32

*Barber v. Nestle USA, Inc.*,
  154 F. Supp. 3d 954 (C.D. Cal. 2015), *aff'd*,
  730 F. App'x 464 (9th Cir. 2018)..................................................5

*Bank of Am. Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017)...........................................................22

*Bates v. Nw. Human Servs., Inc.*,
  466 F. Supp. 2d 69 (D.D.C. 2006)................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................10

*Boim v. Quranic Literacy Inst.*,
  291 F.3d 1000 (7th Cir. 2002), *overruled on other grounds sub nom.*
  *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008)............31

*Brill v. Chevron Corp.*,
  No. 15-cv-04916-JD, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017)................................20

*Bryan v. United States*,
  524 U.S. 184 (1998) .............................................................15

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
  274 F. Supp. 2d 86 (D.D.C. 2003)...............................................11

*In re Chocolate Confectionary Antitrust Litig.*,
  801 F.3d 383 (3d Cir. 2015)......................................................14

*Copeland v. Twitter, Inc.*,
  352 F. Supp. 3d 965 (N.D. Cal. 2018).........................................31

iii

*Crosby v. Twitter, Inc.*,
   921 F.3d 617, 623 (6th Cir. 2019) ..............................................................................24

*Crosby v. Twitter, Inc.*,
   303 F. Supp. 3d 564 (E.D. Mich. 2018) .......................................................................31

*Democracy Forward Found. v. White House Office of Am. Innovation*,
   356 F. Supp. 3d 61 (D.D.C. 2019) ................................................................................5

*Doe v. Beaumont Indep. Sch. Dist.*,
   172 F.R.D. 215 (E.D. Tex. 1997) ................................................................................14

*Doe v. Von Eschenbach*,
   No. CIV.A.06 2131 RMC, 2007 WL 1848013 (D.D.C. June 27, 2007) ....................14

*E.E.O.C. v. Outback Steak House of Fla., Inc.*,
   520 F. Supp. 2d 1250 (D. Colo. 2007) ........................................................................14

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ..........................................................................................14

*Embree v. Wyndham Worldwide Corp.*,
   779 F. App'x 658 (11th Cir. 2019) ..............................................................................12

*Fields v. Twitter, Inc.*,
   881 F.3d 739 (9th Cir. 2018) .......................................................................................22

*Flores-Figueroa v. United States*,
   556 U.S. 646 (2009) .....................................................................................................38

*Freeman v. HSBC Holdings PLC*,
   413 F. Supp. 3d 67 (E.D.N.Y. 2019) .............................................................17, 22, 33

*Goldberg v. UBS AG*,
   660 F. Supp. 2d 410 (E.D.N.Y. 2009) .........................................................................31

*\*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983)...........................................................................29, 30, 31, 32

*Hamilton v. Paulson*,
   542 F. Supp. 2d 37 (D.D.C. 2008), *rev'd on other grounds*,
   666 F.3d 1344 (D.C. Cir. 2012) ....................................................................................5

*Kaempe v. Myers*,
   367 F.3d 958 (D.C. Cir. 2004)...........................................................................2, 10, 16

*\*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) .......................................................................................21

iv

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) ..................................................................17

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ..........................................................29, 30, 31

*Magluta v. Samples*,
  256 F.3d 1282 (11th Cir. 2001) ................................................................12

*Martin v. City of N.Y.*,
  No. 07 Civ. 7384 (DC), 2008 WL 1826483 (S.D.N.Y. Apr. 23, 2008) ......................11

*Mastafa v. Chevron Corp.*,
  770 F.3d 170 (2d Cir. 2014) ....................................................................20

*Miller v. Holzmann*,
  No. 95-cv-1231 (RCL), 2007 WL 778568 (D.D.C. Mar. 6, 2007) ............................14

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y 2009) ............................................................6

*Owens v. BNP Paribas, S.A.* ("*Owens I*"),
  235 F. Supp. 3d 85 (D.D.C. 2017)...............................................................16

*Owens v. BNP Paribas, S.A.* ("*Owens II*"),
  897 F.3d 266 (D.C. Cir. 2018)............................................................ *passim*

*Ridley v. VMT Long Term Care Mgmt.*,
  68 F. Supp. 3d 88 (D.D.C. 2014)................................................................13

*Rojas v. Fed. Aviation Admin.*,
  927 F.3d 1046 (9th Cir. 2019) ..................................................................6

*Rothstein v. UBS AG*,
  647 F. Supp. 2d 292 (S.D.N.Y. 2009), *aff'd*, 708 F.3d 82 (2d Cir. 2013)...................31

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer US L.L.P.*,
  682 F.3d 1043 (D.C. Cir. 2012)................................................................13

*Shatsky v. PLO*,
  No. 02-2280 (RJL), 2017 WL 2666111 (D.D.C. June 20, 2017),
  *vacated on other grounds*,
  No. 17-7168, 2020 WL 1856490 (D.C. Cir. Apr. 14, 2020) ................................22, 26

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) ................................................................16, 24

*Simpson v. Socialist People's Libyan Arab Jamahiriya*,
  362 F. Supp. 2d 168 (D.D.C. 2005), *aff'd*, 470 F.3d 356 (D.C. Cir. 2006)...................6

*Stansell v. BGP, Inc.*,
   No. 8:09-cv-2501-T-30AEP, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011)..............20

*Stutts v. De Dietrich Grp.*,
   No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ....................21

*\*Taamneh v. Twitter, Inc.*,
   343 F. Supp. 3d 904 (N.D. Cal. 2018)........................................................30, 31, 32, 35

*In re Terrorist Attacks on Sept. 11, 2001*,
   740 F. Supp. 2d 494 (S.D.N.Y. 2010) ........................................................24

*Toumazou v. Turkish Republic of N. Cyprus*,
   71 F. Supp. 3d 7 (D.D.C. 2014)..........................................................11, 12

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
   842 F.3d 430 (6th Cir. 2016) .....................................................38

*United States ex. rel. Thomas v. Siemens AG*,
   708 F. Supp. 2d 505 (E.D. Pa. 2010)....................................................13, 14

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) ...................................................19

*Zapata v. HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019) ................................................20, 25

## STATUTES & RULES

31 C.F.R. § 594.201 ...................................................................15

31 C.F.R. § 594.204 ...................................................................15

18 U.S.C. § 2331 *et seq.*................................................................1, 21

18 U.S.C. § 2331(1) ................................................................8, 9

18 U.S.C. § 2331(1)(A)........................................................8, 18, 26

18 U.S.C. § 2331(1)(B).....................................................19, 20, 21, 22

18 U.S.C. § 2332f ...................................................................27

18 U.S.C. § 2332f(a)(1) ................................................................27

18 U.S.C. § 2332f(d)(1) ................................................................27

18 U.S.C. § 2333(a) ............................................................8, 9, 18, 22

18 U.S.C. § 2333(d) ................................................................................................ *passim*

18 U.S.C. § 2333(d)(2) .......................................................................................... *passim*

18 U.S.C. § 2335(a) ...................................................................................................24

18 U.S.C. § 2339A .................................................................................................. *passim*

18 U.S.C. § 2339B ...........................................................................................9, 15, 26

18 U.S.C. § 2339C .................................................................................................. *passim*

18 U.S.C. § 2339C(a)(1)(A) ...............................................................................27, 28

18 U.S.C. § 2339C(a)(1)(B) ...............................................................................27, 28

50 U.S.C. § 1702 .......................................................................................................10

50 U.S.C. § 1705(a) ......................................................................................10, 15, 26

50 U.S.C. § 1705(c) ...................................................................................................15

Fed. R. Civ. P. 12(b)(6).............................................................................................2, 10

JASTA § 2(a)(5), 130 Stat. 852 ...............................................................................29

<u>OTHER AUTHORITIES</u>

162 Cong. Rec. H5240 (daily ed. Sept. 9, 2016) (statement of Rep. Goodlatte).........36, 38

Central Intelligence Agency, The World Factbook, *Afghanistan*,
    https://www.cia.gov/library/publications/the-world-factbook/geos/af.html................25

Letter from the President: Six Month Consolidated War Powers Resolution Report
    (Dec. 11, 2017), https://www.whitehouse.gov/briefings-statements/text-letter-
    president-speaker-house-representatives-president-pro-tempore-senate-2/ ................28

S. Rep. No. 111-345 (2010), U.S. Senate Committee on Armed Services, Report,
    Inquiry into the Role & Oversight of Private Security Contractors in
    Afghanistan (Oct. 26, 2010)................................................................................. *passim*

*The Taliban: Engagement or Confrontation? Hearing Before the S. Comm. on
    Foreign Relations*, 106th Cong. 4 (2000) (statement of Hon. Karl F. Inderfurth,
    Assistant Secretary of State for South Asian Affairs, Department of State) ..........5, 16

United Nations Security Council, Press Release, *Peacekeeping Under-Secretary-General Briefs Security Council on Afghanistan: London Conference, Security Situation, New Parliament Focus* (Feb. 10, 2006), https://www.un.org/press/en/2006/sc8634.doc.htm............................................5, 15, 16

U.S. Agency for International Development, Press Release, *Tarakhil Power Plant Handed Over to Afghan Government* (June 27, 2010), https://2012-2017.usaid.gov/afghanistan/news-information/press-releases/tarakhil-power-plant-handed-over-afghan-government............................4, 15

U.S. Agency for International Development, *Tarakhil Power Plant*, https://www.usaid.gov/node/51751 (last updated May 7, 2019)............................4, 16

U.S. Dep't of Defense, *Secretary Rumsfeld Meets with Ismail Khan in Herat, Afghanistan* (April 27, 2002), https://dod.defense.gov/OIR/gallery/igphoto/2001240619/ .....................................5, 16

U.S. Dep't of State, Diplomatic Cable from Embassy (Islamabad) to Sec. of State, Doc. No. 1995ISLAMA08102 (Sept. 4, 1995)........................................................5, 16

U.S. Dep't of State, Diplomatic Cable from Embassy (Islamabad) to Sec. of State, Doc. No. 1995ISLAMA08185 (Sept. 6, 1995)........................................................5, 16

U.S. Dep't of State, *Foreign Terrorist Organizations*, https://www.state.gov/foreign-terrorist-organizations/...................................27, 34, 37

## PRELIMINARY STATEMENT

Plaintiffs understandably seek to hold someone responsible for the loss of life and limb that has occurred during the nearly two-decades-long war in Afghanistan.  But this lawsuit misses the mark by pinning liability on those who sought to aid the United States in maintaining stability in post-invasion Afghanistan and to protect U.S. forces stationed there.  Bringing their claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, Plaintiffs broadly assert that U.S. defense contractors knowingly and intentionally caused over 125 armed attacks against the very U.S. forces they served by paying protection money to the Taliban to protect their business interests.  Defendant Janus Global Operations LLC ("Janus")—an American company that has been hired by, and continues to serve, the U.S. government to protect its personnel in Afghanistan and elsewhere—vehemently denies Plaintiffs' conclusory allegations that it knowingly or intentionally aided in terrorist attacks, and moves to dismiss for several reasons.

*First*, the Complaint should be dismissed in its entirety because Plaintiffs do not plausibly allege that Janus knowingly (let alone intentionally) made payments to the Taliban.  Of the five government contracts listed in the Complaint, Plaintiffs do not even *attempt* to plead facts to support their claims as to four of the contracts.  As for the remaining contract—executed in January 2008 and concerning the provision of security by Janus for the U.S. Army's Adraskan National Training Center—Plaintiffs assert that Janus paid three local individuals purportedly connected to the Taliban to staff guards under the contract.  But they not only fail to make any non-conclusory allegations to support those assertions, their allegations are *contradicted* by the very Senate Armed Services Committee Report (the "Senate Report") cited in the Complaint on which Plaintiffs purport to rely, and by official government documents subject to judicial notice.

*Second,* Plaintiffs' direct liability claims fail for two additional reasons.  First, Plaintiffs do not (and plainly cannot) allege that Janus acted with the objective intent of furthering terrorist aims.  To the contrary, the Complaint alleges that Janus was being extorted by the Taliban and making payments for its *own protection*, not with any goal of harming others.  Next, Janus's actions are far too remote from the attacks at issue in both time and place to support a direct liability claim under the ATA.  In essence, Plaintiffs contend that the narrow set of alleged contacts between Janus and three individuals at Adraskan in 2008 makes Janus responsible for *any* Taliban attack that occurred in Afghanistan between 2009 and 2019.  That cannot be the law.

*Third,* Janus also cannot be held liable under an aiding-and-abetting theory of liability because Plaintiffs do not plausibly allege that Janus provided "substantial assistance" to any designated Foreign Terrorist Organization ("FTO"), let alone knowingly.  Plaintiffs' attempts to evade the ATA's requirement that the attacks at issue be "committed, planned, or authorized" by an FTO—which the Taliban is not—are unavailing.

## FACTUAL BACKGROUND

Defendant Janus Global Operations LLC, formerly known as EOD Technology, Inc., disputes many allegations in the Complaint, including the implausible and offensive assertion that it knowingly or intentionally supported attacks against U.S. forces.  Solely for purposes of this Rule 12(b)(6) motion, Janus treats as true the factual allegations in the Complaint that are well-pleaded, non-conclusory, and not contradicted by documents incorporated by reference in the Complaint or facts subject to judicial notice.  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

### A.    Plaintiffs' Allegations Regarding Janus

Janus is a civilian government contractor that has a long history of providing explosive ordinance disposal and private-security services to numerous U.S. government administrations and departments, and, as relevant to this case, provided such services in various parts of Afghanistan through five different contracts with different branches of the U.S. government between 2008 and 2012.  *See* Compl. ¶¶ 177-178.

Plaintiffs, relying on generalized allegations about "corruption" in Afghanistan, *see, e.g.*, *id.* ¶¶ 47-83, make sweeping and speculative assertions that Defendants, private companies operating in post-invasion Afghanistan, would have purportedly paid protection money to the Taliban between 2006 and 2014.  *Id.* ¶ 6.  But notably absent from the Complaint are any non-conclusory allegations that *Janus* ever made any such payments.  Indeed, Plaintiffs' allegations concerning Janus are confined to only five pages of their 274-page Complaint, and those allegations—many of which are affirmatively contradicted by the Senate Armed Services Committee Report[1] (the "Senate Report") on which Plaintiffs rely—fail to support any of Plaintiffs' claims.  *See* Compl. ¶¶ 177-187.

According to Plaintiffs, Janus served various U.S. government agencies between 2008 and 2012 pursuant to five contracts, variously involving security and mine-clearance services.  *Id.* ¶ 178.  As to four of those five contracts, Plaintiffs do not even attempt to allege when, where, how, or to whom Janus made any protection money payments, let alone that any such payments were made to the Taliban or supported terrorist attacks on Americans.  Plaintiffs' allegations

---

[1] S. Rep. No. 111-345 (2010), U.S. Senate Committee on Armed Services, Report, Inquiry into the Role & Oversight of Private Security Contractors in Afghanistan (Oct. 26, 2010) (the "Senate Report"), attached as Exhibit A to the Declaration of Paul S. Mishkin ("Mishkin Decl."), filed contemporaneously herewith.

extend no further than one-sentence descriptions of the contracts in question and the conclusory assertion that it was purportedly "contractors' standard practice" to pay protection money to the Taliban. *Id.* ¶ 179.

### 1.      The Adraskan Contract

The only contract for which Plaintiffs provide more than identifying information is one $7 million contract executed with the U.S. Army in January 2008 to provide security in and around the Adraskan National Training Center (the "Adraskan Contract"). Compl. ¶ 178(a). Plaintiffs' allegations refer to three individuals who allegedly assisted Janus in sourcing local individuals to serve as guards for the Adraskan Contract: "General Wahab," Haji Dawoud, and Mirza Khan.

### (a)      General Wahab

Plaintiffs allege that Janus "turned to" "General Wahab" in "early 2008" to source guards for the Adraskan Contract. Compl. ¶ 182. At that time, Wahab allegedly commanded the "Jihadi Order Regiment of Herat" (the "Regiment"), which Plaintiffs assert in a conclusory manner was a "local Taliban chapter." *Id.* But the only source that Plaintiffs cite in connection with these allegations, the Senate Report, makes no such connection between the Regiment and the Taliban. To the contrary, the Senate Report states that the Regiment operated in and around Herat Province "implementing Ismail [Khan]'s personal agenda." Senate Report at 41. Khan, far from being affiliated with the Taliban, was the Minister of Water & Energy and a Cabinet member in the *U.S.-backed government led by Hamid Karzai* during the U.S. occupation.[2] The U.S.

---

[2] U.S. Agency for Int'l Dev. ("USAID"), Press Release, *Tarakhil Power Plant Handed Over to Afghan Government* (June 27, 2010), https://2012-2017.usaid.gov/afghanistan/news-information/press-releases/tarakhil-power-plant-handed-over-afghan-government (Mishkin Decl., Ex. B); USAID, *Tarakhil Power Plant*, https://www.usaid.gov/node/51751 (last updated May 7, (….continued)

Department of Defense referred to Khan's "support" as "crucial to the new national

government."[3]  Indeed, as the U.S. government has long recognized, Khan fought *against* the

Taliban after the group rose to power following the Soviet Union's withdrawal from

Afghanistan.[4]  The Senate Report refers to Wahab as Ismail Khan's "aide de camp" and

_____

(continued….)

2019) ("On August 5, 2009, President Hamid Karzai, Minister of Energy and Water Ismail Khan, and U.S. Ambassador Karl Eikenberry inaugurated the initial 35 MW of electricity at the power plant.") (Mishkin Decl., Ex. C); United Nations Security Council, Press Release, *Peacekeeping Under-Secretary-General Briefs Security Council on Afghanistan: London Conference, Security Situation, New Parlimentary Focus* (Feb. 10, 2006), https://www.un.org/press/en/2006/sc8634.doc.htm ("U.N. Press Release") (detailing unrest in Afghanistan, and noting that "[i]n an effort to calm the situation, President Karzai had dispatched a delegation headed by Ismail Khan, former Governor of Herat and current Minister of Energy, Water and Power, to mediate") (Mishkin Decl., Ex. D).

      The Court may take judicial notice of these governmental and intergovernmental agency publications.  *See Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008) (judicial notice may be taken of public records and government documents available from reliable sources on the internet), *rev'd on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012); *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 68 n.4 (D.D.C. 2019) (taking notice of a White House press release as it was "a government document available from a reliable source"); *Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954, 958 n.1 (C.D. Cal. 2015) (taking notice of documents published by the United Nations because "[s]uch documents are published by a governmental entity and are not subject to reasonable dispute"), *aff'd*, 730 F. App'x 464 (9th Cir. 2018).

      [3] U.S. Dep't of Defense, *Secretary Rumsfeld Meets with Ismail Khan in Herat, Afghanistan* (April 27, 2002), https://dod.defense.gov/OIR/gallery/igphoto/2001240619/ (Mishkin Decl., Ex. E).

      [4] *See The Taliban: Engagement or Confrontation? Hearing Before the S. Comm. on Foreign Relations*, 106th Cong. 9 (2000) (statement of Hon. Karl F. Inderfurth, Assistant Secretary of State for South Asian Affairs, Department of State) ("Let me cite a few of the latest indicators of erosion in Taliban authority and effectiveness, all occurring during the past several months. In March, Ismail Khan, the anti-Taliban former governor of Herat, escaped with two senior aides from a Kandahar prison where he had been held since 1997."), *available at* https://www.govinfo.gov/content/pkg/CHRG-106shrg68769/pdf/CHRG-106shrg68769.pdf ("Congressional Testimony") (Mishkin Decl., Ex. F); U.S. Dep't of State, Diplomatic Cable from Embassy (Islamabad) to Sec. of State, Doc. No. 1995ISLAMA08102 (Sept. 4, 1995) (assessing whether Khan would be able to hold Herat against advancing Taliban forces), *available at* https://nsarchive2.gwu.edu/NSAEBB/NSAEBB97/tal10.pdf (Mishkin Decl., Ex. G); U.S. Dep't of State, Diplomatic Cable from Embassy (Islamabad) to Sec. of State, Doc. No. (….continued)

"informal 'number two man.'"  *Id.* at 40.  Plaintiffs allege no facts whatsoever to support their assertion that Wahab was a member of the Taliban.

> ### (b)   Haji Dawoud

Plaintiffs also make a conclusory allegation that Janus "paid" a "known Taliban cutout," Haji Dawoud, to assist in staffing the Adraskan Contract.  But Plaintiffs' only alleged support for their statement that Janus knew that Dawoud was affiliated with the Taliban consists of (1) a single "military-intelligence report" that the Complaint does not allege Janus ever saw and (2) an "ArmorGroup security report" that Janus is again not alleged to have seen, and which merely contains the "type of" information that Plaintiffs speculate would have been available to Janus. Compl. ¶ 186.[5]  Moreover, both reports were issued *five months after* Janus allegedly relied on Dawoud for recruitment purposes.  *See* Senate Report at 46-47.  The Complaint contains no allegation that Dawoud had any involvement in recruiting after either report was issued.

Moreover, the Senate Report, again Plaintiffs' only source for their allegations, nowhere contains any reference to any payment by Janus to Dawoud at any time, let alone a protection

---

(continued….)

1995ISLAMA08185 (Sept. 6, 1995) (noting Khan fled Herat after the Taliban took the city), *available at* https://nsarchive2.gwu.edu/NSAEBB/NSAEBB97/tal11.pdf (Mishkin Decl., Ex. H, and together with Exhibit G, the "Diplomatic Cables").

The Court may take judicial notice of diplomatic cables, *see Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 178 (D.D.C. 2005) (holding that "intergovernmental cables are eminently recognizable through judicial notice"), *aff'd*, 470 F.3d 356 (D.C. Cir. 2006), and Congressional hearing transcripts, *see, e.g., Rojas v. Fed. Aviation Admin.*, 927 F.3d 1046, 1051 n.1 (9th Cir. 2019) ("In general, [the court] may take judicial notice of publicly available congressional records, including transcripts of congressional hearings."); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 504 (S.D.N.Y. 2009) (holding that "transcripts of Congressional hearing testimony" are "public records . . . subject to judicial notice").

[5] Whether Dawoud was in fact a Taliban member is less than clear.  The Senate Report quotes a U.S. Army Sergeant as stating that he "would play both sides."  Senate Report at 46.

money payment to the Taliban.  The Senate Report notes *interactions* between Janus and Dawoud concerning staffing for the Adraskan Contract because Dawoud was the "elder" of a nearby village, but it nowhere mentions any payments.  *See* Senate Report at 46.  Moreover, the Senate Report notes that a U.S. Army Master Sergeant deployed to Adraskan likewise "had several discussions with Haji Dawoud during [the Master Sergeant's] time at Adraskan," and reported that he knew Janus personnel and Dawoud "would talk a lot."  *Id.*  The Complaint nowhere alleges any facts to show that such discussions were paired with corrupt payments.

### (c)   Mirza Khan

Finally, Plaintiffs allege that Janus sourced security guards from Mirza Khan.  Compl. ¶ 187.  But Plaintiffs do not allege that Khan was a member of the Taliban.  *See Id.* ¶ 187.  Instead, Plaintiffs allege that Khan was a member of the Iranian Revolutionary Guard Corps' Qods Force, an entirely distinct group.  *Id.*  The Complaint does not allege that any Plaintiff was the victim of any attack by the Qods Force.  Moreover, Plaintiffs do not allege that Janus *knew* Khan was a member of the Qods Force, which the Senate Report refers to as a "clandestine[]" organization. Senate Report at 48.

### B.   The Armed Attacks at Issue

The 385 Plaintiffs' claims arise from armed attacks over an approximately ten-year period between 2009 and 2019 that killed or wounded 143 U.S. service members and security contractors, U.S. government employees, and others in the course of armed conflict in Afghanistan.[6]  The Complaint alleges 127 separate attacks, 91 allegedly involving the Taliban, 29 allegedly involving

---

[6] The temporal scope of Plaintiffs' claims is unclear.  The first sentence of the Complaint states, "This lawsuit seeks damages . . . on behalf of American service members and civilians . . . who were killed or wounded while serving their country in Afghanistan between 2009 and *2017*." Compl. ¶ 1 (emphasis added).  However, the Complaint alleges attacks that injured Plaintiffs as recently as June *2019*.  Compl. ¶ 652.

the Haqqani Network, six allegedly involving the Kabul Attack Network, and one allegedly

involving the Taliban, al-Qaeda, and the Haqqani Network.  Plaintiffs are victims of these attacks,

their relatives, and their estates.

## STATUTORY FRAMEWORK

The ATA provides a private right of action for treble civil damages, subject to several

limitations and exclusions, to U.S. nationals who are victims of a criminal "act of international

terrorism."  18 U.S.C. § 2333(a).   In addition to claims for direct liability, the ATA also allows

claims for aiding-and-abetting liability in certain circumstances.  *Id.* § 2333(d).

Plaintiffs bring direct liability claims under § 2333(a) and aiding-and-abetting claims under

§ 2333(d).  For each type of claim, each Plaintiff must plead and establish that his or her injury

occurred "by reason of an act of international terrorism."  *Id.* § 2333(a).  The ATA sets forth four

requirements for an act to constitute "an act of international terrorism."  *Id.* § 2331(1).  The act

must: (1) occur abroad or transcend national boundaries; (2) be "violent" or "dangerous to human

life"; (3) violate federal or state criminal law (or constitute an act that would do so if committed in

the United States); and (4) "appear to be intended" to "intimidate or coerce a civilian population,"

"influence the policy of a government by intimidation or coercion," or "affect the conduct of a

government by mass destruction, assassination, or kidnapping."  *Id.*  Together, the second and the

third of these requirements mean that a plaintiff, in addition to pleading and establishing the other

elements of an ATA civil claim, must plead and establish that the conduct of the defendant (on a

direct claim) or of the primary actor (on an aiding-and-abetting claim) satisfies the elements of a

violent or dangerous criminal offense, including the applicable state-of-mind element.  *See id.*

§ 2331(1)(A).

8

Congress placed careful limitations on ATA liability.  To prevail on a direct liability claim, a plaintiff must establish that the defendant itself committed an "act of international terrorism" and so must show that the defendant's *own* conduct satisfies the objective intent, violent/dangerous, and criminal elements embedded within the ATA's definition of "international terrorism."  *Id.* § 2331(1).  In addition, to satisfy the statute's "by reason of" requirement, *id.* § 2333(a), the plaintiff must establish that the defendant's terrorist act proximately caused the plaintiff's injury.  *Owens v. BNP Paribas, SA*, 897 F.3d 266, 273 (D.C. Cir. 2018) ("*Owens II*").  Moreover, to prevail on an aiding-and-abetting liability claim, a plaintiff must establish that the "act of international terrorism" that injured the plaintiff was "committed, planned, or authorized by" an FTO and that the defendant "knowingly provid[ed] substantial assistance" to "the person who committed such an act of international terrorism"—i.e., to the designated FTO.  18 U.S.C. § 2333(d).

## PLAINTIFFS' CLAIMS

Each of the 385 Plaintiffs asserts the same six ATA claims against all Defendants.  Counts 1 through 4 are direct liability claims brought under 18 U.S.C. § 2333(a) for "acts of international terrorism" allegedly committed by Defendants.  Count 1 alleges that Defendants caused Plaintiffs' injuries by knowingly providing material support to terrorists in violation of 18 U.S.C. § 2339A, which makes it a crime to provide "material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out," certain federal terrorism offenses.  Compl. ¶¶ 1262-68.  Count 2 alleges that Defendants violated 18 U.S.C. § 2339B, which makes it a crime to "knowingly provide[] material support or resources to [an FTO]."  Compl. ¶¶ 1269-75.  Count 3 alleges that Defendants violated 18 U.S.C. § 2339C, which makes it a crime to "unlawfully and willfully provide[] or collect[] funds" with the intent or knowledge

that they will be used to commit certain terrorism offenses.  Compl. ¶¶ 1276-82.  Count 4 alleges

that Janus violated 50 U.S.C. § 1705(a), which makes it a crime "to violate, attempt to violate,

conspire to violate, or cause a violation" of a Presidential international emergency economic

order issued under 50 U.S.C. § 1702.  Compl. ¶¶ 1283-88.

Counts 5 and 6 are aiding-and-abetting claims under 18 U.S.C. § 2333(d)(2).  Count 5

alleges that Janus aided and abetted each of the more than 125 attacks described in the Complaint,

spanning the entire country of Afghanistan over an approximately ten-year period.  Compl.

¶¶ 1289-97.  Count 6 alleges that each Defendant aided and abetted a RICO conspiracy "to expel

Americans from Afghanistan through crime and anti-American violence."  *Id.* ¶¶ 1298-307.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must plead facts sufficient

to state a claim that is "plausible on its face," and cannot rest on mere "possibility" or on

allegations that are "merely consistent with" their theory of liability.  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007)).  Although

well-pleaded allegations are accepted as true, the Court need not accept "a legal conclusion

couched as a factual allegation."  *Id.*  Nor must it credit allegations that are contradicted by

documents the Complaint incorporates by reference or by matters subject to judicial notice.

*Kaempe*, 367 F.3d at 963.

## ARGUMENT

## I.   THE COMPLAINT SHOULD BE DISMISSED AGAINST JANUS IN ITS ENTIRETY BECAUSE PLAINTIFFS DO NOT ALLEGE JANUS KNOWINGLY MADE PAYMENTS TO THE TALIBAN

All of Plaintiffs' claims against Janus should be dismissed because Plaintiffs do not

plausibly allege that Janus knowingly (let alone intentionally) made payments to the Taliban.

Plaintiffs' allegations consist almost entirely of vague, generalized allegations that are not particular as to any Defendant and therefore constitute impermissible group pleading. And even in the few pages of the Complaint that refer to Janus specifically, Plaintiffs fail to allege any facts whatsoever with respect to four of the five contracts Janus executed in Afghanistan. As for the fifth, remaining contract, Plaintiffs not only fail to make any non-conclusory allegations to support their assertions that Janus made payments to the Taliban, but their allegations are *contradicted* by the only source on which Plaintiffs purport to rely, as well as by official government documents subject to judicial notice. For these reasons, all of Plaintiffs' claims against Janus fail.

### A.      Plaintiffs Engage in Impermissible Group Pleading

Plaintiffs present a long list of generalized allegations claiming that all Defendants must have paid protection money to the Taliban because it was common in Afghanistan. In doing so, Plaintiffs refer vaguely to all Defendants as an undifferentiated whole, failing to differentiate among individual Defendants or between the Defendants and numerous other third parties in Afghanistan. Such "group pleading" is impermissible because "a complaint against multiple defendants [must] indicate clearly the defendants against whom relief is sought and the basis upon which the relief is sought against the particular defendants." *Martin v. City of New York*, No. 07 Civ. 7384(DC), 2008 WL 1826483, at *1 (S.D.N.Y. Apr. 23, 2008) (internal quotation marks omitted). "[A] plaintiff cannot satisfy the minimum pleading requirements . . . by 'lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct.'" *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (quoting *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001)); *see also Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 85 (D.D.C. 2006) (dismissing RICO claim where plaintiffs "generally neglect to distinguish between the defendants when describing

11

the factual underpinnings of the complaint").  Indeed, "given the extreme nature of the charge of terrorism, fairness requires *extra-careful scrutiny* of plaintiffs' allegations *as to any particular defendant . . . .*"  *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 103–04 (D.D.C. 2003) (emphases added).

Here, the Complaint is replete with sweeping allegations that "Defendants financed the Taliban through protection payments from at least 2006 until 2014"; "Defendants both actively facilitated and benefited from such payments"; "Defendants agreed to the Taliban's demands"; and "Defendants often paid the Taliban through their local subcontractors."  *E.g.*, Compl. ¶¶ 2, 3, 5, 6, 61.  Yet as purported support for those statements, Plaintiffs merely rely on conclusory and generalized assertions that "Defendants each followed" the "common practice" of "pay[ing] protection money to the Taliban," *id.* ¶ 83, repetitively citing allegations of corruption by companies that were purportedly "like Defendants" to imply that all Defendants conducted themselves in the same way, *see id.* ¶¶ 9, 48, 54, 61, 64-66, 71, 72, 74, 76, 78, 81, 88, 92, 93, 98. Indeed, Plaintiffs do not even bother to square their generalized allegations with the few pages of the Complaint that are actually specific to Janus—for instance, Janus's earliest alleged contract in Afghanistan began in 2008, *id.* ¶ 178(a), so Janus cannot be said to have made protection payments since "at least 2006," *id.* ¶ 6.  The Complaint's generalized assertions of misconduct are thus plainly inadequate to state a claim.  *See, e.g.*, *Toumazou*, 71 F. Supp. 3d at 21; *Embree v. Wyndham Worldwide Corporation*, 779 Fed. App'x. 658, 661 (11th Cir. 2019) (affirming dismissal of "shotgun pleading" complaint that "pervasively lumped separate companies together in a conclusory fashion, treated separate companies as a single entity without explanation, and

failed to differentiate the allegations against each defendant so that each could identify its allegedly improper conduct").[7]

### B.    Plaintiffs Offer Only the Barest of Conclusory Allegations Regarding Four of the Five Janus Contracts Listed in the Complaint

Turning to the mere five pages of the 274-page complaint that actually concern Janus, Plaintiffs fail to plausibly allege facts showing that Janus "paid protection money to the Taliban in connection with several contracts in Afghanistan from at least 2008 until 2012." Compl. ¶ 177. Plaintiffs allege five contracts pursuant to which Janus provided services to various government agencies, including the United States Army and State Department, but do not even *attempt* to plead facts to support their claims that Janus made protection money payments to the Taliban with respect to four of the five contracts. *See* Background, *supra*, at 4.[8] Because the Complaint is completely devoid of any non-conclusory allegations regarding the nature of any alleged Taliban payments made in connection with these contracts, Plaintiffs' claims regarding those contracts must be dismissed. *See Ridley v. VMT Long Term Care Mgmt., Inc.*, 68 F. Supp. 3d 88, 91 (D.D.C. 2014) (granting motion to dismiss where "the complaint asserts nothing more than a 'mere possibility of misconduct'" (quoting *Iqbal*, 556 U.S. at 679)); *United States ex. rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 515 (E.D. Pa. 2010) (dismissing as inadequately pleaded certain claims to the extent they were based on "seventeen contracts listed as an exhibit to the [complaint]" that contained no specific allegations); *see also RSM Prod. Corp. v.*

---

[7] *See also, e.g.*, *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (allegations about "the defendants" deficient where realities of time and place "make plain that all of the defendants could not have participated in every act complained of").

[8] Specifically, the four contracts are the Task Force Duke Contract, the USAESCH Mine Clearance Contract, the Kabul Embassy Contract, and the UAE Kandahar Contract. Compl. ¶ 178.

*Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1052 (D.C. Cir. 2012)

("[U]nsupported conclusory allegations are 'not entitled to be assumed true' . . . ." (quoting *Iqbal*,

556 U.S. at 681)).

At most, Plaintiffs claim that, because Janus employees responsible for guarding an

Army training center in the town of Adraskan purportedly paid three local Taliban-affiliated

individuals to staff guards at the training center (which allegations, as discussed at Part I.C *infra*,

are not plausible either), therefore *other* Janus employees working on *other* contracts at *other*

locations in Afghanistan must have engaged in improper dealings as well.  Such speculative

reasoning cannot withstand a motion to dismiss.  *See Doe v. Von Eschenbach*, No. CIV.A.06

2131 RMC, 2007 WL 1848013, at *2 (D.D.C. June 27, 2007) (rejecting speculative "it has

happened before, therefore it might happen here" reasoning (quoting *Doe v. Beaumont Indep.*

*Sch. Dist.*, 172 F.R.D. 215, 215 (E.D. Tex. 1997))); *Miller v. Holzmann*, No. 95-cv-1231 (RCL),

2007 WL 778568, at *6 (D.D.C. Mar. 6, 2007) (finding plaintiff's "guilt by association"

allegations inadequate to establish the court's personal jurisdiction); *Thomas*, 708 F. Supp. 2d at

515 (rejecting argument that because defendant "misrepresented discounts with respect to the

four contracts [plaintiff] does specify, it must have made similar misrepresentations" as to other

contracts, as "simply a baseless assumption unsupported by factual allegations").[9]

---

[9] *See also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402-03 (3d Cir. 2015) (disapproving of "unabashed propensity reasoning—the fallacy that 'if it happened there, it could have happened here'"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting plaintiffs' allegations that "if it happened there, it could have happened here"); *E.E.O.C. v. Outback Steak House of Fla., Inc.*, 520 F. Supp. 2d 1250, 1264 (D. Colo. 2007) (holding that EEOC investigation of defendant business in one region did not support claims of nationwide misconduct).

### C.    Plaintiffs Do Not Plausibly Allege that Janus Knowingly Made Payments to the Taliban in Connection with the Adraskan Contract

Plaintiffs' allegations regarding the Adraskan Contract—the sole contract as to which Plaintiffs offer *any* specific allegations relating to Janus—also fail, because the Complaint fails to plausibly allege any payments by Janus to the Taliban, let alone knowing payments.  And absent knowing payments to the Taliban, all of Plaintiffs' claims against Janus must be dismissed.  *See* 18 U.S.C. §§ 2339A, 2339B, 2339C, 2333(d) (requiring knowing support or assistance to terrorists); 50 U.S.C. § 1705(a) (requiring willful sanctions violation).[10]

Plaintiffs allege that Janus made payments to three purportedly Taliban-affiliated individuals: "General Wahab," Haji Dawoud, and Mirza Khan.  None of those allegations pass muster.  *First*, with respect to Wahab, Plaintiffs offer the conclusory assertion that he "answered directly to the leader of a local Taliban chapter."  Compl. ¶ 182.  That allegation is not only unsupported but contradicted by the Senate Report Plaintiffs cite—which is the only source that Plaintiffs rely on for their allegations against Janus.  According to the Senate Report, the alleged "local Taliban chapter" is nothing of the sort, and instead is an organization that "operat[ed] in and around Herat implementing Ismail's [Khan] personal agenda."  Senate Report at 41.  The Senate Report states that Wahab was Ismail Khan's "aide de camp" and "informal 'number two man.'"  *Id.* at 40.  Nowhere in the Senate Report is Ismail Khan referred to as a member of the

---

[10] 50 U.S.C. § 1705(a) prohibits "willfully commit[ing], willfully attempt[ing] to commit, or willfully conspir[ing] to commit, or aid[ing] or abet[ting] in the commission of," a violation of regulations issued pursuant to the International Emergency Economic Powers Act ("IEEPA").  50 U.S.C. §§ 1705(a), (c).  Such regulations prohibit U.S. persons from (1) "transfer[ing], pa[ying], export[ing], withdraw[ing] or otherwise deal[ing] in" property if that property belongs to a specially designated global terrorist ("SDGT"), 31 C.F.R. § 594.201; and (2) "engag[ing] in any transaction or dealing in property of . . . [SDGTs]," 31 C.F.R. § 594.204.  Because Plaintiffs do not plausibly allege that Janus knowingly paid the Taliban, Plaintiffs *a fortiori* fail to meet 50 U.S.C. § 1705(a)'s higher willfulness standard.  *See Bryan v. United States*, 524 U.S. 184, 191 (1998) (holding a "'willful' act is one undertaken with a 'bad purpose'").

Taliban.  And for good reason—Khan was a Cabinet member in the *U.S.-backed Afghan government of Hamid Karzai*,[11] and fought *against* the Taliban after the group rose to power following the Soviet Union's withdrawal.[12]  The Court need not countenance Plaintiffs' conclusory allegations that Wahab was Taliban given that they are flatly contradicted by both the only document Plaintiffs cite for support, as well as basic information about the Afghan government of which the Court may take judicial notice.  *See Kaempe*, 367 F.3d at 963.  And not having plausibly alleged that Wahab was Taliban, Plaintiffs *a fortiori* have failed to plead that Janus *knew* Wahab was Taliban.  *Siegel v. HSBC N. Amer. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) (dismissing ATA claims where plaintiffs did not plausibly allege that a terrorist group received alleged funds or that defendant "knew or intended" that terrorists would receive the funds).

Plaintiffs' allegations regarding Haji Dawoud fare no better.  As an initial matter, Plaintiffs' only alleged support for their statement that Dawoud was affiliated with the Taliban are two intelligence reports that Janus is not alleged to have even had access to, let alone to have reviewed, but that are rather alleged merely to have contained the "type of" information that Plaintiffs speculate would have been available to Janus.  Compl. ¶ 186.  In any event, both reports

---

[11] *See, e.g.*, USAID Press Release (Mishkin Decl., Ex. B) (describing Khan as the Acting Minister of Energy and Water during a June 2010 ceremony where the U.S. government, with the U.S. Ambassador in attendance, handed control of a power plant to the Ministry); U.N. Press Release (Mishkin Decl., Ex. D) (noting that, "[i]n an effort to calm [local unrest], President Karzai had dispatched a delegation headed by Ismail Khan, former Governor of Herat and current Minister of Energy, Water and Power, to mediate"); *see also* Mishkin Decl., Exs. C-E.

[12] *See* Congressional Testimony (Mishkin Decl., Ex. F) at 9 ("Let me cite a few of the latest indicators of erosion in Taliban authority and effectiveness, all occurring during the past several months. In March, Ismail Khan, the anti-Taliban former governor of Herat, escaped with two senior aides from a Kandahar prison where he had been held since 1997."); Diplomatic Cables (discussing conflict between Khan and Taliban) (Mishkin Decl., Exs. G-H).

were issued *five months after* Janus allegedly relied on Dawoud to recruit guards for its January

2018 Adraskan Contract.  *See* Senate Report at 46-47.  The Complaint thus fails to allege any facts

plausibly showing that Janus *knew* that Dawoud was Taliban at the time it recruited individuals for

the Adraskan Contract.  *See Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 98-99 (D.D.C. 2017)

("*Owens I*") (dismissing ATA claims where plaintiffs did not plausibly allege that defendants

knew they were supporting a terrorist organization), *aff'd*, 897 F.3d 266 (D.C. Cir. 2018);

*Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 89 (E.D.N.Y. 2019) (dismissing ATA

claims where plaintiffs had not plausibly alleged that defendants knew their funds were intended to

"finance or facilitate" terrorist activities).

Moreover, Plaintiffs fail to allege any factual support for their conclusory assertion that

Janus ever *paid* Dawoud.  The Senate Report—which is again the only source Plaintiffs cite for

support—tellingly says no such thing.  The Senate Report merely notes interactions between Janus

and Dawoud concerning staffing for the Adraskan Contract given his status as the "elder" of a

nearby village—interactions that were known to U.S. Army personnel on the ground and that the

U.S. Army at times itself engaged in as well.  *See* Senate Report at 46.  The Senate Report nowhere

mentions any payments.  *Id.*  It is a huge and unsupported leap from the allegation of perfectly

legal conversations with the nearby village elder to the claim that illegal protection payments to

the Taliban must have been made.  *See Kowal v. MCI Communications Corp.*, 16 F. 3d 1271,

1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by plaintiffs if such

inferences are unsupported by the facts set out in the complaint.").[13]

---

[13] It is *a fortiori* the case that Plaintiffs have not plausibly alleged *material* payments to
the Taliban, as is required to state a violation of 18 U.S.C. §§ 2339A-C, or *substantial* assistance,
as is required to state a violation of 18 U.S.C. § 2333(d)(2).

Finally, the allegations regarding Mirza Khan are plainly insufficient.  Plaintiffs do not even allege that Khan *was* a member of the Taliban (or al-Qaeda or the Haqqani Network), let alone that Janus *knew* that he was.  *See id.* ¶ 187.  That alone should end the matter as to Khan. Because Plaintiffs allege only to have been injured in attacks by those groups, which Plaintiffs do not allege Mirza Khan to have been a part of, Plaintiffs cannot sustain a claim against Janus based on its alleged interactions with Khan.

Because Plaintiffs have failed to allege that Janus made payments to the Taliban, let alone that it knowingly did so, all claims against Janus should be dismissed.

## II.    PLAINTIFFS' DIRECT LIABILITY CLAIMS FAIL FOR SEVERAL ADDITIONAL REASONS

Plaintiffs' direct liability claims independently fail with respect to Janus because several other threshold requirements for those claims have not been satisfied.

Counts 1 through 4 of the Complaint allege that Defendants are subject to primary liability under the ATA, 18 U.S.C. § 2333(a), on the theory that Defendants' *own* conduct constituted "acts of international terrorism" that injured Plaintiffs.  *See* Compl. ¶¶ 1262-88.  To establish that Defendants committed an "act of international terrorism," Plaintiffs must show (among other things) that Defendants' *own* conduct: (1) was violent or dangerous to human life; (2) appears to have been intended to achieve certain terroristic objectives, such as intimidating or coercing a civilian population or influencing government policy by intimidation or coercion; and (3) violated a federal or state criminal law.  18 U.S.C. § 2331(1)(A), (B).  Moreover, because the ATA creates a civil cause of action only for U.S. nationals "injured . . . *by reason of* an act of international terrorism," 18 U.S.C. § 2333(a) (emphasis added), Plaintiffs must establish that Defendants proximately caused their injuries.  *Owens II*, 897 F.3d at 273.

Plaintiffs' allegations fail to satisfy any of these requirements, much less all of them. *First*, Janus's alleged actions plainly were not intended to achieve terroristic ends and were also neither violent nor dangerous to human life. *Second*, Plaintiffs fail to plead that Janus's interactions with three subcontractors in connection with the Adraskan Contract were the proximate (i.e., direct and substantial) cause of their injuries given the time elapsed and geographic distance between the limited alleged transactions and subsequent harm Plaintiffs suffered. *Third*, Plaintiffs fail to adequately plead a predicate criminal violation of U.S. law.

**A.    The Complaint Fails to Plead that Janus Committed Acts of International Terrorism Under the ATA**

**1.    The Complaint Fails to Plead that Janus Acted with Objective Terrorist Intent**

In order to adequately plead a claim for direct ATA liability, Plaintiffs must plead facts sufficient to establish that each Defendant *itself* committed an "act of international terrorism." Under the ATA, a defendant cannot have committed "an act of international terrorism" unless that defendant's own actions objectively appear to have been intended to (i) "intimidate or coerce a civilian population," (ii) "influence the policy of a government by intimidation or coercion," or (iii) "affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B); *see Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (Section 2331(1)(B) creates "an objective standard to recognize the apparent intentions of actions."). To suggest that Janus's actions in the course of fulfilling its obligations under contracts with, for example, the U.S. Army, evince an objective terrorist intent is, quite simply, absurd.

Plaintiffs' theory is that Janus relied on individuals allegedly connected to the Taliban to assist in staffing its contracts in Afghanistan to ensure that the Taliban did not attack Janus

personnel or the government personnel that Janus was seeking to protect.  Even accepting

Plaintiffs' flawed theory as true, an objective observer would recognize the intent of Janus's

alleged conduct to be to keep its own and its clients' employees *safe from Taliban attack*, not to

"intimidate or coerce a civilian population," "influence the policy of a government by

intimidation or coercion," or "affect the conduct of a government by mass destruction,

assassination, or kidnapping."  18 U.S.C. § 2331(1)(B).  Indeed, the Complaint itself ascribes an

intent to Janus that has nothing to do with wanting to harm civilians or governments (and, if

anything, implies the opposite).  *See, e.g.*, Compl. ¶¶ 47 (describing Defendants' motives as

being "[t]o increase their profit margins and redirect attacks away from their business interests");

¶¶ 177, 179-81 (stating that the money Janus allegedly paid "to the Taliban" was for "*protection*,"

and in order "to be safe"); ¶ 183 ("EODT's rationale for using General Wahab reflected the

classic motivation for paying protection money.").

 Plaintiffs attempt to characterize the particular methods of effectuating Janus's alleged

safety and profit motives as ill-advised or corrupt.  But regardless of the manner in which Janus

allegedly pursued its goals of protecting its employees and its business, it is highly implausible to

ascribe to Janus any intent to intimidate civilians or coerce governments through acts of

terrorism.  Indeed, similarly strained theories have been consistently rejected by the courts to

have considered them.  *See, e.g.*, *Mastafa v. Chevron Corp.*, 770 F.3d 170, 194 (2d Cir. 2014)

(holding that it was implausible to conclude that corrupt oil-for-food dealings with Saddam

Hussein's regime in Iraq were "intending—and taking deliberate steps with the purpose of

assisting—the Saddam Hussein regime's torture and abuse of Iraqi persons"); *Zapata v. HSBC

Holdings PLC*, 414 F. Supp. 3d 342, 359 (E.D.N.Y. 2019) (granting motion to dismiss on the

basis, among others, that HSBC's alleged laundering of funds for drug cartels objectively

"appeared to be motivated by economics, not by a desire to 'intimidate or coerce'" (internal
quotation marks omitted)); *Brill v. Chevron Corp.*, 2017 WL 76894, at *1, *4 (N.D. Cal. Jan. 9,
2017) (dismissing ATA claims because allegedly corrupt oil-for-food transactions, which
allegedly helped Saddam Hussein finance terrorism, did not appear to be intended to intimidate
or coerce); *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011) (dismissing
complaint that "failed to adequately plead" that the complaint's allegations would "lead an
objective observer to conclude Defendants intended to achieve any one of the results in
§ 2331(1)(B)"); *Stutts v. De Dietrich Grp.*, 2006 WL 1867060, at *1-2 (E.D.N.Y. June 30, 2006)
("[E]ngaging in commercial banking activity" with suppliers of chemicals to Saddam Hussein's
regime in Iraq did not appear to be "designed to coerce civilians or government entities as
required under § 2331.").

The Seventh Circuit's recent decision in *Kemper v. Deutsche Bank AG* underscores this
conclusion. *See* 911 F.3d 383 (7th Cir. 2018). There, the plaintiff sued Deutsche Bank under the
ATA for allegedly helping Iranian state-owned banks "evade" U.S. sanctions to fund militias in
Iraq. *Id.* at 386-88. The Seventh Circuit held, however, that "[t]o the objective observer, [the
bank's] interactions with Iranian entities were motivated by economics, not by a desire to
'intimidate or coerce.'" *Id.* at 390; *see also id.* at 394 (noting that the only plausible "implication"
from plaintiff's allegations is that "Deutsche Bank's sanctions-avoiding actions, while wrongful,
were designed to increase its profits," not to fund terrorism). Similarly here, the Complaint
alleges that Janus's conduct was motivated by economics and/or a desire to keep its employees
and clients *safe*, "not by a desire to 'intimidate or coerce'" civilians or governments. *Id.* at 390.

### 2. The Complaint Fails to Plead that Janus's Alleged Actions Were Violent or Dangerous to Human Life

Plaintiffs also fail to plausibly allege that Janus's actions were "violent" or "dangerous to human life," as is required for direct liability under the ATA.   As discussed above, Plaintiffs' theory is that Janus hired and paid individuals with ties to the Taliban for "*protection*" and in order "to be safe."  Compl. ¶¶ 177, 179-81 (emphasis added).  The most sensible characterization of these actions is that they were intended to *avoid* violence and danger to human life, not to *cause* it.

Moreover, the individuals whom Janus allegedly paid were either not connected to the Taliban at all or at best "would play both sides"; Plaintiffs allege no direct payments from Janus to the Taliban itself.  *See* Senate Report at 46; Background, *supra*, at 3-7.  Thus, Plaintiffs do not allege that Janus *itself* engaged in "acts dangerous to human life," but at best only that the persons with which Janus interacted may have.  *See Freeman* 413 F. Supp. 3d at 91 ("At best, the [Complaint] can be read to allege that Defendants' . . . clients have engaged in acts dangerous to human life").  Without more, "§ 2331(1)(B) cannot be met and the Court cannot plausibly conclude that [Janus's] actions were sufficiently life-endangering to meet the statutory definition of an act of international terrorism."  *Id.*

### B. Plaintiffs' Claims Do Not Satisfy the ATA's Proximate Causation Requirement

Plaintiffs' primary liability claims also fail to satisfy the ATA's "traditionally rigorous proximate cause requirement."  *Shatsky v. PLO*, 2017 WL 2666111, at *7 (D.D.C. June 20, 2017), *vacated on other grounds*, No. 17-7168, 2020 WL 1856490 (D.C. Cir. Apr. 14, 2020).  In essence, Plaintiffs contend that a narrow set of alleged contacts between Janus and three

individuals at Adraskan in 2008 makes Janus responsible for every terrorist attack that occurred in Afghanistan for the next nine years. That cannot be right.

To plead injury "by reason of" a defendant's conduct, 18 U.S.C. § 2333(a), an ATA plaintiff must plausibly allege *both* that the defendant's conduct was a "substantial factor" in causing the plaintiff's injuries *and* that those injuries were "reasonably foreseeable." *Owens II*, 897 F.3d at 273; *see also Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) ("[F]oreseeability alone is not sufficient to establish proximate cause . . . ."). To meet the substantial-factor requirement, the plaintiff "must" establish "some direct relation between the injury asserted and the injurious conduct alleged." *Owens II*, 897 F.3d at 273 n.8 (quoting *Fields v. Twitter, Inc.*, 881 F.3d 739, 745 (9th Cir. 2018)). Whether there is a direct relationship between the plaintiff's injury and the defendant's allegedly wrongful conduct is the "central question" in proximate causation. *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

In order to satisfy proximate causation under the ATA, the D.C. Circuit has held that a complaint must "adequately plead facts alleging that [a defendant] *substantially* contributed to Plaintiffs' injuries because the funds . . . actually were transferred to [terrorists] and aided in [a particular terrorist attack]." *Id.* at 276 (internal quotation marks omitted). Plaintiffs here have failed to allege that Janus substantially contributed to Plaintiffs' injuries because the attacks at issue were all both temporally and geographically far removed from Janus's alleged conduct.[14]

---

[14] Ten plaintiffs are alleged to have been killed or injured in attacks committed by the Kabul Attack Network. Compl. ¶¶ 311, 344, 463, 630, 715, 801, 928, 981, 1096, 1155, 1181. *See infra* Section III.B.1. Those Plaintiffs separately fail to allege proximate causation, as they cannot claim that payments to the Taliban caused injuries inflicted by the Kabul Attack Network, which is a separate organization. *See infra* Section III.B.1.

The Complaint contains generalized and conclusory allegations that "Defendants' protection payments supplied the Taliban with an important stream of revenue."  Compl. ¶ 85. But as to Janus, Plaintiffs' only specific allegations relate to recruiting for the small, $7 million Adraskan Contract with the U.S. Army in January 2008 through three third-party local subcontractors.  *See* Background, *supra*, at 4-7.  Plaintiffs offer no factual allegations whatsoever regarding the timing of any purported payments to the Taliban in connection with the Adraskan Contract, other than that Janus sought General Wahab's assistance in staffing the Adraskan Contract in "early 2008," when Adraskan recruited employees to fulfill its newly acquired contract.  Compl. ¶ 182.[15]  The first attack that injured Plaintiffs occurred on December 30, 2009, nearly two years later.  *Id*. ¶¶ 306, 338, 472, 1011, 1239.[16]  And the majority of Plaintiffs' alleged injuries did not occur until 2011 or later—three years after Janus executed the Adraskan Contract—with some attacks not occurring until five, six, seven, and even eleven years later. *See* Appendix 1 (showing location and timing of attacks).

Under the ATA, "a defendant's liability cannot . . . go forward to eternity."  *Crosby v. Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019); *see also In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010) ("Where . . . there is a *remoteness in time*, there

---

[15] The Complaint also contains a conclusory allegation that "EODT paid protection money to the Taliban in connection with several contracts in Afghanistan from at least 2008 until 2012," citing to five disparate contracts Janus entered into with various government agencies between January 2008 and December 2011.  Compl. ¶¶ 177-78.  But as discussed at Part I.C *supra*, the only specific allegations in the Complaint relate to the January 2008 Adraskan Contract.

[16] The statute of limitations on Plaintiffs' claims under the ATA is ten years.  *See* 18 U.S.C. § 2335(a) ("[A] suit for recovery of damages under section 2333 this title shall not be maintained unless commenced within 10 years . . . .").  For this reason, Plaintiffs allege only injuries arising from attacks that occurred after December 27, 2009 (ten years before the filing of the Complaint).  However, Janus's alleged conduct occurred in "early 2008," long before the statute of limitations expired.  Compl. ¶ 182.

must be sufficient factual allegations of a connection between the material support provided and the acts of terrorism that caused plaintiffs' injuries, such that a reasonable trier of fact could conclude that it was more likely than not that the support provided by the defendant assisted the terrorists in the commission of the terrorist act." (emphasis added)). Indeed, courts have held that a months-long gap between alleged assistance and subsequent terrorist attacks renders resultant ATA claims implausible. *See Siegel v. HSBC N. Am. Holdings*, 933 F.3d 217, 224 (2d Cir. 2019) ("HSBC's decision not to provide banking services to [an intermediary] for the ten months preceding the [attacks] makes it implausible under the circumstances that HSBC had knowingly assumed a role in the Attacks.").

Here, where the temporal gap between the alleged conduct and the attacks in question is at least approximately *two years* and in many cases far more, Plaintiffs have not plausibly alleged that Janus's recruiting of guards in connection with its Adraskan Contract was a "substantial factor" in any of the attacks at issue, let alone the more than 125 attacks on Americans across Afghanistan over an approximately ten-year time frame alleged in the Complaint. *Owens II*, 897 F.3d at 273.

Plaintiffs similarly fail to explain how Janus's limited alleged interactions with three individuals in Adraskan, located near Afghanistan's western border in the Herat Province, render Janus responsible for any attacks that occurred throughout the entire country. "[T]his is precisely the kind of unlimited, sprawling, and speculative liability" forbidden under the ATA. *Zapata*, 414 F. Supp. 3d at 357. The first attack that injured Plaintiffs in this case occurred in Khost Province on the eastern border of Afghanistan, adjacent to Pakistan—i.e., at the other end

of Afghanistan from Adraskan, over 1,000 kilometers away.  Compl. ¶¶ 472, 1011, 1239.[17]

Indeed, the Complaint alleges that the *Pakistani* Taliban was involved in that attack.  *Id*. ¶¶ 187,

473.  In the same vein, most of the attacks that injured Plaintiffs occurred in traditional Taliban

strongholds in Helmand and Kandahar provinces in southern Afghanistan, approximately 500

kilometers from Adraskan.  *Id.* ¶¶ 39, 41.  Between 2010 and 2019, 45 attacks took place in

Helmand, and 28 took place in Kandahar between just 2010 and 2013.  *See* Appendix 1.  Many

of the other attacks that injured Plaintiffs took place in the provinces around the capital of Kabul

and on the eastern border with Pakistan (44 attacks between 2010 and 2017).  Notably, there

were *no attacks* in Herat Province—where the Adraskan National Training Center is located—

that injured Plaintiffs.  This lack of geographic proximity between Janus's actions and Plaintiffs'

alleged injuries further sinks Plaintiffs' claims.  *See Shatsky*, 2017 WL 2666111, at *9 (attacks

several dozen kilometers from where payments occurred did not support a finding of proximate

causation).

### C.    Plaintiffs Do Not Adequately Plead a Predicate Crime to Support Direct ATA Liability

An act constitutes "international terrorism" under the ATA only if the defendant's

conduct also violated a federal or state criminal law. 18 U.S.C. § 2331(1)(A).  Plaintiffs attempt

to plead the violation of four criminal provisions—18 U.S.C. §§ 2339A (Count One), 2339B

(Count Two), and 2339C (Count Three), and 50 U.S.C. § 1705(a) (Count Four)—which

respectively prohibit providing material support to terrorists, providing material support to a

designated FTO, the financing of terrorism, and sanctions violations.  As discussed in Part I.C

---

[17] Afghanistan is approximately the size of Texas.  Central Intelligence Agency, The World Factbook, *Afghanistan*, https://www.cia.gov/library/publications/the-world-factbook/geos/af.html (Afghanistan is "almost six times the size of Virginia; slightly smaller than Texas").

*supra*, Plaintiffs have not plausibly alleged that Janus provided material support to any terrorist act, let alone that Janus did so knowingly or intentionally, and accordingly Plaintiffs' claims that Janus violated Sections 2339A-C and 50 U.S.C. § 1705(a) fail.  Plaintiffs' claims under Section 2339B and Section 2339C also fail for the additional reasons below.

## 1.   Plaintiffs Do Not Allege that Janus Knowingly Paid an FTO (Count Two, 18 U.S.C. § 2339B)

To base a claim for primary liability on a violation of 18 U.S.C. § 2339B, a plaintiff must show that the defendant "knowingly provide[d] material support or resources to a foreign terrorist organization."  Thus, under Section 2339B, Plaintiffs must show that the defendant knew it was supporting a *designated FTO* (which the Taliban is not and never has been). Plaintiffs fail to plead such facts as to Janus.

The Complaint's allegations specific to Janus are entirely devoid of any reference to any FTO.  The Complaint contains no allegations that Janus even interacted with, let alone knowingly made payments to, any member of the Haqqani Network or al-Qaeda, the only two FTOs alleged to have been involved in attacks on any Plaintiffs.[18]  Because Plaintiffs have not alleged any facts to suggest that Janus knowingly paid a designated FTO, Count Two should be dismissed.

## 2.   Plaintiffs' ATA Claim Predicated on Financing Terrorism Should Be Dismissed (Count Three, 18 U.S.C. § 2339C)

Section 2339C criminalizes the provision or collection of funds with the intent or knowledge that they will be used to commit an offense either (1) within the scope of certain

---

[18] Moreover, the Haqqani Network was not designated as an FTO until September 19, 2012.  *See* U.S. Dep't of State, *Foreign Terrorist Organizations*, https://www.state.gov/foreign-terrorist-organizations/ (last visited April 6, 2020).  The Adraskan Contract was executed in January 2008, *almost five years* before the Haqqani Network was designated as an FTO.

terrorism-related treaties, 18 U.S.C. § 2339C(a)(1)(A), or (2) to attack civilians, *id.* § 2339C(a)(1)(B). Plaintiffs' efforts to invoke these provisions fail.

With respect to § 2339C(a)(1)(A), Plaintiffs allege that Defendants' conduct violated the International Convention for the Suppression of Terrorist Bombings, as implemented by 18 U.S.C. § 2332f.  Compl. ¶ 1277.  However, only a subset of the attacks are potentially within the scope of that Convention.[19]  And all of the attacks within that remaining subset fall within an express statutory exclusion providing that § 2332f does not apply to "the activities of armed forces during an armed conflict."  18 U.S.C. § 2332f(d)(1).  All of the attacks for which Plaintiffs seek to recover under § 2339C(a)(1)(A) took place during the armed conflict in Afghanistan,[20] and the Complaint alleges nothing to suggest that any of the attacks did not involve "the activities of armed forces."  Indeed, of the 143 victims named in the complaint, 132 were members of the armed forces, and the other 11 consisted of government contractors supporting U.S. forces in Afghanistan and a CIA employee.

Plaintiffs fare no better in trying to use § 2339C(a)(1)(B) as a predicate for ATA liability. That section expressly applies only to acts "intended to cause death or serious bodily injury *to a civilian*, or to any other person *not taking an active part* in the hostilities in a situation of armed conflict."  18 U.S.C. § 2339C(a)(1)(B) (emphases added).  As noted, 132 of the 143 victims were

---

[19] Section 2332f covers only "bombings" of public and certain other places using "explosive[s]" or similar devices.  18 U.S.C. § 2332f(a)(1).  At least fifteen of the attacks (some injuring more than one victim) are not alleged to have involved explosives.  *See* Compl. ¶¶ 363, 394, 400, 409, 415, 420, 428, 441, 463, 546, 662, 896, 987, 1051, 1089, 1109, 1176, 1255.

[20] As President Trump explained in December 2017, "[t]he United States currently remains in an armed conflict, including in Afghanistan and against the Taliban, and active hostilities remain ongoing." Letter from the President: Six Month Consolidated War Powers Resolution Report (Dec. 11, 2017), https://www.whitehouse.gov/briefings-statements/text-letter-president-speaker-house-representatives-president-pro-tempore-senate-2/.

U.S. service members and were therefore by definition not "civilians."  And all of the remaining

victims were supporting U.S. forces in Afghanistan and therefore "taking an active part" in the

hostilities.  *Id.*[21]  As a result, Plaintiffs have not alleged any facts to plausibly show that § 2339C

applies.

## III.     PLAINTIFFS' AIDING-AND-ABETTING CLAIMS ALSO FAIL FOR SEVERAL ADDITIONAL REASONS

For the reasons discussed in Part I *supra*, Plaintiffs' claims against Janus should be

dismissed for failure to plausibly allege knowing payments to the Taliban.  Plaintiffs' secondary

liability claims against Janus are also defective for multiple additional reasons.

Plaintiffs allege in Counts 5 and 6 that Defendants aided and abetted the persons who

committed the acts of international terrorism that injured Plaintiffs.  *See* 18 U.S.C. § 2333(d)(2);

Compl. ¶¶ 1289-1307.  Such secondary liability under the ATA is confined to instances where (1)

the defendant provided "substantial assistance" to "the person who committed" the "act of

international terrorism"; (2) the act of international terrorism was "committed, planned, or

authorized" by an entity designated by the Secretary of State as an FTO; and (3) the defendant

*knew* both that it was substantially assisting that act and that a designated FTO had the requisite

involvement in that act.  18 U.S.C. § 2333(d)(2).  Plaintiffs fail to plausibly allege any of these

elements as to Janus.

### A.      Plaintiffs Fail to Plead that Janus Substantially Assisted the Taliban in Carrying Out Alleged Acts of International Terrorism

In 2016, Congress amended the ATA to provide for aiding-and-abetting liability when it

passed the Justice Against Sponsors of Terrorism Act ("JASTA").  In doing so, Congress set a

---

[21] *See* Compl. ¶¶ 363, 447, 472, 630, 715, 801, 928, 1011, 1096, 1181, 1239 (allegations relating to government contractor and CIA employee victims).

high bar: "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*. Aiding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Plaintiffs' allegations in this case do not meet these demanding requirements.

In determining whether Janus provided "substantial assistance" to an FTO's attacks under the ATA, 18 U.S.C. § 2333(d)(2), Congress instructed that courts consider the factors set forth in *Halberstam*, 705 F.2d 472, specifically: "(1) the nature of the act encouraged, (2) the amount [and kind] of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 478, 483-84); *see* JASTA § 2(a)(5), 130 Stat. 852. Here, those factors compel dismissal.

The first and second *Halberstam* factors—the nature of the act allegedly encouraged, and the amount and kind of assistance given—"dictate[] what aid might matter, i.e., be substantial." *Halberstam*, 705 F.2d at 484. Janus plainly did not "encourage[]" the Taliban to conduct any attacks and is instead alleged to have only indirectly supported the Taliban by engaging with three subcontractors. Compl. ¶ 182-87. Beyond generally alleging that "[v]ast sums of money disappeared into this web of corrupt contractors and subcontractors," *id*. ¶ 53, the Complaint fails to make any specific connection between any given purported payment and a subsequent attack. This is a critical defect because assisting a "foreign terrorist organization generally or such an organization's general course of conduct" does not amount to "substantial assistance" to a particular terrorist act. *Taamneh v. Twitter*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018); *accord*

*Linde*, 882 F.3d at 329 ("[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.").

The third and fourth *Halberstam* factors—whether the defendant was present at the time of the principal violation, and the defendant's relationship to the principal wrongdoer, 705 F.2d at 478, 484—further support the conclusion that Plaintiffs have not pleaded "substantial assistance" as to Janus.  Plaintiffs do not (and cannot) allege that Janus "was present" to support any Taliban act of terrorism.  *Id.*[22]  Similarly, Plaintiffs have not plausibly alleged that Janus had any special relationship with the Taliban.  The *Halberstam* court indicated that a close relationship or a relationship where the defendant had a position of authority could weigh in favor of substantial assistance.  *See Halberstam*, 705 F.2d at 484.  There, the defendant lived with the principal wrongdoer and actively assisted in laundering proceeds from burglaries over time.  *Id.*  Here, Plaintiffs do not and plainly cannot allege that Janus had a close relationship with the Taliban, let alone was in a position of authority with respect to it.  The only "relationships" Plaintiffs describe are Janus's limited, arms-length interactions with the three individuals associated with the Adraskan Contract, which Plaintiffs claim were in the nature of extortionary demands for payments to avoid being attacked.  That is worlds away from the defendant seeking to help her live-in criminal boyfriend's illicit activities, as in *Halberstam*.

The fifth *Halberstam* factor, state of mind, requires a showing that the defendant "was one in spirit with the [principal wrongdoer]."  705 F.2d at 484.  This requirement is different from the general scienter element of aiding-and-abetting, which arises from § 2333(d)(2)'s use of

---

[22] To the extent Janus employees or contractors may have been present at Taliban attacks, it was as *victims*.  *See* Senate Report at 44-45 (noting three local guards at Adraskan National Training Center allegedly sponsored by General Wahab were killed or injured when their vehicle was struck by an IED).

the word "knowingly."  S*ee infra* Section III.C.  Instead, this state of mind requirement turns on

whether the defendant shared the principal wrongdoer's objective and intended to assist the

principal in committing a tort.  *See Linde*, 882 F.3d at 329 n.10.  Courts have emphasized that

this factor requires not merely that the alleged aider-and-abettor knew of the principal

wrongdoer's illegal activities, but also that he *desired* to help those activities succeed.[23]  It would

be preposterous to contend that Janus was "one in spirit" with the Taliban in their efforts to kill

American soldiers in Afghanistan.  *Halberstam*, 705 F. 2d at 484; *Taamneh*, 343 F. Supp. at 918.

The only motivations ascribed to Defendants are commercial and safety objectives—to protect

their employees, clients, and businesses and "increase their profit margins."  Compl. ¶¶ 3, 47,

179-80, 183.

Finally, the sixth *Halberstam* factor—the duration of the aid provided by the defendants

to the principal violators, 705 F.2d at 484—also supports dismissal.  As discussed in Parts I.B

and I.C *supra*, despite making a conclusory allegation that Janus paid protection money from at

least 2008 to 2012, Plaintiffs' specific allegations relate only to Janus's actions with regard to the

---

[23] *See Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 574-75 (E.D. Mich. 2018) (dismissing aiding and abetting claim where defendants were not "of a mind to see this horrible event take place"); *Taamneh*, 343 F. Supp. 3d at 917-18 (fifth *Halberstam* factor unsatisfied where "there is no allegation that Defendants have any intent to further ISIS's terrorism"); *Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 975-76 (N.D. Cal. 2018) (substantial assistance not adequately pleaded where "there is no evidence that defendants … intended ISIS to carry out the attacks"); *Boim v. Quranic Literacy Inst. & Holy Land Found.*, 291 F.3d 1000, 1023 (7th Cir. 2002) (requiring plaintiffs to "prove that the defendants knew of Hamas' illegal activities, *that they desired to help those activities succeed*, and they engaged in some act of helping the illegal activities") (emphasis added), *overruled on other grounds by Boim*, 549 F.3d 685; *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425 (E.D.N.Y. 2009) ("[S]ubstantial assistance means more than just a little aid, and requires . . . a desire to help that activity succeed . . . .") (internal citations and quotation marks omitted); *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 295 (S.D.N.Y. 2009) (requiring plaintiffs to prove that "defendant not only knew that its funds would be used to sponsor terrorist acts by Hamas and Hezbollah, *but also intended to do so*") (emphasis added), *aff'd*, 708 F.3d 82 (2d Cir. 2013).

Adraskan Contract in January 2008, and the Complaint is completely silent with respect to the duration of Janus's purported Taliban payments.  Particularly given that Plaintiffs seek damages for terrorist acts carried out in Afghanistan between December 2009 and 2019, Compl. ¶ 1, approximately *two to eleven years* after the Adraskan Contract was entered into, this factor, too, supports the conclusion that Plaintiffs have not adequately alleged "substantial assistance."  *See Averbach v. Cairo Amman Bank,* No. 19-CV-0004-GHW-KHP, 2020 WL 486860, at *17 (S.D.N.Y. Jan. 21, 2020) (sixth *Halberstam* factor did not support plaintiff's claim where the fund transfers at issue "took place over a much shorter period of time [than four-year period plaintiffs had asserted] and well before any of the Attacks that injured Plaintiffs or their family members").

### B.    The Complaint Does Not Satisfy § 2333(d)'s Requirement that an FTO "Committed, Planned, or Authorized" the Attacks that Janus Allegedly Aided

#### 1.    The Complaint Does Not Adequately Plead that an FTO Committed, Planned, or Authorized the Vast Majority of Attacks at Issue

A defendant may not be held secondarily liable under the ATA unless the attacks that the defendant allegedly aided were "committed, planned, or authorized" by a designated foreign terrorist organization.  18 U.S.C. § 2333(d).  Count 5 of the Complaint, Plaintiffs' primary claim for aiding-and-abetting liability, is expressly confined to "acts of international terrorism committed by the Taliban."  Compl. ¶¶ 1289-97.  The Taliban, however, has *never* been designated as an FTO.

Moreover, the Complaint's allegations as to the *vast* majority of the attacks, involving 98 of the 143 attack victims, do not make *any* reference to organizations other than the Taliban

being involved in any way, whether in the planning or execution of the attack.[24]  And ten other

plaintiffs are alleged to have been injured or killed in attacks committed by the "Kabul Attack

Network."  Compl. ¶¶ 311, 344 (Cabrera), 463 (Brodeur), 630 (Dodge), 715 (Goins), 801

(Hughes), 928 (McEvoy), 981 (Newman), 1096 (Roldan), 1155 (Sparks), 1181 (Sutton).  To the

extent the Kabul Attack Network is a recognizable organization or entity of any sort, it too has

never been designated as an FTO, nor are these attacks allegedly linked to any other entity that is

an FTO.  Accordingly, 108 of the 143 Plaintiff groups' secondary liability claims fail for this

reason alone.

Plaintiffs attempt to gloss over these defects by alleging that, at a high level, there are

substantial connections between the Taliban and/or the Kabul Attack Network, on the one hand,

and al-Qaeda and/or the Haqqani Network, on the other.  In doing so, Plaintiffs attempt to

conflate the different entities and treat attacks by one as if they were attacks by the others.  This

amounts to little more than second-guessing of the State Department's reasoned and informed

designations of FTOs—and its decision *not* to designate the Taliban as an FTO—and an attempt

---

[24] *See* Compl. ¶¶ 363 (Allen), 370 (Billy G. Anderson), 381 (Brian M. Anderson), 386 (Aragon), 394 (Atwell), 400 (Baldridge), 409 (Balduf), 415 (Barrett), 420 (Bays), 433 (Bell), 447 (Benton), 452 (Boucher), 458 (Briseño-Alvarez), 481 (Brunkhorst), 494 (Campbell), 499 (Cardoza), 506 (Caron), 513 (Carroll), 518 (Centanni), 523 (Chisholm), 529 (Christian), 536 (Clark), 546 (Conrad), 552 (Cottle), 557 (Cox), 570 (Culbreth), 576 (Cullins), 584 (Dandrea), 597 (Daniels), 604 (Davis), 610 (Day), 616 (DeYoung), 621 (Dion), 637 (Donahue), 645 (Dunning), 652 (Ellis), 654 (Elwell), 662 (Essex), 672 (Fant), 677 (Fingar), 686 (Michael L. Freeman), 691 (Ronald D. Freeman), 698 (Garrison), 710 (Gilbert), 724 (Goldsmith), 737 (Green), 744 (Hanson), 751 (Harper), 769 (Harton), 774 (Hernandez), 780 (Hidalgo), 786 (Holley), 791 (Honaker), 793 (Howard), 806 (Hunter), 812 (Infante), 819 (Ingram), 830 (Johnson), 841 (Klein), 845 (Landrum), 854 (Leicht), 865 (Lemon), 874 (Looney), 880 (Madden), 885 (Malin), 902 (Wyatt J. Martin), 941 (Means), 946 (Mendes), 948 (Miller), 953 (Mittler), 958 (Morgado), 964 (Morrison), 969 (Mullins), 976 (Murach), 993 (Nicol), 1006 (Ott), 1021 (Peters), 1029 (Plunk), 1037 (Prescott), 1044 (Pyeatt), 1084 (Rogers), 1089 (Roland), 1104 (Rozanski), 1119 (Shanfield), 1126 (Sinkler), 1143 (Snow), 1150 (Solesbee), 1164 (Springmann), 1169 (Stout), 1191 (Thomas), 1197 (Tilton), 1202 (Timoney), 1207 (Torian), 1216 (Trimble), 1218 (Verardo), 1226 (West), 1233 (Winters), 1247 (Wright); *see also id.* ¶¶ 285-86.

to thereby subvert the clear requirements of the ATA.[25]  If an attack was committed, planned, or authorized by an FTO, then Plaintiffs are required to allege as much.  Indeed, with respect to certain attacks, Plaintiffs did exactly that, a fact that renders the defective nature of their allegations as to the vast majority of attacks particularly apparent.[26]  The absence of any reference to an FTO with respect to the above-referenced attacks is fatal to Plaintiffs' secondary liability claims as to those attacks.

## 2. The Complaint Cannot Invoke RICO to Evade the Statutory FTO Requirement

Recognizing this critical deficiency, Plaintiffs attempt to advance a novel theory that Plaintiffs were not harmed in individual "act[s] of international terrorism"—i.e., the acts that must be "committed, planned, or authorized" by an FTO—but rather were all purportedly harmed by a *single act* of international terrorism that Plaintiffs refer to as the "Taliban-al-Qaeda Campaign."  *See* Compl. ¶¶ 1298-1307.  According to this theory, the Taliban-al-Qaeda Campaign constituted a "pattern of racketeering activity" that violated RICO.  *Id.* ¶ 1301.  And Plaintiffs claim that this purported RICO violation, unlike the actual attacks in question, was

---

[25] Moreover, this attempted end-run around the Secretary of State's FTO designation is defective as to the Haqqani Network for the additional reason that it was not designated as an FTO until September 19, 2012, well after the majority of the attacks against Plaintiffs occurred.  *See* 18 U.S.C. § 2333(d)(2)  (requiring entity to have "been designated as a foreign terrorist organization . . . as of the date on which such act of international terrorism was committed, planned, or authorized"); U.S. Dep't of State, *Foreign Terrorist Organizations*.

[26] *Compare* Compl. ¶ 363 ("On September 6, 2010, Mr. Allen was injured in an insider attack committed by the Taliban in Kandahar Province, Afghanistan.") *with* Compl. ¶ 473 ("The Camp Chapman Attack was planned and authorized by al-Qaeda, and jointly committed by al-Qaeda, the Pakistani Taliban, and the Haqqani Network, a part of the Taliban. For its part, the Haqqani Network provided substantial assistance to its al-Qaeda and Pakistani Taliban terrorist partners in the Camp Chapman Attack, including the al-Qaeda suicide bomber who triggered the suicide vest. On information and belief, the Haqqani Network provided key support for the Camp Chapman Attack, including but not limited to, intelligence and logistical support. The Taliban has publicly taken responsibility for the attack.").

"committed, planned, and/or authorized by al-Qaeda . . . and by the Haqqani Network."  *Id.*
¶ 1306.  This strained theory fails for three reasons.

First, the plain language of the ATA makes inescapably clear that it is concerned with
"*an act*" of terrorism giving rise to injury, and that it is exactly each such act that must be
"committed, planned, or authorized" by a designated FTO.  18 U.S.C. § 2333(d)(2) (emphasis
added).  However, "a pattern of racketeering activity involving crimes that include murder,
attempted murder, conspiracy to murder, kidnapping, and arson, [and various other crimes],"
Compl. ¶ 1301, is plainly not "*an act*."  Nor would a "Campaign" be considered, in parlance
common or otherwise, "an act."  Plaintiffs may not escape the requirement to plead that a
designated FTO "committed, planned, or authorized" "an act of international terrorism" that
injured them by instead pleading some amorphous "campaign."  *See Taamneh*, 343 F. Supp. 3d
at 916 (emphasizing that use of the singular "act" in § 2333(d)(2) requires a "connect[ion] with a
specific crime," not a terrorist group's "general course of conduct").

Second, Plaintiffs' RICO theory is at odds with clear congressional intent to limit ATA
aiding-and-abetting liability only to those persons who *directly* provide substantial assistance to
an FTO's terrorist act.  *See* 18 U.S.C. § 2333(d)(2) (limiting liability only to those persons who
"aid[] and abet[], by knowingly providing substantial assistance, or who conspire[] with *the
person who committed such an act of international terrorism*") (emphasis added); *see also* 162
Cong. Rec. H5240 (daily ed. Sept. 9, 2016) (statement of Rep. Goodlatte) ("Secondary liability
should only attach to persons who have actual knowledge that they are *directly* providing
substantial assistance to a designated foreign terrorist organization in connection with the
commission of an act of international terrorism.") (emphasis added).  Plaintiffs' RICO theory,
based on a purported affiliation between designated FTOs—al-Qaeda and the Haqqani

Network—and a "Campaign" of criminal activity committed by an entirely different group is inconsistent with this intent of Congress to strictly confine aiding-and-abetting liability.

Third, Plaintiffs' arguments improperly conflate whether al-Qaeda and the Haqqani Network "committed, planned, or authorized" the acts of international terrorism that injured or killed Plaintiffs with whether those entities ever *conspired* with the Taliban in some more general sense.  For example, Plaintiffs allege that, "[f]rom at least 2007 through 2016, terrorists from al-Qaeda *conspired* with Mullah Omar and others to conduct and maintain the Taliban as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Afghanistan."  Compl. ¶ 1299 (emphasis added).  In addition to being conclusory, "[c]onspir[ing] . . . to conduct and maintain the Taliban as a terrorist enterprise"—to the extent a discernible activity at all—is not the same as "commit[ing], plan[ning], or authoriz[ing]" one of the acts of terrorism that injured or killed Plaintiffs.[27]  18 U.S.C. § 2333(d)(2).  Indeed, Plaintiffs' attempts to conflate the Taliban with al-Qaeda and the Haqqani Network for purposes of ATA liability would eviscerate the Executive Branch's considered decision to designate only al-Qaeda and the Haqqani Network, and *not* the Taliban, as an FTO.[28]  If any attack by the Taliban qualifies as an attack "planned, committed, or authorized" by an FTO because the Taliban, al-Qaeda, and the Haqqani Network were all purportedly part of the same "Campaign," the

---

[27] Plaintiffs' other allegations regarding al-Qaeda's or the Haqqani Network's role in the purported "Campaign" are similarly high-level, generalized, and conclusory.  *See, e.g.*, Compl. ¶¶ 1301 ("Mullah Omar and other terrorists employed by or associated with the Taliban and al-Qaeda conducted and participated in the conduct of the Taliban's affairs . . . .  The same terrorists also maintained interests in and control of the Taliban . . . ."); 1306 ("The Taliban-al-Qaeda Campaign was committed, planned, and/or authorized by al-Qaeda . . . and by the Haqqani Network.").

[28] *See* U.S. Dep't of State, *Foreign Terrorist Organizations*.

Executive Branch's careful distinctions between those entities' designations would be rendered meaningless.

### C.   The Complaint Fails to Plead Knowledge of Attacks "Committed, Planned, or Authorized" by an FTO

Plaintiffs' claims of aiding-and-abetting liability also fail because of Plaintiffs' failure to adequately plead that Janus "knowingly" provided substantial assistance to acts of international terrorism committed, planned, or authorized by an FTO.  As an initial matter, Plaintiffs fail to plead that Janus knowingly provided substantial assistance to any attack.  *See* Part III.A *supra.* Moreover, aiding-and-abetting liability under the ATA only extends to persons "who aid[] and abet[], by knowingly providing substantial assistance, . . . *such* an act of international terrorism." 18 U.S.C. § 2333(d)(2) (emphasis added).  "*[S]uch* an act of international terrorism" is an act of international terrorism "committed, planned, or authorized" by "an organization that had been designated as a foreign terrorist organization . . . as of the date on which such act of international terrorism was committed, planned, or authorized."  *Id.* (emphasis added).  Thus, the aiding-and-abetting liability provision requires "knowingly providing substantial assistance" to "an act of international terrorism" "committed, planned, or authorized" by a designated FTO.

This plain reading of the statute is further supported by a well-settled canon of statutory construction that a knowledge requirement applies to *each* element of a claim—including, critically here, "knowing" that a designated FTO served the requisite role in the act of international terrorism.  *See, e.g.*, *Flores-Figueroa v. United States*, 556 U.S. 646, 647, 650-53, 657 (2009) (applying the standard rule that the word "knowingly" applies to each element of the statutory language that follows it in a criminal case); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436-37, 439 (6th Cir. 2016) (explaining, in a civil case, that the "ordinary rules of grammar" support application of that rule).

38

Evidence of congressional intent further supports the plain statutory text.  In enacting aiding-and-abetting liability, then-Chairman of the House Judiciary Committee Bob Goodlatte expressly stated that he understood the bill to limit liability to only the most culpable actors: "Secondary liability should only attach to persons who have actual knowledge that they are directly providing substantial assistance to a designated foreign terrorist organization."  162 Cong. Rec. H5240 (daily ed. Sept. 9, 2016) (statement of Rep. Goodlatte).

Here, Plaintiffs' claims come nowhere close to satisfying this requirement.  In the eleven paragraphs of the complaint devoted to Janus's activities in Afghanistan, not a single reference is made to a single FTO alleged to be responsible for any of the attacks at issue.  *See* Compl. ¶¶ 177-87.  Plaintiffs allege only that Janus had dealings with General Wahab, Haji Dawoud, and Mirza Khan, but neither Plaintiffs nor the Senate Report allege, let alone plausibly, that they were members of the FTOs allegedly involved in the attacks that injured Plaintiffs.  *See id.*  For this reason alone, the Complaint's aiding-and-abetting claims must be dismissed as to Janus for failure to state a claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims against Janus should be dismissed in their entirety with prejudice.

Dated:  April 29, 2020                    Respectfully submitted,

 /s/ Kenneth L. Wainstein
Kenneth L. Wainstein (D.C. Bar No. 451058)
Neil H. MacBride (D.C. Bar No. 439137)
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
Tel: (202) 962-7030; Fax: (202) 962-7118
kenneth.wainstein@davispolk.com
neil.macbride@davispolk.com

Paul S. Mishkin (admitted *pro hac vice*)
Adam G. Mehes (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4292; Fax: (212) 701-5292
paul.mishkin@davispolk.com
adam.mehes@davispolk.com

*Counsel for Defendant Janus Global*
*Operations LLC*

# Appendix 1



## Location and Year of Alleged Conduct by Janus and Alleged Attacks on Plaintiffs

**Key**

Province: Total # of Attacks
(Year(s) of Attacks)

Kunar: 5
(2010)

Laghman: 2
(2011)

Kabul: 5
(2011-2015)

Paktia: 8
(2010-2013)

Khost: 4
(Dec. 2009-2012)

Logar: 6
(2010-2013)

Nangahar: 2
(2012-2017)

Kunduz: 1
(2010)

Baghlan: 1
(2011)

Parwan: 1
(2014)

Wardak: 7
(2010-2013)

Ghazni: 2
(2011-2012)

Paktika: 2
(2010-2013)

Zabul: 2
(2010-2012)

Urazgan: 2
(2010-2012)

Kandahar: 28
(2010-2013)

Faryab: 2
(2010-2012)

Badghis: 2
(2010-2011)

Helmand: 45
(2010-2019)

Adraskan

Alleged conduct by Janus
(Adraskan National Training Center, January 2008)

Miles
200

Kilometers
200

0

0