## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AUGUST CABRERA, *et al.*,

        Plaintiffs,

    v.

BLACK & VEATCH SPECIAL PROJECTS
CORPORATION, *et al.*,

        Defendants.

Case No. 19-cv-03833 (EGS)

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ENVIRONMENTAL CHEMICAL CORPORATION'S RULE 12(B)(6) MOTION TO DISMISS

SQUIRE PATTON BOGGS (US) LLP

Mitchell R. Berger (D.C. Bar No. 385467)
Alexandra E. Chopin (D.C. Bar No. 490736)
2550 M Street, NW
Washington, DC 20037
mitchell.berger@squirepb.com
alexandra.chopin@squirepb.com

*Counsel for Defendant*
*Environmental Chemical Corporation*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ......................................................................................... 1

II.    ARGUMENT ............................................................................................... 5

    A.    The Complaint Fails To State A Claim For Primary Liability. ............................ 6

        1.    The Complaint Fails To Allege Plausible Facts To Show The Actual Knowledge Required Under 18 U.S.C. § 2339A And 18 U.S.C. § 2339C. ....... 6

        2.    The Complaint Never Establishes Required Elements For A Valid Claim Under 18 U.S.C. § 2339B. .................... 18

        3.    Plaintiffs Do Not Adequately Allege ECC "Willfully" Violated IEEPA. ................................................. 20

        4.    Plaintiffs Fail To Allege Either Proximate Causation Or But-For Causation For Their Primary Liability Claims. ..................................... 22

    B.    Payments For Legitimate Services Pursuant To An Arms-Length Contract Are Not An Act of International Terrorism. ................................................. 32

    C.    Plaintiffs Fail To State A Claim For Secondary Liability Under The ATA. ......... 38

        1.    The Complaint Fails To Allege Plausible Facts To Show That ECC Provided Support To A Designated FTO. ............................................... 39

        2.    The Complaint Does Not Sufficiently Plead That ECC Was "Aware" It Was Assuming A "Role" In Terrorist Activities. ................................. 40

        3.    The Complaint Alleges No Plausible Facts To Show ECC Substantially Assisted The Taliban In Carrying Out Its Alleged Acts of International Terrorism. .......................................................... 42

        4.    RICO Cannot Supplant JASTA's Secondary Liability Requirements. . 44

III.    CONCLUSION ............................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Arvin Kam v. ECC*,
   No. 3:16-cv-02643-JD, 2019 U.S. Dist. LEXIS 64282 (N.D. Cal. Apr. 15,
   2019) .................................................................................................................1, 17, 37

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).........................................................................................5, 8

*Averbach v. Cairo Amman Bank*,
   No. 19-cv-0004, 2020 U.S. Dist. LEXIS 10902 (E.D.N.Y. Sept. 16, 2019) ..........43

*Babb v. Wilkie*,
   206 L.Ed.2d 432 (2020) ........................................................................................24

*Backpage.com, LLC v. Lynch*,
   216 F. Supp. 3d 96 (D.D.C. 2016) ........................................................................7

*Bank of Am. Corp. v. City of Miami*,
   137 S. Ct. 1296 (2017)...........................................................................................29

*Banneker Ventures LLC v. Graham*,
   798 F.3d 1119 (D.C. Cir. 2015) ............................................................................6

*Bates v. Nw. Human Servs., Inc.*,
   466 F. Supp. 2d 69 (D.D.C. 2006) ........................................................................8

*Brill v. Chevron Corp.*,
   No. 15-cv-04916, 2018 U.S. Dist LEXIS 137579 (N.D.Cal. Aug. 14, 2018) .................26, 29

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
   274 F. Supp. 2d 86 (D.D.C. 2003) ........................................................................8

*Cabrera v. Islamic Republic of Iran*,
   No. 1:19-cv-03835 (D.D.C. Dec. 27, 2019).........................................................3

*Cedric Kushner Promotions Ltd. v. King*,
   533 U.S. 158 (2001)................................................................................................45

*In re Chiquita Brands, Int'l Inc.*,
   284 F. Supp. 3d 1284 (S.D. Fla. 2018) ............................................................7, 18

*Authorities upon which we chiefly rely are marked with asterisks.

*Clayborn v. Twitter, Inc.*,
  No. 17-cv-06894-LB, 2018 U.S. Dist. LEXIS 217877 (N.D. Cal. Dec. 31,
  2018) ........................................................................................................223

*\*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
  206 L. Ed. 2d 356 (2020) ............................................................... *passim*

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ...............................................................6

*Fields v. Twitter, Inc.*,
  881 F.3d 739 (9th Cir. 2018) .........................................................27, 28

*Freeman v. HSBC Holdings PLC*,
  413 F. Supp. 3d 67 (E.D.N.Y. 2019) ....................................................29

*Gill v. Arab Bank PLC*,
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) ..............................................25, 26

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 542 (E.D.N.Y. 2012) ....................................................5

*Gonzalez v. Google*,
  335 F. Supp. 3d 1156 (N.D. Cal. 2018) ................................................22

*\*Halberstam v. Welch*,
  705 F.2d 474 (D.C. Cir. 1983) ......................................................... *passim*

*Honickman v. Blom Bank SAL*,
  No. 19-cv-00008, 2020 U.S. Dist. LEXIS 7222 (E.D.N.Y. Jan. 14, 2020) ......................41, 43

*Jiggetts v. Dist. of Columbia*,
  319 F.R.D. 408 (D.D.C. 2017)...............................................................8

*Kadi v. Geithner*,
  42 F. Supp. 3d 1 (D.D.C. 2012) ...........................................................21

*Kaplan v. Lebanese Canadian Bank, SAL*,
  405 F. Supp. 3d 525 (S.D.N.Y. 2019)......................................34, 38, 44

*\*Kemper v. Deutsche Bank AG*,
  911 F.3d 383 (7th Cir. 2018) ......................................................... *passim*

*\*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018).......................................................... *passim*

*\*Linde v. Arab Bank, PLC*,
  97 F. Supp. 3d 287 (E.D.N.Y. 2015) .......................................23, 25, 26

*O'Neill v. Al-Rajhi Bank*,
714 F.3d 118 (2d Cir. 2013)........................................................................................28

*Owens v. BNP Paribas, S.A.*,
235 F. Supp. 3d 85 (D.D.C. 2017) (*Owens III*) ................................................20, 25

*Owens v. Republic of Sudan*,
374 F. Supp. 2d 1 (D.D.C. 2005) (*Owens I*) ........................................................6, 7

*\*Owens v. BNP Paribas, S.A.*,
897 F.3d 266 (D.C. Cir. 2018) (*Owens II*)................................................... *passim*

*Retana v. Twitter, Inc.*,
419 F. Supp. 3d 989 (N.D. Tex. 2019) ......................................................................22

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013)................................................................................25, 28, 29

*Shatsky v. PLO*,
No. 02-2280 (RJL), 2017 U.S. Dist. LEXIS 94946 (D.D.C. June 20, 2017) ..........27

*\*Siegel v. HSBC N. Am. Holdings*,
933 F.3d 217 (2d Cir. 2019)................................................................... *passim*

*Strauss v. Crédit Lyonnais, S.A.*,
379 F. Supp. 3d 148 (E.D.N.Y. 2019) ..............................................................37, 41

*Strauss v. Credit Lyonnais, S.A.*,
No. CV-06-0702 (CPS), 2006 U.S. Dist. LEXIS 72649 (E.D.N.Y. Oct. 5,
2006) ...................................................................................................................25, 26

*Stutts v. De Dietrich Group*,
No. 03-CV-4058, 2006 U.S. Dist. LEXIS 47638 (E.D.N.Y. June 30, 2006) ..........33

*\*Taamneh v. Twitter, Inc.*,
343 F. Supp. 3d 904 (N.D. Cal. 2018) ............................................................... *passim*

*Toumazou v. Turkish Republic of N. Cyprus*,
71 F. Supp. 3d 7 (D.D.C. 2014)....................................................................................8

*United States v. Mehanna*,
735 F.3d 32 (1st Cir. 2013)......................................................................................6, 7

*United States v. Mousavi*,
604 F.3d 1084 (9th Cir. 2010) ....................................................................................21

*United States v. Quinn*,
401 F. Supp. 2d 80 (D.D.C. 2005)..............................................................................21

*University of Texas Southwestern Medical Center v. Nassar*,
    570 U.S. 338 (2013)........................................................................................24

*Weiss v. Nat'l Westminster Bank PLC*,
    768 F.3d 202 (2d Cir. 2014)...........................................................................32

*Wultz v. Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) ............................................................6, 7, 18

**Statutes**

18 U.S.C. § 1962 ....................................................................................................45

18 U.S.C. § 2331 ..........................................................................................32, 33, 34

18 U.S.C. § 2333 ................................................................................................ *passim*

18 U.S.C. § 2339A ............................................................................................. *passim*

18 U.S.C. § 2339B ............................................................................................. *passim*

18 U.S.C. § 2339C ............................................................................................. *passim*

50 U.S.C. § 1705 ................................................................................................20, 22

Publ. L. 112-81, 125 Stat. 1298, 1510-13 (Dec. 31, 2011).........................................15

**Rules**

Fed. R. Civ. P. 12(B)(6)..........................................................................................28

**Other Authorities**

31 C.F.R. § 594 ......................................................................................................21

66 Fed. Reg. 49079 (Sept. 23, 2001) ........................................................................21

## INDEX OF EXHIBITS

1. Exhibit 1: Report of the Committee on Armed Services, United States Senate, Inquiry Into The Role And Oversight Of Private Security Contractors In Afghanistan (Oct. 26, 2010) (referenced at Compl. ¶¶ 137-51, 180-87) (referenced throughout the Complaint and subject to judicial notice).

2. Exhibit 2: Special Insp. Gen. For Afghanistan Reconstr., Construction Of The Special Forces Kandak In Kandahar: Audit Of Costs Incurred By Environmental Chemical Corp., Financial Audit No. 16-30 (Apr. 2016) (referenced at Compl. ¶ 133 nn.163-65 and subject to judicial notice).

3. Exhibit 3: Continuing Services Agreement between Arvin Kam Construction and Environmental Chemical Corporation International (Oct. 2, 2010) (referenced at Compl. ¶ 133).

4. Exhibit 4: Aug. 24, 2012 Letter from ECC to Arvin Kam (attaching CENTCOM Jul. 24, 2012 determination and Kerment L. Goss Aug. 16, 2012 Cure Notice) (referenced at Compl. ¶ 134 n.166).

5. Exhibit 5: Notice of Motion and Motion for Summary Judgment of Defendant Environmental Chemical Corporation Doing Business as ECC Remediation Services and Memo. of Points and Authorities, Arvin Kam Constr. Co. v. Envtl. Chem. Corp., No. 16-cv-02643-JD, ECF No. 37 (N.D. Cal. filed Aug. 24, 2018) (subject to judicial notice).

6. Exhibit 6: Special Insp. Gen. For Afghanistan Reconstr., Kunduz Afghan National Police Provincial Headquarters: After Construction Delays and Cost Increases, Concerns Remain About the Facility's Usability and Sustainability, SIGAR Inspection 13-4 (Jan. 24, 2013) (subject to judicial notice).

7. Exhibit 7: Opinion by Admin. Judge Dickinson on Cross-Motions for Summary Judgment, Appeal of ECCI-C Metag, JV, ASBCA No. 59031 (Oct. 22, 2015) (referenced at Compl. ¶ 136 and subject to judicial notice).

8. Exhibit 8: Appellant's Motion for Summary Judgment, Appeal of ECCI-C Metag JV, ASBCA No. 59031 (referenced at Compl. ¶ 135 n.167 and subject to judicial notice).

9. Exhibit 9: Contracting Officer's Final Decision (COFD), W5J9JE-10-D-0007, Task Order 0003, ANP UP Provincial HQ/Med, Kunduz, Afghanistan, Serial Letter No. 5950.003.COR.C-0027 (Nov. 20, 2013) (subject to judicial notice).

10. Exhibit 10: Decl. of Col. Sadat in Support of Plaintiff Arvin Kam Construction Company's Motion for Summary Judgment, Arvin Kam Constr. Co. v. Envtl. Chem. Corp., No. 16-cv 02643-JD, ECF No. 42 (N.D. Cal. filed Aug. 24, 2018) (subject to judicial notice).

## **GLOSSARY**

| | |
|---|---|
| AFCEC | U.S. Air Force Civil Engineering Center |
| AFCEE | Air Force Center for Engineering and the Environment |
| AGMA | ArmorGroup Mine Action |
| ArmorGroup | ArmorGroup North America Inc. |
| Arvin Kam | Arvin Kam Construction Company |
| ATA | AntiTerrorism Act |
| CENTCOM | U.S. Central Command |
| ECC | Environmental Chemical Corporation |
| FTO | Foreign Terrorist Organization |
| IEEPA | International Emergency Economic Powers Act |
| ISAF | International Security Assistance Force, also known as the Coalition |
| JASTA | Justice Against Sponsors of Terrorism Act |
| SIGAR | Special Inspector General for Afghanistan Reconstruction |

## I.  INTRODUCTION

While the Antiterrorism Act, 18 U.S.C. § 2333, created a powerful tool to penalize acts of international terrorism against United States citizens, there is a common requirement built into each section of the ATA on which Plaintiffs rely.  To prove their claims, Plaintiffs must be able to show that Defendant Environmental Chemical Corporation ("ECC") <u>knew</u> that its arms-length payments to its security and other subcontractors supported "acts of international terrorism committed by the Taliban" (Compl. ¶ 1290) or a designated Foreign Terrorist Organization ("FTO").  While the ATA and interpretive case law describe the knowledge element required for each cause of action in slightly different terms, Plaintiffs cannot demonstrate that ECC had the required knowledge for any of their six claims, and their case against ECC must be dismissed.

Specifically, the Complaint makes only conclusory or generalized allegations that ECC "knew or intended" that its arms-length payments to its security and construction subcontractors facilitated the terrorist attacks at issue or supported an FTO.  Plaintiff must instead allege specific facts to establish ECC's actual knowledge that its contractor payments "would be used in preparation for, or in carrying out" those terrorist attacks, to satisfy Sections 2339A and 2339C (Counts 1 and 3).  Likewise, the Complaint never plausibly demonstrates that ECC made payments to its subcontractors "knowing[]" that those payments instead were being diverted to designated FTOs, which Section 2339B requires (Count 2).  Nor do Plaintiffs make any plausible allegations that ECC "willfully" violated U.S. sanctions when it made arms-length payments to its subcontractors, none of which was then an FTO or otherwise sanctioned by the U.S. government.  Plaintiffs accordingly cannot establish primary liability under IEEPA (Count 4).

Logically, because ECC did not "know or intend" that its arms-length payments to security and construction contractors "would be used in preparation for, or in carrying out" the terrorist attacks at issue, ECC also was not "aware" that, by making payments to its contractors for

commercial services, ECC was "assuming a 'role' in terrorist activities." This is an essential element of Plaintiffs' JASTA secondary-liability claims (Counts 5 and 6). By making contractually-required payments to its subcontractors for the commercial services they rendered, ECC also did not provide "substantial assistance" to the unknown third parties who committed the attacks at issue, another essential element of the same JASTA secondary-liability claims. In any event, Plaintiffs' allegations that the attacks were "committed by the Taliban" defeats their JASTA claim, because the Taliban is not an FTO. Compl. ¶ 1290. Confronted with this obstacle, Plaintiffs implausibly allege, at odds with U.S. government statements, that al-Qaeda and the Haqqani Network (after its 2012 FTO designation) committed, planned, or authorized those Taliban attacks, and attempt to evade stringent ATA requirements by importing RICO into the realm of terrorist attacks (Count 6).

The inability of the Complaint to hurdle the essential knowledge elements of the ATA is not its only dispositive failing. ECC's payments for subcontractor services pursuant to (and in settlement of) arms-length contracts is ordinary-course commercial activity, not "international terrorism"—an essential element for all of Plaintiffs' ATA primary-liability claims (Counts 1 through 4). Plaintiffs concede that ECC obtained and paid for security and construction subcontractor services for a purely commercial purpose, that is, to perform and safeguard its construction projects in Afghanistan and thereby earn revenue, and to build critical facilities at the direction of the U.S. Army Corps of Engineers and the U.S. Air Force. *See* Compl. ¶ 4. Plaintiffs also concede that ECC implemented directives of the U.S. government, and took reasonable steps to protect against any support of terrorist activity.

Similarly, the Complaint never plausibly alleges a but-for or proximate cause connection between ECC's arms-length payments to its subcontractors and the attacks at issue in this case,

without both of which Plaintiffs cannot establish ATA primary liability (Counts 1 through 4).  This causation breakdown is confirmed particularly by the number of intermediary actors between ECC and the attackers, the remoteness in time and geography between ECC's operations and the attacks, and the Taliban's access to multiple funding sources.  Plaintiffs cannot show, as they must, that ECC caused or assisted these Taliban attacks.  Plaintiffs implicitly acknowledge this fact by bringing another lawsuit in this Court against Iran, seeking recoveries for the same injuries resulting from the same attacks in Afghanistan.  *See Cabrera v. Islamic Republic of Iran*, No. 1:19-cv-03835 (D.D.C. Dec. 27, 2019).  By suing Iran for the same attacks, which provided a different alleged funding source, Plaintiffs highlight their inability to trace a causal connection between their injuries and ECC's actions.

The Complaint cites to hundreds of publicly available documents in an attempt to give more heft to the primary and secondary liability claims, which otherwise rely impermissibly on generalized allegations.  Time and again, however, Plaintiffs' citations tell an incomplete story. Not one of Plaintiffs' sources demonstrates or concludes that ECC engaged in or supported acts of international terrorism; instead, those sources show ECC implemented U.S. government instructions and took active steps to protect against any support of terrorist activity.

For example, Plaintiffs rely heavily on a report of an investigation into these same issues by the United States Senate Armed Services Committee and audits by the Special Inspector General for Afghanistan Reconstruction, to allege that ECC, through its subcontractors, paid protection money to the Taliban in connection with four construction contracts in Afghanistan. *See* Compl. ¶¶ 128-43.  In express contradiction of those allegations, Plaintiffs' cited sources and other public documents actually show:

- ECC did not know that the local private contractors providing security and construction services for its Afghanistan construction projects were affiliated with an FTO, the Taliban,

or other terrorist group. Accordingly, ECC did not know that any ECC contractor-payments allegedly were diverted to support terrorist activity.[1]

- Despite intensive U.S. government oversight and auditing of ECC's work, and related U.S. federal court proceedings, there has never been a U.S. government or judicial finding that ECC's contractor-payments were diverted or otherwise used to support terrorist activity or terrorist groups.[2]

- ECC actively took steps before and after hiring security and construction personnel to ensure that its subcontractors were employing local personnel that were not affiliated with an FTO, the Taliban or any other terrorist group, by vetting its subcontractors and their employees, notifying the United States government of security issues, and terminating personnel when reports surfaced of their Taliban or insurgency affiliation.[3]

- As soon as reports surfaced that, on one project, local security personnel had "gone to the dark side" and joined the Taliban, and on a second project, the construction subcontractor was "supporting an insurgency", ECC took immediate action to terminate those personnel in full compliance with U.S. government instructions.[4]

- After ECC terminated the construction subcontractor, the subcontractor filed claims with the Afghan Attorney General seeking payment for work completed before the termination. The Afghan government pressured ECC to settle those claims, but ECC subsequently obtained a U.S. court order voiding that settlement and thereby vindicating the government's directive.[5]

Circuit law empowers this Court to determine the legal insufficiency of Plaintiffs' claims

based on those documents without converting this Motion into one for summary judgment.

---

[1] *See* Ex. 1, Report of the Committee on Armed Services, United States Senate, *Inquiry Into The Role And Oversight Of Private Security Contractors In Afghanistan* (Oct. 26, 2010) ("Senate Report"), at 17-18.

[2] *See generally* Ex. 1 (Senate Report); Ex. 2, Special Insp. Gen. For Afghanistan Reconst., Financial Audit No. 16-30 (Apr. 2016) ("2016 SIGAR Report"); Order on Partial Summary Judgment, *Arvin Kam v. ECC*, No. 3:16-cv-02643-JD, 2019 U.S. Dist. LEXIS 64282 (N.D. Cal. Apr. 15, 2019).

[3] *See, e.g.*, Ex. 1 (Senate Report) at 58 (describing "a strict vetting and screening process" for local hires); Ex. 3, Continuing Services Agreement, Arvin Kam Construction and Environmental Chemical Corporation, International (Oct. 2, 2010)), § 2.12 (warranting subcontractor "compl[iance] with, all federal, state and local laws…").

[4] Ex. 1 (Senate Report) at 19; Ex. 4 Aug. 24, 2012 Letter from ECC to Arvin Kam (terminating Arvin Kam) (Arvin Kam Termination Letter).

[5] *See* Ex. 5, Order on Motion for Summary Judgment, *Arvin Kam v. Environ. Chem. Corp.*, No. 3:16-cv-02643 (N.D. Cal. Aug. 24, 2018), at 6-7; Motion for Summary Judgment, at 11-12.

Through its analysis of these documents, this Motion demonstrates that amendment of the Complaint cannot cure Plaintiffs' knowledge, causation, and other essential-element defects as to ECC. The claims against ECC accordingly must be dismissed with prejudice.

## II.   ARGUMENT

ATA civil actions require a plaintiff to make multi-level allegations supported by plausible facts, not only that the defendant has violated a predicate criminal statute, but also that the defendant has violated the additional elements established in 18 U.S.C. § 2333(a). *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) ("[A] suit for damages under the ATA is akin to a Russian matryoshka doll, with statutes nested inside of statutes.") (internal quotation and citation omitted). Those additional civil elements are: "First, a U.S. national must have suffered an injury. Second, there must have been an act of international terrorism. And third, the U.S. national's injury must have occurred 'by reason of' the act of international terrorism. That is, there must be some causal connection between the act of international terrorism and the U.S. national's injury." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 270 (D.C. Cir. 2018) (*Owens II)*. Plaintiffs fail to plausibly allege facts to support the second and third of these elements.

Throughout the Complaint, Plaintiffs generally plead the conclusory elements of each ATA cause of action. But Plaintiffs ultimately do not state valid claims against ECC, because the Complaint omits "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). *Iqbal* instructs that a claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation, emphasis omitted).

As a result, this Court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations. . . Nor must we accept as true the complaint's factual

allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Owens II*, 897 F.3d at 272-73 (internal citation marks and quotation omitted); *see also Banneker Ventures LLC v. Graham*, 798 F.3d 1119, 1133-34 n.6 (D.C. Cir. 2015) ("Defendants would have been entitled to rely on the [document plaintiff referenced] to show any inaccuracy about its contents, because a referenced document may always be read to evidence what it incontestably shows."); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("[W]e may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice.").

In the following discussion, ECC sets out each of Plaintiffs' six claims, beginning with the primary liability claims and followed by the secondary liability claims, and demonstrates why each lacks "sufficient factual matter" to survive dismissal.

A.     The Complaint Fails To State A Claim For Primary Liability.

1.     The Complaint Fails To Allege Plausible Facts To Show The Actual Knowledge Required Under 18 U.S.C. § 2339A And 18 U.S.C. § 2339C.

Plaintiffs allege no facts to show that ECC had <u>actual knowledge or intent</u> that its payments to its subcontractors would support terrorist attacks, the heightened *scienter* required for violations of Section 2339A (Count 1), or Section 2339C (Count 3).   The actual knowledge or intent requirement "extends <u>both</u> to the support itself, and to the underlying purposes for which the support is given."  *United States v. Mehanna*, 735 F.3d 32, 43 (1st Cir. 2013) (emphasis added) (describing § 2339A requirement) (quoting *United States v. Stewart*, 590 F.3d 93, 113 n.18 (2d Cir. 2009)); *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 13 (D.D.C. 2005) ("*Owens I*") (Section 2339A); *Wultz v. Republic of Iran*, 755 F. Supp. 2d 1, 47 (D.D.C. 2010) (Section 2339C).

Applying that amplified standard to this case, Plaintiffs must allege plausible facts to show that ECC "provided the support or resources acting with the knowledge or intent that the support

would be used in preparation for, or in carrying out, specific terror-related crimes." *In re Chiquita Brands Int'l. Inc.*, 284 F. Supp. 3d at 1309; *see also Mehanna*, 735 F.3d at 43.  Plaintiffs "must show evidence" of ECC's specific intent to pay its subcontractors actually knowing or intending that those payments would be used to support terrorist activity.  *Owens I*, 374 F. Supp. 2d at 13.

The Complaint does not say anything about actual knowledge, however, and instead features a number of dispositive pleading defects.  To begin, Plaintiffs' allegations that ECC "should have known" or "recklessly disregarded" do not meet the heightened *scienter* requirements under Section 2339A and 2339C.  *See Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 109 (D.D.C. 2016) (holding "reckless disregard" does not satisfy "knowing" mental state); Compl. ¶¶ 95, 148.  Instead, the ATA "requires allegations of intentional misconduct—in addition to other state-of-mind requirements incorporated in §§ 2339A-2339C. . . ."  *Wultz*, 755 F. Supp. 2d at 42.  In other words, the "intentional misconduct" requirement for ATA civil actions mandates that Plaintiffs make plausible fact allegations of "actual knowledge" to satisfy the heightened mental state requirements for each predicate act.  *See id.* at 53.  Plaintiffs do not allege any facts to show that or how or when ECC had actual knowledge or intent, and therefore do not plausibly allege facts to satisfy the intentional misconduct element of the ATA.  ECC is a decades-long contractor to the U.S. armed forces, with many ECC employees who were former U.S. military.[6] ECC worked hand in glove with the same military branches whose members include Plaintiffs.  It is facially implausible that ECC would endanger their partners in the rebuilding of Afghanistan.

Specifically, Plaintiffs' allegations regarding ECC's mental state fall short of the actual knowledge standard, because they only make conclusory *scienter* allegations based on media and

---

[6] Career Paths for Active Duty and Veterans, https://www.ecc.net/ecc/index.asp?page=100 ("ECC actively recruits people who have honorably served in the military … in 2019, nearly 20% of all new hires were military veterans!").

other third-party sources reporting on the general practices of private contractors in Afghanistan in order to leap to the conclusion that "Defendants knowingly (or recklessly) paid protection money to the Taliban." Compl. ¶ 65; *see also, e.g., id.* ¶¶ 9-11, 59-62, 95, 97. Plaintiffs depend almost entirely on this "shotgun" pleading approach, which is improper because it does not give each defendant fair notice of the claims against it.[7] This Court routinely dismisses claims for this reason. *See, e.g., Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (Friedman, J.) (dismissing because "the plaintiffs fail to distinguish between each entity, simply referring to all HSBC defendants collectively throughout the complaint and their briefing."); *see also Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 74 n.5, 85 (D.D.C. 2006) (Walton, J.) (dismissing because "[i]t is unclear from the complaint exactly what role each defendant played in providing these services to the plaintiffs, as the plaintiffs almost entirely fail to distinguish between the defendants when making their factual allegations").

Plaintiffs also make many allegations that rest on "mere possibility," or are "merely consistent with'… liability, [which] 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see* Compl. ¶¶ 5, 52, 65, 79, 82, 102, 119, 132-33, 150 (all describing "typical" actions by "contractors" or "indications" of terrorist activity). None of these allegations shows ECC's actual knowledge that its payments to subcontractors "would be used in preparation for, or in carrying out" terror attacks.

---

[7] Allegations against a group of "Defendants" do not satisfy ATA pleading standards. *Jiggetts v. Dist. of Columbia*, 319 F.R.D. 408, 417 (D.D.C. 2017). Indeed, "given the extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of plaintiffs' allegations as to any particular defendant, to ensure that he—or it—does indeed have fair notice of what the plaintiffs' claim is and the grounds upon which it rests[.]" *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 103-04 (D.D.C. 2003).

The section of the Complaint that specifically discusses ECC suffers from the same inadequacies. For example, Plaintiffs lump ECC in with what they call "the ArmorGroup Defendants", although the Complaint acknowledges that ArmorGroup was ECC's subcontractor on just one project. Compl. ¶ 128. After homogenizing these separate companies and separate projects, Plaintiffs generalize still further, alleging that "the ArmorGroup Defendants paid protection money to the Taliban" to safeguard "work in geographic areas under Taliban control or influence." *Id.* ¶ 131. ArmorGroup allegedly followed "<u>contractors' standard practice</u> in such circumstances", *i.e.*, "to pay protection money to discourage the Taliban from attacking their projects." *Id.* Further, Plaintiffs' pleading of generalized facts about the ArmorGroup Defendants' payments to local personnel is unfounded, because ECC made its payments to ArmorGroup, which had the contractual authority to select its own method of performance.

Layering on still further generalizations, Plaintiffs bootstrap this "standard practice" allegation by rooting it in Complaint Paragraphs 65-82, which contain only generalized allegations about protection payments made by unnamed contractors in Afghanistan based on media reports, unrelated government investigations, and unrelated private studies. Paragraphs 65-82 refer consistently to "companies like Defendants" and "contractors like Defendants," but never show that <u>ECC itself</u> had actual knowledge its payments were going to support the attacks at issue here. Compl. ¶¶ 65-66, 71-72, 74, 76, 78, 81. To the extent Paragraphs 65-82 do name names, Plaintiffs principally discuss companies unrelated to ECC, and mention "the ArmorGroup Defendants" only once to allege that they were paying "real (yet no less unlawful) salaries they knew would benefit the insurgency." Compl. ¶ 82. There is no citation support for this allegation, and no facts to show how or that ECC had actual knowledge that their payments "would benefit the insurgency."

This pattern continues throughout; rather than alleging facts specific to ECC, Plaintiffs extrapolate theories from unrelated source material about the general practices of unspecified "contractors" in Afghanistan to reach conclusions about ECC or the ArmorGroup Defendants.  For example, Paragraph 131 relies for support on Paragraph 80 to claim "the ArmorGroup Defendants made payments to the Taliban worth several million dollars."   But Paragraph 80 only alleges generally that "[c]ompanies paid" and "contractors often made payments," and conjectures that "many analysts estimated a largely across-the-board 'tax'" by the Taliban without alleging any specific facts plausibly showing ECC payments to the Taliban. Compl. ¶¶ 80, 131.  *See Owens II*, 897 F.3d at 276 ("The complaint alleges that the Sudanese banks transmitted the funds from [the banks] directly to al Qaeda" but "[w]e see no nonconclusory allegation in the Complaint that plausibly shows that the money [the banks] transferred to [Sudan] were in fact sent to [al Qaeda] or that [Sudan] would have been unable to fund the attacks by [al Qaeda] without the cash provided by [the banks].").

Similarly, Paragraph 132 alleges that "ECC's Kandahar Airfield contract required work in a historical Taliban stronghold, which typically involved especially high-dollar payments" based on Paragraph 194.  *Id*. ¶ 132.  But Paragraph 194 contains only general statements that "[r]oad construction projects in Afghanistan have long been attractive targets for insurgent extortion", and contains no actual fact allegations as to ECC.  *Id*. ¶ 194; *see also id.* ¶ 131 (alleging ArmorGroup Defendants followed "standard practice, which was especially prevalent among contractors working in comparable factual circumstances"); ¶ 132 (alleging ArmorGroup Defendants' projects contained "indicia" of protection payments, because "Afghanistan's Ring Road was well-known

in Afghanistan as a frequent target of Taliban extortion efforts, and contractors regularly paid

protection money to secure their sections of the road").[8]

> a) <u>The Senate Armed Services Committee Report Shows That ECC Did Not Have Actual Knowledge That Payments To Its Shindand Airbase Subcontractor Were Used To Fund Terror Attacks.[9]</u>

Even when they do make specific allegations about ECC regarding the Shindand Airbase

Contract, Plaintiffs do not allege plausible facts to show ECC had actual knowledge.  And while

Plaintiffs rely heavily for their allegations on a report of the U.S. Senate Armed Services

Committee ("SASC"), following its 2010 inquiry into private security contractors in Afghanistan,

Plaintiffs have cherry-picked the Senate Report, and fail to mention critical findings of the SASC.

*See* Ex. 1 (Senate Report).  Those additional findings make it impossible for Plaintiffs to allege

plausibly that ECC had actual knowledge to support their Section 2339A and 2339C claims.

The Senate Report describes that ECC and ArmorGroup, with the help of the U.S. military,

undertook an extensive due diligence process before hiring local security personnel for the

Shindand project.  *See id.* at 8-9, 58.  ArmorGroup also warranted in its contract with ECC that it

would conduct "a strict vetting and screening process" of potential employees, and that

ArmorGroup required from each candidate "a signed declaration stating that they were not a

member of the Taliban" and other verifications.  *Id.* at 58-59.  ECC and ArmorGroup also hired

key personnel on the recommendation of U.S. military personnel on site at Shindand.  The U.S.

Military Team Leader referred ECC and ArmorGroup to two men, nicknamed Mr. Pink and Mr.

---

[8] Plaintiffs imply that the "Ring Road" was a solitary, contiguous project.  In fact, the Ring Road encircles Afghanistan, and segments were constructed across 3200 kilometers—thousands of miles apart and more than a decade apart.

[9] The Complaint contains no plausible facts or allegations related to two of the four construction projects that allegedly gave rise to Plaintiffs' claims (2011 Kandahar Airfield, 2012 Ring Road contract). *See* Compl. ¶¶ 132-33; *see infra* n. 18-19.

White, who could provide the "30 local guards initially needed for the job." *Id.* at 8. The Senate Report concluded that Mr. White was "cooperating with American forces." *Id.*

In its investigation of the Shindand Airbase project, the SASC reported that "[t]he U.S. Military Team Leader … acknowledged recommending Mr. Pink to ECC" because "he 'was the person that we felt comfortable with,' and the Team Leader "did not suspect that Pink had Taliban ties or was working against Coalition interests." *Id.* at 9. Before the U.S. Military Team Leader recommended Mr. Pink, moreover, he "held a meeting with the Shindand governor and village elders from the Shindand District to make sure that they 'had no issues' with the referral of Pink to the contractor." *Id.* In addition, ECC's Security Manager discussed Mr. Pink and Mr. White with U.S. Military personnel before hiring them, and also "was advised that no derogatory information was found on any individual the company proposed to hire at Shindand." *Id.* at 10. ECC's Security Manager also met with Mr. Pink and Mr. White, who agreed to provide men from their villages to work as security guards at Shindand. *See id.*

Despite this due diligence, in December 2007, Mr. Pink and his men ambushed and killed Mr. White. *See* Ex. 1 (Senate Report) at 14. When the SASC interviewed ArmorGroup's Senior Team Leader about the incident, he "attributed the shooting to competition over contracting work at the airbase." *Id.* (explaining Mr. Pink wanted all of the Shindand security work).[10] Further, Mr. White and Mr. Pink "were rivals in everything, and just didn't like each other." *Id.* It was in this context that an ECC employee commented, "it was kind of like a mafia thing. If you rub somebody

---

[10] One ArmorGroup document examined by the SASC referred to Mr. Pink and Mr. White as "two feuding warlords," but sources SASC interviewed "said that the feud developed over time, resulting from competition for business at the airbase." Ex. 1(Senate Report) at 8 n.46. There is no suggestion that this feud was anything other than commercial, or that it involved any affiliation with the Taliban, confirming that ECC did not have actual knowledge that ArmorGroup's payments to local security personnel allegedly were going to support terror attacks.

out, you'll get a bigger piece of the pie."  *Id.*; *but see* Compl. ¶ 138 (mischaracterizing Senate Report).  ECC accordingly did not have actual knowledge that Mr. Pink's killing of Mr. White was related to the Taliban or any other terrorist group.

The Senate Report confirms ECC's lack of actual knowledge that its payments to local security personnel allegedly would be used to fund terror attacks.  On January 13, 2008, ArmorGroup received reports that Mr. Pink was "now aligned" with the Taliban.  Senate Report at 18.  In response, ArmorGroup confiscated the cell phones of all of the local security guards, and on January 19, 2008, terminated all of the security personnel affiliated with Mr. Pink.  *See id.* at 18-19.  When interviewed by the SASC, the ArmorGroup Senior Team Leader stated his belief in retrospect that Mr. Pink had become affiliated with the Taliban because he no longer had income from Shindand Airbase.  *See id.*

In the meantime, Mr. White's brother, nicknamed Mr. White II, met with ArmorGroup and ECC personnel about assuming his brother's role at Shindand.  *See id.* at 17.  During that conversation, Mr. White II convinced ECC and ArmorGroup that he intended to pursue his brother's killer through legitimate government authorities, including the Afghan National Police. *See id.*  Mr. White II also gave assurances that the feud between Mr. Pink and Mr. White "[would] have no bearing on the situation at the airfield."  *Id.*  ECC and ArmorGroup believed Mr. White II to be a Commander in the Afghan National Police ("ANP") when they hired him, or at least had a "close working relationship with the ANP."  *See id.* at 17-18.  These facts confirm ECC's and Armor Group's due diligence in hiring local personnel, and ECC's lack of actual knowledge that its payments to its subcontractor allegedly would be used to fund terror attacks.

The earliest ECC allegedly learned of Mr. White II's alleged affiliation with the Taliban was August 21, 2008, when Mr. White II was killed while hosting a "Taliban meeting held in the

village of Azizabad that was raided by U.S. and Afghan military forces." *Id*. at 5; Compl. ¶¶ 141-42. The Senate Report discusses evidence that contradicts this conclusion, however. In the weeks following the Azizabad raid "information circulated that the raid was the result of false information provided to coalition forces by Mr. Pink . . . ." Ex. 1(Senate Report) at 32; *see also id.* (Afghan President stating that Azizabad raid resulted from "total misinformation fed to the [coalition] forces"). In September 2008, Mr. Pink was arrested, tried, and convicted for "providing false information that led to" the Azizabad raid, thereby corroborating the statements of the Afghan President. *Id.* at 32 (noting that the verdict was later overruled).

The day after the Azizabad raid, ArmorGroup dismissed its guards from the Shindand, (Senate Report) at iv, 30, 33. Plaintiffs admit this fact. *See* Compl. ¶ 149; Ex. 1 (Senate Report) at 33. [11] Although the Complaint alleges that ArmorGroup subsequently "authorized a $1,000 discretionary payment to White II's family" as part of an ArmorGroup policy for compensating the families of guards killed on the job, ArmorGroup employees confirmed to the SASC that this payment was never made. *See* Ex. 1 (Senate Report) at 31-32. In any event, the Complaint fails to allege facts to show that ECC had actual knowledge of or authorized ArmorGroup's discretionary payment.

b) <u>ECC Did Not Have Actual Knowledge That Arvin Kam Had Any Affiliation With The Taliban, Any FTO, Or Any Terrorist Group While Employed By ECC On The Kunduz Police Project.</u>

Plaintiffs also make allegations about ECC paying a settlement to Arvin Kam Construction Company, an Afghan construction firm that was a subcontractor on a U.S. Army Corps of

---

[11] Defendant Armor Group Mining Action (AGMA) is ArmorGroup's sister company. AGMA employed Mr. White II (and a Mr. White III) as security on its subcontract for another project in Afghanistan that was <u>not</u> affiliated with ECC or the Shindand Airbase project. *See* Compl. ¶ 144; Ex. 1 (Senate Report) at 33-34.

Engineers project, to build a police station in Kunduz.  *See* Compl. ¶¶ 134-36.  Plaintiffs insinuate

that the settlement amounted to a payment to a terrorist group, but Plaintiffs' allegations say

nothing, as they must, about what ECC actually knew or intended or for what purpose the

settlement money was to be used.  *See id.* ¶ 135.  The Complaint also does not contain any facts

to show that ECC had actual knowledge that any FTO or terrorist group was employed by ECC on

the Kunduz project, or that ECC had actual knowledge or intent to make payments to Arvin Kam

that would be used to support terror attacks.

On July 24, 2012, nearly two years after ECC hired Arvin Kam as a subcontractor on the

Kunduz project, [12] CENTCOM determined that Arvin Kam was "actively supporting an

insurgency," a classification requiring the prime contractor to terminate the subcontractor.  *See*

Section 841, National Defense Authorization Act for Fiscal Year 2012, Publ. L. 112-81, 125 Stat.

1298, 1510-13 (Dec. 31, 2011); *see also* Compl. ¶ 134.  On August 16, 2012, the Army instructed

ECC to terminate Arvin Kam within ten days, which ECC did on August 24 in compliance with

the government's instructions.  Ex. 4 (Arvin Kam Termination Letter); *but see* Compl. ¶¶ 134-

35 (alleging ECC "belatedly" terminated Arvin Kam).

Although Arvin Kam "supporting an insurgency" status was the subject of investigations

and reviews by the Army Corps of Engineers, the Armed Services Board of Contract Appeals

("ASBCA"), the SASC, and the SIGAR, the U.S. government has never alleged that ECC was in

league with Arvin Kam, or otherwise supporting a terrorist group or terror attacks, and indeed has

continued to award vital U.S. military contracts to ECC.  That ECC never had actual knowledge

or intent that its payments to a subcontractor allegedly would be used to support terrorist activities

is further apparent from the fact that the U.S. government: 1) engaged in intensive oversight and

---

[12] Compl. ¶ 134; Ex. 3 (Arvin Kam Subcontract)

auditing of ECC's work on the Kunduz Police project, *see* Compl. ¶¶ 117-18, 2) knew ECC was paying Arvin Kam for its construction work on the project, and 3) took no action against ECC despite being authorized to terminate or void its contracts with ECC.  *See generally* Ex. 6 (2013 SIGAR Report).  In fact, when ECC subsequently filed a reimbursement claim for costs and delays resulting from the termination, which ECC contended were provided for under the government contract, *see* Compl. ¶ 134, the ASBCA concluded that the U.S. government failed to establish that it had a right to terminate Arvin Kam under Section 841, and also failed to prove the Army knew Arvin Kam was supporting an insurgency prior to receiving the order to terminate Arvin Kam.  *See* Ex. 7 (ASBCA decision), at 25.  If the Army did not know, neither did ECC.

There are also no plausible allegations in the Complaint connecting Arvin Kam to any of the attacks against Plaintiffs, and no substantive allegations that any payments by ECC to Arvin Kam supported those attacks.  Instead, ECC hired Arvin Kam only after ECC and ArmorGroup's due diligence review determined 1) that Arvin Kam was qualified to subcontract on the project, and 2) that Arvin Kam was not on the Excluded Parties List System, a U.S. government list of individuals and entities with whom it is illegal to contract.  *See* Ex. 8 (ECC Motion for Summary Judgment in ASBCA Proceedings), at 5.  Consistent with its due diligence of Arvin Kam, when ECC sought reimbursement of its increased costs according to the contract terms, ECC reasoned that "the Government clearly has knowledge about Arvin Kam, which ECCI does not. … [T]he subcontracts were awarded to Arvin Kam, after ECCI conducted its due diligence.  As such, the Government … is penalizing ECCI (via the Cure Notice), as if it is ECCI's fault for having subcontracted with Arvin Kam." Ex. 9(Final Decision of Contracting Officer) at 7.  The Army's contracting officer on the Kunduz project confirmed:  "[T]he termination was not based on what

ECCI knew or did not know, or on whether ECCI had employed due diligence regarding investigation of Arvin Kam." *Id.* at 13.

Following its termination, Arvin Kam filed a $9 million complaint with the Afghan Attorney General ("AAG") against ECC, claiming that ECC owed it for work it had performed on the Kunduz project prior to Arvin Kam's termination, and that the U.S. military had improperly designated it as "supporting an insurgency." [13]  Ex. 10 (Decl. of Col. Sadat, Arvin Kam Motion for Summary Judgment), at 1-2.  The AAG's Investigations Unit subsequently summoned ECC and Arvin Kam to its offices on a Saturday so that ECC could answer the AAG's questions about Arvin Kam's claims.  ECC sought guidance from the United States government regarding the AAG's involvement, but never received a response.  *See* Ex. 5 (Brief in Support of Motion for Summary Judgment (Dkt. No. 37)), at 6-7.  Under pressure from the AAG, ECC settled Arvin Kam's claims for work it had performed prior to its termination, including the Kunduz Police contract.  *See* Compl. ¶ 135; Ex. 5 (Brief in Support of Motion for Summary Judgment (Dkt. No. 37)), at 6-7.  ECC subsequently obtained an order voiding the settlement *ab initio*.  *See Arvin Kam Constr. Co.*, 2019 U.S. Dist. LEXIS 64282, at *12 ("There is no question that AKCC's subcontract with ECC was void as against public policy under the express provisions of Section 841(a) of the NDAA.") (Donato, J.).

The Complaint and the documents it incorporates by reference or that are subject to judicial notice all confirm that Plaintiffs cannot (and did not) plausibly allege that ECC had actual knowledge that its payments to Arvin Kam pursuant to arms-length contracts were to "be used in

---

[13] The Afghan National Directorate of Security concluded that "[Arvin Kam] did not provide any support to any domestic or foreign entities involved in terrorism or terrorism related activities," and "[t]he Office of the President of Afghanistan directed the Afghan Ministry of Justice to clear [Arvin Kam] of any suspicion involving aid and support to terrorism." Ex. 10 (Decl. of Col. Sadat in Support of Arvin Kam Motion for Summary Judgment), at 1-2.

preparation for, or in carrying out" terrorist attacks.   Plaintiffs accordingly fail to satisfy the

heightened *scienter* requirements of Sections 2339A and 2339C as to either the Shindand project

or the Kunduz project, the two ECC projects about which Plaintiffs make substantive allegations.[14]

2.     The Complaint Never Establishes Required Elements For A Valid Claim
       Under 18 U.S.C. § 2339B.

Plaintiffs also claim that ECC violated 18 U.S.C. § 2339B (Count 2), which imposes

liability on anyone who "<u>knowingly</u> provides material support or resources to a foreign terrorist

organization, or attempts or conspires to do so. . . ."  18 U.S.C. § 2339B(a)(1) (emphasis added).

In contrast to Section 2339A and 2339C, Section 2339B "broadly criminalizes the provision of

'material support' to formally designated foreign terrorist organizations, and requires knowledge

about the organization's connection to terrorism, but not a specific intent to further its terrorist

activities."   *In re Chiquita Brands*, 284 F. Supp. 3d at 1309 (emphasis added) (citing *Holder v.

Humanitarian Law Project*, 561 U.S. 1 (2010)).   The ATA's "intentional misconduct" requirement

mandates that Plaintiffs allege plausible facts to show ECC had actual knowledge that it was

providing material support to an FTO—constructive knowledge or reckless indifference do not

suffice as a matter of law.   *See Wultz*, 755 F. Supp. 2d at 42, 46, 53 ("Discussing the state-of-mind

requirement, the Supreme Court recently stressed that 'Congress plainly spoke to the necessary

mental state for a violation of § 2339B, and it chose knowledge about the organization's connection

to terrorism. . . .'") (quoting *Holder,* 561 U.S. at 16); *but see* Compl. ¶ 1271 ("Defendants knew

or recklessly disregarded….").

---

[14] Plaintiffs focus on two of the four ECC contracts, Shindand Airbase and Kunduz Police station.
Of the remaining two projects, Plaintiffs very briefly address Kandahar Airfield but make no
affirmative allegations of wrongdoing, and Plaintiffs do not discuss Ring Road. *See* Compl. ¶ 133;
*infra* n.18-19.

The ATA provides that a person can violate Section 2339B in any one of three ways. *See* 18 U.S.C. § 2339B(a)(1). Plaintiffs rely for their 2339B claims on just the first of those three, and allege generally that "Defendants" knew or recklessly disregarded that they were making protection payments to an FTO, the Haqqani Network. *See* 18 U.S.C. § 2339B(a)(1) ("a person must have knowledge that the organization is a designated terrorist organization"); Compl. ¶¶ 1270-71. The United States designated the Haqqani Network as an FTO on September 7, 2012, and the Complaint vilifies "Defendants'" conduct "since that designation." Compl. ¶ 1271. Plaintiffs name the Taliban throughout the Complaint, but Plaintiffs cannot satisfy the FTO requirement of 2339B by making generalized allegations about the Taliban. *See id.* ¶¶ 128-50. The Haqqani Network and the Taliban are separate organizations, and the Taliban is not an FTO.[15] *But see id.* ¶ 1263 n.428 (combining the Taliban and Haqqani Network).

ECC demonstrated in Part II.A.1 that Plaintiffs do not plausibly allege that ECC had actual knowledge that its subcontractor payments were supporting terrorist acts by the Taliban or anyone else. That deficiency logically forecloses Plaintiffs' ability to show the more specific actual knowledge required for a 2339B claim, *i.e.*, that ECC knew it was directing payments to a designated FTO. In any event, Plaintiffs do not plausibly allege that ECC knowingly provided material support to any FTO on any of the four ECC government contracts at issue here.

With regard to the Shindand Airbase project, ECC and ArmorGroup promptly terminated all security personnel hired by Mr. Pink and Mr. White II when reports surfaced in January 2008

---

[15] "Although the Haqqani network is officially subsumed under the larger Taliban umbrella organization…, the Haqqanis maintain distinct command and control, and lines of operations." The Haqqani Network, http://www.understandingwar.org/report/haqqani-network; *see also* Council on Foreign Relations, "Afghanistan Endgame, Part One: Is Sirajuddin Haqqani Ready for Peace?", https://www.cfr.org/blog/afghanistan-endgame-part-one-sirajuddin-haqqani-ready-peace (describing Haqqani Network as a separate entity that has "close ties to the Taliban").

and August 2008, respectively, alleging that the two men were affiliated with the Taliban.  *See* Ex. 1 (Senate Report) at 18-19, 30; *supra* pp. 13, 15-16.  The Complaint contains no plausible fact allegations linking Mr. Pink and Mr. White to the Haqqani Network or any FTO.  There are no plausible fact allegations that ArmorGroup was a mere pass-through to the Haqqani Network or any FTO, let alone that ECC had actual knowledge to that effect.  Any alleged payments or support by ArmorGroup to Shindand Airbase security personnel purportedly affiliated with the Taliban ceased years before the Haqqani Network was designated as an FTO in September 2012; ECC's subcontract with ArmorGroup ended in December 2008.  *See* Compl. ¶ 1270; Ex. 1 (Senate Report) at 36.

The same deficiencies are dispositive of Plaintiffs' claims about ECC's work on the Kunduz Police contract.  ECC demonstrated in Part II.A that the Complaint does not plausibly allege facts to show how or that ECC had actual knowledge that Arvin Kam had an affiliation with any FTO, or that any ECC payments to Arvin Kam for legitimate construction work were supporting an FTO.  *See supra* pp. 14-18.  Plaintiffs' failure to allege plausible facts to show ECC had actual knowledge that it made payments to support Haqqani Network or any other FTO warrants dismissal of the 2339B claim against ECC.

### 3.    Plaintiffs Do Not Adequately Allege ECC "Willfully" Violated IEEPA.

Plaintiffs fail in their creative attempt to use the International Emergency Economic Powers Act, 50 U.S.C. §§ 1705(a), 1705(c) ("IEEPA"), as a predicate act for primary liability under the ATA.  This theory falls apart because Plaintiffs do not allege facts plausibly showing that ECC "willfully violate[d], attempt[ed] to violate, conspire[d] to violate, or cause[d] a violation of regulations issued pursuant to IEEPA."  *Owens v. BNP Paribas, S.A.*, 235 F. Supp. 3d 85, 88 n.3 (D.D.C. 2017) ("*Owens III*").  The *scienter* requirement for <u>criminal</u> IEEPA violations—the only type that can serve as an ATA predicate act—obliges Plaintiffs to allege "willfulness."  This

"requires more than mere voluntariness of action (or omission), but instead criminalizes conduct only if undertaken with knowledge that it was unlawful.  In other words, in this context, 'willfully' means with 'knowledge of illegality.'"  *United States v. Quinn*, 401 F. Supp. 2d 80, 101 (D.D.C. 2005); *see also United States v. Mousavi,* 604 F.3d 1084, 1094 (9th Cir. 2010) (requiring proof beyond a reasonable doubt that defendant acted with knowledge).  For the same reasons that Plaintiffs fail to allege plausible facts illustrating ECC's actual knowledge for their 2339A-C claims, Plaintiffs' allegations never plausibly show that ECC "willfully" violated any U.S. sanctions regime, as required for an IEEPA-based ATA claim.

Plaintiffs rely on Executive Order 13224, which designated the Taliban as a Specially Designated Global Terrorist in 2002.[16]  66 Fed. Reg. 49079 (Sept. 23, 2001); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 6 (D.D.C. 2012).  All Taliban assets are therefore blocked and "may not be transferred, paid, exported, withdrawn or otherwise dealt in", and "no U.S. person may engage in any transaction or dealing in property or interests in property" of the Taliban.  31 C.F.R. §§ 594.201, 594.204; *see* Compl. ¶ 1284.  In an effort to stitch all of this together, Plaintiffs allege that all "Defendants" violated these regulations by "engaging in transactions with the Taliban" without authorization.  Compl. ¶¶ 1284, 1288.  Plaintiffs instead make only conclusory, generalized allegations that all "Defendants" "willfully … engage[d] in the transfer, payment, export, withdrawal or otherwise dealing in the property of the Taliban" and "willfully … engage[d] in transactions with the Taliban." *Id*. ¶ 1284; 31 C.F.R. §§ 594.201, 594.204.  Plaintiffs have not pled sufficient facts to show that ECC's payments to its subcontractors were illegal under IEEPA. *See* Compl. ¶ 1284.

---

[16] Specially Designated Nationals and Blocked Persons List, U.S. Department of the Treasury, https://sanctionssearch.ofac.treas.gov/Details.aspx?id=261

Even in an IEEPA claim, moreover, the Complaint must contain sufficient facts to support plausible allegations of an "act of international terrorism" and the causation requirements built into the ATA's "by reason of" language.  *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 911 (N.D. Cal. 2018) (Section 1705 claim requires the same analysis as ATA claims).   Federal courts routinely reject claims of ATA liability predicated on sanctions violations, holding that those violations cannot constitute acts of "international terrorism" because they are economically driven and do not supply the requisite causation.  *See, e.g., Owens II,* 897 F.3d at 274; *see also Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018).   Plaintiffs' IEEPA claim, like Plaintiffs' other primary liability ATA claims, fails to demonstrate that Defendant ECC committed an "act of international terrorism" or proximately caused Plaintiffs injuries for the same reasons.  *See infra* Part II.A(4) (no proximate causation); II.B (no act of international terrorism).

It is also significant that at no time did the U.S. government seek to bring a criminal claim under IEEPA against ECC.  This case thus resembles ATA cases grounded on allegations of IEEPA violations in which the government never brought charges for IEEPA violations, and all of which have been dismissed.  *See, e.g., Retana v. Twitter, Inc.,* 419 F. Supp. 3d 989, 993 (N.D. Tex. 2019); *Clayborn v. Twitter, Inc.*, No. 17-cv-06894-LB, 2018 U.S. Dist. LEXIS 217877, at *16-17 (N.D. Cal. Dec. 31, 2018); *Gonzalez v. Google*, 335 F. Supp. 3d 1156, 1175 (N.D. Cal. 2018).

### 4.   Plaintiffs Fail To Allege Either Proximate Causation Or But-For Causation For Their Primary Liability Claims.

Plaintiffs cannot plead a valid ATA claim unless they also plausibly allege facts to demonstrate proximate causation because "the ATA ultimately is a tort statute. That means that causation must be proven before liability is established."  *Kemper*, 911 F.3d at 390; *see Owens II*, 897 F.3d at 275.  In addition to proximate cause, a recent Supreme Court ruling confirms what it described as "textbook tort law"—that a plaintiff also must plead plausible facts to demonstrate

but-for causation.  *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 206 L. Ed. 2d 356, 361 (U.S. 2020).  The Complaint fails to plausibly allege sufficient facts to demonstrate either type of causation.

Plaintiffs' causation theory fails to establish but-for causation, because it depends on the notion that money is fungible, *i.e.*, that ECC's subcontractor payments were diverted to the Taliban and thereby "gave the Taliban <u>fungible</u> resources that were vital to the Taliban's ability to sustain its terrorist enterprise."  Compl. ¶ 87 (emphasis added); *see also id.* ¶ 94 ("Defendants' protection payments generally flowed up the Taliban's organizational chain (or were made directly to top-level Taliban institutions) and supplied <u>fungible</u> U.S. dollars available for use by leadership. … The Taliban's high-level commanders then used those <u>fungible</u> dollars supplied by Defendants to finance their nationwide terrorist campaign against Americans in Afghanistan.") (emphasis added).

The Taliban's undisputed access to multiple funding sources—confirmed by Plaintiffs' separate lawsuit against Iran for these same attacks—forecloses any allegation that the Taliban could not have waged these attacks "but for" money allegedly diverted from ECC.  As another district court explained, "[e]ven if an ATA plaintiff could show that a particular dollar was used in furtherance of a particular attack . . . . that plaintiff still could never prove that absent the defendant's providing that dollar, a group like Hamas would not have made up the shortfall from elsewhere."  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 324 (E.D.N.Y. 2015).

There likewise is no plausible proximate causal-connection between ECC's arms-length subcontractor payments and the attacks at issue.  Among other elements, proximate cause requires a "substantial factor" relationship between a defendant's acts and a plaintiff's injury.  *Owens II*, 897 F.3d at 275.  Because the Taliban has multiple funding sources, and given the alleged number

of intermediary actors between ECC's subcontractor payments and the attackers, and the alleged remoteness in time and geography between ECC's operations and the attacks, Plaintiffs cannot allege plausibly that ECC's payments were a substantial factor in the terror attacks at issue here. Equally, those same factors demonstrate that it was not "reasonably foreseeable" that ECC's subcontractor payments would cause the terror attacks in this case.

a)   The Supreme Court's Ruling In *Comcast* Requires But-For Causation, And Invalidates Plaintiffs' Reliance On The "Fungible Dollars" Argument.

The Supreme Court recently confirmed that the "ancient and simple 'but for' common law causation test…supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action." *Comcast*, 206 L. Ed. 2d at 362 (quoting *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 347 (2013)); *see also Babb v. Wilkie*, 206 L.Ed.2d 432, 448 (U.S. 2020) ("But-for causation is 'the background against which Congress legislate[s],' and it is 'the default rul[e Congress] is presumed to have incorporated, absent an indication to the contrary in the statute itself.'") (quoting *Nassar*, 570 U.S. at 347).

This default rule applies in any tort case, including under the ATA. *See Comcast*, 206 L. Ed. 2d at 360 ("In the law of torts, … a plaintiff must first plead and then prove that its injury would not have occurred 'but for' the defendant's unlawful conduct"); *Babb*, 206 L.Ed.2d at 447-48 ("We have explained that '[c]ausation in fact—*i.e.,* proof that the defendant's conduct did in fact cause the plaintiff 's injury—is a standard requirement of any tort claim.'") (quoting *Nassar*, 570 U.S. at 346, and citing various types of tort cases). "[T]hese are the default rules [Congress] is presumed to have incorporated, absent an indication to the contrary in the statute itself." *Nassar*,

570 U.S. at 347.  There is no indication in the language of the ATA that Congress removed the but-for causation requirement in the statute.

The ATA's "by reason of" language requires "some causal connection between the act of international terrorism and the U.S. national's injury." *Owens II*, 897 F.3d at 270.  Plaintiffs are accordingly obligated to meet the but-for causation standard in addition to proximate cause. *Owens III* addressed this same language in the context of the ATA, and held that "the 'by reason of' language has a well-understood meaning . . . .  This language requires 'a showing that the defendant's violation not only was a 'but for' cause of the injury, but was the proximate cause as well.'" 235 F. Supp. 3d at 96 (internal citation, brackets omitted) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013)); *see also Comcast,* 206 L. Ed. 2d at 363 (holding that "'by reason of '… is a term[] we have often held indicate[s] a but-for causation requirement") (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176-77 (2009)).

*Comcast* vitiates prior out-of-circuit-precedent holding that the ATA does not require but-for cause, because those older cases did not engage in the textual analysis required by *Comcast*, but instead implemented a non-textual and policy-based desire to make it easier to punish terrorists. This is evident from those cases' focus on concerns about the functionality and legislative history of the ATA, rather than on statutory construction.[17]  *See* 206 L. Ed. 2d at 362.  *Comcast* also nullifies past ATA cases that depended upon legislative history, because *Comcast* held that

---

[17] For example, in *Goldberg v. UBS AG*, the district court relied on "[c]ommon sense" to hold that the ATA does not require but-for causation, because  "[s]uch a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA." 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009); *see also Kemper*, 911 F.3d at 391; *Gill v. Arab Bank PLC*, 893 F. Supp. 2d 474, 507-08 (E.D.N.Y. 2012); *Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702, 2006 U.S. Dist. LEXIS 72649, at *57 (E.D.N.Y. Oct. 5, 2006); *Linde*, 97 F. Supp. 3d at 323, 325.

legislatively-created tort causes of action mandate a but-for causation standard unless Congress expressly provides otherwise.  *See id.* (citing cases).

The Complaint does not—and cannot—plausibly allege that the Taliban attacks at issue would not have occurred in the absence of ECC's payments to its subcontractors.  The Complaint nowhere alleges that ECC's payments to its subcontractors directly funded the attacks in which Plaintiffs were harmed, or that ECC's payments were irreplaceable for purposes of the Taliban's funding stream.  Instead, the Complaint emphasizes that "Defendants' protection payments gave the Taliban <u>fungible</u> resources."  Compl. ¶ 87 (emphasis added); *see also id.* ¶ 94.  While Plaintiffs allege their claims based on the principle that money is fungible, such that Plaintiffs do not need to trace ECC's subcontractor payments to the Taliban attacks here, the "but for" standard reiterated in *Comcast* cannot be satisfied with a "money is fungible" approach.  *See id.* ¶¶ 87, 94.

Applying the but-for causation standard in this case, Plaintiffs cannot plausibly trace ECC's payments to the attacks at issue, because the Taliban had multiple funding sources that would have funded its attacks in any event.  This was the concern about but-for causation, in fact, of those past ATA cases that *Comcast* makes defunct: "But-for causation … is nearly impossible to prove, because money is fungible. …  [and a] plaintiff could never prove that absent the defendant's providing that dollar, a group like Hamas would not have made up the shortfall from elsewhere." *Linde*, 97 F. Supp. 3d at 324; *see also Strauss*, 2006 U.S. Dist. LEXIS 72469 at *58-59 ("[B]ecause money is fungible, it is not generally possible to say that a particular dollar caused a particular act or paid for a particular gun."); *Gill*, 893 F. Supp. 2d at 507-08 ("[R]equiring an ATA plaintiff, at least in the material support context, to prove but-for causation would come up against the basic problem of the fungibility of money"); *Brill v. Chevron Corp.*, No. 15-cv-04916, 2018 U.S. Dist. LEXIS 137579, at *13-14 (N.D.Cal. Aug. 14, 2018) ("Plaintiffs offer no facts indicating that

Chevron's money somehow retained its identity and cohesiveness as it traveled through the hands of these many intermediaries.  [P]laintiffs . . . must allege more than that Chevron contributed funds to an evil empire.").  Plaintiffs and other courts may consider that outcome undesirable, but neither can dispense with but-for causation in ATA cases—it is the rule.

> b)   Plaintiffs Never Demonstrate Proximate Cause Because They Rely On Generalized Allegations Instead of Plausible Facts.

Nor does the Complaint plead a plausible proximate causal-connection between ECC's arms-length payments to its security contractors and the attacks at issue in this case.  Plaintiffs cannot establish proximate cause as to ECC, because proximate causation is interrupted by the many intermediary actors between ECC and the terrorists who committed the attacks, and the remoteness in time and geography between ECC's construction projects and the attacks.

A plaintiff cannot adequately allege that he or she was injured "by reason of" the defendants' conduct under 18 U.S.C. § 2333 without also meeting the ATA's "traditionally rigorous proximate cause requirement."  *Shatsky v. PLO*, No. 02-2280 (RJL), 2017 U.S. Dist. LEXIS 94946, at *23 (D.D.C. June 20, 2017), *vacated on other grounds by Shatsky v. PLO*, No. 17-7168, 2020 U.S. App. LEXIS 11734 (D.C. Cir. Apr. 14, 2020); *see also Owens II*, 897 F.3d at 273.  To adequately plead proximate cause, an ATA plaintiff must plausibly allege both (1) that the defendant's conduct was a "substantial factor" in causing his or her injuries and (2) that those injuries were "reasonably foreseeable or anticipated as a natural consequence" of the defendant's conduct.  *Owens II*, 897 F.3d at 273.

To satisfy the substantial-factor requirement, a plaintiff "must" establish "some direct relation between the injury asserted and the injurious conduct alleged"; the "central question" is whether ECC's allegedly wrongful conduct "led directly" to the Plaintiffs' injury.  *Id.* at 273 n.8 (citations and internal quotes omitted); *see also Fields v. Twitter, Inc.*, 881 F.3d 739, 744 (9th Cir.

2018) ("[T]o satisfy the ATA's 'by reason of' requirement, a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts."). Plaintiffs' allegations fall short of those requirements, much as they did in *Terrorist Attacks on September 11, 2001 v. Al Rajhi Bank* (*In re Terrorist Attacks on September 11, 2001*), 714 F.3d 118, 124 (2d Cir. 2013). The Second Circuit explained why plaintiffs' proximate cause allegations were insufficient: "Simply put, plaintiffs do not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks." *Id.* at 124. Plaintiffs' allegations here are even more attenuated, because ECC was not funding a subcontractor (ArmorGroup) that supported terrorism. Instead, ECC (and ArmorGroup) took meaningful steps to prevent any such associations.

Plaintiffs must also plausibly allege that their "injur[ies] w[ere] reasonably foreseeable or anticipated as a natural consequence" of ECC's conduct. *Rothstein*, 708 F.3d at 91 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)); *Fields*, 881 F.3d at 747. Importantly, "foreseeability alone is not sufficient to establish proximate cause." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017).

When an ATA defendant engages in business with an entity that is not designated as an FTO, as ECC did here with its non-FTO subcontractors, federal courts reject causation based on attacks committed by third parties, even when a plaintiff alleges that the defendant's counter-party in the business relationship funded or supported the third-party attackers. Another district court has explained: "Thus, given that Defendants' alleged Iranian clients are engaged in worldwide commerce, it strains credulity to assume or infer that any person or business that provides services

to such organizations, even illegal services, becomes 'a substantial factor in the sequence of responsible causation' for any terrorist attack that the Iranian organization later supports." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 94, 97 n.38 (E.D.N.Y. 2019) (quoting *Rothstein*, 708 F.3d at 91); ; *Brill*, 2018 U.S. Dist. LEXIS 137579, at *13-14 (dismissing ATA claims based on illegal "kickbacks" to pre-war Iraqi officials who allegedly helped Saddam Hussein fund terrorist attacks, because imposing ATA liability on the defendant "only for doing business, albeit illegally, with a rogue state would extend the scope of the [ATA] far beyond Congress's mandate").

Because ECC's subcontractors were not FTOs, Plaintiffs have a higher burden and must allege plausible facts to show how ECC's commercial relationship with its subcontractors pursuant to contracts with the U.S. military substantially and foreseeably contributed to the terror attacks here. Plaintiffs fail to meet that burden because, both now and during the life of the subcontracts, the non-FTO counter-parties here (ECC's subcontractors) have a host of legitimate business activities and do not "solely exist for terrorist purposes." *Freeman*, 413 F. Supp. 3d at 94; *O'Sullivan*, 2019 U.S. Dist. LEXIS 53134, at *28 (same); *Brill,* 2018 U.S. Dist. LEXIS 137579, at *13-14 (citing cases).

Plaintiffs do not even attempt to link two of ECC's projects (Ring Road[18] and Kandahar Airfield[19]) to the Taliban attacks at issue here. Plaintiffs' effort to do so with ECC's other projects

---

[18] "On January 17, 2012, the Asian Development Bank awarded a multiyear, $477 million contract to a joint venture that ECC controlled and directed, under which ECC was to construct a 233-kilometer portion of Afghanistan's Ring Road." *Id.* ¶ 130(g). Plaintiffs only generally allege that the "Ring Road was well-known in Afghanistan as a frequent target of Taliban extortion efforts, and contractors regularly paid protection money to secure their sections of the road." *Id.* ¶ 132. Plaintiffs do not allege that ECC made any payments to the Taliban that led directly to the terror attacks at issue here.

[19] On February 28, 2011, the U.S. Air Force Civil Engineering Center awarded ECC a contract to construct "infrastructure for an airfield in Kandahar, Afghanistan." Compl. ¶ 130(f). SIGAR

(Shindand Airbase and Kunduz Police project) fail the *Owens II* proximate-cause test as a matter of law, because the Complaint contains no plausible allegations that ECC's subcontractor-payments "led directly" to Plaintiffs' injuries in the terror attacks at issue.  897 F.3d at 273 n.8. Nor are there any plausible fact allegations that those injuries were "reasonably foreseeable." *Id*. at 273.

With regard to the Shindand Airbase project, Plaintiffs allege that ECC's subcontractor, ArmorGroup, "paid substantial sums under its contract with ECC" to security personnel who were allegedly affiliated with the Taliban.  Compl. ¶ 137.  The Complaint fails to establish proximate causation, because it does not allege any plausible facts to show that ECC made direct payments to the Taliban during the Shindand Airbase project, that ECC's payments to ArmorGroup for its work on the Shindand Airbase project were given to the Taliban, or that ArmorGroup exists solely to further terror.  *See supra* 11-14.  The Complaint also does not allege facts to show that the payments ArmorGroup made on the Shindand project to its security personnel allegedly affiliated with the Taliban "led directly" to the terror attacks that injured Plaintiffs.  Equally problematic is that the Complaint does not directly connect the security personnel working for ArmorGroup with any of the attacks against Plaintiffs.

Further, any payments and support that ArmorGroup allegedly provided to security personnel hired by Mr. Pink and Mr. White cannot establish proximate cause because they were too remote in time and distance from the attacks at issue here.  The earliest attacks at issue here

---

auditors did not conclude that any ECC payments were diverted to terrorist groups or to support terrorist activity.  SIGAR auditors concluded certain ECC payments made to local laborers lacked certain documentation, *see* Ex. 2 (2016 SIGAR Report), at 16-17, Compl. ¶ 133, but noted ECC had other relevant information about the Afghan laborers, including information about the work performed and monthly salaries.  Ex. 2 (2016 SIGAR Report) at 27-28.

occurred on December 30, 2009, over one year _after_ ArmorGroup ceased providing security services to ECC on the Shindand Airbase Contract and nearly 16 months _after_ ArmorGroup terminated all personnel connected to Mr. Pink and Mr. White II, and therefore allegedly affiliated with the Taliban.  Compl. ¶ 473.  In addition, the December 2009 attacks took place in Khost Province, approximately 600 miles from the Shindand Airbase in Herat Province.  _See id._  In fact, none of the Plaintiffs were attacked in Herat Province.  The attacks closest to Shindand Airbase were in neighboring provinces, but both attacks occurred in Badghis Province, on May 17, 2010 and April 21, 2011—17 months and 29 months, respectively, after ArmorGroup stopped working as ECC's security subcontractor.  _Id._ ¶¶ 370-80, 610-15.  Given these facts, Plaintiffs cannot establish that ECC's payments to ArmorGroup "led directly" to any of Plaintiffs' injuries or that any such injuries were a foreseeable consequence of ECC's actions.  _Owens II_, 897 F.3d at 273.

The same issues defeat proximate cause with regard to the Kunduz Police contract.  The Complaint does not allege any plausible facts to show that ECC made direct payments to the Taliban during the Kunduz Police project, or that ECC's payments to Arvin Kam for its work on the project or in settlement of Arvin Kam's claims were given to the Taliban.  _See supra_ at pp. 14-18.  Plaintiffs also never allege substantive facts to show that ECC directly supported a terrorist group, financially or otherwise, which "led directly" to the terror attacks on Plaintiffs.  Instead, Plaintiffs assert that ECC should be primarily liable under the ATA for payments it made for construction services to its subcontractor, because CENTCOM determined (nearly two years into the project) that Arvin Kam was "supporting an insurgency" in Afghanistan.  Compl. ¶ 134.  Plaintiffs do not supply any facts to show that ECC knew before it was informed of the CENTCOM determination that Arvin Kam was "supporting an insurgency."  Plaintiffs also do not supply any facts to demonstrate that payments to Arvin Kam under the arms-length contract with ECC, or

pursuant to the settlement agreement, "led directly" to any of Plaintiffs' injuries or that Plaintiffs' injuries were a foreseeable consequence of ECC's actions. *Owens II*, 897 F.3d at 273.

As with the Shindand Airbase project, Plaintiffs' allegations related to ECC's work on the Kunduz Police project are too remote in time and location from the attacks at issue here.  Only one of the attacks on Plaintiffs occurred in Kunduz Province, but on June 12, 2010—over three months <u>before</u> ECC was awarded the Kunduz Police project on September 16, 2010.  *See* Compl.  ¶¶ 130, 381-85.  The Complaint identifies one attack that occurred in neighboring Baghlan Province on January 20, 2011, but this attack occurred four months after ECC was awarded the Kunduz project and <u>over two and a half years before</u> Arvin Kam was designated as an entity "supporting an insurgency." *Id.* ¶¶ 134, 1126-32.  Courts have recognized that a months-long gap between alleged assistance and subsequent terrorist attacks renders resultant ATA claims implausible. *See, e.g., Siegel v. HSBC N. Am. Holdings*, 933 F.3d 217, 224 (2d Cir. 2019) (ten month gap "makes it implausible … that HSBC had knowingly assumed a role in the Attacks").

B.     <u>Payments For Legitimate Services Pursuant To An Arms-Length Contract Are Not An Act of International Terrorism.</u>

To establish their primary liability claims under the ATA, Plaintiffs must allege that ECC committed an act of "international terrorism." 18 U.S.C. § 2331.  Plaintiffs must allege plausible facts to show that ECC's actions "appear to be intended" to "intimidate or coerce a civilian population," to "influence the policy of a government by intimidation or coercion," or to "affect the conduct of a government by mass destruction, assassination, or kidnapping." *Id*. § 2331(1)(B). This test "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014).  Plaintiffs also must have alleged that ECC's actions were "violent" or "dangerous to human life." 18 U.S.C. § 2331(1)(A).

Plaintiffs concede that ECC engaged security and construction subcontractor services for a purely commercial purpose, that is, to perform and safeguard its construction projects in Afghanistan so that ECC could earn revenue and perform under its contracts with the U.S. military. *See e.g.,* Compl. ¶¶ 3-5 ("Defendants" payments were "[t]o protect those businesses and grow their profits," "saved Defendants money," and were viewed as the "the cost of doing business"); *id.* ¶ 59 (alleging "Defendants" "chose to pay not because of any reconstruction imperative, but because it served their financial interests"). Plaintiffs also admit that ECC paid its subcontractors pursuant to (and in settlement of) arms-length contracts. *See id*. ¶¶ 82, 131.

Plaintiffs' concession that ECC was motivated by its financial interest is dispositive because that motive obviates Plaintiffs' ability to demonstrate an act of international terrorism. ECC was "motivated by economics, not by a desire to 'intimidate or coerce,'" *Kemper*, 911 F.3d at 390, and consequently could not have intended to "intimidate or coerce a civilian population," to "influence the policy of a government by intimidation or coercion," or to "affect the conduct of a government by mass destruction, assassination, or kidnapping." *Id*. § 2331(1)(B). Other federal courts routinely dismiss ATA claims based on similar economic motives. *See, e.g., Kemper,* 911 F.3d at 390-94 (holding that providing bank services to Iranian entities could not constitute international terrorism, because "[t]o the objective observer, its interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce'") (quoting 18 U.S.C. § 2331(1)(B)(i), (ii)); *Stutts v. De Dietrich Group,* No. 03-CV-4058 (ILG), 2006 U.S. Dist. LEXIS 47638, at 11-12 (E.D.N.Y. June 30, 2006) ("The plain language of the ATA compels the conclusion that, by engaging in commercial banking activity, the Bank Defendants were not involved in 'violent acts or acts dangerous to human life.' Nor were their actions designed to coerce civilians or government entities as required under § 2331.").

Because Plaintiffs predominantly depend upon allegations of routine commercial activity to support the Section 2331 "act of international terrorism" element, Plaintiffs needed to plead additional facts to show that ECC's payments to its subcontractors were "violent" or "dangerous to human life" and were "intended to intimidate or coerce."  18 U.S.C. § 2331(1)(A)-(B); *see also Kemper*, 911 F.3d at 390  ("[I]nteractions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce.'"); *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 532 (S.D.N.Y. 2019) (dismissing case because "the provision of financial services does not, in itself, equate to international terrorism. Plaintiffs must plausibly allege that Defendant's <u>own</u> actions" involved violence, were intended to intimidate or coerce) (citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018)).  Plaintiffs never allege any such facts, and this Court cannot infer them from the Complaint, as the Court of Appeals could in *Owens II*, where the plaintiffs had alleged sufficient facts to establish a relationship between the bank and Sudan. 897 F.3d at 275.  Left with only allegations about ECC's economic motivations, then, Plaintiffs cannot show that "the provision of [commercial] services, which are not inherently violent or dangerous," or were "acts dangerous to human life, particularly because the factual allegations delineating relationships between those services and the terrorist attacks at issue are so attenuated." *O'Sullivan*, 2019 U.S. Dist. LEXIS 53134, at *33.[20]

---

[20] ECC notes that all of Plaintiffs' claims are barred by the ATA Act of War exception, because the attacks on Plaintiffs took place during the course of the United States' armed conflict with the Taliban.  The ATA provides "[n]o action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war."  18 U.S.C. 2336(a).  "Act of war" is defined to include acts occurring during "(a) declared war; (b) armed conflict, whether or not war has been declared, between two or more nations; or (c) armed conflict between military forces of any origin."  18 U.S.C. § 2331.  However, the Act of War exception "becomes salient only if the act in question qualifies as 'an act of international terrorism' in the first place."  *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 513 (D.C. Cir. 2018).  ECC has demonstrated that its payments to contractors for legitimate services pursuant to arms-length commercial contracts are not acts of international terrorism. *See* Part II.C.

> a)  Plaintiffs Have Not Sufficiently Alleged Terroristic Intent Under 18 U.S.C. § 2333(a).

Plaintiffs do not allege, as they must, that ECC had knowledge or intent that it would be supporting terror groups or terrorist activity rather than paying for its subcontractors for contracted security and construction services.  With regard to Shindand Airbase, ECC paid its subcontractor, ArmorGroup, and ArmorGroup was responsible for vetting and paying its local security personnel, including Mr. Pink, Mr. White, and Mr. White II.  *See supra* pp. 11-14 (discussing personnel at Shindand Airbase project); Ex. 1 (Senate Report) at 8-9, 58; Compl. ¶ 130(a).  ArmorGroup also warranted in the contract with ECC that its employees were "subject to a strict vetting and screening process" and that ArmorGroup required from each candidate "a signed declaration stating that they were not a member of the Taliban" and other verifications.  Ex. 1 (Senate Report) at 58-59.

As further evidence that ECC did not have terroristic intent, ECC with ArmorGroup undertook a due diligence process before it hired its key local security personnel at Shindand Airbase.  That process included referrals and interviews of Mr. Pink and Mr. White by U.S. military personnel on site at Shindand Airbase, and also by ArmorGroup and ECC, a meeting between U.S. military with Shindand's governor and village elders, background checks, and meetings between ECC and Mr. Pink and Mr. White.  *See id.* at 8-9.  The Senate Armed Services Committee investigated ECC's and ArmorGroup's extensive due diligence and found no fault with that process.  The SASC also determined that ArmorGroup's decision to rely on local personnel to provide security was commercially reasonable and necessary due to "the lack of other feasible options," because the "U.S. and Coalition military forces were not available," and given the

---

"positive impact of providing employment to local inhabitants in hotly contested areas who otherwise would be more likely to become insurgents for simple economic reasons." *Id*. at 88.  In fact, the SASC concluded "more than 93 percent of private security contractor personnel in Afghanistan are local nationals." *Id*. at 81.

The lack of terrorist intent equally is evident from ECC's termination (through ArmorGroup) of Shindand Airbase security personnel suspected to be affiliated with the Taliban. This was also the finding of the SASC, which concluded "in January 2008 ArmorGroup fired at least 15 guards at Shindand after determining that some of them were providing information on airfield security to a local warlord who was reportedly aligned with the Taliban." Ex. 1 (Senate Report) at 61.  Following the Azizabad raid, in August 2008, when ECC learned that local reports surfaced that Mr. White II was affiliated with the Taliban, ECC (through ArmorGroup) terminated all Shindand Airbase security guards under Mr. White II's supervision. *See* Compl. ¶ 149; Ex. 1 (Senate Report) at 33-34.

ECC's conduct on the Kunduz Police project with its subcontractor, Arvin Kam, also negates any plausible allegation of terroristic intent and instead shows ECC's intent to avoid providing support for terrorists or insurgents.  Prior to engaging Arvin Kam, ECC undertook a thorough due diligence review to confirm that Arvin Kam was a suitable contracting partner.  ECC terminated Arvin Kam as soon as the U.S. government instructed.  When Arvin Kam responded to its termination by filing a complaint with the Afghan government, the Afghan government pressured ECC to pay Arvin Kam for its pre-termination work on the project.  *See* Ex. 5 (Brief in Support of Motion for Summary Judgment (Dkt. 37)), at 6-7.  ECC sought guidance from the U.S. government, and subsequently obtained an order in federal court voiding *ab initio* the settlement

agreement in order to effect the government's directive regarding Arvin Kam.  *See Arvin Kam*, 2019 U.S. Dist. LEXIS 64282, at *12.

These actions individually and collectively negate any plausible allegation of terroristic intent.  Plaintiffs' allegations show only that ECC's payments to its subcontractors objectively were motivated by a desire to efficiently and securely manage its various construction contracts and to earn revenue, and to implement the U.S. government's plans to reconstruct Afghanistan after many years of conflict. *See* Compl. ¶¶ 3-5, 59.  These allegations resemble the allegations in *Strauss v. Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148 (E.D.N.Y. 2019).  The *Strauss* plaintiffs alleged that the defendant "merely provided banking services to [the FTO] for ostensibly charitable purposes", leading the court to conclude there was no terroristic intent.  379 F. Supp. 3d at 160-61.  In contrast, *Linde* held Arab Bank had terroristic intent, because the evidence "demonstrated that defendant Arab Bank processed bank transfers that 'were explicitly identified as payments for suicide bombings.'"  *Id.*, 379 F. Supp. 3d at 160 (contrasting *Strauss* with *Linde*, 882 F.3d at 321).

> b)   The Complaint Fails To Allege Plausibly That ECC Engaged In "Violent Acts or Acts Dangerous To Human Life."

The Complaint also fails to allege plausibly that ECC engaged in "violent acts or acts dangerous to human life," because there is nothing inherently dangerous about making payments to subcontractors as part of a "routine" commercial transaction. *Linde*, 882 F.3d at 327 (holding that "providing routine financial services to members and associates of terrorist organizations" cannot alone "compel a finding as a matter of law, the services were violent or life-endangering acts"); *see also O'Sullivan*, 2019 U.S. Dist. LEXIS 53134 at *31-33 ("[T]he provision of banking services, which are not inherently violent or dangerous" are not "acts dangerous to human life."). This is particularly true when the "factual allegations delineating relationships between those

[transactions] and the terrorist attacks at issue are … attenuated," as they are here.  *Id.* (dismissal because no act of international terrorism).

The Complaint's only relevant, non-conclusory allegations about ECC are: 1) that ECC hired and paid its subcontractors pursuant to arms-length contracts for security and construction services; 2) that ECC (through ArmorGroup) terminated local employees when reports reached ECC that some of ArmorGroup's Shindand Airbase personnel had a possible Taliban connection, and when the U.S. government instructed ECC to terminate Arvin Kam; and, 3) that ECC settled (but later voided) Arvin Kam's claims seeking payment for pre-termination construction work. Even assuming that these payments were diverted by third-parties in a way that "gave the Taliban fungible resources" used to carry out the attacks against Plaintiffs, the Complaint does not contain any allegations supported by plausible facts showing that ECC intended or contemplated that result.  Compl. ¶ 87, 134.  Accordingly, there is no plausible allegation that ECC committed a violent act or an act dangerous to human life.  *See Kaplan*, 405 F. Supp. 3d at 532 (holding although defendant was aware it was violating U.S. sanctions by providing financial services to Hizbollah affiliates, "the provision of financial services does not, in itself, equate to international terrorism"); *O'Sullivan*, 2019 U.S. Dist. LEXIS 53134 at *31-33 (holding "the provision of banking services, which are not inherently violent or dangerous" were not "acts dangerous to human life").

      C.    <u>Plaintiffs Fail To State A Claim For Secondary Liability Under The ATA.</u>

The ATA, as amended by JASTA, provides that to plead a valid aiding and abetting claim (secondary liability), Plaintiffs must allege sufficient facts to demonstrate that ECC "knowingly provid[ed] substantial assistance" to an act of international terrorism "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization [FTO]… as of the date on which such act of international terrorism was committed."  18 U.S.C. § 2333(d). The "knowingly" element of an aiding and abetting claim "requires the secondary actor to be

'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities" and to have been "aware that … it was playing a role in violent or life endangering acts whose apparent intent was to intimidate or coerce civilians or to affect a government."  *Linde*, 882 F.3d at 329.

Plaintiffs' ATA aiding and abetting claim (Claim 5) fails, because the Complaint does not offer plausible facts to demonstrate that ECC 1) was "aware" it was "assuming a 'role' in terrorist activities," 2) provided "substantial assistance" to the remote third-parties that committed the attacks at issue, and 3) provided assistance to an FTO that committed, planned, or authorized the attacks at issue, because the Taliban has never been a designated FTO.  Nor can Plaintiffs soften the ATA's aiding and abetting liability requirements by pleading RICO as a predicate (Claim 6), because "JASTA … confirms that Congress knows how to provide for aiding and abetting liability explicitly."  *Owens II*, 897 F.3d at 278.  Consequently, Plaintiffs must have plausibly alleged the requirements of 18 U.S.C. § 2333(d) to establish ATA aiding and abetting liability.

1.    The Complaint Fails To Allege Plausible Facts To Show That ECC Provided Support To A Designated FTO.

Plaintiffs' claims for secondary-liability fail because Plaintiffs allege that the attacks at issue were "committed by the Taliban," and the Taliban is not a designated FTO, as explicitly provided for in 18 U.S.C. § 2333(d)(2). *See* Compl. ¶ 1290; *see also supra* n.15.  The Taliban is the only terrorist group to which third parties allegedly diverted ECC's subcontractor payments, but the Taliban has never been designated an FTO.[21]  ECC has established that the Complaint does not allege facts to show ECC had any connection with the Haqqani Network. *See supra* pp. 19-20.

Nor can Plaintiffs circumvent JASTA's plain language with conclusory allegations that the Taliban was part of a terrorist syndicate with al-Qaeda, such that alleged material support to one

---

[21] *See* U.S. Dep't of State, *Foreign Terrorist Organizations*, https://www.state.gov/foreign-terrorist-organizations

member of the syndicate is construed as support to all of the members. *See* Compl. ¶ 273.  The United States consistently distinguishes al-Qaeda—a designated FTO since 1999—from the Taliban, an organization that still considers itself the rightful government of Afghanistan and a partner for peace with the United States.[22]  The Complaint admits that the Taliban operates as a "shadow local government."  Compl. ¶ 43; *see id*. ¶¶ 44, 78, 283, 291.  Plaintiffs therefore cannot treat al-Qaeda as interchangeable with the Taliban.

        2.      <u>The Complaint Does Not Sufficiently Plead That ECC Was "Aware" It Was Assuming A "Role" In Terrorist Activities.</u>

The ATA, as amended by JASTA, provides that federal courts should look to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), for guidance regarding ATA aiding and abetting liability. *Halberstam* requires that "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" and "must knowingly and substantially assist the principal violation."  705 F.2d at 477.  The defendant must have been "generally aware that, [by providing [] services] it was thereby playing a role in … violent or life-endangering activities."  *Siegel*, 933 F.3d at 224 (internal quotation marks and citations omitted); *see also Owens II*, 897 F.3d at 277 (holding when defendant provides assistance, it must be "'generally aware' of its role as part of [an FTO's] illegal activities").

This is a stricter *scienter* requirement than that of "18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities."  *Siegel*, 933 F.3d at 224.  ECC has demonstrated that Plaintiffs cannot meet the *scienter* requirement of 18 U.S.C. § 2339B. *See supra*

---

[22] Mujib Mashal, *Taliban and U.S. Strike Deal To Withdraw American Troops From Afghanistan*, The New York Times (Feb. 29, 2020), https://www.nytimes.com/2020/02/29/ world/asia/us-taliban-deal.html

pp. 18-20.  Logically, Plaintiffs also fail to meet the stricter *scienter* requirement of "awareness" to make out a valid aiding and abetting claim, because the Complaint alleges only that ECC made payments to its subcontractors pursuant to arms-length contracts for construction and security services on U.S. government project sites.  Plaintiffs nowhere allege facts to demonstrate that ECC was aware it had assumed a role in an FTO's terrorist activities.  *See Linde*, 882 F.3d at 329 ("[A]iding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization.  Aiding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities."); *see also Siegel*, 933 F.3d at 226; *Honickman v. Blom Bank SAL*, No. 19-cv-00008, 2020 U.S. Dist. LEXIS 7222, at *38 (E.D.N.Y. Jan. 14, 2020).

Plaintiffs also rely largely on allegations about "Defendants."  This is not only impermissible group pleading, but is fatal to Plaintiffs' claims, because Plaintiffs do not allege that ECC knew it was playing a "role" in a terrorist group's activities.  Courts consistently reject generalized knowledge allegations like these.  In *Siegel,* 933 F.3d at 224, for example, the complaint alleged the defendant "was aware that [a third party] was believed by some to have links to … terrorist organizations."  To plead a valid aiding and abetting claim, however, the plaintiff needed to make "further allegations that would support a conclusion that [the defendant] knowingly played a role in the terrorist activities."  *Id*.; s*ee also Taamneh,* 343 F. Supp. 3d at 917.  Even in cases where there are plausible allegations that the defendant provided material support directly to a designated FTO, courts require that the defendant have specific knowledge that it was playing a "role" in terrorist activity, over and above support for a terrorist organization itself.  *Linde*, 882 F.3d at 329-30; *Strauss*, 379 F. Supp. 3d at 164.

Plaintiffs fail to include "further allegations that would support a conclusion that [ECC] knowingly played a role in the terrorist activities" in this case. *Siegel*, 933 F.3d at 224. The Complaint instead rests on allegations that all "Defendants" made subcontractor payments that provided "fungible resources" to a terrorist group or insurgency. Compl. ¶ 87. There are no plausible allegations that ECC was aware that, by paying Arvin Kam or ArmorGroup, ECC was playing a "role" in terrorist activity, including the attacks that harmed Plaintiffs.

3.   The Complaint Alleges No Plausible Facts To Show ECC Substantially Assisted The Taliban In Carrying Out Its Alleged Acts of International Terrorism.

ECC's payments to its subcontractors according to an arms-length contract do not equate to "substantial assistance" to terrorists who committed the attacks that injured Plaintiffs. In *Halberstam*, the D.C. Circuit identified six factors relevant to "how much encouragement or assistance is substantial enough" to satisfy the *scienter* requirement that the defendant "must knowingly and substantially assist the principal violation." 705 F.2d at 487-88; *see also Siegel*, 933 F.3d at 225 (citing *Halberstam*, 705 F.2d at 483-88) (listing six factors).

Plaintiffs' allegations of "substantial assistance" are insufficient because "there are insufficient allegations that Defendants played a role in any particular terrorist activities." *Taamneh*, 343 F. Supp. 3d at 918. ECC has demonstrated that its payments to subcontractors under U.S. government contracts are too attenuated from attacks at issue here to constitute substantial assistance for purposes of proximate cause. With no plausible fact allegations to show a substantial connection to the attacks for primary-liability purposes, Plaintiffs likewise cannot demonstrate that ECC's subcontractor payments provided substantial assistance to an FTO in order to commit the attacks on Plaintiffs. In fact, a review of recent ATA case law by another district court revealed a general "trend in JASTA case law toward disallowing claims against defendants who did not deal directly with a terrorist organization or its proxy." *Averbach v. Cairo Amman*

*Bank*, No. 19-cv-0004-GHW-KHP, 2020 U.S. Dist. LEXIS 10902, at *40 (E.D.N.Y. Sept. 16, 2019) (collecting cases and dismissing secondary liability claim against bank that serviced high ranking Hamas members but not Hamas itself), *aff'd by* No. 1:19-cv-00004-GHW, 2020 U.S. Dist. LEXIS 40430 (S.D.N.Y. Mar. 9, 2020).

The six-factor *Halberstam* test further demonstrates that the Complaint fails to allege plausibly that ECC substantially assisted the attacks against Plaintiffs.  <u>First</u>, in making payments required by arms-length and objectively commercial contracts, ECC cannot plausibly be said to have "encouraged" the third-party attacks that ultimately injured Plaintiffs.  Plaintiffs must allege ECC "acted in a manner that encouraged the specific act in question or, at a minimum, activities involving violence." *See Siegel*, 933 F.3d at 225; *Honickman*, 2020 U.S. Dist. LEXIS 7222, at *31; *Averbach*, 2020 U.S. Dist. LEXIS 10902, at *52. There are no non-conclusory allegations in the Complaint that ECC acted so as to encourage violent acts or the attacks in question.

<u>Second</u>, Plaintiffs do not identify the "amount of" assistance allegedly given by ECC to the entities that committed the attacks.  Plaintiffs do not identify any payments that flowed from ECC to an FTO, nor do they explain how such payments contributed to the attacks on Plaintiffs. *See Honickman*, 2020 U.S. Dist. LEXIS 7222, at *32.  <u>Third</u>, Plaintiffs (correctly) do not and cannot allege that ECC or its employees were "presen[t]… at the time of the tort." *Siegel*, 933 F.3d at 225 (dismissing where "HSBC was not 'present' at the time of the November 9 Attacks.").

<u>Fourth</u>, the Complaint does not allege facts to show that ECC has a "relationship" with an FTO that committed the attacks on Plaintiffs.  *See id.* (dismissing secondary liability claim where "plaintiffs do not plead any non-conclusory allegations that HSBC had a relationship with [an FTO]."). "'[A]rms-length'… relationship[s]," like those ECC had with its subcontractors, cannot form the basis for substantial assistance. *Taamneh*, 343 F. Supp. 3d at 918.  <u>Fifth</u>, Plaintiffs do

not, and cannot, allege plausible facts that ECC knowingly and intentionally assumed a role in or support the terror attacks by an FTO.  Instead, the Complaint alleges only that ECC's payments went to its subcontractors for construction and security services pursuant to the parties' contracts.  *See Siegel*, 933 F.3d at 225; *Kaplan*, 405 F. Supp. 3d at 536.  <u>Sixth</u>, *Halberstam* instructs that "[t]he length of time an alleged aider-abettor has been involved with a tortfeasor . . . may afford evidence of the defendant's state of mind."  705 F.2d at 484.  None of ECC's arms-length relationships with its subcontractors or their employees evidences that ECC was "involved with a tortfeasor" engaged in terrorist activity, including the attacks at issue here.  *Id*. With only those attenuated allegations, Plaintiffs fail to plausibly allege "substantial assistance" under JASTA.  Plaintiffs' secondary liability claim must be dismissed.

### 4.    RICO Cannot Supplant JASTA's Secondary Liability Requirements.

Plaintiffs allege that hundreds of multiple-individual terror attacks over a decade constituted a "Taliban al-Qaeda Campaign", which was an enterprise for purposes of RICO and suffices for secondary ATA liability.  *See* Compl. ¶¶ 1300-07.  The D.C. Circuit in *Owens II*, 897 F.3d at 278, confirmed that Section 2333(d)'s requirements are the only route by which the ATA permits secondary liability.  Plaintiffs cannot use RICO (and its less stringent requirements) as an ATA predicate, because an FTO must commit the act of international terrorism.  *See Halberstam*, 705 F.2d at 477; *see supra* pp. 18-20.

JASTA secondary liability requires both that a defendant "knowingly and substantially assist the principal violation", and that a designated FTO commit, plan, or authorize the act of terrorism that injures the plaintiff.  *Halberstam*, 705 F.2d at 477; 18 U.S.C. § 2333(d)(2).  JASTA requires "<u>an</u> act" and a "connect[ion] with a specific crime," and not "an organization's general course of conduct."  *Taamneh*, 343 F. Supp. 3d at 916; *see supra* pp. 7-10 (generalized allegations about terrorists' course of conduct).  However, Plaintiffs use the word "act" to mean different

things according to their needs:  They use "act" to describe numerous individual Taliban attacks for purposes of the RICO predicate, *see* Compl. ¶ 1301 (pleading "a pattern of racketeering activity involving … commission of acts of terrorism transcending national boundaries"), but to satisfy the ATA element, they claim there was a single terror campaign.  *See id.* ¶ 1302 ("The Taliban-al-Qaeda Campaign was an act of international terrorism.").  Those generalized, single "campaign" allegations are improper, because an ATA defendant must be "generally aware" it is playing a "role" in a specific course of a defendant's violent conduct.  *Siegel*, 933 F.3d at 224.  Even so, Plaintiffs have not alleged:  1) the "Taliban al-Qaeda campaign" was responsible for the attacks here, 2) ECC's payments to its subcontractors pursuant to arms-length government contracts were made or diverted to entities affiliated with al-Qaeda or any FTO, or 3) that those payments were causally connected to the attacks that harmed Plaintiffs.

Further dispositive is that RICO requires that specific entities or individuals—distinct from the enterprise—commit the RICO violations.  *See* 18 U.S.C. § 1962(c).  It is a "basic principle that to establish liability under § 1962 one must <u>allege and prove the existence of two distinct entities</u> (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a difference name."  *Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 161 (2001) (emphasis added).  Whether a defendant is liable "depends on showing that the defendants conducted or participated in the conduct of the <u>enterprise's</u> affairs, not just their <u>own</u> affairs."  *Id.* at 163 (internal quotation marks and citation omitted).   As detailed throughout this Motion, Plaintiffs make no such showing as to ECC.

## III.  CONCLUSION

For all of the foregoing reasons, Plaintiffs' claims against ECC should be dismissed with prejudice.

Dated:  April 29, 2020    Respectfully submitted,

          SQUIRE PATTON BOGGS (US) LLP

          /s/ Mitchell R. Berger
          Mitchell R. Berger (D.C. Bar No. 385467)
          Alexandra E. Chopin (D.C. Bar No. 490736)
          2550 M Street, NW
          Washington, DC 20037
          mitchell.berger@squirepb.com
          alexandra.chopin@squirepb.com

          *Counsel for Defendant*
          *Environmental Chemical Corporation*