**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AUGUST CABRERA, M.G.C., by and through his
next friend August Cabrera, R.X.C., by and through
his next friend August Cabrera, CORBIN
CABRERA, GILLIAN LEIGH CABRERA,
RONALD PAUL HOPKINS, SUZANNE RENAE
MARTINEZ, JD PROSSER, ROBERT CABRERA,
DANIEL MATIAS CABRERA, GLORIA DIANE
TRELFA, CHARLES E. ADKINS, SHEILA G.
GOOD, VELVET L. ADKINS, ALMA MURPHY,
LUCAS GONZALES, PAUL MURPHY, JOSE
ALEMAN, STEPHANIE HAGER, GINNY LAMB,
SHERRY LOAN, LINDA PHANEUF, CAITLIN
ELIZABETH ANDERSON, L.G.A., by and through
her next friend Caitlin Elizabeth Anderson, BOBBY
GENE ANDERSON, PATRICIA MARLENE
GOODWIN, APRIL LYNN ANDERSON, BOBBY
JOE ANDERSON, JOHN DAVID ANDERSON,
MARGARET ANDERSON, ROSA IRMA
HALLIDAY, ARMANDO OCHOA, EDUARDO
OCHOA, BRAD JOSEPH HALLIDAY, CHERYL
ATWELL, ERIN RIEDEL, CHRISTOPHER
BALDRIDGE, E.B., by and through his next friend
Christopher Baldridge, L.B., by and through his next
friend Christopher Baldridge, S.B., by and through
her next friend Christopher Baldridge, JESSIE
BALDRIDGE, VIRGINIA NEWSOM, KYLE
BALDUF, BRETT BARRETT, SHANNON
DENISE COLLINS, APRIL ANGEL BAYS,
TIMOTHY LEE BAYS, BRENDA GRINER,
LINDSAY REDOUTEY, ANGELA KAHLER,
JAMES BELL, PAMELA E. ALEXANDER BELL,
LONDON JACINDA BELL, ANDREA ROE,
SCOTT BENNEDSEN, TRACY BENNEDSEN,
JAMIE JOHANNA COATES, FREDERICK C.
BENSON, BEVERLY MILLS, BRIANNA N.
BENSON, BETHANY ANN BENTON, MARY
BORDER, KATHERINE ABREU-BORDER,
DELAYNIE K. PEEK, JAMES MICHAEL
BOUCHER JR., JAMES BOUCHER SR.,
KIMBERLEY BOUCHER, BRITANY BOUCHER,
FRANCISCO JAVIER BRISEÑO GUTIERREZ,
LUIS BRISEÑO, SUSAN BRODEUR, D.L.B., by
and through his next friend Susan Brodeur, E.L.B.,

Case No. 19-cv-03833-EGS

JURY TRIAL DEMANDED

by and through her next friend Susan Brodeur,
JOYCE A. BRODEUR, LAWRENCE A.
BRODEUR, ARIELL S. TAYLOR, individually,
and for the estate of CHRISTOPHER L. BROWN,
BARBARA BROWN, HAROLD BROWN SR.,
REGINA BROWN, PAULA RICH, RICHARD G.
BRUNKHORST, JANICE HARRIMAN BRYANT,
S.L.B., by and through his next friend Janice
Harriman Bryant, WILLIAM MICHAEL BURLEY,
TAMMY OLMSTEAD, MICHAEL COLLINS,
DAN OLMSTEAD, JAMES REGINALD
CAMPBELL, ARTHUR CAMPBELL, AUDREY
CAMPBELL, TINA MARIE CAMPBELL, MARIA
CARDOZA, RAMIRO CARDOZA SR., RAMIRO
CARDOZA JR., JEFF CARON, CASSANDRA
CARON, KAREN CARON, SUMER J. ROBERTS,
JON CENTANNI, MARCUS CHISCHILLY,
GLENN CHISHOLM, LINDA REYNOLDS,
KARMA CHISHOLM, DONNA BALL,
MICHAEL CHRISTIAN, MICHAEL AARON
CHRISTIAN, KEYKO D. CLARK, CORTEIZE
CLARK, PRECIOUS CLARK, CLEVELAND
DAVIS, JONATHAN CLEARY, APRIL CLEARY,
HOLLY CONRAD, B.C., by and through his next
friend Holly Conrad, KENNETH COTTLE, ROSS
COX, NICOLE COX, A.C., by and through his next
friend Ross Cox, B.C., by and through his next
friend Ross Cox, H.C., by and through her next
friend Ross Cox, PEYTON COONEY, DAVID
AARON CROW, CHERYL A. CULBRETH,
WALTER L. CULBRETH, JAMES FARRIS
CULLINS JR., COOPER HENRY PIKE CULLINS,
DONAVAN KURT SCHILLING CULLINS,
BARBARA SCHILLING, ANTHONY
D'AUGUSTINE, PATRICIA D'AUGUSTINE,
JENNIFER D'AUGUSTINE, NICOLE
D'AUGUSTINE, MICHELE KULESA,
SAMANTHA DAEHLING, BRENDA
DAEHLING, KIRK W. DAEHLING, ADAM
DAEHLING, KAYLA MARIE DAEHLING,
MARCUS DANDREA, N.D., by and through her
next friend Marcus Dandrea, LEANORA
DANDREA, MARK WILLIAM DANDREA, H.D.,
by and through her next friend Leanora Dandrea,
I.D., by and through his next friend Leanora
Dandrea, BENJAMIN DANDREA, GABRIEL

DANDREA, HANNAH DANDREA, JOSHUA
DANDREA, SAMUEL DANDREA, JAMES L.
DANIELS, LUCAS DANIELS, SOPHIE
DANIELS, ROBERT CHARLES DARROUGH,
JUDITH SARA DARROUGH, HELENA DAVIS,
C.D., by and through his next friend Helena Davis,
DON DAY, KATHY DAY, JOSEPH ROGER
DESLAURIERS, LISA DESLAURIERS, TEDDI
DEYOUNG, ALBERTO D. DIAZ, KAYLA N.
DIAZ, N.J.D, by and through her next friend Kayla
N. Diaz, N.J.A.D., by and through her next friend
Kayla N. Diaz, FRANCES P. DIAZ, MAXIMO
DIAZ, ANTHONY M. DIAZ, MATTHEW J.
DIAZ, PATRICIA ELSNER, KELSEY THOMAS,
MARK ELSNER, JACKIE ALLEN, MARK
ANTHONY ELSNER, KELLI DODGE, B.C.D., by
and through his next friend Kelli Dodge, P.A.D., by
and through her next friend Kelli Dodge, JULIE
SCHROCK, RYAN DONAHUE, CHANDLER
SCHROCK, TAYLOR SCHROCK, ROBERT
ALEXANDER DOVE, ROBERT L. DUNNING,
TOMOE DUNNING, JOY COY, J.G.A., by and
through his next friend Jamie Allison, KYLE
EDGERTON, ERICH ELLIS, JAMES RUSSELL
ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS,
JAMES EARL ELLIS, BRIAN EDWARD ELLIS,
JULIE ANN ELLIS, VANESSA MARIE
ANZURES, VICTOR RAYMOND ELLIS,
DENNIS JOHN ELM, DONNA LEE ELM,
CATHERINE ELM BOATWRIGHT, MARGARET
ELM CAMPBELL, MATTHEW ELM,
CHRISTINE RANGEL, KRISTEN A. ELWELL,
E.M.E., by and through her next friend Kristen A.
Elwell, N.B.E., by and through his next friend
Kristen A. Elwell, SUSAN BURKHARD,
CHARLES ESSEX, MARION RUTH HOPKINS,
JOHN EWY, JOHN L. FANT, DAVID FINGAR,
RHONDA G. FINGAR, ANDREA DIETZ,
BUFORD JEREMIAH FINGAR, DONALD
JOSHUA FINGAR, C.F., by and through his next
friend Stephanie Jane Fisher, K.F., by and through
his next friend Stephanie Jane Fisher, STEPHANIE
JANE FISHER, THOMAS ANTHONY
FOGARTY, STEPHANIE FREEMAN, KATIE C.
FREEMAN, K.M.F., by and through her next friend
Katie C. Freeman, W.D.F., by and through his next

friend Katie C. Freeman, BRIAN FREEMAN,
LOUELLA E. FRISON, JOSEPH D. GARRISON,
KENDRA GARZA, DAVID PIEPER, GAYLE
MARIE PIEPER, KAILA CARRIER, TROY M.W.
PIEPER, JUDITH ROWE GENTZ, JOANNA
GILBERT, PATRICIA GOINS, PAUL EDWARD
GOINS III, EMMITT DWAYNE BURNS, JANICE
CARUSO, DANA RAINEY, JOHN WAYNE
GOLDSMITH, LORIE GOLDSMITH, L.C.D., by
and through her next friend, Bridgett L. DeHoff,
KIRK ANDREW GOLLNITZ, TYLER
GOLLNITZ, CEDRIC FRANK GORDON, ANN L.
GOULD, JAMES A. GOULD, JULIANNA
SYMKOWIAK, A.J.Q., by and through her next
friend Kevin L. Grady, JAMES A. GRADY,
JAMES MICHAEL GRADY, KEVIN L. GRADY,
SUNI CHABROW, KRISTIN CARACCIOLO,
PAIGE ERLANGER, TRAVIS SCOTT GREEN,
JULIE GREEN, A.G., by and through her next
friend Travis Scott Green, A.G., by and through her
next friend Travis Scott Green, E.G., by and through
her next friend Travis Scott Green, T.G., by and
through her next friend Travis Scott Green,
GLENDA GREEN, COLBY ANDERSON,
HAYLEY ANDERSON, MATT GRIFFIN,
SHAWN PATRICK GRIFFIN, SHEILA
RISTAINO, CAROL GRIFFIN, DANIEL
GRIFFIN, CELESTINA GROCHOWIAK, D.G., by
and through his next friend Celestina Grochowiak,
CARLOS BENJAMIN GROSS RIOS SR.,
SOCCORO GROSS PANIAGUA, CARLOS
BENJAMIN GROSS PANIAGUA, FELICIA
GROSS PANIAGUA, LOWELL HANSON JR.,
MEGAN KATHLEEN DOHN, CYNTHIA
HANSON, JERRY HARDISON, TERESA
HARDISON, JUSTINA HARDISON, BRIAN
HARPER, ANGELA MARIE HARPER, HOLLY
MARIE HARPE, JOSEPH TROY HULSEY JR.,
SORAINYA HARRIS, TENNYSON CHARLES
HARRIS, TIFFANY DOTSON, ASHLEY
MICHELLE HARRIS, CHRISTOPHER WAYNE
JOHNSON, DAVID L. PARKER, FELICIA ANN
HARRIS, MICHAEL RUFUS II, STEPHANIE
RUFUS, RUTH M. HARTON, DAUS ISAIAH
HEMPKER, DENNIS HEMPKER, JEWELYN
HEMPKER, ALEX HENIGAN, TODD MCCLAIN

HENIGAN, JOAN THELMA HENSLEY, TERRY
L. HENSLEY, EVANGELINE FERRERA, DON
HERNANDEZ, EDUARDO FERRERA, CONNIE
DIANNE BECK HERZEL, STEPHANIE LYNN
HAYHURST, ANDREA HIDALGO, JORGE
HIDALGO, CHRISTEN ELAINE HOLLEY,
S.G.C.H., by and through her next friend Christen
Elaine Holley, CHARISSA DELGIORNO,
DOMINIC GIACCHI, ALYSSA NICOLE
SHERIDAN, ANDREW SHAWN SHERIDAN,
KEVIN HONAKER, SONGMI KIETZMANN,
BENJAMIN HORSLEY, JOHN HORSLEY, BART
LARUE HOWARD, CONSTANCE LOUISE
HOWARD, ALEXANDER JAMES HOWARD,
OLIVIA MARIE HOWARD, KRISTINE ANNE
ZITNY, ERIC M. HUNTER, KENNA HUNTER,
J.H., by and through his next friend Kenna Hunter,
K.H., by and through her next friend Kenna Hunter,
BETTY DARLENE BLACK, JOEY J. HUNTER,
JOEY J. HUNTER II, NICHOLAS WALTER
ROBINSON IV, JESUS INFANTE, JESSICA
INFANTE, JUAN INFANTE, MICHAEL K.
INGRAM SR., JULIE INGRAM, ADAM JACKS,
PAUL ELMER JAYNE, SHERRY A. SKEENS,
ADAM MATTHEW JAYNE, G.A.S., by and
through his next friend Kent Alan Skeens, T.L.S., by
and through his next friend Kent Alan Skeens,
Z.R.S., by and through her next friend Kent Alan
Skeens, KENT ALAN SKEENS, DARIUS
LERONE JOHNSON, JUDY B. CUSACK,
DENNIS JOHNSON, TERI JOHNSON, CHERYL
JOHNSON, KEVIN KING, STEPHANIE ANN
MILLER, ANNGEL JOY NORKIST, H.N., by and
through his next friend William Newnham, AUJZA
NORKIST, WILLIAM NEWNHAM, MICHAEL
KISSELOFF SR., MILAGROS KISSELOFF,
EDWARD KLEIN, ABBY KNAPP-MORRIS,
K.K., by and through her next friend Abby Knapp-
Morris, BRANDON KORONA, BRIAN LAMBKA,
JORDAN LAMBKA, ELLIOT LANDER,
HOLLAN LANDER, T.L., by and through her next
friend Elliot Lander, GREGORY N. LANDER,
KIMBER MORIN, ERIC LANDER, CATHERYN
SCHOENFARBER, NATASHA BUCHANAN,
L.A.E.L.B., by and through her next friend Natasha
Buchanan, S.L.L.B., by and through her next friend

Natasha Buchanan, DOUGLAS A. LANDPHAIR,
JEAN S. LANDPHAIR, MEREDITH
LANDPHAIR, MIRANDA LANDRUM, B.R.L., by
and through her next friend Miranda Landrum,
G.B.L., by and through his next friend Miranda
Landrum, JAMES R. LANDRUM, JANET
LANDRUM, DAVID WILLIAM HAALILIO LAU,
HAMIDE LAU, K.L., by and through his next
friend David William Haalilio Lau, M.L., by and
through her next friend David William Haalilio Lau,
ALEXANDER LAU, VIVIAN PERRY, HOLLY
LAU ABRAHAM, LEROY WINGKIT LAU JR.,
MICHELLE LEE RAUSCHENBERGER, JAMMIE
JOANN SMITH, CRAIG LEICHT, SHIRLY A.
LEICHT, ELIZABETH C. LEICHT, JESSE H.
LEICHT, JONATHAN LEICHT, MARY ROSE
LEICHT, SARAH GRACE LEICHT, JARED
SATOSHI LEMON, K.E.L., by and through her
next friend Jared Satoshi Lemon, FRANK L.
LEMON, JACKIE L. LEMON, BENJAMIN
LEMON, MATTHEW C.S. LEMON, NATHAN
KENJI LEMON, CHARLES S. LIGON, C.
RICHARD LOONEY, MARTHA LOONEY,
TODD SIMPSON LOVE, MARTIN E. MADDEN,
MARTIN P. MADDEN, LINDSEY R.
MALDONADO, PAMELA J. MADDEN, KYLE
MALIN, ALICIA MALIN, C.M., by and through
his next friend Alicia Malin, K.M., by and through
his next friend Alicia Malin, TAYLOR MARTA,
KRISTIE SURPRENANT, BOB SURPRENANT,
BRIAN M. MARTIN, JULIE K. MARTIN,
CATHERINE G. MARTIN, ELIZABETH A.
MARTIN, THOMAS PIERCE MAYS, ALYSON
OVERMAN RODGERS, CODY CHEYENNE
MAYS, TAMMY RENEE MAYS, ANNIE L.
MCBRIDE, CHESTER R. MCBRIDE SR., JOYCE
PATRICIA PAULSEN, KEVIN WILLIAMS,
SONJA MCDANIEL, M.M., by and through his
next friend Sonja McDaniel, CHARLETTE
GILBERT, CHARMAINE RENEE GILBERT,
JORDAN GILBERT, JASMINE THOMAS,
KATHLEEN MCEVOY, MICHELLE ROSE
MCEVOY, PATRICK CHARLES MCEVOY,
JANICE H. PROCTOR, LUANN VARNEY,
SHANNON K. MCNULTY, JOHN MEANS,
NICHOLAS D. MENDES, CLARENCE JOSEPH

METCALF, KIMBERLY METCALF, JEREMY J.
METZGER, SARAH BETH MILLER MORGAN,
THERESA KARLSON, CRISTINE MITTLER,
TERRY MITTLER, JOYCE L. TURNER, MISTY
MARIE BARCLAY, ALEXANDER LEE
MITTLER, CARMELITA D. FERNANDO,
GLADYS DEL VALLE MONTANEZ, KIARA C.
PEREZ, RENES PEREZ, ANDREA KESSLER,
JOSE ALBERTO MORGADO, ERIC MORGADO,
SUSAN MORRISON, MIRIAM A. MULLEN,
WILLIAM J. MULLEN, CATHERINE MULLINS,
THOMAS MULLINS, BETHANY ROSE
MULLINS RANDALL, CHET MURACH,
WILLIAM ANTHONY MURACH, HUGH DEAN
NEENAN, KATHLEEN MARIE NEENAN,
TIMOTHY F. NEENAN, LESA COON NEENAN,
GABRIEL NEGRON, MARTA TORRES, JOSE
NEGRON, MARIBEL NEGRON, MARVIN
NEGRON, AMANDA NEWMAN, DERRICK
ANTHONY DAVIS, DONALD EDWARD
NEWMAN SR., CYNTHIA NICHOLS,
DOUGLAS NICHOLS, BRANDON NICHOLS,
BECKY S. POOCK, ROGER POOCK, PATRICIA
A. NICOL, ROLAND N. NICOL, ALAINA
NICOL, ROLAND J. NICOL, THOMAS PRIOLO,
SUSAN NOVAK, JESSICA NOVAK CRUZ,
CREIGHTON DAVID OSBORN, KADE M.
OSBORN, KATLYN M. OSBORN, CHRISTA L.
OSBORN, JULIA OTT, MINDYLOU PARESI,
ELIZABETH SANTINA PARESI, JANET G.
PARESI, SANTINA CARTISSER, TERRY
PARESI, ALEXANDRA VANDENBROEK, JOHN
O. PATTERSON, ADAN PEREZ, ANTHONY
PEREZ, NICHOLAS JOSEPH FRANCIS PEREZ,
ASHLEY PETERS, G.R.P., by and through his next
friend Ashley Peters, DEBORAH JEAN PETERS,
DENNIS W. PETERS, CHRISTINE H. PHILLIPS,
S.N.P., by and through her next friend Christine H.
Phillips, GLENDA WILLARD, MICHELLE
HOCK, RANEE MASSONI, JORDAN PLUNK,
JUSTIN T. PLUNK, JANIE RABALAIS
GONCALVES, AARON WILLIAM PRESCOTT,
JACOB RICHARD PRESCOTT, JOSHUA
MICHAEL PRESCOTT, CYNTHIA L. PYEATT,
LON SCOTT PYEATT, EMILY SMALLEY,
LONA L. BOSLEY, ANDREA N. RATZLAFF,

BLAINE A. REDDING, HEATHER L. REED,
DAVID REED, DOLORES A. REED, SCOTT
REGELIN, SHIRENE REGELIN, CASSIE MARIE
RICHARDSON, CYNTHIA JEFFRIES
RICHMOND, RANDY RISTAU, H.R., by and
through her next friend Randy Ristau, SUZANNE
RISTAU, CHRISTOPHER POWERS, JANNETT
CECILIA ROBERTS, E.N.R., by and through his
next friend Jannett Cecilia Roberts, MIGUEL
ANGEL NATHANIEL ROBERTS, CARLOS
CRUZ, JOEL C. CRUZ, LESLIE RODRIGUEZ,
R.G., by and through her next friend Leslie
Rodriguez, RODOLFO RODRIGUEZ SR.,
RODZIE EFREN RODRIGUEZ, ANGELA RITA
MARIE ROGERS, BARBARA A. ROLAND,
MARK K. ROLAND, ERICA M. ROLAND,
LIESELOTTE R. ROLDAN, ANGEL R.
ROLDAN, MATTHIAS P. ROLDAN,
SAMANTHA G. ROLDAN, CHRISTOPHER J.
ROSEBROCK, ALEX JASON ROZANSKI,
COLLEEN WHIPPLE, NATALIE SCHMIDT,
A.L.S., by and through his next friend Natalie
Schmidt, LEEANN SCHMIDT, PHILLIP J.
SCHMIDT, BRANDON TYLER SCHMIDT,
DUANE SCHULTZ, THOMAS SCHWALLIE,
DAVID SHANFIELD, PAMELA SHANFIELD,
SYDNEY SHANFIELD, SHERRY JEAN PEPPER,
SUZI L. FERNANDEZ, LOWELL BRENT
SIBLEY, individually, and for the estate of
FORREST B. SIBLEY, SPENSER J.
FERNANDEZ, JORDAN L. SIBLEY,
GEORGANNE M. SIERCKS, G.S., by and through
his next friend Georganne M. Siercks, G.S., by and
through his next friend Georganne M. Siercks,
JACQUELINE B. THOMPSON, RANDOLPH D.
THOMPSON, BRITTNEY BULLOCK, ANDREW
SLACK, JESSE SLACK, JONATHAN H. SLACK,
LAUREN SLACK, ROSE ANN CROSSMAN,
JESSICA COOK, MARY BETH SMEDINGHOFF,
THOMAS SMEDINGHOFF, JOAN M.
SMEDINGHOFF, MARK T. SMEDINGHOFF,
REGINA C. SMEDINGHOFF, DELORIS SNOW,
M.B., by and through her next friend Deloris Snow,
DAMEN SNOW, DINEEN SNYDER, EDWARD
SNYDER, DAMIEN EDWARD SNYDER,
NATASHA A. SNYDER, LARRY MICHAEL

SOLESBEE, TRINA SOLESBEE, GUSTAVO
ALFONSO SOLTERO SR., MARIA SOLTERO,
ADRIAN CARRILLO SOLTERO, DONNA J.
SOUFRINE, MICHAEL J. SOUFRINE, GARRY
LEE SPARKS, JAN MARIE HURNBLAD
SPARKS, ERIK SPARKS, ZACHARY DOUGLAS
SPARKS, JANE SPARKS, ANNETTE SPEHAR,
PATRICK SPEHAR, LISA MARTINUSEN,
MARIE SENTINA MIELKE, JACOB LOUIS
SPEHAR, LUKE SPEHAR, TINA LYNN
SEEKINS, MITCHELL L. STAMBAUGH, PAUL
ALLEN STARNER, RAQUEL J. STARNER,
AMBERLY G. STARNER, HUNTER S.
STARNER, BRUNO T. STOECKLI, BILLY
MICHAEL STOUT, ROBIN STOUT, MELISSA
STOUT, MICHAEL DAVID STOUT, GARRETT
LAYNE FUNK, ERIN NICOLE GOSS, SUMMER
BREANNE SUTTON, HARRIET SUTTON,
TRECIA BROCK HOOD, WENDY SHEDD,
FREDDIE DEWEY SUTTON, DURAND S.
TANNER, KELLY N. TANNER, MEGAN E.
TANNER, EVELYN TAYLOR, DANICA
THOMAS, L.T., by and through her next friend
Danica Thomas, JULIE MAGANA, RYAN
GREGORY TIMONEY, DIANE TIMONEY,
GREGORY TIMONEY, FREDERICK ALLEN
TOLON, ESTA SMITH, JOE TORIAN, EMILY
TORIAN, NATHAN EWELL TORIAN, JIMMY
SMITH, BRITTANY TAYLOR TOWNSEND,
KEVIN TRIMBLE, MICHAEL VERARDO,
TAMARA ANNE BOYETT, TERRY LYNN
BOYETT, BARRY WELCH, LORRIA WELCH,
ZACKARY WELCH, JOHN M. WEST, MARCIA
M. WEST, KRISTINE WILLIS, DAVID
WHIPPLE, KIMBERLEY A. WHIPPLE, BRIAN
GREGORY CLYBURN, SEAN WHIPPLE,
ANTHONY CURTIS WHITE, A.E.W., by and
through his next friend Anthony Curtis White,
Z.L.W., by and through his next friend Anthony
Curtis White, LAURA WHITE, MARK
ANTHONY WHITE, JENNIFER LYNN WHITE,
MARTHA CAROLINA SMITH, individually, and
for the estate of JAMES T. WICKLIFF-CHACIN,
THOMAS ELMER WICKLIFF, MICHELLE
CAROLINA ROTELLI, CLARENCE WILLIAMS
JR., TALISA SHERVON WILLIAMS,

SAMANTHA SHERVON WILLIAMS, ABRILL RENEE WILLIAMS-OSBOURNE, CHERYL SPIVEY, CORBIN WAYNE HUNT, DANA MARIE BERNHARDT, MARY LEE WISE, MARY HEATHER WISE, E.P., by and through his next friend Dana Marie Bernhardt, MARK G. WORLEY, MONA G. BETZEN, GREGORY W. WORLEY, F.S., by and through her next friend Ashley Rose Serocki, DAWN MARIE PATTEE, JALISA MARIE HAMMOND, KRISTEN COLLEEN WRIGHT, SHARON K. ZAEHRINGER, NICOLE R. SCOTT, CHRIS LEE ZIMMERMAN, MICHELLE ZIMMERMAN, BAILY ZIMMERMAN,

                Plaintiffs,

      v.

BLACK & VEATCH SPECIAL PROJECTS CORPORATION, CENTERRA GROUP, LLC, DAI GLOBAL LLC, ENVIRONMENTAL CHEMICAL CORPORATION, G4S HOLDINGS INTERNATIONAL (AG) LIMITED, G4S RISK MANAGEMENT LIMITED, JANUS GLOBAL OPERATIONS LLC, LOUIS BERGER GROUP, INC., LOUIS BERGER INTERNATIONAL, INC., LOUIS BERGER GROUP, INC. / BLACK & VEATCH SPECIAL PROJECTS CORPORATION JOINT VENTURE, MTN GROUP LIMITED, MTN (DUBAI) LIMITED, MTN AFGHANISTAN, BLUMONT, INC., BLUMONT GLOBAL DEVELOPMENT, INC., INTERNATIONAL RELIEF AND DEVELOPMENT, INC., CHEMONICS INTERNATIONAL, INC.

                Defendants.

**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE ANTI-TERRORISM ACT**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

THE DEFENDANTS ...................................................................................................... 9

    A.     The ArmorGroup Defendants ................................................... 9

    B.     The DAI Defendant ................................................................ 10

    C.     The ECC Defendant ............................................................... 10

    D.     The EOD Technology Defendant ........................................... 10

    E.     The LBG/Black & Veatch Defendants ................................... 11

    F.     The MTN Defendants ............................................................ 12

    G.     The IRD Defendants .............................................................. 12

    H.     The Chemonics Defendant ..................................................... 13

JURISDICTION AND VENUE .................................................................................... 13

FACTUAL ALLEGATIONS ........................................................................................ 14

I.     IN THE WAKE OF THE SEPTEMBER 11 ATTACKS, THE AL-QAEDA-BACKED AFGHAN TALIBAN LAUNCHED A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN AFGHANISTAN ................................ 14

II.     DEFENDANTS KNOWINGLY OR RECKLESSLY FINANCED TERRORISM BY PAYING PROTECTION MONEY TO THE TALIBAN ........... 18

    A.     Defendants Operated In A Corrupt Afghan Contracting Environment That Encouraged Protection Payments ......................................................... 18

    B.     Western Contractors Commonly Structured Their Operations In Afghanistan To Funnel Protection Payments To The Taliban.............................. 22

III.     DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR PAYMENTS FINANCED TALIBAN ATTACKS ON AMERICANS ................... 41

    A.     Defendants' Protection Payments Directly Funded The Taliban's Terrorist Campaign Against Americans In Afghanistan ................................... 41

    B.     Defendants Knew Or Recklessly Disregarded That Their Payments Financed Anti-American Terrorism....................................................... 48

C.     The U.S. Government Opposed Defendants' Payment Of Protection Money To The Taliban ............................................................ 59

IV.    EACH DEFENDANT MADE PROTECTION PAYMENTS THAT IT KNEW OR RECKLESSLY DISREGARDED WOULD BENEFIT THE TALIBAN ...................................................................................... 67

A.     The ArmorGroup Defendants .............................................. 67

1.    The ArmorGroup Defendants Made Protection Payments To The Taliban ............................................................ 67

2.    ArmorGroup's Protection Payments Comport With Its Other Conduct In Afghanistan ............................................. 78

3.    The ArmorGroup Defendants' Payments Had A Substantial Nexus To The United States ............................ 79

B.     The DAI Defendant ............................................................. 83

1.    DAI Made Protection Payments To The Taliban ............ 83

2.    DAI's Protection Payments Comport With Its Other Conduct In Afghanistan ............................................. 97

C.     The ECC Defendant ............................................................ 99

D.     The EOD Technology Defendant ....................................... 105

E.     The LBG/BV Defendants .................................................. 112

1.    The LBG/BV Defendants Made Protection Payments To The Taliban ....... 112

2.    The LBG/BV Defendants' Protection Payments Comport With Their Other Conduct In Afghanistan And Similar Markets ................................... 129

F.     The MTN Defendants ....................................................... 131

1.    MTN Made Protection Payments To The Taliban ......... 133

2.    MTN Supported The Taliban By Deactivating Its Cellular Towers At Night ........................................... 140

3.    MTN's Protection Payments Comport With Its Conduct In Other Markets ............................................. 147

4.    MTN's Conduct Had A Substantial Nexus To The United States ............... 150

a.    MTN's conduct targeted the United States ........................................... 152

          b.      MTN's conduct relied on American contacts .......................................... 157

     G.      The IRD Defendants ......................................................................................... 173

          1.      IRD Made Protection Payments To The Taliban............................................ 173

          2.      IRD's Protection Payments Comport With Its Other Conduct In
                 Afghanistan ................................................................................................ 180

     H.      The Chemonics Defendant.................................................................................. 183

V.      THE TALIBAN, WITH SUBSTANTIAL SUPPORT FROM AL-QAEDA,
        USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST
        ATTACKS THAT KILLED AND INJURED AMERICANS IN
        AFGHANISTAN ...................................................................................................... 188

     A.      The Taliban Was Part Of A Terrorist Syndicate That Waged A Deadly
             Insurgency Against Americans In Afghanistan .................................................. 188

          1.      The Taliban ................................................................................................. 190

          2.      The Haqqani Network.................................................................................. 196

          3.      The Kabul Attack Network........................................................................... 203

     B.      Al-Qaeda Committed, Planned, And Authorized The Terrorist Attacks
             That Killed And Injured Plaintiffs ..................................................................... 205

          1.      Al-Qaeda's Leadership Of The Taliban Terrorist Syndicate ........................ 205

          2.      Al-Qaeda's Planning And Authorization Of Taliban Terrorist Attacks ....... 211

          3.      Al-Qaeda's Direct Participation In Taliban Terrorist Attacks ..................... 225

          4.      Defendants' Knowledge of Al-Qaeda's Role ............................................. 230

VI.     THE TALIBAN KILLED AND INJURED PLAINTIFFS THROUGH ACTS
        OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND
        AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK........... 231

        The David E. Cabrera Family ................................................................................. 232

        The Charles L. Adkins Family................................................................................ 234

        The Raymond C. Alcaraz Family ........................................................................... 235

        The Nicholas J. Aleman Family.............................................................................. 236

        The William Allen Family ...................................................................................... 237

        The Billy G. Anderson Family................................................................................ 238

The Brian M. Anderson Family ........................................................ 240

The Carlos A. Aragon Family .......................................................... 241

The Bradley W. Atwell Family ......................................................... 242

The Dillon C. Baldridge Family ....................................................... 243

The Kevin B. Balduf Family ............................................................ 244

The Brandon A. Barrett Family ........................................................ 245

The Joseph A. Bauer Family ............................................................ 246

The William M. Bays Family ........................................................... 247

The Thomas A. Baysore Jr. Family .................................................... 248

The Vincent J. Bell Family .............................................................. 249

The Robert N. Bennedsen Family ...................................................... 250

The Darrik C. Benson Family ........................................................... 251

The Brett Benton Family ................................................................. 252

The Jeremie S. Border Family .......................................................... 253

The James Michael Boucher Jr. Family .............................................. 254

The Francisco J. Briseño-Alvarez Jr. Family ....................................... 255

The David L. Brodeur Family ........................................................... 256

The Christopher L. Brown Family and Estate ....................................... 258

The Harold Brown Jr. Family ........................................................... 259

The Scott W. Brunkhorst Family ....................................................... 260

The Frank D. Bryant Jr. Family ........................................................ 261

The Nicholas B. Burley Family ......................................................... 262

The Joshua R. Campbell Family ........................................................ 263

The Karl A. Campbell Family ........................................................... 264

The Kevin Cardoza Family .............................................................. 265

The Joseph T. Caron Family ............................................................ 266

The Patrick R. Carroll Family .......................................................... 267

The Rick J. Centanni Family ............................................................ 268

Marcus Chischilly ......................................................................... 269

The Benjamen G. Chisholm Family .................................................... 270

The Rusty H. Christian Family .......................................................... 271

The Chazray C. Clark Family ........................................................... 272

The Jonathan Cleary Family ............................................................ 273

The Timothy J. Conrad Jr. Family ..................................................... 274

The Robert J. Cottle Family ............................................................................... 275

The Ross Cox Family ......................................................................................... 276

The Robert W. Crow Family ............................................................................... 277

The Justin E. Culbreth Family ........................................................................... 278

The Joshua J. Cullins Family ............................................................................. 279

The Joseph D'Augustine Family ........................................................................ 280

The Mitchell K. Daehling Family ...................................................................... 282

The Marcus Dandrea Family ............................................................................. 283

The Devin J. Daniels Family .............................................................................. 284

The James M. Darrough Family ......................................................................... 286

The Jonathan D. Davis Family ........................................................................... 287

The David P. Day Family .................................................................................... 288

The Joseph Roger Deslauriers Family ............................................................... 289

The Matthew J. DeYoung Family ....................................................................... 290

The Alberto D. Diaz Family ............................................................................... 290

The John P. Dion Family .................................................................................... 292

The Corey J. Dodge Family ................................................................................ 293

The Max W. Donahue Family ............................................................................ 294

Robert Alexander Dove ...................................................................................... 296

The Stephen J. Dunning Family ......................................................................... 296

The Patrick Keith Durham Family ..................................................................... 297

The Donald R. Edgerton Family ......................................................................... 298

The Erich Ellis Family ........................................................................................ 299

The Robert W. Ellis Family ................................................................................ 300

The Vincent J. Ellis Family ................................................................................ 301

The Michael D. Elm Family ............................................................................... 302

The Kenneth B. Elwell Family ........................................................................... 304

The Richard A. Essex Family ............................................................................. 305

The Jered W. Ewy Family ................................................................................... 306

The Garrett A. Fant Family ................................................................................. 307

The Jason D. Fingar Family ................................................................................ 308

The Thomas K. Fogarty Family .......................................................................... 309

The Michael L. Freeman Jr. Family .................................................................... 310

The Ronald D. Freeman Family .......................................................................... 311

The Demetrius M. Frison Family ........................................................................... 312

The Joseph M. Garrison Family ........................................................................... 313

The Kendra Garza Family ..................................................................................... 314

The Joel C. Gentz Family ...................................................................................... 315

The William Joseph Gilbert Family ..................................................................... 316

The Paul Goins Jr. Family ..................................................................................... 317

The Wyatt A. Goldsmith Family ......................................................................... 318

The Jonathan A. Gollnitz Family ......................................................................... 319

The Brittany Bria Gordon Family ........................................................................ 320

The Kristopher J. Gould Family ........................................................................... 321

The Ryan J. Grady Family ..................................................................................... 322

The Douglas J. Green Family ................................................................................ 323

The Travis Scott Green Family ............................................................................. 325

The Kevin J. Griffin Family .................................................................................. 326

The Casey J. Grochowiak Family ......................................................................... 328

The William Gross Paniagua Family .................................................................... 329

The Matthias N. Hanson Family ........................................................................... 330

The Jeremy F. Hardison Family ........................................................................... 331

The Scott D. Harper Family .................................................................................. 332

The Devon J. Harris Family .................................................................................. 334

The Joshua A. Harton Family ............................................................................... 335

The Daus Isaiah Hempker Family ........................................................................ 336

The Jay Henigan Family ........................................................................................ 337

The Nicholas C.D. Hensley Family ...................................................................... 338

The Jose A. Hernandez Family ............................................................................. 339

The Alan Herzel Family ........................................................................................ 340

The Daren M. Hidalgo Family .............................................................................. 341

The Floyd E.C. Holley Family .............................................................................. 342

Kevin Honaker ....................................................................................................... 344

The Justin L. Horsley Family ............................................................................... 344

The Abram L. Howard Family .............................................................................. 345

The Michael A. Hughes Family ............................................................................ 347

The Eric M. Hunter Family ................................................................................... 348

The Jesse Infante Family ....................................................................................... 349

The Michael K. Ingram Jr. Family.........................................................................350

Adam Jacks ...........................................................................................................351

The Ryan P. Jayne Family ....................................................................................352

The Darius Lerone Johnson Family ......................................................................353

The Joseph D. Johnson Family .............................................................................354

The Timothy L. Johnson Family...........................................................................355

The Kevin King Family ........................................................................................356

The Hansen B. Kirkpatrick Family ......................................................................357

The Denis D. Kisseloff Family .............................................................................358

Edward Klein .........................................................................................................359

The Michael J. Knapp Family ..............................................................................360

Brandon Korona.....................................................................................................361

The Todd W. Lambka Family ...............................................................................362

The Elliot Lander Family ......................................................................................363

The Jason D. Landphair Family............................................................................364

The Brandon J. Landrum Family ..........................................................................365

The David William Haalilio Lau Family ..............................................................367

The Jacob C. Leicht Family ..................................................................................368

The Jared Satoshi Lemon Family .........................................................................370

Charles S. Ligon....................................................................................................371

The Andrew R. Looney Family ............................................................................372

Todd Simpson Love ..............................................................................................373

The Russell E. Madden Family.............................................................................373

The Kyle Malin Family .........................................................................................375

The Chase S. Marta Family ..................................................................................376

The Ethan J. Martin Family ..................................................................................376

The Wyatt J. Martin Family..................................................................................377

The Chauncy R. Mays Family ..............................................................................379

The Chester J. McBride III Family .......................................................................380

The Matthew Q. McClintock Family....................................................................381

The Mecolus C. McDaniel Family........................................................................382

The Richard P. McEvoy Family ...........................................................................383

The Richard L. McNulty III Family .....................................................................385

The Dale W. Means Family ..................................................................................386

Nicholas D. Mendes ............................................................................................. 387

The Michael J. Metcalf Family ........................................................................... 387

The Jonathan M. Metzger Family ....................................................................... 388

The Paul J. Miller Family ................................................................................... 389

The Eugene C. Mills III Family .......................................................................... 390

The Shaun M. Mittler Family ............................................................................. 391

The Conrad A. Mora Family ............................................................................... 392

The Gil I. Morales Del Valle Family ................................................................... 393

The Travis A. Morgado Family ........................................................................... 394

The Donald S. Morrison Family .......................................................................... 395

The Sean W. Mullen Family ............................................................................... 396

The Brandon S. Mullins Family .......................................................................... 397

The Thomas Paige Murach Family ...................................................................... 398

The Brendan P. Neenan Family ........................................................................... 399

The Carlos J. Negron Sr. Family ......................................................................... 401

The Christopher R. Newman Family .................................................................... 402

The Bryan J. Nichols Family ............................................................................... 403

The Donald L. Nichols Family ............................................................................ 404

The Andrew C. Nicol Family ............................................................................... 405

The Rafael A. Nieves Jr. Family .......................................................................... 406

The Adam J. Novak Family ................................................................................. 407

The Kyle B. Osborn Family ................................................................................. 408

The Nicholas S. Ott Family ................................................................................. 410

The Dane Clark Paresi Family ............................................................................. 410

John O. Patterson ................................................................................................ 412

The Joseph R. Perez Family ................................................................................ 413

The Joseph Michael Peters Family ...................................................................... 414

The Francis G. Phillips IV Family ....................................................................... 415

The Jared C. Plunk Family .................................................................................. 416

The Matthew C. Powell Family ........................................................................... 417

The Brandon Joseph Prescott Family ................................................................... 418

The Lucas Todd Pyeatt Family ............................................................................ 419

The Christopher K. Raible Family ....................................................................... 420

The Thomas A. Ratzlaff Family ........................................................................... 421

The Blaine E. Redding Family ........................................................................... 422

The Jesse D. Reed Family ................................................................................ 423

The Chad R. Regelin Family ............................................................................ 424

The Joseph A. Richardson Family .................................................................... 425

The Colby Lee Richmond Family ..................................................................... 426

The Michael E. Ristau Family .......................................................................... 427

The Edgar N. Roberts III Family ...................................................................... 428

The Mario Rodriguez Jr. Family ...................................................................... 429

The Rodolfo Rodriguez Jr. Family ................................................................... 430

The Jason A. Rogers Family ............................................................................. 431

The Matthew D. Roland Family ....................................................................... 432

The Angel Roldan Jr. Family ........................................................................... 433

Christopher J. Rosebrock .................................................................................. 435

The Nicholas J. Rozanski Family ..................................................................... 435

The Rex L. Schad Family ................................................................................. 436

The Jonathan P. Schmidt Family ...................................................................... 437

The Nathaniel J.A. Schultz Family .................................................................. 439

The Jacob M. Schwallie Family ....................................................................... 439

The Derek L. Shanfield Family ........................................................................ 440

The Justin B. Shoecraft Family ........................................................................ 441

The Forrest B. Sibley Family and Estate .......................................................... 442

The Billy J. Siercks Family .............................................................................. 444

The Amy R. Sinkler Family .............................................................................. 445

The Wade A. Slack Family ............................................................................... 446

The Anne T. Smedinghoff Family .................................................................... 447

The Deangelo B. Snow Family ......................................................................... 448

The Devin A. Snyder Family ............................................................................ 450

The Kristoffer M. Solesbee Family .................................................................. 451

The Omar Soltero Family ................................................................................. 452

The Eric D. Soufrine Family ............................................................................ 453

The Orion N. Sparks Family ............................................................................ 454

The Nicholas P. Spehar Family ........................................................................ 455

The Tyler M. Springmann Family .................................................................... 456

The Cameron J. Stambaugh Family .................................................................. 457

The Paul Allen Starner Family ................................................................ 458

The Kyle P. Stoeckli Family ................................................................... 459

The Kyle Brandon Stout Family ............................................................. 460

The Joshua J. Strickland Family ............................................................. 461

The Barry Sutton Family ........................................................................ 462

The Durand S. Tanner Family ................................................................ 464

The James E. Thode Family .................................................................... 465

The Allen R. Thomas Family .................................................................. 466

The Jesse R. Tilton Family ..................................................................... 467

The Ryan Gregory Timoney Family ....................................................... 467

Frederick Allen Tolon ............................................................................ 468

The Aaron C. Torian Family ................................................................... 469

The Jon R. Townsend Family .................................................................. 470

Kevin Trimble ........................................................................................ 471

Michael Verardo ..................................................................................... 472

The Chad S. Wade Family ...................................................................... 472

The Nickolas S. Welch Family ............................................................... 473

The Matthew J. West Family .................................................................. 474

The Blake D. Whipple Family ................................................................ 476

The Benjamin D. White Family .............................................................. 477

The James T. Wickliff-Chacin Family and Estate .................................. 478

The Clarence Williams III Family .......................................................... 479

The Leston M. Winters Family ............................................................... 481

The Jeremy Jason Wise Family .............................................................. 482

The Mark G. Worley Family ................................................................... 483

The Randal P. Wright Family ................................................................. 484

The Frank R. Zaehringer III Family ....................................................... 485

The Sonny C. Zimmerman Family ......................................................... 486

CLAIMS FOR RELIEF ........................................................................... 487

COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
[All Defendants:  Primary Liability, 18 U.S.C. § 2339A Predicate] .......................................... 487

COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
[MTN Defendants:  Primary Liability, 18 U.S.C. § 2339B Predicate] ....................................... 489

COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
§ 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339C Predicate] ......................... 491

COUNT FOUR:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
[U.S. Defendants:  Primary Liability, 50 U.S.C. § 1705(a) Predicate] ..................................... 492

COUNT FIVE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
[All Defendants:  Aiding-And-Abetting Liability, Attack Predicate] ....................................... 494

COUNT SIX:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
[All Defendants:  Aiding-and-Abetting Liability, RICO predicate] .......................................... 495

JURY DEMAND ......................................................................................................................... 498

PRAYER FOR RELIEF ........................................................................................................... 498

## **<u>INTRODUCTION</u>**

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act on behalf of

American service members and civilians, and their families, who were killed or wounded while

serving their country in Afghanistan between 2009 and 2017.  While these men and women

worked to rebuild post-invasion Afghanistan, they were attacked by an al-Qaeda-backed,

Taliban-led terrorist insurgency that Defendants helped finance.  Defendants supported the

Taliban for a simple reason:  Defendants were all large Western companies with lucrative

businesses in post-9/11 Afghanistan, and they all paid the Taliban to refrain from attacking their

business interests.  Those protection payments aided and abetted terrorism by directly funding an

insurgency that killed and injured thousands of Americans.  The allegations below are based on

more than 10 confidential witnesses with direct and indirect knowledge of the alleged facts;

internal company documents; declassified military-intelligence reporting; congressional

testimony and reports; press accounts; and Plaintiffs' recollections.

2.      After the Taliban's initial losses in the wake of the U.S. military's post-9/11

invasion, it regenerated as a deadly terrorist insurgency intent on expelling Coalition forces and

deposing Afghanistan's recognized democratic government.  Reliable funding was essential to

that goal.  In 2005, the Taliban's central leadership council (called the "Quetta Shura") began

prescribing regulations for extracting protection money from international businesses operating

in Afghanistan.  To that end, the Taliban systematically approached companies operating in its

areas of influence and demanded a percentage of their revenues.  The Taliban motivated

companies to make the payments by presenting them with a choice:  either meet the Taliban's

monetary demands and help fund its insurgency, or else spend even more money on expensive

security measures to fend off the risk of future Taliban attacks.

3. Defendants agreed to the Taliban's demands. The details varied – some Defendants worked on development projects, others provided private-security services, while another operated a cellular-telephone network – but each owned valuable business assets in areas vulnerable to Taliban attack. To protect those businesses and maximize their profits, Defendants paid the Taliban to leave them alone. The payments saved Defendants money: it was cheaper to buy off the Taliban than it would have been to invest in the security necessary to mitigate the terrorists' threats. And, generally speaking, the payments worked as intended. Paying the Taliban reduced the frequency with which Defendants themselves faced the threat of terrorist attack, and it allowed them to cut corners on security too. One American business owner who paid protection money described the typical mindset in slightly hyperbolic (yet no less revealing) terms: "We don't need any security if the payments are made. Nobody f---s with us."

4. Defendants' protection payments adhered to the common practice followed by most contractors in post-9/11 Afghanistan. Most contractors viewed terrorist protection payments as the cost of doing business, and they openly admitted as much. Typical statements by companies operating in Taliban-controlled areas included: "I pay the Taliban not to attack my goods, and I don't care what they do with the money"; "You have to [pay the Taliban]. Everybody does"; and "We assume that our people are paying off the Taliban." Investigations by U.S. military-intelligence agencies, USAID, Congress, and journalists all confirmed that such statements matched the reality on the ground. In one vivid example reported by Bob Woodward, a senior U.S. official told the White House in 2009 that "[a]ll the contractors for development projects pay the Taliban for protection and use of the roads, so American and coalition dollars help finance the Taliban." Under that prevailing industry practice, companies typically paid the Taliban in amounts worth between 20 and 40 percent of the project being "protected."

5.     Defendants often (but not always) paid the Taliban through their local subcontractors, in an effort to reduce the risk the payments would be traced back to them.  Many projects in Afghanistan involved chains of subcontractors – in which a prime contractor funneled both the work and the money through layers of additional corporate entities – and Defendants exploited that structure to facilitate payments to insurgents without detection.  Indeed, Defendants often hired local subcontractors intending for those companies to deliver "security" for Defendants' projects by paying off the Taliban.  Those protection payments were typically structured in one of two ways.  First, the payments often took the form of cash transfers – routed through Afghanistan's hard-to-trace *hawala* system – to Taliban agents.  Alternatively, the payments sometimes took the form of salary disbursements to Taliban "guards" that Defendants (or their subcontractors) put on their payroll.  Either way, the logic was the same.  Defendants decided that buying off the terrorists was the most efficient way to operate their businesses while managing their own security risks – even though doing so jeopardized other American lives.

6.     Each Defendant financed the Taliban through protection payments from at least 2008 until at least 2013.  The allegations of such payments below include (but are not limited to) contract numbers on which Defendants made payments; identities of subcontractors they used to facilitate the flow of money; indications of how they concealed payments on their books; and examples of specific payments made by each.  The details varied by Defendant.  Some relied on corrupt security companies to deliver protection money to secure their expensive development projects.  One openly admitted to heading off "Taliban . . . demand[s] [for] payment" by "employ[ing] folks affiliated with them."  Another made cash payments to discourage the Taliban from attacking its cellular towers.  Yet another hired a subcontractor that the U.S. government determined was "supporting the insurgency" and, after learning of it, paid the

subcontractor $1.5 million anyway. And still others sourced their security guards from Taliban cutouts with colorful, *Reservoir Dogs*-inspired nicknames like "Mr. Pink," "Mr. White," or "Commander Blue." A Taliban warlord employed by the ArmorGroup Defendants even engaged in a literal firefight with Coalition forces when his Taliban meeting was raided.

7. The MTN Defendants went beyond financing Taliban operations and ventured into active coordination. Not only did MTN make payments that financed terrorism; it also deactivated its cellular network at night because the Taliban asked it to. Nighttime cellular service was important to Coalition intelligence-collection efforts: it allowed human sources to call Coalition tip lines inconspicuously, and active phone signals allowed U.S. special operators to track high-value terrorists for nighttime capture-or-kill raids. For those reasons, the Taliban demanded that cellular-network operators switch off their signals at night. MTN, in response, openly admitted to "obey[ing] the [Taliban's] orders." It did so even though the Taliban's stated reason for issuing them was to interfere with Coalition intelligence activities. When asked why it complied, MTN stated it could not "afford to be seen as siding with the Afghan government against the Taliban . . . [Y]ou have to prove in words and in deeds that you are neutral."

8. Defendants' conduct supported the Taliban's terrorist campaign against Americans in Afghanistan. When Defendants paid the Taliban not to attack them, they were not reducing the overall threat of terrorist violence; they were redirecting the attacks to other targets – including Plaintiffs and their family members. At the same time, Defendants' financing intensified the Taliban's terrorist insurgency. Protection money was quantitatively significant – by most accounts the Taliban's largest (or second-largest) funding source overall – and the Taliban's highly disciplined process for extracting it made for an especially potent form of terrorist finance. Even relatively low-dollar protection payments had an outsized effect on the

Taliban's terrorist capabilities by subsidizing salaries and weapons for multiple terrorists.

Defendants' decision to make larger, seven-figure payments had an even greater effect:  it

translated directly into substantial numbers of fighters, weapons, and bombs that the Taliban

used to kill and injure U.S. troops.  Plaintiffs bore the consequences of that tragic decision.

9.      Beyond paying the Taliban directly, Defendants also knew or recklessly

disregarded that their subcontractors used their money to make protection payments.  That

practice was an open secret in Afghanistan and communicated repeatedly to firms operating

there.  For example, in a 2009 *Time Magazine* cover story, the author observed that "protection

payments are so widespread that one contractor I interviewed responded incredulously to

questions about how the system worked.  'You must be the only person in Afghanistan who

doesn't know this is going on,' he said."  When Defendants paid their crooked local

subcontractors for "security" in that environment, they knew full well where the money was

going.  That is why the lead forensic accountant for a U.S.-military-led interagency task force

blamed Western contractors for funding terrorism.  As he explained, based on U.S. intelligence

reporting, "I always viewed [the contractors] as an aider and abettor of terrorist acts."

10.     Defendants similarly knew or recklessly disregarded that their payments

(including the ones their subcontractors made) helped finance the Taliban's terrorist campaign in

particular.  Defendants or their agents often negotiated those payments at meetings with Taliban

officials, representing the centralized Taliban Financial Commission, which left no doubt that the

payments were for the Taliban's benefit.  The Taliban also generated documents on official

Taliban letterhead – including so-called "Night Letters" and tax receipts – that memorialized the

protection racket and further notified Defendants about whom their payments were helping.  And

the Taliban openly identified anti-American terrorism as the reason it sought such payments.

Given the Taliban's own conduct, companies that chose to comply with its demands understood the consequences.  They knew their payments would strengthen the Taliban's terrorist insurgency, but they decided that their own personal interests were more important.  In the words of one former high-level employee of Defendant LBG/BV Joint Venture:  "Yes, I know the money is going to the Taliban, yes I know it's going to come back and bite ISAF and the Coalition and hurt what [they're] trying to do," but "there's no other way to get the roads built."

11.     Widespread media coverage also notified Defendants of the link between their protection payments and anti-American terrorism.  Throughout the relevant period, major media outlets reported (for example) that American-backed projects in Afghanistan paid "protection money"; that such money included "payments to insurgents"; that private-security companies made payments that "helped to fund the Taliban"; that contractors paid a "20% 'protection tax'" levied by the Taliban; and that Western aid funneled through such contractors "winds up subsidizing the enemy."  As Secretary of State Hillary Clinton testified to Congress in 2009, "one of the major sources of funding for the Taliban is the protection money."  All of this was high-profile, international news that Defendants could not have overlooked in good faith.

12.     Several Defendants or their agents made public admissions manifesting their view that protection money was an acceptable cost of doing business.  An LBG project manager, for example, justified the company's protection payments by saying of the Taliban:  "They're not all bad. . . .  [I]f they're not disrupting my project, they are moderate Talibs."  LBG's security subcontractor similarly admitted that its guards "'were ex-Taliban, or even current Taliban, but the fact that they weren't attacking us along the way – whatever worked for us worked.'"  An employee of the same subcontractor, which provided security on behalf of at least four Defendants, testified that "the company I was working for was defrauding the U.S. government

to pay the Taliban."  The theme throughout was Defendants' belief that their own profits and their own perceived security needs outweighed the downsides of funding terrorists.  As another subcontractor for several Defendants summarized the mentality:  " 'We don't get involved in any politics, we just finish the work and move on,' he said.  'As long as we are safe, we don't care.' "

13.    The U.S. government publicly opposed protection payments and attempted to stop them.  Multiple agencies set up task forces designed to interrupt the flow of protection money to terrorists in Afghanistan, and U.S. officials stated repeatedly that such payments were illegal and counterproductive.  Federal regulations also required prime contractors to ensure that their contracting practices – including the money spent by their subcontractors – did not finance terrorism.  Most Defendants violated those requirements and concealed their payments, in part because they knew the U.S. government considered such payments to be illegal.  As an Assistant Attorney General stated publicly in announcing a 2007 guilty plea concerning similar conduct in Colombia:  "corporations are on notice that they cannot make protection payments to terrorists."

14.    The deficient internal controls that facilitated Defendants' payments to the Taliban also enabled related misconduct.  Defendant LBG's then-CEO, CFO, and Controller all pleaded guilty to wire fraud in connection with the same Afghanistan contracts under which the company paid protection money.  The two co-founders of LBG's principal security subcontractor did the same.  Two more LBG executives pleaded guilty to a global bribery scheme that employed the same accounting tricks LBG used to conceal its protection payments in Afghanistan.  Defendant DAI, for its part, fired more than 10 employees after USAID found out it had committed "pervasive fraud" in Afghanistan.  Defendant ArmorGroup resolved allegations that it had fraudulently overbilled the U.S. government on its largest Afghanistan contract.  Defendant MTN Group made corrupt payments to win business from the Iranian government.

And in 2015, USAID suspended Defendant IRD from receiving any more federal contracts, based on its "systemic problems with financial management and controls."  In response, IRD's CEO, CFO, and General Counsel were all forced to resign.

15.     Defendants' payments, and the Taliban attacks they funded, were acts of "international terrorism."  18 U.S.C. § 2333(a).  At all relevant times, the United States designated the Taliban as a Specially Designated Global Terrorist, which reflected the Taliban's status as one of the world's deadliest terrorist groups.  Since the U.S.-led invasion following 9/11, the Taliban's core purpose has been to expel Americans from Afghanistan and overthrow the country's U.S.-backed democratic government.  In furtherance of that goal, Taliban fighters attacked civilians indiscriminately; conducted kidnappings, torture, and executions; and refused to identify themselves or otherwise comply with the Geneva Conventions.  To date, the Taliban-led insurgency has killed well more than 1,500 U.S. service members and wounded roughly 20,000 more.  Defendants' protection payments helped finance those heinous acts of terrorism.

16.     The Taliban's terrorist attacks against Plaintiffs were "planned," "authorized," and in many instances jointly "committed" by al-Qaeda, 18 U.S.C. § 2333(d)(2), the Islamic terrorist group that the United States has designated as a Foreign Terrorist Organization since 1999.  The al-Qaeda and Taliban organizations have long been fused together:  each pledged allegiance to the other; the two shared money, weapons, and personnel; and they jointly devised attacks at meetings involving a collection of anti-American terrorists that the U.S. government described as a "syndicate."  Al-Qaeda's role in the syndicate was pivotal.  Al-Qaeda supplied the Taliban with technical and tactical expertise that helped the Taliban conduct sophisticated terrorist operations, and it offered the Taliban vital religious justifications for carrying them out.  As a U.S. military-intelligence official said in 2009 in describing the Taliban's close relationship

with al-Qaeda:  "The line between the Taliban and al Qaeda is increasingly blurred, especially from a command and control perspective."

17.     Plaintiffs are U.S. citizens, and their family members, who served in Afghanistan between 2009 and 2017 and who were killed or wounded in Taliban terrorist attacks.  As alleged below, Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism Act ("ATA").  Defendants violated the ATA, 18 U.S.C. § 2333(a), by providing material support to the Taliban in violation of U.S. criminal law.  They are also secondarily liable under the ATA, 18 U.S.C. § 2333(d)(2), because they aided and abetted the Taliban's campaign to commit terrorist attacks in Afghanistan that were committed, planned, or authorized by al-Qaeda.

## THE DEFENDANTS

### A.     The ArmorGroup Defendants

18.     Defendant Centerra Group, LLC is a privately held Delaware company whose principal place of business is in Palm Beach Gardens, Florida.  Centerra Group, LLC is the successor to ArmorGroup North America, Inc. (together with its parent and affiliates, "ArmorGroup"), which was a Delaware company with its principal place of business in McLean, Virginia.  In 2008, ArmorGroup North America, Inc. was merged into Wackenhut Services, Inc. as part of G4S's acquisition of ArmorGroup.  Wackenhut Services, Inc. was later renamed G4S Government Solutions, Inc.  In 2014, after G4S sold G4S Government Solutions, Inc. to a private buyer, G4S Government Solutions, Inc. was renamed Centerra Group, LLC.

19.     Defendant G4S Holdings International (AG) Limited is a wholly owned subsidiary of G4S plc (collectively with its subsidiaries and affiliates, "G4S"), which is headquartered in the United Kingdom and whose stock trades publicly under the ticker symbol GFSZY.  G4S Holdings International (AG) Limited is incorporated in the United Kingdom, and its principal place of business is in London, England.  G4S Holdings International (AG) Limited

is the successor to ArmorGroup International plc.  On September 15, 2008, in connection with

G4S's acquisition of ArmorGroup, ArmorGroup International plc was renamed ArmorGroup

International Limited.  On September 21, 2010, ArmorGroup International Limited was renamed

again as G4S Holdings International (AG) Limited.

20.     Defendant G4S Risk Management Limited is a wholly owned subsidiary of G4S

plc.  G4S Risk Management Limited is incorporated in the United Kingdom, and its principal

place of business is in London, England.  G4S Holdings International (AG) Limited is the

successor to ArmorGroup Services Limited, which was an affiliate of ArmorGroup North

America, Inc. that held multiple contracts in Afghanistan from 2007 onward under the trade

name ArmorGroup Mine Action ("AGMA").  On or about July 9, 2009, after G4S's acquisition

of ArmorGroup, ArmorGroup Services Limited was renamed G4S Risk Management Limited.

### B.     The DAI Defendant

21.     Defendant DAI Global LLC is a privately held Delaware company, and its

principal place of business is in Bethesda, Maryland.  DAI Global LLC is the successor to

Development Alternatives, Inc. (together with DAI Global LLC, "DAI"), because on April 21,

2016, Development Alternatives, Inc. converted itself into a Limited Liability Corporation and

renamed itself as DAI Global, LLC.

### C.     The ECC Defendant

22.     Defendant Environmental Chemical Corporation ("ECC") is a privately held

Kentucky corporation, and its principal place of business is in Burlingame, California.

### D.     The EOD Technology Defendant

23.     Defendant Janus Global Operations LLC is a privately held Delaware company,

and its principal place of business is in Lenoir City, Tennessee.  It is the successor to EOD

Technology, Inc.  On March 25, 2013, EOD Technology, Inc. changed its name to Sterling

Operations, Inc.; on June 29, 2016, Sterling Operations, Inc. converted itself into a Limited

Liability Corporation and renamed itself as Janus Global Operations LLC.

### E.      The LBG/Black & Veatch Defendants

24.      Defendant Black & Veatch Special Projects Corporation is a wholly owned

subsidiary of Black & Veatch Holding Company (together with its subsidiaries, "Black &

Veatch"), which is a privately held Delaware company with its principal place of business in

Overland Park, Kansas.  Black & Veatch Special Projects Corporation is a Missouri company,

and its principal place of business is in Overland Park, Kansas.

25.      Defendant Louis Berger Group, Inc. (together with its subsidiaries and affiliates,

"LBG") is a wholly owned subsidiary of WSP Global Inc., which is headquartered in Canada

and whose stock trades publicly over the counter under the ticker symbol WSPOF.  Louis Berger

Group, Inc. is a New Jersey company, and its principal place of business is in Morristown, New

Jersey.  Louis Berger Group, Inc. has an agent in this District.

26.      Defendant Louis Berger International, Inc. is a wholly owned subsidiary of Louis

Berger Group, Inc.  Louis Berger International, Inc. is a Delaware company, and its principal

place of business is in Morristown, New Jersey.  In a Deferred Prosecution Agreement resolving

a U.S. Department of Justice investigation, Louis Berger International, Inc. stated that, as part of

a corporate restructuring in or about 2015, the company assumed responsibility for LBG's

international operations and liabilities previously held by other LBG affiliates.[1]

27.      Defendant The Louis Berger Group Inc. / Black & Veatch Special Projects

Corporation Joint Venture ("LBG/BV Joint Venture," or "Joint Venture") is a joint venture of

---

[1] Order for Continuance, Deferred Prosecution Agreement at Attach. A ¶ 2, *United States v. Louis Berger International, Inc.*, Mag. No. 15-mj-3624-MF (D.N.J. filed July 7, 2015), Dkt. 1 ("*LBG FCPA DPA*").

Louis Berger Group, Inc. and Black & Veatch Special Projects Corporation.  It is not separately incorporated from its two partners, and its principal place of business is in Washington, D.C.

### F.    The MTN Defendants

28.    Defendant MTN Group Limited ("MTN Group," together with its subsidiaries, "MTN") is a South African telecommunications company whose stock trades publicly on the Johannesburg Stock Exchange under the ticker symbol MTN:SJ.  Its principal place of business is in Roodepoort, South Africa.

29.    Defendant MTN (Dubai) Limited ("MTN Dubai") is a wholly owned subsidiary of MTN Group Limited.  It is a Dubai company, and its principal place of business is in Dubai.

30.    Defendant MTN Afghanistan is a wholly owned subsidiary of MTN Dubai.  It is an Afghan company, and its principal place of business is in Kabul, Afghanistan.

### G.    The IRD Defendants

31.    Defendant Blumont, Inc. (together with its subsidiaries, "Blumont") is a Wisconsin holding company, and its principal place of business is in Madison, Wisconsin. Blumont was created in a January 2016 reorganization of its predecessor, International Relief and Development ("IRD").  On information and belief, as part of that reorganization, Blumont, Inc. assumed many of the rights and liabilities previously held by Defendant International Relief and Development, Inc., including with respect to IRD's work in Afghanistan.

32.    Defendant Blumont Global Development, Inc. is a subsidiary of Blumont, Inc. Blumont Global Development, Inc. is a Wisconsin company, and its principal place of business is in Madison, Wisconsin.  Blumont Global Development, Inc. is an operating company that implements Blumont's projects in Afghanistan.  On information and belief, Blumont Global Development, Inc. also assumed many of the rights and liabilities previously held by Defendant International Relief and Development, Inc. as part of IRD's January 2016 reorganization.

12

33.     Defendant International Relief and Development, Inc. is a Virginia company, and its principal place of business is in Arlington, Virginia.  International Relief and Development, Inc.'s principal office is in the same building suite as Blumont's "US regional office,"[2] and the only three officers for International Relief and Development, Inc. registered with the Virginia Secretary of State are Blumont, Inc.'s Chairman, CEO, and General Counsel.

**H.     The Chemonics Defendant**

34.     Defendant Chemonics International, Inc. ("Chemonics") is a privately held Delaware company, and its principal place of business is in Washington, D.C.

## JURISDICTION AND VENUE

35.     This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 2331.

36.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

37.     Venue is proper in this District under 18 U.S.C. § 2334(a) because Defendants LBG/BV Joint Venture and Chemonics reside in this District and because Defendant Louis Berger Group, Inc. has an agent in this District.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

---

[2] Blumont, *Contact*, https://blumont.org/about/contact/ (last visited May 20, 2020).

## FACTUAL ALLEGATIONS

**I.    IN THE WAKE OF THE SEPTEMBER 11 ATTACKS, THE AL-QAEDA-BACKED AFGHAN TALIBAN LAUNCHED A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN AFGHANISTAN**

38.    Defendants' conduct occurred against the backdrop of several decades of Afghan history, in which the Taliban emerged as a terrorist group, rose to power, suffered defeat at the hands of the U.S. military, but survived as a terrorist insurgency that needed Defendants' money to kill and injure Americans in Afghanistan.  The following 14 paragraphs of this Complaint describe that background.

39.    In December 1979, the Soviet Union invaded Afghanistan to shore up the country's Communist regime.  Armed Afghan groups known as the "mujahedin" – Arabic for a Muslim engaged in Jihad – rose up to resist the invading Soviet forces.  The mujahedin forced the Soviet army to withdraw in 1989.  Three years later, the mujahedin defeated the Soviet-backed ruling regime in Kabul and established an interim government in its place.

40.    In the early 1990's, the Taliban emerged as a particularly radical faction of the mujahedin.  The Taliban was a predominantly Pashtun movement led by Mullah Mohammad Omar – who gave himself the title Amir Ul-Mumineen, or "leader of the faithful" – and it consisted mostly of former mujahedin fighters intent on imposing a severe form of Islamic law throughout Afghanistan.  The Taliban began its rise to power in 1994, when it seized control of Kandahar, the country's most populous city in southern Afghanistan.  In 1996, the Taliban captured Kabul and drove the interim government into northern Afghanistan, where the interim government established the Northern Alliance.  For the next five years, the Northern Alliance and the Taliban fought for control over Afghanistan.

41.    During this period, the United States did not recognize the Taliban as the government of Afghanistan.  In August 1997, the U.S. government ordered the Afghan embassy

in Washington, D.C. to close.  As the Department of State explained in 2000, Afghanistan during this period was plagued by "civil war," with "no functioning central government."[3]

42.     From 1996 to 2001, the Taliban provided safe harbor to al-Qaeda, the Islamic terrorist group founded by Osama bin Laden.  From its headquarters in Afghanistan, al-Qaeda planned and executed the September 11, 2001 terrorist attacks against the United States.

43.     In the wake of the 9/11 attacks, the United States demanded that the Taliban stop harboring al-Qaeda and turn Osama bin Laden over to U.S. custody.  The Taliban refused. Instead, eight days after 9/11, Mullah Omar issued an "Order" decreeing that "[a]ll the infidel powers of the world have united against the [Taliban]" and instructing Taliban mujahedin to be "ready" to "mak[e] sacrifices" to "defeat" the "infidel powers."[4]

44.     On October 7, 2001, the United States initiated Operation Enduring Freedom and invaded Afghanistan.  The operation's purpose was to destroy the Taliban regime and degrade Afghanistan's utility as a base of operations for anti-American terrorists, including al-Qaeda.

45.     U.S. forces quickly defeated the Taliban contingent in Kabul.  By November 2001, the Taliban fled Kabul, and the following month it abandoned Kandahar, its historical stronghold in southern Afghanistan.  While rank-and-file Taliban fighters dispersed back into the countryside, the Taliban leadership – including Mullah Omar – took refuge in Pakistan.

46.     In December 2001, the United Nations passed Resolution 1386, authorizing the International Security Assistance Force ("ISAF," often called the "Coalition"), whose mandate was to assist the newly formed Afghan government in rebuilding the country.

---

[3] U.S. Dep't of State, *1999 Country Reports On Human Rights Practices* (Feb. 25, 2000), https://1997-2001.state.gov/global/human_rights/1999_hrp_report/afghanis.html.

[4] Mullah Mohammad Omar, *His Excellency's Amir Ul-Mumineen's Order*, Anis (Sept. 19, 2001).

47.     Meanwhile, from Pakistan, the remnants of the Taliban regime began plotting its return.  In 2003, Mullah Omar formed the Quetta Shura, a leadership council that functioned as the group's governing body.  Under the Quetta Shura's leadership, the Taliban regenerated as a deadly terrorist group intent on expelling the United States from Afghanistan, overthrowing the recognized government of Afghanistan, and re-establishing Islamic rule.  To that end, in 2005 and early 2006, a rebuilt Taliban began staging terrorist attacks on Coalition forces, Afghan government personnel, and civilians with increasing frequency.  Through this terrorist offensive, the Taliban obtained de facto control of key provinces – including (but not limited to) Kandahar, Helmand, Herat, and Khost Provinces.

48.     The Taliban insurgency included the Haqqani Network, an especially violent part of the Taliban concentrated in southeastern and eastern Afghanistan.  *See infra* Part V.A.2.

49.     The Taliban organized itself through "shuras," which resembled traditional mafia commissions and which engaged in criminal tactics to raise money for the Taliban's terrorist enterprise.  The Taliban extracted money to fund terrorism not only through district and provincial institutions – set up to resemble a "shadow" local government in each key province and district – but also via the Taliban Financial Commission, a centralized fundraising arm that reported to the Quetta Shura.  As with traditional organized-crime syndicates, Taliban leadership established procedures governing both how money should be raised and how it should be spent. For example, it promulgated a Code of Conduct that set forth "strict instructions" for "money matters, literally institutionalizing how profits earned from organized crime are to be distributed

16

within the command chain."[5]  Those instructions helped ensure that the Taliban raised money effectively, and that it spent the money efficiently in service of its Islamic terrorist agenda.

50.     Due in large part to its fundraising prowess, the Taliban insurgency grew more lethal each month and year as it mastered terrorist tactics such as the use of improvised explosive devices ("IEDs") and suicide bombings.  By the first quarter of 2009, the U.S. Department of Defense observed that Afghanistan had seen the "highest levels of violence" since the inception of Operation Enduring Freedom.[6]  The escalating violence prompted President Obama, on December 1, 2009, to announce a "surge" of additional U.S. troops to Afghanistan.  The surge deployed roughly 30,000 additional troops.  In June 2011, President Obama announced that the additional troops would be withdrawn over the course of the next year.

51.     From 2009 forward, while the United States was surging additional troops into Afghanistan, Coalition forces faced intense attack from Taliban terrorists intent on expelling them from the country.  The Taliban's "kinetic capabilities" reached their peak in or about 2010, and its fighters continued to inflict substantial casualties on Americans in the years that followed.[7]  All told, since Operation Enduring Freedom began, the Taliban-led insurgency has killed well more than 1,500 U.S. service members and wounded approximately 20,000 more.

52.     The Taliban has become perhaps the most lethal terrorist group in the world. According to the Global Terrorism Index, terrorism-related deaths in Afghanistan soared in 2018 to more than 7,300 – with the Taliban responsible for most of them.  The Taliban's tactical

---

[5] Gretchen Peters, *Crime & Insurgency In The Tribal Areas Of Afghanistan & Pakistan* at 16, Combatting Terrorism Ctr. (Oct. 15, 2010) ("*Crime & Insurgency*").

[6] U.S. Dep't of Def., *Report on Progress Toward Security & Stability in Afghanistan* at 7 (Jan. 2009).

[7] U.S. Dep't of Def., *Report on Progress Toward Security & Stability in Afghanistan* at 2 (Dec. 2012).

sophistication, close relationship with al-Qaeda, fundraising capabilities, and commitment to violence have enabled it to kill and injure untold thousands of people, including Americans and Afghans alike.  Today, as reported in the Global Terrorism Index study, the Taliban has "overt[aken] the Islamic State group to become the deadliest terrorist organization in the world."[8]

## II.    DEFENDANTS KNOWINGLY OR RECKLESSLY FINANCED TERRORISM BY PAYING PROTECTION MONEY TO THE TALIBAN

53.    Defendants each operated lucrative businesses in post-invasion Afghanistan. MTN was Afghanistan's largest provider of cellular-telephone service; the other Defendants or their co-Defendant affiliates each obtained U.S. government contracts to implement large-scale development projects or to provide private-security services in Afghanistan.  Some Defendants also obtained subcontracts to perform these tasks while working under prime contractors to the U.S. government.  To increase their profit margins by redirecting attacks away from their business interests – and, in the case of MTN, to intentionally assist the Taliban's effort to drive Americans out of Afghanistan – Defendants knowingly paid protection money to the Taliban.

54.    The specifics of each Defendants' payments are discussed in Part IV below.  To lay the groundwork for those allegations, the next two sections describe the post-invasion Afghanistan contracting environment and survey the evidence that large Western contractors, including Defendants, commonly and openly made protection payments to the Taliban.

### A.    Defendants Operated In A Corrupt Afghan Contracting Environment That Encouraged Protection Payments

55.    Defendants' protection payments occurred in a contracting environment marked by pervasive corruption.  From 2007-2014, Afghanistan was one of the most corrupt countries in

---

[8] J.P. Lawrence, *US, Allies' Military Successes Drove Down Terrorism Deaths Almost Everywhere Except Afghanistan, Report Says*, Stars & Stripes (Nov. 21, 2019), 2019 WLNR 35166439.

the world.  In the Transparency International corruption perceptions index – widely considered the most authoritative measure of country-level corruption – Afghanistan ranked near the very bottom each year.  Those rankings reflected longstanding traditions of corruption that affected virtually every level of Afghan civil society.  A 2009 study co-authored by Defendant Louis Berger Group, Inc. for the United States Agency for International Development ("USAID") found that corruption in Afghanistan was "more than the standard issue bribery"; it "ha[d] become a system, through which networks of corrupt practices and people . . . reach[ed] across the whole of government to subvert governance."[9]  Similarly, Douglas Wissing, an investigative journalist studying the connection between Afghan corruption and terrorist financing, observed that "[e]ndemic payoffs began to pervade every aspect of Afghan life."[10]

56.     International contractors looking to profit off the Afghan market faced an equally corrupt business environment.  The Afghan government recognized as much in a highly publicized white paper, explaining that the "large informal economy" in Afghanistan, "as well as the unprecedented large inflows of international assistance and the pressures to commit development aid quickly, carry associated vulnerabilities to corruption."[11]  Contractors spending Western aid in this environment – and companies (including MTN) seeking to profit off the Afghan people – therefore faced unusually high corruption risks.  As a Georgetown University

---

[9] Checchi & Company Consulting, Inc. and Louis Berger Group, Inc., *Assessment of Corruption in Afghanistan* at 4, USAID Contract No. GS-10F-0425M (2009) ("*LBG USAID Report*").

[10] Douglas Wissing, *Funding The Enemy:  How U.S. Taxpayers Bankroll The Taliban* at 87 (Prometheus Books 2012) ("*Funding The Enemy*").

[11] *LBG USAID Report* at 5 (citing Islamic Republic of Afghanistan, *Afghanistan National Development Strategy 1387–1391* (2008–2013) at 9 (June 2008), https://www.wto.org/english/thewto_e/acc_e/afg_e/WTACCAFG18_CD_1.pdf).

security-studies professor put it, "Virtually every transaction in Afghanistan involves some degree of payoff . . . Everyone is getting a piece of the money."[12]

57.     Western contractors operating in Afghanistan knowingly structured their transactions to exploit that corrupt business environment.  They did so by laundering money through a web of local subcontractors – hired for tasks such as security, construction, and logistics – that could make corrupt payoffs downstream while (in theory) maintaining deniability for the prime contractor whose money they were spending.  Some projects had as many as five different companies in the contracting chain:  a prime contractor would interface with the U.S. government (or similar Western institution); the prime contractor would then outsource performance to a subcontractor; the subcontractor would hire another subcontractor, which would hire another in turn; and eventually some local company would perform the work on the ground on the prime contractor's behalf.  This structure allowed the final subcontractor to make corrupt payments while the companies higher up in the chain denied involvement; it also ensured that the "funds available for project work [we]re quickly and significantly depleted."[13]

58.     These same contracting practices typically led to poor-quality work that undermined U.S. reconstruction objectives.  As the former head of the U.S. interagency Afghan Threat Finance Cell ("ATFC") outlined:  "We paid for things that weren't built, or they were built shoddily, and a big part of the reason for that was that the contracts were often given to big American or European firms, and those firms would subcontract the work while keeping a slice

---

[12] Hindustan Times, *About A Billion Dollars Worth of US Aid Diverted To Taliban Coffers* (Oct. 2, 2010) ("*About A Billion Dollars Worth of US Aid Diverted*"), 2010 WLNR 21539943.

[13] Matt Waldman, *Falling Short:  Aid Effectiveness In Afghanistan* at 18 (Oxfam Int'l, Mar. 2008) ("*Oxfam Report*"), https://www-cdn.oxfam.org/s3fs-public/file_attachments/ACBAR_aid_ effectiveness_paper_0803_3.pdf.

of the money."[14]  Because those companies' subcontractors would first "pay the Taliban, plus

pay the corrupt officials," there was often not enough money left to actually "build the project."[15]

59.     Vast sums of money disappeared into this web of corrupt contractors and

subcontractors.  With prime contractors abandoning their oversight role, in part to maintain

plausible deniability over the protection payments they were encouraging, subcontractors rarely

spent Western contract money for its intended purpose.  One contemporaneous assessment by

Kabul Group Consulting estimated that as much as 75% of "aid money pumped into the country"

was diverted for illegitimate purposes.[16]  A 2010 U.S. government audit was even bleaker:

analysts estimated that "only about 10 percent of the aid budget actually reaches the people in

Afghanistan who need it."[17]  Of the remaining 90 percent, a substantial portion went to the

Taliban, while some went to more garden-variety corruption.

60.     Defendant LBG well illustrates the point.  In 2005, LBG received a U.S.

government contract to build a road between Kabul and the nearby airport.  LBG subcontracted

out the project, and the downstream subcontractors ultimately built the road at a total cost of over

$2.4 million per kilometer – at least quadruple the average cost for comparable work.[18]  LBG's

overpriced road, as was typical of LBG road-construction projects at the time, quickly began to

fall apart due to shoddy construction.  But the problem was not confined to LBG:  many

contractors, similarly outsourcing their work to unaccountable and unreliable subcontractors,

---

[14] Interview with Kirk Meyer, Former Director of the Afghan Threat Finance Cell, Combating Terrorism Archive Project (Apr. 2, 2014) ("*Meyer Interview*"), https://globalecco.org/kirk-meyer-former-director-of-the-afghan-threat-finance-cell.

[15] *Id.*

[16] Jonathan Owen, *Army Launches Investigation:  Corrupt Afghans Stealing Millions From Aid Funds*, The Independent (Mar. 7, 2010) ("*Army Launches Investigation*").

[17] *About A Billion Dollars Worth of U.S. Aid Diverted*.

[18] *Oxfam Report* at 19.

regularly sponsored expensive projects "using substandard materials and methods."[19]  As a result, 2010-era Afghanistan was "littered with abandoned or half-built structures" that reflected the inept and corrupt contracting practices employed by Defendants.[20]

61.     Western contractors' reliance on chains of unscrupulous subcontractors was widely understood to be corrupt.  LBG's 2009 study for USAID documented that "Afghan perceptions of rampant corruption include corruption in the donor community, due to the high costs, bureaucratic procedures, and layers of contracting and subcontracting in many projects."[21] A 2011 report by the U.S. Senate Committee on Foreign Relations likewise criticized the widespread "use of large numbers of contractors" as inviting "corruption through multiple subcontractors."[22]  The prevailing criticism of such practices led General Petraeus to issue formal contracting guidance in 2010 that emphasized the importance of "contract[ing] with vendors that have fewer sub-contractors.  Excessive sub-contracting tiers provide opportunities for criminal networks and insurgents to divert contract money from its intended purpose."[23]  Although not the only cause, Defendants' use of multiple contracting tiers enabled them to make enormous profits while delivering substandard work.  It also, as alleged below, helped them fund the Taliban.

### B.  Western Contractors Commonly Structured Their Operations In Afghanistan To Funnel Protection Payments To The Taliban

62.     Defendants employed the same contracting process to funnel money to the Taliban.  Defendants paid the money as protection:  they decided that the cheapest way to shield

---

[19] U.S. Senate Committee on Foreign Relations, Majority Staff Report, *Evaluating U.S. Foreign Assistance To Afghanistan* at 16 (June 8, 2011) ("*Kerry Report*").

[20] *Id.*

[21] *LBG USAID Report* at 51.

[22] *Kerry Report* at 16.

[23] General David Petraeus, *COMISAF's Counterinsurgency (COIN) Contracting Guidance* at 1 (Sept. 8, 2010) ("*COMISAF's Contracting Guidance*").

their projects from attack was to pay the Taliban to leave them alone and instead attack other

targets – like Plaintiffs and their family members.  As detailed in this section, similar payments

were pervasive throughout Afghanistan and supplied the Taliban with an important stream of

financing to fund their terrorist attacks across the country.

63.    At all relevant times, the Taliban used threats of terrorist violence to extract

protection money from international companies doing business in Afghanistan.  Such threats

were particularly frequent in (though not limited to) geographic areas of Taliban control.  By

2006, the Taliban had achieved control of wide swaths of southern and eastern Afghanistan, and

by 2009 it had installed "shadow" governments in 33 of Afghanistan's 34 provinces.  It

leveraged that control into protection payments.  As an anticorruption investigator working for

the U.S. House of Representatives explained, it was "long-standing business practice within

Afghanistan to use your control of the security environment in order to extort payment from

those who want to operate within your space, whether it's construction of a cellphone tower, a

dam, or running trucks."[24]  The Taliban perfected that practice by threatening contractors'

businesses until (and sometimes even after) they met the terrorists' financial demands.

64.    The Taliban's threats presented companies with a choice:  alert the government

and seek the U.S. military's assistance while investing in legitimate security to protect their

projects, or instead save time and money by paying the Taliban to direct its attacks elsewhere.

One American executive whose company conducted business in Afghanistan described the

decision as " 'whether you'd rather pay $1,000' for Afghans to safely deliver a truck, even if part

of the money goes to the insurgents, or pay 10 times that much for security provided by the U.S.

---

[24] Karen DeYoung, *Afghan Corruption:  How To Follow The Money?*, Wash. Post (Mar. 29, 2010) ("*Afghan Corruption*"), 2010 WLNR 26719956.

military or contractors."[25]  Contractors, including Defendants, typically chose the former option.

The owner of one logistics subcontractor described the prevailing mentality:  " 'I pay the Taliban

not to attack my goods, and I don't care what they do with the money,' he said laughing.  'If you

don't, the next day your property is attacked and destroyed.' "[26]

66.  Companies, including Defendants, rationalized their payments to the Taliban by

framing them as a necessary cost of business.  But the payments were unnecessary – even from

the standpoint of Defendants' own security needs – and counterproductive.  In reality, they chose

to pay not because of any reconstruction imperative, but because it served their financial

interests.  As an adviser to the Afghan Interior Ministry explained, "the costs of enabling the

Taliban's protection racket outweigh the benefits of any reconstruction that might come out of

it."[27]  He noted that "it might be more convenient to pay off the Taliban, and it might be faster,"

but it "both prolongs the war and feeds criminality, which in turn turns more people against the

government."[28]  By diverting money to insurgents, the payments lowered the projects' quality

and undermined whatever counterinsurgency benefits they might have otherwise delivered.

66.  Although some contracts required the U.S. government to reimburse the prime

contractor for local security costs, that did not eliminate the profit motive for Defendants to

orchestrate protection payments.  Even on "cost plus" contracts, where profits were pegged to a

fixed percentage of the government's costs, such payments benefited the prime contractor in two

significant ways.  First, had Defendants implemented legitimate, more-expensive security

---

[25] *Id.*

[26] Hamid Shalizi, *Afghan Firms Said To Pay Off Taliban With Foreign Cash*, Reuters (Oct. 13, 2010) ("*Afghan Firms Pay Off Taliban*").

[27] Aryn Baker, *How The Taliban Thrives* at 51, Time Magazine (Sept. 7, 2009) ("*How The Taliban Thrives*").

[28] *Id.* at 51.

measures, that would have raised the cost of their proposals on the front end and jeopardized their ability to win as many contracts.  Making protection payments kept their proposed security costs artificially deflated and lowered the price of their bids, thereby helping them obtain the contracts in the first place.  Second, protection payments offered a simpler and less time-consuming way of purchasing project security, which freed up internal resources for Defendants to undertake more projects overall.  Had they spent the time and effort – even apart from the expense – needed to implement legitimate security, they would have been able to perform fewer projects, and thus would have made less money on an aggregate basis.

67.    As a negotiating play, terrorists occasionally threatened or even attacked contractors that were paying protection money, albeit less frequently than those that elected not to pay.  For that reason, a contractor's experience facing actual or threatened attacks was not inconsistent with it having made protection payments.  Often, such threats were merely an indication of ongoing negotiations over the amount to be paid.  On balance, though, contractors who paid the Taliban bought themselves relative security at an attractive price.

68.    Contractors, including Defendants, often routed money to the Taliban through their subcontractor networks.  Just as delegating contract performance to corrupt subcontractors worsened the quality of the services provided, *see supra* ¶¶ 58-60, so too did it create opaque pools of money from which to pay off the Taliban.  As one journalist observed in 2009, there was a "web of financial connections between major international contractors and the Taliban" through "which the insurgents provide protection . . . in return for a healthy cut of the proceeds."[29]  Western contractors, including Defendants, used their subcontractors to "pay bribes

---

[29] Jean MacKenzie, *Charge Probed That U.S. Aid Helps Fund Taliban*, Star-Ledger (Sept. 5, 2009), 2009 WLNR 17449038 ("*U.S. Aid Helps Fund Taliban*").

to Taliban representatives and even [to] seek written authorisation to work in an area from Taliban leaders."[30]  As explained below, Defendants both actively facilitated and benefited from such payments that their subcontractors delivered on their behalf.  *See infra* ¶¶ 91, 95-96.

69.      Watan Risk Management (together with its affiliates, "Watan"), a now-infamous Afghan security subcontractor, offers a particularly egregious example.  Watan was one of the largest private-security companies in Afghanistan, and it made its money on subcontracts to protect convoys ferrying goods and fuel around the country.  In that capacity, Watan worked for many of the largest Western contractors in Afghanistan, including, on information and belief, most of the Defendants.  "There were so many contracts out there," Watan's managing director stated later, "that you could win anything you wanted . . . The margins were insane."[31]  In 18 months, Watan's revenues ballooned from $500,000 to $58 million.

70.      Watan was profitable both because it paid the Taliban and because it cheaply sourced its supply of "security guards" from the ranks of the Taliban, including the Haqqani Network.  Contractors and subcontractors that outsourced security to Watan were, in effect, knowingly hiring the Taliban to provide security.  Decisions to hire Watan for security supplied the Taliban, including the Haqqanis, with money and intelligence that undermined American interests.  For example, according to a declassified DIA intelligence report:

> As of 29 August 2010, Qabool ((Khan)), who is ***a manager for Watan*** private security company in Khowst Province, Afghanistan, ***is secretly providing information on U.S. bases to Siraj ((Haqqani))'s intelligence section*** in Miram Shah, Pakistan . . . . Khan is currently a manager with Watan security, and has private security guards posted on U.S. bases Salerno and Chapman.  ***Khan receives $800.00 U.S. Dollars per guard, per month, in which*** $200.00 U.S. Dollars goes to the guard, $300.00 U.S. Dollars to Khan, and ***$300.00 U.S. Dollars is given to the Haqqani Network***.  Khan also provides the Haqqani

---

[30] International Crisis Group, *Aid & Conflict In Afghanistan* at 20, Asia Report No. 210 (Aug. 4, 2011).

[31] Matthieu Aikins, *The Bidding War*, New Yorker (Feb. 28, 2016).

Network with license plate numbers of the vehicles on the base, plus the names and physical descriptions of U.S. military and contractors on the base.[32]

71.     In December 2010, the U.S. military debarred Watan from government contracting, as part of its efforts to "clean up a contracting process in Afghanistan that has been riddled with corruption and allowed U.S. funds to pass to insurgents."[33]  Before the debarment, however, Western contractors commonly hired Watan despite proliferating allegations that it was "bribing both government officials and Taliban commanders."[34]

72.     Watan illustrates a broader pattern in which companies, including Defendants, knowingly (or recklessly) paid protection money to the Taliban.  The widespread existence of such protection-money payments has been confirmed by U.S. reconstruction agencies, U.S. military officials, congressional investigators, industry participants, and journalists.  To begin, USAID itself recognized that a "main challenge[]" facing U.S. development efforts in Afghanistan was "ensuring that USAID resources do not benefit the Taliban or other malign groups."[35]  The agency documented those risks in a 2009 "investigation into allegations that its funds for road and bridge construction in Afghanistan are ending up in the hands of the Taliban, through a protection racket for contractors."[36]  An employee of the U.S. Embassy in Kabul described the typical "arrangement as 'organized crime,'" in which "the Taliban takes as much

---

[32] Defense Intelligence Agency, *Qabool Khan Providing Secret Information To The Haqqani Network On U.S. Bases In Salerno & Chapman*, Intelligence Information Report (Aug. 31, 2010) (emphasis added), https://www.dia.mil/FOIA/FOIA-Electronic-Reading-Room/FOIA-Reading-Room-Afghanistan/FileId/114000/.

[33] Heidi Vogt, *U.S. Blacklists Afghan Security Firm Tied To Karzai*, Associated Press (Dec. 9, 2010).

[34] *Id.*

[35] USAID, *Fact Sheet on Accountable Assistance for Afghanistan ($A^3$)* (June 2011).

[36] *U.S. Aid Helps Fund Taliban*.

as 20 percent of development aid awarded to contractors."[37]  Summing up the results of that and similar investigations, a Congressional Research Service analyst wrote in 2011 that, "[a]ccording to numerous government officials, intelligence sources, and contractor reports, significant amounts of contracting funds flow to criminal networks and insurgents."[38]

73.     U.S. military officials documented the same pattern.  Several ISAF officials confirmed to the *New York Times* in 2010 that prominent Afghan security subcontractors hired by Western contractors were suspected of "using American money to bribe the Taliban."[39]  A 2014 Pentagon study similarly found that, "[b]y the time the US started the surge, 'Convoy protection money . . . was simply a cost of doing business.' "[40]  The "complex and arduous logistics chain" used to implement U.S. government contracts, the study continued, "fuel[ed] corruption" and "provid[ed] a financial windfall to the Taliban."[41]  As the lead forensic accountant for Task Force 2010 – an interagency group that studied the relationship between counterinsurgency and contracting practices in Afghanistan – described the evidence:  "U.S. taxpayer dollars reached the insurgents through a layer of intermediaries that began with the contractors.  'I always viewed them as an aider and abettor of terrorist acts.' "[42]

74.     Task Force 2010 gathered additional evidence that Western contractors in Afghanistan financed the insurgency.  The "big companies we found," the Task Force's first

---

[37] Dana Chivvis, *Is The Taliban Getting A Cut Of U.S. Aid?*, CBS News (Sept. 3, 2009).

[38] Moshe Schwartz, *Wartime Contracting in Afghanistan:  Analysis & Issues For Congress* at 5-6, Congressional Research Service (Nov. 14, 2011), https://fas.org/sgp/crs/natsec/R42084.pdf.

[39] Dexter Filkins, *Convoy Guards In Afghanistan Face An Inquiry*, N.Y. Times (June 6, 2010).

[40] Joint & Coalition Operational Analysis (JCOA), *Operationalizing Counter/Anti-Corruption Study* § 2.2 (Feb. 28, 2014) (ellipses in original), https://www.hsdl.org/?view&did=756004.

[41] *Id.*

[42] Matthieu Aikins, *The Bidding War*, The New Yorker (Feb. 28, 2016).

director stated, "they're all corrupt."[43]  In the Task Force's review of roughly 3,000 contracts in

the theater, it estimated that on average "18% of contract money went to the Taliban, Haqqani,

[and] other insurgent groups.  And it was often a higher percent."[44]  Another counterterrorism

investigator, working for the U.S. Treasury Department with Task Force 2010, stated that his

investigation "found that 25% of the money went to the wrong hands."[45]  An Assistant Secretary

of State, relaying the intelligence community's concerns at the time, agreed with that assessment.

"We didn't intentionally go and say, here is [a] bullet, please shoot an American, but the fact that

some of our stuff [went] to the Taliban through fairly direct means was probably true."[46]

75.     The ATFC, another interagency group that drew on law-enforcement and

intelligence assets to interdict insurgent funding sources, performed a series of sophisticated

audits of Taliban financing.  Those audits drilled down to the province and district level and

confirmed that "one of the biggest funding sources for the insurgency" was U.S.-sponsored

"development projects."[47]  As the ATFC Director explained, "there were a lot of projects being

done in areas where we didn't control the terrain.  Either the Taliban controlled it or these were

areas where the terrain was contested and the Taliban played a major role."[48]  In those cases,

"about 25 percent of *every* development project's funding was going to the insurgency."[49]

---

[43] SIGAR Interview with Gert Berthold, *Lessons Learned Record of Interview* at 2 (Oct. 6, 2015) ("*SIGAR Interview with Gert Berthold*").

[44] *SIGAR Interview with Gert Berthold* at 5.

[45] SIGAR Interview with Thomas Creal, *Lessons Learned Record of* Interview at 3 (Mar. 23, 2016).

[46] SIGAR Interview with Amb. Richard Boucher, *Lessons Learned Record of Interview* at 6 (Oct. 15, 2015).

[47] *Meyer Interview*.

[48] *Id*.

[49] *Id*. (emphasis added).

76.     Congressional investigations reached similar conclusions.  Most prominently, the bipartisan Commission on Wartime Contracting in Iraq and Afghanistan, after a lengthy investigation, found in 2011 that "U.S. funds have been diverted to insurgents and warlords as a cost of doing business in Afghanistan . . . The Commission finds it particularly alarming that Afghan subcontractors on U.S.-funded convoys, road construction, and development projects pay insurgent groups for protection."[50]  According to the evidence the Commission collected – not all of which appeared in its final report – U.S. contractors knew that the "standard rate" the Taliban charged was between 10-20%, and nearly all contractors universally paid for projects in Taliban-controlled or -influenced areas.  Representative John Tierney echoed that message at a congressional hearing, observing that "the extortion of international contractors is a booming industry" in Afghanistan.[51]  And at the same hearing, Brigadier General Stephen Townsend said of Western security and development spending in Afghanistan:  "It's clear to us some of that money is going in the insurgency and we've got to do whatever we can to stop that."[52]

77.     The Special Inspector General for Afghanistan Reconstruction ("SIGAR"), an oversight entity Congress created to monitor U.S. government spending in Afghanistan, echoed the same theme.  In a "Lessons Learned" report surveying U.S. reconstruction efforts, SIGAR concluded that "DOD and USAID reliance on private security contractors led to a substantial percentage of expenditures being diverted to insurgent groups."[53]  After noting the problem as it

---

[50] Commission on Wartime Contracting in Iraq and Afghanistan, *Transforming Wartime Contracting:  Controlling Costs, Reducing Risks* at 73 (Aug. 2011) ("*CWC Report*").

[51] *Corruption in Afghanistan Defense Contracting*, Hr'g Before the U.S. House Committee On Oversight and Government Reform (Sept. 16, 2011) (statement of Rep. John Tierney), 2011 WLNR 29411184 ("*Hearing on Corruption in Afghanistan Defense Contracting*").

[52] *Id.* (statement of Brig. Gen. Stephen Townsend).

[53] SIGAR, *Stabilization:  Lessons From the U.S. Experience In Afghanistan* 65 (May 2018) ("*Stabilization Lessons*").

applied to "Pentagon logistics contractors," SIGAR emphasized that "the role of USAID implementing partners, or their private security contractors, in paying 'taxes' in exchange for the ability to access project sites" was "equally problematic."[54]

78.     Richard Holbrooke, the White House's special envoy for Afghanistan and Pakistan in 2009, offered the same assessment.  As recounted by Bob Woodward in a *New York Times* bestselling book, Mr. Holbrooke explained at a White House principals meeting that included President Obama, "All the contractors for development projects pay the Taliban for protection and use of the roads, so American and coalition dollars help finance the Taliban."[55]

79.     Business owners operating in Afghanistan confirmed the standard practice of paying protection money to the Taliban.  An owner of one telecommunications firm operating in southern Afghanistan admitted to a reporter in 2009 that his firm "pays 2,000 dollars in protection money per month [to the Taliban] for each of his transmission masts.  'You have to do it.  Everybody does.'"[56]  The vice president of a Kabul-based logistics subcontractor called such protection-money payments "a big source of money for the insurgents."[57]  The owner of another road-repair contractor similarly told the media that he paid "insurgents a substantial part of a $1.2 million contract" as protection money, after Taliban terrorists told him, "You know we need this American money to help us fund our Jihad."[58]  And another subcontractor working on a bridge project in Helmand "admitted he agreed to add 20 percent to the budget for the project

---

[54] *Id.*

[55] Bob Woodward, *Obama's Wars* 25 (Simon & Schuster 2010).

[56] Can Merey, *How The Taliban Has Turned Extortion Into A Gold Mine*, Deutsche Presse-Agentur GmbH (June 4, 2009) ("*Taliban Has Turned Extortion Into A Gold Mine*").

[57] Matthew Green & Farhan Bokhari, *High Costs To Get NATO Supplies Past Taliban*, Financial Times (Nov. 13, 2009).

[58] *Afghan Firms Pay Off Taliban.*

and to kickback that amount to the Taliban as protection money."[59]  That subcontractor, like several others, "confirm[ed] that it was standard practice to build in a kick back to the Taliban to ensure that militants did not attack or disrupt a construction project."[60]

80.     An American security contractor reported similar concerns to the U.S. government that Western contractors were "paying Taliban insurgents not to attack them."[61]  The standard playbook, the contractor explained, was to "get ahold of the local Taliban commander, ask how much will it cost us to get this work done and have you not mess with us, and by the way we'll hire you to do the security."[62]  He concluded:  "I have yet to find a security company that doesn't rely on payoffs to the Taliban."[63]  That mirrored the assessment of the Afghanistan country director of a large NGO, who explained that "the Taliban and local warlords typically take between 10-20% of the value of any project as the price to provide protection."[64]

81.     Journalists and other experts likewise documented widespread protection payments to the Taliban.  One Kabul-based investigative journalist gathered evidence in 2009 that "[v]irtually every major project includes a healthy cut for the insurgents."[65]  Around the same time, *CBS News* reported on claims that "U.S.-funded contractors have been spending a

---

[59] Joseph V. Micallef, *Follow The Money:  The Taliban's Growing Criminal Empire* (2011) ("*Follow The Money*"), https://www.military.com/daily-news/2017/04/03/follow-the-money-the-talibans-growing-criminal-empire.html.

[60] *Id.*

[61] David Wood, *Allegation:  Some Contractors In Afghanistan Paying Protection Money To Taliban*, Politics Daily (Dec. 21, 2009).

[62] *Id.*

[63] *Id.*

[64] Majority Staff Interview of an NGO's Afghanistan Country Director, U.S. House of Representatives Subcommittee on National Security and Foreign Affairs, Committee on Oversight and Government Reform (Jan. 30, 2010).

[65] Jean MacKenzie, *Funding The Afghan Taliban*, GlobalPost (Aug. 7, 2009) ("*Funding The Afghan Taliban*").

hefty chunk of [their] funding on protection payments to the Taliban – for years."[66]  *Sydney Morning Herald* journalists, after a fact-finding trip to southeast Afghanistan, detailed how "[i]t is effectively the Taliban who decide which local contractors will work on a project," often by "setting a level of protection money that the contractor can afford to pay."[67]  And Mr. Wissing, in an exhaustively researched book, surveyed comparable reports that "insurgents used extortion of US development money for their funding."[68]  The Taliban's funding, he explained, came from "supply-convoy shakedowns, construction-protection rackets, Taliban 'taxes' on corrupt officials, payoffs from NGOs[,] and major Afghan businesses," including "cell phones" – which were the industries in which Defendants operated.[69]

82.     Academic field work reached the same conclusion.  In one article sourced to extensive in-country interviews, including with members of the Taliban, two Afghanistan scholars explained that "protection money" for "transportation" and "development projects" became new income sources" for the Taliban.[70]  In the process, a "consensus" developed among companies implementing "development projects" in Afghanistan that it had "become impossible" to avoid making "payments that end up in Taliban coffers."[71]  The "practice is so widespread," the authors explained, that "company owners approach [the] Taliban and voluntarily pay the[m] 10 percent to ensure good relations."[72]

---

[66] Nancy Cordes, *Is Taxpayer Money Funding The Taliban?*, CBS News (Sept. 3, 2009).

[67] Paul McGeough & David Brill, *Insurgents Play A Perilous Mountain Game*, Sydney Morning Herald (Sept. 27, 2009) ("*Insurgents Play A Perilous Mountain Game*"), https://www.smh.com.au/world/insurgents-play-a-perilous-mountain-game-20090926-g73f.html.

[68] *Funding The Enemy* at 234.

[69] *Id.*

[70] James Weir & Hekmattullah Azamy, *Economic Impediments to a Taliban Peace Process*, 10 Econ. of Peace & Sec. J. 75, 80 (2015) ("*Economic Impediments*").

[71] *Id.*

[72] *Id.*

83.     Those protection payments continued despite mounting concerns raised by U.S. and British military leaders that Western companies were financing terrorism in Afghanistan.  In early 2010, a British Major General ordered a "probe into construction and logistics contracts" as part of ISAF's "wider crackdown," in which General Stanley McChrystal likewise "declared war on those making millions out of what has become a billion-dollar black hole for aid funds."[73] While those probes went forward, local Afghan experts estimated that large portions of Western contracting dollars in Afghanistan continued flowing to the Taliban as protection money.  As one journalist reporting on those developments observed, the probes manifested a widespread realization that, due to payments by unscrupulous contractors, "the very money supposed to win over the hearts and minds of Afghans is ending up in the hands of the Taliban."[74]

84.     Western contractors working in Afghanistan, including Defendants, routed their payments to the Taliban through two primary channels.  *First*, they negotiated payments with a senior Taliban "contracts officer" in Kabul, Quetta, Pakistan, or at the provincial level.  The Taliban followed an organized, highly regulated process in negotiating an appropriate level of protection money with the contractor.  As part of that process, Taliban auditors and engineers inspected the project paperwork and used the estimated value to calibrate the amount of protection money demanded.  The Taliban specifically appointed officials (internally called "inspection teams") tasked with assessing such projects and calculating the appropriate "tax" amount.  The centralized Taliban Financial Commission supervised the resulting payments.  As the U.N. Security Council explained after a lengthy analysis, the Commission oversaw the

---

[73] *Army Launches Investigation.*

[74] *Id.*

process of extracting payments from "construction and trucking companies, mobile telephone operators, mining companies[,] and aid and development projects."[75]

85.     The procedure through which the Taliban extracted those payments was straightforward.  At in-person meetings conducted either directly with the Western contractor or through an intermediary, the Taliban contracts officer did due diligence on the proposed project and then either "agree[d] [to] protection money with the contractor," or simply "demand[ed] a cut" of the proceeds.[76]  Defendants virtually always agreed to pay.

86.     The Taliban's Code of Conduct confirms the group's systematic practice of extracting protection payments from large firms doing business in Afghanistan, such as Defendants.  Section 5 of the Code set forth regulations requiring Taliban fighters to kickback 20 percent of any money seized in terrorist attacks as "*khoms*" (an Islamic tax) to the Taliban's "provincial official"; the remaining four-fifths was given to those on the frontline.  However, any money or property "seized without fighting" from Western projects – such as the fruits of successful negotiations with Western contractors – was sent to leadership to "be spent on the mujahedeen's needs" throughout Afghanistan.[77]

87.     Section 9 of the Taliban's Code further prescribed regulations for "control and arrangement of the affairs of [private] companies and [non-governmental] organisations" and entrusted authority over those affairs to the "Organisations and Companies Commission" reporting to the Quetta Shura.[78]  The Taliban created that Commission in or about 2006 to ensure that protection money would benefit the broader Taliban organization rather than individual

---

[75] U.N. Security Council, *First Report of the Analytical Support & Sanctions Implementation Monitoring Team* ¶ 35 (Sept. 5, 2012) ("*U.N. Financing Report*").

[76] *Id.* ¶ 39.

[77] Code of Conduct For The Mujahadeen § 5 (2010 ed.).

[78] *Id.* § 9.

commanders.  In an interview published on the Taliban's official website, the head of the

Commission described the decision to "constitute a separate commission for the control of NGOs

and companies and for the effective organisation and coordination of their activities and

expenditures."[79]  Proper "expenditures" by contractors, he explained, were crucial for them to

obtain "permission letters" from the Taliban to fulfill their contracts.[80]  If companies refused, he

warned, the "mujahedeen of the Islamic Emirate can halt these kinds of violators."[81]

88.     Gretchen Peters, a recognized expert on Afghan terrorist financing who has

written extensively about and testified before Congress on the topic, has likewise documented

high-level protection-money negotiations between Western contractors, including Defendants,

and Taliban leadership.  "The Quetta Shura," she explained, "collects protection money from

larger businesses, notably the telecommunications sector and construction projects funded by

international aid organizations and the Coalition."[82]  Such payments were neither *ad hoc* nor the

function of individual rogue insurgents; they occurred in an environment in which the Taliban

leadership had "moved to regulate how protection money is collected from larger businesses, aid

and development projects."[83]  Those Taliban regulations – ensuring a predictable set of payments

from contractors to the Taliban Financial Commission – were designed to bring a degree of

regularity to the protection rackets on which the Taliban relied to finance its insurgency.

89.     Industry participants confirmed the existence of such "high-level negotiations"

between "the Taliban and major contractors."[84]  For example, an owner of a telecommunications

---

[79] Interview with Mawlawi Ahmad Bilal, Al-Emera (Mar. 20, 2014).

[80] *Id.*

[81] *Id.*

[82] *Crime & Insurgency* at 31.

[83] *Id.* at 29.

[84] *Funding The Afghan Taliban*.

firm admitted negotiating with the Taliban's "so-called commission, a kind of shadow economics ministry of the militants, headed by Mullah [Baradar], a deputy of Taliban leader Mullah Omar."[85]  As the executive explained, buying "commission approval" for an economic project was one way to "'make sure that your business is not being attacked.'"[86]  Contractors operating in Afghanistan typically "regard[ed] these overheads as a cost of doing business," even though they knew the payments allowed "the insurgency [to] benefit[] financially."[87]

90.     *Second*, in addition to high-level negotiations with senior Taliban officials, companies, including Defendants, also paid protection money to local Taliban commanders in the areas where they were operating.  They negotiated those payments not directly with the Taliban Financial Commission, but with lower-level Taliban officials operating at the provincial or district level.  The Taliban set up shadow governments – including a so-called "governor" – in most areas, and contractors frequently sought to obtain the Taliban governor's approval before building in a given area.  A *Le Monde* journalist reported on a typical example in 2010:  the Taliban "governor" of Kunduz, a northern province in which (at least) Defendants Chemonics, DAI, ECC, IRD, LBG/BV Joint Venture, and MTN operated, took "a percentage of almost all construction work in the area, including roads, bridges, schools and clinics."[88]

91.     Companies, including Defendants, typically routed these more-localized payments through their subcontractors.  Most often, private-security firms arranged payment on their clients' behalf.  The security firms paid the Taliban either by making cash payments through the Afghan *hawala* system – the country's historic informal money exchange and

---

[85] *How The Taliban Has Turned Extortion Into A Gold Mine*.

[86] *Id*.

[87] *U.N. Financing Report* ¶ 40.

[88] Louis Imbert, *The Taliban's Secret Weapon: Security*, Le Monde Diplomatique (Oct. 2010) ("*Taliban's Secret Weapon*").

transfer network – or by directly hiring Taliban members and putting them on the payroll as "security guards."  Either way, the logic of the payments was simple:  they reduced the threat of attacks on the contractors' own projects at an attractive price.  As one American executive with business in Afghanistan put it in slightly overstated terms, "No matter how bad things get out there, the trucks always get through. . . We don't need any security if the payments are made. Nobody f---s with us."

92.     Companies paid the Taliban protection money in relatively predictable percentages on each project they undertook in Afghanistan.  The percentages could vary based on several factors, including contract size, location, and the particular Taliban officials involved. But overall, many analysts estimated a largely consistent 20% across-the-board "tax" that the Taliban levied on every economically significant project.  The percentage could vary upwards on occasion:  one supplier operating in Helmand admitted to "tack[ing] on about 30 percent extra for the Taliban,"[89] while officials in Farah Province estimated that the Taliban was extracting "up to 40 percent of the money coming in" for development.[90]  One Afghan intelligence official noted examples of private-security companies "paying as much as 60 percent of their gross profits" to Taliban insurgents for so-called "convoy security."[91]

93.     The same scheme delivered protection payments to the Haqqani Network, which was the part of the Taliban concentrated in eastern and southeastern Afghanistan.  The Haqqani Network ran especially potent protection rackets that extracted revenues from large companies, including Defendants, conducting business in its territory.  As Ms. Peters testified before

---

[89] *Funding The Afghan Taliban*.

[90] Jean MacKenzie, *Who Is Funding The Afghan Taliban?  You Don't Want To Know*, Reuters Global News Journal (Aug. 13, 2009) ("*Who Is Funding The Afghan Taliban?*").

[91] Jake Sherman & Victoria DiDomenico, *The Public Cost Of Private Security In Afghanistan* at 8, NYU Ctr. on Int'l Cooperation Briefing Paper (Sept. 2009).

Congress, the Haqqanis "systematically extort all business that takes place in their areas of operations."[92]  That conclusion echoed the statements of the Haqqani Network's own members. This "protection racket for construction firms," a former Haqqani commander told the *New York Times*, was " 'the most important source of funding for the Haqqanis.' "[93]

94.     Contractors, including Defendants, typically concealed their protection payments from the U.S. government by inflating their costs and misrepresenting protection money as a legitimate security expense.  For example, one Afghan construction subcontractor stated that he "builds in a minimum of 20 percent for the Taliban in his cost estimates" – so that of every $1 million he received, "$200,000 is siphoned off for the insurgents."[94]  Similarly, the criminal-run security subcontractor U.S. Protection and Investigation ("USPI"), *see infra* ¶¶ 255-263, added fictitious security guards to its payroll and concealed the protection payments as "salaries" for the ghost employees.  It then passed the costs of those protection payments up the chain for reimbursement by the prime contractor.  Alternatively, the ArmorGroup Defendants hired Taliban cutouts as security personnel – and so paid protection money in the form of real (yet no less unlawful) salaries they knew would benefit the insurgency.  *See infra* ¶¶ 150-168.

95.     As explained below, Defendants each followed the standard practice and paid protection money to the Taliban, including through their subcontractors, using one or more of the methods described above.  *See infra* Part IV.  In doing so, they both orchestrated and knowingly benefited from their subcontractors' payments.  Defendants actively orchestrated the payments

---

[92] *Combatting The Haqqani Terrorist Network*, Hr'g Before the U.S. House Committee On Foreign Relations, Subcommittee On Terrorism, Nonproliferation, and Trade, 112 Cong. 177 (Sept. 13, 2012) (statement of Gretchen Peters, author, *Haqqani Network Financing*).

[93] Mark Mazzetti et al., *Brutal Haqqani Crime Clan Bedevils U.S. In Afghanistan*, N.Y. Times (Sept. 24, 2011) ("*Brutal Haqqani Crime Clan*").

[94] *Who Is Funding The Afghan Taliban?*.

by obtaining the underlying government contracts to pay for the work that needed "protection" from the Taliban; by retaining and outsourcing security to the corrupt subcontractors they knew would pay money to terrorists; by encouraging their subcontractors to make the payments, either explicitly or implicitly; by supplying the financing that the subcontractors used to make the payments; and then by knowingly approving reimbursement of the payments.  Subcontractors' contracts with Defendants typically required Defendants to review and approve their expenses,[95] and Defendants knowingly accepted expense reports that hid or mischaracterized the payoffs. Throughout, Defendants had the right to control their subcontractors' security activities and knew that their subcontractors were acting on their behalf.

96.     When the subcontractors paid the Taliban, they did so as part of their performance under their contracts with Defendants.  The subcontractors would have been unable to make payments to the Taliban without Defendants' money and approval.  Defendants supplied the funds for the protection payments because they, even more than their subcontractors, financially benefited from them.  Indeed, the core purpose of the payments was to benefit the Defendants by shielding their projects from Taliban attack at an affordable price (or, in the case of MTN, also to assist the Taliban's effort to drive Americans out of Afghanistan).  To obtain that benefit, Defendants needed and intended for their money to reach the Taliban.

---

[95] *See*, *e.g.*, Subcontract No. 02-04-GG451AF-07 between The Louis Berger Group Inc. and U.S. Protection and Investigation, LLC, Appendix II (effective Sept. 5, 2004) (requiring subcontractor to submit monthly invoices indicating labor rates applied and hours expended and "any other direct costs"); Subcontract No. IRP-04-08-GH1308-LB-AF-l0 between the LBG/BV Joint Venture and a construction subcontractor, Section IV, Sub-Clause 60.1(c) (effective Apr. 26, 2008) (requiring subcontractor to submit monthly statement including the unit rates and prices for tasks performed); Subcontract No. AKC.CSA.AEDMATOC.5950 between ECCI-C, Metag, LLC JV and Arvin Kam Construction, Part A, Section 7.8 (Sept. 6, 2010) ("At any time prior to final payment of a [Work Authorization], ECCI-C may request an audit of the invoices or payment applications and substantiating material.").

III.     **DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR
         PAYMENTS FINANCED TALIBAN ATTACKS ON AMERICANS**

A.       **Defendants' Protection Payments Directly Funded The Taliban's Terrorist
         Campaign Against Americans In Afghanistan**

97.      Money supplied the lifeblood of the Taliban insurgency.  Financing gave the

Taliban the means to recruit and pay terrorist fighters; to acquire weapons and explosives with

which to attack Coalition forces; and to maintain the vast operational infrastructure needed to

sustain the insurgency.  In 2011, it cost the Taliban an estimated $100-155 million overall to

launch attacks and up to $300 million to "maintain[] the insurgency" generally.[96]  Those costs

ballooned as the insurgency intensified.  As a U.N. Security Council report documented, from

2006-2012, the Taliban "managed to finance an ever-increasing number of attacks, reflecting a

year-on-year increase in income."[97]  The Taliban's access to financing was vital to its ability to

sustain its growing campaign of terrorism against the United States.  As one military historian

observed in 2011, "the Taliban's most significant weapon is not its arms or its ability to mobilize

jihadists but the vast sums of money that it seems to have at its disposal."[98]

98.      Defendants' conduct aided the Taliban's terrorist enterprise.  The very nature of

the protection-money demands – backed by violent threats conveyed by the same Taliban

fighters who were waging an insurgency against the United States – ensured a close connection

between the payments and subsequent Taliban attacks on American forces.  Such attacks were a

necessary consequence of Defendants' payments.  When they paid the Taliban protection money,

they were not lessening the overall risk of terrorist violence; they were paying the Taliban to

redirect its attacks to other targets.  One prevailing slogan among private-security contractors in

---

[96] *U.N. Financing Report* ¶ 34.

[97] *Id*.

[98] *Follow The Money*.

Afghanistan captured that mentality:  contractors often said "you want them to fight Big Army [*i.e.*, the U.S. Army] before they fight you."  Defendants' payments accomplished exactly that. They paid the Taliban to attack Coalition forces rather than Defendants' own businesses.

99.     Defendants' protection payments supplied the Taliban with an important stream of revenue it used to finance terrorist attacks against Americans in Afghanistan.  Defendants' protection payments, which created an income stream overseen directly by Quetta leadership, gave the Taliban fungible resources that were vital to its ability to sustain its terrorist enterprise. For that reason, the Commission on Wartime Contracting observed that "diverted funds," channeled from Western contractors to the Taliban, "directly strengthen the insurgency."[99]

100.     The Taliban institutionalized control of its protection-money revenue.  The extraction of protection payments occurred via a highly regulated process designed to ensure that such payments would benefit the broader insurgency.  The Taliban's 2009 Code of Conduct, for example, contained extensive regulations dictating to local field commanders how to collect (and spend) protection money from foreign businesses.  As Ms. Peters explained, those regulations "literally institutionaliz[ed] how profits earned from organized crime are to be distributed within the command chain."[100]  The money flowed both ways – from local commanders up to the Financial Commission for use by the Taliban's central leadership, and conversely from the leadership back down to local commanders for use in the field.  In all cases, the Quetta Shura maintained "final say in all matters of collecting protection money."[101]  That discipline allowed protection money collected from all over the country to finance the Taliban's terrorist machine.

---

[99] *CWC Report* at 74.

[100] *Crime & Insurgency* at 16.

[101] *Id.* at 17.

101.     Defendants' protection payments similarly financed the Haqqani Network.  Not only did Defendants fund the Haqqanis directly, *see supra* ¶ 93, but their payments to the Taliban likewise financed Haqqani operations.  The Haqqani Network was part of the Taliban and operationally intertwined with Taliban leadership.  *See infra* Part V.A.2.  For that reason, according to a declassified 2009 DIA cable, "a large majority of the Haqqani Network (HQN) funding comes from the Quetta . . . , Pakistan-based Taliban leadership."[102]  As Ms. Peters concluded, the Haqqani Network relied on the Taliban organization to "cover operational costs," with the amount of financing depending on "the funding capacity of the Taliban leadership."[103] The money flow went both ways:  payments to the Taliban supported Haqqani attacks, and payments to the Haqqani Network supported Taliban attacks.[104]

102.     Protection payments supplied the Taliban with the means to buy weapons and explosives for use in terrorist attacks.  Weapons capable of killing and injuring Americans cost money, and Defendants' protection payments provided the Taliban with a potent source of funding to cover the cost of its escalating insurgency.  As Ms. Peters explained, once companies decided to "pay off insurgents to avoid having [their] projects attacked," the "insurgents then spen[t] the money they raise[d] to purchase weapons and explosives, which in turn get used to kill American soldiers."[105]  Congressman Bill Delahunt was even more succinct.  Responding to reports that "U.S.-funded contractors" made "protection payments to the Taliban," he observed:

---

[102] Def. Intelligence Agency, *Afghanistan – Haqqani Network Finances* (Sept. 24, 2009).

[103] Gretchen Peters, *Haqqani Network Financing:  The Evolution Of An Industry* at 23, Combatting Terrorism Ctr. (July 2012) ("*Haqqani Network Financing*").

[104] *Crime & Insurgency* at 33 (Quetta Shura agreed with the Haqqani Network "to operate alongside each other and to divide the proceeds they earn in some zones where more than one faction operates.").

[105] *Id.* at 31.

"That translates into money that the Taliban are using to attack and kill American military personnel, and that's just simply outrageous."[106]

103.    Even relatively small protection payments had an outsized effect on the Taliban's terrorist capabilities.  Although estimates vary, the Taliban paid many of its rank-and-file fighters about $100 per month, while mid-level commanders made upwards of $350 per month. As for many of the IEDs that the Taliban used against Coalition troops, a Pakistani security official estimated that they cost a mere $100 to make.[107]  At those rates, even a single protection payment of $2,000 could finance substantial insurgent violence:  it could put ten fighters and a commander in the field for a month, and supply them with five IEDs.  And Defendants each made payments that were many orders of magnitude higher.  Those payments materially strengthened the Taliban's ability to finance the attacks that killed and injured Plaintiffs.

104.    The effect of protection payments was especially pronounced because they enabled Taliban commanders to pay recruits who fought against the Coalition for financial (rather than ideological) reasons.  Taliban commanders typically operated on thin margins and faced constant pressure to raise enough money both to pay fighters and to launch attacks. Protection money was essential to fulfilling both needs:  had Defendants refused to pay and cut off that source of revenue, it would have forced Taliban commanders to "deci[de] between paying and feeding [their] troops and launching attacks."[108]  Defendants' payments freed Taliban commanders from that choice and enabled them to retain their fighters while continuing with attacks on Coalition forces.  As one academic study concluded, protection payments in

---

[106] Nancy Cordes, *Is Taxpayer Money Funding The Taliban?*, CBS News (Sept. 3, 2009).

[107] *See* Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

[108] *Meyer Interview*.

connection with "development projects and supply contracts" thus "fund[ed] the Taliban and their affiliates" while also "encouraging alienated men to join the insurgency for easy money."[109]

105.    This financial link applied to protection payments in all their forms.  Due to the Taliban's fundraising apparatus, cash payments to local commanders (or the Taliban Financial Commission) flowed to Taliban leadership for use wherever the insurgents decided to focus their resources.  "Salary" payments to Taliban fighters had a similar effect.  Not only did those payments relieve financial pressure on local Taliban commanders, but the Taliban extracted a portion of all salary payments received by individual Taliban members – which it likewise routed to the Taliban Financial Commission for the benefit of the nationwide insurgency.

106.    Protection payments supplied one of the most quantitatively significant sources of funding for the Taliban.  As Secretary of State Hillary Clinton testified before the U.S. Senate Committee on Foreign Relations in 2009:  "[O]ne of the major sources of funding for the Taliban is the protection money."[110]  The systematic payments effected by large international companies swamped other, smaller-scale protection rackets.  "A far larger source of Taliban income" as compared to such other schemes, the *Sunday Telegraph* reported in September 2009, was the money the Taliban extracted from companies providing security or "provid[ing] new infrastructure, such as schools and roads."[111]  The Commission on Wartime Contracting thus

---

[109] *Economic Impediments* at 80.

[110] *Afghanistan: Assessing The Road Ahead*, Hr'g Before the U.S. Senate Committee on Foreign Relations, S. Hr'g 111-479, at 48 (Dec. 3, 2009) (statement of Hillary Rodham Clinton, Sec'y of State, U.S. State Dep't) ("S. Hr'g 111-479").

[111] Christopher Booker, *How We Help To Arm The Taliban*, Sunday Telegraph (Sept. 13, 2009) ("*How We Help To Arm The Taliban*").

concluded that "[e]xtortion of funds from U.S. construction projects and transportation contracts is the insurgents' second-largest funding source," behind only drug trafficking.[112]

107.    In many areas of the country, protection payments supplied the single most significant source of funding for insurgent violence.  In areas where "there [wa]s little or no poppy grown," protection rackets were "believed to be the largest source of income for the insurgents."[113]  That was nowhere more true than in the areas where the Taliban acted through the Haqqani Network.  In the areas of Haqqani influence – including eastern and southeastern provinces where many Defendants did business – protection money accounted for "the network's largest source of income."[114]  As one local businessman with experience in the area reported of the Haqqanis, "Compared to extortion, . . . everything else is peanuts."[115]

108.    Drug trafficking in Afghanistan was not enough by itself to finance the Taliban's nationwide terrorist campaign.  As the U.N. Security Council concluded in its report on Taliban financing, "the amount of money raised from the drug trade is insufficient to meet the cost of insurgent activity" throughout Afghanistan.[116]  Protection rackets were essential to the Taliban's ability to make up that shortfall.  While the Taliban placed increasing emphasis on the "lucrative source . . . [of] foreign funding of development projects," its relative share of Afghanistan's drug economy remained "not particularly large in percentage terms."[117]  Compared to protection

---

[112] *CWC Report* at 74.  As additional evidence surfaced, it became clear that the "drug trade" was not "as big a funding source for the insurgency as a lot of people thought."  *Meyer Interview*. Rather, U.S. intelligence surfaced evidence that U.S. government-funded "development projects" became "one of the biggest funding sources for the insurgency."  *Id.*

[113] *Crime & Insurgency* at 31.

[114] *Haqqani Network Financing* at 40.

[115] *Id.*

[116] *U.N. Financing Report* ¶ 38.

[117] *Id.* ¶¶ 38, 39.

payments from Western contractors, the U.N. Security Council observed, the Taliban's comparatively small share of the country's drug money "suggests that the Taliban do not make great efforts to exploit this potential source of revenue."[118]

109.     Protection payments also strengthened the Taliban by allowing it to diversify its income.  For an insurgent group subject to crippling international sanctions, diversification was critical:  it offered the Taliban a degree of financial resiliency that made it less susceptible to American counterinsurgency efforts.  That is why, as the U.S. military began to successfully interdict the Taliban's other revenue sources (such as narcotics), the Taliban relied increasingly on its protection rackets.  That stream of protection money – particularly from larger, well-financed contractors, including Defendants – supplied reliable funding for the insurgency and, almost as importantly, offered insurance against the risk of other funding sources drying up.

110.     Protection payments from Western companies, including Defendants, were also qualitatively material to the Taliban's terrorist enterprise because of their unique link to the Taliban's leadership.  Unlike funding from other sources (such as smaller businesses) that were more often spent locally, Defendants' protection payments generally flowed up the Taliban's organizational chain – or were made directly to top-level Taliban institutions – and supplied fungible U.S. dollars available for use by leadership wherever it saw fit.[119]  In addition, the payments often conferred intelligence benefits to the Taliban by providing details about U.S. government, military, and contractor operations in the area.  *See*, *e.g.*, *supra* ¶ 70.  The Taliban's

---

[118] *Id.* ¶ 38.

[119] *Id.* ¶ 35 ("[T]he money flowing from "construction and trucking companies, mobile telephone operators, mining companies[,] and aid and development projects goes to the Taliban Financial Commission[,] which answers to the Taliban leadership.").

high-level commanders then used the money and intelligence supplied by Defendants to finance their nationwide terrorist campaign against Americans in Afghanistan.

111.    The Taliban's top-down organizational hierarchy ensured that protection money collected locally in one province helped to finance Taliban operations throughout the country – including in provinces miles away from the site of the payment.  That was a core reason why the Taliban moved to institutionalize the collection of protection money from large firms, including Defendants:  rather than have commanders spend their protection money locally, the Taliban directed the funds into the group's central coffers for use on a nationwide scale.[120]  As two Afghanistan scholars documented, such "funds flow[ed] from Taliban-controlled regions up the chain of command to the leadership and then bec[a]me re-dispensed in the form of individual payments" in key provinces throughout Afghanistan.[121]  Accordingly, Defendants' payments did not merely finance attacks in the immediate areas of their projects; the Taliban's process for redistributing those payments made sure that they financed terrorism throughout Afghanistan.

## B.      Defendants Knew Or Recklessly Disregarded That Their Payments Financed Anti-American Terrorism

112.    Defendants knew (or recklessly disregarded) that they were supplying funding to Taliban terrorists intent on attacking Americans in Afghanistan.  The Taliban openly proclaimed that the money was for terrorism:  as the Taliban told one subcontractor in a typical example, "You know we need this American money to help us fund our Jihad."[122]  The demands for payments, which the Taliban itself tied to the insurgency, alerted Defendants to the connection between the payments and insurgent violence.  As one security firm that faced demands for

---

[120] *See id.*; *Crime & Insurgency* at 17.

[121] *Economic Impediments* at 75.

[122] *Afghan Firms Pay Off Taliban*.

protection money acknowledged in a November 2007 memorandum, it was obvious that "[i]f we make payment that money will be funneled back into [the Taliban's] fight against the Coalition."

113.     Defendants also negotiated their payments in circumstances that left no doubt about whom they were financing.  With respect to the large-scale payments negotiated directly with the Quetta Shura, Defendants (or their agents) met with high-level Taliban representatives who openly represented the Taliban's Financial Commission.  *See supra* ¶¶ 84-89.  The payments to local Taliban officials likewise occurred via negotiations with commanders or shadow "governors" who openly identified as Taliban members.  *See supra* ¶¶ 90-91.  Given the Taliban-controlled geographies in which Defendants operated, Defendants assuredly knew (or recklessly disregarded) that the officials they were paying off worked for the Taliban.

114.     The Taliban memorialized its protection racket in documents that further notified Defendants that they were financing terrorists.  Most prominently, the Taliban often conveyed its demands for protection payments in so-called "Night Letters."  Night Letters – whose name comes from their frequent delivery during the night – were documents on official Taliban letterhead bearing the Taliban's insignia.  Although Night Letters could convey a variety of threats, the Taliban commonly sent them to companies to demand protection payments.  One typical example, delivered to phone companies in Wardak Province, stated that "we are expecting you to provide financial support for the Taliban stationed in Saidabad district.  If you cannot, then you should stop your work.  Otherwise you have no right to complain in the future (we are warning you of future incidents)."  Another, authored by the "Islamic [Emirate] of Afghanistan" (the Taliban's formal name for itself), informed a local construction company that it "cannot continue to work unless it does obtain permission from the Mojahedeen.  Or else, it does not have the right to complain."  Night Letters were widespread in Afghanistan, particularly

in areas of Taliban control, and were one of the principal means through which the Taliban communicated its demands for protection money to companies, including Defendants.

115.    Similarly, after effecting the payments, companies regularly received so-called "tax receipts" from the Taliban, providing them with documentation proving they had paid their dues to the insurgents.  The Taliban Financial Commission encouraged the provision of tax receipts as a way of further standardizing and accounting for the revenue raised through the insurgents' protection rackets.  And those tax receipts – like the Night Letters – appeared on Taliban letterhead and made clear on their face that protection money was intended for the Taliban's benefit.  On information and belief, Defendants or their agents received Night Letters and Taliban tax receipts in connection with their projects in Afghanistan.

116.    Defendants did not believe – nor was it true – that their payments were necessary for them to avoid imminent death or serious bodily injury.  The Taliban typically did not extract protection payments by physically confronting companies and threatening immediate violence; rather, the threats were often vaguer and futuristic – as in the Night Letters mentioned above. Many times, those threats were directed at Defendants' equipment or projects, rather than their personnel.  Given the non-immediate nature of the threats, Defendants could notify the U.S. government of the Taliban's protection racket and try to enlist the military's assistance in responding.  But rather than avail themselves of such options, Defendants decided that the simplest (and most profitable) option was to make the payments the Taliban demanded.

117.    Defendants' practice of funneling many (though far from all) of their payments through subcontractors, *see supra* ¶¶ 68, 95-96, only heightens their culpability.  Defendants intentionally used the contracting process to insulate themselves from the payments on paper, but that process – offloading responsibility to local subcontractors several layers removed – was

simply their technique for encouraging the payments while avoiding responsibility. The payments may often have been physically delivered by an intermediary, but Defendants knew they were occurring and purposefully orchestrated them. That is because Defendants could only obtain their desired business outcome by ensuring that their money actually reached the Taliban. Had Defendants' subcontractors spent the money on some other, legitimate purpose, rather than directing it to the Taliban, Defendants would not have obtained the security benefit they wanted.

118. Western contractors have confirmed their understanding that, during the relevant timeframe, local intermediaries were routing contract money to the Taliban on their behalf. The head of one private-security company admitted that his "boss wouldn't appreciate it if I went to negotiate face to face with the tribal leaders of Helmand" – historically a key part of Taliban leadership – so he instead used "intermediaries who recruit our security guards locally."[123] Exemplifying the no-questions-asked mentality typical of many contractors, the executive stated, "You just hope they're not linked too closely with the Taliban."[124]

119. Another contractor negotiating a shipment of pipes through Helmand confirmed to a reporter that he typically "tacked on about 30 percent extra for the Taliban," which he accounted for as "transportation costs" charged back to the prime contractor running the project.[125] When the "foreign contractor in charge of the project" was asked about it, the contractor admitted, "We assume that our people are paying off the Taliban."[126]

120. Yet another American contractor admitted that his protection payments – amounting to 16% of his gross revenues – were "all revenue that will ultimately be shared by the

---

[123] *Taliban's Secret Weapon*.

[124] *Id.*

[125] *Funding The Afghan Taliban*.

[126] *Id.*

Taliban."[127]  This contractor was well aware of the consequences:  " 'All of this could be seen as material support for enemy forces,' he muse[d].  'But you have to weigh that against everything that is being done in that project.  Are you aiding and abetting the enemy if you have to pay to get a school built?  It's the cost of doing business here.' "[128]

121.    At all relevant times, it was common knowledge among businesses operating in Afghanistan, including Defendants, that Western contracting dollars were flowing to the Taliban in the form of protection money.  Because the Taliban openly demanded the money – and because local subcontractors openly paid it – companies on the ground in Afghanistan were widely aware of the practice.  One journalist referred to such payments as an "open secret"[129]; another called protection payments a "widely known practice in Afghanistan"[130]; and experts described it to *CBS News* as an "open secret on the streets."[131]  Defendants were sophisticated companies with millions of dollars in revenues on the line in Afghanistan.  They were aware of this prevailing understanding that their "security" payments were flowing to the Taliban.

122.    A *Time Magazine* cover story on September 7, 2009, entitled "Taliban Inc. – How Drugs, Extortion, Protection Rackets And Foreign Aid Fuel The Afghan Insurgency," accompanied a full-page cover graphic depicting an AK-47 lying on top of a box full of $100 bills.  In the article, the author noted that "protection payments are so widespread that one contractor I interviewed responded incredulously to questions about how the system worked.  'You must be the only person in Afghanistan who doesn't know this is going on,' he said."[132]

---

[127] *How The Taliban Thrives* at 50.

[128] *Id.*

[129] *Funding The Afghan Taliban*.

[130] Dana Chivvis, *Is The Taliban Getting A Cut Of U.S. Aid?*, CBS News (Sept. 3, 2009).

[131] Nancy Cordes, *Is Taxpayer Money Funding The Taliban?*, CBS News (Sept. 3, 2009).

[132] *How The Taliban Thrives* at 50.

123.    Throughout the relevant timeframe, accounts from other prominent media sources also reported that contractors and subcontractors were redirecting Western contract funds to the Taliban.  Those widespread reports further informed Defendants that their expenditures in Afghanistan were delivering protection money to the Taliban.  Examples include:

- *BBC International Reports (Europe)*, October 2004:  "[T]he merging of organized crime and terrorism is a new phenomenon.  BND President Hanning assumes 'that terrorist structures, such as **the Taleban and Al-Qa'idah, finance their fight through the extortion of protection money** as well as direct involvement in drug-trafficking.'"[133]

- *National Post (Canada)*, September 2006:  "The Taliban still have a partnership with al-Qaeda, which provides them training and foreign fighters.  If they have it their way, Afghanistan would once again be a hot-house of terrorism.  Today, **the Taliban is** also in league with drug lords, protecting the crop, **taking protection money like any mafia**, and using that money to fund their insurgency."[134]

- *Times Record News*, August 2008:  "The Taliban tried a similar cell phone tower extortion racket, but it backfired.  StrategyPage reported on June 15 that **the Taliban were expanding 'their extortion campaign, demanding that businesses pay "protection money" to avoid being attacked'** and an effort by the Taliban 'to control cell phone use has quickly evolved into just another extortion campaign.' . . . 'But then, noting that there were several cell phone companies operating in southern Afghanistan, **the Taliban went to the different companies and offered not only "protection," but damage to a competitor, for a price**.'"[135]

- *Inter Press Service*, September 2008:  "Often petrol delivery and logistics companies have to pay protection money to various tribal elders.  In one route, between the capitals of Kandahar and Urozgan provinces, **contractors pay millions in protection money, some of which may end up in the hands of the Taliban**, [Matthew] Leeming says."[136]

- *Hindustan Times*, December 2008:  "NATO convoys carrying military supplies for NATO bases in South Afghanistan, are reported **paying Taleban commanders protection money to ensure safe passage**. . . .  The Times has learnt that it is the outsourcing of convoys that [leads to] payoffs amounting to millions of pounds, including money from British taxpayers,

---

[133] BBC International Reports (Europe), *German Intelligence Chief Says Bin-Ladin Still Alive* (Oct. 10, 2004).  All emphases in this paragraph are added.

[134] Jaap de Hoop Scheffer, *The World Can Do More:  NATO's Secretary-General On What Afghanistan Needs*, National Post (Sept. 13, 2006), 2006 WLNR 26238821.

[135] Times Record News, *Anatomy Of Terror* (Aug. 21, 2008), 2008 WLNR 31329261.

[136] Anand Gopal, *Afghanistan:  Subsidised Fuel Trail Winds Back To Pakistan*, Inter Press Service (Sept. 30, 2008).

are given to the Taleban.  Several fuel importers, trucking and security company owners confirmed the controversial payments."[137]

- *Deutsche Presse Agentur, June 2009*:  "Afghanistan's private sector does its share to finance the insurgency – albeit not entirely voluntarily.  ***Those who want to do business in the south have to pay protection money to the Taliban***.  According to businessmen, even the international troops indirectly put money in the insurgents' war chest . . . 'Everything has to do with money,' said [Khalid] Naderi, who co-owns a telecommunications firm that operates in the restive south, where he pays $2,000 in protection money per month for each of his transmission masts.  'You have to do it.  Everybody does.'"[138]

- *Frankfurter Rundschau* (Germany), *July 2009*:  "***In the cases of major projects***, contractors have to have the construction plans and bidding documents scrutinized by Taleban engineers after which ***the amount of the charge is fixed***."[139]

- *Time Magazine, September 2009*:  "[Sargon] Heinrich says some 16% of his gross revenue goes to 'facilitation fees,' mostly to protect shipments of valuable equipment coming from the border.  '***That is all revenue that will ultimately be shared by the Taliban***.' . . . In fact, ***protection payments are so widespread*** that one contractor I interviewed responded incredulously to questions about how the system worked.  '***You must be the only person in Afghanistan who doesn't know this is going on***,' he said."[140]

- *Star-Ledger, September 2009*:  "The United States Agency for International Development has opened an investigation into allegations that its ***funds for road and bridge construction in Afghanistan are ending up in the hands of the Taliban, through a protection racket*** for contractors.  And a House Foreign Affairs Committee member, Rep. Bill Delahunt (D-Mass.), vowed to hold hearings on the issue in the fall, saying:  'The idea that American taxpayer dollars are ending up with the Taliban is a cause for grave concern.'"[141]

- *Sunday Telegraph, September 2009*:  "***A far larger source of Taliban income***, *however, are the* ***protection rackets by which they siphon off a significant part of the billions of dollars*** we and other Western countries pour into Afghanistan to keep troops supplied and to provide new infrastructure, such as schools and roads, under a multiplicity of aid programmes."[142]

- *Sydney Morning Herald, September 2009*:  "The Taliban also keep an eye on local individuals who get work on the project – especially those doing the all-important security jobs. . . . ***Deals in which the Taliban top up their coffers by demanding as much as 30 per cent of the value of a contract as protection money are rife***."[143]

---

[137] Hindustan Times, *NATO Convoys Paying Taleban Protection Money For Safe Passage In Afghanistan* (Dec. 12, 2008), 2008 WLNR 23872308.

[138] *How The Taliban Has Turned Extortion Into A Gold Mine*.

[139] Willi Germund, *Steuergeld für Taliban*, Frankfurther Rundschau (July 1, 2009) (quoted by Thomas Ruttig, *The Other Side* at 20-21, Afghanistan Analysts Network (July 2009)).

[140] *How The Taliban Thrives* at 50.

[141] *U.S. Aid Helps Fund Taliban*.

[142] *How We Help To Arm The Taliban*.

[143] *Insurgents Play A Perilous Mountain Game*.

- *The Independent*, March 2010:  "[The investigation] is prompted by mounting concerns that ***the very money supposed to win over the hearts and minds of Afghans is ending up in the hands of the Taliban***, drug lords or profiteers.  The British commander's concern is part of a wider crackdown on corruption, with General Stanley McChrystal having declared war on those making millions out of what has become a billion-dollar black hole for aid funds, in an anti-corruption directive issued last month.  A third of the costs of supplying the armed forces in Afghanistan is spent on paying protection, bribery and safe passage."[144]

- *Washington Post*, March 2010:  "According to senior Obama administration officials, ***some of* [*the money*] *may be going to the Taliban, as part of a protection racket*** in which insurgents and local warlords are paid to allow the trucks unimpeded passage, often sending their own vehicles to accompany the convoys through their areas of control.  The essential question, said an American executive whose company does significant work in Afghanistan, is 'whether ***you'd rather pay $1,000' for Afghans to safely deliver a truck, even if part of the money goes to the insurgents***, or pay 10 times that much for security provided by the U.S. military or contractors."[145]

- *New York Times*, June 2010:  "For months, ***reports have abounded here that the Afghan mercenaries*** who escort American and other NATO convoys through the badlands ***have been bribing Taliban insurgents*** to let them pass.  . . . Although the investigation is not complete, the officials suspect that at least some of these security companies – many of which have ties to top Afghan officials – are ***using American money to bribe the Taliban***."[146]

- *The Guardian*, June 2010:  "Private haulage companies that carry vital supplies to American soldiers in Afghanistan have ***helped to fund the Taliban and fuel 'a vast protection racket*** run by a shadowy network of warlords,' according to a US congressional report."[147]

- *NPR*, June 2010:  "In fact, a lot of the money is already being wasted because we, the international community, is donating tens of billions of dollars to aid Afghanistan.  But what happens when contractors go out to build hospitals or other projects?  ***They wind up paying off the Taliban protection money.  So in effect, the international aid winds up subsidizing the enemy***.  That is what's going on right now."[148]

- *Washington Post*, July 2010:  "Contracting officials, under heavy pressure to produce results, often favor efficiency over all other factors, military officials said.  A recent report by a House oversight subcommittee concluded that ***tens of millions of dollars*** spent to protect U.S. military supply convoys traveling through dangerous parts of the country ***went to local***

---

[144] *Army Launches Investigation*.

[145] *Afghan Corruption*.

[146] Dexter Filkins, *Convoy Guards In Afghanistan Face An Inquiry*, N.Y. Times (June 6, 2010).

[147] Jon Boone, *Afghanistan Haulage Contract Helping To Fund Taliban, Says US Report*, The Guardian (June 22, 2010).

[148] *The Way Forward In Afghanistan Post-McChrystal*, National Public Radio, Talk of the Nation (June 24, 2010) (statement of Max Boot), 2010 WLNR 12796179.

*warlords, listed as 'subcontractors,' in the form of protection money.  Some of the funds*, the report concluded, *likely went to the Taliban*."[149]

- *Los Angeles Times*, October 2010:  "The report, released Thursday by the inspector general of the U.S. Agency for International Development, says **subcontractors** hired to protect a development project near Jalalabad *may have paid more than $5 million to the militants* through local authorities. . . . The report says local *authorities often demand a 20% 'protection tax'* in such circumstances.  Under those deals – along the lines of extortionist protection rackets in the U.S. – *the Taliban sends security guards with promises that they won't attack the subcontractors* or their equipment and won't try to halt the contract work, the report says."[150]

- *Hindustan Times*, October 2010:  "About one billion dollars worth of *U.S. aid has wound up in the hands of the Taliban* and other insurgency groups, war analysts and government auditors say.  *Sub-contractors have reportedly diverted the funds* from programs meant to stabilize Afghanistan.  In fact, the auditors say, graft has gotten so bad that the U.S. government estimates that only about 10 percent of the aid budget actually reaches the people in Afghanistan who need it."[151]

- *Christian Science Monitor*, October 2010:  "The Senate investigation also turned up mounting evidence to suggest that largely unmonitored Pentagon *contracts with private security companies* – half of which are Afghan-owned – *may also be lining the pockets of Taliban insurgents* who agree not to attack convoys in exchange for cash.  '*If you want to know the driving force of corruption* in Afghanistan, it's not Afghan culture,' warns Anthony Cordesman, a security specialist at the Center for Strategic and International Studies in Washington.  '*It's American contracting*.'"[152]

- *Fox News*, October 2010:  "And that, she says, has *formalized a massive protection industry that is run, in many but not all cases, by the Taliban*.  'We should be surprised not that convoys are attacked, but by how few get attacked,' Fair said.  That is the same assessment that Richard Holbrooke, the special envoy for Afghanistan and Pakistan, gave to President Obama more than a year ago, according to Bob Woodward's book, Obama's Wars.  '*All the contractors for development projects pay the Taliban for protection and use of the roads, so American and coalition dollars help finance the Taliban*,' Woodward wrote."[153]

- *The Australian*, December 2010:  "Roads and buildings have been contracted to favoured Western companies which cream off profits, then sub-contract to local businesses to do the

[149] Karen DeYoung, *Afghan War Funds Face New Scrutiny Program To Spur Local Businesses May Instead Benefit Power Brokers*, Wash. Post (July 30, 2010), 2010 WLNR 26709005.

[150] Paul Richter, *Audit:  U.S. Government Funds May Have Gone To Taliban*, L.A. Times (Sept. 30, 2010).

[151] *About A Billion Dollars Worth of US Aid Diverted*.

[152] Anna Mulrine, *Rogue Security Companies Threaten US Gains In Afghanistan War*, Christian Sci. Monitor (Oct. 21, 2010).

[153] Ed Barnes, *Up To $1 Billion In U.S. Aid Winds Up In Taliban Coffers*, Fox News (Oct. 22, 2010) ("*Up To $1 Billion In U.S. Aid Winds Up In Taliban Coffers*").

work.  These then sub-sub-contract again to even cheaper local firms . . . To protect themselves, the convoy owners hire local security companies.  In many instances *the security firms then pay off the Taliban not to attack.  In such situations, Western taxpayers are effectively funding the Taliban*."[154]

- *New York Times*, May 2011:  "Critics say that **payoffs to insurgent groups**, either directly or indirectly, **by contractors** working on highways and other large projects in Afghanistan **are routine**.  Some **officials say they are widely accepted in the field as a cost of doing business**, especially in areas not fully under the control of the United States military or the Afghan government."[155]

- *Washington Post*, August 2011:  "The U.S. military has moved to **stem the flow of contract money to Afghan insurgents**, awarding at least 20 companies new contracts worth about $1 billion for military supply transport and suspending seven current subcontractors it found lacking in 'integrity and business ethics.' . . .  Congressional investigators determined last year that **much of the transport and security money went to the Taliban** and Afghan warlords as part of a protection racket to ensure the safe arrival of the convoys, conclusions that were confirmed this spring by military and intelligence inquiries."[156]

- *The Oregonian*, September 2011:  "Most galling of all is that after the illegal drug trade, the **single largest source of funding** to Afghan insurgents – our enemy – is the **extortion of 'protection' money** from U.S.-backed transportation and construction contractors."[157]

- *Agence France Presse*, September 2012:  " '**Revenue extorted from nationwide enterprises** such as narcotics producers and traffickers, construction and trucking companies, mobile telephone operators, mining companies[,] and aid and development projects **goes to the Taliban Financial Commission** which answers to the Taliban leadership,' said the report. . . .  The sanctions experts said the Taliban have made foreign development funds a 'lucrative source'.  '**Estimates of Taliban income from contracts funded by the United States and other overseas donors range from 10 percent to 20 percent** of the total, usually by the Taliban agreeing protection money with the contractor or demanding a cut.' "[158]

---

[154] Tom Coghlan, *Aid Robs Afghan & Iraqi Poor, Helps Rich*, The Australian (Dec. 29, 2010), 2010 WLNR 25517589.

[155] Alissa J. Rubin & James Risen, *Costly Afghanistan Road Project Is Marred By Unsavory Alliances*, N.Y. Times (May 1, 2011) ("*Afghanistan Road Project Marred By Unsavory Alliances*").

[156] Karen DeYoung, *U.S. Awards Contracts In Afghanistan*, Wash. Post (Aug. 16, 2011), 2011 WLNR 16187412.

[157] The Oregonian, *Losing $60 Billion To Fraud & Waste* (Sept. 7, 2011), 2011 WLNR 17729205.

[158] Agence France Presse, *Taliban Made $400mn In 2011 From Taxes, Extortion: UN* (Sept. 11, 2012), https://www.nation.co.ke/news/world/Taliban-made--400-mn/1068-1504748-w0sl0a/index.html.

- *The Hindu,* September 2012:  "[C]*ontractors* in Afghanistan often ***say they have to make payoffs of between 10 and 20 percent to ensure work can go ahead***.  In Farah, local officials have claimed that the payoffs are as high as 40 per cent."[159]

124.    On information and belief, Defendants were aware of these reports or similar ones, and their substance, which documented how protection payments made by Western contractors and subcontractors financed the Taliban's terrorist attacks.  Defendants are sophisticated companies, all of which specialize in performing work in high-risk countries like Afghanistan.  Given their business models, and the contractual role they undertook to monitor the local security environment, Defendants each monitored open-source reporting on the risks of operating in Afghanistan.  As part of those efforts, Defendants' standard practice would have been to conduct basic research on the Afghan market and the mechanics of local subcontracting.  Even cursory research of that nature would have uncovered the press reports discussing protection payments set forth above, or other similar reports.

125.    Defendants subscribed to intelligence-reporting services that further alerted them to the link between their contracting practices and terrorist finance.  For example, Strategic Forecasting Inc., popularly known as Stratfor, is a global strategic-intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world.  Stratfor regularly reported on protection payments in Afghanistan, including by directly emailing Defendants copies of media reports.  Examples of such reports included a *Wall Street Journal* article reporting that "cellphone company executives in Afghanistan say operators or their contractors routinely disburse protection money to Taliban commanders,"[160] and a local Afghan

---

[159] Praveen Swami, *Why Terrorists Aren't Scared of Sanctions*, The Hindu (Sept. 12, 2012).

[160] Strategic Forecasting, Inc., zac.colvin@stratfor.com to ct@stratfor.com & military@stratfor.com & mesa@stratfor.com, *Af/Pak Sweep* (Mar. 24, 2010).

media interview reporting that "contractors have links with the Taliban and other extremist groups and pay them //protection money// for the safe passage of the supplies."[161]

126.     On information and belief, based on purported Stratfor subscription lists (as published online), executives of the ArmorGroup, Chemonics, DAI, LBG, Black & Veatch, and MTN Defendants had access to Stratfor's intelligence services when those messages were transmitted.  The recipient list included at least 16 employees of ArmorGroup, Chemonics, Black & Veatch, DAI, LBG, and MTN who regularly received the type of updates alleged above.

### C.     The U.S. Government Opposed Defendants' Payment Of Protection Money To The Taliban

127.     The U.S. government did not approve, publicly or privately, of Defendants' protection payments.  The government relied on its chosen Western contractors – including Defendants – to take responsibility for ensuring the financial integrity of their contracting practices in Afghanistan.  At all times, the government conveyed the message that protection payments violated U.S. law and undermined U.S. foreign-policy objectives in Afghanistan.

128.     The U.S. government has long been on record that protection payments to terrorists are unlawful – no matter their motivation.  On March 19, 2007, Chiquita Brands International, Inc. ("Chiquita"), a multinational banana supplier, pleaded guilty in this District to having provided material support to the United Self-Defense Forces of Colombia ("AUC") in Colombia.[162]  Chiquita had routed protection payments to the AUC – then designated as a Specially Designated Global Terrorist – "through various intermediaries," and had falsely

---

[161] Strategic Forecasting, Inc., dialogbot@smtp.stratfor.com to translations@stratfor.com, *Pak/Pakistan/South Asia* (June 11, 2010) (marks in original).

[162] *See* Plea Agreement, *United States v. Chiquita Brands Int'l, Inc.*, No. 07-cr-00055-RCL (D.D.C. filed Mar. 19, 2007), Dkt. 11.

accounted for them as "security payments."[163]  Chiquita later argued that it paid AUC protection

money "under threat of violence," but the U.S. Department of Justice responded that the

"payments were illegal and could not continue."[164]  It thus charged Chiquita with (and Chiquita

pleaded to) the federal crime of transacting with a Specially Designated Global Terrorist.[165]

129.    In the public press release announcing the plea deal, an Assistant Attorney

General stated:  "Like any criminal enterprise, a terrorist organization needs a funding stream to

support its operations. . . . Thanks to Chiquita's cooperation and this prosecution, that funding

stream is now dry and corporations are on notice that they cannot make protection payments to

terrorists."[166]  A U.S. Attorney further emphasized:  "Funding a terrorist organization can never

be treated as a cost of doing business. . . .  American businesses must take note that payments to

terrorists are of a whole different category.  They are crimes."[167]

130.    On information and belief, Defendants were aware of the *Chiquita* settlement and

its clear message that the U.S. government considered protection payments illegal.  The

settlement received extensive scrutiny among the international business community and was the

subject of recurring media coverage.  Media outlets describing the settlement included *United

Press International* on March 14, 2007; the *Washington Times* on March 19, 2007; the

*Associated Press* the next day; and the *Washington Post* on August 2, 2007.[168]

---

[163] Press Release, U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty To Making Payments To A Designated Terrorist Organization & Agrees To Pay $25 Million Fine* (Mar. 19, 2007) ("*Chiquita Brands International Pleads Guilty*").

[164] *Id.*

[165] *See* 50 U.S.C. §§ 1701, 1705; 31 C.F.R. §§ 594.201(a), 594.701(c); Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001).

[166] *Chiquita Brands International Pleads Guilty*.

[167] *Id.*

[168] *See* United Press International, *Chiquita To Pay $25M For Terrorist Payoffs* (Mar. 14, 2007); Matt Apuzzo, *Chiquita Pleads Guilty To Doing Business With Terrorists*, Assoc. Press

131.    The U.S. government viewed protection payments in Afghanistan the same way. Government officials stated that, as with Chiquita's payments to terrorists in Colombia, protection payments to the Taliban were unlawful and undermined U.S. reconstruction objectives.  For example, at a House Subcommittee hearing, an Assistant Deputy Defense Undersecretary for Program Support was asked whether "facilitation payments . . . to provincial governors, to local police or warlords in order to ensure that trucks aren't bothered [are] legal under United States law?"[169]  He responded:  "Clearly, it's not . . . and it's counterproductive to what we're trying to do."[170]  The U.S. Special Inspector General for Afghanistan Reconstruction ("SIGAR") similarly opined that "I don't think that there should ever be or ever condone paying off a Taliban entity for anything . . . Obviously that's wrong; it's against the law and counter to any counterinsurgency or reconstruction initiative that we would like to see put in place."[171]

132.    The congressional Commission on Wartime Contracting found it "particularly alarming" that "subcontractors on U.S.-funded convoys, road construction, and development projects pay insurgent groups for protection."[172]  Based on such statements, Defendants knew that the U.S. government was institutionally opposed to protection-money payments.

133.    Protection payments also violated express U.S. government contracting requirements and regulations.  Under the terms of their contracts, prime contractors bore responsibility for ensuring the integrity of U.S. spending in Afghanistan.  The government

---

(Mar. 20, 2007); *Chiquita Pleads To Protection Payoffs*, Wash. Times (Mar. 19, 2007); Carol D. Leonnig, *In Terrorism-Law Case, Chiquita Points to U.S.*, Wash. Post (Aug. 2, 2007).

[169] *Hearing on Corruption in Afghanistan Defense Contracting* (statement by Rep. John F. Tierney (D. Mass.)).

[170] *Id.* (statement of Assistant Deputy Undersecretary Gary Motsek).

[171] *Funding The Enemy* at 196.

[172] *CWC Report* at 73.

further imposed requirements designed to ensure that private contractors lived up to that

responsibility.  For example, USAID's contracts contained a "standard clause" reminding its

contractors that "U.S. law prohibits transactions with, and the provision of resources and support

to, individuals and organizations associated with terrorism.  It is the legal responsibility of the

contractor/recipient to ensure compliance with these Executive Orders and laws."[173]  U.S.

Central Command ("CENTCOM") contracts similarly were required to contain a standard clause

requiring government contractors to comply with all U.S. and Afghan laws, which included a

prohibition on providing material support to terrorists.[174]

134.    Prime contractors were required to include those same clauses in their contracts

with – and ensure compliance by – their subcontractors.[175]  The "vetting" requirements were

especially strict for any subcontractors that were to be armed under the contracts.  Moreover, the

Defense Contract Audit Agency's audit manual promulgated guidance instructing that "prime

contractor oversight of subcontractors" should, among other things, "include technical and

financial performance monitoring" and "ensure that payment to the subcontractor for the work

accomplished was in accordance with the subcontract terms and based on allowability,

---

[173] Memorandum from Bruce N. Bower, USAID Regional Inspector General to Earl W. Gast, USAID Afghanistan Director, *Review Of Security Costs Charged To USAID's Projects In Afghanistan* (Review Report No. 5-306-10-002-S) at 11 (Sept. 29, 2010) ("*2010 USAID OIG Report*"), https://oig.usaid.gov/sites/default/files/2018-06/5-306-10-002-s.pdf.

[174] *See* Office of Under Secretary of Defense, *Class Deviation – Implementation Of The Synchronized Predeployment & Operational Tracker (SPOT) To Account For Contractor Personnel Performing In The United States Central Command Area Of Responsibility*, Memorandum for Directors Of Defense Agencies (Oct. 17, 2007).

[175] *See, e.g.*, USAID Contract No. DFD-I-00-05-00250, § H.15 (Sept. 27, 2005) (issued to Defendant DAI) ("[t]his provision must be included in all subcontracts/subawards"); USAID Contract No. 306-C-00-11-00506, § H.17 (Oct. 29, 2010) (issued to Defendant Black & Veatch Special Projects Corporation) ("[t]his provision must be included in all subcontracts/sub-awards").

allocability and reasonableness principles."[176]  Most Defendants' protection payments – whether made directly, or through subcontractors – violated those requirements and reflected a failure to live up to their responsibility to ensure the legality of their contract spending in Afghanistan.

135.    Contractors typically concealed their individual payments from the U.S. government by funneling the money through networks of subcontractors and mischaracterizing the payments in their books and records as "security" costs.  For that reason, the U.S. government was unaware of the specific illegal payments that Defendants made.

136.    As the U.S. government became aware of broader patterns of protection payments in Afghanistan, it implemented a number of programs to curtail them.  For example, it created the ATFC and Task Force 2010, both of which were interagency groups that drew on intelligence assets to identify and interrupt flows of contracting money to the insurgency.  Congress also created SIGAR, which scrutinized and audited government contracting as part of a broader anti-corruption mandate.  And USAID implemented several programs – including Accountable Assistance for Afghanistan – to "ensure the proper procedures are in place to help protect assistance dollars from being diverted from their development purpose by extortion or corruption."[177]  The net effect of these various efforts was to elevate anti-corruption to a distinct line of effort in the Coalition's campaign plan, and to convey unmistakably to industry participants that protection payments were unacceptable.

137.    The U.S. government also implemented a broader array of programs designed to combat corruption in Afghanistan.  Those programs, which included SIGAR audits and a variety

---

[176] SIGAR, *Progress Made Toward Increased Stability Under USAID's Afghanistan Stabilization Initiative-East Program But Transition To Long Term Development Efforts Not Yet Achieved* at 9, SIGAR Audit No. 12-11 (June 29, 2012).

[177] USAID, *Fact Sheet On Accountable Assistance for Afghanistan* (June 2011).

of initiatives carried out under the auspices of Task Force Shafafiyat, reflected the U.S. policy imperative of reducing corruption throughout Afghanistan.  That effort, led by then-Brigadier General H.R. McMaster, evinced a vigorous commitment by the U.S. military in 2009 and afterwards to stamp out corruption in Afghanistan.  The outgoing ISAF Commander underscored the importance of those measures to U.S. policy:  as he briefed President Obama in 2013, "corruption is **the** existential, strategic threat to Afghanistan."[178]  Defendants' payments fueled the type of corruption that U.S. agencies were attempting to eradicate.

138.    The U.S. government on occasion encouraged companies to hire local Afghans or employ local Afghan businesses in connection with some projects.  This was not a license for Defendants to hire Taliban fighters or to allow their Afghan partners to pay insurgents.  On the contrary:  the U.S. government at all times communicated an expectation that Defendants should vet their local partners and take affirmative steps to ensure that the money they paid to those partners did not flow to the Taliban.  And the U.S. government repeatedly made clear that the payment of protection money – or the payment of Taliban "taxes" – in exchange for permission to proceed with U.S.-funded projects was illegal and counterproductive.  Neither USAID nor ISAF ever suggested that such payments were either an inevitable consequence or an acceptable cost of implementing U.S.-funded projects in Taliban areas.

139.    In September 2010, General Petraeus issued formal contracting guidance designed to further discourage protection payments to the Taliban.  In the guidance document, General Petraeus emphasized that "[w]here our money goes is as important as the service provided or the

---

[178] Joint and Coalition Operational Analysis (JCOA), *Operationalizing Counter/Anti-Corruption Study* at 1 (Feb. 28, 2014) (emphasis in original), https://www.hsdl.org/?view&did=756004.

product delivered."[179]  He thus instructed contracting officers to "[h]old prime contractors responsible for the behavior and performance of their sub-contractors," with an understanding that "[e]xcessive sub-contracting tiers provide opportunities for criminal networks and insurgents to divert contract money from its intended purpose."[180]  At bottom, the U.S. government's goal was to improve its systems and ensure that its "vendors and contractors" did not "empower the wrong people or allow the diversion of funds" to insurgents.[181]  The government took a number of steps to implement that guidance, including by ramping up its vetting efforts and affirmatively suspending or debarring certain contractors with suspected links to insurgents.

140.    Defendants nonetheless remained able to execute their payments to insurgents despite the U.S. government's efforts to stop them, for several reasons.  *First*, the government often lacked visibility into the subcontracting networks through which the payments flowed and so had to "rely exclusively on prime contractors" to vet and supervise the subcontractors.[182] When Defendants knowingly (or recklessly) funneled protection money through those subcontractors, the structure of the transactions made it difficult for the government to trace the money with enough precision to take corrective action.  Such payments frustrated the U.S. military's policy of identifying and terminating "contracts with supporters of the insurgency."[183]

141.    *Second*, the U.S. government faced staffing shortages that impeded its efforts to fully monitor the large number of contractors and subcontractors operating in Afghanistan.  With

---

[179] *COMISAF's Contracting Guidance* at 1.

[180] *Id.*

[181] *Id.*

[182] U.S. Special Inspector General for Afghanistan Reconstruction, *Contracting With The Enemy:  DOD Has Limited Assurance That Contractors With Links To Enemy Groups Are Identified And Their Contracts Terminated* at 8, Audit No. 13-6 (Apr. 2013).

[183] *Id.*

a limited number of qualified contracting officers available – and a vast network of contracts to

supervise – the government lacked the resources to investigate every payment made by

Defendants or their subcontractors.  Defendants were able to exploit those resource constraints to

conceal their protection payments from U.S. government personnel, when they should have been

the ones to flag such issues for the agencies funding their projects with U.S. taxpayer money.

142.    *Third*, the U.S. government relied on the good faith of its contractors to prevent

payments to the insurgents, because the contractors often had access to better on-the-ground

information than did the government.  Due to Defendants' business ties – and the long in-country

tenures of many of their personnel, as compared to the typically short rotations of U.S.

government deployments – Defendants had unique real-time visibility into where their money

was going.  That made it even easier to conceal their payments from U.S. regulators.

143.    As one senior terror-finance investigator for the U.S. government explained in an

interview with SIGAR, for a government investigator in Afghanistan:

> [I]t takes 6-9 months to understand what's going on, become cognizant.  You hit
> your stride at 12 to 15 months.  It's that base of knowledge to know who, what, to
> follow threats, say oh this is a problem.  To get access to records (for forensic
> accounting), you need demonstrated suspicious behavior.
>
> Therefore *continuity* is critical.  It was typically *contractors*, not government, who
> provided continuity – [Subject Matter Experts] who eat, live and breathe this
> stuff.  In contrast, the military is assigned, but does not have specialization in
> these areas.[184]

Given those constraints, it was Defendants (not the U.S. government) that had the resources,

expertise, and obligation to ensure that their practices did not materially support the Taliban.

144.    In sum, the U.S. government clearly stated its opposition to protection payments

and attempted to curtail them.  But those efforts were imperfect, and, at all times, Western

---

[184] *SIGAR Interview with Gert Berthold* at 4 (emphasis in original).

contractors, including Defendants, functioned as the U.S. government's principal tool against terrorist financing. But Defendants abused that trust to pay off the Taliban and increase their profit margins. Defendants' conduct forms the basis of this lawsuit; Plaintiffs expressly disclaim any challenge to the U.S. government's policy decisions.

## IV. EACH DEFENDANT MADE PROTECTION PAYMENTS THAT IT KNEW OR RECKLESSLY DISREGARDED WOULD BENEFIT THE TALIBAN

### A. The ArmorGroup Defendants

#### 1. The ArmorGroup Defendants Made Protection Payments To The Taliban

145. The ArmorGroup Defendants consist of several companies that made protection payments to the Taliban in connection with various projects from at least 2007 until at least 2015. Defendant Centerra Group LLC is the successor to ArmorGroup North America, Inc. ("AGNA"), which held multiple contracts in Afghanistan from 2007 until at least 2011. Defendant G4S Holdings International (AG) Ltd. is the successor to ArmorGroup International plc ("AGI"), which oversaw and directed AGNA's conduct. Defendant G4S Risk Management Ltd. is the successor to ArmorGroup Services Limited, which also held multiple contracts in Afghanistan from 2007 onward under the trade name Armor Group Mine Action ("AGMA").

146. AGNA provided a Washington-area hub through which ArmorGroup bid for and executed its U.S.-government contracts. But London-based AGI was also involved in and supervised ArmorGroup's performance under those contracts. As AGI's regional director wrote in an October 21, 2007 email, AGI "manages and executes the delivery piece of our contracts" because "AGNA is neither structured nor able to execute . . . follow on phases after contract bid compilation." AGI's role in implementing ArmorGroup's Afghanistan contracts was thus equal to, if not even more significant than, AGNA's. According to the former head of AGNA contracting, AGNA functioned essentially as a "shell company set up by AGI to bid for and

obtain U.S. contracts that could only be awarded to American companies."[185]  AGI thus

exercised control over, and was jointly responsible for, the AGNA conduct set forth below.

147.    The ArmorGroup Defendants executed multiple government contracts in

Afghanistan during the relevant timeframe.  Those contracts include, but are not limited to:

a.    2007 Shindand Airbase Contract:  In March 2007, pursuant to Contract No. FA-8903-06-D-8511, Task Order 18, the U.S. Air Force hired ECC as the prime contractor supervising an expansion of the Shindand Airbase in Herat Province, Afghanistan.  The prime contract was valued at $42.5 million.  On April 27, 2007, pursuant to Continuing Services Agreement No. Armor.CSA.HERC.4500, ECC hired AGNA as its security subcontractor for the project.  AGNA provided security under that contract for the next twenty months and generated about $5.1 million in revenue.

b.    2007 Shindand Mine Clearance Contract:  In or about May 2007, ECC hired AGMA to conduct mine clearance around the Shindand Airbase in Herat Province, in connection with ECC's Contract No. FA-8903-04-D-8672 with the U.S. Air Force.  That contract lasted roughly 18 months, until December 2008.

c.    2007 Kabul Embassy Contract:  In July 2007, pursuant to Contract No. SAQMPD-07-C0054, the U.S. State Department hired AGNA to provide security in and around the U.S. Embassy in Kabul, Afghanistan.  The contract had a 5-year term and was valued at approximately $189 million.

d.    2008 UNOPS Mine Clearance Contract:  In or about the summer of 2008, the United Nations Office for Project Services ("UNOPS") retained AGMA to perform mine clearance in Herat Province, including the area in and around Shindand.  The contract was valued at approximately $15 million.

e.    2008-2009 PRT Security Contract:  In or about 2008-2009, AGNA and AGI obtained a contract to provide security for a Coalition Provincial Reconstruction Team's ("PRT") personnel in and around Helmand Province.  On information and belief, this was a multiyear contract on which ArmorGroup generated millions of dollars in revenue.

f.    2010 UK FCO Contract:  In or about March 2010, G4S Holdings International (AG) Limited and/or G4S Risk Management Limited obtained a contract from the U.K. Foreign Commonwealth Office to provide security services throughout Afghanistan, including in Helmand, Kandahar, and other Taliban-controlled

---

[185] Compl. ¶ 53, *United States ex rel. Gordon v. ArmorGroup North America, Inc.*, No. 09-cv-01547-RCL (D.D.C. filed Aug. 17, 2009), Dkt. 1.

territories.  The contract was valued at roughly 27 million GBP per year and had a three-year duration.

**g.**    2011 Local Guard Services Contract:  In or about 2011, pursuant to Contract No. SAQMMA11C0023, the U.S. State Department awarded AGNA a contract to provide local guard services in Afghanistan.  The contract was valued at approximately $180 million.

**h.**    2015 British Embassy Contract:  In 2015, G4S Holdings International (AG) Limited and/or G4S Risk Management Limited signed a 5-year, GBP 100 million contract to provide security in and around the British Embassy in Afghanistan.

148.    From at least 2007 through 2015, the ArmorGroup Defendants maintained a general policy of paying the Taliban to protect the projects they implemented in Taliban-controlled or -influenced regions.  That policy applied to each of the contracts the ArmorGroup Defendants implemented in Afghanistan.  The ArmorGroup Defendants knew that policy meant that their money was funding attacks on U.S. personnel in Afghanistan.  *See supra* Part III.A-B.  Some indications of the ArmorGroup Defendants' payments include:

- Industry practice:  According to more than 10 confidential witnesses, including former U.S. government officials, academic and other experts, and industry participants, protection payments to the Taliban were pervasive and routine among U.S. and U.K. private-security contactors operating in Afghanistan.  The ArmorGroup Defendants' payments alleged below are not mere isolated incidents; they are examples of the industry playbook that was followed almost uniformly by private-security companies like ArmorGroup operating in Taliban areas of Afghanistan.

- Appeasement of controlling factions:  The ArmorGroup Defendants designed their security plans to be "fair" to each "warlord" who "controlled and influenced" the relevant area.[186] As was standard practice, that policy entailed payments to the Taliban when ArmorGroup operated in Taliban-controlled areas.  *See supra* Part II.B.

- Local hiring:  The ArmorGroup Defendants also maintained a policy of sourcing their security guards locally, even when operating deep in Taliban-controlled areas.  For example, AGMA's Afghanistan Country Manager explained that the "problems" AGMA encountered

---

[186] Email from AGNA's Country Operations Manager to John Windham (Dec. 11, 2008) ("The lack of infrastructure meant that the area was controlled and influenced by two feuding warlords . . . to be fair to both factions [ArmorGroup] employed a total of 44 local national armed guards on the base, 22 from each faction.").

in Herat Province would "have to be solved locally,"[187] both because guards from other areas would risk being attacked and because it was less "expensive" to source guards locally.[188] As the ArmorGroup Defendants knew, local sourcing in areas under Taliban control was a well-worn strategy for directing payments to the Taliban. *See supra* Parts II.B, III.B.

- <u>Operational geography</u>:  the ArmorGroup Defendants also operated extensively in Helmand and Kandahar, which are two historical Taliban strongholds in which protection payments were the norm.  According to a former Afghan government spokesman for Helmand Province, private-security companies operating in Helmand in or about 2010 typically funneled protection money to the Taliban.  Kandahar was similar:  the Quetta Shura followed a standard practice of "lev[ying] 'taxes' on major projects in Kandahar," including by extracting "protection money" from "private security firms."[189]  Given the ArmorGroup Defendants' approach to security, they could not have operated in Helmand and Kandahar without paying off the Taliban commanders who controlled the area.

- <u>Indifference to funding consequences</u>:  The ArmorGroup Defendants also have a documented track record of expressed indifference to where their money goes.  For example, AGNA's Senior Team Leader, when confronted with evidence that AGNA had been paying Taliban cutouts in Shindand, said, "I pay the guy direct . . . And what he does with his money outside and thereafter . . . I can't control that."[190]  That philosophy, prevalent throughout the ArmorGroup Defendants' operations, led it to pay off insurgents in Taliban areas.

149.     The ArmorGroup Defendants' payments were consistent with private-security contractors' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage.  *See supra* ¶¶ 63, 72-94.  In following that standard practice, the ArmorGroup Defendants made payments that were, on information and belief, worth at least 20 to 40 percent of their contracts' value.  *See supra* ¶ 92.  As a result, across their contracts, the ArmorGroup Defendants made payments to the Taliban worth at least several million dollars.

---

[187] *AGMA Project Consultancy Report For The UNOPS Shindand A Contract* at 17 (July 2008).

[188] Senate Armed Services Committee staff interview of AGMA's Project Leader at 230-31 (Dec. 5, 2009).

[189] Anand Gopal, *The Battle For Afghanistan:  Militancy and Conflict In Kandahar* 28-30, New Am. Found. (Nov. 2010) ("*The Battle For Afghanistan*").

[190] Senate Armed Services Committee staff interview of AGNA Senior Team Leader at 63 (Dec. 5, 2009).

150.    The Shindand Airbase Contract offers a good illustration of the ArmorGroup

Defendants' general practice.  With respect to that contract, AGNA – acting as subcontractor for

ECC, with ECC's approval – sourced its guards from two local Taliban cutouts:  Nadir Khan and

Timor Shah.  AGNA nicknamed them "Mr. Pink" and "Mr. White," respectively, in homage to

the criminal bank robbers from the Quentin Tarantino movie *Reservoir Dogs*.  U.S. military

personnel stationed nearby considered Mr. Pink to be a "mid-level Taliban manager."[191]  Even

so, AGNA retained Mr. Pink and his men and paid them substantial sums of money under its

contract with ECC.  Those payments were, in effect, protection payments directly to the Taliban.

151.    On December 12, 2007, Mr. Pink shot Mr. White and killed him.  ECC's Security

Manager later described the shooting as "kind of like a mafia thing.  If you rub somebody out,

you'll get a bigger piece of the pie."[192]  Shortly thereafter, Mr. Pink fled to a nearby village and

took refuge "with a number of Taliban fighters and a Taliban commander."[193]  Yet despite Mr.

Pink's execution of Mr. White, and despite reports that he was working with the Taliban, ECC

and AGNA kept using his men to provide security for the project.  As the Senate Armed Services

Committee found after an extensive investigation, "there is little evidence that Pink's men were,

in fact, 'phased out' at that time."[194]  On the contrary:  on January 3, 2008, more than three

weeks after the shooting, an ArmorGroup document indicated that AGNA had "issued thousands

of rounds of ammunition for training" Mr. Pink's Taliban subordinates.[195]  ArmorGroup's

decision to provide literal ammunition to Mr. Pink's men mere weeks after their Taliban-

---

[191] U.S. Senate Committee on Armed Services, Report, *Inquiry Into The Role & Oversight Of
Private Security Contractors In Afghanistan* at ii (Oct. 26, 2010) ("*Senate Contractors Report*").

[192] *Id.*

[193] *Id.* at 16.

[194] *Id.* at 16-17.

[195] *Id.* at 17.

affiliated boss had conducted a public, mafia-style execution of another Taliban manager typified ArmorGroup's approach to providing "security" in Afghanistan.

152.    Throughout this time period, ArmorGroup supplied Mr. Pink's and Mr. White's men with AK-47s and paid them regular wages.  When later asked what happened to the money that ECC and ArmorGroup supplied to these Taliban-affiliated commanders, an ArmorGroup employee responded:  "I pay the guy direct, he signs for the amount that I gave him.  And what he does with his money outside and thereafter . . . I can't control that."[196]

153.    With Mr. Pink in hiding after Mr. White's execution, ECC and ArmorGroup were forced to find a new commander for their contingent of security guards.  They turned to another Taliban commander:  the deceased Mr. White's brother – named Reza Khan – whom they nicknamed "Mr. White II."  ECC and AGNA hired Mr. White II and his men even though Mr. White II lacked a bona fide registered security company, as required under Afghan law.

154.    Mr. White II's terrorist ties eventually precipitated an armed confrontation with the U.S. military.  On August 21, 2008, Mr. White II hosted a "Taliban meeting held in the village of Azizabad that was raided by U.S. and Afghan military forces."[197]  The raid was part of an operation to "capture or kill Mullah Sadeq, a high value Taliban commander," and was premised on intelligence that "20 to 30 anti-coalition fighters would be attending a shura that night" to be "held at the home of Mr. White's brother, Mr. White II."[198]  The Taliban planned its shura to occur simultaneously with a "ceremony to commemorate the death of Mr. White."[199]

---

[196] *Id.* at 11.

[197] *Id.* at 5.

[198] *Id.* at 6.

[199] *Id.*

155.     During the Azizabad raid, Taliban fighters opened fire on U.S. forces.  The resulting firefight required U.S. air support from an AC-130 gunship, and the U.S. military Team Leader later called it "the most kinetic engagement" of his tour in Afghanistan.[200]  Mr. White II, who was Mullah Sadeq's uncle and the host of the Taliban meeting, was among the casualties. So too were at least six other fighters working for ArmorGroup.  U.S. military investigators later found ArmorGroup uniforms, sensitive intelligence materials, advanced munitions, and IED-making materials on site.  Ultimately, the U.S. military concluded that the Mr. White II-hosted meeting involved many people "associated with the insurgency," and that "most likely, some of the anti-coalition militia in Azizabad were also security contractors for ArmorGroup."[201]

156.     After the Azizabad raid, in which the Taliban fighters on ArmorGroup's payroll had engaged in a firefight with U.S. troops, ArmorGroup received pointed inquiries from ISAF forces.  As described by ArmorGroup's Country Operations Manager in an email to its London-based Country Director, "During the subsequent military follow-up, [ArmorGroup] uniforms were found in the villages and ISAF Forces have asked a few questions in relation to why 'adversaries' would be in possession of [ArmorGroup] clothing."[202]

157.     Those questions did not dissuade ArmorGroup.  After the raid, as documented by the Senate Armed Services Committee, ArmorGroup "authorized a $1,000 discretionary payment to White II's family."[203]  ArmorGroup thus decided to compensate Mr. White II's family for Mr. White's death, even after Coalition forces killed him for hosting a Taliban meeting.

---

[200] *Id.*

[201] *Id.* at 7 (internal brackets omitted).

[202] Email from ArmorGroup Country Operations Manager to A. Brown (Aug. 22, 2008).

[203] *Senate Contractors Report* at 31.

158.    AGMA's conduct in connection with the UNOPS Mine Clearance contract was similar.  At AGNA's recommendation – facilitated by a meeting that AGNA brokered – AGMA too selected Mr. White II as its local security provider.  AGMA paid Mr. White II $12,350 per month and stated it had "no idea what" he "did with the money."[204]  On top of that, AGMA also paid $180 per month to each of Mr. White II's fighters.  It made those payments despite Mr. White II's known associations with the Taliban.  According to an Army Sergeant operating in the area, Mr. White II "was a supporter of Taliban operations" and "help[ed] the Taliban with money."[205]  Mr. White II, the Army Sergeant continued, "would provide money because of his contracting jobs with ArmorGroup.  He had a lot of money from that and he would give that money to Taliban commanders, and they in turn would buy weapons and ammo."[206]

159.    On June 9, 2008, AGMA hired a consultant – identified in the Senate Armed Services Committee's report only as "Tony" – to assess AGMA's work on the UNOPS contract. "Tony" traveled to the site and stayed until mid-July.

160.    On July 19, 2008, "Tony" issued a report that was circulated to AGMA's senior leadership.  The report noted that Mr. White II's weapons had recently been confiscated by the Afghan government in a "crack down by the government to collect all militia's unregistered weapons and vehicles."[207]  Further, according to Senate investigators, "media accounts from this time linked weapons confiscated in the Shindand area to those belonging to the Taliban for their

---

[204] *Id.* at 23.

[205] *Id.* at 23-24 (internal brackets omitted).

[206] *Id.* at 24.

[207] *Id.* at 26.

expected use in 'terrorist attacks.' "[208]  The weapons seized from Mr. White II, a Marine officer

reported, included landmines and other "pretty significant stuff."[209]

161.    The August 21, 2008 firefight between Mr. White II's men and Coalition forces

received worldwide media attention and took on a high profile within Afghanistan.  Even after

Coalition forces killed Mr. White II in a raid on a Taliban shura, however, AGMA turned to yet

another Taliban member to replace him:  his younger brother, Gul Mohammed.  AGMA

nicknamed the younger brother of the slain Taliban commander "Mr. White III."  In an email

responding to the news that Mr. White III had "taken over the family security business," AGMA

called it "great news" and remarked:  "strange how business goes on."[210]

162.    AGMA decided to keep the rest of Mr. White II's men on the payroll and place

them under Mr. White III's command.  As for the six other ArmorGroup employees killed in the

Azizabad raid, Mr. White III requested – and AGMA agreed – that they "be replaced by their

brothers."[211]  AGMA agreed to that request even though the Taliban was widely understood in

Afghanistan as a familial organization, such that if one family member was loyal to the Taliban,

it was highly likely that his immediate relatives were too.  Indeed, when an Army intelligence

officer later learned that AGMA had hired Mr. White III and his men, he explained that he

" 'absolutely' would have had concerns" and considered it "a counterintelligence threat."[212]

163.    Both ArmorGroup and ECC knew or recklessly disregarded that their security

guards were associated with the Taliban.  Internal company documents described Mr. White and

---

[208] *Id.*

[209] *Id.* at 27.

[210] *Id.* at 33.

[211] *Id.*

[212] *Id.* at 34.

Mr. Pink as "warlords" and "clan leaders," and an ArmorGroup document asserted that both had fled Afghanistan for Iran but that Mr. White returned to the country in 2003 "on the side of the Taliban."[213]  ArmorGroup's intelligence reporting later suggested that Mr. Pink, for his part, was "now known Taliban and has gone into the kidnapping game for ransom."[214]  As for Mr. Pink's men, ECC's own Monthly Security Report from December 2007 – at which point ECC and ArmorGroup were still paying and arming fighters loyal to Mr. Pink – reported that Mr. Pink had taken refuge "with a number of Taliban fighters and a Taliban commander."[215]  And even after the highly publicized Azizabad raid, which finally prompted AGNA and ECC to sever ties with Mr. White II's men because "they could 'no longer be trusted,' " AGMA kept paying them and even added Mr. White III and his fighters to the payroll.[216]

164.  ArmorGroup's and ECC had financial motives for buying security from Taliban warlords.  Rather than hire guards from reputable U.S. security firms, ArmorGroup and ECC chose to save money by sourcing their guards from low-cost Afghan warlords.  For example, when interviewed by Senate staff, AGMA's Project Leader for the Shindand Airbase project "said that there were options other than using Mr. White II for security but that they were 'more expensive.' "[217]  As an intelligence analyst observed, "[a]t the core of this strategy was cost – lowering cost to perform the task, while maximizing profits."[218]  The analyst concluded, based

---

[213] *Id.* at 8 (brackets omitted).

[214] *Id.* at 21 (brackets omitted).

[215] *Id.* at 16.

[216] *Id.* at 33.

[217] *Id.* at 26.

[218] George C. Lovewine, *Outsourcing The Global War On Terrorism:  Private Military Companies and American Intervention In Iraq and Afghanistan* 37 (Palgrave Macmillan 2014).

on the Senate report and other evidence, that ArmorGroup's low-cost strategy "resulted in the company providing financial support to groups fighting the US military."[219]

165.     Despite the indications that ECC and ArmorGroup were paying known Taliban associates, neither ArmorGroup nor ECC sought the requisite authority from the U.S. military to arm those fighters.  In fact, when Senate investigators later interviewed ArmorGroup and ECC about Mr. Pink and Mr. White, the companies were able "to provide little personal information about the two men."[220]  Nonetheless, the companies armed and paid substantial sums of money to both men, their fighters, and their Taliban-loyalist brothers.  And throughout it all, the companies claimed that they simply had "no idea what" the fighters "did with the money."[221] They made that claim despite widely reported facts that the Taliban used funds funneled up from their on-the-ground operatives, particularly those coming from protection payments, to carry out terrorist attacks against Americans, such as Plaintiffs and their family members.

166.     The U.S. government relied on ArmorGroup and ECC to vet their security guards and ensure that ECC and ArmorGroup contract funds were not reaching the Taliban.[222]  For that reason, ArmorGroup's proposal for the Shindand project promised rigorous vetting processes, such as procuring a "signed declaration" that its guards "were not a member of the Taliban" and diligence on its guards' "family and background."[223]  ArmorGroup did not follow through and procure the required declarations.  Instead, it concealed its guards' Taliban affiliations.  For

---

[219] *Id*. at 36.

[220] *Senate Contractors Report* at 8.

[221] *Id.* at 23.

[222] *See id.* at 16 ("Asked whether [the U.S. Air Force] ran intelligence checks on the individual warlords to determine whether or not the U.S. government should be partnering with them, the project manager said '[we] relied on the primary contractor to do that.' ").

[223] ArmorGroup, *Technical Proposal:  Afghan National Army Air Corps Expansion, Shindand, Afghanistan for ECCI* at 15 (Jan. 12, 2007).

example, when AGMA submitted its security plan to UNOPS, it called Mr. White II a "respected tribal elder" and omitted any mention that he was a Taliban manager and fundraiser.[224]

167.    In the wake of the Senate Armed Services Committee's extensive report on all this misconduct, Senator Carl Levin summarized its findings as showing that ECC and the ArmorGroup Defendants "helped play into the hands of the enemy" and were "creating the very threat they are hired to combat."[225]  A senior fellow at the Center for a New American Security similarly described the report as detailing a "stark" choice:  "allow subcontractors to pay the Taliban protection money, and essentially fund the enemy with taxpayer dollars, or bar protection payments and absorb a higher degree of risk of attack" on contractors' businesses.[226]

168.    ArmorGroup took a different perspective.  In response to the evidence arrayed against Mr. White and his brothers, an AGMA Director told the Committee, "I would like to put on the record recognition of the services that the Whites provided us . . . we are forever grateful to Mr. White's family . . . because they kept our people safe."[227]

## 2.    ArmorGroup's Protection Payments Comport With Its Other Conduct In Afghanistan

169.    ArmorGroup's protection payments reflected a system of deficient internal controls that also permitted related misconduct.  According to two ex-Marines who used to work for ArmorGroup, AGNA "materially misrepresented" its "capabilities in winning the contract award" to protect the U.S. Embassy in Kabul.[228]  ArmorGroup's management, the employees

---

[224] ArmorGroup Mine Action Afghanistan, *Security Plan* (Apr. 22, 2008).

[225] Karen DeYoung, *Senate Report: Mismanaged U.S. Contractor Money Aids Enemy In Afghanistan*, Wash. Post (Oct. 8, 2010).

[226] Sydney Morning Herald, *Pentagon Acts As Money For Contractors Ends Up In Taliban Hands* (Oct. 9, 2010).

[227] *Senate Contractors Report* at 37 (ellipses in original).

[228] Compl. ¶ 2, *United States ex rel. Sauer v. ArmorGroup North America, Inc.*, No. 08-cv-00698-RCL (D.D.C. filed Apr. 24, 2008), Dkt. 1.

alleged, "ha[d] no regard for the security of the United States Embassy, and [was] interested in only their stocks."[229]

170.    The executive director of the Project on Government Oversight later testified about related misconduct to the Commission on Wartime Contracting.  Summarizing witness interviews and documents, she testified:  "practically from Day One, ArmorGroup North America knowingly underperformed in its mission in order to maximize its profits."[230] Consistent with that statement, the U.S. State Department eventually fired ArmorGroup from the contract, after an internal U.S. State Department security evaluation found a slew of contract violations and performance deficiencies.

171.    Similarly, a former Director of Business Development for AGNA alleged that AGNA submitted false claims in connection with its Kabul Embassy contract, including by misrepresenting the qualifications of its guards.[231]  After the U.S. Department of Justice intervened in the case, ArmorGroup resolved the claims for $7.5 million.[232]

### 3.    The ArmorGroup Defendants' Payments Had A Substantial Nexus To The United States

172.    The ArmorGroup Defendants' protection payments were closely tied to the United States.  AGI (now G4S Holdings International (AG) Limited) made payments through AGNA (now Defendant Centerra Group, LLC), its Virginia-based, American subsidiary, and through AGMA (the trade name used by ArmorGroup Services Limited, now Defendant G4S

---

[229] *Id.* ¶ 3.

[230] Testimony of Danielle Brian Before The Commission on Wartime Contracting In Iraq and Afghanistan (Sept. 14, 2009), https://www.pogo.org/testimony/2009/09/testimony-of-danielle-brian-before-commission-on-wartime-contracting-in-iraq-and-afghanistan/.

[231] Compl. ¶¶ 51-62, *United States ex rel. Gordon v. ArmorGroup North America, Inc.*, No. 09-cv-01547-RCL (D.D.C. filed Aug. 17, 2009), Dkt. 1.

[232] Press Release, U.S. Dep't of Justice, *ArmorGroup North America and Its Affiliates Pay $7.5 Million To Resolve False Claims Act Allegations* (July 7, 2011).

Risk Management Ltd.).  AGNA and AGMA obtained prime contracts with the U.S.

government, or subcontracts with other U.S. government prime contractors, for AGI's benefit.

173.    AGNA, as alleged by its former Director of Business Development, functioned as

a "shell company set up by AGI to bid for and obtain U.S. contracts that could only be awarded

to American companies."[233]  AGI could not have obtained or implemented U.S. government

contracts or subcontracts without maintaining a substantial U.S. presence.  AGNA's Virginia

office acted as the contracting entity and was responsible for submitting claims to the U.S.

government or the other contractors working on the project.  AGI thus characterized AGNA's

"Washington office" as the "hub for the Group's bidding for and management of major US

Government contracts overseas while coordinating the Group's relationships with the larger US

defence integrators."[234]  AGI recognized that it needed AGNA's U.S. presence to bid for and

obtain sensitive contracts like the one to protect the U.S. Embassy in Kabul.

174.    As a result of this arrangement, ArmorGroup's Shindand Airbase subcontract was

between AGNA (an American company) and ECC (another American company) for work under

a prime contract between ECC (an American company) and the U.S. government.  The two State

Department contracts were between AGNA (an American company) and the U.S. government

directly.  Each was negotiated and executed in the United States; each required extensive

communications with ECC or U.S. government personnel located in the United States; and each

involved American money that AGNA used to pay the Taliban.  AGI and AGNA obtained the

money they used to pay the Taliban from AGNA's American counterparties, and they made

those payments to secure work on projects that were managed by and for the benefit of those

---

[233] Compl. ¶ 53, *United States ex rel. Gordon v. ArmorGroup North America, Inc.*, No. 09-cv-01547-RCL (D.D.C. filed Aug. 17, 2009), Dkt. 1.

[234] ArmorGroup International plc, *Annual Report & Accounts 2007* at 11 (Aug. 13, 2008).

same American counterparties.  In doing so, AGI and AGNA breached U.S.-based contractual requirements prohibiting material support to the Taliban.

175.    For its part, AGMA obtained the 2007 Shindand Mine Clearance subcontract directly from ECC – an American entity – and made repeated communications to ECC personnel in the United States.  AGMA negotiated with, submitted reports to, and was paid by a U.S. company for its mine-clearance work in Shindand.  In making protection payments, AGMA also breached contractual requirements prohibiting material support to the Taliban.

176.    The other contracts AGI executed through AGMA also relied on contacts with the United States.  Given AGI's managerial role overseeing both AGNA and AGMA contracts, AGMA personnel frequently worked with and relied on U.S.-based personnel to implement AGMA's projects in Afghanistan.  For example, on the UNOPS contract, AGNA personnel – working for a U.S. entity, on a contract available only to U.S. companies – recommended Mr. White II to AGMA, and AGMA relied on AGNA's American employees to broker the critical meeting where AGMA ultimately retained Mr. White II.  *See supra* ¶ 158.  When later asked why AGMA decided to retain Mr. White II and his Taliban fighters, AGMA's Afghanistan Country Manager invoked the "long standing relationship between ArmorGroup International and White II" – a relationship that arose from and depended on ArmorGroup's U.S. contract held by AGI's American subsidiary, AGNA.[235]

177.    As with the other ArmorGroup Defendants, AGMA's U.S.-based contacts were important.  The United States led Coalition forces in Afghanistan and spearheaded the civilian reconstruction effort.  When other entities like UNOPS offered contracts in Afghanistan, they did

---

[235] *Senate Contractors Report* at 25 (quoting *AGMA Project Consultancy Report For The UNOPS Shindand A Contract* 17 (July 2008) (brackets omitted)).

so in close consultation with the U.S. government and in service of U.S. objectives.  AGMA's

cooperation with its U.S. affiliate already working on U.S. government contracts was thus

material in it obtaining work from UNOPS.  On information and belief, AGMA would not have

obtained the UNOPS demining contract without promising close coordination with the U.S.

ArmorGroup teams already providing security for the nearby U.S. airfield.  That was particularly

true because the AGMA teams implementing that UNOPS contract involved many of the same

ArmorGroup personnel who were already working for ECC in the same area.  AGMA's work on

both contracts depended on its contractual relationship and repeated communications with ECC.

178.    The ArmorGroup Defendants' private-security work in Afghanistan required

frequent interactions with U.S. officials.  That was true not only of ArmorGroup's contracts in

Herat and Kabul, but also of G4S's contracts to provide security in Helmand and Kandahar.

With those latter contracts, G4S was retained to provide security both to UK officials and to

USAID officials representing the U.S. government.  In performing under those contracts, G4S

employees routinely interacted with U.S. officials who were part of the local PRT.  G4S, like

ArmorGroup did in Herat and Kabul, also developed its security plans based in part on

intelligence that G4S obtained from U.S. military officials.  Those contacts with U.S. personnel

were material to G4S's performance under the contracts on which it made protection payments.

179.    The ArmorGroup Defendants' decision to pay protection money to the Taliban

was also expressly aimed at the United States, because when making those payments, the

ArmorGroup Defendants knew they were aiding Taliban attacks that were designed specifically

to influence U.S. policy by killing and injuring American personnel.  *See supra* Part III.A-B.

B.      **The DAI Defendant**

1.      **DAI Made Protection Payments To The Taliban**

180.    Defendant DAI likewise made protection payments to the Taliban in connection with several projects in Afghanistan between 2007 and 2016.  Those projects were implemented by DAI Global LLC's predecessor, Development Alternatives, Inc.

181.    DAI was USAID's second-largest development contractor in Afghanistan, behind only LBG.  From FY2007 until FY2009, LBG and DAI together accounted for about $1 billion in development projects, or about one-half the value of USAID's total contracts with all of its contractors in Afghanistan.[236]  Overall, through June 2013, DAI remained the second-largest USAID contractor in Afghanistan, with contract obligations valued at $886 million.

182.    DAI executed multiple government contracts in Afghanistan and pertinent parts of Pakistan during the relevant timeframe.  Those contracts include, but are not limited to:

a.      The LGCD Contract:  On October 2, 2006, USAID awarded to DAI Task Order 2 under Contract No. DFD-I-00-05-00250, for USAID's Local Governance and Community Development ("LGCD") program.  The contract was originally for 3 years and $95 million, but USAID later increased the funding to $349 million and extended the term through April 30, 2011.

b.      The ASMED Contract:  On February 15, 2007, USAID awarded to DAI Contract No. 306-C-00-07-00503-00 under USAID's Afghanistan Small and Medium Enterprises Development ("ASMED") program.  The contract was originally scheduled to last through October 31, 2011 and to involve expenditures of $55 million, but USAID later increased the funding to $113 million and extended the term through November 30, 2012.

c.      The FATA Contract:  In January 2008, USAID awarded to DAI a 3-year, $43.4 million contract under the agency's Federal Administered Tribal Areas Development Program ("FATA") program.  The agency later increased the contract amount by $2.2 million.

d.      The IDEA-NEW Contract:  In March 2009, USAID awarded to DAI Cooperative Agreement No. 306-A-00-09-00508 under its Incentives Driving Economic

---

[236] *See Kerry Report* at 15.

Alternatives for the North, East, West ("IDEA-NEW) program.  This was a 5-year, $150 million contract.

e.   The ASI Contract:  On June 25, 2009, USAID awarded to DAI Contract No. DOT-I-02-08-0035-0, Task Order 2 under the USAID's Afghanistan Stabilization Initiative ("ASI") program.  The contract called for DAI to perform work between November 1, 2011 and September 25, 2012.  The contract was originally valued at approximately $151 million, but subsequent modifications reduced the value to approximately $83 million.

f.   The RAMP UP East Contract:  On June 10, 2010, USAID awarded to DAI Contract No. 306-C-00-10-00526-00 under USAID's regional Afghan municipalities for urban populations / regional command east ("RAMP UP East") program.

g.   The RAISE Contract:  On July 15, 2010, USAID awarded to DAI Task Order EDH-I-14-05-00004 under prime contract EDH-I-00-05-00004.  The agency awarded this 4.5 year, $49.1 million task order to DAI to implement the Agricultural Credit Enhancement project under its Rural Agricultural Income and Sustainable Environment ("RAISE") program.

k.   The ACE-II Contract:  On June 16, 2015, USAID awarded to DAI Order No. AID-306-BC-15-00005 of Contract No. AID-EEM-E-00-05-00002, a 4-year, $18 million contract under USAID's Agricultural Credit Enhancement-II ("ACE-II") program.

l.   The RADP-East Contract:  On July 21, 2016, USAID awarded to DAI Contract No. AID-306-C-16-00011 under USAID's Regional Agriculture Development Program – East ("RADP-East").

183.   From at least 2007 through 2016, DAI maintained a general policy of paying the Taliban to protect the projects it implemented in Taliban-controlled or -influenced regions.  That policy applied to each of the contracts DAI implemented in Afghanistan.  DAI's practice was to make especially large payments in connection with its projects in P2K, Logar, Wardak, Helmand, and Kandahar provinces.  Some indications of that practice include:

- Industry practice:  According to more than 10 confidential witnesses, including former U.S. government officials, academic and other experts, and industry participants, protection payments to the Taliban were pervasive and routine among USAID contractors operating in Afghanistan.  DAI's payments alleged below are not mere isolated incidents; they are examples of the industry playbook that was almost uniformly followed by American development companies operating in Taliban areas of Afghanistan.

84

- <u>Office discussions</u>:  Beginning in at least 2007, employees at DAI's Kabul offices frequently discussed DAI's protection payments.  The prevailing understanding among many employees at DAI's offices was that DAI paid the Taliban – either directly or through its subcontractors – to secure its projects in Taliban-controlled areas.  Those discussions occurred in hushed tones and were rarely out in the open; management avoided documenting the practice in official meetings.  But the typical view expressed by multiple employees was that DAI had to pay the Taliban to proceed with its work in unstable areas.

- <u>M&E reviews</u>:  Multiple companies hired to perform monitoring and evaluation ("M&E") work on DAI's projects collected evidence of DAI's pervasive payments to the Taliban.  The evidence, which included interviews with DAI project staff in the field, indicated that DAI maintained a practice of buying the Taliban's support for its projects by directing money to Taliban members – either through direct cash payoffs or by employing Taliban members to work on project sites.  When asked by M&E investigators to justify that conduct, DAI employees asserted that the practice was acceptable because, in sum and substance, they believed that "everyone else in Afghanistan is doing it too."

- <u>Permission letters</u>:  DAI and its subcontractors also procured "permission letters" from the Taliban granting them formal authority to implement multiple projects in the provinces identified above, which the Taliban issued only to contractors that had made the necessary protection payments.  *See supra* Part III.B.

- <u>Lack of financial controls</u>:  DAI avoided placing rigorous controls on what its subcontractors could do with DAI's money.  It did so in part to permit DAI's subcontractors to make protection payments, which DAI encouraged while often avoiding the details.  For example, one M&E auditor presented DAI management in Kabul with individual names on payroll records showing that DAI was employing active Taliban members – including one recipient of DAI's funds who was a close relative of the local Taliban commander.  DAI management dismissed the objection and declined to stop payment to the employee.

184.  DAI's payments were consistent with USAID implementers' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage.  *See supra* ¶¶ 63, 72-94.  That practice was especially prevalent among the largest development contractors in Afghanistan:  the biggest contractors faced the highest security risks, and had the highest profit incentives, which motivated them to buy off the Taliban almost universally.  In following that standard practice, DAI made payments that were, on information and belief, worth at least 20 to 40 percent of its contracts' value.  *See supra* ¶ 92.  As a result, across its contracts, DAI made payments to the Taliban worth at least several million dollars.

185.    DAI paid the Taliban in violation of a clause in its USAID contracts stating:  "The Contractor is reminded that U.S. Executive Orders and U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism.  It is the legal responsibility of the Contractor to ensure compliance with these Executive Orders and laws.  This provision must be included in all subcontracts/sub-awards issued under this contract."  This provision appeared, for example, in DAI's USAID Contract No. DFD-I-00-05-00250, issued on September 27, 2005.  On information and belief, the same clause appeared in USAID's contracts with the LBG/BV Defendants, IRD, and Chemonics.

186.    DAI financially supported the Taliban both through payments it negotiated itself and through payments it funneled through its subcontractors.  *See supra* ¶¶ 84-93.  In the latter circumstance, DAI actively participated in its subcontractors' conduct by (among other things) approving the charges and authorizing their payment.  *See supra* ¶¶ 95-96.  For example, DAI orchestrated some of its payments through USPI, a criminal-run subcontractor whose personnel DAI hired in or about 2008.  *See infra* ¶¶ 255-263.  In all cases, DAI knew (or recklessly disregarded) it was funding attacks on U.S. personnel in Afghanistan.  *See supra* Part III.A-B.

187.    As one example of its general policy, DAI knowingly made protection payments to secure its stabilization work in Kunar Province in connection with the LGCD and ASI contracts.  According to a DAI field director in Kunar, DAI chose to engage directly with the "local Taliban . . . right on the border with Pakistan," near DAI's project sites.  The field director admitted that "the Taliban would interrupt work and demand payment" from DAI, but when "we would refuse, sometimes a deal would be cut whereby we would employ folks affiliated with them – they were all from the community, after all."  The employment "deal" that DAI "cut" with the Taliban was not merely ordinary-course employment of the local community.  It was

framed by DAI itself as a calculated response to the Taliban's demand for payment, and it involved DAI hiring Taliban personnel for the purpose of directing funds to the Taliban.

188.    DAI also specifically paid protection money on its RAISE contract, which DAI implemented in Kunar, Nangarhar, and Laghman Provinces.  An M&E company hired to evaluate that project performed extensive field work assessing its effectiveness.  In the course of that field work, M&E investigators collected evidence – primarily in the form of field interviews with DAI staff – confirming that DAI and its subcontractors were paying the Taliban for permission to access the project sites.  In conversations with M&E investigators, DAI staff – both local project staff and national staff in Kabul – confirmed awareness of those payments.  But when DAI's M&E consultant tried to raise the issue more formally in a project report, the consultant was instructed to remove any reference to Taliban payments from the final report.

189.    DAI also orchestrated protection payments in connection with road- and school-construction it performed under several of its contracts.  That work occurred in southern provinces under Taliban control, and DAI employees believed that protection payments were necessary for project completion in both instances.  DAI employees had conversations at its offices in Kabul discussing those payments.  Employees in Kabul took note of one DAI operative who would periodically pick up bags of cash, along with a special encrypted laptop, for transport out to the provinces to make "security payments."  The understanding among certain Kabul-based DAI employees was that this operative was transporting protection money to the Taliban.

190.    DAI's FATA contract was similar.  Under that contract, DAI implemented a series of projects to increase the capacity of FATA governmental institutions and NGOs.  The FATA – a semi-autonomous tribal region in northwestern Pakistan along the Afghanistan border

– was a notoriously insecure, Haqqani-controlled area in which protection payments were routine.  As Ms. Peters documented in 2012:

> Local sources report large and rising security payments made by contractors for USAID-funded projects in the FATA appearing in Haqqani coffers.  'A contractor receiving a contract in the millions of rupees will normally have to pay up to 15 percent of the value of that contract in tax to the Taliban,' said a local tribal elder who is involved in the construction business.  "This has become a rich source of income for the Taliban in recent years."[237]

In keeping with its general practice, DAI followed the same pattern and paid the Haqqani Network to secure its work under the FATA contract.

191.    As another example of DAI's general practice, in 2010, the USAID Office of Inspector General ("OIG") conducted a review of DAI's performance under the LGCD contract and found "indications that Afghan subcontractors" working for DAI "had paid insurgents for protection in remote and insecure areas of Afghanistan."[238]  The OIG's inquiry "was triggered after a series of online and newspaper articles . . . documented the diversion of millions of dollars in U.S. aid money to the Taliban."[239]

192.    OIG formally structured its investigation as a "review" rather than an "audit."  A "review" is much like an "audit," but it is designed for faster completion.  Because of the urgency associated with OIG's investigation, OIG chose to perform a "review" so that it could complete its work faster.  Even so, in this instance the OIG auditors who performed the review adhered to all auditing standards, and the work they did – and the rigor with which they did it – was functionally indistinguishable from the work done in a formal USAID "audit."

---

[237] *Haqqani Network Financing* at 44.

[238] *2010 USAID OIG Report* at 2.

[239] Colum Lynch, *U.S. Tax Money Goes To Taliban*, Foreign Policy (Sept. 30, 2010).

193.     A pair of OIG auditors conducted virtually all of the field work for the review.

Preparations began in early 2010, and the field work commenced on March 29, 2010.  The field

work consisted of in-person witness interviews, review of DAI's and its subcontractors'

documents, and consultations with U.S. intelligence analysts.  The two auditors worked full-time

on the investigation for six weeks.  As part of their field work, they interviewed 43 different

witnesses from USAID, DAI, and DAI's security subcontractor.  After interviewing DAI

management personnel and witnesses from one of DAI's security subcontractors, Edinburgh

International, in Kabul, the auditors traveled to the Nangarhar PRT to interview project staff.

194.     Although the auditors began by focusing on Edinburgh International – DAI's

security subcontractor in Kabul – they shifted focus soon after.  Because Edinburgh's role in this

case was limited primarily to providing security for DAI's main offices in downtown Kabul –

not an insecure area under Taliban control – the auditors determined that Edinburgh should not

be the focus of the review.  Rather, in consultation with USAID subject-matter experts and

intelligence analysts, the auditors shifted focus to the area where they determined protection

payments were more likely:  on local DAI project sites in Nangarhar and Kunar Provinces.

195.     The auditors then found overwhelming testimonial and documentary evidence

that DAI was knowingly orchestrating protection payments to the Taliban in connection with the

LGCD project.  The DAI payments they uncovered took two forms.  First, there was a standard

20% "protection tax" that the Taliban in that region charged contractors to obtain "permission"

to perform work in a given village or province.  This 20% baseline was negotiable and could

vary upwards or downwards depending on the particular subcontract at issue.  The auditors

uncovered evidence that the Taliban often would stage a minor attack – like burning a bulldozer

– to demonstrate its seriousness or to create leverage to extract additional payments.  Second,

DAI's local subcontractors – not Edinburgh, but the companies performing the local work out in the provinces – often hired Taliban guards to "provide security" for the projects, such that the protection money took the form of salary payments.  According to the evidence collected by the auditors, DAI's subcontractors made the payments in cash, submitted the expenses to DAI for reimbursement, and DAI in turn passed the costs along to USAID.

196.     The auditors also confirmed that DAI was aware that it was making and approving payments to the Taliban on the LGCD project.  DAI employed project managers who were out in the provinces working alongside the local subcontractors.  Those employees were in a position to observe the protection payments firsthand.  Moreover, in witness interviews, several DAI employees admitted knowing about the protection payments.  Their stated justification – which was consistent with the inference the auditors drew in light of the totality of the evidence – was monetary.  DAI was profiting handsomely off its USAID projects, and DAI employees feared that, unless they approved payments to insurgents, there would be no way to perform at a cost level that would allow DAI to continue winning business from USAID.

197.     One senior DAI employee in Afghanistan in particular was quite forthcoming to the USAID auditors about the extent to which DAI was knowingly orchestrating protection payments to the Taliban on the LGCD and other projects.  That DAI employee objected to the practice internally and tried to convince senior management to take steps to stop it.  The DAI employee, whom the OIG auditors found credible, stated that DAI ignored the objection.

198.     The auditors also surfaced documentary evidence, including Security Incident Reports, alerting DAI to the protection payments.  DAI's subcontractors were required to submit reports to DAI describing any significant security incident, and those write-ups often discussed the Taliban's demand for "protection taxes."  One example that made its way into OIG's final

report came in late 2008, when Taliban insurgents in Kunar Province burned a bulldozer as part of a negotiation over protection payments.[240]  DAI knew that the incident was linked to ongoing financial discussions with the insurgents – as part of the Taliban's attempt to renegotiate the terms of payments that were already occurring – but when DAI reported the incident to USAID, it omitted discussion of the Taliban altogether.  Although DAI subsequently suspended work on that particular project, it billed USAID for the work already performed – including protection money it knew that its subcontractor had paid.

199.    In early July 2010, the auditors completed a full draft report documenting their findings.  The findings – which USAID OIG and Mission officials viewed as demonstrating DAI's complicity in funding the Taliban on the LGCD project – sparked intense discussion within Embassy Kabul.  Around the same time, a version of the draft report made its way to DAI.  In response, DAI's CEO flew to Kabul for a special in-person meeting with USAID officials to discuss the draft report.  The meeting occurred in late June or early July 2010.

200.    The meeting was held in a conference room at USAID's offices within Kabul's Green Zone.  Five people attended:  DAI's CEO, two other DAI employees, and two USAID officials.  The CEO did virtually all of the talking for DAI.  He treated the draft OIG report as an attack on DAI, and he became defensive during the discussion.  Although he offered cursory denials that DAI knew about payments to the Taliban, he offered no substance or evidence to back up his denial.  Instead, he chastised OIG, belittled its work, and criticized USAID for the supposedly "false expectation" that DAI could truly be expected to prevent any LGCD project money from reaching the insurgency.  In so many words, he accused USAID of being "naïve" if it thought DAI could operate in an area like Nangarhar without at least some money ending up

---

[240] *2010 USAID OIG Report* at 4.

with the Taliban.  Throughout, the CEO displayed no remorse and offered no indication that DAI intended to reform its practices in response to OIG's findings.

201.    At the meeting, DAI's CEO also suggested that DAI was not responsible for what its subcontractors may have done on the LGCD project.  Without engaging with the substance of whether DAI itself knew of the payments, a USAID official responded by informing DAI's CEO that USAID expected DAI to be responsible for the conduct of its subcontractors and to establish systems to prevent its subcontractors from paying the Taliban.  As for exactly who was responsible for overseeing the conduct of DAI's subcontractors in the field, the USAID official told DAI's CEO, in sum and substance:  "That's what we're paying you for."

202.    A USAID official who attended the meeting was taken aback by DAI's CEO's arrogant demeanor.  The USAID official did not find the CEO's cursory denials credible and was struck by his unwillingness to engage with the substantive evidence backing up the auditors' findings.  At the meeting, the official conveyed USAID's strong view to DAI that payments to insurgents were prohibited and were never an acceptable "price" of implementing in insecure areas.  The official stood by OIG's findings and emphasized to DAI's CEO that OIG had found evidence of insurgent payoffs on DAI's contract.  But DAI gave no indication that it took USAID's warning seriously.  The USAID official left the meeting with the impression that DAI did not care about the problems surfaced by the review and did not intend to change its ways.

203.    The draft report then circulated for review by certain OIG officials in Washington, D.C.  Not all of the auditors' evidence and findings made its way into the final report.  Meanwhile, on July 22, 2010, the draft report formally went to the Afghanistan Mission for comments.  On August 24, 2010, in a memorandum influenced heavily by pressure from DAI and from Washington, D.C. officials, the Mission issued a response to the draft report.

204.    OIG finalized its report on September 29, 2010.  During the finalization process,

an independent fact-checker confirmed that every assertion in the report was sourced to a

document or witness interview in the audit file.  In keeping with the auditors' investigation, the

report "found no indication that Edinburgh International" itself had made protection payments.[241]

However, the report noted "indications that Afghan subcontractors working on the LGCD project

had paid insurgents for protection."[242]  The report went on to explain that DAI's subcontractors

had "negotiate[d] security terms with insurgents either directly or indirectly through community

leaders.  Insurgents could demand from the subcontractor a 'protection tax' of up to 20 percent

of the total subcontract value in exchange for protection."[243]  Applying that metric to the value

of DAI's LGCD projects implemented in 2009 alone, the report estimated that "$5.2 million of

USAID funds were at risk of falling into the hands of insurgents."[244]

205.    The report explained that the "protection" the Taliban sold to DAI and its

subcontractors "include[d] Taliban-provided security guards for the activity site and a promise

not to attack the subcontractor's personnel and equipment."[245]  The Taliban often "tr[ied] to

renegotiate the terms of the security arrangement" midstream by "extort[ing] more money from

the subcontractor" and "threaten[ing] violence if the subcontractor did not comply."[246]  As U.S.

intelligence officials confirmed, the Taliban's extraction of protection money from DAI's project

---

[241] *Id.* at 2.

[242] *Id.*

[243] *Id.* at 4.

[244] *Id.* at 6.

[245] *Id.* at 4.

[246] *Id.*

"fit[ ] the pattern" evident throughout Afghanistan and especially "endemic in Taliban stronghold areas" like Kunar Province, where DAI implemented the LGCD project.[247]

206.    The report also explained how DAI and its subcontractors recouped the payments. "The most common method," the OIG found, "was to include the amount in the total cost of the subcontract up front, because subcontractors knew that the tax would have to be paid before implementation."[248]  The subcontractors then classified the protection money as "mobilization costs" and "billed them to DAI through normal invoicing procedures."[249]  DAI, in turn, passed those so-called "costs" on to USAID for reimbursement.  On occasion, "line items in the project budget might be inflated, or subcontractors might recoup costs by substituting low-quality, cheap materials for promised high-quality materials."[250]  Either way, DAI enabled its subcontractors to obtain U.S. government money and knowingly reimbursed them for payments to the Taliban.

207.    The report further suggested that the "LGCD project may have contributed to the risk" of insurgent funding through "its very design and approach."[251]  True or not, Plaintiffs expressly disclaim any theory of liability premised on any USAID program's "design and approach."  Although the project design may have contributed to DAI's incentive to make the payments, USAID's clear position – conveyed both in official documents and in conversations with DAI – was that DAI must *not* allow any USAID funds to reach the Taliban.  And if that proved impossible in a given area, USAID instructed DAI to cease implementing altogether.  As the Mission stated in commenting on OIG's draft report, USAID contacted DAI implementers to

---

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] *Id.* at 3.

"ensure they do not implement in high-risk areas."[252]  But DAI did not follow USAID's instruction; it continued implementing in areas where it believed payments were necessary.

208.    The OIG report also surveyed some (but not all) of the evidence that DAI knew or recklessly disregarded that its subcontractors were paying the Taliban.  DAI's security team was aware of several Taliban attacks and threats against its project that matched well-known techniques through which the Taliban extracted protection money.[253]  DAI was also aware of the practice – known to virtually everyone in Afghanistan – that local "security" expenditures included pay-offs to Taliban.  *See supra* Part III.B.  Indeed, the report's sourcing for the conclusion that protection payments were made included DAI's own personnel.[254]  And most of the "DAI personnel" OIG interviewed admitted that DAI could not "provide reasonable assurance of preventing USAID funds from going to the Taliban or others in exchange for protection" of the LGCD project.[255]  Yet DAI nonetheless chose to "pay[] the full amount of the subcontract" and passed on the costs – including the protection money – to USAID.[256]

209.    The report made waves among other U.S. government entities.  The Commission on Wartime Contracting summarized OIG's review as finding that "Afghan subcontractors on a USAID community-development program in Kunar Province were paying up to 20 percent of their total subcontract value to insurgents for 'protection.' "[257]  SIGAR distilled it to a finding that "a local LGCD program subcontractor inflated projected costs by up to 20 percent,

---

[252] *Id.* at 14.

[253] *See id.*

[254] *See id.* at 4 (basing findings about protection money on "[i]nterviews with personnel from USAID, U.S. intelligence, and DAI").

[255] *Id.* at 6.

[256] *Id.* at 4.

[257] *CWC Report* at 74.

obfuscated its intent by attributing the expense to 'mobilization costs,' and then used these funds to pay insurgents not to attack the project sites."[258]  And one journalist similarly summarized it as finding that "one company, DAI of Bethesda, [Maryland], involved in rehabilitation was forced to pay five million dollars in protection money to Taliban-connected groups."[259]

210.    DAI knowingly approved and encouraged those payments.  Under the LGCD contract, DAI was responsible for monitoring the day-to-day work of its subcontractors and approving all project expenses.[260]  DAI authorized its subcontractors' protection payments as a way of saving on security costs and allowing the project to proceed efficiently.  Indeed, the audit file collected evidence – including admissions – that DAI knew of its subcontractors' conduct.

211.    The Mission's comments on the OIG report did not dispute the evidence that DAI's subcontractors had paid the Taliban for protection on the LGCD project.  Nor did the comments dispute the evidence that DAI knew of and approved those payments.  Rather, the Mission's comments asserted generally that DAI "does conduct risk and impact assessments of the security situation" and "implements" other monitoring measures.[261]  The OIG auditors responsible for the review disagreed with that assertion, and the response did not identify any evidence for it.  In fact, although DAI *told* USAID that it employed such measures, DAI did not adequately implement those measures.  Instead, to grow its own profits, DAI encouraged its subcontractors to pay the Taliban.  The people responsible for approving the Mission response were unaware of the extent of DAI's involvement with the LGCD protection payments.

---

[258] *Stabilization Lessons* at 50.

[259] *Up To $1 Billion In U.S. Aid Winds Up In Taliban Coffers*.

[260] USAID Contract No. DFD-I-02-05-00250-00, Task Order No. 2, Articles IX, XI.

[261] *2010 USAID OIG Report* at 11, 14.

212.     DAI's CEO issued an internal memo in response to the OIG report, dismissing it as "largely circumstantial, speculative, and unsubstantiated."  But the CEO could not dispute the OIG's specific findings – based on DAI witnesses and documents – that protection money was likely paid.  According to a journalist who obtained the memo, the CEO "was forced to admit that there were areas in which DAI could not adequately monitor its projects, nor ensure that U.S. funds did not find their way into insurgent coffers."[262]  He thus mounted a different defense of DAI's work, saying its projects were worthwhile even though "we cannot provide assurance – to an auditor's satisfaction – that not a penny of U.S. funds is reaching undesirable elements."[263]

### 2.     DAI's Protection Payments Comport With Its Other Conduct In Afghanistan

213.     DAI's protection payments reflected a system of deficient internal controls that also permitted related misconduct.  For example, OIG "found indications of pervasive fraud in DAI's LGCD office in Jalalabad and indications of endemic corruption in Nangarhar Province."[264]  The fraud involved DAI employees receiving kickbacks from favored subcontractors in exchange for leaking inside information about "how much the project was worth, how much to bid on the project, what the project entailed, and where to inflate the prices in the bids."[265]  The OIG's examination "showed inflated prices" submitted by "several approved subcontractor[s]."[266]  In addition, the OIG found "indications that these same employees were

---

[262] Jean MacKenzie, *U.S. Funding For The Taliban:  Can It Be Stopped?*, GlobalPost (Oct. 12, 2010) ("*U.S. Funding For The Taliban*").

[263] *Id.*

[264] *2010 USAID OIG Report* at 2.

[265] *Id.* at 6.

[266] *Id.*

working in collusion to fabricate monitoring reports" that falsely depicted "progress on existing LGCD subprojects when little or no progress had actually been made."[267]

214.    In June 2010, after USAID expanded its investigation of the LGCD fraud and brought in members of SIGAR and the FBI, as well as local Afghan prosecutors, DAI belatedly terminated ten of its employees who had been involved in the fraud.  The firings came on the heels of another DAI internal audit that had uncovered "similar instances of pervasive fraud" in DAI's regional office in Herat.[268]  The internal audit, as summarized by OIG, revealed "double billing, inflated costs, missing receipts, and suspicious invoices."[269]  As a result, DAI fired three more employees and caused several more to resign.

215.    On occasion, DAI belatedly reported such fraud to USAID, after an internal audit discovered it – as with the Herat fraud.  On other occasions, as with the LGCD fraud, DAI did not self-report.  And on at least one other occasion, a DAI internal audit discovered suspicious payments that DAI chose not to share with USAID.[270]

216.    In 2009-era Afghanistan, protection payments were common in part because the corrupt environment made them easy to hide.  *See supra* Part II.A.[271]  DAI's contracting practices fit that pattern and further suggested that DAI hid protection payments within inflated and unsubstantiated expenditures.  For example, one audit of DAI's LGCD project found that

---

[267] *Id.* at 7.

[268] *Id.*

[269] *Id.*

[270] *See* USAID OIG Afghanistan and Pakistan Oversight Report at 66 (January – March 2012).

[271] *See also U.S. Funding For The Taliban* (observing that protection payments for development projects could be "hidden in a variety of ways," including through "inflated estimates for equipment, padded transportation costs, [and] substituting inferior materials for the top-grade ones billed").

DAI was "unable to locate the contract file, payment vouchers, or project receipts for fuel purchases totaling $3,424,400" and that "DAI staff had no explanation."[272]  The same audit also found "rental payments . . . made to the project cashier, instead of to the lessors identified in the lease agreements," with "no documentation showing that the lessors had signed for receipt of their monthly rents."[273]  Such unexplained and unverified expenditures, made to implement a project in Taliban-controlled geographies, are a further indication of protection payments.

## C.    The ECC Defendant

217.    Defendant Environmental Chemical Corporation ("ECC") is a construction and engineering company that worked on multiple projects in Afghanistan from at least 2007 until 2014.  ECC's contracts include, but are not limited to:

**a.**    2005 Kandahar Airfield Contract:  On October 1, 2005, ECC obtained Contract No. FA8903-06-D-8511-0074 to construct infrastructure for an airfield in Kandahar, Afghanistan.  This contract was valued at $1.2 billion and called for work through at least 2016.  ECC later obtained multiple subsequent Task Orders under that contract, including a February 28, 2011 task order that called for performance through April 23, 2014 and provided for payment of roughly $21 million in cost reimbursement and $560,000 in fees, as well as a 2010 task order valued at roughly $80 million.

**b.**    2007 Shindand Airbase Contract:  In March 2007, pursuant to Contract No. FA-8903-06-D-8511, Task Order 18, the U.S. Air Force hired ECC as the prime contractor supervising an expansion of the Shindand Airbase in Herat Province, Afghanistan.  This prime contract was valued at $42.5 million.

**c.**    2007 Shindand Ordnance Clearance:  In or about March 2007, pursuant to Contract No. FA-8903-04-D-8672, the U.S. Air Force hired ECC to conduct a site survey and unexploded ordinance clearance in and around Shindand.  This contract was valued at $1.2 million.

**d.**    2010 Kunduz Police Contract:  On March 8, 2010, the U.S. Army Corps of Engineers, pursuant to Contract No. W5J9JE-10-D-0007, awarded a multiyear design and construction contract to a joint venture that ECC controlled and directed.  On September 16, 2010, pursuant to Task Order 3 under that contract,

---

[272] USAID OIG Afghanistan and Pakistan Oversight Report at 66 (January – March 2012).
[273] *Id.*

ECC received a $12 million award to design and build facilities for the Afghan police headquarters in Kunduz Province, Afghanistan.

e.   2012 Ring Road Contract:  On January 17, 2012, the Asian Development Bank awarded a multiyear, $477 million contract to a joint venture that ECC controlled and directed, under which ECC was to construct a 233-kilometer portion of Afghanistan's Ring Road.

218.   From at least 2007 through 2014, ECC maintained a general policy of paying the Taliban to protect the projects it implemented in Taliban-controlled or -influenced regions.  That policy applied to each of the contracts ECC implemented in Afghanistan.  Some indications of that policy include:

- Industry practice:  According to more than 10 confidential witnesses, including former U.S. government officials, academic and other experts, and industry participants, protection payments to the Taliban were pervasive and routine among U.S. construction and security contactors operating in Afghanistan during the relevant timeframe.  ECC's payments alleged below are not mere isolated incidents; they are examples of the industry playbook that was followed almost uniformly by construction and security companies operating in Taliban areas of Afghanistan.

- Insurgent-connected subcontractors:  ECC's pattern of hiring insurgent-connected contractors illustrates the same practice.  ECC hired AGNA on one contract and expressly approved ArmorGroup's strategy of delivering security by hiring Taliban cutouts.  *See supra* Part IV.A.1.  On a separate contract, ECC also hired an Afghan contractor, Arvin Kam Construction Company, which was directly aligned with insurgents.  *See infra* ¶¶ 224-228.  In Afghanistan, a prime contractor's use of such subcontractors is a well-established technique for effecting protection payments to the Taliban.  *See supra* Part II.B.

- Operational geography:  ECC operated extensively in Kandahar Province, the traditional seat of Taliban power that was under near-total Taliban control.  In Kandahar, the Quetta Shura employed a standard practice of "lev[ying] 'taxes' on major projects," including by extracting "protection money" from "construction companies [and] private security firms."[274]  Similarly, in Kunduz Province, where ECC also operated, local residents reported that "the Taliban levy a tax of 10 percent on businesses in a mafia-style network."  The Taliban "'shadow governor' of Kunduz[] takes a percentage of almost all construction work in the area."[275]  ECC's work in those regions is indicative of it paying the Taliban.

- Project type:  ECC also performed a *type* of work that is particularly indicative of protection payments.  ECC's own conduct demonstrates its policy of making protection payments in

---

[274] *The Battle For Afghanistan*.

[275] *Taliban's Secret Weapon*.

connection with airfield construction specifically.  *See supra* ¶¶ 150-167.  Similarly, the Ring Road was a particularly frequent target of the Taliban, with contractors regularly paying protection money to secure their work on the road.  *See infra* ¶ 252.[276]

- Lack of financial controls:  ECC also avoided placing rigorous controls on what its subcontractors could do with its money, which knowingly facilitated its payments to the Taliban.  For example, a 2016 outside audit found that ECC's expenditures under the Kandahar Airfield Contract included nearly $200,000 in cash payments for which ECC lacked real documentation.[277]  Such unexplained cash expenditures in a Taliban stronghold are an additional indication of protection payments.

219.    ECC's payments were consistent with construction contractors' standard

operating practice on projects with comparable funding profiles, security risks, and geographical

coverage.  *See supra* ¶¶ 63, 72-94.  In following that standard practice, ECC made payments that

were, on information and belief, worth at least 20 to 40 percent of its contracts' value.  *See supra*

¶ 92.  As a result, across its contracts, ECC made payments to the Taliban worth at least several

million dollars.

220.    ECC financially supported the Taliban both through payments it negotiated itself

and through payments it funneled through its subcontractors.  *See supra* ¶¶ 84-93.  In the latter

circumstance, ECC actively participated in its subcontractors' conduct by (among other things)

approving the subcontractors' charges for the protection payments and authorizing their

reimbursement.  *See supra* ¶¶ 95-96.  In all cases, ECC knew (or recklessly disregarded) that its

money was funding attacks on U.S. personnel in Afghanistan.  *See supra* Part III.A-B.

221.    The Shindand Airbase Contract offers a good illustration of ECC's general

practice.  As alleged above, ECC participated in and approved of the ArmorGroup Defendants'

---

[276] *See also Funding the Enemy* at 92 ("Afghan road reconstruction became the great American boondoggle – and also an important source of finding for the Taliban.").

[277] SIGAR, *Construction Of The Special Forces Kandak In Kandahar:  Audit Of Costs Incurred By Environmental Chemical Corp.* at 16, Financial Audit No. 16-30 (Apr. 2016).

payments to the Taliban in connection with that contract, including the decision to hire and pay Mr. Pink, Mr. White, Mr. White II, and their insurgent fighters. *See supra* ¶¶ 150-167.

222.    ECC knew that ArmorGroup was funding the Taliban on ECC's behalf.  ECC employees worked alongside ArmorGroup employees in Shindand; ECC's Security Manager traveled personally with ArmorGroup to Shindand in May 2007 to design the security plan; and ECC received regular incident reporting from ArmorGroup – so much so that ECC's own security reports documented the key incidents involving Mr. Pink, Mr. White, and Mr. White II.[278]  ECC's close relationship with ArmorGroup and access to detailed security reporting ensured that it knew of the links between ArmorGroup's guards and the Taliban.  In fact, ECC's Security Manager first established the relationship with Mr. Pink and Mr. White and personally struck the agreement for both men to supply ArmorGroup's security guards.  He also met personally with Mr. White II and made the decision to hire him.

223.    ArmorGroup's proposal to ECC, when ECC was first deciding to hire ArmorGroup, represented that ArmorGroup would perform diligence on its security guards, including by procuring a "signed declaration stating that they were not a member of the Taliban."[279]  As ECC knew, ArmorGroup did not follow through and never procured the promised declarations from the Taliban fighters it hired to provide security on ECC's behalf.

224.    The Kunduz Police Contract offers another good illustration of ECC's general policy.  On that project, ECC channeled protection payments to the Taliban through its Afghan subcontractor, Arvin Kam Construction Company ("Arvin Kam").  After ECC retained Arvin

---

[278] *See*, *e.g.*, ECC, *Serious Incident Report* (July 29, 2007); ECC, *Serious Incident Report* (Aug. 9, 2007); ECC, *Monthly Situation Report TO 18* (Dec. 2007); ECC, *Monthly Security Report TO 18* (Jan. 2008).

[279] ArmorGroup, *Technical Proposal:  Afghan National Army Air Corps Expansion, Shindand, Afghanistan for ECCI* at 15 (Jan. 12, 2007).

Kam and began work on the project, CENTCOM determined that Arvin Kam had been "actively supporting an insurgency" and instructed ECC to terminate its subcontract.[280]  ECC later conceded that "Arvin Kam was actively supporting insurgents in Afghanistan," remains "an active supporter of terrorists," and is a "known enemy of the United States."[281]

225.    But ECC did not immediately terminate Arvin Kam after CENTCOM determined it was an enemy of the United States.  Rather, ECC waited a month and forced the government to send ECC a Cure Notice and to threaten ECC with default under its contract.  As the government observed, "ECCI should have terminated Arvin Kam immediately" and was "well aware that termination would be an appropriate action."[282]  Rather than immediately comply, however, ECC held off on terminating Arvin Kam and initiated administrative proceedings against the U.S. Army Corps of Engineers, claiming that the government's termination notice was unlawful.

226.    In litigating the termination notice, ECC did not meaningfully dispute that Arvin Kam supported the insurgency; it argued instead that the government "cannot direct termination of a subcontractor based upon [such a] finding."[283]  ECC claimed it should have been able to continue using Arvin Kam even when doing so supported the insurgency.  As the government

---

[280] Gen. James N. Mattis, *FY2012 National Defense Authorization Act, § 841 Notification* (July 24, 2012); Kerment L. Goss, *Contract No. W5J9JE-10-D-0007, Task Orders 0003, 0006, 0007 and 0009, Afghanistan – Cure Notice* (Aug. 16, 2012).

[281] ECC's Motion for Summary Judgment at 8-9, *Arvin Kam Constr. Co. v. ECC*, No. 16-cv-02643-JD (N.D. Cal. filed Aug. 24, 2018), Dkt. 37.

[282] Respondent's Cross Motion for Summary Judgment at 9, *Appeal of ECCI-Metag, JV*, ASBCA, No. 59031 (filed Oct. 6, 2014).

[283] Appellant's Motion for Summary Judgment at 7, *Appeal of ECCI-Metag, JV*, ASBCA No. 59031 (undated).

stated, "ECCI's argument [was] apparently that even though Arvin Kam was committing treason, the Contracting Officer had no authority to force ECCI to terminate Arvin Kam."[284]

227.    After belatedly terminating Arvin Kam, ECC agreed to "settle" with its subcontractor by paying it $1.5 million.  ECC agreed to make that payment (and did make it, according to Arvin Kam) *after* it knew CENTCOM had determined that Arvin Kam was "actively supporting" the insurgency.  ECC did so despite acknowledging that "contracting with Arvin Kam is illegal pursuant to § 841 NDAA legislation.  Indeed, the current and past versions of § 841 are found under Subtitle E which is captioned 'Never Contract With the Enemy,' and § 841 itself i[s] titled 'PROHIBITION ON PROVIDING FUNDS TO THE ENEMY.' "[285] Nonetheless, in its claims against the government, ECC sought reimbursement for more than $3.1 million in costs it had incurred by terminating Arvin Kam.

228.    In moving for summary judgment on ECC's administrative claims, the government described what ECC had done:

> ***ECCI employed Arvin Kam which, it turned out, was engaged in supporting the insurgency***, a violation of the laws of Afghanistan.  ***ECCI was the party to the Contract responsible for ensuring that its own subcontractors did not violate the laws of Afghanistan***, not Respondent.  It was ECCI's failure to fulfill this provision of the Contract that led to the need to terminate Arvin Kam.  Arvin Kam's termination was not caused by any failure on the part of Respondent; instead, it was necessitated entirely by ECCI's failure to ensure that its subcontractor was not violating the laws of Afghanistan.  In bringing this action, ***ECCI is attempting to shift the consequences of its own action, in hiring a subcontractor who was supporting the insurgency***, to Respondent.  Those consequences rightly should be borne by ECCI, as the party at fault.[286]

---

[284] Respondent's Cross Motion for Summary Judgment at 9, *Appeal of ECCI-Metag, JV*, ASBCA No. 59031 (filed Oct. 6, 2014).

[285] ECC's Motion for Summary Judgment at 15, *Arvin Kam Constr. Co. v. ECC*, No. 16-cv-02643-JD (N.D. Cal. filed Aug. 24, 2018), Dkt. 37.

[286] Respondent's Cross Motion for Summary Judgment at 10, *Appeal of ECCI-Metag, JV*, ASBCA No. 59031 (filed Oct. 6, 2014) (emphasis added).

After the Armed Services Board of Contract Appeals denied both parties' cross-motions for summary judgment, they reached a confidential settlement.

### D.     The EOD Technology Defendant

229.     Defendant Janus Global Operations LLC is the successor to EOD Technology, Inc. ("EODT").  EODT specialized in explosive-ordnance disposal but also provided a variety of other private-security services in Afghanistan.  EODT paid protection money to the Taliban in connection with several contracts in Afghanistan from at least 2008 until 2016.

230.     EODT executed multiple security contracts in Afghanistan during the relevant timeframe.  Those contracts include, but are not limited to:

a.     2008 Adraskan Training Center Contract:  On January 5, 2008, via Contract No. W91B4M-08-C-0014, the U.S. Army awarded EODT a contract to provide security in and around the Adraskan National Training Center, near Shindand. The Army paid EODT nearly $7 million under the contract.

b.     2009 Task Force Duke Contract:  In or about June 2009, the U.S. military awarded EODT a multiple-task-order contract, worth a total of $99.9 million, to provide security services in the Task Force Duke area of operations in northeastern Afghanistan.

c.     2010 USAESCH Mine Clearance Contract:  In or about February 1, 2010, the U.S. Army Engineering and Support Center, Huntsville ("USAESCH") awarded EODT a $60 million security contract to provide mine-clearance services throughout Afghanistan.

d.     2010 Kabul Embassy Contract:  In or about October 2010, the U.S. State Department awarded EODT a $274 million contract to provide security services in and around the U.S. Embassy in Kabul.  EODT obtained that contract after the U.S. State Department fired ArmorGroup.  The U.S. State Department fired EODT from that same contract in March 2011.

e.     2011 UAE Kandahar Contract:  In or about December 2011, the United Arab Emirates ("UAE") awarded EODT a contract to provide mine-action services in Kandahar Province.  The contract was worth more than $25 million.

f.     2014 Environmental Remediation Contract:  In or about November 2014, pursuant to Task Order 14 in connection with Contract No. W912DY10D0016, the U.S. Army hired EODT to perform environmental remediation services

throughout Afghanistan.  The contract was valued at roughly $32 million and called for performance through 2022.

231.    From at least 2008 through 2016, EODT maintained a general policy of paying the Taliban to protect the projects they implemented in Taliban-controlled or -influenced regions. That policy applied to each of the contracts EODT implemented in Afghanistan.  Some indications of that policy include:

- Industry practice:  According to more than 10 confidential witnesses, including former U.S. government officials, academic and other experts, and industry participants, protection payments to the Taliban were pervasive and routine among U.S. private-security contactors operating in Afghanistan.  EODT's payments alleged below are not mere isolated incidents; they are examples of the industry playbook that was followed almost uniformly by private-security companies operating in Taliban areas of Afghanistan.

- Appeasement of controlling factions:  EODT calibrated its staffing practices to appease the various warlords who controlled the areas in which it operated.  As EODT's Afghanistan Security Manager explained, EODT believed it a "better approach" to security to "assign quotas" to local "warlords" so that each warlord had "fair and equitable quotas" of representation within EODT's guard forces.[287]  In Taliban-controlled areas, this technique was a well-worn way of delivering money to the Taliban for protection.  *See supra* Part II.B.

- Indifference toward guard origin:  EODT also manifested a willingness to pay whichever guards would most effectively protect its projects, no matter their origin or affiliation.  EODT declined to disclose one Taliban cutout from whom it sourced guards to the U.S. military because the situation "was what it was.  They were our neighbors.  The village borders the facility and they were going to be an entity we had to contend with no matter what."[288]  That philosophy, when applied to work performed in Taliban areas, led EODT to pay the Taliban for security – under the theory that EODT would have had to "contend with" the Taliban "no matter what."  *See supra* Part II.B.

- USPI experience:  EODT's Deputy Country Manager came from USPI and exported USPI's security practices to EODT.  On at least two occasions, EODT relied on the Deputy Country Manager's preferences – based on his experience with USPI – to source its security guards.[289]  USPI was a criminal-run security firm notorious for effecting protection payments to the Taliban on behalf of clients like Defendants LBG, DAI, and Chemonics.  *See infra* ¶¶ 255-263.  EODT's use of a former USPI official to bring USPI's practices to EODT is another strong indication of its general policy of making protection payments.

---

[287] Senate Armed Services Committee interview of EODT Afghanistan Security Manager at 54 (Nov. 24, 2009).

[288] *Id.*

[289] *See Senate Contractors Report* at 41-42, 47.

- Operational geography:  EODT also operated extensively in areas of especially strong Taliban control, including in Kandahar (for the UAE contract), and Kunar, Nangahar, Laghman, and Nuristan Provinces (for the Task Force Duke contract).  Protection payments by security companies operating in those provinces were the norm, and EODT's work in those regions is indicative of protection payments.

232.    EODT's payments were consistent with private-security contractors' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage.  *See supra* ¶¶ 63, 72-94.  In following that standard practice, EODT made payments that were, on information and belief, worth at least 20 to 40 percent of its contracts' value.  *See supra* ¶ 92.  As a result, across its contracts, EODT made payments to the Taliban worth at least several million dollars.

233.    In an interview with Senate staff, EODT's Deputy Country Manager all but admitted that EODT facilitated the payment of protection money.  Asked about EODT's practice of sourcing guards in deference to "tribal sensitivities," the Deputy Country Manager stated, "In the scope of Afghanistan, there's a lot of tribal lines, commander lines.  And those lines – you're not supposed to cross them, okay?"  EODT's logic in navigating those issues was simple:  it "need[ed] the cooperation of all of [the commanders] to make sure that you don't cross a tribal line or you don't cross a commander line and step on their toes, which could be detrimental for [] well-being.  You know, I mean, if you're going to travel, you need to be safe."[290]  EODT's solution was to purchase security from the local "commanders" from whom it "need[ed] to be safe."  In Taliban areas, that meant EODT was making payments to the Taliban.

234.    When EODT operated in areas controlled by Taliban commanders, its philosophy of securing the "cooperation of all of them" and avoiding "step[ping] on their toes" meant that

---

[290] *Id.* at 39.

EODT paid protection money to the insurgents – either by making cash payoffs to insurgents or by placing Taliban fighters directly on EODT's payroll.  *See supra* Part II.B.  In all cases, EODT knew (or recklessly disregarded) that its money was funding attacks on U.S. personnel in Afghanistan.  *See supra* Part III.A-B.

235.    In early 2008, shortly after obtaining the Adraskan Training Center Contract, EODT turned to a man named "General Wahab" to source guards for its 350-person private security force.  General Wahab was not part of the Afghan military, but derived his name from his tenure as a former mujahedeen commander fighting against the Soviets.  General Wahab commanded 300 fighters near Shindand and answered directly to the leader of a local Taliban chapter called the "Jihadi Order Regiment of Herat."  An Army contracting officer characterized General Wahab as follows:  "If Afghan[s] – and they do – if they have a mafia, he's part of their mafia. . . .  [H]e's like the Godfather.  He would have a piece of everything. Almost every contract that was run north of Adraskan."[291]  General Wahab was "influential in getting people contracts," the officer continued, "but he would also expect kickbacks."[292]

236.    EODT discovered General Wahab through its Deputy Country Manager, who had previously worked for USPI.  EODT's rationale for using General Wahab reflected the classic motivation for paying protection money.  As the Deputy Country Manager explained:  "Now, if [Wahab is] mad at me, or upset with me, you know, the – I'm not saying that he would have ambushed us, but the potential for something happening on the road, without his protection, certainly has increased."[293]  That led EODT to pay General Wahab – both to source guards and to supply them with weapons – despite his role in a local insurgent militia.  Indeed, when an

---

[291] *Id.* at 50.

[292] *Id.*

[293] *Id.* at 42.

EODT employee asked U.S. military representatives about General Wahab, EODT received a "spew of how Wahab was such a bad guy."[294]  The EODT employee then reported to his boss that "the Army hates General Wahab."[295]  EODT chose to pay him anyway.

237.     General Wahab was widely known in Afghanistan as having been "a loyal Taliban commander."[296]  In or about 2005, he shifted to maintaining a private militia that he offered to U.S. companies, including USPI and EODT.  But that shift did not sever his ties with the Taliban.  On the contrary:  "General Wahab's relationship with USPI was mired by . . . claims that some of [his] guards had known ties with the Taliban."[297]

238.     General Wahab provided Taliban guards to EODT.  In fact, many of the guards whom EODT sourced through General Wahab came from ArmorGroup.  Several were fighters who reported to Mr. Pink, the "mid-level Taliban manager" who had murdered Mr. White and had taken refuge in a Taliban stronghold.  *See supra* ¶ 150.  Almost immediately after ArmorGroup belatedly fired Mr. Pink's men – for having passed sensitive security information to Mr. Pink – EODT hired them.  By the time EODT hired Mr. Pink's fighters, Mr. Pink had "gone to the dark side (is in full league with the Taliban)" and had been "promoted to Mulla" by Taliban leadership.[298]  Mr. Pink's fighters both supplied Mr. Pink with money and "provid[ed] sensitive security information" to him.[299]  EODT hired them anyway.

---

[294] *Id.* at 49.

[295] *Id.*

[296] George C. Lovewine, *Outsourcing The Global War On Terrorism:  Private Military Companies and American Intervention In Iraq and Afghanistan* 42 (Palgrave Macmillan 2014).

[297] *Id.*

[298] *Senate Contractors Report* at 19.

[299] *Id.* at iv.

239.    When EODT hired Mr. Pink's fighters, it knew it was financially supporting the Taliban.  EODT knew that "Shindand had been infested by Taliban," and its Country Security Manager "didn't have a good feeling about recruiting out of the South."[300]  EODT also claimed that it conducted "rigorous" vetting on its guards – because EODT knew the importance of "sound vetting and screening" – and so discovered its security guards' ties to the Taliban.[301] Despite EODT's asserted vetting, it chose to hire guards from an area it knew was "infested by Taliban" and to pay off the openly Taliban-aligned fighters ArmorGroup had just fired.

240.    In hiring Mr. Pink's Taliban fighters, EODT "maintained an informal liaison with ArmorGroup's Senior Team Leader at Shindand."[302]  But EODT claimed to the Senate Armed Services Committee that it had declined to contact ArmorGroup about Mr. Pink's fired Taliban fighters that EODT then retained.[303]  EODT justified that decision by appealing to the competitive business environment, claiming, "Every company is bidding on the same contract, and they're – not everybody is inclined to help each other out."[304]  At the same time, however, EODT asserted that it had conducted background checks on Mr. Pink's men.[305]  Given the surrounding circumstances, EODT knew (or recklessly disregarded) that Mr. Pink's men were Taliban members.  The decision to avoid asking ArmorGroup about its belated firing of Mr. Pink's fighters reflected a conscious desire to avoid documenting that fact.

---

[300] *Id.* at 45.

[301] EODT, *Volume I:  Technical Proposal, Adraskan National Training Center (NTC) Security, Herat, Afghanistan* at 22-24 (Nov. 2007).

[302] *Senate Contractors Report* at 45.

[303] *Id.*

[304] *Id.* at 46.

[305] *Id.* at 49.

241.    EODT also sourced security guards from a second known Taliban cutout named Haji Dawoud.  EODT paid Dawoud even though U.S. military reporting in the area, based on the type of information available to EODT, identified him as a Taliban member collaborating with Mullah Sadeq – the Taliban regional commander and target of the famous August 21, 2008 U.S. military raid in Azizabad.  A military-intelligence report "identified Dawoud as one of the village's Taliban and said he was responsible for the kidnapping of an Afghan National Directorate of Security officer and his son twenty days earlier."[306]  An ArmorGroup security report (based on the type of information also available to EODT) likewise described Dawoud as the "main influence" at a "high profile [Taliban] meeting" who had been "responsible for the recent kidnappings" in the area.[307]  Despite – or more likely because of – those indications of Haji Dawoud's Taliban affiliations, EODT chose to hire and pay him for security.

242.    EODT also sourced security guards from a third insurgent named Mirza Khan, whom EODT called "Commander Blue."  As with General Wahab, EODT hired Commander Blue based on its Deputy Country Manager's experience with him at USPI.  According to U.S. military reporting, Commander Blue was a former police officer who worked with the Iranian Revolutionary Guard Corps' Qods Force.[308]  On information and belief, Commander Blue was a Qods Force asset who assisted the Iranian government in facilitating Taliban attacks.  The Qods Force is a designated Foreign Terrorist Organization ("FTO") that has long instigated anti-American terrorism on behalf of the Iranian regime.[309]  At all relevant times, the Qods Force "provide[d] material support to terrorist or militant groups such as . . . the Taliban" as part of its

---

[306] *Id.* at 47.

[307] *Id.* at 46.

[308] *See id.* at 48.

[309] *See* Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

strategy to "undermin[e] U.S. and [NATO] objectives by fomenting violence" in Afghanistan.[310]

Yet despite Commander Blue's relationship with the Qods Force, EODT purposefully "knew

little about whom [he] was interacting with," because EODT believed that an investigation

would have "blow[n] his cover."[311]  On information and belief, EODT's security guards sourced

from Commander Blue were local Taliban who had relationships with Commander Blue.

EODT's willingness to pay a "Commander" whom it recklessly disregarded was a Qods Force

asset accorded with its broader strategy of buying security from insurgent-affiliated warlords.

243.    EODT declined to disclose its relationship with Haji Dawoud and Commander

Blue to the U.S. military, and it never solicited the U.S. military's views on whether it should

rely on them.  When confronted with those facts, EODT's Deputy Site Security Manager

"expressed indifference" about the affiliations of its go-betweens, arguing, "We didn't hire . . .

the elders.  I'm not interested in anybody that doesn't work for me."[312]  That philosophy –

refusing to vet or disclose the insurgent "elders" from whom EODT sourced its security guards –

allowed EODT to buy security for its projects by funneling protection money to the Taliban.

E.    **The LBG/BV Defendants**

1.    **The LBG/BV Defendants Made Protection Payments To The Taliban**

244.    The LBG/BV Defendants consist of several companies that made protection

payments to the Taliban in connection with various projects at least from 2006 until at least

2013.  Defendant Louis Berger Group, Inc. held several government contracts on which it paid

protection money.  Defendant Louis Berger International, Inc. assumed responsibility for LBG's

international operations and liabilities previously held by other LBG affiliates.  The LBG/BV

---

[310] U.S. Dep't of Def., *Annual Report on Military Power of Iran* at 3 (Apr. 2012).

[311] *Senate Contractors Report* at 48.

[312] *Id*. at 50-51.

Joint Venture was a joint venture of Louis Berger Group, Inc. and Black & Veatch Special

Projects Corporation, which itself held several government contracts on which it paid protection

money.  As joint venturers, the LBG Defendants and Black & Veatch are jointly and severally

liable for the tortious conduct of their Joint Venture.

245.    Through June 2013, the LBG/BV Joint Venture was the single largest USAID

contractor in Afghanistan, with total contract obligations valued at $1.05 billion.  LBG by itself –

leaving aside its interest in the joint venture – was the fourth largest USAID contractor in

Afghanistan, with contract obligations valued at $699 million.  Black & Veatch, for its part, was

the seventh largest contractor, with contract obligations valued at $230 million.

246.    The LBG/BV Defendants managed their contracts out of their Washington, D.C.

offices and made regular communications between their Washington, D.C. offices and USAID's

Washington, D.C. offices.  Ultimate decision-making authority over the contracts, including over

whether and how to pay protection money, rested with personnel in Washington, D.C.

247.    The LBG/BV Defendants executed multiple government contracts in Afghanistan

during the relevant timeframe.  Those contracts include, but are not limited to:

    **a.**    <u>USAID REFS Program</u>:  In September 2002, USAID awarded LBG Contract No. 306-C-00-02-00500-00 under its Rehabilitation of Economic Facilities and Services ("REFS") program.  The REFS program award was a multiple-task-order contract that covered work on a variety of projects, which were governed by individual task orders.  The contract originally contemplated $155 million of work through December 31, 2005, but as of 2007, its completion date was extended to June 30, 2007 and its estimated cost had ballooned to $730 million.

    **b.**    <u>USAID AIRP</u>:  In August 2006, USAID awarded the LBG/JV Joint Venture Contract No. 306-I-00-06-00517-00 under its Afghanistan Infrastructure and Reconstruction Program ("AIRP").  The AIRP award was a multiple-task-order contract that covered work on a variety of projects, which were governed by individual task orders.  Many of the AIRP task orders called for continuing work on the same projects that had been funded by the REFS program.  The USAID AIRP award to the Joint Venture was worth $1.4 billion.

    **c.**    <u>Individual Task Orders</u>:  Individual task orders issued under these two contracts included, but were not limited to:

- **Ring Road** – **REFS:**  LBG received a task order under the REFS contract to construct portions of the Ring Road between Kabul, Kandahar, and Herat.

- **Kajaki Dam** – **REFS:**  LBG received a task order under the REFS contract to rebuild parts of the Kajaki Dam hydropower plant in Helmand Province.

- **Schools and Clinics – REFS:**  LBG received a task order under the REFS contract to build schools and clinics throughout Afghanistan.

- **Ring Road** – **AIRP:**  The LBG/BV Joint Venture received task orders under the AIRP contract to manage construction of new roads throughout Afghanistan, including the 101-km Gardez-Khost Highway, the 103-km Keshim-Faizabad Road, and the Southern Strategy Road in Kandahar Province.

- **Kajaki Dam** – **AIRP:**  The LBG/BV Joint Venture received a task order under the AIRP contract to refurbish a hydroelectric turbine at the Kajaki Dam.

- **Kabul Power Plant** – **AIRP:**  The LBG/BV Joint Venture received at least two task orders under the AIRP contract to perform construction and rehabilitation work at the Kabul Power Plant.

    **d.**    <u>USAID Kandahar Power Initiative / Kandahar Helmand Power Project</u>:  In December 2010, after USAID terminated LBG's work on the Kajaki Dam, USAID awarded Black & Veatch Special Projects Corporation Contract No. 306-C-00-11-00506 to perform a variety of energy-related projects in Helmand, including continuing work on the Kajaki Dam.  The contract as awarded called for $266 million of work but was later reduced to $229 million.

248.    From at least 2006 through 2014, the LBG/BV Defendants maintained a general

policy of paying the Taliban to secure their projects in Taliban-controlled or -influenced regions.

That policy applied to each of the contracts the LBG/BV Defendants implemented in

Afghanistan.  Some indications of that general policy include:

- <u>Industry practice</u>:  According to more than 10 confidential witnesses, including former U.S. government officials, academic and other experts, and industry participants, protection payments to the Taliban were pervasive and routine among USAID contractors operating in Afghanistan.  The LBG/BV Defendants' payments alleged below are not mere isolated incidents; they are examples of the industry playbook that was almost uniformly followed by American development companies operating in Taliban areas of Afghanistan.

- <u>Office discussions</u>:  In or about 2010, employees at the Joint Venture's Kabul offices frequently discussed protection payments to the Taliban.  The prevailing understanding among many employees was that LBG, Black & Veatch, and the Joint Venture paid the Taliban – either directly or through subcontractors – to secure their projects in Taliban-

controlled areas.  Those discussions occurred in hushed tones and were rarely out in the open; management avoided documenting the practice in official meetings.  But the dominant view, expressed by multiple Joint Venture employees, was that LBG, Black & Veatch, and the Joint Venture had to pay the Taliban to proceed with their work in unstable areas.

- Contracting partner interactions:  LBG and Joint Venture personnel interacted with other contracting partners on their projects, including the United Nations Office for Project Services ("UNOPS"), and those interactions manifested the LBG/BV Defendants' belief that payments to insurgents were an ordinary and necessary part of operating in areas of Taliban control.  That understanding was specifically conveyed by (among others) LBG's Chief of Party, Deputy Chief of Party, and Director of Administration – all of whom had significant managerial roles in implementing the Joint Venture's projects.

- Security subcontractor usage:  LBG and Joint Venture personnel regularly met with their security subcontractors, including USPI, to convey the message that they expected the security personnel to make payments as necessary to allow their projects to go forward in unstable areas.  That policy, passed down from LBG and Joint Venture management, led the security subcontractors to make monthly payments on the LBG/BV Defendants' behalf.  These security subcontractor payments typically amounted to between $15,000 and $20,000 per month to each local Taliban commander with leverage over the Joint Venture's projects.  On many occasions, subcontractors notified the LBG/BV Defendants about the existence of those payments.

- Lack of financial controls:  LBG and the Joint Venture purposefully maintained a system of deficient internal controls that enabled them to mask payments to insurgents (and other illegal payoffs) and conceal them from USAID.  The accounting techniques the Joint Venture employed were designed to prevent outside auditors from tracking its expenditures, and they permitted the Joint Venture's subcontractors to make protection payments with little accountability.  On several occasions, senior LBG accountants in Kabul raised objections (both orally and in writing) about the consequences of the Joint Venture's deficient accounting processes.  They were ignored and pushed out.

249.    The LBG/BV Defendants' payments were consistent with USAID implementers' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage.  *See supra* ¶¶ 63, 72-94.  That practice was especially prevalent among the largest development contractors in Afghanistan:  the biggest contractors faced the highest security risks, and the highest profit incentives, which motivated them to buy off the Taliban almost universally.  In following that standard practice, the LBG/BV Defendants made payments that were, on information and belief, worth at least 20 to 40 percent of their contracts' value.  *See*

*supra* ¶ 92.  As a result, across their contracts, the LBG/BV Defendants made payments to the Taliban worth at least several million dollars.

250.    The LBG/BV Defendants financially supported the Taliban both through payments they negotiated themselves and through payments they funneled through their subcontractors.  *See supra* ¶¶ 84-93.  In the latter circumstance, the LBG/BV Defendants actively participated in their subcontractors' conduct by (among other things) approving the charges for the protection payments and authorizing their reimbursement.  *See supra* ¶¶ 95-96.  In all cases, the LBG/BV Defendants knew (or recklessly disregarded) that their money was funding attacks on U.S. personnel in Afghanistan.  *See supra* Part III.A-B.

251.    The LBG/BV Defendants made those payments in violation of a clause in their USAID contracts stating:  "The Contractor is reminded that U.S. Executive Orders and U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism.  It is the legal responsibility of the Contractor to ensure compliance with these Executive Orders and laws.  This provision must be included in all subcontracts/sub-awards issued under this contract."  This provision appeared, for example, in Contract No. 306-C-00-11-00506, issued to Black & Veatch Special Projects Corporation on October 29, 2010.  It also appeared in the subcontract that Louis Berger Group, Inc. entered with USPI on September 2, 2004.

252.    Much of the LBG/BV Defendants' work focused on Afghanistan's Ring Road, which was a two-lane highway encircling the country.  Road-construction projects in Afghanistan have long been attractive targets for insurgents demanding payoffs, and the roads the LBG/BV Defendants built provided the Taliban with a well-known source of protection

money. As Mr. Wissing summarized the evidence, "Afghan road construction became the great American boondoggle – and also an important source of financing for the Taliban."[313]

253. LBG's construction of the Kabul-Kandahar highway, which formed one key part of the Ring Road, provides a case in point. In building that highway, LBG openly worked with local militiamen, including Watan, who were well-known insurgent fundraisers. *See supra* ¶¶ 69-71. Referring to the Watan-sourced anti-Coalition fighters whom LBG agreed to pay, an LBG official described the situation as a "catch-22. 'If you don't pay them off, they kill your security staff and your contractors,' he sa[id]. 'If you do pay them off, it exacerbates the problem for the future.' "[314] LBG repeatedly chose to pay and "exacerbate the problem," strengthening insurgents who were killing American service members and civilians, rather than pursue alternatives that would have kept money out of the hands of the Taliban.

254. From 2003 until at least 2008, LBG relied on USPI as its lead security subcontractor in Afghanistan. Early examples of LBG-USPI subcontracts include subcontract Nos. REFS 03-02-GG451-RD-0010 (executed in June 2003) and REFS 02-04-GG451AF-017 (executed in September 2004). The subcontracts gave LBG express authority to veto USPI's hiring of personnel and to supervise the terms under which USPI entered into further subcontracts. They also made LBG responsible for effecting payment to USPI and approving USPI's bills. LBG was USPI's single most important client.

255. USPI had, in the words of one watchdog group monitoring them, a "spotty reputation in Afghanistan from the beginning."[315] As early as 2005, it was reportedly paying

---

[313] *Funding The Enemy* at 92.

[314] Daniel Schulman, *The Cowboys Of Kabul*, Mother Jones (July 27, 2009) ("*The Cowboys Of Kabul*"), https://www.motherjones.com/politics/2009/07/cowboys-of-kabul/.

[315] Fariba Nawa, *Afghanistan, Inc.: A CorpWatch Investigative Report* at 15 (Oct. 6, 2006) ("*Afghanistan, Inc.*").

high "wages" to local warlords "without imposing any apparent accountability on them."[316]  It also "routinely collaborate[d] with local militia commanders" and did not deny doing so when interviewed about it.[317]  For that reason, reports circulated in 2006 that USPI's "deliberate use of warlords and militias" had "fuel[ed] a Taliban-led insurgency that continues to gain power."[318]  LBG was aware of such criticisms of USPI's practices but resisted terminating its subcontractor, noting concerns in an internal memorandum about "cutting off the warlords that USPI was dealing with." [319]  As LBG's Deputy Chief of Party put it, " 'Considering the probable flow of the money, it would be a security risk to the project . . . if they did anything that disrupted that flow of money[.]' "[320]  At least one security expert who worked directly with LBG's Deputy Chief of Party on the Ring Road project concluded that the Deputy Chief of Party knew of and approved USPI's policy of making protection payments to Taliban insurgents.

256.    USPI regularly made protection payments on LBG's behalf to secure projects implemented under the USAID's REFS program.  USPI negotiated those payments with local Taliban commanders or governors and paid the agreed-upon money (reimbursed by LBG) to discourage the Taliban from attacking LBG's projects.  USPI made the payments on a monthly basis, and the standard percentages ranged from 10-20% of the value of the contracts being secured.  USPI did not make these payments solely on LBG's behalf; it often made lump-sum protection payments to secure all of its clients' projects.  But LBG was USPI's most important,

---

[316] International Crisis Group, *Afghanistan: Getting Disarmament Back On Track* at 1, Asia Briefing N˚35 (Feb. 23, 2005).

[317] *Afghanistan, Inc.* at 16; *see id.* at 17 ("Bill Dupre, the operations manager at the firm in Kabul, did not deny that USPI worked with commanders.").

[318] *Afghanistan, Inc.* at 29.

[319] *The Cowboys Of Kabul*.

[320] *Id.*

highest-dollar client, and a substantial portion of USPI's payments consisted of LBG's money and were made on LBG's behalf.  USPI delivered these payments in cash – which it obtained from LBG – and routed them to the Taliban through the Afghan *hawala* system.

257.    On one occasion, in or about 2007, a USPI employee working for LBG was driving in a car when he received a call from a construction subcontractor the Joint Venture had hired to build part of a road in Kandahar under the AIRP contract.  The subcontractor warned that the Taliban had just fired an RPG at an LBG construction site near Maiwand.  The USPI employee called the local Taliban commander and asked why the project site was attacked.  The Taliban commander responded, in substance:  "It was just a reminder.  You owe us for the next month."  The USPI employee responded by calling a *hawala* broker and making a payment.

258.    In September 2008, the U.S. Department of Justice indicted USPI and its senior management for fraud.[321]  The indictment alleged that USPI had, from 2005-2007, systematically inflated its charged expenses under its LBG-USAID subcontracts in Afghanistan.  Under that scheme, USPI billed USAID (through LBG) for a significant number of fictitious costs, including inflated fuel purchases and salaries for "ghost" security guards who did not exist.  On September 9, 2009, USPI's co-founders pleaded guilty and admitted that the facts alleged in the indictment were true.[322]  Shortly thereafter, USAID debarred USPI (and its two co-founders) and prohibited it (and them) from participating in any additional USAID contracts.  Although LBG was not indicted as part of that case, LBG's senior employees were already aware that USPI had been including fictitious costs, including "ghost" worker salaries, on its invoices.

---

[321] *See* Indictment, *United States v. United States Protection & Investigations, LLC*, No. 08-cr-00306-RMC-1 (D.D.C. filed Sept. 30, 2008), Dkt. 3.

[322] *See, e.g.*, Plea Agreement, *United States v. Spier*, No. 08-cr-00306-RMC-2 (D.D.C. filed Sept. 9, 2009), Dkt. 76.

259.     As late as November 2008 – after USPI had been indicted for defrauding the government – LBG was still using USPI to provide security services in connection with LBG's government contracts.  Then, after USAID finally debarred USPI in 2009 because its executives had pleaded guilty to fraud, USPI's founders started a new security company re-branded as "Servcor."  The re-brand was publicly reported in 2009.[323]  Servcor continued to work on LBG's projects for USAID – this time as a second-level subcontractor – even though LBG knew that the people controlling it had been debarred and convicted of fraud.  That arrangement lasted until 2012, when USAID discovered it and debarred Servcor too.  During this time, many of the same USPI employees, now working for Servcor, continued to make protection payments to the Taliban on behalf of LBG and the LBG/BV Joint Venture.

260.     USPI effectuated its protection payments using the same accounting techniques it used to defraud USAID.  USPI often claimed that the protection payments were for "security," and it invented fictitious guards to whom it was supposedly paying cash "salaries."  Those so-called salary payments – which corresponded to no legitimate expense – created a slush fund that USPI could use for extra-legal purposes.  LBG knowingly supplied the money for the slush fund and in turn obtained reimbursement from USAID for the costs involved.  USPI's founders have admitted that they used some of the resulting slush fund to enrich themselves personally.  But they also used the same slush fund to make *hawala* protection payments to the Taliban.

261.     USPI's former assistant security coordinator, who worked directly with LBG engineers on the REFS program in Helmand, expressly connected USPI's fraud with protection payments to the Taliban.  He testified that, when he was at USPI in 2007, he learned that "the

---

[323] *See* Daniel Schulman, *Cowboys Of Kabul Plead Guilty, But The Ride Ain't Over*, Mother Jones (Sept. 16, 2009).

company I was working for was defrauding the U.S. government to pay the Taliban" so that the Taliban would in turn refrain from attacking USPI's "convoys."  His testimony matched a description previously provided to the FBI by a USPI whistleblower.  As summarized in a Memorandum of Interview with a Confidential Source, the USPI whistleblower "decided to leave [USPI] because [USPI Country Operations Manager Bill] Dupre told him that USPI was using the money . . . to pay the 'bad guys' . . . by 'bad guys' Dupre meant the Taliban."

262.    The LBG/BV Defendants knew (or recklessly disregarded) that USPI – like many of its other subcontractors – paid protection money on their behalf.  Their subcontractors regularly informed LBG at in-person meetings, held either in the Kabul office or the local project offices in Taliban strongholds like Kandahar, that the Taliban was demanding money as the price of allowing projects to move forward.  LBG's response, in sum and substance, was "that's your problem."  LBG (on behalf of the Joint Venture) conveyed to its subcontractors that they should pay the money if necessary, but that LBG "didn't want to know" the details and that any payments should be classified as legitimate security expenses.  The message was clear:  LBG did not want to receive separate bills from its subcontractors for protection payments, to which USAID would object; it wanted the payments lumped in with other, more legitimate expenses.

263.    LBG and USPI both effectively admitted this practice.  One LBG project manager acknowledged being "aware of the Taliban pressure on his local contractors" and of the financial conditions the Taliban placed on LBG's projects.[324]  After comparing the Taliban's protection rackets to those run by the Mafia, he opined:  " 'They're not all bad. . . .  [I]f they're not disrupting my project, they are moderate Talibs.' "[325]  As for USPI, its former security

---

[324] *Insurgents Play A Perilous Mountain Game*.

[325] *Id.*

coordinator conceded that some of its guards " 'were ex-Taliban, or even current Taliban, but the fact that they weren't attacking us along the way – whatever worked for us worked.' "[326]

264.    In June 2007, LBG's Chief of Party wrote a letter to USPI's CEO describing LBG's and USPI's close relationship in Afghanistan.  The letter stated:

> If there are awards for security firms providing such services, then USPI should have won them all from 2003 to 2007.  Your story is as important and as worthy as the LBG engineering story.  You and your firm were our project armor and our project shield for four years.  Not only could we not have functioned without this protection, we could not have delivered the benefits we did without you.  ***USPI was not just a sub-contractor, USPI was our integral girded partner and the success of the project is as attributable to USPI as it was to LBG***.[327]

LBG's Chief of Party concluded by telling USPI's CEO that "I would not want to do my job without you," and called it "one of the greatest pleasures in my life to serve with you."[328]  Fifteen months later, the letter's recipient was indicted for fraud.  A year after that, he pleaded guilty.

265.    The LBG/BV Defendants' payments were not limited to those effectuated by USPI.  In or about 2010, the Joint Venture "lost" about $250,000 in an incident that triggered a USAID investigation.  The Joint Venture's Director of Operations in Kabul had given roughly $250,000 in cash to a Joint Venture employee to take out into the provinces – ostensibly to meet payroll – but the employee disappeared with the money.  In the wake of that incident, one HR employee initially tasked with looking into the issue was instructed not to write a memo documenting any findings.  The Joint Venture settled administratively with USAID, and part of the settlement's terms required the Joint Venture to hire a CPA to review and clean up its books.

---

[326] *The Cowboys Of Kabul*.

[327] Ltr. from M. McGovern to D. Spier, *Your Performance & Service To The USAID Funded Rehabilitation Of Economics Facilities & Services (REFS) Project, 2003-2007* (June 30, 2007).

[328] *Id.*

266.     It did not take long for this internal auditor to confirm that the Joint Venture's accounting processes were actively obfuscating where its money was going.  In the auditor's view, the Joint Venture's accounting processes were not even close to complying with accepted accounting standards, let alone with the USAID contract.  Missing or forged invoices, unexplained expenditures, "ghost" workers, and duplicate charges were just a few of the problems the auditor surfaced.  The auditor issued repeated warnings – both orally and in detailed internal emails – about these accounting improprieties.  The auditor's message to Joint Venture management was that the auditor could not verify that the Joint Venture was spending its money on lawful purposes.  During the same conversations, the auditor asked repeatedly who was actually receiving the money that the Joint Venture was spending.  The Kabul management team mostly dismissed those questions and refused to put in place additional controls.

267.     Around the same time, protection payments were a frequent subject of discussion at the Joint Venture offices in Kabul, with several employees expressing concern that the Joint Venture was paying off insurgents.  At least one LBG employee linked those same accounting improprieties (which the auditor had identified) with payments to the Taliban, and that employee raised concerns with LBG senior management.  The Joint Venture took no meaningful action in response.  As a third former employee explained the common thinking, "if you go through [the Taliban's] area, you have to hire them to guard you.  It's the only way it worked.  It's just that we got good at dressing it up and hiding it in a way that SIGAR couldn't find it."

268.     LBG, Black & Veatch, and the Joint Venture all knew that they were funding the Taliban in project areas that touched on Taliban territory.  According to one former high-level Joint Venture employee who personally worked on at least one project implemented in a Taliban-controlled area, "it was accepted wisdom that our money was paying the Taliban – only

the most naïve person wasn't aware of it."  Not only was the Joint Venture aware of the media coverage documenting such payments, but it employed many people with years of on-the-ground experience in Afghanistan who knew that the prevailing industry practice called for protection payments.  The LBG/BV Defendants made those payments because they viewed them as a necessary cost of doing business efficiently.  As the former high-level Joint Venture employee described the thinking, the Joint Venture practiced "willful ignorance" about the details and the consequences of its payments.  The employee explained:  "Yes, I know the money is going to the Taliban, yes I know it's going to come back and bite ISAF and the Coalition and hurt what [they're] trying to do, but it's done – there's no other way to get the roads built."

269.    The Kajaki Dam provides another illustration of the LBG/BV Defendants' protection payments.  From 2006 onward, the Taliban repeatedly threatened the Kajaki Dam with the intent of extracting protection money.  By 2011, "[t]o anyone who lives near the dam or officials who have traveled there, it is clear the Taliban is in control of Kajaki."[329]  As an on-the-ground journalist observed in 2011, any security deal that Black & Veatch or its subcontractors struck to finish the dam "will almost certainly involve massive payments to the insurgents. . . . Any contractor working in the area will be forced to pay some sort of premium for protection, which will likely go to the Taliban.  Otherwise, the work simply will not get done."[330]  The Taliban's control of the area was so total that at times it "control[led] at least a third of the [dam's] output" and "collect[ed] taxes from the people for its use."[331]  The Joint Venture's and

---

[329] Jean MacKenzie, *Watershed Of Waste:  Afghanistan's Kajaki Dam & USAID*, GlobalPost (Oct. 11, 2011).

[330] *Id.*

[331] Megan Rose, *Afghanistan Waste Exhibit A:  Kajaki Dam, More Than $300M Spent & Still Not Done*, Pro Publica (Jan. 19, 2016).

Black & Veatch's policy, when operating in such areas of Taliban control, was to make payments to the Taliban to allow their work to go forward unimpeded.

270.    Other LBG/BV Joint Venture projects were similar.  For example, the Joint Venture operated extensively in the Haqqani-controlled "P2K" (Paktia, Paktika, and Khost) region, where protection payments were the norm.  As a matter of local custom and practice, the Joint Venture and Black & Veatch paid "hefty fees" to the Haqqanis to secure their projects throughout the region.[332]

271.    Specifically, the LBG/BV Joint Venture made documented protection payments to the Haqqani Network in connection with the Gardez-Khost Highway.  That highway, running 101 kilometers from Gardez to Khost in southeastern Afghanistan, traversed the heart of Haqqani-controlled territory.  USAID funded construction of the Gardez-Khost Highway under Task Order 8 to the AIRP contract; the contract called for four phases of work to begin in May 2007 and end by October 2014.  USAID paid the Joint Venture $175 million to perform Phase 1, from May 2007 until March 2012.  By the end of that first phase, USAID lost confidence in the Joint Venture and did not renew its contract to work on the subsequent phases.

272.    The Joint Venture prepared for its work on the Gardez-Khost Highway by brokering a shura with tribal elders in Zadran – the ancestral seat of power for the Haqqani Network, halfway between Gardez and Khost.  The meeting, which occurred in late 2008 or early 2009 and was hosted in a high-school-style auditorium, included Joint Venture personnel, tribal elders, and Taliban fighters.  Shortly before the meeting was set to begin, roughly 100 Taliban fighters entered the room.  One attendee became visibly shaken and whispered to a colleague "these are Taliban, they're going to kill us."  But the Joint Venture representatives

---

[332] *Haqqani Network Financing* at 41-42.

promised the fighters that the project was well-funded and reassured them by stating that the "money and the jobs are going to come to you."  In the view of at least one participant, the Joint Venture that day bought the loyalty of the local Taliban by promising to hire the insurgents.

273.     The LBG/BV Joint Venture thereafter purchased security for the Gardez-Khost Highway by routing protection payments to the Haqqani Network.  Those payments included at least $1 million a year to a Haqqani cutout known as "Mr. Arafat."  According to a contractor who worked on the project, Mr. Arafat's monthly retainer "was grossly inflated above the legitimate costs of security."[333]  Meanwhile, Mr. Arafat's "insurgent connections," the *New York Times* reported, "appear to have been known to virtually everyone."[334]  And several contractors and officials involved believed that a portion of the payments to Mr. Arafat were flowing to the Haqqanis.  Yet the LBG/BV Joint Venture was willing to pay Mr. Arafat because "payoffs to insurgent groups" were "widely accepted in the field as a cost of doing business."[335]  Indeed, an LBG engineer openly worried about what would happen to the lucrative project without Mr. Arafat.  As he told the *New York Times*, "[Arafat is] keeping relative peace, and if he's killed we are worried that there will be infighting and there will be more problems."[336]

274.     The LBG/BV Joint Venture paid Mr. Arafat through another security subcontractor, ISS-Safenet.  The payments were part of a calibrated plan, orchestrated by the Joint Venture and implemented by ISS-Safenet, to reduce security risks by buying good will with the Haqqanis.  ISS-Safenet's security "plan . . . emphasized the criticality of good relations with the local communities," while at the same time acknowledging that "the Haqqani Network[] was

---

[333] *Afghanistan Road Project Marred By Unsavory Alliances*.

[334] *Id.*

[335] *Id.*

[336] *Id.*

particularly well-embedded due to many family ties in villages occupying key terrain."[337]  The

Joint Venture's reference to "good relations" with the Haqqani-controlled community was a

euphemism for ISS-Safenet's payment of protection money to insurgents.

275.    In early 2011, as the *New York Times* was reporting on the LBG/BV Joint

Venture's payments to Mr. Arafat, USAID disqualified him as a subcontractor and rendered him

ineligible to receive any future USAID funds.  Around the same time, Task Force 2010

disqualified another one of the LBG/BV Joint Venture's construction subcontractors based on

"derogatory information," which, according to the *New York Times*, "referred to evidence that

the local construction company had ties to the Haqqani group and was paying it off."[338]

276.    The LBG/BV Joint Venture and its subcontractors followed a common strategy:

they thought it better to pay money to the Haqqani Network than to pay for appropriate security,

enlist the U.S. military's assistance, or face a threat of attack themselves.  Even in public, they

effectively embraced this approach.  A journalist reporting a story for the Indian magazine

*Caravan* noted that, in light of common practice in the region, "it should come as no surprise that

. . . Commander Arafat, who was hired to provide security for the project, ended up being a

conduit for payoffs to the Haqqanis."[339]  When asked about the link, the country manager for a

subcontractor on the project said his company regularly hired security "from local actors they

knew little about.  'We don't get involved in any politics, we just finish the work and move on,'

he said.  'As long as we are safe, we don't care.' "[340]

---

[337] Ltr. from R. Rademeyer, Country Security Manager for the LBG/BV JV, to M. Le Roux, ISS-Safenet JV, *Letter of Commendation for ISS-Safenet* (June 25, 2012).

[338] *Afghanistan Road Project Marred By Unsavory Alliances*.

[339] Matthieu Aikins, *India's $2 Billion Aid Package May Be Feeding The Insurgency As Well*, Caravan Magazine (Sept. 2011), https://marinekslee.tistory.com/m/47.

[340] *Id.*

277.     The LBG/BV Joint Venture also funded the Haqqani Network through another subcontractor, Haji Khalil Zadran Construction Company ("HKZCC").  Together with a company owned by Sirajuddin Haqqani – Sadullah Kahn and Brothers Engineering and Construction Company – HKZCC obtained a $15 million subcontract from the Joint Venture to work on the Gardez-Khost highway.  According to one U.S. government memorandum, both companies were owned by "facilitators and commanders of the Haqqani Network."  Indeed, the ATFC concluded that HKZCC was a front company set up for the express purpose of "funding the Haqqani network."  The LBG/BV Joint Venture nonetheless hired HKZCC – knowing that it was a Haqqani front – to buy protection from Haqqani attacks on the Gardez-Khost highway.

278.     Haqqani officials have corroborated the importance of protection payments like the ones that the LBG/BV Joint Venture made to secure the Gardez-Khost Highway.  In an interview with the *New York Times*, a former Haqqani commander called "extortion 'the most important source of funding for the Haqqanis' " and "point[ed] out that a multiyear road project linking Khost to Gardez in southeastern Afghanistan was rarely attacked by insurgent forces because a Haqqani commander was its paid protector."[341]  He concluded:  "The Haqqanis know that the contractors make thousands and millions of dollars, so these contractors are very good sources of income for them."[342]  And because the LBG/BV Joint Venture was willing to pay, American money meant for development instead financed the Haqqani terrorist enterprise.

279.     In the end, the Joint Venture's protection payments may have bought them relative peace, but they did not deliver a functional road.  The final estimated cost was $176 million – nearly triple the original estimate – which worked out to roughly $2.8 million per mile.

---

[341] *Brutal Haqqani Crime Clan*.

[342] *Id.*

Despite the astronomical cost, the *New York Times* reported in 2011, the "stretch of the highway completed just six months ago is already falling apart."[343]  That result – massive expense, healthy profits for LBG and Black & Veatch, illegal payments to insurgents, and ultimately a non-functional road – was typical of Defendants' work in Afghanistan.  As Mr. Wissing concluded after surveying the greed, corruption, and incompetence that plagued the project from start to finish, the "Gardez-Khost Highway seemed to encompass the whole mess."[344]

2.      The LBG/BV Defendants' Protection Payments Comport With Their Other Conduct In Afghanistan And Similar Markets

280.     The LBG/BV Defendants' protection payments reflected a system of deficient internal controls that also permitted related misconduct.  For example, on November 5, 2010, LBG entered a Deferred Prosecution Agreement in which it admitted to criminally defrauding the U.S. government in connection with its work in Afghanistan.  As LBG admitted, it systematically manipulated its books to inflate the "indirect costs" it sought from USAID for reimbursement.  Because of that conduct, LBG was forced to resolve criminal charges brought by the U.S. Attorney's Office for the District of New Jersey; civil allegations brought by the DOJ's Fraud Section; and administrative claims asserted by USAID.  In connection with that resolution, LBG's Chairman and CEO, CFO, and Controller all pleaded guilty to wire fraud.

281.     In total, LBG paid $69.3 million in criminal and civil penalties to resolve those claims, which represented an "apparent record war-zone settlement."[345]  In announcing the resolution, the U.S. Attorney stated:  "This fraud is about more than playing with the numbers to rip off the government.  Funds that could have raised hope from the rubble instead padded the

---

[343] *Afghanistan Road Project Marred By Unsavory Alliances*.

[344] *Funding The Enemy* at 248.

[345] Marisa Taylor & Warren P. Strobel, *$69.3 Million Afghan-Contracting Fine May Be A Record*, McClatchy Newspapers (D.C.) (Nov. 6, 2010).

129

bottom line.  This criminal conduct sends the wrong message to the world about what we stand

for as a nation."[346]  So did LBG's payments to the insurgents who were killing American troops.

282.    Similarly, from 1998 until 2010, LBG engaged in a scheme to pay bribes to

foreign officials in various countries in the Middle East and Southeast Asia.  In 2015, LBG and

the U.S. Attorney's Office for the District of New Jersey entered another Deferred Prosecution

Agreement in which LBG admitted to having orchestrated that criminal-bribery scheme.  LBG

admitted it made the payments to secure lucrative government contracts and that it orchestrated

ways to "conceal the corrupt payments" through accounting euphemisms like "commitment fee,"

"counterpart per diem," "marketing fee," and "field operation expenses."[347]  To effectuate the

payments, LBG had agents "submit[] inflated and fictitious invoices to generate cash that was

then used later for the payment of bribes through intermediaries."[348]

283.    LBG often structured its corrupt payments to flow through intermediaries with

which it had a subcontracting relationship.  For example, LBG contracted with the Indonesian

government "by interposing a one-man consulting company as the prime contractor in order to

avoid directly paying bribes to foreign officials even though [LBG] was well aware that the

prime contractor was paying bribes."[349]  LBG also often routed corrupt payments through "the

accounts of sub-contractors who had provided no legitimate services."[350]  LBG relied on similar

transaction structures to route its protection payments to the Taliban.  *See supra* ¶¶ 256-264.

---

[346] U.S. Attorney's Office, District of New Jersey, *Scheme To Defraud Government On Reconstruction Contracts Leads To Criminal Charges & Civil Penalties For Louis Berger Group, Inc.* at 2-3 (Nov. 5, 2010).

[347] *LBG FCPA DPA* at Attach. A ¶ 8

[348] *Id.* at Attach. A ¶ 9.

[349] *Id.* at Attach. A ¶ 12.

[350] *Id.* at Attach. A ¶ 11.

284.     In resolving these criminal bribery charges under the Foreign Corrupt Practices Act, LBG paid a $17.1 million criminal penalty.  Two of its Senior Vice Presidents also pleaded guilty to conspiracy and bribery charges.

285.     Black & Veatch also engaged in similar conduct in Afghanistan.  In 2009, a Black & Veatch employee acted as the Country Security Manager for the LBG/BV Joint Venture's projects under the AIRP.  From at least February to May 2009, the Country Security Manager "solicit[ed] kickbacks from private security vendors in return for favorable treatment for those potential bidders in connection with one or more subcontracts to provide private security services to protect USAID personnel and contractors in Afghanistan operating under the AIRP prime contract."[351]  On November 16, 2009, based on that conduct, he pleaded guilty to conspiring to solicit kickbacks.  He was sentenced to nine months' imprisonment.

### F.     The MTN Defendants

286.     The MTN Defendants consist of three companies that each provided material support to the Taliban.  MTN Afghanistan (or its predecessor) has operated cellular towers in Afghanistan continuously since 2006.  MTN Group and MTN Dubai are MTN Afghanistan's parent companies that held themselves out as responsible for MTN Afghanistan's operations.

287.     MTN Afghanistan, as the telephone operating company on the ground in Afghanistan, has provided material support to terrorists by delivering protection payments to the Taliban since 2007, *see infra* Part IV.F.1, and by deactivating its transmission masts at the Taliban's request since at least 2008, *see infra* Part IV.F.2.

---

[351] Statement of Facts ¶ 7, *United States v. Walker*, No. 09-cr-00478-GBL-1 (E.D. Va. filed Nov. 16, 2009), Dkt. 27.

288.    MTN Group oversaw and authorized MTN Afghanistan's practice of providing support to the Taliban.  MTN Group maintained direct contact with the MTN Afghanistan security official responsible for interfacing with the Taliban, and MTN Group officials encouraged and approved MTN Afghanistan's practice of paying off the Taliban.  *See infra* ¶¶ 306, 330-333.  MTN Group also instructed MTN Afghanistan to comply with the Taliban's directives to switch off its transmission masts at night.  *See infra* ¶ 333.  Further, in obtaining financing for MTN Afghanistan's operations, MTN Group assumed responsibility for MTN Afghanistan's conduct, including its interactions with the Taliban.  *See infra* ¶¶ 356, 367.

289.    MTN Dubai was an MTN Group subsidiary and shell company created for financial and tax purposes.  It contained no independent business operations from MTN Group, was run by MTN Group employees, and agreed as part of a U.S.-based financing deal to assume responsibility for MTN Afghanistan's operations – including its interactions with the Taliban. *See infra* ¶¶ 366-67.  Both MTN Group and MTN Dubai also facilitated MTN Afghanistan's conduct by reaching out to Washington, D.C. to conceal MTN's material support for terrorists from its U.S.-based financiers.  *See infra* ¶ 368.

290.    Plaintiffs use the term "MTN" in this section to refer collectively to the MTN family of companies.  Unless otherwise specified, when Plaintiffs use that term to describe MTN's conduct in Afghanistan, "MTN" refers to conduct that was implemented on the ground by MTN Afghanistan and approved by both MTN Group and MTN Dubai.

### 1.      MTN Made Protection Payments To The Taliban

291.    MTN has become one of the world's most valuable telephone companies by "wading into nations dealing with war, sanctions and strife."[352]  Success in unstable markets, including Afghanistan, has yielded profits.  MTN is now, due to this business model, "bigger by some measures than its U.S. counterparts."[353]

292.    MTN followed that model in Afghanistan.  In mid-2006, MTN Group bought Areeba, a Lebanese telephone company that had recently won a license to provide cellular-telephone service in Afghanistan.  MTN entered the Afghan market shortly thereafter and began as the country's third-largest provider (consistent with its status as the third entrant), well behind the two incumbents.  But MTN grew quickly, and by late 2010 it had obtained an estimated 32% market share – the largest of Afghanistan's then-five cellular-phone providers.  As MTN grew, it rebranded Areeba as MTN Afghanistan, and it expanded its geographical footprint throughout the country.  By 2012, MTN had a presence in virtually every province in Afghanistan, including many that were under Taliban control or influence.

293.    While MTN was achieving rapid growth in Afghanistan, the cellular-telephone sector provided a critical source of financing for the Taliban.  As reported by the *Wall Street Journal* in 2010, telephone industry executives themselves "say operators or their contractors routinely disburse protection money to Taliban commanders in dangerous districts.  That's usually in addition to cash that's openly passed to local tribal elders to protect a cell-tower site – cash that often also ends up in Taliban pockets."[354]  "Coalition officers," the article continued,

---

[352] Alexandra Wexler, *Telecom Giant Pushes Into Dangerous Areas*, Wall St. J. (Aug. 10, 2019).

[353] *Id.*

[354] Yaroslav Trofimov, *Cell Carriers Bow To Taliban Threat*, Wall St. J. (Mar. 22, 2010) ("*Cell Carriers Bow To Taliban Threat*").

"confirm that carriers make payments to the Taliban."[355]  Those payments mirrored the

protection money delivered by other Defendants.  As terrorist-financing expert Thomas Ruttig

documented, just as the Taliban raised "taxes" from international contractors doing business in

Afghanistan, so too did it levy similar "taxes" on "the big telecom companies" like MTN.[356]

294.    The logic behind MTN's protection payments partially matched the logic

motivating the other Defendants.  As alleged below, *see infra* Part IV.F.4.a, the MTN Defendants

intended to harm American interests in Afghanistan, and supporting the Taliban allowed them to

do so.  In addition, MTN had economic motivations similar to those of the other Defendants.

Specifically, the Taliban asked MTN to "pay monthly protection fees in each province, or face

having their transmission towers attacked."[357]  The going rate was "usually in the range of

$2,000 per tower, per month, but it depends on who controls the zone around each tower."[358]  In

some areas, MTN made payments to local Taliban commanders in exchange for protection.  In

others – such as Helmand and Kandahar – MTN operated in a Taliban-controlled environment in

which protection "payments must go directly to Quetta."[359]  For example, one company

confirmed to *Deutsche Presse Agentur* that it made $2,000-per-tower monthly payments to the

Taliban.  The company's owner posited:  "You have to do it.  Everybody does."[360]

295.    The Taliban conveyed its protection-money demands to MTN and other large

cellular-phone providers via Night Letters.  Dr. Barnett Rubin, an Afghanistan policy expert,

---

[355] *Id.*

[356] Thomas Ruttig, *The Other Side* at 20, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

[357] *Crime & Insurgency* at 32.

[358] *Id.*

[359] *Id.*; *see id.* (one company admitting it "routinely sen[t] a representative to Pakistan to pay off the Taliban leadership").

[360] *How The Taliban Has Turned Extortion Into A Gold Mine*.

obtained a copy of one such letter in 2008 from an industry source and explained why "[s]etting up a cell phone tower anywhere in Afghanistan requires the consent of whoever 'controls' the territory, or at least has the power to blow [it] up."[361]  As a result, cellular-phone companies in southern Afghanistan – where MTN had a heavy presence – typically believed they "ha[d] to pay the Taliban."[362]  The *Financial Times* likewise reported in 2008 that Taliban commanders in Wardak Province had "sent letters to mobile phone companies demanding 'financial support' in return for operating" in Taliban-run areas.[363]  Those tactics were successful.  One industry source estimated in 2009 that "every single one of the shadow provincial governors set up by the Taliban leadership council receives $50,000 to $60,000 in protection money each month alone from the telecommunications sector, the largest legal growth market in Afghanistan."[364]

296.    The Taliban itself confirmed that practice.  After the *Financial Times* obtained a copy of a Taliban Night Letter demanding protection payments from cellular-phone companies in Wardak Province, the reporter called the telephone number listed as the point of contact in the Taliban's letter.  A "local Taliban official" answered and confirmed that "two companies had responded to their demands" by agreeing to pay.  On information and belief, MTN was one of them.  The Taliban official explained:  "When a company sets up they have to pay tax to the government of Afghanistan. . . .  We are the government here and they must pay tax to us."[365]

---

[361] Barnett Rubin, *Taliban & Telecoms – Secret Negotiations Just Got Easier, And At A Price You Can Afford!* (Mar. 31, 2008), icga.blogspot.com/2008/03/rubin-taliban-and-telecoms-secret.html.

[362] *Id.*

[363] Jon Boone, *Telecom Chief Says Rivals Pay Taliban Protection*, Fin. Times (June 9, 2008) ("*Rivals Pay Taliban Protection*").

[364] *How The Taliban Has Turned Extortion Into A Gold Mine*.

[365] *Rivals Pay Taliban Protection*.

297.    MTN was a particularly aggressive practitioner of protection payments.  Rather than invest in expensive security for its transmission masts, MTN purchased cheaper "security" by buying it from the Taliban.  Indeed, MTN declined to use armed guards to protect its towers.  Without paying for physical security, MTN both had the free cash flow and the incentive to buy peace with the Taliban.  The CEO of one of MTN's largest competitors, Roshan, alleged as much in 2008.  According to an interview the CEO gave to the *Financial Times*, other "phone companies in Afghanistan [were] bowing to criminal and Taliban demands to pay protection money to avoid the destruction of their transmission masts."[366]  In the interview, Roshan's CEO continued:  "I believe the competition is paying money, but we don't do that."[367]  Of Roshan's four largest competitors, three of them denied the accusation on the record.  Only "MTN, the South African based multinational phone company, was not available for comment."[368]

298.    MTN's public statements reflect its practice of paying protection money.  Because MTN paid the Taliban, it was, in its own words, " 'not a target.' "[369]  According to an MTN Afghanistan executive, "it's enough for a driver to show at a Taliban checkpoint a company letter stating that equipment aboard the truck belongs to MTN and not to the U.S. forces."[370]

299.    MTN negotiated its protection payments in direct discussions between MTN Afghanistan's security department and Taliban commanders.  MTN's security department consisted of roughly 600 total staff in Afghanistan, which included both local Afghan employees of MTN Afghanistan and a South African security component from MTN Group.  The security

---

[366] *Id.*

[367] *Id.*

[368] *Id.*

[369] *Cell Carriers Bow To Taliban Threat.*

[370] *Id.*

department consisted of three different layers:  provincial, regional, and a Tactical Operations Center in Kabul.  Security personnel throughout those levels orchestrated pay offs to the Taliban. For example, one high-ranking MTN Afghanistan official conducted at least 38 telephone negotiations (which he recorded) with Taliban officials from 2007-2014, in which he engaged in so-called "security coordination" with the insurgency.  The MTN employees who witnessed those conversations knew they were illegal, so they typically went to the roof of MTN Afghanistan's Kabul headquarters building – where they could maintain absolute privacy – to conduct their Taliban negotiations in secret.  In addition, on at least one occasion, MTN negotiated its payments at an in-person meeting held with Taliban officials near Quetta, Pakistan. MTN employees in Afghanistan understood that those negotiations involved MTN agreeing to make both cash payments and in-kind bribes (including equipment) to the Taliban.

300.    The ATFC gathered evidence from 2008-2012 confirming MTN Afghanistan's practice of paying off the Taliban.  The ATFC generated intelligence products, memorialized in DEA Form 6's and Intelligence Information Reports, describing the common practice among Afghan telecommunications firms of paying the Taliban.  According to the ATFC's evidence, MTN Afghanistan was the worst offender of all the companies.  The ATFC confirmed MTN Afghanistan's frequent insurgent payments both in interviews with MTN employees and in wire intercepts collected by the Afghan government's Sensitive Investigative Unit.  In witness interviews with ATFC investigators, MTN employees admitted that MTN Afghanistan paid insurgents not to threaten its cell towers.  They justified those payments by appealing to MTN's commercial interests:  MTN sources told the ATFC that it was cheaper to pay the Taliban than it would have been to rebuild the towers in the face of Taliban threats.

301.    MTN's practice of making protection payments to the Taliban extended to the Haqqani Network.  From at least 2010 through 2016, MTN operated towers in Haqqani-controlled territory in southeast and eastern Afghanistan, and it purchased security for those towers by paying the Haqqani Network.  The Network's chief financial operative, Nasiruddin Haqqani, oversaw those payments, and they typically occurred on a semi-annual basis.

302.    The U.S. government strongly opposed MTN's practice of paying the Taliban.  ISAF's leadership was aware of cell-phone companies making protection payments to the Taliban and pressured the companies to stop.  On information and belief, the U.S. government exerted that pressure in direct discussions between the U.S. government and MTN, and also through the Afghan Ministry of Communications.  On one occasion, an ISAF commander raised the issue directly with President Karzai.  In such conversations, ISAF's leadership specifically rejected the argument that protection payments represented an acceptable price of MTN maintaining its network in Afghanistan.  ISAF and the Afghan government warned MTN Afghanistan that its business practices were supporting the insurgency and were threatening Coalition forces, and both entities instructed MTN to stop.  MTN refused.

303.    MTN supplied the Taliban with more substantial assistance than its competitors did.  MTN's 2006 entry into Afghanistan set the stage for the Taliban's cellular-tower rackets by adding another participant to the Afghan cellular marketplace.  Until that point, the Taliban's ability to extract money from the two incumbent providers had been limited.  Once MTN emerged in 2006, it became the third cellular company in Afghanistan, which gave the Taliban additional leverage to execute on its protection racket.  That is because, with MTN agreeing to pay the Taliban, the Taliban was free to follow through on its threats against other companies without the risk that doing so would cut off all cellular service in Afghanistan – service on which

the Taliban itself relied.  Indeed, because Taliban fighters commonly preferred to use MTN's

network for their own communications, the Taliban did not want to destroy MTN's network.

304.    A review of available cell-tower attack data supports the same conclusion.

Plaintiffs have analyzed all of the available purported U.S. military Significant Activities reports,

as published online, that describe attacks between 2004 and 2010 against or in the immediate

vicinity of a cellular tower in Afghanistan.  The data shows a clear disparity between MTN and

its two main competitors, Roshan and Afghan Wireless Communication Company ("AWCC").

From 2004 to 2009, AWCC and Roshan suffered at least 6 and 7 attacks on their towers,

respectively, whereas MTN – which did not even pay guards to protect its towers – faced only 1

(non-lethal) attack.  The disparity is consistent with Roshan's accusation that MTN paid

protection money to the Taliban.

305.    That attack disparity existed despite MTN's and Roshan's deployment of

transmission masts at similar times in similar locations.  For example, Roshan's CEO cited to the

*Financial Times* an instance on May 14, 2008, in which the Taliban attacked one of Roshan's

towers in Wardak Province, yet two similar nearby towers (including one belonging to MTN)

were not attacked.[371]  The most likely explanation for the difference is that MTN had paid

protection money, whereas Roshan had not.  Indeed, in 2009, Roshan maintained company rules

that prohibited it from paying protection money to terrorists.  Because Roshan refused to pay, the

Taliban destroyed 18 of Roshan's towers in and around the 2009 Afghan elections.

306.    The senior MTN Afghanistan security official who oversaw many of MTN

Afghanistan's protection payments to the Taliban reported directly to the head of MTN Group's

head of business risk management, in Johannesburg, South Africa.  MTN Group was specifically

---

[371] *Rivals Pay Taliban Protection.*

aware of, and approved, MTN Afghanistan's practice of paying the Taliban for security.  In fact, MTN Group compensated MTN Afghanistan's security team with cash bonuses reflecting its success at resolving "security issues" involving the Taliban.  Those bonuses typically had three levels:  Level 1 ($1,500, for local operatives); Level 2 ($5,000, for regional operatives); and Level 3 ($10,000, for national operatives).  The head of MTN Afghanistan's security group received roughly $66,000 in such bonuses during the relevant timeframe, which specifically compensated him for negotiating with the Taliban successfully.  MTN Group even gave him an award for best "display[ing] the Group's values in MTN Afghanistan."

307.    MTN's overall payments to the Taliban reached tens, if not hundreds, of millions of dollars.  Applying the standard rate of $2,000 per tower per month to MTN's collection of roughly 1,300 towers yields an estimated payment of $2.6 million per month.  At that rate, MTN's payments from 2007 through 2016 well surpassed $100 million.

## 2.    MTN Supported The Taliban By Deactivating Its Cellular Towers At Night

308.    MTN also provided material support to the Taliban by deactivating its cell towers at the Taliban's request.  In or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night.  The Taliban justified that demand by arguing that Coalition forces were "using the cellular networks to track its insurgents throughout the war-torn country."[372]  Coalition forces, a Taliban spokesman stated, were "misusing the cell towers for their intelligence works."[373]  Because the Taliban believed that

---

[372] Paul Vecchiatto, *MTN Concerned By Afghanistan Threats*, ITWeb Cape Town (Feb. 28, 2008) ("*MTN Concerned By Afghanistan Threats*"), https://www.itweb.co.za/ content/dgp45MaYRYZMX9l8.

[373] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

shutting down nighttime service would impede Coalition intelligence efforts, it demanded that the cellular-phone companies deactivate their transmission masts from 5 p.m. until 3 a.m.  Later, the Taliban insisted that the companies keep their masts deactivated until 6:30 a.m.

309.    MTN granted the Taliban's requests.  In early 2008, MTN Group issued a statement that it was "aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas.  We are evaluating the situation and liaising with our executives and the relevant authorities in Afghanistan."[374]  The "executives" apparently decided to accommodate the Taliban's "need" and shut down MTN's transmission masts at night.  MTN and others, the *Wall Street Journal* reported in 2010, "strictly abide[d] by Taliban hours in several provinces, going off air precisely at 5 p.m. and going back on at 6:30 a.m."[375]  And when the Taliban ordered cellular-phone companies in Helmand to "switch off the signal," MTN Afghanistan's head of legal and government affairs told the media: "We decided to obey the orders and we have been shut down since yesterday."[376]  Since 2008, MTN's policy has remained consistent:  it has followed the Taliban's directives and switched off its transmission masts for the Taliban's benefit – typically at night.

310.    MTN shut down its towers for the same reason it paid protection money:  to maintain good relations with the Taliban.  MTN made no effort to hide its motivation in that regard.  When asked about shutting down its network, MTN Afghanistan's head of legal and government affairs explained that the company could not "afford to be seen as siding with the Afghan government against the Taliban . . .  'You should not give a justification to the others

---

[374] *MTN Concerned By Afghanistan Threats.*

[375] *Cell Carriers Bow To Taliban Threat.*

[376] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011).

that you are favoring the government – and you have to prove in words and in deeds that you are neutral.'"[377]

311.    MTN went to great lengths to maintain its "neutrality" and do what the Taliban asked of it.  Even in 2011, after President Karzai issued a decree formally demanding that MTN (and its competitors) reactivate their towers at night, MTN refused the recognized government's directive and continued to follow the Taliban's requests.  One executive summed up MTN's (and others') refusal to follow President Karzai's directive:  "We're not going to turn on our masts and become part of the army of the Afghan government."[378]  By shutting down its towers, MTN decided, it could reduce the risk that the Taliban would threaten MTN's commercial interests.

312.    The ATFC gathered evidence confirming that MTN was switching off its transmission masts at night to comply with Taliban demands.  Based on intelligence reporting, wire intercepts, and interviews with MTN sources, the ATFC concluded that MTN Afghanistan was deactivating its cell towers in coordination with the Taliban.  The justification offered by MTN Afghanistan employees was, again, financial:  turning off the towers helped MTN save money by avoiding the need for MTN to invest in expensive security or to rebuild its towers. The ATFC observed that the security threat MTN faced was not primarily to its employees; it was to equipment that MTN did not want to spend the money to protect or rebuild.

313.    MTN Afghanistan implemented tower shutdowns through a secretive process that originated with its security team.  The head of MTN Afghanistan's security division would negotiate with the Taliban to determine which towers (called "Base Transceiver Stations" by MTN's technical team) to shut down, and at which times.  Then, based on information received

---

[377] *Cell Carriers Bow To Taliban Threat*.

[378] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

from the Taliban, MTN's security team relayed instructions to MTN Afghanistan's technical team directing them to implement the shutdowns.  The instructions pinpointed the particular quadrant(s) within particular MTN towers' coverage areas in which Taliban operatives were located, specifying that MTN should turn off the signal within those quadrants.  That enabled MTN to satisfy the Taliban's demands while also allowing MTN to continue earning revenue from customers in the other quadrants – and also to deceive the government about the extent of its shutdown.  MTN employees further avoided memorializing these instructions over company email or in memos; they instead used phone calls or text messages with the purpose of avoiding a paper trail that would document their cooperation with the Taliban.

314.     At all relevant times, MTN Group was aware of, and approved, MTN Afghanistan's practice of shutting down its towers to comply with the Taliban's requests.  *See supra* ¶¶ 306, 309; *infra* ¶¶ 330-333.  MTN Afghanistan would not have maintained that policy without specific buy-in from MTN Group's senior management in South Africa.

315.     MTN's conduct strengthened the Taliban and undermined U.S. counterinsurgency efforts.  By 2010, the Taliban was "using the cellphone system as an instrument of war against the Afghan government and the U.S.-led coalition."[379]  The insurgents, one Army officer told the *New York Times*, used MTN's cell towers "as a weapons system" against Coalition forces.[380] Indeed, cell phones were crucial to the Taliban – they provided a convenient form of communication and helped insurgents coordinate attacks – but they also came with two major downsides.  First, U.S. intelligence tracked the Taliban's phone signals and used them to locate

---

[379] *Cell Carriers Bow To Taliban Threat*.

[380] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

high-level targets for capture-or-kill missions.  Second, cell phones provided Afghan civilians

with the ability to call Coalition tip lines and provide valuable human intelligence.

316.    Nighttime deactivation was the Taliban's solution to both problems.  U.S. Special

Forces typically execute high-value raids at night, and deactivated cell signals impeded those

missions by making the insurgent targets harder to track.  That was the Taliban's stated rationale

for demanding nighttime signal deactivation:  its spokesman argued that Taliban fighters had

"been increasingly targeted by foreigners recently and we know they are using the services of

these phone companies against us.' "[381]  As another Taliban spokesman explained publicly, the

Taliban viewed the "cutoffs as a line of defense," in which its "'main goal is to degrade the

enemy's capability in tracking down our mujahedeen.'"[382]  Consistent with that statement, *AFP*

reported that "Taliban militants regularly demand that mobile phone companies switch off their

networks at night, fearing that NATO-led forces can track them through phone signals."[383]

317.    Similarly, nighttime deactivation obstructed Coalition efforts to gather human

intelligence.  Cell phones provided a key conduit for Afghan civilians to pass intelligence to

Coalition personnel.  But as the U.S. military director of the Telecommunication Advisory Team

explained, "[i]f the masts are off Afghans can't report anything . . . If you see an insurgent you

can't call the police to say check this out."[384]  And Afghan informants were "usually reluctant to

call in tips during daytime, when they can be spotted by Taliban sympathizers."[385]  Human

---

[381] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011) ("*Taliban Shut Down Cell Phones*").

[382] Alissa J. Rubin, *Taliban Using Modern Means To Add To Sway*, N.Y. Times (Oct. 4, 2011).

[383] *Taliban Shut Down Cell Phones*.

[384] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

[385] *Cell Carriers Bow To Taliban Threat*.

intelligence thus typically flowed to the Coalition at night.  By agreeing to shut down its transmission masts, MTN knowingly deprived Coalition forces of that vital intelligence.

318.    In 2010, *CBS News* reported on this so-called "détente" between the Taliban and large mobile-phone companies, including MTN.  "The phone companies shut down their cell towers at night, preventing local residents from discreetly calling coalition military tip lines.  In exchange, Taliban militants don't target the costly cell towers with explosives."[386]  The trade was a major strategic victory for the Taliban.  As Roshan's COO explained in trying to justify a similar decision:  "We play by their rules; we don't like to play around when people's lives are at stake. . . .  From a political perspective, it's quite a coup for them."[387]

319.    MTN's tower shutdowns substantially contributed to the Taliban's ability to commit the attacks that killed and injured Plaintiffs.  The Taliban targeted its shutdown orders at key districts and provinces with tactical importance for ongoing Taliban operations.  As MTN knew, tower deactivation in those areas impeded Coalition forces from locating Taliban operatives and degraded the Coalition's ability to interdict Taliban ongoing attacks.  Indeed, the U.S. intelligence benefits gleaned from active cell towers were so potent that ISAF often executed operations designed specifically to induce Taliban operatives to use their phones.  By the same token, the operational impact of MTN's tower-shutdown policy was so extreme that ISAF, U.S. Embassy, and Afghan government personnel repeatedly pressured MTN to stop.  ISAF command considered such shutdowns to be a significant threat to U.S. counterinsurgency efforts.  And those shutdowns occurred in the key provinces and districts in which Plaintiffs (or their family members) were operating when they were killed and injured.  By defying the U.S.

---

[386] Alex Sundby, *Afghan Cell Carriers Follow Taliban Rules*, CBS News (Mar. 24, 2010).
[387] *Id.*

government and obeying the Taliban in the contested areas in which the insurgents were fighting Americans, MTN materially supported the Taliban attacks that killed and injured Plaintiffs.

320.    The U.S. government tried to address those problems by encouraging Afghanistan's cellular-phone providers to move their transmission masts onto secure U.S. bases. As the U.S. government explained in proposing the idea, securely located transmission masts would be difficult for the Taliban to attack – and could thus eliminate the putative reason MTN was deactivating its cell towers when the Taliban told it to.  Roshan, according to a purported 2009 U.S. State Department cable (as published online), was "keen to develop this partnership with the USG and sees it as a way to promote mutual security, communications, and commercial strategies for Afghanistan."[388]  MTN, by contrast, refused to participate and declined even to join Roshan and AWCC at the U.S. government-brokered meeting to discuss the idea.

321.    Neither the U.S. government nor the Afghan government ever condoned or conveyed approval of MTN's tower-shutdown policy.  Although news reports on occasion quoted individual Afghan government officials suggesting a resignation to the reality of MTN's shutdown policy, the official Afghan government position – conveyed at in-person meetings held with MTN, including at least one with President Karzai himself – was that cell-phone companies must keep their towers active at night.  The U.S. government was even more strongly committed to that position.  ISAF leadership especially rejected the suggestion that MTN's conduct represented an acceptable way of protecting its network.  ISAF expected MTN to keep its towers on, invest in security to protect them itself rather than paying the Taliban, and ultimately rebuild

---

[388] U.S. State Dep't Cable ¶ 11, *Using Connection Technologies To Promote US Strategic Interests In Afghanistan* (July 23, 2009).

them if necessary. ISAF considered that course of action not only feasible, but mandatory for a company like MTN reaping profits in an insurgency-afflicted country like Afghanistan.

### 3. MTN's Protection Payments Comport With Its Conduct In Other Markets

322. MTN's conduct above reflected a willingness to support America's enemies as a way to increase profits in Afghanistan. The same calculation pervaded MTN's other conduct in the region. While MTN Group was devising a plan to enter the Afghanistan market, the same MTN Group management team was working to obtain business from Iran. In 2004, Iran had awarded a cellular-phone license to MTN's competitor, Turkcell. But MTN then engaged in a corrupt scheme to take the license away from Turkcell and enter the Iranian market itself. MTN's efforts were successful and led it to acquire a 49% stake in Irancell – a joint venture with an Iranian government-controlled consortium. MTN internally called its corrupt scheme to enter the Iranian market "Project Snooker."[389]

323. Project Snooker required close cooperation between MTN and the Iranian government. In a July 5, 2005 letter to the former Iranian Deputy Minister of Defense, MTN Group's CEO invited Iranian officials to an in-person meeting – building on a prior meeting MTN Group had attended in Tehran – to discuss the "nature and extent of financial assistance that the MTN Group could provide to [its] Iranian partners."[390] The negotiations were successful. On September 18, 2005, MTN Group signed a Letter Agreement giving it the right to acquire 49% of Irancell. Section 8 of the Letter Agreement also pledged broader cooperation between the MTN Group and its Iranian partners: "The cooperation between MTN and Iranian

---

[389] *See* Memorandum from Phuthuma Nhleko to Sifiso Dabengwa *et al.*, *Overview & Way Forward – Project Snooker* (Sept. 21, 2005) ("*Project Snooker Mem.*").

[390] Ltr. from P. Nhleko to Mr. Foruzandeh & Dr. Mahmoudzadeh, *Invitation To Visit The MTN Group In South Africa* (July 5, 2005).

shareholders should be in the line of defensive, security and political cooperation.  MTN shall fully support cooperation regarding the aforementioned issues in South Africa."[391]

324.    MTN thereafter became the Iranian government's chief outside telecommunications partner.  In that capacity, MTN helped Iran grow its cellular-phone sector and evade American sanctions, particularly by helping Iran acquire embargoed U.S.-made communications technology.  According to "documents and numerous interviews conducted by Reuters," MTN specifically focused on "acquiring embargoed products" for Iran's benefit.[392]

325.    All of the above took place while Iran was a designated State Sponsor of Terrorism.[393]  In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[394]  By supplying cellular technology to the Iranian government and assisting Iran in acquiring embargoed products, MTN frustrated U.S. sanctions policy designed to combat Iran's sponsorship of terrorism abroad.

326.    Project Snooker was successful not only because MTN pledged strategic cooperation with the Iranian government, but also because MTN made at least two corrupt payments to government officials, one of which it structured as a consultancy payment.  On December 11, 2006, MTN Group's CEO instructed MTN Group's CFO to "finalise all

---

[391] MTN-Irancell Consortium Letter Agreement § 8 (Sept. 18, 2005).

[392] Steve Stecklow, *Exclusive:  Iranian Cell-Phone Carrier Obtained Banned U.S. Tech*, Reuters (June 4, 2012).

[393] *See* Statement of Sec'y of State George P. Shultz designating Iran, 49 Fed. Reg. 2836–02 (Jan. 23, 1984); U.S. State Dep't, *State Sponsors of Terrorism*, https://www.state. gov/j/ct/list/c14151.htm.

[394] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

agreements with the consultants" who had "assisted the Company" in obtaining the Iran deal.[395]

The first agreement called for MTN Group to make a $400,000 payment for the benefit of an

Iranian government operative.  The payment was effectuated through an MTN Group subsidiary,

MTN International (Mauritius) Limited, and sent to a consulting firm owned by the Iranian

operative's associate.  On April 4, 2007, MTN wired the $400,000 to the putative "consultant."

MTN has never proffered a legitimate explanation for that payment.

327.    MTN's second corrupt payment was to South Africa's ambassador to Iran.

MTN's Iran Director has admitted to paying the Ambassador $200,000 in cash out of his own

funds, which he tied to cooperation in helping MTN secure its equity interest in Irancell.

328.    In June 2018, South Africa's anti-corruption police – called the "Hawks" – raided

the offices of MTN and its outside counsel as part of an investigation into Irancell-connected

bribery.[396]  Roughly eight months later, the Hawks also arrested the former Ambassador whom

MTN had bribed.  On information and belief, the investigation remains ongoing.

329.    Similarly, on or about October 26, 2015, the Nigerian Communication

Commission fined MTN Group $5.2 billion for failing to meet a deadline to disconnect 5.1

million unregistered subscribers in Nigeria.  Nigeria imposed the deadline on all cellular

operators in the country due to evidence that unregistered phones were facilitating the activities

of criminal gangs and terrorists, including Boko Haram.  The requirements that MTN violated,

---

[395] Memorandum from Phuthuma Nhleko to Irene Charnley, *Consultancy Agreements* (Dec. 11, 2006).

[396] *See* Kyle Cowan, *Hawks Raid MTN, Top Law Firm In Decade-Long Turkcell Battle*, Fin24 (June 5, 2018), https://www.fin24.com/Companies/ICT/hawks-raid-mtn-top-law-firm-in-decade-long-turkcell-battle-20180605.

the *Wall Street Journal* reported, were "meant to combat terrorism."[397]   MTN eventually

negotiated the criminal fine down to $1.67 billion and agreed to pay it in seven installments.

### 4.     MTN's Conduct Had A Substantial Nexus To The United States

330.     MTN's support for the Taliban relied on significant contacts with the United

States.  MTN Group was a key player in orchestrating both those U.S. contacts and MTN's

material support to the Taliban.  At a high level, MTN employs a top-down management

structure in which MTN Group centralizes operational control over the functions performed by

its various subsidiaries.  During the relevant timeframe, MTN Group divided responsibility for

its subsidiaries into six business groups; MTN Afghanistan (and Irancell) fell under the purview

of the Middle East and North Africa ("MENA") group.  The MENA group's functional units

resided in Dubai and reported directly to senior management in South Africa.

331.     MTN Group made the decision to enter the Afghanistan market in 2006, when it

completed the Areeba acquisition.  As part of the merger – negotiated and executed by MTN

Group's senior management – MTN took control of Areeba Afghanistan LLC.  MTN Group later

rebranded Areeba Afghanistan LLC and changed its name to MTN Afghanistan.

332.     Because MTN's business model depends on unstable countries, including

Afghanistan, one of MTN Group's core management responsibilities is to manage operational

and political risk in the countries MTN enters.  Assessments of those risks occur both before the

decision to enter a market – here, as MTN entered Afghanistan in 2006 – and on an ongoing

basis.  As MTN Group explained in its 2007 Annual Report, "active mitigation of [country] risk

is a priority. . .  In Afghanistan, continued political instability has made operating conditions

---

[397] Alexandra Wexler, *Nigeria Reduces MTN Group Fine By $1.8 Billion*, Wall St. J. (Dec. 3, 2015).

challenging.  MTN and other mobile operators have suffered minor losses as a result of political

violence."[398]  In mitigating those risks – which here included designing a strategy for dealing

with the Taliban – MTN Group implemented a number of measures, including the "appointment

of a Group crisis manager"; the implementation of "physical and staff security measures"; and

"[c]ontinual monitoring of the political environment in operating countries."[399]  MTN Group, not

its operating subsidiaries, thus developed MTN's strategy for addressing the Taliban.

333.     Those policies required MTN Group's close supervision of MTN Afghanistan's

payments to the Taliban and the deactivation of its towers.  According to a statement released by

MTN Group in 2008, "MTN Group" was "monitoring threats to its Afghanistan operation

closely."[400]  When the Taliban first demanded that MTN shut down its towers at night, the MTN

Group responded:

> The MTN Group is aware of reports of the Taliban communicating a need for
> mobile operations to be suspended at certain times during the night in sensitive
> areas.  We are evaluating the situation and liaising with our executives and
> relevant authorities in Afghanistan.  The MTN Group does not expect this to have
> a material impact on its operations in Afghanistan.  No further details can be
> made available at this stage.[401]

As explained above, MTN Group made the decision – and instructed its subsidiary – to comply

with the Taliban's demands.  *See supra* Part IV.F.2.  MTN Group also approved its subsidiary's

practice of making payments to Taliban insurgents.  *See supra* Part IV.F.1.  Those decisions had

a substantial connection to the United States for the reasons explained below.

---

[398] MTN Group Limited, *Integrated Business Report For The Year Ended 31 December 2007*, Risk Management, www.mtn-investor.com/mtn_ar07/corp_risk.html.

[399] *Id.*

[400] *MTN Concerned By Afghanistan Threats.*

[401] *Id.*

### a.    MTN's conduct targeted the United States

334.    MTN's provision of material support to the Taliban was expressly aimed at the United States.  At all relevant times, MTN knew that the Taliban was targeting the United States. The Taliban did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, the Taliban directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that it could inflict pain in the United States and influence U.S. policy.  *See infra* Part V.A.1.  As the U.S. Attorney for the Southern District of New York recently stated, the "Haqqani Network and the Taliban have been and are engaged in highly public acts of terrorism against U.S. interests, including U.S. and coalition forces in Afghanistan."[402]  And the Taliban's ultimate, publicly stated goal was to effect a withdrawal of Coalition forces from Afghanistan.  Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.  *See infra* Part VI.

335.    MTN made direct payments to the Taliban knowing that the Taliban would use MTN's payments to target U.S. citizens in terrorist attacks.  *See supra* Part IV.F.1.  Those payments were no accident.  MTN intentionally directed its money to the Taliban, and intentionally aided the Taliban's terrorist campaign, in exchange for the Taliban's agreement to route its attacks away from MTN's business interests and toward U.S. forces instead.

336.    MTN's decision to shut down its transmission masts at the Taliban's request was also expressly aimed at the United States.  MTN knew, based on conversations with U.S. and Afghan officials, that active cellular networks provided the United States with a vital flow of intelligence and supported Coalition operations against the Taliban.  When MTN turned the

---

[402] Press Release, U.S. Dep't of Justice, *Manhattan U.S. Attorney Announces Extradition Of OFAC-Sanctioned Afghan Man For Narco-Terrorism Offenses* (Feb. 6, 2019).

towers off, it intentionally deprived the United States of that critical intelligence.  Indeed, the Taliban's publicly stated reason for demanding tower shutdowns was to interfere with U.S. operations.  *See supra* Part IV.F.2.  When MTN complied with those demands, it targeted the United States by robbing U.S. forces of intelligence that MTN knew they needed.

337.    Although MTN's primary motivation for assisting the Taliban was financial – it saved money by doing so – it also intended to harm Americans in Afghanistan.  One reason MTN cooperated with the Taliban was to align itself with the Taliban's effort to drive Americans out of the country.  MTN had three distinct but related reasons for desiring that outcome.

338.    *First*, MTN intended to harm Americans because it decided that was the necessary price of maintaining a good relationship with the Taliban.  The Taliban was explicit – both in public, and in conversations with industry participants – that it wanted MTN's financial and technical help in fighting against U.S. forces in particular.  Thus, for MTN to achieve its business objectives vis-à-vis the Taliban, MTN needed to disassociate itself from the United States and prove that it could deliver value to the Taliban in its insurgency against U.S. forces.  As the Taliban declared in threatening one of MTN's competitors that was (unlike MTN) resisting the Taliban's demands, "You are equal to the Americans.  The actions we take against Americans, we will take against you."[403]  MTN intentionally helped the Taliban as a way of demonstrating to the terrorists that it was not "equal to the Americans" in the same way.  Similarly, MTN refused to consider hosting towers on U.S.-secured bases.  *See supra* ¶ 320.

339.    *Second*, MTN benefited from attacks on American forces insofar as those attacks encouraged U.S. policymakers to withdraw from Afghanistan.  MTN's business model focuses

---

[403] Alissa J. Rubin, *Taliban Using Modern Means To Add To Sway*, N.Y. Times (Oct. 4, 2011).

on dangerous or unstable markets without a major U.S. presence.  For example, of the 21

countries where MTN operated as of 2015, at least six were in the midst of armed insurgencies,

while at least five others were characterized by dictatorships or widespread human rights

abuses.[404]  MTN depends on such conditions to make money.  In stable, U.S.-allied democracies,

MTN would have little hope of competing with reputable U.S.- and European- linked

telecommunications firms.  But because those firms typically will not enter terrorism-plagued

countries like Afghanistan, MTN has been able to achieve rapid growth.  That is why, as of

2011, MTN's four largest markets outside of South Africa were Iran, Syria, Nigeria, and Ghana.

340.    A common theme in those markets is the lack of a significant U.S. presence and

the routine use of terroristic violence.  Throughout MTN's history, it has exploited the United

States' absence to flout U.S. laws and take actions facially against the U.S. national interest.  For

example, it pledged "security and political cooperation" with the government of Iran;[405] assisted

Iran in circumventing American sanctions, *supra* ¶ 324; supported Boko Haram in Nigeria, *supra*

¶ 329; and assisted the Assad regime in Syria in quashing democratic dissent.[406]  MTN Group's

penchant for disregarding American law was on display in 2012, when it rebuffed U.S. pressure

to exit the Iranian market.  In adhering to the company's defiance of U.S. law, MTN's CEO

stated that "[w]e are guided by South African government policies" and noted MTN's intent to

cooperate with countries "that aren't necessarily easily swayed by the U.S. position on issues."[407]

---

[404] *See* Rob Rose, *In For A Wild Ride At MTN*, Fin. Mail (Nov. 6, 2015), 2015 WLNR 33008921.

[405] MTN-Irancell Consortium Letter Agreement § 8 (Sept. 18, 2005).

[406] *See* Zack Whittaker, *Surveillance & Censorship:  Inside Syria's Internet*, CBS News (Dec. 12, 2013).

[407] Devon Maylie, *South African Wireless Firm MTN To Remain In Iran*, Wall St. J. (Mar. 8, 2012).

341.    MTN is able to maintain its disregard for U.S. law because it focuses on exploiting markets with a limited U.S. presence.  Allowing Afghanistan to become a stable, U.S.-allied democracy would have threatened MTN's operations there and been inconsistent with MTN's core business model.  Accordingly, on information and belief, MTN Group believed that MTN would benefit if the Taliban succeeded in driving U.S. forces out of the country, leaving Afghanistan more like the other despotic countries in which MTN operates.

342.    *Third*, MTN Group's support for Taliban attacks against U.S. citizens advanced the foreign-policy interests of MTN Group's most important business partner.  As noted above, MTN Group negotiated MTN's 49% equity stake in Irancell – Iran's second-largest cell-phone company.  *See supra* Part IV.F.3.  The companies that own Iran's 51% stake in Irancell – MTN's joint venture partners – are Iran Electronics Industries and the Mostazafan Foundation.  Both are known fronts for the Iranian Revolutionary Guards Corps ("IRGC").  The United States has imposed sanctions on Iran Electronics Industries,[408] and Mostazafan is directly controlled by Grand Ayatollah Khamenei.  For those reasons, the U.S. State Department purportedly referred to Irancell (as published online) as being "fully owned by the IRGC."[409]

343.    MTN Group depends on its partnership with the IRGC.  As of 2012, Iran was MTN's fastest growing market and its third largest source of revenue overall.  Today, Iran is MTN's second-biggest market by subscribers.  MTN Group's financial incentive to satiate its IRGC partners has led it to take a number of illegal steps to assist the Iranian regime.  MTN helped the IRGC install surveillance software to track its political enemies in Iran; helped the

---

[408] Press Release, U.S. Dep't of Treasury, *Treasury Designates Iranian Military Firms* (Sep. 17, 2008).

[409] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

IRGC evade American sanctions; and – much like it did in Afghanistan – periodically shut down its transmission towers in Iran to stifle democratic protests against the Iranian regime.[410]  When pressed by journalists to condemn Iran's use of MTN's surveillance equipment, MTN's CEO declined and stated, "What the [IRGC] decides to do with that equipment is not in our hands. We cannot say who they listen to and when."[411]  As three South African investigative journalists summarized these acts in an informative headline, "MTN [is] in bed with Iran's military."[412]

344.    MTN Group cooperates with the IRGC despite knowing that the IRGC is the world's worst sponsor of anti-American terrorism.  As President Trump stated in announcing the IRGC's designation as a Foreign Terrorist Organization, "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft."[413]  Enmity toward America is foundational for the Iranian regime.  At a 2005 rally, Grand Ayatollah Khamenei explained, "Our people say 'Death to America,' and this is like the saying 'I seek God's refuge from the accursed Satan,' which is recited before any chapter of the Koran, even before 'In the name of Allah the Compassionate, the Merciful.' "[414]  Khamenei said the routine chanting of "Death to America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready to attack him. . . .  The saying 'Death to America' is for this purpose."[415]

---

[410] *See*, *e.g.*, Steve Stecklow et. al, *Chinese Tech Giant Aids Iran*, Wall St. J. (Oct. 27, 2011); Anthony Cuthbertson, *Iran Shuts Down Internet Amid Protests, Leaving Country 'Isolated from the World'*, Independent (Nov. 19, 2019).

[411] Devon Maylie, *South African Wireless Firm MTN To Remain In Iran*, Wall St. J. (Mar. 8, 2012).

[412] Craig Mckune et. al, *MTN In Bed With Iran's Military*, Mail & Guardian (Feb. 10, 2012).

[413] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization (Apr. 8, 2019).

[414] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005), https://www.memri.org/tv/iranian-leader-ali-khamenei-death-america-true-believer-should-never-forget-satan-always-present.

[415] *Id.*

345.    The IRGC's global terrorist campaign against the United States has long included support for to the Taliban.  As the U.S. Treasury Department found in 2007:

> Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban. . . .  Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.[416]

Such support for the Taliban forms an important part of Iran's anti-American foreign policy.  As Pakistan's former Ambassador to the United States described, "Iran has been supporting the Taliban with a view to inflict pain on the U.S. in Afghanistan.  From Iran's point of view, Afghanistan is another battleground where they can cause damage to Americans."[417]

346.    MTN Group's agreement to aid the Taliban served the IRGC's agenda of inflicting pain on U.S. forces.  It also fulfilled MTN Group's contractual obligation to engage in "defensive, security and political cooperation" with its IRGC partner.[418]  Such cooperation offered MTN Group added motivation for agreeing to the Taliban's demands.  MTN's support for the Taliban did not merely grow its profits by saving on security costs; it also benefited MTN's business by inflicting harm on an enemy of MTN's most lucrative business partner.

### b.    MTN's conduct relied on American contacts

347.    MTN Group also connected MTN's support of the Taliban to the United States by obtaining financing in reliance on U.S. contacts.  MTN Group supplied financing for MTN's Afghanistan operations through several capital investments in MTN Afghanistan.  In doing so, MTN Group tied MTN's unlawful conduct to the United States in two ways:  by (1) obtaining

---

[416] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[417] Quoted in Guy Taylor, *Iran Expands Taliban Support, Targets U.S. Troops In Afghanistan*, Wash. Times (Jan. 21, 2020), 2020 WLNR 1919574.

[418] MTN-Irancell Consortium Letter Agreement § 8 (Sept. 18, 2005).

U.S.-supplied debt financing that it used to fund MTN Afghanistan's cash payments to the

Taliban; and (2) obtaining political-risk insurance from a U.S.-based entity – which was material

to MTN's Afghan operations – expressly conditioned on a promise to refrain from engaging in

terrorist finance.  Both U.S. contacts were closely related to MTN's support for the Taliban.

348.    **IFC Financing.**  The International Finance Corporation ("IFC") – a Washington,

D.C.-based arm of the World Bank – first invested in Areeba Afghanistan (MTN Afghanistan's

predecessor) in 2006.  The initial IFC facility totaled $45 million, consisting of $40 million in

debt and $5 million in equity.  The money was disbursed over several years, including after

MTN Group purchased Areeba and began building out its operations in Afghanistan.

349.    In early 2007, MTN Group obtained a commitment from IFC for additional

funding.  In June 2009, MTN Group built on that existing commitment and obtained an

additional $75 million facility from IFC to fund MTN's Afghanistan operations.  IFC's $75

million facility consisted of $65 million of debt and $10 million in equity – the latter of which

bought IFC a 9.1% stake in MTN Afghanistan.  IFC held the equity until July 2013, when it

exercised a put option and sold its shares to MTN Dubai.

350.    MTN Group obtained the IFC facility on MTN Afghanistan's behalf.  In doing so,

MTN Group affirmatively reached out to IFC and initiated contact with IFC employees in the

United States to apply for funding.  The resulting application process, which stretched over at

least several months, involved repeated communications from MTN Group to IFC employees in

the United States.  IFC's standard policies and procedures required each of the following steps,

which, on information and belief, MTN Group followed in obtaining the financing at issue:

- <u>MTN Investment Proposal</u>:  MTN Group prepared a written Investment Proposal for IFC's consideration, which described in detail MTN Afghanistan's business plan, MTN Group's proposed use for IFC's funding, and a proposed security plan for protecting IFC's investment

from insurgent risks.  MTN Group transmitted the Investment Proposal to IFC's Washington, D.C. headquarters.

- <u>MTN communications facilitating IFC preliminary review and appraisal</u>:  Based on MTN Group's Investment Proposal, IFC conducted a preliminary appraisal of the project, including an assessment of the risks posed to MTN Afghanistan's cell towers in Afghanistan and the effect that the insurgency would have on MTN's business prospects.  This stage involved multiple communications between IFC's U.S.-based investment officer(s) and MTN Group executives.  MTN Group focused on convincing IFC that the project's risks – including the security risks posed by Taliban insurgents – were sufficiently low to warrant IFC's investment.

- <u>IFC preliminary approval</u>:  Based on information submitted by MTN Group to U.S.-based IFC employees, IFC's telecommunications departmental management – based in its Washington, D.C. headquarters – gave preliminary approval to the project.  That approval was based, in part, on MTN Group's representations to IFC that MTN Afghanistan's operations would comply with all applicable IFC standards, including its security and anti-corruption requirements.

- <u>MTN contract negotiation</u>:  IFC and MTN Group negotiated the terms of the contract that would govern IFC's participation in funding MTN Afghanistan's operations.  This involved MTN Group communicating repeatedly with IFC's U.S.-based staff over contract terms and conditions.

- <u>MTN contract execution</u>:  IFC formally approved the project – through a vote of its Board of Directors in Washington, D.C. – and executed the contract with MTN Group.  MTN Group countersigned the contract knowing that its counterparty was based in and authorizing the contract out of Washington, D.C.

- <u>Project implementation</u>:  MTN Group and IFC continued discussions during the project implementation phase, which required regular communications (written and oral) between MTN Group and IFC personnel in Washington, D.C.

351.    On information and belief, in its contract with IFC, MTN Group agreed to send all written notices relating to the contract to IFC's headquarters at 2121 Pennsylvania Ave., N.W., Washington, D.C.  20433.  MTN Group volunteered to continue sending a variety of documents to Washington, D.C. every month, quarter, and year, including certifications confirming that MTN Group was complying with all contractual requirements and refraining from corrupt payments and other forms of material support to terrorists in Afghanistan.

352.    On information and belief, MTN Group's contract with IFC adhered to IFC's common practice and so contained a clause in whith MTN "irrevocably agree[d] that any legal action, suit or proceeding arising out of or relating to this [contract with IFC] may be brought in the courts of the United States of America located in the Southern District of New York."  On information and belief, MTN Group waived any argument that a U.S. venue was "inconvenient."

353.    On information and belief, MTN Group elected to receive IFC financing disbursed out of bank accounts that IFC held in New York.  On information and belief, MTN Group also agreed to repay IFC's loans by making regular payments into a designated New York-based bank account.  The IFC disbursed the money directly to MTN Afghanistan, and MTN Afghanistan used that U.S.-based financing both to fund its protection payments and to build the infrastructure that allowed it to deactivate its cell towers at the Taliban's request.  As a result, MTN Afghanistan directly used American-sourced money, which MTN Group purposefully obtained from the United States, to finance MTN's support for the Taliban.

354.    MTN Group itself linked MTN's support for the Taliban to its receipt of IFC funding.  That is because the perceived risk that insurgents posed to MTN Afghanistan's cell towers was material to IFC's due diligence on – and valuation of – MTN's business in Afghanistan.  To convince IFC to fund MTN's business on favorable terms, MTN Group represented to IFC that the security risks to its towers were relatively low and fell within an acceptable range.  MTN's illegal strategy of supporting the insurgency, in turn, was baked into the artificially low threat level that MTN Group conveyed to IFC.  On information and belief, had MTN Group disclosed the true level of risk to MTN Afghanistan's towers – one not secretly depressed by its support for the Taliban – IFC would have either refused to issue financing or

would have done so on less favorable terms.  In that way, MTN Group relied on its support for

the Taliban to maximize the financial benefits of IFC funding from the United States.

355.    On information and belief, MTN Group's contract with IFC contained

prohibitions on providing material support to terrorists.  MTN Group agreed in the contract to

certify, and ensure compliance with, all "applicable laws" – a category that included the U.S.

Anti-Terrorism Act.  MTN Group also agreed (among other things) to "assess risks posed by its

security arrangements to those within and outside the project site."[419]  MTN Group thus

volunteered to "make reasonable inquiries to ensure that those providing security [for MTN

Afghanistan] are not implicated in past abuses, will train them adequately in the use of force (and

where applicable, firearms) and appropriate conduct toward workers and the local community,

and require them to act within the applicable law."[420]  Similarly, on information and belief, IFC's

contract with MTN Group also prohibited corrupt payments and other security practices that

violated Afghan law.  MTN Group's decision to approve payments to Taliban terrorists and to

deactivate MTN's cell towers breached all of those contract requirements.

356.    MTN Group agreed to notify IFC – in writing, delivered in hard-copy form to

IFC's headquarters in Washington, D.C. – of any information suggesting a violation of those

requirements.  MTN Group, not MTN Afghanistan, assumed contractual responsibility for

ensuring that MTN Afghanistan's practices complied with IFC's requirements.  MTN Group

further warranted that it possessed the "corporate power to . . . comply with its obligations"

under the contract – which included covenants requiring it to ensure that MTN Afghanistan

refrained from corrupt or illegal practices concerning the Taliban.  Throughout, the contract

---

[419] IFC, *Performance Standard 4:  Community Health, Safety and Security* 17 (Apr. 30,
2006).

[420] *Id.*

conveyed IFC's expectation that, as a condition of obtaining IFC's financing, MTN Group bore

responsibility for ensuring that MTN Afghanistan would not materially support terrorism, and

that MTN Group would promptly disclose to IFC any such incidents if they ever occurred.

357.    Rather than comply with those commitments, MTN Group reached out to

Washington, D.C. and repeatedly informed IFC officials there that MTN Afghanistan was *not*

supporting the Taliban.  Those periodic certifications, sent to IFC's headquarters at 2121

Pennsylvania Ave., were material to MTN's continued ability to support the Taliban.  Without

those inaccurate certifications, the IFC would have, on information and belief, canceled its

funding and jeopardized MTN's ability to access capital from any other source.  Indeed, IFC

maintains a "zero tolerance" policy toward terrorist finance.[421]  For that reason, MTN was able to

support the Taliban only by repeatedly misleading its IFC funders about what it was doing.  A

necessary part of that scheme was MTN Group's decision to send inaccurate statements about

MTN Afghanistan's conduct to its Washington, D.C.-based counterparty.

358.    **MIGA Guarantees.**  MTN Group also obtained coverage guarantees from the

Multilateral Investment Guarantee Agency ("MIGA") – another Washington, D.C.-based arm of

the World Bank – to facilitate MTN Afghanistan's operations.  MIGA guarantees operate as a

form of political-risk insurance and protect the guarantee holder against common risks that might

otherwise deter a multinational company from investing in unstable regions.  Under MIGA

coverage guarantees, the "guarantee holder" obtains the insurance, executes a contract with

MIGA, and assumes responsibility for ensuring that the contractual terms are met.  The "project

---

[421] IFC, *Navigating Essential Anti-Money Laundering & Combating The Financing Of Terrorism Requirements in Trade Finance: A Guide for Respondent Banks* 28 (Sep. 2018) ("There has to be a group-wide culture of zero tolerance for [money laundering / terrorist finance].").

enterprise," in turn, forms the underlying business – which must be supervised and controlled by the guarantee holder – that MIGA's coverage is intended to finance.  In this case, MTN Group and MTN Dubai were the guarantee holders; MTN Afghanistan was the project enterprise.

359.    On July 3, 2007, MTN Group obtained its first MIGA facility, which provided a $76.5 million guarantee covering its investment in MTN Afghanistan.  MTN Group itself was the guarantee holder, and MIGA announced that, through its coverage, "MTN Group of South Africa[] will install, operate, and maintain a 100 percent digital GSM technology network via its Afghan subsidiary, Areeba Afghanistan LLC [later rebranded to MTN Afghanistan]."[422]  In 2011, MTN Group replaced that facility with an $80.4 million MIGA guarantee to cover MTN Afghanistan's expansion of operations.  MTN Group remained the guarantee holder, and MTN Group "financed" MTN Afghanistan's expansion "through a shareholder loan and an equity investment" via its intermediate subsidiary, MTN Dubai.[423]

360.    Also in or about June 2011, MTN Group obtained a second MIGA guarantee to cover MTN Afghanistan's operations.  This guarantee was for $82.1 million and provided coverage against the risks of transfer restriction, expropriation, and war and civil disturbance.  For purposes of this second guarantee, MTN Dubai served as the guarantee holder.[424]

361.    MTN Group obtained the MIGA guarantees on MTN Afghanistan's and MTN Dubai's behalf.  In doing so, MTN Group affirmatively reached out to MIGA and initiated contact with MIGA employees in Washington, D.C. to apply for coverage.  The resulting

---

[422] MIGA Press Release, *MIGA Supports Critical Telecommunications Investment In Afghanistan* (July 3, 2007), https://www.miga.org/press-release/miga-supports-critical-telecommunications-investment-afghanistan.

[423] MIGA Project Brief, *MTN Afghanistan* (July 7, 2011), https://www.miga.org/project/mtn-afghanistan.

[424] *See* MIGA Project Brief, *MTN Afghanistan* (June 2011), https://www.miga.org/project/mtn-afghanistan-0.

application process, which stretched over at least several months, included repeated

communications from MTN Group to MIGA employees located in the United States.  MIGA's

standard policies and procedures required each of the following steps, which, on information and

belief, MTN Group followed in obtaining the guarantees at issue:

- MTN's preliminary application:  MTN Group completed a Preliminary Application, which
  described the nature of MTN Afghanistan's operations, the proposed nature of MIGA's
  support, and estimated financial projections.  MTN Group submitted the application to
  MIGA's application office at 1818 H Street, NW, Washington, D.C. 20433.

- MTN discussions with MIGA underwriter:  After preliminary review by MIGA, MTN Group
  contacted MIGA underwriters in Washington, D.C. to discuss the project – including the type
  of coverage sought, MIGA's pricing, and the various risks to the project, such as Taliban
  insurgent risks.

- MTN definitive application:  After negotiating preliminary terms with MIGA through
  communications with the United States, MTN Group submitted a Definitive Application on a
  form provided by MIGA's underwriting team.  MTN Group submitted the Definitive
  Application form to MIGA's Washington, D.C. offices.  To support the application, MTN
  Group provided a business plan, financial reports, and other documents relating to MTN
  Afghanistan.

- MTN's support for MIGA's due diligence:  MTN Group then engaged in extensive
  communications with MIGA personnel in Washington, D.C. to facilitate MIGA's due
  diligence process.  MTN Group focused on convincing MIGA that the project's risks –
  including the security risks posed by Taliban insurgents – were sufficiently low to warrant
  MIGA's investment.

- MTN contract execution:  After MIGA's Board approved the project, in a vote held in
  Washington, D.C., MTN Group and MTN Dubai executed the respective contracts for which
  they were the guarantee holders.  MTN Group and MTN Dubai countersigned their contracts
  knowing that their counterparty was based in and authorizing the contract out of Washington,
  D.C.

- Project implementation:  MTN Group and MTN Dubai continued to exchange
  communications with MIGA during the project implementation phase, which required
  regular conversations between MTN Group personnel and MIGA personnel in Washington,
  D.C.  For example, for any insurance claims that MTN Group or MTN Dubai submitted
  under the policy, MTN Group and MTN Dubai agreed to send formal, written notices to
  Washington, D.C.

362.    On information and belief, MTN's contracts with MIGA stated that they were "deemed made in Washington, DC, United States of America,"[425] and set MIGA's "Notice Address" at 1818 H Street, N.W., Washington, D.C. 20433.[426]  MTN Group and MTN Dubai also agreed that any disputes with MIGA would be resolved through arbitration proceedings to be "held in Washington, DC, United States."[427]

363.    On information and belief, in their contracts with MIGA, MTN Group and MTN Dubai agreed to send all written notices relating to the contract to MIGA's headquarters at 1818 H St. NW.  MTN Group and MTN Dubai volunteered to continue sending a variety of written notifications to Washington, D.C. every month, quarter, and year, including certifications confirming that MTN Group and MTN Dubai were complying with the contracts and refraining from corrupt payments or other forms of material support to terrorists in Afghanistan.

364.    On information and belief, MTN Group's and MTN Dubai's performance under their contracts with MIGA included both Defendants paying premiums to MIGA by sending regular payments to the United States, which required MTN's use of the U.S. banking system.

365.    MTN Group itself linked MTN's support for the Taliban to its MIGA guarantees. That is because the perceived risk that insurgents posed to MTN Afghanistan's cell towers was material to MIGA's due diligence on – and valuation of – MTN's business in Afghanistan.  To convince MIGA to back MTN's operations and give it a favorable deal, MTN Group represented to MIGA that the security risks to its towers were relatively low and fell within an acceptable range.  MTN's illegal strategy of supporting the insurgency, in turn, was baked into that

---

[425] MIGA, Template Contract of Guarantee for Non-Shareholder Loans at 5 (Nov. 2016), https://www.miga.org/sites/default/files/archive/Documents/Contract%20of%20Guarantee%20for%20Non-Shareholder%20Loans.pdf.

[426] *Id.* at 4.

[427] *Id*. pt. II, art. 14.2.

artificially low threat level that MTN Group conveyed to MIGA.  On information and belief, had

MTN Group disclosed the true level of risk to MTN Afghanistan's towers – one not secretly

depressed by its support for the Taliban – MIGA would have either refused to issue a guarantee

or would have done so at a less attractive price.  In that way, MTN Group relied on its support

for the Taliban to maximize the financial benefits of MIGA's U.S.-based support.

366.    On information and belief, MTN Group's and MTN Dubai's contracts with

MIGA contained prohibitions on providing material support to terrorists.  Among other things,

MTN Group and MTN Dubai agreed to "assess risks to those within and outside the project site

posed by its security arrangements."[428]  By making that agreement, MTN Group and MTN Dubai

agreed to "make reasonable inquiries to satisfy [themselves] that those providing security [for

MTN Afghanistan] are not implicated in past abuses, will train them adequately in the use of

force (and where applicable, firearms) and appropriate conduct toward workers and the local

community, and require them to act within the applicable law."[429]  Similarly, MTN Group and

MTN Dubai agreed to refrain from corrupt payments and other security practices that violated

Afghan law.  Both MTN Group and MTN Dubai breached those obligations.  MTN's protection

payments qualified as a "corrupt practice" under MIGA's definition, and its support for the

Taliban violated Afghanistan's prohibitions on both terrorist financing and money laundering.

367.    MTN Group and MTN Dubai agreed to notify MIGA – in writing, delivered in

hard-copy form to MIGA's headquarters in Washington, D.C. – of any information suggesting a

violation of those requirements.  MTN Group and MTN Dubai, not MTN Afghanistan, assumed

responsibility for ensuring that MTN Afghanistan's practices complied with those requirements.

---

[428] MIGA, *Performance Standards On Social & Environmental Sustainability* 22 (Oct. 1, 2013).

[429] *Id.*

For example, the prohibition on corrupt payments read as follows: "the Guarantee Holder shall diligently enforce its rights pursuant to the Loan Agreement and consistent with local law to *cause the Project Enterprise to* . . . (h) refrain from . . . engaging in Corrupt Practices."[430]  By entering into the contracts, MTN Group and MTN Dubai communicated to their Washington, D.C. counterparts that they were taking responsibility for ensuring that MTN Afghanistan would not materially support terrorism.  MTN Group and MTN Dubai further agreed to disclose to MIGA any such incidents if they ever occurred.

368.    Rather than comply with those commitments, MTN Group and MTN Dubai reached out to Washington, D.C. and repeatedly informed MIGA officials there that MTN Afghanistan was *not* supporting the Taliban.  Those periodic certifications, sent to MIGA's headquarters at 1818 H St., were material to MTN's continued ability to support the Taliban. Without those inaccurate certifications, MIGA would have, on information and belief, canceled its guarantees and jeopardized MTN Afghanistan's entire business.  Indeed, MIGA "has identified corruption as among the greatest obstacles to economic and social development," and it "leads the way in mitigating integrity risks" through a zero-tolerance "stance against fraud, corruption, [and] related misconduct."[431]  Due in part to U.S. leadership of (and support for) MIGA, MIGA has made anticorruption and counterinsurgency an important part of its mission. For that reason, MTN was able to support the Taliban only by repeatedly misleading MIGA about what it was doing.  A necessary part of that scheme was MTN Group's and MTN Dubai's decision to send inaccurate statements to their Washington, D.C.-based counterparty.

---

[430] MIGA, Template Contract §§ 12.1, 12.1(h) (emphasis added).

[431] MIGA, *Integrity*, https://www.miga.org/integrity (last visited May 14, 2020).

369.    IFC's and MIGA's official alignment with U.S. counterinsurgency objectives was especially strong in Afghanistan.  In 2002, the World Bank's U.S.-appointed President tied the Bank's development financing in Afghanistan to the U.S.-led war on terror, stating:  "This is not an issue of luxury, and it is not an issue of charity.  It is an issue of self-interest.  I cannot imagine we have spent billions of dollars on a war to allow it to recur two, three, four years down the track."[432]  Similarly, in 2004, the World Bank published a comprehensive position paper on the need to establish a "counter-terrorism financing regime in Afghanistan," observing that "terrorist financing can have devastating economic and social consequences."[433]  As part of "Afghanistan's unique circumstances," the World Bank emphasized the need to control the use of Afghanistan's *hawala* system "in facilitating transnational crime and terrorism."[434]

370.    An IFC Strategy Note for Afghanistan – which MIGA also adopted – likewise identified the Taliban as a key threat and embraced "the US administration's recently announced strategy" for addressing "development, political and security linkages" in Afghanistan.[435] Consistent with that objective, IFC and MIGA "attest[ed] to the importance of the Bank's enhanced supervisory role throughout project execution" in Afghanistan, including "project-specific security arrangements" and oversight of "security service contractors."[436]  One risk that IFC specifically warned against was the "leakage of funds" to insurgents.[437]

---

[432] Quoted in Amit Baruah, *India Prepared To Restore Telecom Network*, Hindu (Jan. 21, 2002), 2002 WLNR 15684542.

[433] Alastair J. McKechnie, *Strengthening the Collaborative Process for Building an Effective Anti-Money Laundering and Counter-Terrorism Financing Regime in Afghanistan* 1 (International Bank for Reconstruction & Development 2004).

[434] *Id*. at 20.

[435] International Dev. Assoc. & International Fin. Corp., *Interim Strategy Note For Islamic Rep. of Afghanistan* ¶ ii, Report No. 47939-AF (May 5, 2009) ("*IFC Strategy Note*").

[436] *Id*. ¶¶ 124-25.

[437] *Id*. ¶ 126.

371.    MTN Group's decision to solicit funding from U.S.-based entities – and then to conceal its conduct through communications to the United States – was important to its scheme. The existence of U.S.-backed financing sent a critical signal to investors and bolstered the public credibility of MTN's conduct in Afghanistan.  As MIGA has explained, its financing "play[s] an important role in conflict-affected and fragile economies" by mitigating the "perceived risks" that commonly deprive projects of access to capital.[438]  Especially in the telecommunications sector, "the presence of MIGA guarantees [often] makes the difference between a go and a no-go decision for investors concerned about country risk."[439]  That was nowhere more evident than in Afghanistan, where MIGA's and IFC's involvement supplied needed credibility that allowed MTN to build and maintain its infrastructure in the face of political uncertainty and terrorism. As a result of IFC's and MIGA's support, MTN Afghanistan's "[p]rofitability margins [were] higher than expected despite very real and grave risks, including security threats from insurgent forces."[440]  Without IFC and MIGA financing tied to the United States, MTN would not have been able to provide material support to the Taliban through its Afghanistan operations.

372.    MTN's U.S.-based financing did not exclusively go to expand its operations and construct new towers.  MTN Group also used IFC's and MIGA's support to fund infrastructure and maintenance for MTN Afghanistan's existing towers, including by funding the security infrastructure that MTN used both to route its payments to the Taliban and to deactivate its transmission masts at the Taliban's request.

---

[438] MIGA Brief, *MIGA: Mobilizing Investments, Rebuilding Confidence* (Jan. 2015).

[439] MIGA Telecommunications Brief, *MIGA: Connecting Telecommunications Investments* (Apr. 2013).

[440] MIGA Brief, *MIGA: Mobilizing Investments, Rebuilding Confidence* (Jan. 2015).

373.     MTN Group's Regional Vice President for Middle East and North Africa confirmed the importance of such U.S. financing.  In 2009, after MTN obtained the $75 million facility from IFC, its Regional VP stated that "MTN Group places high importance on its operation in Afghanistan . . . IFC is providing long-term funding, which is a great vote of confidence for this frontier market.  It will enable us to serve the people of Afghanistan by enhancing network coverage and expanding high-quality services to a greater number of customers."[441]  That announcement, as much as the actual capital to follow, was critical to MTN.  The World Bank offered a similar analysis.  In 2015, it explained that, "With MIGA guarantee coverage and IFC's investment and advisory support, MTN has been able to exceed expectations and reach over five million subscribers, close to a one-third market share."[442]

374.     **The central role of the United States in MTN's conduct.**  By obtaining financing from IFC and MIGA, MTN intentionally benefited from an association with the United States.  MTN's reliance on U.S.-based financing was no coincidence.  Given the extreme risks facing businesses considering investing in 2007-era Afghanistan, U.S.-backed investment provided vital institutional credibility to MTN Afghanistan and offered needed reassurance to MTN Group's shareholders.  The signal sent by U.S.-backed investment – in light of the United States' position at the head of the global economic order – provided benefits to MTN Group that financing sourced elsewhere could not have replicated.  That is one reason IFC and MIGA are

---

[441] Press Release, IFC, *IFC Invests $75 Million To Expand Mobile Communications Access In Afghanistan* (June 22, 2009), https://ifcextapps.ifc.org/ifcext/pressroom/ifcpressroom.nsf/ 1f70cd9a07d692d685256ee1001cdd37/9b9783b665eff8ad852575dd0055abc1.

[442] World Bank Grp., *Afghanistan Country Snapshot* at 53 (Oct. 2015), http://documents. worldbank.org/curated/en/307891467998464206/pdf/100112-WP-PUBLIC-Box393225B-Afghanistan-Country-Snapshot.pdf.

based in Washington, D.C.: their U.S. location enhanced their ability to "make an investment more attractive to potential investors and lenders by lowering its overall risk profile."[443]

375.    IFC and MIGA are both closely tied to the United States, such that companies seeking out their financing benefit from U.S. contacts.  By contracting with IFC and MIGA, MTN benefited from its affiliation with the United States in the following ways:

- U.S. funding:  As the World Bank's founding members recognized at inception, the World Bank's "success . . . would depend to a large extent on the active contribution to be made by the United States."[444]  In the years since, the United States has long been the World Bank's largest funder.  Consistent with that status, the United States is the largest shareholder in both IFC and MIGA, and it possesses the largest share of voting power in each entity.  As of 2011, for example, the United States owned 24% of IFC's shares, while the next-largest shareholder (Japan) held only 6%.  The United States' outsized voting power, and influence over other shareholders, gives it substantial control over both agencies.  Neither IFC nor MIGA would exist without the institutional and financial support of the United States.

- U.S. headquarters:  IFC and MIGA deliberately chose to locate their headquarters in Washington, D.C.  During the World Bank's founding negotiations, the American delegation – led by Fred Vinson – was "quite adamant about Washington," which imbued the World Bank with the benefits associated with being in the "international diplomatic center of the United States."[445]  With respect to one lending arm of the World Bank, delegates argued against a D.C. headquarters, asserting that the "Bank as an international institution should not be associated with the capital of any nation."[446]  But the delegates rejected that argument and chose Washington, D.C., giving "substantial weight" to the views of the United States as "the country in which the Bank is to be located."[447]

- U.S. development capital:  Washington, D.C. also offers a variety of other benefits to recipients of development funds, including MTN:  it offers access to a labor pool with unique expertise in development finance; close proximity to other development agencies like USAID and OPIC; access to U.S. financial institutions; and "ready access to data and material relating to the economies of many countries."[448]  Those D.C. contacts are what make

---

[443] MIGA Brief, *MIGA: Mobilizing Investments, Rebuilding Confidence* at 1 (Jan. 2015), https://www.miga.org/sites/default/files/archive/Documents/conflict.pdf.

[444] The World Bank / IFC Archives Oral History Program, *Interview With Dr. Pieter Lieftinck* 2 (Feb. 5, 1987).

[445] *Id.*

[446] International Bank for Reconstruction & Development, Committee on Site (Mar. 14, 1946) ("*Site Committee Report*").

[447] *Id.*

[448] *Id.*

IFC and MIGA such attractive investment partners, and MTN Group knowingly benefited from those contacts when it sought out IFC and MIGA backing for MTN Afghanistan.

- U.S. personnel:  The president of the World Bank works full-time in Washington, D.C. and traditionally has always been nominated by the United States.  That "custom," which has been in place for decades, "guarantee[s] . . . American leadership at the World Bank."[449]  The World Bank President also chairs the Board of Directors of both IFC and MIGA.  During the relevant period, the World Bank president was a U.S. citizen.  The benefits of having U.S.-based personnel also extend down to IFC's and MIGA's programming, by allowing funding recipients to leverage the expertise of both agencies' U.S.-based staff.

- U.S. leadership:  According to a U.S. Treasury Department FY2002 budget justification, U.S. support for World Bank financing agencies "provide[s] the United States with strong, effective instruments for advancing American interests and values around the world."[450]  Those institutions have supplied a forum for "[s]ustained and effective American leadership,"[451] including through "day-to-day oversight" of and "close involvement" with MIGA and IFC.[452]  IFC and MIGA allow their clients (including MTN) to benefit from that leadership by conveying to the market and to other governments that a project is backed by a U.S.-based entity.  For example, MIGA touts its "status as a member of the World Bank Group" and its "relationship with shareholder governments" as a key value it offers, which gives its clients "additional leverage in protecting investments."[453]

- U.S. values:  A final benefit that IFC and MIGA offer their clients like MTN is a public signal "ensur[ing] that projects comply with what are considered to be the world's best social and environmental safeguards."[454]  One of the key safeguards that animates both agencies' financing decisions is anticorruption,[455] which reflects their close connection to the United

---

[449] Martin A. Weiss, *Selecting The World Bank President*, Cong. Research Serv. (Feb. 8, 2019).

[450] U.S. Dep't of Treasury, *Multilateral Development Banks:  Instruments For Advancing American Interests, Values & Leadership*, in Treasury International Programs Budget Justification Document 115 (July 31, 2001) ("*Treasury Budget Justification*"); *see also* U.S. Dep't of Treasury, *Multilateral Development Banks*, https://home.treasury.gov/policy-issues/international/multilateral-development-banks ("America's leadership in [multilateral development banks] ensures that the United States can help shape the global development agenda, leveraging its investments to ensure effectiveness and on-the-ground impact.").

[451] *Id*. at 115.

[452] *Id*. at 120.

[453] MIGA, *What We Do*, https://www.miga.org/what-we-do (last visited May 14, 2020).

[454] *Id*.

[455] *See* MIGA, *Integrity*, https://www.miga.org/integrity (last visited May 14, 2020) ("The World Bank Group has identified corruption as among the greatest obstacles to economic and social development."); IFC *Combating Fraud & Corruption*, https://www.ifc.org/wps/wcm/connect/Topics_Ext_Content/IFC_External_Corporate_Site/AC_Home (last visited May 14, 2020) (similar).

States.  Indeed, "[t]he U.S. has actively advocated" for "policies and programs to firmly establish the imperative of good governance on the international development agenda," through which the U.S. government has convinced IFC and MIGA to put "anti-corruption policies in place."[456]  Those policies – and the presumption that IFC's and MIGA's clients will comply with them – offer financial value.  By affiliating with IFC and MIGA, MTN Group and MTN Dubai signaled to investors, the industry, and other governments that MTN's Afghanistan operations were aligned with U.S. anticorruption values.

376.    During the time period at issue, no non-U.S.-based financing source could replicate those benefits for MTN.  Nor would the financing have been as valuable to MTN if IFC and MIGA were located elsewhere and less closely tied to the United States.  On information and belief, these considerations – based on the U.S. contacts that MTN created by obtaining World Bank support – formed part of MTN Group's motivation for seeking out financing from IFC and MIGA.  But, as alleged above, MTN Group used those U.S. contacts to finance operations that it structured to provide material support to the very insurgents the United States was fighting.

### G.    The IRD Defendants

#### 1.    IRD Made Protection Payments To The Taliban

377.    The IRD Defendants consist of several companies responsible for protection payments that IRD made to the Taliban from at least 2007 until at least 2015.  Defendant International Relief and Development, Inc. is a U.S. government contractor that implemented USAID-funded development projects in Afghanistan and paid the Taliban to protect those projects.  After IRD rebranded as Blumont in January 2016, Blumont, Inc. and Blumont Global Development, Inc. assumed IRD's liabilities and absorbed some or all of its Afghanistan contracts.  In this section, Plaintiffs use "IRD" to refer to conduct implemented by International Relief and Development, Inc. for which the two Blumont Defendants are also liable.

---

[456] *Treasury Budget Justification* at 119.

378.     IRD was by far the largest recipient of Afghanistan-related "cooperative agreements" from USAID, which are a type of agreement in which the implementer is afforded greater operational flexibility – subject to less day-to-day oversight from USAID – than in a traditional contract.  From 2002 until 2013, IRD received $895 million in USAID cooperative agreements for work implemented in Afghanistan.  The second-largest recipient of such agreements during that period obtained $279 million in contracts.

379.     IRD is nominally a non-profit entity.  But during the relevant timeframe, IRD paid its employees – both managers and rank-and-file – far more than comparable non-profits in Afghanistan.  Six-figure salaries were the norm, with higher-level managers earning $500,000 or more per year.  For example, IRD's founder in 2013 "was slated to receive $690,000 in compensation, plus a $900,000 contribution to his retirement account," while his wife "received $1.1 million in compensation."[457]  According to a former State Department official who worked alongside IRD, it was a "nonprofit in name only."[458]  In reality, the official explained, IRD's founders "built an organization designed to get USAID money."[459]  From 2007 to 2013, IRD reported revenues of more than $3 billion.

380.     IRD implemented multiple government contracts in Afghanistan during the relevant timeframe.  Those contracts include, but are not limited to:

    **a.**    <u>2006 HRLS Program</u>:  In March 2006, USAID awarded IRD task order number 306-M-00-06-00505-00 to implement its Human Resources and Logistical Support ("HRLS") program in Afghanistan.  The task order, as modified, covered 5 years and was valued at $84 million.

---

[457] Scott Higham & Steven Rich, *USAID Suspends IRD, Its Largest Nonprofit Contractor In Iraq & Afghanistan*, Wash. Post (Jan. 26, 2015).  IRD's Board later objected to those amounts in light of an ongoing USAID investigation and demanded that they return some of it.  *See id*.

[458] Scott Higham et al., *Doing Well By Doing Good:  The High Price Of Working In War Zones*, Wash. Post (May 4, 2014).

[459] *Id*.

b.   <u>2007 Strategic Provincial Roads</u>:  In November 2007, USAID awarded IRD a 4-year cooperative agreement, via agreement number 306-A-00-08-00509-00, to implement its Strategic Provincial Road – Southern & Eastern Afghanistan program ("SPR").  The project had a 4-year term and was originally valued at $400 million, which USAID later increased to $498 million.

c.   <u>2008 AVIPA Program</u>:  In September 2008, USAID awarded IRD a 4.5-year cooperative agreement, via agreement number 306-DFD-A-00-08-00304-00, to implement the Afghanistan Vouchers for Increased Production in Agriculture ("AVIPA") program.  The contract was initially funded at $33 million, but the value later increased to $470 million.

c.   <u>2011 EQUALS Program</u>:  In April 2011, USAID awarded IRD a 5-year contract, via contract number 306-C-00-11-00512-00, to implement its Engineering, Quality Assurance and Logistical Support ("EQUALS") program.  The contract was originally valued at $97 million but later increased to $126 million.

d.   <u>2011 S-Rad Program</u>:  In August 2011, USAID awarded IRD a 1-year cooperative agreement, via agreement number 306-A-00-11-00525-00, to implement the Southern Regional Agricultural Development ("S-RAD") program in Afghanistan.  The agreement was valued at nearly $70 million.

e.   <u>2011 ACAP II Program</u>:  In September 2011, USAID awarded IRD a 3-year cooperative agreement, via agreement number 306-A-00-11-00533-00, to implement the Afghan Civilian Assistance Program II ("ACAP II") in Afghanistan.  The agreement was valued at $77 million.

f.   <u>2013 KFZ Program</u>:  In July 2013, USAID awarded IRD a 3-year cooperative agreement, via agreement number AID-306-A-13-00008, to implement the Kandahar Food Zone ("KFZ") program.  The agreement was initially valued at $18 million and later increased to $45 million.

381.   From at least 2007 through at least 2015, IRD maintained a general policy of paying the Taliban to secure its projects in Taliban-controlled or -influenced regions.  That policy applied to each of the contracts IRD implemented in Afghanistan.  Some indications of that policy include:

- <u>Industry practice</u>:  According to more than 10 confidential witnesses, including former U.S. government officials, academic and other experts, and industry participants, protection payments to the Taliban were pervasive and routine among USAID contractors operating in Afghanistan.  IRD's payments alleged below are not mere isolated incidents; they are examples of the industry playbook that was almost uniformly followed by American development companies operating in Taliban areas of Afghanistan.

- <u>Office discussions</u>: In or about 2009, employees at IRD's Kabul offices frequently discussed protection payments to the Taliban.  The prevailing understanding among many employees was that IRD was paying the Taliban – either directly or through subcontractors – to secure their projects in Taliban-controlled areas.  Those discussions occurred out in the open and contributed to a mindset among IRD staffers that the only feasible way to implement in Taliban areas was to make protection payments to the insurgents who would otherwise threaten the projects.

- <u>M&E reviews</u>:  Multiple M&E employees evaluating IRD's projects collected evidence of IRD's protection-payment policy.  The evidence, which included conversations with IRD project staff in the field, indicated that IRD maintained a practice of buying the Taliban's support for its projects.  For example, on one occasion, an M&E auditor presented evidence to IRD management in Kabul that an IRD subcontractor had been paying the Taliban in Kandahar.  In response, IRD employees confirmed their awareness of the practice but justified it as a necessary cost of completing IRD's work in insurgent-controlled areas.

- <u>Lack of financial controls</u>:  IRD also avoided placing rigorous controls on what its subcontractors could do with IRD's money.  That was designed (in part) to permit IRD's subcontractors to make protection payments while also insulating IRD managers from the details.  IRD's sole emphasis in designing its internal controls was to verify that it met its "burn rate" – that is, confirming that IRD had fully spent all of the money it had been allocated.  IRD made no effort to trace where its money was actually going and rebuffed efforts to put in place controls that would have exposed its practice of authorizing protection payments.

382.     IRD's payments were consistent with USAID implementers' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage. *See supra* ¶¶ 63, 72-94.  That practice was especially prevalent among the larger development contractors in Afghanistan:  the biggest contractors faced the highest security risks, and the highest profit incentive, which motivated them to buy off the Taliban almost universally.  In following that standard practice, IRD made payments that were, on information and belief, worth at least 20 to 40 percent of its contracts' value.  *See supra* ¶ 92.  As a result, across its contracts, IRD made payments to the Taliban worth at least several million dollars.

383.     IRD financially supported the Taliban both through payments it negotiated itself and through payments it funneled through its subcontractors.  *See supra* ¶¶ 84-93.  In the latter

circumstance, IRD actively participated in its subcontractors' conduct by (among other things) approving the charges for the protection payments and authorizing their reimbursement.  *See supra* ¶¶ 95-96.  In all cases, IRD knew (or recklessly disregarded) that its money was funding attacks on U.S. personnel in Afghanistan.  *See supra* Part III.A-B.

384.     The AVIPA program offers a good illustration of IRD's general practice.  That program focused on agricultural projects in Helmand and Kandahar, which are two historical Taliban strongholds where protection payments were the norm.  *See supra* ¶ 148.  IRD ran that project out of an office in Lashkar Gar, in Helmand Province.  There, IRD employees considered it common knowledge that IRD was paying the Taliban as a way to protect its projects out in the field.  Those payments occurred in part through IRD subcontractors purchasing "security" from Taliban insurgents near the village of Marjah.  On one occasion, in or around 2010-2011, an IRD subcontractor explained directly to an IRD employee in Lashkar Gar that the subcontractor's bills were more expensive than projected because the subcontractor was directing part of its budget to the Taliban.  IRD did not instruct the subcontractor to stop.

385.     IRD employees implementing the AVIPA program knew the Taliban was receiving IRD's money and materials.  AVIPA included one program in which IRD distributed cash, fertilizer, and seeds to Afghan farmers.  IRD's project team knew that both its money and its agricultural products were reaching the Taliban.  With the cash, IRD often paid local Afghan villagers without checking their identification (as required) or doing any other diligence, knowing that Taliban members were among the recipients.  As for the agricultural products, IRD discovered that its fertilizer and seeds were also funding the Taliban; individual Taliban members were obtaining both products from IRD and monetizing them on the black market. One IRD employee at Lashkar Gar, upon discovering this, reported it to IRD management and

urged IRD to shut down the program.  IRD refused and instructed the employee to continue

implementing as before – no matter whom IRD's resources were benefiting.

386.    According to one estimate by an M&E employee tasked with evaluating the

AVIPA program, roughly 20% of the people that IRD distributed assistance to were Taliban

members.  When the M&E employee alerted IRD managers to the problem and urged them to

put in place controls to prevent this from occurring, the employee was ignored.

387.    On one occasion, in or about 2011, IRD was forced to (belatedly) fire one of its

local employees in Helmand who was working on the AVIPA program, after the U.S. Marine

Corps intercepted communications between the employee and the Taliban in the area.

388.    The SPR program was similar.  IRD's offices in Kabul – which were on a

luxurious block in Kabul known as "IRD street" – hosted frequent employee discussions about

the best way for IRD to implement the SPR program in the face of Taliban threats.  That

program, which was designed to build tertiary roads in many districts (including several under

Taliban control or influence), entailed regular IRD payments to the Taliban to provide

"security."  Those payments took two forms:  (1) cash payments to Taliban representatives, and

(2) the retention of Taliban-owned local subcontractors to perform the work.  Project staffers on

the SPR project spoke openly about the challenges posed by insurgents and the financial

strategies that IRD used to obtain Taliban "permission" to proceed with its work.

389.    In or about late 2010, one IRD construction subcontractor working on the SPR

project in Laghman Province knowingly hired Taliban guards directly onto its payroll for a fee of

roughly $70,000 for seven months of work.  The subcontractor openly admitted to the payments

and justified them through a simple cost-benefit analysis.  In the subcontractor's recollection, the

Taliban-sourced security guards cost only $10,000 per month, whereas it would have cost roughly double that amount to hire non-Taliban security guards for the construction site.

390.    The KFZ program provides another example of IRD's policy.  That program involved work in Kandahar – a Taliban stronghold – and entailed routine payments from IRD to the Taliban.  On one occasion in or about 2014, an M&E consultant evaluating the project met with IRD's principal subcontractor to discuss its bills.  The M&E consultant had observed that the quality of materials used on the project was substandard and did not match those disclosed on the project's original Bill of Quantity.  When pressed for an explanation, the subcontractor explained that it had to spend between 10-20% of its budget bribing the Taliban, which left insufficient money remaining in the budget to meet the project specifications.  When the consultant passed that explanation along to IRD managers in Kabul, IRD confirmed its awareness of the practice.  The IRD managers justified the subcontractor's actions by stating its belief that it needed to pay the Taliban to secure "permission" to work in an area like Kandahar.

391.    Task Force 2010 collected evidence documenting IRD's practice of paying money to insurgents on these and other projects.  In the course of performing a systemic analysis of contracting corruption and its link to terrorist finance, Task Force 2010 auditors discovered that IRD's protection payments were especially pronounced.  In or about 2011, Task Force 2010 performed an audit, drawing on U.S. intelligence reporting, that confirmed IRD's role in financing the insurgency in connection with the contracts identified above.

392.    IRD was especially aware of protection payments' consequences, due to similar work it performed in Iraq.  In Iraq, IRD implemented a USAID cash-for-work program – comparable to the AVIPA program in Afghanistan – in insurgent-controlled areas.  There, IRD

likewise paid insurgents, often through a "complex web of contractors and subcontractors."[460]

According to a U.S. Army Colonel who worked alongside IRD in Iraq, IRD's corrupt payments

– including "'protection' bribes" – were "feeding the insurgents' ability to continue to resupply

and fight against us."  As a former U.S. Ambassador explained, "We were losing soldiers," and

IRD was implementing "a program that, I believe, contributed to this."[461]  Ultimately, IRD's

"money was going to the militias" and "buy[ing] weapons and ammunition to use against us."[462]

393.    These accusations against IRD appeared in a highly publicized 2010 article in the

*Nation*.  IRD was aware of the article and, on information and belief, spoke to the reporter before

its publication.  Despite the article, IRD continued to employ the same practices of financing the

terrorists who were attacking Americans in Afghanistan.

## 2.    IRD's Protection Payments Comport With Its Other Conduct In Afghanistan

394.    IRD's protection payments reflected a system of deficient internal controls that

also permitted related misconduct.  IRD's deficient controls sprang from IRD's overriding

concern for its own revenues.  On the SPR project, for example, IRD spent less than half of the

project money on actual road construction.  The remainder went to "security" costs, "community

development" costs, and IRD's profits.  The result, the *Washington Post* reported, was "vast

sums of money . . . being squandered" on IRD's projects.[463]  IRD managers were obsessed with

the company's "burn rate":  the measure of how quickly and fully IRD spent the money USAID

---

[460] Luke Mogelson, *Aiding The Insurgency*, The Nation (May 12, 2010) ("*Aiding The Insurgency*").

[461] *Id.*

[462] Scott Higham et al., *Doing Well By Doing Good:  The High Price Of Working In War Zones*, Wash. Post (May 4, 2014).

[463] Scott Higham & Steven Rich, *USAID Suspends IRD, Its Largest Nonprofit Contractor In Iraq & Afghanistan*, Wash. Post (Jan. 26, 2015).

had allocated to it, which IRD viewed as the key to obtaining additional funding.  In essence, the faster IRD spent the money (even if on undisclosed protection payments to the Taliban), the more total money it would receive from the U.S. government.

395.    The *Wall Street Journal* reported that, according to former IRD workers on the SPR project, "IRD staff were falsifying reports and exaggerating the impact of the development projects."[464]  That was consistent with IRD's longstanding practice of creating inaccurate reports on its projects.  On the AVIPA project, for example, IRD officials routinely suppressed unfavorable facts and encouraged its employees to "paint a rosy picture" for USAID.  And when M&E employees raised concerns about IRD handing out cash to Taliban members, IRD dismissed those concerns and authorized distributions based on forged or duplicate invoices.  In doing so, IRD remained true to the principles it followed in Iraq.  There, as in Afghanistan, IRD paid "militia members" based on falsified "time sheets" that "made no pretense of truth."[465]

396.    Throughout, IRD developed a reputation in Afghanistan development circles for "serious managerial, technical and oversight deficiencies."[466]  Its projects were routinely plagued by missing money, unauthorized expenditures, and a near-total lack of accountability on the ground.  In one typical example that captures IRD's work in Afghanistan, IRD was unable to locate any of the expensive tractors it had purchased with USAID money and supposedly distributed to Afghan farmers.  As SIGAR succinctly observed, "All 69 tractors that IRD distributed under [the] USAID contract for AVIPA-Plus program are missing."[467]

---

[464] Dion Nissenbaum, *Roads to Nowhere:  Program to Win Over Afghans Fails*, Wall St. J. (Feb. 10, 2012).

[465] *Aiding The Insurgency*.

[466] Scott Higham et. al, *Doing Well By Doing Good:  The High Price Of Working In War Zones*, Wash. Post (May 4, 2014).

[467] Tweet by @SIGARHQ (Jun. 27, 2013), https://twitter.com/SIGARHQ/status/350327739468886019?s=20.

397.     On January 26, 2015, USAID suspended IRD from receiving federal contracts based on an administrative finding that IRD had engaged in a "consistent pattern of mischarging the United States Government."[468]  The suspension finding also documented IRD's "systemic problems with financial management and controls."[469]  On April 13, 2015, USAID observed that IRD had responded with "sweeping changes," including by dissolving its Board of Directors, separating its CEO, and putting in place a reorganization plan that would ultimately lead to IRD's rebranding as Blumont.[470]  Despite those changes, USAID continued the suspension.

398.     On August 3, 2015, a court in this District preliminarily enjoined the USAID suspension order, finding it procedurally deficient.[471]  The court did not rule on the underlying evidence substantiating USAID's findings about IRD.  On September 25, 2015, USAID administratively settled with IRD, based in large part on "some improvements in IRD's management and financial controls" that the company implemented after June 2015.[472]

399.     In the midst of the USAID suspension proceedings, more than six senior IRD officials resigned, including its CFO, General Counsel, and Chief Administrative Officer.

400.     On August 16, 2016, IRD's director of contracts in Afghanistan was sentenced to 46 months in prison "for his role in a bribery scheme" concerning an IRD "program in

---

[468] Memorandum from K. Stohs to A. Djahanbani, *Recommendation Of Suspension Of International Relief & Development (IRD)* at 4 (Jan. 26, 2015).

[469] *Id*.

[470] Memorandum from K. Stohs to A. Djahanbani, *Recommendation For The Continued Suspension of International Relief And Development, Inc. et al.* at 1 (Apr. 13, 2015).

[471] Order, *International Relief & Dev., Inc. v. USAID*, No. 15-cv-854-RCL (D.D.C. Aug. 3, 2015) (Dkt. 35).

[472] Ltr. from C. White to IRD, *Notice Of Intent To Enter Into An Administrative Agreement With IRD & Its Affiliates* (Sep. 25, 2015).

Afghanistan."[473]  As part of a guilty plea, he admitted that he "solicited and received a $51,000 bribe" from an Afghan subcontractor seeking to work with IRD.  He further "attempted to conceal the bribe proceeds by conspiring with others to . . . circumvent the financial institutions' mandatory cash reporting requirements."[474]

### H.      The Chemonics Defendant

401.     Chemonics made protection payments to the Taliban from at least 2006 until at least 2015.  During the relevant timeframe, Chemonics was one of the largest recipients of USAID contract money in Afghanistan.  As of 2013, Chemonics had received $822 million in contracts – the third largest overall, behind only the LBG/BV Joint Venture and DAI.

402.     Chemonics implemented multiple government contracts in Afghanistan during the relevant timeframe.  Those contracts include, but are not limited to:

  a.      2003 RAMP Project:  In July 2003, USAID awarded Chemonics a 3-year contract, via contract number 306-C-00-03-00502-00, to implement USAID's Rebuilding Agricultural Markets Program ("RAMP").  The contract was valued at $153.4 million.

  b.      2005 ALP/S Project:  In February 2005, USAID awarded Chemonics a 4.5 year (as modified) contract, via contract number 306-M-00-05-00516-00, to implement USAID's Alternative Livelihoods Program/Southern Region ("ALP/S").  The contract, as later modified by USAID, was valued at $166 million.

  c.      2006 ASAP Project:  In November 2006, USAID awarded Chemonics a 5-year contract, via contract number 306-C-00-07-00501-00, to implement the Accelerated Sustainable Agriculture Program ("ASAP") in Afghanistan.  The contract was valued at $62 million, which USAID later increased to $133 million.

  d.      2009 ASI Program:  In June 2009, USAID awarded Chemonics a 3-year contract, via contract number 306-DOT-I-02-08-00033-00, to implement the Afghanistan Stabilization Initiative ("ASI") program.  The contract was initially valued at $160 million, which USAID later decreased to $120 million.

---

[473] Press Release, U.S. Dep't of Justice, *Former Employee of U.S. Contractor In Afghanistan Sentenced On Bribery & Structuring Conspiracy Charges* (Feb. 16, 2016).

[474] *Id.*

    **e.**    <u>2010 RAMP-UP South Program</u>:  In June 2010, USAID awarded Chemonics a 3.75 year contract, via contract number 306-C-00-10005-27, to implement USAID's Regional Afghan Municipalities Program for Urban Populations ("RAMP-UP") program in southern Afghanistan.  The contract was valued at $101 million.

    **g.**    <u>2013 RADP-S Program</u>:  In October 2013, USAID awarded Chemonics a 4-year contract, via contact number 306-C-13-00018, to implement USAID's Regional Agricultural Development Program ("RADP-S") in southern Afghanistan.  The contract, as modified, was valued at $109 million.

    **h.**    <u>2014 RADP-W Program</u>:  In August 2014, USAID awarded Chemonics a 5-year contract, via contract number 306-C-14-00007, to implement USAID's Regional Agricultural Development Program ("RADP-W") in western Afghanistan.  The contract was valued at $70 million.

403.  From at least 2006 through at least 2015, Chemonics maintained a general policy of paying the Taliban to secure its projects in Taliban-controlled or –influenced regions.  That policy applied to each of the contracts Chemonics implemented in Afghanistan.  Some indications of that policy include:

- <u>Industry practice</u>:  According to more than 10 confidential witnesses, including former U.S. government officials, academic and other experts, and industry participants, protection payments to the Taliban were pervasive and routine among USAID contractors operating in Afghanistan.  Chemonics's payments alleged below are not mere isolated incidents; they are examples of the industry playbook that was almost uniformly followed by American development companies operating in Taliban areas of Afghanistan.

- <u>Operational geography</u>:  Chemonics operated extensively in Kandahar, Helmand, and Herat Provinces, among others, which were under near-total Taliban control.  The characteristics of these provinces encouraged companies implementing high-value projects to pay the Taliban.  For example, in Kandahar, the local Taliban commanders maintained a policy of threatening development projects unless they "registered" with the Taliban and "pa[id] our tax."  As for Helmand, given the Taliban's stranglehold on the area, virtually any development project there "almost certainly involve[d] massive payments to the insurgents."[475]  Herat was similar: interviews with industry participants and Taliban commanders in both Helmand and Herat "indicate a consensus that it has become impossible to execute government or internationally sponsored development projects without payments that end up in Taliban coffers."[476]

---

[475] Jean MacKenzie, *Watershed Of Waste:  Afghanistan's Kajaki Dam & USAID*, GlobalPost (Oct. 11, 2011).

[476] *Economic Impediments* at 80.

- Project type:  Chemonics focused on agricultural and stabilization projects, which both were especially potent sources of insurgent finance.[477]  Agriculture projects by necessity required travel to remote, rural areas – virtually always under Taliban control – and entailed payments both to travel to the project sites and to protect workers in the field.  For example, Chemonics implemented the ASI project in the Taliban-controlled southern provinces, and its practice was similar to the one employed by DAI – which implemented the same project in the East and paid protection money to the Taliban there.  *See supra* ¶ 187.

- Lack of financial controls:  Chemonics became one of USAID's largest contractors in Afghanistan due to its "ability to cut corners and manipulate figures."[478]  Chemonics's lack of financial controls – as with the other Defendants – enabled money to flow to insurgents with little oversight.  For example, on the ASI-South Program alone, a SIGAR audit found more than $2 million in Chemonics expenditures that were "not supported by sufficient documentation to allow [auditors] to determine their accuracy and allowability."  Such unexplained expenditures, on a project implemented in a Taliban heartland, are a strong indication of protection payments.

404.    Chemonics's payments were consistent with USAID implementers' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage.  *See supra* ¶¶ 63, 72-94.  That practice was especially prevalent among the largest development contractors in Afghanistan:  the biggest contractors faced the highest security risks, and the highest profit incentive, which motivated them to buy off the Taliban almost universally.  In following that standard practice, Chemonics made payments that were, on information and belief, worth at least 20 to 40 percent of its contracts' value.  *See supra* ¶ 92.  As a result, across its contracts, Chemonics made payments to the Taliban worth at least several million dollars.

---

[477] *See, e.g.*, *Stabilization Lessons* at 65 ("a substantial percentage of expenditures [were] diverted to insurgent groups," including through "USAID implementing partners, or their private security contractors, . . . paying 'taxes' in exchange for the ability to access project sites and implement projects without facing attacks").

[478] Conor Keane, *US Nation-Building In Afghanistan* 121 (Routledge 2016); *see also, e.g.*, USAID OIG, *Audit Of USAID/Afghanistan's Afghanistan Stabilization Initiative For The Southern Region*, Report No. F-306-12-001-P at 2 (Nov. 13, 2011) ("Chemonics reported planned accomplishments instead of reporting actual results to USAID/Afghanistan, significantly overstating its actual accomplishments.").

405.     Chemonics financially supported the Taliban both through payments it negotiated itself and through payments it funneled through its subcontractors.  *See supra* ¶¶ 84-93.  In the latter circumstance, Chemonics actively participated in its subcontractors' conduct by (among other things) approving the charges for the protection payments and authorizing their reimbursement.  *See supra* ¶¶ 95-96.  In all cases, Chemonics knew (or recklessly disregarded) that its money was funding attacks on U.S. personnel in Afghanistan.  *See supra* Part III.A-B.

406.     The RAMP and ALP/S projects offer good illustrations of Chemonics's standard practice. Beginning in 2004, Chemonics hired USPI as its principal security provider on those (and other) projects.  Chemonics's motivation for hiring USPI was financial:  USPI was the cheapest security option – because it paid off (rather than fighting) insurgents – and Chemonics thought the prices quoted by higher-caliber competitors were too expensive.  USPI soon became embedded in Chemonics's operations throughout Afghanistan, including in Kandahar, Helmand, Kabul, and Zabul.  Chemonics even adopted a policy requiring that all employees travel with a USPI escort.  Examples included USPI-escorted trips along the Kabul-Kandahar highway, visits to LBG construction sites in Zabul, and travel in and around the Kajaki Dam in Helmand.

407.     During this time, in Taliban-controlled or –influenced areas, USPI regularly paid the Taliban – either through cash payments or by sourcing its guards directly from local Taliban warlords.  *See supra* ¶¶ 255-263.  Multiple USPI employees have admitted to that practice, *see supra* ¶¶ 261, 263, and USPI was widely known in Afghanistan for its protection payments.  In keeping with its standard practice, USPI bought security for Chemonics using the same techniques it used for LBG, Black & Veatch, and DAI.

408.     Chemonics knew that USPI was paying the Taliban on Chemonics's behalf.  A senior Chemonics official specifically understood that USPI was able to provide security so

cheaply because it bought the loyalty of the local warlords in the areas in which it operated.

Through conversations with USPI employees and first-hand experiences traveling with USPI

convoys, the Chemonics official observed that USPI's practices were enabling local militia

commanders responsible for violence in the regions in which Chemonics operated.  In some

areas, including certain northern provinces, this meant that USPI was financing armed criminal

militias with their own independent agendas.  In the southern areas where Chemonics's work

was concentrated, however, it meant financing the Taliban.

409.    On one occasion, in or about 2005, a senior Chemonics employee objected to

USPI's practices and refused to continue work in Helmand so long as Chemonics remained

affiliated with USPI.  At the same time, the Chemonics employee also suggested that the security

situation had deteriorated so much in Helmand that Chemonics should postpone its work until it

could replace USPI and find a better way to provide security for the projects.  Chemonics

ignored the employee's objections and fired the employee shortly thereafter.

410.    Chemonics did not make payments solely through USPI.  As another example, it

also paid protection money to secure its work on the ASI and RAMP-UP South projects.  In

connection with those projects, Chemonics leased a compound in Kandahar from General

Sherzai, a notorious insurgent-affiliated warlord whose role in Kandahar was similar to General

Wahab's in Kunar.  *See supra* ¶¶ 235-237.  General Sherzai was not a military officer; he was a

well-known insurgent fundraiser and crime lord.  Companies that hired General Sherzai did so in

part as a way of buying peace with the Taliban.  His relationship to the Taliban was apparent

from his living quarters:  he lived in an expensive house, with no security, in the heart of a

Taliban-controlled area – and yet was never attacked.  For that reason, one Chemonics employee

confronted the Chemonics Chief of Party in or about 2010 and objected to Chemonics's practice

of paying General Sherzai for security.  In response, the Chief of Party dismissed the concerns

and explained that Sherzai was the cheapest, most effective way to protect Chemonics's workers.

411.    As with the other Defendants, Chemonics's payments sprang from an internal

culture in Afghanistan that emphasized making money rather than effective development.  Much

like IRD, Chemonics's primary objective was to maintain a high "burn rate" – simply spending

as much money as possible, so that it could justify even higher awards on the next project.  This

emphasis led to Chemonics management pressuring employees to manipulate reports to USAID

to show progress when none existed; to Chemonics employees recording more work hours than

had actually occurred on projects; and to subcontractors inventing "ghost" workers that

Chemonics knowingly reimbursed.  As a result, Chemonics's Afghanistan work was immensely

profitable, with its middle- and upper-level managers receiving large six-figure salaries and

bonuses on top.  That emphasis on maximizing profits, as with the other Defendants, also led it

to knowingly make and approve payments to the Taliban to secure its projects in Afghanistan.

## V.    THE TALIBAN, WITH SUBSTANTIAL SUPPORT FROM AL-QAEDA, USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS IN AFGHANISTAN

### A.    The Taliban Was Part Of A Terrorist Syndicate That Waged A Deadly Insurgency Against Americans In Afghanistan

412.    Defendants' payments supported acts of international terrorism that killed and

injured Plaintiffs.  In this section, Plaintiffs identify the terrorist groups, subgroups, and

partnerships responsible for the specific attacks that killed and injured them.  Each worked in

concert and shared resources, personnel, and operational plans.  Given such coordination, a

former CIA official and senior White House antiterrorism advisor – representing the U.S.

government's consensus view – called the resulting terrorist superstructure a "syndicate,"

composed of al-Qaeda, the Taliban, and other allied FTOs.[479]  Osama bin Laden himself conceived of al-Qaeda as the leader of a terrorist coalition, including the Taliban, across Pakistan and Afghanistan.[480]

413.    Due to the mutually reinforcing ties between the Taliban and al-Qaeda in Afghanistan, support for the one benefited the other.  Defendants' protection payments to the Taliban thus had crosscutting effects:  they enabled wide-ranging terrorist attacks against Americans in Afghanistan, executed mostly by the Taliban but supported by (and sometimes jointly committed with) al-Qaeda and the other components of the overarching syndicate.

414.    Each of the terrorist entities below used indiscriminate violence against American armed forces members serving as part of Operation Enduring Freedom or the ISAF, as well as civilians, to achieve political ends.  Their primary goal was to intimidate and coerce the U.S. government (and other Coalition countries) to withdraw Coalition personnel from Afghanistan, and to affect the conduct of those governments by mass destruction, assassination, and kidnapping.  The terrorists also sought to intimidate the newly elected (and U.S.-backed) recognized government of Afghanistan.  And the insurgency used violence to intimidate and coerce the civilian population of Afghanistan to abide by a severe form of Islamic Sharia law.

415.    At all relevant times, Defendants knew that the entities below were terrorist organizations targeting both American service members and American and Afghan civilians.  They knew this not only because it was common knowledge in Afghanistan – a prevailing understanding of which Defendants and their agents were aware – but also because it was

---

[479] Bruce Riedel, *Deadly Embrace: Pakistan, America, And The Future Of The Global Jihad* at 1 (Brookings Inst. Press 2d ed. 2011) ("*Deadly Embrace*").

[480] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Weekly Standard (July 4, 2011) ("*The al Qaeda – Taliban Connection*").

reported by both the U.S. government and the Western press.  *See supra* Parts I, III.B, III.C.  One notorious example of this is the Taliban's role in enabling the 9/11 attacks by harboring Osama bin Laden and other al-Qaeda terrorists.

416.    None of the terrorist entities identified below adhered to the Geneva Conventions or the laws of war.  Among other violations, they refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons.  None was associated with a recognized government.  And none was waging a civil war, nor did any have a legitimate claim to sovereignty over Afghan territory.

### 1.    The Taliban

417.    The Taliban is a Sunni Islamic terrorist organization composed originally of former mujahideen fighters who had expelled the Soviet Union from Afghanistan.  In July 2002, President George W. Bush amended Executive Order 13224 to designate the Taliban and its leader Mohammed Omar as Specially Designated Global Terrorists.[481]  In doing so, President Bush terminated President Clinton's Executive Order 13129, which had observed that the Taliban had "de facto control over the territory of Afghanistan,"[482] finding that the situation "has been significantly altered given the success of the military campaign in Afghanistan."[483] President Bush found that the Taliban's designation was necessary to guard against "grave acts of terrorism and threats of terrorism committed by foreign terrorists."[484]

418.    Even before that designation, which followed the September 11 attacks and the beginning of Operation Enduring Freedom, the U.S. government considered the Taliban a

---

[481] *See* Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

[482] Exec. Order No. 13,129, 64 Fed. Reg. 36,759, 36,760 (July 7, 1999).

[483] Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

[484] *Id.*

terrorist group and never recognized it as the government of Afghanistan.  *See supra* Part I.

Pakistan, Saudi Arabia, and the United Arab Emirates alone recognized the Taliban as the

government following its capture of Kabul in 1996; no other country followed suit.

419.    Following its capture of Kabul, the Taliban continued to focus on terrorism and

imposing strict Sharia law, rather than rebuilding the country.  As an Assistant Secretary of State

for South Asian Affairs testified, the Taliban demonstrated "no desire to provide even the most

rudimentary health, education, or other social services expected of any government.  Instead,

they have chosen to devote their resources to waging war on the Afghan people, and exporting

instability to their neighbors."[485]

420.    After 1996, the government of President Rabbani retained Afghanistan's seat at

the United Nations, despite repeated attempts by the Taliban to gain U.N. recognition.  The

United States opposed the Taliban's attempts to gain recognition from the United Nations.

421.    Within weeks of the September 11 attacks, the United Arab Emirates and Saudi

Arabia severed diplomatic relations with the Taliban.  Shortly thereafter, the U.S. military

launched Operation Enduring Freedom and quickly expelled the Taliban from much of

Afghanistan.  *See supra* Part I.  By November 2001, Pakistan withdrew its diplomatic

recognition of the Taliban, leaving the Taliban with no international recognition.

422.    Around the same time, in November 2001, the United Nations met in Bonn,

Germany to discuss the future of Afghanistan.  The Bonn Conference included delegates from

---

[485] *Afghanistan's Humanitarian Crisis:  Is Enough Aid Reaching Afghanistan?*:  Hr'g Before
the U.S. Senate Committee  On Foreign Relations, Subcomm. On Near East & South Asian
Affairs, S. Hr'g 107-235, at 18 (Oct. 10, 2001) (statement of Christina Rocca, Asst. Sec'y, South
Asia, Dep't of State).

multiple Afghan groups, but not the Taliban.  The delegates agreed to an interim government led by Hamid Karzai and called for international peacekeepers to provide security.

423.    The United States recognized the interim government in Afghanistan on December 22, 2001.  It re-opened the American Embassy in Kabul on January 17, 2002.

424.    Hamid Karzai was elected President of the Afghan Transitional Administration in June 2002 by the *loya jirga*, a traditional Afghan assembly of tribal leaders, which did not include any members of the Taliban.  President Karzai addressed the U.N. General Assembly as the President of Afghanistan in September 2002.  In December 2002, the U.N. Security Council recognized "the Transitional Administration as the sole legitimate Government of Afghanistan, pending democratic elections in 2004" and reaffirmed its "commitment to assist the Transitional Administration in its efforts to ensure security, prosperity, tolerance and respect for human rights for all people of Afghanistan, and to combat terrorism, extremism and narco-trafficking."[486]

425.    In May 2003, the United States declared an end to major combat operations in Afghanistan, with Secretary of Defense Donald Rumsfeld marking the beginning of "a period of stability and stabilization and reconstruction activities."[487]  NATO assumed command of the ISAF in August, and in October, the U.N. Security Council expanded the ISAF's mandate "to support the Afghan Transitional Authority and its successors in the maintenance of security."[488]

426.    A special constitutional *loya jirga* approved a new Constitution for the new Islamic Republic of Afghanistan on January 4, 2004.  The Taliban did not participate.  Under the new Constitution, in October 2004, the Afghan people elected President Karzai to a five-year term as president.  The Taliban threatened to disrupt that election by attacking polling places.

---

[486] U.N. Security Council Resolution 1453 (Dec. 24, 2002).

[487] *Rumsfeld:  Major Combat Over in Afghanistan*, CNN (May 1, 2003).

[488] U.N. Security Council Resolution 1510, ¶ 1 (Oct. 13, 2003).

427.    The U.S. military and ISAF continued to operate in Afghanistan at the invitation

of the Afghan government.  On May 23, 2005, President Bush and President Karzai issued a

Joint Declaration of the United States-Afghanistan Strategic Partnership in order to strengthen

"Afghanistan's long-term security, democracy and prosperity," which provided for continued

U.S. military operations in Afghanistan.[489]  In September 2005, the Minister for Foreign Affairs

of Afghanistan told the United Nations that Afghanistan "welcome[d] the prospect of ISAF

continuing to operate in Afghanistan until our Security Forces are fully able to provide security

to our nation."[490]  The U.N. Security Council reauthorized the ISAF later that month.[491]

428.    On December 26, 2007, Congress enacted a law declaring that, for purposes of

"section 212(a)(3)(B) of the Immigration and Nationality Act, . . . the Taliban shall be

considered to be a terrorist organization."[492]  As a State Department official explained, the U.S.

government treats the Taliban "as a Foreign Terrorist Organization for immigration purposes."[493]

429.    In sum, at all relevant times, the U.S. government viewed the Taliban as a terrorist

group, not as the legitimate armed force or government of any nation.

430.    Although the Taliban had local chapters throughout Afghanistan, it operated as a

top-down hierarchy through which the Quetta Shura (the seat of Taliban political power) and the

Peshawar Shura (the seat of its so-called "military" power) exerted command and control over

---

[489] Joint Declaration of the United States-Afghanistan Strategic Partnership, 1 Pub. Papers 853 (May 23, 2005).

[490] Letter from Secretary-General to the President of the Security Council, U.N. Doc. S/2005/574, at 2 (Sept. 12, 2005).

[491] U.N. Security Council Resolution 1623 (Sept. 13, 2005)

[492] Consolidated Appropriations Act of 2007, § 691(d), Pub. L. No. 110-161, 121 Stat. 1844, 2365.

[493] U.S. Dep't of State, *Senior Administration Officials on the Terrorist Designation of the Haqqani Network* (Sept. 7, 2012).

rank-and-file Taliban fighters.  The Taliban's top-down, command-and-control mechanisms were particularly strong with respect to the collection of protection money and the attacks that such money funded.  *See supra* ¶ 100.  The degree of control exerted by Taliban leadership is also evident in the February 2020 U.S.-Taliban agreement.[494]  Since that agreement, entered into by Taliban leadership, Taliban rank-and-file fighters throughout the country have complied with leadership's directive to desist from all large-scale attacks on U.S. forces.

431.    The Taliban's principal goal has long been to expel Americans from the country and undermine the democratically elected government of Afghanistan.  To that end, the Taliban began ramping up attacks on U.S. forces during the mid-2000s.  The Taliban also began to use new attack types during this timeframe, including suicide bombings.  For example, the Taliban committed six suicide bombings in Afghanistan in 2004, as compared to 141 in 2006.  Remotely detonated bombings also more than doubled between 2005 and 2006.

432.    In 2008 and 2009, the growing Taliban-led insurgency attacked U.S. forces throughout Afghanistan, with a particular emphasis on the southern provinces, especially Helmand and Kandahar.  In 2009, responding to the Taliban's growing threat, U.S. Marines launched counterinsurgency operations focused on "restoring government services, bolstering local police forces, and protecting civilians from Taliban incursion."[495]  The Taliban, in turn, responded with escalating violence.  By 2010, the Taliban's power and influence was growing, and it had regained much of the territory it had lost after September 11.

---

[494] Agreement For Bringing Peace To Afghanistan Between The Islamic Emirate Of Afghanistan which is not recognized by the United States as a state and is known as the Taliban and the United States of America (Feb. 29, 2020).

[495] Council on Foreign Relations, *Timeline: The U.S. War in Afghanistan: 1999 – 2020* (last visited June 3, 2020).

433.    The Taliban often attacked American military forces, contractors, and Afghan forces.  But it also targeted civilian aid workers, NGOs, and Afghan civilians.  In recent years, the Taliban has increased attacks on civilians by placing explosives in public locations and using suicide bombers.  It routinely used improvised explosive devices that included passive detonation devices that would be triggered by any nearby movement (including by civilians).  It has also used civilians to attract Coalition forces before detonating a bomb, frequently killing more civilians than Coalition forces.  In doing so, the Taliban would have violated the laws of war if it was subject to them, and did not comply with the Geneva Conventions.  It neither wore uniforms nor otherwise distinguished its fighters from civilians.  It conscripted children into committing attacks.  The Taliban also regularly targeted teachers, children, doctors, and clerics.  And it engaged in widespread kidnapping and torture in an effort to terrorize its enemies.

434.    In addition, the Taliban summarily executed Afghan civilians without a trial if they were suspected of aiding the Coalition.  According to a Taliban *fatwa* (an authoritative religious decree), "[d]uring the attack by America, if any Muslim – regardless of whether they are Afghan or non-Afghan – cooperates with the infidels, or if he helps and spies for them, then that person will be just like the foreign invaders and killing him becomes mandatory."[496]

435.    The Taliban carried out the terrorist attacks that killed or injured the Plaintiffs in this case.  To effectuate those attacks, it employed a number of different terrorist tactics.  Most prominently, the Taliban relied heavily on IEDs, including Explosively Formed Penetrators ("EFPs"), designed to destroy American armored vehicles and inflict heavy casualties.  Many Plaintiffs, or their family members, were killed or injured by a Taliban-planted IED or EFP.

---

[496] *Resolution & Fatwa Of A Big Gathering Of Clerics*, Anis (Sept. 23, 2001).

436.    The Taliban also has attacked U.S. forces and U.S. government contractors using suicide bombers with increased frequency.  Many Plaintiffs, or their family members, were killed or injured in Taliban suicide-bomber attacks.  *See infra* Part V.B.2.  For example, on April 4, 2012, a suicide bomber detonated a bomb in a park killing CPT Nicholas J. Rozanski, whose family members are Plaintiffs, and severly injuring Plaintiffs SFC David William Haalilio Lau and CPT Christopher J. Rosebrock.  *See infra* ¶¶ 2152-2158; 1604-1617; 2148-2151.

437.    The Taliban (often through the Haqqani Network, *see infra* Part V.A.2), also employed insider attacks carried out by members of the Afghan Army.  According to an August 2012 statement by Mullah Omar, Taliban terrorists "cleverly infiltrated in the ranks of the enemy according to the plan given to them last year."[497]  He similarly encouraged Afghan officers to "defect and join the Taliban."[498]  These attacks took place in all areas of Afghanistan, and the Taliban regularly claimed responsibility for them.[499]  Many Plaintiffs in this case, or their family members, were killed or injured in Taliban-insider attacks.  For example, Sgt Kevin B. Balduf, whose family members are Plaintiffs, was killed in an insider attack committed by the Taliban. *See infra* ¶¶ 625-632.

## 2.    The Haqqani Network

438.    The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s.  It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani.  The Haqqani Network is part of the Taliban and is closely allied and interdependent with al-Qaeda.

---

[497] Bill Roggio, *Mullah Omar Addresses Green-on-Blue Attacks*, Long War J. (Aug. 20, 2012).

[498] *Id.*

[499] *See* Bill Roggio, *2 More ISAF Troops Wounded In Latest Green-On-Blue Attack*, Long War J. (Aug. 13, 2012).

439.    On September 19, 2012, the U.S. State Department designated the Haqqani Network as an FTO.[500]

440.    The United States previously designated multiple Haqqani leaders as Specially Designated Global Terrorists.  On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States."[501]  In 2010 and 2011, the U.S. Treasury Department designated three other members of the Haqqani family – Nasiruddin, Khalil Al-Rahman, and Badruddin – as fundraisers and commanders of the Haqqani Network. By February 2014, the U.S. State Department and the U.S. Treasury Department had designated fourteen leaders in the Haqqani Network under Executive Order 13224.

441.    The Haqqani Network began supplying weapons to the Taliban in the mid-1990s, when the Taliban was in its infancy.  It has operated as part of the Taliban since approximately 1995, when its founder Jalaluddin Haqqani swore allegiance to the Taliban.  Jalaluddin Haqqani was the Minister of Tribal Affairs for the Taliban until the U.S. invasion.

442.    The Haqqani Network was especially active in the southeastern parts of Afghanistan, particularly in P2K.  It also developed a significant presence in the surrounding Provinces of Kabul, Logar, Wardak, Ghazni, and Zabul.  Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in those areas.  Sirajuddin Haqqani explained in 2010 that the Haqqani Network is "assigned by the Islamic Emirate in the southeastern front of Afghanistan

---

[500] U.S. Dep't of State, *Country Reports on Terrorism 2017*, at 294 (Sept. 2018).

[501] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended*, 73 Fed. Reg. 12,499 (Mar. 7, 2008).

(Paktia, Khost, Paktika) and we have mujahideen members who are carrying out jihad in the north (provinces in northern Afghanistan) and in the south (provinces in southern Afghanistan), and they are operating under the Amirs of the provinces they are under."[502]

443.    The Taliban's terrorist commanders and shadow governors in the P2K area are often members of the Haqqani Network.  As the U.S. State Department explained when it announced the designation of Mullah Sangeen Zadran as a Specially Designated Global Terrorist, Sangeen Zadran served as the "Shadow Governor for Paktika province, Afghanistan and a commander of the Haqqani Network, a Taliban-affiliated group."[503]  Similarly, Abdul Aziz Abbasin is a "key commander in the Haqqani Network" who simultaneously functioned as the broader Taliban organization's shadow governor for the Orgun District in Paktika Province.[504]

444.    The Haqqani's influence is not limited to the southeastern provinces.  There is also significant overlap between the broader leadership of the Taliban and the Haqqani Network.  Sirajuddin Haqqani (Jalaluddin's son and successor) has been a member of the Taliban's governing council since at least 2010.  Since 2015, he has been the Deputy Emir of the Taliban, which is the second in command in the Taliban's leadership.

445.    In particular, the Haqqani Network has overseen the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan.  After September 11, Jalaluddin Haqqani effectively served as the Taliban's secretary of terrorism and planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government.  In October 2001, a

---

[502] Bill Roggio, *Taliban Cooperation With al Qaeda 'Is At The Highest Limits' – Siraj Haqqani*, Long War J. (Apr. 15, 2010) ("*Taliban Cooperation*").

[503] Press Release, U.S. Dep't of State, *Designation Of Haqqani Network Commander Sangeen Zadran* (Aug. 16, 2011).

[504] Bill Roggio, *US Adds 5 al Qaeda, Taliban, Haqqani Network, And IMU Facilitators To Terrorist List*, Long War J. (Sept. 29, 2011).

purported Jihadist publication (as published online) described Jalaluddin as the "chief of the Taliban army."[505]  Indeed, in an interview with Sirajuddin published by Gulf News UAE, the interviewer identified Jalaluddin as "the commander-in-chief of the Taliban's southern military command" – akin to the Taliban combat chief – "[and] Mullah Omar's top military strategist and commander."[506]  As for his son, Sirajuddin is now Deputy Emir of the Taliban and oversees its terrorist operations throughout the country.

446.    Similarly, according to Brigadier General Charles H. Cleveland, the chief spokesman for U.S. and NATO forces in Afghanistan, as of 2016, Sirajuddin Haqqani "increasingly runs the day-to-day military operations for the Taliban, and, we believe, is likely involved in appointing shadow governors."[507]

447.    In 2016, *the New York Times* reported that, according to a senior Taliban commander in southern Afghanistan, Sirajuddin Haqqani was in "constant contact" with Taliban field commanders throughout Afghanistan, including outside the Haqqani Network's area of particular influence in the southeast.[508]  According to the commander, all Taliban field commanders had to contact Sirajuddin Haqqani for permission before launching attacks.

448.    The Haqqani Network also influenced Taliban decisions about which types of attacks to employ.  The Haqqani Network was the first to use suicide bombings in Afghanistan, an innovation that al-Qaeda taught it.  The Haqqani Network also was involved in the rising number of Taliban-insider attacks – which strategically undermined relations between U.S. and

---

[505] Karachi Jasarat, *Chief of Taliban Army Contacts Jamaat-i-Islami Chief* (Oct. 11, 2001).

[506] Aslam Khan, *Taliban Leader Warns of Long Guerilla War*, Gulf News UAE (Oct. 20, 2001).

[507] Mujib Mashal, *Haqqanis Steering Deadlier Taliban In Afghanistan, Officials Say*, N.Y. Times (May 7, 2016).

[508] *Id.*

Afghan forces.  By 2007, Army Lieutenant Colonel Dave Anders, the director of operations for Combined Joint Task Force-82, explained that "Siraj[uddin Haqqani] is the one dictating the new parameters of brutality associated with Taliban senior leadership" employing "[k]idnappings, assassinations, beheading women, indiscriminate killings and suicide bombers."[509]

449.    The Haqqani Network's influence within the broader Taliban organization is not limited to planning and authorizing attacks.  Even outside of the Haqqani's traditional stronghold, its members often commit attacks alongside other Taliban terrorists.  For example, in early 2009, the Haqqani Network was operating in the southern provinces of Helmand and Kandahar.  A spokesman for the Taliban reportedly confirmed that the Haqqani Network was operating in "Kandahar as well as nearby Helmand province to provide training, support – particularly in bomb-making – and to carry out attacks."[510]

450.    In 2013, "[a] combined force in . . . Kandahar . . . arrested a Haqqani Network facilitator who managed supply routes from [Kandahar City] to other provinces" and was "also . . . believed to have been instrumental in the acquisition and distribution of lethal aid to Haqqani fighters for attacks against Afghan and coalition forces."[511]  And a successful 2017 Taliban attack in Kandahar against the United Arab Emirates ambassador to Afghanistan was attributed to the Haqqani Network.

---

[509] Bill Roggio, *Targeting Taliban Commander Siraj Haqqani*, Long War J. (Oct. 20, 2007).

[510] Murray Brewster, *Fanatical Taliban Wing Moves Into Kandahar*, The Star (Feb. 8, 2009).

[511] U.S. Dep't of Def., *Afghan, Coalition Forces Kill Insurgents in Logar Province* (Feb. 20, 2013).

451.    Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban.[512]  The Taliban, for its part, has rejected claims that the Haqqani Network is a separate entity from the Taliban.[513]

452.    The Haqqani Network also has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory.  After September 11, the Haqqanis provided sanctuary to bin Laden after he fled Afghanistan; Jalaluddin Haqqani himself announced that the Taliban would "retreat to the mountains and begin a long guerrilla war to reclaim our pure land from infidels" and stated that "Osama bin Laden . . . [is] safe and sound and carrying out [his] duties."[514]

453.    The Haqqani Network's close relationship with other terrorist groups has helped to develop the modern terrorist syndicate operating in Afghanistan.  In furtherance of that goal, the Haqqani Network provides protection to al-Qaeda so that it can launch attacks in Afghanistan and plan acts of international terrorism abroad.  Senior Haqqani Network officials also have publicly indicated that the Haqqani Network and al-Qaeda are one.[515]  And in July 2008, Jalaluddin Haqqani's son – 18 year old Muhamman Omar Haqqani – was killed alongside a top al-Qaeda commander in southeast Afghanistan.  The Haqqani Network also maintains training camps and safe houses that have been used by al-Qaeda and Taliban operatives.

---

[512] *See* Bill Roggio, *US Military Searches For Kabul Attack Network Members*, Long War J. (Apr. 27, 2016).

[513] *See* Bill Roggio, *Taliban Call Haqqani Network A 'Conjured Entity'*, Long War J. (Sept. 9, 2012).

[514] Aslam Khan, *Taliban Leader Warns Of Long Guerilla War*, Gulf News UAE (Oct. 21, 2001).

[515] *See* Bill Roggio, *An Interview With Mullah Sangeen*, Long War J. (Sept. 17, 2009).

454.    More recently, Sirajuddin Haqqani has welcomed al-Qaeda members to join and fight with the Haqqani Network and the rest of the Taliban.[516]  According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council.[517]  U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.[518]  And when the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a Specially Designated Global Terrorist, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations."[519]  The U.S. Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.[520]

455.    The Haqqani Network is often considered the most radical part of the Taliban. Like the Taliban, it relies on terrorist attacks – including suicide bombings, IED and EFP attacks, insider attacks, and complex attacks – rather than open combat.[521]  The Haqqani Network routinely would violate the laws of war if it were subject to them, and it does not comply with the Geneva Conventions.

456.    Many Plaintiffs, or their family members, were killed or injured in attacks by the Haqqani Network.  For example, the Haqqani Network (in conjunction with al-Qaeda, *see infra* Part V.B.3) conducted the Taliban's terrorist attacks in the P2K area of Afghanistan, including

---

[516] *Taliban Cooperation*.

[517] *Id.*

[518] Hindustan Times, *'Al Qaeda Very Active In Afghanistan, Preparing for Attacks'* (Apr. 14, 2016) ("The Taliban's current deputy commander, Siraj Haqqani, is head of the Haqqani Network and al Qaeda's top facilitator in Afghanistan, according to US officials.").

[519] Press Release, U.S. Dep't of Treasury, *Treasury Targets The Financial And Support Networks Of Al Qa'ida And The Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[520] *See*, *e.g.*, Press Release, U.S. Dep't of Treasury, *Treasury Department Targets Key Haqqani Network Leaders* (Feb. 5, 2014).

[521] Bill Roggio, *Haqqani Network Promotes Suicide, IED Attacks, And Ambushes In 'Caravan of Heroes'*, Long War J. (Apr. 10, 2015).

the May 6, 2012 IED attack that severely injured Plaintiff CPL Jonathan Cleary and killed SSG

Thomas K. Fogarty, whose family members are plaintiffs in this case. *See infra* ¶¶ 858-863;

1146-1155.

457. The Haqqani Network also committed many high profile kidnappings. For

example, on August 7, 2016, the Haqqani Network kidnapped Professor Kevin King, who is a

Plaintiff in this case, at gunpoint just outside the gates of American University of Afghanistan. It

held him hostage under deplorable conditions for more than three years before finally releasing

him as part of a prisoner exchange. *See infra* ¶¶ 1522-1527.

458. The Haqqani Network also participated in the attack on Forward Operating Base

Chapman that killed seven Americans on December 30, 2009, including Mr. Harold Brown, Jr.,

Mr. Dane Clark Paresi, and Mr. Jeremy Jason Wise, whose family members are Plaintiffs in this

case. *See infra* ¶¶ 743-752; 1954-1965; 2526-2535.

### 3. The Kabul Attack Network

459. The Kabul Attack Network is an operational manifestation of the terrorist

syndicate led by al-Qaeda and the Taliban, including the Haqqani Network. Specifically, the

Kabul Attack Network is a set of terrorist cells, which includes members from each of the

terrorist groups involved in the syndicate, and focuses on attacks against targets in Kabul and

extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Kunar, Ghazni, and

Zabul.[522] It is active around key waypoints and transit routes on the way to Kabul, including

---

[522] Bill Roggio, *Karzai Assassination Plotters Part of Kabul Attack Network*, Long War J.
(Oct. 5, 2011).

Wardak, Ghazni City, and areas of Logar Province.  The Kabul Attack Network was responsible for suicide bombings and other attacks on Americans in Kabul and the surrounding areas.[523]

460.    The Kabul Attack Network's members include the Taliban (including the Haqqani Network), as well as al-Qaeda, Lashkar-e-Taiba, and other terrorist organizations active in the Kabul area.  Each of these terrorist groups participates in Kabul Attack Network attacks and contributes personnel and resources to such attacks.  Attacks committed by the Kabul Attack Network are committed jointly by al-Qaeda, Taliban, and Haqqani Network personnel.  By the same token, funding for any of the involved terrorist groups contributed to the Network's attacks.

461.    The Kabul Attack Network is led by Mullah Dawood, the Taliban's shadow governor for Kabul who is also a Taliban and Haqqani Network commander, and Taj Mir Jawad, a top commander in the Haqqani Network with a long history of high-profile attacks.  On information and belief, both Dawood and Jawad reported to Sirajuddin Haqqani, the dual-hatted al-Qaeda-Taliban terrorist ultimately responsible for the Kabul Attack Network's attack strategy.

462.    According to an ISAF public affairs officer, the "Haqqani Network is deeply entrenched in the Kabul Attack Network specifically with the facilitation of weapons and fighters into the area south of Kabul in Logar and Wardak."[524]  Additionally, senior Haqqani leaders operating from their traditional strongholds often planned and executed terrorist attacks by the Kabul Attack Network, sometimes even giving tactical advice during attacks.

463.    Many Plaintiffs, or their family members, were killed or injured in attacks by the Kabul Attack Network.  For example, on October 29, 2011, the Kabul Attack Network executed

---

[523] Bill Roggio, *Afghan Intel Captures Taliban Commander Involved In Targeting 'Foreigners' In Kabul*, Long War J. (Mar. 31, 2015).

[524] Bill Roggio, *Senior Taliban Commander Killed in Eastern Afghanistan*, Long War J. (Aug. 20, 2010).

a suicide-bombing attack that destroyed a large armored bus transporting U.S. forces around

Kabul and killed LTC David E. Cabrera, SGT James M. Darrough, and SSG Christopher R.

Newman, whose family members are Plaintiffs in this case, and 16 others.  *See infra* ¶¶ 524-540;

960-967; 1886-1894.  Almost four years later, on August 22, 2015, the Kabul Attack Network

murdered U.S. government contractors (and Army veterans) Mr. Corey J. Dodge, Mr. Richard P.

McEvoy, and Mr. Barry Sutton whose family members are also Plaintiffs in this case, in a

suicide-bombing attack against a NATO convoy in Kabul.  *See infra* ¶¶ 1020-1028; 1739-1749;

2372-2383.

### B.  Al-Qaeda Committed, Planned, And Authorized The Terrorist Attacks That Killed And Injured Plaintiffs

464.    Osama bin Laden formed al-Qaeda in the 1980s in response to the Soviet

occupation of Afghanistan.  For decades, al-Qaeda has been a Sunni Islamic terrorist

organization intent on destroying the United States.  Al-Qaeda jointly committed, planned, or

authorized each of the Taliban attacks that killed or injured Plaintiffs or their family members.

### 1.      Al-Qaeda's Leadership Of The Taliban Terrorist Syndicate

465.    Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to

transform al-Qaeda into a global terrorist group capable of launching attacks around the world.

After moving to Sudan in the early 1990s, al-Qaeda's leadership returned to Afghanistan in

approximately 1996, where it was sheltered by the Taliban for the next five years. Osama bin

Laden declared war on the United States in a published *fatwa* (an authoritative religious decree)

in 1996.[525]  One scholar who surveyed first-hand accounts of the initial meeting between bin

---

[525] Anne Stenersen, *Al-Qaida in Afghanistan* at 62-63 (Cambridge Univ. Press, 2017) ("*Al-Qaida in Afghanistan*"); Counter Extremism Project, *Osama bin Laden*; Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* at 47-48 ("*The 9/11 Commission Report*").

Laden and the Taliban during this period reported that it "emphasize[d] the Taliban's humble attitude toward the Saudi guest and their immediate readiness to serve him."[526]

466.    In return for the Taliban's safe harbor, al-Qaeda provided substantial resources to the Taliban.  By March 1997, bin Laden had met with Mullah Mohammed Omar personally and offered to lend his fighters to the Taliban.  As bin Laden's deputy, Abu Hafs al-Masri, wrote at the time, the Taliban "movement is a capable Islamic entity and it is possible that it can be a turning point for the betterment of the Islamic world.  The movement needs a vision and it needs support.  It needs someone who will give it a military strategy.  And it needs to build a military force which is suitable for the situation in Afghanistan."[527]  To that end, al-Qaeda shared technical knowledge with the Taliban and paid the Taliban between $10 million to $20 million a year for shelter.  In doing so, Al-Qaeda supplied the strategy and support the Taliban needed to morph into a deadly terrorist group capable of inflicting mass casualties on Americans.

467.    At the same time that Osama bin Laden was cementing his ties with the Taliban, he was escalating his attacks on the United States.  In 1998, while under the Taliban's protection, Osama bin Laden declared a global jihad against the United States, calling on all Muslims to kill Americans at any opportunity.  On August 7, 1998, al-Qaeda suicide bombers in explosive-laden trucks attacked U.S. embassies in Kenya and Tanzania, killing more than 200 people.  The United States responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan and demanded that Mullah Omar turn over Osama bin Laden.  He refused.

---

[526] *Al-Qaida in Afghanistan* at 58.

[527] *Id.* at 67-68.

468.    On October 8, 1999, the U.S. State Department designated al-Qaeda as an FTO, and a week later the United Nations called for sanctions against the Taliban unless it expelled bin Laden from Afghanistan.  Again, the Taliban refused.

469.    In the spring 2001, Osama bin Laden, on behalf of al-Qaeda, pledged an oath of allegiance to Mullah Omar and the Taliban.  A few months later, on September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands.  A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93.  The United States demanded once again that the Taliban turn over bin Laden, and once again the Taliban refused.  The Coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.  *See supra* Part I.

470.    Al-Qaeda's and the Taliban's close relationship continued long after September 11.  During this period, the Taliban's "ties to al-Qaeda were crucial to the Taliban's growth as an insurgency after its routing from Afghanistan."[528]  In May 2007, for example, Taliban official Mullah Dadullah said, "[W]e and al-Qaeda are as one."[529]  In early 2009, a military-intelligence official was quoted as saying, "The line between the Taliban and al Qaeda is increasingly blurred, especially from a command and control perspective."[530]  By the end of that year, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly:  "We are deeply concerned about the growing level of collusion between the Taliban and al Qaeda," he told *The Wall Street Journal*.[531]  And as Lieutenant General Ronald L. Burgess, Jr. testified to

---

[528]   Lauren McNally & Marvin G. Weinbaum, *A Resilient Al-Qaeda In Afghanistan And Pakistan*, MEI Policy Focus 2016-18, at 3 (Aug. 2016) ("*Resilient al-Qaeda*").

[529] *The Other Side* at 23.

[530] Bill Roggio, *Al Qaeda Builds A 'Shadow Army'*, Wash. Times (Feb. 13, 2009).

[531] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009) ("*Afghan Police Killings Highlight Holes in Security*").

the Senate Select Committee on Intelligence, "Al-Qa'eda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."[532]

471.    The Taliban and al-Qaeda have remained intimately intertwined in the years since.  For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced his acceptance of the pledge the following day.[533]  When Mansour was killed in May 2016, Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada.

472.    The overlap between the organizations meant that al-Qaeda routinely played an important role in Taliban and Haqqani terrorist attacks.  As terrorism scholars Bill Roggio and Thomas Joscelyn observed, "[i]t is not clear where, say, al Qaeda ends and the Taliban and other terrorist groups begin.  This is by design.  Bin Laden envisioned al Qaeda as the vanguard of a broader jihadist coalition.  Al Qaeda was always a joint venture."[534]  Mr. Joscelyn testified that the word "syndicate" – referring to the Taliban's and al-Qaeda's joint terrorist venture in Afghanistan – offers an "excellent description of how al Qaeda operates."[535]

473.    Al-Qaeda's leadership of that terrorist syndicate reflected the degree to which al-Qaeda and the Taliban became fully and operationally intertwined.  As India's Permanent Representative to the United Nations explained in describing the al-Qaeda-Taliban "syndicate of

---

[532] *Current and Projected National Security Threats to the United States?*:  Hr'g Before the U.S. Senate Committee on Intelligence, S. Hr'g 111-557, at 13 (Feb. 2, 2010) (statement of Lt. Gen. Ronald Burgess, Jr., Dir., Def. Intelligence Agency), 2010 WLNR 27828348.

[533] Thomas Joscelyn & Bill Roggio, *New Taliban Emir Accepts al Qaeda's Oath Of Allegiance*, Long War J. (Aug. 14, 2015).

[534] *The al Qaeda – Taliban Connection.*

[535] *Al-Qaeda In Afghanistan and Pakistan:  An Enduring Threat*, Hr'g Before the U.S. House Committee On Foreign Affairs, Subcommittee On Terrorism, Nonproliferation, and Trade, S. Hr'g 113-156, at 28 (May 20, 2014) (statement of Thomas Joscelyn, Sr. Research Fellow, Found. for Def. of Democracies), 2014 WLNR 13518260.

terrorism," both groups were by 2011 "ideologically and operationally fused."[536]  By the fall of

2009, noted journalist Peter Bergen concluded, "the Taliban and Al Qaeda function more or less

as a single entity.  The signs of this are everywhere."[537]

474.    The Taliban and al-Qaeda's interdependence and joint venture continued

throughout the period in which Plaintiffs were killed and injured.  As two journalists noted in

2016, the U.S. military's relative success against al-Qaeda neither eliminated al-Qaeda nor broke

apart the syndicate in which it participated:  Afghanistan's southern and eastern provinces

remained a "hub of Afghan insurgents and [the] al-Qaeda-led terrorist syndicate."[538]

475.    In 2010, one terrorism scholar warned against drawing a bright line between al-

Qaeda and the Afghan terrorist groups that it sponsored.  In explaining the importance of

"recogniz[ing] the link between al Qa'ida and Afghan insurgent groups," he observed that a

"policy focused on targeting al-Qa'ida – and not the Taliban, Haqqani Network, or other groups

– would ignore one of the most egregious lessons from September 11."[539]

476.    The U.S. government agreed with that assessment.  During the relevant

timeframe, the U.S. government repeatedly stated that al-Qaeda and the Taliban acted together in

a terrorist "syndicate," and warned against efforts to distinguish between them.  Examples

include:

- Secretary of State Hillary Clinton, July 2009:  "[W]e had an intensive strategic review upon taking office[.]  And we not only brought the entire United States government together, but

---

[536] *India Against Hasty Troop Withdrawal From Afghanistan*, Daily Fin. Post (Oct. 1, 2011), 2011 WLNR 20105460 (quoting Hardeep Singh Puri, India's Permanent Representative to the United Nations).

[537] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009) ("*The Front*").

[538] Ayaz Ahmed & Dr. Faisal Javed, *Pakistan And SCO:  Opportunities for Pakistan*, Asian Defence J. (Aug. 31, 2016), 2016 WLNR 25890108.

[539] Seth G. Jones, *In the Graveyard of Empires:  America's War in Afghanistan* at 332 (W.W. Norton & Co. 2010) ("*Graveyard of Empires*").

we reached out to friends and allies . . . [T]he result of that strategic review was to conclude that *al-Qaeda* is supported by and uses its extremist allies like elements within *the Taliban . . . to be proxies for a lot of its attacks* . . . So the *Taliban* . . . [is] part of a kind of *terrorist syndicate with al-Qaeda at the center*[.]"[540]

- Secretary of State Hillary Clinton, December 2009:  "[W]e have increasingly come to see these organizations *not as separate independent operators* that occasionally cooperate with one another, *but as part of a syndicate of terrorism*. . . . [T]he level of operational cooperation, training, equipping, financing, has grown exponentially.  And *at the head of the table, like an old Mafia kind of diagram, sits al Qaeda*."[541]

- Secretary of Defense Robert Gates, January 2010:  "Defense Secretary Robert M. Gates said yesterday that *Al Qaeda was using proxy terrorist groups to orchestrate attacks in* . . . *Afghanistan* as part of a broader strategy to destabilize the region.  In a news conference held after two days of meetings with Indian officials, *Gates said Al Qaeda had formed a 'syndicate' of terrorist groups with Taliban factions in Afghanistan and Pakistan* . . . 'What we see is that the success of any one of these groups leads to new capabilities and a new reputation for all,' Gates said.  *'A victory for one is a victory for all.'*  US intelligence officials have said that jihadi groups in the region are cooperating more closely than ever . . . *Gates said all of the factions were working under the umbrella of Al Qaeda*."[542]

- Secretary of Defense Robert Gates, May 2010:  "The other concern we have . . . is the *creation of the syndicate of terrorist organizations* that are working with each other, *al Qaeda,* the Taliban in Pakistan*, the Taliban in Afghanistan, the Haqqani Network*.  There are five or six of these groups that are now really working together and *a success for one is a success for all* . . . And so this problem has become more complex as these groups have gotten *closer and cooperated operationally* in a way that we really haven't seen, I think, significantly before 2007, 2006."[543]

- Under Secretary of Defense for Policy Michele Flournoy, April 2011:  "*We view al Qaeda, Haqqani, the Taliban, these are all part of a syndicate* of groups that help each other.  *The Pakistanis tend to make finer distinctions between them* -- you know, not being . . . tolerant to some, like al Qaeda, but otherwise tolerating others.  *We are trying to* work with them to *shift that perspective* and shift that calculus."[544]

---

[540] *Sec. of State Hillary Clinton*, NBC News:  Meet the Press (July 26, 2009) (emphases added).  All emphases in this paragraph are added.

[541] S. Hr'g 111-479, at 24.

[542] *Gates Casts Qaeda As Terror Syndicate*, Wash. Post (Jan. 21, 2010), 2010 WLNR 1263055 ("*Gates Casts Qaeda As Terror Syndicate*").

[543] *John King Presents:  Full Interview with Secretary of Defense Robert Gates*, CNN (May 8, 2010), 2010 WLNR 27823364.

[544] Hindustan Times, *Pakistan Must Meet Certain Expectations on Counter-Terrorism* (Apr. 22, 2011).

## 2. Al-Qaeda's Planning And Authorization Of Taliban Terrorist Attacks

477.     Since at least the mid-2000s, al-Qaeda planned and authorized the Taliban's,

including the Haqqani Network's, attacks on U.S. forces in Afghanistan in several ways.

478.     **Authorization.**  Al-Qaeda provided critical religious authorization for Taliban

(including the Haqqani Network) attacks on U.S. forces.  As noted above, in 1998 Osama bin

Laden himself directed all Muslims to kill Americans at every opportunity.  In the ensuing years,

senior al-Qaeda leaders issued a series of *fatwas* directed toward the Afghan Taliban, conferring

religious permission for them to attack Americans in Afghanistan.  Examples include:

- Osama bin Laden, October 2001:  "[A]s [Mullah] Omar has said, the British invaded and were defeated in Afghanistan before bin Laden was to be found here, and the Russians came, before we did, and now *the Americans have come, and we implore God to defeat them like He defeated their previous allies*. . . . I say that *jihad is without doubt mandatory* for all Muslims . . ."[545]

- Ayman al-Zawahiri, May 2006:  "I address my statement to my Muslim brothers in Kabul … *I appeal to Muslims in Kabul in particular and throughout Afghanistan in general, for the sake of God, to sincerely stand against the infidels' forces*, which are invading Muslims' lands. . . . I appeal to my Muslim brothers in Kabul in particular, and throughout Afghanistan in general, to defend Islam. . . . I urge them to . . . *resist this infidel*, oppressive, and unjust occupation of Muslims' lands. . . . My Muslim brothers in Kabul in particular and throughout Afghanistan in general:  Stand by the mujahideen until the invading forces are expelled . . ."[546]

- Ayman al-Zawahiri, August 2009:  "*What is taking place in Afghanistan is a lesson that the entire Muslim Nation must learn*.  *The Afghans should be proud of the fact that they will go down in Islamic history as the people whose Islamic emirate*, led by the Commander of the Faithful, Mullah Muhammad Omar (may God protect him) *has challenged America*, the strongest power on the face of the earth.  This emirate has sacrificed all it has for the sake of its doctrine, its principals, and for the protection and the safety of its Muslim migrant brothers, as well as the oppressed mujahidin . . ."[547]

- Ayman al-Zawahiri, May 2012:  "O' Muslim, glorious, defiant Afghan people, and O' Muslim Ummah everywhere:  *join the Mujahideen, support and back them up, and fight*

---

[545] Al-Jazeera, *Osama bin Laden: Terror for Terror* (Oct. 21, 2001).

[546] Al-Jazeera, *Ayman al-Zawahiri:  Zawahiri Addresses Afghans* (May 30, 2006).

[547] Al-Sahab, *Ayman al-Zawahiri:  The Facts of Jihad and the Lies of Hypocrisy* (Aug. 4, 2009).

**under the banner of the Islamic Emirate under the leadership of the Amir of Believers Mulla Muhammad Omar Mujahid** . . . who caused the Crusaders consecutive defeats and who are on the verge of expelling them [Crusaders] from the pure Afghanistan . . . Fight the enemies of Allah . . . Their defeat began appearing on the horizon, so intensify your attacks on them until Allah gives you dominance over them."[548]

479.    After Osama bin Laden was killed, the Taliban confirmed his religious and moral authority over their Afghan jihad, stating:  "Osama Bin Laden You were the **sheikh of the Umma**, a zealous man, and **the scholar and imam of the nation at the level of Jihad** and the fighting of the enemies and their minions.  You were **our** sheikh, **our** imam and **role model**, the hero and miracle of our times, unique among your peers, pious and highly sensible."[549]

480.    Al-Qaeda also authorized the Taliban's terrorist attacks through its participation in the Afghan-Pakistani terrorist "syndicate" described above.  *See supra* Part V.B.1.  That multi-group syndicate involved periodic mafia-style meetings in which al-Qaeda, the Taliban (including the Haqqani Network), and other members of the syndicate (such as Lashkar-e-Taiba) would confer about geographies and targets to attack.[550]  The syndicate jointly authorized particular types of terrorist attacks in particular geographies to be carried out by the syndicate's individual members.  Among other things, the syndicate specifically approved:  (i) the creation and operation of the Kabul Attack Network to attack Americans in Kabul and the surrounding provinces; (ii) the campaign of suicide attacks against Americans throughout Afghanistan; (iii) the Taliban's campaign of using anti-American IED and suicide attacks specifically in

---

[548] As-Sahab, *Ayman al-Zawahiri:  Statement On The Burning of Qur'ans In Kabul* (May 9, 2012).

[549] Al-Somood, *Bin Laden Is Alive O Dead Ones And The Cowards Should Not Dare Close Their Eyes* (July 1, 2011) (emphasis added).

[550] *See The al Qaeda – Taliban Connection*.

Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces and P2K; and (iv) the Taliban's

"surge" in Kandahar and Helmand from 2010 through 2012.

481.    The close operational coordination not only manifested itself in the Kabul Attack

Network, but also provided a broader terrorist superstructure that organized the insurgency

throughout Afghanistan.  In observing that this superstructure formed an Afghan-Pakistani

"syndicate" of sorts, a former CIA analyst and White House observer documented several

notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the intricate

connections between al Qaeda and its allies in Pakistan and Afghanistan."[551]

482.    Consistent with all these activities, al-Qaeda operatives often assumed a position

of moral, religious, and tactical authority over Taliban members.  Al-Qaeda members, for

example, often "act[ed] as instructors and religious teachers for Taliban personnel and their

family members."[552]

483.    Al-Qaeda's messages of authorization extended to suicide bombings.  In February

2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and

Iraq.  A few months later, he reiterated in a *fatwa* directed at Afghans that "jihad against [the

Coalition] is your duty" and that, "If you start suicide attacks, you will see the fear of Americans

all over the world."[553]  The Taliban had previously viewed suicide attacks as taboo, but al-Qaeda

convinced it that such attacks were religiously permissible.  Al-Qaeda trumpeted that success

online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past,

---

[551] *Deadly Embrace* at 100.

[552] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds*, Long War J. (June 23, 2019) ("*Al Qaeda Growing Stronger*").

[553] *Osama bin Laden:  Calls for Martyrdom Operations Against US and British Interests* (Apr. 10, 2003) (emphasis added).

they have now become a regular phenomenon!"[554]  With al-Qaeda's authorization, the number of

suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in

2005, and more than 100 in 2006.

484.    Al-Qaeda's role in that suicide-bombing trend was pivotal.  As Islamic history

scholar Brian Glyn Williams explained, "Al Qaeda operatives carried out two to three [suicide]

bombings per year on the Afghan government and NATO troops from 2002 to 2004 that were

meant to demonstrate the effectiveness of this alien tactic to the local Taliban.  These

demonstrative acts and videos of successful [al-Qaeda] suicide bombings in Iraq seem to have

convinced the Taliban to condone the previously taboo tactic of suicide bombing."[555]

485.    Al-Qaeda also authorized the Taliban's use of IED attacks against Americans in

Afghanistan.  Osama bin Laden publicly called for the Taliban to escalate its IED campaign

against Americans in Afghanistan on several occasions in 2006 alone, in speeches in which he

instructed his followers that Allah supported their use of IEDs because of the psychological

terror, "destruction of the soldier's morale" and "rise in cases of suicide among" Americans.

Osama bin Laden's messages of authorization – directed toward a specific type of Muslim

(Afghan Taliban), class of target (Americans in Afghanistan), and weapon (IEDs) – were

important in enabling the Taliban's IED campaign against Coalition forces.

486.    Al-Qaeda also authorized the Taliban's use of RPG attacks against Americans in

Afghanistan.  In 2006, for example, Osama bin Laden publicly called for anti-American terrorists

to escalate their use of RPGs in Afghanistan.

---

[554] Brian Glyn Williams, *Suicide Bombings in Afghanistan* at 5, Jane's Islamic Affairs
Analyst (Sept. 2007).

[555] Brian Glyn Williams, *Afghanistan Declassified: A Guide To America's Longest War* at
202 (Univ. Penn. Press 2012).

487.     Al-Qaeda also authorized the Taliban's campaign of kidnapping Americans and others who supported the Afghan government.  For example, Mustafa Abu al-Yazid (aka Saeed al-Masri), was one of al-Qaeda's founders, served as al-Qaeda's leader in Afghanistan, and helped persuade the Taliban to "adopt[ ] a number of 'al-Qaida inspired' tactics, first and foremost suicide bombings, but also others associated with al-Qaida, such as kidnappings, decapitation of hostages, roadside bombs, and an active media campaign."[556]  Similarly, another senior al-Qaeda leader, Abu Hafs al-Najdi (aka Abdul Ghani), "commonly instructed subordinate leaders to conduct kidnapping operations against foreigners."[557]

488.     **Planning.** Al-Qaeda also planned the Taliban's, including the Haqqani Network's, terrorist attacks against Americans in Afghanistan.  Working through its syndicate partners and from its safe havens on both sides of the Afghanistan-Pakistan border, al-Qaeda "plan[ned] international as well as regional terrorist attacks, particularly in Afghanistan."[558]  Two terrorism scholars explained al-Qaeda's syndicate-related shuras as follows:

> The staying power of al-Qaeda became rooted in its ability to draw from and coordinate with allied groups embedded in multiple networks on both sides of the border. . . . It established a number of shuras to **coordinate strategy, operations, and tactics** against the West and regional allied governments. In particular, al-Qaeda fighters have been involved in **planning and carrying out suicide attacks, developing improved explosive devices, and helping conduct operations** against high-value targets.[559]

---

[556] Anne Stenersen, *Blood Brothers Or A Marriage Of Convenience? The Ideological Relationship Between Al-Qaida And The Taliban*, Paper presented at ISA's 50th Annual Convention, "Exploring the Past, Anticipating the Future" in New York City, February 15-18, 2009, https://convention2.allacademic.com/one/isa/isa09/.

[557] ISAF Joint Command, *ISAF Confirms Number 2 Insurgent Killed In Coalition Airstrike*, Def. Visual Info. Distribution Serv. (Apr. 13, 2011).

[558] *Resilient al-Qaeda* at 3.

[559] *Id*. at 3-4.

489.    Al-Qaeda training provided another key mechanism through which that planning

occurred.  Before the September 11 attacks, al-Qaeda operated training camps in eastern

Afghanistan at the Taliban's request.  By 2005 at the latest, al-Qaeda began bringing instructors

from Iraq to train the Taliban how to fight Americans.

490.    By the mid-2000's, al-Qaeda's partnership with the Haqqani Network had

facilitated the emergence of a network of al-Qaeda training camps in North Waziristan.

According to a declassified 2008 Defense Intelligence Agency intelligence report:

> [Sirajuddin] ***Haqqani is also affiliated with the several foreign fighter (ff)
> training facilities that are controlled by or associated with al Qaeda*** (AQ) in
> North Waziristan.
> . . . A list and brief description of each facility follows.
> A.  Mohammad Taher ((Yuldashov)), leader of the Islamic Movement of
> Uzbekistan (IMU), and his 60 bodyguards are staying at an AQ training center in
> Miram Shah Dand.
> B.  There is an al-Qaeda training center located at the Miskeen and Khaisur in
> Miram Shah.  Approximately 45 U/I Arabs and Uzbeks receive training there.
> C.  An AQ training facility called "Shaki Masood" is located in Miram Shah and
> over 200 AQ members (NFI) reside there; Usama bin Laden has been seen in this
> center (NFI).
> D.  Another AQ training facility is located at Spin-Qamar in Masood District of
> Northern Waziristan.  Over 80 Arabs receive training there (NFI).[560]

491.    One al-Qaeda operative, whom U.S. officials characterized as "an important al-

Qaida planner and explosives expert," Ghazwan al-Yemeni, trained Taliban members in Miran

Shah, in Pakistan.[561]  He eventually helped plan the December 30, 2009 attack on Camp

Chapman that killed Mr. Harold Brown, Jr., Mr. Dane Clark Paresi, and Mr. Jeremy Jason Wise,

whose family members are Plaintiffs in this case.  *See infra* ¶¶ 743-752; 1954-1965; 2526-2535.

---

[560] Def. Intelligence Agency, *Intelligence Information Report:  Location and Activities of the
Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern
Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))* (Apr. 16, 2008) (emphasis
added; original emphasis omitted).

[561] Evan F. Kohlmann, *Al-Qa'ida's Yemeni Expatriate Faction In Pakistan* at 11-12, CTC
Sentinel (Jan. 2011).

492.     The training continued throughout the relevant timeframe of this case.  In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province – both reportedly "hosted by the Taliban."[562]  One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles.

493.     Al-Qaeda specifically planned the Kabul Attack Network's campaign of terror, including its suicide bombings and insider attacks.  As two terrorism scholars explained, the "operational and tactical cooperation" provided by al-Qaeda "increased the ability of the Haqqani Network to carry out sophisticated attacks in Kabul," including insider attacks in Kabul "through operations [that al-Qaeda] planned together with Sirajuddin Haqqani."[563]

494.     Al-Qaeda also planned Taliban attacks by devising the operational scheme through which the Taliban carried out its attacks.  Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates those activities.  For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was "a high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG")] and Taliban forces within Afghanistan," which the leaders of the respective terrorist groups conceived during a meeting in Pakistan in early spring 2003[564]  Another purported Gitmo detainee file as quoted by Messrs. Roggio and Joscelyn concerning Haroon al Afghani, a dual-hatted al-Qaeda/HIG terrorist, stated:

> [Afghani] is assessed to have attended a joint operations meeting among extremist elements in mid-2006.  A letter describing an 11 August 2006 meeting between commanders of the Taliban, al Qaeda, [Lashkar e Taiba], . . .  and the Islamic

---

[562] Thomas Joscelyn & Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

[563] *Resilient al-Qaeda* at 9.

[564] *The al Qaeda – Taliban Connection*.

Party (probably a reference to the HIG), disclosed that the groups decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations.[565]

Taken together, these reports "demonstrate a high degree of collusion between al Qaeda and other terrorist groups" as part of a "jihadist hydra" that shared the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."[566]

496. The Taliban also relied on "Al-Sahab, al Qa'ida's media enterprise, to distribute video propaganda and recruit supporters."[567]  As terrorism scholar Seth Jones explained, al-Qaeda's media support for the Taliban was as important operationally as its financial support: "Afghan groups were able to tap into the broad international jihadi network" because "al Qa'ida was instrumental in improving" the Taliban's "communications capabilities."[568]  In addition, "jihadi websites, with links to al Qa'ida, . . . helped raise funds for the Taliban.  Some solicited military items for the Taliban, including gas masks and night vision goggles."[569]

496. Al-Qaeda also taught the Taliban effective terrorist tradecraft.  Through its relationship with al-Qaeda, the Taliban "developed or acquired new commercial communications gear and field equipment," as well as "good tactical, camouflage, and marksmanship training."[570] They also "share[d] communication and transportation routes, coordinate[d] attacks, and even utilize[d] the same explosive and suicide-bomber networks."[571]

---

[565] *Id.* (brackets in original)

[566] *Id.*

[567] *Graveyard of Empires* at 232.

[568] *Id.* at 291.

[569] *Id.* at 292.

[570] *Id.* at 293.

[571] *Resilient al-Qaeda* at 9.

497.     All of these activities were part of al-Qaeda's planning of the Taliban's terrorist attacks in Afghanistan.  By providing an array of advice, direction, and material support to the Taliban, al-Qaeda was able to use the Taliban for its own jihadist ends.  In so doing, al-Qaeda followed its more general practice of planning terrorist attacks whose details it would delegate to local Islamic proxies.  As terrorism scholar Thomas Ruttig observed:  "Both in Afghanistan and Pakistan, al-Qaeda exploits local conditions by co-opting militant groups with local battle experience."[572]  Here, its "cooptation" of the Taliban was especially effective.

498.     Al-Qaeda's planning activities extended to suicide bombings in particular.  The suicide attacker is a core component of al-Qaeda's ideology and operational philosophy.  Al-Qaeda exported its suicide-bombing expertise to the Taliban through their joint syndicate, and in so doing played a pivotal leadership and operational role in every Taliban suicide bombing in Afghanistan during the relevant time period.  For that reason, every suicide bombing alleged in this case was jointly planned and committed by al-Qaeda and the Taliban.

499.     Al-Qaeda planned suicide bombings in Afghanistan by mounting a coordinated communications campaign to persuade Taliban (including Haqqani) terrorists to embrace suicide attacks against Americans.  This campaign included messages touting suicide attacks and honoring "martyrs" through al-Qaeda print and video outlines; promoting religious "scholarly" outreach; and emphasizing in-person indoctrination of Taliban and Haqqani leadership.

500.     Al-Qaeda used this message – and the moral authority conveyed by bin Laden's 2003 *fatwa* authorizing martyrdom operations – to change the Taliban's organizational posture toward suicide bombing.  Those efforts convinced the Taliban to begin participating in, and claiming credit for, al-Qaeda-planned suicide attacks in Afghanistan.  Without al-Qaeda's

---

[572] *The Other Side* at 22.

involvement, neither Taliban leadership nor its rank-and-file commanders would have embraced suicide bombing as a permissible tactic against Coalition forces in Afghanistan.  As Dr. Jones summarized the evidence, "Al Qa'ida's involvement was particularly important in this regard because Afghan insurgent groups were surprisingly inept at suicide attacks."[573]

501.    To implement its planned suicide-bombing campaign, al-Qaeda also created and ran training camps that converted disaffected recruits into suicide bombers at an industrial scale. In collaboration with other syndicate members, Al-Qaeda created and designed a process for identifying candidates for martyrdom operations; indoctrinating them with the necessary religious and socio-political concepts; and training them how, for example, to conceal a suicide vest, navigate a checkpoint, and detonate for maximum impact.  Some of this training occurred in al-Qaeda-affiliated camps in Pakistan.

502.    Under al-Qaeda's standard training procedure for suicide bombers, each suicide bomber swore fealty to al-Qaeda.  Al-Qaeda emphasized declarations of fealty to ensure the suicide bomber's commitment to al-Qaeda's and the Taliban's jihad by creating a psychological "point of no return" for the bomber.  Suicide bombers who completed al-Qaeda's training course were officially viewed by al-Qaeda as al-Qaeda operatives and given all the stature in jihadist circles that such a title provided.

503.    To carry-out their joint suicide bombing campaign, al-Qaeda and the Taliban relied upon a series of dual-hatted al-Qaeda/Taliban terrorists to support the key nodes of the training and recruitment effort, including the madrassas from which most recruits were drawn and the training camps in which they were refined into suicide weapons.  Such dual-hatted al-Qaeda/Taliban terrorists include, but are not limited to, the following:

---

[573] *Graveyard of Empires* at 293.

- **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network.  Sirajuddin Haqqani operated at least four joint al-Qaeda/Taliban training camps in North Waziristan, from which al-Qaeda and the Taliban supported the suicide bombing campaign in Afghanistan with a regular stream of al-Qaeda operatives to participate in Taliban martyrdom attacks.  On information and belief, Sirajuddin Haqqani helped plan many of the suicide attacks in this case, including, but not limited to, the October 29, 2011 suicide bombing conducted by al-Qaeda and the Haqqani Network under the auspices of the Kabul Attack Network, which killed LTC David E. Cabrera, SGT James M. Darrough, and SSG Christopher R. Newman.  *See infra* ¶¶ 524-540, 960-967; 1886-1894.

- **Qari Ziaur Rahman**, a dual-hatted al-Qaeda/Taliban terrorist who was a top regional commander of both organizations in Kunar and Nuristan Provinces.  Rahman worked closely with al-Qaeda's chief of operations for Kunar Province, Abu Ikhlas al-Masri, with whom he shared operations, training, and logistics resources.  On information and belief, Rahman helped plan suicide attacks that took place in N2KL, including, but not limited to, the June 21, 2010 suicide attack in Kunar Province that killed SGT Andrew R. Looney.  *See infra* ¶¶ 1646-1653.

- **Sheikh Aminullah (aka Fazeel-a-Tul Shaykh Abu Mohammed Ameen al Peshwari)**, a dual-hatted al-Qaeda/Taliban terrorist who ran the Ganj Madrassa, which trained and recruited suicide bombers for al-Qaeda and the Taliban.  On information and belief, Sheikh Aminullah helped plan suicide attacks that took place in N2KL.

504.     Al-Qaeda also created the suicide network infrastructure necessary to deploy al-Qaeda suicide bombers in support of the Taliban's jihad against Americans in Afghanistan.  This attack infrastructure included:  (i) high-level meetings between representatives of al-Qaeda, the Taliban, and other members of the syndicate; (ii) joint al-Qaeda/Taliban safe houses and ratlines to support the deployment of suicide bombers inside Afghanistan; and (iii) a constellation of al-Qaeda-affiliated propaganda outlets that glorified the attackers, which was essential both for increasing the likelihood that a particular attacker would carry out his or her attack, as well as incentivizing the next generation of suicide bombers.

505.     As a reflection of the joint nature of al-Qaeda-Taliban martyrdom operations, al-Qaeda suicide bombers were often referred to as "Mullah Omar's Missiles."  By following a strategy in which the weapon (i.e., the suicide bomber) was created by al-Qaeda and then

deployed by the Taliban, both organizations played to their respective operational competencies to maximize the impact of their shared jihad against Americans in Afghanistan.

506.    Al-Qaeda's planning of the Taliban's terrorist campaign against Americans in Afghanistan also emphasized tactics designed to shoot down American helicopters, including Black Hawks and Chinooks.  Al-Qaeda's role was essential, as the Afghan Taliban and Haqqani Network terrorists had no tactical experience successfully targeting American helicopters prior to their training from al-Qaeda.  Al-Qaeda's anti-helicopter training was renowned in jihadist circles, having successfully trained terrorists in Iraq and Somalia with a substantial history of downing American helicopters, including the "Black Hawk Down" incident during the Battle of Mogadishu in 1993, and a litany of successful attacks in Iraq from 2003 through 2008.

507.    Shooting down a helicopter with an RPG requires precise training and is one of the most challenging attack types for an unskilled terrorist to execute.  Consequently, al-Qaeda's specialized skills, experience, and training had an outsized impact on the Taliban and Haqqani Network.  On information and belief, al-Qaeda deployed trainers into Afghanistan for the specific purpose of teaching Taliban fighters how to execute attacks targeting helicopters.  The Taliban used this training to attack multiple American and Coalition helicopters, including in a June 9, 2010 attack that killed Capt Joel C. Gentz and SrA Benjamin D. White, whose family members are Plaintiffs in this case.  *See infra* ¶¶ 1196-1202; 2486-2497.

508.    Al-Qaeda also planned the Taliban's campaign of fertilizer-based IED attacks in Afghanistan.  As Mr. Bergen documented in 2009:

> [I]n recent years, Taliban leaders have drawn especially close to Al Qaeda. . . . Today, at the leadership level, the Taliban and Al Qaeda function ***more or less as a single entity***. The signs of this are everywhere. For instance, IED attacks in Afghanistan have increased dramatically since 2004. What happened? As a Taliban member told Sami Yousafzai and Ron Moreau of *Newsweek*, "***The Arabs taught us how to make an IED by mixing nitrate fertilizer and diesel fuel and***

> *how to pack plastic explosives and to connect them to detonators and remote-control devices like mobile phones*. We learned how to do this blindfolded so we could safely plant IEDs in the dark."[574]

Since 2007, approximately 80% or more of all the IEDs used in deadly attacks against Americans in Afghanistan have been fertilizer-based devices.  On information and belief, nearly all of the IED victims in this case were killed or wounded by fertilizer-based IEDs planted by the Taliban and derived from al-Qaeda schematics and training.

509.    More broadly, al-Qaeda members regularly trained Taliban commanders in sophisticated bomb-making techniques that were material to the Taliban's ability to assemble and deploy explosives against Coalition forces.  According to the terrorist scholar Seth Jones:

> Insurgent groups also used al Qa'ida support to construct increasingly sophisticated improvised explosive devices (IEDs), including remote controlled detonators.  For example, al Qa'ida ran a handful of manufacturing sites in the Bush Mountains, the Khamran Mountains, and the Shakai Valley in Pakistan's Federally Administered Tribal Areas.  They ranged from small facilities hidden within compounds that build IEDs to much larger "IED factories" that doubled as training centers and labs whose recruits experimented with IED technology.  Some of this explosives expertise came from Iraqi groups that provided information on making and using various kinds of remotely controlled devices and timers.[575]

As part of that assistance, al-Qaeda also invited Taliban commanders to Iraq, where they learned how to make armor-penetrating "shaped" charges,[576] a type of IED later known as an EFP.

510.    Al-Qaeda's support of Taliban IED and EFP attacks also included the use of forward deployed al-Qaeda terrorist trainers throughout Afghanistan.  For example, by 2010, "[i]n southern Afghanistan, there [were] pockets of al Qa'ida . . . in Helmand and several neighboring provinces, such as Kandahar and Zabol," which helped the Taliban "conduct suicide

---

[574] *The Front* (emphases added).

[575] *Graveyard Of Empires* at 292.

[576] Sami Yousafzai & Ron Moreau, *Unholy Allies:  The Taliban Haven't Quit, And Some Are Getting Help And Inspiration From Iraq*, Newsweek (Sept. 25, 2005) ("*Unholy Allies*").

attacks and other improvised explosive device[ ]" attacks.[577]  Al-Qaeda also forward deployed IED terrorist trainers in P2K and N2KL.

511.    Al-Qaeda's planning efforts were significant and amplified the lethality of the Taliban insurgency.  Indeed, al-Qaeda's ability to export its terrorism expertise to local groups like the Taliban is what "renders al-Qaeda effective in the first place."[578]  In the case of the Taliban, al-Qaeda executed the "transfer of technical knowhow, devices, and training for IED use, truck and suicide bombings as well as the channel[ ]ing of what some observer[s] call 'strategic-level funding.'"[579]  Those activities were material to the Taliban's ability to execute the type of attacks that killed and injured Plaintiffs.  As Mr. Ruttig concluded, al-Qaeda's activities "raise[d] the level of sophistication of Taleban and associated networks' operations."[580]

512.    As Mr. Bergen put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do – as trainers and force multipliers."[581]  Al-Qaeda's sophistication and support was important to the Taliban's terrorist enterprise.  And al-Qaeda's involvement went beyond technical support; it also worked actively with Taliban leadership to set strategy and orchestrate attacks.  For that reason, "Al Qaeda leader Ayman al-Zawahiri, Hamza bin Laden and the Taliban leadership 'have repeatedly emphasized the importance of the alliance between' the two groups."[582]

---

[577] *Graveyard of Empires* at 330.

[578] *The Other Side* at 22.

[579] *Id.*

[580] *Id.*

[581] *The Front*.

[582] *Al Qaeda Growing Stronger*.

### 3. Al-Qaeda's Direct Participation In Taliban Terrorist Attacks

513. Al-Qaeda members also committed attacks alongside the Taliban, including some of the attacks that killed or injured Plaintiffs or their family members. In the early 2000s, al-Qaeda's third-ranking member, Abu Layth-al Libi, participated in attacks on Americans in Afghanistan alongside Taliban members under the command of Sirajuddin Haqqani. On July 13, 2008, Taliban and al-Qaeda members jointly attacked a U.S.-Afghan outpost in Wanat in Nuristan Province, killing nine U.S. soldiers. In May 2010, Taliban and al-Qaeda members participated in an attack on the U.S. airbase in Bagram, killing an American contractor. On August 6, 2011, Taliban and al-Qaeda members shot down a Chinook helicopter killing its 38 occupants, including SOC (SEAL) Darrik C. Benson, CW2 Bryan J. Nichols, SOCS (SEAL) Thomas A. Ratzlaff, and SO2 (SEAL) Nicholas P. Spehar, whose family members are Plaintiffs in this case. *See infra* ¶¶ 683-691; 1895-1903; 2040-2046; 2314-2325.

514. In fact, many terrorist operatives were "dual-hatted," meaning that they were both Taliban and al-Qaeda members. Those dual-hatted terrorists directly committed many of the attacks that killed and injured Plaintiffs. Examples are set forth below.

515. **Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical (and contiguous) Nangarhar, Nuristan, Kunar and Laghman Provinces (known as "N2KL"), which were well-known al-Qaeda strongholds. In N2KL, al-Qaeda and the Taliban maintained joint cells responsible for anti-American terrorism. The dual-hatted terrorists who ran the cells include:

- **Farouq al-Qahtani**, al-Qaeda's "emir for eastern Afghanistan" who "supported the Taliban-led insurgency against the Afghan government, US forces and their allies."[583] Al-Qahtani maintained this position until he was killed in a U.S. airstrike in or about October 2016.

---

[583] Thomas Joscelyn, *Pentagon Confirms Death of Senior al Qaeda Leader In Afghanistan* (Nov. 4, 2016).

After Qahtani's death, al-Qaeda's General Command issued a statement praising Qahtani's leadership of a joint cell with the Taliban, through which Qahtani and others "participated with their mujahidin brothers from the Islamic Emirate . . . in cleansing [Kunar and Nuristan Province] from the crusaders' abomination."[584]

- **Sakhr al-Taifi**, al-Qaeda's second-highest leader in Afghanistan, who, while embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against Afghan security forces and coalition troops throughout eastern Afghanistan," and "also supplie[d] weapons and equipment to insurgents."[585]  On information and belief, al-Taifi helped commit all of the attacks carried out by joint al-Qaeda/Taliban cells in N2KL until he was killed in a Coalition airstrike on or about May 27, 2012.

- **Mufti Assad**, an al-Qaeda network and "insurgent leader who controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout eastern Afghanistan and coordinated their attacks across the region," and "was also an explosives expert who provided training to insurgents on how to construct and use improvised explosive devices."[586]  On information and belief, Assad replaced al-Taifi after the latter was killed, and Assad assumed the same role until he himself was killed in a coalition airstrike on or about August 2012.

- **Abdallah Umar al-Qurayshi**, a senior al-Qaeda operative who commanded the joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces.  On information and belief, al-Qurayshi helped commit all of the attacks carried out by joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces prior to his death on or about September 25, 2010 during a coalition airstrike that also killed a senior Taliban commander named Matin who operated as part of the al-Quarayshi's joint al-Qaeda/Taliban cell.

- **Abu Atta al-Kuwaiti**, a senior al-Qaeda explosives expert who coordinated the Nuristan and Kunar Province al-Qaeda/Taliban joint cells' IED and suicide bomb attacks.  On information and belief, al-Kuwaiti helped commit every IED attack carried out by joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces prior to his death on or about September 25, 2010 during the same coalition airstrike that also killed al-Qurayshi and the Taliban commander Matin.

- **Abu Ikhlas al-Masri**, an al-Qaeda commander responsible for helping coordinate al-Qaeda / Taliban attacks in Kunar Province from 2008 until his capture on or about December 2010.  On information and belief, al-Masri helped commit all of the attacks carried out by al-Qaeda/Taliban joint cells in Kunar Province until his death.

- **Sa'ad bin Abi Waqas**, a senior al-Qaeda leader who "coordinated attacks against coalition forces" and "conducted training" for terrorists throughout Kunar Province, "as well as

---

[584] *Al-Qaeda General Command:  The Martyrdom of the Commander Faruq al-Qahtani And His Comrades In Konar Province* (Nov. 23, 2016).

[585] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (May 28, 2012).

[586] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Aug. 5, 2012).

weapons procurement."[587]  Waqas replaced al-Masri as al-Qaeda's operations chief in Kunar Province until Waqas was killed in the same April 13, 2011 coalition airstrike that killed Abu Hafs al-Najdi (aka Abdul Ghani).  On information and belief, Waqas helped commit all of the attacks carried out by al-Qaeda/Taliban joint cells in Kunar Province after al-Masri's death.

- **Abu Hafs al-Najdi (aka Abdul Ghani)**, a senior al-Qaeda operative who directed al-Qaeda operations in Kunar Province, and was specifically responsible for "planning attacks against Afghan and coalition forces" and "directing suicide-bomb attacks targeting U.S. government officials" that were facilitated by his "network" of Taliban terrorists.[588]  On information and belief, al-Najdi planned and authorized the Taliban's attacks against Americans in Kunar Province, including its suicide attacks, prior to his death in a Coalition airstrike on April 13, 2011.

- **Fatah Gul**, an al-Qaeda facilitator who "ran terrorist training camps where insurgents learned how to conduct improvised explosive devices attacks" in the N2KL area.[589]  Fatah Gul maintained this position until he was killed in a Coalition airstrike in or about August 2012.

516.    On information and belief, joint al-Qaeda/Taliban cells operating under the local command of the above al-Qaeda terrorists committed the attacks that killed and/or injured SFC Charles L. Adkins, SGT Dillon C. Baldridge, SGT William M. Bays, Mr. Brett Benton, SPC Francisco J. Briseño-Alvarez, Jr., SSG Christopher L. Brown, PFC Benjamen G. Chisholm, SGT Timothy J. Conrad, Jr., CSM Kevin J. Griffin, SGT William Gross Paniagua, SGT Michael J. Knapp, SPC Charles S. Ligon, SGT Andrew R. Looney, SSG Shaun M. Mittler, SPC Carlos J. Negron, Sr., SPC Donald L. Nichols, SPC Jared C. Plunk, SPC Blaine E. Redding, and SGT Devin A. Snyder.  *See infra* ¶¶ 542, 615, 648, 693, 717, 736, 831, 865, 1287, 1306, 1551, 1643, 1647, 1798, 1876, 1905, 1998, 2048, 2269.

517.    **Paktia, Paktika, and Khost ("P2K") Provinces.**  Like N2KL, P2K was a strategically critical area that historically served as a Haqqani Network stronghold and also

---

[587] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Apr. 16, 2011).

[588] U.S. Dep't of Def., *Strike Kills No. 2 Insurgent in Afghanistan* (Apr. 26, 2011).

[589] ISAF Joint Command, *Morning Operational Update* (Aug. 5, 2012).

operated as a "traditional al-Qaeda safe haven[]."[590]  In this area, al-Qaeda and the Taliban,

through the Haqqani Network, maintained joint cells responsible for anti-American terrorism.

The dual-hatted terrorists who ran the cells included:

- **Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani**), a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under the direct protection of Siraj Haqqani, himself a member of al-Qaeda's military council.  On information and belief, Harrach helped commit every major Haqqani Network attack in Afghanistan prior to his death on or about May 19, 2010.

- **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network, who has stated that al-Qaeda "enlighten[s] the road for [the Taliban] and they resist against the cross worshippers [i.e., the Americans] by cooperating with us and us with them in one trench," pursuant to cooperation between al-Qaeda and the Taliban "at the highest limits."[591]  On information and belief, Sirajuddin Haqqani planned, authorized, and helped to commit the Haqqani Network's attack campaign in P2K after Harrach's death on or about May 19, 2010.

- **Khalil al-Rahman Haqqani**, is Jalaluddin Haqqani's brother and a dual-hatted al-Qaeda/Taliban terrorist, serving as a "fundraiser, financier, and operational commander" for the Haqqani Network,[592] as well as an agent who "acted on behalf of al-Qa'ida"[593] and had "been linked to al-Qa'ida terrorist operations."[594]  On information and belief, Khalil al-Rahman Haqqani helped to plan, authorize, and commit the Haqqani Network's attacks in P2K after Harrach's death on or about May 19, 2010.

518.    On information and belief, joint al-Qaeda/Taliban cells operating under the local

command of the above dual-hatted al-Qaeda/Taliban terrorists committed the attacks that killed

and/or injured Sgt Nicholas J. Aleman, SSG Thomas A. Baysore, Jr., CPL Jonathan Cleary, SGT

Robert W. Crow, PFC Vincent J. Ellis, SPC Michael D. Elm, 2LT Jered W. Ewy, SSG Thomas

---

[590] *Resilient al-Qaeda* at 11-12.

[591] *Taliban Cooperation*.

[592] Bill Roggio, *US Designates al Qaeda, Haqqani Network Leaders As Terrorists*, Long War J. (Feb. 9, 2011).

[593] Press Release, U.S. Dep't of Treasury, *Treasury Targets The Financial And Support Networks of Al Qa'ida And The Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[594] Press Release, U.S. Dep't of State, *Rewards for Justice - Reward Offers for Information on Haqqani Network Leaders* (Aug. 20, 2014).

K. Fogarty, 1LT Demetrius M. Frison, SGT Jeremy F. Hardison, SPC Ryan P. Jayne, SGT

Brandon Korona, 1LT Todd W. Lambka, CPL Ethan J. Martin, SSG Mecolus C. McDaniel, PFC

Richard L. McNulty, III, SPC Rafael A. Nieves, Jr., PVT Adam J. Novak, SGT Joseph A.

Richardson, SGT Joshua J. Strickland, SFC James E. Thode, and SSG Sonny C. Zimmerman.

*See infra* ¶¶ 560, 658, 859, 890, 1082, 1092, 1122, 1147, 1174, 1325, 1489, 1559, 1563, 1684,

1728, 1751, 1923, 1930, 2072, 2366, 2392, 2562.

519.    **Kabul Attack Network-Related Provinces.**  Al-Qaeda deployed senior

operatives to coordinate attacks in the strategically critical cluster of provinces around the capital

city.  This area was the focus of the Kabul Attack Network, where al-Qaeda and the Taliban,

including the Haqqani Network, maintained joint al-Qaeda/Taliban cells responsible for planning

and committing terrorist attacks.  *See supra* Part V.A.3.  The dual-hatted al-Qaeda/Taliban

terrorists who ran the cells included:

- **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network.  On information and belief, Sirajuddin Haqqani has served as the overall strategic planner supervising the activities of the Kabul Attack Network beginning no later than April 2010, and he has continued in that role to this day.
- **Ahmed Jan Wazir**, a dual-hatted al-Qaeda/Taliban terrorist who, in 2008, was named commander of jihadist forces in Ghazni Province by both al-Qaeda and the Taliban.  On information and belief, Wazir commanded the activities of the Kabul Attack Network in Ghazni Province, and planned every attack committed by the Kabul Attack Network there until he was killed by a Coalition air strike on or about November 21, 2013.

520.    On information and belief, the joint al-Qaeda/Taliban Kabul Attack Network cells

operating under the command of these dual-hatted al-Qaeda/Taliban terrorists committed the

attacks that killed and/or injured Maj David L. Brodeur, Lt Co Frank D. Bryant Jr., LTC David

E. Cabrera, SGT Karl A. Campbell, SGT James M. Darrough, Mr. Corey J. Dodge, Mr. Paul

Goins, Jr., SGT Jonathan A. Gollnitz, Mr. Jay Henigan, Mr. Michael A. Hughes, Mr. Jason D.

Landphair, Mr. Richard P. McEvoy, SSG Christopher R. Newman, Mr. Angel Roldan, Jr., Ms.

Anne T. Smedinghoff, SSG Orion N. Sparks, and Mr. Barry Sutton. *See infra* ¶¶ 525, 725, 761, 786, 961, 1021, 1211, 1230, 1373, 1449, 1582, 1740, 1887, 2139, 2249, 2304, 2373.

### 4.    Defendants' Knowledge of Al-Qaeda's Role

521.    Defendants knew about or recklessly disregarded al-Qaeda's role in Taliban attacks in Afghanistan, given the topic's wide coverage in mainstream media outlets.  For example:

- On September 26, 2005, *Newsweek* reported that al-Qaeda was bringing instructors from Iraq to train the Taliban how to commit terrorist attacks against Americans.[595]

- On November 29, 2009, the *Associated Press* reported that a Pakistani official believed that al-Qaeda was likely providing the Taliban with "[t]he training to make, place and detonate" IEDs used to kill U.S. troops.[596]

- On December 3, 2009, Secretary Clinton testified publicly that the U.S. government viewed al-Qaeda and the Taliban "not as separate independent operators" but "as part of a syndicate of terrorism."[597]

- On January 21, 2010, Secretary Gates stated publicly that al-Qaeda and the Taliban "had formed a 'syndicate' of terrorist groups," and that the Taliban was one of the "factions" that was "working under the umbrella of Al Qaeda."[598]

- On December 15, 2009, the *Wall Street Journal* quoted Admiral Mullen as saying that U.S. officials were "deeply concerned about the growing level of collusion between the Taliban and al Qaeda."[599]

- On January 5, 2010, the *Wall Street Journal* reported in a front-page article that the December 30, 2009 attack on Camp Chapman was carried out by a bomber working with al-Qaeda, and that the Taliban had claimed responsibility for it.[600]

- On May 28, 2011, the *Washington Post* reported that Secretary Clinton said the goal of United States talks with the Taliban was "to split the Taliban from al-Qaeda."[601]

---

[595] *Unholy Allies*.

[596] Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

[597] S. Hr'g 111-479, at 24.

[598] *Gates Casts Qaeda As Terror Syndicate*.

[599] *Afghan Police Killings Highlight Holes in Security*.

[600] Siobhan Gorman et al., *CIA Blast Blamed on Double Agent*, Wall St. J. (Jan. 6, 2010).

[601] Karen DeYoung, *Clinton Sees 'Turning Point' After Brief Visit to Pakistan*, Wash. Post (May 28, 2011), 2011 WLNR 10685527.

- On April 30, 2012, the *Guardian* reported:  "Anyone who follows the wars in Afghanistan and Pakistan closely knows that, despite the talk of diminished al-Qaida numbers on the ground, its activists and affiliates are heavily involved in the Taliban military campaign.  In particular, it contributes military expertise to the spectacular attacks organised out of Waziristan, it sends groups of fighters from there to the front lines and it inspires."[602]

- On October 21, 2015, an opinion piece in the *New York Times* described Zawahiri's "oath of fealty" to Mullah Mansour.[603]

Given Defendants' sophistication and on-the-ground experience in Afghanistan, they were aware

of reports like these, and their substance, which documented that the Taliban insurgency

Defendants were funding was supported in substantial part by al-Qaeda.

## VI.   THE TALIBAN KILLED AND INJURED PLAINTIFFS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK

522.    The Taliban's terrorist campaign, for which Defendants provided material

support, killed and injured Plaintiffs and their family members.  Each of the acts of international

terrorism described below was committed by the Taliban, including the Haqqani Network, or

jointly committed by the Taliban and al-Qaeda.  The express purpose of that terrorist campaign

was to target U.S. citizens, like Plaintiffs and their deceased family members, to inflict injury felt

in the United States and effect a change in U.S policy.  In addition, al-Qaeda – a designated FTO

at all relevant times – planned and authorized each of these attacks.  *See supra* Part V.B.

523.    The attacks that injured or killed Plaintiffs would have violated the laws of war if

these terrorist groups were subject to it.  The terrorists did not wear uniforms or otherwise

distinguish themselves from civilians, conscripted children into committing attacks, targeted

---

[602] Michael Semple, *The Taliban Need Help to Break Their Al-Qaida Ties*, The Guardian (Apr. 30, 2012).

[603] Thomas Joscelyn & Bill Roggio, *Are We Losing Afghanistan Again?*, N.Y. Times (Oct. 21, 2015).

humanitarian workers, and engaged in widespread kidnapping and torture in order to intimidate their enemies.

**The David E. Cabrera Family**

524.     Lieutenant Colonel David E. Cabrera served in Afghanistan as a member of the U.S. Army.  On October 29, 2011, LTC Cabrera was injured in a suicide bombing attack in Kabul Province, Afghanistan.  LTC Cabrera died on October 29, 2011 as a result of injuries sustained during the attack.

525.     The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

526.     LTC Cabrera's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

527.     LTC Cabrera was a national of the United States at the time of the attack and his death.

528.     As a result of the attack, LTC Cabrera was injured in his person and/or property. The Plaintiff members of the Cabrera Family are the survivors and/or heirs of LTC Cabrera and are entitled to recover for the damages LTC Cabrera sustained.

529.     Plaintiff August Cabrera is the widow of LTC Cabrera.  She is a national of the United States.

530.    Plaintiff M.G.C., by and through his next friend August Cabrera, is the minor son of LTC Cabrera.  He is a national of the United States.

531.    Plaintiff R.X.C., by and through his next friend August Cabrera, is the minor son of LTC Cabrera.  He is a national of the United States.

532.    Plaintiff Corbin Cabrera is the son of LTC Cabrera.  He is a national of the United States.

533.    Plaintiff Gillian Leigh Cabrera is the daughter of LTC Cabrera.  She is a national of the United States.

534.    Plaintiff Ronald Paul Hopkins is the brother of LTC Cabrera.  He is a national of the United States.

535.    Plaintiff Suzanne Renae Martinez is the sister of LTC Cabrera.  She is a national of the United States.

536.    Plaintiff JD Prosser is the sister of LTC Cabrera.  She is a national of the United States.

537.    Plaintiff Robert Cabrera is the foster-father of LTC Cabrera.  He is a national of the United States.  Robert Cabrera lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological son.

538.    Plaintiff Daniel Matias Cabrera is the foster-brother of LTC Cabrera.  He is a national of the United States.  Daniel Matias Cabrera lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological brother.

539.    Plaintiff Gloria Diane Trelfa is the foster-sister of LTC Cabrera.  She is a national of the United States.  Gloria Diane Trelfa lived in the same household as LTC Cabrera for a

substantial period of time and considered LTC Cabrera the functional equivalent of a biological brother.

540.     As a result of the October 29, 2011 attack and LTC Cabrera's injuries and death, each member of the Cabrera Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Cabrera's society, companionship, and counsel.

**The Charles L. Adkins Family**

541.     Sergeant First Class Charles L. Adkins served in Afghanistan as a member of the U.S. Army.  On April 16, 2011, SFC Adkins was injured in a suicide bombing insider attack in Laghman Province, Afghanistan.  SFC Adkins died on April 16, 2011 as a result of injuries sustained during the attack.

542.     The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

543.     SFC Adkins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

544.     SFC Adkins was a national of the United States at the time of the attack and his death.

545.     As a result of the attack, SFC Adkins was injured in his person and/or property. The Plaintiff members of the Adkins Family are the survivors and/or heirs of SFC Adkins and are entitled to recover for the damages SFC Adkins sustained.

546.     Plaintiff Charles E. Adkins is the father of SFC Adkins.  He is a national of the United States.

547.     Plaintiff Sheila G. Good is the mother of SFC Adkins.  She is a national of the United States.

548.     Plaintiff Velvet L. Adkins is the step-mother of SFC Adkins.  She is a national of the United States.  Velvet L. Adkins lived in the same household as SFC Adkins for a substantial period of time and considered SFC Adkins the functional equivalent of a biological son.

549.     As a result of the April 16, 2011 attack and SFC Adkins's injuries and death, each member of the Adkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Adkins's society, companionship, and counsel.

**The Raymond C. Alcaraz Family**

550.     Sergeant Raymond C. Alcaraz served in Afghanistan as a member of the U.S. Army.  On August 31, 2010, SGT Alcaraz was injured in an IED attack in Logar Province, Afghanistan.  SGT Alcaraz died on August 31, 2010 as a result of injuries sustained during the attack.

551.     The attack was committed by the Haqqani Network, a part of the Taliban.

552.     SGT Alcaraz's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

553.     SGT Alcaraz was a national of the United States at the time of the attack and his death.

554.     As a result of the attack, SGT Alcaraz was injured in his person and/or property. The Plaintiff members of the Alcaraz Family are the survivors and/or heirs of SGT Alcaraz and are entitled to recover for the damages SGT Alcaraz sustained.

555. Plaintiff Alma Murphy is the mother of SGT Alcaraz. She is a national of the United States.

556. Plaintiff Lucas Gonzales is the brother of SGT Alcaraz. He is a national of the United States.

557. Plaintiff Paul Murphy is the step-father of SGT Alcaraz. He is a national of the United States. Paul Murphy lived in the same household as SGT Alcaraz for a substantial period of time and considered SGT Alcaraz the functional equivalent of a biological son.

558. As a result of the August 31, 2010 attack and SGT Alcaraz's injuries and death, each member of the Alcaraz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Alcaraz's society, companionship, and counsel.

**The Nicholas J. Aleman Family**

559. Sergeant Nicholas J. Aleman served in Afghanistan as a member of the U.S. Marine Corps. On December 5, 2010, Sgt Aleman was injured in a suicide bombing insider attack in Paktia Province, Afghanistan. Sgt Aleman died on December 5, 2010 as a result of injuries sustained during the attack.

560. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

561. Sgt Aleman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was improperly wearing the uniform of his enemy, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a market.

562.    Sgt Aleman was a national of the United States at the time of the attack and his death.

563.    As a result of the attack, Sgt Aleman was injured in his person and/or property. The Plaintiff members of the Aleman Family are the survivors and/or heirs of Sgt Aleman and are entitled to recover for the damages Sgt Aleman sustained.

564.    Plaintiff Jose Aleman is the father of Sgt Aleman.  He is a national of the United States.

565.    Plaintiff Stephanie Hager is the sister of Sgt Aleman.  She is a national of the United States.

566.    As a result of the December 5, 2010 attack and Sgt Aleman's injuries and death, each member of the Aleman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Aleman's society, companionship, and counsel.

**The William Allen Family**

567.    William Allen served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On September 6, 2010, Mr. Allen was injured in a mortar attack in Kandahar Province, Afghanistan.  Mr. Allen died on September 6, 2010 as a result of injuries sustained during the attack.

568.    The attack was committed by the Taliban.

569.    Mr. Allen's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

570.    Mr. Allen was a national of the United States at the time of the attack and his death.

571.    As a result of the attack, Mr. Allen was injured in his person and/or property.  The Plaintiff members of the Allen Family are the survivors and/or heirs of Mr. Allen and are entitled to recover for the damages Mr. Allen sustained.

572.    Plaintiff Ginny Lamb is the sister of Mr. Allen.  She is a national of the United States.

573.    Plaintiff Sherry Loan is the sister of Mr. Allen.  She is a national of the United States.

574.    Plaintiff Linda Phaneuf is the sister of Mr. Allen.  She is a national of the United States.

575.    As a result of the September 6, 2010 attack and Mr. Allen's injuries and death, each member of the Allen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Allen's society, companionship, and counsel.

**The Billy G. Anderson Family**

576.    Private First Class Billy G. Anderson served in Afghanistan as a member of the U.S. Army.  On May 17, 2010, PFC Anderson was injured in an IED attack in Badghis Province, Afghanistan.  PFC Anderson died on May 17, 2010 as a result of injuries sustained during the attack.

577.    The attack was committed by the Taliban.

578.    PFC Anderson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

579.    PFC Anderson was a national of the United States at the time of the attack and his death.

580.    As a result of the attack, PFC Anderson was injured in his person and/or property. The Plaintiff members of the Anderson Family are the survivors and/or heirs of PFC Anderson and are entitled to recover for the damages PFC Anderson sustained.

581.    Plaintiff Caitlin Elizabeth Anderson is the widow of PFC Anderson.  She is a national of the United States.

582.    Plaintiff L.G.A., by and through her next friend Caitlin Elizabeth Anderson, is the minor daughter of PFC Anderson.  She is a national of the United States.

583.    Plaintiff Bobby Gene Anderson is the father of PFC Anderson.  He is a national of the United States.

584.    Plaintiff Patricia Marlene Goodwin is the mother of PFC Anderson.  She is a national of the United States.

585.    Plaintiff April Lynn Anderson is the sister of PFC Anderson.  She is a national of the United States.

586.    Plaintiff Bobby Joe Anderson is the brother of PFC Anderson.  He is a national of the United States.

587.    Plaintiff John David Anderson is the brother of PFC Anderson.  He is a national of the United States.

588.    As a result of the May 17, 2010 attack and PFC Anderson's injuries and death, each member of the Anderson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Anderson's society, companionship, and counsel.

**The Brian M. Anderson Family**

589.    Specialist Brian M. Anderson served in Afghanistan as a member of the U.S. Army.  On June 12, 2010, SPC Anderson was injured in an IED attack in Kunduz Province, Afghanistan.  SPC Anderson died on June 12, 2010 as a result of injuries sustained during the attack.

590.    The attack was committed by the Taliban.

591.    SPC Anderson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

592.    SPC Anderson was a national of the United States at the time of the attack and his death.

593.    As a result of the attack, SPC Anderson was injured in his person and/or property. The Plaintiff members of the Anderson Family are the survivors and/or heirs of SPC Anderson and are entitled to recover for the damages SPC Anderson sustained.

594.    Plaintiff Margaret Anderson is the mother of SPC Anderson.  She is a national of the United States.

595.    As a result of the June 12, 2010 attack and SPC Anderson's injuries and death, each member of the Anderson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Anderson's society, companionship, and counsel.

**The Carlos A. Aragon Family**

596.     Lance Corporal Carlos A. Aragon served in Afghanistan as a member of the U.S. Marine Corps Reserve.  On March 1, 2010, LCpl Aragon was injured in an IED attack in Helmand Province, Afghanistan.  LCpl Aragon died on March 1, 2010 as a result of injuries sustained during the attack.

597.     The attack was committed by the Taliban.

598.     LCpl Aragon's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

599.     LCpl Aragon was a national of the United States at the time of the attack and his death.

600.     As a result of the attack, LCpl Aragon was injured in his person and/or property. The Plaintiff members of the Aragon Family are the survivors and/or heirs of LCpl Aragon and are entitled to recover for the damages LCpl Aragon sustained.

601.     Plaintiff Rosa Irma Halliday is the mother of LCpl Aragon.  She is a national of the United States.

602.     Plaintiff Armando Ochoa is the brother of LCpl Aragon.  He is a national of the United States.

603.     Plaintiff Eduardo Ochoa is the brother of LCpl Aragon.  He is a national of the United States.

604.     Plaintiff Brad Joseph Halliday is the step-father of LCpl Aragon.  He is a national of the United States.  Brad Joseph Halliday lived in the same household as LCpl Aragon for a

substantial period of time and considered LCpl Aragon the functional equivalent of a biological son.

605.     As a result of the March 1, 2010 attack and LCpl Aragon's injuries and death, each member of the Aragon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Aragon's society, companionship, and counsel.

**The Bradley W. Atwell Family**

606.     Sergeant Bradley W. Atwell served in Afghanistan as a member of the U.S. Marine Corps.  On September 15, 2012, Sgt Atwell was injured in complex attack involving SAR rifles and rocket propelled grenades during which the insurgents disguised themselves in American military uniforms in Helmand Province, Afghanistan.  Sgt Atwell died on September 15, 2012 as a result of injuries sustained during the attack.

607.     The attack was committed by the Taliban.

608.     Sgt Atwell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorists who committed the attack was unlawfully wearing the uniform of his enemy.

609.     Sgt Atwell was a national of the United States at the time of the attack and his death.

610.     As a result of the attack, Sgt Atwell was injured in his person and/or property. The Plaintiff members of the Atwell Family are the survivors and/or heirs of Sgt Atwell and are entitled to recover for the damages Sgt Atwell sustained.

611.     Plaintiff Cheryl Atwell is the mother of Sgt Atwell.  She is a national of the United States.

612.    Plaintiff Erin Riedel is the sister of Sgt Atwell.  She is a national of the United States.

613.    As a result of the September 15, 2012 attack and Sgt Atwell's injuries and death, each member of the Atwell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Atwell's society, companionship, and counsel.

**The Dillon C. Baldridge Family**

614.    Sergeant Dillon C. Baldridge served in Afghanistan as a member of the U.S. Army.  On June 10, 2017, SGT Baldridge was injured in an insider attack in Nangarhar Province, Afghanistan.  SGT Baldridge died on June 10, 2017 as a result of injuries sustained during the attack.

615.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

616.    SGT Baldridge's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

617.    SGT Baldridge was a national of the United States at the time of the attack and his death.

618.    As a result of the attack, SGT Baldridge was injured in his person and/or property. The Plaintiff members of the Baldridge Family are the survivors and/or heirs of SGT Baldridge and are entitled to recover for the damages SGT Baldridge sustained.

619.    Plaintiff Christopher Baldridge is the father of SGT Baldridge.  He is a national of the United States.

620.     Plaintiff E.B., by and through his next friend Christopher Baldridge, is the minor brother of SGT Baldridge.  He is a national of the United States.

621.     Plaintiff L.B., by and through his next friend Christopher Baldridge, is the minor brother of SGT Baldridge.  He is a national of the United States.

622.     Plaintiff S.B., by and through her next friend Christopher Baldridge, is the minor sister of SGT Baldridge.  She is a national of the United States.

623.     Plaintiff Jessie Baldridge is the step-mother of SGT Baldridge.  She is a national of the United States.  Jessie Baldridge lived in the same household as SGT Baldridge for a substantial period of time and considered SGT Baldridge the functional equivalent of a biological son.

624.     As a result of the June 10, 2017 attack and SGT Baldridge's injuries and death, each member of the Baldridge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Baldridge's society, companionship, and counsel.

**The Kevin B. Balduf Family**

625.     Sergeant Kevin B. Balduf served in Afghanistan as a member of the U.S. Marine Corps.  On May 12, 2011, Sgt Balduf was injured in an insider attack in Helmand Province, Afghanistan.  Sgt Balduf died on May 12, 2011 as a result of injuries sustained during the attack.

626.     The attack was committed by the Taliban.

627.     Sgt Balduf's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

628.     Sgt Balduf was a national of the United States at the time of the attack and his death.

629.     As a result of the attack, Sgt Balduf was injured in his person and/or property. The Plaintiff members of the Balduf Family are the survivors and/or heirs of Sgt Balduf and are entitled to recover for the damages Sgt Balduf sustained.

630.     Plaintiff Virginia Newsom is the mother of Sgt Balduf.  She is a national of the United States.

631.     Plaintiff Kyle Balduf is the brother of Sgt Balduf.  He is a national of the United States.

632.     As a result of the May 12, 2011 attack and Sgt Balduf's injuries and death, each member of the Balduf Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Balduf's society, companionship, and counsel.

**The Brandon A. Barrett Family**

633.     Captain Brandon A. Barrett served in Afghanistan as a member of the U.S. Marine Corps.  On May 5, 2010, Capt Barrett was injured in a sniper attack in Helmand Province, Afghanistan.  Capt Barrett died on May 5, 2010 as a result of injuries sustained during the attack.

634.     The attack was committed by the Taliban.

635.     Capt Barrett's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

636.     Capt Barrett was a national of the United States at the time of the attack and his death.

637.     As a result of the attack, Capt Barrett was injured in his person and/or property. The Plaintiff members of the Barrett Family are the survivors and/or heirs of Capt Barrett and are entitled to recover for the damages Capt Barrett sustained.

638.     Plaintiff Brett Barrett is the father of Capt Barrett.  He is a national of the United States.

639.     As a result of the May 5, 2010 attack and Capt Barrett's injuries and death, each member of the Barrett Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Barrett's society, companionship, and counsel.

**The Joseph A. Bauer Family**

640.     Specialist Joseph A. Bauer served in Afghanistan as a member of the U.S. Army. On July 24, 2010, SPC Bauer was injured in an IED attack in Zabul Province, Afghanistan.  SPC Bauer died on July 24, 2010 as a result of injuries sustained during the attack.

641.     The attack was committed by the Haqqani Network, a part of the Taliban.

642.     SPC Bauer's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

643.     SPC Bauer was a national of the United States at the time of the attack and his death.

644.     As a result of the attack, SPC Bauer was injured in his person and/or property. The Plaintiff members of the Bauer Family are the survivors and/or heirs of SPC Bauer and are entitled to recover for the damages SPC Bauer sustained.

645.     Plaintiff Shannon Denise Collins is the sister of SPC Bauer.  She is a national of the United States.

646.     As a result of the July 24, 2010 attack and SPC Bauer's injuries and death, each member of the Bauer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bauer's society, companionship, and counsel.

**The William M. Bays Family**

647.     Sergeant William M. Bays served in Afghanistan as a member of the U.S. Army. On June 10, 2017, SGT Bays was injured in an insider attack in Nangarhar Province, Afghanistan.  SGT Bays died on June 10, 2017 as a result of injuries sustained during the attack.

648.     The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

649.     SGT Bays's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

650.     SGT Bays was a national of the United States at the time of the attack and his death.

651.     As a result of the attack, SGT Bays was injured in his person and/or property. The Plaintiff members of the Bays Family are the survivors and/or heirs of SGT Bays and are entitled to recover for the damages SGT Bays sustained.

652.     Plaintiff April Angel Bays is the mother of SGT Bays.  She is a national of the United States.

653.     Plaintiff Timothy Lee Bays is the father of SGT Bays.  He is a national of the United States.

654.    Plaintiff Brenda Griner is the sister of SGT Bays.  She is a national of the United States.

655.    Plaintiff Lindsay Redoutey is the sister of SGT Bays.  She is a national of the United States.

656.    As a result of the June 10, 2017 attack and SGT Bays's injuries and death, each member of the Bays Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Bays's society, companionship, and counsel.

**The Thomas A. Baysore Jr. Family**

657.    Staff Sergeant Thomas A. Baysore Jr. served in Afghanistan as a member of the U.S. Army.  On September 26, 2013, SSG Baysore was injured in an insider attack in Paktia Province, Afghanistan.  SSG Baysore died on September 26, 2013 as a result of injuries sustained during the attack.

658.    The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

659.    SSG Baysore's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

660.    SSG Baysore was a national of the United States at the time of the attack and his death.

661.    As a result of the attack, SSG Baysore was injured in his person and/or property. The Plaintiff members of the Baysore Family are the survivors and/or heirs of SSG Baysore and are entitled to recover for the damages SSG Baysore sustained.

662.     Plaintiff Angela Kahler is the sister of SSG Baysore.  She is a national of the United States.

663.     As a result of the September 26, 2013 attack and SSG Baysore's injuries and death, each member of the Baysore Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Baysore's society, companionship, and counsel.

**The Vincent J. Bell Family**

664.     Staff Sergeant Vincent J. Bell served in Afghanistan as a member of the U.S. Marine Corps.  On November 30, 2011, SSgt Bell was injured in an IED attack in Helmand Province, Afghanistan.  SSgt Bell died on November 30, 2011 as a result of injuries sustained during the attack.

665.     The attack was committed by the Taliban.

666.     SSgt Bell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

667.     SSgt Bell was a national of the United States at the time of the attack and his death.

668.     As a result of the attack, SSgt Bell was injured in his person and/or property.  The Plaintiff members of the Bell Family are the survivors and/or heirs of SSgt Bell and are entitled to recover for the damages SSgt Bell sustained.

669.     Plaintiff James Bell is the father of SSgt Bell.  He is a national of the United States.

670.    Plaintiff Pamela E. Alexander Bell is the mother of SSgt Bell.  She is a national of the United States.

671.    Plaintiff London Jacinda Bell is the sister of SSgt Bell.  She is a national of the United States.

672.    Plaintiff Andrea Roe is the sister of SSgt Bell.  She is a national of the United States.

673.    As a result of the November 30, 2011 attack and SSgt Bell's injuries and death, each member of the Bell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Bell's society, companionship, and counsel.

**The Robert N. Bennedsen Family**

674.    First Lieutenant Robert N. Bennedsen served in Afghanistan as a member of the U.S. Army.  On July 18, 2010, 1LT Bennedsen was injured in an IED attack in Zabul Province, Afghanistan.  1LT Bennedsen died on July 18, 2010 as a result of injuries sustained during the attack.

675.    The attack was committed by the Haqqani Network, a part of the Taliban.

676.    1LT Bennedsen's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

677.    1LT Bennedsen was a national of the United States at the time of the attack and his death.

678.     As a result of the attack, 1LT Bennedsen was injured in his person and/or property.  The Plaintiff members of the Bennedsen Family are the survivors and/or heirs of 1LT Bennedsen and are entitled to recover for the damages 1LT Bennedsen sustained.

679.     Plaintiff Scott Bennedsen is the father of 1LT Bennedsen.  He is a national of the United States.

680.     Plaintiff Tracy Bennedsen is the mother of 1LT Bennedsen.  She is a national of the United States.

681.     Plaintiff Jamie Johanna Coates is the sister of 1LT Bennedsen.  She is a national of the United States.

682.     As a result of the July 18, 2010 attack and 1LT Bennedsen's injuries and death, each member of the Bennedsen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Bennedsen's society, companionship, and counsel.

**The Darrik C. Benson Family**

683.     Chief Petty Officer (SEAL) Darrik C. Benson served in Afghanistan as a member of the U.S. Navy.  On August 6, 2011, SOC (SEAL) Benson was injured in an attack on a helicopter in Wardak Province, Afghanistan.  SOC (SEAL) Benson died on August 6, 2011 as a result of injuries sustained during the attack.

684.     The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

685.     SOC (SEAL) Benson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

686.     SOC (SEAL) Benson was a national of the United States at the time of the attack and his death.

687.     As a result of the attack, SOC (SEAL) Benson was injured in his person and/or property.  The Plaintiff members of the Benson Family are the survivors and/or heirs of SOC (SEAL) Benson and are entitled to recover for the damages SOC (SEAL) Benson sustained.

688.     Plaintiff Frederick C. Benson is the father of SOC (SEAL) Benson.  He is a national of the United States.

689.     Plaintiff Beverly Mills is the mother of SOC (SEAL) Benson.  She is a national of the United States.

690.     Plaintiff Brianna N. Benson is the sister of SOC (SEAL) Benson.  She is a national of the United States.

691.     As a result of the August 6, 2011 attack and SOC (SEAL) Benson's injuries and death, each member of the Benson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SOC (SEAL) Benson's society, companionship, and counsel.

**The Brett Benton Family**

692.     Brett Benton served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On June 4, 2011, Mr. Benton was injured in an IED attack in Laghman Province, Afghanistan.  Mr. Benton died on June 4, 2011 as a result of injuries sustained during the attack.

693.     The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

694.     Mr. Benton's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in

hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

695.    Mr. Benton was a national of the United States at the time of the attack and his death.

696.    As a result of the attack, Mr. Benton was injured in his person and/or property. The Plaintiff members of the Benton Family are the survivors and/or heirs of Mr. Benton and are entitled to recover for the damages Mr. Benton sustained.

697.    Plaintiff Bethany Ann Benton is the widow of Mr. Benton.  She is a national of the United States.

698.    As a result of the June 4, 2011 attack and Mr. Benton's injuries and death, each member of the Benton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Benton's society, companionship, and counsel.

**The Jeremie S. Border Family**

699.    Staff Sergeant Jeremie S. Border served in Afghanistan as a member of the U.S. Army.  On September 1, 2012, SSG Border was injured in a complex attack involving small arms fire and grenades in Ghazni Province, Afghanistan.  SSG Border died on September 1, 2012 as a result of injuries sustained during the attack.

700.    The attack was committed by the Haqqani Network, a part of the Taliban.

701.    SSG Border's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

702.     SSG Border was a national of the United States at the time of the attack and his death.

703.     As a result of the attack, SSG Border was injured in his person and/or property. The Plaintiff members of the Border Family are the survivors and/or heirs of SSG Border and are entitled to recover for the damages SSG Border sustained.

704.     Plaintiff Mary Border is the mother of SSG Border.  She is a national of the United States.

705.     Plaintiff Katherine Abreu-Border is the sister of SSG Border.  She is a national of the United States.

706.     Plaintiff Delaynie K. Peek is the sister of SSG Border.  She is a national of the United States.

707.     As a result of the September 1, 2012 attack and SSG Border's injuries and death, each member of the Border Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Border's society, companionship, and counsel.

**The James Michael Boucher Jr. Family**

708.     Plaintiff Corporal James Michael Boucher Jr. served in Afghanistan as a member of the U.S. Marine Corps.  On June 12, 2011, Cpl Boucher was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded Cpl Boucher, who lost both of his legs and suffered from a serious injury to his left-hand.  As a result of the June 12, 2011 attack and his injuries, Cpl Boucher has experienced severe physical and emotional pain and suffering.

709.     The attack was committed by the Taliban.

710.    The attack that injured Cpl Boucher would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

711.    Cpl Boucher was a national of the United States at the time of the attack, and remains one to this day.

712.    Plaintiff James Boucher Sr. is the father of Cpl Boucher. He is a national of the United States.

713.    Plaintiff Kimberley Boucher is the mother of Cpl Boucher. She is a national of the United States.

714.    Plaintiff Britany Boucher is the sister of Cpl Boucher. She is a national of the United States.

715.    As a result of the June 12, 2011 attack and Cpl Boucher's injuries, each member of the Boucher Family has experienced severe mental anguish, emotional pain and suffering.

**The Francisco J. Briseño-Alvarez Jr. Family**

716.    Specialist Francisco J. Briseño-Alvarez Jr. served in Afghanistan as a member of the U.S. Army National Guard. On September 25, 2011, SPC Briseño-Alvarez was injured in an IED attack in Laghman Province, Afghanistan. SPC Briseño-Alvarez died on September 25, 2011 as a result of injuries sustained during the attack.

717.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

718.    SPC Briseño-Alvarez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

719.    SPC Briseño-Alvarez was a member of the armed forces at the time of the attack and his death.

720.    As a result of the attack, SPC Briseño-Alvarez was injured in his person and/or property.  The Plaintiff members of the Briseño-Alvarez Family are the survivors and/or heirs of SPC Briseño-Alvarez and are entitled to recover for the damages SPC Briseño-Alvarez sustained.

721.    Plaintiff Francisco Javier Briseño Gutierrez is the father of SPC Briseño-Alvarez. He is a national of the United States.

722.    Plaintiff Luis Briseño is the brother of SPC Briseño-Alvarez.  He is a national of the United States.

723.    As a result of the September 25, 2011 attack and SPC Briseño-Alvarez's injuries and death, each member of the Briseño-Alvarez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Briseño-Alvarez's society, companionship, and counsel.

**The David L. Brodeur Family**

724.    Major David L. Brodeur served in Afghanistan as a member of the U.S. Air Force.  On April 27, 2011, Maj Brodeur was injured in an insider attack in Kabul Province, Afghanistan.  Maj Brodeur died on April 27, 2011 as a result of injuries sustained during the attack.

725.    The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

726.    Maj Brodeur's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

727.    Maj Brodeur was a national of the United States at the time of the attack and his death.

728.    As a result of the attack, Maj Brodeur was injured in his person and/or property. The Plaintiff members of the Brodeur Family are the survivors and/or heirs of Maj Brodeur and are entitled to recover for the damages Maj Brodeur sustained.

729.    Plaintiff Susan Brodeur is the widow of Maj Brodeur.  She is a national of the United States.

730.    Plaintiff D.L.B., by and through his next friend Susan Brodeur, is the minor son of Maj Brodeur.  He is a national of the United States.

731.    Plaintiff E.L.B., by and through her next friend Susan Brodeur, is the minor daughter of Maj Brodeur.  She is a national of the United States.

732.    Plaintiff Joyce A. Brodeur is the mother of Maj Brodeur.  She is a national of the United States.

733.    Plaintiff Lawrence A. Brodeur is the father of Maj Brodeur.  He is a national of the United States.

734.    As a result of the April 27, 2011 attack and Maj Brodeur's injuries and death, each member of the Brodeur Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Maj Brodeur's society, companionship, and counsel.

**The Christopher L. Brown Family and Estate**

735.    Staff Sergeant Christopher L. Brown served in Afghanistan as a member of the U.S. Army.  On April 3, 2012, SSG Brown was injured in an IED attack in Kunar Province, Afghanistan.  SSG Brown died on April 3, 2012 as a result of injuries sustained during the attack.

736.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

737.    SSG Brown's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

738.    SSG Brown was a national of the United States at the time of the attack and his death.

739.    As a result of the attack, SSG Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of SSG Brown and are entitled to recover for the damages SSG Brown sustained.

740.    Plaintiff Ariell S. Taylor is the widow of SSG Brown.  She is a national of the United States.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Brown's estate.

741.     As a result of the April 3, 2012 attack and SSG Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Brown's society, companionship, and counsel.

742.     SSG Brown's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder.

**The Harold Brown Jr. Family**

743.     Harold Brown Jr. served in Afghanistan as a U.S. government employee serving in the Central Intelligence Agency.  On December 30, 2009, Mr. Brown was injured in a suicide bombing attack in Khost Province, Afghanistan.  Mr. Brown died on December 30, 2009 as a result of injuries sustained during the attack.

744.     The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack).

745.     Mr. Brown's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack posed as an informant in order to gain access to the base and did not identify himself as an enemy combatant.

746.     Mr. Brown was a national of the United States at the time of the attack and his death.

747.     As a result of the attack, Mr. Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of Mr. Brown and are entitled to recover for the damages Mr. Brown sustained.

748.     Plaintiff Barbara Brown is the mother of Mr. Brown.  She is a national of the United States.

749.    Plaintiff Harold Brown Sr. is the father of Mr. Brown.  He is a national of the United States.

750.    Plaintiff Regina Brown is the sister of Mr. Brown.  She is a national of the United States.

751.    Plaintiff Paula Rich is the sister of Mr. Brown.  She is a national of the United States.

752.    As a result of the December 30, 2009 attack and Mr. Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Brown's society, companionship, and counsel.

**The Scott W. Brunkhorst Family**

753.    Staff Sergeant Scott W. Brunkhorst served in Afghanistan as a member of the U.S. Army.  On March 30, 2010, SSG Brunkhorst was injured in an IED attack in Kandahar Province, Afghanistan.  SSG Brunkhorst died on March 30, 2010 as a result of injuries sustained during the attack.

754.    The attack was committed by the Taliban.

755.    SSG Brunkhorst's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

756.    SSG Brunkhorst was a national of the United States at the time of the attack and his death.

757.     As a result of the attack, SSG Brunkhorst was injured in his person and/or property.  The Plaintiff members of the Brunkhorst Family are the survivors and/or heirs of SSG Brunkhorst and are entitled to recover for the damages SSG Brunkhorst sustained.

758.     Plaintiff Richard G. Brunkhorst is the father of SSG Brunkhorst.  He is a national of the United States.

759.     As a result of the March 30, 2010 attack and SSG Brunkhorst's injuries and death, each member of the Brunkhorst Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Brunkhorst's society, companionship, and counsel.

**The Frank D. Bryant Jr. Family**

760.     Lieutenant Colonel Frank D. Bryant Jr. served in Afghanistan as a member of the U.S. Air Force.  On April 27, 2011, Lt Co Bryant was injured in an insider attack in Kabul Province, Afghanistan.  Lt Co Bryant died on April 27, 2011 as a result of injuries sustained during the attack.

761.     The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

762.     Lt Co Bryant's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

763.     Lt Co Bryant was a national of the United States at the time of the attack and his death.

764.     As a result of the attack, Lt Co Bryant was injured in his person and/or property. The Plaintiff members of the Bryant Family are the survivors and/or heirs of Lt Co Bryant and are entitled to recover for the damages Lt Co Bryant sustained.

765.     Plaintiff Janice Harriman Bryant is the widow of Lt Co Bryant.  She is a national of the United States.

766.     Plaintiff S.L.B., by and through his next friend Janice Harriman Bryant, is the minor son of Lt Co Bryant.  He is a national of the United States.

767.     As a result of the April 27, 2011 attack and Lt Co Bryant's injuries and death, each member of the Bryant Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Lt Co Bryant's society, companionship, and counsel.

**The Nicholas B. Burley Family**

768.     Specialist Nicholas B. Burley served in Afghanistan as a member of the U.S. Army.  On July 30, 2013, SPC Burley was injured in an indirect fire attack in Logar Province, Afghanistan.  SPC Burley died on July 30, 2013 as a result of injuries sustained during the attack.

769.     The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

770.     SPC Burley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

771.     SPC Burley was a national of the United States at the time of the attack and his death.

772.     As a result of the attack, SPC Burley was injured in his person and/or property. The Plaintiff members of the Burley Family are the survivors and/or heirs of SPC Burley and are entitled to recover for the damages SPC Burley sustained.

773.     Plaintiff William Michael Burley is the father of SPC Burley.  He is a national of the United States.

774.     Plaintiff Tammy Olmstead is the mother of SPC Burley.  She is a national of the United States.

775.     Plaintiff Michael Collins is the brother of SPC Burley.  He is a national of the United States.

776.     Plaintiff Dan Olmstead is the step-father of SPC Burley.  He is a national of the United States.  Dan Olmstead lived in the same household as SPC Burley for a substantial period of time and considered SPC Burley the functional equivalent of a biological son.

777.     As a result of the July 30, 2013 attack and SPC Burley's injuries and death, each member of the Burley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Burley's society, companionship, and counsel.

**The Joshua R. Campbell Family**

778.     Specialist Joshua R. Campbell served in Afghanistan as a member of the U.S. Army.  On January 29, 2011, SPC Campbell was injured in an IED attack in Helmand Province, Afghanistan.  SPC Campbell died on January 29, 2011 as a result of injuries sustained during the attack.

779.     The attack was committed by the Taliban.

780.     SPC Campbell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive

detonation system indiscriminately placed civilians at risk.

781.    SPC Campbell was a national of the United States at the time of the attack and his

death.

782.    As a result of the attack, SPC Campbell was injured in his person and/or property.

The Plaintiff members of the Campbell Family are the survivors and/or heirs of SPC Campbell

and are entitled to recover for the damages SPC Campbell sustained.

783.    Plaintiff James Reginald Campbell is the father of SPC Campbell.  He is a

national of the United States.

784.    As a result of the January 29, 2011 attack and SPC Campbell's injuries and death,

each member of the Campbell Family has experienced severe mental anguish, emotional pain

and suffering, and the loss of SPC Campbell's society, companionship, and counsel.

**The Karl A. Campbell Family**

785.    Sergeant Karl A. Campbell served in Afghanistan as a member of the U.S. Army.

On October 4, 2010, SGT Campbell was injured in an IED attack in Kabul Province,

Afghanistan.  SGT Campbell died on October 4, 2010 as a result of injuries sustained during the

attack.

786.    The attack was committed by the Taliban (including the Haqqani Network) and

al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack

Network.

787.    SGT Campbell's murder would have violated the laws of war if these terrorist

groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

788.     SGT Campbell was a national of the United States at the time of the attack and his death.

789.     As a result of the attack, SGT Campbell was injured in his person and/or property. The Plaintiff members of the Campbell Family are the survivors and/or heirs of SGT Campbell and are entitled to recover for the damages SGT Campbell sustained.

790.     Plaintiff Arthur Campbell is the father of SGT Campbell.  He is a national of the United States.

791.     Plaintiff Audrey Campbell is the mother of SGT Campbell.  She is a national of the United States.

792.     Plaintiff Tina Marie Campbell is the sister of SGT Campbell.  She is a national of the United States.

793.     As a result of the October 4, 2010 attack and SGT Campbell's injuries and death, each member of the Campbell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Campbell's society, companionship, and counsel.

**The Kevin Cardoza Family**

794.     Specialist Kevin Cardoza served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Cardoza was injured in an IED attack in Kandahar Province, Afghanistan. SPC Cardoza died on May 4, 2013 as a result of injuries sustained during the attack.

795.     The attack was committed by the Taliban.

796.     SPC Cardoza's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive

detonation system indiscriminately placed civilians at risk.

797.    SPC Cardoza was a national of the United States at the time of the attack and his

death.

798.    As a result of the attack, SPC Cardoza was injured in his person and/or property.

The Plaintiff members of the Cardoza Family are the survivors and/or heirs of SPC Cardoza and

are entitled to recover for the damages SPC Cardoza sustained.

799.    Plaintiff Maria Cardoza is the mother of SPC Cardoza.  She is a national of the

United States.

800.    Plaintiff Ramiro Cardoza Sr. is the father of SPC Cardoza.  He is a national of the

United States.

801.    Plaintiff Ramiro Cardoza Jr. is the brother of SPC Cardoza.  He is a national of

the United States.

802.    As a result of the May 4, 2013 attack and SPC Cardoza's injuries and death, each

member of the Cardoza Family has experienced severe mental anguish, emotional pain and

suffering, and the loss of SPC Cardoza's society, companionship, and counsel.

**The Joseph T. Caron Family**

803.    Specialist Joseph T. Caron served in Afghanistan as a member of the U.S. Army.

On April 11, 2010, SPC Caron was injured in an IED attack in Helmand Province, Afghanistan.

SPC Caron died on April 11, 2010 as a result of injuries sustained during the attack.

804.    The attack was committed by the Taliban.

805.    SPC Caron's murder would have violated the laws of war if these terrorist groups

were subject to them because, among other reasons, the terrorist(s) who planted the IED neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

806.    SPC Caron was a national of the United States at the time of the attack and his death.

807.    As a result of the attack, SPC Caron was injured in his person and/or property. The Plaintiff members of the Caron Family are the survivors and/or heirs of SPC Caron and are entitled to recover for the damages SPC Caron sustained.

808.    Plaintiff Jeff Caron is the father of SPC Caron.  He is a national of the United States.

809.    Plaintiff Cassandra Caron is the sister of SPC Caron.  She is a national of the United States.

810.    Plaintiff Karen Caron is the step-mother of SPC Caron.  She is a national of the United States.  Karen Caron lived in the same household as SPC Caron for a substantial period of time and considered SPC Caron the functional equivalent of a biological son.

811.    As a result of the April 11, 2010 attack and SPC Caron's injuries and death, each member of the Caron Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Caron's society, companionship, and counsel.

**The Patrick R. Carroll Family**

812.    Sergeant Patrick R. Carroll served in Afghanistan as a member of the U.S. Army. On February 7, 2011, SGT Carroll was injured in an IED attack in Kandahar Province, Afghanistan.  SGT Carroll died on February 7, 2011 as a result of injuries sustained during the attack.

813.    The attack was committed by the Taliban.

814.     SGT Carroll's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

815.     SGT Carroll was a national of the United States at the time of the attack and his death.

816.     As a result of the attack, SGT Carroll was injured in his person and/or property. The Plaintiff members of the Carroll Family are the survivors and/or heirs of SGT Carroll and are entitled to recover for the damages SGT Carroll sustained.

817.     Plaintiff Sumer J. Roberts is the sister of SGT Carroll.  She is a national of the United States.

818.     As a result of the February 7, 2011 attack and SGT Carroll's injuries and death, each member of the Carroll Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Carroll's society, companionship, and counsel.

**The Rick J. Centanni Family**

819.     Lance Corporal Rick J. Centanni served in Afghanistan as a member of the U.S. Marine Corps.  On March 24, 2010, LCpl Centanni was injured in an IED attack in Helmand Province, Afghanistan.  LCpl Centanni died on March 24, 2010 as a result of injuries sustained during the attack.

820.     The attack was committed by the Taliban.

821.     LCpl Centanni's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

822.    LCpl Centanni was a national of the United States at the time of the attack and his death.

823.    As a result of the attack, LCpl Centanni was injured in his person and/or property. The Plaintiff members of the Centanni Family are the survivors and/or heirs of LCpl Centanni and are entitled to recover for the damages LCpl Centanni sustained.

824.    Plaintiff Jon Centanni is the father of LCpl Centanni.  He is a national of the United States.

825.    As a result of the March 24, 2010 attack and LCpl Centanni's injuries and death, each member of the Centanni Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Centanni's society, companionship, and counsel.

**Marcus Chischilly**

826.    Plaintiff Sergeant Marcus Chischilly served in Afghanistan as a member of the U.S. Marine Corps.  On October 9, 2010, Sgt Chischilly was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded Sgt Chischilly, who lost his left leg above the knee.  As a result of the October 9, 2010 attack and his injuries, Sgt Chischilly has experienced severe physical and emotional pain and suffering.

827.    The attack was committed by the Taliban.

828.    The attack that injured Sgt Chischilly would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

829.    Sgt Chischilly was a national of the United States at the time of the attack and remains one to this day.

**The Benjamen G. Chisholm Family**

830.    Private First Class Benjamen G. Chisholm served in Afghanistan as a member of the U.S. Army.  On August 17, 2010, PFC Chisholm was injured in an IED attack in Kunar Province, Afghanistan.  PFC Chisholm died on August 17, 2010 as a result of injuries sustained during the attack.

831.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

832.    PFC Chisholm's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

833.    PFC Chisholm was a national of the United States at the time of the attack and his death.

834.    As a result of the attack, PFC Chisholm was injured in his person and/or property. The Plaintiff members of the Chisholm Family are the survivors and/or heirs of PFC Chisholm and are entitled to recover for the damages PFC Chisholm sustained.

835.    Plaintiff Glenn Chisholm is the father of PFC Chisholm.  He is a national of the United States.

836.    Plaintiff Linda Reynolds is the mother of PFC Chisholm.  She is a national of the United States.

837.     Plaintiff Karma Chisholm is the step-mother of PFC Chisholm.  She is a national of the United States.  Karma Chisholm lived in the same household as PFC Chisholm for a substantial period of time and considered PFC Chisholm the functional equivalent of a biological son.

838.     As a result of the August 17, 2010 attack and PFC Chisholm's injuries and death, each member of the Chisholm Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Chisholm's society, companionship, and counsel.

**The Rusty H. Christian Family**

839.     Staff Sergeant Rusty H. Christian served in Afghanistan as a member of the U.S. Army.  On January 28, 2010, SSG Christian was injured in an IED attack in Uruzgan Province, Afghanistan.  SSG Christian died on January 28, 2010 as a result of injuries sustained during the attack.

840.     The attack was committed by the Taliban.

841.     SSG Christian's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

842.     SSG Christian was a national of the United States at the time of the attack and his death.

843.     As a result of the attack, SSG Christian was injured in his person and/or property. The Plaintiff members of the Christian Family are the survivors and/or heirs of SSG Christian and are entitled to recover for the damages SSG Christian sustained.

844.    Plaintiff Donna Ball is the mother of SSG Christian.  She is a national of the United States.

845.    Plaintiff Michael Christian is the father of SSG Christian.  He is a national of the United States.

846.    Plaintiff Michael Aaron Christian is the brother of SSG Christian.  He is a national of the United States.

847.    As a result of the January 28, 2010 attack and SSG Christian's injuries and death, each member of the Christian Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Christian's society, companionship, and counsel.

**The Chazray C. Clark Family**

848.    Specialist Chazray C. Clark served in Afghanistan as a member of the U.S. Army. On September 18, 2011, SPC Clark was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Clark died on September 18, 2011 as a result of injuries sustained during the attack.

849.    The attack was committed by the Taliban.

850.    SPC Clark's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

851.    SPC Clark was a national of the United States at the time of the attack and his death.

852.     As a result of the attack, SPC Clark was injured in his person and/or property. The Plaintiff members of the Clark Family are the survivors and/or heirs of SPC Clark and are entitled to recover for the damages SPC Clark sustained.

853.     Plaintiff Keyko D. Clark is the mother of SPC Clark.  She is a national of the United States.

854.     Plaintiff Corteize Clark is the brother of SPC Clark.  He is a national of the United States.

855.     Plaintiff Precious Clark is the sister of SPC Clark.  She is a national of the United States.

856.     Plaintiff Cleveland Davis is the brother of SPC Clark.  He is a national of the United States.

857.     As a result of the September 18, 2011 attack and SPC Clark's injuries and death, each member of the Clark Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Clark's society, companionship, and counsel.

**The Jonathan Cleary Family**

858.     Plaintiff Corporal Jonathan Cleary served in Afghanistan as a member of the U.S. Army.  On May 6, 2012, CPL Cleary was injured in an IED attack in Paktia Province, Afghanistan.  The attack severely wounded CPL Cleary, who lost his right leg below the knee. As a result of the May 6, 2012 attack and his injuries, CPL Cleary has experienced severe physical and emotional pain and suffering.

859.     The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

860.    The attack that injured CPL Cleary would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

861.    CPL Cleary was a national of the United States at the time of the attack, and remains one to this day.

862.    Plaintiff April Cleary is the mother of CPL Cleary.  She is a national of the United States.

863.    As a result of the May 6, 2012 attack and CPL Cleary's injuries, each member of the Cleary Family has experienced severe mental anguish, emotional pain and suffering.

**The Timothy J. Conrad Jr. Family**

864.    Sergeant Timothy J. Conrad Jr. served in Afghanistan as a member of the U.S. Army.  On February 23, 2012, SGT Conrad was injured in an insider attack in Nangarhar Province, Afghanistan.  SGT Conrad died on February 23, 2012 as a result of injuries sustained during the attack.

865.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

866.    SGT Conrad's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

867.    SGT Conrad was a national of the United States at the time of the attack and his death.

868.     As a result of the attack, SGT Conrad was injured in his person and/or property. The Plaintiff members of the Conrad Family are the survivors and/or heirs of SGT Conrad and are entitled to recover for the damages SGT Conrad sustained.

869.     Plaintiff Holly Conrad is the widow of SGT Conrad.  She is a national of the United States.

870.     Plaintiff B.C., by and through his next friend Holly Conrad, is the minor son of SGT Conrad.  He is a national of the United States.

871.     As a result of the February 23, 2012 attack and SGT Conrad's injuries and death, each member of the Conrad Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Conrad's society, companionship, and counsel.

**The Robert J. Cottle Family**

872.     Sergeant Major Robert J. Cottle served in Afghanistan as a member of the U.S. Marine Corps Reserve.  On March 24, 2010, SgtMaj Cottle was injured in an IED attack in Helmand Province, Afghanistan.  SgtMaj Cottle died on March 24, 2010 as a result of injuries sustained during the attack.

873.     The attack was committed by the Taliban.

874.     SgtMaj Cottle's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

875.     SgtMaj Cottle was a national of the United States at the time of the attack and his death.

876.     As a result of the attack, SgtMaj Cottle was injured in his person and/or property. The Plaintiff members of the Cottle Family are the survivors and/or heirs of SgtMaj Cottle and are entitled to recover for the damages SgtMaj Cottle sustained.

877.     Plaintiff Kenneth Cottle is the father of SgtMaj Cottle.  He is a national of the United States.

878.     As a result of the March 24, 2010 attack and SgtMaj Cottle's injuries and death, each member of the Cottle Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SgtMaj Cottle's society, companionship, and counsel.

**The Ross Cox Family**

879.     Plaintiff Staff Sergeant Ross Cox served in Afghanistan as a member of the U.S. Army.  On November 15, 2011, SSG Cox was injured in an IED attack in Kandahar Province, Afghanistan.  The attack severely wounded SSG Cox, who lost his left leg and suffered a serious right leg injury, left arm nerve damage, and hearing loss.  As a result of the November 15, 2011 attack and his injuries, SSG Cox has experienced severe physical and emotional pain and suffering.

880.     The attack was committed by the Taliban.

881.     The attack that injured SSG Cox would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

882.     SSG Cox was a national of the United States at the time of the attack, and remains one to this day.

883.    Plaintiff Nicole Cox is the wife of SSG Cox.  She is a national of the United States.

884.    Plaintiff A.C., by and through his next friend Ross Cox, is the minor son of SSG Cox.  He is a national of the United States.

885.    Plaintiff B.C., by and through his next friend Ross Cox, is the minor son of SSG Cox.  He is a national of the United States.

886.    Plaintiff H.C., by and through her next friend Ross Cox, is the minor daughter of SSG Cox.  She is a national of the United States.

887.    Plaintiff Peyton Cooney is the daughter of SSG Cox.  She is a national of the United States.

888.    As a result of the November 15, 2011 attack and SSG Cox's injuries, each member of the Cox Family has experienced severe mental anguish, emotional pain and suffering.

**The Robert W. Crow Family**

889.    Sergeant Robert W. Crow served in Afghanistan as a member of the U.S. Army National Guard.  On July 10, 2010, SGT Crow was injured in an IED attack in Paktika Province, Afghanistan.  SGT Crow died on July 10, 2010 as a result of injuries sustained during the attack.

890.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

891.    SGT Crow's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

892.    SGT Crow was a national of the United States at the time of the attack and his death.

893.    As a result of the attack, SGT Crow was injured in his person and/or property. The Plaintiff members of the Crow Family are the survivors and/or heirs of SGT Crow and are entitled to recover for the damages SGT Crow sustained.

894.    Plaintiff David Aaron Crow is the son of SGT Crow.  He is a national of the United States.

895.    As a result of the July 10, 2010 attack and SGT Crow's injuries and death, each member of the Crow Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Crow's society, companionship, and counsel.

**The Justin E. Culbreth Family**

896.    Specialist Justin E. Culbreth served in Afghanistan as a member of the U.S. Army.  On November 17, 2010, SPC Culbreth was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Culbreth died on November 17, 2010 as a result of injuries sustained during the attack.

897.    The attack was committed by the Taliban.

898.    SPC Culbreth's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

899.    SPC Culbreth was a national of the United States at the time of the attack and his death.

900.     As a result of the attack, SPC Culbreth was injured in his person and/or property. The Plaintiff members of the Culbreth Family are the survivors and/or heirs of SPC Culbreth and are entitled to recover for the damages SPC Culbreth sustained.

901.     Plaintiff Cheryl A. Culbreth is the mother of SPC Culbreth.  She is a national of the United States.

902.     Plaintiff Walter L. Culbreth is the father of SPC Culbreth.  He is a national of the United States.

903.     As a result of the November 17, 2010 attack and SPC Culbreth's injuries and death, each member of the Culbreth Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Culbreth's society, companionship, and counsel.

**The Joshua J. Cullins Family**

904.     Staff Sergeant Joshua J. Cullins served in Afghanistan as a member of the U.S. Marine Corps.  On October 19, 2010, SSgt Cullins was injured in an IED attack in Helmand Province, Afghanistan.  SSgt Cullins died on October 19, 2010 as a result of injuries sustained during the attack.

905.     The attack was committed by the Taliban.

906.     SSgt Cullins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

907.     SSgt Cullins was a national of the United States at the time of the attack and his death.

908.     As a result of the attack, SSgt Cullins was injured in his person and/or property. The Plaintiff members of the Cullins Family are the survivors and/or heirs of SSgt Cullins and are entitled to recover for the damages SSgt Cullins sustained.

909.     Plaintiff James Farris Cullins Jr. is the father of SSgt Cullins. He is a national of the United States.

910.     Plaintiff Cooper Henry Pike Cullins is the brother of SSgt Cullins. He is a national of the United States.

911.     Plaintiff Donavan Kurt Schilling Cullins is the brother of SSgt Cullins. He is a national of the United States.

912.     Plaintiff Barbara Schilling is the step-mother of SSgt Cullins. She is a national of the United States. Barbara Schilling lived in the same household as SSgt Cullins for a substantial period of time and considered SSgt Cullins the functional equivalent of a biological son.

913.     As a result of the October 19, 2010 attack and SSgt Cullins's injuries and death, each member of the Cullins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Cullins's society, companionship, and counsel.

**The Joseph D'Augustine Family**

914.     Staff Sergeant Joseph D'Augustine served in Afghanistan as a member of the U.S. Marine Corps. On March 27, 2012, SSgt D'Augustine was injured in an IED attack in Helmand Province, Afghanistan. SSgt D'Augustine died on March 27, 2012 as a result of injuries sustained during the attack.

915.     The attack was committed by the Taliban.

916.    SSgt D'Augustine's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

917.    SSgt D'Augustine was a national of the United States at the time of the attack and his death.

918.    As a result of the attack, SSgt D'Augustine was injured in his person and/or property.  The Plaintiff members of the D'Augustine Family are the survivors and/or heirs of SSgt D'Augustine and are entitled to recover for the damages SSgt D'Augustine sustained.

919.    Plaintiff Anthony D'Augustine is the father of SSgt D'Augustine.  He is a national of the United States.

920.    Plaintiff Patricia D'Augustine is the mother of SSgt D'Augustine.  She is a national of the United States.

921.    Plaintiff Jennifer D'Augustine is the sister of SSgt D'Augustine.  She is a national of the United States.

922.    Plaintiff Nicole D'Augustine is the sister of SSgt D'Augustine.  She is a national of the United States.

923.    Plaintiff Michele Kulesa is the sister of SSgt D'Augustine.  She is a national of the United States.

924.    As a result of the March 27, 2012 attack and SSgt D'Augustine's injuries and death, each member of the D'Augustine Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt D'Augustine's society, companionship, and counsel.

**The Mitchell K. Daehling Family**

925.     Specialist Mitchell K. Daehling served in Afghanistan as a member of the U.S. Army.  On May 14, 2013, SPC Daehling was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Daehling died on May 14, 2013 as a result of injuries sustained during the attack.

926.     The attack was committed by the Taliban.

927.     SPC Daehling's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

928.     SPC Daehling was a national of the United States at the time of the attack and his death.

929.     As a result of the attack, SPC Daehling was injured in his person and/or property. The Plaintiff members of the Daehling Family are the survivors and/or heirs of SPC Daehling and are entitled to recover for the damages SPC Daehling sustained.

930.     Plaintiff Samantha Daehling is the widow of SPC Daehling.  She is a national of the United States.

931.     Plaintiff Brenda Daehling is the mother of SPC Daehling.  She is a national of the United States.

932.     Plaintiff Kirk W. Daehling is the father of SPC Daehling.  He is a national of the United States.

933.     Plaintiff Adam Daehling is the brother of SPC Daehling.  He is a national of the United States.

934.    Plaintiff Kayla Marie Daehling is the sister of SPC Daehling.  She is a national of the United States.

935.    As a result of the May 14, 2013 attack and SPC Daehling's injuries and death, each member of the Daehling Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Daehling's society, companionship, and counsel.

**The Marcus Dandrea Family**

936.    Plaintiff Sergeant Marcus Dandrea served in Afghanistan as a member of the U.S. Marine Corps.  On February 24, 2011, Sgt Dandrea was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded Sgt Dandrea, who lost both of his legs above the knee and suffered injuries to his right hand and arm and a traumatic brain injury.  As a result of the February 24, 2011 attack and his injuries, Sgt Dandrea has experienced severe physical and emotional pain and suffering.

937.    The attack was committed by the Taliban.

938.    The attack that injured Sgt Dandrea would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

939.    Sgt Dandrea was a national of the United States at the time of the attack, and remains one to this day.

940.    Plaintiff N.D., by and through her next friend Marcus Dandrea, is the minor daughter of Sgt Dandrea.  She is a national of the United States.

941.    Plaintiff Leanora Dandrea is the mother of Sgt Dandrea.  She is a national of the United States.

942.     Plaintiff Mark William Dandrea is the father of Sgt Dandrea.  He is a national of the United States.

943.     Plaintiff H.D., by and through her next friend Leanora Dandrea, is the minor sister of Sgt Dandrea.  She is a national of the United States.

944.     Plaintiff I.D., by and through his next friend Leanora Dandrea, is the minor brother of Sgt Dandrea.  He is a national of the United States.

945.     Plaintiff Benjamin Dandrea is the brother of Sgt Dandrea.  He is a national of the United States.

946.     Plaintiff Gabriel Dandrea is the brother of Sgt Dandrea.  He is a national of the United States.

947.     Plaintiff Hannah Dandrea is the sister of Sgt Dandrea.  She is a national of the United States.

948.     Plaintiff Joshua Dandrea is the brother of Sgt Dandrea.  He is a national of the United States.

949.     Plaintiff Samuel Dandrea is the brother of Sgt Dandrea.  He is a national of the United States.

950.     As a result of the February 24, 2011 attack and Sgt Dandrea's injuries, each member of the Dandrea Family has experienced severe mental anguish, emotional pain and suffering.

**The Devin J. Daniels Family**

951.     Sergeant Devin J. Daniels served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SGT Daniels was injured in an IED attack in Helmand Province,

Afghanistan.  SGT Daniels died on August 25, 2011 as a result of injuries sustained during the attack.

952.    The attack was committed by the Taliban.

953.    SGT Daniels's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

954.    SGT Daniels was a national of the United States at the time of the attack and his death.

955.    As a result of the attack, SGT Daniels was injured in his person and/or property. The Plaintiff members of the Daniels Family are the survivors and/or heirs of SGT Daniels and are entitled to recover for the damages SGT Daniels sustained.

956.    Plaintiff James L. Daniels is the father of SGT Daniels.  He is a national of the United States.

957.    Plaintiff Lucas Daniels is the brother of SGT Daniels.  He is a national of the United States.

958.    Plaintiff Sophie Daniels is the sister of SGT Daniels.  She is a national of the United States.

959.    As a result of the August 25, 2011 attack and SGT Daniels's injuries and death, each member of the Daniels Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Daniels's society, companionship, and counsel.

**The James M. Darrough Family**

960.    Sergeant James M. Darrough served in Afghanistan as a member of the U.S.

Army.  On October 29, 2011, SGT Darrough was injured in a suicide bombing attack in Kabul

Province, Afghanistan.  SGT Darrough died on October 29, 2011 as a result of injuries sustained

during the attack.

961.    The attack was committed by the Taliban (including the Haqqani Network) and

al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack

Network.

962.    SGT Darrough's murder would have violated the laws of war if these terrorist

groups were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the

attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it

occurred on a busy road near a university.

963.    SGT Darrough was a national of the United States at the time of the attack and his

death.

964.    As a result of the attack, SGT Darrough was injured in his person and/or property.

The Plaintiff members of the Darrough Family are the survivors and/or heirs of SGT Darrough

and are entitled to recover for the damages SGT Darrough sustained.

965.    Plaintiff Robert Charles Darrough is the father of SGT Darrough.  He is a national

of the United States.

966.    Plaintiff Judith Sara Darrough is the step-mother of SGT Darrough.  She is a

national of the United States.  Judith Sara Darrough lived in the same household as SGT

Darrough for a substantial period of time and considered SGT Darrough the functional equivalent of a biological son.

967.    As a result of the October 29, 2011 attack and SGT Darrough's injuries and death, each member of the Darrough Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Darrough's society, companionship, and counsel.

**The Jonathan D. Davis Family**

968.    Staff Sergeant Jonathan D. Davis served in Afghanistan as a member of the U.S. Marine Corps.  On February 22, 2013, SSgt Davis was injured in an IED attack in Helmand Province, Afghanistan.  SSgt Davis died on February 22, 2013 as a result of injuries sustained during the attack.

969.    The attack was committed by the Taliban.

970.    SSgt Davis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

971.    SSgt Davis was a national of the United States at the time of the attack and his death.

972.    As a result of the attack, SSgt Davis was injured in his person and/or property. The Plaintiff members of the Davis Family are the survivors and/or heirs of SSgt Davis and are entitled to recover for the damages SSgt Davis sustained.

973.    Plaintiff Helena Davis is the widow of SSgt Davis.  She is a national of the United States.

974.    Plaintiff C.D., by and through his next friend Helena Davis, is the minor son of SSgt Davis.  He is a national of the United States.

975.    As a result of the February 22, 2013 attack and SSgt Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Davis's society, companionship, and counsel.

## The David P. Day Family

976.    Staff Sergeant David P. Day served in Afghanistan as a member of the U.S. Marine Corps.  On April 24, 2011, SSgt Day was injured in an IED attack in Badghis Province, Afghanistan.  SSgt Day died on April 24, 2011 as a result of injuries sustained during the attack.

977.    The attack was committed by the Taliban.

978.    SSgt Day's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

979.    SSgt Day was a national of the United States at the time of the attack and his death.

980.    As a result of the attack, SSgt Day was injured in his person and/or property.  The Plaintiff members of the Day Family are the survivors and/or heirs of SSgt Day and are entitled to recover for the damages SSgt Day sustained.

981.    Plaintiff Don Day is the father of SSgt Day.  He is a national of the United States.

982.    Plaintiff Kathy Day is the mother of SSgt Day.  She is a national of the United States.

983.    As a result of the April 24, 2011 attack and SSgt Day's injuries and death, each member of the Day Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Day's society, companionship, and counsel.

**The Joseph Roger Deslauriers Family**

984.    Plaintiff Master Sergeant Joseph Roger Deslauriers served in Afghanistan as a member of the U.S. Air Force.  On September 23, 2011, MSgt Deslauriers was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded MSgt Deslauriers, who lost both of his legs above the knee and his left arm below the elbow.  As a result of the September 23, 2011 attack and his injuries, MSgt Deslauriers has experienced severe physical and emotional pain and suffering.

985.    The attack was committed by the Taliban.

986.    The attack that injured MSgt Deslauriers would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

987.    MSgt Deslauriers was a national of the United States at the time of the attack, and remains one to this day.

988.    Plaintiff Lisa Deslauriers is the wife of MSgt Deslauriers.  She is a national of the United States.

989.    As a result of the September 23, 2011 attack and MSgt Deslauriers's injuries, each member of the Deslauriers Family has experienced severe mental anguish, emotional pain and suffering.

**The Matthew J. DeYoung Family**

990.     Sergeant Matthew J. DeYoung served in Afghanistan as a member of the U.S. Marine Corps.  On February 18, 2011, Sgt DeYoung was injured in an IED attack in Helmand Province, Afghanistan.  Sgt DeYoung died on February 18, 2011 as a result of injuries sustained during the attack.

991.     The attack was committed by the Taliban.

992.     Sgt DeYoung's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

993.     Sgt DeYoung was a national of the United States at the time of the attack and his death.

994.     As a result of the attack, Sgt DeYoung was injured in his person and/or property. The Plaintiff members of the DeYoung Family are the survivors and/or heirs of Sgt DeYoung and are entitled to recover for the damages Sgt DeYoung sustained.

995.     Plaintiff Teddi DeYoung is the mother of Sgt DeYoung.  She is a national of the United States.

996.     As a result of the February 18, 2011 attack and Sgt DeYoung's injuries and death, each member of the DeYoung Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt DeYoung's society, companionship, and counsel.

**The Alberto D. Diaz Family**

997.     Plaintiff Specialist Alberto D. Diaz served in Afghanistan as a member of the U.S. Army.  On August 12, 2014, SPC Diaz was injured in an IED attack in Kandahar Province,

Afghanistan.  The attack severely wounded SPC Diaz, who suffered severe brain injuries and facial damage requiring complete right-side facial reconstruction, and also suffers from post-traumatic stress disorder, chronic fatigue syndrome, chronic pain, social anxiety, panic attacks, hearing loss and tremors.  As a result of the August 12, 2014 attack and his injuries, SPC Diaz has experienced severe physical and emotional pain and suffering.

998.   The attack was committed by the Taliban.

999.   The attack that injured SPC Diaz would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1000.   SPC Diaz was a national of the United States at the time of the attack, and remains one to this day.

1001.   Plaintiff Kayla N. Diaz is the wife of SPC Diaz.  She is a national of the United States.

1002.   Plaintiff N.J.D., by and through her next friend Kayla N. Diaz, is the minor daughter of SPC Diaz.  She is a national of the United States.

1003.   Plaintiff N.J.A.D., by and through his next friend Kayla N. Diaz, is the minor son of SPC Diaz.  He is a national of the United States.

1004.   Plaintiff Frances P. Diaz is the mother of SPC Diaz.  She is a national of the United States.

1005.   Plaintiff Maximo Diaz is the father of SPC Diaz.  He is a national of the United States.

1006.   Plaintiff Anthony M. Diaz is the brother of SPC Diaz.  He is a national of the United States.

1007.   Plaintiff Matthew J. Diaz is the brother of SPC Diaz.  He is a national of the United States.

1008.   As a result of the August 12, 2014 attack and SPC Diaz's injuries, each member of the Diaz Family has experienced severe mental anguish, emotional pain and suffering.

**The John P. Dion Family**

1009.   Private First Class John P. Dion served in Afghanistan as a member of the U.S. Army.  On January 3, 2010, PFC Dion was injured in an IED attack in Kandahar Province, Afghanistan.  PFC Dion died on January 3, 2010 as a result of injuries sustained during the attack.

1010.   The attack was committed by the Taliban.

1011.   PFC Dion's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1012.   PFC Dion was a national of the United States at the time of the attack and his death.

1013.   As a result of the attack, PFC Dion was injured in his person and/or property.  The Plaintiff members of the Dion Family are the survivors and/or heirs of PFC Dion and are entitled to recover for the damages PFC Dion sustained.

1014.   Plaintiff Patricia Elsner is the mother of PFC Dion.  She is a national of the United States.

1015.   Plaintiff Kelsey Thomas is the sister of PFC Dion.  She is a national of the United States.

1016.   Plaintiff Mark Elsner is the step-father of PFC Dion.  He is a national of the United States.  Mark Elsner lived in the same household as PFC Dion for a substantial period of time and considered PFC Dion the functional equivalent of a biological son.

1017.   Plaintiff Jackie Allen is the step-sister of PFC Dion.  She is a national of the United States.  Jackie Allen lived in the same household as PFC Dion for a substantial period of time and considered PFC Dion the functional equivalent of a biological brother.

1018.   Plaintiff Mark Anthony Elsner is the step-brother of PFC Dion.  He is a national of the United States.  Mark Anthony Elsner lived in the same household as PFC Dion for a substantial period of time and considered PFC Dion the functional equivalent of a biological brother.

1019.   As a result of the January 3, 2010 attack and PFC Dion's injuries and death, each member of the Dion Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Dion's society, companionship, and counsel.

**The Corey J. Dodge Family**

1020.   Corey J. Dodge served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On August 22, 2015, Mr. Dodge was injured in a suicide bombing attack in Kabul Province, Afghanistan.  Mr. Dodge died on August 22, 2015 as a result of injuries sustained during the attack.

1021.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

1022.   Mr. Dodge's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

1023.   Mr. Dodge was a national of the United States at the time of the attack and his death.

1024.   As a result of the attack, Mr. Dodge was injured in his person and/or property. The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

1025.   Plaintiff Kelli Dodge is the widow of Mr. Dodge.  She is a national of the United States.

1026.   Plaintiff B.C.D., by and through his next friend Kelli Dodge, is the minor son of Mr. Dodge.  He is a national of the United States.

1027.   Plaintiff P.A.D., by and through her next friend Kelli Dodge, is the minor daughter of Mr. Dodge.  She is a national of the United States.

1028.   As a result of the August 22, 2015 attack and Mr. Dodge's injuries and death, each member of the Dodge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Dodge's society, companionship, and counsel.

**The Max W. Donahue Family**

1029.   Corporal Max W. Donahue served in Afghanistan as a member of the U.S. Marine Corps.  On August 4, 2010, Cpl Donahue was injured in an IED attack in Helmand Province,

Afghanistan.  Cpl Donahue died on August 7, 2010 as a result of injuries sustained during the attack.

1030.   The attack was committed by the Taliban.

1031.   Cpl Donahue's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1032.   Cpl Donahue was a national of the United States at the time of the attack and his death.

1033.   As a result of the attack, Cpl Donahue was injured in his person and/or property. The Plaintiff members of the Donahue Family are the survivors and/or heirs of Cpl Donahue and are entitled to recover for the damages Cpl Donahue sustained.

1034.   Plaintiff Julie Schrock is the mother of Cpl Donahue.  She is a national of the United States.

1035.   Plaintiff Ryan Donahue is the brother of Cpl Donahue.  He is a national of the United States.

1036.   Plaintiff Chandler Schrock is the step-father of Cpl Donahue.  He is a national of the United States.  Chandler Schrock lived in the same household as Cpl Donahue for a substantial period of time and considered Cpl Donahue the functional equivalent of a biological son.

1037.   Plaintiff Taylor Schrock is the step-brother of Cpl Donahue.  He is a national of the United States.  Taylor Schrock lived in the same household as Cpl Donahue for a substantial period of time and considered Cpl Donahue the functional equivalent of a biological brother.

1038.   As a result of the August 4, 2010 attack and Cpl Donahue's injuries and death, each member of the Donahue Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Donahue's society, companionship, and counsel.

**Robert Alexander Dove**

1039.   Plaintiff Staff Sergeant Robert Alexander Dove served in Afghanistan as a member of the U.S. Army.  On June 9, 2012, SSG Dove was injured in an IED attack in Kandahar Province, Afghanistan.  The attack severely wounded SSG Dove, who lost his right arm below the elbow and right leg above knee, and suffered a traumatic brain injury, crushed pelvis, numerous soft tissue and shrapnel injuries, hearing loss, and multiple fractures of the left hand requiring 38 surgeries.  As a result of the June 9, 2012 attack and his injuries, SSG Dove has experienced severe physical and emotional pain and suffering.

1040.   The attack was committed by the Taliban.

1041.   The attack that injured SSG Dove would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1042.   SSG Dove was a national of the United States at the time of the attack and remains one to this day.

**The Stephen J. Dunning Family**

1043.   Staff Sergeant Stephen J. Dunning served in Afghanistan as a member of the U.S. Marine Corps.  On October 27, 2011, SSgt Dunning was injured in an IED attack in Helmand Province, Afghanistan.  SSgt Dunning died on October 27, 2011 as a result of injuries sustained during the attack.

1044.   The attack was committed by the Taliban.

1045.   SSgt Dunning's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1046.   SSgt Dunning was a national of the United States at the time of the attack and his death.

1047.   As a result of the attack, SSgt Dunning was injured in his person and/or property. The Plaintiff members of the Dunning Family are the survivors and/or heirs of SSgt Dunning and are entitled to recover for the damages SSgt Dunning sustained.

1048.   Plaintiff Robert L. Dunning is the father of SSgt Dunning.  He is a national of the United States.

1049.   Plaintiff Tomoe Dunning is the mother of SSgt Dunning.  She is a national of the United States.

1050.   Plaintiff Joy Coy is the sister of SSgt Dunning.  She is a national of the United States.

1051.   As a result of the October 27, 2011 attack and SSgt Dunning's injuries and death, each member of the Dunning Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Dunning's society, companionship, and counsel.

**The Patrick Keith Durham Family**

1052.   Sergeant Patrick Keith Durham served in Afghanistan as a member of the U.S. Army.  On August 28, 2010, SGT Durham was injured in an IED attack in Kandahar Province,

Afghanistan.  SGT Durham died on August 28, 2010 as a result of injuries sustained during the attack.

1053.   The attack was committed by the Taliban.

1054.   SGT Durham's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1055.   SGT Durham was a national of the United States at the time of the attack and his death.

1056.   As a result of the attack, SGT Durham was injured in his person and/or property. The Plaintiff members of the Durham Family are the survivors and/or heirs of SGT Durham and are entitled to recover for the damages SGT Durham sustained.

1057.   Plaintiff J.G.A., by and through his next friend Jamie Allison, is the minor son of SGT Durham.  He is a national of the United States.

1058.   As a result of the August 28, 2010 attack and SGT Durham's injuries and death, each member of the Durham Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Durham's society, companionship, and counsel.

**The Donald R. Edgerton Family**

1059.   Sergeant Donald R. Edgerton served in Afghanistan as a member of the U.S. Army.  On July 10, 2010, SGT Edgerton was injured in an IED attack in Kunduz Province, Afghanistan.  SGT Edgerton died on July 10, 2010 as a result of injuries sustained during the attack.

1060.   The attack was committed by the Taliban.

1061.   SGT Edgerton's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1062.   SGT Edgerton was a national of the United States at the time of the attack and his death.

1063.   As a result of the attack, SGT Edgerton was injured in his person and/or property. The Plaintiff members of the Edgerton Family are the survivors and/or heirs of SGT Edgerton and are entitled to recover for the damages SGT Edgerton sustained.

1064.   Plaintiff Kyle Edgerton is the brother of SGT Edgerton.  He is a national of the United States.

1065.   As a result of the July 10, 2010 attack and SGT Edgerton's injuries and death, each member of the Edgerton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Edgerton's society, companionship, and counsel.

**The Erich Ellis Family**

1066.   Plaintiff Sergeant Erich Ellis served in Afghanistan as a member of the U.S. Marine Corps.  On June 12, 2012, Sgt Ellis was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded Sgt Ellis, who lost his right leg and suffered extensive, permanent damage to his left leg, right arm, and upper right leg as well as a traumatic brain injury.  As a result of the June 12, 2012 attack and his injuries, Sgt Ellis has experienced severe physical and emotional pain and suffering.

1067.   The attack was committed by the Taliban.

1068.   The attack that injured Sgt Ellis would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1069.   Sgt Ellis was a national of the United States at the time of the attack, and remains one to this day.

1070.   Plaintiff James Russell Ellis is the father of Sgt Ellis.  He is a national of the United States.

1071.   As a result of the June 12, 2012 attack and Sgt Ellis's injuries, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering.

**The Robert W. Ellis Family**

1072.   Specialist Robert W. Ellis served in Afghanistan as a member of the U.S. Army. On June 18, 2013, SPC Ellis was injured in a rocket attack in Parwan Province, Afghanistan. SPC Ellis died on June 18, 2013 as a result of injuries sustained during the attack.

1073.   The attack was committed by the Taliban.

1074.   SPC Ellis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1075.   SPC Ellis was a national of the United States at the time of the attack and his death.

1076.   As a result of the attack, SPC Ellis was injured in his person and/or property.  The Plaintiff members of the Ellis Family are the survivors and/or heirs of SPC Ellis and are entitled to recover for the damages SPC Ellis sustained.

1077.   Plaintiff Joelle R. Ellis is the mother of SPC Ellis.  She is a national of the United States.

1078.   Plaintiff John F. Ellis is the father of SPC Ellis.  He is a national of the United States.

1079.   Plaintiff James Earl Ellis is the brother of SPC Ellis.  He is a national of the United States.

1080.   As a result of the June 18, 2013 attack and SPC Ellis's injuries and death, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Ellis's society, companionship, and counsel.

**The Vincent J. Ellis Family**

1081.   Private First Class Vincent J. Ellis served in Afghanistan as a member of the U.S. Army.  On June 1, 2012, PFC Ellis was injured in a complex attack involving a suicide truck bomb, small arms fire, and rocket propelled and fragmentation grenades in Khost Province, Afghanistan.  PFC Ellis died on June 6, 2012 as a result of injuries sustained during the attack.

1082.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1083.   PFC Ellis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1084.   PFC Ellis was a national of the United States at the time of the attack and his death.

1085.   As a result of the attack, PFC Ellis was injured in his person and/or property.  The Plaintiff members of the Ellis Family are the survivors and/or heirs of PFC Ellis and are entitled to recover for the damages PFC Ellis sustained.

1086.   Plaintiff Brian Edward Ellis is the father of PFC Ellis.  He is a national of the United States.

1087.   Plaintiff Julie Ann Ellis is the mother of PFC Ellis.  She is a national of the United States.

1088.   Plaintiff Vanessa Marie Anzures is the sister of PFC Ellis.  She is a national of the United States.

1089.   Plaintiff Victor Raymond Ellis is the brother of PFC Ellis.  He is a national of the United States.

1090.   As a result of the June 1, 2012 attack and PFC Ellis's injuries and death, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Ellis's society, companionship, and counsel.

**The Michael D. Elm Family**

1091.   Specialist Michael D. Elm served in Afghanistan as a member of the U.S. Army. On October 14, 2011, SPC Elm was injured in an IED attack in Khost Province, Afghanistan. SPC Elm died on October 14, 2011 as a result of injuries sustained during the attack.

1092.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1093.   SPC Elm's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1094.   SPC Elm was a national of the United States at the time of the attack and his death.

1095.   As a result of the attack, SPC Elm was injured in his person and/or property.  The Plaintiff members of the Elm Family are the survivors and/or heirs of SPC Elm and are entitled to recover for the damages SPC Elm sustained.

1096.   Plaintiff Dennis John Elm is the father of SPC Elm.  He is a national of the United States.

1097.   Plaintiff Donna Lee Elm is the mother of SPC Elm.  She is a national of the United States.

1098.   Plaintiff Catherine Elm Boatwright is the sister of SPC Elm.  She is a national of the United States.

1099.   Plaintiff Margaret Elm Campbell is the sister of SPC Elm.  She is a national of the United States.

1100.   Plaintiff Matthew Elm is the brother of SPC Elm.  He is a national of the United States.

1101.   Plaintiff Christine Rangel is the sister of SPC Elm.  She is a national of the United States.

1102.   As a result of the October 14, 2011 attack and SPC Elm's injuries and death, each member of the Elm Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Elm's society, companionship, and counsel.

**The Kenneth B. Elwell Family**

1103.   Sergeant First Class Kenneth B. Elwell served in Afghanistan as a member of the U.S. Army.  On July 17, 2011, SFC Elwell was injured in a complex attack involving an IED and small arms fire in Kandahar Province, Afghanistan.  SFC Elwell died on July 17, 2011 as a result of injuries sustained during the attack.

1104.   The attack was committed by the Taliban.

1105.   SFC Elwell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1106.   SFC Elwell was a national of the United States at the time of the attack and his death.

1107.   As a result of the attack, SFC Elwell was injured in his person and/or property. The Plaintiff members of the Elwell Family are the survivors and/or heirs of SFC Elwell and are entitled to recover for the damages SFC Elwell sustained.

1108.   Plaintiff Kristen A. Elwell is the widow of SFC Elwell.  She is a national of the United States.

1109.   Plaintiff E.M.E., by and through her next friend Kristen A. Elwell, is the minor daughter of SFC Elwell.  She is a national of the United States.

1110.   Plaintiff N.B.E., by and through his next friend Kristen A. Elwell, is the minor son of SFC Elwell.  He is a national of the United States.

1111.   Plaintiff Susan Burkhard is the sister of SFC Elwell.  She is a national of the United States.

1112.   As a result of the July 17, 2011 attack and SFC Elwell's injuries and death, each member of the Elwell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Elwell's society, companionship, and counsel.

**The Richard A. Essex Family**

1113.   Sergeant Richard A. Essex served in Afghanistan as a member of the U.S. Army. On August 16, 2012, SGT Essex was injured in an attack on a helicopter in Kandahar Province, Afghanistan.  SGT Essex died on August 16, 2012 as a result of injuries sustained during the attack.

1114.   The attack was committed by the Taliban.

1115.   SGT Essex's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1116.   SGT Essex was a national of the United States at the time of the attack and his death.

1117.   As a result of the attack, SGT Essex was injured in his person and/or property. The Plaintiff members of the Essex Family are the survivors and/or heirs of SGT Essex and are entitled to recover for the damages SGT Essex sustained.

1118.   Plaintiff Charles Essex is the father of SGT Essex.  He is a national of the United States.

1119.   Plaintiff Marion Ruth Hopkins is the mother of SGT Essex.  She is a national of the United States.

1120.   As a result of the August 16, 2012 attack and SGT Essex's injuries and death, each member of the Essex Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Essex's society, companionship, and counsel.

**The Jered W. Ewy Family**

1121.   Second Lieutenant Jered W. Ewy served in Afghanistan as a member of the U.S. Army National Guard.  On July 29, 2011, 2LT Ewy was injured in an IED attack in Paktia Province, Afghanistan.  2LT Ewy died on July 29, 2011 as a result of injuries sustained during the attack.

1122.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1123.   2LT Ewy's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1124.   2LT Ewy was a national of the United States at the time of the attack and his death.

1125.   As a result of the attack, 2LT Ewy was injured in his person and/or property.  The Plaintiff members of the Ewy Family are the survivors and/or heirs of 2LT Ewy and are entitled to recover for the damages 2LT Ewy sustained.

1126.   Plaintiff John Ewy is the father of 2LT Ewy.  He is a national of the United States.

1127.   As a result of the July 29, 2011 attack and 2LT Ewy's injuries and death, each member of the Ewy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 2LT Ewy's society, companionship, and counsel.

**The Garrett A. Fant Family**

1128.   Specialist Garrett A. Fant served in Afghanistan as a member of the U.S. Army. On September 26, 2011, SPC Fant was injured in an IED attack in Helmand Province, Afghanistan.  SPC Fant died on September 26, 2011 as a result of injuries sustained during the attack.

1129.   The attack was committed by the Taliban.

1130.   SPC Fant's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1131.   SPC Fant was a national of the United States at the time of the attack and his death.

1132.   As a result of the attack, SPC Fant was injured in his person and/or property.  The Plaintiff members of the Fant Family are the survivors and/or heirs of SPC Fant and are entitled to recover for the damages SPC Fant sustained.

1133.   Plaintiff John L. Fant is the father of SPC Fant.  He is a national of the United States.

1134.   As a result of the September 26, 2011 attack and SPC Fant's injuries and death, each member of the Fant Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Fant's society, companionship, and counsel.

**The Jason D. Fingar Family**

1135.   Specialist Jason D. Fingar served in Afghanistan as a member of the U.S. Army. On May 22, 2010, SPC Fingar was injured in an IED attack in Helmand Province, Afghanistan. SPC Fingar died on May 22, 2010 as a result of injuries sustained during the attack.

1136.   The attack was committed by the Taliban.

1137.   SPC Fingar's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1138.   SPC Fingar was a national of the United States at the time of the attack and his death.

1139.   As a result of the attack, SPC Fingar was injured in his person and/or property. The Plaintiff members of the Fingar Family are the survivors and/or heirs of SPC Fingar and are entitled to recover for the damages SPC Fingar sustained.

1140.   Plaintiff David Fingar is the father of SPC Fingar.  He is a national of the United States.

1141.   Plaintiff Rhonda G. Fingar is the mother of SPC Fingar.  She is a national of the United States.

1142.   Plaintiff Andrea Dietz is the sister of SPC Fingar.  She is a national of the United States.

1143.   Plaintiff Buford Jeremiah Fingar is the brother of SPC Fingar.  He is a national of the United States.

1144.   Plaintiff Donald Joshua Fingar is the brother of SPC Fingar.  He is a national of the United States.

1145.   As a result of the May 22, 2010 attack and SPC Fingar's injuries and death, each member of the Fingar Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Fingar's society, companionship, and counsel.

**The Thomas K. Fogarty Family**

1146.   Staff Sergeant Thomas K. Fogarty served in Afghanistan as a member of the U.S. Army.  On May 6, 2012, SSG Fogarty was injured in an IED attack in Paktia Province, Afghanistan.  SSG Fogarty died on May 6, 2012 as a result of injuries sustained during the attack.

1147.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1148.   SSG Fogarty's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1149.  SSG Fogarty was a national of the United States at the time of the attack and his death.

1150.   As a result of the attack, SSG Fogarty was injured in his person and/or property. The Plaintiff members of the Fogarty Family are the survivors and/or heirs of SSG Fogarty and are entitled to recover for the damages SSG Fogarty sustained.

1151.   Plaintiff C.F., by and through his next friend Stephanie Jane Fisher, is the minor son of SSG Fogarty.  He is a national of the United States.

1152.   Plaintiff K.F., by and through his next friend Stephanie Jane Fisher, is the minor son of SSG Fogarty.  He is a national of the United States.

1153.   Plaintiff Stephanie Jane Fisher is the mother of SSG Fogarty.  She is a national of the United States.

1154.   Plaintiff Thomas Anthony Fogarty is the father of SSG Fogarty.  He is a national of the United States.

1155.   As a result of the May 6, 2012 attack and SSG Fogarty's injuries and death, each member of the Fogarty Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Fogarty's society, companionship, and counsel.

**The Michael L. Freeman Jr. Family**

1156.   Lance Corporal Michael L. Freeman Jr. served in Afghanistan as a member of the U.S. Marine Corps.  On February 1, 2010, LCpl Freeman was injured in an IED attack in Helmand Province, Afghanistan.  LCpl Freeman died on February 1, 2010 as a result of injuries sustained during the attack.

1157.   The attack was committed by the Taliban.

1158.   LCpl Freeman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1159.   LCpl Freeman was a national of the United States at the time of the attack and his death.

1160.   As a result of the attack, LCpl Freeman was injured in his person and/or property. The Plaintiff members of the Freeman Family are the survivors and/or heirs of LCpl Freeman and are entitled to recover for the damages LCpl Freeman sustained.

1161.   Plaintiff Stephanie Freeman is the widow of LCpl Freeman.  She is a national of the United States.

1162.   As a result of the February 1, 2010 attack and LCpl Freeman's injuries and death, each member of the Freeman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Freeman's society, companionship, and counsel.

**The Ronald D. Freeman Family**

1163.   Lance Corporal Ronald D. Freeman served in Afghanistan as a member of the U.S. Marine Corps.  On April 28, 2011, LCpl Freeman was injured in an IED attack in Helmand Province, Afghanistan.  LCpl Freeman died on April 28, 2011 as a result of injuries sustained during the attack.

1164.   The attack was committed by the Taliban.

1165.   LCpl Freeman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1166.   LCpl Freeman was a national of the United States at the time of the attack and his death.

1167.   As a result of the attack, LCpl Freeman was injured in his person and/or property. The Plaintiff members of the Freeman Family are the survivors and/or heirs of LCpl Freeman and are entitled to recover for the damages LCpl Freeman sustained.

1168.   Plaintiff Katie C. Freeman is the widow of LCpl Freeman.  She is a national of the United States.

1169.   Plaintiff K.M.F., by and through her next friend Katie C. Freeman, is the minor daughter of LCpl Freeman.  She is a national of the United States.

1170.   Plaintiff W.D.F., by and through his next friend Katie C. Freeman is the minor son of LCpl Freeman.  He is a national of the United States.

1171.   Plaintiff Brian Freeman is the father of LCpl Freeman.  He is a national of the United States.

1172.   As a result of the April 28, 2011 attack and LCpl Freeman's injuries and death, each member of the Freeman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Freeman's society, companionship, and counsel.

**The Demetrius M. Frison Family**

1173.   First Lieutenant Demetrius M. Frison served in Afghanistan as a member of the U.S. Army.  On May 10, 2011, 1LT Frison was injured in an IED attack in Khost Province, Afghanistan.  1LT Frison died on May 10, 2011 as a result of injuries sustained during the attack.

1174.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1175.   1LT Frison's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1176.   1LT Frison was a national of the United States at the time of the attack and his death.

1177.   As a result of the attack, 1LT Frison was injured in his person and/or property. The Plaintiff members of the Frison Family are the survivors and/or heirs of 1LT Frison and are entitled to recover for the damages 1LT Frison sustained.

1178.   Plaintiff Louella E. Frison is the mother of 1LT Frison.  She is a national of the United States.

1179.   As a result of the May 10, 2011 attack and 1LT Frison's injuries and death, each member of the Frison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Frison's society, companionship, and counsel.

**The Joseph M. Garrison Family**

1180.   Sergeant Joseph M. Garrison served in Afghanistan as a member of the U.S. Marine Corps.  On June 6, 2011, Sgt Garrison was injured in an IED attack in Helmand Province, Afghanistan.  Sgt Garrison died on June 6, 2011 as a result of injuries sustained during the attack.

1181.   The attack was committed by the Taliban.

1182.   Sgt Garrison's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1183.   Sgt Garrison was a national of the United States at the time of the attack and his death.

1184.   As a result of the attack, Sgt Garrison was injured in his person and/or property. The Plaintiff members of the Garrison Family are the survivors and/or heirs of Sgt Garrison and are entitled to recover for the damages Sgt Garrison sustained.

1185.   Plaintiff Joseph D. Garrison is the father of Sgt Garrison.  He is a national of the United States.

1186.   As a result of the June 6, 2011 attack and Sgt Garrison's injuries and death, each member of the Garrison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Garrison's society, companionship, and counsel.

**The Kendra Garza Family**

1187.   Plaintiff Sergeant Kendra Garza served in Afghanistan as a member of the U.S. Army.  On May 11, 2010, SGT Garza was injured in an IED attack in Logar Province, Afghanistan.  The attack severely wounded SGT Garza, who lost her left leg, suffered multiple pelvic fractures, and suffers from post-traumatic stress disorder.  As a result of the May 11, 2010 attack and her injuries, SGT Garza has experienced severe physical and emotional pain and suffering.

1188.   The attack was committed by the Haqqani Network, a part of the Taliban.

1189.   The attack that injured SGT Garza would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1190.   SGT Garza was a national of the United States at the time of the attack, and remains one to this day.

1191.   Plaintiff David Pieper is the father of SGT Garza.  He is a national of the United States.

1192.   Plaintiff Gayle Marie Pieper is the mother of SGT Garza.  She is a national of the United States.

1193.   Plaintiff Kaila Carrier is the sister of SGT Garza.  She is a national of the United States.

1194.   Plaintiff Troy M.W. Pieper is the brother of SGT Garza.  He is a national of the United States.

1195.   As a result of the May 11, 2010 attack and SGT Garza's injuries, each member of the Garza Family has experienced severe mental anguish, emotional pain and suffering.

**The Joel C. Gentz Family**

1196.   Captain Joel C. Gentz served in Afghanistan as a member of the U.S. Air Force. On June 9, 2010, Capt Gentz was injured in an attack on a helicopter in Helmand Province, Afghanistan.  Capt Gentz died on June 9, 2010 as a result of injuries sustained during the attack.

1197.   The attack was committed by the Taliban.

1198.   Capt Gentz's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1199.   Capt Gentz was a national of the United States at the time of the attack and his death.

1200.   As a result of the attack, Capt Gentz was injured in his person and/or property. The Plaintiff members of the Gentz Family are the survivors and/or heirs of Capt Gentz and are entitled to recover for the damages Capt Gentz sustained.

1201.   Plaintiff Judith Rowe Gentz is the mother of Capt Gentz.  She is a national of the United States.

1202.   As a result of the June 9, 2010 attack and Capt Gentz's injuries and death, each member of the Gentz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Gentz's society, companionship, and counsel.

**The William Joseph Gilbert Family**

1203.   Specialist William Joseph Gilbert served in Afghanistan as a member of the U.S. Army.  On May 14, 2013, SPC Gilbert was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Gilbert died on May 14, 2013 as a result of injuries sustained during the attack.

1204.   The attack was committed by the Taliban.

1205.   SPC Gilbert's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1206.   SPC Gilbert was a national of the United States at the time of the attack and his death.

1207.   As a result of the attack, SPC Gilbert was injured in his person and/or property. The Plaintiff members of the Gilbert Family are the survivors and/or heirs of SPC Gilbert and are entitled to recover for the damages SPC Gilbert sustained.

1208.   Plaintiff Joanna Gilbert is the mother of SPC Gilbert.  She is a national of the United States.

1209.   As a result of the May 14, 2013 attack and SPC Gilbert's injuries and death, each member of the Gilbert Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gilbert's society, companionship, and counsel.

## The Paul Goins Jr. Family

1210.   Paul Goins Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On February 10, 2014, Mr. Goins was injured in an IED attack in Kabul Province, Afghanistan.  Mr. Goins died on February 10, 2014 as a result of injuries sustained during the attack.

1211.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

1212.   Mr. Goins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1213.   Mr. Goins was a national of the United States at the time of the attack and his death.

1214.   As a result of the attack, Mr. Goins was injured in his person and/or property. The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

1215.   Plaintiff Patricia Goins is the widow of Mr. Goins.  She is a national of the United States.

1216.   Plaintiff Paul Edward Goins III is the son of Mr. Goins.  He is a national of the United States.

1217.   Plaintiff Emmitt Dwayne Burns is the step-son of Mr. Goins.  He is a national of the United States.  Emmitt Dwayne Burns lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

1218.   Plaintiff Janice Caruso is the step-daughter of Mr. Goins.  She is a national of the United States.  Janice Caruso lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

1219.   Plaintiff Dana Rainey is the step-daughter of Mr. Goins.  She is a national of the United States.  Dana Rainey lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

1220.   As a result of the February 10, 2014 attack and Mr. Goins's injuries and death, each member of the Goins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Goins's society, companionship, and counsel.

**The Wyatt A. Goldsmith Family**

1221.   Sergeant First Class Wyatt A. Goldsmith served in Afghanistan as a member of the U.S. Army.  On July 15, 2011, SFC Goldsmith was injured in a rocket propelled grenade attack in Helmand Province, Afghanistan.  SFC Goldsmith died on July 15, 2011 as a result of injuries sustained during the attack.

1222.   The attack was committed by the Taliban.

1223.   SFC Goldsmith's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1224.   SFC Goldsmith was a national of the United States at the time of the attack and his death.

1225.   As a result of the attack, SFC Goldsmith was injured in his person and/or property.  The Plaintiff members of the Goldsmith Family are the survivors and/or heirs of SFC Goldsmith and are entitled to recover for the damages SFC Goldsmith sustained.

1226.   Plaintiff John Wayne Goldsmith is the father of SFC Goldsmith.  He is a national of the United States.

1227.   Plaintiff Lorie Goldsmith is the mother of SFC Goldsmith.  She is a national of the United States.

1228.   As a result of the July 15, 2011 attack and SFC Goldsmith's injuries and death, each member of the Goldsmith Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Goldsmith's society, companionship, and counsel.

**The Jonathan A. Gollnitz Family**

1229.   Sergeant Jonathan A. Gollnitz served in Afghanistan as a member of the U.S. Army.  On September 26, 2012, SGT Gollnitz was injured in a suicide bombing attack in Logar Province, Afghanistan.  SGT Gollnitz died on September 26, 2012 as a result of injuries sustained during the attack.

1230.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

1231.  SGT Gollnitz's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1232.  SGT Gollnitz was a national of the United States at the time of the attack and his death.

1233.  As a result of the attack, SGT Gollnitz was injured in his person and/or property. The Plaintiff members of the Gollnitz Family are the survivors and/or heirs of SGT Gollnitz and are entitled to recover for the damages SGT Gollnitz sustained.

1234.  Plaintiff L.C.D., by and through his next friend, Bridgett L. DeHoff, is the son of SGT Gollnitz.  He is a national of the United States.

1235.  Plaintiff Kirk Andrew Gollnitz is the brother of SGT Gollnitz.  He is a national of the United States.

1236.  Plaintiff Tyler Gollnitz is the brother of SGT Gollnitz.  He is a national of the United States.

1237.  As a result of the September 26, 2012 attack and SGT Gollnitz's injuries and death, each member of the Gollnitz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gollnitz's society, companionship, and counsel.

**The Brittany Bria Gordon Family**

1238.  Specialist Brittany Bria Gordon served in Afghanistan as a member of the U.S. Army.  On October 13, 2012, SPC Gordon was injured in an IED attack in Zabul Province, Afghanistan.  SPC Gordon died on October 13, 2012 as a result of injuries sustained during the attack.

1239.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1240.   SPC Gordon's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1241.   SPC Gordon was a national of the United States at the time of the attack and her death.

1242.   As a result of the attack, SPC Gordon was injured in her person and/or property. The Plaintiff members of the Gordon Family are the survivors and/or heirs of SPC Gordon and are entitled to recover for the damages SPC Gordon sustained.

1243.   Plaintiff Cedric Frank Gordon is the father of SPC Gordon.  He is a national of the United States.

1244.   As a result of the October 13, 2012 attack and SPC Gordon's injuries and death, each member of the Gordon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gordon's society, companionship, and counsel.

**The Kristopher J. Gould Family**

1245.   Sergeant Kristopher J. Gould served in Afghanistan as a member of the U.S. Army.  On February 27, 2011, SGT Gould was injured in an IED attack in Ghazni Province, Afghanistan.  SGT Gould died on February 27, 2011 as a result of injuries sustained during the attack.

1246.   The attack was committed by the Haqqani Network, a part of the Taliban.

1247.   SGT Gould's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1248.   SGT Gould was a national of the United States at the time of the attack and his death.

1249.   As a result of the attack, SGT Gould was injured in his person and/or property. The Plaintiff members of the Gould Family are the survivors and/or heirs of SGT Gould and are entitled to recover for the damages SGT Gould sustained.

1250.   Plaintiff Ann L. Gould is the mother of SGT Gould.  She is a national of the United States.

1251.   Plaintiff James A. Gould is the father of SGT Gould.  He is a national of the United States.

1252.   Plaintiff Julianna Symkowiak is the sister of SGT Gould.  She is a national of the United States.

1253.   As a result of the February 27, 2011 attack and SGT Gould's injuries and death, each member of the Gould Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gould's society, companionship, and counsel.

**The Ryan J. Grady Family**

1254.   Specialist Ryan J. Grady served in Afghanistan as a member of the U.S. Army National Guard.  On July 2, 2010, SPC Grady was injured in an IED attack in Parwan Province, Afghanistan.  SPC Grady died on July 2, 2010 as a result of injuries sustained during the attack.

1255.   The attack was committed by the Taliban.

1256.   SPC Grady's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1257.   SPC Grady was a national of the United States at the time of the attack and his death.

1258.   As a result of the attack, SPC Grady was injured in his person and/or property. The Plaintiff members of the Grady Family are the survivors and/or heirs of SPC Grady and are entitled to recover for the damages SPC Grady sustained.

1259.   Plaintiff A.J.Q., by and through her next friend Kevin L. Grady, is the minor daughter of SPC Grady.  She is a national of the United States.

1260.   Plaintiff James A. Grady is the father of SPC Grady.  He is a national of the United States.

1261.   Plaintiff James Michael Grady is the brother of SPC Grady.  He is a national of the United States.

1262.   Plaintiff Kevin L. Grady is the brother of SPC Grady.  He is a national of the United States.

1263.   As a result of the July 2, 2010 attack and SPC Grady's injuries and death, each member of the Grady Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Grady's society, companionship, and counsel.

**The Douglas J. Green Family**

1264.   Specialist Douglas J. Green served in Afghanistan as a member of the U.S. Army. On August 28, 2011, SPC Green was injured in an IED attack in Kandahar Province,

Afghanistan.  SPC Green died on August 28, 2011 as a result of injuries sustained during the attack.

1265.   The attack was committed by the Taliban.

1266.   SPC Green's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1267.   SPC Green was a national of the United States at the time of the attack and his death.

1268.   As a result of the attack, SPC Green was injured in his person and/or property. The Plaintiff members of the Green Family are the survivors and/or heirs of SPC Green and are entitled to recover for the damages SPC Green sustained.

1269.   Plaintiff Suni Chabrow is the mother of SPC Green.  She is a national of the United States.

1270.   Plaintiff Kristin Caracciolo is the sister of SPC Green.  She is a national of the United States.

1271.   Plaintiff Paige Erlanger is the sister of SPC Green.  She is a national of the United States.

1272.   As a result of the August 28, 2011 attack and SPC Green's injuries and death, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Green's society, companionship, and counsel.

## The Travis Scott Green Family

1273.   Plaintiff Gunnery Sergeant Travis Scott Green served in Afghanistan as a member of the U.S. Marine Corps.  On September 19, 2011, GySgt Green was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded GySgt Green, who lost both of his legs, suffered a traumatic brain injury and micro bleeds, and suffers from post-traumatic stress disorder.  As a result of the September 19, 2011 attack and his injuries, GySgt Green has experienced severe physical and emotional pain and suffering.

1274.   The attack was committed by the Taliban.

1275.   The attack that injured GySgt Green would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1276.   GySgt Green was a national of the United States at the time of the attack, and remains one to this day.

1277.   Plaintiff Julie Green is the ex-wife of GySgt Green.  She is a national of the United States.

1278.   Plaintiff A.G., by and through her next friend Travis Scott Green, is the minor daughter of GySgt Green.  She is a national of the United States.

1279.   Plaintiff A.G., by and through her next friend Travis Scott Green, is the minor daughter of GySgt Green.  She is a national of the United States.

1280.   Plaintiff E.G., by and through her next friend Travis Scott Green, is the minor daughter of GySgt Green.  She is a national of the United States.

1281.   Plaintiff T.G., by and through her next friend Travis Scott Green, is the minor daughter of GySgt Green.  She is a national of the United States.

1282.   Plaintiff Glenda Green is the sister of GySgt Green.  She is a national of the United States.

1283.   Plaintiff Colby Anderson is the step-son of GySgt Green.  He is a national of the United States.  Colby Anderson lived in the same household as GySgt Green for a substantial period of time and considers GySgt Green the functional equivalent of a biological father.

1284.   Plaintiff Hayley Anderson is the step-daughter of GySgt Green.  She is a national of the United States.  Hayley Anderson lived in the same household as GySgt Green for a substantial period of time and considers GySgt Green the functional equivalent of a biological father.

1285.   As a result of the September 19, 2011 attack and GySgt Green's injuries, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering.

**The Kevin J. Griffin Family**

1286.   Command Sergeant Major Kevin J. Griffin served in Afghanistan as a member of the U.S. Army.  On August 8, 2012, CSM Griffin was injured in a suicide bombing attack in Kunar Province, Afghanistan.  CSM Griffin died on August 8, 2012 as a result of injuries sustained during the attack.

1287.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1288.   CSM Griffin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1289.   CSM Griffin was a national of the United States at the time of the attack and his death.

1290.   As a result of the attack, CSM Griffin was injured in his person and/or property. The Plaintiff members of the Griffin Family are the survivors and/or heirs of CSM Griffin and are entitled to recover for the damages CSM Griffin sustained.

1291.   Plaintiff Matt Griffin is the brother of CSM Griffin.  He is a national of the United States.

1292.   Plaintiff Shawn Patrick Griffin is the brother of CSM Griffin.  He is a national of the United States.

1293.   Plaintiff Sheila Ristaino is the sister of CSM Griffin.  She is a national of the United States.

1294.   Plaintiff Carol Griffin is the step-mother of CSM Griffin.  She is a national of the United States.  Carol Griffin lived in the same household as CSM Griffin for a substantial period of time and considered CSM Griffin the functional equivalent of a biological son.

1295.   Plaintiff Daniel Griffin is the step-brother of CSM Griffin.  He is a national of the United States.  Daniel Griffin lived in the same household as CSM Griffin for a substantial period of time and considered CSM Griffin the functional equivalent of a biological brother.

1296.   As a result of the August 8, 2012 attack and CSM Griffin's injuries and death, each member of the Griffin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CSM Griffin's society, companionship, and counsel.

**The Casey J. Grochowiak Family**

1297.   Staff Sergeant Casey J. Grochowiak served in Afghanistan as a member of the U.S. Army.  On August 30, 2010, SSG Grochowiak was injured in an IED attack in Kandahar Province, Afghanistan.  SSG Grochowiak died on August 30, 2010 as a result of injuries sustained during the attack.

1298.   The attack was committed by the Taliban.

1299.   SSG Grochowiak's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1300.   SSG Grochowiak was a national of the United States at the time of the attack and his death.

1301.   As a result of the attack, SSG Grochowiak was injured in his person and/or property.  The Plaintiff members of the Grochowiak Family are the survivors and/or heirs of SSG Grochowiak and are entitled to recover for the damages SSG Grochowiak sustained.

1302.   Plaintiff Celestina Grochowiak is the widow of SSG Grochowiak.  She is a national of the United States.

1303.   Plaintiff D.G., by and through his next friend Celestina Grochowiak, is the minor son of SSG Grochowiak.  He is a national of the United States.

1304.   As a result of the August 30, 2010 attack and SSG Grochowiak's injuries and death, each member of the Grochowiak Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Grochowiak's society, companionship, and counsel.

**The William Gross Paniagua Family**

1305.   Sergeant William Gross Paniagua served in Afghanistan as a member of the U.S. Army.  On July 31, 2011, SGT Gross Paniagua was injured in an IED attack in Kunar Province, Afghanistan.  SGT Gross Paniagua died on July 31, 2011 as a result of injuries sustained during the attack.

1306.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1307.   SGT Gross Paniagua's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1308.   SGT Gross Paniagua was a national of the United States at the time of the attack and his death.

1309.   As a result of the attack, SGT Gross Paniagua was injured in his person and/or property.  The Plaintiff members of the Gross Paniagua Family are the survivors and/or heirs of SGT Gross Paniagua and are entitled to recover for the damages SGT Gross Paniagua sustained.

1310.   Plaintiff Carlos Benjamin Gross Rios Sr. is the father of SGT Gross Paniagua.  He is a national of the United States.

1311.   Plaintiff Soccoro Gross Paniagua is the mother of SGT Gross Paniagua.  She is a national of the United States.

1312.   Plaintiff Carlos Benjamin Gross Paniagua is the brother of SGT Gross Paniagua.  He is a national of the United States.

1313.    Plaintiff Felicia Gross Paniagua is the cousin and foster-sister of SGT Gross Paniagua.  She is a national of the United States.  Felicia Gross Paniagua lived in the same household as SGT Gross Paniagua for a substantial period of time and considered SGT Gross Paniagua the functional equivalent of a biological brother.

1314.    As a result of the July 31, 2011 attack and SGT Gross Paniagua's injuries and death, each member of the Gross Paniagua Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gross Paniagua's society, companionship, and counsel.

**The Matthias N. Hanson Family**

1315.    Lance Corporal Matthias N. Hanson served in Afghanistan as a member of the U.S. Marine Corps.  On February 21, 2010, LCpl Hanson was injured in an IED attack in Helmand Province, Afghanistan.  LCpl Hanson died on February 21, 2010 as a result of injuries sustained during the attack.

1316.    The attack was committed by the Taliban.

1317.    LCpl Hanson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1318.    LCpl Hanson was a national of the United States at the time of the attack and his death.

1319.    As a result of the attack, LCpl Hanson was injured in his person and/or property. The Plaintiff members of the Hanson Family are the survivors and/or heirs of LCpl Hanson and are entitled to recover for the damages LCpl Hanson sustained.

1320.   Plaintiff Lowell Hanson Jr. is the father of LCpl Hanson.  He is a national of the United States.

1321.   Plaintiff Megan Kathleen Dohn is the sister of LCpl Hanson.  She is a national of the United States.

1322.   Plaintiff Cynthia Hanson is the step-mother of LCpl Hanson.  She is a national of the United States.  Cynthia Hanson lived in the same household as LCpl Hanson for a substantial period of time and considered LCpl Hanson the functional equivalent of a biological son.

1323.   As a result of the February 21, 2010 attack and LCpl Hanson's injuries and death, each member of the Hanson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Hanson's society, companionship, and counsel.

**The Jeremy F. Hardison Family**

1324.   Sergeant Jeremy F. Hardison served in Afghanistan as a member of the U.S. Army National Guard.  On October 1, 2012, SGT Hardison was injured in a suicide bombing attack by an individual wearing an Afghan police uniform in Khost Province, Afghanistan.  SGT Hardison died on October 1, 2012 as a result of injuries sustained during the attack.

1325.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1326.   SGT Hardison's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was improperly wearing the uniform of his enemy, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public market.

1327.   SGT Hardison was a national of the United States at the time of the attack and his death.

1328.   As a result of the attack, SGT Hardison was injured in his person and/or property. The Plaintiff members of the Hardison Family are the survivors and/or heirs of SGT Hardison and are entitled to recover for the damages SGT Hardison sustained.

1329.   Plaintiff Jerry Hardison is the father of SGT Hardison.  He is a national of the United States.

1330.   Plaintiff Teresa Hardison is the mother of SGT Hardison.  She is a national of the United States.

1331.   Plaintiff Justina Hardison is the sister of SGT Hardison.  She is a national of the United States.

1332.   As a result of the October 1, 2012 attack and SGT Hardison's injuries and death, each member of the Hardison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Hardison's society, companionship, and counsel.

**The Scott D. Harper Family**

1333.   Lance Corporal Scott D. Harper served in Afghanistan as a member of the U.S. Marine Corps.  On October 13, 2011, LCpl Harper was injured in an IED attack in Helmand Province, Afghanistan.  LCpl Harper died on October 13, 2011 as a result of injuries sustained during the attack.

1334.   The attack was committed by the Taliban.

1335.   LCpl Harper's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1336.   LCpl Harper was a national of the United States at the time of the attack and his death.

1337.   As a result of the attack, LCpl Harper was injured in his person and/or property. The Plaintiff members of the Harper Family are the survivors and/or heirs of LCpl Harper and are entitled to recover for the damages LCpl Harper sustained.

1338.   Plaintiff Brian Harper is the father of LCpl Harper.  He is a national of the United States.

1339.   Plaintiff Angela Marie Harper is the step-mother of LCpl Harper.  She is a national of the United States.  Angela Marie Harper lived in the same household as LCpl Harper for a substantial period of time and considered LCpl Harper the functional equivalent of a biological son.

1340.   Plaintiff Holly Marie Harpe is the step-sister of LCpl Harper.  She is a national of the United States.  Holly Marie Harpe lived in the same household as LCpl Harper for a substantial period of time and considered LCpl Harper the functional equivalent of a biological brother.

1341.   Plaintiff Joseph Troy Hulsey Jr. is the step-brother of LCpl Harper.  He is a national of the United States.  Joseph Troy Hulsey Jr. lived in the same household as LCpl Harper for a substantial period of time and considered LCpl Harper the functional equivalent of a biological brother.

1342.   As a result of the October 13, 2011 attack and LCpl Harper's injuries and death, each member of the Harper Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Harper's society, companionship, and counsel.

**The Devon J. Harris Family**

1343.   Private First Class Devon J. Harris served in Afghanistan as a member of the U.S. Army.  On November 27, 2010, PFC Harris was injured in a rocket propelled grenade attack in Wardak Province, Afghanistan.  PFC Harris died on November 27, 2010 as a result of injuries sustained during the attack.

1344.   The attack was committed by the Haqqani Network, a part of the Taliban.

1345.   PFC Harris's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1346.   PFC Harris was a national of the United States at the time of the attack and his death.

1347.   As a result of the attack, PFC Harris was injured in his person and/or property. The Plaintiff members of the Harris Family are the survivors and/or heirs of PFC Harris and are entitled to recover for the damages PFC Harris sustained.

1348.   Plaintiff Sorainya Harris is the mother of PFC Harris.  She is a national of the United States.

1349.   Plaintiff Tennyson Charles Harris is the father of PFC Harris.  He is a national of the United States.

1350.   Plaintiff Tiffany Dotson is the sister of PFC Harris.  She is a national of the United States.

1351.   Plaintiff Ashley Michelle Harris is the sister of PFC Harris.  She is a national of the United States.

1352.   Plaintiff Christopher Wayne Johnson is the brother of PFC Harris.  He is a national of the United States.

1353.   Plaintiff David L. Parker is the brother of PFC Harris.  He is a national of the United States.

1354.   Plaintiff Felicia Ann Harris is the step-mother of PFC Harris.  She is a national of the United States.  Felicia Ann Harris lived in the same household as PFC Harris for a substantial period of time and considered PFC Harris the functional equivalent of a biological son.

1355.   Plaintiff Michael Rufus II is the step-brother of PFC Harris.  He is a national of the United States.  Michael Rufus II lived in the same household as PFC Harris for a substantial period of time and considered PFC Harris the functional equivalent of a biological brother.

1356.   Plaintiff Stephanie Rufus is the step-sister of PFC Harris.  She is a national of the United States.  Stephanie Rufus lived in the same household as PFC Harris for a substantial period of time and considered PFC Harris the functional equivalent of a biological brother.

1357.   As a result of the November 27, 2010 attack and PFC Harris's injuries and death, each member of the Harris Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Harris's society, companionship, and counsel.

**The Joshua A. Harton Family**

1358.   Corporal Joshua A. Harton served in Afghanistan as a member of the U.S. Army. On September 18, 2010, CPL Harton was injured in a rocket propelled grenade attack in Faryab Province, Afghanistan.  CPL Harton died on September 18, 2010 as a result of injuries sustained during the attack.

1359.   The attack was committed by the Taliban.

1360.   CPL Harton's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1361.   CPL Harton was a national of the United States at the time of the attack and his death.

1362.   As a result of the attack, CPL Harton was injured in his person and/or property. The Plaintiff members of the Harton Family are the survivors and/or heirs of CPL Harton and are entitled to recover for the damages CPL Harton sustained.

1363.   Plaintiff Ruth M. Harton is the mother of CPL Harton.  She is a national of the United States.

1364.   As a result of the September 18, 2010 attack and CPL Harton's injuries and death, each member of the Harton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Harton's society, companionship, and counsel.

**The Daus Isaiah Hempker Family**

1365.   Plaintiff Specialist Daus Isaiah Hempker served in Afghanistan as a member of the U.S. Army.  On September 16, 2010, SPC Hempker was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded SPC Hempker, who suffered a severe abdominal injury from the blast requiring multiple surgeries and two years in a transition facility; he also suffers from tinnitus, a traumatic brain injury, and post-traumatic stress disorder.  As a result of the September 16, 2010 attack and his injuries, SPC Hempker has experienced severe physical and emotional pain and suffering.

1366.   The attack was committed by the Taliban.

1367.   The attack that injured SPC Hempker would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1368.   SPC Hempker was a national of the United States at the time of the attack, and remains one to this day.

1369.   Plaintiff Dennis Hempker is the father of SPC Hempker.  He is a national of the United States.

1370.   Plaintiff Jewelyn Hempker is the sister of SPC Hempker.  She is a national of the United States.

1371.   As a result of the September 16, 2010 attack and SPC Hempker's injuries, each member of the Hempker Family has experienced severe mental anguish, emotional pain and suffering.

**The Jay Henigan Family**

1372.   Jay Henigan served in Afghanistan as a civilian government contractor working for the Central Intelligence Agency.  On September 25, 2011, Mr. Henigan was injured in an insider attack in Kabul Province, Afghanistan.  Mr. Henigan died on September 25, 2011 as a result of injuries sustained during the attack.

1373.   The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

1374.   Mr. Henigan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in

hostilities, and the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1375.   Mr. Henigan was a national of the United States at the time of the attack and his death.

1376.   As a result of the attack, Mr. Henigan was injured in his person and/or property. The Plaintiff members of the Henigan Family are the survivors and/or heirs of Mr. Henigan and are entitled to recover for the damages Mr. Henigan sustained.

1377.   Plaintiff Alex Henigan is the son of Mr. Henigan.  He is a national of the United States.

1378.   Plaintiff Todd McClain Henigan is the son of Mr. Henigan.  He is a national of the United States.

1379.   As a result of the September 25, 2011 attack and Mr. Henigan's injuries and death, each member of the Henigan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Henigan's society, companionship, and counsel.

**The Nicholas C.D. Hensley Family**

1380.   Specialist Nicholas C.D. Hensley served in Afghanistan as a member of the U.S. Army.  On June 15, 2011, SPC Hensley was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Hensley died on June 24, 2011 as a result of injuries sustained during the attack.

1381.   The attack was committed by the Taliban.

1382.   SPC Hensley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive

detonation system indiscriminately placed civilians at risk.

1383.   SPC Hensley was a national of the United States at the time of the attack and his

death.

1384.   As a result of the attack, SPC Hensley was injured in his person and/or property.

The Plaintiff members of the Hensley Family are the survivors and/or heirs of SPC Hensley and

are entitled to recover for the damages SPC Hensley sustained.

1385.   Plaintiff Joan Thelma Hensley is the mother of SPC Hensley.  She is a national of

the United States.

1386.   Plaintiff Terry L. Hensley is the father of SPC Hensley.  He is a national of the

United States.

1387.   As a result of the June 15, 2011 attack and SPC Hensley's injuries and death, each

member of the Hensley Family has experienced severe mental anguish, emotional pain and

suffering, and the loss of SPC Hensley's society, companionship, and counsel.

**The Jose A. Hernandez Family**

1388.   Lance Corporal Jose A. Hernandez served in Afghanistan as a member of the U.S.

Marine Corps.  On December 14, 2010, LCpl Hernandez was injured in an IED attack in

Helmand Province, Afghanistan.  LCpl Hernandez died on December 14, 2010 as a result of

injuries sustained during the attack.

1389.   The attack was committed by the Taliban.

1390.   LCpl Hernandez's murder would have violated the laws of war if these terrorist

groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1391.   LCpl Hernandez was a national of the United States at the time of the attack and his death.

1392.   As a result of the attack, LCpl Hernandez was injured in his person and/or property.  The Plaintiff members of the Hernandez Family are the survivors and/or heirs of LCpl Hernandez and are entitled to recover for the damages LCpl Hernandez sustained.

1393.   Plaintiff Evangeline Ferrera is the mother of LCpl Hernandez.  She is a national of the United States.

1394.   Plaintiff Don Hernandez is the brother of LCpl Hernandez.  He is a national of the United States.

1395.   Plaintiff Eduardo Ferrera is the step-father of LCpl Hernandez and is his survivor and/or heir.  Eduardo Ferrera lived in the same household as LCpl Hernandez for a substantial period of time and considered LCpl Hernandez the functional equivalent of a biological son.

1396.   As a result of the December 14, 2010 attack and LCpl Hernandez's injuries and death, each member of the Hernandez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Hernandez's society, companionship, and counsel.

**The Alan Herzel Family**

1397.   Alan Herzel served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On September 6, 2010, Mr. Herzel was injured in a mortar attack in Kandahar Province, Afghanistan.  Mr. Herzel died on September 6, 2010 as a result of injuries sustained during the attack.

1398.   The attack was committed by the Taliban.

1399.   Mr. Herzel's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1400.   Mr. Herzel was a national of the United States at the time of the attack and his death.

1401.   As a result of the attack, Mr. Herzel was injured in his person and/or property. The Plaintiff members of the Herzel Family are the survivors and/or heirs of Mr. Herzel and are entitled to recover for the damages Mr. Herzel sustained.

1402.   Plaintiff Connie Dianne Beck Herzel is the widow of Mr. Herzel.  She is a national of the United States.

1403.   Plaintiff Stephanie Lynn Hayhurst is the step-daughter of Mr. Herzel.  She is a national of the United States.  Stephanie Lynn Hayhurst lived in the same household as Mr. Herzel for a substantial period of time and considered Mr. Herzel the functional equivalent of a biological father.

1404.   As a result of the September 6, 2010 attack and Mr. Herzel's injuries and death, each member of the Herzel Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Herzel's society, companionship, and counsel.

**The Daren M. Hidalgo Family**

1405.   First Lieutenant Daren M. Hidalgo served in Afghanistan as a member of the U.S. Army.  On February 20, 2011, 1LT Hidalgo was injured in an IED attack in Kandahar Province, Afghanistan.  1LT Hidalgo died on February 20, 2011 as a result of injuries sustained during the attack.

1406.   The attack was committed by the Taliban.

1407.   1LT Hidalgo's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1408.   1LT Hidalgo was a national of the United States at the time of the attack and his death.

1409.   As a result of the attack, 1LT Hidalgo was injured in his person and/or property. The Plaintiff members of the Hidalgo Family are the survivors and/or heirs of 1LT Hidalgo and are entitled to recover for the damages 1LT Hidalgo sustained.

1410.   Plaintiff Andrea Hidalgo is the mother of 1LT Hidalgo.  She is a national of the United States.

1411.   Plaintiff Jorge Hidalgo is the father of 1LT Hidalgo.  He is a national of the United States.

1412.   As a result of the February 20, 2011 attack and 1LT Hidalgo's injuries and death, each member of the Hidalgo Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Hidalgo's society, companionship, and counsel.

**The Floyd E.C. Holley Family**

1413.   Gunnery Sergeant Floyd E.C. Holley served in Afghanistan as a member of the U.S. Marine Corps.  On August 29, 2010, GySgt Holley was injured in an IED attack in Helmand Province, Afghanistan.  GySgt Holley died on August 29, 2010 as a result of injuries sustained during the attack.

1414.   The attack was committed by the Taliban.

1415.   GySgt Holley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1416.   GySgt Holley was a national of the United States at the time of the attack and his death.

1417.   As a result of the attack, GySgt Holley was injured in his person and/or property. The Plaintiff members of the Holley Family are the survivors and/or heirs of GySgt Holley and are entitled to recover for the damages GySgt Holley sustained.

1418.   Plaintiff Christen Elaine Holley is the widow of GySgt Holley.  She is a national of the United States.

1419.   Plaintiff S.G.C.H., by and through her next friend Christen Elaine Holley, is the minor daughter of GySgt Holley.  She is a national of the United States.

1420.   Plaintiff Charissa DelGiorno is the sister of GySgt Holley.  She is a national of the United States.

1421.   Plaintiff Dominic Giacchi is the brother of GySgt Holley.  He is a national of the United States.

1422.   Plaintiff Alyssa Nicole Sheridan is the step-daughter of GySgt Holley.  She is a national of the United States.  Alyssa Nicole Sheridan lived in the same household as GySgt Holley for a substantial period of time and considered GySgt Holley the functional equivalent of a biological father.

1423.   Plaintiff Andrew Shawn Sheridan is the step-son of GySgt Holley.  He is a national of the United States.  Andrew Shawn Sheridan lived in the same household as GySgt

Holley for a substantial period of time and considered GySgt Holley the functional equivalent of a biological father.

1424.   As a result of the August 29, 2010 attack and GySgt Holley's injuries and death, each member of the Holley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of GySgt Holley's society, companionship, and counsel.

**Kevin Honaker**

1425.   Plaintiff Lance Corporal Kevin Honaker served in Afghanistan as a member of the U.S. Marine Corps.  On September 13, 2011, LCpl Honaker was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded LCpl Honaker, who lost his left leg above the knee, his right leg below the knee, and a finger on his left hand.  As a result of the September 13, 2011 attack and his injuries, LCpl Honaker has experienced severe physical and emotional pain and suffering.

1426.   The attack was committed by the Taliban.

1427.   The attack that injured LCpl Honaker would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1428.   LCpl Honaker was a national of the United States at the time of the attack and remains one to this day.

**The Justin L. Horsley Family**

1429.   Specialist Justin L. Horsley served in Afghanistan as a member of the U.S. Army. On July 22, 2012, SPC Horsley was injured in an IED attack in Logar Province, Afghanistan. SPC Horsley died on July 22, 2012 as a result of injuries sustained during the attack.

1430.   The attack was committed by the Haqqani Network, a part of the Taliban.

1431.   SPC Horsley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1432.   SPC Horsley was a national of the United States at the time of the attack and his death.

1433.   As a result of the attack, SPC Horsley was injured in his person and/or property. The Plaintiff members of the Horsley Family are the survivors and/or heirs of SPC Horsley and are entitled to recover for the damages SPC Horsley sustained.

1434.   Plaintiff Songmi Kietzmann is the mother of SPC Horsley.  She is a national of the United States.

1435.   Plaintiff Benjamin Horsley is the brother of SPC Horsley.  He is a national of the United States.

1436.   Plaintiff John Horsley is the brother of SPC Horsley.  He is a national of the United States.

1437.   As a result of the July 22, 2012 attack and SPC Horsley's injuries and death, each member of the Horsley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Horsley's society, companionship, and counsel.

**The Abram L. Howard Family**

1438.   Lance Corporal Abram L. Howard served in Afghanistan as a member of the U.S. Marine Corps Reserve.  On July 27, 2010, LCpl Howard was injured in an IED attack in

Helmand Province, Afghanistan.  LCpl Howard died on July 27, 2010 as a result of injuries sustained during the attack.

1439.   The attack was committed by the Taliban.

1440.   LCpl Howard's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1441.   LCpl Howard was a national of the United States at the time of the attack and his death.

1442.   As a result of the attack, LCpl Howard was injured in his person and/or property. The Plaintiff members of the Howard Family are the survivors and/or heirs of LCpl Howard and are entitled to recover for the damages LCpl Howard sustained.

1443.   Plaintiff Bart LaRue Howard is the father of LCpl Howard.  He is a national of the United States.

1444.   Plaintiff Constance Louise Howard is the mother of LCpl Howard.  She is a national of the United States.

1445.   Plaintiff Alexander James Howard is the brother of LCpl Howard.  He is a national of the United States.

1446.   Plaintiff Olivia Marie Howard is the sister of LCpl Howard.  She is a national of the United States.

1447.   As a result of the July 27, 2010 attack and LCpl Howard's injuries and death, each member of the Howard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Howard's society, companionship, and counsel.

**The Michael A. Hughes Family**

1448.   Michael A. Hughes served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On February 10, 2014, Mr. Hughes was injured in an IED attack in Kabul Province, Afghanistan.  Mr. Hughes died on February 10, 2014 as a result of injuries sustained during the attack.

1449.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

1450.   Mr. Hughes's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1451.   Mr. Hughes was a national of the United States at the time of the attack and his death.

1452.   As a result of the attack, Mr. Hughes was injured in his person and/or property. The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover for the damages Mr. Hughes sustained.

1453.   Plaintiff Kristine Anne Zitny is the sister of Mr. Hughes.  She is a national of the United States.

1454.   As a result of the February 10, 2014 attack and Mr. Hughes's injuries and death, each member of the Hughes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Hughes's society, companionship, and counsel.

**The Eric M. Hunter Family**

1455.   Plaintiff Sergeant Eric M. Hunter served in Afghanistan as a member of the U.S. Army.  On May 31, 2012, SGT Hunter was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded SGT Hunter, who lost his right leg and suffered from a severely injured left leg, post-traumatic stress disorder, and a traumatic brain injury.  As a result of the May 31, 2012 attack and his injuries, SGT Hunter has experienced severe physical and emotional pain and suffering.

1456.   The attack was committed by the Taliban.

1457.   The attack that injured SGT Hunter would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1458.   SGT Hunter was a national of the United States at the time of the attack, and remains one to this day.

1459.   Plaintiff Kenna Hunter is the wife of SGT Hunter.  She is a national of the United States.

1460.   Plaintiff J.H., by and through his next friend Kenna Hunter, is the minor son of SGT Hunter.  He is a national of the United States.

1461.   Plaintiff K.H., by and through her next friend Kenna Hunter, is the minor daughter of SGT Hunter.  She is a national of the United States.

1462.   Plaintiff Betty Darlene Black is the mother of SGT Hunter.  She is a national of the United States.

1463.   Plaintiff Joey J. Hunter is the father of SGT Hunter.  He is a national of the United States.

1464.   Plaintiff Joey J. Hunter II is the brother of SGT Hunter.  He is a national of the United States.

1465.   Plaintiff Nicholas Walter Robinson IV is the brother of SGT Hunter.  He is a national of the United States.

1466.   As a result of the May 31, 2012 attack and SGT Hunter's injuries, each member of the Hunter Family has experienced severe mental anguish, emotional pain and suffering.

**The Jesse Infante Family**

1467.   Staff Sergeant Jesse Infante served in Afghanistan as a member of the U.S. Army. On August 30, 2010, SSG Infante was injured in an IED attack in Helmand Province, Afghanistan.  SSG Infante died on August 30, 2010 as a result of injuries sustained during the attack.

1468.   The attack was committed by the Taliban.

1469.   SSG Infante's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1470.   SSG Infante was a national of the United States at the time of the attack and his death.

1471.   As a result of the attack, SSG Infante was injured in his person and/or property. The Plaintiff members of the Infante Family are the survivors and/or heirs of SSG Infante and are entitled to recover for the damages SSG Infante sustained.

1472.   Plaintiff Jesus Infante is the father of SSG Infante.  He is a national of the United States.

1473.   Plaintiff Jessica Infante is the sister of SSG Infante.  She is a national of the United States.

1474.   Plaintiff Juan Infante is the brother of SSG Infante.  He is a national of the United States.

1475.   As a result of the August 30, 2010 attack and SSG Infante's injuries and death, each member of the Infante Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Infante's society, companionship, and counsel.

**The Michael K. Ingram Jr. Family**

1476.   Sergeant Michael K. Ingram Jr. served in Afghanistan as a member of the U.S. Army.  On April 17, 2010, SGT Ingram was injured in an IED attack in Kandahar Province, Afghanistan.  SGT Ingram died on April 17, 2010 as a result of injuries sustained during the attack.

1477.   The attack was committed by the Taliban.

1478.   SGT Ingram's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1479.   SGT Ingram was a national of the United States at the time of the attack and his death.

1480.   As a result of the attack, SGT Ingram was injured in his person and/or property. The Plaintiff members of the Ingram Family are the survivors and/or heirs of SGT Ingram and are entitled to recover for the damages SGT Ingram sustained.

1481.   Plaintiff Michael K. Ingram Sr. is the father of SGT Ingram.  He is a national of the United States.

1482.   Plaintiff Julie Ingram is the step-mother of SGT Ingram.  She is a national of the United States.  Julie Ingram lived in the same household as SGT Ingram for a substantial period of time and considered SGT Ingram the functional equivalent of a biological son.

1483.   As a result of the April 17, 2010 attack and SGT Ingram's injuries and death, each member of the Ingram Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ingram's society, companionship, and counsel.

**Adam Jacks**

1484.   Plaintiff Sergeant Adam Jacks served in Afghanistan as a member of the U.S. Marine Corps.  On April 3, 2011, Sgt Jacks was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded Sgt Jacks, who lost his right leg below the knee, required reconstructive surgery of the left leg, and sustained a traumatic brain injury.  As a result of the April 3, 2011 attack and his injuries, Sgt Jacks has experienced severe physical and emotional pain and suffering.

1485.   The attack was committed by the Taliban.

1486.   The attack that injured Sgt Jacks would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1487.   Sgt Jacks was a national of the United States at the time of the attack and remains one to this day.

**The Ryan P. Jayne Family**

1488.   Specialist Ryan P. Jayne served in Afghanistan as a member of the U.S. Army Reserve.  On November 3, 2012, SPC Jayne was injured in an IED attack in Paktia Province, Afghanistan.  SPC Jayne died on November 3, 2012 as a result of injuries sustained during the attack.

1489.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1490.   SPC Jayne's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1491.   SPC Jayne was a national of the United States at the time of the attack and his death.

1492.   As a result of the attack, SPC Jayne was injured in his person and/or property. The Plaintiff members of the Jayne Family are the survivors and/or heirs of SPC Jayne and are entitled to recover for the damages SPC Jayne sustained.

1493.   Plaintiff Paul Elmer Jayne is the father of SPC Jayne.  He is a national of the United States.

1494.   Plaintiff Sherry A. Skeens is the mother of SPC Jayne.  She is a national of the United States.

1495.   Plaintiff Adam Matthew Jayne is the brother of SPC Jayne.  He is a national of the United States.

1496.   Plaintiff G.A.S., by and through his next friend Kent Alan Skeens, is the minor brother of SPC Jayne.  He is a national of the United States.

1497.   Plaintiff T.L.S., by and through his next friend Kent Alan Skeens, is the minor brother of SPC Jayne.  He is a national of the United States.

1498.   Plaintiff Z.R.S., by and through her next friend Kent Alan Skeens, is the minor sister of SPC Jayne.  She is a national of the United States.

1499.   Plaintiff Kent Alan Skeens is the step-father of SPC Jayne.  He is a national of the United States.  Kent Alan Skeens lived in the same household as SPC Jayne for a substantial period of time and considered SPC Jayne the functional equivalent of a biological son.

1500.   As a result of the November 3, 2012 attack and SPC Jayne's injuries and death, each member of the Jayne Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Jayne's society, companionship, and counsel.

**The Darius Lerone Johnson Family**

1501.   Plaintiff Staff Sergeant Darius Lerone Johnson served in Afghanistan as a member of the U.S. Army.  On July 17, 2011, SSG Johnson was injured in a complex attack involving an IED and small arms fire in Kandahar Province, Afghanistan.  The attack severely wounded SSG Johnson, who lost his left arm, and suffered from burns on over 30 percent of his body, a broken jaw, and extensive scaring, requiring 28 surgeries; he also suffers from a traumatic brain injury, post-traumatic stress disorder, depression, nightmares, and insomnia.  As a result of the July 17, 2011 attack and his injuries, SSG Johnson has experienced severe physical and emotional pain and suffering.

1502.   The attack was committed by the Taliban.

1503.   The attack that injured SSG Johnson would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1504.   SSG Johnson was a national of the United States at the time of the attack, and remains one to this day.

1505.   Plaintiff Judy B. Cusack is the mother of SSG Johnson.  She is a national of the United States.

1506.   As a result of the July 17, 2011 attack and SSG Johnson's injuries, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering.

**The Joseph D. Johnson Family**

1507.   Specialist Joseph D. Johnson served in Afghanistan as a member of the U.S. Army.  On June 16, 2010, SPC Johnson was injured in an IED attack in Kunduz Province, Afghanistan.  SPC Johnson died on June 16, 2010 as a result of injuries sustained during the attack.

1508.   The attack was committed by the Taliban.

1509.   SPC Johnson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1510.   SPC Johnson was a national of the United States at the time of the attack and his death.

1511.   As a result of the attack, SPC Johnson was injured in his person and/or property. The Plaintiff members of the Johnson Family are the survivors and/or heirs of SPC Johnson and are entitled to recover for the damages SPC Johnson sustained.

1512.   Plaintiff Dennis Johnson is the father of SPC Johnson.  He is a national of the United States.

1513.   Plaintiff Teri Johnson is the mother of SPC Johnson.  She is a national of the United States.

1514.   As a result of the June 16, 2010 attack and SPC Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Johnson's society, companionship, and counsel.

**The Timothy L. Johnson Family**

1515.   Specialist Timothy L. Johnson served in Afghanistan as a member of the U.S. Army.  On September 16, 2010, SPC Johnson was injured in an IED attack in Helmand Province, Afghanistan.  SPC Johnson died on September 16, 2010 as a result of injuries sustained during the attack.

1516.   The attack was committed by the Taliban.

1517.   SPC Johnson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1518.   SPC Johnson was a national of the United States at the time of the attack and his death.

1519.   As a result of the attack, SPC Johnson was injured in his person and/or property. The Plaintiff members of the Johnson Family are the survivors and/or heirs of SPC Johnson and are entitled to recover for the damages SPC Johnson sustained.

1520.   Plaintiff Cheryl Johnson is the mother of SPC Johnson.  She is a national of the United States.

1521.   As a result of the September 16, 2010 attack and SPC Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Johnson's society, companionship, and counsel.

**The Kevin King Family**

1522.   Plaintiff Professor Kevin King served in Afghanistan as a civilian professor teaching at American University of Afghanistan.  On August 7, 2016, Mr. King was kidnapped at gunpoint just outside the front gates of American University of Afghanistan.  Mr. King was held hostage under deplorable conditions, beaten frequently, and denied adequate medical care for over three years before being released in a prisoner exchange on November 19, 2019.  The attack severely wounded Mr. King, and he has suffered from severe caloric malnutrition, muscle atrophy, peripheral neuropathy, hypocalcemia, vitamin D deficiency, low bone mineral density, hyperparathyroidism, frostbite on feet and ankles, a weak bladder, and other physical injuries due to repeated beatings.  As a result of the August 7, 2016 attack and his injuries, Mr. King has experienced severe physical and emotional pain and suffering.

1523.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1524.   The attack that injured Mr. King would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian college

professor not taking part in hostilities and was tortured during captivity, and the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1525.   Mr. King was a national of the United States at the time of the attack, and remains one to this day.

1526.   Plaintiff Stephanie Ann Miller is the sister of Mr. King.  She is a national of the United States.

1527.   As a result of the August 7, 2016 attack and Mr. King's injuries, each member of the King Family has experienced severe mental anguish, emotional pain and suffering.

**The Hansen B. Kirkpatrick Family**

1528.   Private First Class Hansen B. Kirkpatrick served in Afghanistan as a member of the U.S. Army.  On July 3, 2017, PFC Kirkpatrick was injured in an indirect fire attack in Helmand Province, Afghanistan.  PFC Kirkpatrick died on July 3, 2017 as a result of injuries sustained during the attack.

1529.   The attack was committed by the Taliban.

1530.   PFC Kirkpatrick's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

1531.   PFC Kirkpatrick was a national of the United States at the time of the attack and his death.

1532.   As a result of the attack, PFC Kirkpatrick was injured in his person and/or property.  The Plaintiff members of the Kirkpatrick Family are the survivors and/or heirs of PFC Kirkpatrick and are entitled to recover for the damages PFC Kirkpatrick sustained.

1533.   Plaintiff Anngel Joy Norkist is the mother of PFC Kirkpatrick.  She is a national of the United States.

1534.   Plaintiff H.N., by and through his next friend William Newnham, is the minor brother of PFC Kirkpatrick.  He is a national of the United States.

1535.   Plaintiff Aujza Norkist is the sister of PFC Kirkpatrick.  She is a national of the United States.

1536.   Plaintiff William Newnham is the step-father of PFC Kirkpatrick.  He is a national of the United States.  William Newnham lived in the same household as PFC Kirkpatrick for a substantial period of time and considered PFC Kirkpatrick the functional equivalent of a biological son.

1537.   As a result of the July 3, 2017 attack and PFC Kirkpatrick's injuries and death, each member of the Kirkpatrick Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Kirkpatrick's society, companionship, and counsel.

**The Denis D. Kisseloff Family**

1538.   Sergeant Denis D. Kisseloff served in Afghanistan as a member of the U.S. Army National Guard.  On May 14, 2010, SGT Kisseloff was injured in a rocket propelled grenade attack in Logar Province, Afghanistan.  SGT Kisseloff died on May 14, 2010 as a result of injuries sustained during the attack.

1539.   The attack was committed by the Haqqani Network, a part of the Taliban.

1540.   SGT Kisseloff's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1541.   SGT Kisseloff was a national of the United States at the time of the attack and his death.

1542.   As a result of the attack, SGT Kisseloff was injured in his person and/or property. The Plaintiff members of the Kisseloff Family are the survivors and/or heirs of SGT Kisseloff and are entitled to recover for the damages SGT Kisseloff sustained.

1543.   Plaintiff Michael Kisseloff Sr. is the father of SGT Kisseloff.  He is a national of the United States.

1544.   Plaintiff Milagros Kisseloff is the mother of SGT Kisseloff.  She is a national of the United States.

1545.   As a result of the May 14, 2010 attack and SGT Kisseloff's injuries and death, each member of the Kisseloff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Kisseloff's society, companionship, and counsel.

**Edward Klein**

1546.   Plaintiff Major Edward Klein served in Afghanistan as a member of the U.S. Army.  On October 22, 2012, MAJ Klein was injured in an IED attack in Kandahar Province, Afghanistan.  The attack severely wounded MAJ Klein, who lost both legs above the knee, his right arm, and three fingers on his left hand.  As a result of the October 22, 2012 attack and his injuries, MAJ Klein has experienced severe physical and emotional pain and suffering.

1547.   The attack was committed by the Taliban.

1548.   The attack that injured MAJ Klein would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1549.   MAJ Klein was a national of the United States at the time of the attack and remains one to this day.

**The Michael J. Knapp Family**

1550.   Sergeant Michael J. Knapp served in Afghanistan as a member of the U.S. Army. On May 18, 2012, SGT Knapp was injured in an indirect fire attack in Kunar Province, Afghanistan.  SGT Knapp died on May 18, 2012 as a result of injuries sustained during the attack.

1551.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1552.   SGT Knapp's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

1553.   SGT Knapp was a national of the United States at the time of the attack and his death.

1554.   As a result of the attack, SGT Knapp was injured in his person and/or property. The Plaintiff members of the Knapp Family are the survivors and/or heirs of SGT Knapp and are entitled to recover for the damages SGT Knapp sustained.

1555.   Plaintiff Abby Knapp-Morris is the widow of SGT Knapp.  She is a national of the United States.

1556.   Plaintiff K.K., by and through her next friend Abby Knapp-Morris, is the minor daughter of SGT Knapp.  She is a national of the United States.

1557.   As a result of the May 18, 2012 attack and SGT Knapp's injuries and death, each member of the Knapp Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Knapp's society, companionship, and counsel.

**Brandon Korona**

1558.   Plaintiff Sergeant Brandon Korona served in Afghanistan as a member of the U.S. Army.  On June 23, 2013, SGT Korona was injured in an IED attack in Paktika Province, Afghanistan.  The attack severely wounded SGT Korona, who suffered from significant injuries to his left leg requiring a below-knee amputation in 2017, a fractured right ankle, and a traumatic brain injury.  As a result of the June 23, 2013 attack and his injuries, SGT Korona has experienced severe physical and emotional pain and suffering.

1559.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1560.   The attack that injured SGT Korona would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1561.   SGT Korona was a national of the United States at the time of the attack and remains one to this day.

**The Todd W. Lambka Family**

1562.   First Lieutenant Todd W. Lambka served in Afghanistan as a member of the U.S. Army.  On August 1, 2012, 1LT Lambka was injured in an IED attack in Paktika Province, Afghanistan.  1LT Lambka died on August 1, 2012 as a result of injuries sustained during the attack.

1563.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1564.   1LT Lambka's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1565.   1LT Lambka was a national of the United States at the time of the attack and his death.

1566.   As a result of the attack, 1LT Lambka was injured in his person and/or property. The Plaintiff members of the Lambka Family are the survivors and/or heirs of 1LT Lambka and are entitled to recover for the damages 1LT Lambka sustained.

1567.   Plaintiff Brian Lambka is the father of 1LT Lambka.  He is a national of the United States.

1568.   Plaintiff Jordan Lambka is the brother of 1LT Lambka.  He is a national of the United States.

1569.   As a result of the August 1, 2012 attack and 1LT Lambka's injuries and death, each member of the Lambka Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Lambka's society, companionship, and counsel.

**The Elliot Lander Family**

1570.   Plaintiff First Sergeant Elliot Lander served in Afghanistan as a member of the U.S. Marine Corps.  On March 14, 2011, 1SG Lander was injured in a complex attack involving small arms and light machine gun fire and a hand grenade in Helmand Province, Afghanistan. The attack severely wounded 1SG Lander, who suffered a gunshot wound to his left hip resulting in permanent disability and shrapnel wounds causing significant scarring all over his body; he also suffers from a traumatic brain injury, tinnitus, memory loss, headaches, and post-traumatic stress disorder.  As a result of the March 14, 2011 attack and his injuries, 1SG Lander has experienced severe physical and emotional pain and suffering.

1571.   The attack was committed by the Taliban.

1572.   The attack that injured 1SG Lander would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1573.   1SG Lander was a national of the United States at the time of the attack, and remains one to this day.

1574.   Plaintiff Hollan Lander is the wife of 1SG Lander.  She is a national of the United States.

1575.   Plaintiff T.L., by and through her next friend Elliot Lander, is the minor daughter of 1SG Lander.  She is a national of the United States.

1576.   Plaintiff Gregory N. Lander is the father of 1SG Lander.  He is a national of the United States.

1577.   Plaintiff Kimber Morin is the mother of 1SG Lander.  She is a national of the United States.

1578.   Plaintiff Eric Lander is the brother of 1SG Lander.  He is a national of the United States.

1579.   Plaintiff Catheryn Schoenfarber is the sister of 1SG Lander.  She is a national of the United States.

1580.   As a result of the March 14, 2011 attack and 1SG Lander's injuries, each member of the Lander Family has experienced severe mental anguish, emotional pain and suffering.

**The Jason D. Landphair Family**

1581.   Jason D. Landphair served in Afghanistan as a civilian government contractor working for Praetorian Standard Inc.  On January 29, 2015, Mr. Landphair was injured in an insider attack in Kabul Province, Afghanistan.  Mr. Landphair died on January 29, 2015 as a result of injuries sustained during the attack.

1582.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

1583.   Mr. Landphair's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1584.   Mr. Landphair was a national of the United States at the time of the attack and his death.

1585.   As a result of the attack, Mr. Landphair was injured in his person and/or property. The Plaintiff members of the Landphair Family are the survivors and/or heirs of Mr. Landphair and are entitled to recover for the damages Mr. Landphair sustained.

1586.   Plaintiff Natasha Buchanan is the widow of Mr. Landphair.  She is a national of the United States.

1587.   Plaintiff L.A.E.L.B., by and through her next friend Natasha Buchanan, is the minor daughter of Mr. Landphair.  She is a national of the United States.

1588.   Plaintiff S.L.L.B., by and through her next friend Natasha Buchanan, is the minor daughter of Mr. Landphair.  She is a national of the United States.

1589.   Plaintiff Douglas A. Landphair is the father of Mr. Landphair.  He is a national of the United States.

1590.   Plaintiff Jean S. Landphair is the mother of Mr. Landphair.  She is a national of the United States.

1591.   Plaintiff Meredith Landphair is the sister of Mr. Landphair.  She is a national of the United States.

1592.   As a result of the January 29, 2015 attack and Mr. Landphair's injuries and death, each member of the Landphair Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Landphair's society, companionship, and counsel.

**The Brandon J. Landrum Family**

1593.   First Lieutenant Brandon J. Landrum served in Afghanistan as a member of the U.S. Army.  On May 4, 2013, 1LT Landrum was injured in an IED attack in Kandahar Province,

Afghanistan.  1LT Landrum died on May 4, 2013 as a result of injuries sustained during the attack.

1594.   The attack was committed by the Taliban.

1595.   1LT Landrum's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1596.   1LT Landrum was a national of the United States at the time of the attack and his death.

1597.   As a result of the attack, 1LT Landrum was injured in his person and/or property. The Plaintiff members of the Landrum Family are the survivors and/or heirs of 1LT Landrum and are entitled to recover for the damages 1LT Landrum sustained.

1598.   Plaintiff Miranda Landrum is the widow of 1LT Landrum.  She is a national of the United States.

1599.   Plaintiff B.R.L., by and through her next friend Miranda Landrum, is the minor daughter of 1LT Landrum.  She is a national of the United States.

1600.   Plaintiff G.B.L., by and through his next friend Miranda Landrum, is the minor son of 1LT Landrum.  He is a national of the United States.

1601.   Plaintiff James R. Landrum is the father of 1LT Landrum.  He is a national of the United States.

1602.   Plaintiff Janet Landrum is the mother of 1LT Landrum.  She is a national of the United States.

1603.   As a result of the May 4, 2013 attack and 1LT Landrum's injuries and death, each member of the Landrum Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Landrum's society, companionship, and counsel.

**The David William Haalilio Lau Family**

1604.   Plaintiff Sergeant First Class David William Haalilio Lau served in Afghanistan as a member of the U.S. Army National Guard.  On April 4, 2012, SFC Lau was injured in a suicide bombing attack in Faryab Province, Afghanistan.  The attack severely wounded SFC Lau, who suffered severe injuries to both his legs requiring three years in a limb salvage program, extensive injuries to his dominant hand including the loss of a finger resulting in diminished function, severe injuries to shoulders and bicep, limb atrophy, dental injuries, loss of hearing, burns, and embedded toxic ball bearings.  As a result of the April 4, 2012 attack and his injuries, SFC Lau has experienced severe physical and emotional pain and suffering.

1605.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing and training the suicide bomber.

1606.   The attack that injured SFC Lau would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

1607.   SFC Lau was a national of the United States at the time of the attack, and remains one to this day.

1608.   Plaintiff Hamide Lau is the wife of SFC Lau.  She is a national of the United States.

1609.   Plaintiff K.L., by and through his next friend David William Haalilio Lau, is the minor son of SFC Lau.  He is a national of the United States.

1610.   Plaintiff M.L., by and through her next friend David William Haalilio Lau, is the minor daughter of SFC Lau.  She is a national of the United States.

1611.   Plaintiff Alexander Lau is the son of SFC Lau.  He is a national of the United States.

1612.   Plaintiff Vivian Perry is the mother of SFC Lau.  She is a national of the United States.

1613.   Plaintiff Holly Lau Abraham is the sister of SFC Lau.  She is a national of the United States.

1614.   Plaintiff Leroy Wingkit Lau Jr. is the brother of SFC Lau.  He is a national of the United States.

1615.   Plaintiff Michelle Lee Rauschenberger is the sister of SFC Lau.  She is a national of the United States.

1616.   Plaintiff Jammie Joann Smith is the sister of SFC Lau.  She is a national of the United States.

1617.   As a result of the April 4, 2012 attack and SFC Lau's injuries, each member of the Lau Family has experienced severe mental anguish, emotional pain and suffering.

**The Jacob C. Leicht Family**

1618.   Corporal Jacob C. Leicht served in Afghanistan as a member of the U.S. Marine Corps.  On May 27, 2010, Cpl Leicht was injured in an IED attack in Helmand Province, Afghanistan.  Cpl Leicht died on May 27, 2010 as a result of injuries sustained during the attack.

1619.   The attack was committed by the Taliban.

1620.   Cpl Leicht's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1621.   Cpl Leicht was a national of the United States at the time of the attack and his death.

1622.   As a result of the attack, Cpl Leicht was injured in his person and/or property. The Plaintiff members of the Leicht Family are the survivors and/or heirs of Cpl Leicht and are entitled to recover for the damages Cpl Leicht sustained.

1623.   Plaintiff Craig Leicht is the father of Cpl Leicht.  He is a national of the United States.

1624.   Plaintiff Shirly A. Leicht is the mother of Cpl Leicht.  She is a national of the United States.

1625.   Plaintiff Elizabeth C. Leicht is the sister of Cpl Leicht.  She is a national of the United States.

1626.   Plaintiff Jesse H. Leicht is the brother of Cpl Leicht.  He is a national of the United States.

1627.   Plaintiff Jonathan Leicht is the brother of Cpl Leicht.  He is a national of the United States.

1628.   Plaintiff Mary Rose Leicht is the sister of Cpl Leicht.  She is a national of the United States.

1629.   Plaintiff Sarah Grace Leicht is the sister of Cpl Leicht.  She is a national of the United States.

1630.   As a result of the May 27, 2010 attack and Cpl Leicht's injuries and death, each member of the Leicht Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Leicht's society, companionship, and counsel.

**The Jared Satoshi Lemon Family**

1631.   Plaintiff Sergeant Jared Satoshi Lemon served in Afghanistan as a member of the U.S. Army.  On April 11, 2010, SGT Lemon was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded SGT Lemon, who suffered from a compound fracture of his right arm, requiring amputation, shrapnel injuries to his head and back, post-traumatic stress disorder, and a traumatic brain injury.  As a result of the April 11, 2010 attack and his injuries, SGT Lemon has experienced severe physical and emotional pain and suffering.

1632.   The attack was committed by the Taliban.

1633.   The attack that injured SGT Lemon would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1634.   SGT Lemon was a national of the United States at the time of the attack, and remains one to this day.

1635.   Plaintiff K.E.L., by and through her next friend Jared Satoshi Lemon, is the minor daughter of SGT Lemon.  She is a national of the United States.

1636.   Plaintiff Frank L. Lemon is the father of SGT Lemon.  He is a national of the United States.

1637.   Plaintiff Jackie L. Lemon is the mother of SGT Lemon.  She is a national of the United States.

1638.   Plaintiff Benjamin Lemon is the brother of SGT Lemon.  He is a national of the United States.

1639.   Plaintiff Matthew C. S. Lemon is the brother of SGT Lemon.  He is a national of the United States.

1640.   Plaintiff Nathan Kenji Lemon is the brother of SGT Lemon.  He is a national of the United States.

1641.   As a result of the April 11, 2010 attack and SGT Lemon's injuries, each member of the Lemon Family has experienced severe mental anguish, emotional pain and suffering.

**Charles S. Ligon**

1642.   Plaintiff Specialist Charles S. Ligon served in Afghanistan as a member of the U.S. Army.  On December 11, 2011, SPC Ligon was injured in an IED attack in Kunar Province, Afghanistan.  The attack severely wounded SPC Ligon, who lost his left leg above the knee and sustained shrapnel to the right leg with open tibula and fibula fractures, a left open eye globe rupture, left tympanic membrane rupture with traumatic brain injury, and peppering and burns to the left hand.  As a result of the December 11, 2011 attack and his injuries, SPC Ligon has experienced severe physical and emotional pain and suffering.

1643.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1644.   The attack that injured SPC Ligon would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1645. SPC Ligon was a national of the United States at the time of the attack and remains one to this day.

**The Andrew R. Looney Family**

1646. Sergeant Andrew R. Looney served in Afghanistan as a member of the U.S. Army. On June 21, 2010, SGT Looney was injured in a suicide bombing attack in Kunar Province, Afghanistan. SGT Looney died on June 21, 2010 as a result of injuries sustained during the attack.

1647. The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1648. SGT Looney's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1649. SGT Looney was a national of the United States at the time of the attack and his death.

1650. As a result of the attack, SGT Looney was injured in his person and/or property. The Plaintiff members of the Looney Family are the survivors and/or heirs of SGT Looney and are entitled to recover for the damages SGT Looney sustained.

1651. Plaintiff C. Richard Looney is the father of SGT Looney. He is a national of the United States.

1652. Plaintiff Martha Looney is the mother of SGT Looney. She is a national of the United States.

1653.   As a result of the June 21, 2010 attack and SGT Looney's injuries and death, each member of the Looney Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Looney's society, companionship, and counsel.

**Todd Simpson Love**

1654.   Plaintiff Corporal Todd Simpson Love served in Afghanistan as a member of the U.S. Marine Corps.  On October 25, 2010, Cpl Love was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded Cpl Love, who lost his left arm below the elbow and both his legs from just below the waist and suffers from hearing loss and a mild traumatic brain injury.  As a result of the October 25, 2010 attack and his injuries, Cpl Love has experienced severe physical and emotional pain and suffering.

1655.   The attack was committed by the Taliban.

1656.   The attack that injured Cpl Love would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1657.   Cpl Love was a national of the United States at the time of the attack and remains one to this day.

**The Russell E. Madden Family**

1658.   Specialist Russell E. Madden served in Afghanistan as a member of the U.S. Army.  On June 23, 2010, SPC Madden was injured in an indirect fire attack in Logar Province, Afghanistan.  SPC Madden died on June 23, 2010 as a result of injuries sustained during the attack.

1659.   The attack was committed by the Haqqani Network, a part of the Taliban.

1660.   SPC Madden's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

1661.   SPC Madden was a national of the United States at the time of the attack and his death.

1662.   As a result of the attack, SPC Madden was injured in his person and/or property. The Plaintiff members of the Madden Family are the survivors and/or heirs of SPC Madden and are entitled to recover for the damages SPC Madden sustained.

1663.   Plaintiff Martin E. Madden is the father of SPC Madden.  He is a national of the United States.

1664.   Plaintiff Martin P. Madden is the brother of SPC Madden.  He is a national of the United States.

1665.   Plaintiff Lindsey R. Maldonado is the sister of SPC Madden.  She is a national of the United States.

1666.   Plaintiff Pamela J. Madden is the step-mother of SPC Madden.  She is a national of the United States.  Pamela J. Madden lived in the same household as SPC Madden for a substantial period of time and considered SPC Madden the functional equivalent of a biological son.

1667.   As a result of the June 23, 2010 attack and SPC Madden's injuries and death, each member of the Madden Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Madden's society, companionship, and counsel.

**The Kyle Malin Family**

1668.   Plaintiff Staff Sergeant Kyle Malin served in Afghanistan as a member of the U.S. Army.  On July 12, 2010, SSG Malin was injured in an IED attack in Kandahar Province, Afghanistan.  The attack severely wounded SSG Malin, who lost both his legs above the knee. As a result of the July 12, 2010 attack and his injuries, SSG Malin has experienced severe physical and emotional pain and suffering.

1669.   The attack was committed by the Taliban.

1670.   The attack that injured SSG Malin would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1671.   SSG Malin was a national of the United States at the time of the attack, and remains one to this day.

1672.   Plaintiff Alicia Malin is the wife of SSG Malin.  She is a national of the United States.

1673.   Plaintiff C.M., by and through his next friend Alicia Malin, is the minor son of SSG Malin.  He is a national of the United States.

1674.   Plaintiff K.M., by and through his next friend Alicia Malin, is the minor son of SSG Malin.  He is a national of the United States.

1675.   As a result of the July 12, 2010 attack and SSG Malin's injuries, each member of the Malin Family has experienced severe mental anguish, emotional pain and suffering.

**The Chase S. Marta Family**

1676.   Specialist Chase S. Marta served in Afghanistan as a member of the U.S. Army. On May 7, 2012, SPC Marta was injured in an IED attack in Ghazni Province, Afghanistan. SPC Marta died on May 7, 2012 as a result of injuries sustained during the attack.

1677.   The attack was committed by the Haqqani Network, a part of the Taliban.

1678.   SPC Marta's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1679.   SPC Marta was a national of the United States at the time of the attack and his death.

1680.   As a result of the attack, SPC Marta was injured in his person and/or property. The Plaintiff members of the Marta Family are the survivors and/or heirs of SPC Marta and are entitled to recover for the damages SPC Marta sustained.

1681.   Plaintiff Taylor Marta is the sister of SPC Marta.  She is a national of the United States.

1682.   As a result of the May 7, 2012 attack and SPC Marta's injuries and death, each member of the Marta Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Marta's society, companionship, and counsel.

**The Ethan J. Martin Family**

1683.   Corporal Ethan J. Martin served in Afghanistan as a member of the U.S. Army. On August 7, 2012, CPL Martin was injured in an insider attack in Paktia Province, Afghanistan. CPL Martin died on August 7, 2012 as a result of injuries sustained during the attack.

1684.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1685.   CPL Martin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1686.   CPL Martin was a national of the United States at the time of the attack and his death.

1687.   As a result of the attack, CPL Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of CPL Martin and are entitled to recover for the damages CPL Martin sustained.

1688.   Plaintiff Kristie Surprenant is the mother of CPL Martin.  She is a national of the United States.

1689.   Plaintiff Bob Surprenant is the step-father of CPL Martin.  He is a national of the United States.  Bob Surprenant lived in the same household as CPL Martin for a substantial period of time and considered CPL Martin the functional equivalent of a biological son.

1690.   As a result of the August 7, 2012 attack and CPL Martin's injuries and death, each member of the Martin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Martin's society, companionship, and counsel.

**The Wyatt J. Martin Family**

1691.   Specialist Wyatt J. Martin served in Afghanistan as a member of the U.S. Army. On December 12, 2014, SPC Martin was injured in a command wire-detonated IED attack in

Parwan Province, Afghanistan.  SPC Martin died on December 12, 2014 as a result of injuries sustained during the attack.

1692.   The attack was committed by the Taliban.

1693.   SPC Martin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1694.   SPC Martin was a national of the United States at the time of the attack and his death.

1695.   As a result of the attack, SPC Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of SPC Martin and are entitled to recover for the damages SPC Martin sustained.

1696.   Plaintiff Brian M. Martin is the father of SPC Martin.  He is a national of the United States.

1697.   Plaintiff Julie K. Martin is the mother of SPC Martin.  She is a national of the United States.

1698.   Plaintiff Catherine G. Martin is the sister of SPC Martin.  She is a national of the United States.

1699.   Plaintiff Elizabeth A. Martin is the sister of SPC Martin.  She is a national of the United States.

1700.   As a result of the December 12, 2014 attack and SPC Martin's injuries and death, each member of the Martin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Martin's society, companionship, and counsel.

**The Chauncy R. Mays Family**

1701.   Staff Sergeant Chauncy R. Mays served in Afghanistan as a member of the U.S. Army.  On February 28, 2011, SSG Mays was injured in an IED attack in Wardak Province, Afghanistan.  SSG Mays died on February 28, 2011 as a result of injuries sustained during the attack.

1702.   The attack was committed by the Haqqani Network, a part of the Taliban.

1703.   SSG Mays's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1704.   SSG Mays was a national of the United States at the time of the attack and his death.

1705.   As a result of the attack, SSG Mays was injured in his person and/or property. The Plaintiff members of the Mays Family are the survivors and/or heirs of SSG Mays and are entitled to recover for the damages SSG Mays sustained.

1706.   Plaintiff Thomas Pierce Mays is the father of SSG Mays.  He is a national of the United States.

1707.   Plaintiff Alyson Overman Rodgers is the mother of SSG Mays.  She is a national of the United States.

1708.   Plaintiff Cody Cheyenne Mays is the brother of SSG Mays.  He is a national of the United States.

1709.   Plaintiff Tammy Renee Mays is the step-mother of SSG Mays.  She is a national of the United States.  Tammy Renee Mays lived in the same household as SSG Mays for a

substantial period of time and considered SSG Mays the functional equivalent of a biological son.

1710.   As a result of the February 28, 2011 attack and SSG Mays's injuries and death, each member of the Mays Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mays's society, companionship, and counsel.

**The Chester J. McBride III Family**

1711.   Staff Sergeant Chester J. McBride III served in Afghanistan as a member of the U.S. Air Force.  On December 21, 2015, SSgt McBride was injured in a suicide bombing attack in Parwan Province, Afghanistan.  SSgt McBride died on December 21, 2015 as a result of injuries sustained during the attack.

1712.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing, indoctrinating, and training the suicide bomber.

1713.   SSgt McBride's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1714.   SSgt McBride was a national of the United States at the time of the attack and his death.

1715.   As a result of the attack, SSgt McBride was injured in his person and/or property. The Plaintiff members of the McBride Family are the survivors and/or heirs of SSgt McBride and are entitled to recover for the damages SSgt McBride sustained.

1716.   Plaintiff Annie L. McBride is the mother of SSgt McBride.  She is a national of the United States.

1717.   Plaintiff Chester R. McBride Sr. is the father of SSgt McBride.  He is a national of the United States.

1718.   As a result of the December 21, 2015 attack and SSgt McBride's injuries and death, each member of the McBride Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt McBride's society, companionship, and counsel.

**The Matthew Q. McClintock Family**

1719.   Sergeant First Class Matthew Q. McClintock served in Afghanistan as a member of the U.S. Army National Guard.  On January 5, 2016, SFC McClintock was injured in a complex attack involving small arms fire in Helmand Province, Afghanistan.  SFC McClintock died on January 5, 2016 as a result of injuries sustained during the attack.

1720.   The attack was committed by the Taliban.

1721.   SFC McClintock's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1722.   SFC McClintock was a national of the United States at the time of the attack and his death.

1723.   As a result of the attack, SFC McClintock was injured in his person and/or property.  The Plaintiff members of the McClintock Family are the survivors and/or heirs of SFC McClintock and are entitled to recover for the damages SFC McClintock sustained.

1724.   Plaintiff Joyce Patricia Paulsen is the mother of SFC McClintock.  She is a national of the United States.

1725.   Plaintiff Kevin Williams is the brother of SFC McClintock.  He is a national of the United States.

1726.   As a result of the January 5, 2016 attack and SFC McClintock's injuries and death, each member of the McClintock Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC McClintock's society, companionship, and counsel.

**The Mecolus C. McDaniel Family**

1727.   Staff Sergeant Mecolus C. McDaniel served in Afghanistan as a member of the U.S. Army.  On March 19, 2011, SSG McDaniel was injured in an IED attack in Khost Province, Afghanistan.  SSG McDaniel died on March 19, 2011 as a result of injuries sustained during the attack.

1728.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1729.   SSG McDaniel's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1730.   SSG McDaniel was a national of the United States at the time of the attack and his death.

1731.   As a result of the attack, SSG McDaniel was injured in his person and/or property. The Plaintiff members of the McDaniel Family are the survivors and/or heirs of SSG McDaniel and are entitled to recover for the damages SSG McDaniel sustained.

1732.   Plaintiff Sonja McDaniel is the widow of SSG McDaniel.  She is a national of the United States.

1733.   Plaintiff M.M., by and through his next friend Sonja McDaniel, is the minor son of SSG McDaniel.  He is a national of the United States.

1734.   Plaintiff Charlette Gilbert is the step-daughter of SSG McDaniel.  She is a national of the United States.  Charlette Gilbert lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

1735.   Plaintiff Charmaine Renee Gilbert is the step-daughter of SSG McDaniel.  She is a national of the United States.  Charmaine Renee Gilbert lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

1736.   Plaintiff Jordan Gilbert is the step-son of SSG McDaniel.  He is a national of the United States.  Jordan Gilbert lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

1737.   Plaintiff Jasmine Thomas is the step-daughter of SSG McDaniel.  She is a national of the United States.  Jasmine Thomas lived in the same household as SSG McDaniel for a substantial period of time and considered SSG McDaniel the functional equivalent of a biological father.

1738.   As a result of the March 19, 2011 attack and SSG McDaniel's injuries and death, each member of the McDaniel Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG McDaniel's society, companionship, and counsel.

**The Richard P. McEvoy Family**

1739.   Richard P. McEvoy served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On August 22, 2015, Mr. McEvoy was injured in a suicide bombing

attack in Kabul Province, Afghanistan.  Mr. McEvoy died on August 22, 2015 as a result of injuries sustained during the attack.

1740.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

1741.   Mr. McEvoy's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

1742.   Mr. McEvoy was a national of the United States at the time of the attack and his death.

1743.   As a result of the attack, Mr. McEvoy was injured in his person and/or property. The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

1744.   Plaintiff Kathleen McEvoy is the widow of Mr. McEvoy.  She is a national of the United States.

1745.   Plaintiff Michelle Rose McEvoy is the daughter of Mr. McEvoy.  She is a national of the United States.

1746.   Plaintiff Patrick Charles McEvoy is the son of Mr. McEvoy.  He is a national of the United States.

1747.   Plaintiff Janice H. Proctor is the mother of Mr. McEvoy.  She is a national of the United States.

1748.   Plaintiff Luann Varney is the sister of Mr. McEvoy.  She is a national of the United States.

1749.   As a result of the August 22, 2015 attack and Mr. McEvoy's injuries and death, each member of the McEvoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. McEvoy's society, companionship, and counsel.

**The Richard L. McNulty III Family**

1750.   Private First Class Richard L. McNulty III served in Afghanistan as a member of the U.S. Army.  On May 13, 2012, PFC McNulty was injured in an IED attack in Khost Province, Afghanistan.  PFC McNulty died on May 13, 2012 as a result of injuries sustained during the attack.

1751.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1752.   PFC McNulty's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1753.   PFC McNulty was a national of the United States at the time of the attack and his death.

1754.   As a result of the attack, PFC McNulty was injured in his person and/or property. The Plaintiff members of the McNulty Family are the survivors and/or heirs of PFC McNulty and are entitled to recover for the damages PFC McNulty sustained.

1755.   Plaintiff Shannon K. McNulty is the sister of PFC McNulty.  She is a national of the United States.

1756.   As a result of the May 13, 2012 attack and PFC McNulty's injuries and death, each member of the McNulty Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McNulty's society, companionship, and counsel.

**The Dale W. Means Family**

1757.   Lance Corporal Dale W. Means served in Afghanistan as a member of the U.S. Marine Corps.  On November 18, 2012, LCpl Means was injured in an IED attack in Helmand Province, Afghanistan.  LCpl Means died on November 18, 2012 as a result of injuries sustained during the attack.

1758.   The attack was committed by the Taliban.

1759.   LCpl Means's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1760.   LCpl Means was a national of the United States at the time of the attack and his death.

1761.   As a result of the attack, LCpl Means was injured in his person and/or property. The Plaintiff members of the Means Family are the survivors and/or heirs of LCpl Means and are entitled to recover for the damages LCpl Means sustained.

1762.   Plaintiff John Means is the father of LCpl Means.  He is a national of the United States.

1763.   As a result of the November 18, 2012 attack and LCpl Means's injuries and death, each member of the Means Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Means's society, companionship, and counsel.

**Nicholas D. Mendes**

1764.   Plaintiff Sergeant Nicholas D. Mendes served in Afghanistan as a member of the U.S. Army.  On April 30, 2011, SGT Mendes was injured in an IED attack in Kandahar Province, Afghanistan.  The attack severely wounded SGT Mendes, who was paralyzed from the neck down.  As a result of the April 30, 2011 attack and his injuries, SGT Mendes has experienced severe physical and emotional pain and suffering.

1765.   The attack was committed by the Taliban.

1766.   The attack that injured SGT Mendes would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1767.   SGT Mendes was a national of the United States at the time of the attack and remains one to this day.

**The Michael J. Metcalf Family**

1768.   Private First Class Michael J. Metcalf served in Afghanistan as a member of the U.S. Army.  On April 22, 2012, PFC Metcalf was injured in an IED attack in Ghazni Province, Afghanistan.  PFC Metcalf died on April 22, 2012 as a result of injuries sustained during the attack.

1769.   The attack was committed by the Haqqani Network, a part of the Taliban.

1770.   PFC Metcalf's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1771.   PFC Metcalf was a national of the United States at the time of the attack and his death.

1772.   As a result of the attack, PFC Metcalf was injured in his person and/or property. The Plaintiff members of the Metcalf Family are the survivors and/or heirs of PFC Metcalf and are entitled to recover for the damages PFC Metcalf sustained.

1773.   Plaintiff Clarence Joseph Metcalf is the father of PFC Metcalf.  He is a national of the United States.

1774.   Plaintiff Kimberly Metcalf is the mother of PFC Metcalf.  She is a national of the United States.

1775.   As a result of the April 22, 2012 attack and PFC Metcalf's injuries and death, each member of the Metcalf Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Metcalf's society, companionship, and counsel.

**The Jonathan M. Metzger Family**

1776.   Staff Sergeant Jonathan M. Metzger served in Afghanistan as a member of the U.S. Army National Guard.  On January 6, 2012, SSG Metzger was injured in an IED attack in Kandahar Province, Afghanistan.  SSG Metzger died on January 6, 2012 as a result of injuries sustained during the attack.

1777.   The attack was committed by the Taliban.

1778.   SSG Metzger's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1779.   SSG Metzger was a national of the United States at the time of the attack and his death.

1780.   As a result of the attack, SSG Metzger was injured in his person and/or property. The Plaintiff members of the Metzger Family are the survivors and/or heirs of SSG Metzger and are entitled to recover for the damages SSG Metzger sustained.

1781.   Plaintiff Jeremy J. Metzger is the brother of SSG Metzger.  He is a national of the United States.

1782.   As a result of the January 6, 2012 attack and SSG Metzger's injuries and death, each member of the Metzger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Metzger's society, companionship, and counsel.

**The Paul J. Miller Family**

1783.   Corporal Paul J. Miller served in Afghanistan as a member of the U.S. Marine Corps.  On July 19, 2010, Cpl Miller was injured in an IED attack in Helmand Province, Afghanistan.  Cpl Miller died on July 19, 2010 as a result of injuries sustained during the attack.

1784.   The attack was committed by the Taliban.

1785.   Cpl Miller's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1786.   Cpl Miller was a national of the United States at the time of the attack and his death.

1787.   As a result of the attack, Cpl Miller was injured in his person and/or property. The Plaintiff members of the Miller Family are the survivors and/or heirs of Cpl Miller and are entitled to recover for the damages Cpl Miller sustained.

1788.   Plaintiff Sarah Beth Miller Morgan is the widow of Cpl Miller.  She is a national of the United States.

1789.   As a result of the July 19, 2010 attack and Cpl Miller's injuries and death, each member of the Miller Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Miller's society, companionship, and counsel.

**The Eugene C. Mills III Family**

1790.   Lance Corporal Eugene C. Mills III served in Afghanistan as a member of the U.S. Marine Corps.  On June 22, 2012, LCpl Mills was injured in a sniper attack in Helmand Province, Afghanistan.  LCpl Mills died on June 22, 2012 as a result of injuries sustained during the attack.

1791.   The attack was committed by the Taliban.

1792.   LCpl Mills's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1793.   LCpl Mills was a national of the United States at the time of the attack and his death.

1794.   As a result of the attack, LCpl Mills was injured in his person and/or property. The Plaintiff members of the Mills Family are the survivors and/or heirs of LCpl Mills and are entitled to recover for the damages LCpl Mills sustained.

1795.   Plaintiff Theresa Karlson is the mother of LCpl Mills.  She is a national of the United States.

1796.   As a result of the June 22, 2012 attack and LCpl Mills's injuries and death, each member of the Mills Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Mills's society, companionship, and counsel.

**The Shaun M. Mittler Family**

1797.   Staff Sergeant Shaun M. Mittler served in Afghanistan as a member of the U.S. Army.  On July 10, 2010, SSG Mittler was injured in a complex attack involving small arms fire and rocket propelled grenades in Kunar Province, Afghanistan.  SSG Mittler died on July 10, 2010 as a result of injuries sustained during the attack.

1798.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1799.   SSG Mittler's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1800.   SSG Mittler was a national of the United States at the time of the attack and his death.

1801.   As a result of the attack, SSG Mittler was injured in his person and/or property. The Plaintiff members of the Mittler Family are the survivors and/or heirs of SSG Mittler and are entitled to recover for the damages SSG Mittler sustained.

1802.   Plaintiff Cristine Mittler is the daughter of SSG Mittler.  She is a national of the United States.

1803.   Plaintiff Terry Mittler is the father of SSG Mittler.  He is a national of the United States.

1804.   Plaintiff Joyce L. Turner is the mother of SSG Mittler.  She is a national of the United States.

1805.   Plaintiff Misty Marie Barclay is the sister of SSG Mittler.  She is a national of the United States.

1806.   Plaintiff Alexander Lee Mittler is the brother of SSG Mittler.  He is a national of the United States.

1807.   As a result of the July 10, 2010 attack and SSG Mittler's injuries and death, each member of the Mittler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mittler's society, companionship, and counsel.

**The Conrad A. Mora Family**

1808.   Staff Sergeant Conrad A. Mora served in Afghanistan as a member of the U.S. Army.  On July 24, 2010, SSG Mora was injured in an IED attack in Zabul Province, Afghanistan.  SSG Mora died on July 24, 2010 as a result of injuries sustained during the attack.

1809.   The attack was committed by the Haqqani Network, a part of the Taliban.

1810.   SSG Mora's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1811.   SSG Mora was a national of the United States at the time of the attack and his death.

1812.   As a result of the attack, SSG Mora was injured in his person and/or property. The Plaintiff members of the Mora Family are the survivors and/or heirs of SSG Mora and are entitled to recover for the damages SSG Mora sustained.

1813.   Plaintiff Carmelita D. Fernando is the mother of SSG Mora.  She is a national of the United States.

1814.   As a result of the July 24, 2010 attack and SSG Mora's injuries and death, each member of the Mora Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mora's society, companionship, and counsel.

**The Gil I. Morales Del Valle Family**

1815.   Private First Class Gil I. Morales Del Valle served in Afghanistan as a member of the U.S. Army.  On August 3, 2011, PFC Morales Del Valle was injured in an IED attack in Wardak Province, Afghanistan.  PFC Morales Del Valle died on August 3, 2011 as a result of injuries sustained during the attack.

1816.   The attack was committed by the Haqqani Network, a part of the Taliban.

1817.   PFC Morales Del Valle's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1818.   PFC Morales Del Valle was a national of the United States at the time of the attack and his death.

1819.   As a result of the attack, PFC Morales Del Valle was injured in his person and/or property.  The Plaintiff members of the Morales Del Valle Family are the survivors and/or heirs of PFC Morales Del Valle and are entitled to recover for the damages PFC Morales Del Valle sustained.

1820.   Plaintiff Gladys Del Valle Montanez is the mother of PFC Morales Del Valle. She is a national of the United States.

1821.   Plaintiff Kiara C. Perez is the sister of PFC Morales Del Valle.  She is a national of the United States.

1822.   Plaintiff Renes Perez is the step-father of PFC Morales Del Valle.  He is a national of the United States.  Renes Perez lived in the same household as PFC Morales Del Valle for a substantial period of time and considered PFC Morales Del Valle the functional equivalent of a biological son.

1823.   As a result of the August 3, 2011 attack and PFC Morales Del Valle's injuries and death, each member of the Morales Del Valle Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Morales Del Valle's society, companionship, and counsel.

**The Travis A. Morgado Family**

1824.   Second Lieutenant Travis A. Morgado served in Afghanistan as a member of the U.S. Army.  On May 23, 2012, 2LT Morgado was injured in an IED attack in Kandahar Province, Afghanistan.  2LT Morgado died on May 23, 2012 as a result of injuries sustained during the attack.

1825.   The attack was committed by the Taliban.

1826.   2LT Morgado's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1827.   2LT Morgado was a national of the United States at the time of the attack and his death.

1828.   As a result of the attack, 2LT Morgado was injured in his person and/or property. The Plaintiff members of the Morgado Family are the survivors and/or heirs of 2LT Morgado and are entitled to recover for the damages 2LT Morgado sustained.

1829.   Plaintiff Andrea Kessler is the mother of 2LT Morgado.  She is a national of the United States.

1830.   Plaintiff Jose Alberto Morgado is the father of 2LT Morgado.  He is a national of the United States.

1831.   Plaintiff Eric Morgado is the brother of 2LT Morgado.  He is a national of the United States.

1832.   As a result of the May 23, 2012 attack and 2LT Morgado's injuries and death, each member of the Morgado Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 2LT Morgado's society, companionship, and counsel.

**The Donald S. Morrison Family**

1833.   Specialist Donald S. Morrison served in Afghanistan as a member of the U.S. Army.  On September 26, 2010, SPC Morrison was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Morrison died on September 26, 2010 as a result of injuries sustained during the attack.

1834.   The attack was committed by the Taliban.

1835.   SPC Morrison's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1836.   SPC Morrison was a national of the United States at the time of the attack and his death.

1837.   As a result of the attack, SPC Morrison was injured in his person and/or property. The Plaintiff members of the Morrison Family are the survivors and/or heirs of SPC Morrison and are entitled to recover for the damages SPC Morrison sustained.

1838.   Plaintiff Susan Morrison is the mother of SPC Morrison.  She is a national of the United States.

1839.   As a result of the September 26, 2010 attack and SPC Morrison's injuries and death, each member of the Morrison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Morrison's society, companionship, and counsel.

**The Sean W. Mullen Family**

1840.   Warrant Officer Sean W. Mullen served in Afghanistan as a member of the U.S. Army.  On June 2, 2013, WO1 Mullen was injured in an IED attack in Helmand Province, Afghanistan.  WO1 Mullen died on June 2, 2013 as a result of injuries sustained during the attack.

1841.   The attack was committed by the Taliban.

1842.   WO1 Mullen's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1843.   WO1 Mullen was a national of the United States at the time of the attack and his death.

1844.   As a result of the attack, WO1 Mullen was injured in his person and/or property. The Plaintiff members of the Mullen Family are the survivors and/or heirs of WO1 Mullen and are entitled to recover for the damages WO1 Mullen sustained.

1845.   Plaintiff Miriam A. Mullen is the mother of WO1 Mullen.  She is a national of the United States.

1846.   Plaintiff William J. Mullen is the father of WO1 Mullen.  He is a national of the United States.

1847.   As a result of the June 2, 2013 attack and WO1 Mullen's injuries and death, each member of the Mullen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of WO1 Mullen's society, companionship, and counsel.

**The Brandon S. Mullins Family**

1848.   Specialist Brandon S. Mullins served in Afghanistan as a member of the U.S. Army.  On August 25, 2011, SPC Mullins was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Mullins died on August 25, 2011 as a result of injuries sustained during the attack.

1849.   The attack was committed by the Taliban.

1850.   SPC Mullins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1851.   SPC Mullins was a national of the United States at the time of the attack and his death.

1852.   As a result of the attack, SPC Mullins was injured in his person and/or property. The Plaintiff members of the Mullins Family are the survivors and/or heirs of SPC Mullins and are entitled to recover for the damages SPC Mullins sustained.

1853.   Plaintiff Catherine Mullins is the mother of SPC Mullins.  She is a national of the United States.

1854.   Plaintiff Thomas Mullins is the father of SPC Mullins.  He is a national of the United States.

1855.   Plaintiff Bethany Rose Mullins Randall is the sister of SPC Mullins.  She is a national of the United States.

1856.   As a result of the August 25, 2011 attack and SPC Mullins's injuries and death, each member of the Mullins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Mullins's society, companionship, and counsel.

**The Thomas Paige Murach Family**

1857.   Specialist Thomas Paige Murach served in Afghanistan as a member of the U.S. Army.  On May 4, 2013, SPC Murach was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Murach died on May 4, 2013 as a result of injuries sustained during the attack.

1858.   The attack was committed by the Taliban.

1859.   SPC Murach's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1860.   SPC Murach was a national of the United States at the time of the attack and his death.

1861.   As a result of the attack, SPC Murach was injured in his person and/or property. The Plaintiff members of the Murach Family are the survivors and/or heirs of SPC Murach and are entitled to recover for the damages SPC Murach sustained.

1862.   Plaintiff Chet Murach is the father of SPC Murach.  He is a national of the United States.

1863.   Plaintiff William Anthony Murach is the brother of SPC Murach.  He is a national of the United States.

1864.   As a result of the May 4, 2013 attack and SPC Murach's injuries and death, each member of the Murach Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Murach's society, companionship, and counsel.

**The Brendan P. Neenan Family**

1865.   Specialist Brendan P. Neenan served in Afghanistan as a member of the U.S. Army.  On June 7, 2010, SPC Neenan was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Neenan died on June 7, 2010 as a result of injuries sustained during the attack.

1866.   The attack was committed by the Taliban.

1867.   SPC Neenan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1868.   SPC Neenan was a national of the United States at the time of the attack and his death.

1869.   As a result of the attack, SPC Neenan was injured in his person and/or property. The Plaintiff members of the Neenan Family are the survivors and/or heirs of SPC Neenan and are entitled to recover for the damages SPC Neenan sustained.

1870.   Plaintiff Hugh Dean Neenan is the father of SPC Neenan.  He is a national of the United States.

1871.   Plaintiff Kathleen Marie Neenan is the sister of SPC Neenan.  She is a national of the United States.

1872.   Plaintiff Timothy F. Neenan is the brother of SPC Neenan.  He is a national of the United States.

1873.   Plaintiff Lesa Coon Neenan is the step-mother of SPC Neenan.  She is a national of the United States.  Lesa Coon Neenan lived in the same household as SPC Neenan for a substantial period of time and considered SPC Neenan the functional equivalent of a biological son.

1874.   As a result of the June 7, 2010 attack and SPC Neenan's injuries and death, each member of the Neenan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Neenan's society, companionship, and counsel.

**The Carlos J. Negron Sr. Family**

1875.   Specialist Carlos J. Negron Sr. served in Afghanistan as a member of the U.S. Army.  On July 10, 2010, SPC Negron was injured in a complex attack involving a rocket propelled grenade and small arms fire in Kunar Province, Afghanistan.  SPC Negron died on July 10, 2010 as a result of injuries sustained during the attack.

1876.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1877.   SPC Negron's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1878.   SPC Negron was a national of the United States at the time of the attack and his death.

1879.   As a result of the attack, SPC Negron was injured in his person and/or property. The Plaintiff members of the Negron Family are the survivors and/or heirs of SPC Negron and are entitled to recover for the damages SPC Negron sustained.

1880.   Plaintiff Gabriel Negron is the father of SPC Negron.  He is a national of the United States.

1881.   Plaintiff Marta Torres is the mother of SPC Negron.  She is a national of the United States.

1882.   Plaintiff Jose Negron is the brother of SPC Negron.  He is a national of the United States.

1883.   Plaintiff Maribel Negron is the sister of SPC Negron.  She is a national of the United States.

1884.   Plaintiff Marvin Negron is the brother of SPC Negron.  He is a national of the United States.

1885.   As a result of the July 10, 2010 attack and SPC Negron's injuries and death, each member of the Negron Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Negron's society, companionship, and counsel.

**The Christopher R. Newman Family**

1886.   Staff Sergeant Christopher R. Newman served in Afghanistan as a member of the U.S. Army.  On October 29, 2011, SSG Newman was injured in a suicide bombing attack in Kabul Province, Afghanistan.  SSG Newman died on October 29, 2011 as a result of injuries sustained during the attack.

1887.   The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

1888.   SSG Newman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

1889.   SSG Newman was a national of the United States at the time of the attack and his death.

1890.   As a result of the attack, SSG Newman was injured in his person and/or property. The Plaintiff members of the Newman Family are the survivors and/or heirs of SSG Newman and are entitled to recover for the damages SSG Newman sustained.

1891.   Plaintiff Amanda Newman is the widow of SSG Newman.  She is a national of the United States.

1892.   Plaintiff Derrick Anthony Davis is the brother of SSG Newman.  He is a national of the United States.

1893.   Plaintiff Donald Edward Newman Sr. is the grandfather of SSG Newman.  He is a national of the United States.  Donald Edward Newman Sr. lived in the same household as SSG Newman for a substantial period of time and considered SSG Newman the functional equivalent of a biological son.

1894.   As a result of the October 29, 2011 attack and SSG Newman's injuries and death, each member of the Newman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Newman's society, companionship, and counsel.

**The Bryan J. Nichols Family**

1895.   Chief Warrant Officer 2 Bryan J. Nichols served in Afghanistan as a member of the U.S. Army Reserve.  On August 6, 2011, CW2 Nichols was injured in an attack on a helicopter in Wardak Province, Afghanistan.  CW2 Nichols died on August 6, 2011 as a result of injuries sustained during the attack.

1896.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

1897.   CW2 Nichols's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1898.   CW2 Nichols was a national of the United States at the time of the attack and his death.

1899.   As a result of the attack, CW2 Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of CW2 Nichols and are entitled to recover for the damages CW2 Nichols sustained.

1900.   Plaintiff Cynthia Nichols is the mother of CW2 Nichols.  She is a national of the United States.

1901.   Plaintiff Douglas Nichols is the father of CW2 Nichols.  He is a national of the United States.

1902.   Plaintiff Brandon Nichols is the brother of CW2 Nichols.  He is a national of the United States.

1903.   As a result of the August 6, 2011 attack and CW2 Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW2 Nichols's society, companionship, and counsel.

**The Donald L. Nichols Family**

1904.   Specialist Donald L. Nichols served in Afghanistan as a member of the U.S. Army National Guard.  On April 13, 2011, SPC Nichols was injured in an IED attack in Laghman Province, Afghanistan.  SPC Nichols died on April 13, 2011 as a result of injuries sustained during the attack.

1905.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1906.   SPC Nichols's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1907. SPC Nichols was a national of the United States at the time of the attack and his death.

1908. As a result of the attack, SPC Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

1909. Plaintiff Becky S. Poock is the mother of SPC Nichols. She is a national of the United States.

1910. Plaintiff Roger Poock is the step-father of SPC Nichols. He is a national of the United States. Roger Poock lived in the same household as SPC Nichols for a substantial period of time and considered SPC Nichols the functional equivalent of a biological son.

1911. As a result of the April 13, 2011 attack and SPC Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nichols's society, companionship, and counsel.

**The Andrew C. Nicol Family**

1912. Sergeant Andrew C. Nicol served in Afghanistan as a member of the U.S. Army. On August 8, 2010, SGT Nicol was injured in an IED attack in Kandahar Province, Afghanistan. SGT Nicol died on August 8, 2010 as a result of injuries sustained during the attack.

1913. The attack was committed by the Taliban.

1914. SGT Nicol's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1915.   SGT Nicol was a national of the United States at the time of the attack and his death.

1916.   As a result of the attack, SGT Nicol was injured in his person and/or property. The Plaintiff members of the Nicol Family are the survivors and/or heirs of SGT Nicol and are entitled to recover for the damages SGT Nicol sustained.

1917.   Plaintiff Patricia A. Nicol is the mother of SGT Nicol.  She is a national of the United States.

1918.   Plaintiff Roland N. Nicol is the father of SGT Nicol.  He is a national of the United States.

1919.   Plaintiff Alaina Nicol is the sister of SGT Nicol.  She is a national of the United States.

1920.   Plaintiff Roland J. Nicol is the brother of SGT Nicol.  He is a national of the United States.

1921.   As a result of the August 8, 2010 attack and SGT Nicol's injuries and death, each member of the Nicol Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Nicol's society, companionship, and counsel.

**The Rafael A. Nieves Jr. Family**

1922.   Specialist Rafael A. Nieves Jr. served in Afghanistan as a member of the U.S. Army.  On July 10, 2011, SPC Nieves was injured in a complex attack involving small arms fire and rocket propelled grenades in Paktika Province, Afghanistan.  SPC Nieves died on July 10, 2011 as a result of injuries sustained during the attack.

1923.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1924.   SPC Nieves's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1925.   SPC Nieves was a national of the United States at the time of the attack and his death.

1926.   As a result of the attack, SPC Nieves was injured in his person and/or property. The Plaintiff members of the Nieves Family are the survivors and/or heirs of SPC Nieves and are entitled to recover for the damages SPC Nieves sustained.

1927.   Plaintiff Thomas Priolo is the foster-father of SPC Nieves.  He is a national of the United States.  Thomas Priolo lived in the same household as SPC Nieves for a substantial period of time and considered SPC Nieves the functional equivalent of a biological son.

1928.   As a result of the July 10, 2011 attack and SPC Nieves's injuries and death, each member of the Nieves Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nieves's society, companionship, and counsel.

**The Adam J. Novak Family**

1929.   Private Adam J. Novak served in Afghanistan as a member of the U.S. Army.  On August 27, 2010, PVT Novak was injured in an IED attack in Paktia Province, Afghanistan. PVT Novak died on August 27, 2010 as a result of injuries sustained during the attack.

1930.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1931.   PVT Novak's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1932.   PVT Novak was a national of the United States at the time of the attack and his death.

1933.   As a result of the attack, PVT Novak was injured in his person and/or property. The Plaintiff members of the Novak Family are the survivors and/or heirs of PVT Novak and are entitled to recover for the damages PVT Novak sustained.

1934.   Plaintiff Susan Novak is the mother of PVT Novak.  She is a national of the United States.

1935.   Plaintiff Jessica Novak Cruz is the sister of PVT Novak.  She is a national of the United States.

1936.   As a result of the August 27, 2010 attack and PVT Novak's injuries and death, each member of the Novak Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PVT Novak's society, companionship, and counsel.

**The Kyle B. Osborn Family**

1937.   Sergeant Kyle B. Osborn served in Afghanistan as a member of the U.S. Army. On September 13, 2012, SGT Osborn was injured in a rocket propelled grenade attack in Ghazni

Province, Afghanistan.  SGT Osborn died on September 13, 2012 as a result of injuries sustained during the attack.

1938.   The attack was committed by the Haqqani Network, a part of the Taliban.

1939.   SGT Osborn's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1940.   SGT Osborn was a national of the United States at the time of the attack and his death.

1941.   As a result of the attack, SGT Osborn was injured in his person and/or property. The Plaintiff members of the Osborn Family are the survivors and/or heirs of SGT Osborn and are entitled to recover for the damages SGT Osborn sustained.

1942.   Plaintiff Creighton David Osborn is the father of SGT Osborn.  He is a national of the United States.

1943.   Plaintiff Kade M. Osborn is the brother of SGT Osborn.  He is a national of the United States.

1944.   Plaintiff Katlyn M. Osborn is the sister of SGT Osborn.  She is a national of the United States.

1945.   Plaintiff Christa L. Osborn is the step-mother of SGT Osborn.  She is a national of the United States.  Christa L. Osborn lived in the same household as SGT Osborn for a substantial period of time and considered SGT Osborn the functional equivalent of a biological son.

1946.   As a result of the September 13, 2012 attack and SGT Osborn's injuries and death, each member of the Osborn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Osborn's society, companionship, and counsel.

**The Nicholas S. Ott Family**

1947.   Corporal Nicholas S. Ott served in Afghanistan as a member of the U.S. Marine Corps.  On August 10, 2011, Cpl Ott was injured in an IED attack in Helmand Province, Afghanistan.  Cpl Ott died on August 10, 2011 as a result of injuries sustained during the attack.

1948.   The attack was committed by the Taliban.

1949.   Cpl Ott's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1950.   Cpl Ott was a national of the United States at the time of the attack and his death.

1951.   As a result of the attack, Cpl Ott was injured in his person and/or property.  The Plaintiff members of the Ott Family are the survivors and/or heirs of Cpl Ott and are entitled to recover for the damages Cpl Ott sustained.

1952.   Plaintiff Julia Ott is the sister of Cpl Ott.  She is a national of the United States.

1953.   As a result of the August 10, 2011 attack and Cpl Ott's injuries and death, each member of the Ott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Ott's society, companionship, and counsel.

**The Dane Clark Paresi Family**

1954.   Dane Clark Paresi served in Afghanistan as a civilian government contractor working for Xe Services.  On December 30, 2009, Mr. Paresi was injured in a suicide bombing

attack in Khost Province, Afghanistan.  Mr. Paresi died on December 30, 2009 as a result of injuries sustained during the attack.

1955.   The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack).

1956.   Mr. Paresi's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack posed as an informant in order to gain access to the base and did not identify himself as an enemy combatant.

1957.   Mr. Paresi was a national of the United States at the time of the attack and his death.

1958.   As a result of the attack, Mr. Paresi was injured in his person and/or property. The Plaintiff members of the Paresi Family are the survivors and/or heirs of Mr. Paresi and are entitled to recover for the damages Mr. Paresi sustained.

1959.   Plaintiff Mindylou Paresi is the widow of Mr. Paresi.  She is a national of the United States.

1960.   Plaintiff Elizabeth Santina Paresi is the daughter of Mr. Paresi.  She is a national of the United States.

1961.   Plaintiff Janet G. Paresi is the mother of Mr. Paresi.  She is a national of the United States.

1962.   Plaintiff Santina Cartisser is the sister of Mr. Paresi.  She is a national of the United States.

1963.   Plaintiff Terry Paresi is the brother of Mr. Paresi.  He is a national of the United States.

1964.   Plaintiff Alexandra VandenBroek is the step-daughter of Mr. Paresi.  She is a national of the United States.  Alexandra VandenBroek lived in the same household as Mr. Paresi for a substantial period of time and considered Mr. Paresi the functional equivalent of a biological father.

1965.   As a result of the December 30, 2009 attack and Mr. Paresi's injuries and death, each member of the Paresi Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Paresi's society, companionship, and counsel.

**John O. Patterson**

1966.   Plaintiff Lance Corporal John O. Patterson served in Afghanistan as a member of the U.S. Marine Corps.  On January 23, 2011, LCpl Patterson was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded LCpl Patterson, who lost his left leg below the knee and required right leg reconstruction.  As a result of the January 23, 2011 attack and his injuries, LCpl Patterson has experienced severe physical and emotional pain and suffering.

1967.   The attack was committed by the Taliban.

1968.   The attack that injured LCpl Patterson would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1969.   LCpl Patterson was a national of the United States at the time of the attack and remains one to this day.

**The Joseph R. Perez Family**

1970.   Customs Advisor Joseph R. Perez served in Afghanistan as a civilian government contractor working for FedSys.  On July 22, 2012, Mr. Perez was injured in an insider attack in Herat Province, Afghanistan.  Mr. Perez died on July 22, 2012 as a result of injuries sustained during the attack.

1971.   The attack was committed by the Taliban.

1972.   Mr. Perez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1973.   Mr. Perez was a national of the United States at the time of the attack and his death.

1974.   As a result of the attack, Mr. Perez was injured in his person and/or property.  The Plaintiff members of the Perez Family are the survivors and/or heirs of Mr. Perez and are entitled to recover for the damages Mr. Perez sustained.

1975.   Plaintiff Adan Perez is the son of Mr. Perez.  He is a national of the United States.

1976.   Plaintiff Anthony Perez is the son of Mr. Perez.  He is a national of the United States.

1977.   Plaintiff Nicholas Joseph Francis Perez is the son of Mr. Perez.  He is a national of the United States.

1978.   As a result of the July 22, 2012 attack and Mr. Perez's injuries and death, each member of the Perez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Perez's society, companionship, and counsel.

**The Joseph Michael Peters Family**

1979.   Sergeant Joseph Michael Peters served in Afghanistan as a member of the U.S. Army.  On October 6, 2013, SGT Peters was injured in an IED attack in Kandahar Province, Afghanistan.  SGT Peters died on October 6, 2013 as a result of injuries sustained during the attack.

1980.   The attack was committed by the Taliban.

1981.   SGT Peters's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1982.   SGT Peters was a national of the United States at the time of the attack and his death.

1983.   As a result of the attack, SGT Peters was injured in his person and/or property. The Plaintiff members of the Peters Family are the survivors and/or heirs of SGT Peters and are entitled to recover for the damages SGT Peters sustained.

1984.   Plaintiff Ashley Peters is the widow of SGT Peters.  She is a national of the United States.

1985.   Plaintiff G.R.P., by and through his next friend Ashley Peters, is the minor son of SGT Peters.  He is a national of the United States.

1986.   Plaintiff Deborah Jean Peters is the mother of SGT Peters.  She is a national of the United States.

1987.   Plaintiff Dennis W. Peters is the father of SGT Peters.  He is a national of the United States.

1988.   As a result of the October 6, 2013 attack and SGT Peters's injuries and death, each member of the Peters Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Peters's society, companionship, and counsel.

**The Francis G. Phillips IV Family**

1989.   Staff Sergeant Francis G. Phillips IV served in Afghanistan as a member of the U.S. Army.  On May 4, 2013, SSG Phillips was injured in an IED attack in Kandahar Province, Afghanistan.  SSG Phillips died on May 4, 2013 as a result of injuries sustained during the attack.

1990.   The attack was committed by the Taliban.

1991.   SSG Phillips's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1992.   SSG Phillips was a national of the United States at the time of the attack and his death.

1993.   As a result of the attack, SSG Phillips was injured in his person and/or property. The Plaintiff members of the Phillips Family are the survivors and/or heirs of SSG Phillips and are entitled to recover for the damages SSG Phillips sustained.

1994.   Plaintiff Christine H. Phillips is the widow of SSG Phillips.  She is a national of the United States.

1995.   Plaintiff S.N.P., by and through her next friend Christine H. Phillips, is the minor daughter of SSG Phillips.  She is a national of the United States.

1996.   As a result of the May 4, 2013 attack and SSG Phillips's injuries and death, each member of the Phillips Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Phillips's society, companionship, and counsel.

**The Jared C. Plunk Family**

1997.   Specialist Jared C. Plunk served in Afghanistan as a member of the U.S. Army. On June 25, 2010, SPC Plunk was injured in a complex attack involving small arms fire and rocket propelled grenades in Kunar Province, Afghanistan.  SPC Plunk died on June 25, 2010 as a result of injuries sustained during the attack.

1998.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1999.   SPC Plunk's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2000.   SPC Plunk was a national of the United States at the time of the attack and his death.

2001.   As a result of the attack, SPC Plunk was injured in his person and/or property. The Plaintiff members of the Plunk Family are the survivors and/or heirs of SPC Plunk and are entitled to recover for the damages SPC Plunk sustained.

2002.   Plaintiff Glenda Willard is the mother of SPC Plunk.  She is a national of the United States.

2003.   Plaintiff Michelle Hock is the sister of SPC Plunk.  She is a national of the United States.

2004.   Plaintiff Ranee Massoni is the sister of SPC Plunk.  She is a national of the United States.

2005.   Plaintiff Jordan Plunk is the brother of SPC Plunk.  He is a national of the United States.

2006.   Plaintiff Justin T. Plunk is the brother of SPC Plunk.  He is a national of the United States.

2007.   As a result of the June 25, 2010 attack and SPC Plunk's injuries and death, each member of the Plunk Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Plunk's society, companionship, and counsel.

**The Matthew C. Powell Family**

2008.   Specialist Matthew C. Powell served in Afghanistan as a member of the U.S. Army.  On October 12, 2010, SPC Powell was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Powell died on October 12, 2010 as a result of injuries sustained during the attack.

2009.   The attack was committed by the Taliban.

2010.   SPC Powell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2011.   SPC Powell was a national of the United States at the time of the attack and his death.

2012.   As a result of the attack, SPC Powell was injured in his person and/or property. The Plaintiff members of the Powell Family are the survivors and/or heirs of SPC Powell and are entitled to recover for the damages SPC Powell sustained.

2013.   Plaintiff Janie Rabalais Goncalves is the mother of SPC Powell.  She is a national of the United States.

2014.   As a result of the October 12, 2010 attack and SPC Powell's injuries and death, each member of the Powell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Powell's society, companionship, and counsel.

**The Brandon Joseph Prescott Family**

2015.   Specialist Brandon Joseph Prescott served in Afghanistan as a member of the U.S. Army.  On May 4, 2013, SPC Prescott was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Prescott died on May 4, 2013 as a result of injuries sustained during the attack.

2016.   The attack was committed by the Taliban.

2017.   SPC Prescott's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2018.   SPC Prescott was a national of the United States at the time of the attack and his death.

2019.   As a result of the attack, SPC Prescott was injured in his person and/or property. The Plaintiff members of the Prescott Family are the survivors and/or heirs of SPC Prescott and are entitled to recover for the damages SPC Prescott sustained.

2020.   Plaintiff Aaron William Prescott is the brother of SPC Prescott.  He is a national of the United States.

2021.   Plaintiff Jacob Richard Prescott is the brother of SPC Prescott.  He is a national of the United States.

2022.   Plaintiff Joshua Michael Prescott is the brother of SPC Prescott.  He is a national of the United States.

2023.   As a result of the May 4, 2013 attack and SPC Prescott's injuries and death, each member of the Prescott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Prescott's society, companionship, and counsel.

**The Lucas Todd Pyeatt Family**

2024.   Corporal Lucas Todd Pyeatt served in Afghanistan as a member of the U.S. Marine Corps.  On February 5, 2011, Cpl Pyeatt was injured in an IED attack in Helmand Province, Afghanistan.  Cpl Pyeatt died on February 5, 2011 as a result of injuries sustained during the attack.

2025.   The attack was committed by the Taliban.

2026.   Cpl Pyeatt's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2027.   Cpl Pyeatt was a national of the United States at the time of the attack and his death.

2028.   As a result of the attack, Cpl Pyeatt was injured in his person and/or property. The Plaintiff members of the Pyeatt Family are the survivors and/or heirs of Cpl Pyeatt and are entitled to recover for the damages Cpl Pyeatt sustained.

2029.   Plaintiff Cynthia L. Pyeatt is the mother of Cpl Pyeatt.  She is a national of the United States.

2030.   Plaintiff Lon Scott Pyeatt is the father of Cpl Pyeatt.  He is a national of the United States.

2031.   Plaintiff Emily Smalley is the sister of Cpl Pyeatt.  She is a national of the United States.

2032.   As a result of the February 5, 2011 attack and Cpl Pyeatt's injuries and death, each member of the Pyeatt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Pyeatt's society, companionship, and counsel.

**The Christopher K. Raible Family**

2033.   Lieutenant Colonel Christopher K. Raible served in Afghanistan as a member of the U.S. Marine Corps.  On September 15, 2012, LtCol Raible was injured in complex attack involving SAR rifles and rocket propelled grenades during which the insurgents disguised themselves in American military uniforms in Helmand Province, Afghanistan.  LtCol Raible died on September 15, 2012 as a result of injuries sustained during the attack.

2034.   The attack was committed by the Taliban.

2035.   LtCol Raible's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorists who committed the attack was unlawfully wearing the uniform of his enemy.

2036.   LtCol Raible was a national of the United States at the time of the attack and his death.

2037.   As a result of the attack, LtCol Raible was injured in his person and/or property. The Plaintiff members of the Raible Family are the survivors and/or heirs of LtCol Raible and are entitled to recover for the damages LtCol Raible sustained.

2038.   Plaintiff Lona L. Bosley is the sister of LtCol Raible.  She is a national of the United States.

2039.   As a result of the September 15, 2012 attack and LtCol Raible's injuries and death, each member of the Raible Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LtCol Raible's society, companionship, and counsel.

**The Thomas A. Ratzlaff Family**

2040.   Senior Chief Petty Officer (SEAL) Thomas A. Ratzlaff served in Afghanistan as a member of the U.S. Navy.  On August 6, 2011, SOCS (SEAL) Ratzlaff was injured in an attack on a helicopter in Wardak Province, Afghanistan.  SOCS (SEAL) Ratzlaff died on August 6, 2011 as a result of injuries sustained during the attack.

2041.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

2042.   SOCS (SEAL) Ratzlaff's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2043.   SOCS (SEAL) Ratzlaff was a national of the United States at the time of the attack and his death.

2044.   As a result of the attack, SOCS (SEAL) Ratzlaff was injured in his person and/or property.  The Plaintiff members of the Ratzlaff Family are the survivors and/or heirs of SOCS (SEAL) Ratzlaff and are entitled to recover for the damages SOCS (SEAL) Ratzlaff sustained.

2045.   Plaintiff Andrea N. Ratzlaff is the widow of SOCS (SEAL) Ratzlaff.  She is a national of the United States.

2046.   As a result of the August 6, 2011 attack and SOCS (SEAL) Ratzlaff's injuries and death, each member of the Ratzlaff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SOCS (SEAL) Ratzlaff's society, companionship, and counsel.

### The Blaine E. Redding Family

2047.   Specialist Blaine E. Redding served in Afghanistan as a member of the U.S. Army.  On June 7, 2010, SPC Redding was injured in an IED attack in Kunar Province, Afghanistan.  SPC Redding died on June 7, 2010 as a result of injuries sustained during the attack.

2048.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2049.   SPC Redding's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2050.   SPC Redding was a national of the United States at the time of the attack and his death.

2051.   As a result of the attack, SPC Redding was injured in his person and/or property. The Plaintiff members of the Redding Family are the survivors and/or heirs of SPC Redding and are entitled to recover for the damages SPC Redding sustained.

2052.   Plaintiff Blaine A. Redding is the father of SPC Redding.  He is a national of the United States.

2053.   As a result of the June 7, 2010 attack and SPC Redding's injuries and death, each member of the Redding Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Redding's society, companionship, and counsel.

**The Jesse D. Reed Family**

2054.   Specialist Jesse D. Reed served in Afghanistan as a member of the U.S. Army. On July 14, 2010, SPC Reed was injured in an IED attack in Zabul Province, Afghanistan.  SPC Reed died on July 14, 2010 as a result of injuries sustained during the attack.

2055.   The attack was committed by the Haqqani Network, a part of the Taliban.

2056.   SPC Reed's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2057.   SPC Reed was a national of the United States at the time of the attack and his death.

2058.   As a result of the attack, SPC Reed was injured in his person and/or property. The Plaintiff members of the Reed Family are the survivors and/or heirs of SPC Reed and are entitled to recover for the damages SPC Reed sustained.

2059.   Plaintiff Heather L. Reed is the widow of SPC Reed.  She is a national of the United States.

2060.   Plaintiff David Reed is the father of SPC Reed.  He is a national of the United States.

2061.   Plaintiff Dolores A. Reed is the mother of SPC Reed.  She is a national of the United States.

2062.   As a result of the July 14, 2010 attack and SPC Reed's injuries and death, each member of the Reed Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Reed's society, companionship, and counsel.

**The Chad R. Regelin Family**

2063.   Petty Officer First Class Chad R. Regelin served in Afghanistan as a member of the U.S. Navy.  On January 2, 2012, PO1 Regelin was injured in an IED attack in Helmand Province, Afghanistan.  PO1 Regelin died on January 2, 2012 as a result of injuries sustained during the attack.

2064.   The attack was committed by the Taliban.

2065.   PO1 Regelin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2066.   PO1 Regelin was a national of the United States at the time of the attack and his death.

2067.   As a result of the attack, PO1 Regelin was injured in his person and/or property. The Plaintiff members of the Regelin Family are the survivors and/or heirs of PO1 Regelin and are entitled to recover for the damages PO1 Regelin sustained.

2068.   Plaintiff Scott Regelin is the father of PO1 Regelin.  He is a national of the United States.

2069.   Plaintiff Shirene Regelin is the mother of PO1 Regelin.  She is a national of the United States.

2070.   As a result of the January 2, 2012 attack and PO1 Regelin's injuries and death, each member of the Regelin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Regelin's society, companionship, and counsel.

**The Joseph A. Richardson Family**

2071.   Sergeant Joseph A. Richardson served in Afghanistan as a member of the U.S. Army.  On November 16, 2012, SGT Richardson was injured in a complex attack involving an IED and small arms fire in Paktika Province, Afghanistan.  SGT Richardson died on November 16, 2012 as a result of injuries sustained during the attack.

2072.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2073.   SGT Richardson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2074.   SGT Richardson was a national of the United States at the time of the attack and his death.

2075.   As a result of the attack, SGT Richardson was injured in his person and/or property.  The Plaintiff members of the Richardson Family are the survivors and/or heirs of SGT Richardson and are entitled to recover for the damages SGT Richardson sustained.

2076.   Plaintiff Cassie Marie Richardson is the sister of SGT Richardson.  She is a national of the United States.

2077.   As a result of the November 16, 2012 attack and SGT Richardson's injuries and death, each member of the Richardson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Richardson's society, companionship, and counsel.

**The Colby Lee Richmond Family**

2078.   Sergeant Colby Lee Richmond served in Afghanistan as a member of the U.S. Army.  On August 25, 2011, SGT Richmond was injured in an IED attack in Helmand Province, Afghanistan.  SGT Richmond died on August 25, 2011 as a result of injuries sustained during the attack.

2079.   The attack was committed by the Taliban.

2080.   SGT Richmond's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2081.   SGT Richmond was a national of the United States at the time of the attack and his death.

2082.   As a result of the attack, SGT Richmond was injured in his person and/or property.  The Plaintiff members of the Richmond Family are the survivors and/or heirs of SGT Richmond and are entitled to recover for the damages SGT Richmond sustained.

2083.   Plaintiff Cynthia Jeffries Richmond is the mother of SGT Richmond.  She is a national of the United States.

2084.   As a result of the August 25, 2011 attack and SGT Richmond's injuries and death, each member of the Richmond Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Richmond's society, companionship, and counsel.

**The Michael E. Ristau Family**

2085.   Sergeant Michael E. Ristau served in Afghanistan as a member of the U.S. Army. On July 13, 2012, SGT Ristau was injured in an IED attack in Zabul Province, Afghanistan. SGT Ristau died on July 13, 2012 as a result of injuries sustained during the attack.

2086.   The attack was committed by the Haqqani Network, a part of the Taliban.

2087.   SGT Ristau's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2088.   SGT Ristau was a national of the United States at the time of the attack and his death.

2089.   As a result of the attack, SGT Ristau was injured in his person and/or property. The Plaintiff members of the Ristau Family are the survivors and/or heirs of SGT Ristau and are entitled to recover for the damages SGT Ristau sustained.

2090.   Plaintiff Randy Ristau is the father of SGT Ristau.  He is a national of the United States.

2091.   Plaintiff H.R., by and through her next friend Randy Ristau, is the minor sister of SGT Ristau.  She is a national of the United States.

2092.   Plaintiff Suzanne Ristau is the step-mother of SGT Ristau.  She is a national of the United States.  Suzanne Ristau lived in the same household as SGT Ristau for a substantial period of time and considered SGT Ristau the functional equivalent of a biological son.

2093.   Plaintiff Christopher Powers is the step-brother of SGT Ristau.  He is a national of the United States.  Christopher Powers lived in the same household as SGT Ristau for a substantial period of time and considered SGT Ristau the functional equivalent of a biological brother.

2094.   As a result of the July 13, 2012 attack and SGT Ristau's injuries and death, each member of the Ristau Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ristau's society, companionship, and counsel.

**The Edgar N. Roberts III Family**

2095.   Sergeant First Class Edgar N. Roberts III served in Afghanistan as a member of the U.S. Army National Guard.  On June 26, 2010, SFC Roberts was injured in an IED attack in Wardak Province, Afghanistan.  SFC Roberts died on August 17, 2010 as a result of injuries sustained during the attack.

2096.   The attack was committed by the Haqqani Network, a part of the Taliban.

2097.   SFC Roberts's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2098.   SFC Roberts was a national of the United States at the time of the attack and his death.

2099.   As a result of the attack, SFC Roberts was injured in his person and/or property. The Plaintiff members of the Roberts Family are the survivors and/or heirs of SFC Roberts and are entitled to recover for the damages SFC Roberts sustained.

2100.   Plaintiff Jannett Cecilia Roberts is the widow of SFC Roberts and is his survivor and/or heir.

2101.   Plaintiff E.N.R., by and through his next friend Jannett Cecilia Roberts, is the minor son of SFC Roberts.  He is a national of the United States.

2102.   Plaintiff Miguel Angel Nathaniel Roberts is the son of SFC Roberts.  He is a national of the United States.

2103.   Plaintiff Carlos Cruz is the step-son of SFC Roberts.  He is a national of the United States.  Carlos Cruz lived in the same household as SFC Roberts for a substantial period of time and considered SFC Roberts the functional equivalent of a biological father.

2104.   Plaintiff Joel C. Cruz is the step-son of SFC Roberts.  He is a national of the United States.  Joel C. Cruz lived in the same household as SFC Roberts for a substantial period of time and considered SFC Roberts the functional equivalent of a biological father.

2105.   As a result of the June 26, 2010 attack and SFC Roberts's injuries and death, each member of the Roberts Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Roberts's society, companionship, and counsel.

**The Mario Rodriguez Jr. Family**

2106.   Sergeant Mario Rodriguez Jr. served in Afghanistan as a member of the U.S. Army.  On June 11, 2010, SGT Rodriguez was injured in a complex attack involving small arms fire and rocket propelled grenades in Logar Province, Afghanistan.  SGT Rodriguez died on June 11, 2010 as a result of injuries sustained during the attack.

2107.   The attack was committed by the Haqqani Network, a part of the Taliban.

2108.   SGT Rodriguez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2109.   SGT Rodriguez was a national of the United States at the time of the attack and his death.

2110.   As a result of the attack, SGT Rodriguez was injured in his person and/or property.  The Plaintiff members of the Rodriguez Family are the survivors and/or heirs of SGT Rodriguez and are entitled to recover for the damages SGT Rodriguez sustained.

2111.   Plaintiff Leslie Rodriguez is the widow of SGT Rodriguez.  She is a national of the United States.

2112.   Plaintiff R.G., by and through her next friend Leslie Rodriguez, is the minor step-daughter of SGT Rodriguez.  She is a national of the United States.  R.G. lived in the same household as SGT Rodriguez for a substantial period of time and considered SGT Rodriguez the functional equivalent of a biological father.

2113.   As a result of the June 11, 2010 attack and SGT Rodriguez's injuries and death, each member of the Rodriguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Rodriguez's society, companionship, and counsel.

**The Rodolfo Rodriguez Jr. Family**

2114.   Sergeant Rodolfo Rodriguez Jr. served in Afghanistan as a member of the U.S. Army.  On September 14, 2011, SGT Rodriguez was injured in an IED attack in Kandahar Province, Afghanistan.  SGT Rodriguez died on September 14, 2011 as a result of injuries sustained during the attack.

2115.   The attack was committed by the Taliban.

2116.   SGT Rodriguez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2117.   SGT Rodriguez was a national of the United States at the time of the attack and his death.

2118.   As a result of the attack, SGT Rodriguez was injured in his person and/or property.  The Plaintiff members of the Rodriguez Family are the survivors and/or heirs of SGT Rodriguez and are entitled to recover for the damages SGT Rodriguez sustained.

2119.   Plaintiff Rodolfo Rodriguez Sr. is the father of SGT Rodriguez.  He is a national of the United States.

2120.   Plaintiff Rodzie Efren Rodriguez is the brother of SGT Rodriguez.  He is a national of the United States.

2121.   As a result of the September 14, 2011 attack and SGT Rodriguez's injuries and death, each member of the Rodriguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Rodriguez's society, companionship, and counsel.

**The Jason A. Rogers Family**

2122.   Staff Sergeant Jason A. Rogers served in Afghanistan as a member of the U.S. Marine Corps.  On April 7, 2011, SSgt Rogers was injured in an IED attack in Helmand Province, Afghanistan.  SSgt Rogers died on April 7, 2011 as a result of injuries sustained during the attack.

2123.   The attack was committed by the Taliban.

2124.   SSgt Rogers's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2125.   SSgt Rogers was a national of the United States at the time of the attack and his death.

2126.   As a result of the attack, SSgt Rogers was injured in his person and/or property. The Plaintiff members of the Rogers Family are the survivors and/or heirs of SSgt Rogers and are entitled to recover for the damages SSgt Rogers sustained.

2127.   Plaintiff Angela Rita Marie Rogers is the widow of SSgt Rogers.  She is a national of the United States.

2128.   As a result of the April 7, 2011 attack and SSgt Rogers's injuries and death, each member of the Rogers Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Rogers's society, companionship, and counsel.

**The Matthew D. Roland Family**

2129.   Captain Matthew D. Roland served in Afghanistan as a member of the U.S. Air Force.  On August 26, 2015, Capt Roland was injured in an insider attack in Helmand Province, Afghanistan.  Capt Roland died on August 26, 2015 as a result of injuries sustained during the attack.

2130.   The attack was committed by the Taliban.

2131.   Capt Roland's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2132.   Capt Roland was a national of the United States at the time of the attack and his death.

2133.   As a result of the attack, Capt Roland was injured in his person and/or property. The Plaintiff members of the Roland Family are the survivors and/or heirs of Capt Roland and are entitled to recover for the damages Capt Roland sustained.

2134.   Plaintiff Barbara A. Roland is the mother of Capt Roland.  She is a national of the United States.

2135.   Plaintiff Mark K. Roland is the father of Capt Roland.  He is a national of the United States.

2136.   Plaintiff Erica M. Roland is the sister of Capt Roland.  She is a national of the United States.

2137.   As a result of the August 26, 2015 attack and Capt Roland's injuries and death, each member of the Roland Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Roland's society, companionship, and counsel.

**The Angel Roldan Jr. Family**

2138.   Angel Roldan Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On May 16, 2013, Mr. Roldan was injured in a suicide bombing attack in Kabul Province, Afghanistan.  Mr. Roldan died on May 16, 2013 as a result of injuries sustained during the attack.

2139.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

2140.   Mr. Roldan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road during rush hour.

2141.   Mr. Roldan was a national of the United States at the time of the attack and his death.

2142.   As a result of the attack, Mr. Roldan was injured in his person and/or property. The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

2143.   Plaintiff Lieselotte R. Roldan is the widow of Mr. Roldan.  She is a national of the United States.

2144.   Plaintiff Angel R. Roldan is the son of Mr. Roldan.  He is a national of the United States.

2145.   Plaintiff Matthias P. Roldan is the son of Mr. Roldan.  He is a national of the United States.

2146.   Plaintiff Samantha G. Roldan is the daughter of Mr. Roldan.  She is a national of the United States.

2147.   As a result of the May 16, 2013 attack and Mr. Roldan's injuries and death, each member of the Roldan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Roldan's society, companionship, and counsel.

**Christopher J. Rosebrock**

2148.   Plaintiff Captain Christopher J. Rosebrock served in Afghanistan as a member of the U.S. Army National Guard.  On April 4, 2012, CPT Rosebrock was injured in a suicide bombing attack in Faryab Province, Afghanistan.  The attack severely wounded CPT Rosebrock, who suffers from disfiguring shrapnel wounds, muscular atrophy and reduced mobility in his left arm, a concussion, a traumatic brain injury, and blown eardrums.  As a result of the April 4, 2012 attack and his injuries, CPT Rosebrock has experienced severe physical and emotional pain and suffering.

2149.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing and training the suicide bomber.

2150.   The attack that injured CPT Rosebrock would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

2151.   CPT Rosebrock was a national of the United States at the time of the attack and remains one to this day.

**The Nicholas J. Rozanski Family**

2152.   Captain Nicholas J. Rozanski served in Afghanistan as a member of the U.S. Army National Guard.  On April 4, 2012, CPT Rozanski was injured in a suicide bombing attack in Faryab Province, Afghanistan.  CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the attack.

2153.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing, indoctrinating, and training the suicide bomber.

2154.   CPT Rozanski's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

2155.   CPT Rozanski was a national of the United States at the time of the attack and his death.

2156.   As a result of the attack, CPT Rozanski was injured in his person and/or property. The Plaintiff members of the Rozanski Family are the survivors and/or heirs of CPT Rozanski and are entitled to recover for the damages CPT Rozanski sustained.

2157.   Plaintiff Alex Jason Rozanski is the brother of CPT Rozanski.  He is a national of the United States.

2158.   As a result of the April 4, 2012 attack and CPT Rozanski's injuries and death, each member of the Rozanski Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Rozanski's society, companionship, and counsel.

**The Rex L. Schad Family**

2159.   Staff Sergeant Rex L. Schad served in Afghanistan as a member of the U.S. Army.  On March 11, 2013, SSG Schad was injured in an insider attack in Wardak Province, Afghanistan.  SSG Schad died on March 11, 2013 as a result of injuries sustained during the attack.

2160.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

2161.   SSG Schad's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2162.   SSG Schad was a national of the United States at the time of the attack and his death.

2163.   As a result of the attack, SSG Schad was injured in his person and/or property. The Plaintiff members of the Schad Family are the survivors and/or heirs of SSG Schad and are entitled to recover for the damages SSG Schad sustained.

2164.   Plaintiff Colleen Whipple is the mother of SSG Schad.  She is a national of the United States.

2165.   As a result of the March 11, 2013 attack and SSG Schad's injuries and death, each member of the Schad Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Schad's society, companionship, and counsel.

**The Jonathan P. Schmidt Family**

2166.   Staff Sergeant Jonathan P. Schmidt served in Afghanistan as a member of the U.S. Army.  On September 1, 2012, SSG Schmidt was injured in a complex attack involving small arms fire and grenades in Ghazni Province, Afghanistan.  SSG Schmidt died on September 1, 2012 as a result of injuries sustained during the attack.

2167.   The attack was committed by the Haqqani Network, a part of the Taliban.

2168.   SSG Schmidt's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2169.   SSG Schmidt was a national of the United States at the time of the attack and his death.

2170.   As a result of the attack, SSG Schmidt was injured in his person and/or property. The Plaintiff members of the Schmidt Family are the survivors and/or heirs of SSG Schmidt and are entitled to recover for the damages SSG Schmidt sustained.

2171.   Plaintiff Natalie Schmidt is the widow of SSG Schmidt.  She is a national of the United States.

2172.   Plaintiff A.L.S., by and through his next friend Natalie Schmidt, is the minor son of SSG Schmidt.  He is a national of the United States.

2173.   Plaintiff LeeAnn Schmidt is the mother of SSG Schmidt.  She is a national of the United States.

2174.   Plaintiff Phillip J. Schmidt is the father of SSG Schmidt.  He is a national of the United States.

2175.   Plaintiff Brandon Tyler Schmidt is the brother of SSG Schmidt.  He is a national of the United States.

2176.   As a result of the September 1, 2012 attack and SSG Schmidt's injuries and death, each member of the Schmidt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Schmidt's society, companionship, and counsel.

**The Nathaniel J.A. Schultz Family**

2177.   Lance Corporal Nathaniel J.A. Schultz served in Afghanistan as a member of the U.S. Marine Corps.  On August 21, 2010, LCpl Schultz was injured in an IED attack in Helmand Province, Afghanistan.  LCpl Schultz died on August 21, 2010 as a result of injuries sustained during the attack.

2178.   The attack was committed by the Taliban.

2179.   LCpl Schultz's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2180.   LCpl Schultz was a national of the United States at the time of the attack and his death.

2181.   As a result of the attack, LCpl Schultz was injured in his person and/or property. The Plaintiff members of the Schultz Family are the survivors and/or heirs of LCpl Schultz and are entitled to recover for the damages LCpl Schultz sustained.

2182.   Plaintiff Duane Schultz is the father of LCpl Schultz.  He is a national of the United States.

2183.   As a result of the August 21, 2010 attack and LCpl Schultz's injuries and death, each member of the Schultz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Schultz's society, companionship, and counsel.

**The Jacob M. Schwallie Family**

2184.   Sergeant Jacob M. Schwallie served in Afghanistan as a member of the U.S. Army.  On May 7, 2012, SGT Schwallie was injured in an IED attack in Ghazni Province,

Afghanistan.  SGT Schwallie died on May 7, 2012 as a result of injuries sustained during the attack.

2185.   The attack was committed by the Haqqani Network, a part of the Taliban.

2186.   SGT Schwallie's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2187.   SGT Schwallie was a national of the United States at the time of the attack and his death.

2188.   As a result of the attack, SGT Schwallie was injured in his person and/or property.  The Plaintiff members of the Schwallie Family are the survivors and/or heirs of SGT Schwallie and are entitled to recover for the damages SGT Schwallie sustained.

2189.   Plaintiff Thomas Schwallie is the father of SGT Schwallie.  He is a national of the United States.

2190.   As a result of the May 7, 2012 attack and SGT Schwallie's injuries and death, each member of the Schwallie Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schwallie's society, companionship, and counsel.

**The Derek L. Shanfield Family**

2191.   Sergeant Derek L. Shanfield served in Afghanistan as a member of the U.S. Marine Corps.  On June 8, 2010, Sgt Shanfield was injured in an IED attack in Helmand Province, Afghanistan.  Sgt Shanfield died on June 8, 2010 as a result of injuries sustained during the attack.

2192.   The attack was committed by the Taliban.

2193.   Sgt Shanfield's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2194.   Sgt Shanfield was a national of the United States at the time of the attack and his death.

2195.   As a result of the attack, Sgt Shanfield was injured in his person and/or property. The Plaintiff members of the Shanfield Family are the survivors and/or heirs of Sgt Shanfield and are entitled to recover for the damages Sgt Shanfield sustained.

2196.   Plaintiff David Shanfield is the father of Sgt Shanfield.  He is a national of the United States.

2197.   Plaintiff Pamela Shanfield is the mother of Sgt Shanfield.  She is a national of the United States.

2198.   Plaintiff Sydney Shanfield is the brother of Sgt Shanfield.  He is a national of the United States.

2199.   As a result of the June 8, 2010 attack and Sgt Shanfield's injuries and death, each member of the Shanfield Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Shanfield's society, companionship, and counsel.

**The Justin B. Shoecraft Family**

2200.   Specialist Justin B. Shoecraft served in Afghanistan as a member of the U.S. Army.  On August 24, 2010, SPC Shoecraft was injured in an IED attack in Uruzgan Province, Afghanistan.  SPC Shoecraft died on August 24, 2010 as a result of injuries sustained during the attack.

2201.   The attack was committed by the Taliban.

2202.   SPC Shoecraft's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2203.   SPC Shoecraft was a national of the United States at the time of the attack and his death.

2204.   As a result of the attack, SPC Shoecraft was injured in his person and/or property. The Plaintiff members of the Shoecraft Family are the survivors and/or heirs of SPC Shoecraft and are entitled to recover for the damages SPC Shoecraft sustained.

2205.   Plaintiff Sherry Jean Pepper is the sister of SPC Shoecraft.  She is a national of the United States.

2206.   As a result of the August 24, 2010 attack and SPC Shoecraft's injuries and death, each member of the Shoecraft Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Shoecraft's society, companionship, and counsel.

**The Forrest B. Sibley Family and Estate**

2207.   Staff Sergeant Forrest B. Sibley served in Afghanistan as a member of the U.S. Air Force.  On August 26, 2015, SSgt Sibley was injured in an insider attack in Helmand Province, Afghanistan.  SSgt Sibley died on August 26, 2015 as a result of injuries sustained during the attack.

2208.   The attack was committed by the Taliban.

2209.   SSgt Sibley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2210.   SSgt Sibley was a national of the United States at the time of the attack and his death.

2211.   As a result of the attack, SSgt Sibley was injured in his person and/or property. The Plaintiff members of the Sibley Family are the survivors and/or heirs of SSgt Sibley and are entitled to recover for the damages SSgt Sibley sustained.

2212.   Plaintiff Suzi L. Fernandez is the mother of SSgt Sibley.  She is a national of the United States.

2213.   Plaintiff Lowell Brent Sibley is the father of SSgt Sibley.  He is a national of the United States.  He brings claims in both his personal capacity and his representative capacity on behalf of SSgt Sibley's estate.

2214.   Plaintiff Spenser J. Fernandez is the brother of SSgt Sibley.  He is a national of the United States.

2215.   Plaintiff Jordan L. Sibley is the sister of SSgt Sibley.  She is a national of the United States.

2216.   As a result of the August 26, 2015 attack and SSgt Sibley's injuries and death, each member of the Sibley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Sibley's society, companionship, and counsel.

2217.   SSgt Sibley's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder.

**The Billy J. Siercks Family**

2218.   First Sergeant Billy J. Siercks served in Afghanistan as a member of the U.S. Army.  On September 27, 2011, 1SG Siercks was injured in an indirect fire attack in Logar Province, Afghanistan.  1SG Siercks died on September 28, 2011 as a result of injuries sustained during the attack.

2219.   The attack was committed by the Haqqani Network, a part of the Taliban.

2220.   1SG Siercks's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

2221.   1SG Siercks was a national of the United States at the time of the attack and his death.

2222.   As a result of the attack, 1SG Siercks was injured in his person and/or property. The Plaintiff members of the Siercks Family are the survivors and/or heirs of 1SG Siercks and are entitled to recover for the damages 1SG Siercks sustained.

2223.   Plaintiff Georganne M. Siercks is the widow of 1SG Siercks.  She is a national of the United States.

2224.   Plaintiff G.S., by and through his next friend Georganne M. Siercks, is the minor son of 1SG Siercks.  He is a national of the United States.

2225.   Plaintiff G.S., by and through his next friend Georganne M. Siercks, is the minor son of 1SG Siercks.  He is a national of the United States.

2226.   As a result of the September 27, 2011 attack and 1SG Siercks's injuries and death, each member of the Siercks Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1SG Siercks's society, companionship, and counsel.

**The Amy R. Sinkler Family**

2227.   Private First Class Amy R. Sinkler served in Afghanistan as a member of the U.S. Army.  On January 20, 2011, PFC Sinkler was injured in a rocket propelled grenade attack in Baghlan Province, Afghanistan.  PFC Sinkler died on January 20, 2011 as a result of injuries sustained during the attack.

2228.   The attack was committed by the Taliban.

2229.   PFC Sinkler's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2230.   PFC Sinkler was a national of the United States at the time of the attack and her death.

2231.   As a result of the attack, PFC Sinkler was injured in her person and/or property. The Plaintiff members of the Sinkler Family are the survivors and/or heirs of PFC Sinkler and are entitled to recover for the damages PFC Sinkler sustained.

2232.   Plaintiff Jacqueline B. Thompson is the mother of PFC Sinkler.  She is a national of the United States.

2233.   Plaintiff Randolph D. Thompson is the father of PFC Sinkler.  He is a national of the United States.

2234.   Plaintiff Brittney Bullock is the sister of PFC Sinkler.  She is a national of the United States.

2235.   As a result of the January 20, 2011 attack and PFC Sinkler's injuries and death, each member of the Sinkler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Sinkler's society, companionship, and counsel.

**The Wade A. Slack Family**

2236.   Specialist Wade A. Slack served in Afghanistan as a member of the U.S. Army. On May 6, 2010, SPC Slack was injured in an indirect fire attack in Wardak Province, Afghanistan.  SPC Slack died on May 6, 2010 as a result of injuries sustained during the attack.

2237.   The attack was committed by the Haqqani Network, a part of the Taliban.

2238.   SPC Slack's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

2239.   SPC Slack was a national of the United States at the time of the attack and his death.

2240.   As a result of the attack, SPC Slack was injured in his person and/or property. The Plaintiff members of the Slack Family are the survivors and/or heirs of SPC Slack and are entitled to recover for the damages SPC Slack sustained.

2241.   Plaintiff Andrew Slack is the brother of SPC Slack.  He is a national of the United States.

2242.   Plaintiff Jesse Slack is the brother of SPC Slack.  He is a national of the United States.

2243.   Plaintiff Jonathan H. Slack is the brother of SPC Slack.  He is a national of the United States.

2244.   Plaintiff Lauren Slack is the sister of SPC Slack.  She is a national of the United States.

2245.   Plaintiff Rose Ann Crossman is the step-mother of SPC Slack.  She is a national of the United States.  Rose Ann Crossman lived in the same household as SPC Slack for a substantial period of time and considered SPC Slack the functional equivalent of a biological son.

2246.   Plaintiff Jessica Cook is the step-sister of SPC Slack.  She is a national of the United States.  Jessica Cook lived in the same household as SPC Slack for a substantial period of time and considered SPC Slack the functional equivalent of a biological brother.

2247.   As a result of the May 6, 2010 attack and SPC Slack's injuries and death, each member of the Slack Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Slack's society, companionship, and counsel.

**The Anne T. Smedinghoff Family**

2248.   U.S. Foreign Service officer Anne T. Smedinghoff served in Afghanistan as a member of the U.S. State Department.  On April 6, 2013, Ms. Smedinghoff was injured in a suicide bombing attack in Zabul Province, Afghanistan.  Ms. Smedinghoff died on April 6, 2013 as a result of injuries sustained during the attack.

2249.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

2250.   Ms. Smedinghoff's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, she was a civilian State Department

Employee not taking part in hostilities and escorting Afghan journalists covering American officials donating books to a school.

2251.   Ms. Smedinghoff was a national of the United States at the time of the attack and her death.

2252.   As a result of the attack, Ms. Smedinghoff was injured in her person and/or property.  The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages Ms. Smedinghoff sustained.

2253.   Plaintiff Mary Beth Smedinghoff is the mother of Ms. Smedinghoff.  She is a national of the United States.

2254.   Plaintiff Thomas Smedinghoff is the father of Ms. Smedinghoff.  He is a national of the United States.

2255.   Plaintiff Joan M. Smedinghoff is the sister of Ms. Smedinghoff.  She is a national of the United States.

2256.   Plaintiff Mark T. Smedinghoff is the brother of Ms. Smedinghoff.  He is a national of the United States.

2257.   Plaintiff Regina C. Smedinghoff is the sister of Ms. Smedinghoff.  She is a national of the United States.

2258.   As a result of the April 6, 2013 attack and Ms. Smedinghoff's injuries and death, each member of the Smedinghoff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Smedinghoff's society, companionship, and counsel.

**The Deangelo B. Snow Family**

2259.   Specialist Deangelo B. Snow served in Afghanistan as a member of the U.S. Army.  On September 17, 2010, SPC Snow was injured in a rocket propelled grenade attack in

Kandahar Province, Afghanistan.  SPC Snow died on September 17, 2010 as a result of injuries sustained during the attack.

2260.   The attack was committed by the Taliban.

2261.   SPC Snow's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2262.   SPC Snow was a national of the United States at the time of the attack and his death.

2263.   As a result of the attack, SPC Snow was injured in his person and/or property. The Plaintiff members of the Snow Family are the survivors and/or heirs of SPC Snow and are entitled to recover for the damages SPC Snow sustained.

2264.   Plaintiff Deloris Snow is the mother of SPC Snow.  She is a national of the United States.

2265.   Plaintiff M.B., by and through her next friend Deloris Snow, is the minor sister of SPC Snow.  She is a national of the United States.

2266.   Plaintiff Damen Snow is the brother of SPC Snow.  He is a national of the United States.

2267.   As a result of the September 17, 2010 attack and SPC Snow's injuries and death, each member of the Snow Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Snow's society, companionship, and counsel.

**The Devin A. Snyder Family**

2268.   Sergeant Devin A. Snyder served in Afghanistan as a member of the U.S. Army. On June 4, 2011, SGT Snyder was injured in an IED attack in Laghman Province, Afghanistan. SGT Snyder died on June 4, 2011 as a result of injuries sustained during the attack.

2269.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2270.   SGT Snyder's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2271.   SGT Snyder was a national of the United States at the time of the attack and her death.

2272.   As a result of the attack, SGT Snyder was injured in her person and/or property. The Plaintiff members of the Snyder Family are the survivors and/or heirs of SGT Snyder and are entitled to recover for the damages SGT Snyder sustained.

2273.   Plaintiff Dineen Snyder is the mother of SGT Snyder.  She is a national of the United States.

2274.   Plaintiff Edward Snyder is the father of SGT Snyder.  He is a national of the United States.

2275.   Plaintiff Damien Edward Snyder is the brother of SGT Snyder.  He is a national of the United States.

2276.   Plaintiff Natasha A. Snyder is the sister of SGT Snyder.  She is a national of the United States.

2277.   As a result of the June 4, 2011 attack and SGT Snyder's injuries and death, each member of the Snyder Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Snyder's society, companionship, and counsel.

**The Kristoffer M. Solesbee Family**

2278.   Technical Sergeant Kristoffer M. Solesbee served in Afghanistan as a member of the U.S. Air Force.  On May 26, 2011, TSgt Solesbee was injured in an IED attack in Kandahar Province, Afghanistan.  TSgt Solesbee died on May 26, 2011 as a result of injuries sustained during the attack.

2279.   The attack was committed by the Taliban.

2280.   TSgt Solesbee's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2281.   TSgt Solesbee was a national of the United States at the time of the attack and his death.

2282.   As a result of the attack, TSgt Solesbee was injured in his person and/or property. The Plaintiff members of the Solesbee Family are the survivors and/or heirs of TSgt Solesbee and are entitled to recover for the damages TSgt Solesbee sustained.

2283.   Plaintiff Larry Michael Solesbee is the father of TSgt Solesbee.  He is a national of the United States.

2284.   Plaintiff Trina Solesbee is the sister of TSgt Solesbee.  She is a national of the United States.

2285.   As a result of the May 26, 2011 attack and TSgt Solesbee's injuries and death, each member of the Solesbee Family has experienced severe mental anguish, emotional pain and suffering, and the loss of TSgt Solesbee's society, companionship, and counsel.

**The Omar Soltero Family**

2286.   Specialist Omar Soltero served in Afghanistan as a member of the U.S. Army. On January 31, 2011, SPC Soltero was injured in an IED attack in Wardak Province, Afghanistan.  SPC Soltero died on January 31, 2011 as a result of injuries sustained during the attack.

2287.   The attack was committed by the Haqqani Network, a part of the Taliban.

2288.   SPC Soltero's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2289.   SPC Soltero was a national of the United States at the time of the attack and his death.

2290.   As a result of the attack, SPC Soltero was injured in his person and/or property. The Plaintiff members of the Soltero Family are the survivors and/or heirs of SPC Soltero and are entitled to recover for the damages SPC Soltero sustained.

2291.   Plaintiff Gustavo Alfonso Soltero Sr. is the father of SPC Soltero.  He is a national of the United States.

2292.   Plaintiff Maria Soltero is the mother of SPC Soltero and is his survivor and/or heir.

2293.   Plaintiff Adrian Carrillo Soltero is the brother of SPC Soltero.  He is a national of the United States.

2294.   As a result of the January 31, 2011 attack and SPC Soltero's injuries and death, each member of the Soltero Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Soltero's society, companionship, and counsel.

**The Eric D. Soufrine Family**

2295.   Private First Class Eric D. Soufrine served in Afghanistan as a member of the U.S. Army.  On June 14, 2011, PFC Soufrine was injured in an IED attack in Farah Province, Afghanistan.  PFC Soufrine died on June 14, 2011 as a result of injuries sustained during the attack.

2296.   The attack was committed by the Taliban.

2297.   PFC Soufrine's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2298.   PFC Soufrine was a national of the United States at the time of the attack and his death.

2299.   As a result of the attack, PFC Soufrine was injured in his person and/or property. The Plaintiff members of the Soufrine Family are the survivors and/or heirs of PFC Soufrine and are entitled to recover for the damages PFC Soufrine sustained.

2300.   Plaintiff Donna J. Soufrine is the mother of PFC Soufrine.  She is a national of the United States.

2301.   Plaintiff Michael J. Soufrine is the father of PFC Soufrine.  He is a national of the United States.

2302.   As a result of the June 14, 2011 attack and PFC Soufrine's injuries and death, each member of the Soufrine Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Soufrine's society, companionship, and counsel.

**The Orion N. Sparks Family**

2303.   Staff Sergeant Orion N. Sparks served in Afghanistan as a member of the U.S. Army.  On September 26, 2012, SSG Sparks was injured in a suicide bombing attack in Logar Province, Afghanistan.  SSG Sparks died on September 26, 2012 as a result of injuries sustained during the attack.

2304.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

2305.   SSG Sparks's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2306.   SSG Sparks was a national of the United States at the time of the attack and his death.

2307.   As a result of the attack, SSG Sparks was injured in his person and/or property. The Plaintiff members of the Sparks Family are the survivors and/or heirs of SSG Sparks and are entitled to recover for the damages SSG Sparks sustained.

2308.   Plaintiff Garry Lee Sparks is the father of SSG Sparks.  He is a national of the United States.

2309.   Plaintiff Jan Marie Hurnblad Sparks is the mother of SSG Sparks.  She is a national of the United States.

2310.   Plaintiff Erik Sparks is the brother of SSG Sparks.  He is a national of the United States.

2311.   Plaintiff Zachary Douglas Sparks is the brother of SSG Sparks.  He is a national of the United States.

2312.   Plaintiff Jane Sparks is the step-mother of SSG Sparks.  She is a national of the United States.  Jane Sparks lived in the same household as SSG Sparks for a substantial period of time and considered SSG Sparks the functional equivalent of a biological son.

2313.   As a result of the September 26, 2012 attack and SSG Sparks's injuries and death, each member of the Sparks Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Sparks's society, companionship, and counsel.

**The Nicholas P. Spehar Family**

2314.   Petty Officer 2nd Class (SEAL) Nicholas P. Spehar served in Afghanistan as a member of the U.S. Navy.  On August 6, 2011, SO2 (SEAL) Spehar was injured in an attack on a helicopter in Wardak Province, Afghanistan.  SO2 (SEAL) Spehar died on August 6, 2011 as a result of injuries sustained during the attack.

2315.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

2316.   SO2 (SEAL) Spehar's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2317.   SO2 (SEAL) Spehar was a national of the United States at the time of the attack and his death.

2318.   As a result of the attack, SO2 (SEAL) Spehar was injured in his person and/or property.  The Plaintiff members of the Spehar Family are the survivors and/or heirs of SO2 (SEAL) Spehar and are entitled to recover for the damages SO2 (SEAL) Spehar sustained.

2319.   Plaintiff Annette Spehar is the mother of SO2 (SEAL) Spehar.  She is a national of the United States.

2320.   Plaintiff Patrick Spehar is the father of SO2 (SEAL) Spehar.  He is a national of the United States.

2321.   Plaintiff Lisa Martinusen is the sister of SO2 (SEAL) Spehar.  She is a national of the United States.

2322.   Plaintiff Marie Sentina Mielke is the sister of SO2 (SEAL) Spehar.  She is a national of the United States.

2323.   Plaintiff Jacob Louis Spehar is the brother of SO2 (SEAL) Spehar.  He is a national of the United States.

2324.   Plaintiff Luke Spehar is the brother of SO2 (SEAL) Spehar.  He is a national of the United States.

2325.   As a result of the August 6, 2011 attack and SO2 (SEAL) Spehar's injuries and death, each member of the Spehar Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SO2 (SEAL) Spehar's society, companionship, and counsel.

**The Tyler M. Springmann Family**

2326.   Private First Class Tyler M. Springmann served in Afghanistan as a member of the U.S. Army.  On July 17, 2011, PFC Springmann was injured in a complex attack involving

456

an IED and small arms fire in Kandahar Province, Afghanistan.  PFC Springmann died on July 17, 2011 as a result of injuries sustained during the attack.

2327.   The attack was committed by the Taliban.

2328.   PFC Springmann's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2329.   PFC Springmann was a national of the United States at the time of the attack and his death.

2330.   As a result of the attack, PFC Springmann was injured in his person and/or property.  The Plaintiff members of the Springmann Family are the survivors and/or heirs of PFC Springmann and are entitled to recover for the damages PFC Springmann sustained.

2331.   Plaintiff Tina Lynn Seekins is the mother of PFC Springmann.  She is a national of the United States.

2332.   As a result of the July 17, 2011 attack and PFC Springmann's injuries and death, each member of the Springmann Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Springmann's society, companionship, and counsel.

**The Cameron J. Stambaugh Family**

2333.   Specialist Cameron J. Stambaugh served in Afghanistan as a member of the U.S. Army.  On July 8, 2012, SPC Stambaugh was injured in an IED attack in Wardak Province, Afghanistan.  SPC Stambaugh died on July 8, 2012 as a result of injuries sustained during the attack.

2334.   The attack was committed by the Haqqani Network, a part of the Taliban.

2335.   SPC Stambaugh's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2336.   SPC Stambaugh was a national of the United States at the time of the attack and his death.

2337.   As a result of the attack, SPC Stambaugh was injured in his person and/or property.  The Plaintiff members of the Stambaugh Family are the survivors and/or heirs of SPC Stambaugh and are entitled to recover for the damages SPC Stambaugh sustained.

2338.   Plaintiff Mitchell L. Stambaugh is the father of SPC Stambaugh.  He is a national of the United States.

2339.   As a result of the July 8, 2012 attack and SPC Stambaugh's injuries and death, each member of the Stambaugh Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Stambaugh's society, companionship, and counsel.

**The Paul Allen Starner Family**

2340.   Plaintiff Master Sergeant Paul Allen Starner served in Afghanistan as a member of the U.S. Marine Corps.  On July 1, 2010, MSgt Starner was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded MSgt Starner, who lost right leg below the knee, required left foot reconstruction surgery, and sustained a traumatic brain injury. As a result of the July 1, 2010 attack and his injuries, MSgt Starner has experienced severe physical and emotional pain and suffering.

2341.   The attack was committed by the Taliban.

2342.   The attack that injured MSgt Starner would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2343.   MSgt Starner was a national of the United States at the time of the attack, and remains one to this day.

2344.   Plaintiff Raquel J. Starner is the wife of MSgt Starner.  She is a national of the United States.

2345.   Plaintiff Amberly G. Starner is the daughter of MSgt Starner.  She is a national of the United States.

2346.   Plaintiff Hunter S. Starner is the son of MSgt Starner.  He is a national of the United States.

2347.   As a result of the July 1, 2010 attack and MSgt Starner's injuries, each member of the Starner Family has experienced severe mental anguish, emotional pain and suffering.

**The Kyle P. Stoeckli Family**

2348.   Specialist Kyle P. Stoeckli served in Afghanistan as a member of the U.S. Army. On June 1, 2013, SPC Stoeckli was injured in an IED attack in Kandahar Province, Afghanistan. SPC Stoeckli died on June 1, 2013 as a result of injuries sustained during the attack.

2349.   The attack was committed by the Taliban.

2350.   SPC Stoeckli's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2351.   SPC Stoeckli was a national of the United States at the time of the attack and his death.

2352.   As a result of the attack, SPC Stoeckli was injured in his person and/or property. The Plaintiff members of the Stoeckli Family are the survivors and/or heirs of SPC Stoeckli and are entitled to recover for the damages SPC Stoeckli sustained.

2353.   Plaintiff Bruno T. Stoeckli is the father of SPC Stoeckli.  He is a national of the United States.

2354.   As a result of the June 1, 2013 attack and SPC Stoeckli's injuries and death, each member of the Stoeckli Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Stoeckli's society, companionship, and counsel.

**The Kyle Brandon Stout Family**

2355.   Sergeant Kyle Brandon Stout served in Afghanistan as a member of the U.S. Army.  On July 30, 2010, SGT Stout was injured in an IED attack in Kandahar Province, Afghanistan.  SGT Stout died on July 30, 2010 as a result of injuries sustained during the attack.

2356.   The attack was committed by the Taliban.

2357.   SGT Stout's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2358.   SGT Stout was a national of the United States at the time of the attack and his death.

2359.   As a result of the attack, SGT Stout was injured in his person and/or property. The Plaintiff members of the Stout Family are the survivors and/or heirs of SGT Stout and are entitled to recover for the damages SGT Stout sustained.

2360.   Plaintiff Billy Michael Stout is the father of SGT Stout.  He is a national of the United States.

2361.   Plaintiff Robin Stout is the mother of SGT Stout.  She is a national of the United States.

2362.   Plaintiff Melissa Stout is the sister of SGT Stout.  She is a national of the United States.

2363.   Plaintiff Michael David Stout is the brother of SGT Stout.  He is a national of the United States.

2364.   As a result of the July 30, 2010 attack and SGT Stout's injuries and death, each member of the Stout Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Stout's society, companionship, and counsel.

**The Joshua J. Strickland Family**

2365.   Sergeant Joshua J. Strickland served in Afghanistan as a member of the U.S. Army.  On September 21, 2013, SGT Strickland was injured in an insider attack in Paktia Province, Afghanistan.  SGT Strickland died on September 21, 2013 as a result of injuries sustained during the attack.

2366.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2367.   SGT Strickland's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2368.   SGT Strickland was a national of the United States at the time of the attack and his death.

2369.   As a result of the attack, SGT Strickland was injured in his person and/or property.  The Plaintiff members of the Strickland Family are the survivors and/or heirs of SGT Strickland and are entitled to recover for the damages SGT Strickland sustained.

2370.   Plaintiff Garrett Layne Funk is the brother of SGT Strickland.  He is a national of the United States.

2371.   As a result of the September 21, 2013 attack and SGT Strickland's injuries and death, each member of the Strickland Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Strickland's society, companionship, and counsel.

**The Barry Sutton Family**

2372.   Barry Sutton served in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  On August 22, 2015, Mr. Sutton was injured in a suicide bombing attack in Kabul Province, Afghanistan.  Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the attack.

2373.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

2374.   Mr. Sutton's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in

hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

2375.   Mr. Sutton was a national of the United States at the time of the attack and his death.

2376.   As a result of the attack, Mr. Sutton was injured in his person and/or property. The Plaintiff members of the Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

2377.   Plaintiff Erin Nicole Goss is the daughter of Mr. Sutton.  She is a national of the United States.

2378.   Plaintiff Summer Breanne Sutton is the daughter of Mr. Sutton.  She is a national of the United States.

2379.   Plaintiff Harriet Sutton is the mother of Mr. Sutton.  She is a national of the United States.

2380.   Plaintiff Trecia Brock Hood is the sister of Mr. Sutton.  She is a national of the United States.

2381.   Plaintiff Wendy Shedd is the sister of Mr. Sutton.  She is a national of the United States.

2382.   Plaintiff Freddie Dewey Sutton is the brother of Mr. Sutton.  He is a national of the United States.

2383.   As a result of the August 22, 2015 attack and Mr. Sutton's injuries and death, each member of the Sutton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sutton's society, companionship, and counsel.

**The Durand S. Tanner Family**

2384.   Plaintiff Major Durand S. Tanner served in Afghanistan as a member of the U.S. Marine Corps.  On July 1, 2010, Maj Tanner was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded Maj Tanner, who lost his right leg below the knee, required facial reconstruction surgery, and sustained a fractured left hand, shrapnel to the right thigh, and a traumatic brain injury.  As a result of the July 1, 2010 attack and his injuries, Maj Tanner has experienced severe physical and emotional pain and suffering.

2385.   The attack was committed by the Taliban.

2386.   The attack that injured Maj Tanner would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2387.   Maj Tanner was a national of the United States at the time of the attack, and remains one to this day.

2388.   Plaintiff Kelly N. Tanner is the daughter of Maj Tanner.  She is a national of the United States.

2389.   Plaintiff Megan E. Tanner is the daughter of Maj Tanner.  She is a national of the United States.

2390.   As a result of the July 1, 2010 attack and Maj Tanner's injuries, each member of the Tanner Family has experienced severe mental anguish, emotional pain and suffering.

**The James E. Thode Family**

2391.   Sergeant First Class James E. Thode served in Afghanistan as a member of the U.S. Army National Guard.  On December 2, 2010, SFC Thode was injured in an IED attack in Khost Province, Afghanistan.  SFC Thode died on December 2, 2010 as a result of injuries sustained during the attack.

2392.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2393.   SFC Thode's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2394.   SFC Thode was a national of the United States at the time of the attack and his death.

2395.   As a result of the attack, SFC Thode was injured in his person and/or property. The Plaintiff members of the Thode Family are the survivors and/or heirs of SFC Thode and are entitled to recover for the damages SFC Thode sustained.

2396.   Plaintiff Evelyn Taylor is the mother of SFC Thode.  She is a national of the United States.

2397.   As a result of the December 2, 2010 attack and SFC Thode's injuries and death, each member of the Thode Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Thode's society, companionship, and counsel.

**The Allen R. Thomas Family**

2398.   Staff Sergeant Allen R. Thomas served in Afghanistan as a member of the U.S. Army.  On March 16, 2010, SSG Thomas was injured in a suicide bombing attack in Helmand Province, Afghanistan.  SSG Thomas died on September 29, 2013 as a result of injuries sustained during the attack.

2399.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing, indoctrinating, and training the suicide bomber.

2400.   SSG Thomas's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2401.   SSG Thomas was a national of the United States at the time of the attack and his death.

2402.   As a result of the attack, SSG Thomas was injured in his person and/or property. The Plaintiff members of the Thomas Family are the survivors and/or heirs of SSG Thomas and are entitled to recover for the damages SSG Thomas sustained.

2403.   Plaintiff Danica Thomas is the widow of SSG Thomas.  She is a national of the United States.

2404.   Plaintiff L.T., by and through her next friend Danica Thomas, is the minor daughter of SSG Thomas.  She is a national of the United States.

2405.   As a result of the March 16, 2010 attack and SSG Thomas's injuries and death, each member of the Thomas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Thomas's society, companionship, and counsel.

**The Jesse R. Tilton Family**

2406.   Sergeant Jesse R. Tilton served in Afghanistan as a member of the U.S. Army. On July 13, 2010, SGT Tilton was injured in a complex attack involving small arms fire and rocket propelled grenades in Kandahar Province, Afghanistan.  SGT Tilton died on July 16, 2010 as a result of injuries sustained during the attack.

2407.   The attack was committed by the Taliban.

2408.   SGT Tilton's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2409.   SGT Tilton was a national of the United States at the time of the attack and his death.

2410.   As a result of the attack, SGT Tilton was injured in his person and/or property. The Plaintiff members of the Tilton Family are the survivors and/or heirs of SGT Tilton and are entitled to recover for the damages SGT Tilton sustained.

2411.   Plaintiff Julie Magana is the mother of SGT Tilton.  She is a national of the United States.

2412.   As a result of the July 13, 2010 attack and SGT Tilton's injuries and death, each member of the Tilton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Tilton's society, companionship, and counsel.

**The Ryan Gregory Timoney Family**

2413.   Plaintiff Captain Ryan Gregory Timoney served in Afghanistan as a member of the U.S. Army.  On May 20, 2012, CPT Timoney was injured in a suicide bomber attack in Uruzgan Province, Afghanistan.  The attack severely wounded CPT Timoney, who lost his left

leg, suffered shrapnel injuries to his left arm, left chest, left abdomen, and left side of his skull, and also suffers from spinal pain, seizures, physical limitations, and speech, reading and vision difficulty.  As a result of the May 20, 2012 attack and his injuries, CPT Timoney has experienced severe physical and emotional pain and suffering.

2414.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing and training the suicide bomber.

2415.   The attack that injured CPT Timoney would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2416.   CPT Timoney was a national of the United States at the time of the attack, and remains one to this day.

2417.   Plaintiff Diane Timoney is the mother of CPT Timoney.  She is a national of the United States.

2418.   Plaintiff Gregory Timoney is the father of CPT Timoney.  He is a national of the United States.

2419.   As a result of the May 20, 2012 attack and CPT Timoney's injuries, each member of the Timoney Family has experienced severe mental anguish, emotional pain and suffering.

**Frederick Allen Tolon**

2420.   Plaintiff Sergeant Frederick Allen Tolon served in Afghanistan as a member of the U.S. Army.  On October 10, 2011, SGT Tolon was injured in a complex attack involving small arms fire and indirect fire in Kandahar Province, Afghanistan.  The attack severely wounded SGT Tolon, who suffers from severely deforming scarring on his chest with shrapnel

pieces remaining in his chest, nerve damage to, and very limited mobility of, the right arm, permanent partial vision loss, traumatic brain injury, tinnitus, post-traumatic stress disorder, and anxiety.  As a result of the October 10, 2011 attack and his injuries, SGT Tolon has experienced severe physical and emotional pain and suffering.

2421.   The attack was committed by the Taliban.

2422.   The attack that injured SGT Tolon would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2423.   SGT Tolon was a national of the United States at the time of the attack and remains one to this day.

**The Aaron C. Torian Family**

2424.   Master Sergeant Aaron C. Torian served in Afghanistan as a member of the U.S. Marine Corps.  On February 15, 2014, MSgt Torian was injured in an IED attack in Helmand Province, Afghanistan.  MSgt Torian died on February 15, 2014 as a result of injuries sustained during the attack.

2425.   The attack was committed by the Taliban.

2426.   MSgt Torian's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2427.   MSgt Torian was a national of the United States at the time of the attack and his death.

2428.   As a result of the attack, MSgt Torian was injured in his person and/or property. The Plaintiff members of the Torian Family are the survivors and/or heirs of MSgt Torian and are entitled to recover for the damages MSgt Torian sustained.

2429.   Plaintiff Esta Smith is the mother of MSgt Torian.  She is a national of the United States.

2430.   Plaintiff Joe Torian is the father of MSgt Torian.  He is a national of the United States.

2431.   Plaintiff Emily Torian is the sister of MSgt Torian.  She is a national of the United States.

2432.   Plaintiff Nathan Ewell Torian is the brother of MSgt Torian.  He is a national of the United States.

2433.   Plaintiff Jimmy Smith is the step-father of MSgt Torian.  He is a national of the United States.  Jimmy Smith lived in the same household as MSgt Torian for a substantial period of time and considered MSgt Torian the functional equivalent of a biological son.

2434.   As a result of the February 15, 2014 attack and MSgt Torian's injuries and death, each member of the Torian Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSgt Torian's society, companionship, and counsel.

**The Jon R. Townsend Family**

2435.   Private First Class Jon R. Townsend served in Afghanistan as a member of the U.S. Army.  On September 16, 2012, PFC Townsend was injured in an insider attack in Zabul Province, Afghanistan.  PFC Townsend died on September 16, 2012 as a result of injuries sustained during the attack.

2436.   The attack was committed by the Haqqani Network, a part of the Taliban.

2437.   PFC Townsend's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2438.   PFC Townsend was a national of the United States at the time of the attack and his death.

2439.   As a result of the attack, PFC Townsend was injured in his person and/or property.  The Plaintiff members of the Townsend Family are the survivors and/or heirs of PFC Townsend and are entitled to recover for the damages PFC Townsend sustained.

2440.   Plaintiff Brittany Taylor Townsend is the widow of PFC Townsend.  She is a national of the United States.

2441.   As a result of the September 16, 2012 attack and PFC Townsend's injuries and death, each member of the Townsend Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Townsend's society, companionship, and counsel.

**Kevin Trimble**

2442.   Plaintiff Private First Class Kevin Trimble served in Afghanistan as a member of the U.S. Army.  On September 17, 2012, PFC Trimble was injured in an IED attack in Kandahar Province, Afghanistan.  The attack severely wounded PFC Trimble, who lost both legs above the knee, lost his left arm above the elbow, and also suffers from post-traumatic stress disorder and partial hearing loss.  As a result of the September 17, 2012 attack and his injuries, PFC Trimble has experienced severe physical and emotional pain and suffering.

2443.   The attack was committed by the Taliban.

2444.   The attack that injured PFC Trimble would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2445.   PFC Trimble was a national of the United States at the time of the attack and remains one to this day.

**Michael Verardo**

2446.   Plaintiff Sergeant Michael Verardo served in Afghanistan as a member of the U.S. Army.  On April 24, 2010, SGT Verardo was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded SGT Verardo, who lost one of his legs and part of his left arm and suffers from significant burns, a traumatic brain injury, eardrum injury, and injuries to his face and airways.  As a result of the April 24, 2010 attack and his injuries, SGT Verardo has experienced severe physical and emotional pain and suffering.

2447.   The attack was committed by the Taliban.

2448.   The attack that injured SGT Verardo would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2449.   SGT Verardo was a national of the United States at the time of the attack and remains one to this day.

**The Chad S. Wade Family**

2450.   Corporal Chad S. Wade served in Afghanistan as a member of the U.S. Marine Corps.  On December 1, 2010, Cpl Wade was injured in an IED attack in Helmand Province, Afghanistan.  Cpl Wade died on December 1, 2010 as a result of injuries sustained during the attack.

2451.   The attack was committed by the Taliban.

2452.   Cpl Wade's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2453.   Cpl Wade was a national of the United States at the time of the attack and his death.

2454.   As a result of the attack, Cpl Wade was injured in his person and/or property.  The Plaintiff members of the Wade Family are the survivors and/or heirs of Cpl Wade and are entitled to recover for the damages Cpl Wade sustained.

2455.   Plaintiff Tamara Anne Boyett is the mother of Cpl Wade.  She is a national of the United States.

2456.   Plaintiff Terry Lynn Boyett is the step-father of Cpl Wade.  He is a national of the United States.  Terry Lynn Boyett lived in the same household as Cpl Wade for a substantial period of time and considered Cpl Wade the functional equivalent of a biological son.

2457.   As a result of the December 1, 2010 attack and Cpl Wade's injuries and death, each member of the Wade Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Wade's society, companionship, and counsel.

**The Nickolas S. Welch Family**

2458.   Specialist Nickolas S. Welch served in Afghanistan as a member of the U.S. Army.  On July 23, 2013, SPC Welch was injured in an IED attack in Wardak Province, Afghanistan.  SPC Welch died on August 6, 2013 as a result of injuries sustained during the attack.

2459.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

2460.   SPC Welch's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2461.   SPC Welch was a national of the United States at the time of the attack and his death.

2462.   As a result of the attack, SPC Welch was injured in his person and/or property. The Plaintiff members of the Welch Family are the survivors and/or heirs of SPC Welch and are entitled to recover for the damages SPC Welch sustained.

2463.   Plaintiff Barry Welch is the father of SPC Welch.  He is a national of the United States.

2464.   Plaintiff Lorria Welch is the mother of SPC Welch.  She is a national of the United States.

2465.   Plaintiff Zackary Welch is the brother of SPC Welch.  He is a national of the United States.

2466.   As a result of the July 23, 2013 attack and SPC Welch's injuries and death, each member of the Welch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Welch's society, companionship, and counsel.

**The Matthew J. West Family**

2467.   Staff Sergeant Matthew J. West served in Afghanistan as a member of the U.S. Army.  On August 30, 2010, SSG West was injured in an IED attack in Helmand Province,

Afghanistan.  SSG West died on August 30, 2010 as a result of injuries sustained during the attack.

2468.   The attack was committed by the Taliban.

2469.   SSG West's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2470.   SSG West was a national of the United States at the time of the attack and his death.

2471.   As a result of the attack, SSG West was injured in his person and/or property. The Plaintiff members of the West Family are the survivors and/or heirs of SSG West and are entitled to recover for the damages SSG West sustained.

2472.   Plaintiff John M. West is the father of SSG West.  He is a national of the United States.

2473.   Plaintiff Marcia M. West is the mother of SSG West.  She is a national of the United States.

2474.   Plaintiff Kristine Willis is the sister of SSG West.  She is a national of the United States.

2475.   As a result of the August 30, 2010 attack and SSG West's injuries and death, each member of the West Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG West's society, companionship, and counsel.

**The Blake D. Whipple Family**

2476. Specialist Blake D. Whipple served in Afghanistan as a member of the U.S. Army. On November 5, 2010, SPC Whipple was injured in an IED attack in Ghazni Province, Afghanistan. SPC Whipple died on November 5, 2010 as a result of injuries sustained during the attack.

2477. The attack was committed by the Haqqani Network, a part of the Taliban.

2478. SPC Whipple's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2479. SPC Whipple was a national of the United States at the time of the attack and his death.

2480. As a result of the attack, SPC Whipple was injured in his person and/or property. The Plaintiff members of the Whipple Family are the survivors and/or heirs of SPC Whipple and are entitled to recover for the damages SPC Whipple sustained.

2481. Plaintiff David Whipple is the father of SPC Whipple. He is a national of the United States.

2482. Plaintiff Kimberley A. Whipple is the mother of SPC Whipple. She is a national of the United States.

2483. Plaintiff Brian Gregory Clyburn is the brother of SPC Whipple. He is a national of the United States.

2484. Plaintiff Sean Whipple is the brother of SPC Whipple. He is a national of the United States.

2485.   As a result of the November 5, 2010 attack and SPC Whipple's injuries and death, each member of the Whipple Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Whipple's society, companionship, and counsel.

**The Benjamin D. White Family**

2486.   Senior Airman Benjamin D. White served in Afghanistan as a member of the U.S. Air Force.  On June 9, 2010, SrA White was injured in an attack on a helicopter in Helmand Province, Afghanistan.  SrA White died on June 9, 2010 as a result of injuries sustained during the attack.

2487.   The attack was committed by the Taliban.

2488.   SrA White's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2489.   SrA White was a national of the United States at the time of the attack and his death.

2490.   As a result of the attack, SrA White was injured in his person and/or property. The Plaintiff members of the White Family are the survivors and/or heirs of SrA White and are entitled to recover for the damages SrA White sustained.

2491.   Plaintiff Anthony Curtis White is the father of SrA White.  He is a national of the United States.

2492.   Plaintiff A.E.W., by and through his next friend Anthony Curtis White, is the minor brother of SrA White.  He is a national of the United States.

2493.   Plaintiff Z.L.W., by and through his next friend Anthony Curtis White, is the minor brother of SrA White.  He is a national of the United States.

2494.   Plaintiff Laura White is the sister of SrA White.  She is a national of the United States.

2495.   Plaintiff Mark Anthony White is the brother of SrA White.  He is a national of the United States.

2496.   Plaintiff Jennifer Lynn White is the step-mother of SrA White.  She is a national of the United States.  Jennifer Lynn White lived in the same household as SrA White for a substantial period of time and considered SrA White the functional equivalent of a biological son.

2497.   As a result of the June 9, 2010 attack and SrA White's injuries and death, each member of the White Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SrA White's society, companionship, and counsel.

**The James T. Wickliff-Chacin Family and Estate**

2498.   Specialist James T. Wickliff-Chacin served in Afghanistan as a member of the U.S. Army.  On August 12, 2013, SPC Wickliff-Chacin was injured in an IED attack in Logar Province, Afghanistan.  SPC Wickliff-Chacin died on September 20, 2013 as a result of injuries sustained during the attack.

2499.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

2500.   SPC Wickliff-Chacin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2501.   SPC Wickliff-Chacin was a national of the United States at the time of the attack and his death.

2502.   As a result of the attack, SPC Wickliff-Chacin was injured in his person and/or property.  The Plaintiff members of the Wickliff-Chacin Family are the survivors and/or heirs of SPC Wickliff-Chacin and are entitled to recover for the damages SPC Wickliff-Chacin sustained.

2503.   Plaintiff Martha Carolina Smith is the mother of SPC Wickliff-Chacin.  She is a national of the United States.  She brings claims in both her personal capacity and her representative capacity on behalf of SPC Wickliff-Chacin's estate.

2504.   Plaintiff Thomas Elmer Wickliff is the father of SPC Wickliff-Chacin.  He is a national of the United States.

2505.   Plaintiff Michelle Carolina Rotelli is the sister of SPC Wickliff-Chacin.  She is a national of the United States.

2506.   As a result of the August 12, 2013 attack and SPC Wickliff-Chacin's injuries and death, each member of the Wickliff-Chacin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Wickliff-Chacin's society, companionship, and counsel.

2507.   SPC Wickliff-Chacin's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder.

**The Clarence Williams III Family**

2508.   Specialist Clarence Williams III served in Afghanistan as a member of the U.S. Army.  On July 8, 2012, SPC Williams was injured in an IED attack in Wardak Province, Afghanistan.  SPC Williams died on July 8, 2012 as a result of injuries sustained during the attack.

2509.   The attack was committed by the Haqqani Network, a part of the Taliban.

2510.   SPC Williams's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2511.   SPC Williams was a national of the United States at the time of the attack and his death.

2512.   As a result of the attack, SPC Williams was injured in his person and/or property. The Plaintiff members of the Williams Family are the survivors and/or heirs of SPC Williams and are entitled to recover for the damages SPC Williams sustained.

2513.   Plaintiff Clarence Williams Jr. is the father of SPC Williams.  He is a national of the United States.

2514.   Plaintiff Talisa Shervon Williams is the mother of SPC Williams.  She is a national of the United States.

2515.   Plaintiff Samantha Shervon Williams is the sister of SPC Williams.  She is a national of the United States.

2516.   Plaintiff Abrill Renee Williams-Osbourne is the sister of SPC Williams.  She is a national of the United States.

2517.   As a result of the July 8, 2012 attack and SPC Williams's injuries and death, each member of the Williams Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Williams's society, companionship, and counsel.

**The Leston M. Winters Family**

2518.   Staff Sergeant Leston M. Winters served in Afghanistan as a member of the U.S. Army.  On July 15, 2010, SSG Winters was injured in an IED attack in Kandahar Province, Afghanistan.  SSG Winters died on July 15, 2010 as a result of injuries sustained during the attack.

2519.   The attack was committed by the Taliban.

2520.   SSG Winters's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2521.   SSG Winters was a national of the United States at the time of the attack and his death.

2522.   As a result of the attack, SSG Winters was injured in his person and/or property. The Plaintiff members of the Winters Family are the survivors and/or heirs of SSG Winters and are entitled to recover for the damages SSG Winters sustained.

2523.   Plaintiff Cheryl Spivey is the mother of SSG Winters.  She is a national of the United States.

2524.   Plaintiff Corbin Wayne Hunt is the brother of SSG Winters.  He is a national of the United States.

2525.   As a result of the July 15, 2010 attack and SSG Winters's injuries and death, each member of the Winters Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Winters's society, companionship, and counsel.

**The Jeremy Jason Wise Family**

2526.   Jeremy Jason Wise served in Afghanistan as a civilian government contractor working for Xe Services.  On December 30, 2009, Mr. Wise was injured in a suicide bombing attack in Khost Province, Afghanistan.  Mr. Wise died on December 30, 2009 as a result of injuries sustained during the attack.

2527.   The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack).

2528.   Mr. Wise's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack posed as an informant in order to gain access to the base and did not identify himself as an enemy combatant.

2529.   Mr. Wise was a national of the United States at the time of the attack and his death.

2530.   As a result of the attack, Mr. Wise was injured in his person and/or property.  The Plaintiff members of the Wise Family are the survivors and/or heirs of Mr. Wise and are entitled to recover for the damages Mr. Wise sustained.

2531.   Plaintiff Dana Marie Bernhardt is the widow of Mr. Wise.  She is a national of the United States.

2532.   Plaintiff Mary Lee Wise is the mother of Mr. Wise.  She is a national of the United States.

2533.   Plaintiff Mary Heather Wise is the sister of Mr. Wise.  She is a national of the United States.

2534.   Plaintiff E.P., by and through his next friend Dana Marie Bernhardt, is the minor step-son of Mr. Wise.  He is a national of the United States.  E.P. lived in the same household as Mr. Wise for a substantial period of time and considered Mr. Wise the functional equivalent of a biological father.

2535.   As a result of the December 30, 2009 attack and Mr. Wise's injuries and death, each member of the Wise Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Wise's society, companionship, and counsel.

**The Mark G. Worley Family**

2536.   Plaintiff Sergeant Mark G. Worley served in Afghanistan as a member of the U.S. Army.  On August 11, 2012, SGT Worley was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded SGT Worley, who lost his right leg below the knee, and sustained nerve damage in left leg with dropfoot and a deep laceration to his right forearm. As a result of the August 11, 2012 attack and his injuries, SGT Worley has experienced severe physical and emotional pain and suffering.

2537.   The attack was committed by the Taliban.

2538.   The attack that injured SGT Worley would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2539.   SGT Worley was a national of the United States at the time of the attack, and remains one to this day.

2540.   Plaintiff Mona G. Betzen is the mother of SGT Worley.  She is a national of the United States.

2541.   Plaintiff Gregory W. Worley is the father of SGT Worley.  He is a national of the United States.

2542.   As a result of the August 11, 2012 attack and SGT Worley's injuries, each member of the Worley Family has experienced severe mental anguish, emotional pain and suffering.

**The Randal P. Wright Family**

2543.   Lance Corporal Randal P. Wright served in Afghanistan as a member of the U.S. Marine Corps.  On May 7, 2010, LCpl. Wright was injured in an IED attack in Helmand Province, Afghanistan.  LCpl. Wright died on March 9, 2017 as a result of injuries sustained during the attack.

2544.   The attack was committed by the Taliban.

2545.   LCpl. Wright's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2546.   LCpl. Wright was a national of the United States at the time of the attack and his death.

2547.   As a result of the attack, LCpl. Wright was injured in his person and/or property. The Plaintiff members of the Wright Family are the survivors and/or heirs of LCpl. Wright and are entitled to recover for the damages LCpl. Wright sustained.

2548.   Plaintiff F.S., by and through her next friend Ashley Rose Serocki, is the minor daughter of LCpl. Wright.  She is a national of the United States.

2549.   Plaintiff Dawn Marie Pattee is the mother of LCpl. Wright.  She is a national of the United States.

2550.   Plaintiff Jalisa Marie Hammond is the sister of LCpl. Wright.  She is a national of the United States.

2551.   Plaintiff Kristen Colleen Wright is the sister of LCpl. Wright.  She is a national of the United States.

2552.   As a result of the May 7, 2010 attack and LCpl. Wright's injuries and death, each member of the Wright Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl. Wright's society, companionship, and counsel.

**The Frank R. Zaehringer III Family**

2553.   Sergeant Frank R. Zaehringer III served in Afghanistan as a member of the U.S. Marine Corps.  On October 11, 2010, Sgt Zaehringer was injured in an IED attack in Helmand Province, Afghanistan.  Sgt Zaehringer died on October 11, 2010 as a result of injuries sustained during the attack.

2554.   The attack was committed by the Taliban.

2555.   Sgt Zaehringer's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2556.   Sgt Zaehringer was a national of the United States at the time of the attack and his death.

2557.   As a result of the attack, Sgt Zaehringer was injured in his person and/or property. The Plaintiff members of the Zaehringer Family are the survivors and/or heirs of Sgt Zaehringer and are entitled to recover for the damages Sgt Zaehringer sustained.

2558.   Plaintiff Sharon K. Zaehringer is the mother of Sgt Zaehringer.  She is a national of the United States.

2559.   Plaintiff Nicole R. Scott is the sister of Sgt Zaehringer.  She is a national of the United States.

2560.   As a result of the October 11, 2010 attack and Sgt Zaehringer's injuries and death, each member of the Zaehringer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Zaehringer's society, companionship, and counsel.

**The Sonny C. Zimmerman Family**

2561.   Staff Sergeant Sonny C. Zimmerman served in Afghanistan as a member of the U.S. Army.  On July 15, 2013, SSG Zimmerman was injured in an attack involving a recoilless rifle in Paktia Province, Afghanistan.  SSG Zimmerman died on July 15, 2013 as a result of injuries sustained during the attack.

2562.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2563.   SSG Zimmerman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2564.   SSG Zimmerman was a national of the United States at the time of the attack and his death.

2565.   As a result of the attack, SSG Zimmerman was injured in his person and/or property.  The Plaintiff members of the Zimmerman Family are the survivors and/or heirs of SSG Zimmerman and are entitled to recover for the damages SSG Zimmerman sustained.

2566.   Plaintiff Chris Lee Zimmerman is the father of SSG Zimmerman.  He is a national of the United States.

2567.   Plaintiff Michelle Zimmerman is the mother of SSG Zimmerman.  She is a national of the United States.

2568.   Plaintiff Baily Zimmerman is the sister of SSG Zimmerman.  She is a national of the United States.

2569.   As a result of the July 15, 2013 attack and SSG Zimmerman's injuries and death, each member of the Zimmerman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Zimmerman's society, companionship, and counsel.

## CLAIMS FOR RELIEF

### COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339A Predicate]

2570.   Plaintiffs incorporate their factual allegations above.

2571.   Defendants provided material support to the Taliban and/or the Haqqani Network[604] in violation of 18 U.S.C. § 2339A.  They did so by making payments to the Taliban that financed the Taliban's terrorist attacks, and, in the case of MTN, by deactivating its transmission masts to assist the Taliban's counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan.  Defendants' payments took the form of currency or

---

[604] All references to the "Taliban" in Counts One through Six below are inclusive of the Haqqani Network, unless otherwise specified.  *See supra* Part V.A.2 (explaining that the Haqqani Network is part of the Taliban).  Attacks committed by the Taliban also include attacks committed by the Kabul Attack Network and joint Taliban-al-Qaeda cells, which definitionally reflect Taliban involvement.  *See supra* Parts V.A.3; V.B.3.

monetary instruments or financial securities, which qualified as material support under 18 U.S.C.

§ 2339A(b)(1).  MTN's manipulation of its cellular signals for the Taliban's benefit also

provided a service; assistance derived from scientific, technical, or other specialized knowledge;

communications equipment; facilities; and personnel (that is, the persons who carried out the

deactivation requests), which likewise qualified as material support.

2572.   Defendants knew or recklessly disregarded that their material support would be

used by the Taliban in the preparation for, or in carrying out, the destruction of U.S. property by

fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S.

employees performing official duties, hostage taking, damaging U.S. government property,

killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of

terrorism transcending national boundaries, bombing government facilities, financing terrorism,

and receiving training from FTOs.  Those acts by the Taliban, in turn, violated the criminal laws

of the United States, or would have violated those laws had they been committed within the

jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203,

1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  Defendants also

disguised the nature of their support, in further violation of 18 U.S.C. § 2339A.

2573.   Defendants' conduct, by providing material support to a group that was

committing terrorist acts against Americans, involved violent acts and acts dangerous to human

life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).[605]

Defendants' support for the Taliban appears, as an objective matter, to have been intended (a) to

---

[605] *See, e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010)
(violation of material-support statutes, even without any "subjective intent" to further terrorist
objectives, meets statutory definition of "international terrorism" based on such support's
"objective 'external appearance' "); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86,
106-07 (D.D.C. 2003) (similar).

intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2574.   Defendants' provision of material support to the Taliban occurred primarily outside the territorial jurisdiction of the United States.

2575.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2576.   As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339A, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT TWO:**  **VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)**
**[MTN Defendants:  Primary Liability, 18 U.S.C. § 2339B Predicate]**

2577.   Plaintiffs incorporate their factual allegations above.  Plaintiffs assert this count against the MTN Defendants only.

2578.   The MTN Defendants provided material support to the Haqqani Network in violation of 18 U.S.C. § 2339B.  MTN did so by making cash and in-kind payments to the Haqqani Network, and by deactivating its transmission masts to assist the Haqqani Network's counterintelligence activities and undermine U.S. counterinsurgency efforts.  MTN's protection payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1).  MTN's manipulation of its cellular signals for the Haqqani Network's benefit also provided the Haqqani Network with a service;

assistance derived from scientific, technical or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the deactivation requests), all of which likewise qualified as material support.  MTN further disguised the nature of its support, in further violation of 18 U.S.C. § 2339B.

2579.   The United States has designated the Haqqani Network as an FTO under 8 U.S.C. § 1189 since September 19, 2012.  At all times since that designation, MTN knew or recklessly disregarded that the Haqqani Network was a designated FTO and/or that the Haqqani Network had engaged in acts of terrorism against the United States.

2580.   MTN's conduct, by providing material support to a designated FTO, involved violent acts and acts dangerous to human life.  MTN's conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  MTN's support for the Haqqani Network appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2581.   MTN's provision of material support to the Haqqani Network occurred primarily outside the territorial jurisdiction of the United States.

2582.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of MTN's conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by MTN's conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2583.   As a result of MTN's violation of 18 U.S.C. §§ 2333(a) and 2339B, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339C Predicate]

2584.   Plaintiffs incorporate their factual allegations above.

2585.   Defendants, by making payments to the Taliban that financed the Taliban's terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A).  Defendants knew or recklessly disregarded that the Taliban would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

2586.   Defendants, by making payments to the Taliban that financed the Taliban's terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B).  Defendants knew or recklessly disregarded that the Taliban would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the Taliban's purpose was to intimidate the U.S. and Afghan populations and to compel the U.S. and Afghan governments to effect a withdrawal of U.S. forces from Afghanistan.

2587.   Defendants' provision of funds to the Taliban involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  Defendants' support for the Taliban appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United

States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2588.   Defendants' provision of funds to the Taliban occurred primarily outside the territorial jurisdiction of the United States.

2589.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2590.   As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### COUNT FOUR:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [U.S. Defendants:  Primary Liability, 50 U.S.C. § 1705(a) Predicate]

2591.   Plaintiffs incorporate their factual allegations above.  Plaintiffs assert this count against Centerra Group, LLC; DAI Global, LLC; Environmental Chemical Corporation; Janus Global Operations, LLC; Black & Veatch Special Projects Corporation; Louis Berger Group Inc.; Louis Berger International, Inc.; The Louis Berger Group Inc. / Black & Veatch Special Projects Corp. Joint Venture; Blumont, Inc.; Blumont Global Development, Inc.; International Relief and Development, Inc.; and Chemonics International, Inc. (together, the "U.S. Defendants").

2592.   On July 2, 2002, the United States designated the Taliban as a Specially Designated Global Terrorist under Executive Order 13224.  Because of that designation, 31 C.F.R. § 594.204(a) prohibited U.S. persons from contributing funds, goods, or services to the Taliban without authorization.  After the Taliban's designation, the U.S. Defendants willfully

violated § 594.204(a) by engaging in transactions with the Taliban, including by making contributions and provisions of funds, goods, or services to and for the benefit of the Taliban. The conduct was willful because the U.S. Defendants (as companies operating in Afghanistan) knew of the Taliban's SDGT designation, *see supra* Part V.A.1, and they knew that transactions with SDGTs were unlawful, *see supra* ¶¶ 128-130.  On information and belief, the U.S. Defendants also were not authorized to engage in any of this conduct.  The U.S. Defendants' conduct therefore violated 50 U.S.C. § 1705(a) and (c).

2593.   The U.S. Defendants' unlawful transactions with the Taliban involved violent acts and acts dangerous to human life.  The U.S. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  The U.S. Defendants' transactions with the Taliban appear, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2594.   The U.S. Defendants' transactions with the Taliban occurred primarily outside the territorial jurisdiction of the United States.

2595.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the U.S. Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the U.S. Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2596.   As a result of the U.S. Defendants' violation of 18 U.S.C. § 2333(a) and 50

U.S.C. § 1705(a) & (c), Plaintiffs are entitled to recover economic and non-economic damages,

including solatium damages.

## COUNT FIVE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
[All Defendants:  Aiding-And-Abetting Liability, Attack Predicate]

2597.   Plaintiffs incorporate their factual allegations above.

2598.   The terrorist attacks that killed or injured Plaintiffs or their family members were

acts of international terrorism committed by the Taliban, including the Haqqani Network.

2599.   The terrorist attacks committed by the Taliban, which killed or injured Plaintiffs

and their family members, were violent acts and acts dangerous to human life that violated the

criminal laws of the United States and many States, or would have violated those laws had they

been committed within the jurisdiction of the United States or of the States.  In particular, each

attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping,

and arson, in violation of state law; and the destruction of U.S. property by fire or explosive,

conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees

performing official duties, hostage taking, damaging U.S. government property, killing U.S.

nationals abroad, use of weapons of mass destruction, commission of acts of terrorism

transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C.

§§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

2600.   The Taliban's terrorist attacks appear to have been intended (a) to intimidate or

coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b)

to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and

coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by

mass destruction, assassination, and kidnapping.

2601.   The Taliban's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

2602.   Defendants aided and abetted and knowingly provided substantial assistance to the Taliban – and aided and abetted and knowingly provided substantial assistance to the Taliban's attacks on Plaintiffs – by making payments to the Taliban that financed those attacks, and, in the case of MTN, by deactivating its transmission masts to assist the Taliban's counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan.

2603.   The Taliban attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

2604.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by the Taliban.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2605.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT SIX:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants:  Aiding-and-Abetting Liability, RICO predicate]

2606.   Plaintiffs incorporate their factual allegations above.

2607.   From at least 2007 through 2016, terrorists from al-Qaeda conspired with Mullah Omar and others to conduct and maintain the Taliban as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Afghanistan.  Throughout that time, the Taliban was a group of associated individuals that functioned as a continuing unit, and the Taliban's

express purpose at all times included violence against, and the expulsion of, Americans in Afghanistan.  The Taliban engaged in, and its activities affected, foreign commerce.

2608.   From at least 2007 through 2016, Mullah Omar and other terrorists employed by or associated with the Taliban and al-Qaeda (including without limitation Sirajuddin Haqqani, Jalaluddin Haqqani, Mullah Baradar, Mawlawi Ahmad Bilal, and other terrorists described in this Complaint) have maintained interests in and conducted the affairs of the Taliban as an enterprise by engaging in a campaign to expel Americans from Afghanistan through crime and anti-American violence (the "Taliban-al-Qaeda Campaign").

2609.   Specifically, Mullah Omar and other terrorists employed by or associated with the Taliban and al-Qaeda conducted and participated in the conduct of the Taliban's affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  The same terrorists also maintained interests in and control of the Taliban (and conspired to do so) through this pattern of racketeering activity.

2610.   The Taliban-al-Qaeda Campaign was an act of international terrorism.  It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a

pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States.  The Taliban-al-Qaeda Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2611.   The Taliban-al-Qaeda Campaign occurred primarily outside the territorial jurisdiction of the United States.

2612.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Taliban-al-Qaeda Campaign.  Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Mullah Omar and other terrorists associated with the Taliban conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of the Taliban.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Taliban-al-Qaeda Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2613.   Defendants aided and abetted and knowingly provided substantial assistance to the Taliban, its members, and the Taliban-al-Qaeda Campaign.  Defendants did so by making payments to the Taliban that financed the Taliban's terrorist attacks, and, in the case of MTN, by deactivating its transmission masts to assist the Taliban's counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan.

2614.   The Taliban-al-Qaeda Campaign was committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

2615.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

2616.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

2617.   Plaintiffs request that the Court:

(a)   Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)   Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)   Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d)   Award Plaintiffs prejudgment interest; and

(e)   Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  June 5, 2020

Respectfully submitted,

*/s/ Joshua D. Branson*

Michael J. Gottlieb (D.C. Bar No. 974960)
Randall Jackson (D.C. Bar No. 490798)
Nicholas Reddick*
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
Tel: (202) 303-1000
Fax: (202) 303-2000
MGottlieb@willkie.com
RJackson@willkie.com
NReddick@willkie.com

Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Grace W. Knofczynski (D.C. Bar No. 15000407)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com

Randy D. Singer (D.C.D. Bar No. VA057)†
Rosalyn K. Singer (D.C.D. Bar No. VA063)
Kevin A. Hoffman (D.C. Bar No. 1044559)
Singer Davis, LLC
1209 Laskin Road
Virginia Beach, VA 23451
Tel: (757) 301-9995
Fax: (757) 233-1084
randy.singer@singerdavis.law
rosalyn.singer@singerdavis.law
kevin.hoffman@singerdavis.law

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*

---

* D.C. Bar application pending; California Bar No. 288779.  Practicing under the supervision of members of the D.C. Bar.

† Singer Davis, LLC is co-counsel for the Paresi and Wise Families.  *See supra* ¶¶ 1954-1965, 2526-2535.  Other counsel represent all Plaintiffs, including the Paresi and Wise Families.