**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AUGUST CABRERA, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 19-cv-3833-EGS-ZMF |
| BLACK & VEATCH SPECIAL PROJECTS CORPORATION, *et al.*, | JURY TRIAL DEMANDED |
| Defendants. | |

**OPPOSITION TO THE MTN DEFENDANTS'
<u>MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    A.  Legal Background ............................................................................................... 3

    B.  Factual Background ........................................................................................... 5

        1.  Protection money and the rise of the Taliban insurgency .......................... 5

        2.  MTN's financial and operational support for the Taliban ......................... 6

        3.  The nexus between MTN's conduct and the United States ....................... 9

STANDARD OF REVIEW ................................................................................................... 12

ARGUMENT ........................................................................................................................ 12

I.   PLAINTIFFS' ALLEGATIONS SUPPORT THE EXERCISE OF PERSONAL
     JURISDICTION OVER THE MTN DEFENDANTS .................................................. 12

    A.  MTN's Conduct Was Directed At The United States ...................................... 13

        1.  MTN directed its protection payments at the United States ................... 13

        2.  MTN directed its tower shutdowns at the United States .......................... 20

    B.  MTN's Support For The Taliban Relied On U.S. Contacts ............................ 21

        1.  MTN purposefully availed itself of the United States .............................. 22

        2.  MTN's U.S. contacts are "suit-related" ................................................ 27

        3.  The World Bank's status as an international organization does not divest the Court of
           jurisdiction ............................................................................................ 33

           a.  IFC and MIGA supply substantial U.S. contacts ............................. 33

           b.  The government-contacts exception is inapplicable ........................... 34

           c.  MTN's slippery-slope arguments are unpersuasive ........................... 36

    C.  Personal Jurisdiction Is Reasonable Because It Serves Vital Federal Interests ............... 38

    D.  Alternatively, Jurisdictional Discovery Is Warranted .................................... 39

II. PLAINTIFFS SUFFICIENTLY PLEAD CLAIMS UNDER THE ATA..............................40

    A.  Plaintiffs Sufficiently Plead Primary-Liability Claims.....................................41

    B.  Plaintiffs Sufficiently Plead Secondary-Liability Claims.................................42

CONCLUSION..............................................................................................................45

# TABLE OF AUTHORITIES[*]

Page(s)

**Cases**

*Adelson v. Hananel*, 652 F.3d 75 (1st Cir. 2011) ........................................................... 39

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64 (D.D.C. 2004) .................. 34, 37

*Air Crash over the S. Indian Ocean on Mar. 8, 2014, In re*,
  946 F.3d 607 (D.C. Cir. 2020) ...................................................................................37

*\*Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*,
  503 F.3d 544 (6th Cir. 2007) ........................................................... 22, 24, 25, 27, 30

*Akhmetshin v. Browder*, 407 F. Supp. 3d 11 (D.D.C. 2020)......................................... 35

*Am. Action Network, Inc. v. Cater Am., LLC*, 983 F. Supp. 2d 112 (D.D.C. 2013) .................... 26

*Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102 (1987) ........................................... 37, 38

*Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154 (D.D.C. 2014) ................. 12

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1 (1st Cir. 2009) ...................................... 27

*Atchley v. AstraZeneca UK Ltd.*, 2020 WL 4040345 (D.D.C. July 17, 2020),
  *appeal docketed*, No. 20-7077 (D.C. Cir. Aug. 21, 2020)....................................... 16

*Azzam v. Rightway Dev. Inc.*, 789 F. Supp. 2d 110 (D.D.C. 2011) ............................................... 17

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ............................ 12, 18, 19

*Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281 (D.C. Cir. 2011) .................................... 35

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) ........................ 41, 44

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773 (2017) ............................. 32, 33

*\*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)......................................................*passim*

*\*Calder v. Jones*, 465 U.S. 783 (1984).......................................................... 13, 14, 20, 21

*Carvalho, In re*, 598 B.R. 356 (D.D.C. 2019) ...............................................................41

---

[*] Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

iii

*Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, *In re*,
190 F. Supp. 3d 1100 (S.D. Fla. 2016) ("*Chiquita II*") ..................................................42, 44, 45

\*_Chiquita Brands Int'l, Inc._, *In re*,
284 F. Supp. 3d 1284 (S.D. Fla. 2018) ("*Chiquita III*") ....................................................41, 45

*Citadel Inv. Grp., L.L.C. v. Citadel Capital Co.*, 699 F. Supp. 2d 303 (D.D.C. 2010) ............... 23

*Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*,
640 F.3d 369 (D.C. Cir. 2011) ...................................................................................... 35

*Companhia Brasileira Carbureto de Calcio v. Applied Indus. Materials Corp.*,
35 A.3d 1127 (D.C. 2012) ............................................................................................ 35

*Concesionaria DHM, S.A. v. IFC*, 307 F. Supp. 2d 553 (S.D.N.Y. 2004) .................................. 34

*Covey Run, LLC v. Wash. Capital, LLC*, 196 F. Supp. 3d 87 (D.D.C. 2016)........................ 24, 25

\*_C.W. Downer & Co. v. Bioriginal Food & Sci. Corp._,
771 F.3d 59 (1st Cir. 2014).................................................................... 23, 24, 25, 38

*Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1 (D.D.C. 2003).................... 39-40

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010)........ 30

*Dooley v. United Tech. Corp.*, 786 F. Supp. 65 (D.D.C. 1992), *abrogated on other grounds by FC Inv. Grp. v. IFX Markets Ltd.*, 786 F. Supp. 65 (D.C. Cir. 2008)............. 24, 26

*Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008) ...................... 21

*Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237 (D.D.C. 2015)................................ 27

*Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115 (D.C. Cir. 2019)................................... 13

*Env. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808 (D.C. 1976) ............. 35

*Fandel v. Arabian Am. Oil Co.*, 345 F.2d 87 (D.C. Cir. 1965)..................................................... 34

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474 (E.D.N.Y. 2012)................................................... 36

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009).......................................4, 36, 37, 38

*Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005) ............................27

*Guidry v. U.S. Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999)...........................................................39

iv

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ........................................................42, 43, 44

*Helmer v. Doletskaya*, 393 F.3d 201 (D.C. Cir. 2004) ................................................................22, 36

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................................14, 39

*IFC v. GDK Sys., Inc.*, 711 F. Supp. 15 (D.D.C. 1989) .................................................................33

*IMAPizza, LLC v. AT Pizza Ltd.*, 334 F. Supp. 3d 95 (D.D.C. 2018) .........................................30

*Jam v. IFC*, 139 S. Ct. 759 (2019) ...............................................................................................27

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) .............................................................26

*Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) ................................................19, 20

*Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991) ................................................36

*Knox v. MetalForming, Inc.*, 914 F.3d 685 (1st Cir. 2019) ..........................................................22

*Kroger v. Legalbill.com LLC*, 2005 WL 4908968 (D.D.C. 2005)...........................................24, 26

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ...............30, 31

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) .....................................................42, 43, 44

*Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017) ..........................................................15

*Lufthansa Sys. Infratec GmbH v. Wi-SKY Inflight, Inc.*,
   2011 WL 862314 (E.D. Va. Mar. 9, 2011) ................................................................................23

*Maryland Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80 (D.D.C. 2019) .................26

*Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857 (9th Cir. 2003) ........................28, 38, 39

*Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353 (7th Cir. 1996)...................27

*Millicom Int'l Cell. S.A. v. Rep. of Costa Rica*, 995 F. Supp. 14 (D.D.C. 1998)...........................33

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006)...............................................................14

*Mullins v. TestAmerica, Inc.*, 564 F.3d 386 (5th Cir. 2009) ........................................................21

*\*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005)...............................................12, 13, 18, 20, 35

*Myers v. Casino Queen, Inc.*, 689 F.3d 904 (8th Cir. 2012)........................................................30

*Nat'l Cmty. Reinvestment Coalition v. Accredited Home Lenders Holding Co.*,
  573 F. Supp. 2d 70 (D.D.C. 2008) ............................................................39

*Nat'l Patent Dev. Corp. v. TJ Smith & Nephew Ltd.*,
  877 F.2d 1003 (D.C. Cir. 1989) ...............................................35, 36, 37

*Nat'l Women's Political Caucus, Inc. v. Metro. Louisville Women's
  Political Caucus, Inc.*, 359 F. Supp. 3d 13 (D.D.C. 2019) .....................12, 17, 18, 25

*Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708 (1st Cir. 1996) ........................................31

*Nuevos Destinos, LLC v. Peck*, 2019 WL 78780 (D.D.C. Jan. 2, 2019) ........................23

*\*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007) .................................29, 30, 31

*Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) ............................16

*Okolie v. Future Servs. Gen. Trading & Contracting Co.*,
  102 F. Supp. 3d 172 (D.D.C. 2015) ............................................................31

*Overseas Partners, Inc. v. Progen*, 15 F. Supp. 2d 47 (D.D.C. 1998) ....................................23, 25

*Owens v. Rep. of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) ..............................................44

*Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1 (1st Cir. 2018) .................................25

*Prejean v. Sonatrach, Inc.*, 652 F.2d 1260 (5th Cir. 1981) ...........................................31

*Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270 (10th Cir. 2005)..................................22, 39

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003).............39

*Relman, Dane & Colfax PLLC v. Fair Hous. Council of San Fernando Valley*,
  2019 WL 3779901 (D.D.C. Aug. 12, 2019) .........................................27

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016)....................................37

*Rose v. Silver*, 394 A.2d 1368 (D.C. 1978).................................................35

*SEC v. Lines Overseas Mgmt., Ltd.*, 2005 WL 3627141, at *6 (D.D.C. 2005) .............................25

*Singh v. Mukasey*, 543 F.3d 1 (1st Cir. 2008)..............................................17

*Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927 (D.C. Cir. 1982)................................35, 36

*Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..........................32

*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*,
   563 F.3d 1285 (Fed Cir. 2009) ........................................................................38, 39

*Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904 (N.D. Cal. 2018)............................................43, 44

*Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010)......................................................................21

*Terrorist Attacks on Sept. 11, 2011, In re*,
   538 F.3d 71 (2d Cir. 2008) ......................................................................................15

*In re Terrorist Attacks on Sept. 11, 2001, In re*,
   714 F.3d 659 (2d Cir. 2013) ..............................................................13, 15, 16, 40

*Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013)....................................................25

*Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15 (D.D.C. 2017).......................................27

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010)...........................................................................31, 35

*U.S. OPM Data Sec. Breach Litig., In re*, 928 F.3d 42 (D.C. Cir. 2019) ......................................17

*uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421 (7th Cir. 2010)............................................29, 30

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
   779 F. App'x 66 (2d Cir. 2019..........................................................................16, 40

*United States v. Fairchild*, 122 F.3d 605 (8th Cir. 1997) ...............................................................17

*United States v. Haipe*, 769 F.3d 1189 (D.C. Cir. 2014) ................................................................42

*United States v. Shabban*, 612 F.3d 693 (D.C. Cir. 2010) ..............................................................17

*Urquhart-Bradley v. Mobley*, 964 F.3d 36 (D.C. Cir. 2020) .............................................. *passim*

*Walden v. Fiore*, 571 U.S. 277 (2014)............................................................................13, 14, 15

*Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016).........................................................14, 29, 30

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014)...........................................17

*Wellness Publ'g v. Barefoot*, 128 F. App'x 266 (3d Cir. 2005)...................................................21

*World Wide Travel Inc. v. Travelmate US, Inc.*, 6 F. Supp. 3d 1 (D.D.C. 2013) ...................22, 27

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)...............................................38

*Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010) ...................................................14

*Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*,
    2016 WL 1367734 (D.D.C. Apr. 4, 2016) ...........................................................................23, 26

*Xie v. Sklover & Co.*, 260 F. Supp. 3d 30 (D.D.C. 2017) ...................................................22, 24, 40

**Statutes, Codes, and Rules**

Justice Against Sponsors of Terrorism Act ("JASTA"),
    Pub. L. No. 114-222, 130 Stat. 852 (2016) ......................................................................... 4

        § 2(a) .......................................................................................................................... 38

        § 2(a)(6) .......................................................................................................... 4, 14, 15

        § 2(b) ...................................................................................................... 4, 14, 15, 44

18 U.S.C. § 2331(1) .................................................................................................................. 41

18 U.S.C. § 2331(1)(B) ............................................................................................................ 41

18 U.S.C. § 2331(1)(C) ............................................................................................................ 37

18 U.S.C. § 2333 ...................................................................................................................... 38

18 U.S.C. § 2333(a) ......................................................................................................... 4, 37, 41

18 U.S.C. § 2333(d)(2) ............................................................................................................ 45

18 U.S.C. § 2334 ...................................................................................................................... 4

18 U.S.C. § 2334(a) .................................................................................................................. 38

18 U.S.C. § 2334(d) .................................................................................................................. 4

18 U.S.C. § 2338 ...................................................................................................................... 4

22 U.S.C. § 282f ....................................................................................................................... 33

22 U.S.C. § 288a(a) .................................................................................................................. 33

22 U.S.C. § 290k-9 ................................................................................................................... 33

Fed. R. Civ. P. 4(k)(2) .............................................................................................................. 12

Fed. R. Civ. P. 4(k)(2)(A) ......................................................................................................... 12

Fed. R. Civ. P. 4(k)(2)(B) ......................................................................................................... 12

Fed R. Civ. P. 12(b)(2)................................................................................................17

Fed R. Civ. P. 12(b)(6)................................................................................................12

D.C. Code § 13-423 ....................................................................................................12

**Other Authorities, Legislative Materials**

Anti-Terrorism Act, H.R. Rep. 102-1040 (1992) .......................................................3, 4

Anti-Terrorism Act, S. Rep. No. 102-342 (1992)......................................................3, 4

Amicus Br. of U.S. Senators Charles E. Grassley *et al.*, *Sokolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Apr. 6, 2017), 2017 WL 1291691....................................4

## INTRODUCTION

For more than a decade, MTN has been integral to the Taliban's terrorist campaign against Americans in Afghanistan.[1]  It entered the Afghan market in 2006, in the midst of an escalating insurgency, and it soon grew to become the country's dominant mobile-phone provider.  Its expansion strategy was simple:  MTN bought its way into dangerous areas of Afghanistan by paying the Taliban to protect it.  It also deactivated its cell towers at the Taliban's behest, switching off parts of its network at night to obstruct the U.S. military operations that depended on active cell signals.  Both decisions contributed substantially to the Taliban's terrorist insurgency.  As MTN understood, the money and operational support it gave the Taliban – at a scale unrivaled by any other Western company – helped the terrorists kill and maim thousands of Americans.  Plaintiffs and their family members are among the victims.

This case seeks to hold MTN accountable in an American court for the American deaths it caused.  The claims arise under the Anti-Terrorism Act ("ATA"), which Congress enacted – and imbued with broad jurisdictional and venue provisions – to ensure that U.S. courts would hear cases just like this.  Indeed, Congress found that extraterritorial civil jurisdiction over such cases is vital to U.S. national security.  MTN's conduct illustrates why.  MTN gave the Taliban enough money to fund every terrorist attack in this case many times over, and MTN intentionally manipulated its network to prevent the U.S. military from interdicting those attacks.  That conduct offends the core of the ATA and entitles Plaintiffs – Gold Star Families and wounded American service members who suffered as a result – to seek relief against MTN in a U.S. court.

Denouncing this case as "legal imperialism," Dkt. 102-1 ("Mot.") at 19, MTN insists that

---

[1] As in the Amended Complaint (Dkt. 82, "AC"), "MTN" means the three MTN Defendants. AC ¶¶ 28-30, 290.  All participated in the unlawful conduct described below.  AC ¶¶ 286-90, 330-33.  Unless otherwise specified, all internal quotations, brackets, and emphases are omitted.

the Due Process Clause overrides Congress's judgment here. Because the terrorists whom MTN aided were located in Afghanistan, MTN argues, its support for those terrorists did not create the minimum contacts with the United States necessary to expose it to suit in a U.S. court.

That argument fails under any reasonable reading of the Due Process Clause. *First*, MTN's conduct falls within the traditional rule that a tortfeasor is subject to jurisdiction in any forum that its conduct targets. Both MTN's protection payments and tower shutdowns were targeted at the United States and caused tortious effects in this forum. That is sufficient under the Supreme Court's "effects" test for personal jurisdiction. For the protection payments, MTN says that the Taliban (rather than MTN itself) targeted the United States, but it relies on cases involving *indirect* payments. It ignores the settled principle that *direct* payments to terrorists expose the funder to jurisdiction in U.S. courts. As for the tower shutdowns, MTN says essentially nothing at all. Nor could it: because MTN (not the Taliban) shut down the cell towers to hinder U.S. operations, MTN is subject to jurisdiction even under its own test.

MTN also harbored anti-American motives in supporting the Taliban, which further supports (though is unnecessary to) effects-based jurisdiction. The most prominent reason is MTN's alliance with Iran. Iran is MTN's most important business partner, and MTN has worked closely with the IRGC for years. At the same time, the IRGC was cultivating the Taliban's terrorist insurgency with the aim of killing Americans in Afghanistan. MTN's Iranian ties gave it all the more reason to back the terrorist aims of Iran's Afghan proxy. MTN professes outrage at these allegations, but its evidence-free responses at best raise fact issues for trial.

*Second*, MTN also "purposefully availed" itself of the United States by obtaining funding and insurance guarantees from U.S.-based arms of the World Bank. In doing so, MTN reached out to the United States and engaged in repeated communications with U.S.-based personnel.

Those U.S. contacts were not coincidental; they were prerequisites to its protection payments and funded the very cell towers that MTN manipulated to support the Taliban. MTN even signed contracts (and made written certifications) promising U.S. personnel it would *not* support the Taliban. MTN's response – that only the physical delivery of cash to the Taliban in Afghanistan counts as "suit-related" conduct – is legally unsound and would effectively eliminate U.S. jurisdiction over terrorist funders. The Court should recognize and reject MTN's argument for what it is: an attempt to enshrine a rule that a foreign company can obtain U.S. financing, use the financing to support terrorist attacks on Americans, and face no accountability for doing so.

In the end, MTN's position rests mostly on rhetorical umbrage, about how "shocking" and "offensive" and "breathtaking" and "outrageous" the allegations are. Mot. 3, 9, 19, 25. The adjectives are apt, but not for the reason MTN suggests. It is indeed outrageous that a public company would partner with Iran, become Afghanistan's largest mobile-phone provider, and use its position to support terrorists responsible for thousands of American deaths. And it is equally outrageous that a company would do those things while insisting it cannot even be called into an American court. No other forum is available to Plaintiffs. That is, of course, why MTN devotes 36 pages to jurisdiction: to try to dodge the only forum in which it will ever face accountability. The Constitution does not support that outcome. The motion to dismiss should be denied.

## BACKGROUND

### A.    Legal Background

Congress enacted the ATA in 1992 to "provid[e] victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories." S. Rep. No. 102-342, at 22 (1992). Congress had recently solved a similar problem in the criminal law, enacting a " 'long-arm' statute" to confer "criminal jurisdiction [over] acts of international terrorism" around the world. H.R. Rep. 102-1040, at 5 (1992). The ATA built on its criminal counterpart

and fulfilled the "need for a companion civil legal cause of action." *Id*.  Congress determined

that the "extension of civil jurisdiction" to terrorism cases was necessary to fill a damaging "gap

in our efforts to develop a comprehensive legal response to international terrorism." *Id*.

The ATA achieved that objective by providing a "cause of action for American victims of

terrorism." *Id*.; *see* 18 U.S.C. § 2333(a).  Congress imbued the ATA with broad jurisdictional

and venue provisions, 18 U.S.C. §§ 2334(a), 2338, designed to "extend[] the same jurisdictional

structure that undergirds the reach of American criminal law to the civil remedies that it defines,"

S. Rep. No. 102-342, at 45.  Congress also barred *forum non conveniens* arguments, 18 U.S.C.

§ 2334(d), which further ensured that Americans harmed by terrorism can pursue "broad

remedies in a procedurally privileged U.S. forum," *Goldberg v. UBS AG*, 660 F. Supp. 2d 410,

422 (E.D.N.Y. 2009).  Those features reflected Congress's view that "vital interests in protecting

U.S. nationals and combating terrorism are linked directly to the assertion of jurisdiction over

ATA civil claims."  Amicus Br. of U.S. Senators Charles E. Grassley *et al.* at 7, *Sokolow v.

Palestine Liberation Org.*, No. 16-1071 (U.S. Apr. 6, 2017), 2017 WL 1291691 ("Grassley Br.").

Congress reaffirmed its view in the Justice Against Sponsors of Terrorism Act

("JASTA"), which expanded ATA liability.  *See* Pub. L. No. 114-222, 130 Stat. 852 (2016).

JASTA found that entities that "contribute material support or resources" to terrorists that attack

Americans "necessarily direct their conduct at the United States, and should reasonably

anticipate being brought to court" here.  *Id*. § 2(a)(6).  JASTA's "purpose" was "to provide civil

litigants with the broadest possible basis, consistent with the Constitution of the United States, to

seek relief against" companies that give "support, directly or indirectly, to foreign [terrorists]."

*Id*. § 2(b).  Those findings confirm "Congress's considered judgment" that personal "jurisdiction

over ATA claims is appropriate and consistent with the Due Process Clause."  Grassley Br. at 4.

**B.      Factual Background**

**1.      Protection money and the rise of the Taliban insurgency**

Before September 11, 2001, the Taliban wielded de-facto control over wide swaths of Afghanistan.  AC ¶¶ 40-42.  In October 2001, in response to the 9/11 terrorist attacks, the U.S. military invaded Afghanistan and removed the Taliban from power.  AC ¶ 44.  Defeated on the battlefield, the Taliban leadership fled to Pakistan while its fighters dispersed into the Afghan countryside.  AC ¶ 45.  From there, the Taliban began plotting a terrorist campaign to attack the United States and the democratic Afghan government it was trying to build.  AC ¶¶ 46-49.

The Taliban's terrorist insurgency grew rapidly in scope and lethality.  AC ¶¶ 50-52.  By 2006, the Taliban was seizing control of many areas of Afghanistan, and by 2009 it had installed "shadow" governments in 33 of the country's 34 provinces.  AC ¶ 63.  As its power grew, so did its need for money.  AC ¶ 97.  Funding was the lifeblood of the Taliban's insurgency, and corporate protection money supplied an especially useful form of terrorist finance.  AC ¶¶ 98-111.  The Taliban habitually used threats to extract protection payments from international companies doing business in areas of Afghanistan that it controlled or influenced.  AC ¶¶ 63, 72-83.  Those payments financed the Taliban's terrorist operations and translated directly into weapons, explosives, and fighters it used to kill and wound Americans.  AC ¶¶ 97-106.

The results were tragic.  What MTN brands (at 20, 42) a "civil war" was actually the world's deadliest terrorist group – at all times designated as a Specially Designated Global Terrorist by the U.S. government, AC ¶ 417 – massacring thousands of people, AC ¶¶ 51-52, 431-37.  Taliban fighters targeted Americans in particular, with the goal of coercing the United States into leaving the country.  AC ¶¶ 431-32.  It also murdered civilians, tortured its enemies, and refused to comply with the Geneva Conventions.  AC ¶¶ 433-44.  All told, the Taliban killed more than 1,500 Americans, wounded roughly 20,000 more, and inflicted pain on their families

in the United States.  AC ¶ 51.  Plaintiffs are among its many victims.  AC ¶¶ 522-2569.

### 2. MTN's financial and operational support for the Taliban

**a.** MTN is a South African mobile-phone provider that operates predominantly in markets plagued by violence.  AC ¶¶ 286-91.  As the Taliban spread in Afghanistan, so did MTN.  Although MTN came late to Afghanistan in 2006 as the third market entrant, it rapidly surpassed the two incumbents to become Afghanistan's largest cell provider.  AC ¶¶ 292, 303.  As MTN and the Taliban grew in parallel, MTN became a key source of financing for the terrorists.  AC ¶¶ 293-97.  The Taliban was adept at extracting protection payments from cell-phone companies:  it threatened to attack towers and other equipment – imposing economic costs on the companies – unless they supplied the Taliban with cash to fund its insurgency.  AC ¶¶ 293-94, 338.  Unlike some of its competitors (but like certain others), MTN made a business decision to pay the Taliban.  AC ¶¶ 294-98, 305.  The going rate was $2,000 per tower per month, and at that rate MTN paid the terrorists more than $100 million in total.  AC ¶¶ 294, 307.

MTN was a prolific Taliban donor.  AC ¶¶ 297-305.  More so than its competitors, MTN bought its way into Taliban-controlled areas by paying off the terrorists who might otherwise threaten its infrastructure.  AC ¶¶ 297, 303-04.  It even negotiated many of those payments in direct conversations with Taliban commanders.  AC ¶¶ 299, 335.  From 2007-2014, for example, one high-ranking MTN official held at least 38 recorded telephone negotiations with the Taliban to set the terms of their so-called "security coordination."  AC ¶ 299.  Aware that those discussions were illegal, MTN often conducted them in secret from the roof of its Kabul headquarters.  *Id*.  Other times it traveled to Pakistan to meet Taliban leaders in person.  *Id*.  The resulting payments were confirmed not only by open-source accounts, AC ¶¶ 294-98, but also by U.S. intelligence reporting based on informants and wire intercepts, AC ¶ 300.  In several interviews with U.S. interrogators, MTN employees admitted to the payoffs.  AC ¶¶ 297-98.

6

MTN's protection payments worked as intended. Because of its support for the Taliban, MTN faced far fewer Taliban attacks than its competitors and saved significantly on security expenses. AC ¶¶ 304-05. In the words of an MTN Afghanistan executive, MTN was "not a target" for the Taliban: to avoid terrorist attack, he claimed, "it's enough for a driver to show at a Taliban checkpoint a company letter stating that equipment aboard the truck belongs to MTN and not to the U.S. forces." AC ¶ 298. Indeed, MTN positioned itself as the Taliban's preferred mobile-phone provider. AC ¶ 303. The Taliban was thus content to focus its attacks on MTN's competitors while allowing MTN to seize additional market share. AC ¶¶ 297-98, 303-05.

**b.** MTN's support for the Taliban also extended beyond the financial. From 2008 onward, MTN not only paid money to the Taliban; it also deactivated its cell towers at night when the Taliban asked it to do so. AC ¶¶ 7, 308-21. The Taliban determined early on that the United States was "misusing the cell towers for [its] intelligence works." AC ¶ 308. Nighttime cell service posed a major tactical problem for the terrorists: Afghan civilians used the cover of darkness to call Coalition tip lines with vital human intelligence, and U.S. (and Coalition) forces used the Taliban's cell signals at night to track terrorists for special-operations raids. AC ¶ 315. Both were integral to U.S. counterinsurgency strategy in Afghanistan. AC ¶¶ 315-21.

Nighttime deactivation solved those problems for the Taliban. Realizing that U.S. forces were using the terrorists' cell phones against it, the Taliban asked cell companies to switch off their signals at night. AC ¶¶ 308, 316-17. MTN openly agreed. AC ¶¶ 309-14. For U.S. forces, the results were devastating. AC ¶¶ 315-19. MTN's shutdowns occurred at times and locations calibrated to benefit Taliban fighters, and MTN knew the shutdowns directly undermined U.S. efforts to interdict the terrorist operations that killed and injured U.S. service members. AC ¶¶ 315, 318-21. U.S. military leadership thus viewed the shutdowns as a grave threat to U.S.

strategy and pressured MTN (including via President Karzai) to stop.  AC ¶¶ 311, 320-21.  But MTN refused.  Its rationale, according to an MTN Afghanistan executive, was that MTN could not "afford to be seen as siding with the Afghan government against the Taliban . . . [Y]ou have to prove in words and in deeds that you are neutral."  AC ¶¶ 7, 310.

MTN was not neutral.  It coordinated its shutdowns directly with the terrorists.  The Taliban fed precise instructions to MTN security personnel that pinpointed the specific quadrants within MTN's coverage areas where Taliban fighters were located.  AC ¶ 313.  The geographic pinpointing enabled MTN to black out the signal in those quadrants while leaving its signal active elsewhere – thereby maximizing the benefit to the Taliban without alerting the Afghan government.  *Id*.  MTN's security and technical teams then worked together to implement the Taliban's instructions.  *Id.*  Realizing this was illegal and wanting to avoid a paper trail, MTN shied away from documenting the shutdowns in emails and instead coordinated them through phone calls and text messages.  *Id*.  That conduct again redounded to MTN's financial benefit.  AC ¶¶ 292, 304, 312.  By deactivating its network in the manner prescribed by the Taliban, MTN improved its standing with the terrorists, further reduced the threat to its towers, and obviated the need to invest in expensive security to protect its infrastructure in insecure areas.  AC ¶ 312.

The U.S. military vehemently rejected those "benefits" as acceptable reasons for MTN's protection payments or tower shutdowns.  AC ¶¶ 302, 321.  Even so, the military came up with a plan in 2009 to host the companies' cell towers on secure military bases, where they would be safe from Taliban attack.  AC ¶¶ 320, 338.  The idea was to eliminate the putative incentive for MTN (and, to a lesser extent, other companies) to pay protection money, and MTN's competitors were "keen to develop this partnership with the USG."  AC ¶ 320.  MTN had different ideas.  When the U.S. government brokered a meeting to discuss the plan, MTN refused to attend.  *Id*.

    **c.**      MTN's illegal conduct in Afghanistan reflected its broader business model. AC ¶¶ 322-29. MTN has long profited from instability and autocracy: it does best, and gains market share the fastest, in countries plagued by political violence. AC ¶¶ 339-41. Iran is the most notorious example. AC ¶ 343. In 2005, MTN entered a joint venture pledging "defensive, security and political cooperation" with an array of Iranian state partners. AC ¶ 323. Those partners were IRGC fronts, AC ¶ 342, and MTN secured their business by bribing an Iranian defense official, AC ¶¶ 322-26. Through that venture, MTN became the IRGC's most important telecommunications partner. AC ¶ 324. As in Afghanistan, MTN has switched off its towers in Iran at the IRGC's behest, in the latter case to help the regime quash dissent. AC ¶ 343.

    Today, the IRGC is designated as an FTO and recognized as the world's worst sponsor of terrorism. AC ¶¶ 325, 344. At all relevant times, Iran's government has publicly sponsored the Taliban's insurgency with the aim of causing terrorist attacks on Americans in Afghanistan. AC ¶ 345. While MTN's partner was actively sponsoring anti-American terrorists in Afghanistan, MTN was providing the same terrorists with vital financial and operational aid. AC ¶¶ 291-321.

    All this gave MTN added motivation for helping the Taliban. AC ¶¶ 337-46. As with many terrorist financiers, MTN's motives were multifaceted, and Taliban threats surely played a role in its cooperation. AC ¶¶ 294, 310. But MTN also wanted the Taliban to succeed. Aligning itself with the Taliban (while claiming "neutrality," AC ¶ 311) served MTN's interests by directing the terrorists' attacks onto U.S. forces. AC ¶ 338. Terrorist violence also stoked the sort of political instability in which MTN has long thrived. AC ¶¶ 339-41. And helping the Taliban attack Americans strengthened MTN's bond with its Iranian patron. AC ¶¶ 342-46.

        **3.**      **The nexus between MTN's conduct and the United States**

    MTN's support for the Taliban inflicted pain on U.S. service members and their families back home. But MTN also tied its conduct to the United States in other ways. AC ¶¶ 347-76.

MTN Group was the architect of both the ties and the conduct.  AC ¶¶ 330-33.  MTN Group

oversaw MTN Afghanistan's operations and approved its policy of paying the Taliban and

shutting down towers.  AC ¶¶ 306, 314, 332-33.  It also sought U.S. backing for the operations

those payments and shutdowns protected.  AC ¶ 347.  That backing took the form of multiple

D.C.-based contracts executed by MTN Group or its subsidiary, MTN Dubai.[2]  AC ¶¶ 348-68.

First, MTN obtained two contracts for debt and equity financing from the International

Finance Corporation ("IFC"), a D.C.-based arm of the World Bank.  AC ¶¶ 348-57.  The initial

facility totaled $45 million and was disbursed beginning in 2006, when MTN entered the market.

AC ¶ 348.  In 2009, MTN Group returned to IFC and executed another contract for an additional

$75 million.  AC ¶¶ 304-05, 309, 349.  Both facilities supplied funds MTN used to pay the

Taliban and to build the cell towers that it then manipulated for the Taliban's benefit.  *Id*.; *see*

AC ¶ 353.  That money itself was crucial – MTN lacked other funding options – and so was the

legitimacy conveyed by World Bank backing for MTN's operations.  AC ¶¶ 371-73, 376.

Second, MTN Group obtained coverage guarantees from the Multilateral Investment

Guarantee Agency ("MIGA"), another D.C.-based arm of the World Bank.  AC ¶¶ 358-68.

MTN Group executed two contracts with MIGA, while MTN Dubai executed a third.  AC

¶¶ 358-61.  Those contracts provided MTN Afghanistan with insurance coverage from 2007

through at least 2015.  AC ¶ 373.  As with the IFC financing, MIGA coverage offered substantial

value to MTN and was a key driver of its expansion throughout Afghanistan.  AC ¶¶ 371-76.

The IFC and MIGA contracts entailed extensive contact with the United States.  MTN

solicited each deal by reaching into the District of Columbia to initiate negotiations.  AC ¶¶ 350,

---

[2] MTN Dubai was a shell company created for tax purposes.  AC ¶ 289.  MTN Group used
MTN Dubai to execute one of the U.S. financing deals, through which MTN Dubai assumed
responsibility for and participated in MTN Afghanistan's tortious conduct.  AC ¶¶ 289, 366-67.

361.  It then communicated regularly with D.C.-based personnel by phone and in writing; received money from and paid premiums to U.S. bank accounts; and sent monthly certifications to D.C. verifying it was *not* providing material support to the Taliban.  AC ¶¶ 350-68.  The IFC contracts further contained U.S. venue clauses in which MTN Group consented to be sued in U.S. courts.  AC ¶ 352.  The MIGA contracts, for their part, stated they were "deemed made in Washington, DC" and provided for dispute resolution "in Washington, DC."  AC ¶ 362.

Those U.S. contacts were no coincidence.  IFC's and MIGA's U.S. location – and strong backing from the U.S. government – were key to the value proposition they offered to MTN.  AC ¶ 375.  MTN intentionally derived an array of benefits from its association with its U.S.-based funders, and the U.S location formed part of its motivation for soliciting their support.  AC ¶¶ 371-76.  Given IFC's and MIGA's alignment with U.S. counterinsurgency policy in Afghanistan, AC ¶¶ 368-70, however, their support came with a price:  MTN had to promise that it would not aid terrorists, AC ¶¶ 355-56, 366-67.  MTN breached that promise and instead used IFC's and MIGA's backing to finance and legitimize its support for the Taliban.  AC ¶ 376.

## C.    Plaintiffs' Claims

Plaintiffs are U.S. citizens (or their family members) who were killed or injured between 2009 and 2017 by the Taliban.  AC ¶¶ 1, 17.  They are U.S. service members who served in Afghanistan to stabilize the country, U.S. civilians working on security or reconstruction projects, and the family members of both.  AC ¶¶ 522-2569.  They were killed and injured in a gruesome wave of terrorist attacks involving suicide bombings, IEDs, kidnappings, and other tactics.  *E.g.*, AC ¶¶ 524, 550, 1522.  Every Plaintiff asserts three primary-liability (AC ¶¶ 2570-90) and two aiding-abetting claims (AC ¶¶ 2597-2615) against MTN under the ATA.

## STANDARD OF REVIEW

On a motion to dismiss for lack of personal jurisdiction, the court credits Plaintiffs'

allegations and draws reasonable inferences in their favor.  *Urquhart-Bradley v. Mobley*, 964

F.3d 36, 40 n.2 (D.C. Cir. 2020).  All jurisdictional facts in the Complaint "must be accepted as

true unless they are directly contradicted by an affidavit, which here they are not."  *Nat'l*

*Women's Political Caucus, Inc. v. Metro. Louisville Women's Political Caucus, Inc.*, 359 F.

Supp. 3d 13, 21 (D.D.C. 2019) ("*NWPC*").  The Court should "consider all allegations of

jurisdictional facts in a light most favorable to the assertion of personal jurisdiction."  *Associated*

*Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 161 (D.D.C. 2014).

The standard under Rule 12(b)(6) is similar.  The Court again accepts Plaintiffs'

allegations and affords them all reasonable inferences.  *Banneker Ventures, LLC v. Graham*, 798

F.3d 1119, 1129 (D.C. Cir. 2015).  Plaintiffs need not proffer "detailed factual allegations," but

need allege enough "factual matter" to state a "claim to relief that is plausible on its face."  *Id*.

## ARGUMENT

## I.    PLAINTIFFS' ALLEGATIONS SUPPORT THE EXERCISE OF PERSONAL JURISDICTION OVER THE MTN DEFENDANTS

Personal jurisdiction over MTN arises under the federal long-arm statute, which confers

jurisdiction over federal-law claims as to defendants that are "not subject to jurisdiction in any

state's courts of general jurisdiction."  Fed. R. Civ. P. 4(k)(2)(A).  That rule relieves Plaintiffs of

the need – present in most cases in this District – to establish that MTN meets the requirements

of D.C.'s local long-arm statute.  *Compare* D.C. Code § 13-423, *with Mwani v. bin Laden*, 417

F.3d 1, 10-11 (D.C. Cir. 2005) (explaining Rule 4(k)(2)).  Rather, personal jurisdiction under

Rule 4(k)(2)(B) is warranted so long as it comports with the "United States Constitution."

Personal jurisdiction satisfies constitutional due process if "there are 'minimum contacts'

12

between the defendant and the forum such that the defendant should reasonably anticipate being haled into court there." *Urquhart-Bradley*, 964 F.3d at 44. In the typical case involving D.C.'s long-arm statute, the relevant "forum" is the District itself. *Id*. at 48-49. But here, because Plaintiffs' claims arise under federal law and invoke Rule 4(k)(2), the forum is the "United States as a whole." *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019).

### A.    MTN's Conduct Was Directed At The United States

The first way a defendant can establish "minimum contacts" is by engaging in "malignant actions directed at and felt in [the] forum." *Mwani*, 417 F.3d at 13. Under that principle, "*physical* contacts" with the United States are unnecessary. *Id*. at 12-13. A defendant that acts entirely outside the forum subjects itself to jurisdiction when the "effects" of its tortious conduct are "expressly aimed" at the forum such that it should "reasonably anticipate being haled into court there." *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). Injuring "a forum resident" alone is insufficient; "the effects of [the] conduct" must be "connected to the forum" itself. *Walden v. Fiore*, 571 U.S. 277, 290 (2014); *see Calder*, 465 U.S. at 789 ("Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."). Here, MTN aimed its conduct at the United States in two ways, either of which is sufficient.

### 1.    MTN directed its protection payments at the United States

**a.**    MTN directed its conduct at the United States by making protection payments it knew would facilitate attacks targeting U.S. citizens. AC ¶¶ 334-35. The attacks that MTN financed intentionally targeted Plaintiffs in an effort to terrorize the United States into leaving Afghanistan. AC ¶¶ 334, 338, 431-32, 522. Those attacks were designed to, and did, "cause pain and sow terror in [Plaintiffs'] home country." *Mwani*, 417 F.3d at 13. By purposefully funding such attacks, MTN subjected itself to jurisdiction here. *See In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 678-79 (2d Cir. 2013) (extending jurisdiction to defendants that

13

provided "support *directly* to al Qaeda when al Qaeda allegedly was known to be targeting the United States"); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 34 (D.D.C. 2010) ("[w]here a bank has knowledge that it is funding terrorists . . . contacts created by such funding can support [personal jurisdiction]"); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006) (holding that "effects doctrine" provides jurisdiction over defendants that provide terrorist "financing").

The resulting contacts were "with the forum" rather than just "persons who reside there." *Walden*, 571 U.S. at 285 (no jurisdiction where sole contact was with Nevada resident whose residency was coincidental). The attacks MTN funded were not "indiscriminate" attacks that injured Americans by chance; they "were specifically targeted against [U.S.] citizens" and designed to influence U.S. policy. *Waldman v. PLO*, 835 F.3d 317, 338-39 (2d Cir. 2016); *see* AC ¶¶ 334, 431. Unlike in cases where personal jurisdiction has failed, then, MTN supported attacks that were "indisputably aimed to kill Americans." *Klieman*, 923 F.3d at 1126. In such circumstances, " 'the relationship among the defendant, th[is] forum, and the litigation' " is overwhelming. *Walden*, 571 U.S. at 291 (quoting *Calder*, 465 U.S. at 788).

That conclusion accords with Congress's findings. Congress found that entities that "directly or indirectly" fund terrorism "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States." JASTA § 2(a)(6). MTN did just that by making direct payments to the Taliban, thus funding the Taliban's terrorist attacks. AC ¶¶ 291-307. Congress's judgment that MTN "direct[ed] [its] conduct" at this forum, JASTA § 2(b), merits substantial weight. Courts widely defer to the political branches' "national security and foreign policy" judgments, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) ("*HLP*"), and Congress here reached the judgment that MTN's support for the Taliban "connects [its conduct] to the forum" in a meaningful way, *Walden*, 571 U.S. at 290; *see*

*Livnat v. Palestinian Auth.*, 851 F.3d 45, 56 (D.C. Cir. 2017) ("congressional interests may be relevant to . . . due-process standards"). This Court should respect that determination and require MTN to answer in an American court for the American deaths it caused.

**b.** MTN's attempt (at 15-17) to shift those jurisdictional contacts to the Taliban is unpersuasive. The ATA's core premise is that those who knowingly fund terrorism assume responsibility for – and the contacts created by – the terrorist acts they fund. *Supra* pp. 3-4; JASTA § 2(a)(6), 2(b). Any due-process analysis must account for that feature of Plaintiffs' cause of action. *Cf. Walden*, 571 U.S. at 287 ("The strength of [the] connection [in *Calder*] was largely a function of the nature of the libel tort."). Given the statute, the terrorist attacks MTN funded are not "random, fortuitous, or attenuated" contacts; they are "necessary element[s]" of Plaintiffs' claims and demonstrate that MTN's conduct was purposefully directed at the United States. *Id*. at 286-88. That statutory distinction undermines MTN's reliance (at 14-15) on cases, like *Walden*, involving state-law claims in which the forum had no interest.

The Second Circuit's ATA precedent is instructive. As that court explained, personal jurisdiction under the ATA extends beyond terrorist groups themselves to include the funders who supply terrorists with "financial and other resources." *Terrorist Attacks*, 714 F.3d at 678-79. The court thus granted jurisdictional discovery against charities that gave "material support directly to al Qaeda when al Qaeda allegedly was known to be targeting the United States," *id*., just as MTN directly funded the Taliban here when it was known to be targeting the United States. In making that distinction, the Second Circuit distinguished the lead ATA case MTN cites (at 16) as one involving mere "'*indirect funding*.'" *Id*. at 675 (quoting *In re Terrorist Attacks on Sept. 11, 2011*, 538 F.3d 71, 95 (2d Cir. 2008)). Such cases might have allowed MTN to escape jurisdiction if its payments to the Taliban had been indirect. *Id*. at 675-78. But MTN

made payments *directly* to the Taliban, which it negotiated in bilateral conversations and routed straight to Taliban operatives. AC ¶¶ 295-307, 335. That support is "more direct and one step closer to [terrorists]" than in all the cases MTN cites. *Terrorist Attacks*, 714 F.3d at 678.[3]

      **c.**        MTN's specific intent to harm Americans offers an additional basis for that conclusion. Even "indirect support" of terrorists can create jurisdiction if a defendant "intend[s]" its support to "cause injury in the United States." *Id.* at 679; *see Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66, 68-69 (2d Cir. 2019) ("financial services" provided indirectly to terrorists sufficient if "done with the specific intent to further [group's] terrorism"). To be clear, such intent is not required in cases of direct support and so is unnecessary here. *Terrorist Attacks*, 714 F.3d at 678-79. Even so, Plaintiffs allege MTN supported the Taliban in part to aid its insurgency against U.S. forces. AC ¶¶ 337-46. Such "specific intent" further warrants effects-based jurisdiction. *Lloyd's*, 779 F. App'x at 68.

      MTN responds (at 3, 19) mostly with empty rhetoric about how "outrageous" or "offensive" the allegations are. The Court should disregard the rhetoric and accept Plaintiffs' allegations as true. *See Urquhart-Bradley*, 964 F.3d at 40 n.2. Indeed, Plaintiffs ground their intent allegations in the unique nature of MTN's payments to terrorists, the details of MTN's business model, and its close financial and operational partnership with the IRGC. AC ¶¶ 337-46. Put simply, MTN financially benefits (and has benefited) from the Taliban's victories over U.S. forces. AC ¶¶ 339-41, 346. That alone makes plausible MTN's intent to assist it.

      MTN's factual criticisms (at 17-21) are premature. Courts are "lenient" – including in

---

[3] *Cf. Atchley v. AstraZeneca UK Ltd.*, 2020 WL 4040345, at *5 (D.D.C. 2020), *appeal docketed*, No. 20-7077 (D.C. Cir. Aug. 21, 2020) (payments "*indirectly* connected to . . . terrorist attacks"); *Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *7 (D.D.C. 2019) ("allegations of indirect support").

terrorism cases – in "allowing scienter issues to withstand summary judgment based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014). That is even more true on a motion to dismiss, when most "direct evidence of intent . . . remains exclusively in the hands of the defendants." *Azzam v. Rightway Dev. Inc.*, 789 F. Supp. 2d 110, 118-19 (D.D.C. 2011). Here, MTN controls the direct evidence of its state of mind, but it chose to quibble with the allegations rather than put on any proof – which, on a Rule 12(b)(2) motion, it could have done. *See NWPC*, 359 F.3d at 18. It should therefore save its factual hair-splitting for after discovery. *See In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019) ("[f]erreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage").

Regardless, MTN's criticisms fail on their own terms. *First*, MTN errs (at 20) in attributing its conduct solely to "violence" and "intimidation from the Taliban." Taliban threats may have contributed to MTN's motivation to pay, but that is hardly inconsistent with Plaintiffs' allegation that MTN's desire to harm Americans *also* played a role. *See United States v. Shabban*, 612 F.3d 693, 696 (D.C. Cir. 2010) ("evidence that a defendant had multiple intentions does not mean there [is] insufficient evidence of the requisite statutory intent"). Indeed, people and entities typically act with mixed motives.[4] Here, protection was not MTN's only motive: when the U.S. government offered to host MTN's towers on U.S. military bases – to prevent the very extortion on which MTN now blames its conduct – MTN refused to even take the meeting. AC ¶ 320. Were MTN purely an innocent victim of Taliban threats, it would have done the opposite. Moreover, as MTN itself points out (at 24-25), it continued to obtain IFC funding and

---

[4] *See*, *e.g.*, *Singh v. Mukasey*, 543 F.3d 1, 5 (1st Cir. 2008) ("persecutors may have more than one motivation"); *United States v. Fairchild*, 122 F.3d 605, 612 (8th Cir. 1997) (affirming jury instruction "on multiple intent" where assailant "had multiple reasons" for acting).

MIGA guarantees to expand its Afghanistan operations even after it had begun paying the Taliban.  That is not the conduct of a coerced victim; it is the behavior of a willing participant.

In arguing for different facts, MTN relies (at 7-9, 19-20) on snippets from media articles cited in the Complaint.  Such extra-pleading hearsay provides no basis for rejecting Plaintiffs' allegations.  *See NWPC*, 359 F. Supp. 3d at 21 (jurisdictional allegations presumed true unless "directly contradicted by an affidavit").[5]  MTN says (at 4 n.2) the Complaint "incorporates [these articles] by reference," but the D.C. Circuit has held that when a plaintiff merely cites a part of a document to support a discrete allegation, courts should not "adopt the factual contents of the [document] wholesale" on a motion to dismiss.  *Banneker*, 798 F.3d at 1134.  At any rate, MTN's extra-pleading quotes concern the industry generally,[6] which ignores that MTN was the worst offender and the most enthusiastic supporter of the Taliban.  AC ¶¶ 297, 300, 303-05.

*Second*, MTN's appeal (at 17) to its supposed status as a "leading telecommunications company" is unpersuasive.  MTN's market share aside, it has a long history of bribing terrorists, courting despots, and exploiting political violence for monetary gain.  AC ¶¶ 324-29, 340, 343.  Afghanistan offers a textbook example.  The Complaint describes, in detail, how MTN's market share grew alongside the Taliban, AC ¶¶ 292-93, and how MTN exploited the insurgency to gain an advantage over its competitors, AC ¶¶ 303-05.  As those allegations confirm, the Taliban is good for MTN's business.  AC ¶¶ 339-41.  Yet MTN asks (at 18) the Court to find otherwise – with no evidentiary record – because MTN operates in some "U.S.-allied democracies" like Nigeria and Ghana.  Of course, Afghanistan is also a U.S.-allied democracy, and MTN operates

---

[5] By contrast, because Plaintiffs seek merely to proceed to discovery (rather than asking the Court to find facts), they may rely on hearsay at this stage.  *See Mwani*, 417 F.3d at 7.

[6] For example, though the *Wall Street Journal* reported the Taliban "killed staff" of unnamed "carriers," Dkt. 102-7 at 1, there is no evidence that *MTN* lost any staff to Taliban attacks.

there by paying terrorists.  The point is that MTN does best in "dangerous or unstable markets," and it benefits when groups like the Taliban succeed in minimizing U.S. influence.  AC ¶ 339.

*Third*, MTN fails (at 19-20 & n.8) in its effort to downplay its partnership with Iran. MTN pledged "defensive, security and political cooperation" with IRGC fronts, AC ¶¶ 323, 340, 342, 346,[7] and it has repeatedly defied U.S. laws to aid the Iranian regime, AC ¶¶ 324-25, 343. MTN's close ties to Iran strengthened its anti-American motives.  AC ¶¶ 342-46.  That is not "guilt-by-association," Mot. 19, but business reality:  MTN chose to partner with Iran – a sworn U.S. enemy that sponsored the Afghan insurgency against U.S. forces – while eschewing any U.S. operations.  AC ¶¶ 339, 343-44.  Given those loyalties, it was only natural that MTN's conduct in Afghanistan was calculated to undermine U.S. interests while promoting Iran's.  AC ¶¶ 345-46.  Even now, MTN points to nothing in its history to suggest that, when it came to the Taliban's so-called (Mot. 20) "civil war," MTN had any desire for the United States to win.

MTN's analogy to an ATA case about "business dealings . . . with sanctioned Iranian entities" is inapt.  Mot. 20 (citing *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018)).  There, the defendant bank never "serviced a terrorist group directly," but instead cleared transactions for intermediate "Iranian institutions."  *Kemper*, 911 F.3d at 392-93.  The Seventh Circuit declined to infer from those Iranian transactions alone an intent to support separate Iraqi terrorists with whom the bank never dealt.  *Id*. at 390.  Perhaps that holding would be relevant to MTN's motion had it dealt only with the IRGC and never paid the Taliban.  But therein lies the difference:  unlike in *Kemper*, Plaintiffs *do* allege that MTN made "direct donations to a known

---

[7] One of the two Irancell entities is Khamenei's own foundation, AC ¶ 342, while the other is sanctioned as an "Iranian Military Firm[]."  AC ¶ 342 & n.408.  Plaintiffs' allegation that those two entities are IRGC fronts should be presumed true.  *See Banneker*, 798 F.3d at 1129.  MTN's attempt (at 19 n.8) to distinguish them from the IRGC raises premature fact questions.

terrorist organization" that killed thousands of Americans. *Id*. MTN's alliance with the IRGC merely bolsters the inference that it harbored anti-American animus in doing so.

### 2.    MTN directed its tower shutdowns at the United States

MTN also directed its conduct at the United States by shutting down its cell towers at the Taliban's behest. AC ¶ 336. The express aim of those tower shutdowns was to deprive U.S. forces of vital intelligence and obstruct U.S. operations. AC ¶¶ 308-10, 315-20. MTN succeeded in that aim: its decision to switch off its cell signals impeded U.S. intelligence activities and thwarted a key component of the U.S. Coalition's strategy for combatting the Taliban. AC ¶¶ 319, 321. MTN knew all this. MTN knew that shutting down its towers would hamper U.S. operations, and it knew its cell towers were serving "'as a weapons system' against Coalition forces." AC ¶ 315; *see* AC ¶¶ 313, 316-17, 336. Yet MTN went ahead anyway. That decision, in effect and intent, was a "malignant action[] directed at and felt in this forum." *Mwani*, 417 F.3d at 13. Nothing else is needed for jurisdiction. *See id*. Indeed, MTN concedes (at 15, quoting *Mwani*) that "terrorists who 'purposefully direct their terror at the United States' expose themselves to suit here." By coordinating shutdowns with the Taliban, MTN committed acts of "terrorism" under the ATA. *Infra* Part II.A. MTN is not bin Laden, the defendant in *Mwani*, but it exposed itself to U.S. jurisdiction just as surely as he did.

MTN offers essentially no response. Its six-page discussion (at 15-21) of Plaintiffs' primary basis for jurisdiction argues about the protection payments but effectively ignores the tower shutdowns. That is for good reason: when MTN turned off its cell signals at night, it became the "primary participant[] in an alleged wrongdoing intentionally directed at [U.S. citizens]." *Calder*, 465 U.S. at 790. The Taliban did not deactivate the towers and choke off U.S. intelligence; MTN did. Plaintiffs thus are not asserting jurisdiction over MTN based on its "knowledge that *someone else* has a connection to the forum." Mot. 16. MTN itself created the

forum connection when it willfully manipulated its network to thwart U.S. operations.

MTN's innocent-victim narrative, even if true, would not alter that conclusion. No matter its ultimate motivation, MTN's *act* of shutting down its towers had the immediate aim of depriving U.S. forces of vital intelligence. AC ¶¶ 315-17, 336. Whether motivated by malice or profit, such interference was directed at the U.S. forum.[8] MTN may claim now that it only targeted U.S. forces due to Taliban threats, but in *Calder* itself the "effects" that conferred jurisdiction "were not bound up in the defendants' intentions." *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1077 (10th Cir. 2008) (Gorsuch, J.). There, the "defendant writer and editor were professionals presumably interested chiefly in the sale of newspapers, not in doing *intentional* harm to" the woman they defamed. *Id.* Yet because they "intended to write an article" that targeted California and was distributed in California, jurisdiction in California was appropriate. *Id.* Here, too, MTN shut down its towers "for the very purpose of having [the] consequences felt" by U.S. forces. *Id.* That MTN had added financial reasons for directing those tortious consequences at America does not make jurisdiction here any less appropriate.

### B.    MTN's Support For The Taliban Relied On U.S. Contacts

Effects aside, a defendant also can create "minimum contacts" by "purposefully avail[ing] himself of the benefits and protections of [the forum's] laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). MTN here created multiple other "suit-related" U.S. contacts, *Urquhart-Bradley*, 964 F.3d at 44, which provide an independent basis for jurisdiction.

---

[8] *See*, *e.g.*, *Tamburo v. Dworkin*, 601 F.3d 693, 697 (7th Cir. 2010) (jurisdiction arose from economically motivated conduct that "tortuously generate[d] a consumer boycott against [forum resident]"); *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 402 (5th Cir. 2009) (jurisdiction arose from economically motivated out-of-forum conduct that "thwarted [in-forum resident's] right to payment . . . under [its] contracts"); *Wellness Publ'g v. Barefoot*, 128 F. App'x 266, 270 (3d Cir. 2005) (jurisdiction arose from economic "interference" with forum resident's business).

### 1.    MTN purposefully availed itself of the United States

**a.**    A defendant establishes "minimum contacts with a forum if she enters into a contract that has a substantial connection with the forum." *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004). Executing a "contract with a forum resident clearly constitutes a 'contact' with that forum," but courts typically require "something more" to show that the contract evidences purposeful availment of the forum. *World Wide Travel Inc. v. Travelmate US, Inc.*, 6 F. Supp. 3d 1, 7 (D.D.C. 2013). Courts in this District take a "context-specific, fact-intensive approach" to assessing such jurisdictional links. *Xie v. Sklover & Co.*, 260 F. Supp. 3d 30, 40 (D.D.C. 2017). Relevant factors include the contracting "parties' 'prior negotiations,' the 'contemplated future consequences' of the contract, the 'terms of the contract,' and 'the parties' actual course of dealing.'" *Id.* (quoting *Burger King*, 471 U.S. at 479).

MTN's contracts with IFC and MIGA (*supra* pp. 9-11) evince the "something more" that indicates purposeful availment.[9] Four key factors show the requisite connection.

*First*, MTN solicited financing from D.C.-based funders *because of* their presence in the United States. MTN approached IFC and MIGA – not the other way around – and requested their support for its Afghanistan operations. AC ¶¶ 350, 361. Courts often find such active solicitation to be a strong indication of purposeful availment.[10] MTN wanted the funding,

---

[9] MTN is incorrect (at 21 n.9) that MTN Afghanistan avoided those contacts. MTN Afghanistan may not have executed the contracts, but it was each contract's focal point and beneficiary. AC ¶¶ 349-50, 358. It worked hand-in-hand with MTN Group and purposefully benefited from the U.S. contracts MTN Group negotiated on its behalf. AC ¶¶ 330-33, 371-72; *see Knox v. MetalForming, Inc.*, 914 F.3d 685, 694 (1st Cir. 2019) ("international business" cannot "shield itself from suit by a careful but formalistic structuring of its business dealings").

[10] *See, e.g.*, *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) ("Defendants reached out beyond [their home's] borders to conduct business with a company whose principal place of business it knew to be in [the forum]."); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005) (defendant "solicited [in-forum counterparty's] assistance" knowing counterparty's "services . . . were to be performed in [the

expertise, and credibility that only U.S.-backed contracts could provide, AC ¶¶ 371-76, so it

"reached out" into the United States and requested that IFC and MIGA "undertake extensive

activities on [MTN's] behalf," *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d

59, 67-68 (1st Cir. 2014). IFC's and MIGA's resulting D.C.-based activities were "undertaken at

[MTN's] request and are attributable to [MTN]." *Id.* As one of MTN's cases (cited in Mot. 15-

16) thus recognizes, a foreign company avails itself of this forum when it "purposefully seek[s]

business relationships with investors in the United States." *Nuevos Destinos, LLC v. Peck*, 2019

WL 78780, at *8 (D.D.C. 2019) (Sullivan J.) (citing *Citadel Inv. Grp., L.L.C. v. Citadel Capital

Co.*, 699 F. Supp. 2d 303, 315 (D.D.C. 2010)). That is what Plaintiffs allege here.

       MTN's D.C.-focused solicitation is especially important because of the way it leveraged

IFC's and MIGA's role in its Afghanistan operations. MTN did not just want their money,

though the financing does supply a relevant forum contact.[11] Equally important was the *public

legitimacy* MTN attained by broadcasting its affiliation with both U.S.-backed entities. AC

¶¶ 371-73. The Complaint explains why IFC's and MIGA's D.C. location was a key driver of

the public credibility their support conveyed, AC ¶¶ 374-76, and MTN adduces no evidence in

response. Those conceded, unique-to-D.C. benefits obtained by MTN confirm the substantial

connection to the United States. *See Xenophon Strategies, Inc. v. Jernigan Copeland &

Anderson, PLLC*, 2016 WL 1367734, at *4 (D.D.C 2016) (counterparty's D.C.-centric

qualifications, including "expertise in dealing with [other D.C.-based] organizations," indicated

---

forum]"); *Overseas Partners, Inc. v. Progen*, 15 F. Supp. 2d 47, 51 (D.D.C. 1998) (contacts
"particularly" strong "where the non-resident solicited the business relationship").

   [11] *See Citadel*, 699 F. Supp. 2d at 314-15 (foreign company subject to jurisdiction because it
"sought business relationships" with U.S. "investors"); *Lufthansa Sys. Infratec GmbH v. Wi-SKY
Inflight, Inc.*, 2011 WL 862314, at *5 (E.D. Va. 2011) (foreign company "availed itself" of
forum by "actively pursu[ing] financing options" in the forum).

purposeful availment); *Dooley v. United Tech. Corp.*, 786 F. Supp. 65, 72 (D.D.C. 1992) (out-of-forum defendants availed themselves of D.C. by using D.C. entity's "legitimate existence" to "shield their bribes" to "Saudi officials from government scrutiny"), *abrogated on other grounds by FC Inv. Grp. v. IFX Markets Ltd.*, 786 F. Supp. 65 (D.C. Cir. 2008).

*Second*, MTN's contracts required extensive communications with U.S.-based personnel. MTN negotiated those contracts not only by initiating conversations with D.C. personnel, but also by repeatedly sending written documentation into (with the intent of receiving return documentation from) the forum.  AC ¶¶ 350, 361.  Such negotiations are another strong indication of purposeful availment.[12]  Moreover, MTN's performance required continued U.S.-focused interactions – including sending reports to the United States (AC ¶¶ 351, 356-57, 363, 368), receiving IFC funds from (and paying MIGA premiums to) U.S. bank accounts (AC ¶¶ 353, 364), and consulting with U.S.-based experts (AC ¶ 375).  Those interactions further strengthen MTN's connection to the United States.  *See Air Prods.*, 503 F.3d at 551-52 (contract led to frequent "telephone, email, facsimile, and ordinary mail correspondence" with in-forum counterparty); *Covey Run, LLC v. Wash. Capital, LLC*, 196 F. Supp. 3d 87, 98 n.6 (D.D.C. 2016) (defendants "repeatedly communicated with, and sent payments to" in-forum counterparty); *Kroger v. Legalbill.com LLC*, 2005 WL 4908968, at *5 (D.D.C. 2005) ("contract requires continuous contact with Washington, D.C.," including by receiving "invoices for review").

*Third*, MTN's contracts contain textual indicia of the U.S. connection.  Both the IFC and MIGA contracts had venue clauses in which MTN agreed to defend litigation here.  AC ¶¶ 352, 362.  The D.C. Circuit has held that such "consent to suit in the [forum] . . . can be indicative of

---

[12] *See C.W. Downer*, 771 F.3d at 68 (jurisdiction arose when defendant "actively negotiated the contract"); *Xie*, 260 F. Supp. 3d at 41 ("mailings, telephone calls, emails, filings, and negotiation sessions" with "D.C.-based individuals" supported jurisdiction).

24

[a defendant's] own perceptions of [its] degree of contact with a particular forum." *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1192 (D.C. Cir. 2013); *see SEC v. Lines Overseas Mgmt., Ltd.*, 2005 WL 3627141, at *6 (D.D.C. 2005) (U.S. venue and arbitration clauses in contract supplied "one factor" supporting minimum contacts with the United States). The MIGA contracts similarly were "deemed made in Washington DC." AC ¶ 362.[13] And all the contracts specified D.C.-based "notice addresses" requiring MTN to communicate with the forum. AC ¶¶ 351, 363. The myriad U.S. references on the face of the contracts reinforce the jurisdictional contacts they create. *See Covey Run*, 196 F. Supp. 3d at 98 (purposeful availment when "contractual documents at issue expressly state that one of the parties to the deal . . . operated out of the District of Columbia, and that [defendant] was responsible for communicating with [it]").

*Fourth*, the long duration of MTN's relationship with the forum amplifies its jurisdictional contacts. MTN's association with IFC began with its 2006 entry into Afghanistan and lasted for at least seven years, AC ¶¶ 348-49, while its MIGA association began in 2007 and continued for at least eight years, AC ¶¶ 359-60, 373. Relationships that span so many years indicate "purposeful availment," not "random" or "fortuitous" contacts. *Air Prods.*, 503 F.3d at 551. Courts thus view such long-standing relationships as supportive of jurisdiction. *See id.* ("almost nine years"); *C.W. Downer*, 771 F.3d at 67 ("four-year working relationship"); *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 10 (1st Cir. 2018) ("three-and-a-half years"). On top of the factors above, MTN's long "relationship with [two] D.C.-based entit[ies]" confirms that it "availed itself of the benefits and protections of [U.S.] law." *NWPC*, 359 F. Supp. 3d at 20-21.

---

[13] MTN argues (at 31) that the MIGA contract identifies The Hague as the arbitral "seat." But the actual venue remained in Washington, D.C., *see* AC ¶ 362, and the "seat" clause – functionally a choice-of-law clause for arbitrations – is "clearly not dispositive" on its own. *Thompson Hine*, 734 F.3d at 1192; *see Overseas Partners*, 15 F. Supp. 2d at 51 (exercising jurisdiction based on D.C.-linked contract that contained Turkish choice-of-law clause).

**b.**     MTN's attempts to downplay its forum contacts lack merit.  It portrays (at 32) IFC and MIGA as entities that just "happen to be headquartered here," and so frames (at 30) their U.S. activities as mere coincidental contacts that no "*MTN Defendant* created."  But those are simply factual assertions for which MTN offers no evidence.  As set out in the Complaint, MTN sought out IFC and MIGA *because of* their U.S. contacts, *supra* pp. 23-24, and those U.S. contacts were essential to the value that MTN extracted from both, AC ¶¶ 371, 374-76.  *See Xenophon*, 2016 WL 1367734, at *4 (noting defendant's unique need for a D.C. counterparty).  In any event, the contracts themselves – with their myriad references to the United States – belie any notion that the U.S. ties were a mere happenstance for IFC and MIGA.  *Supra* p. 25.

MTN also errs (at 29-31) in citing its conduct overseas.  MTN is right, of course, that its contracts also had a connection to Afghanistan.  But forum contacts need not be exclusive.  *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775-76 (1984) (upholding jurisdiction over "lawsuit in New Hampshire . . . even though only a small portion of [defamatory content was] distributed in New Hampshire").  Courts in this District routinely exercise jurisdiction over defendants with greater ties to other fora.[14]  All that matters is that "enough of [the relevant] conduct occurred in or affected the [forum]."  *Maryland Digital*, 394 F. Supp. 3d at 92.

A final point disposes of MTN's remaining arguments.  MTN goes through the contacts above – its solicitations, negotiations, contract executions, money transfers, certifications, and venue clauses – and suggests that each individually is insufficient.  *See* Mot. 26-31 (citing, *e.g.*,

---

[14] *See, e.g.*, *Maryland Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 92 (D.D.C. 2019) (contract "negotiation and formation" outside of District); *Am. Action Network, Inc. v. Cater Am., LLC*, 983 F. Supp. 2d 112, 120-21 (D.D.C. 2013) ("much of the performance" was "in Tampa"); *Kroger*, 2005 WL 4908968, at *8 ("The negotiation of the [relevant] contract took place outside the District and, on its face, the contract contemplated . . . activities in Europe exclusively."); *Dooley*, 786 F. Supp. at 72-73 (defendants paid "bribes" to "Saudi officials").

*World Wide Travel*, 6 F. Supp. 3d at 8 (finding no jurisdiction "based *solely* on the fact that a defendant initiated contract negotiations (and subsequently entered into a contract) with a D.C. counterparty")).  That piecemeal approach is mistaken, because the sum of MTN's contacts is what matters.[15]  Even if no single contact above would support "personal jurisdiction if viewed in isolation," they are more than enough "collectively."  *Relman, Dane & Colfax PLLC v. Fair Hous. Council of San Fernando Valley*, 2019 WL 3779901, at \*14 (D.D.C. 2019).

### 2. MTN's U.S. contacts are "suit-related"

**a.**    MTN's contacts are "suit-related conduct" that confer jurisdiction over MTN.  *Urquhart-Bradley*, 964 F.3d at 44.  The "relatedness test is a flexible, relaxed standard," *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009), and it does not require a claim to "formally arise from defendant's contacts," *Air Prods.*, 503 F.3d at 553.  Instead, courts in this District look for "'some sort of causal relationship between a defendant's U.S. contacts and the episode in suit.'"  *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 27 (D.D.C. 2017) (quoting *Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 247 (D.D.C. 2015)).

Plaintiffs allege such a relationship here.  At the most basic level, MTN would never have built or sustained its operations in Afghanistan without the U.S. backing that MTN's contracts with IFC and MIGA supplied.  AC ¶¶ 353, 357, 368, 371-73.  Given Afghanistan's risk profile, MTN had no other realistic funding options.  AC ¶¶ 371-74, 376; *see Jam v. IFC*, 139 S. Ct. 759, 766 (2019) (IFC "finances private-sector development projects that cannot otherwise attract capital on reasonable terms").  Its U.S. contacts were thus a but-for cause of the tort:  had

---

[15] *See, e.g.*, *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("[n]o single event or contact connecting defendant to the forum state need be demonstrated; rather, the *totality of all the defendant's contacts*" must create the connection); *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1361 (7th Cir. 1996) (similar).

MTN never obtained U.S. financing and U.S. insurance, it would not have been able to pay the terrorists or obstruct U.S. operations in Afghanistan.  That alone is a strong indication that MTN's contacts are sufficiently suit-related.  *See Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 864 (9th Cir. 2003) (employing a "but for" test for claim's relation to forum contacts).

The link between contacts and claims was especially strong as to the tower shutdowns. Given the way MTN manipulated its network, its cell towers functioned "as a weapons system" against U.S. forces.  AC ¶ 315.  The towers gave the insurgents vital communications tools – MTN was the Taliban's preferred mobile-phone provider, AC ¶ 303 – while simultaneously hindering U.S. intelligence efforts, ¶¶ AC 315-21.  Every time MTN built (or expanded) a tower with U.S. money, then, it effectively gave the insurgents another "instrument of war against the Afghan government and the U.S.-led coalition."  AC ¶ 315.  IFC's and MIGA's support were vital to that entire enterprise.  AC ¶¶ 371-73.  MTN's use of its U.S. contacts to fund and legitimize the deployment of pro-Taliban warfighting instruments creates an ample "relationship among the defendant, the forum, and the litigation."  *Urquhart-Bradley*, 964 F.3d at 44.

The contract terms further linked MTN's U.S. contacts to this case.  Each IFC and MIGA contract prohibited MTN from paying or supporting the Taliban.  AC ¶¶ 355, 366.  Those terms were material to the bargain:  IFC and MIGA each prioritized stopping terrorist finance and rooting out corrupt conduct, and both entities identified the "leakage of funds" to insurgents as a particular concern.  AC ¶¶ 369-70.  As a condition of obtaining U.S.-based backing, then, MTN had to promise it would *not* pay the Taliban for security.  AC ¶¶ 355-57, 366-68.

MTN's conduct deepened the nexus further still.  MTN decided to cooperate with the Taliban in part to deceive IFC's and MIGA's underwriting process and deflate the reported threat level to its towers.  AC ¶¶ 354, 365.  That, in turn, allowed MTN to obtain U.S.-based financing

(and insurance) on more favorable terms.  *Id*.  By doing so, MTN itself linked its material support to its U.S. contracts by using the former to obtain the latter.  MTN's scheme also required it to send monthly certifications to this forum, misleading IFC and MIGA and verifying it was *not* paying the Taliban.  AC ¶¶ 356-57, 367-68.  Without those forum communications, MTN could not have continued violating the ATA.  AC ¶¶ 356-57, 367-68, 371.

All of this goes to a fundamental point.  For a jurisdictional contact to "relate to" a controversy, "[i]t is enough that a meaningful link exists between a legal obligation that arose in the forum and the substance of the plaintiffs' claims."  *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007).  The key is to "keep the quid pro quo" between contact and claim "proportional and personal jurisdiction reasonably foreseeable."  *Id.* at 323; *see uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 430-31 (7th Cir. 2010) (adopting same standard and observing that the "precise causal relationship between contacts and claim [is] not important").  Here, part of the "quo" for the "pro" of MTN accepting U.S. financing for its Afghan operations was its agreement to refrain from using those operations to aid terrorists.  The link between the two – evident both in the agreements and in MTN's own conduct – made it foreseeable that MTN could face a lawsuit in U.S. court by the U.S. victims of the attacks it supported.

**b.**     MTN's core response (at 22, 25) is that this case is not "really about" IFC or MIGA.  For MTN, only the isolated act "'that could have subjected [it] to liability under the ATA'" matters.  Mot. 22 (quoting *Waldman*, 835 F.3d at 335).  Because it physically paid terrorists in Afghanistan, MTN discounts (at 21-26) all of its U.S. contacts as irrelevant.

That legal standard is unfounded.  To be relevant, a forum contact need only be "suit-related," *Urquhart-Bradley*, 964 F.3d at 44; it need not be the thing that makes a defendant's conduct illegal.  Indeed, courts routinely derive jurisdiction from forum contacts that are not

themselves tortious.[16]  Here, the final acts that violated the ATA may have occurred in

Afghanistan, but they were part of a broader course of conduct that touched the United States.

*See supra* Part I.B.2.a.  That is sufficient.  *See Air Prods.*, 503 F.3d at 553 (focusing not on final

tortious act in isolation but on "business relationship" that enabled it); *IMAPizza*, 334 F. Supp.

3d at 115 (exercising jurisdiction when "the main events underlying the claim occurred abroad").

MTN's contact-must-be-tortious standard is especially ill-suited for ATA cases.

Because the ATA requires support of *foreign* terrorists, 18 U.S.C. § 2331(1)(C), it is unlikely

that U.S. contacts will ever be the thing that makes a defendant's conduct illegal.  After all, every

defendant in every ATA case could say the case is "really about" the overseas terrorists.  The

Court should reject such oversimplifications, which would effectively immunize foreign

defendants from ATA liability.  Personal jurisdiction demands a "highly realistic approach" that

situates MTN's material support alongside the U.S. contacts that enabled it.  *Burger King*, 471

U.S. at 479; *see Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1270

(11th Cir. 2010) ("*Burger King* requires a realistic examination of the entire course of dealing.").

Those U.S. contacts may not have been illegal *in isolation*, but they did form a key part of the

overall "conduct that . . . [created] liability under the ATA."  *Waldman*, 835 F.3d at 335.[17]

---

[16] *See*, *e.g.*, *O'Connor*, 496 F.3d at 323-24 (contact was mailing brochures to forum
residence; unlawful conduct was out-of-forum negligence causing out-of-forum injury); *Air
Prods.*, 503 F.3d at 551-53 (contact was negotiating with in-forum manufacturer; unlawful
conduct was "transfer of assets that occurred wholly outside the state"); *Myers v. Casino Queen,
Inc.*, 689 F.3d 904, 912-14 (8th Cir. 2012) (contact was in-forum advertising; unlawful conduct
was out-of-forum failure to provide security); *uBID*, 623 F.3d at 430-31 (contact was online
messages directed to forum; tortious conduct was out-of-forum trademark infringement);
*IMAPizza, LLC v. AT Pizza Ltd*., 334 F. Supp. 3d 95, 115 (D.D.C. 2018) (forum contact was
business trip to forum; unlawful conduct was trademark infringement that "occurred abroad").

[17] Regardless, this line from *Waldman* that MTN quotes (at 22, 25) is not only from out of
Circuit, but is *dicta* – because the defendants there had no relevant U.S. contacts at all.  *See* 835
F.3d at 335.  In the Second Circuit, personal jurisdiction does not require the ATA violation
literally to take place within the United States.  *See Licci ex rel. Licci v. Lebanese Canadian*

Contrary to MTN's assertion (at 22-23), its contract-based contacts must be assessed even though this is a tort case. Erecting a firewall between contracts and torts represents the sort of "mechanical test[]" for jurisdiction the Supreme Court has rejected. *Burger King*, 471 U.S. at 479. In fact, courts regularly exercise jurisdiction over tort claims based on forum contacts created by contract. *See United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 887-88 (D.C. Cir. 2010) (affirming jurisdiction over False Claims Act claims based on "contracts" with U.S. government); *Licci*, 732 F.3d at 173 (affirming jurisdiction over ATA claims based on contract-created correspondent bank accounts).[18] What matters is not the claim's formal common-law provenance, but whether the link between claim and contact is "intimate enough to keep . . . jurisdiction reasonably foreseeable." *O'Connor*, 496 F.3d at 323.[19]

    **c.**    MTN's factual critiques are similarly meritless. MTN says (at 24-25) its U.S. contacts post-dated the ATA violations, but IFC provided its first $45 million facility in 2006 and disbursed funds at the inception of MTN's entry into Afghanistan. AC ¶ 348. Although the next IFC loan may not have hit MTN's accounts until 2011, MTN obtained IFC's second equity infusion and loan *commitment* much earlier, AC ¶ 349; Dkt. 102-4 at 53, and the signal sent by that commitment was as important as the money itself, AC ¶¶ 371, 373, 375. IFC's early public

---

*Bank, SAL*, 732 F.3d 161, 172-73 (2d Cir. 2013) (ATA violation was delivery of funds to Hezbollah in Lebanon; forum contact was maintenance of correspondent accounts in New York).

   [18] *See also Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996) (accepting link "between a contractual or business association and a subsequent tort"); *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981) ("Logically, there is no reason why a tort cannot grow out of a contractual contact.").

   [19] MTN cites (at 23) *Okolie v. Future Services General Trading & Contracting Company*, 102 F. Supp. 3d 172 (D.D.C. 2015) (Sullivan, J.), but that case was a D.C. long-arm-statute case involving overseas negligence that was "extremely attenuated" from the forum contacts. *See id.* at 177. The proffered relationship between contract and claim "border[ed] on the absurd," *id.*, and lacked the causal links present here, *supra* pp. 27-29. On those facts, the "injury sounding in tort [did] not 'arise from' a contract for services." *Okolie*, 102 F. Supp. 3d at 177. That observation did not announce a categorical rule disqualifying contractual contacts in tort cases.

backing of MTN's Afghanistan operations – alongside MIGA's in 2007, AC ¶ 359 – was crucial in enabling MTN to commit its torts.  That some of the money arrived later is of no moment.

In any event, a strict contact-then-claim temporal sequence is unnecessary.  Even if MTN could have entered the Afghan market without U.S. backing, IFC and MIGA were necessary to sustain its nationwide expansion.  AC ¶¶ 371-76.  At a minimum, its market share would have fallen dramatically – and would have been far less damaging to U.S. forces – without its IFC and MIGA relationships.  *Id.*  On that issue, another ATA case is instructive.  *See Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3 (E.D.N.Y. 2016).  In *Strauss*, jurisdiction existed over a foreign bank for routing just five wire transfers through the United States as compared to "at least 280 other transfers" routed "elsewhere in the world."  *Id.* at 20-21.  Although the U.S. transactions accounted for only "1.8% of the total" and post-dated many of the illegal transfers, they remained "an integral facet of the conduct" that financed terrorism and so warranted jurisdiction over the entire course of dealing.  *Id.*  So too here.  Even if *some* of MTN's U.S. contacts post-dated *some* of MTN's individual ATA violations, Plaintiffs' allegations likewise "evidence a broader operation fundamentally intertwined with [the United States]."  *Id.* at 22.

MTN's reliance (at 24) on *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773 (2017), is misplaced.  There, non-California plaintiffs sued a non-California drug manufacturer based on a contract with a "California distributor" that had nothing to do with the "pharmacies that dispensed [the drug] to them."  *Id.* at 1783.  That distributor was neither necessary to the defendant's operations nor causally linked in any way to the sale of drugs at issue.  *See id.* at 1778-83.  This case is different.  Whether or not MTN used fungible IFC dollars specifically to pay the Taliban, it certainly used them to prop up the operations of which those protection payments were an integral part.  *Supra* pp. 27-29.  Moreover, the United States (unlike

California in *Bristol-Myers*) has a vital "interest in the claims" brought by U.S. terror victims. 137 S. Ct. at 1780.  Plaintiffs are thus more like the *California* consumers in *Bristol-Myers* who sued in their "home State[]," as to whom everyone agreed there was jurisdiction.  *Id*. at 1783-84.

### 3. The World Bank's status as an international organization does not divest the Court of jurisdiction

#### a. IFC and MIGA supply substantial U.S. contacts

IFC's and MIGA's international status do not lessen the jurisdictional significance of the contacts MTN created by communicating with and relying on the U.S. forum.  Federal law gives both IFC and MIGA the capacity to contract, to buy and sell property, and to initiate lawsuits. *See* 22 U.S.C. § 288a(a).  Both deliberately located themselves in D.C. and derive substantial benefits from their D.C. location.  AC ¶ 375; *see Millicom Int'l Cell. S.A. v. Rep. of Costa Rica*, 995 F. Supp. 14, 16 n.4 (D.D.C. 1998) ("The IFC is a corporation organized under the laws of the District of Columbia, with its headquarters in Washington, D.C.").  For venue purposes, therefore, each is "deemed to be an inhabitant of" Washington, D.C.  22 U.S.C. §§ 282f, 290k-9. In addition, their "very right . . . to enter into contacts" is a creature of "federal law."  *IFC v. GDK Sys., Inc.*, 711 F. Supp. 15, 18 (D.D.C. 1989).  Thus, any lawsuit in which IFC or MIGA participates is "deemed to arise under the laws of the United States."  22 U.S.C. §§ 282f, 290k-9.

By contracting with IFC and MIGA, MTN purposefully obtained "the benefits and protections" of those laws.  *Burger King*, 471 U.S. at 476.  The Complaint lays out, in detail, how MTN benefited from IFC's and MIGA's presence in the United States.  AC ¶¶ 374-75.  Part of that is reputational – U.S. funding and leadership are key to their credibility, AC ¶¶ 371-75 – and part of it is programmatic.  The U.S. location not only signaled IFC's and MIGA's alignment with U.S. priorities, but MTN also received practical benefits from their proximity to other U.S. institutions and access to U.S. personnel.  AC ¶ 375.  Thus, IFC often sues (and is sued) in U.S.

courts, and one court held that the U.S. nexus entailed by IFC's contracting process created "substantial contacts" with New York for purposes of the federal venue statute.  *Concesionaria DHM, S.A. v. IFC*, 307 F. Supp. 2d 553, 558-59 (S.D.N.Y. 2004).  A similar analysis applies here.  Just as the counterparty in *Burger King* "exist[ed] by the grace of Florida's laws," Mot. 32, IFC and MIGA exist due to U.S. backing and so substantially connect MTN to this forum.

*AGS*, which MTN cites, is not to the contrary.  Mot. 32-33 (citing *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64 (D.D.C. 2004)).  There, non-U.S. plaintiffs sued a non-U.S., IFC-funded defendant over a business dispute concerning Peruvian mine operations.  *Id*. at 81-82.  The foreign plaintiffs made no showing that the IFC funds "relate[d] to the injuries they allegedly suffered in Peru."  *Id*. at 82.  Because there was no such relationship, the court held that the IFC funding could not make the foreign defendant "reasonably foresee being haled into this jurisdiction's courts."  *Id*.  That holding does not suggest that IFC and MIGA funding are disqualified as U.S. contacts in a case like this.  *AGS* emphasized that the plaintiffs were not "even United States citizens" and that the case concerned "events about which the District has no interest."  *Id*.  The opposite is true here:  this case is brought by U.S. citizens, and the United States has a powerful interest in it.  *AGS* supports jurisdiction in such circumstances.

### b.    The government-contacts exception is inapplicable

MTN's use (at 33-34) of the government-contacts exception is unavailing.  That exception is limited to cases that arise under the D.C. long-arm statute, which this case does not.  *See Fandel v. Arabian Am. Oil Co.*, 345 F.2d 87, 89 (D.C. Cir. 1965) ("We are construing what [the long-arm] statute does, and not determining what the furthest reach of legislative power could be constituent with constitutional limitations.").  That is self-evident not just in the cases articulating the exception, but also in the D.C. Circuit's deference to the D.C. Court of Appeals

on the exception's contours.  *See Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*, 640 F.3d 369, 371 (D.C. Cir. 2011).  The D.C. Court of Appeals, for its part, has described the exception as a First Amendment-based limitation – inapplicable here – on one provision of the D.C. long-arm statute creating jurisdiction over nonresidents for "transacting any business" in the District.  *Rose v. Silver*, 394 A.2d 1368, 1373-74 & n.6 (D.C. 1978).[20]

The government-contacts exception is irrelevant because this case arises under the federal long-arm statute, which also eliminates any concerns about misreading D.C. statutes to turn the District into a national litigation forum.  *Compare, e.g., Env. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc) (noting concerns about D.C. courts becoming a "national judicial forum"), *with Mwani*, 417 F.3d at 10-11.  Indeed, the ATA's purpose is to make *federal courts* a national judicial forum for terrorism claims.  *Supra* pp. 3-4.  In analogous circumstances, the D.C. Circuit has relied on government contacts to create jurisdiction.  *See Miller*, 608 F.3d at 887 ("contract" with "the [U.S.] Government"); *Nat'l Patent Dev. Corp. v. TJ Smith & Nephew Ltd.*, 877 F.2d 1003, 1009-10 (D.C. Cir. 1989) (en banc) (R.B. Ginsburg, J.) (registration with Patent and Trademark Office); *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 931-32 (D.C. Cir. 1982) (R.B. Ginsburg, J.) ("regular

---

[20] It does not appear that MTN could take advantage of the First Amendment limitation on the D.C. long-arm statute if that statute were relevant.  "It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government."  *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 288 (D.C. Cir. 2011) (Kavanaugh, J.).  And there is no serious argument that MTN, a foreign corporation, possessed any right under the Petition Clause to contract with IFC and MIGA for assistance.  *See Companhia Brasileira Carbureto de Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127, 1133 (D.C. 2012) (contacts exception exists to ensure that "people have the right to petition their government").  Plaintiffs recognize that Judge Sullivan construed the long-arm statute as also intended to prevent local D.C. courts from becoming a national judicial forum in *Akhmetshin v. Browder*, 407 F. Supp. 3d 11 (D.D.C. 2020), which is currently pending appeal before the D.C. Circuit, but that "national forum" rationale for the exception is likewise inapplicable as discussed below.

contacts Interpol has with this country and District," primarily the Department of Justice).

Congress's judgment in the ATA similarly outweighs any abstract "public interest" served by World Bank contracting. Mot. 33, 36. After all, commercial contracting, *Helmer*, 393 F.3d at 205-06; patent registration, *National Patent*, 877 F.2d at 1009-10; and law-enforcement cooperation, *Steinberg*, 672 F.2d at 931-32, are all in the public interest too. Yet those things suffice for jurisdiction. Here, World Bank contracting may well promote the public interest in general, but it ceases to do so when used to finance terrorism. In such circumstances, Defendants' policy concerns must yield to Congress's legislative choices in the ATA.

MTN's reliance on *Klinghoffer* confirms the point. Mot. 33 (citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)). In that pre-ATA decision, the court disregarded the defendant's "UN-related activities" under New York's long-arm statute. *Id*. at 51-52; *see id*. at 50 n.6 (applying "jurisdictional bases of New York law" that are "more limited than those allowed under federal standards"). But *Klinghoffer* was the ATA's "essential inspiration," and it led Congress to recognize the ATA's "fundamental purpose" as "providing jurisdiction in the Federal Courts." *Goldberg*, 660 F. Supp. 2d at 421-22; *see Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 494 (E.D.N.Y. 2012) ("the [ATA's] civil remedy provision became law in large part because of the *Klinghoffer* litigation"). MTN's attempt to discount its forum contacts by analogizing to the very case that precipitated the ATA highlights why jurisdiction is appropriate.

### c.    MTN's slippery-slope arguments are unpersuasive

In a last-ditch effort to evade U.S. jurisdiction, MTN speculates (at 2, 27, 34) about the volume of World Bank-funded projects that might become embroiled in future U.S. lawsuits. To begin, such speculation has no place in the jurisdictional analysis. There are also "staggering" (Mot. 27) numbers of entities that contract with D.C. residents, *Helmer*, 393 F.3d at 205-06; hire

D.C. employees, *Urquhart-Bradley*, 964 F.3d at 48; or register patents here, *National Patent*, 877 F.2d at 1009-10 – yet all those activities can give rise to personal jurisdiction. The legal question in each instance is whether the conduct creates pertinent "minimum contacts." *Urquhart-Bradley*, 964 F.3d at 44-45. The potential volume of future cases is irrelevant to that inquiry.

In any event, MTN's concerns are overblown. Its parade of horribles (at 33-34) consists of non-U.S. plaintiffs suing World Bank-funded defendants over controversies in which this forum "has no interest." *AGS*, 346 F. Supp. 2d at 82. Personal jurisdiction would remain inappropriate in such cases. *Id*. MTN identifies no U.S. law that would even apply to the extraterritorial disputes it predicts will arrive in U.S. courts. For example, in the dispute between "Honduran farmers and a local millionaire," Mot. 34, foreign law[21] would apply and U.S. jurisdiction would almost certainly be unreasonable, *see Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102, 114-16 (1987). And even if jurisdiction existed, there would be compelling forum non-conveniens arguments for dismissal. *See*, *e.g.*, *In re Air Crash over the S. Indian Ocean on Mar. 8, 2014*, 946 F.3d 607, 612-15 (D.C. Cir. 2020). Such defenses will protect ordinary foreign defendants from the "costs of U.S.-style discovery" that MTN fears. Mot. 33.

Here, where Plaintiffs are U.S. citizens invoking a federal statute designed to address foreign terrorism, the real slippery slope tilts in the opposite direction. Under MTN's theory, any foreign company could obtain World Bank money from the United States, knowingly use it to finance American deaths, and *still* escape accountability in U.S. courts. That is not the law. Congress enacted the ATA to confer jurisdiction over cases just like this and to offer redress to U.S. citizens just like Plaintiffs. *See Goldberg*, 660 F. Supp. 2d at 422. Congress's judgment

---

[21] *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2106-08 (2016) (explaining presumption against extraterritoriality). That presumption is overcome here because Congress legislated extraterritorially in explicit terms. *See* 18 U.S.C. §§ 2331(1)(C), 2333(a).

weighs much more heavily in the calculus than does MTN's speculation about future lawsuits.

### C. Personal Jurisdiction Is Reasonable Because It Serves Vital Federal Interests

Personal jurisdiction is also warranted because it "comport[s] with fair play and substantial justice." *Burger King*, 471 U.S. at 476. Courts balance the defendant's burden, the forum's interest, the plaintiff's interest in obtaining relief, judicial efficiency, and substantive social policies. *See Asahi*, 480 U.S. at 113. Those factors weigh heavily in Plaintiffs' favor.

Only the first factor cuts in MTN's favor, and only minimally so. Modern "'communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.'" *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*, 563 F.3d 1285, 1299 (Fed Cir. 2009) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980)). By agreeing to contracts with U.S. venue clauses in which it agreed to litigate here, MTN has shown that any burden is negligible. AC ¶¶ 352, 362. That is even more true in this case, where MTN has retained "sophisticated American lawyers." *Mattel*, 354 F.3d at 867.

The next two factors – the forum interest and Plaintiffs' need to litigate here – far outweigh any residual burden on MTN. The United States has an overwhelming interest in enforcing the ATA, *supra* pp. 3-4, and Congress crafted the statute to provide "broad remedies in a procedurally privileged U.S. forum," *Goldberg*, 660 F. Supp. 2d at 422. As MTN concedes (at 35), Plaintiffs have a strong interest in pursuing those remedies here. Congress has already weighed all these interests and determined that they overcome whatever inconvenience MTN may incur. *See* 18 U.S.C. §§ 2333-2334; JASTA § 2(a); *cf. Synthes*, 563 F.3d at 1299 ("any burden on [defendant] is sufficiently outweighed by the interest of the United States in adjudicating the dispute and the interest of [plaintiff] in obtaining . . . relief"); *C.W. Downer*, 771 F.3d at 70 (forum's "interest in adjudicating the dispute" is "particularly weighty factor").

The final two factors also favor jurisdiction.  "The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years."  *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003).  There is thus nothing unfair or unforeseeable about an American court holding foreign companies accountable for knowingly funding terrorist attacks on Americans.  Indeed, MTN can identify no actual policy held by South Africa or any other country that this lawsuit would offend.  *Cf. Synthes*, 563 F.3d at 1300 (court could identify no "substantive interests of other nations" that would be "hindered"); *Mattel*, 354 F.3d at 867 (similar).

The balance of those factors is not close.  The "Government's interest in combatting terrorism" reflects an "urgent objective of the highest order."  *HLP*, 561 U.S. at 28.  The resulting U.S. "interest in adjudicating th[is] dispute" is so overwhelming that it would warrant "jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."  *Burger King*, 471 U.S. at 477.  Given security interests so compelling, in fact, jurisdiction would exist even on a "borderline showing of [minimum contacts]."  *Pro Axess*, 428 F.3d at 1280.[22] Accordingly, even if the Court thought the minimum-contacts analysis were close (it is not), the overriding national interest in the ATA would still justify jurisdiction.

### D.     Alternatively, Jurisdictional Discovery Is Warranted

Although the Court should deny MTN's motion outright, in the alternative it should authorize jurisdictional discovery.  In this District, the " 'standard for permitting jurisdictional discovery is quite liberal.' "  *Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 74 (D.D.C. 2008) (Sullivan, J.) (quoting *Diamond Chem. Co.*

---

[22] *See Adelson v. Hananel*, 652 F.3d 75, 84 (1st Cir. 2011) ("an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness"); *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 631 (5th Cir. 1999) (similar).

*v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003)).  The D.C. Circuit has "held many times that, if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified."  *Urquhart-Bradley*, 964 F.3d at 48.

Plaintiffs can so supplement their allegations.  *First*, discovery would confirm that MTN provided support "*directly* to [the Taliban]," which would create jurisdiction under any test. *Terrorist Attacks*, 714 F.3d at 678.  Such discovery should cover "(1) when the alleged support was given to [the Taliban], (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directly at the United States, [and] (4) specifically how [MTN was] involved in the process of providing support."  *Lloyd's*, 779 F. App'x at 69.

*Second*, discovery would flesh out MTN's IFC and MIGA forum contacts.  As explained above (at 26-27, 31-32), MTN urges contested factual inferences without attaching any of its World Bank contracts or communications.  The Court should require MTN to produce those documents.  Plaintiffs should also receive discovery into MTN's internal documents concerning those contracts, which would shed light on the "context-specific, fact-intensive" factors relevant to purposeful availment.  *Xie*, 260 F. Supp. 3d at 40.  Such discovery would further illustrate the causal link between MTN's contracts and its aid to the Taliban.  *Supra* pp. 27-29.

*Third*, the Court should permit discovery into the USAID "partnership" MTN invokes. Mot. 5-6, 19.  MTN asserts (at 19) that partnership refutes Plaintiffs' jurisdictional theory, but that raises questions about the program's provenance and the degree of U.S. contact it entailed. If MTN used the USAID-funded program "allowing funds transfers," Mot. 5, to facilitate its terrorist payoffs, the associated U.S. contacts would provide another basis for jurisdiction.

## II.    PLAINTIFFS SUFFICIENTLY PLEAD CLAIMS UNDER THE ATA

The merits are the easiest part of this case.  MTN not only gave the Taliban more than $100 million, AC ¶ 307, but also coordinated tower shutdowns with the aim of impeding U.S.

counter-terrorism operations, AC ¶¶ 308-21.  Such large-scale, operationally vital support to world-famous terrorists presents a straightforward case for ATA liability.

### A.    Plaintiffs Sufficiently Plead Primary-Liability Claims

Primary liability arises under the ATA when a defendant commits an "act of international terrorism."  18 U.S.C. § 2333(a).  MTN's material support meets that definition because it involved dangerous acts, violated U.S. criminal law, occurred primarily outside U.S. territory, and "appear[ed] to be intended" to achieve the three terrorist aims set out in the statute.  18 U.S.C. § 2331(1) (laying out definition); *see* AC ¶¶ 2570-90 (alleging elements).

MTN challenges (at 36-39) only the last element.[23]  That requirement – that MTN's conduct "appear to be intended" to achieve a terrorist aim, 18 U.S.C. § 2331(1)(B), "is not a state-of-mind requirement; it is a matter of external appearance," *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008) (en banc).  This apparent-intent requirement is met when the "foreseeable consequences" of a defendant's conduct promote a terrorist aim.  *Id.*  Here, MTN funded the Taliban and shut down its towers to aid Taliban operations, knowing the result would be terrorist violence.  *Supra* pp. 6-9.  Courts often hold that less-extreme allegations raise an inference of apparent terroristic intent.  *See, e.g.*, *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1319 (S.D. Fla. 2018) ("*Chiquita III*"); Dev. Opp. 61-62 & n.43.

MTN responds (at 36-39) with the same flawed legal arguments that the other Defendants raise.  Those arguments fail for the reasons Plaintiffs explain elsewhere.  Dev. Opp. 62-65.  They

---

[23] In a cursory footnote (at 39 n.17), MTN also mentions the "ATA's proximate-causation requirement."  MTN has forfeited this argument.  *See In re Carvalho*, 598 B.R. 356, 361 (D.D.C. 2019).  Regardless, Plaintiffs plead proximate cause against MTN for the reasons explained as to the other Defendants.  *See* Opp'n to Dev. Contractor Defs.' Mots. to Dismiss ("Dev. Opp."), Part II.A.  If anything, the allegations against MTN are even stronger, given the sheer scale of its monetary assistance and the operational impact of its tower shutdowns.  AC ¶¶ 307, 319.

are particularly unpersuasive as to MTN, which subjectively supported the Taliban's terrorist agenda. *Supra* Part I.A.1.c. MTN's assertion (at 37) that it had "a different motivation" does not displace that intent. *See United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) ("money-raising goals obviously do not preclude a finding of [terroristic] intent"); *Chiquita III*, 284 F. Supp. 3d at 1319 ("That Chiquita's material support may have had multiple motivational triggers, some salutary, are factors for the trier of fact to consider.").

The cases MTN cites (at 37-39) are distinguishable. *See* Dev. Opp. 64-65 (addressing same cases). None involves a defendant like MTN that made direct payments to terrorists – including to the Haqqani Network after its FTO designation, AC ¶¶ 301, 2570-83 – while having subjective intent to aid the terrorists' agenda. *Supra* Part I.A.1.c. And none involves a defendant that did anything like shut down cell towers to give operational support to terrorists. *Supra* Part I.A.2. Whatever the outcome against the other Defendants, those facts raise a strong inference at this stage that MTN appeared to harbor the requisite terroristic intent. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (apparent intent raises "questions of fact for a jury").

### B.    Plaintiffs Sufficiently Plead Secondary-Liability Claims

Plaintiffs also state two aiding-abetting claims against MTN. AC ¶¶ 2597-2615. Aiding-abetting liability has three elements: (1) a terrorist group must "perform a wrongful act"; (2) "the defendant must be generally aware of his role" in the "overall illegal or tortious activity"; and (3) "the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 487-88 (D.C. Cir. 1983). The Taliban's acts undisputedly satisfy the first element, and Plaintiffs properly allege the other two.

**1.**    Plaintiffs allege that MTN was "'aware' that, by assisting [the Taliban], it [was] itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705

F.2d at 477).  Making protection payments to terrorists qualifies as such as "role."  *See* Dev. Opp. 70-71, 83-85  Violence was inherent to the payments; it was both the reason for and the natural consequence of MTN's decision to pay.  AC ¶¶ 98-99, 112-16, 294-97.  Even under MTN's narrative (at 7-9), terrorism was why it paid:  MTN feared the Taliban was going to attack MTN, so it paid the terrorists to direct their attacks at Americans instead.  AC ¶¶ 334-35, 338.  That decision – effectively inducing the Taliban to attack U.S. forces – establishes the requisite mental state and distinguishes the cases MTN cites.  Dev. Opp. 72-75.

MTN had a particularly culpable state of mind.  *First*, MTN provided the terrorists not only with money, but also with operational support by shutting down its towers.  AC ¶¶ 308-21. The latter is even worse – and even more closely tied to violence – than were the back-office tasks in *Halberstam*.  *See* 705 F.2d at 486-87 (assistance involved processing "payments" and "financial transactions").  *Second*, MTN harbored anti-American motives in providing its support to the Taliban.  AC ¶¶ 337-46.  Although such "specific intent" is unnecessary for secondary liability, it amplifies MTN's culpability.  *Linde*, 882 F.3d at 329 & n.10.

MTN argues (at 41) that aiding-abetting "requires more than just material support for a terrorist organization."  Even if that were true, *but see* Dev. Opp. 70-71, 75-78, 83-85, Plaintiffs do allege "more":  the Complaint details how protection payments were tied uniquely to insurgent operations and supplied the Taliban with revenue that was both quantitatively and qualitatively material to its attacks on Americans.  AC ¶¶ 97-111.  It also details how MTN's tower shutdowns were geographically and temporally calibrated to facilitate the very type of terrorist attacks that killed and injured Plaintiffs and their family members.  AC ¶¶ 315-21. MTN cites no case dismissing aiding-abetting claims with facts anywhere close to these.[24]

---

[24] *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904 (N.D. Cal. 2018), which MTN cites (at 41-

MTN criticizes (at 41) those allegations for not tying MTN to the individual "attacks that killed and injured Plaintiffs." But in *Halberstam* itself, the defendant neither knew about nor assisted the individual murder for which she was held liable. 705 F.2d at 475-76, 488. The same principle applies to terrorism. As the D.C. Circuit has explained, "courts have required neither specific intent nor direct traceability to establish the liability of material supporters of terrorism." *Owens v. Rep. of Sudan*, 864 F.3d 751, 799 (D.C. Cir. 2017), *vacated on other grounds by Opati v. Rep. of Sudan*, 140 S.Ct. 1601 (2020). The reason is simple: because "support is fungible," requiring a plaintiff to trace an individual dollar to an individual attack would "render [the statute] ineffectual." *Id*. That is true for primary liability, *see id*. (citing *Boim*, 549 F.3d at 698-99), and it is even more true under JASTA's liberal secondary-liability provisions, *see* JASTA § 2(b). For that reason, MTN's lead case (Mot. 41) rejects the individual-attack standard it now propounds. *See Linde*, 882 F.3d at 329 (defendant need not "kn[o]w of the specific attacks").

2.      Plaintiffs also plead that MTN "knowingly and substantially assist[ed]" the Taliban's terrorist acts. *Halberstam*, 705 F.2d at 488. Plaintiffs elsewhere analyze the *Halberstam* factors in great detail, *see* Dev. Opp. Part III.A.2, and for efficiency's sake will not repeat that analysis here. Even more than with the other Defendants, the material support MTN provided to the Taliban was "substantial" under each factor. *Compare id*., *with* AC ¶¶ 291-321.

MTN concedes (at 44 & n.18) that the two most important factors – the amount and duration of assistance – favor Plaintiffs. *See Halberstam*, 705 F.2d at 488 ("*duration of the*

45) seven times in five pages, illustrates the point. There, plaintiffs sued *social-media companies* for a bombing to which they gave no direct or indirect aid; they merely "provide[d] routine services generally available to members of the public." *Id*. at 918. That case is far afield. In this context, protection payments that help a terrorist group "continue and intensify its terrorist campaign" create aiding-abetting liability. *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 190 F. Supp. 3d 1100, 1119 (S.D. Fla. 2016) ("*Chiquita II*").

*assistance* has strongly influenced our weighing of [defendant's] assistance" and the "value of

her assistance"). As it must: MTN's payments of more than $100 million, spanning a decade,

represent a *more-than-5000%* increase over the $1.7 million in protection payments (over nine

years) that another court held sufficient for aiding-abetting Colombian terrorism. *Compare* AC

¶ 307, *with Chiquita II*, 190 F. Supp. 3d at 1104. That is more than enough. MTN's arguments

(at 44-45) on the other factors are meritless and seek to invent legal requirements for aiding-

abetting that appear nowhere in the statute. *See* Dev. Opp. 76-83 (rebutting identical arguments).

MTN also rehashes (at 43) its argument that it did not earmark its assistance for use in the

individual attacks at issue, but the point remains unpersuasive. *Supra* p. 42. MTN gave the

Taliban enough money to commit *every single attack* in this case many times over. *Compare*

AC ¶ 307, *with* AC ¶ 103. It also shut down its towers in the most contested, dangerous areas

where the Taliban attacked Plaintiffs, directly contributing to their deaths. AC ¶ 319. Nothing

else is needed. *See* Dev. Opp. 55-57, 77-78 (aid need not flow to individual attack).

Finally, even if MTN's support for the Taliban was "coerced," Mot. 43, that would not

make it any less "substantial," 18 U.S.C. § 2333(d)(2). Making protection payments to terrorists

is a federal crime, AC ¶¶ 128-30, and the inherent nexus to violence makes such payments a

particularly pernicious form of terrorist finance, *see* Dev. Opp. 70-75. The supposed "coercion"

– which left MTN with no doubt that its support was benefiting violent terrorists –simply makes

the conduct worse. *Cf. Chiquita III*, 284 F. Supp. 3d at 1314-20. And the social-media cases on

which MTN again bases (at 43-45) its defense are not even in the same factual universe. Put

simply, if not even MTN's decade-long financial and operational partnership with the Taliban is

"substantial" under JASTA, no corporate conduct in any ATA case ever will be.

## CONCLUSION

The Court should deny the motion, or alternatively order jurisdictional discovery.

Dated:  December 8, 2020

Respectfully submitted,

*/s/ Joshua D. Branson*

Michael J. Gottlieb (D.C. Bar No. 974960)       Joshua D. Branson (D.C. Bar No. 981623)
Randall Jackson (D.C. Bar No. 490798)           Andrew E. Goldsmith (D.C. Bar No. 1007074)
Nicholas Reddick (D.C. Bar No. 1670683)         Grace W. Knofczynski (D.C. Bar No.
Willkie Farr & Gallagher LLP                    15000407)
1875 K Street, N.W.                             Kellogg, Hansen, Todd,
Washington, DC 20006-1238                        Figel & Frederick, P.L.L.C.
Tel: (202) 303-1000                             1615 M Street, N.W., Suite 400
Fax: (202) 303-2000                             Washington, D.C. 20036
MGottlieb@willkie.com                           Tel:  (202) 326-7900
RJackson@willkie.com                            Fax:  (202) 326-7999
NReddick@willkie.com                            jbranson@kellogghansen.com
                                                agoldsmith@kellogghansen.com
                                                gknofczynski@kellogghansen.com

                                                Ryan R. Sparacino (D.C. Bar No. 493700)
                                                Sparacino PLLC
                                                1920 L Street, NW, Suite 535
                                                Washington, D.C. 20036
                                                Tel:  (202) 629-3530
                                                ryan.sparacino@sparacinopllc.com

                                                *Counsel for Plaintiffs*