# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AUGUST CABRERA, *et al.*, | |
| Plaintiffs, | |
| | Case No. 19-cv-3833-EGS-ZMF |
| v. | |
| BLACK & VEATCH SPECIAL PROJECTS CORPORATION, *et al.*, | JURY TRIAL DEMANDED |
| Defendants. | |

## OPPOSITION TO THE DEFENSE CONTRACTOR DEFENDANTS' <u>MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 3

ARGUMENT ................................................................................................................... 5

I.   PLAINTIFFS SUFFICIENTLY ALLEGE THAT EACH DEFENDANT MADE
     PROTECTION PAYMENTS TO THE TALIBAN ................................................... 5

     A.  The Complaint Alleges Plausibly That Each Defendant Maintained A Practice Of Paying
         The Taliban For Security .................................................................................... 5

     B.  Each Defendant's Factual Arguments Are Unpersuasive ................................... 8

         1.  ArmorGroup ................................................................................................. 9

             a.  Plaintiffs' protection-payment allegations are sufficient ...................... 9

             b.  Plaintiffs' knowledge allegations are sufficient ................................. 13

             c.  ArmorGroup's factual assertions are improper ................................... 17

             d.  ArmorGroup's other factual criticisms are unpersuasive ................... 19

         2.  ECC ........................................................................................................... 24

             a.  Plaintiffs' allegations are sufficient ................................................... 24

             b.  ECC's arguments are unpersuasive ..................................................... 26

         3.  EODT ........................................................................................................ 30

             a.  EODT paid Taliban fighters ............................................................... 30

             b.  Plaintiffs' knowledge allegations are sufficient ................................. 32

             c.  EODT's arguments are unpersuasive .................................................. 35

     C.  The Court Should Reject Defendants' Attempt To Confine This Case To The Individual
         Examples .......................................................................................................... 38

     D.  There Is No "Extra Careful Scrutiny" Standard For ATA Cases ...................... 42

II.  PLAINTIFFS SUFFICIENTLY PLEAD PRIMARY-LIABILITY CLAIMS ...................... 43

A.  Plaintiffs Properly Allege Causation ................................................................43

B.  Plaintiffs Allege The Other Elements Of Primary Liability ...............................47

III. PLAINTIFFS SUFFICIENTLY PLEAD SECONDARY-LIABILITY CLAIMS ................. 49

A.  Plaintiffs Allege Substantial Assistance To The Taliban ...................................49

B.  Plaintiffs Plead The Requisite FTO Involvement ............................................50

C.  Plaintiffs Need Not Allege That Defendants Aided An FTO ............................52

IV. ARMORGROUP MISUSES THE POLITICAL QUESTION DOCTRINE......................... 53

V.  PLAINTIFFS SUFFICIENTLY PLEAD A BASIS FOR THE COURT TO EXERCISE
    PERSONAL JURISDICTION OVER THE G4S DEFENDANTS ........................................ 55

A.  G4S's Protection Payments Were Directed At The United States ....................56

B.  G4S's Protection Payments Relied On U.S. Contacts ......................................58

    1.  The G4S Defendants purposefully availed themselves of the United States .............. 58

        a.  G4S Holdings (AGI) .............................................................. 59

        b.  G4S Risk Management (AGMA) ........................................... 62

    2.  The G4S Defendants' U.S. contacts are suit-related ................................................ 64

C.  Jurisdiction Is Reasonable Because It Serves Vital National Interests .............68

D.  Alternatively, Jurisdictional Discovery Is Warranted ......................................68

CONCLUSION ................................................................................................ 70

# TABLE OF AUTHORITIES[*]

Page(s)

**Cases**

*Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex 2011) ........................................... 12

*Adelson v. Hananel*, 652 F.3d 75 (1st Cir. 2011) ......................................................... 68

*Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544 (6th Cir. 2007) ................. 61, 64

*Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8 (D.C. Cir. 2008)............... 42, 43

*Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010)..................................................... 51

*Ali v. Obama*, 736 F.3d 542 (D.C. Cir. 2013)......................................................... 22, 23

*Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13 (D.D.C. 2014) ................................66-67

*Alsabri v. Obama*, 764 F. Supp. 2d 60 (D.D.C. 2011),
    *aff'd*, 684 F.3d 1298 (D.C. Cir. 2012) ......................................................... 51

*Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019) ..................................................... 55

*Arvin Kam Constr. Co. v. Env't Chem. Corp.*,
    2019 WL 1598220 (N.D. Cal. Apr. 15, 2019) ........................................... 26, 28, 29

*Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102 (1987) ................................. 68

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................. 8

*Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154 (D.D.C. 2014) ................. 55

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1 (1st Cir. 2009) ...................... 64

*Atchley v. AstraZeneca UK Ltd.*, 2020 WL 4040345 (D.D.C. July 17, 2020),
    *appeal docketed*, No. 20-7077 (D.C. Cir. Aug. 21, 2020)...................... 51, 52, 54, 63

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) .... 5, 18, 19, 20, 39, 42, 52

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
    2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020)...................................... 16, 21, 26, 30

---

[*] Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................... 5

*Bello v. Howard Univ.*, 898 F. Supp. 2d 213 (D.D.C. 2012) ....................................... 36

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) .............................. 46

\*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)......................... 58, 59, 61, 62, 64, 67, 68

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003) ......................... 42-43

*Cabrera v. B&H Nat'l Place, Inc.*, 2015 WL 9269335 (D.D.C. Sept. 28, 2015) ................... 17-18

*Calder v. Jones*, 465 U.S. 783 (1984) ....................................................................... 56

*Cardiac Devices Qui Tam Litig., In re*,
    221 F.R.D. 318 (D. Conn. 2004) ......................................................................39

*Carvalho, In re*,
    598 B.R. 356 (D.D.C. 2019) ............................................................................56

\*Chiquita Brands Int'l, Inc., In re*,
    284 F. Supp. 3d 1284 (S.D. Fla. 2018) ("*Chiquita III*") ..............................38, 46, 52

*Chocolate Confectionary Antitrust Litig., In re*,
    801 F.3d 383 (3d Cir. 2015) ..........................................................................42

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*,
    140 S. Ct. 1009 (2020)....................................................................45-46

*Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) ............................................ 46

*Covey Run, LLC v. Wash. Capital, LLC*, 196 F. Supp. 3d 87 (D.D.C. 2016).............................. 61

*C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59 (1st Cir. 2014) ................... 68

*Defense Training Sys. v. Int'l Charter Inc. of Wyo.*,
    30 F. Supp. 3d 867 (D. Alaska 2014) ..............................................................62

*Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231 (S.D.N.Y. 2013) .............................. 7

*Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1 (D.D.C. 2003)).  .................... 69

*Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16 (D.D.C. 2008).................................... 60

*Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001) ...................................................... 60

*Doe v. Van Eschenbach*, 2007 WL 1848013 (D.D.C. June 27, 2007)...........................................41

*Domestic Airline Travel Antitrust Litig., In re*,
221 F. Supp. 3d 46 (D.D.C. 2016)..........................................................................36

*Elevator Antitrust Litig., In re*,
502 F.3d 47 (2d Cir. 2007) ...................................................................................42

*El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996),
*vacated on other grounds, Samantar v. Yousef*, 560 U.S. 305 (2010)...............................59, 69

*Embree v. Syndham Worldwide Corp.*, 779 F. App'x 658 (11th Cir. 2019)................................41

*Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237 (D.D.C. 2015)..............................64

*Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115
(D.C. Cir. 2019) ("*Klieman II*").......................................................................56, 57

*Estate of Thompson v. Phillips*, 741 F. App'x 94 (3d Cir. 2018) .................................................67

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008) ..........................................63

*FC Inv. Grp. LC v. Lichtenstein*, 441 F. Supp. 2d 3 (D.D.C. 2006) .............................................63

*Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67 (E.D.N.Y. 2019) .....................................51

*Galloway v. Chugach Gov't Servs., Inc.*, 199 F. Supp. 3d 145 (D.D.C. 2016) .....................14, 30

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474 (E.D.N.Y. 2012)...........................................46, 54

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009).......................................................46

*Goodman v. Kimbrough*, 718 F.3d 1325 (11th Cir. 2013).............................................................18

*Guidry v. U.S. Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999) ..........................................................68

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...........................................................49, 50

*Helmer v. Doletskaya*, 393 F.3d 201 (D.C. Cir. 2004) .................................................................58

*Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, --- F. Supp. 3d ----,
2020 WL 6143654 (E.D.N.Y. Oct. 20, 2020)...............................14, 15, 16, 21, 30, 33

*Hunt v. Rodriguez*, 2009 WL 173070 (E.D. Cal. Jan. 26, 2009) ..................................................36

*Hurd v. Dist. of Columbia*, 864 F.3d 671 (D.C. Cir. 2017) ...........................................18, 27, 36

*Hussein v. Dahabshiil Transfer Servs. Limited*, 230 F. Supp. 3d 167 (S.D.N.Y. 2017) ......... 47-48

*Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833 (2018) ...........................................46

*ICC Eval. Serv., LLC v. Int'l Assoc. of Plumbing & Mech. Officials, Inc.*,
    2020 WL 1905132 (D.D.C. Apr. 17, 2020) ...........................................5, 8, 19, 21, 61

*Jiggetts v. Dist. of Columbia*, 319 F.R.D. 408 (D.D.C. 2017) .......................................41

*Kaplan v. Hezbollah*, 2019 WL 2103168 (D.D.C. May, 14, 2019) ...............................54

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ...............................................66

*Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18 (D.D.C. 2012) ....................... 58-59, 61

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ......................27, 36

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004) .................................................................47

*Kroger v. Legalbill.com LLC*, 2005 WL 4908968 (D.D.C. Apr. 7, 2005) ...........................62, 63

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ....................67

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) .................................12

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015) ..................................47

*Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017) ........................................57

*Lodi Mem'l Hosp. Ass'n, Inc. v. Tiger Lines, LLC*,
    2017 WL 999458 (E.D. Cal. Mar. 15, 2017) ...............................................38

*Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001) ...............................................41

*Malek v. Flagstar Bank*, 70 F. Supp. 3d 23 (D.D.C. 2014) .........................................70

*Mayorga v. Merdon*, 928 F.3d 84 (D.C. Cir. 2019) ..................................................18

*McFadden v. WMATA*, 949 F. Supp. 2d 214 (D.D.C. 2013) ........................................61

*Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..................................... 12, 49-50

*Miller v. Holzmann*, 2007 WL 778568 (D.D.C. Mar. 6, 2007) ....................................41

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006) .........................................54, 57

*Mousovi v. Obama*, 2016 WL 3771240 (D.D.C. July 11, 2016) .................................................22

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) ................................................................ 55-56

*Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.*,
    573 F. Supp. 2d 70 (D.D.C. 2008) ................................................................................ 68-69

*Nat'l Women's Political Caucus, Inc. v. Metro. Louisville Women's Political Caucus,
    Inc.*, 359 F. Supp. 3d 13 (D.D.C. 2019)..............................................................................55

*N. Am. Butterfly Assoc. v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020) .................................46

*Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708 (1st Cir. 1996) ............................................67

*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007) ....................64, 65, 67

*Odah v. United States*, 611 F.3d 8 (D.C. Cir. 2010).........................................................51

*Okolie v. Future Servs. Gen. Trading & Contracting Co.*, 102 F. Supp. 3d 172
    (D.D.C. 2015) ....................................................................................................................... 66-67

*Owens v. Rep. of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017), *vacated on other
    grounds by Opati v. Rep. of Sudan*, 140 S.Ct. 1601 (2020) ("*Owens III*")....................33, 44, 47

*Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) ("*Owens IV*")................................44

*Packaged Ice Antitrust Litig., In re*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010)....................................................................................42

*Paroline v. United States*, 134 S. Ct. 1710 (2014)........................................................46

*Patrick v. Dist. of Columbia*, 179 F. Supp. 3d 82 (D.D.C. 2016),.................................40

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*,
    172 F. Supp. 3d 700 (S.D.N.Y. 2016) ................................................................................ 7-8

*Prejean v. Sonatrach, Inc.*, 652 F.2d 1260 (5th Cir. 1981) ..........................................67

*Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270 (10th Cir. 2005).........................68

*Rundquist v. Vapiano SE*, 2012 WL 5954706 (D.D.C. Nov. 9, 2012) ..........................59

*Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1 (D.D.C. 1996).....................................61, 63

*SEC v. Bilzerian*, 378 F.3d 1100 (D.C. Cir. 2004) ........................................................56

*Shatsky v. PLO*, 955 F.3d 1016 (D.C. Cir. 2020) ..........................................................57

*Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ...........................54

*Strauss v. Crédit Lyonnais, S.A.*,175 F. Supp. 3d 3 (E.D.N.Y. 2016) ...........................66

*Strauss v. Crédit Lyonnais, S.A.*, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017) ........53

*Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203 (D.C. Cir. 2020) ...............................5, 19

*Terrorist Attacks on Sept. 11, 2001, In re*,
  714 F.3d 659 (2d Cir. 2013) ...............................................................57, 58, 69

*Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013)............................ 63-64

*TIG Ins. Co. v. Rep. of Arg.*, 967 F.3d 778 (D.C. Cir. 2020)........................................43

*Transamerica Leasing, Inc. v. La Republica de Venez.*, 200 F.3d 843 (D.C. Cir. 2000) .............62

*Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15 (D.D.C. 2017)........................64

*Taslidzic v. Luther*, 2018 WL 3134419 (S.D. Fla. May 21, 2018) ...............................38

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
  779 F. App'x 66 (2d Cir. 2019).....................................................................69

*United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000)................................................23

*United States v. Kozeny*, 643 F. Supp. 2d 415 (S.D.N.Y. 2009) ("*Kozeny I*") ..........6, 33

*United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011)........................................... 34-35

*United States v. Lacey*, 423 F. Supp. 3d 748 (D. Ariz. 2019)......................................23

*United States v. Mellen*, 393 F.3d 175 (D.C. Cir. 2004)..............................................34

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ..................14

*United States v. Quinn*, 403 F. Supp. 2d 57 (D.D.C. 2005)................................ 13-14, 17

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)............................................23

*United States v. Wynn*, 61 F.3d 921 (D.C. Cir. 1995)..................................................35

*United States ex rel. Chin v. CVS Pharmacy, Inc.*,
  2017 WL 4174416 (C.D. Cal. Aug. 15, 2017)................................................38

*United States ex rel. Lovett v. Holzer Clinic,*
　2014 WL 12767601 (S.D. Ohio Mar. 26, 2014) ...................................................................38

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,*
　608 F.3d 871 (D.C. Cir. 2010) .....................................................................61, 62, 67

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am. Inc.,*
　238 F. Supp. 2d 258 (D.D.C. 2002) .........................................................................39

*United States ex rel. Sansbury v. LB&B Assoc., Inc.,* 58 F. Supp. 3d 37 (D.D.C. 2004) ........38, 40

*United States ex rel. Spay v. CVS Caremark Corp.,*
　913 F. Supp. 2d 125 (E.D. Pa. 2012) ........................................................ 38-39, 40, 41

*United States ex rel. Thomas v. Siemens AG,* 708 F. Supp. 2d 505 (E.D. Pa. 2010)....................41

*United States ex rel. Vainer v. Davita, Inc.,*
　2012 WL 12832381 (N.D. Ga. Mar. 2, 2012) .........................................................38

*United States ex rel. Yarberry v. Sears Holding Corp.,*
　2013 WL 1287058 (S.D. Ill. Mar. 28, 2013) .........................................................41

*Urquhart-Bradley v. Mobley,* 964 F.3d 36 (D.C. Cir. 2020) ................................55, 56, 58, 64, 69

*Vitamins Antitrust Litig., In re,*
　94 F. Supp. 2d 26 (D.D.C. 2000) ..........................................................................69

*Waldman v. PLO,* 835 F.3d 317 (2d Cir. 2016) ..............................................................57

*Walsh Constr. Co. II v. U.S. Surety Co.,* 334 F. Supp. 3d 282 (D.D.C. 2018) ...............................7

*Weiss v. Arab Bank, PLC,* 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007) ....................................54

*Weiss v. Nat'l Westminster Bank PLC,* 768 F.3d 202 (2d Cir. 2014)..........................................13

*Wultz v. Islamic Rep. of Iran,* 755 F. Supp. 2d 1 (D.D.C. 2010) ......................................26, 45, 57

*Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC,*
　2016 WL 1367734 (D.D.C. Apr. 4, 2016) ...........................................................63, 64

*Xie v. Sklover & Co.,* 260 F. Supp. 3d 30 (D.D.C. 2017) ..................................................58, 59, 70

*Zaidan v. Trump,* 317 F. Supp. 3d 8 (D.D.C. 2018). ..................................................8, 19, 21, 40

**Statutes, Rules, and Regulations**

Anti-Terrorism Act, H.R. Rep. 102-1040 (1992) ........................................................ 29

Anti-Terrorism Act, S. Rep. No. 102-342 (1992) ...................................................... 46

Authorization for Use of Military Force, Pub. L. 107-40, § 2,
    115 Stat. 224 (Sep. 18, 2001) ........................................................................... 55

Justice Against Sponsors of Terrorism Act ("JASTA"),
    Pub. L. No. 114-222, 130 Stat. 852 (2016) ...................................................... 43

        § 2(a) .................................................................................................... 43

        § 2(b) ....................................................................................... 43, 49, 52

1 U.S.C. § 1 ................................................................................................................ 49

18 U.S.C. § 2331(4) .................................................................................................. 55

18 U.S.C. § 2331(4)(B) ............................................................................................ 54

18 U.S.C. § 2331(C) ................................................................................................. 66

18 U.S.C. § 2333(a) ............................................................................................ 29, 43

18 U.S.C. § 2333(d)(1) ............................................................................................. 49

18 U.S.C. § 2333(d)(2) ............................................................................. 43, 49, 50, 53

18 U.S.C. § 2334(a) .................................................................................................. 56

18 U.S.C. § 2336 ...................................................................................................... 54

18 U.S.C. § 2339A .................................................................................................... 29

18 U.S.C. § 2339B .................................................................................................... 52

18 U.S.C. § 2339C .................................................................................................... 29

28 U.S.C. § 1605A(a)(1) .......................................................................................... 47

Fed. R. Civ. P. 4(k)(2) .............................................................................................. 56

Fed. R. Civ. P. 4(k)(2)(A) ........................................................................................ 55

Fed. R. Civ. P. 8(a)(2) .............................................................................................. 42

Fed. R. Civ. P. 9(b) ................................................................................................ 42

Fed. R. Civ. P. 15(a)(2) ......................................................................................... 70

Fed. R. Evid. 201(b) .............................................................................................. 36

31 C.F.R. § 594.204 ............................................................................................... 47

D.C. Code § 13-423 ............................................................................................... 55

**Other Authorities**
Compl., *United States ex rel. Gordon v. ArmorGroup North America, Inc.*, No. 09-cv-01547-
    RCL (D.D.C. filed Aug. 17, 2009), Dkt. 1 .......................................................... 60

## INTRODUCTION

Plaintiffs in this lawsuit are American service members and civilians, and their families, whom the Taliban attacked in Afghanistan between 2009 and 2017. The Defendants addressed in this brief are large defense contractors that knowingly financed those attacks.[1] The reason was straightforward: Defendants obtained lucrative defense contracts in Afghanistan, and they paid the Taliban to refrain from attacking their business interests so that they could save money on security costs. Their protection payments, in turn, gave the Taliban vital funding with which to buy weapons, pay recruits, and launch attacks. In that way, the payments here mirrored those paid by the other Defendants and conformed to the industry custom in 2008-era Afghanistan. *See* Dev. Opp. 14-20. The direct effect of Defendants' payments was to strengthen a terrorist insurgency that killed and injured thousands of Americans, including Plaintiffs.

The payments made by these Defendants offer a vivid illustration of the Taliban's protection racket. Like most Western contractors in Afghanistan, Defendants operated in Taliban-controlled regions that posed security risks to their contracts. They solved that problem by buying "security" directly from the insurgents themselves. They gave the warlords they hired colorful, *Reservoir Dogs*-inspired nicknames – including "Mr. Pink," "Mr. White," and "Commander Blue" – and avoided memorializing any meaningful information about them. When later asked by Senate investigators to justify their hiring practices, Defendants dissembled

---

[1] The term "Defendants" in this brief refers to the specific defense contractors addressed by this opposition: the ArmorGroup Defendants (Dkt. 82, "AC," ¶¶ 18-20; *see also infra* note 8); Environmental Chemical Corporation ("ECC," AC ¶ 22); and Janus Global Operations LLC, as successor to EOD Technology, Inc. ("EODT," AC ¶ 23). Plaintiffs respond collectively to these Defendants' motions to dismiss. *Cf.* Dkts. 105-1 ("G4S Br."); 110-1 ("ECC Br."); 109-1 ("EODT Br."). For judicial-economy purposes, this brief incorporates by reference Plaintiffs' concurrent opposition to the USAID-contractor Defendants' motions to dismiss. *See* Opp'n to Dev. Contractor Defs.' Mots. To Dismiss ("Dev. Opp."). Unless otherwise specified, all internal quotations, brackets, and emphases are omitted from all citations herein.

about their need to "be safe."  Defendants' eagerness to purchase their own safety from murderous insurgent warlords epitomizes why the Taliban's protection racket was so successful.

In their motions to dismiss, Defendants depict an alternate universe in which their payments appear more innocuous.  They stitch that universe together largely from their own out-of-court statements, some Internet research, and even their legal briefs in other cases – all of which they cite for the truth of the matters asserted.  Defendants then use their jumble of hearsay to attack the allegations.  In Defendants' telling, the U.S. military wanted them to work with criminal warlords; their failure to document any vetting of their security guards was an accident; and they had no idea their warlord partners were tied to the Taliban.  That narrative has gaping holes and is unpersuasive at every step.  More importantly, it is at odds with the Complaint's allegations.  Perhaps Defendants can later convince a jury that it was just bad luck that their procession of hand-picked warlords kept turning out to be Taliban.  At this stage, however, the Court should accept Plaintiffs' allegations that Defendants knowingly hired terrorists.

Otherwise, Defendants here make the same flawed legal arguments about the Anti-Terrorism Act ("ATA") that Plaintiffs address in their other briefs.  Those various arguments – using nominal "intermediaries" to defeat causation, requiring Plaintiffs to trace individual dollars to individual attacks, demanding but-for causation, insisting that the Haqqani Network was separate from the Taliban, and downplaying al-Qaeda's role – remain meritless.  Such arguments all reduce to a common theme.  Defendants' briefs repeatedly argue the facts – often based on extrinsic sources that are not nearly admissible – and then say the resulting narrative makes Plaintiffs' ATA claims "implausible."  That badly mistakes the role of a motion to dismiss.

The sad truth of post-invasion Afghanistan was that the Taliban had some version of "Mr. Pink" or "Mr. White" raising money in virtually every province.  The episodes involving those

warlords do not capture the entire universe of Defendants' liability, but they do offer rich examples of the terrorist payoffs that *every* Defendant in this case was making on *every* project. Once Plaintiffs' allegations about those payments are accepted – as is required at this stage – the question of Defendants' ATA liability is not close. The motions to dismiss should be denied.

## BACKGROUND

Defendants here are companies (or their successors) that belong to three corporate families that contracted with the U.S. Department of Defense ("DOD") to perform work in Afghanistan. AC ¶¶ 18-20 (ArmorGroup Defendants), 22 (ECC), 23 (EODT). ECC is a construction company that performed a variety of road-construction and airfield-expansion projects in Afghanistan. AC ¶ 217. ArmorGroup and EODT are private-security companies that guarded ECC's projects and similar ones. AC ¶¶ 145-47, 229-30. Each company, like the other Defendants, secured its projects by participating in the Taliban's protection racket. AC ¶¶ 63-96. Plaintiffs describe in detail below each Defendant's payments to the Taliban. *Infra* Part I.

The industry dynamics that led USAID contractors to pay protection money had the same effect on private-security and defense contractors, including Defendants. AC ¶¶ 3, 6, 62-65, 69-83, 91-92, 112, 118, 121-23; *see also* Dev. Opp. 4-13 (explaining legal and factual background equally applicable here). Indeed, it was often private-security companies that effectuated insurgent payoffs on their contractor clients' behalf. AC ¶¶ 77, 91-92; *see* AC ¶¶ 255-64 (noting one infamous example). As the Special Inspector General for Afghanistan Reconstruction ("SIGAR") found in one report, "DOD and USAID reliance on private security contractors led to a substantial percentage of expenditures being diverted to insurgent groups." AC ¶ 77.

DOD was aware that U.S. defense contracts in Afghanistan risked funding the Taliban. AC ¶¶ 131, 136-39. DOD thus took a number of steps to curtail protection payments, including through interagency task forces and contract probes. AC ¶¶ 83, 136. At all times, however,

DOD's principal weapons against protection payments were the prime and subcontractors to which it paid so much money.  AC ¶¶ 141-44; *see* Dkt. 105-2 ("Senate Rep.") at 16 (DOD "relied on the primary contractor" to perform diligence).  To that end, DOD insisted on contract language requiring U.S. prime contractors (and their subcontractors) to vet their guards and verify the absence of any ties to the insurgency.  AC ¶¶ 133-34.  Those clauses reflected the core counterinsurgency principle articulated by General Petraeus in Coalition contracting guidance: that "where our money goes is as important as the service provided."  AC ¶ 139.

Defendants disregarded that principle because they found buying off the Taliban cheaper and easier than the alternative.  AC ¶¶ 63-66, 148, 164, 218, 231-34.  EODT's Deputy Country Manager well explained the prevailing logic:  he said he sourced his security guards from local warlord commanders because he "need[ed] the cooperation of all of [the commanders] to make sure that you don't cross a tribal line or you don't cross a commander line and step on their toes, which could be detrimental for [] well-being.  You know, I mean, if you're going to travel, you need to be safe."  AC ¶ 233.  EODT, like the other Defendants, did not care that those "commanders" were often terrorists.  AC ¶¶ 63-94, 234.  They viewed their job as staying "safe" while earning large profits, and at that they were relatively successful.  But their philosophy came with a heartbreaking price:  it gave the Taliban the money it needed to sustain its terrorist campaign against U.S. service members who, unlike Defendants, could not buy their way out of danger.  AC ¶¶ 97-111.  Thousands of Americans were killed and injured as a result, including Plaintiffs (and their family members) who were serving in Afghanistan.  AC ¶¶ 15, 17.

Based on these facts, Plaintiffs assert three primary-liability (AC ¶¶ 2570-76, 2584-96) and two aiding-abetting claims (AC ¶¶ 2597-2615) against these Defendants under the ATA.[2]

---

[2] Plaintiffs do not bring Count Four (AC ¶ 2591) against the G4S Defendants (AC ¶¶ 19-20).

## ARGUMENT

## I.    PLAINTIFFS SUFFICIENTLY ALLEGE THAT EACH DEFENDANT MADE PROTECTION PAYMENTS TO THE TALIBAN

At this early stage of the case, Plaintiffs need only supply a " 'short and plain statement of the claim showing that [they are] entitled to relief' " under the ATA.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)).  In assessing whether the Complaint meets that standard, the Court should accept its allegations as true and draw all reasonable inferences in Plaintiffs' favor.  *See id.*  Defendants cannot obtain dismissal by arguing that the alleged facts are "improbable," or by advancing "alternative explanations." *Id.*  Plaintiffs need not provide "detailed factual allegations."  *Id.*  Rather, to survive dismissal, Plaintiffs need only plead enough " 'factual matter, accepted as true, to state a claim to relief that is plausible on its face.' "  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

As explained below, the Complaint easily meets that standard.  The plausibility standard is not a "probability requirement," *id.*, and Plaintiffs have no obligation to "prove [their] ultimate claim" at this stage, *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1211 (D.C. Cir. 2020).  The core inquiry instead is whether the allegations "give the defendant[s] fair notice" of the claims. *ICC Eval. Serv., LLC v. Int'l Assoc. of Plumbing & Mech. Officials, Inc.*, 2020 WL 1905132, at *11 (D.D.C. 2020) (Sullivan, J.).  That is not a high bar.  The Court should thus "construe [the allegations] in [Plaintiffs'] favor, view the factual allegations as a whole, accept them as true, and grant [Plaintiffs] the benefit of all inferences that can be derived."  *Id.* at *12.

### A.    The Complaint Alleges Plausibly That Each Defendant Maintained A Practice Of Paying The Taliban For Security

The Complaint alleges that each Defendant paid the Taliban for protection in Afghanistan.  AC ¶¶ 145-68 (ArmorGroup), 217-28 (ECC), 229-43 (EODT).  Those allegations are presumed true at this stage.  *See Banneker*, 798 F.3d at 1128-29.  To begin, each Defendant

oversaw (ECC) or provided (ArmorGroup and EODT) private-security services in areas under Taliban control or influence.  AC ¶¶ 147-48, 217-18, 230-31.  Payoffs to the Taliban were a nearly universal feature of such services.  AC ¶¶ 53-96.  Corrupt payments "pervade[d] every aspect of Afghan life" during this period, and "virtually every transaction in Afghanistan involve[d] some degree of payoff."  AC ¶¶ 55, 56.  In Taliban areas – where insurgents had the ability to disrupt projects of which they disapproved – those payoffs went to the Taliban.  AC ¶¶ 62-68.  The reason was straightforward:  the Taliban leveraged its "control of the security environment in order to extort payment" from companies working in its territory.  AC ¶ 63.

Taliban procedures confirm the plausibility of those allegations.  Recognizing that private-security contractors offered a lucrative source of terrorist financing, the Taliban created a formal, regulated process for extracting payment from them (and other contractors too).  AC ¶¶ 49, 75, 100.  That process – codified in the Taliban Code of Conduct and enforced by the Taliban Financial Commission, as well as its subunit, the Taliban Organisations and Companies Commission – extended to virtually every Western contractor in Taliban areas.  AC ¶¶ 84-88.  The protection racket was "literally institutionalized," AC ¶ 100, and its defining characteristic was its near-universal application, AC ¶¶ 63-96.  As a matter of practice, the Taliban thus demanded that every company, including Defendants, obtain "permission" to conduct business.  AC ¶ 87.  The resulting payments became "so widespread" that "company owners approach[ed] the Taliban and voluntarily pa[id]" to establish "good relations" with the insurgents.  AC ¶ 82.

Those facts alone support an inference that Defendants followed the industry practice and made the payments demanded of them.  *See United States v. Kozeny*, 643 F. Supp. 2d 415, 419-20 (S.D.N.Y. 2009) ("*Kozeny I*") (admitting "evidence of the prevalence of corrupt business practices" in foreign country because such evidence "makes it probable that [defendant] was

aware that [corrupt] officials were being bribed" on a given transaction).  In Taliban areas, as documented by one House Committee staff interview, "the Taliban and local warlords typically take between 10-20% of the value of *any project* as the price to provide protection."  AC ¶ 80 (emphasis added).  Indeed, the Complaint is replete with sources – including government reports, media accounts, and company statements – attesting to the practice's industry-wide scope.[3]  Such allegations reveal "practices so pervasive that a reasonable fact-finder could infer that those practices affected the [contracts] at issue in this case."  *Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231, 238 (S.D.N.Y. 2013) (applying similar logic to mortgage-fraud context).

The Complaint further alleges that each Defendant followed that standard practice.  AC ¶¶ 149 (ArmorGroup), 219 (ECC), 232 (EODT).  It identifies systemic indications of each Defendant's payments and details why its projects conformed to industry custom.  AC ¶¶ 148, 218, 231.  For each Defendant, Plaintiffs also offer multiple examples of payments on specific projects.  AC ¶¶ 150-68 (ArmorGroup), 220-28 (ECC), 233-43 (EODT).  Those examples, on top of the industry-practice allegations, are more than enough at this stage.  *See Walsh Constr. Co. II v. U.S. Surety Co.*, 334 F. Supp. 3d 282, 291-92 (D.D.C. 2018) (sustaining allegation of company's general practice "buttresse[d] . . . with a specific example"); *Phoenix Light SF Ltd. v.*

---

[3] *E.g.*, AC ¶¶ 73 (Pentagon study of private-security firms finding that "[c]onvoy protection money" was "*simply a cost of doing business*"),74 (Task Force 2010 auditor stating the "big companies we found . . . *they're all corrupt*"), 76 (commission finding that standardized protection payments were treated "as a *cost of doing business* in Afghanistan"), 79 (subcontractor confirmation that "it was *standard practice* to build in a kick back to the Taliban"), 79 (another company defending protection payments by saying, "You have to do it. *Everybody does.*"), 80 (contractor statement that "I have *yet to find a security company* that doesn't rely on payoffs"), 81 (report that "*virtually every major project* includes a healthy cut for the insurgents"), 90 (report that Taliban took "a percentage of *almost all construction work* in the area"), 122 (*Time* cover story that "protection payments are *so widespread*" that contractor said, "You must be *the only person* in Afghanistan who doesn't know"), 205 (OIG report that DAI payments "fit the pattern . . . *endemic in* Taliban stronghold areas") (emphases added).

*Deutsche Bank Nat'l Trust Co.*, 172 F. Supp. 3d 700, 713-14 (S.D.N.Y. 2016) (sustaining allegations based on "industry[] practices" plus "specific examples of alleged problems").

All told, the Complaint devotes some 140 paragraphs to Plaintiffs' allegations that these Defendants paid the Taliban. AC ¶¶ 55-168, 217-43. Whatever the merits of Defendants' factual defenses, those allegations look nothing like the "unadorned, the defendant-unlawfully-harmed-me accusation[s]" that courts reject. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive dismissal, Plaintiffs need not "allege the *most* plausible set of facts, but merely *a* plausible set of facts." *Zaidan v. Trump*, 317 F. Supp. 3d 8, 20 (D.D.C. 2018). Because the Complaint does so, the Court should deny the motions. *See ICC*, 2020 WL 1905132, at *13.

## B.    Each Defendant's Factual Arguments Are Unpersuasive

Defendants here attack the Complaint using most of the same flawed techniques employed by the development-contractor Defendants. *See* Dev. Opp. Part I. As Plaintiffs explain elsewhere, the Court should reject the "group pleading" criticisms,[4] *id*. at 20-22; the demands for unnecessary specificity,[5] *id.* at 22-23; the requests for exculpatory inferences,[6] *id.* at 24-25; and the heavy use of extra-pleading materials,[7] *id.* at 25-27. Stripped of those faulty theories, each Defendant's attempt to argue the facts falls apart.

Because each Defendant here devotes so much attention to the allegations that single it out by name, Plaintiffs start with those allegations below. *Infra* Parts I.B.1-3. Plaintiffs then

---

[4] *Cf.* G4S Br. 13-15; EODT Br. 13-15; ECC Br. 9-12, 23; *see also infra* Part I.C.

[5] *Cf.* G4S Br. 19-20 (demanding "requisite level of specificity" that individual "payments were directed to the Taliban organization"); EODT Br. 29 (demanding that Plaintiffs "specify . . . amounts paid to Wahab, Dawoud, or Khan").

[6] *Cf.* G4S Br. 29-33 (spinning counter-narrative about Pink and White); ECC Br. 5-6, 13-22 (same for Pink, White, and Arvin Kam); EODT Br. 5-8 (same for Wahab, Dawoud, and Mirza Khan (aka Commander Blue)).

[7] *Cf.* Dkts. 110-02 to 110-23 (ECC exhibits); Dkts. 109-03 to 109-11 (EODT exhibits).

address Defendants' flawed attempt to confine the case to those allegations. *Infra* Parts I.C-D.

### 1. ArmorGroup

#### a. Plaintiffs' protection-payment allegations are sufficient

The ArmorGroup Defendants[8] maintained a practice of making protection payments to the Taliban in Taliban regions. AC ¶¶ 145-71. The ArmorGroup Defendants obtained at least eight private-security contracts that entailed work in such regions, AC ¶ 147, and they regularly paid insurgents to redirect terrorist attacks away from their projects, AC ¶¶ 148-49. Plaintiffs identify several indicia of that practice, beyond the industry custom it reflected: the Complaint cites internal company emails; ArmorGroup's stated policy of sourcing guards from Taliban-run areas; its philosophy of remaining "fair" to each "warlord" who "controlled and influenced" the territory; and the specific insurgent-infested geographies in which it operated. AC ¶ 148.

The Complaint offers several specific examples of ArmorGroup's payments, starting with AGNA's Shindand Airbase contract. AC ¶¶ 150-68. That contract, which commenced in March 2007 and was implemented by AGNA and AGI, AC ¶¶ 146, 147a, called for private-security guards to protect an airbase-expansion project in an area that "had been infested by Taliban," AC ¶ 239; *see* AC ¶¶ 147a, 150. From the outset, ArmorGroup addressed the Taliban threat by sourcing its guards from two local Taliban cutouts. AC ¶¶ 150-51. It nicknamed them "Mr. Pink" and "Mr. White" – in homage to murderous criminals from the movie *Reservoir Dogs* – and proceeded to supply both with money, weapons, and ammunition. AC ¶¶ 150-52, 164-65.

---

[8] The ArmorGroup Defendants comprise Centerra Group, LLC, as successor to ArmorGroup North America, Inc. ("AGNA"), a U.S. ArmorGroup subsidiary that held several private-security contracts in Afghanistan, AC ¶ 18; G4S Holdings International (AG) Limited ("G4S Holdings"), as successor to ArmorGroup International plc ("AGI"), AC ¶ 19, which oversaw and directed the other ArmorGroup Defendants' conduct, AC ¶¶ 146, 172-74, 76; and G4S Risk Management Limited ("G4S Risk Management"), as successor to ArmorGroup Services Limited, which held several contracts under the trade name ArmorGroup Mine Action ("AGMA"), AC ¶ 20.

Those payments and weapons benefited the Taliban organization with which both warlords were affiliated.  AC ¶ 150; *see* Senate Rep. ii ("Documents and testimony link those warlords and their successors, to murder, kidnapping, bribery, and anti-Coalition activities.").

On December 12, 2007, Pink shot White to death.  AC ¶ 151.  ECC's Security Manager described White's execution as a "mafia thing.  If you rub somebody out, you'll get a bigger piece of the pie."  *Id*.  Having executed his rival warlord, Pink then fled and took refuge with nearby "Taliban fighters and a Taliban commander."  *Id*.  Now "holed up with the Taliban," Senate Rep. ii, Pink continued gathering intelligence from his fighters – who remained ArmorGroup employees – to stage IED attacks against nearby U.S. forces, *id*. at ii, 18-19.  Yet "[d]espite reports linking Pink to the Taliban, ArmorGroup continued to employ his men for more than a month after [White's] murder."  *Id*. at ii.  On January 3, 2008, for example – weeks after ArmorGroup received reports that Pink was hiding with the Taliban – it "issued thousands of rounds of ammunition for training Mr. Pink's Taliban subordinates."  AC ¶ 151.[9]

With White dead and Pink in hiding with the Taliban, ArmorGroup needed a new security provider.  It turned to White's brother – nicknamed "Mr. White II" by ArmorGroup – who was another Taliban operative.  AC ¶¶ 153, 158.  White II was the uncle of Mullah Sadeq, a "high value Taliban commander" responsible for "coordinat[ing] IED attacks in Herat and Farah Provinces."  Senate Rep. 6-7.  Not only did AGNA hire White II, but AGI and AGMA also hired him for AGMA's nearby mine-clearance work.  AC ¶¶ 147d, 158-59.  That enabled White II to supply the "Taliban with money" through his "contracting jobs with ArmorGroup."  AC ¶ 158.

---

[9] ArmorGroup's suggestion (at 7-8, 22) that Pink only became Taliban after the White execution lacks merit.  An ECC report revealed that "Pink was *promoted to Mulla* after winning his feud (having killed) with Mr. White."  Senate Rep. 19 (emphasis added).  He could not have been "promoted" within the organization unless he was already part of it.

Indeed, White II was effective as a Taliban fundraiser because he had a "large amount of money from the contracting [with ArmorGroup and ECC] on the [Shindand] airfield."  Senate Rep. 28.[10]

White II's terrorist ties were soon laid bare for the world.  On August 21, 2008, White II hosted a Taliban shura at his home in Azizabad to commemorate White I and plan terrorist attacks.  AC ¶ 154; *see* Senate Rep. 6-8.  The shura was attended by more than 20 Taliban fighters, including White II's nephew, Mullah Sadeq.  AC ¶ 154.  After learning of the shura, Coalition forces executed a raid on the meeting to capture or kill Sadeq.  *Id.*  A full-on battle ensued:  the fighting was so intense it required air support from an AC-130 gunship, injured a U.S. soldier, and was described by the U.S. team leader as "the most kinetic engagement" of his tour.  AC ¶ 155; *see* Senate Rep. 6.  White II and seven ArmorGroup guards died in the firefight.  Senate Rep. 29.  Afterwards, investigators "found ArmorGroup uniforms, sensitive intelligence materials, advanced munitions, and IED-making materials on site."  AC ¶ 155.  The U.S. military concluded from the terrorist paraphernalia – all sitting in White II's house – that "security contractors for ArmorGroup" were part of "the anti-coalition militia in Azizabad."  *Id.*

The Azizabad raid made international news, and ArmorGroup learned of it almost immediately.  AC ¶ 161; Senate Rep. 30-31.  But after learning that its security provider had died in a battle with the U.S. military, surrounded by terrorists at a Taliban shura he was hosting, ArmorGroup did not disavow Mr. White II.  AC ¶¶ 156-57.  Far from it:  AGNA authorized a $1,000 payment to White II's family, while AGMA made similar payments to the families of the six Taliban AGMA-employed guards killed in the raid.  AC ¶ 157; Senate Rep. 31-32.  Those payments alone – which gave $7,000 to the families of the martyred Taliban terrorists whom

---

[10] Contrary to ArmorGroup's insinuation (at 5-7, 19), its payments to each warlord's fighters were effectively payments to the warlords themselves.  AC ¶¶ 152, 165; *see* Senate Rep. 11, 23.

ArmorGroup had employed – were enough to fund a terrorist cell loaded with IEDs for more than three months.  AC ¶ 103.  Alleging such "martyr payments" to the families of terrorists provides a classic example of allegations that state an ATA claim.  *See Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 623-24 (S.D. Tex. 2011); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 577-78 (E.D.N.Y. 2005).

Things only grew worse from there.  The public disclosure of White II's Taliban affiliation forced AGNA to remove his remaining guards from its payroll.  Senate Rep. 33.  "[AGMA], however, did just the opposite."  *Id*.  AGMA not only kept White II's Taliban guards on payroll; it placed them under the command of his younger brother, whom it nicknamed "Mr. White III."  AC ¶¶ 161-62.  AGMA also agreed to White III's request that it replace the second Mr. White's six slain Taliban fighters with their brothers.  AC ¶ 162.  The Taliban is a highly familial organization, and hiring the immediate relative of a slain Taliban leader in a Taliban-controlled area meant that AGMA was simply hiring another Taliban warlord.  *Id*.  That was, of course, the point:  upon realizing that White III was ready to fill in for his brother, AGMA called it "business as usual," Senate Rep. 33, and remarked, "strange how business goes on," AC ¶ 161.

AGMA did not inform the U.S. military of its decision to keep White II's men or to hire White III.  AC ¶ 161; Senate Rep. 34.  A U.S. intelligence officer testified that he "absolutely" would have opposed the decision had he known about it, calling White III and his fighters "a counterintelligence threat."  AC ¶ 162.  In the months that followed, AGMA itself expressed concern that White III's men were placing IEDs (which were used only by insurgents) nearby.  Senate Rep. 34-36.  That "concern" about White III's terrorist activities "was probably raised every week" within AGMA, and AGMA's Country Manager recognized the "potential threat from Mr. White III and his men."  *Id*. at iv.  But AGMA continued paying them.  AC ¶¶ 162-65.

Its justification reflected the traditional rationale for protection money.  As an AGMA manager opined, if AGMA did not keep paying White III and his terrorist fighters, they "might join forces with either the ArmorGroup security guards which have been released or worse still Mr. Pink and become a formidable force against ArmorGroup" and others.  Senate Rep. 33.

All told, ArmorGroup kept various Taliban fighters on its payroll for roughly 18 months in Shindand.  *Compare* Senate Rep. ii (guards begin in June 2007), *with id.* at iv (contracts ended in December 2008).  While cycling through Mr. Pink and all three White brothers, ArmorGroup gave each warlord and his fighters cash, weapons, ammunition, and training.  AC ¶¶ 151-52, 157, 165.  As one analyst concluded from the evidence, ArmorGroup's conduct "resulted in the company providing financial support to groups fighting the US military."  AC ¶ 164.  Although the Senate Report does not quantify the total value of ArmorGroup's Shindand payments, they appear to have approached $300,000 over the life of the project.[11]  Those payments, Senator Carl Levin concluded after the Senate Committee inquiry, "helped play into the hands of the enemy" and "creat[ed] the very threat [ArmorGroup was] hired to combat."  AC ¶ 167.

### b.    Plaintiffs' knowledge allegations are sufficient

ArmorGroup knew that its Shindand security payments benefited the Taliban.  AC ¶¶ 163-68.  Courts apply a "lenient standard" in assessing "scienter issues" under the ATA, recognizing that "such issues are appropriate for resolution by the trier of fact."  *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014).  Plaintiffs need not proffer "[d]irect evidence of knowledge," which is "rarely available" even at trial.  *United States v. Quinn*, 403 F.

---

[11] The Senate Report quantifies only AGMA's payments to White II and his men, explaining that it paid White II $12,350 per month, plus $180 per month to each of his 20 guards.  Senate Rep. 23-24.  That total comes to nearly $16,000 per month.  Assuming comparable monthly payments over the 18-month contract, it projects to over $287,000 in total.

Supp. 2d 57, 66-67 (D.D.C. 2005); *see United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) ("state of mind is rarely susceptible of proof by direct evidence" and may be "inferred from . . . indirect and circumstantial evidence"). That is even more true at the pleading stage, where "allegations regarding an opposing party's state of mind are inevitably fraught" and turn on information within the defendant's control. *Galloway v. Chugach Gov't Servs., Inc.*, 199 F. Supp. 3d 145, 152-53 (D.D.C. 2016). In assessing the "plausibility" of knowledge, "the Court must be cognizant that those engaged in knowing violations of the law seldom announce that fact and that it is not the Court's role to act as factfinder." *Id*. at 153.

Here, Plaintiffs plead a "litany of warning signs" alerting ArmorGroup that it was funding "terrorist activities." *Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, --- F. Supp. 3d ----, 2020 WL 6143654, at *8 (E.D.N.Y. 2020). Such "red flags" raise a plausible inference of knowledge at this stage. *Id*. at *9. *First*, AGNA's Shindand proposal promised it would conduct diligence on each guard's "family and background" and procure a "signed declaration" that each was "not a member of the Taliban." AC ¶ 166. But it refused to follow through and was either unwilling or unable to obtain the promised declarations. *Id*.; *see* Senate Rep. 59. Nor did ArmorGroup seek approval from DOD to arm the fighters sourced by Pink and White, as federal law required it to do. AC ¶ 165; Senate Rep. 10. Those acts alone are highly probative of ArmorGroup's knowledge. ArmorGroup knew it was operating in a Taliban region and knew that local warlords could well supply it with Taliban guards; that is why ArmorGroup promised the U.S. government it would *verify that each guard was not Taliban*. AC ¶ 166. ArmorGroup's failure to do what it promised – and its decision to then illegally arm its Taliban guards without asking DOD – suggests strongly that it knew of its guards' terrorist affiliations.

*Second*, Pink's and White's own conduct supplied another red flag. Their ArmorGroup-

14

given nicknames, through which AGNA paid cinematic homage to homicidal criminals, are incriminating enough on their own. Both warlords lived up to the nicknames in December 2007, when Pink conducted his "mafia"-style hit on White at a local bazaar. AC ¶ 151; Senate Rep. 14. Within days of the execution, Pink's affiliation with the Taliban became impossible to deny. AC ¶¶ 150-51. ArmorGroup thus knew in December that its first Taliban warlord had "rub[bed] . . . out" its second warlord, and not over some moral dispute: the execution was Pink's attempt to "get a bigger piece of the pie." AC ¶ 151. As for White, his attendance at a "Five Families"-style tribal meeting with AGNA's other Taliban warlord in a Taliban stronghold was a clear warning sign about his own affiliation with the Taliban. *Cf. Henkin*, 2020 WL 6143654, at *7-8. That early warning sign further placed ArmorGroup on notice of the Taliban ties possessed by the other White family members it chose to hire after White I's death. AC ¶ 162.

*Third*, ArmorGroup's decision to keep "Pink's men on the ArmorGroup guard force," Senate Rep. 16, after their boss executed White is another strong indication of the necessary knowledge, AC ¶¶ 151, 163. In the "days that followed" the execution, "local nationals reported that Mr. Pink was in a village near the airbase with a number of Taliban fighters and a Taliban commander." Senate Rep. 16. Despite those "reports linking Pink to the Taliban," however, "ArmorGroup continued to employ his men for more than a month." *Id*. at ii. And during that month, ArmorGroup gave Pink's fighters even more cash and ammunition. AC ¶¶ 151-52. It is difficult to imagine a more culpable act than supplying literal bullets to Taliban fighters with actual knowledge that their murderous boss had taken refuge with a nearby Taliban commander.

*Fourth*, ArmorGroup knew that White II lacked a registered private security company as required by Afghan law. AC ¶ 153; Senate Rep. 26-28. When an AGMA consultant investigated the issue, he learned that the Afghan government had confiscated White II's

weapons because they belonged to an illegal militia.  AC ¶¶ 159-60.  Media accounts at the time

further "linked weapons confiscated in the Shindand area to those belonging to the Taliban for

their expected use in 'terrorist attacks.' "  AC ¶ 160; *see* Senate Rep. 27-28 ("the Taliban wanted

to use these weapons in terrorist attacks").  Such public reports tying the Taliban to unlawful

weapons in Shindand further alerted ArmorGroup that its warlord – who openly used those very

weapons to operate his illegal militia – was likewise affiliated with the Taliban.  *See Henkin*,

2020 WL 6143654, at *8 (inferring knowledge from "publicly available" information); *Bartlett*

*v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *10 (E.D.N.Y. 2020)

(inferring knowledge from terrorist links reported "in contemporaneous mass media").

 *Fifth*, ArmorGroup's cost-motivated refusal to source guards from outside of Shindand

supplies another circumstantial indication of knowledge.  AC ¶ 164.  As an AGNA employee

admitted, " 'it was highly unusual' to 'recruit people from the local area' because of their ties to

the people in that area."  Senate Rep. 26.  That was particularly true in a Taliban-infested area

like Shindand, where ArmorGroup knew it should have brought in guards from outside who

were "not affiliated to anybody."  *Id*.  But it declined to go that route because it thought that (1)

"bring[ing] our outsiders" into Shindand "would have been suicide for the guys" because the

local Taliban would have attacked them; and (2) paying anyone other than White II would have

been "more expensive."  *Id*. at 25-26; *see* AC ¶ 164.  Both of those rationales – the desire to

avoid Taliban attacks, and to save money – are indicative of protection money.  AC ¶¶ 63-66.

 *Sixth*, ArmorGroup's conduct after the Azizabad raid dispels any possible inference that

its conduct was accidental.  That raid left no real doubt that White II and his men were Taliban.

AC ¶¶ 155-57.  In fact, after finding ArmorGroup uniforms at White II's compound, Coalition

forces asked AGI "why 'adversaries' would be in possession of [ArmorGroup] clothing."  Senate

Rep. 30-31.  Yet AGI, AGNA, and AGMA paid off their Taliban-affiliated families anyway.

*Supra* pp. 11-12.  AGI and AGMA also kept paying White II's men and hired White III to

command them.  AC ¶¶ 162-63.  And with actual knowledge of all that, AGMA's director later

"put on the record" that "we are forever grateful to Mr. White's family . . . because they kept our

people safe."  AC ¶ 168.  His stated mentality – that paying terrorists is acceptable so long as

"our people" are "safe" – encapsulates the logic of protection money.  AC ¶¶ 3, 91.  It also

supports the inference that ArmorGroup knew about its guards' Taliban links the entire time.

*See Quinn*, 403 F. Supp. 2d at 67 (evidence of defendant's "understanding . . . *after* all of the

allegedly unlawful transactions" is "probative of [his] knowledge . . . at earlier points in time").

### c.    ArmorGroup's factual assertions are improper

ArmorGroup's motion spins (at 6-10, 22-23, 29-33) a lengthy counter-narrative about the

Pink and White families.  That narrative rests on a slew of self-serving hearsay that is both

inaccurate and procedurally improper.  Most fundamentally, the vast majority of those assertions

are sourced to ArmorGroup's *own statements*.  Indeed, ArmorGroup's motion repeatedly quotes

company witnesses, attributes their statements to the "Senate Report," and asks the Court to

accept them all as true.[12]  The Court should reject those arguments out of hand.

It goes without saying that a defendant cannot obtain dismissal on the pleadings by

offering its own testimony to rebut a plaintiff's allegations.  *See*, *e.g.*, *Cabrera v. B&H Nat'l*

---

[12] *E.g.*, G4S Br. 6-7 (quoting ECC employee's assertion that U.S. military "referred him to
White"); G4S Br. 7 (asserting that "no derogatory information was found" on Pink and White,
based on AGNA witness); G4S Br. 8 (asserting that White II "wore a police uniform" and "drove
a police car," based on same AGNA witness); *id.* (citing ECC witness's assertion, in conflict
with AGNA witness, that White II "owned electronics stores"); G4S Br. 9 (asserting that
"AGMA understood [the White II weapons seizure] to be due to a dispute between an Afghan
official and White II regarding their 'financial agreement,'" based on AGMA witness); G4S Br.
23 (quoting AGMA's own assertion that "White II was known as a respected tribal elder").

*Place, Inc.*, 2015 WL 9269335, at *4 (D.D.C. 2015) ("improper" to dismiss claims "simply because [defendant] has denied them in an affidavit"). That principle does not evaporate merely because the testimony here appears in a report cited by Plaintiffs. By citing the Senate Report, Plaintiffs do not "adopt every word within [the report] as true." *Banneker*, 798 F.3d at 1133. That is especially true of the self-serving statements of ArmorGroup witnesses, which are hearsay and would be inadmissible at trial. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1333 n.2 (11th Cir. 2013) ("placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible"). Crediting such hearsay now – before Plaintiffs have even had a chance to cross-examine the witnesses being quoted or obtain contradictory evidence in discovery – would deprive Plaintiffs of their right to "discover and present relevant evidence." *Hurd v. Dist. of Columbia*, 864 F.3d 671, 686-87 (D.C. Cir. 2017).

Nor does the Senate Report adopt ArmorGroup's statements as true. For example, AGNA's Senior Team Leader – who is the source for most of the "facts" recited in ArmorGroup's brief – "told the Committee that [we] decided to 'disassociate ourselves with Pink' " "following the incident" with White. Senate Rep. 16. Yet in the Report's very next clause, the Committee found there was "little evidence that Pink's men were, in fact, 'phased out' at that time." *Id*. The same witness also claimed that "he provided U.S. Military personnel with the names of the guards he hired so that they could conduct background checks." *Id*. at 10. But a U.S. military official said the opposite, and ArmorGroup had no documentary corroboration of its story. *Id*. ("the U.S. Military Team Leader said that he did not see a list of names"). Even at trial, a jury would not be obliged to credit ArmorGroup's dubious account of the facts. *See Mayorga v. Merdon*, 928 F.3d 84, 94 (D.C. Cir. 2019) ("it is ordinarily the role of the jury" to weigh the "testimony of a witness" who "may be impaired by party self-interest").

Just as a jury could disbelieve ArmorGroup's witnesses, so should the Court decline to credit them at this stage. Because the Senate Report typically quoted those witnesses to cast doubt on their credibility, Plaintiffs' reliance on the Report in no way endorses their factual recitation. *See Banneker*, 798 F.3d at 1133-34. If anything, their testimony merely reveals factual disputes that warrant discovery to resolve. *See*, *e.g.*, *ICC*, 2020 WL 1905132, at *11-13.

### d.    ArmorGroup's other factual criticisms are unpersuasive

ArmorGroup's remaining arguments (at 22-23, 29-33), like the other Defendants' positions, misapprehend the relevant pleading standard. Dev. Opp. Part I.B.2. Each mistakenly demands that Plaintiffs offer "evidence" of the warlords' terrorist affiliations, *Strike 3*, 964 F.3d at 1211, and each tries to explain away ArmorGroup's payments by positing a competing "plausible explanation" for them, *Zaidan*, 317 F. Supp. 3d at 20. None is successful.[13]

To begin, ArmorGroup repeatedly asserts that "the U.S. military recommended to AGNA that it hire Pink and White." G4S Br. 22; *see id.* at 6-7, 30. As to White, that assertion is sourced to a self-interested ECC witness and conflicts with the relevant U.S. official's recollection. *See* Senate Rep. 9 ("The Team Leader said, however, that while Mr. White was known to him, he did not think he referred ECC to White."). As for Pink, though a U.S. military Team Leader recommended him to ECC as an initial "point of contact," the Team Leader "didn't want to be involved in contracting" and ended his "relationship with the contractors" after the

---

[13] G4S Holdings' denial (at 15) of liability lacks merit. Its argument rests on the mistaken premise that the Court should ignore all allegations beyond the examples. *Infra* Part I.C; *see* AC ¶¶ 147f, 147h, 148 (noting standalone G4S contracts on which Plaintiffs allege G4S made payments to the Taliban). Regardless, AGI (G4S Holdings' predecessor) played a pivotal role in directing AGNA's and AGMA's conduct on the Shindand contracts discussed at length in the Complaint and is liable for the payments to Mr. Pink and the various Mr. Whites. *See infra* Part V.B.1 (noting AGNA was AGI's agent); AC ¶¶ 172-74, 176 (alleging AGI approved and directed AGMA's conduct, including on the UNOPS contract); *see also* Dkt. 110-5 at 24 (calling AGMA "a fully established service line of ArmorGroup International").

initial referral.  *Id.*  The U.S. government "relied on the primary contractor" to vet the "warlords," not the other way around.  *Id.* at 16; *see* AC ¶¶ 135-44.  AGNA thus won the Shindand contract by promising a "strict vetting and screening process" for each guard it hired.  Senate Rep. 58-59.  That a single military officer once recommended Pink as an initial point of contact hardly justifies hiring him, much less all the additional illegal conduct that followed.

Once AGNA hired Pink and his terrorist fighters, its conduct escalated from there.  Its decision to keep paying Pink's men even after he had murdered White and "holed up with the Taliban," Senate Rep. ii, offers a case in point.  ArmorGroup says (at 30) it only learned the truth about Pink on January 13, 2008, but it ignores an ECC report *from December 2007* describing Pink's Taliban affiliation "in the days that followed" the murder of White.  *Id.* at 16.  Given the intimate ties between ECC and ArmorGroup, AC ¶¶ 221-23, it defies belief to suggest ECC never shared that information.  ArmorGroup contends otherwise by citing a January 13 "report[]" that 'Pink has now aligned himself with the Taliban,' " Senate Rep. 19, and then asserting (at 7) without evidence that the report was the "first" AGNA had heard of the matter.  Even if true, ArmorGroup is not entitled to that inference at this stage.  *See Banneker*, 798 F.3d at 1129.

ArmorGroup's defense of White II is even less persuasive.  When ArmorGroup hired White II, it knew (at a minimum) that (1) its first two warlords reminded it of murderous criminals (cop killers, in fact) from *Reservoir Dogs*, AC ¶ 150; (2) its first warlord was "in full league with the Taliban," Senate Rep. 18; and (3) that same Taliban warlord had murdered the other one in a "mafia-style" hit, AC ¶ 151.  But ArmorGroup decided to double down with White II anyway.  When he too turned out to be Taliban – and died defending his stash of Taliban weaponry from an attack on his infamous terrorist nephew – ArmorGroup claims (at 31-32) to

have been shocked.[14]  Again, this is a company that said it conducted "strict vetting" of every

guard's "family and background."  Senate Rep. 58-59.  Its professed ignorance strains credulity.

ArmorGroup responds (at 30-31) that a "reasonable observer" would view White II more

sympathetically.  That asks the wrong question.  Plaintiffs need not disprove ArmorGroup's

inferences in the Complaint; they need only supply "*a* plausible set of facts."  *Zaidan*, 317 F.

Supp. 3d at 20; *see ICC*, 2020 WL 1905132, at *11.  Plaintiffs thus need not produce "conclusive

evidence" proving that ArmorGroup actually connected the dots between all the "various red

flags" about White II.  *Henkin*, 2020 WL 6143654, at *9.[15]  According to ArmorGroup, of

course, only a company document spelling out that "we know we are paying the Taliban" will

do.  But that standard is "virtually impossible" to meet, and it is not the law.  *Id*.; *see Bartlett*,

2020 WL 7089448 at *10-11 (rejecting such a standard as "unrealistic").

ArmorGroup's proffered account (at 9-10, 31-32) of the Azizabad raid is more of the

same.  It conjures (at 9-10) uncertainty over whether the Azizabad shura was actually a "civilian

funeral gathering" and says "it was widely believed that Pink, through his associates, fed the

U.S. military false information" to attack it.  But an Army Brigadier General investigated those

very claims and called them " 'disingenuous, without merit, and concretely disputed' by evidence

presented in his findings."  Senate Rep. 32.  And Coalition investigators found IED-making

materials and other terrorist weaponry at White II's compound.  AC ¶¶ 154-56.  But in a

---

[14] ArmorGroup is wrong (at 30-31) that Pink and White could not both have been Taliban while remaining personal enemies.  Their conflict was economic, not ideological, and it is common for personal rivalries to exist within a criminal group like the Taliban.

[15] ArmorGroup's assertion (at 8) that it thought White II was a "police officer" should not be credited at this stage, and regardless, also lacks merit.  ArmorGroup's underlying source for that position is the same AGNA witness whose credibility the Senate Report repeatedly calls into question.  In fact, "White II had no responsibility for policing."  Senate Rep. 18.  The police-officer narrative also contradicts ECC's asserted view that White II was a "businessman who owned electronics stores."  *Id*. at 17.

maneuver that typifies its motion, ArmorGroup skips over those findings, cites instead to the hearsay account of an AGMA consultant, and asks the Court to credit its version of the facts as "widely believed." G4S Br. 9. That is very far from a basis for dismissal. Dev. Opp. Part I.B.

ArmorGroup's spin (at 32-33) on White III is the least compelling of all. Again, White III was yet another Taliban warlord whom AGMA hired to take command of White II's temporarily leaderless Taliban guards in the wake of White II's death. AC ¶¶ 161-63. Even AGNA was forced to "dismiss[]" those guards after the Azizabad raid, concluding "they could no longer be trusted." Senate Rep. 33. AGMA, however, not only kept "White II's men but they agreed to hire the brothers of White II's men killed in the raid on the Taliban." *Id*. ArmorGroup does not even try to explain why AGMA was willing to continue employing guards that its U.S. affiliate had just fired. Its decision – keeping a dead Taliban warlord's soldiers on payroll, hiring the brothers of six others who had just died fighting the U.S. military, and placing them all under the command of the previous Taliban leader's brother – is indefensible. *Supra* pp. 12-13.

ArmorGroup caricatures (at 32) these allegations as "guilt by association" and downplays family lineage as irrelevant. But "determining whether an individual is part of . . . the Taliban . . . almost always requires drawing inferences from circumstantial evidence, such as that individual's personal associations." *Ali v. Obama*, 736 F.3d 542, 546 (D.C. Cir. 2013) (Kavanaugh, J.). With the Taliban, family ties are a key indicator of membership. AC ¶ 162; *cf. Mousovi v. Obama*, 2016 WL 3771240, at *9 (D.D.C. 2016) (finding detainee's association with Taliban and allied group based in part on "indirect familial relationship"). ArmorGroup agreed: it promised to vet each guard's "*family* and background" to verify he was "not a member of the Taliban." Senate Rep. 59 (emphasis added). ArmorGroup cannot dismiss as irrelevant the very thing it promised to probe for Taliban links. Indeed, because the Taliban is unlike an enemy

force in "traditional wars" and does not "issue membership cards," associational indicators like family ties supply the most realistic way to determine its "membership." *Ali*, 736 F.3d at 546.

Here, the problem was not just that White III was White II's brother and Mullah Sadeq's uncle. It was that he also (1) came from a Taliban stronghold that had already produced multiple Taliban warlords; (2) took command of *the same guards* who had worked for his dead Taliban brother and whom AGMA's own affiliate had just fired for that reason; (3) demanded that ArmorGroup hire the brothers of six other dead Taliban soldiers; and (4) communicated he had "taken over the family security business." Senate Rep. 33. Nothing about that suggests that White III intended to do things differently from White II. To the contrary, when planning the hiring of White III after Azizabad, AGMA considered it "business as usual." *Id.*

Finally, ArmorGroup's belated remedial measures do not help its cause. Although AGNA eventually cut ties with Pink's and White II's Taliban fighters, *see* G4S Br. 8, 10, a jury could readily find that it had previously known of these fighters' Taliban affiliation and that it fired them to cover its tracks.[16] Such conduct reflected a pattern: hire Taliban fighters to save money, AC ¶ 164; ignore the red flags, *supra* Part I.B.1.b; avoid documenting the problem, AC ¶ 166; and then cut the fighters loose only once the Taliban link became impossible to keep hidden, Senate Rep. 16-17, 33. This pattern did not happen only once. It happened with Pink, White, White II, and then White III, placing each episode in a decidedly more incriminating light. *See United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000) (evidence of similar acts "on a prior occasion . . . decrease[s] the likelihood" that act is "accidental[] or innocent[]").

---

[16] *Cf. United States v. Warshak*, 631 F.3d 266, 309 (6th Cir. 2010) ("A reasonable juror could easily conclude that any supposedly remedial measures were simply undertaken to create plausible deniability."); *United States v. Lacey*, 423 F. Supp. 3d 748, 754-55 (D. Ariz. 2019) ("moderation effort[]" intended merely "to create a 'veneer of deniability'")

2.    **ECC**

a.    **Plaintiffs' allegations are sufficient**

ECC likewise maintained a practice of making protection payments to the Taliban in Taliban-controlled and -influenced regions.  AC ¶¶ 217-28.  ECC obtained at least five defense contracts that entailed work in such regions, AC ¶ 217, and it regularly paid insurgents to redirect terrorist attacks away from those projects, AC ¶¶ 218-20.  Plaintiffs identify several indicia of that practice, beyond the industry custom it reflected:  the Complaint cites ECC's pattern of hiring insurgent-linked subcontractors; its particular project types, including work on Afghanistan's infamous Ring Road; the Taliban-infested geographies, like Shindand, in which ECC operated; and a lack of financial controls indicative of insurgent payoffs.  AC ¶ 218.

The Complaint also offers specific examples of ECC's payments.  AC ¶¶ 221-28.  For one, ECC supervised AGNA on the Shindand Airbase contract and participated in AGNA's decisions to hire and pay Mr. Pink, Mr. White, and Mr. White II.  *Supra* Part I.B.1; AC ¶ 221. ECC's Security Manager met personally with all three and made the ultimate decision to retain each warlord.  AC ¶ 222.  ECC personnel were also on the ground with AGNA, accompanied AGNA personnel in Shindand, and were intimately involved in designing the security plan in which Mr. Pink and the first two Mr. Whites played an integral role.  *Id.*  Every key incident involving Pink, White, and White II above was documented in ECC's own files.  *Id.*  In that way, ECC demonstrated the typical relationship between prime and subcontractors in Afghanistan: ArmorGroup had on-the-ground responsibility for paying the guards, but it did so with ECC's knowledge, involvement, and approval.  *Compare* AC ¶¶ 221-23, *with* AC ¶¶ 95-96.

ECC's Kunduz Police Contract offers an even more compelling example.  On that project, ECC channeled payments to the insurgency through a local subcontractor, Arvin Kam Construction Company ("Arvin Kam").  AC ¶¶ 224-28.  In July 2012, while ECC was paying

Arvin Kam under its subcontract, the U.S. military determined that Arvin Kam was "actively supporting [the Afghan] insurgency" and thus prohibited U.S contractors from paying it "directly or indirectly."  Dkt. 110-9 at 5; AC ¶ 224.  That determination occurred under a federal law specially designed to "prevent the continued flow of United States funds to insurgents."  Dkt. 110-8 at 14; *see* Dkt. 110-9 at 3 (invoking "force protection reasons").  As ECC later admitted in federal court, Arvin Kam was at the time "actively supporting insurgents in Afghanistan," was "an active supporter of terrorists," and was a "known enemy of the United States."  AC ¶ 224.

ECC still resisted the U.S. military's efforts to terminate its relationship with Arvin Kam.  AC ¶¶ 225-26.  After the initial designation, the government observed, "ECC[] should have terminated Arvin Kam immediately" and was "well aware that termination would be an appropriate action."  AC ¶ 225.  ECC, however, sent Arvin Kam a termination notice only after the Army threatened ECC with default under its own prime contract.  *Id.*[17]  ECC also promptly initiated litigation against the Army, claiming that Arvin Kam's insurgent affiliations did not permit the U.S. government to "direct termination of [the] subcontractor."  AC ¶ 226.  As the government summarized ECC's position:  "ECC[]'s argument was apparently that even though Arvin Kam was committing treason, the [Army] had no authority to force ECC[] to terminate Arvin Kam."  *Id*.  That mindset – focusing only on ECC's bottom line while showing no concern for having paid terrorists – exemplified ECC's approach in Afghanistan.  AC ¶ 218.

Meanwhile, ECC agreed to "settle" its resulting dispute with Arvin Kam by providing additional cash to its Taliban-affiliated subcontractor.  AC ¶ 227.  As a court later observed,

---

[17] ECC's disclosure of the Arvin Kam issue was not "proactive[]," ECC Br. 36; it went to the Army only after the Air Force had already raised the issue with ECC, *id.* at 6.  ECC's stratagem only heightens its culpability:  a jury could infer that ECC alerted the Army to force the Army to expressly direct it to terminate Arvin Kam, so that ECC could then use the direction as an excuse to recoup its costs (including its "settlement" costs) from the U.S. government.  AC ¶¶ 225-28.

"[w]hy ECC did this is unclear, particularly since the parties do not dispute that it terminated the contract with [Arvin Kam] purely on the basis of the national security and insurgency determination." *Arvin Kam Constr. Co. v. Env't Chem. Corp.*, 2019 WL 1598220, at *2 (N.D. Cal. 2019). Yet despite having been forced to terminate Arvin Kam's contract – knowing that the sole reason was Arvin Kam's association with the Afghan insurgency – *ECC still paid it an additional $1.5 million*. AC ¶ 227. It also asserted claims against the U.S. government seeking reimbursement for more than $3.1 million it had incurred in terminating Arvin Kam. *Id.* In doing so, the government concluded, "ECC[] [was] attempting to shift the consequences of its own action, in hiring a subcontractor who was supporting the insurgency." AC ¶ 228.

The Arvin Kam payments alone subject ECC to ATA liability. After ECC received notice that Arvin Kam was part of the insurgency, ECC proceeded to pay Arvin Kam at least $1.5 million anyway. AC ¶ 227. The documents ECC filed with its motion to dismiss not only confirm that "settlement" payment, Dkt. 110-12, Encl. (6) at 16, but also suggest that ECC went on to make a series of additional payments, *id.* at 20-23 (reporting extra payments on December 18, 2012). Making such payments to terrorists *after* learning of their connection to terrorism falls within the heartland of ATA liability.[18] Given the low cost of Afghan terrorism, AC ¶ 103, $1.5 million was enough to finance large numbers of attacks on Americans.

### b.    ECC's arguments are unpersuasive

ECC, even more than ArmorGroup, attacks (at 3-23) the "plausibility" of Plaintiffs' allegations by weaving a counter-narrative from an array of extra-pleading materials. *See* Dev.

---

[18] *See Bartlett*, 2020 WL 7089448 at *9-10 (sustaining knowledge allegations given terrorist "designation" of funding recipient); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 50-52 (D.D.C. 2010) (sustaining ATA claims against bank that transferred money to affiliate of Palestinian Islamic Jihad after "Israel officials" informed it that "the money transferred was being used to fund terror").

Opp. 25-27 (explaining flaw in that approach). Plaintiffs have not had a chance to test ECC's assertions in discovery, and few of those assertions are grounded in anything resembling admissible evidence. If defendants like ECC are "permitted to present their own version of the facts at the pleading stage – and district courts accept those facts as uncontroverted and true – it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

Like ArmorGroup, ECC repeatedly quotes its own (or ArmorGroup's) out-of-court statements and portrays them as Senate Committee findings.[19] That gambit remains improper. *Supra* pp. 17-19. ECC also cites its own website;[20] ECC-drafted correspondence;[21] a putative declaration from an Afghan witness;[22] an audit report;[23] and even assertions made in ECC's legal briefs.[24] ECC then asks the Court to accept those materials for their truth and use the resulting "facts" to reject Plaintiffs' allegations. None of that is permissible. Dev. Opp. 25-26. The Court should not credit the disputed facts ECC derives from such materials, especially the self-serving statements in its own legal filings. *See Hurd*, 864 F.3d at 686 (courts can take judicial notice of legal filings "as a record of what was said" but not "for the truth of the matter asserted").

That principle dispenses with most of ECC's factual arguments. ECC attempts (at 13-17) to defend its relationship with Mr. Pink and the first two Mr. Whites using the same arguments

---

[19] *Compare* ECC Br. 14 ("The Senate Report concluded that Mr. White was 'cooperating with American forces.'"), *with* Senate Rep. 8 (describing what "[o]ne ArmorGroup document said"); *see also*, *e.g.*, ECC Br. 5 & n.2, 6 & n.5, 13-16.

[20] ECC Br. 9 n.13.

[21] ECC Br. 6 n.8, 21 (citing Dkts. 110-11, 110-12).

[22] ECC Br. 21 n.29 (citing Dkt. 110-18).

[23] ECC Br. 19 & n.26, 41 (citing Dkt. 110-15).

[24] ECC Br. 6 & n.7, 20 & n.27 (citing Dkt. 110-7), *id.* at 6 & nn.8-9, 21 & n.30 (citing Dkt. 110-10).

ArmorGroup raised above, but those points remain unpersuasive.  *Supra* Part I.B.1.d.  All of the red flags alerting ArmorGroup to those warlords' Taliban connections also alerted ECC to the same thing.  *Compare supra* Part I.B.1.b, *with* AC ¶¶ 221-23.  Indeed, ECC elsewhere admits that it exercised control over ArmorGroup, claiming credit for terminating Pink's and White II's men "through ArmorGroup."  ECC Br. 35 (calling this "ECC's termination").  ECC cannot take credit for the remedial measures while denying responsibility for the decisions that made those measures necessary.  And although ECC cites (at 13-14, 35) AGNA's promise that it would procure declarations from its guards, ECC knew that AGNA never followed through.  AC ¶ 223.

ECC's defense (at 17-22) of the Arvin Kam payments fares no better.  ECC offers no credible justification for having given at least $1.5 million to Arvin Kam *after* the U.S. military designated it as supporting the insurgency.  That July 2012 designation, ECC has recognized, invoked authority instructing firms to "Never Contract With The Enemy."  AC ¶ 227.  Whether or not ECC had actual knowledge of Arvin Kam's terrorist affiliation before that designation, *cf.* ECC Br. 19-21, there is no conceivable defense for its payments thereafter.  AC ¶¶ 227-28.

ECC intimates (at 21) it paid Arvin Kam under "pressure" from the Afghan Attorney General, but that assertion is both factually unfounded and legally irrelevant.  As for the facts, ECC cites (at 21) only its own summary-judgment briefing in a related case, plus an untested declaration from a putative Afghan witness.  Neither would be admissible at trial, and the Court can credit neither of them now.  And as for the law, alleged pressure from Afghan officials – who ECC admits were often "corrupt[]," Dkt. 110-12 at 3 – is no excuse for funding terrorists.  AC ¶¶ 127-30; *cf. Arvin Kam*, 2019 WL 1598220, at *2 (casting doubt on ECC's "vague suggestion that it was pressured into [the payments] by political forces").

ECC's only other response is to claim that the U.S. government "did not object to the

settlement payments."  ECC Br. 21; *see id.* at 6, 33.  The record does not reflect what the U.S. government knew about ECC's payments, or what its reaction was.  If anything, the government's summary-judgment briefing against ECC conveyed its profound disapproval of ECC's conduct.  AC ¶¶ 225-26, 228.  In any event, the ATA contains no "government non-objection" defense.  At best, ECC's theory is that the U.S. government learned of its "settlement" payments to Arvin Kam after the fact and failed then to initiate additional litigation against ECC.  That does not make ECC's payments any less illegal under the ATA or the criminal laws it incorporates.  *See* 18 U.S.C. §§ 2333(a), 2339A, 2339C.  Indeed, the ATA's purpose was to create a civil cause of action to supplement the role of criminal enforcement.  *See* H.R. Rep. 102-1040, at *5 (1992).  That the U.S. government failed to prosecute ECC is beside the point.[25]

Although the post-designation "settlement" is enough for liability, ECC also had knowledge of Arvin Kam's terrorist connections years earlier.  ECC hired Arvin Kam in 2010 to perform a variety of tasks in Kunduz Province.  AC ¶¶ 217d, 224; *see* Dkt. 110-6.  By that time, the Taliban was extracting a standard "tax of 10 percent on businesses" in Kunduz, and public reports indicated that the Taliban's "shadow governor" took "a percentage of almost all construction work in the area."  AC ¶ 218.  Overwhelming media coverage also reported at the time that protection money was ubiquitous in Taliban areas.  AC ¶¶ 122-26.  ECC was aware of that coverage, given its representation that it "possesse[d] the degree of knowledge that is 'standard' to experienced contractors in this industry and location."  Dkt. 110-17 at 57 § 1.  It further warranted it would "gain other relevant information that is reasonably available" about the security environment in which it was operating.  *Id.*  In light of those commitments, it is

---

[25] ECC also says (at 21) it "obtained an order" from a U.S. court "voiding the Arvin Kam settlement."  *See* ECC Br. 6 (similar).  In fact, ECC only obtained that order after Arvin Kam sued ECC for breach of contract in the United States.  *See Arvin Kam*, 2019 WL 1598220, at *1.

plausible that ECC knew (or avoided knowing) of the public reports describing protection payments even before the U.S. government publicly designated Arvin Kam as supporting the Taliban.  *See Bartlett*, 2020 WL 7089448, at *9-12 (sustaining similar knowledge allegations).

In addition, ECC's Kunduz contract came on the heels of its Shindand contract, on which the Senate Committee publicly reported that ECC had hired Taliban-aligned warlords.  *Supra* p. 24.  This was another bright "red flag[]" alerting ECC to the substantial risk that Arvin Kam was likewise tied to the insurgency.  *Henkin*, 2020 WL 6143654, at *9.  But ECC's theory is that it read the Senate Report, discovered that its warlord partners in Shindand had been in league with the Taliban, and then drew no inferences whatsoever about its relationship with Arvin Kam – even though Arvin Kam was working in an area (like Shindand) run by the Taliban and in which protection payments were widely known to be routine.  At a minimum, Plaintiffs are entitled to test that implausible story in discovery.  *See Galloway*, 199 F. Supp. 3d at 152-53.  As DOD stated in rejecting ECC's attempt to shirk responsibility for Arvin Kam, ECC was "responsible for the acts of its subcontractor, as is proper under the law of prime/subcontractor relations." Dkt. 110-16 at 13.  Accordingly, its years-long relationship with a hand-picked subcontractor that was in league with the Taliban is more than enough to state a claim.

### 3.    EODT

#### a.    EODT paid Taliban fighters

EODT likewise maintained a practice of paying the Taliban for protection in Taliban-controlled or -influenced regions.  AC ¶¶ 229-43.  EODT obtained at least six private-security contracts that entailed work in such regions, AC ¶ 230, and it regularly paid insurgents to redirect terrorist attacks away from those projects, AC ¶¶ 231-34.  Plaintiffs identify several indicia of that practice, beyond the industry custom it reflected:  the Complaint cites EODT's philosophy of appeasing each warlord within the areas where it operated; its policy of sourcing guards from

whatever group posed the greatest threat to its operations; its reliance on practices used by U.S. Protection and Investigation ("USPI"), the criminal contractor that paid the Taliban as a matter of routine (AC ¶¶ 231, 255-63); and the Taliban-infested geographies in which EODT concentrated.  AC ¶ 231.  In describing its approach, EODT's Deputy Country Manager explained that EODT secured the "cooperation" of local commanders in each area to ensure that "you don't cross a tribal line or you don't cross a commander line," because "if you're going to travel, you need to be safe."  AC ¶ 233.  In the Taliban areas where EODT worked, that inexorably meant EODT was buying the "cooperation" of Taliban commanders.  AC ¶¶ 233-34.

As an example, EODT paid Taliban fighters to guard a 2008 project in Adraskan, near Shindand.  AC ¶¶ 230a, 235-43.  EODT found those guards through "local strongmen" whom it referred to as "commanders" or "notables."  Senate Rep. 38.  But "what was most notable about those individuals was their affiliations with criminal and anti-coalition activities."  *Id*.

The Complaint offers three illustrations of those payments.  *First*, in early 2008, EODT relied on a warlord named "General Wahab" to source its guards in Adraskan.  AC ¶¶ 230a, 235.  General Wahab was a Taliban cutout and former mujahedeen commander, who cut a "mafia" like figure and acted "like the Godfather" in Adraskan.  AC ¶ 235.  EODT's use of Wahab financially supported the Taliban.  AC ¶¶ 235-39.  Indeed, General Wahab was a known "loyal Taliban commander" who, by 2005, had gone into the business of selling private-security forces to U.S. contractors.  AC ¶ 237.  The U.S. Army "hate[d] General Wahab" and, according to EODT, gave EODT a "spew of how Wahab was such a bad guy."  AC ¶ 236.  Yet EODT chose to pay him anyway.  *Id*.  Its rationale embodied the logic of protection money:  EODT's Deputy Country Manager opined that "if Wahab is mad at me, or upset with me, you know the – I'm not saying that he would have ambushed us, but the potential for something happening on the road,

without his protection, certainly has increased."  *Id.*; *see* AC ¶¶ 63-66, 98, 100-02.

General Wahab supplied EODT with Taliban guards.  AC ¶¶ 237-38.  Most notable was his sponsorship of Pink's men, whom ArmorGroup had just fired for passing sensitive security information to the Taliban.  AC ¶ 238.  When EODT hired Pink's guards, Pink was "in full league with the Taliban" and had been "promoted to Mulla" (a leader) by the Taliban.  *Id.*  Even ECC and ArmorGroup had determined that they had "very little choice but to fire Pink's men."  Senate Rep. ii.  EODT, however, took the opposite view and hired those same Taliban guards via a local criminal who had recently and openly served as a Taliban commander.  AC ¶¶ 235-40.

*Second*, EODT also sourced security guards from Haji Dawoud, another Taliban member in Herat.  AC ¶ 241.  U.S. military intelligence at the time "identified Dawoud as one of the village's Taliban" and concluded he was in league with Mullah Sadeq, the high-level insurgent commander who was the target of the famous Azizabad raid.  *Id.*  An ArmorGroup security report – based on the same type of information available to EODT – likewise described Dawoud as the "main influence" at a "high profile Taliban meeting" to plan kidnappings in the region.  *Id.*  Yet EODT relied on Dawoud as one of its key "manpower providers."  Senate Rep. v.

*Third*, EODT also sourced security guards from a third insurgent, whom it nicknamed "Commander Blue."  AC ¶ 242.  Commander Blue was an Iranian Qods Force asset stationed in Afghanistan to sponsor Taliban attacks on U.S. forces.  *Id.*; *see* AC ¶¶ 344-45 (describing Qods Force-Taliban relationship).  EODT intentionally "knew little about whom [Commander Blue] was interacting with," because it believed an investigation would have "blown his cover."  AC ¶ 242.  Commander Blue supplied EODT with additional Taliban guards.  *Id.*

### b.  Plaintiffs' knowledge allegations are sufficient

EODT knew it was paying the Taliban.  AC ¶¶ 233-34, 239-43.  At the outset, EODT

knew that Shindand "had been infested by Taliban," and EODT's Security Manager admitted he

"didn't have a good feeling about recruiting" there for that reason.  AC ¶ 239; Senate Rep. 45.

His feeling was well-grounded:  it was widely known in the industry that local security providers

in areas like Shindand paid Taliban guards for security.  AC ¶¶ 118-26; *see* AC ¶¶ 63-94.

EODT's actions should be viewed through that lens.  *See Owens v. Rep. of Sudan*, 864 F.3d 751,

794 (D.C. Cir. 2017) (material support should not be "[v]iewed in isolation" but in light of the

"broader picture"), *vacated on other grounds by Opati v. Rep. of Sudan*, 140 S. Ct. 1601 (2020).

("*Owens III*"); *Kozeny I*, 643 F. Supp. 2d at 419-20 ("prevalence of corrupt business practices in

[country]" made it "probable" that defendant "was aware" of bribery).  Given the context, that

EODT ended up with Taliban fighters on its payroll would have been expected.

     EODT's relationship with USPI amplifies that inference.  USPI was the leading purveyor

of protection money in Afghanistan and had a "spotty reputation" for that reason.  AC ¶¶ 255-61.

Even so, EODT hired its Deputy Country Manager from USPI, put him in charge of security, and

copied USPI's practices.  AC ¶ 231.  EODT decided to use General Wahab and Commander

Blue due to USPI's experience with both.  AC ¶ 236; Senate Rep. 47.  EODT also used Wahab

to hire "nearly 40 guards" who "listed prior work experience with USPI."  Senate Rep. 45 n.352.

Perhaps EODT can convince a jury that all this is pure coincidence, and that it had no idea that

the USPI official it hired would follow the USPI playbook and hire the same Taliban guards that

USPI had recently used.  But a far more plausible inference – to which Plaintiffs are entitled at

this stage – is that EODT knew exactly what it was doing.  AC ¶¶ 231-34.

     EODT was also aware of specific "red flags" about the Taliban warlords it used.  *Henkin*,

2020 WL 6143654, at *8.  EODT admittedly knew the "Army hates General Wahab," AC ¶ 236,

and it proffers no explanation for why it partnered with a warlord in a Taliban-infested area

whom it knew the U.S. military "hated." Still worse was its decision to follow Wahab's advice of hiring Pink's Taliban guards. At the time, EODT maintained an "informal liaison" with ArmorGroup, which had actual knowledge of Pink's status as a Taliban mullah. AC ¶ 240. Yet EODT claims it inexplicably declined to ask ArmorGroup about Pink's men, even though it knew they came from ArmorGroup and even though EODT's procedures called for "vetting" through "every possible avenue." Senate Rep. 45 & n.352. A jury could conclude from such conduct that EODT suspected it was hiring Taliban fighters and wanted to avoid confirming it. *See United States v. Mellen*, 393 F.3d 175, 181 (D.C. Cir. 2004) (Roberts, J.) (affirming conviction before Sullivan, J., and noting that "guilty knowledge need not be proven only by evidence of what a defendant affirmatively knew" but can be inferred when defendant "consciously avoided" learning fact he had "reason to suspect").[26]

Dawoud was similar. Both U.S. military and ArmorGroup personnel in the area knew of Dawoud's Taliban affiliation. AC ¶ 241. That knowledge came from the same types of information available to EODT. *Id.* EODT never tries to explain why ArmorGroup supposedly knew more about EODT's own guards than EODT did. Instead, it effectively claims (at 19) its vetting accidentally missed the Taliban link; that it then forgot to disclose Dawoud's role to the U.S. military; and that it therefore never learned what the U.S. military and ArmorGroup knew. AC ¶¶ 241, 243; *see* Senate Rep. 46-47, 48-50. A jury could again view that implausible sequence as evidence of willful blindness. *See United States v. Kozeny*, 667 F.3d 122, 134 (2d

---

[26] There were comparable red flags about Commander Blue. AC ¶¶ 242-43. EODT knew he was "play[ing] both sides," Senate Rep. 48; that is why it declined to investigate his relationships – to avoid "blow[ing] his cover," AC ¶ 242. And although EODT summarily denies (at 20-21) he was tied to the Taliban, it ignores Plaintiffs' allegation to the contrary. AC ¶ 242. As the Senate Report found, Commander Blue "works with a hostile foreign government" – in context, Iran's Qods Force – to "provid[e] training, arms, and financial support to surrogate groups and terrorist organizations" in Afghanistan. Senate Rep. 48; *see* AC ¶¶ 344-45.

Cir. 2011) (conscious avoidance shown by evidence that "others with access to the same sources of information . . . were able to figure out [corrupt] scheme and avoid participating"); *United States v. Wynn*, 61 F.3d 921, 925 (D.C. Cir. 1995) (jury could infer defendant's knowledge that "money was dirty" from his business partners' status as "notorious" criminals).

Finally, EODT's defense of its hiring practices strengthens the inference of knowledge. EODT went to Wahab based on his experience with USPI, which considered him to be a "sweet talker but a criminal just the same." Senate Rep. 42. EODT then justified working with Wahab (and Blue) by invoking the danger each could otherwise pose to EODT's operations. *See id.* (explaining "potential for something happening on the road" if Wahab is "mad at me"); *id.* at 47 (invoking need to get Blue's "blessing" to make sure that "it's safe to go through"). And EODT justified its relationship with Dawoud by claiming it "was what it was." *Id.* at 50. Dawoud was one of "our neighbors. The village borders the facility and they were going to be an entity we had to contend with no matter what." *Id.* In the context of an area EODT knew was "infested by Taliban," those statements are all code for protection payments. AC ¶ 239.

### c.    EODT's arguments are unpersuasive

EODT's attempt to argue the facts comes up short. Like ArmorGroup and ECC, it purports to disprove (at 5-9, 17-21) Plaintiffs' allegations by invoking extrinsic materials. Those materials range from press releases,[27] to diplomatic cables,[28] to out-of-court witness statements.[29] None can be credited at this stage. Dev. Opp. 25-27; *supra* pp. 17-19. EODT argues (at 5-6 nn.3 & 5) that the Court can take judicial notice of these materials as government records, but EODT

---

[27] EODT Br. 5-6 & nn.3-4, 18 n.13 (citing Dkts. 109-4, 109-5, 109-6, 109-7).

[28] EODT Br. 6 & n.5 (citing Dkts. 109-9, 109-10).

[29] EODT Br. 6 & n.5 (citing Dkt. 109-8); EODT Br. 18 (calling General Wahab "Ismail Khan's 'aide de camp'" based on statement by EODT witness repeated in Senate Report).

fails to show that the *facts* those records assert are beyond " 'reasonable dispute.' " *Hurd*, 864 F.3d at 686 (quoting Fed. R. Evid. 201(b)). Courts' authority to find facts via judicial notice does not extend to "highly contextual, case-specific question[s]" such as General Wahab's link to the Taliban. *Id.*[30] At most, EODT's cases suggest the Court can take judicial notice of the *existence* of the materials it cites. That is a far cry from accepting them "for the truth of the matters asserted." *Bello v. Howard Univ.*, 898 F. Supp. 2d 213, 223 n.5 (D.D.C. 2012).

EODT's discussion of General Wahab (at 5-7, 18-19) sails equally wide of the mark. Rather than address General Wahab directly, EODT devotes several pages to someone else named Ismail Khan. Through a series of extrinsic materials and transitive inferences, EODT asks the Court to find that (1) Khan was anti-Taliban; (2) Wahab was in league with Khan; and so (3) Wahab must have been anti-Taliban too. The logic falters at every step.

The first two assumptions rest on extra-pleading sources and fail for that reason alone. For example, EODT sources its assertion that Wahab was "Ismail Khan's 'aide de camp' " to the Senate Report's recitation of testimony by an EODT witness. EODT Br. 18 (quoting Senate Rep. 40). The Court should not credit such testimony. *Supra* pp. 17-19. But even if Wahab were tied to Khan, EODT's assertion (at 7) that he must have been "an *enemy* of the Taliban" would not follow. Afghanistan was full of powerbrokers who, though linked to government officials or independent warlords, were *also* affiliated with the Taliban. *E.g.*, AC ¶¶ 69-71 (explaining how Watan, a Karzai family-run security provider, cooperated with the Haqqanis), 255 (explaining how local "warlords and militias" were "fuel[ling] a Taliban-led insurgency");

---

[30] *See Khoja*, 899 F.3d at 1001 (declining to notice contents of an "agency report"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71-72 (D.D.C. 2016) (declining to use "government" records to "counter the factual allegations underlying Plaintiffs' claim"); *Hunt v. Rodriguez*, 2009 WL 173070, at *3 (E.D. Cal. 2009) ("[J]udicial notice is not a vehicle" for accepting "the facts in every governmental record.").

Senate Rep. v (noting warlords would "play both sides").  Wahab was similar:  he undisputedly was once a "loyal Taliban commander," and even after he went into the private-security business, he kept up his terrorist affiliations by sourcing guards with "known ties with the Taliban."  AC ¶ 237.  Wahab's asserted link to Khan no more disproves those allegations than Watan's link to the Karzai family stopped it from funding the insurgency.  AC ¶¶ 69-71.

Wahab's own conduct confirms the point.  For all of EODT's efforts to clear Wahab by implication, it never mentions the most incriminating fact about him:  that he encouraged EODT to hire Pink's crew of Taliban fighters *after AGNA had fired them for being Taliban*.  AC ¶¶ 238-40.  To put it mildly, a warlord's reliance on known Taliban guards is a strong indication of the warlord's Taliban affiliation.[31]  The Complaint thus invokes Wahab primarily to explain how EODT's relationship with Pink's men came to be.  *Compare* AC ¶¶ 238-40, *with* AC ¶¶ 150-52, 163.  EODT has nothing to say in response, so it opts to ignore Pink's men altogether in favor of a lengthy digression about Wahab's asserted relationship with an unrelated third party.  That maneuver well illustrates why the Court should allow discovery before finding facts.

EODT errs similarly in denying (at 20) that it paid Dawoud directly.  The Senate Report documents the common practice for Taliban warlords to take a cut of the salaries paid to their men.  *E.g.*, Senate Rep. 11 (Pink), 50 (Wahab).  Dawoud thus profited – and funneled the profits to Taliban leadership – from EODT's financial arrangement with his guards.  AC ¶¶ 100, 111, 241.  Dawoud would not have cooperated with EODT otherwise; he did not plausibly agree to

---

[31] That is why Plaintiffs allege that Wahab's "Jihadi Order Regiment of Herat" was part of the Taliban.  AC ¶ 235.  Whatever EODT's story about Ismail Khan (at 5-7, 18-19), Wahab supplied EODT with Taliban guards.  AC ¶¶ 237-40.  Moreover, the Senate Report suggests that Wahab's son was "suspected of being an agent of a hostile foreign government," which in context referred to Iran.  Senate Rep. v.  It is not plausible that Wahab was an "*enemy* of the Taliban," EODT Br. 7, while his son was an asset of the Taliban's principal foreign sponsor.

work for EODT for free.  Regardless, as a Taliban operative, Dawoud's men were assuredly

Taliban too.  Even if EODT did not pay Dawoud personally, paying his men was just as bad.

## C.    The Court Should Reject Defendants' Attempt To Confine This Case To The Individual Examples

Defendants here also follow the same playbook employed by the development-contractor

Defendants:  attack the examples in isolation and ask the Court to disregard everything else.  *See*

Dev. Opp. Part I.B.1.  As just explained, their arguments about the examples are factually

deficient.  And given the low marginal cost of Taliban terrorism, AC ¶ 103, the examples alone

are sufficient to defeat the motions to dismiss, *see In re Chiquita Brands Int'l, Inc.*, 284 F. Supp.

3d 1284, 1297, 1317-18 (S.D. Fla. 2018) ("*Chiquita III*") (sustaining ATA claims based on

$32,000-per-year payments due to low "cost of putting a FARC guerilla in the field").

But more broadly, Defendants' narrow focus on the examples in a vacuum is misplaced.

Neither Rule 8 nor the ATA requires a plaintiff to identify every instance of a defendant's

unlawful conduct.  Dev. Opp. 19-20.  Courts often sustain complaints that allege a general

scheme and illustrate it through examples.  *See*, *e.g.*, *United States ex rel. Sansbury v. LB&B*

*Assoc., Inc.*, 58 F. Supp. 3d 37, 55-56 (D.D.C. 2014) (Sullivan, J.) (accepting allegations of

broad fraudulent scheme based on "only two examples").[32]  Here, too, the examples are not

_____

[32] *See also Taslidzic v. Luther*, 2018 WL 3134419, at *5 (S.D. Fla. 2018) (rejecting argument
that plaintiff alleged only "a handful of instances where [defendant] allegedly denigrated
Plaintiffs' business activities," because "specific instances cited are mere examples"); *United
States ex rel. Chin v. CVS Pharmacy, Inc.*, 2017 WL 4174416, at *7 (C.D. Cal. 2017)
(nationwide scheme based on "four specific examples"); *Lodi Mem'l Hosp. Ass'n, Inc. v. Tiger
Lines, LLC*, 2017 WL 999458, at *7 (E.D. Cal. 2017) (sustaining use of individual examples to
plead claims based on "56 incidents," holding "Plaintiff needs only to provide facts supporting
illustrative examples of the types of representations"); *United States ex rel. Lovett v. Holzer
Clinic*, 2014 WL 12767601, at *10-11 (S.D. Ohio 2014) (sustaining allegations of "systematic,
common practice of upcoding" based on "representative examples"); *United States ex rel. Vainer
v. Davita, Inc.*, 2012 WL 12832381, at *8 (N.D. Ga. 2012) ("nationwide" scheme does not
require "specificity" about "each and every claim [plaintiffs] allege was false"); *United States ex*

exhaustive; they merely illustrate Defendants' broader practice of paying the Taliban for security.  *Supra* Part I.A.  The Court should credit those allegations as pleaded, for three reasons.

*First*, viewing Plaintiffs' examples as illustrative rather than exhaustive accords with the principle that Plaintiffs are entitled to "all reasonable inferences" on a motion to dismiss. *Banneker*, 798 F.3d at 1129.  Here, the individual protection payments Plaintiffs allege are indicative of a much broader problem.  AC ¶¶ 148-49, 218-19, 231-32.  In each illustration, Plaintiffs allege that Defendants' country-level decisionmakers sanctioned the payments.[33]  The natural inference is that those same decisionmakers made the same decision when confronted by the same Taliban threats in nearby regions.  For example, EODT decided to work through Wahab in Adraskan because it feared that, if he were "upset," the risk of "something happening on the road, without his protection, certainly has increased."  AC ¶ 236.  All it takes is applying that very same logic to EODT's work in Kandahar – the Taliban's historic stronghold, AC ¶¶ 148, 230e – to yield the conclusion that EODT decided to pay Taliban warlords there too.

*Second*, the uniformity of the Taliban's practice bolsters the plausibility of that inference. The Taliban erected procedures designed to elicit a uniform response from companies doing business in its various territories.  AC ¶¶ 63-64, 84-88, 100.  Those procedures entailed (among other things) the Taliban proactively reaching out to large Western contractors to solicit

_____

*rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 177-78 (E.D. Pa. 2012) ("Plaintiff cannot be expected to plead with particularity each and every false claim nationwide."); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) ("courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct"); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am. Inc.*, 238 F. Supp. 2d 258, 268 (D.D.C. 2002) (sustaining alleged 12-year "nationwide" scheme based on one "specific place").

[33] *See* AC ¶ 156 (AGNA's Country Operations Manager); Senate Rep. 22 (AGMA's Afghanistan Country Manager); AC ¶ 222 (ECC's Security Manager); AC ¶ 233 (EODT's Deputy Country Manager).

protection payments on every significant project.  *Id.*  The names of the individual warlords may have changed from region to region, but the concept was the same.  Every Taliban-controlled area of Afghanistan had its own local version of Mr. Pink and Mr. White, who served the same function they did.  AC ¶¶ 49, 62-65, 100.  If AGNA agreed to pay Pink, White, and White II in Shindand, it is at least "*a* plausible set of facts," *Zaidan*, 317 F. Supp. at 20, that AGNA reacted similarly when confronted by the same insurgent playbook in Helmand, AC ¶ 147e.[34]

*Third*, allowing Plaintiffs to plead by example accounts for Defendants' informational advantage at the pleading stage.  Courts do not typically require plaintiffs to allege the type of "details" they can only realistically "fill in . . . through the discovery process."  *Sansbury*, 58 F. Supp. 3d at 58.  Here, Defendants control the accounting records and subcontract documentation that will shed light on exactly which Taliban warlords functioned as the "Mr. Pink" or "Mr. White" across their various projects.  Plaintiffs thus "cannot be expected to plead with particularity each and every [protection payment] nationwide without the benefit of at least some discovery, as such information rests solely within Defendants' control."  *Spay*, 913 F. Supp. 2d at 177.  And because that principle applies in fraud cases subject to a heightened pleading standard, *see id.* at 143-44; *Sansbury*, 58 F. Supp. 3d at 56, it applies here with even greater force.

The cases Defendants cite do not support a different conclusion.  Defendants mostly rely on the same cases as the development-contractor Defendants, and Plaintiffs will not belabor their

---

[34] The Taliban's uniform practice distinguishes *Patrick v. Dist. of Columbia*, 179 F. Supp. 3d 82 (D.D.C. 2016), which ECC cites (at 12 n.16) and which held that "four anecdotes" of police brutality were insufficient to hold a municipality liable for a top-down "custom or policy" of such brutality.  *Id.* at 88-89.  Not only is that case legally inapposite, but it is factually distinguishable because the anecdotes there were dissimilar and did not "coalesce into a discernible policy."  *Id.* at 89.  Here, Plaintiffs allege at length that the examples are illustrative of a common – indeed, an industry-wide – practice that responded to the Taliban's nationwide, institutionalized protection racket.  *Supra* Part I.A; Dev. Opp. 17-20.

response.  *Compare* ECC Br. 10-12; EODT Br. 14-15, *with* Dev. Opp. 21-22.  Defendants also cite irrelevant "shotgun pleading" cases,[35] or cases that apply a heightened pleading standard for fraud.[36]  None precludes Plaintiffs from using industry-practice allegations to plead that the specific illustrations of Defendants' payments exemplify a broader practice of protection payments.  AC ¶¶ 147-49, 217-20, 230-32; *see United States ex rel. Yarberry v. Sears Holding Corp.*, 2013 WL 1287058, at *5 (S.D. Ill. 2013) (rejecting argument that "kickback allegations" lack the requisite "specificity" when they are "untethered to specific transactions").

In sum, the Court should reject Defendants' premise that the only part of the "498-page complaint that actually concern[s]" them is the subsection that focuses on them by name.  EODT Br. 15; *cf.* G4S Br. 11-15; ECC Br. 8-13.  Such a framing conflicts with core pleading principles and ignores the import of Plaintiffs' broader allegations.  *See* Dev. Opp. 43-44 (refuting similar arguments by Chemonics).  The Court should similarly reject the premise that the only allegations that matter are the ones that go into detail about individual contracts.  *Cf.* EODT Br. 15-16.  Plaintiffs are under no obligation to allege specific details about the payments made on every single contract; they need only raise a "plausible" inference that such payments were

---

[35] *Cf. Embree v. Syndham Worldwide Corp.*, 779 F. App'x 658, 660 (11th Cir. 2019) (criticizing "complaint's failure to separate into counts the various claims" asserted) (cited in EODT Br. 15); *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (complaint full of "rambling irrelevancies" without "discrete claims" pleaded "in separate counts") (cited in EODT Br. 15 n.9); *Jiggetts v. Dist. of Columbia*, 319 F.R.D. 408, 417 (D.D.C. 2017) (similar) (cited in G4S Br. 11-12; ECC Br. 10 n.14).  Others are even further afield and do not concern the Rule 12(b)(6) pleading standard at all.  *Cf. Doe v. Van Eschenbach*, 2007 WL 1848013, at *2-3 (D.D.C. 2007) (addressing standard for obtaining leave to "proceed anonymously") (cited in EODT Br. 16-17); *Miller v. Holzmann*, 2007 WL 778568 at *6 (D.D.C. 2007) (addressing jurisdictional standard for imputing forum contacts across entities) (cited in EODT Br. 17).

[36] *Cf. United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 515 (E.D. Pa. 2010) (cited in G4S Br. 14; EODT Br. 16).  *Thomas* is also distinguishable because that case did not involve "generalized practices by Defendants" that led to "multiple" violations "nationwide" – which would be sufficient even under Rule 9(b).  *Spay*, 913 F. Supp. 2d at 177 n.34.

made. *Banneker*, 798 F.3d at 1129. The Complaint easily clears that bar.[37]

### D.    There Is No "Extra Careful Scrutiny" Standard For ATA Cases

Because Defendants' factual challenges fail under ordinary pleading standards, they attempt to move the goalposts: they each contend that the "'charge of terrorism'" is so "'extreme'" that it "'requires extra-careful scrutiny of plaintiffs' allegations as to any particular defendant.'" EODT Br. 14 (quoting *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 103-04 (D.D.C. 2003) (emphasis omitted)); *see* G4S Br. 12; ECC Br. 10 n.14.

Defendants' preferred standard is textually unfounded. Rule 8(a)(2) applies to all civil pleadings and requires only a "short and plain statement of the claim." Nothing in that rule or any other authorizes courts to ratchet up the pleading standard to reflect how "extreme" the alleged conduct is. Rather, the rules apply a heightened standard in only narrow, specified circumstances involving "fraud or mistake." Fed R. Civ. P. 9(b). Defendants err in asking the Court to export that heightened standard beyond the circumstances set out by the rules' text. *See Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 84 (D.C. Cir. 2008) (noting "admonition" that courts "are not to impose heightened pleading requirements").[38]

---

[37] EODT's reliance on antitrust cases confirms the distinction. *Cf.* EODT Br. 17 n.11 (citing *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402-03 (3d Cir. 2015); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007)). *Chocolate Confectionary* held that an antitrust conspiracy in a foreign country, "without more, generally does not tend to prove a domestic conspiracy." 801 F.3d at 403. But that principle evaporates "if the two markets are sufficiently similar or adjacent and the relevant activities are sufficiently linked or tied in some way." *Id.*; *see Elevator*, 502 F.3d at 52 ("evidence of linkage between such foreign conduct and conduct here" could warrant plausible inference of domestic conspiracy). The latter analysis applies here. The Complaint includes ample allegations that Defendants' various projects in a single country are "sufficiently linked." *Chocolate Confectionary*, 801 F.3d at 403; *see* AC ¶¶ 53-96, 148, 218, 231. The logic of EODT's cases confirms the sufficiency of those allegations. *See In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1010 (E.D. Mich. 2010) (*Elevator* supports dismissal on "if there, then here" grounds only when plaintiffs are "reaching across the ocean to unproven allegations in an unknown market").

[38] *Burnett* did not hold otherwise. *See* 274 F. Supp. 2d at 103-04 ("No heightened standard

Holding Plaintiffs to an "extra-careful-scrutiny" standard also conflicts with the ATA. In expanding ATA liability, Congress declared that the statute's "purpose" is to "provide civil litigants with the broadest possible basis" to "seek relief against persons . . . that have provided material support, directly or indirectly, to [terrorists]." Justice Against Sponsors of Terrorism Act § 2(b), Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"). That declaration is strong evidence of Congress's intent. *See TIG Ins. Co. v. Rep. of Arg.*, 967 F.3d 778, 785-86 (D.C. Cir. 2020) (citing "Congress' enacted findings and declaration of purpose" in evaluating "text and purpose"). The Court should not adopt a special pleading standard that makes it *harder* for Plaintiffs to avail themselves of remedies Congress intended to be as "broad" as possible.

## II.    PLAINTIFFS SUFFICIENTLY PLEAD PRIMARY-LIABILITY CLAIMS

The Complaint pleads the same three primary-liability claims here that it pleads against the development-contractor Defendants. AC ¶¶ 2570-76, 2584-96. Once the Court accepts the protection-payment allegations described above, the same legal analysis in Plaintiffs' other brief demonstrates these Defendants' primary liability under the ATA. Dev. Opp. Part II.[39]

### A.    Plaintiffs Properly Allege Causation

Defendants' protection payments bear a "reasonable connection" to Plaintiffs' injuries. *Owens III*, 864 F.3d at 794. Those payments, as with the ones made by the other Defendants, substantially financed the Taliban's terrorist insurgency. AC ¶¶ 97-123; Dev. Opp. 47-51. The

---

of pleading will be applied in this case[]."). To the extent the "extra careful scrutiny" language can be read to the contrary, *id.*, it is unpersuasive and at odds with *Aktieselskabet*.

[39] ArmorGroup asserts in a footnote (at 12 n.4) that JASTA silently abrogated primary liability under the ATA. They cite no case for that proposition, and for good reason. JASTA states its intent to *expand* liability, not constrict it, *see* JASTA § 2(a), 2(b), and nothing in the statute's text or history suggests Congress wanted to abolish primary liability. Nor does primary liability make JASTA "superfluous." G4S Br. 12 n.4. The two have different elements: one requires proximate cause and has no FTO element, while the other requires substantial assistance and does have an FTO element. *Compare* 18 U.S.C. § 2333(a), *with* 18 U.S.C. § 2333(d)(2).

resulting link to terrorism supplies proximate cause under the D.C. Circuit's precedent, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 274-76 (D.C. Cir. 2018) ("*Owens IV*"); *Owens III*, 864 F.3d at 794-99, in accordance with the ATA's design, Dev. Opp. 47-51 (explaining causal theory).

Defendants respond mostly with the same arguments Plaintiffs refute elsewhere. They mistakenly interpose supposed "intermediaries" in the causal chain;[40] invoke temporal and geographic distance as a defense;[41] demand that Plaintiffs trace individual payments to individual terrorist attacks;[42] mischaracterize other courts' intermediary-causation decisions as holding that Plaintiffs must show that each payment was "necessary to" each attack;[43] and criticize Plaintiffs for bringing claims against other Defendants who are also responsible for their injuries.[44] Those arguments remain inconsistent with the statute and with D.C. Circuit precedent.

The facts alleged here demonstrate the flaw in all of the Defendants' intermediary-based causation arguments. Dev. Opp. Part II.A.2. ECC's and ArmorGroup's relationship epitomizes the principle that prime contractors were responsible for their subcontractors' payments. *Compare supra* p. 24, *with* Dev. Opp. 51-53. As an Army contracting officer stated in explaining standard language in ECC's Kunduz Airfield contract, DOD's contracts made "the contractor responsible for the acts of its subcontractor, as is proper under the law of prime/subcontractor relations." Dkt. 110-16 at 13. Allowing Defendants to shirk responsibility for the payments they knew their subcontractors were making conflicts with the core thesis of DOD's approach to contracting in Afghanistan. *Id*. at 12-13; *see* AC ¶¶ 133-39.

---

[40] *Compare* G4S Br. 18-19; ECC Br. 28-31; EODT Br. 29-30, *with* Dev. Opp. 51-55.

[41] *Compare* G4S Br. 21-22; ECC Br. 31-32; EODT Br. 26-29, *with* Dev. Opp. 56-58.

[42] *Compare* ECC Br. 30-31; EODT Br. 28-29, *with* Dev. Opp. 55-56.

[43] *Compare* ECC Br. 27; EODT Br. 29-30, *with* Dev. Opp. 58-59.

[44] *Compare* ECC Br. 4, *with* Dev. Opp. 60.

As for the other "intermediaries" Defendants posit, their local Taliban warlords in Shindand – Pink, White I, White II, White III, Wahab, Dawoud, and Blue – were nothing like independent sovereign states (or commercial banking intermediaries) separating Defendants from the Taliban. *Compare* AC ¶¶ 150-68, 221-23, 235-43, *with* Dev. Opp. 53-54 (addressing the intermediary cases). To the contrary, their affiliation with the Taliban is what made them attractive security partners in the first place. AC ¶¶ 148-49, 218-20, 231-34. Defendants were in an area that was "infested by Taliban," AC ¶ 239, and their central challenge was to devise a security plan for heading off Taliban attacks. Buying off Taliban cutouts was the easiest way to accomplish that task and does not insulate them from liability. AC ¶¶ 64-66, 91, 164.

In that way, Defendants' conduct was a microcosm of the Taliban's broader protection racket. The Taliban set up institutional structures to ensure that money collected by people like White II and Dawoud systematically benefited the Taliban's broader organization. AC ¶¶ 90-91, 100, 105, 111. For example, White II "would provide money" to "Taliban commanders" using the funds he obtained from "his contracting jobs with ArmorGroup." AC ¶ 158. Paying White II was thus the same as paying "the Taliban as an organization," G4S Br. 18; warlords like White II are exactly how the Taliban raised money, AC ¶¶ 49, 105. In the context of an institutionalized protection racket, Defendants cannot escape liability merely because they paid local Taliban cutouts rather than the Quetta Shura itself. *See Wultz*, 755 F. Supp. 2d at 51 (liability extends to cases where "the ultimate beneficiary" of transaction is a terrorist group).

Nor does the ATA require but-for causation. *Compare* G4S Br. 16-17; ECC Br. 25-28; EODT Br. 30 n.21, *with* Dev. Opp. 58-59 & n.41. Defendants' reliance on *Comcast Corp. v. National Association of African American-Owned Media*, 140 S. Ct. 1009 (2020), is misplaced. That case identified the "'but for' common law causation test" as the "'default' or 'background'

rule against which Congress is normally presumed to have legislated." *Id*. at 1014. But it also noted that "most rules bear their exceptions" and that courts should look to "text," "history," and "precedent" to determine whether any given statute conforms to the background rule. *Id*. Here, the term "by reason of" on its own merely "denotes some form of causation," and courts must consult "context" to determine whether it imposes "but-for cause as opposed to proximate cause or sole cause." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018).

The ATA is a well-established "exception[]," *Comcast*, 134 S. Ct. at 1014, to the background presumption of but-for causation. Indeed, a long line of cases has rejected attempts to graft a but-for causal requirement onto the ATA. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 696-97 (7th Cir. 2008) (en banc).[45] The reason is simple: because it is "impossible to determine" which of a terrorist group's myriad funding sources is necessary for any given attack, a but-for-cause requirement would leave courts with "a wrong and an injury but no remedy." *Id*. That cannot be reconciled with Congress's intent to choke off the "flow of money" "at any point along the causal chain of terrorism." S. Rep. No. 102-342, at 22 (1992).[46] Any presumption of but-for cause evaporates in such circumstances. *See Paroline v. United States*, 572 U.S. 434, 450 (2014) (declining to read "as a result of" to require but-for causation where it is "not possible to prove" that victim's injury "would be less . . . but for one

---

[45] *See also Chiquita III*, 284 F. Supp. 3d at 1310 & n.23 ("Federal courts have consistently rejected imposition of a 'but for' causation requirement under the ATA, recognizing the impossibilities of proof in tracing damage caused by the funding of terrorism due to the fungibility of money."); *Gill v. Arab Bank PLC*, 893 F. Supp. 2d 474, 507-08 (E.D.N.Y. 2012); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429-30 (E.D.N.Y. 2009).

[46] Defendants are incorrect to imply (*e.g.*, ECC Br. 26) that the Court cannot consider legislative history in this context. *See N. Am. Butterfly Assoc. v. Wolf*, 977 F.3d 1244, 1259 (D.C. Cir. 2020) ("traditional tools of statutory interpretation" include "text, structure, purpose, and legislative history"); *Cohen v. United States*, 650 F.3d 717, 729-30 (D.C. Cir. 2011) (relying on "Committee Report" to understand "animating purpose" of statute).

[defendant's] individual role in the large, loosely connected network" that injured her).

The D.C. Circuit has reached that very conclusion in interpreting the closely related terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), which provides a cause of action for injuries "caused by" a foreign state's "material support" of terrorism. 28 U.S.C. § 1605A(a)(1). The Circuit twice held that the term "caused by" there does not require but-for causation. *See Owens III*, 864 F.3d at 799 (refusing to "require[] more than proximate cause"); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129 (D.C. Cir. 2004) ("courts generally regard 'but for' causation as inappropriate" when "a 'but for' standard" would "absolve" group of "joint tortfeasors"). Defendants' argument would overturn those holdings and deal a body blow to courts' ability to ever hold terrorist financers accountable. Defendants even admit that is the point of their argument: to impose a standard that, as to terrorism, is " 'nearly impossible to prove.' " ECC Br. 27-28 (quoting *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 324 (E.D.N.Y. 2015)). Nothing in *Comcast* supports that anomalous result.

### B.    Plaintiffs Allege The Other Elements Of Primary Liability

Defendants' other primary-liability arguments largely mirror those of the development-contractor Defendants. As with those other contractors, Plaintiffs here sufficiently allege apparent intent,[47] dangerousness,[48] and Defendants' commission of three predicate crimes.[49] For efficiency's sake, Plaintiffs will not reprise the same analysis in this brief.

ArmorGroup's reliance (at 28-29, 36) on *Hussein v. Dahabshiil Transfer Services Ltd.*,

---

[47] *Compare* G4S Br. 24-26; ECC Br. 33-34; EODT Br. 22-24, *with* Dev. Opp. Part II.B.1-2.

[48] *Compare* G4S Br. 24-26; ECC Br. 34; EODT Br. 25, *with* Dev. Opp. Part II.B.3.

[49] *Compare* G4S Br. 33-38; ECC Br. 8-23; EODT Br. 31-33, *with* Dev. Opp. Part II.C. ArmorGroup asserts (at 37) that Count Four fails because Plaintiffs' allegations do not "involve any 'property' of the Taliban," but the regulation underlying that count bars any unauthorized "contribution or provision of funds" to the Taliban. 31 C.F.R. § 594.204 (cited at AC ¶ 2592).

230 F. Supp. 3d 167 (S.D.N.Y. 2017), is misplaced. *Hussein* acknowledged that ATA plaintiffs can satisfy the statute's scienter standard by alleging " 'knowing' conduct or 'reckless' conduct." *Id*. at 171 n.2. It further held that knowledge can be inferred from allegations that "the defendant banks were on notice of the terrorist connections of specific customers." *Id*. at 176. On the facts before it, however, the court ruled there were no allegations that the banks processed any transactions under "suspicious circumstances that would raise 'red flags.' " *Id*. at 177. Rather, the plaintiff alleged only " 'routine' banking services" that raised no inference that "defendants had reason to believe that their customers were terrorists or were assisting terrorists." *Id*. at 176.

Here, Plaintiffs supply the "red flags," *id*. at 177, that were missing in *Hussein*. *Supra* Parts I.B.1.b (ArmorGroup), I.B.2 (ECC), I.C.3.b (EODT). The key difference between this case and *Hussein* – and, for that matter, every other case Defendants cite – is that Defendants *benefited* from the Taliban's receipt of their money. Dev. Opp. 53. In most ATA banking cases, the allegations concern a bank's failure to stop a terrorist-linked entity from using its " 'routine' banking services." *Hussein*, 230 F. Supp. 3d at 176. Such banks are agnostic about terrorism: they want as many customers as possible, but they gain nothing from a customer's affiliation with terrorists. Here, by contrast, Defendants' goal was to "be safe" in Taliban-controlled areas at a cheap price, AC ¶ 233, and terrorist payments were how they bought that safety. The payoffs were not some byproduct of ordinary commercial relationships; they were the thing that made the business model possible. AC ¶¶ 148, 163-65, 218, 231, 233-34. That places the red flags here in a more incriminating light than those in *Hussein* and cases like it.[50]

---

[50] ArmorGroup asserts ignorance of the "highly technical statutes" surrounding the Taliban's SDGT designation, G4S Br. 37-38, but cannot credibly deny awareness that it was not allowed to pay money to the Taliban, AC ¶ 2592; Dev. Opp. 67-68. And Defendants acted "willfully" under 18 U.S.C. § 2339C(a)(1) for the same reason they acted "willfully" under the statutes prohibiting transactions with an SDGT. *Compare* G4S Br. 34-36, *with* Dev. Opp. 67.

## III.    PLAINTIFFS SUFFICIENTLY PLEAD SECONDARY-LIABILITY CLAIMS

The Complaint also pleads the same two secondary-liability claims here that it pleads

against the development-contractor Defendants.  AC ¶¶ 2597-2615.  The same legal analysis

demonstrates these Defendants' secondary liability.  Dev. Opp. Part III.

### A.    Plaintiffs Allege Substantial Assistance To The Taliban

Defendants' protection payments substantially assisted the Taliban by providing it with

financing for terrorist attacks.  AC ¶¶ 97-111; Dev. Opp. Part III.A.  Defendants' arguments

again mirror those of the development-contractor Defendants:  they recycle the same faulty

causation arguments,[51] and they take the same flawed view of the factors from *Halberstam v.*

*Welch*, 705 F.2d 472 (D.C. Cir. 1983).[52]  None is persuasive.  Dev. Opp. 71-83.

Each Defendant here (G4S Br. 42; ECC Br. 39; EODT Br. 35) also insists that JASTA

requires Plaintiffs to trace individual payments to individual attacks.  That argument conflicts

with the statute.  Most importantly, it ignores JASTA's text, which imposes liability on anyone

"who aids and abets, by knowingly providing substantial assistance [to], or who conspires with[,]

*the person* who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2)

(emphasis added); *see* JASTA § 2(b) (declaring "purpose" to penalize those that "provide[]

material support, directly or indirectly, to foreign organizations or persons that engage in terrorist

activities").  Congress further gave the term "person" in JASTA a broad meaning, 18 U.S.C.

§ 2333(d)(1), which includes not just "individuals" but also "associations" and "societies," 1

U.S.C. § 1.[53]  In doing so, Congress made clear that a "defendant may be liable under the ATA

---

[51] *Compare* G4S Br. 42-45; ECC Br. 39-40; EODT Br. 33-34, *with* Dev. Opp. 71-75.

[52] *Compare* G4S Br. 43-47; ECC Br. 40-42; EODT Br. 35-38, *with* Dev. Opp. 75-83.  ECC also raises the same aiding-abetting scienter arguments Plaintiffs refute elsewhere.  *Compare* ECC Br. 42-44, *with* Dev. Opp. Part III.B.

[53] That is broader than the definition otherwise provided in the ATA, 18 U.S.C. § 2331(3),

for aiding the organization behind the attacks, not only the individual 'triggerman.' "  *Miller v. Arab Bank*, 372 F. Supp. 3d at 48.  Defendants offer no textual reason to conclude otherwise.

*Halberstam*, which Congress adopted as the standard for aiding-abetting liability under the ATA, confirms the point.  No Defendant in this case is willing to acknowledge a basic reality of *Halberstam*:  that Linda Hamilton did not aid the individual murder for which she was held liable.  705 F.2d at 487-88.  Indeed, she did not even know about it.  *Id*.  Rather, she gave clerical assistance to the underlying "burglary enterprise," of which murder was a "foreseeable consequence."  *Id*. at 488.  She was held liable for the murder even though she disclaimed any knowledge of violence.  *Id*. at 474-76.  This case is a close analogue:  whether or not Defendants knew about any one attack in isolation, they substantially aided the terrorist enterprise that those attacks served.  *Supra* Part I; AC ¶¶ 97-111.  The result should be the same as in *Halberstam*.  If anything, a dollars-to-attacks standard makes even less sense here, given that the D.C. Circuit has rejected it as unworkable in the terrorism context.  Dev. Opp. Part II.A.3.

### B.    Plaintiffs Plead The Requisite FTO Involvement

Plaintiffs also allege that an FTO "committed, planned, or authorized" the relevant terrorist acts.  18 U.S.C. § 2333(d)(2); *see* Dev. Opp. Parts III.C-D.  The arguments here once again mirror those addressed in Plaintiffs' other briefs:  Defendants take the same flawed view of al-Qaeda and the Haqqani Network;[54] they make the same faulty arguments against Count Six;[55] and EODT makes the same erroneous FTO scienter argument as DAI and others.[56]

Defendants caricature Plaintiffs' FTO theory by accusing Plaintiffs of "conflat[ing] the

_____

which further confirms Congress's intent for aiding-abetting liability to sweep expansively.

[54] *Compare* G4S Br. 38-42; ECC Br. 37-38; EODT Br. 39-41, *with* Dev. Opp. 88-96.

[55] *Compare* G4S Br. 47-48; ECC Br. 44-45; EODT Br. 41-42, *with* Dev. Opp. 98-100.

[56] *Compare* EODT Br. 42-44, *with* Dev. Opp. 96-97.

different entities and treat[ing] attacks by one as if they were attacks by the others."  EODT Br. 40; *see* G4S Br. 41 (similar).  That is not what Plaintiffs allege.  Plaintiffs recognize that the Taliban and al-Qaeda were separate groups with their own juridical identities.[57]  But the two worked hand-in-hand to form a "syndicate" of terrorism that sponsored terrorist attacks in which *both groups participated*.  AC ¶¶ 470-76, 513-20.  The syndicate meant that al-Qaeda and the Taliban often conducted joint operations and employed "dual-hatted" terrorists who were members of both groups – points that courts in this Circuit have recognized many times.[58]  Their institutional ties also meant that al-Qaeda took steps to "plan" and "authorize" the attacks that the Taliban committed.  AC ¶¶ 477-512.  Al-Qaeda personnel may not have always accompanied each Taliban fighter to each attack site, but al-Qaeda played a "significant role" in every "particular attack" nonetheless.  *Atchley v. AstraZeneca UK Ltd.*, 2020 WL 4040345, at *11 (D.D.C. 2020), *appeal docketed*, No. 20-7077 (D.C. Cir. Aug. 21, 2020).

ArmorGroup asks (at 41) the Court to reject as "unwarranted" the notion that "al-Qaeda 'planned' or 'authorized' *every single* Taliban attack on U.S. forces in Afghanistan."  But the Court need not go that far to deny the motions to dismiss.  At this stage, Plaintiffs need only raise a "reasonable inference[]" that al-Qaeda planned or authorized the particular attacks set out in the Complaint.  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 97 (E.D.N.Y. 2019).

---

[57] Defendants also mischaracterize Plaintiffs' allegations about the Haqqani Network and the Kabul Attack Network.  The first was part of the Taliban, and Defendants' insistence to the contrary is just a premature attempt to argue the facts.  Dev. Opp. 89-90.  The second was not a separate "entity" at all, but rather a phrase used to describe operations conducted jointly by al-Qaeda, the Taliban, and others.  AC ¶¶ 459-63; Dev. Opp. 89.

[58] *See*, *e.g.*, *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010) (noting "Al Qaeda-affiliated" cell that "fought alongside the Taliban"); *Odah v. United States*, 611 F.3d 8, 16-17 (D.C. Cir. 2010) (identifying individual terrorist "as a Taliban and al Qaeda member"); *Alsabri v. Obama*, 764 F. Supp. 2d 60, 75 (D.D.C. 2011), *aff'd*, 684 F.3d 1298 (D.C. Cir. 2012) (identifying individual terrorist as "integrated into the al-Qaida/Taliban structure").

Whatever the evidence ultimately shows about those attacks, the Complaint alleges a sufficient nexus between al-Qaeda and each individual attack to warrant discovery. Dev. Opp. 85-96. ArmorGroup's critique is better addressed on a full discovery record. *See Banneker*, 798 F.3d at 1129 (assertion that facts are "improbable" is not a basis for dismissal before discovery).

In any event, there is nothing problematic about an inference that al-Qaeda "planned" or "authorized" every attack by a specific proxy group (the Taliban) in a specific theater (Afghanistan) during a specific timeframe (from 2009-2017). AC ¶¶ 464-520. Neither ArmorGroup nor any other Defendant identifies a factual reason to doubt that inference. The most they can muster is a citation to *Atchley*, which called JASTA a "limited statute" that "circumscrib[es] aiding-and-abetting." 2020 WL 4040345, at *11. Whatever the merits of *Atchley*'s holding, it says little about the particular relationship between al-Qaeda and the Taliban's attacks here. Again, JASTA's "purpose" was to provide the "broadest possible basis" to assert claims against those who "provid[e] material support . . . to foreign organizations or persons that engage in terrorist activities." JASTA § 2(b). Nothing in the statute's text supports reading the FTO requirement narrowly to preclude theories that cover large numbers of attacks.

### C.    Plaintiffs Need Not Allege That Defendants Aided An FTO

ECC goes to great lengths (at 1-2, 24, 37) to portray Plaintiffs' withdrawal of Count Two (under 18 U.S.C. § 2339B) as to ECC as some fatal concession. It is not. It means only that Plaintiffs do not allege that ECC directly paid Haqqani Network operatives after that group's September 2012 FTO designation. But Plaintiffs continue to allege that ECC's payments to the Taliban proximately caused Haqqani-committed attacks, because the Haqqani Network was part of the Taliban. AC ¶¶ 101, 443-55; *see Chiquita III*, 284 F. Supp. 3d at 1318 (proximate cause extended across separate terrorist cells in light of broader group's "hierarchy"). Defendants'

arguments to the contrary (*e.g.*, G4S Br. 40; ECC Br. 40; EODT Br. 40) disregard Plaintiffs' factual allegations and insist on treating the Haqqani Network as autonomous from the Taliban. The Court should reject those arguments for the reasons explained elsewhere.  Dev. Opp. 89-90.

ArmorGroup and ECC similarly err (G4S Br. 39-47; ECC Br. 40) in asserting that Plaintiffs must allege they provided substantial assistance to an FTO.  That is not what the statute says.  JASTA imposes secondary liability on those who assist the "person who committed [the] act of international terrorism" responsible for a plaintiff's injury.  18 U.S.C. § 2333(d)(2).  It then separately requires that an FTO have "committed, planned, or authorized" the same act.  *Id*. The plain text thus makes clear that the assistance need only be to the "person *who committed* the terrorist act."  *Strauss v. Crédit Lyonnais, S.A.*, 2017 WL 4480755, at *4 (E.D.N.Y. 2017). Whether a defendant also aids the FTO that "merely authorized (rather than committed) the terrorist act" is irrelevant.  *Id*.  ECC's argument betrays that textual error:  ECC says it is liable only if it aided an "[a]ttack *committed* by an FTO."  ECC Br. 37 (emphasis added).  Because the statute on its face extends more broadly, the Court should reject ECC's argument.

To be clear, the Taliban *committed* every attack at issue here – whether on its own, jointly with al-Qaeda (AC ¶¶ 513-20), through the Haqqani Network (AC ¶¶ 438-58), or as part of the Kabul Attack Network (AC ¶¶ 459-63).  That makes Defendants liable for assisting the Taliban as the "person" that "committed" the terrorist acts.  18 U.S.C. § 2333(d)(2).  Separately, Plaintiffs *also* allege that al-Qaeda sometimes *joined* in the commission of the attack, and at all times also "planned" or "authorized" the Taliban's terrorist attacks.  But the Taliban committed every attack.  Accordingly, it makes no difference whether Defendants aided al-Qaeda.

## IV.    ARMORGROUP MISUSES THE POLITICAL QUESTION DOCTRINE

ArmorGroup also seeks (at 48-53) to manufacture a non-justiciable political question by invoking the ATA's act-of-war defense.  There is a good reason most Defendants do not make

this argument.  Courts have repeatedly held that ATA claims do not present political questions.

Dev. Opp. 101 & n.74.  Here, Plaintiffs' claims merely apply a statutory right of action to

Defendants' private conduct.  That raises legal, not political, questions.  Dev. Opp. Part IV.A.1.

      The act-of-war defense does not alter that conclusion.  Like the elements of Plaintiffs'

claims, the act-of-war defense was established by Congress in the ATA.  Courts thus routinely

consider and reject act-of-war defenses.[59]  But ArmorGroup now suggests that those cases are

incorrectly decided and even unconstitutional.  After all, its argument is hardly limited to

Afghanistan:  if the "status of an armed conflict" were truly a political question, G4S Br. 51,

courts would *never* be able to adjudicate act-of-war defenses.  The result would hold the entire

ATA unconstitutional, on the grounds that 18 U.S.C. § 2336 delegates to courts questions they

could never answer.  ArmorGroup gives no reason for the Court to take that extraordinary step.

      In any event, ArmorGroup's premise is faulty.  Like Black & Veatch, *see* Dev. Opp. Part

IV.C, ArmorGroup does not come close to showing that Operation Enduring Freedom began as

an "armed conflict . . . between two or more nations."  18 U.S.C. § 2331(4)(B).  The Court can

reject that argument using the ordinary tools of statutory construction.  Dev. Opp. 106-09.  And

rather than marshal statutory arguments to the contrary, ArmorGroup cites tangential materials

about President Bush's treatment of Taliban prisoners and his discretionary application of the

Geneva Conventions.  *Compare* G4S Br. 49-50, *with* Dev. Opp. 107.  None suggests that the

Executive Branch considered the Taliban a "nation[]" under the ATA's act-of-war defense.[60]

---

    [59] *See, e.g.*, *Atchley*, 2020 WL 4040345, at *8; *Kaplan v. Hezbollah*, 2019 WL 2103168, at *1-2 (D.D.C. 2019); *Gill*, 893 F. Supp. 2d at 511-17; *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *10-11 (M.D. Fla. 2011); *Weiss v. Arab Bank, PLC*, 2007 WL 4565060, at *5-6 (E.D.N.Y. 2007); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1333-34 (D. Utah 2006).

    [60] ArmorGroup also cites (at 49) the Authorization for Use of Military Force, but that statute authorized force "against those nations, *organizations, or persons*" determined to be involved in

Nor would any political question be "inextricable from the case." *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019). Even if the Court were barred from determining whether Operation Enduring Freedom was a qualifying "armed conflict" under the act-of-war defense, ArmorGroup would still bear the burden of showing that the Taliban's attacks occurred "in the course of" such a conflict, 18 U.S.C. § 2331(4). They did not, for the reasons explained elsewhere. Dev. Opp. Part IV.C.3. The Court can reject the defense on that basis without ever reaching the "armed conflict" question that ArmorGroup characterizes as non-justiciable.

## V.   PLAINTIFFS SUFFICIENTLY PLEAD A BASIS FOR THE COURT TO EXERCISE PERSONAL JURISDICTION OVER THE G4S DEFENDANTS

On a motion to dismiss for lack of personal jurisdiction, the court credits Plaintiffs' allegations and draws reasonable inferences in their favor. *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 40 n.2 (D.C. Cir. 2020). All jurisdictional facts in the Complaint "must be accepted as true unless they are directly contradicted by an affidavit, which here they are not." *Nat'l Women's Political Caucus, Inc. v. Metro. Louisville Women's Political Caucus, Inc.*, 359 F. Supp. 3d 13, 21 (D.D.C. 2019) ("*NWPC*"). The Court should "consider all allegations of jurisdictional facts in a light most favorable to the assertion of personal jurisdiction." *Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 161 (D.D.C. 2014).

Personal jurisdiction over the G4S Defendants arises under the federal long-arm statute, which applies to federal claims against defendants that are "not subject to jurisdiction in any state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2)(A). That rule relieves Plaintiffs of the need – present in most cases in this District – to establish that the G4S Defendants satisfy D.C.'s local long-arm statute. *Compare* D.C. Code § 13-423, *with Mwani v. bin Laden*, 417 F.3d

---

the September 11 attacks. Pub. L. 107-40, § 2, 115 Stat. 224 (Sep. 18, 2001) (emphasis added). ArmorGroup cites no evidence that the Taliban fell under the "nation" part of that clause.

1, 10-11 (D.C. Cir. 2005) (explaining Rule 4(k)(2)).  Rather, personal jurisdiction under Rule 4(k)(2)(B) is warranted so long as it comports with the "United States Constitution."

Personal jurisdiction satisfies due process if "there are 'minimum contacts' between the defendant and the forum such that the defendant should reasonably anticipate being haled into court there." *Urquhart-Bradley*, 964 F.3d at 44.  In the typical case involving D.C.'s long-arm statute, the relevant "forum" is the District.  *Id*. at 48-49.  But here, because Plaintiffs' claims arise under federal law and invoke Rule 4(k)(2), the forum is the "United States as a whole." *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019) ("*Klieman II*").[61]

### A.    G4S's Protection Payments Were Directed At The United States

The first way a defendant can establish "minimum contacts" is by engaging in "malignant actions directed at and felt in [the] forum."  *Mwani*, 417 F.3d at 13.  Under that principle, "*physical* contacts" are unnecessary.  *Id*. at 12-13.  A defendant that acts outside the forum subjects itself to jurisdiction when the "effects" of its conduct are "expressly aimed" at the forum such that it should "reasonably anticipate being haled into court there."  *Calder v. Jones*, 465 U.S. 783, 789-90 (1984).  The effects of the G4S Defendants' conduct meet that test here.

G4S directed its conduct at the United States by making protection payments it knew would facilitate attacks targeting U.S. citizens.  AC ¶ 179; *supra* Parts I, II.A.  The attacks that G4S financed targeted Plaintiffs in an effort to terrorize the United States into leaving

---

[61] In a footnote (at 59 n.20), Centerra suggests that "Plaintiffs have likely failed to establish personal jurisdiction over AGNA."  Centerra has forfeited this argument.  *See In re Carvalho*, 598 B.R. 356, 361-62 (D.D.C. 2019).  Regardless, Plaintiffs plead (AC ¶ 36) jurisdiction over Centerra (as successor to AGNA) under Rule 4(k)(1)(C), which confers jurisdiction over a defendant served as "authorized by a federal statute."  Plaintiffs served Centerra – an American company subject to general jurisdiction in the United States – via the ATA's nationwide-service provision.  *See* 18 U.S.C. § 2334(a); Dkt. 51 at 2.  Plaintiffs thus need not comply with D.C.'s long-arm statute.  *See SEC v. Bilzerian*, 378 F.3d 1100, 1106 n.8 (D.C. Cir. 2004).

Afghanistan.  AC ¶¶ 334, 431-33, 522.  By knowingly funding such attacks, G4S subjected itself

to jurisdiction here.  *See In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 678-79 (2d Cir.

2013) (extending jurisdiction to defendants that provided "support *directly* to al Qaeda when al

Qaeda allegedly was known to be targeting the United States"); *Wultz,* 755 F. Supp. 2d at 34

("[w]here a bank has knowledge that it is funding terrorists . . . contacts created by such funding

can support [personal jurisdiction]"); *Morris*, 415 F. Supp. 2d at 1336 (similar).  That conclusion

also accords with Congress's findings for the reasons Plaintiffs explain elsewhere.  *See* Opp'n to

MTN Def.'s Mot. to Dismiss ("MTN Opp.") at 14-15.

      G4S's arguments are unpersuasive.  It mostly recycles its merits arguments and

characterizes Plaintiffs' protection-payment allegations as "conclusory."  G4S Br. 56-57.  Those

arguments fail for the reasons stated above.  *Supra* Parts I.A, I.B.1, I.C.  And once the Court

credits Plaintiffs' allegations that G4S made payments to the Taliban, G4S's other arguments

collapse.  It cites (at 57) ATA cases in which "effects" jurisdiction was lacking, but those cases

involved attacks that targeted *non-U.S. citizens* and only injured Americans by chance.[62]  This

case is different.  Here, the Taliban attacks G4S funded "were specifically targeted against [U.S.]

citizens," *Waldman v. PLO*, 835 F.3d 317, 338-39 (2d Cir. 2016), and were aimed to influence

U.S. policy, *see* AC ¶¶ 431-32, 522.  Unlike in the cases G4S cites, those attacks were

"indisputably aimed to kill Americans."  *Klieman II*, 923 F.3d at 1126.

      G4S's cursory attempt (at 55, 57) to pass those jurisdictional contacts off on the Taliban

also fails, just as MTN's similar argument does.  MTN Opp. 15-16.  The Second Circuit's ATA

---

[62] *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017) ("attack" not "aimed to influence U.S. policy"); *Klieman II*, 923 F.3d at 1125 (applying *Livnat* and explaining that attacks were motivated by "dynamics altogether internal to the Israeli-Palestinian conflict"); *Shatsky v. PLO*, 955 F.3d 1016, 1037 (D.C. Cir. 2020) (applying those cases to similar fact pattern involving anti-Israeli violence).

precedent is again instructive.  *Id*. at 15.  The Second Circuit distinguished direct-funding cases

from those involving "indirect funding" and held that jurisdiction over terrorist funders is

warranted where the support is "more direct and one step closer to [terrorists]."  *Terrorist*

*Attacks*, 714 F.3d at 675, 678.  Here, G4S made direct monetary payments to the Taliban

knowing that the Taliban was targeting Americans in terrorist attacks.  *Supra* Part I.B.1.  For

example, AGMA (G4S Risk Management's predecessor) hired and paid White III and his group

of known Taliban fighters.  AC ¶¶ 161-62.  It did so *after* White III's Taliban-leader brother and

the same group of terrorists had engaged in an internationally reported battle with U.S. forces,

and *after* AGNA had fired them for being Taliban.  AC ¶ 163.  Placing known Taliban leaders

and their terrorist fighters on payroll epitomizes the type of "direct" terrorist financing the

Second Circuit holds sufficient for personal jurisdiction.  *Terrorist Attacks*, 714 F.3d at 678.

### B.    G4S's Protection Payments Relied On U.S. Contacts

Effects aside, a defendant also can create "minimum contacts" by "purposefully

avail[ing] himself of the benefits and protections of [the forum's] laws."  *Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 475 (1985).  Each G4S Defendant created such "suit-related" U.S.

contacts, *Urquhart-Bradley*, 964 F.3d at 44, which provide an independent basis for jurisdiction.

### 1.    The G4S Defendants purposefully availed themselves of the United States

A defendant creates "minimum contacts with a forum if she enters into a contract that has

a substantial connection with the forum."  *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir.

2004).  Courts in this District take a "context-specific, fact-intensive approach" to assessing a

given contract's jurisdictional links to a forum.  *Xie v. Sklover & Co.*, 260 F. Supp. 3d 30, 40

(D.D.C. 2017).  Relevant factors include the contracting "parties' 'prior negotiations,' the

'contemplated future consequences' of the contract, the 'terms of the contract,' and 'the parties'

actual course of dealing.' "  *Id.* (quoting *Burger King*, 471 U.S. at 479).  Here, the G4S

Defendants executed contracts that indicate purposeful availment of the United States.

       **a.**      **G4S Holdings (AGI).**  G4S Holdings (through its predecessor AGI) purposefully

availed itself of the United States by executing U.S. government contracts through a U.S.-based

agent.  AC ¶¶ 172-74.  Specifically, AGI used AGNA – an American subsidiary – to obtain and

perform the private-security contracts on which it paid protection money.  *Id.*  AGNA's U.S.

contacts were attributable to AGI, because a "local subsidiary's contacts can be imputed to the

foreign parent" when "one acts as an agent of the other."  *El-Fadl v. Cent. Bank of Jordan*, 75

F.3d 668, 676 (D.C. Cir. 1996), *vacated on other grounds, Samantar v. Yousef*, 560 U.S. 305

(2010).  A foreign company thus creates jurisdiction when it directs an agent to transact in the

forum.  *See Rundquist v. Vapiano SE*, 2012 WL 5954706, at *6-7 (D.D.C. 2012) (attributing to

foreign company the contacts of a third party that was "acting as an agent on [its] behalf").

       AGNA was AGI's agent here.  According to AGNA's head of contracting, AGNA was

just a "shell company set up by AGI to bid for and obtain U.S. contracts that could only be

awarded to American companies."  AC ¶¶ 146, 173.  AGNA served no other purpose than to

obtain American business for AGI.  AC ¶¶ 146, 172-73.  AGI thus characterized AGNA's

"Washington office" as the "hub for [Armor]Group's bidding for and management of major US

Government contracts overseas."  AC ¶ 173.  And AGMA's Country Manager confirmed that

AGNA's contracts really belonged to AGI, describing *AGNA's* relationship with White II (AC

¶¶ 150-57) as a "relationship between *ArmorGroup International* and White II."  AC ¶ 176

(emphasis added).  AGNA's narrow function – bidding for U.S. contracts that AGI could not

obtain directly – demonstrates a jurisdictionally sufficient agency relationship.  *See Khatib v.*

*Alliance Bankshares Corp.*, 846 F. Supp. 2d 18, 32 (D.D.C. 2012) (jurisdiction warranted when

local "subsidiary's activities 'can be understood as a manifestation of the parent's presence' in the forum") (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001)).

AGI also "exercise[d] a level of control" over AGNA indicative of an agency relationship. *Id.* That control reflected the structure discussed above. AGNA nominally obtained the contracts from the U.S. government, but AGI directed AGNA's performance and oversaw AGNA's contract implementation. AC ¶ 146. An AGI email quoted in the Complaint explains why, justifying AGI's control by pointing out that "AGNA is neither structured nor able to execute . . . follow on phases after contract bid compilation." *Id.* Because AGNA could do only the "bid compilation," it was AGI that oversaw the actual provision of security services in Afghanistan. AC ¶¶ 146, 172-74. Thus, as AGNA's head of contracting alleged in one example, AGNA's project head for the Kabul Embassy Contract "took his orders directly from AGI in the UK."[63] Such control further supports an inference of agency. *See Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 31-32 (D.D.C. 2008) (agency arose when parent "exerted significant control" over subsidiary's "security" and offered "significant guidance and participation").

AGNA's U.S.-based contacts, once imputed to AGI, are indisputably sufficient for jurisdiction. AGNA's U.S. presence was its whole reason for existing: AGI relied on AGNA to obtain at least four large U.S. government contracts (or subcontracts) available *only* to U.S. companies. AC ¶¶ 146-47, 172-73. And with respect to those contracts, AGNA negotiated the terms directly with the U.S. government and ECC, submitted regular invoices and other contract paperwork to its U.S. counterparties, and received payment in the United States. AC ¶ 174. All of those activities – performed by AGNA personnel intentionally located in the United States –

---

[63] Compl. ¶¶ 36-37, *United States ex rel. Gordon v. ArmorGroup North America, Inc.*, No. 09-cv-01547-RCL (D.D.C. filed Aug. 17, 2009), Dkt. 1.

reflected purposeful availment of "the privilege of conducting business" in this forum.  *Burger King*, 471 U.S. at 476; *see United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 886-87 (D.C. Cir. 2010) (upholding jurisdiction over company that "knew that the United States Government was funding the contract and that all payments [to it] for work done in connection with the contract were funded by payments from the United States Government").[64]

Plaintiffs' agency allegations are not "conclusory."  G4S Br. 60.  AGNA's status as a "shell company" is not some theory Plaintiffs came up with; it was the understanding of AGNA's own head of contracting.  AC ¶ 146.  Plaintiffs also cite an internal company email, AGI's merger documentation, and the statement of AGMA's Country Manager.  AC ¶¶ 146, 173, 176.  Given that agency issues are fact-bound and turn on information within G4S's control, such allegations are more than sufficient at this stage.  *See ICC*, 2020 WL 1905132, at *15 (plaintiffs "need only plead sufficient facts to give rise to an inference that an agency relationship existed"); *McFadden v. WMATA*, 949 F. Supp. 2d 214, 222-23 (D.D.C. 2013) ("The agency question thus is a factual issue ill-suited for resolution at the motion to dismiss stage.").

G4S also attacks (at 59) a different theory of jurisdiction, arguing that "Plaintiffs cannot support an 'alter ego' theory."  But Plaintiffs do not allege that AGNA was AGI's alter ego; they allege it was AGI's agent.  *See* AC ¶ 145 (AGI "oversaw and directed AGNA's conduct").  The latter requires a lesser showing.  *See Khatib*, 846 F. Supp. 2d at 32 ("alter ego" theory requires a "level of control . . . that is above and beyond the level of control that suffices to invoke the

---

[64] *See also*, *e.g.*, *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551-52 (6th Cir. 2007) (contract supported purposeful availment because it led to frequent "telephone, email, facsimile, and ordinary mail correspondence" with in-forum counterparty); *Covey Run, LLC v. Wash. Capital, LLC*, 196 F. Supp. 3d 87, 98 n.6 (D.D.C. 2016) (defendants "repeatedly communicated with, and sent payments to" in-forum counterparty); *Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 7 (D.D.C. 1996) (defendants "reap[ed] financial benefits from transacting business in this forum" by sending "agent" to contract with in-forum entity).

'agency' exception"). Unlike with alter egos, an agency relationship does not require "complete dominion . . . to the point of stripping [the agent] of any meaningful separate identity." *Transamerica Leasing, Inc. v. La Republica de Venez.*, 200 F.3d 843, 849 (D.C. Cir. 2000). G4S's discussion (at 59-61) of the factors for alter-ego status is thus beside the point.

> **b.  G4S Risk Management (AGMA).** G4S Risk Management (through its predecessor AGMA) availed itself of the United States by executing a U.S. government subcontract with ECC for mine clearance near Shindand Airbase. AC ¶¶ 147b, 172, 175. AGMA negotiated the contract with a U.S. counterparty; made repeated communications with ECC personnel in the United States; submitted invoices to the United States; and received payment from the United States. AC ¶¶ 174-75. Those U.S. contacts were again intentional: the mine clearance work secured a U.S. government project, concerned a U.S.-built facility, and was available only via an American prime contractor like ECC. AC ¶¶ 147b, 175. By soliciting and performing under that U.S. contract, AGMA formed contacts with the United States.[65]

G4S's arguments lack merit. It stresses (at 58) its lack of in-person "visits" to the United States, but such physical contacts are unnecessary. Modern communications allow companies to form contacts with a forum without ever "*physically* enter[ing] the forum." *Burger King*, 471 U.S. at 476. Here, AGMA may not have traveled to the United States – though that is a topic for discovery, *infra* Part V.D – but it did engage in repeated communications with ECC in the United States. AC ¶¶ 174-75. Because those U.S. communications were necessary for AGMA

---

[65] *See Bill Harbert*, 608 F.3d at 887 (subcontract with U.S. companies, knowing that "United States government was funding the contract," gave rise to minimum contacts); *Defense Training Sys. v. Int'l Charter Inc. of Wyo.*, 30 F. Supp. 3d 867, 878-79 (D. Alaska 2014) (subcontractors, rather than "submitting bids to the U.S. Military on their own," reached out to "negotiate with [a forum]-based corporation" to obtain subcontract); *Kroger v. Legalbill.com LLC*, 2005 WL 4908968, at *5 (D.D.C. 2005) ("[p]erformance of this contract requires continuous contact with Washington, D.C."); *see also* MTN Opp. Part I.B.1 (explaining factors for contractual contacts).

to obtain and perform its U.S.-government subcontract, they are sufficient with or without in-person visits. *See Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 2016 WL 1367734, at \*4 (D.D.C. 2016) (intentional contract with forum-based counterparty, when reliant on counterparty's forum-based qualifications, creates minimum contacts); *see also Kroger*, 2005 WL 4908968, at \*5 (finding purposeful availment "*even where defendant did not physically travel to the district*"); *Schwartz*, 938 F. Supp. at 5 (that defendant's agent "never set foot in the District is not dispositive"); *FC Inv. Grp. LC v. Lichtenstein*, 441 F. Supp. 2d 3, 8 (D.D.C. 2006) ("series of telephone calls and a facsimile transmission" were sufficient).

The uniquely American interest in AGMA's performance also distinguishes the cases G4S cites. In *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013) (cited in G4S Br. 59), for example, the legal-services contract had no nexus to the forum: a client hired an in-forum law firm "based on [its] economic merit" rather than its forum qualifications, for an out-of-forum matter in which the forum had no interest. *Id*. at 1194. Here, by contrast, the Shindand Airbase subcontract had a strong U.S. nexus: it was available only via an American contractor, was funded by the U.S. government, and served this forum's core policy interests. AC ¶¶ 172-74. Unlike in *Thompson Hine* and the other cases G4S cites (at 59),[66] that contract "create[d] such a 'substantial connection' between the non-resident and the forum that the contract 'alone' could supply the necessary 'minimum contacts.'" *Thompson Hine*, 734 F.3d at 1193 (quoting

---

[66] In *FC Investment Group LC v. IFX Markets, Limited*, 529 F.3d 1087 (D.C. Cir. 2008), the plaintiff "failed to invoke the long-arm statute or any other statutory basis supporting specific jurisdiction." *Id*. at 1095. In nonetheless assessing whether the defendants' conduct satisfied the D.C. long-arm statute, the court held that defendants' "phone calls into the District of Columbia from elsewhere" were insufficient. *Id*. Unlike here, those calls concerned a private transaction and did not relate to performance of a U.S.-funded contract available only via U.S. prime contractors. *See id*. at 1094-95. As for *Atchley*, the contracts were with the *Iraqi* government and funded by *Iraqi* counterparties – not by the U.S. government. 2020 WL 4040345, at \*5.

*Burger King*, 471 U.S. at 475-75); *see Xenophon*, 2016 WL 1367734, at *4 (distinguishing *Thompson Hine* where in-forum counterparty's location was significant and not coincidental).

### 2.    The G4S Defendants' U.S. contacts are suit-related

**a.**    G4S's contacts are "suit-related conduct" that support specific jurisdiction. *Urquhart-Bradley*, 964 F.3d at 44.  The "relatedness test is a flexible, relaxed standard," *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009), and it does not require a claim to "formally arise from defendant's contacts," *Air Prods.*, 503 F.3d at 553.  Instead, courts in this District look for "'some sort of causal relationship between a defendant's U.S. contacts and the episode in suit.'"  *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 27 (D.D.C. 2017) (quoting *Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 247 (D.D.C. 2015)).

Plaintiffs allege such a relationship here.  G4S Holdings (through AGI and AGNA) relied on U.S. contacts to execute at least four U.S. government contracts on which it made payments to the Taliban.  AC ¶¶ 147a, 147c, 147e, 147g.  Those contacts were both the but-for and proximate cause of the payments:  the U.S. government contracts created the projects AGI paid the Taliban to "protect," imposed performance requirements that AGI then purported to satisfy by hiring Taliban guards, and supplied AGI with the money that it used to make the payments.  AC ¶¶ 148-50, 174.  Those contracts also contained clauses forbidding AGI from paying the Taliban and required it to send certifications to the United States verifying that it was complying with U.S. anti-terrorism laws.  AC ¶¶ 133-34, 174.  Plaintiffs allege that any such certifications were false.  AC ¶¶ 147-50.  Indeed, for every payment made to the Taliban, AGI framed it as a legitimate "security" expense and sought reimbursement by sending invoices to (and receiving payment from) the United States.  AC ¶¶ 135, 172, 174.  There was thus a "meaningful link . . . between [the] legal obligation that arose in the forum and the substance of [Plaintiffs'] claims." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007).

G4S Risk Management (via AGMA) was similar.  AGMA's entry into Afghanistan occurred via the ECC subcontract discussed above.  AC ¶ 147b.  As with the AGI and AGNA contracts, AGMA's protection payments on that ECC subcontract were linked intimately to the United States.  Again, AGMA paid the Taliban in performing under that contract and obtained the money to pay the Taliban from its U.S. counterparty.  AC ¶ 175.  The contract also contained a clause prohibiting AGMA from paying terrorists – provisions the U.S. government negotiated to protect Americans just like Plaintiffs.  AC ¶¶ 133-34, 175.  AGMA's use of American money to pay the Taliban to "protect" an American project was amply related to its U.S. contacts.

The same contacts warrant jurisdiction over AGI's and AGMA's related UNOPS-funded mine-clearance work.  AC ¶ 147d.  That 2008 contract – and the protection payments AGI and AGMA made in performing under it – was closely related to the ECC subcontracts.  AC ¶ 147b.  They involved virtually identical work (mine clearance near Shindand Airbase); entailed use of the same personnel across both contracts; concerned the same area; and required the same security services.  AC ¶¶ 176-77.  AGMA could not have obtained the UNOPS contract without the ECC subcontract for the very same work.  AC ¶ 177.  Moreover, the most prominent example of AGMA's support for the Taliban on the UNOPS contract – hiring White II and his cell of Taliban fighters – arose directly from White II's relationship with ECC and AGNA on their related U.S.-based Shindand contract.  AC ¶¶ 147a, 177.  AGMA's reliance on its U.S. affiliate to broker that critical meeting confirms the close interrelationship among AGMA's and AGI's various private-security contracts.  It is therefore "proportional" and "reasonably foreseeable" to exercise jurisdiction over AGMA's protection-payment practices under those various contracts. *O'Connor*, 496 F.3d at 323; *see* MTN Opp. 27-29 (explaining the "suit-related" standard).

Not every protection payment G4S made supporting ATA liability need arise directly

from its U.S. contacts.  *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775-76 (1984)

(upholding jurisdiction over "lawsuit in New Hampshire . . . even though only a small portion of

[defamatory content was] distributed in New Hampshire").  Another ATA personal-jurisdiction

case confirms the point.  *See Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3 (E.D.N.Y.

2016).  In *Strauss*, jurisdiction existed over a foreign bank for routing just five wire transfers

through the United States as compared to "at least 280 other transfers" routed "elsewhere in the

world."  *Id*. at 20-21.  Although the U.S. transactions accounted for only "1.8% of the total"

payments to terrorists, they remained "an integral facet of the conduct" that financed terrorism

and so warranted jurisdiction over the entire course of dealing.  *Id*.  So too here.  Even if some of

G4S's payments occurred on non-U.S. contracts, Plaintiffs' allegations demonstrate that the

course of conduct through which G4S chose to make those payments was "fundamentally

intertwined with [the United States]."  *Id*. at 22.

   **b.**    G4S's arguments are unavailing.  It says (at 63) its payments "took place in

Afghanistan," but the physical location of its tort does not lessen the importance of its U.S.

contacts.  MTN Opp. 29-31.  In every ATA case, the ultimate payment to the terrorist occurs

overseas.  *See* 18 U.S.C. § 2331(C).  But when the payments are related to a U.S. contract – as

G4S's were – they create jurisdiction in U.S. courts.  *See* MTN Opp. Part I.B.2.

   G4S's cases do not suggest otherwise.  In the cases it cites (at 58), the tort did not

implicate the forum's interests and had only a tangential relationship to the government contract

on which the plaintiff tried to pin jurisdiction.[67]  *Okolie*, for example, concerned a contractor's

---

[67] *Cf. Okolie v. Future Servs. Gen. Trading & Contracting Co.*, 102 F. Supp. 3d 172, 177
(D.D.C. 2015) (contract was to supply vehicles to U.S. government; tort was "negligent
operation of vehicles" by contractor's own employees); *Alkanani v. Aegis Def. Servs., LLC*, 976
F. Supp. 2d 13, 27-28 (D.D.C. 2014) (accidental friendly-fire shooting in Iraq did not relate to
private-security contract under D.C. long-arm statute; court reached "legal conclusion . . . under

alleged negligence in "causing a car accident in Kuwait." *Id.* at 174. The contractor provided vehicles in Kuwait pursuant to a U.S. government contract, but the relationship between contract and tort – caused by two of the contractor's employees driving their own cars "at a high speed," *id.* – was "extremely attenuated," *id.* at 177. The plaintiffs were not even residents of the forum. *See id.* at 174. The car wreck that injured them did not, as here, involve the intentional use of U.S. dollars to commit a tort that violated the U.S. contract and that went to the core of the contractor's performance under the contract. *Id.* at 177-78. Thus, although the defendant there "could not have anticipated being haled into a [D.C.] court," *id.* at 177, the opposite is true here.

Nor is G4S correct (at 63-64) that "contract-based contacts" can never confer jurisdiction over "tort injuries as a matter of law." Erecting a firewall between contracts and torts represents the sort of "mechanical test[]" for jurisdiction that the Supreme Court has rejected. *Burger King*, 471 U.S. at 479. In fact, courts regularly exercise jurisdiction over tort claims based on forum contacts created by contract. *See Bill Harbert*, 608 F.3d at 887-88 (affirming jurisdiction over False Claims Act claims based on "contracts"); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013) (affirming jurisdiction over ATA claims based on contract-based contacts concerning use of correspondent banking accounts).[68] What matters is not the claim's common-law provenance, but whether the link between claim and contact is "intimate enough to keep . . . jurisdiction reasonably foreseeable." *O'Connor*, 496 F.3d at 323.

---

the circumstances presented in this case" based on the structure of "D.C.'s long-arm statute").

[68] *See also Estate of Thompson v. Phillips*, 741 F. App'x 94, 99 n.28 (3d Cir. 2018) (using contractual contacts even though "claim sounds entirely in tort"); *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996) (accepting link "between a contractual or business association and a subsequent tort"); *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981) ("Logically, there is no reason why a tort cannot grow out of a contractual contact.").

### C.    Jurisdiction Is Reasonable Because It Serves Vital National Interests

Personal jurisdiction over G4S is also warranted because it "comport[s] with fair play and substantial justice." *Burger King*, 471 U.S. at 476.  In assessing this prong of the inquiry, courts balance the defendant's burden, the forum's interest, the plaintiff's interest in obtaining relief, judicial efficiency, and substantive social policies.  *See Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102, 113 (1987).  For the reasons explained against MTN, those factors together weigh heavily in favor of exercising personal jurisdiction.  MTN Opp. 38-39.

G4S does not argue otherwise.  Because G4S does not (and cannot) deny the strong American "interest in adjudicating th[is] dispute," Plaintiffs can obtain "jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."  *Burger King*, 471 U.S. at 477.[69]  Given the strong national interests embodied in the ATA, in fact, jurisdiction would be warranted even on a "borderline showing of [minimum contacts]."  *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005); *see Adelson v. Hananel*, 652 F.3d 75, 84 (1st Cir. 2011) ("an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness"); *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 631 (5th Cir. 1999) (similar).  The overriding interest in affording Plaintiffs a remedy in U.S. courts therefore amply justifies personal jurisdiction.

### D.    Alternatively, Jurisdictional Discovery Is Warranted

Although the Court should deny G4S's motion outright, in the alternative it should authorize jurisdictional discovery.  In this District, the "'standard for permitting jurisdictional discovery is quite liberal.'"  *Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders*

---

[69] The American "interest in adjudicating the dispute" is "particularly weighty" because G4S does not identify any "burdens, interests, or inefficiencies" that cut "against jurisdiction" over G4S.  *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 70 (1st Cir. 2014).

*Holding Co.*, 573 F. Supp. 2d 70, 74 (D.D.C. 2008) (Sullivan, J.) (quoting *Diamond Chem. Co.*

*v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003)).  The D.C. Circuit has "held many

times that, if a party demonstrates it can supplement its jurisdictional allegations through

discovery, then jurisdictional discovery is justified."  *Urquhart-Bradley*, 964 F.3d at 48.

Plaintiffs can so supplement their allegations here.  *First*, discovery would confirm

Plaintiffs' allegations that G4S "sent financial and other material support *directly* to [the

Taliban]," which would be sufficient for effects-based jurisdiction under any standard.  *Terrorist*

*Attacks*, 714 F.3d at 678; *supra* Part V.A.  Such discovery should cover "(1) when the alleged

support was given to [the Taliban], (2) what support was given, (3) whether the support was

'earmarked' for use in specific schemes or attacks not directed at the United States, [and] (4)

specifically how [G4S was] involved in the process of providing support."  *Underwriting*

*Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66, 69 (2d Cir. 2019).

*Second*, discovery would supplement Plaintiffs' allegations about AGI's and AGNA's

relationship.  As explained above (at 59-62), AGI's agency relationship with AGNA caused it to

assume AGNA's forum contacts.  G4S asserts (at 59-62) that those allegations are insufficiently

detailed, but that raises questions of fact for discovery from both G4S and Centerra concerning

the legacy AGI-AGNA relationship.  *See*, *e.g.*, *Nat'l Cmty.*, 573 F. Supp. 2d at 74 (authorizing

jurisdictional discovery into whether out-of-forum "defendants are alter egos" of in-forum

subsidiary); *In re Vitamins Antitrust Litig.*, 94 F. Supp. 2d 26, 34 (D.D.C. 2000) (ordering

jurisdictional discovery into whether parent was tied to forum "through its activities with its

subsidiary").  Indeed, a plaintiff seeking to show a jurisdictional agency relationship "is entitled

to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by

withholding information on its contacts with the forum."  *El-Fadl*, 75 F.3d at 676.

*Third*, discovery would enhance Plaintiffs' allegations about AGI's and AGMA's U.S. government contracts and subcontracts in Afghanistan. Not only is it plausible that AGI and AGMA executed additional contracts beyond those identified in the Complaint, AC ¶ 147, but the key "context-specific, fact-intensive" details about the contracts, *Xie*, 260 F. Supp. 3d at 40, lie within G4S's exclusive control. G4S should thus be required to produce the relevant contracts and related documentation. It should also produce discovery about its communications with U.S. personnel concerning the negotiation and performance of those contracts.

**CONCLUSION**

The Court should deny Defendants' motions to dismiss or, for the G4S Defendants, order jurisdictional discovery. In the alternative, it should grant Plaintiffs leave to amend to cure any defects the Court might discern. *See* Fed. R. Civ. P. 15(a)(2); *Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 31 & n.5 (D.D.C. 2014).

Dated:  December 8, 2020

Respectfully submitted,

*/s/ Joshua D. Branson*

| | |
|---|---|
| Michael J. Gottlieb (D.C. Bar No. 974960) | Joshua D. Branson (D.C. Bar No. 981623) |
| Randall Jackson (D.C. Bar No. 490798) | Andrew E. Goldsmith (D.C. Bar No. 1007074) |
| Nicholas Reddick (D.C. Bar No. 1670683) | Grace W. Knofczynski (D.C. Bar No. 15000407) |
| Willkie Farr & Gallagher LLP | Kellogg, Hansen, Todd, |
| 1875 K Street, N.W. |  Figel & Frederick, P.L.L.C. |
| Washington, DC 20006-1238 | 1615 M Street, N.W., Suite 400 |
| Tel: (202) 303-1000 | Washington, D.C. 20036 |
| Fax: (202) 303-2000 | Tel:  (202) 326-7900 |
| MGottlieb@willkie.com | Fax:  (202) 326-7999 |
| RJackson@willkie.com | jbranson@kellogghansen.com |
| NReddick@willkie.com | agoldsmith@kellogghansen.com |
| | gknofczynski@kellogghansen.com |

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*