## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AUGUST CABRERA, *et al.*,

          Plaintiffs,

    v.

BLACK & VEATCH SPECIAL PROJECTS
CORPORATION, *et al.*,

          Defendants.

Case No. 19-cv-3833-EGS-ZMF

JURY TRIAL DEMANDED

## OPPOSITION TO THE DEVELOPMENT CONTRACTOR DEFENDANTS'
## MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 4

    A.  Legal Background ............................................................................................ 4

    B.  Factual Background ......................................................................................... 5

        1.  Protection money and the rise of the Taliban insurgency .................... 5

        2.  Defendants' protection payments to the Taliban ................................. 7

        3.  The Taliban's al-Qaeda-sponsored campaign of terrorism ................ 12

    C.  Plaintiffs' Claims ......................................................................................... 13

ARGUMENT ................................................................................................................... 14

I.  PLAINTIFFS SUFFICIENTLY ALLEGE THAT EACH DEFENDANT MADE
PROTECTION PAYMENTS TO THE TALIBAN ................................................. 14

    A.  The Complaint Alleges Plausibly That Each Defendant Maintained A Practice Of
Paying The Taliban For Security ................................................................. 14

    B.  Defendants' Pleading Arguments Rest On Flawed Legal Constructs ............. 17

        1.  Defendants' criticisms of the industry-practice allegations lack merit ...... 17

        2.  Defendants' criticisms of Plaintiffs' exemplar allegations lack merit ...... 22

        3.  Defendants' heavy use of extra-pleading materials is improper ............... 25

    C.  Each Defendant's Individual Factual Arguments Are Unpersuasive ............... 27

        1.  DAI ................................................................................................... 28

        2.  The LBG/BV Defendants ................................................................. 35

        3.  IRD .................................................................................................... 40

        4.  Chemonics ......................................................................................... 42

II.  PLAINTIFFS SUFFICIENTLY PLEAD PRIMARY-LIABILITY CLAIMS (COUNTS
ONE, THREE, AND FOUR) ................................................................................. 47

    A.  Plaintiffs Sufficiently Allege Proximate Cause ............................................ 47

i

1. Defendants' protection payments substantially contributed to the Taliban's terrorist attacks against Americans in Afghanistan ................................... 47

2. Defendants identify no causation-defeating intermediary .......................................... 51

3. Defendants' individual-dollars-to-individual-attacks theory fails ............................ 55

4. Defendants' remaining causation arguments lack merit............................................ 58

B. Plaintiffs Sufficiently Allege Apparent Intent And Dangerousness ................................ 61

C. Plaintiffs Sufficiently Plead Three Predicate Crimes ....................................................... 66

1. Plaintiffs satisfy the scienter elements of the predicate criminal statutes................... 66

2. Black & Veatch's other arguments against Count Three fail ..................................... 68

III. PLAINTIFFS SUFFICIENTLY ALLEGE SECONDARY-LIABILITY CLAIMS .............. 69

A. Defendants Provided Substantial Assistance To The Taliban ......................................... 70

1. Defendants aided the Taliban's terrorist activities...................................................... 70

2. Defendants' assistance was substantial........................................................................ 75

a. Factors 1 and 2: Nature of act assisted and amount of aid.................................. 75

b. Factors 3 and 4: Presence and relationship ........................................................ 78

c. Factor 5: State of mind.......................................................................................... 79

i. Defendants had substantial knowledge ............................................................ 79

ii. The statute contains no specific-intent requirement ........................................ 81

d. Factor 6: Duration ................................................................................................ 83

B. Plaintiffs Plead The Necessary Scienter For Aiding-Abetting Liability ......................... 83

C. An FTO Committed, Planned, Or Authorized Each Terrorist Attack At Issue (Count Five).................................................................................................................... 85

1. Al-Qaeda and/or the post-designation Haqqani Network helped *commit* the attacks that killed and injured 77 primary victims...................................................... 85

2. Al-Qaeda *planned* and *authorized* the remaining attacks.......................................... 90

a. Plaintiffs' allegations are sufficient ..................................................................... 90

            b.  Defendants' arguments are unpersuasive ............................................. 94

        3.  Defendants' FTO scienter and direct-assistance arguments fail ................................. 96

    D.  An FTO Committed, Planned, or Authorized The Taliban's Terrorist Campaign
        (Count Six) .................................................................................................... 98

IV. DEFENDANTS' ADDITIONAL ARGUMENTS LACK MERIT ..................................... 100

    A.  Plaintiffs' Claims Do Not Present A Political Question ................................. 100

    B.  Defendants Are Not Entitled To Derivative Sovereign Immunity ................. 104

    C.  The Act-Of-War Defense Does Not Apply To The Taliban ............................ 106

CONCLUSION ................................................................................................... 110

# TABLE OF AUTHORITIES[*]

Page(s)

**Cases**

*Abecassis v. Wyatt*,
  7 F. Supp. 3d 668 (S.D. Tex. 2014) ...................................................................... 62

*Abecassis v. Wyatt*,
  785 F. Supp. 2d 614 (S.D. Tex. 2011) ............................................................ *passim*

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*,
  957 F. Supp. 1308 (S.D.N.Y. 1997) ...................................................................... 75

*Advocate Health Care Network v. Stapleton*,
  137 S. Ct. 1652 (2017) ........................................................................................ 98

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*,
  219 F.3d 519 (6th Cir. 2000) .................................................................. 75, 77, 83

*Al-Alwi v. Trump*,
  901 F.3d 294 (D.C. Cir. 2018) ...................................................................... 108, 109

*Al-Bihani v. Obama*,
  590 F.3d 866 (D.C. Cir. 2010) .............................................................................. 108

*Allen v. Beta Constr.*,
  309 F. Supp. 2d 42 (D.D.C. 2004) ................................................................... 20, 23

*Almog v. Arab Bank, PLC*,
  471 F. Supp. 2d 257 (E.D.N.Y. 2007) ................................................................... 101

*\*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) ....................................................... 101, 102, 103, 104

*Apollo Grp., Inc. Sec. Litig., In re*,
  2007 WL 778653 (D.D.C. 2007) ........................................................................... 34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................... 17, 24

*Atchley v. AstraZeneca UK Ltd.*,
  2020 WL 4040345 (D.D.C. 2020), *appeal docketed*, No. 20-7077
  (D.C. Cir. Aug. 21, 2020) ................................................................................ *passim*

---

[*] Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

*Averbach v. Cairo Amman Bank*,
  2020 WL 486860 (S.D.N.Y. 2020) ...................................................................... 74

*Backpage.com, LLC v. Lynch*,
  216 F. Supp. 3d 96 (D.D.C. 2016) ...................................................................... 66

*Baker v. Carr*,
  369 U.S. 186 (1962) ............................................................................... 101, 102

*Bank of Am. Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017) ........................................................................................ 58

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015) .................................................................. *passim*

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
  2020 WL 7089448 (E.D.N.Y. 2020) ............................................................ *passim*

*Bates v. Nw. Human Servs. Inc.*,
  466 F. Supp. 2d 69 (D.D.C. 2006) ...................................................................... 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 14

*Biton v. Palestinian Interim Self-Gov't Auth.*,
  412 F. Supp. 2d 1 (D.D.C. 2005) .......................................................... 101, 102, 109

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ...................................................................... *passim*

*Brett v. Att'y Gen. of U.S.*,
  2008 WL 3851555 (D.D.C. 2008) ........................................................................ 22

*Brill v. Chevron Corp.*,
  804 F. App'x 630 (9th Cir. 2020) .................................................................. 53, 64

*Bruce Kirby, Inc. v. Quarter Moon, Inc.*,
  2018 WL 3614120 (D. Conn. 2018) ..................................................................... 20

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
  274 F. Supp. 2d 86 (D.D.C. 2003) ...................................................................... 50

*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016) ................................................................... 104, 105, 106

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ............................................................................................ 69

*Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., In re*,
   690 F. Supp. 2d 1296 (S.D. Fla. 2010) ("*Chiquita I*") ................................................. 52

*Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., In re*,
   190 F. Supp. 3d 1100 (S.D. Fla. 2016) ("*Chiquita II*") ................................................. 71, 75, 76

*\*Chiquita Brands Int'l, Inc.*,
   284 F. Supp. 3d 1284 (S.D. Fla. 2018) ("*Chiquita III*") ................................................. *passim*

*Clayborn v. Twitter*,
   2018 WL 6839754 (N.D. Cal. 2018) ................................................. 95

*Cobb v. Indian Springs, Inc.*,
   522 S.W.2d 383 (Ark. 1975) ................................................. 82

*Commerzbank AG v. U.S. Bank N.A.*,
   277 F. Supp. 3d 483 (S.D.N.Y. 2017) ................................................. 18, 44

*Crosby v. Twitter, Inc.*,
   303 F. Supp. 3d 564 (E.D. Mich. 2018) ................................................. 82

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019) ................................................. 72, 95

*Ctr. for Bio. Diversity* v. Pirie,
   191 F. Supp. 2d 161 (D.D.C. 2002), *vacated on other grounds*,
   2003 WL 179848 (D.C. Cir. 2003) ................................................. 62, 64

*Dexia SA/NV v. Bear, Stearns & Co.*,
   929 F. Supp. 2d 231 (S.D.N.Y. 2013) ................................................. 16, 19

*Doe v. Exxon Mobil Corp.*,
   654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds*,
   527 F. App'x 7 (D.C. Cir. 2013) ................................................. 81

*Domestic Airline Travel Antitrust Litig., In re*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ................................................. 20, 26, 29

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
   894 F.3d 339 (D.C. Cir. 2018) ................................................. 58

*Elahi v. Islamic Rep. of Iran*,
   124 F. Supp. 2d 97 (D.D.C. 2000) ................................................. 93

*El-Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) (en banc ................................................. 102

*Erickson v. Pardus*,
551 U.S. 89 (2007) ..................................................................................................... 22

*Estate of Klieman v. Palestinian Auth.*,
424 F. Supp. 2d 153 (D.D.C. 2006) ............................................................... 101, 109

*First Alliance Mortg. Co., In re*,
471 F.3d 977 (9th Cir. 2006) ..................................................................................... 75

*Fixed Income Shares:  Series M v. Citibank N.A.*,
130 F. Supp. 3d 842 (S.D.N.Y. 2015) ................................................... 18, 19, 44, 67

*Fleck v. Dep't of VA*,
2020 WL 42842 (D.D.C. 2020) ................................................................................. 34

*Flores-Figueroa v. United States*,
556 U.S. 646 (2009) ................................................................................................... 97

*Freeman v. HSBC Holdings PLC*,
413 F. Supp. 3d 67 (E.D.N.Y. 2019) .............................................. 64, 92, 93, 94, 96

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) ............................................... 4, 66, 101, 106

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
422 F. Supp. 2d 96 (D.D.C. 2006) .......................................................................... 101

*Goldberg v. UBS AG*,
660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................... 4, 56, 62, 67

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ........................................................................ *passim*

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) ....................................................................................................... 58

*Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
2020 WL 6143654 (E.D.N.Y. 2020) ............................................................... *passim*

*Herbert v. Nat'l Acad. of Scis.*,
974 F.2d 192 (D.C. Cir. 1992) ................................................................................ 104

*Honickman v. BLOM Bank SAL*,
432 F. Supp. 3d 253 (E.D.N.Y. 2020) ...................................................................... 74

*Hourani v. Mirtchev*,
796 F.3d 1 (D.C. Cir. 2015) .................................................................................... 101

*Hurd v. Dist. of Columbia*,
    864 F.3d 671 (D.C. Cir. 2017) ............................................................................ 25, 26, 27, 45

*ICC Eval. Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Officials, Inc.*,
    2020 WL 1905132 (D.D.C. 2020) ................................................................................ *passim*

*Inland Empire Pub. Lands Council v. Glickman*,
    88 F.3d 697 (9th Cir. 1996) ...................................................................................................... 98

*Intermetro Indus. Corp. v. Enovate Med., LLC*,
    2016 WL 521535 (M.D. Pa. 2016) ............................................................................................ 18

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ................................................................................................................. 101

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
    513 U.S. 527 (1995) ................................................................................................................... 56

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995) ........................................................................................................ 94

*Kaplan v. Lebanese Canadian Bank, SAL*,
    405 F. Supp. 3d 525 (S.D.N.Y. 2019) ................................................................................ 64, 80

*Karcher v. Islamic Rep. of Iran*,
    396 F. Supp. 3d 12 (D.D.C. 2019) ............................................................................................ 88

*KBR, Inc. Burn Pit Litig., In re*,
    744 F.3d 326 (4th Cir. 2014) ................................................................................................... 105

*Kelleher v. Dream Catcher, L.L.C.*,
    263 F. Supp. 3d 322 (D.D.C. 2017) .................................................................................... 86, 87

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ................................................................... 53, 58, 59, 60, 64, 65

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ..................................................................................................... 26

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004) ..................................................................... 55, 58, 59, 60, 78

*Kurd v. Rep. of Turkey*,
    374 F. Supp. 3d 37 (D.D.C. 2019) ...................................................................................... 20, 22

*Lelchook v. Islamic Rep. of Iran*,
    393 F. Supp. 3d 261 (E.D.N.Y. 2019) ...................................................................................... 75

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..................................................................... 49, 58

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2nd Cir. 2018)......................................... 65, 71, 81, 82, 84, 97

*Liston-Smith v. CSAA Fire & Cas. Ins. Co.*,
    2016 WL 6246300 (D. Conn. 2016) ................................................... 18

*Magluta v. Samples*,
    256 F.3d 1282 (11th Cir. 2001) ........................................................ 22

*Malek v. Flagstar Bank*,
    70 F. Supp. 3d 23 (D.D.C. 2014) ..................................................... 110

*McLaughlin v. Anderson*,
    962 F.2d 187 (2d Cir. 1992)............................................................ 100

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ........................... 50, 54, 56, 73, 75, 78

*Nat'l Ass'n. of Mfrs. v. Taylor*,
    582 F.3d 1 (D.C. Cir. 2009)............................................................. 98

*Nattah v. Bush*,
    605 F.3d 1052 (D.C. Cir. 2010) ................................................... 17, 88

*NCUA Bd. v. Wachovia Cap. Markets, LLC*,
    2014 WL 1795294 (S.D.N.Y. 2014).................................................. 18

*Ofisi v. BNP Paribas, S.A.*,
    2018 WL 396234 n.8 (D.D.C. 2018) ................................................. 81

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. 2019).............................................. 53, 74

*Owens v. BNP Paribas S.A.*,
    235 F. Supp. 3d 85 (D.D.C. 2017) ("*Owens II*") .................................. 54

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) ("*Owens IV*") ................................ *passim*

*Owens v. Rep. of Sudan*,
    531 F.3d 884 (D.C. Cir. 2008) ("*Owens I*").......................................... 58

*Owens v. Rep. of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017), *vacated on other grounds*,
    *Opati v. Rep. of Sudan*, 140 S. Ct. 1601 (2020) ("*Owens III*")......... *passim*

*Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*,
  81 F. Supp. 3d 1 (D.D.C. 2015) ........................................................................ 20

*Parhat v. Gates*,
  532 F.3d 834 (D.C. Cir. 2008) ...................................................................... 108

*Paroline v. United States*,
  572 U.S. 434 (2014) .......................................................................... 47, 49, 59

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
  172 F. Supp. 3d 700 (S.D.N.Y. 2016) .............................................................. 17

*Price v. Stryker Corp.*,
  270 F. Supp. 3d 226 (D.D.C. 2017) .................................................................. 20

*Privacy Inf. Ctr. v. DOJ*,
  442 F. Supp. 3d 37 (D.D.C. 2020) .................................................................... 34

*Rael v. Cadena*,
  604 P.2d 822 (N.M. 1979) ............................................................................... 82

*Rail Freight Fuel Surcharge Antitrust Litig.*, In re,
  2020 WL 5016922 (D.D.C. 2020) .................................................................... 24

*Reno v. Bossier Parish Sch. Bd.*,
  520 U.S. 471 (1997) ........................................................................................ 62

*Robinson v. Charter Practices Int'l LLC*,
  2015 WL 1799833 (D. Or. 2015) ...................................................................... 21

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ......................................................................... 53, 59

*Rubin v. Islamic Rep. of Iran*,
  830 F.3d 470 (7th Cir. 2016) ...................................................................... 72, 81

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) .............................................................. 38

*Siegel v. HSBC North Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) ........................................................ 71, 73, 74, 75

*Smith v. District of Columbia*,
  413 F.3d 86 (D.C. Cir. 2005) ........................................................................... 48

*Southern Co. Servs., Inc. v. FERC*,
  353 F.3d 29 (D.C. Cir. 2003) ........................................................................... 27

*Stansell v. BGP, Inc.*,
   2011 WL 1296881 (M.D. Fla. 2011) ................................................................. 50, 51, 65, 108

*Strauss v. Crédit Lyonnais, S.A.*,
   2006 WL 2862704 (E.D.N.Y. 2006) ("*Strauss I*") ........................................................ 67, 80

*Strauss v. Crédit Lyonnais, S.A.*,
   925 F. Supp. 2d 414 (E.D.N.Y. 2013) .............................................................................. 54

*Strike 3 Holdings, LLC v. Doe*,
   964 F.3d 1203 (D.C. Cir. 2020) ...................................................... 14, 23, 25, 88, 96

*Taamneh v. Twitter*,
   343 F. Supp. 3d 904 (N.D. Cal. 2018),
   *appeal docketed*, No. 18-17192 (9th Cir. Nov. 13, 2018) ........................................ 73

*Techniarts Eng'g v. United States*,
   51 F.3d 301 (D.C. Cir. 1995) ........................................................................................ 94

*Texas Mun. Power Agency v. EPA*,
   89 F.3d 858 (D.C. Cir. 1996) ........................................................................................ 98

*Text Messaging Antitrust Litig., In re*,
   630 F.3d 622 (7th Cir. 2010) ........................................................................................ 18

*Toumazou v. Turkish Republic of Northern Cyprus*,
   71 F. Supp. 3d 7 (D.D.C. 2014) .............................................................................. 21, 22

*Ungar v. PLO*,
   402 F.3d 274 (1st Cir. 2005) ....................................................................................... 101

*United States ex rel. Chin v. CVS Pharmacy, Inc.*,
   2017 WL 4174416 (C.D. Cal. 2017) ........................................................................... 20

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am. Inc.*,
   238 F. Supp. 2d 258 (D.D.C. 2002) ............................................................................. 20

*United States ex rel. Sansbury v. LB&B Assocs., Inc.*,
   58 F. Supp. 3d 37 (D.D.C. 2014) ............................................................. 19, 20, 23, 24

*United States v. Akinyoyenu*,
   199 F. Supp. 3d 106 (D.D.C. 2016) ....................................................................... 92, 93

*United States v. Avant*,
   275 F.2d 650 (D.C. Cir. 1960) .............................................................................. 40, 41, 43

*United States v. Banker*,
   876 F.3d 530 (4th Cir. 2017) ................................................................................. 97, 98

*United States v. Dewalt,*
  92 F.3d 1209 (D.C. Cir. 1996) ........................................................... 97

*United States v. Haipe,*
  769 F.3d 1189 (D.C. Cir. 2014) .......................................................... 63

*United States v. Hamidullin,*
  888 F.3d 62 (4th Cir. 2018) ...................................................... 68, 108

*United States v. Hausa,*
  258 F. Supp. 3d 265 (E.D.N.Y. 2017) ................................................ 68

*United States v. Johnson,*
  970 F.2d 907 (D.C. Cir. 1992) ........................................................... 94

*United States v. Jones,*
  471 F.3d 535 (4th Cir. 2006) ............................................................. 97

*United States v. Kamoga,*
  177 F.3d 617 (7th Cir. 1999) ............................................................. 94

*United States v. Kozeny,*
  643 F. Supp. 2d 415 (S.D.N.Y. 2009) ........................................... 15, 44

*United States v. Mitchell,*
  49 F.3d 769 (D.C. Cir. 1995) ............................................................. 94

*United States v. Mousavi,*
  604 F.3d 1084 (9th Cir. 2010) ........................................................... 67

*United States v. Pregler,*
  925 F.2d 268 (8th Cir. 1991) ............................................................. 99

*United States v. Price,*
  --- F.3d ----, 2019 WL 11271472 (9th Cir. 2019) ............................... 97

*United States v. Right to Use & Occupy 3.38 Acres of Land, More or Less, in Alexandria,*
  484 F.2d 1140 (4th Cir. 1973) ........................................................... 94

*United States v. Shabban,*
  612 F.3d 693 (D.C. Cir. 2010) ........................................................... 63

*United States v. U.S. Gypsum Co.,*
  438 U.S. 422 (1978) .......................................................................... 62

*U.S. OPM Data Sec. Breach Litig., In re,*
  928 F.3d 42 (D.C. Cir. 2019) ......................................... 63, 105, 106

*Vila v. Inter-Am. Inv., Corp.*,
    570 F.3d 274 (D.C. Cir. 2009) ............................................................................... 24

*Walsh Constr. Co. II v. U.S. Surety Co.*,
    334 F. Supp. 3d 282 (D.D.C. 2018) ...................................................................... 17

*Weiss v. Nat'l Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) .............................................................. 4, 62

*Weiss v. Nat'l Westminster Bank PLC*,
    768 F.3d 202 (2d Cir. 2014) .................................................................................. 61

*Woods v. Barnett Bank of Ft. Lauderdale*,
    765 F.2d 1004 (11th Cir. 1985) ............................................................................ 79

*\*Wultz v. Islamic Rep. of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) ................................................................. *passim*

*Yueh-Lan Wang v. New Mighty U.S. Tr.*,
    322 F.R.D. 11 (D.D.C. 2017) ............................................ 20, 21, 27, 29, 30, 32

*Zaidan v. Trump*,
    317 F. Supp. 3d 8 (D.D.C. 2018) .............................................................. 17, 39, 87

*Zapata v. HSBC Holdings PLC*,
    414 F. Supp. 3d 342 (E.D.N.Y. 2019) .................................................................. 64

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) ........................................................................ 100, 101, 102

**Statutes and Rules**

1 U.S.C. § 1 ............................................................................................................... 99

8 U.S.C. § 1189 ........................................................................................................ 96

18 U.S.C. § 1962(b)-(d) ............................................................................................ 99

18 U.S.C. § 1964 .................................................................................................... 100

18 U.S.C. § 1964(c) ............................................................................................... 100

18 U.S.C. § 2331(1) .................................................................................... 47, 99, 100

18 U.S.C. § 2331(1)(A) .................................................................................. 65, 66, 99

18 U.S.C. § 2331(1)(B) ............................................................................................. 61

18 U.S.C. § 2331(4) ....................................................................................... 106, 109

18 U.S.C. § 2331(4)(B) .................................................................................. 106, 107

18 U.S.C. § 2331(4)(C) ....................................................................................... 107

18 U.S.C. § 2332f ................................................................................................. 68

18 U.S.C. § 2332f(d)(1) ........................................................................................ 68

18 U.S.C. § 2332f(d)(2) ........................................................................................ 68

18 U.S.C. § 2333(a) ........................................................................ 4, 47, 61, 99, 100

18 U.S.C. § 2333(d)(2) .................................................................................... *passim*

18 U.S.C. § 2339A ................................................................................... 47, 66, 67

18 U.S.C. § 2339C ......................................................................... 47, 66, 67, 68, 69

18 U.S.C. § 2339C(a)(1) ....................................................................................... 69

18 U.S.C. § 2339C(a)(1)(A) .................................................................................. 69

18 U.S.C. § 2339C(a)(1)(B) .................................................................................. 69

50 U.S.C. § 1705(a) ................................................................................. 47, 66, 67

Pub. L. 112-168, 126 Stat. 1299 (Aug. 10, 2012) ................................................. 90

Justice Against Sponsors of Terrorism Act ("JASTA"),
    Pub. L. No. 114-222, 130 Stat. 852 (2016) ................................................ *passim*

        § 2(a) .......................................................................................................... 78

        § 2(a)(4) ....................................................................................................... 4

        § 2(a)(5) ...................................................................................... 69, 96, 100

        § 2(a)(6) ...................................................................................... 5, 49, 72, 81

        § 2(b) ..................................................................................................... *passim*

Fed. R. Civ. P. 8 ...................................................................... 3, 19, 20, 21

Fed R. Civ. P. 8(a) ............................................................................................. 19

Fed. R. Civ. P. 8(a)(2) ................................................................................. 2, 14

Fed. R. Civ. P. 9(b) ........................................................................................... 19

Fed. R. Civ. P. 15(a)(2) ................................................................................. 110

Fed. R. Evid. 201(b) ......................................................................................... 26

## Legislative Materials

H.R. Rep. No. 102-1040 (1992) ................................................................. 107

H.R. Rep. No. 115-858 (2018) ................................................... 5, 107, 108

S. Rep. No. 102-342 (1992) ........................................................... 4, 50, 61

## Other Authorities

Def.'s Mot. for Summ. J., *In re Chiquita Brands Int'l, Inc.*,
     No. 08-md-01916-KAM (S.D. Fla. Apr. 3, 2017), Dkt. 1329 ............................................... 50

Dep't of Justice Office of Legal Counsel, Mem. for A. Gonzales & W. Haynes II:
     *Application Of Treaties And Laws To Al Qaeda & Taliban Detainees*
     (Jan. 22, 2002) ("OLC Mem."), *available at* https://bit.ly/34ECLnP ................................. 107

Factual Proffer, *United States v. Chiquita Brands Int'l, Inc.*,
     No. 07-cr-00055-RCL (D.D.C. Mar. 19, 2007), Dkt. 12 ("*Chiquita Proffer*") .......... 11, 52, 54

Freakonomics Radio, *When Your Safety Becomes My Danger* (Sept. 23, 2020),
     https://bit.ly/3mLDGc9 ............................................................. 37

Mujib Mashal, *Haqqanis Steering Deadlier Taliban In Afghanistan,
     Officials Say*, N.Y. Times (May 7, 2016) ............................................. 90

Press Release, U.S. Treasury Dep't, *Designation of Iranian Entities and
     Individuals for Proliferation Activities and Support for Terrorism*
     (Oct. 25, 2007), https://bit.ly/31ILVO0 ........................................... 90

Restatement (Third) of Torts:  Liab. For Econ. Harm (2020) ..................... 76

SIGAR, *Amb. Richard Boucher Record of Interview* (Oct. 30, 2015),
     https://rb.gy/hkctae ................................................................ 46

SIGAR, Audit No. 14-75-FA, *USAID's Accelerated Sustainable Agriculture Program &
     Afghanistan Stabilization Initiative:  Audit of Costs Incurred by Chemonics International,
     Inc.* (July 2014) ("*SIGAR* Chemonics Audit"), https://bit.ly/2H5oJCf .................... 46

*Webster's Third New Int'l Dict. Unabridged* (2002) ................................. 91, 92

## INTRODUCTION

Plaintiffs are U.S. service members and civilians, and their families, who were killed or maimed by the Taliban between 2009 and 2017 while serving their country in Afghanistan. Defendants are large development contractors that knowingly financed the Taliban's attacks.[1] The reason was straightforward:  Defendants operated lucrative USAID-funded development projects in Afghanistan, and they paid the Taliban to refrain from attacking their business interests so they could avoid investing in legitimate security.  Those protection payments, in turn, gave the Taliban vital funding with which to buy weapons, pay recruits, and launch attacks.  The direct effect was to strengthen a terrorist insurgency that killed and wounded thousands of Americans.  No other stream of financing was as important to the Taliban's terrorist enterprise.

The Taliban's protection racket was highly institutionalized.  Beginning in 2006, the Taliban erected formal structures – including a public Code of Conduct and a central Financial Commission – to systematize the collection of protection money from U.S. contractors like Defendants.  It soon succeeded in making protection payments a standard part of industry practice in Afghanistan.  The Taliban ensured that each development contractor confronted the same set of incentives:  each could invest in expensive and difficult security procedures to address the terrorist threat head on, or it could boost profits by simply buying "security" from the Taliban.  Defendants chose the latter.  Their choice reflected a cruel bargain with the terrorists:  Defendants gave the Taliban the money it needed, and the Taliban in turn redirected its attacks

---

[1] This opposition addresses DAI (Dkt. 82 ("AC"), ¶ 21); the Louis Berger Group/Black & Veatch ("LBG/BV") Defendants (AC ¶¶ 24-27); the International Relief and Development ("IRD") Defendants (AC ¶¶ 31-33); and Chemonics (AC ¶ 34).  It responds collectively to their motions to dismiss.  *Cf.* Dkts. 107-1 ("DAI Br."); 103-1 ("LBG Br."); 106-1 ("BV Br."); 104-1 ("IRD Br."); 111-1 ("Chemonics Br."); *see also* Dkt. 108.  This opposition incorporates by reference Plaintiffs' concurrent opposition to the defense-contractor Defendants' motions to dismiss.  *See* Opp'n to Defense Contractor Defs.' Mots. To Dismiss ("Def. Opp.").

away from Defendants' lucrative projects.  The bargain worked as intended.  Defendants reaped immense profits, and U.S. service members died in the terrorist attacks that ensued.

Defendants' own filings reveal how they rationalized their unlawful payments.  IRD now euphemizes (at 20) the Taliban as a "quasi-governmental organization which did in fact provide governmental services," while Chemonics defends (at 31) its payments by invoking the Taliban's supposed "wide range of lawful, non-violent activities."  Or, as an LBG project manager put it in 2009:  "They're not all bad . . . [I]f they're not disrupting my project, they are moderate Talibs." AC ¶ 12.  It was only natural for companies that viewed the Taliban so sympathetically to pay the terrorists for protection.  Defendants' mindset – that the Taliban must not be so bad so long as it was not attacking *them* – led them to treat terrorist payoffs as a cost of doing business.  But those payments violated multiple criminal laws and contract clauses barring USAID contractors from aiding the Taliban.  And, because the payments funded a terrorist group that killed and injured Plaintiffs and their family members, they also violated the Anti-Terrorism Act ("ATA").

Defendants' motions argue the facts as though before a jury.  They nitpick the allegations for lacking details within their control (such as exact payment amounts); they ignore every allegation that does not single them out by name; they ask the Court to draw contested inferences in their favor; and they cite a spate of extra-pleading "evidence" for their preferred facts.  Those arguments misunderstand the role of a motion to dismiss.  Because this is not a fraud case, Plaintiff need not plead the minutiae Defendants demand.  Rather, they need only supply "a short and plain statement of [their] claim."  Fed. R. Civ. P. 8(a)(2).  The allegations here clear that bar.

Once Plaintiffs' allegations are accepted as pleaded, Defendants' legal arguments fall apart.  *First*, Defendants advocate a set of rules that, if accepted, would nullify primary liability under the ATA.  For example, they say terrorist funding is permissible if it flows through an

intermediary; they demand that Plaintiffs trace individual dollars to individual attacks; and they disclaim intent to harm Americans.  Because such arguments would thwart Congress's intent of stopping terrorist funding, the D.C. Circuit has rejected them all.  And, in an ATA case about corporate protection payments to Colombian terrorists, a federal court rebuffed nearly identical arguments and allowed primary-liability claims to reach a jury.  *See In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018) ("*Chiquita III*").  The claims here are even stronger.

*Second*, Defendants' secondary-liability arguments are especially lacking.  None can be squared with the statutory text, and none is consistent with the seminal D.C. Circuit case codified into the statute.  If paying protection money to terrorists is not aiding-abetting, essentially nothing is.  Indeed, the lead auditor for an interagency Task Force set up to interdict insurgent funding in Afghanistan said he viewed any contractor that paid protection money to be "an aider and abettor of terrorist acts."  AC ¶ 73.  As for the requirement that an FTO "commit[], plan[], or authorize[]" the terrorist acts, 18 U.S.C. § 2333(d)(2), Defendants caricature Plaintiffs' allegations about al-Qaeda's role as "conclusory" while demanding details that would be unnecessary even at trial.  Those arguments not only propound a pleading standard at odds with Rule 8, but also ask the Court to reject the U.S. government's consensus view of the insurgency.

Ultimately, the Court can cut through Defendants' legal theories for the simple reason that protection payments are unique.  Such payments occur because of terrorist threats, and they only work if paid to the terrorists making the threats.  That is why the only recent ATA case to address protection money sustained the claims in full.  It is also why Defendants' recurring analogies to ATA cases about banks and social-media companies fall flat.  Protection payments are nothing like banking or social-media services, and such payments create a link to terrorism far stronger than in the cases Defendants cite.  The motions to dismiss should be denied.

# BACKGROUND

## A.    Legal Background

Congress enacted the ATA in 1992 to "open[] the courthouse door to victims of international terrorism."  S. Rep. No. 102-342, at 45 (1992).  The ATA reflected Congress's dual objectives of "providing victims of terrorism with a remedy" and stopping "the flow of money" to terrorists.  *Id.* at 22.  Congress thus originally designed the statute's civil remedy to impose "liability at any point along the causal chain of terrorism."  *Id.*; *see* 18 U.S.C. § 2333(a).

In the ensuing years, courts applied the ATA to further Congress's purpose of "cut[ting] the terrorists' lifeline" by separating terrorists from "their financial angels."  *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc).  Courts held frequently that the ATA imposed liability for providing general funding to terrorist groups, without requiring plaintiffs to trace the specific attacks that injured them to any one monetary contribution.[2]  Courts divided on the legal theory for imposing such liability:  some held that terrorist funders were directly liable for themselves committing an "act of international terrorism," 18 U.S.C. § 2333(a); *see*, *e.g.*, *Boim*, 549 F.3d at 689-90, whereas others held them secondarily liable as aiders-abettors, *see*, *e.g.*, *Abecassis I*, 785 F. Supp. 2d at 645-49.

In 2016, Congress expanded the ATA in the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 ("JASTA"), which preserves primary liability while also codifying "causes of action for aiding and abetting and conspiracy liability."  *Id.* § 2(a)(4).  In recognizing secondary liability, Congress found that companies that "contribute material support

---

[2] *See*, *e.g.*, *Chiquita III*, 284 F. Supp. 3d 1284, 1318-20; *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 503-08, 521 (E.D.N.Y. 2012); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 647-51 (S.D. Tex. 2011) ("*Abecassis I*"); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 41-57 (D.D.C. 2010); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006) ("*Weiss I*").  Unless otherwise specified, all internal quotations, brackets, and emphases are omitted from all citations.

or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism" against Americans should "anticipate being brought to court in the United States."  *Id.* § 2(a)(6).  Congress explained its "purpose" was to "provide civil litigants with the broadest possible basis . . . to seek relief against" entities that contribute resources "directly or indirectly" to terrorists.  *Id.* § 2(b).  By authorizing civil litigation to "cut[] terrorists' financial lifelines," those provisions together promote "longstanding efforts to reduce global terrorism and thus protect Americans here and abroad."  H.R. Rep. No. 115-858, at 3-4 (2018).

**B.    Factual Background**

**1.    Protection money and the rise of the Taliban insurgency**

Before September 11, 2001, the Taliban wielded de-facto control over wide swaths of Afghanistan.  AC ¶¶ 40-42.  It used that control to cultivate close ties with al-Qaeda, offering Osama bin Laden safe harbor and other assistance as he executed the September 11 attacks.  AC ¶¶ 40-42, 465-69.  The U.S. response to those attacks was swift.  In October 2001, the U.S. military invaded Afghanistan and removed the Taliban from power.  AC ¶ 44.  Defeated on the battlefield, the Taliban leadership fled to Pakistan while its fighters dispersed into the Afghan countryside.  AC ¶ 45.  Mullah Omar, the Taliban's leader, then established the Quetta Shura, a leadership council located in Pakistan that functioned as the terrorists' governing body.  AC ¶¶ 2, 47.  From Pakistan, the Quetta Shura began plotting a terrorist campaign to attack the United States and the democratic Afghan government it was trying to build.  AC ¶¶ 46-49.

The Taliban's terrorist insurgency grew rapidly in scope and lethality.  AC ¶¶ 50-52.  By 2006, the Taliban was seizing control of many areas of Afghanistan, and by 2009, it had installed "shadow" governments in 33 of the country's 34 provinces.  AC ¶¶ 49, 63.  As its power grew, so did its need for money.  AC ¶ 97.  Funding was the lifeblood of the Taliban's insurgency, and its growing violence reflected its fundraising prowess.  AC ¶¶ 49-50, 97, 104.  To that end, the

Taliban created mafia-like processes, codified in an organization-wide Code of Conduct, to raise funds for its terrorist enterprise.  AC ¶¶ 49, 86-87, 100.  It also erected formal structures – organized under the central Taliban Financial Commission – through which its leadership oversaw the process of collecting and spending money nationwide.  AC ¶¶ 10, 49, 84-88, 105.  As one Taliban-financing expert wrote, those structures "literally institutionaliz[ed] how profits earned from organized crime [were] distributed within the command chain."  AC ¶ 49.

Protection money soon emerged as the Taliban's most lucrative funding stream.  AC ¶¶ 104-10.  It was "long-standing business practice within Afghanistan" for groups to "use [their] control of the security environment in order to extort payment from those who want to operate."  AC ¶ 63.  The Taliban perfected that practice by systematically demanding payment from contractors that sought to operate in areas it could influence.  AC ¶¶ 62-63.  It even created a special subunit of the Taliban Financial Commission, called the Organisations and Companies Commission, tasked with collecting protection payments from Western contractors across Afghanistan.  AC ¶ 87.  The Taliban motivated payment by presenting the contractors with a choice:  pay the Taliban for "security," or face the risk of future terrorist attack.  AC ¶ 64.  Large contractors routinely chose the former.  AC ¶¶ 65-83.  After all, legitimate security required costly, time-intensive efforts that most companies were unwilling to implement.  AC ¶¶ 64-67.  It was easier, and cheaper, to simply pay the Taliban.  *Id.*  As one American executive put it, "We don't need any security if the payments are made.  Nobody f---s with us."  AC ¶¶ 3, 91.

Those dynamics led Western contractors working in insecure areas to pay protection money almost universally.  AC ¶¶ 63-96, 121-23.  For the Taliban, U.S. development contractors proved especially profitable.  Although military logistics contractors were most notorious for making protection payments, the Special Inspector General for Afghanistan Reconstruction

("SIGAR") found "equally problematic" "the role of USAID implementing partners, or their private security contractors, in paying 'taxes' in exchange for the ability to access project sites." AC ¶ 77. A wide array of government and non-government investigations documented those payments. AC ¶¶ 72-83. Two expert interagency groups – the Afghan Threat Finance Cell ("ATFC") and Task Force 2010 – studied the problem in particular detail. AC ¶¶ 74-75. They found that the "big companies . . . they're all corrupt," and that on average "18% of contract money went to the Taliban, Haqqani, [and] other insurgent groups. And it was often a higher percent." AC ¶ 74. Such findings were in accord with the industry consensus that the Taliban assessed a standard 20% "tax" on every significant development project. AC ¶¶ 86, 92.

The protection racket's most striking feature was its near-universality. AC ¶¶ 80-82. The Taliban did not demand payment ad hoc from individual firms in isolation; it approached them all and ensured that protection payments became the industry norm. AC ¶¶ 63-94. Thus, as the ATFC's longtime director and Afghan threat-finance expert explained, "about 25 percent of every development project's funding was going to the insurgency." AC ¶ 75. The White House's special envoy for Afghanistan and Pakistan shared that view at a 2009 White House principals meeting. He stated, as recounted in Bob Woodward's bestselling book about Afghanistan, that "[a]ll the contractors for development projects pay the Taliban for protection and use of the roads, so American and coalition dollars help finance the Taliban." AC ¶ 78.

### 2.    Defendants' protection payments to the Taliban

a.    Each Defendant addressed in this brief was a large development contractor that obtained hundreds of millions of dollars in USAID funding for projects in Afghanistan. AC ¶¶ 181-82, 245-47, 378-80, 401-02. Each followed the industry practice and made regular protection payments to the Taliban to secure its projects. AC ¶¶ 183, 248, 381, 403. The basis for Plaintiffs' allegations against these Defendants – both individually and collectively – is laid

out in great detail below.  *See infra* Argument Part I.  Broadly speaking, the payments occurred

in regular (usually monthly) intervals and spanned the entire period Defendants operated in

Afghanistan, *e.g.*, AC ¶¶ 79, 257 – in each case, at least from 2007 to 2013.[3]  In total, each

Defendant paid at least several million dollars in protection money.  AC ¶¶ 184, 249, 382, 404.

 Defendants channeled many (but not all) of those payments through their subcontractors.

AC ¶ 68.  Under their contracts with USAID, Defendants were tasked with hiring and overseeing

subcontractors to work on their projects.  AC ¶¶ 95-96.  Defendants were responsible for

selecting the subcontractors; for hiring and contracting with them; for monitoring their work; for

vetting their downstream partners; and for approving their every expense.  AC ¶¶ 95-96, 138-43.

A key part of Defendants' job, in turn, was ensuring that their chosen subcontractors did not fund

or otherwise support terrorists.  AC ¶¶ 13, 138-40.  USAID's contracts with Defendants thus

contained a "standard clause" reminding them that "U.S. law prohibits transactions with, and the

provision of resources and support to, individuals and organizations associated with terrorism."

AC ¶ 133.  For each project, it was the "legal responsibility of the contractor/recipient" – that is,

Defendants – "to ensure compliance" with U.S. antiterrorism laws.  AC ¶¶ 133, 185.

 Defendants shirked that responsibility.  Rather than ensure their subcontractors' integrity,

Defendants structured their subcontracting relationships to foster corrupt payments.  AC ¶¶ 5,

57-59.  That structure interposed Defendants' subcontractors as "intermediaries" between

Defendants and the Taliban, which enabled protection payments to occur without detection by

USAID.  AC ¶¶ 91, 95-96, 140.  The subcontractors used a variety of accounting tricks to hide

the payments from USAID:  inflated expenses, "ghost" workers, and "missing" documentation

---

[3] DAI made payments at least from 2007 until 2016 (AC ¶ 180); LBG and Black & Veatch at least from 2006 until 2013 (AC ¶ 244); IRD from at least 2007 until 2015 (AC ¶ 377); and Chemonics at least from 2006 until 2015 (AC ¶ 401).

were common.  AC ¶¶ 94, 135, 206, 258, 266, 411.  But Defendants knew about the payments and encouraged them to continue.  AC ¶¶ 186, 250, 383, 405.  By having their subcontractors physically pay the Taliban, Defendants reaped the security benefits those payoffs delivered while remaining nominally insulated from the accounting machinations that enabled them.  AC ¶ 117.

One subcontractor, U.S. Protection and Investigation ("USPI"), illustrates how the scheme worked.  AC ¶¶ 94, 255.  USPI was a notorious security provider that paid the Taliban as a matter of routine.  AC ¶¶ 256-63.  Yet four of the five Defendants (at least) hired USPI to "secure" their projects.  AC ¶¶ 186, 254, 262, 406.  Among other things, a USPI whistleblower testified that "the company [he] was working for was defrauding the U.S. government to pay the Taliban," and its former security coordinator stated publicly that USPI's guards included "current Taliban" members.  AC ¶¶ 261, 263.  USPI concealed those payments by inflating its guard count and paying the Taliban through the "salary" allotted to the fictitious guards.  AC ¶¶ 258, 260.  DOJ indicted USPI for fraud in 2008, and its co-founders went to prison.  AC ¶ 258.  Up until the indictment, Defendants approved every payment USPI made and encouraged its practice of paying protection money.  AC ¶¶ 262-63; *see* AC ¶¶ 95-96, 407-08.

Defendants' payments proved immensely profitable.  Paying the Taliban was less expensive – and far less time-consuming – than the alternative.  AC ¶¶ 64-66.  Defendants could have invested in legitimate security that did not involve protection money, but it would have driven up their costs and jeopardized their ability to win so many lucrative contracts.  *Id*.; *see* AC ¶¶ 116, 196.  As one executive explained, the decision was "whether you'd rather pay $1,000" knowing that "part of the money goes to the insurgents, or pay 10 times that much for security provided by the U.S. military or contractors."  AC ¶¶ 64, 123.  Defendants chose the first option.  As a result, they extracted colossal sums of taxpayer money from USAID.  AC ¶¶ 182, 196, 247,

380, 402.  Their senior managers were especially well-compensated, earning salary and bonus packages that often approached (or even exceeded) seven figures.  *E.g.*, AC ¶¶ 379, 411.

      **b.**      Defendants' profits came with a tragic cost.  Protection money represented a callous pact with the Taliban:  Defendants paid the terrorists to leave their projects alone and to use Defendants' funds to attack other targets instead.  AC ¶¶ 8-10, 62-64, 98.  Plaintiffs and their family members bore the consequences.  AC ¶¶ 8, 522-2569.  Indeed, the Taliban demanded the payments for the express purpose of funding its insurgency against U.S. forces, and Defendants were well aware of that purpose.  AC ¶¶ 112, 117-21.  By agreeing to pay anyway, Defendants aided the Taliban's terrorist enterprise.  AC ¶¶ 97-111.  As one Congressman summarized the problem in 2009, protection payments "translate[] into money that the Taliban are using to attack and kill American military personnel, and that's just simply outrageous."  AC ¶ 102.

      Protection payments were material to the Taliban's terrorist operations.  AC ¶¶ 97-99, 104-12.  Quantitatively speaking, protection money was the Taliban's largest or second-largest source of revenue, potentially behind only drug trafficking.  AC ¶¶ 106-07.  Drug trafficking alone, however, was insufficient to sustain the insurgency, and protection money offered the terrorists vital financial diversification.  AC ¶¶ 108-09.  The protection payments also flowed directly to the Taliban's central leadership, which made them an especially effective form of terrorist finance.  AC ¶ 110.  For those reasons, as Secretary of State Hillary Clinton testified in 2009, "one of the major sources of funding for the Taliban is the protection money."  AC ¶ 106.

      Defendants knew full well where their protection payments were going.  The Taliban conveyed its demands for payment in formal documents, including so-called "Night Letters," that made the link to terrorism plain.  AC ¶¶ 113-15.  It was thus widely known in the industry that protection payments were occurring and funding the insurgency.  AC ¶¶ 118-22.  Prime

contractors, including Defendants, "assume[d] that our people are paying off the Taliban" and knew it "could be seen as material support for enemy forces." AC ¶¶ 4, 118-20. Indeed, public reports repeatedly documented how widespread protection payments were. AC ¶¶ 123-26. Yet Defendants persisted in making them and often intentionally obscured them by funneling them through subcontractors. AC ¶ 117. That is why Task Force 2010's lead accountant viewed U.S. development contractors "as an aider and abettor of terrorist acts." AC ¶¶ 9, 73.

      **c.**      At all times, the U.S. government prohibited Defendants' protection payments. AC ¶¶ 127-44. Its opposition surfaced most prominently in the March 2007 criminal prosecution of Chiquita Brands International ("Chiquita"), a multinational banana supplier. AC ¶ 128. Chiquita operated in Colombia and, "under threat of violence," paid protection money to the United Self-Defense Forces of Colombia ("AUC"), a Specially Designated Global Terrorist ("SDGT"). *Id.* Chiquita paid the AUC "through various intermediaries" and accounted for the money as "security payments." *Id.* The U.S. government charged Chiquita with the crime of transacting with an SDGT. *Id.* In the plea agreement, DOJ rejected the notion that Chiquita was permitted to pay via subcontractors, quoting an email that said of protection money, "[You] [c]annot do indirectly what you cannot do directly."[4] The plea deal soon made worldwide news. AC ¶¶ 129-30. In the press release announcing it, an Assistant Attorney General stated: "corporations are on notice that they cannot make protection payments to terrorists." AC ¶ 129.

      The U.S. government took the same view in Afghanistan. USAID recognized that many projects, which occurred in insecure, hard-to-monitor areas, created risks of protection payments. AC ¶¶ 131-39. The agency thus viewed its prime contractors as responsible for ensuring that

---

[4] Factual Proffer ¶ 56, *United States v. Chiquita Brands Int'l, Inc.*, No. 07-cr-00055-RCL (D.D.C. Mar. 19, 2007), Dkt. 12 ("*Chiquita Proffer*").

such payments did not occur. AC ¶¶ 127, 140-43. The U.S. government also took a number of steps to curtail the payments, including by inserting contract language banning them and creating multiple task forces to interdict them. AC ¶¶ 133-39. But those efforts were imperfect. AC ¶ 140. Defendants were better positioned than USAID to find and stop the payments: they were better staffed, had longer tenures in country, and had greater visibility into their subcontracting networks. AC ¶¶ 140-43. That is why USAID paid Defendants so much money. *E.g.*, AC ¶¶ 200-02. It was Defendants, not USAID, that got rich implementing projects in insurgent-influenced areas. AC ¶¶ 140-44. This case thus is not about whether USAID correctly designed the projects. AC ¶ 144. It is about Defendants' dereliction of their duty implementing them. *Id.*

### 3. The Taliban's al-Qaeda-sponsored campaign of terrorism

Defendants' payments funded a terrorist campaign that killed and injured large numbers of Americans in Afghanistan. AC ¶ 15. In July 2002, President Bush designated the Taliban as an SDGT, which made it a crime to transact with the group. AC ¶ 417. In the ensuing years, the Taliban mastered terrorist tactics it used to target Americans and damage Afghanistan's new democratic government. AC ¶¶ 431-37. It neither wore uniforms nor complied with the laws of war, AC ¶ 523, and it intentionally slaughtered civilians on a massive scale, AC ¶¶ 432-33. All told, the Taliban has killed more than 1,500 Americans and wounded well over 20,000 more. AC ¶ 15. It is, statistically speaking, the deadliest terrorist group in the world. AC ¶ 52.

The Taliban's deadliest cell was the Haqqani Network. AC ¶¶ 438-58. That cell was led by Sirajuddin ("Siraj") Haqqani – who was also a senior Taliban official and a member of al-Qaeda's military council, AC ¶¶ 454, 461 – and it executed the Taliban's terrorist operations in southeastern Afghanistan and other areas. AC ¶¶ 442-45. The Haqqani Network identified as part of the Taliban, and the two were financially and operationally codependent. AC ¶¶ 101, 445-51. The Haqqani Network carried out many of the Taliban attacks at issue in this case. AC

¶¶ 456-58.  In 2012, the United States designated the Haqqani Network as an FTO.  AC ¶ 439.

Al-Qaeda, which has been a designated FTO since 1999, was instrumental to the Taliban's terrorist campaign.  AC ¶¶ 464-521.  Al-Qaeda – together with the Taliban (including the Haqqani Network) and other groups – formed a "syndicate of terrorism" that jointly planned, authorized, and committed terrorist attacks in Afghanistan.  AC ¶¶ 469-76.  The operational details of those attacks are discussed at length below.  *See infra* Argument Part III.C.  Through the syndicate, al-Qaeda operatives often participated directly in Taliban attacks.  AC ¶¶ 513-20.  Most prominent among them were attacks committed by the "Kabul Attack Network," which was the U.S. government's term for the joint Taliban-al-Qaeda cell responsible for attacks in and around Kabul.  AC ¶¶ 459-63.  As one noted journalist concluded in 2009, "the Taliban and Al Qaeda function more or less as a single entity.  The signs of this are everywhere."  AC ¶ 473.

## C.    Plaintiffs' Claims

Plaintiffs are U.S. citizens who were killed or injured between 2009 and 2017 by the Taliban.  AC ¶¶ 1, 17.  They are U.S. service members who deployed to Afghanistan to stabilize the country, American civilians working on security or reconstruction projects, and the family members of both.  AC ¶¶ 522-2569.  They were killed and injured in a gruesome wave of terrorist attacks involving suicide bombings, IEDs, kidnappings, and other tactics.  *E.g.*, AC ¶¶ 524, 550, 1522.  Every Plaintiff asserts three primary-liability (AC ¶¶ 2570-76, 2584-96) and two aiding-abetting claims (AC ¶¶ 2597-2615) against these Defendants under the ATA.  The allegations are sourced to confidential witnesses, company documents, public and non-public intelligence reports, media accounts, and Plaintiffs' recollections.  AC ¶ 1.

**ARGUMENT**

**I.    PLAINTIFFS SUFFICIENTLY ALLEGE THAT EACH DEFENDANT MADE PROTECTION PAYMENTS TO THE TALIBAN**

At this early stage of the case, Plaintiffs need only supply a " ' short and plain statement of the claim showing that [they are] entitled to relief ' " under the ATA.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)).  In assessing whether the Complaint meets that standard, the Court should accept the allegations as true and draw all reasonable inferences in Plaintiffs' favor.  *See id*.  Defendants cannot obtain dismissal by arguing that the alleged facts are "improbable," or by advancing "alternative explanations." *Id*.  Plaintiffs need not provide "detailed factual allegations."  *Id*.  Rather, to survive dismissal, Plaintiffs need only plead enough " ' factual matter, accepted as true, to state a claim to relief that is plausible on its face.' "  *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

As explained below, the Complaint easily meets that standard.  The plausibility standard is not a "probability requirement," *id*., and Plaintiffs have no obligation to "prove [their] ultimate claim" at this stage, *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1211 (D.C. Cir. 2020).  The core inquiry instead is whether the allegations "give the defendant[s] fair notice" of the claims. *ICC Eval. Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Officials, Inc.*, 2020 WL 1905132, at *11 (D.D.C. 2020) (Sullivan, J.).  That is not a high bar.  The Court should thus "construe [the allegations] in [Plaintiffs'] favor, view the factual allegations as a whole, accept them as true, and grant [Plaintiffs] the benefit of all inferences that can be derived."  *Id*. at *12.

**A.    The Complaint Alleges Plausibly That Each Defendant Maintained A Practice Of Paying The Taliban For Security**

The Complaint alleges that each Defendant paid the Taliban to buy security for its development projects in Afghanistan.  AC ¶¶ 180-86 (DAI), 244-50 (LBG/BV), 377-83 (IRD), 401-05 (Chemonics).  Those allegations are presumed true at this stage.  *See Banneker*, 798 F.3d

at 1128-29.  To begin, each Defendant worked on large development projects in areas under Taliban control or influence.  AC ¶¶ 182-83, 247-48, 380-81, 402-03.  Payoffs to the Taliban were a nearly universal feature of such projects.  AC ¶¶ 53-96.  Corrupt payments "pervade[d] every aspect of Afghan life" during this period, and "virtually every transaction in Afghanistan involve[d] some degree of payoff."  AC ¶¶ 55, 56.  In Taliban areas – where insurgents had the ability to disrupt projects of which they disapproved – those payoffs naturally went to the Taliban.  AC ¶¶ 62-68.  The mechanism was simple:  the Taliban leveraged its "control of the security environment in order to extort payment" from companies in its territory.  AC ¶ 63.

Taliban procedures confirm the plausibility of those allegations.  Recognizing that U.S. development contractors offered a lucrative source of terrorist financing, the Taliban created a formal, regulated process for extracting payment from them.  AC ¶¶ 49, 75, 100.  That process – codified in the Taliban Code of Conduct and enforced by the Organisations and Companies Commission – extended to virtually every Western company in Taliban areas.  AC ¶¶ 84-89.  The protection racket was "literally institutionalized," AC ¶ 100, and its defining characteristic was its near-universal application, AC ¶¶ 63-96.  As a matter of practice, the Taliban thus demanded that every company, including Defendants, buy "permission letters" to begin work.  AC ¶ 87.  The resulting payments became "so widespread" that "company owners approach[ed] the Taliban and voluntarily pa[id]" to establish "good relations" with the insurgents.  AC ¶ 82.

Those facts alone support an inference that Defendants followed the industry practice and made the payments demanded of them.  *See United States v. Kozeny*, 643 F. Supp. 2d 415, 419-20 (S.D.N.Y. 2009) (admitting "evidence of the prevalence of corrupt business practices" in foreign country because such evidence "makes it probable that [defendant] was aware that [corrupt] officials were being bribed" on a given transaction).  In Taliban areas, the ATFC

15

director concluded, "about 25 percent of *every* development project's funding was going to the insurgency." AC ¶ 75.  Indeed, the Complaint is replete with sources – including government reports, media accounts, and company statements – attesting to the practice's industry-wide scope.[5]  DAI even invoked the industry standard as a defense, telling auditors its payoffs were acceptable because, in effect, "everyone else in Afghanistan is doing it too." AC ¶ 183.  Such allegations reveal "practices so pervasive that a reasonable fact-finder could infer that those practices affected the [contracts] at issue in this case." *Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231, 238 (S.D.N.Y. 2013) (applying similar logic to mortgage-fraud context).

But Plaintiffs do not rely on industry practice alone.  The Complaint alleges that each Defendant followed that standard practice.  AC ¶¶ 184 (DAI), 249 (LBG/BV), 382 (IRD), 404 (Chemonics).  It identifies systemic indications of each Defendant's payments and details why its projects conformed to industry custom.  AC ¶¶ 183, 248, 381, 403.  For each Defendant, Plaintiffs also offer multiple examples of payments on specific projects.  AC ¶¶ 187-212, 252-79, 384-93, 406-10.  Those examples range from DAI "employ[ing]" Taliban members in Kunar Province, AC ¶ 187; to the Joint Venture buying security through a Haqqani associate named "Mr. Arafat," AC ¶ 273; to an IRD subcontractor in Lashkar Gar telling IRD it was using IRD's money to bribe the Taliban, AC ¶ 384; to Chemonics' use of USPI, AC ¶¶ 406-08.  Those

---

[5] *E.g.*, AC ¶¶ 74 (Task Force 2010 auditor stating the "big companies we found . . . *they're all corrupt*"), 76 (commission finding that standardized protection payments were treated "as a *cost of doing business* in Afghanistan"),78 (briefing to President Obama that "*All* the contractors for development projects pay the Taliban for protection and use of the roads[.]"), 79 (subcontractor confirmation that "it was *standard practice* to build in a kick back to the Taliban"), 80 (contractor statement that "I have *yet to find a security company* that doesn't rely on payoffs"), 81 (report that "*virtually every major project* includes a healthy cut for the insurgents"), 90 (report that Taliban took "a percentage of *almost all construction work* in the area"), 122 (*Time* cover story that "protection payments are *so widespread*" that contractor said, "You must be *the only person* in Afghanistan who doesn't know[.]"), 205 (OIG report that DAI payments "fit the pattern . . . *endemic in* Taliban stronghold areas") (emphases added).

examples, on top of the industry-practice allegations, are more than enough at this stage.  *See Walsh Constr. Co. II v. U.S. Surety Co.*, 334 F. Supp. 3d 282, 291-92 (D.D.C. 2018) (sustaining allegation of general practice "buttresse[d] . . . with a specific example"); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 713-14 (S.D.N.Y. 2016) (sustaining allegations based on "industry[] practices" plus "specific examples of alleged problems").

All told, the Complaint devotes some 185 paragraphs to the allegations that Defendants paid the Taliban.  AC ¶¶ 55-144, 180-212, 244-79, 377-92, 401-11.  Defendants' factual quibbles aside, those allegations look nothing like the "unadorned, the defendant-unlawfully-harmed-me accusation[s]" that courts reject.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive dismissal, Plaintiffs need not "allege the *most* plausible set of facts, but merely *a* plausible set of facts."  *Zaidan v. Trump*, 317 F. Supp. 3d 8, 20 (D.D.C. 2018).  Because the Complaint does so, the Court should deny the motions.  *See ICC*, 2020 WL 1905132, at *13.

## B.    Defendants' Pleading Arguments Rest On Flawed Legal Constructs

Defendants respond by asking the Court to draw a series of factual inferences they say make the Complaint implausible.  Plaintiffs address the details of each factual contention below. *Infra* Part I.C.  But Defendants' arguments also falter at the threshold:  each improperly "attempts to use [*Twombly*] and [*Iqbal*] to enunciate a blanket rule that requires a plaintiff to plead every conceivable fact or face dismissal."  *Nattah v. Bush*, 605 F.3d 1052, 1058 (D.C. Cir. 2010).  Defendants employ three techniques to smuggle in such a rule, all of which fail.

### 1.    Defendants' criticisms of the industry-practice allegations lack merit

**a.**    Defendants' main argument (BV Br. 15-16; DAI Br. 10-11; IRD Br. 23-25; Chemonics Br. 17-20) asks the Court to disregard every allegation in the Complaint that does not mention them by name.  Unless each allegation singles out an individual company, Defendants claim, it must be too "vague, conclusory, [and] group-pleaded" for the Court to accept.  IRD Br.

25.  That argument mistakes the governing pleading standard.

Courts assess plausibility by "view[ing] the factual allegations as a whole" and using context to determine what they can "reasonably infer."  *ICC*, 2020 WL 1905132, at *12.  Industry practice often forms part of the context that courts consider.[6]  Here, Defendants dominated an industry in which experts found that the "big companies" were "all corrupt," AC ¶ 74, and that "every development project's funding was going to the insurgency," AC ¶ 75.  Those allegations are not conclusory merely because the cited sources declined to list out every company by name.  Indeed, it is hardly a leap to infer that the ATFC's findings about "*every development project*" applied to *Defendants*' development projects.  When Defendants call such allegations "conclusory," they are really just asking the Court to determine without evidence that the ATFC's (and similar) findings were wrong.  Those arguments are misplaced at this stage.

Cases about the 2007-era mortgage-backed-security industry are instructive.  Before the financial crisis, that entire industry was plagued by "high default rates, staggering economic losses, and widespread investigation into [mortgage] securitization[s]."  *Commerzbank AG v. U.S. Bank N.A.*, 277 F. Supp. 3d 483, 495 (S.D.N.Y. 2017).  Courts held that allegations about those practices, "though generalized to the industry, are nevertheless specific enough to establish" that individual companies plausibly breached their obligations with respect to particular securities.  *Id.*[7]  The *Commerzbank* court persuasively explained the rationale:  the

_____

[6] *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010) (antitrust claims based in part on "industry structure, and industry practices"); *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 2016 WL 6246300, at *4 (D. Conn. 2016) (insurance claims based in part on "industry-wide practice"); *Intermetro Indus. Corp. v. Enovate Med., LLC*,  2016 WL 521535, at *6 (M.D. Pa. 2016) (patent claims based in part on "general knowledge of the industry"); *NCUA Bd. v. Wachovia Cap. Markets, LLC*, 2014 WL 1795294, at *6 (S.D.N.Y. 2014) (securities claims based in part on "industry-wide allegation of inflated appraisal prices").

[7] *See Fixed Income Shares:  Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 854 (S.D.N.Y. 2015) (holding claims that "sellers breached their representations and warranties are certainly

"breadth of misconduct, recklessness, and oversight in the [mortgage-backed-security] industry at the time [the specific] loans were originated and sold makes it 'implausible to assume that somehow all the mortgage loans underlying the trusts in this action miraculously avoided the pervasive practices of the industry.'" *Id*. (quoting *Fixed Income Shares*, 130 F. Supp. 3d at 854). So too here. Given the broad industry practice of paying the Taliban, it is equally implausible to assume that Defendants "miraculously" abstained from following suit – especially given the specific indicators that Defendants' practices conformed to the industry standard.

For that reason, Defendants' efforts (BV Br. 22; DAI Br. 12; LBG Br. 24-25; IRD Br. 23; Chemonics Br. 17) to confine the Complaint to the individual examples that name each company are unavailing. Those examples are illustrative, not exhaustive. AC ¶¶ 187, 252, 384, 406. Even under the stricter rules for pleading fraud (which do not apply here),[8] plaintiffs have no obligation to give details about every manifestation of an unlawful practice. In one informative case in this District, a defendant criticized expansive fraud allegations for offering "only two examples of contracts that were allegedly fraudulently obtained," for using those examples to illustrate a broader scheme with "an open-ended time frame," and for demonstrating the scheme through "general allegations against all Defendants." *United States ex rel. Sansbury v. LB&B Assocs., Inc.*, 58 F. Supp. 3d 37, 55-56 (D.D.C. 2014) (Sullivan, J.). Judge Sullivan rejected all of those criticisms for demanding "detailed proof of the[] allegations at this early stage." *Id*. at 56. If such criticisms fall short for fraud claims, they are even less compelling here.

This examples-not-exhaustive principle forecloses most of Defendants' arguments. At

---

plausible" given "pervasive" industry practices); *Dexia*, 929 F. Supp. 2d at 238 (sustaining claims about specific "securitizations at issue" based on "practices so pervasive" by defendant).

[8] *See* Fed. R. Civ. P. 9(b) (fraud must be "state[d] with particularity"). This standard is far more demanding than the one applicable here. *See* Fed R. Civ. P. 8(a); *ICC*, 2020 WL 1905132, at *11 (contrasting Rule 8 standard with the requirements for "a fraud case under Rule 9(b)").

bottom, Defendants' strategy for making the Complaint seem implausible is to isolate the individual illustrations, argue the facts about each, and then disregard everything else. Those arguments fail on their own terms, as noted below. *Infra* Part I.C. But they also miss the broader point: the examples signify each Defendant's general practice of paying the Taliban in multiple regions across multiple contracts. AC ¶¶ 182-83, 247-48, 380-81, 402-03. Courts often infer broad schemes based on examples less compelling. *See, e.g.*, *Sansbury*, 58 F. Supp. 3d at 55-56 (multiyear scheme based on "two examples"); *United States ex rel. Chin v. CVS Pharmacy, Inc.*, 2017 WL 4174416, at *7 (C.D. Cal. 2017) (nationwide scheme based on "four specific examples"); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am. Inc.*, 238 F. Supp. 2d 258, 268 (D.D.C. 2002) (12-year "nationwide" scheme based on one "specific place"). This Court should do the same and credit Plaintiffs' systemic allegations.

       **b.**     Defendants' "group pleading" criticism (DAI Br. 11; LBG Br. 24; BV Br. 32 n.113; IRD Br. 23-24; Chemonics Br. 17-18) misses the mark. Courts in this District routinely accept allegations that group defendants together.[9] That is because "nothing in Rule 8 prohibits collectively referring to multiple defendants." *Bruce Kirby, Inc. v. Quarter Moon, Inc.*, 2018 WL 3614120, at *1 (D. Conn. 2018). Here, the Complaint includes collective allegations for the

---

     [9] *See, e.g.*, *Kurd v. Rep. of Turkey*, 374 F. Supp. 3d 37, 59 (D.D.C. 2019) (accepting "generally pled" allegations and rejecting "group pleading" criticism); *Yueh-Lan Wang v. New Mighty U.S. Tr.*, 322 F.R.D. 11, 31 (D.D.C. 2017) (accepting "general allegations lodged against all Defendants"); *Price v. Stryker Corp.*, 270 F. Supp. 3d 226, 229 n.2, 237 (D.D.C. 2017) (accepting allegations "refer[ring] to the three defendants collectively"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 73 (D.D.C. 2016) (accepting allegations that "apply equally to all Defendants"); *Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*, 81 F. Supp. 3d 1, 7 (D.D.C. 2015) ("[P]laintiffs need not show more than general factual allegations laying out a good faith basis for how one or more of the defendants injured plaintiffs. Nor must each plaintiff allege facts against all defendants[.]"); *Sansbury*, 58 F. Supp. 3d at 55-56 (accepting "general allegations against all Defendants"); *Allen v. Beta Constr.*, 309 F. Supp. 2d 42, 46-48 (D.D.C. 2004) (Sullivan, J.) (accepting allegations that "point to all defendants collectively").

simple reason that Defendants participated in the same protection racket at similar times for similar types of projects. AC ¶¶ 53-144. The uniformity was the point: the Taliban formalized procedures to ensure that Defendants' payments remained consistent across company, region, and project. AC ¶¶ 84-88, 100. Plaintiffs thus bring "general allegations lodged against all Defendants," while also including a separate section that "breaks out the individual Defendants where appropriate." *Yueh-Lan*, 322 F.R.D. at 31. Such pleadings are commonplace.

Rejecting those allegations would reward Defendants for the scope of their misconduct. By inveighing against "group pleading," Defendants are essentially arguing that, because all of them made protection payments, none of them can be sued for it. That is not how Rule 8 works. *See Robinson v. Charter Practices Int'l LLC*, 2015 WL 1799833, at *8 (D. Or. 2015) (rejecting "'group' pleading" criticism as "defendants simply disagree[ing] . . . that all defendants did, as a matter of fact, participate in the complained-of conduct"). All Plaintiffs need do at this stage is notify Defendants of the "conduct each is accused of." *Yueh-Lan*, 322 F.R.D. at 31. The Complaint does so by breaking out each Defendant and explaining how the common allegations apply to it. AC ¶¶ 180-212, 244-79, 377-92, 401-11. That is not improper "group pleading"; it is an appropriate way of alleging that Defendants all engaged in similar misconduct.

The cases Defendants cite are not to the contrary. In *Toumazou v. Turkish Republic of Northern Cyprus*, 71 F. Supp. 3d 7 (D.D.C. 2014),[10] for example, the plaintiffs sought to impute to three banking affiliates the conduct of their non-defendant "Turkish subsidiary." *Id*. at 19-22. In rejecting that attempt to pierce the corporate vail and equate the affiliates with a subsidiary, *id*. at 19-20, the court criticized the allegations for "fail[ing] to distinguish between each entity," *id*.

---

[10] Cited in DAI Br. 11; LBG Br. 24 n.27; BV Br. 16 n.58, 32 n.113; IRD Br. 25 n.87; Chemonics Br. 18.

at 21.  In those circumstances – where the *relationship* among corporate entities is itself the issue – plaintiffs should not "lump[] all the defendants together" without any "basis to distinguish their conduct."  *Id*.[11]  But that is not a blanket prohibition on collective allegations.  Here, Plaintiffs neither disregard the corporate form nor bring claims that turn on affiliate relationships.  In such circumstances, allegations against "all Defendants" are permissible.  *Kurd*, 374 F. Supp. 3d at 59.

### 2.    Defendants' criticisms of Plaintiffs' exemplar allegations lack merit

Each Defendant's next technique is to sift through the individual facts alleged against it and attempt to dismiss those allegations as "conclusory spin" the Court should ignore.  DAI Br. 12; *see* BV Br. 22-23; LBG Br. 24-25 & n.27; IRD Br. 11-12; Chemonics Br. 19-22.  Those arguments again misapprehend the governing pleading standard in several ways.

*First*, Defendants demand a level of detail that the federal rules do not require.  When Defendants call a protection-payment allegation "conclusory," they usually mean that Plaintiffs have not specified the date, amount, or person who made it.[12]  But Plaintiffs have no obligation to plead such details.  *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (per curiam) (lack of "[s]pecific facts" does not make an allegation "too conclusory").  Indeed, Rule 8 – unlike Rule 9(b), for fraud cases – does not demand "detailed factual allegations."  *Banneker*, 798 F.3d at

---

[11] The other cases Defendants cite are also inapposite.  In *Bates v. Nw. Human Servs. Inc.*, 466 F. Supp. 2d 69 (D.D.C. 2006) (cited in BV Br. 16 n.60; IRD Br. 25 n.87; Chemonics Br. 18), the issue was whether the defendants were "distinct legal entities" capable of entering a RICO conspiracy.  *Id.* at 85.  In that context, the failure to "separate one defendant's actions from another's" was fatal.  *Id.*  The other cases involved unintelligible complaints full of "rambling irrelevancies."  *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) *cf. Brett v. Att'y Gen. of U.S.*, 2008 WL 3851555, at *1 (D.D.C. 2008).  None of those criticisms applies here.

[12] *E.g.*, DAI Br. 12 & n.2 (criticizing Plaintiffs for basing allegation on an "unidentified consultant," and for not "specifying a contract" on which another payment was made); LBG Br. 11-12 ("plaintiffs do not identify any specific payment, the LBG employee who authorized the payment, the individual to whom the payment was made, or the amount"); BV Br. 5 (criticizing payment allegations for occurring at "unspecified times" through "unnamed Joint Venture officials"); IRD Br. 22 (demanding "specific funds or in-kind goods" that IRD gave the Taliban).

1129.  Because this is not "a fraud case," Plaintiffs "are not required to plead the who, what, when, why, or how of the alleged [payments]."  *ICC*, 2020 WL 1905132, at *11.

There are good reasons Plaintiffs need not plead such particulars.  The type of detail Defendants suggest is necessary – dates, precise payment amounts, and the like – lies within Defendants' exclusive control.  *See Allen*, 309 F. Supp. 2d at 46-48 (denying motion to dismiss because "these details are in defendants' possession").  Plaintiffs cannot reasonably be expected to allege those things before having a chance to "fill in [additional] details through the discovery process."  *Sansbury*, 58 F. Supp. 3d at 58.  Yet Defendants imply that anything short of a forensic review of their books connecting individual line items to the Taliban is too "conclusory" to even warrant discovery.  That gets things backwards.  Because Defendants currently control most of the evidence, the allegations are more than adequate.  *See Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 2020 WL 6143654, at *8-9 (E.D.N.Y. 2020) (explaining ATA pleading standard).

*Second*, Defendants make a similar error in demanding evidence of their protection payments.  When Defendants dismiss an allegation as "speculation," the basis often appears to be that the allegation lacks grounding in admissible evidence.[13]  But Plaintiffs need neither "prove [their] ultimate claim" in the Complaint nor posit "any evidence to back up" their allegations.  *Strike 3*, 964 F.3d at 1211; *see ICC*, 2020 WL 1905132, at *11 (rejecting critique of allegations for lacking "evidence" or "pro[of]").  Thus, when Black & Veatch says (at 8) a cited article does not "prove[] that [it] paid the Taliban," it mistakes the relevant inquiry.  An experienced, on-the-ground journalist's conclusion that "massive payments to the insurgents" "almost certainly"

---

[13] *E.g.*, BV Br. 22 ("[t]here is no *evidence* of any specific payment"); Chemonics Br. 21 ("Chemonics' use of USPI at that time is not *evidence* of Chemonics' knowing participation in schemes to pay protection money"); LBG Br. 18 ("None contain sufficient facts to plausibly *establish* that LBG paid the Taliban directly.") (emphases added).

occurred, AC ¶ 269, may not be enough to prevail at trial, but it raises a "'reasonable inference'" sufficient to warrant discovery. *Sansbury*, 58 F. Supp. 3d at 45 (quoting *Iqbal*, 556 U.S. at 678).

*Third*, Defendants attack each example by asking the Court to assess it in isolation. They do so by first disregarding the industry-practice allegations as "group pleaded" and then arguing that the case turns on the standalone plausibility of each individual example in a vacuum.[14] That technique defies the core principle that courts should "consider the allegations in their totality." *Vila v. Inter-Am. Inv., Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009). Here, the exemplar allegations against any one Defendant do not arise in a vacuum; they exist against the backdrop of an industry in which virtually every company – including the other Defendants in this case – was making protection payments. *Supra* Part I.B.1. Whether or not those broader allegations are sufficient on their own to state a claim (which they are), they substantially buttress the plausibility of each set of individual examples described below. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2020 WL 5016922, at *12 (D.D.C. 2020) (analysis "must consider the complaint in its entirety" rather than "any individual allegation, scrutinized in isolation").

*Fourth*, Defendants repeatedly ask the Court to accept their contested factual inferences. The premise throughout Defendants' motions is that the Complaint's allegations must be "implausible" so long as Defendants can come up with *some* narrative that does not involve protection payments. DAI takes this approach to its logical extreme, spending a full six pages (at 13-19) arguing line-by-line about the factual import of one document cited in the Complaint. Even if DAI's reading of the document were plausible (*but see infra* Part I.C.1.c), such "alternative explanations" offer no basis for dismissal. *Banneker*, 798 F.3d at 1129. Defendants will have their chance at trial to marshal evidence supporting their factual narratives. Until then,

---

[14] *E.g.*, DAI Br. 11-18; IRD Br. 23-25; Chemonics Br. 17-22.

however, the Court should "draw all reasonable inferences" in Plaintiffs' favor. *Id*.

### 3.    Defendants' heavy use of extra-pleading materials is improper

Defendants' final technique seeks to undermine the Complaint with a slew of extra-pleading materials. Those materials run the gamut: they include newspaper articles,[15] contract excerpts,[16] documents authored by government agencies,[17] a press conference,[18] a law review article,[19] and even Defendants' own websites.[20] On the basis of such materials, Defendants assert facts about everything from the purported benefits of their development projects (LBG Br. 4-10), to the reputation of their subcontractors (IRD Br. 6-7), to the structure of the Afghan insurgency (Chemonics Br. 44). And those facts, they claim, make the Complaint implausible.

None of that is proper on a motion to dismiss. The Court should assess Plaintiffs' allegations by presuming them true and construing them liberally, not by judging them against competing facts asserted by Defendants. *See Strike 3*, 964 F.3d at 1211; *ICC*, 2020 WL 1905132, at \*11. Defendants therefore cannot obtain dismissal by citing extra-pleading "evidence . . . to rebut facts adequately stated in" the Complaint. *Hurd v. Dist. of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017). Plaintiffs have not had a chance to test whether Defendants' materials "present a full or fair picture" of the facts they depict. *Id*. at 686. Defendants' need to rely so heavily on those materials only serves to confirm that Plaintiffs' claims, as pleaded, should proceed. *See id*. at 687 (disallowing "documents supportive of [defendant's] view of

---

[15] *E.g.*, BV Br. 3 n.7; DAI Br. 1n.1; Chemonics Br. 6 nn.9-10, 31 n.33 & Ex. I, 44 n.47.

[16] *E.g.*, BV Br. 9 n.29, 22 n.76; DAI Br. 3-4 & Ex. 1; LBG Br. 8 n.14 & Ex. 1, 17 n.21, 22-23; IRD Br. 4 n.8 & Ex. A, 6-8 nn.18-20, 26; Chemonics Br. 7 n.14 & Ex. E, 15 n.19 & Ex. G.

[17] *E.g.*, BV Br. 3-4 nn.4 & 7 & 9-11, 41 n.161 & Ex. 2; DAI Br. 5, 26, 39; LBG 5 n.4, 6 n.6, 7-8 & nn.9-12; IRD Br. 20 n.73; Chemonics Br. 6-7 nn.10, 12-13 & Exs. A, C-D.

[18] BV Br. 3 n.5.

[19] BV Br. 42 n.169.

[20] DAI Br. 2-3, Chemonics Br. 5 n.5

potentially disputed issues"); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (criticizing "temptation to pile on numerous documents to . . . undermine the complaint").

Defendants' justifications for submitting their extra-pleading materials are unpersuasive. *First*, those materials are not subject to judicial notice. A "federal court may take judicial notice of 'a fact that is not subject to reasonable dispute' if it . . . 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.' " *Hurd*, 864 F.3d at 686 (quoting Fed. R. Evid. 201(b)). That is not a license to resolve "highly contextual, case-specific question[s]" on a motion to dismiss. *Id.* Here, Defendants seek to resolve such questions – about their own conduct and its effect on the Afghan insurgency – based on documents they found on various government websites. Such matters are subject to reasonable dispute and are in fact disputed. The Court's assessment of Defendants' online-research materials should therefore await discovery. *See Hurd*, 864 F.3d at 686 (declining to notice government "arrest records"); *Khoja*, 899 F.3d at 1001 (declining to notice "agency report"); *Domestic Airline*, 221 F. Supp. 3d at 71-72 (declining to notice "government" records).

*Second*, Defendants misuse the incorporation-by-reference doctrine. When a plaintiff cites only part of a document to support a discrete allegation, courts should not "treat the entire document as incorporated into the complaint." *Banneker*, 798 F.3d at 1133. By picking out sources cited in the Complaint and using the uncited parts to assert extrinsic (and disputed) facts, Defendants wrongly ask the Court to "adopt every word" of those sources "as true." *Id.* The Court should reject that attempt to smuggle contested facts into a motion to dismiss. *See Khoja*, 899 F.3d at 1003 ("[I]t is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts."); *Domestic Airline*, 221 F. Supp. 3d at 71 (refusing to incorporate documents "merely cited as the source of certain factual allegations").

That conclusion applies with particular force to Defendants' selective contract excerpts. Defendants repeatedly characterize their USAID contracts by quoting from inadmissible, cherry-picked snippets. LBG, for example, submits something that appears to excerpt pages 118-122 from a massive document; LBG then quotes the excerpt while saying nothing about the rest. Dkt. 103-2. Chemonics cites (at 21 n.27) the same excerpt without further context. IRD goes further and submits 1- or 2-page excerpts from six lengthy contracts. Dkt. 104-2. And Black & Veatch goes a step further still: it purports to quote from multiple, unproduced contract sections without even attaching a supporting excerpt, much less the entire contract. BV Br. 9 n.29.[21]

Those machinations illustrate why Plaintiffs are entitled to discovery. A 1-page contract excerpt is not evidence of anything, because "[c]ontracts must be read as a whole, with meaning given to every provision." *Southern Co. Servs., Inc. v. FERC*, 353 F.3d 29, 35 (D.C. Cir. 2003). Yet Defendants seek to short-circuit that process by submitting the parts they view as favorable to them, withholding the remaining (presumably less favorable) parts, and asking the Court to use the excerpts to find exculpatory facts before discovery. To put it mildly, that misapprehends the role of a motion to dismiss. *See Hurd*, 864 F.3d at 686-87 (rejecting defendant's "factual submissions" before giving plaintiff "the opportunity to discover and offer evidence").

## C.    Each Defendant's Individual Factual Arguments Are Unpersuasive

Stripped of those faulty legal constructs, Defendants' factual narratives crumble. Each Defendant's "factual nitpicking" of Plaintiffs' allegations is not only "misplaced" at this stage, *Yueh-Lan*, 322 F.R.D. at 26-27, but also unpersuasive on its own terms.

---

[21] DAI's submissions, though less egregious, also appear to be incomplete. DAI submits individual Task Orders (Dkt. 107-3) without the accompanying base contracts, proposals, or work plans they incorporate, which may bear on their proper interpretation. *E.g.*, Dkt. 107-3 at 18 (referencing "work plan" to be "developed in consultation with USAID").

1.     **DAI**

a.     DAI maintained a practice of making protection payments to the Taliban to secure its development projects in Taliban regions.  AC ¶¶ 180-212.  DAI was the second-largest USAID contractor in Afghanistan, with contract obligations approaching $1 billion during the relevant timeframe.  AC ¶ 181.  It implemented at least nine projects that entailed work in Taliban-controlled or -influenced areas, AC ¶ 182, and it regularly paid insurgents to redirect terrorist attacks away from those projects, AC ¶¶ 183-86.  Plaintiffs identify several indicia of that practice, beyond the industry custom it reflected:  the Complaint cites employee discussions in DAI's offices; evidence of payments collected by DAI's consultants; "permission letters" DAI staff obtained from the Taliban; and DAI's own payroll records.  AC ¶ 183.

The Complaint provides multiple examples of DAI's payments.  AC ¶¶ 187-212.  One is a DAI employee's admission that, in Kunar Province, DAI would "employ folks affiliated with [the Taliban]" as a means of buying security from the insurgents.  AC ¶ 187.  Another involved consultants assessing DAI's "RAISE" contract in Kunar, Nangarhar, and Laghman Provinces, which surfaced evidence that DAI was "paying the Taliban for permission to access the project sites."  AC ¶ 188.  Yet another involved DAI's road- and school-construction work, on which DAI employees understood a DAI operative to be paying protection money to the Taliban.  AC ¶ 189.  And DAI also performed a large contract in a border region where contractors "normally ha[d] to pay up to 15 percent of the value of that contract in tax to the Taliban."  AC ¶ 190.

DAI's attempt (at 12-13) to argue the facts fails, *supra* Part I.A-B, as its discussion of the Kunar Province allegation shows.  *Compare* AC ¶ 187, *with* DAI Br. 12.  The Complaint alleges that DAI's field director described working near "local Taliban . . . right on the border with Pakistan," which caused the Taliban to "interrupt work and demand payment."  AC ¶ 187.  In response, DAI's field director admitted, "a deal would be cut whereby we would employ folks

affiliated with [the Taliban] – they were all from the community, after all."  AC ¶ 187.  DAI now characterizes (at 12) this, without evidence, as lawful aid to "groups who support the Taliban."  Dkt. 107-3 at 9.  But there is a difference between villagers who have to "support the Taliban" out of "coercion" or "desperat[ion]," *id*., and those who are actively *affiliated* with insurgents.  DAI's contract allowed DAI to engage only the former – to dissuade them from joining "militant groups," *id*. – and did *not* allow "transactions with, [or] the provision of resources and support to, individuals and organizations associated with terrorism," *id*. at 50.  DAI here did the latter.  After all, were DAI merely doing its contractual duty to employ at-risk groups, it would not have needed to strike a "deal" *with the Taliban* only after the Taliban "demand[ed] payment."  AC ¶ 187.  That is protection money, not lawful aid to at-risk groups.

        **b.**        Plaintiffs' final example of DAI's payments is even more compelling.  The Complaint describes, in great detail, a USAID Office of Inspector General ("OIG") review of DAI's "LGCD" contract and the evidence of protection payments it surfaced.  AC ¶¶ 191-212.  The review was triggered by public reporting showing "the diversion of millions of dollars in U.S. aid money to the Taliban."  AC ¶ 191.  Two OIG auditors working on the review, through field work conducted over the span of six weeks, collected evidence of DAI's protection payments in Nangarhar and Kunar Provinces.  AC ¶¶ 193-98.  The review culminated in a formal report, and the report supports Plaintiffs' claims in several ways.  AC ¶¶ 204-10.

        *First*, the auditors' field work uncovered "overwhelming testimonial and documentary evidence" that DAI knowingly orchestrated protection payments to the Taliban.  AC ¶ 195.  Those payments occurred through multiple channels, and the auditors confirmed their existence through DAI staff interviews and company documents.  AC ¶¶ 195-98.  One DAI employee, after confirming the protection payments, disclosed that the employee had objected to them

internally and unsuccessfully urged management to change course. AC ¶ 197. The auditors corroborated those findings based on DAI's security reports, which also referenced "protection taxes" and described examples in which DAI's subcontractors had paid them. AC ¶ 198.

*Second*, the auditors' draft report was so incriminating that it prompted DAI's CEO to fly to Kabul and confront USAID officials. AC ¶¶ 199-202. At that meeting, which took place in the summer of 2010 in a USAID conference room in Kabul, DAI's CEO became defensive and chastised OIG for the "false expectation" that DAI could operate in a place like Nangarhar without paying the Taliban. AC ¶¶ 200-01. Rather than offer evidence to rebut OIG's findings, the CEO simply insisted that DAI was not responsible for what its subcontractors did. AC ¶ 201. A USAID official strongly disagreed, stressing to DAI's CEO that OIG had found evidence of illegal Taliban payoffs on DAI's project and emphasizing that USAID considered DAI responsible for those payoffs. AC ¶¶ 201-02. As for who was accountable for DAI's subcontractors, the USAID official told DAI, "That's what we're paying you for." AC ¶ 201. DAI's CEO appeared not to care and simply offered cursory, unsubstantiated denials. AC ¶ 202.

*Third*, the final OIG report memorialized many (but not all) of the auditors' findings. AC ¶¶ 204-08; Dkt. 107-3, Ex. 2 ("OIG Rep."). Most fundamentally, the report noted "indications that Afghan subcontractors working on the LGCD project had paid insurgents for protection." OIG Rep. at 2. "Those subcontractors," the report found, "negotiate[d] security terms with insurgents either directly or indirectly through community leaders." *Id*. at 4. The resulting payments took the form of both cash transfers and agreements to hire "Taliban-provided security guards." *Id*.; *see* AC ¶¶ 205-06. Subcontractors treated the payments as "mobilization costs" and "billed them to DAI through normal invoicing procedures; the costs were then passed on to USAID." OIG Rep. at 4. Applying the standard "20 percent" benchmark measure of the

Taliban's typical "protection tax," the report estimated that, on DAI's LGCD project alone, "$5.2 million of USAID funds were at risk of falling into the hands of insurgents." *Id*. at 6.

The report also surveyed some of the evidence of DAI's knowledge. AC ¶ 208. Most prominently, the report's sourcing for the existence of protection payments included DAI's own personnel. AC ¶ 208 n.254; OIG Rep. at 3-4. When the auditors interviewed "DAI personnel," moreover, they admitted that DAI could not "provide reasonable assurance of preventing USAID funds from going to the Taliban or others in exchange for protection." OIG Rep. at 6. Yet they continued to implement most of the projects anyway. AC ¶ 207. The report further detailed how DAI's subcontractors charged for the payments – in invoices "billed . . . to DAI" – which DAI then approved and sent to USAID for reimbursement. OIG Rep. at 4, 6; AC ¶¶ 206, 210. As the lead OIG auditor thus concluded, DAI knew full well about the payments. AC ¶¶ 195-96.

**c.**      DAI's lengthy attempt (at 13-19) to spin the OIG Report in its favor represents the apogee of Defendants' efforts to litigate the facts on the pleadings. In DAI's telling, the OIG Report – whose findings DAI's CEO flew all the way to Kabul to denounce (AC ¶¶ 199-202), which he criticized after the fact (AC ¶ 212), and which other agencies and journalists viewed as incriminating (AC ¶ 209) – actually exonerated DAI. That reinterpretation is unpersuasive.

DAI starts (at 13-14) by invoking OIG's discussion of Edinburgh International, but that discussion is irrelevant. Although OIG began by looking at Edinburgh, the auditors soon moved on after realizing that Edinburgh's work – providing security for DAI's main offices in a relatively secure part of Kabul – was not the type typically associated with protection payments. AC ¶¶ 193-94. The auditors' failure (OIG Rep. at 3) to find payments *by Edinburgh* is thus unsurprising and beside the point. Once they shifted focus to DAI's field staff in insecure areas of Nangarhar and Kunar, they found ample evidence of Taliban payoffs. AC ¶¶ 194-208.

DAI argues (at 16) that the OIG Report absolved it by observing that its projects were "in areas that were too dangerous to monitor."  But that finding merely confirms Plaintiffs' allegations.  DAI did indeed operate in insurgent-run areas where "little or no monitoring can be conducted," OIG Rep. at 6; that is why DAI found it easiest to throw up its hands and pay the terrorists for security, AC ¶¶ 195-98, 206-08.  It is also why USAID (unsuccessfully) instructed DAI to stop work in "high-risk areas" where such payoffs were likely.  OIG Rep. at 14; *see* AC ¶ 207.  USAID – unlike DAI – took the protection-money issue seriously, banned projects that involved payoffs, and even raised the issue with DAI's CEO.  AC ¶¶ 199-202, 207.[22]  DAI, by contrast, hired and paid subcontractors that DAI's *own staff believed were making protection payments*, AC ¶¶ 195-210, and that DAI's own lawyers now admit (at 16) it did not even try to "monitor."  It is difficult to imagine a starker illustration of DAI's culpability.

DAI similarly errs (at 15) in invoking the "subprojects" it suspended.  Suspending a minority of subprojects due to insurgent threats is not inconsistent with paying protection money on the rest.  AC ¶ 67.  The "bulldozer" incident described by OIG shows why.  AC ¶ 198; OIG Rep. at 4.  As part of ongoing payment negotiations, the Taliban attempted to "extort more money" from a DAI subcontractor and burned a bulldozer as a bargaining ploy.  OIG Rep. at 4.  DAI reported the incident to USAID but, rather than disclose the Taliban's payment demands, blamed the fire on "unknown arsonists."  *Id*.  USAID had to discover the payment demands later and confirm for itself that such demands were "endemic in Taliban stronghold areas."  *Id*.

---

[22] *See also* Ex. A ("Eikenberry Mem.") at 2 (emphasizing policy of "declin[ing] to award" contracts where "it is not possible to determine where the money would go").  True, the OIG Report found (at 3-4) the LGCD project's "design and approach . . . may have contributed to the risk that USAID funds might fall into the hands of insurgents."  *Cf.* DAI Br. 14-15.  But that is not inconsistent with allegations that DAI turned that risk into reality by funding the Taliban.  AC ¶ 207.  The contracts made DAI accountable for selecting and monitoring subcontractors, and they prohibited DAI from paying insurgents.  AC ¶¶ 95, 133, 142-44, 185, 201-02.

Although DAI ultimately agreed to cancel the subproject, it also chose to "pay[] the full amount of the subcontract" while "pass[ing] along" the costs "to USAID." *Id*. at 4-5. Those costs included prior protection payments that DAI knew about and approved anyway. AC ¶ 198.

The same incident refutes DAI's assertion (at 18) that it had no profit motive to pay the Taliban. When DAI's projects failed to benefit the Taliban financially, DAI sometimes had to cancel them. OIG Rep. at 4. Canceling projects, in turn, reduced DAI's profits. That left it with three options: (1) cancel projects in Taliban areas and incur the lost revenues; (2) invest in expensive, legitimate procedures to protect its projects without buying off the insurgents; or (3) approve illegal protection payments and save money. AC ¶¶ 64-66. Option one was less lucrative, and DAI believed option two would increase its security costs and thereby jeopardize its ability to win future business from USAID. AC ¶¶ 66, 196.[23] So it chose option three.

DAI also argues (at 19) the OIG Report exonerates it because OIG's findings were based in part on "DAI's stated concerns." Why DAI considers that exculpatory is unclear. When "DAI officials expressed concerns that insurgents may have extorted protection payments," OIG Rep. at 3, it was hardly some voluntary corporate disclosure; it was individual DAI employees being truthful with OIG auditors during confidential interviews for an agency-initiated review. AC ¶¶ 191-98. Those "concerns" show that DAI acted with scienter. In fact, DAI approved the protection payments despite those very concerns. AC ¶¶ 95, 185, 197. And when confronted about it, DAI's CEO offered cursory denials and blamed DAI's subcontractors. AC ¶¶ 199-202.

DAI's counter-narrative mentions none of this. It glosses over the meeting its CEO flew

---

[23] The effect on future business refutes DAI's argument (at 18) that security costs "had no impact on DAI's bottom line." Even on cost-plus contracts, DAI feared that increased security would raise DAI's cost estimates and so hamper its ability to win future business from USAID – while also reducing the number of projects it could execute at once. AC ¶¶ 66, 196.

to Kabul to attend; skips past Plaintiffs' detailed recounting of the auditors' witness interviews; and simply ignores the Complaint's explanations of the parts of the OIG Report (like the Edinburgh discussion and the bulldozer incident) that DAI casts as exculpatory.  DAI Br. 13-19. Then, after drawing additional inferences in its own favor, DAI calls the resulting factual narrative "devastating."  DAI Br. 18.  Those are summary-judgment arguments, at best.  At this stage, affording Plaintiffs "all reasonable inferences" about the OIG Report, *Banneker*, 798 F.3d at 1129, the Complaint states a plausible claim that DAI facilitated protection payments.

> **d.**    DAI's insistence (at 18) that the Complaint "attempt[s] to undermine the OIG Report" is even less persuasive.  The report, on its own, is incriminating enough to state a claim. AC ¶¶ 204-10; *see*, *e.g.*, OIG Rep. at 4 ("Subcontractors allegedly considered such protection taxes as 'mobilization costs' and billed them to DAI through normal invoicing procedures; the costs were then passed on to USAID for payment.").  Plaintiffs have no need to, and do not, undermine it.  That said, the evidence was even more compelling than the OIG Report let on. AC ¶ 203.  The report was not a "cover-up," DAI Br. 19, but rather a softened, incomplete description of the evidence against DAI.  AC ¶¶ 203-210.  Although DAI asserts (at 18) the "implausibility" of that allegation "cannot be overstated," it cites no evidence for its hyperbole. In fact, courts in this District have credited far worse allegations about government reports.[24] The Court should resolve the issue on a full discovery record, when it can hear from witnesses

---

[24] *See*, *e.g.*, *Fleck v. Dep't of VA*, 2020 WL 42842, at *1-2, 9 (D.D.C. 2020) (sustaining claim that "OIG . . . report's findings and conclusions were based on purposefully incomplete and inaccurate information"); *Elec. Privacy Inf. Ctr. v. DOJ*, 442 F. Supp. 3d 37, 48 (D.D.C. 2020) (ordering in-camera review of report given "grave concerns about the objectivity of the process that preceded the public release"); *In re Apollo Grp., Inc. Sec. Litig.*, 2007 WL 778653, at *7 (D.D.C. 2007) (compelling discovery based on allegation that "government report" "contained obviously false, mistaken, internally inconsistent, and misleading information"); *see also Elec. Privacy Info. Ctr.*, 442 F. Supp. 3d at 51 (noting "[i]nnumerable times that agencies had withheld information" to "cover up embarrassing mistakes or irregularities").

and see documents bearing on whether the final report fully captured the evidence against DAI.

DAI's use (at 16-17) of the USAID Mission's response to the OIG Report is similarly unavailing. Nothing in that response disputes OIG's evidence that protection payments occurred. OIG Rep. at 12-17. DAI is thus left to quote (at 16-17) the Mission's high-level statements about "risk and impact assessments" that DAI supposedly did. Even if those statements were true, they do not undermine Plaintiffs' allegations that DAI paid protection money. In any event, the statements DAI now quotes reflected information provided *by DAI* and pushed by agency bureaucrats in Washington who were unaware of the facts (and with whom OIG disagreed). *Compare* OIG Rep. at 14-15, *with* AC ¶ 211. The Court should not assume their truth.

Further, most of the statements DAI cites from the Mission response are aspirational language about the future[25] or broad characterizations of USAID's "implementers" generally.[26] Neither is properly read as a factual conclusion about what DAI historically did. Indeed, the response itself provides reason to doubt DAI's compliance with its stated procedures, not least of which is the "pervasive fraud in DAI's LGCD Jalalabad office." OIG Rep. at 15; AC ¶¶ 213-16. Again, DAI will have a chance in discovery to prove it implemented the measures noted in the response to the OIG Report. On a motion to dismiss, however, the Court should resolve all ambiguities about the document in Plaintiffs' favor. *See ICC*, 2020 WL 1905132, at *12-13.

### 2.    The LBG/BV Defendants

**a.**    The LBG/BV Defendants likewise maintained a practice of making protection payments to the Taliban. AC ¶¶ 244-79. The Joint Venture was the single-largest USAID

---

[25] *E.g.*, OIG Rep. at 14 (predicting that "due diligence on the part of DAI will continue in the event that high-risk areas become environmentally permissive"); *id*. at 15 ("The COTR has also directed provincial and district level implementer staff to meet weekly [with DAI].").

[26] *Compare, e.g.*, OIG Rep. at 15 ("the Mission believes that its implementers do conduct risk and impact assessments"), *with* DAI Br. 17 (characterizing this as a finding about "DAI").

contractor in Afghanistan, with contract obligations exceeding $1 billion during the relevant period. AC ¶ 245. LBG and Black & Veatch also had large standalone contracts. *Id*. Together, they implemented a variety of projects in Taliban-controlled or -influenced areas, AC ¶ 247, and they regularly paid insurgents to redirect terrorist attacks away from those projects, AC ¶¶ 248-51. Plaintiffs identify several indicia of that practice, beyond the industry custom it reflected: the Complaint cites employee discussions about protection money in the Joint Venture's Kabul offices; admissions by the Joint Venture's officials to other industry participants; its instructions to security subcontractors; and accounting irregularities indicative of such payments. AC ¶ 248.

Plaintiffs offer many examples of those payments. AC ¶¶ 252-79. For LBG, the Complaint describes payoffs on multiple highway-construction projects, including the infamous Ring Road, which became "an important source of financing for the Taliban." AC ¶¶ 252-53. It further details how LBG funneled many of those payments through security subcontractors such as Watan and USPI. AC ¶¶ 253-56; *see* AC ¶¶ 69-71 (Watan), 255-64 (USPI). With respect to the latter, the Complaint cites an example of USPI's payments to the Taliban in connection with an LBG project (AC ¶ 257); USPI's admission that it hired "current Taliban" (AC ¶ 263); a law enforcement interview with a USPI confidential source (AC ¶ 261); and a whistleblower's testimony that USPI "was defrauding the U.S. government to pay the Taliban" (AC ¶ 261).

The Joint Venture was even worse. It too used USPI to facilitate protection payments, including *after* USPI had been indicted and debarred. AC ¶¶ 257-59. It also orchestrated additional payments. AC ¶¶ 265-79. The Complaint collects substantial evidence of the Joint Venture's payments, including: (1) accounting systems designed to hide outgoing payments that multiple employees linked to protection money (AC ¶¶ 265-67); (2) a memorable meeting with Taliban fighters in Zadran in which payments were promised (AC ¶ 272); (3) payoffs made

through a Haqqani associate named "Mr. Arafat" (AC ¶¶ 273-76); and (4) the retention of

another Haqqani-controlled front company to work on the Gardez-Khost highway (AC ¶ 277).

Plaintiffs further allege that Black & Veatch independently made protection payments to secure

its work on the Kajaki Dam, which it took over after USAID fired LBG.  AC ¶¶ 247, 269.

LBG, Black & Veatch, and the Joint Venture all knew about those payments.  AC ¶¶ 254-

55, 260-64, 267-68.  Each had authority over its subcontractors and assumed responsibility for

their bills.  AC ¶¶ 95-96, 250, 254.  They used that authority to encourage protection payments

while remaining (largely) above the details.  AC ¶ 262.  One former Joint Venture employee

described this as "willful ignorance" and noted:  "Yes, I know the money is going to the Taliban,

yes I know it's going to come back and bite ISAF and the Coalition and hurt what they're trying

to do, but it's done – there's no other way to get the roads built."  AC ¶ 268.  Such payments

were "the only way it worked.  It's just that [the Joint Venture] got good at dressing it up and

hiding it in a way that SIGAR couldn't find it."  AC ¶ 267.  Another employee expressed similar

thinking to a journalist, justifying the payments by opining of the Taliban:  "They're not all bad

. . . If they're not disrupting my project, they are moderate Talibs."  AC ¶¶ 12, 263.[27]

**b.**    Black & Veatch's factual arguments (at 2-13) epitomize the flawed pleading

constructs discussed above.  *Supra* Part I.B.  It asks (at 5-6) the Court to disregard Plaintiffs'

industry-practice allegations; decries (at 6-7) a supposed lack of detail; argues (at 7-12) about the

true meaning of certain sources; calls (at 10 n.33) other sources "wholly inaccurate"; and cites (at

2-4) extra-pleading materials to support its preferred narrative.  The entire exercise is flawed.[28]

---

[27] The same employee, in a recent interview about this lawsuit, acknowledged hiring people who "were identified as Taliban."  Freakonomics Radio, *When Your Safety Becomes My Danger* (Sept. 23, 2020), https://bit.ly/3mLDGc9.  Asked to justify the practice, he asserted that LBG's Taliban partners were "not militants" but struck him "more like very strict Quakers."  *Id.*

[28] Black & Veatch's criticism (at 16 & n.61) of Plaintiffs' confidential sources is also

Black & Veatch's attempt (at 10-11) to downplay its use of "Mr. Arafat" illustrates the problem. The Joint Venture used Mr. Arafat from 2008-2011 to secure the Gardez-Khost Highway because he was a Haqqani affiliate who could deliver relative peace with the terrorists. AC ¶¶ 273-76. Mr. Arafat's monthly retainer "was grossly inflated above the legitimate costs of security," and several people involved understood his retainer to be flowing to the Haqqanis. AC ¶ 273. As the *New York Times* reported, "Mr. Arafat's insurgent connections appear to have been known to virtually everyone." *Id*. Another journalist likewise described how Mr. Arafat was "a conduit for payoffs to the Haqqanis." AC ¶ 276. Those allegations should be presumed true. *Supra* Parts I.A, I.B. Yet Black & Veatch urges the opposite (at 10-11 & n.35) because the *New York Times* also reported that USAID did not bar Mr. Arafat from subcontracts until 2011. That is no defense. USAID *relied on Black & Veatch* to select, vet, and supervise its subcontractors. AC ¶¶ 130-44. Black & Veatch was not allowed to pay the Haqqanis through Mr. Arafat in 2010 merely because USAID did not formally disqualify him until 2011.

Similar points apply to Black & Veatch's defense of hiring Haqqani front Haji Khalil Zadran Construction Company ("HKZCC") to work on the same highway. *Compare* AC ¶ 277, *with* BV Br. 9-10. The Complaint alleges that the Joint Venture knowingly paid HKZCC $15 million to channel money to the Haqqanis, and it cites U.S. government findings that HKZCC was set up to "fund[] the Haqqani network." AC ¶ 277. Black & Veatch responds that the Court should reject the allegation because the U.S. government did not sanction HKZCC until after the Joint Venture had hired it. BV Br. 9-10 n.31. That again raises premature fact questions. Black

---

meritless. The case it cites applies the test for using confidential witnesses to raise a "strong inference of scienter" under the Private Securities Litigation Reform Act, which is a much harsher standard than the one applicable here. *Compare Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 300-01 (S.D.N.Y. 2019), *with Banneker*, 798 F.3d at 1129.

& Veatch's position appears to be that it was permitted to pay *any* subcontractor unless and until the U.S. government specifically instructed it to stop.  That is incorrect.  AC ¶¶ 130-44.

Black & Veatch's account of the Zadran meeting is the least compelling of all.  In late 2008 or early 2009, Joint Venture officials met with roughly 100 Taliban fighters, during which one attendee "became visibly shaken and whispered to a colleague 'these are Taliban, they're going to kill us.'"  AC ¶ 272.  The Joint Venture proceeded to buy their loyalty by informing the Taliban that the "money and the jobs are going to come to you."  *Id*.  The Complaint, citing a percipient witness, describes this as a promise to pay active Taliban fighters.  *Id*.  But Black & Veatch now says (at 9) – without evidence – it was actually just an innocuous effort to "hire [] local Afghans to help build a road."  That typifies the sort of unsupported inference courts do not entertain at the pleading stage.  *See Banneker*, 798 F.3d at 1129; *Zaidan*, 317 F. Supp. 3d at 20.[29]

**c.**    LBG, unlike DAI and Black & Veatch, properly accepts (at this stage) Plaintiffs' allegations that "LBG facilitated payments to the Taliban."  LBG Br. 2.  At the same time, its multipage attempt to cast itself as "instrumental in the Afghan reconstruction effort" embodies the same errors discussed above.  *Compare* LBG Br. 4-10, *with supra* Part I.B.  In reality, LBG perpetrated a massive fraud on the U.S. government in Afghanistan, for which its CEO, CFO, and Controller were convicted.  AC ¶¶ 280-81.  It also pleaded guilty to a criminal bribery scheme in a spate of nearby countries, which employed the same accounting tricks LBG used to hide its Taliban payoffs and for which two more executives went to prison.  AC ¶¶ 282-84.  And USPI, its chosen security partner in Afghanistan – which LBG's Chief of Party called "one of the

---

[29] Black & Veatch's defense (at 11-12) of the ISS-Safenet letter cited in the Complaint (AC ¶ 274) is similarly flawed.  The Complaint explains why the letter – given the industry practice of paying insurgents, AC ¶¶ 62-96, especially in Haqqani areas, AC ¶¶ 93, 278 – supports Plaintiffs' claims.  AC ¶ 274.  Black & Veatch's response merely raises fact questions.

greatest pleasures in my life to serve with," AC ¶ 264 – was debarred after its co-founders also pleaded guilty to wire fraud. AC ¶¶ 258-59. All of this criminality happened while LBG was making the protection payments and helps explain how the payoffs occurred. AC ¶¶ 265-68.

LBG also errs (at 17) in pretending that Plaintiffs are suing it for the "mere act of retaining" "security subcontractors" like USPI. That is not what Plaintiffs allege. LBG did not merely "retain" disreputable security companies; it encouraged them to pay insurgents and approved the payments once they were made. AC ¶¶ 95-96, 260-64. Indeed, LBG selected the subcontractors; exercised control over them; and had the obligation to sign off on every item on every bill. AC ¶¶ 95-96, 250-51, 262. Today LBG tries to distance itself from USPI, but in 2007 its Chief of Party wrote USPI's CEO that "USPI was not just a sub-contractor, USPI was our integral girded partner." AC ¶ 264. USPI soon after admitted to "defrauding the U.S. government to pay the Taliban," which were payments it made on LBG's behalf. AC ¶¶ 261-63.

LBG criticizes these allegations for lacking some details, such as who made the payments, or the precise amounts. LBG Br. 10-12, 18. Plaintiffs need not plead such particulars. *Supra* Part I.B.2. The Complaint abounds with facts from which to infer LBG's knowledge, including of payments it paid directly to the Taliban. AC ¶¶ 248, 255, 262-68, 272-78. LBG is free to argue otherwise, but "the question of knowledge is a question of fact for the jury" and not a basis for dismissal. *United States v. Avant*, 275 F.2d 650, 652 (D.C. Cir. 1960).

### 3.    IRD

IRD adhered to a similar practice of making protection payments to secure its development projects in Taliban-controlled or -influenced areas. AC ¶¶ 377-93. Although IRD was a non-profit on paper, it was extraordinarily lucrative: it reported revenues of more than $3 billion from 2007 to 2013 and paid out massive salaries and bonuses. AC ¶ 379. It was also the largest recipient of USAID "cooperative agreements" in Afghanistan – a special type of contract

over which USAID exercised relatively little oversight.  AC ¶ 378.  IRD implemented at least seven such agreements that entailed work in Taliban areas, AC ¶ 380, and it regularly paid insurgents to redirect terrorist attacks away from its projects, AC ¶¶ 381-83.  Plaintiffs identify several indicia of that practice, beyond the industry custom it reflected:  the Complaint cites conversations by IRD staffers in Kabul; the experience of multiple third-party investigators tasked with reviewing IRD's projects; a near-total lack of financial controls that facilitated the payments; and an audit of IRD projects by Task Force 2010.  AC ¶¶ 381, 391.

The Complaint provides four examples of IRD's payments.  AC ¶¶ 384-93.  One involved an IRD agricultural project in Helmand, on which a subcontractor told IRD employees in Lashkar Gar it was making protection payments to nearby Taliban.  AC ¶ 384.  Another concerns IRD's provision of cash-equivalent fertilizer products to the Taliban, which it refused to stop even after learning that the Taliban was monetizing IRD's products on the black market. AC ¶¶ 385-86.  Yet another involved IRD's provincial-roads project, on which one subcontractor paid $70,000 in protection money.  AC ¶¶ 388-89.  And on IRD's "Kandahar Food Zones" project, a monitoring consultant informed IRD management in Kabul that IRD's subcontractors were spending 10-20% of their budget bribing the Taliban.  AC ¶ 390.  In response, IRD management confirmed awareness of the practice and intentionally allowed it to continue.  *Id*.

This was not the first time IRD financed terrorists.  In Iraq, IRD had implemented similar cash-for-work programs and likewise orchestrated "protection bribes" to insurgents.  AC ¶ 392. The resulting scandal was highly publicized, and IRD was aware of it.  AC ¶ 393.  Yet it continued the same practices in Afghanistan.  One reason was IRD's system of deficient internal controls.  AC ¶¶ 394-400.  By 2015, IRD's misconduct became so pronounced that USAID suspended IRD based on a finding that it had engaged in a "consistent pattern of mischarging the

United States Government."  AC ¶ 397.  Although IRD succeeded in vacating the suspension on

procedural grounds, AC ¶ 398, it dissolved its board, fired its CEO, and rebranded itself as

Blumont.  AC ¶ 397.  Soon after, the rest of its leadership team resigned.  AC ¶ 399.

IRD admits (at 5) that U.S. "military contractors" in Afghanistan "often had to pay

insurgents."  IRD's factual discussion then mostly tries to justify that practice.  IRD Br. 3-8.

Those justifications fail.  Although IRD insinuates (at 6-8) that the U.S. government approved its

payments, it neither cites evidence for that assertion nor grapples with Plaintiffs' allegations to

the contrary.  AC ¶¶ 127-44, 185.  IRD's projects may have been "difficult to execute," IRD Br.

7, but USAID paid it large sums to *avoid* helping terrorists, AC ¶¶ 64-65, 133-34, 379, 394.  Its

suggestion it had no choice but to pay the Taliban simply repeats the faulty logic that DOJ

repudiated in charging Chiquita for protection money in Colombia.  AC ¶¶ 128-30.  And IRD's

repeated assertion (at 7 n.21, 15, 19, 30, 33) that it hired the "APPF" is sourced to inadmissible

extra-pleading materials that do not nearly substantiate IRD's position.  *Cf.* IRD Br. 7 n.21.

### 4.    Chemonics

**a.**    Chemonics, like the other Defendants, followed a practice of making protection

payments to the Taliban.  AC ¶¶ 401-11.  Chemonics was the third-largest USAID contractor in

Afghanistan, with $822 million in obligations during the relevant period.  AC ¶ 401.  It

implemented at least seven projects that entailed work in Taliban areas, AC ¶ 402, and it

regularly paid insurgents to redirect attacks away from those projects, AC ¶¶ 403-05.  Plaintiffs

identify several indicia of that practice, beyond the industry custom it reflected:  the Complaint

cites Chemonics' specific geographies (including Kandahar, Helmand, and Herat) where

protection payments were nearly universal; the particular project types Chemonics performed,

which were especially notorious sources of protection money; and its lack of controls – evident

in its "ability to cut corners and manipulate figures" – indicative of such payments.  AC ¶ 403.

The Complaint also offers several specific examples of Chemonics' payments. AC ¶¶ 406-11. Most prominent was Chemonics' heavy reliance on USPI, the criminal-run security subcontractor notorious for paying Taliban insurgents as a matter of routine. AC ¶¶ 406-07; *supra* pp. 9, 36. Chemonics used USPI to protect two of its flagship projects, and it even adopted a policy requiring that all Chemonics employees travel with a USPI escort. AC ¶ 406. When Chemonics used USPI to procure security in Taliban areas – for which the Complaint lays out several examples – it knowingly facilitated USPI's protection payments. AC ¶¶ 406-08. Indeed, Chemonics fired an employee for objecting to its use of USPI in Helmand. AC ¶ 409. Moreover, the Complaint alleges that Chemonics made similar payments to secure other projects in Kandahar, which it routed through a Taliban-affiliated warlord named "General Sherzai." AC ¶ 410. When another Chemonics employee objected to that practice, Chemonics again dismissed the concern, explaining that Sherzai offered the cheapest source of "security." *Id*.

    **b.**    Chemonics' responses lack merit. It assails (at 17-19) Plaintiffs for "[c]iting their own story," for relying on "secondary sources," and for including some "generalizations" in the Complaint. None of that is objectionable under Rule 8. *Supra* Part I.B. The Complaint should be "assumed to be true and construed liberally in [Plaintiffs'] favor." *ICC*, 2020 WL 1905132, at *2 n.2. Nitpicking the sourcing should wait. *Cf.* Chemonics Br. 17-20.[30]

    Chemonics' attacks (at 7-10, 17-20) on Plaintiffs' industry-practice allegations also fail. *Supra* Part I.B.1. In the two provinces (Helmand and Herat) where Chemonics' work was concentrated, a "consensus" developed in the industry that it was "impossible to execute

---

[30] Plaintiffs acknowledge that claims based on attacks that occurred before June 5, 2010 are time-barred as to Chemonics and IRD (but timely as to the other Defendants). *See* Chemonics Br. 45. That said, Chemonics cites one attack in its brief that occurred on July 23, 2013 and so is timely. *Compare* Chemonics Br. 45 n.49, *with* AC ¶ 2466.

[development] projects without payments that end up in Taliban coffers." AC ¶ 403. Another source concurred that virtually every project in Helmand "almost certainly involved massive payments to the insurgents." *Id*. And in Kandahar, the third province in which Chemonics worked heavily, the Taliban allowed projects to proceed only if developers "registered" with the insurgents and "pa[id] our tax." *Id*.; *see* AC ¶ 148 & n.189. Alleging that those facts applied to Chemonics' projects in those very areas is at least "plausible." *Banneker*, 798 F.3d at 1129.

Chemonics insists (at 18-19) that, because these sources did not call out Chemonics by name, they must be talking about everyone else besides Chemonics. That is like Commerzbank arguing that the 2008 financial crisis "miraculously" only affected everybody else's mortgage-backed securities. *Commerzbank*, 277 F. Supp. 3d at 495. It is those arguments, not Plaintiffs' claims, that are implausible. *See id*.; *supra* pp. 18-19 & n.7. That is especially true because Chemonics used USPI, which is and was well known for paying the Taliban. *See Fixed Income Shares*, 130 F. Supp. 3d at 854 (allegations of industry-wide misconduct sufficient to state claim against mortgage-security trustee in part because such allegations included "reports about the major originators and sponsors of loans" included in the trusts at issue). Indeed, the industry-practice allegations that Chemonics tries to discard would be admissible and highly probative *at a criminal trial* against it. *See*, *e.g.*, *Kozeny*, 643 F. Supp. 2d at 419-20 (admitting "background evidence of corruption in [country]" in bribery prosecution). To suggest such allegations cannot even state a claim badly misapprehends the pleading standard. *Supra* Part I.B.1.

Chemonics' more specific arguments fare no better. *First*, Chemonics justifies (at 21-22) its use of USPI by asserting that USAID "recommend[ed]" it do so. But its only source for that assertion is an undated, unauthenticated 6-page excerpt from an LBG document that Chemonics itself did not even receive. Chemonics Br. 21 n.27 (citing Dkt. 103-2). Regardless, the LBG

document merely suggested that USAID contractors "maintain regular contact with" USPI – not that they retain USPI and approve its payments to the Taliban. Dkt. 103-2 at 119. The two are quite different. Under the contracts, Chemonics (not USAID) was responsible for its security subcontractors, and Chemonics (not USAID) was charged with reviewing and signing off on USPI's bills. AC ¶¶ 95-96, 133, 140-44, 405. It is thus no surprise that USAID found out about USPI's practices only later. And it hardly exonerates Chemonics that other corrupt "USAID contractors" like LBG used USPI to do similar things. Dkt. 103-2 at 119.

Similar points dispose of Chemonics' assertion (at 21-22) that the U.N. and the World Bank also hired USPI. Chemonics' extra-pleading sources (at 21 n.28) lack key facts needed to weigh the inference Chemonics propounds, such as whether (and when) the asserted contracts were terminated, whether they even involved work in Taliban areas, and whether they were subcontracts under the purview of corrupt prime contractors like Chemonics. At any rate, even under Chemonics' best version of those facts, the ultimate inference is that the World Bank may have allowed protection payments too. Even if true, that would not excuse what Chemonics did.

*Second*, Chemonics likewise uses extra-pleading submissions (at 7, 22) to defend its relationship with General Sherzai. That tactic epitomizes why courts do not allow defendants to make "factual submissions" before discovery. *Hurd*, 864 F.3d at 687; *see supra* Part I.B.3. Chemonics' unauthenticated letter from USAID (Dkt. 111-6) raises more questions than it answers: it seems to approve use of some type of "Farid Sherzai Residence" but does not specify what "assistance" USAID thought that entailed; leaves unclear whether the approval had been given (or even sought) earlier in Chemonics' relationship with him; and gives no detail about the information Chemonics disclosed (or not) to USAID in seeking the approval. Indeed, USAID "reserve[d] the right to rescind this vetting determination in the event that we become aware of

45

information [suggesting] support for terrorism or criminal activity."  Dkt. 111-6.[31]

More fundamentally, USAID's letter cautioned Chemonics that "[t]his approval does not relieve your organization of its legal obligation to comply with U.S. Executive Orders and U.S. law prohibiting transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism."  Dkt. 111-6.  That disclaimer comports with the Mission Order it implemented – of which Chemonics submits only an excerpt – warning contractors that "all Awardees are expected to conduct their own review of Non-US Parties" to ensure compliance with U.S. anti-terrorism laws.  Dkt. 111-5 at 3.  Again, USAID's vetting efforts were imperfect and depended on full disclosure and cooperation from contractors like Chemonics.  AC ¶¶ 133-44.  Chemonics' arguments to the contrary depend on a slew of factual inferences that go outside the Complaint and are unwarranted at this stage.

*Third*, Chemonics lambasts (at 20-21) Plaintiffs for citing a SIGAR finding that its expenditures were "not supported by sufficient documentation."  AC ¶ 403.[32]  The audit went on to say that one problem identified "was partially attributable to lack of documentation as a result of a terrorist attack."  *SIGAR Chemonics Audit* at 4.  Chemonics, now omitting the word "partially," quotes (at 20) the rest and says the auditors' conclusions were not "because Chemonics had insufficient controls, but because Chemonics itself was a victim of terrorism."

---

[31] Chemonics asserts (at 16 n.21) that, in 2001, Sherzai was "a *CIA-recruited* former mujahideen warlord."  So were many Taliban members.  AC ¶¶ 39-40.  As for Chemonics' assertion (at 16 n.20) that the U.S. government "routinely worked with him," its only source describes a single meeting with Sherzai after which the U.S. government did *not* work with him, stating, "We weren't prepared to build up governors and people who weren't behold[en] to the central government and people who would probably take 20%" for corrupt purposes.  SIGAR, *Amb. Richard Boucher Record of Interview* 6 (Oct. 30, 2015), https://rb.gy/hkctae.

[32] Citing SIGAR, Audit No. 14-75-FA, *USAID's Accelerated Sustainable Agriculture Program & Afghanistan Stabilization Initiative:  Audit of Costs Incurred by Chemonics International, Inc.* (July 2014) ("*SIGAR* Chemonics Audit"), https://bit.ly/2H5oJCf.

That characterization conflicts with SIGAR's finding of "significant deficiencies or material weaknesses in Chemonics' internal controls." *SIGAR Chemonics Audit* (summary page). Regardless, the Complaint contains additional allegations confirming the point. AC ¶ 411.

## II. PLAINTIFFS SUFFICIENTLY PLEAD PRIMARY-LIABILITY CLAIMS (COUNTS ONE, THREE, AND FOUR)

Primary liability arises when a defendant's own conduct constitutes an "act of international terrorism" under the ATA. 18 U.S.C. §§ 2331(1), 2333(a). It works through a "chain of explicit statutory incorporations," under which conduct that violates predicate criminal statutes can also qualify as "international terrorism." *Boim*, 549 F.3d at 690. If such conduct proximately causes a plaintiff's injuries, the defendant is primarily liable. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 270 & n.1 (D.C. Cir. 2018) ("*Owens IV*"). Counts One, Three, and Four are primary-liability claims based on predicate violations of 18 U.S.C. §§ 2339A and 2339C, and 50 U.S.C. § 1705(a), respectively. AC ¶¶ 2570-76, 2584-96 (alleging elements).

### A. Plaintiffs Sufficiently Allege Proximate Cause

#### 1. Defendants' protection payments substantially contributed to the Taliban's terrorist attacks against Americans in Afghanistan

To plead proximate cause, Plaintiffs must allege "some reasonable connection" between Defendants' conduct and their injuries. *Owens v. Rep. of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017), *vacated on other grounds*, *Opati v. Rep. of Sudan*, 140 S. Ct. 1601 (2020) ("*Owens III*"). That requires a plausible inference that (1) Defendants' conduct was a "'substantial factor in the sequence of events'" that led to Plaintiffs' injuries, and (2) the injuries were "'reasonably foreseeable or anticipated as a natural consequence'" of the conduct. *Owens IV*, 897 F.3d at 273 (quoting *Owens III*, 864 F.3d at 794). Causation is absent only when the "'causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.'" *Owens III*, 864 F.3d at 794 (quoting *Paroline v. United States*, 572 U.S. 434, 445

47

(2014)).  Whether the requisite link exists in any given case "is ordinarily a question for the

jury."  *Smith v. District of Columbia*, 413 F.3d 86, 102 (D.C. Cir. 2005).

Plaintiffs satisfy that test by alleging that Defendants' protection payments substantially

financed the Taliban's terrorist operations.  AC ¶¶ 97-123.  Such financing, the D.C. Circuit has

held, causes a terrorist group's attacks when the financing "foster[s] the[] growth" of that group.

*Owens III*, 864 F.3d at 794.  In *Owens III*, the court upheld a finding that Sudan proximately

caused two al-Qaeda-committed Embassy bombings in other countries by providing al-Qaeda

with fungible support that helped it "grow its membership" and "develop its capabilities."  *Id*. at

797. Sudan took no steps to "directly advance[]" the specific "embassy bombings" at issue.  *Id*.

at 799.  Nor did Sudan "directly fund al Qaeda" in general.  *Id*. at 795.  Rather, Sudan's

"financial support" – conveyed indirectly through "tax exceptions" and "access to the formal

banking system" – made it easier for al-Qaeda's "broader organization" to commit terrorist

attacks against Americans.  *Id.* at 794-97.  Under ordinary proximate-cause principles, that was

sufficient to make Sudan liable for al-Qaeda's Embassy bombings in East Africa.  *Id*.[33]

Plaintiffs' causation allegations are even stronger.  Terrorist violence suffused the

Taliban's protection racket:  the violence was both the reason for and the natural result of the

payments Defendants made.  AC ¶¶ 8-11, 98-102.  When Defendants paid protection money,

they knew they were dealing with terrorists – that is *why* they paid.  AC ¶¶ 63, 98, 112.  Indeed,

---

[33] *Owens III* addressed whether the plaintiffs had established proximate cause "for jurisdictional purposes" under the Foreign Sovereign Immunities Act's ("FSIA") terrorism exception.  *Id.* at 778.  Although a plaintiff faces a "lighter burden" in showing jurisdictional causation than in "proving a winning case on the merits," *id*., that reflects the lesser *quantum of evidence* needed to establish jurisdictional facts than to prove facts at trial, *id*. at 784-85 (noting "modest burden of production").  The legal standard for causation remains the same in both situations.  *See id*. at 794 ("proximate cause remains the jurisdictional standard"); *Owens IV*, 897 F.3d at 273 (announcing ATA proximate-cause standard by citing *Owens III*'s legal test).

they paid to redirect the terrorists' attacks away from their own projects and onto U.S. service

members instead.  AC ¶¶ 8, 10-11, 65-66, 98.  The Taliban itself tied those payments to its

insurgency, proclaiming in 2010 that it sought "American money to help us fund our Jihad."  AC

¶ 112.  Such protection payments fulfilled the Taliban's stated goal and translated directly into

weapons and fighters the terrorists used to attack Americans soldiers.  AC ¶¶ 99-104.  The link to

terrorism was not some "mere fortuity," *Paroline*, 572 U.S. at 445; it was the whole point.

   The resulting causal effect was robust.  Defendants' protection payments supplied the

Taliban with a vital stream of revenue and materially enhanced its ability to commit the attacks

that killed and injured Plaintiffs.  AC ¶¶ 97-111.  As Secretary Clinton testified at the time, "one

of the major sources of funding for the Taliban is the protection money."  AC ¶ 106.  Such

payments were both quantitatively material and qualitatively essential to the Taliban's terrorist

enterprise.  AC ¶¶ 97, 106-10.  And each Defendant's payments here – a minimum of several

million dollars, AC ¶¶ 184, 249, 382, 404 – were enough to fund *all* of the attacks at issue.  AC

¶ 103.  Such payments evince a "substantial connection between [Defendants] and terrorism" and

support a plausible inference of proximate cause.  *Owens IV*, 897 F.3d at 275.

   Permitting a causal inference in such circumstances accords with the ATA's design.  *See*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) ("Proximate-

cause analysis is controlled by the nature of the statutory cause of action.").  The ATA's

founding goal was to "interrupt, or at least imperil, the flow of money" "at any point along the

causal chain of terrorism," S. Rep. No. 102-342, at 22, and Congress recently reaffirmed its

intent to curtail the flow of "resources, directly or indirectly, to persons or organizations that

pose a significant risk of committing acts of terrorism," JASTA § 2(a)(6).  By making

"financiers of terrorism" liable for attacks foreseeably committed by the groups they fund, the

*Owens III* standard fulfills the objective of "cut[ting] the terrorists' lifeline." *Boim*, 549 F.3d at 691; *see id*. at 697-98. Courts thus routinely sustain proximate-cause allegations when a defendant gives fungible financing to the terrorist group responsible for the attacks at issue.[34]

*Chiquita III* is on-point. There, Chiquita paid the Colombian FARC about $32,000 per year in protection money – often through "intermediaries" – "to protect the safety of its employees." 284 F. Supp. 3d at 1295-97. After some of the FARC's American victims sued under the ATA, Chiquita moved for summary judgment (*after* discovery) and made virtually every causation argument Defendants make here. *See* Def.'s Mot. for Summ. J. at 31-35, *In re Chiquita Brands Int'l, Inc.*, No. 08-md-01916-KAM (S.D. Fla. Apr. 3, 2017), Dkt. 1329. The court rejected each one. *See Chiquita III*, 284 F. Supp. 3d at 1317-18. It did so because it discerned evidence that Chiquita's protection payments "funnel[ed] money to the FARC" and "enhance[d] and facilitate[d] its ability to perpetrate" terrorism against Americans. *Id*. at 1318. No one argued that Chiquita's individual dollars "ended up in the hands of the specific FARC fronts that carried out the attacks" at issue. *Id*. at 1317. But because the protection payments "conceivably empowered the organization as a whole and enhanced [its] terror capabilities," the court held that "the question of proximate causation . . . is one for the jury." *Id*. at 1318.

That conclusion applies here with even greater force. Here, as in *Chiquita III*, Defendants acceded to "protection money demands" from a terrorist group. *Id*. at 1295. Here, as

---

[34] *See*, *e.g.*, *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 46-47 (E.D.N.Y. 2019) ("rout[ing] payments to terrorist organizations . . . enhanced their ability to fund and commit acts of terrorism"); *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *10 (M.D. Fla. 2011) ("Defendants' contributions potentially allowed the FARC to continue their operations longer" and supported proximate cause); *Wultz*, 755 F. Supp. 2d at 48 (bank's "provision of financial services, including receipt and transfer of funds, proximately caused plaintiffs' alleged injuries"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) ("Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda[.]").

in *Chiquita III*, the payments' "magnitude and timing" made them a "material and substantial factor in enhancing the [group's] terror capabilities." *Id.* at 1317. And here, as in *Chiquita III*, the protection "payments to the [terrorists] created a foreseeable likelihood of . . . facilitat[ing] [their] ability to perpetrate [terrorist] attacks." *Id.* at 1318. The difference is that, whereas Chiquita paid a group that conducted only sporadic "personal attacks on American nationals," *id.*, Defendants here made much larger payments to terrorists who avowedly wanted the money to exterminate the U.S. presence in Afghanistan and who in fact used such funds to cause thousands of American casualties, AC ¶¶ 47-52, 334, 414, 431. If the first is enough to get to a jury, the second is more than enough to defeat a motion to dismiss. *See also Stansell*, 2011 WL 1296881, at *9-10 (sustaining proximate-cause allegations for protection payments).

### 2. Defendants identify no causation-defeating intermediary

**a.** Defendants err in interposing their "third-party subcontractors" as intermediaries that "break[] the causal chain." LBG Br. 22-24; *see* DAI Br. 28-29; BV Br. 27-30; IRD Br. 19; Chemonics Br. 29-31. They rely principally on *Owens IV*, which held that "an independent intermediary" separating a defendant from the relevant terrorists can "create[] a more attenuated chain of causation." 897 F.3d at 275. There, a bank "provided assistance to Sudan, which in turn funded and otherwise supported [the] al Qaeda[] attack[s]" at issue. *Id.* at 269. Because the bank had nothing to do with Sudan's downstream support for al-Qaeda, the court held that Sudan was an "intermediating country" that severed the bank's link to terrorism. *Id.* at 275-76.

This case is dissimilar. Defendants' subcontractors, unlike Sudan, were not an "intermediating country" that walled Defendants off from terrorism. *Id.* at 276. Rather, the subcontractors were instruments through which Defendants accomplished their payments to the Taliban. AC ¶ 68. Indeed, Defendants hand-picked the subcontractors to secure their projects; encouraged the subcontractors to pay protection money; reaped the benefit of the "security" that

51

money bought; and approved each payment their subcontractors made.  AC ¶¶ 91, 95-96.  Paying

the Taliban through the subcontractors was no better than paying it themselves.  *See Boim*, 549

F.3d at 701-02 ("Nor should donors to terrorism be able to escape liability [by] launder[ing]

donations through a chain of intermediate organizations.");  *Abecassis I*, 785 F. Supp. 2d at 646-

49 (kickbacks paid to Saddam "through intermediaries" supported "proximate cause").

       *Chiquita* is again instructive.  Chiquita pleaded guilty to financing the AUC through

"payments to an intermediary known as a 'convivir,' " which was a "private security compan[y]

licensed by the Colombian government."  *Chiquita Proffer* ¶ 21.  The intermediary neither

absolved Chiquita of criminal guilt nor defeated proximate cause under the ATA.  *See id.*; *In re

Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder Derivative Litig.*, 690 F. Supp. 2d

1296, 1310, 1313-15 (S.D. Fla. 2010) ("*Chiquita I*").  Nor did its use of other "intermediaries" to

"negotiate" additional payments to the FARC preclude causation at summary judgment.

*Chiquita III*, 284 F. Supp. 3d at 1297, 1317-18.  All this reflected a "General Rule" of protection

payments:  "[You] [c]annot do indirectly what you cannot do directly."  *Chiquita Proffer* ¶ 56.

       Defendants violated that rule here.  Some of the payments may have flowed through

Defendants' chosen subcontractors, but they reached the Taliban just the same.  In fact, that was

the point:  Defendants *needed* the money to reach the Taliban to achieve the "protection" on

which they depended.  AC ¶¶ 95-96.  If anything, the subcontractors' role – conjuring a veneer

of plausible deniability – just makes the conduct worse.  AC ¶ 117; *see* AC ¶¶ 56-61; *see also*

Eikenberry Mem. 1 (identifying "layers of sub-contracts" as a "significant barrier to oversight"

that yields "corruption").  LBG epitomizes that principle:  while it was paying protection money

in Afghanistan, its executives were exploiting subcontractors to conceal criminal bribery in

neighboring countries.  AC ¶¶ 282-84.  Just as those efforts made LBG more culpable under the

FCPA, *id.*, so does Defendants' deliberately opaque contracting structure here amplify their guilt.

**b.**      None of Defendants' cases suggests otherwise.  All, like *Owens IV*, involved *sovereign* actors (like Sudan's government) that broke the causal chain.[35]  Such cases rest on the inapplicable principle that the need for causal allegations is especially "acute" when a "sovereign state" is involved.  *Owens IV*, 897 F.3d at 276.  The intermediaries in those cases also negated any inference that the defendant's resources actually reached terrorists.  In *Owens IV*, for example, the plaintiffs failed to allege that "any currency processed by [the bank] for Sudan was . . . in fact sent to al Qaeda."  *Id.*; *see Kemper*, 911 F.3d at 394; *Rothstein*, 708 F.3d at 97.

Plaintiffs here supply that missing link by explaining how Defendants' money reached the Taliban.  AC ¶¶ 97-111.  The difference stems from Defendants' posture toward the terrorists.  In *Owens IV*, the bank was agnostic about Sudan's terrorist ties.  It simply wanted Sudan as a customer, and its services remained the same whether Sudan spent money on al-Qaeda or instead on "legitimate agencies."  897 F.3d at 276.  Here, there was no such ambiguity.  Defendants' protection payments were designed to buy off *the terrorists*; that was how they achieved their purpose.  AC ¶¶ 95-96.  And the Taliban actually received Defendants' money, whether directly or via subcontractors.  Defendants cite no case rejecting proximate cause in the face of allegations that a defendant's money was intended to reach the terrorist group at issue.

A contrary rule would frustrate the ATA's core purpose.  Under Defendants' theory, all a company looking to evade the ATA need do is find a nominal intermediary, make sure it has at

---

[35] *See Owens IV*, 897 F.3d at 274-76 (Sudan); *Brill v. Chevron Corp.*, 804 F. App'x 630, 632 (9th Cir. 2020) (Iraq); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392-94 (7th Cir. 2018) (Iran); *Rothstein v. UBS AG*, 708 F.3d 82, 96-97 (2d Cir. 2013) (Iran); *Atchley v. AstraZeneca UK Ltd.*, 2020 WL 4040345, at *9 (D.D.C. 2020), *appeal docketed*, No. 20-7077 (D.C. Cir. Aug. 21, 2020) (Iraqi Ministry of Health); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *8 (S.D.N.Y. 2019) (Iran).

least one "legitimate" function, and then funnel terrorist donations through the intermediary at will.  *E.g.*, Chemonics Br. 30.  Allowing such "money laundering" to defeat causation would leave the ATA "a dead letter."  *Boim*, 549 F.3d at 702.  Indeed, terrorist financing often flows through intermediaries.[36]  In *Owens III*, the intermediaries included "al Qaeda-affiliated businesses," and they did things like provide "legitimate employment for al Qaeda operatives" and invest in "infrastructure projects."  864 F.3d at 783.  Just as those intermediaries and those programs did not defeat causation, *id.* at 794-99, neither do the subcontractors here.

Defendants' arguments demonstrate their own illogic.  They take a view of causation so narrow that three of them even posit *the Taliban* as a "quasi-governmental organization . . . provid[ing] governmental services" that breaks the causal chain.  IRD Br. 20; *see* BV Br. 30; Chemonics Br. 31.  According to this view, Defendants could have delivered cash directly to Mullah Omar himself and faced no liability.  That argument discredits Defendants' entire causation defense.  The Taliban was at all times an SDGT, AC ¶ 417, and nothing about its activities was (Chemonics Br. 31) "lawful," *see* AC ¶¶ 418-37.  That the insurgents did not spend every last dollar on terrorist attacks does nothing to weaken the causal effect of Defendants' payments.  *See*, *e.g.*, *Owens III*, 864 F.3d at 794 (al-Qaeda intermediaries' "export of several agricultural commodities" and "Sudanese infrastructure" projects did not defeat causation); *Boim*, 549 F.3d at 698 (Hamas's "social welfare activities" did not defeat causation).[37]

---

[36] *See*, *e.g.*, *Miller*, 372 F. Supp. 3d at 40, 46-47 (financing flowed through "front organizations"); *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 97 (D.D.C. 2017) ("*Owens II*") (noting that ATA proximate-cause allegations often involve financing "for a terrorist organization or a terrorist front"); *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013) (causal chain went through third-party "organizations controlled by Hamas"); *Abecassis I*, 785 F. Supp. 2d at 648 (kickbacks flowed through intermediaries); *Chiquita Proffer* ¶ 21 (protection payments through intermediaries).

[37] Defendants may attempt to distinguish these cases by arguing that Hamas and al-Qaeda were later designated as FTOs.  But the designations in both cases came after the support in

Finally, Plaintiffs also allege that Defendants negotiated protection payments directly with the Taliban. AC ¶¶ 84-89, 186, 250, 383, 405. The Complaint offers several examples of direct support for the Taliban, including by seven Defendants (and four of the five Defendants at issue here). AC ¶¶ 152-63 (ArmorGroup); 187 (DAI); 232-40 (EODT); 272 (LBG/BV); 299 (MTN); 387 (IRD). Those allegations raise a plausible inference that each Defendant made at least some of its payments directly. *Supra* Part I. Accordingly, even if the Court determined that Defendants' subcontractors precluded causation, that would not warrant dismissal.

### 3.      Defendants' individual-dollars-to-individual-attacks theory fails

Most Defendants (BV Br. 31-32; LBG Br. 21-22; IRD Br. 18-19; Chemonics Br. 32-34) also suggest that proximate cause demands a direct link between their individual dollars and the individual Taliban attacks that harmed Plaintiffs. That suggestion is foreclosed by precedent. In *Owens III*, the D.C. Circuit held that Sudan's failure to "directly advance[] the 1998 embassy bombings" at issue was "irrelevant to proximate cause." 864 F.3d at 799. There were good reasons, the court observed, for not requiring "direct traceability" from dollars to attacks: such a requirement would render the FSIA's material-support prohibition "'ineffectual,'" given that "'material support 'is fungible'" and "'terrorist organizations can hardly be counted on to keep careful bookkeeping records.'" *Id.* (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). Sudan's causal analysis of "al Qaeda's specific aim to bomb American embassies" thus "focuse[d] too narrowly." *Id.* at 798. Because al-Qaeda's "organization benefited greatly from Sudan's aid" more broadly, that aid was a "'substantial factor' in the chain of causation leading to the embassy bombings." *Id.* at 797.

---

question and played no role in the analysis. *See Boim*, 549 F.3d at 713 n.7 (Hamas designation post-dated terrorist attack at issue); *Owens III*, 864 F.3d at 797 (similar).

*Chiquita III* bolsters that conclusion. The court there likewise rejected an individual-dollars-to-bombs standard, "finding it at odds with the impossibilities of proof posed by the fungibility of money." 284 F. Supp. 3d at 1313-14. That holding falls within the mainstream of ATA causation law.[38] Because money is fungible, Plaintiffs need not show that any one protection-money dollar bought any one individual weapon used in any one attack. Because Plaintiffs allege that those payments substantially "enhance[d] the [Taliban's] terror capabilities," the Complaint raises a plausible inference of proximate cause. *Id*. at 1317.

Similar points refute Defendants' attempt to undermine causation with "geographic and temporal" factors. LBG Br. 20; *see* DAI Br. 31-32; BV Br. 31-32; Chemonics Br. 32. As for geography, Sudan's aid in *Owens III* did not even take place in the same *country* as the ultimate attacks, yet the D.C. Circuit readily found proximate cause. *See* 864 F.3d at 796 ("proximate cause 'normally eliminates the bizarre' without 'the need for further temporal or spatial limitations' ") (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995)). The causal link is even stronger here. Given the way the Taliban structured its protection racket, payments in one area of Afghanistan flowed into the Taliban's central coffers and supported terrorist attacks in other areas of the country. AC ¶¶ 49, 87, 99-100, 111, 430. There is thus nothing implausible about a payment in Kandahar financing an attack in Faryab, *cf.* LBG Br. 21; that is exactly how the Taliban's terrorist campaign worked.

*Chiquita III* is once again instructive. There, Chiquita paid two FARC "Fronts" – "semi-autonomous" terrorist "blocs" concentrated in "specific geographic regions," – in Colombia's

---

[38] *See*, *e.g.*, *Goldberg*, 660 F. Supp. 2d at 429 ("Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff."); *Miller*, 372 F. Supp. 3d at 46; *Abecassis I*, 785 F. Supp. 2d at 647.

remote "banana-growing zones."  284 F. Supp. 3d at 1295, 1317.  The plaintiffs claimed that

those localized payments caused attacks committed by *different* Fronts in *different* regions of

Colombia.  *Id*. at 1317.  The court denied summary judgment because a reasonable jury could

find that "funds infused at any level of the hierarchy would foreseeably strengthen the

organizational mission of the [FARC] as a whole, and enhance the terror capabilities of all

component Fronts."  *Id*. at 1318.  Plaintiffs' allegations warrant a similar conclusion.[39]

As for timing, Plaintiffs allege (AC ¶¶ 182-83, 247-48, 380-81, 401-03) that each

Defendant provided a "continuous [multi]-year stream of payments to [the Taliban]."  *Chiquita*

*III*, 284 F. Supp. 3d at 1318.  Not every payment need occur close in time to every attack to

support causation.  *See id.* at 1317-18.  The D.C. Circuit has held that a " 'two year' interval

between [a] defendant's material support and the plaintiff's injury [is] far from the point at which

'considerations of temporal remoteness might cut off liability.' "  *Owens III*, 864 F.3d at 796

(quoting *Boim*, 549 F.3d at 699-700).  Here, each Defendant made payments from at least 2007

through at least 2013 – and, for DAI, IRD, and Chemonics, through 2015 or 2016.  AC ¶¶ 183,

248, 381, 403.  Those payments temporally correlate with the attacks at issue.  AC ¶¶ 1, 17, 522-

2569 (attacks from 2009 until 2017; most from 2010-2012).  For the vast majority of attacks,

moreover, *every* Defendant made payments within the two-year window that *Owens III* called

"far from the point" at which temporal factors might preclude causation.  864 F.3d at 796.  To be

sure, " 'the greater the time between the payments and the attack,' " the " 'weaker the likelihood

that the support played a significant role in facilitating the attacks.' "  Chemonics Br. 32 (quoting

*Chiquita III*, 284 F. Supp. 3d at 1313).  But, as in *Chiquita III*, the question posed by those

---

[39] The same is true of Defendants' contention (DAI Br. 31; IRD Br. 20) that payments to the
Taliban lacked a causal tie to Haqqani-committed attacks.  *Infra* Part III.C.1.c; *see Chiquita III*,
284 F. Supp. 3d at 1295, 1317 (causation existed between "semi-autonomous" cells).

considerations is "one for the jury."  284 F. Supp. 3d at 1318.

### 4.    Defendants' remaining causation arguments lack merit

Defendants' remaining causation arguments are even less persuasive.  Chemonics (at 29) carves up Plaintiffs' theory into six artificially separate "steps," but those steps all form a single causal sequence and so only illustrate the link to terrorism.  *See Owens v. Rep. of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008) ("*Owens I*") (plaintiffs not required to "chart a direct and unbroken factual line between [defendant's] actions and the terrorist act[s]").[40]  The other "steps" involved – such as the Taliban using the protection money to buy weapons – were just the natural consequences of Defendants' conduct.  Such "contributing factors" that are "readily and predictably caused by the defendant's same act" do not preclude causation.  *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 346 (D.C. Cir. 2018).  The causal chain here is short:  Defendants paid terrorists, and the terrorists attacked Plaintiffs and their families.

Defendants also err (BV Br. 30-31; DAI Br. 29-31; IRD Br. 20-21; Chemonics Br. 32-33) in arguing that their payments were not "necessary to" (*i.e.*, a but-for cause of) the attacks.  The statute requires only "proximate causation."  *Owens IV*, 897 F.3d at 273.  *Kemper* – which every Defendant cites repeatedly – explains why.  911 F.3d at 390.  It noted that "strict but-for causation is not necessary to prove ATA liability," because funding terrorists "is done in the context of others committing similarly wrongful acts."  *Id.*  Congress did not intend to enact a causal standard that would immunize all defendants.  *See Kilburn*, 376 F.3d at 1129 ("Such a

---

[40] Although courts sometimes reject causation theories that go "'well beyond the first step,'" Chemonics Br. 29 (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10-11 (2010)), determining what "falls within that 'first step' depends in part on the 'nature of the statutory cause of action,'" *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (quoting *Lexmark*, 572 U.S. at 133).  The core inquiry is "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Lexmark*, 572 U.S. at 133.  Plaintiffs' allegations demonstrate the requisite connection under the ATA.  *Supra* Part II.A.1.

case, in which application of a 'but for' standard to joint tortfeasors could absolve them all, is precisely the one for which courts generally regard 'but for' causation as inappropriate.").

The cases cited by Defendants do not hold otherwise.  Each involved a sovereign intermediary in the causal chain, and each used "necessary"-type verbiage in criticizing allegations *about the intermediaries*.  *See Owens IV*, 897 F.3d at 276 (no allegation that bank's money was "necessary *for Sudan* to fund the embassy bombings") (emphasis added); *see also, e.g.*, *Rothstein*, 708 F.3d at 97 (similar).  As noted above, causation was absent in those cases because there was no inference the banks' money reached the downstream terrorist group.  Such an inference could have been warranted, however, had the intermediary been "unable to fund the attacks . . . without the cash provided by [the bank]."  *Owens IV*, 897 F.3d at 276.  That is why courts in sovereign-intermediary cases often ask whether a defendant's money is "necessary for [the sovereign] to fund the [attacks]:"  if the answer is yes, it suggests that the bank's money flowed through to the terrorists.  *Id*.  Every case Defendants cite uses but-for language in that context.  None endorses the different, statute-destroying standard Defendants now propose.[41]

Defendants' reliance (DAI Br. 30-31; LBG Br. 24-25; BV Br. 30-31; IRD Br. 21-22; Chemonics Br. 32 n.35) on the Taliban's other revenue sources is misplaced for the same reason.  A terrorist's access to alternate funding is not a defense under the ATA.  *See Kemper*, 911 F.3d at 391 (a terrorist funder cannot "escap[e] liability . . . because she was lucky enough that other people were committing similarly wrongful acts at the same time").  That accords with general

---

[41] Two Defendants imply (IRD Br. 17 n.61; Chemonics Br. 28 n.32) that the phrase "by reason of" connotes but-for causation.  Although that is often true, "courts have departed from the but-for standard where circumstances warrant."  *Paroline*, 572 U.S. at 451.  As the D.C. Circuit has explained in detail, terrorist financing is one such circumstance.  *See Kilburn*, 376 F.3d at 1130 (holding that the FSIA terrorism exception's "caused by" language does not require anything more than "proximate cause"); *see also* Def. Opp. 45-47 (further addressing this point).

causation principles.  A "'but-for' causation standard [i]s inappropriate" in cases involving "joint tortfeasors" because the multiplicity of wrongful actors could "absolve them all."  *Kilburn*, 376 F.3d at 1129.  Here, other parties surely financed the Taliban too, but Defendants' protection payments were substantial and more valuable than any other funding stream.  AC ¶¶ 104-10.  That is more than enough for causation.  *See Chiquita III*, 284 F. Supp. 3d at 1317 (sustaining causation even though payments were "but a small fraction of FARC's overall revenues").

Plaintiffs' participation in another lawsuit against Iran is irrelevant for the same reason. *Cf.* DAI Br. 29; LBG Br. 24-25.  Iran too supported the Taliban, and Plaintiffs thus hope to recover from Iran a small fraction of the damages due to them.  But Iran's role does not diminish the causal significance of Defendants' protection payments.  AC ¶¶ 97-111.  Injuries can (and often do) have multiple proximate causes, and it is only natural that Plaintiffs brought multiple lawsuits.  *See*, *e.g.*, *Kilburn*, 376 F.3d at 1127-28; *Kemper*, 911 F.3d at 390-91.  That Iran also supported the same terrorists Defendants funded makes their conduct worse, not better.

Finally, Defendants' fears about "limitless liability" ring hollow.  BV Br. 31; *cf.* DAI Br. 28-29; IRD Br. 20.  As the case moves forward, considerations of "temporal proximity and the magnitude of support" may limit the scope of the claims against some Defendants.  *Chiquita III*, 284 F. Supp. 3d at 1313.  The Court need not hold (and Plaintiffs do not claim) that a single trivial payment to the Taliban would make the payer liable for every Taliban attack in perpetuity. But Defendants did more:  they supplied a multiyear stream of payments in sufficient volumes to fund *all* of the attacks at issue.  *Supra* Part II.A.1.  Additional limits are best implemented "on a fact-specific and *ad hoc* basis" after discovery.  *Chiquita III*, 284 F. Supp. 3d at 1313.  Such constraints will be enough to "avoid[] [a] potentially boundless window of liability."  *Id.*

Far more troubling is the lack of a limiting principle in the other direction.  Defendants

read the causation standard so narrowly they would have the Court construe the ATA out of existence. After all, terrorist funders typically route money through "intermediaries" (LBG Br. 23); aid fungibility always obstructs efforts to trace "particular [illegal] payments" to individual bombs (IRD Br. 21); terrorists inevitably raise money from "other sources" (DAI Br. 30); and they necessarily need multiple "steps" to turn money into attacks (Chemonics Br. 29). In Defendants' telling, of course, all of that exonerates them. Just as Defendants would say Sudan did *not* proximately cause al-Qaeda's Embassy bombings, *see Owens III*, 864 F.3d at 794-99, so would they say that even a $10 million cash bribe negotiated with the Quetta Shura would not "cause" any given attack. Such notions make a mockery of Congress's intent to interrupt "the flow of money" "at any point along the causal chain of terrorism." S. Rep. No. 102-342, at 22.

## B.    Plaintiffs Sufficiently Allege Apparent Intent And Dangerousness

Plaintiffs also plead that Defendants' protection payments "appear[ed] to be intended" to promote the three terrorist aims set out in the statute, 18 U.S.C. § 2331(1)(B),[42] and "involve[d] violent acts or acts dangerous to human life," *id*. § 2331(1)(A). AC ¶¶ 2573, 2587, 2593.

1.    The requirement that a defendant's conduct "appear to be intended" to achieve a terrorist aim, 18 U.S.C. § 2331(1)(B), "is not a state-of-mind requirement; it is a matter of external appearance," *Boim*, 549 F.3d at 694; *see Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) ("an objective standard" pegged to "the apparent intentions of actions"). That requirement is met when the conduct's "foreseeable consequences" promote the terrorist aims in the ATA. *Boim*, 549 F.3d at 694. Here, Defendants knew – as would any

---

[42] The ATA sets forth three terrorist aims, any one of which qualifies conduct as "international terrorism," 18 U.S.C. § 2333(a): "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," *id*. § 2331(1)(B).

independent observer with access to the facts – that the consequences of their material support included Taliban attacks that sought to (and did) achieve all those aims. *Supra* Part II.A. Such allegations, standing alone, raise a plausible inference that Defendants engaged in "international terrorism." *See Chiquita III*, 284 F. Supp. 3d at 1319 ("If a defendant gives money to a terror organization, knowing of the aims and activities of that organization, this conduct creates a jury question as to whether it may objectively be viewed as that which 'appears to be intended' to [intimidate] or coerce a civilian population or government.").[43]

This is not a novel concept in the law. The Supreme Court recognized 40 years ago that "a person who acts (or omits to act) intends a result of his act (or omission) . . . when he knows that the result is practically certain to follow from his conduct, whatever his desire may be as to that result." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978); *see Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) ("people usually intend the natural consequences of their actions"). The ATA's focus on apparent intent is similar; whatever Defendants subjectively desired, the law presumes they intended their actions' natural consequences. *See Boim*, 549 F.3d at 693-94. Here, Defendants knew they were funding Taliban attacks that served terroristic purposes. AC ¶¶ 97-126, 522. A jury could find from such knowledge that Defendants appeared to share the same purpose. *See Ctr. for Bio. Diversity v. Pirie*, 191 F. Supp. 2d 161, 174 (D.D.C. 2002) (Sullivan, J.) ("Such knowing behavior is legally sufficient to establish intent."), *vacated on other grounds*, *Ctr. for Bio. Diversity v. England*, 2003 WL 179848 (D.C. Cir. 2003).

    **2.**    Defendants say they were solely "driven by commercial motives" and so lacked

---

[43] *See also Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 675-76 (S.D. Tex. 2014) ("*Abecassis II*") (same conclusion for "kickbacks" to Iraqi regime); *Wultz*, 755 F. Supp. 2d at 48-49 (commercial banking services); *Goldberg*, 660 F. Supp. 2d at 426-27 (commercial wire transfers); *Boim*, 549 F.3d at 694 (charitable donations); *Weiss I*, 453 F. Supp. 2d at 613 (bank services).

the requisite apparent intent.  LBG Br. 15; *see* DAI Br. 32-24; BV Br. 18-19; IRD Br. 13-16; Chemonics Br. 23-25.  But the only ATA decision in this District to reach the question rejected that argument.  *See Wultz*, 755 F. Supp. 2d at 48-49.  *Wultz* concerned claims against the Bank of China, "an internationally respected financial institution with branches in this country" that also claimed it would be "remarkable" to equate its commercial motives with terroristic intent.  *Id*. at 48.  The court denied its motion because "the law requires only that a defendant's acts appear to be intended to achieve one of the three enumerated items."  *Id*. at 49.  Although subjective terroristic intent was most "directly attributable" to the ultimate terrorists the bank aided, "a reasonable person could easily infer similar intent of [the bank]" from the commercial services it provided the terrorists.  *Id*.  The same conclusion applies to Defendants' protection payments.

Defendants contend (*e.g.*, LBG Br. 14-15) that the Complaint forecloses that conclusion by affirmatively alleging their commercial intent.  That argument presumes incorrectly that people can have only one motive at a time.  *See*, *e.g.*, *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) ("money-raising goals obviously do not preclude a finding of [terroristic] intent"); *United States v. Shabban*, 612 F.3d 693, 696 (D.C. Cir. 2010) ("evidence that a defendant had multiple intentions does not mean there [is] insufficient evidence of the requisite statutory intent").  Defendants did have economic reasons to pay protection money, AC ¶¶ 62, 65, but that does not preclude an inference that they *also* harbored an apparent intent to support the Taliban's terrorist aims.  As the court explained in rejecting an identical argument by Chiquita, that the payments "may have had multiple motivational triggers, some salutary, are factors for the trier of fact to consider."  *Chiquita III*, 284 F. Supp. 3d at 1319.

Weighing Defendants' apparent intent is better saved for a jury after discovery.  *See In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019) ("Ferreting out the most

likely reason for the defendants' actions is not appropriate at the pleadings stage."). That is especially true because Defendants' payments were inherently bound up with violence. Each payment reflected a cruel bargain with the Taliban: facing a threat of violence, Defendants paid the Taliban to direct its attacks at U.S. troops instead of their own projects. AC ¶¶ 8-10, 62-64, 98, 112. A jury should decide whether that bargain – which surely saved Defendants' money, but also shifted terrorist violence onto Plaintiffs and their family members – manifests apparent terroristic intent. Simply put, Defendants "knowingly engaged in activities that ha[d] the direct consequence" of promoting the Taliban's attacks. *Ctr. for Bio. Diversity*, 191 F. Supp. 2d at 174. A jury need not accept Defendants' claim that those results were "unintentional." *Id*.

The cases Defendants cite are inapposite. None is from this District, and nearly all address conduct that did *not* proximately cause terrorism.[44] Because terrorism was not among the consequences of the conduct in those cases, they do not address whether "foreseeable consequences" can create an inference of apparent intent. *Boim*, 549 F.3d at 694. For example, the line from *Kemper* that every Defendant quotes[45] – that "interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce,'" 911 F.3d at 390 – is off-point because those interactions had no causal tie to terrorism, *id*. at 393-95. Defendants' protection payments, by contrast, were purposefully sent to the Taliban and proximately linked to hundreds of attacks. *Supra* Part II.A. *Kemper* and cases like it say nothing about whether a jury could infer apparent terroristic intent from such deliberate payments to terrorists.

---

[44] *See Kemper*, 911 F.3d at 394 (no facts "plausibly suggesting that it was foreseeable that [defendant's] actions would fund terrorism"); *see also Brill*, 804 F. App'x at 632; *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 93-94 (E.D.N.Y. 2019); *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 355-57 (E.D.N.Y. 2019); *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 532-33 (S.D.N.Y. 2019).

[45] *See* DAI Br. 33-34; LBG Br. 14-15; BV Br. 19, 21; IRD Br. 12-14; Chemonics Br. 24.

*Stansell* does not warrant a different conclusion.  Although that case held that protection-payment allegations failed to raise an inference of apparent intent, it did so because the plaintiffs merely asserted the element "in conclusory fashion."  2011 WL 1296881, at *9.  The court thus never addressed the arguments Plaintiffs make here, and it granted leave to amend to cure the defect.  *Id*.  Far more relevant is *Chiquita III*, which seven years later held that protection payments to terrorists raised a triable inference of apparent intent.  284 F. Supp. 3d at 1318-19.  Although Chiquita said it paid to safeguard its workers, the evidence suggested the payments were "the product of a ruthless cost/benefit analysis which accepted a guaranteed human toll . . . as an unfortunate but necessary cost of doing business."  *Id*. at 1298.  The court discerned from such evidence a jury question of whether the payments "objectively appeared to be intended to intimidate or coerce."  *Id*. at 1319.  This Court should reach the same conclusion.

3.      Defendants' conduct was also "dangerous to human life."  18 U.S.C.

§ 2331(1)(A).  Making protection payments to terrorists is "like giving a loaded gun to a child," because it runs an inherent risk of enabling violence.  *Boim*, 549 F.3d at 690.[46]  And the predicate criminal statutes Defendants violated reflect Congress's judgment that funding terrorist groups is dangerous.  *See id*. at 689-91; *Stansell*, 2011 WL 1296881, at *7 (holding that paying protection "money to a terrorist organization such as the FARC . . . is clearly dangerous to human life").  Even Defendants' lead case agrees that "giving fungible dollars to a terrorist organization may be 'dangerous to human life.'"  *Kemper*, 911 F.3d at 390.  That is what Plaintiffs allege here.

Defendants' arguments on this element (LBG Br. 16-19; DAI Br. 34-35; BV Br. 21-23;

---

[46] LBG is incorrect (at 19) that other courts have "cast doubt" on this concept.  *Kemper* later "clarif[ied]" some of *Boim*'s *causation* language, but it confirmed that "giving fungible dollars to a terrorist organization may be 'dangerous to human life.'"  911 F.3d at 390.  As for *Linde*, that case concerned a jury "charging error" and said nothing about the standard for alleging apparent intent at the pleading stage.  *Linde v. Arab Bank*, *PLC*, 882 F.3d 314, 327 (2nd Cir. 2018).

Chemonics Br. 25) merely reprise the flawed causation arguments refuted above.  *Supra* Part

II.A.  Specifically, Defendants again pretend (*e.g.*, LBG Br. 16) that the challenged conduct was

their mere retention of "third-party security contractors."  True, the isolated act of retaining a

subcontractor like USPI, by itself, may not be dangerous.  But knowingly facilitating its

protection payments to the Taliban surely is.  AC ¶¶ 62-68, 94-96.  That is what Plaintiffs claim.

### C.    Plaintiffs Sufficiently Plead Three Predicate Crimes

The Complaint also alleges that Defendants' protection payments were "a violation of the

criminal laws of the United States."  18 U.S.C. § 2331(1)(A).  It pleads that those payments

violated 18 U.S.C. § 2339A (material support), 18 U.S.C. § 2339C (terrorist funding), and 50

U.S.C. § 1705(a) (transacting with an SDGT).  AC ¶¶ 2571-72, 2585-86, 2592-93.

### 1.    Plaintiffs satisfy the scienter elements of the predicate criminal statutes

Plaintiffs allege the mental state required by the predicate crimes they invoke.  The

material-support (18 U.S.C. § 2339A) and terrorist-finance (18 U.S.C. § 2339C) offenses require

that Defendants knew or recklessly disregarded that their payments to the Taliban would be used

for terrorist purposes.  *See Boim*, 549 F.3d at 693 ("To give a small child a loaded gun would be

a case of *criminal* recklessness and therefore satisfy the state of mind requirement for liability

under section 2333 and the statutes that it incorporates by reference."); *Gill*, 893 F. Supp. 2d at

506 (mental state for §§ 2339A and 2339C satisfied if "the defendant was reckless with regard to

the substantial probability of injuries that would likely be suffered by Americans").[47]  Plaintiffs'

allegations meet that standard.  *Infra* Part III.B.  Defendants knew or recklessly disregarded –

---

[47] *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 109 (D.D.C. 2016) (cited in Chemonics Br. 26), is not to the contrary.  That case interprets a different statute with an unusual bifurcated mental-state requirement.  *See id.*

both through direct experience, AC ¶¶ 112-22,[48] and public reporting, AC ¶¶ 123-26 – that their payments supported terrorism.  That is sufficient.  *See Chiquita III*, 284 F. Supp. 3d at 1318-20 (sustaining § 2339A claim where "widely reported news" demonstrated link to terror); *Goldberg*, 660 F. Supp. 2d at 433 ("public sources"); *Strauss v. Crédit Lyonnais, S.A.*, 2006 WL 2862704, at \*15, \*17 (E.D.N.Y. 2006) ("*Strauss I*") ("press discussions"); *see also infra* Part III.A.2.c.

Two Defendants maintain they lacked knowledge that their payments " 'would be used in preparation for, or in carrying out, *specific terror-related crimes*.' "  Chemonics Br. 27 (quoting *Chiquita III*, 284 F. Supp. 3d at 1309); *see* BV Br. 24-26.  But they ignore that "it is not necessary for an ATA plaintiff to show" knowledge of " 'the *particular attacks* that injured plaintiffs.' "  *Chiquita III*, 284 F. Supp. 3d at 1309 (quoting *Wultz*, 755 F. Supp. 2d at 45).  A company that pays " 'protection' money" to a "known terrorist group having only violent organizational goals" creates a "jury question as to whether the payments were made with the requisite 'knowing or intending' *mens rea*."  *Id*. at 1320; *see Wultz*, 755 F. Supp. 2d at 46.

Finally, 50 U.S.C. § 1705(a) prohibits companies from transacting "willfully" with an SDGT, AC ¶ 2592, and 18 U.S.C. § 2339C includes a similar requirement, AC ¶ 2585.  That requires an inference that Defendants knew they were "acting unlawfully" by paying the Taliban.  *United States v. Mousavi*, 604 F.3d 1084, 1092-94 (9th Cir. 2010) (collecting cases).  The Complaint raises that inference.  Given the Taliban's infamous complicity in the 9/11 attacks,

---

[48] Plaintiffs allege direct indications, including from Defendants' employees, that each Defendant knew it was paying the Taliban.  AC ¶¶ 183, 187-89, 200-02 (DAI); AC ¶¶ 248, 253, 261-68, 272-76 (LBG/BV); AC ¶¶ 381, 384-90, 392 (IRD); AC ¶¶ 403, 408-10 (Chemonics).  The Complaint also alleges (AC ¶¶ 112-22) several industry practices from which the Court can infer Defendants' knowledge at this stage.  *See, e.g.*, *Policemen's Annuity & Benefit Fund of City of Chi. V. Bank of Am. NA*, 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013) (inferring knowledge of practices "generally exposed as deficient" in the industry), *abrogated on other grounds by Ret. Bd. of the Policemen's Annuity & Benefit Fund of City of Chi. v. Bank of New York Mellon*, 775 F.3d 154 (2d Cir. 2014); *Fixed Income Shares*, 130 F. Supp. 3d at 854 (similar).

AC ¶¶ 42-43, 417-18, and its well-known insurgency against U.S. forces, AC ¶¶ 417-37, Defendants were not plausibly ignorant of its terrorist designation.  AC ¶¶ 414-15.  And at least after Chiquita's criminal plea, Defendants were "on notice that they cannot make protection payments to terrorists" designated as an SDGT.  AC ¶¶ 13, 129.

### 2.    Black & Veatch's other arguments against Count Three fail

Black & Veatch alone raises an additional defense that affects only Count Three, which asserts a claim under 18 U.S.C. § 2339C.  BV Br. 26.  Plaintiffs allege (AC ¶¶ 2585-86) that Defendants' payments violated both prongs of the statute because Defendants knew their funds would be used "in full or in part" to violate the International Convention for the Suppression of Terrorist Bombings, 18 U.S.C. § 2332f (incorporated by *id.* § 2339C(a)(1)(A), (e)(7)(I)), and to injure civilians or others not taking an active part in hostilities, *id.* § 2339C(a)(1)(B).

Black & Veatch's challenges fail.  *First*, it contends (at 26) that the Taliban's bombings are not covered by § 2332f because the Taliban was an "armed force[] during an armed conflict, as those terms are understood under the law of war," 18 U.S.C. § 2332f(d)(1), or a "military force[] of a state," *id.* § 2332f(d)(2).  But the Taliban was neither of those things.  AC ¶¶ 417-29. For the same reason the Taliban was neither a "military force" nor a participant in a conflict between "nations" under the ATA's act-of-war bar, *infra* Part IV.C, so too is it ineligible for the armed-conflict exemption to § 2332f, *see United States v. Hausa*, 258 F. Supp. 3d 265, 276 (E.D.N.Y. 2017) (exemption is "coterminous with the principle of combatant immunity").[49]

*Second*, Black & Veatch tries (at 26) to pick off individual Plaintiffs' claims by arguing that certain attacks were not bombings under § 2332f, or that some Plaintiffs were outside the

---

[49] *See also United States v. Hamidullin*, 888 F.3d 62, 74 (4th Cir. 2018) (Taliban insurgent not entitled to "combatant immunity" because Taliban did not "conduct[] operations in accordance with the laws and customs of war"); AC ¶¶ 433-34.

scope of § 2339C(a)(1)(B).  But that attempt to limit Count Three to particular Plaintiffs ignores

that the statute prohibits financing that will be used "in full or in part" to violate a treaty or to

attack noncombatants.  18 U.S.C. § 2339C(a)(1).  Black & Veatch does not deny that many of

the attacks here *did* fall under § 2339C(a)(1)(A) or (B).[50]  That the funding may have supported

other attacks too merely shows it was used "in part" for the specified purposes; all of the

financing remained in violation of the statute.  *Cf. Wultz*, 755 F. Supp. 2d at 47 (funds need not

be "actually" used to carry out a qualifying predicate terrorist act).  And because that funding

caused injuries to all Plaintiffs, *supra* Part II.A, all can pursue claims based on § 2339C.

## III.    PLAINTIFFS SUFFICIENTLY ALLEGE SECONDARY-LIABILITY CLAIMS

Defendants are also secondarily liable for the Taliban's terrorist acts in Afghanistan.  AC

¶¶ 2597-2615.  Secondary liability "reaches persons who do not engage in the proscribed

activities at all, but who give a degree of aid to those who do."  *Cent. Bank of Denver, N.A. v.*

*First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994).  It thus does not require

Defendants to have caused Plaintiffs' injuries or to have committed acts of "international

terrorism" themselves.  *See Owens IV*, 897 F.3d at 276-77.  Instead, Defendants are secondarily

liable so long as they "aid[ed] and abet[ted]" the Taliban.  18 U.S.C. § 2333(d)(2).

Congress adopted *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as the "legal

framework for how [secondary] liability should function" under the ATA.  JASTA § 2(a)(5).

*Halberstam* identifies three elements of aiding-abetting liability:  (1) the principal violator must

"perform a wrongful act," (2) "the defendant must be generally aware of his role" in the "overall

illegal or tortious activity," and (3) "the defendant must knowingly and substantially assist the

---

[50] *E.g.*, AC ¶¶ 550, 576, 589, 596, 640, 664, 674 (examples of IED attacks); AC ¶¶ 524, 541, 559, 743, 960 (examples of suicide bombings); AC ¶¶ 567, 692 (examples of civilian victims).

principal violation." 705 F.2d at 487-88. The Taliban's terrorist acts undisputedly satisfied the first element, and Plaintiffs adequately plead the other two. *Infra* Parts III.A-B. Plaintiffs also separately plead that al-Qaeda and/or the Haqqani Network – designated FTOs – "committed, planned, or authorized" the relevant terrorist acts. 18 U.S.C. § 2333(d)(2); *infra* Parts III.C-D.

### A.    Defendants Provided Substantial Assistance To The Taliban

#### 1.    Defendants aided the Taliban's terrorist activities

**a.**    Defendants' protection payments aided the Taliban by providing it with financing for terrorist attacks. AC ¶¶ 97-111. *Halberstam* itself provides a useful analogue. There, the principal tort was a "long-running burglary enterprise" in which a man stole valuables from homes and, on one occasion, murdered a resident. 705 F.2d at 488. The court affirmed that the burglar's live-in companion, Linda Hamilton, was liable for aiding both the enterprise as a whole and the murder committed in its course. *See id*. at 475-76. Hamilton was the burglar's "passive but compliant partner" whose assistance was limited to clerical tasks, like keeping the books and processing payments. *Id*. at 474-76. She neither assisted in nor knew about the murder. *See id*. at 475-76, 488. But her back-office tasks, though "neutral standing alone," were in context "indisputably important" to the overall burglary enterprise. *Id*. at 488. And because "violence" was a "foreseeable risk" of that enterprise, she was liable for the murder. *Id*.

Defendants' role in the tortious activities was even greater than Hamilton's. Unlike Hamilton's clerical tasks in *Halberstam*, Defendants' protection payments were not "neutral standing alone." *Id*. Rather, they were illegal transactions with an SDGT, prohibited by both contract and federal criminal law. *Supra* pp. 67-68. Moreover, each payment was violent in both cause and effect: Defendants paid because of the Taliban's capacity for terrorism, and they did so to redirect the terrorist violence away from their business interests. AC ¶¶ 8-10, 62-64, 98. By making those payments, Defendants "assum[ed] a 'role' in [the Taliban's] terrorist

activities." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477); *see supra* Part II.A.

Defendants' payments also were tied more directly to tortious acts than were Hamilton's back-office tasks.  In *Halberstam*, Hamilton's role in the enterprise came *after* the violent torts. 705 F.2d at 488.  Nothing she did made it easier for her companion to break into houses; she did not, for example, give him weapons or surveil targets.  *Id*. at 474-76.  Here, by contrast, Defendants' payments translated directly into instruments of terrorist violence.  AC ¶¶ 102-07. Just as those payments caused the Taliban's attacks, *supra* Part II.A, so did they aid and abet them.  *See*, *e.g.*, *Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *9 (E.D.N.Y. 2020) (providing terrorists "access to financial services . . . assume[s] a role in Hezbollah's terrorist attacks"); *Henkin*, 2020 WL 6143654, at *12 (financial transfers); *Wultz*, 755 F. Supp. 2d at 57 (bank funding); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder Derivative Litig.*, 190 F. Supp. 3d 1100, 1119 (S.D. Fla. 2016) ("*Chiquita II*") (Colombian protection payments); *Abecassis I*, 785 F. Supp. 2d at 645-47 (cash "kickbacks").

**b.**      Defendants repackage (DAI Br. 43; LBG Br. 26-29; BV Br. 35; Chemonics Br. 33-34) their faulty causation arguments to deny that they aided the Taliban.  The argument is even less persuasive in this context.  For aiding-abetting liability, Plaintiffs need not plead a causal relationship between Defendants' payments and their injuries. *See Owens IV*, 897 F.3d at 276-77; *Linde*, 882 F.3d at 331.  Whatever the proximate-cause standard, the "statute does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations."  *Siegel v. HSBC North Am. Holdings, Inc.*, 933 F.3d 217, 223 n.5 (2d Cir. 2019). Quite the opposite:  Congress's "purpose" was to impose secondary liability on defendants that provide "support, *directly or indirectly*, to [terrorists]."  JASTA § 2(b) (emphasis added). Congress's "statutory declaration of purpose" is strong evidence of its intent and forecloses any

direct-assistance test.  *Rubin v. Islamic Rep. of Iran*, 830 F.3d 470, 479-80 (7th Cir. 2016).

Notably lacking from Defendants' discussion of this issue is any mention of JASTA's text.  Section 2333(d)(2) does not say the word "direct."  Congress's predicate findings say the opposite.  JASTA §§ 2(a)(6), 2(b).  And nothing in *Halberstam* supports a "directness" test either.  *See* 705 F.2d at 481 (no requirement that "injury had directly resulted" from the defendant's aid).  As a matter of statutory construction, then, JASTA does not plausibly exempt indirect terrorist payoffs.  *Supra* Part II.A.2 (refuting similar theory as a matter of causation).

**c.**     None of Defendants' cases supports departing from the statute's plain text. Defendants rely (*e.g.*, Chemonics Br. 34) on *Atchley*, but that decision turned on the role of the Iraqi Ministry of Health – which the court viewed as a legitimate "sovereign entity" that precluded liability.  2020 WL 4040345, at *8, 11.  This case involves no such sovereign and is distinguishable on that basis alone.  *Supra* p. 53.  Regardless, *Atchley* is unpersuasive because it never addresses Congress's stated intent to impose secondary liability on companies that aid terrorists "directly or indirectly."  JASTA § 2(a)(6), 2(b).  This Court should apply the statute as written, rather than *Atchley*'s atextual gloss on it.

*Atchley* derived its direct-assistance concept from *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019), which said in a footnote that courts "routinely dismiss ATA claims" without a "direct link between the defendants and the individual perpetrator."  *Id*. at 627 n.6.  That is true in the context the Sixth Circuit faced:  a case seeking to hold social-media companies liable for an attack by a *lone-wolf* shooter who was not part of the group those companies supposedly aided.  *See id*. at 626-27 (defendants allegedly aided ISIS, but shooter was not part of ISIS and "never had any contact with ISIS").  In that context, the absence of any link between defendant and perpetrator is fatal.  *See* 18 U.S.C. § 2333(d)(2) (assistance must reach the group that

"commit[s]" terrorist act). But the opposite is true in cases, like this one, where the assistance went to the terrorist group responsible for the attacks. *See, e.g.*, *Bartlett*, 2020 WL 7089448, at *11-16; *Henkin*, 2020 WL 6143654, at *10-11 & n.11; *Miller*, 372 F. Supp. 3d at 47-48.

Defendants' briefs are full of other strained analogies to cases about social-media companies. *Taamneh v. Twitter*, 343 F. Supp. 3d 904 (N.D. Cal. 2018), *appeal docketed*, No. 18-17192 (9th Cir. Nov. 13, 2018), which they cite a collective 16 times, illustrates the point. The plaintiff there sought to hold social-media companies liable for a nightclub shooting for which they provided no direct or indirect aid; all they did was "provide[] routine services generally available to the public." *Id*. at 918. The court rejected primary-liability claims by applying a proximate-cause standard it said was harsher than the D.C. Circuit's. *Id*. at 912 & n.4 ("The D.C. Circuit has declined to follow the Ninth Circuit."). It then dismissed the secondary-liability claims for similar reasons and held that merely allowing terrorists onto a general online platform is not "substantial assistance." *Id*. at 916-18. That holding says little about Defendants' protection payments, which were neither generally available nor routine. *Supra* Part II.A. Unlike Twitter, which simply allowed terrorists onto a general website, Defendants gave large sums of money to terrorists – which the terrorists used to fund their attacks on Plaintiffs.

Defendants' reliance (DAI Br. 43) on the so-called "trend in JASTA case law" is equally misplaced. None of Defendants' cases addresses protection payments, and none involves intermediaries that resemble Defendants' subcontractors. *Cf. Henkin*, 2020 WL 6143654, at *8 (addressing and rejecting the same "supposed 'trend'"). *Siegel*, which every Defendants cites,[51]

---

[51] DAI Br. 31-32, 43 & n.8; LBG Br. 21, 30, 39; BV Br. 17 n.62, 35; IRD Br. 30-31, 35 n.118; Chemonics Br. 34-35, 38-39. Two Defendants also use *Siegel* to assert a "temporal mismatch" between their aid and the terrorist attacks. LBG Br. 30; *see* DAI Br. 31-32. In *Siegel*, the defendant bank made a conscious choice to "cease[] doing business with [the terrorist-linked intermediary] altogether" ten months before the attack. 933 F.3d at 224. No

confirms the distinction.  There, the plaintiff sought to extend aiding-abetting liability to a "bank [that] provides *routine banking services* to a foreign, unaffiliated financial institution" which in turn separately "provides support to a terrorist organization."  *Siegel*, 933 F.3d at 223 (emphasis added).  The defendant bank dealt only with a third-party financial institution – separate (in a different country, even) from the terrorists – and provided that institution with general banking services.  *Id*. at 224-25.  Critically, the plaintiffs did not allege that any terrorist ever "received any of th[e] funds" provided by the defendant.  *Id*. at 225.  Because nothing the defendant did aided the downstream terrorist group, there was no aiding-abetting liability.  *Id*. at 224-26.

*Siegel* and the other cases Defendants cite involved banks allowing terrorist-linked entities to use their generally available banking platforms.[52]  The idea is that, by merely offering general services to an intermediary, a bank does not necessarily tether itself to every other entity with which the intermediary then chooses to associate.  That logic is inapplicable to protection-payment cases.  Here, Defendants hired the "intermediaries" to provide security knowing that they would pay the Taliban on Defendants' behalf.  *Supra* Part II.A.2.  Such protection payments – which only work if *terrorists* in fact receive them – are nothing like "routine banking services." *Siegel*, 933 F.3d at 223.  Rather, because protection payments are tied intrinsically to violence, they more resemble the so-called "martyr payments" that courts in banking cases routinely find

---

Defendant here stopped doing business with the Taliban at any point during its tenure in Afghanistan.  Regardless, the D.C. Circuit has held that even "severing ties with [the terrorist group]" two years before an attack would not preclude proximate cause.  *Owens III*, 864 F.3d at 796.  The Court should not adopt a stricter rule for aiding-abetting liability.  *See* JASTA § 2(b).

[52] *See, e.g.*, *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *13 (S.D.N.Y. 2020) ("[m]erely provid[ing] banking services to a Hamas-affiliated charity"); *Honickman v. BLOM Bank SAL*, 432 F. Supp. 3d 253, 264-65 (E.D.N.Y. 2020) ("mere provision of routine banking services" where bank lacked knowledge of "any connection between its [customers] and Hamas"); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *7 (S.D.N.Y. 2019) (defendants' provision of banking "services to various Iranian entities").

violate the ATA. *See*, *e.g.*, *Miller*, 372 F. Supp. 3d at 46-47. But all banking analogies aside,

one thing is clear: because Defendants' payments here actually "reached [the Taliban]," *Siegel*,

933 F.3d at 225, none of Defendants' cases supports dismissing the aiding-abetting claims.

### 2.    Defendants' assistance was substantial

Defendants' assistance was also "substantial." In *Halberstam,* the D.C. Circuit

determined that Hamilton's aid to the burglary enterprise was substantial using six factors:

(1) the nature of the act assisted; (2) the amount and kind of assistance; (3) presence at the time

of the tort; (4) the defendant's relation to the tortfeasor; (5) the defendant's state of mind; and

(6) the duration of the assistance. 705 F.2d at 483-84. Those factors support liability here.

### a.    Factors 1 and 2:  Nature of act assisted and amount of aid

**i.**    *Halberstam*'s first factor explains that "the *nature of the act* involved dictates

what aid might matter, *i.e.*, be substantial." *Id*. at 484. The acts here are the Taliban's terrorist

attacks against Plaintiffs (Count Five) and its terrorist enterprise as a whole (Count Six).

Financing of the type Defendants provided is integral to such activities. *See Boim*, 549 F.3d at

690-91 (explaining importance of "cut[ting] the terrorists' lifeline" by separating them from

"their financial angels"). That is why courts regularly hold that funding a terrorist group assists

the group's attacks.[53] And, more broadly, courts have long held that financial aid to an illegal

enterprise constitutes substantial assistance.[54] The same is true here. Just as Hamilton's back-

---

[53] *See*, *e.g.*, *Bartlett*, 2020 WL 7089448, at *11-16 (persuasively analyzing each *Halberstam* factor); *Henkin*, 2020 WL 6143654, at *12; *Lelchook v. Islamic Rep. of Iran*, 393 F. Supp. 3d 261, 267 (E.D.N.Y. 2019); *Miller*, 372 F. Supp. 3d at 47-48; *Abecassis I*, 785 F. Supp. 2d at 645-49; *Wultz*, 755 F. Supp. 2d at 53, 57; *Chiquita II*, 190 F. Supp. 3d at 1119.

[54] *See*, *e.g.*, *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) (satisfying tortfeasor's "financing needs"); *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) ("$275,000 loan"); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,* 957 F. Supp. 1308, 1330 (S.D.N.Y. 1997) ("[p]articipation in the financing of [the unlawful] scheme").

office help laundering "stolen goods into 'legitimate' wealth" benefited the burglary enterprise in *Halberstam*, 705 F.2d at 488, so did Defendants' protection payments prove "indisputably important," *id*., to the Taliban's terrorist operations in this case, AC ¶¶ 97-111.

    *Halberstam* further suggested a "proportionality test" for "particularly bad or opprobrious acts," under which "a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act."  705 F.2d at 484 n.13; *see* Restatement (Third) of Torts: Liab. For Econ. Harm § 28 cmt. d (2020) ("Third Restatement") ("enormity of a wrong . . . may appropriately cause such lesser acts to be considered aiding and abetting").  Few things are more "blameworthy" than the Taliban's heinous terrorist attacks on Americans.  Under *Halberstam*, then, Defendants would be liable for playing even a "relatively trivial role" in aiding those attacks.  705 F.2d at 484 n.13.  Defendants' protection payments easily clear that threshold.

    *Halberstam*'s second factor concerns the "*amount* [*and kind*] *of assistance given* the wrongdoer."  705 F.2d at 484 (brackets in original).  Here, Defendants each paid the Taliban at least several million dollars in cash.  AC ¶¶ 184, 249, 382, 404.  That assistance was greater than in *Halberstam*, where the assistance was not "overwhelming as to any given burglary."  705 F.2d at 488.  It also surpasses the collective $1.7 million over nine years in protection payments that raised a plausible inference of aiding-abetting liability in *Chiquita II*.  190 F. Supp. 3d at 1104.  And it well exceeds the "hundreds of thousands of Eurodollars" another court recently held sufficient after a persuasive analysis of *Halberstam*.  *Henkin*, 2020 WL 6143654, at *12; *see id*. at *7-11.  As in those cases, Defendants' payments here were substantial because they helped the Taliban to "continue and intensify its terror campaign."  *Chiquita II*, 190 F. Supp. 3d at 1119.

    **ii.**    Defendants each contort (DAI Br. 44; LBG Br. 27; BV Br. 35-37; IRD Br. 35; Chemonics Br. 35) the "nature of the act" factor into a different inquiry altogether.  Seizing on

the word "encouraged" in *Halberstam*, 705 F.2d at 483, Defendants treat this first factor as though it turns on whether they cheered on the Taliban's terrorist activities. *E.g.*, BV Br. 36.

*Halberstam* itself refutes that argument. The "*nature of the act*" is important because it "dictates what aid might matter." *Halberstam*, 705 F.2d at 484. For some torts, encouragement may well be the most important form of aid. For other torts, however, "verbal support" is of "lesser import" than material assistance. *Id.*; *see id.* at 482 ("liability can of course be based on acts of assistance as well as words of encouragement"). This case falls into the latter category. The Taliban did not need Defendants' moral support; it needed their money. AC ¶ 97. Given Congress's "purpose" of providing plaintiffs with the "broadest possible basis" to sue those who provide terrorists with "material support," JASTA § 2(b), Defendants' argument that cash payments to terrorists create liability only if coupled with verbal encouragement is meritless.

Defendants further argue (DAI Br. 44; LBG Br. 28; Chemonics Br. 36) that the Taliban's attacks were not "heavily dependent" on their protection payments. *Halberstam*, 705 F.2d at 488. But the Complaint alleges the opposite by detailing multiple ways in which protection payments were essential to the Taliban's terrorist enterprise. AC ¶¶ 104-10. The effect was especially pronounced given the low marginal cost of each attack, AC ¶ 103, which meant that even a $2,000 payment could put a terrorist cell loaded with IEDs in the field for a month. *See Chiquita III*, 284 F. Supp. 3d at 1317-18 (noting low "cost of putting a FARC guerilla in the field"). Defendants respond (*e.g.,* DAI Br. 30, 44) by again invoking the Taliban's other funding sources, but the argument again fails. "Substantial assistance, after all, does not mean *necessary* assistance." *Aetna*, 219 F.3d at 537. Just as other Taliban funders do not absolve Defendants of primary liability, *supra* Part II.A.4, neither do they render Defendants' assistance insubstantial.

Chemonics' assertion (at 35) that Plaintiffs must tie its payments directly to a "particular

terrorist act" – by which it appears to mean an individual attack – fares no better. The statute

speaks of "providing substantial assistance" to "the person who committed [the] act of

international terrorism" – not of assisting the "act" itself. 18 U.S.C. § 2333(d)(2); *see Miller*,

372 F. Supp. 3d at 48 (rejecting the same argument). That structure comports with *Halberstam*,

in which Hamilton aided the "burglary enterprise" but not the individual murder. 705 F.2d at

488. And as a matter of causation, the D.C. Circuit has rejected a dollars-to-bombs "direct

traceability" test. *Owens III*, 864 F.3d at 799; *see supra* Part II.A.3. Congress did not intend for

JASTA – which it enacted to *expand* ATA liability, JASTA § 2(a)-(b) – to backdoor in a

traceability standard that would render the statute "ineffectual." *Kilburn*, 376 F.3d at 1130.

### b.    Factors 3 and 4:  Presence and relationship

The third factor asks whether a defendant was "*present at the time* of" the principal tort.

*Halberstam*, 705 F.2d at 488. In *Halberstam*, Hamilton was absent from the murder, but she was

present in the burglary enterprise's back-office. *Id.* Here, Defendants were similarly present in

Taliban-controlled or -influenced regions, providing comparably important financial support for

Taliban terrorist operations. *Supra* Part I. Defendants may not have been "'present' at any of

the attacks," LBG Br. 29; *cf.* DAI Br. 44; BV Br. 37; IRD Br. 36; Chemonics Br. 36-37, but

neither was Hamilton. In the context of *financial* aid, physical presence is irrelevant. *See

Halberstam*, 705 F.2d at 482 (no requirement that assistance be given "at the scene of the tort");

*Bartlett*, 2020 WL 7089448, at *13 (sustaining substantial-assistance allegations without

physical presence at attacks); *Henkin*, 2020 WL 6143654, at *12 (similar).

As for the fourth factor, the "*relation to the tortious actor*," *id*. at 488, Defendants had a

long-lasting business relationship with the Taliban, AC ¶¶ 64-68. In the context of the funding

the Taliban needed, *supra* Part III.A.2.a, that bolsters the substantiality of Defendants' aid.

Defendants say they held no "position of authority" over the Taliban, BV Br. 37; *see* DAI Br. 44; IRD Br. 36; Chemonics Br. 37, but neither did Hamilton: she was "passive but compliant." *Halberstam*, 705 F.2d at 474. As for the lack of a personally "close relationship," IRD Br. 36, that cuts in Plaintiffs' favor. Hamilton's romantic partnership with the burglar did not support liability; it led the court to be "wary" of inferring assistance from "normal spousal support activities." *Halberstam*, 705 F.2d at 488. No such concerns exist here.

### c.    Factor 5: State of mind

#### i.    Defendants had substantial knowledge

*Halberstam*'s fifth factor instructs that "the *state of mind* of the defendant may also be relevant." 705 F.2d at 484. This factor concerns whether the "assistance was knowing." *Id*. at 488. Here, Defendants knew they were paying the Taliban – in fact, their core business strategy for making money in Taliban areas depended on it. AC ¶¶ 62-68, 116-21, 186, 250, 383, 405.

For each Defendant, Plaintiffs allege individual facts about its knowledge, *supra* p. 67 n.49, including (but not limited to) an admission from a DAI field director (AC ¶ 187) and an in-person meeting involving DAI's CEO (AC ¶¶ 199-202); public and non-public statements by Joint Venture employees (AC ¶¶ 263-68); conversations between IRD and its subcontractors (AC ¶¶ 384-85); and Chemonics employees objecting internally to paying Taliban conduits (AC ¶¶ 409-10). Defendants were aware these payments were illegal. *Supra* p. 67. That is why they often laundered them through subcontractors, AC ¶¶ 68, 95-96, and hid them through inflated costs, "missing" documentation, and "ghost" workers, AC ¶¶ 94, 135, 206, 216, 258-60, 266, 394-95, 411. Such tactics are an additional indication of knowledge. *See Halberstam*, 705 F.2d at 487 (inferring "*knowing* assistance" from services performed "in an unusual way under unusual circumstances"); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1012 (11th

Cir. 1985) ("[K]nowing assistance can be inferred from atypical business actions.").

Public reports amplify the inference of Defendants' knowledge. AC ¶¶ 123-26. It was widely known in the industry that protection payments were ubiquitous and funding terrorism. AC ¶¶ 118-22. As the author of a *Time* cover story noted, "protection payments are so widespread that one contractor I interviewed responded incredulously to questions about how the system worked. 'You must be the only person in Afghanistan who doesn't know this is going on.'" AC ¶ 122. Defendants' claim that this understanding eluded them alone defies belief.[55]

Some Defendants downplay (DAI Br. 36; IRD Br. 32-33; Chemonics Br. 26) the public-report allegations as irrelevant to their actual knowledge. But unlike in the cases they cite, Plaintiffs identify (AC ¶ 123) a much greater volume of reporting and specifically allege (AC ¶¶ 124-26) that Defendants "read or w[ere] aware of [the media] sources." *Kaplan*, 405 F. Supp. 3d at 535. In any event, Defendants' cases are unpersuasive. *See Henkin*, 2020 WL 6143654, at *8-9. As one court recently explained, there is no "pleading requirement" that an ATA plaintiff allege "with specificity that the [defendant] read or was actually aware of information connecting" its transactions to terrorism. *Id*. at *8. The standard Defendants seek – demanding that the Complaint adduce "conclusive evidence" that a company employee read a particular media story – would make pleading knowledge "virtually impossible." *Id*. at *9; *see Bartlett*, 2020 WL 7089448, at *10-11 (similar). Pleading is about *plausibility*, and it is at least plausible that Defendants – sophisticated companies deriving massive revenues from Afghanistan – knew

---

[55] *See*, *e.g.*, *Henkin*, 2020 WL 6143654, at *4, 8-12 (sustaining aiding-abetting knowledge allegations where "Turkish media had reported on [intermediary's] ties to Hamas"); *Bartlett*, 2020 WL 7089448, at *10 (sustaining knowledge allegations given "widespread knowledge" from "contemporaneous mass media"); *Abecassis I*, 785 F. Supp. 2d at 647 (sustaining aiding-abetting knowledge allegations based on "news stories"); *Strauss I*, 2006 WL 2862704, at *15 (sustaining ATA knowledge allegations based on "press discussions").

of the public reporting connecting their expenditures to the Taliban.  AC ¶¶ 123-24.

### ii.    The statute contains no specific-intent requirement

Defendants argue (DAI Br. 44; LBG Br. 29-30; BV Br. 36; IRD Br. 34 n.114; Chemonics Br. 37) they lack the requisite state of mind because they were not "one in spirit" with the Taliban's desire to kill Americans.  That standard has no basis in the statute.

The ATA's secondary-liability provision covers those who "*knowingly* provid[e] substantial assistance."  18 U.S.C. § 2333(d)(2) (emphasis added).  The word "knowingly," on its face, does not require the mental state Defendants suggest.  *See Linde*, 882 F.3d at 329 (rejecting "specific intent" standard).  To the contrary, Congress's findings explain its intent to provide plaintiffs with the "broadest possible basis" to seek relief, including from companies that "knowingly or recklessly contribute material support" to terrorists.  JASTA § 2(a)(6), 2(b).  A specific-intent standard cannot be squared with those findings.  *See Rubin*, 830 F.3d at 479.

Nor is Defendants' specific-intent standard consistent with aiding-abetting doctrine.  In *Halberstam*, Hamilton did not intend the murder for which she was liable.  *See* 705 F.2d at 475-76, 488.  The D.C. Circuit since has affirmed that an "aider and abettor" need not "share the same purpose as the principal."  *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34-36 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *see Ofisi v. BNP Paribas, S.A.*, 2018 WL 396234, at *4 n.8 (D.D.C. 2018) (similar).  And it is now hornbook law, at least for economic torts, that the state-of-mind factor concerns "the intimacy of a defendant's knowledge" and *not* whether it "desired the tortious outcome."  Third Restatement § 28 cmt. c-d.  Specific intent is therefore unnecessary.  *See Bartlett*, 2020 WL 7089448, at *14 (finding this factor was satisfied when "[d]efendants knew they were enabling fundraising for Hezbollah").

The cases that Defendants cite are unpersuasive.  *Cf. Atchley*, 2020 WL 4040345, at *12;

*Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 574-75 (E.D. Mich. 2018). Both cases drew a "one in spirit" standard from a stray three-word phrase in *Halberstam*, which merely described *one example* of aiding-abetting liability. 705 F.2d at 484 (citing *Rael v. Cadena*, 604 P.2d 822 (N.M. 1979)). That phrase cannot fairly be read as a universal test. Hamilton herself was not "one in spirit" with the burglar's murderous aims: she was a "passive but compliant partner" who knew nothing about murder. 705 F.2d at 474-76, 488.[56] Moreover, many of the cases *Halberstam* surveyed involved aiders-abettors who did not desire the injury for which they were held liable.[57] To be sure, specific intent remains relevant, and if shown would surely magnify a defendant's culpability. *See Linde*, 882 F.3d at 329 & n.10 (rejecting "specific intent" requirement but observing that "evidence of the secondary actor's intent can bear on his state of mind"). But it is not the litmus test for *Halberstam*'s state-of-mind factor.

A specific-intent standard is especially ill-suited for terrorism cases. As *Owens III* explained, "courts have required neither specific intent nor direct traceability to establish the liability of material supporters of terrorism." 864 F.3d at 799. That is for good reason: requiring that " ' a defendant *intended* that his contribution be used for terrorism would as a practical matter eliminate liability.' " *Id.* (quoting *Boim*, 549 F.3d at 698-99) (ellipses and brackets omitted). That is not what Congress had in mind when enacting the ATA, *see Boim*, 549 F.3d at 690-91, and it is not the standard Congress meant to incorporate into the "broad[]" aiding-abetting provision it enacted to expand liability, JASTA § 2(b). This Court should reject

---

[56] True, the court inferred that Hamilton manifested a more general "desire to make the venture succeed." *Halberstam*, 705 F.2d at 488. But it drew that inference from the fact that "Hamilton's assistance was knowing." *Id.* Here, Defendants' knowing conduct – of which the natural consequence was terrorism – likewise "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise." *Id.*; *see supra* Part II.B.

[57] *See, e.g.*, *Cobb v. Indian Springs, Inc.*, 522 S.W.2d 383 (Ark. 1975) (cited in *Halberstam*, 705 F.2d at 482) (guard who encouraged driver to race a car liable for injury to pedestrian).

Defendants' request to transform an idle phrase from *Halberstam* into a legal requirement that would "as a practical matter eliminate liability" under JASTA.  *Owens III*, 864 F.3d at 799.

### d.      Factor 6:  Duration

The sixth factor, "the *duration of the assistance*," *Halberstam*, 705 F.2d at 488, weighs heavily in Plaintiffs' favor.  Defendants each supplied the Taliban with a continuous stream of payments over a multiyear period, ranging from 7 years (LBG/BV, AC ¶ 244) to 9 years (DAI and Chemonics, AC ¶¶ 180, 401).  *See also* AC ¶ 377 (IRD, 8 years).  The longevity of that financing scheme well exceeds the "five years" at issue in *Halberstam*.  705 F.2d at 474.

Three Defendants seek to transform the duration inquiry into something else, claiming that the sixth factor turns on each payment's temporal "relation to the attacks."  LBG Br. 30; *see* DAI Br. 45; Chemonics Br. 37-38.  That argument fails for the reasons given above.  *Supra* Part II.A.3.  The duration factor is about the "length of time an alleged aider-abettor has been involved with a tortfeasor," *Halberstam*, 705 F.2d at 484, not the gap between any one act of assistance and any one individual tort.  So understood, this factor points decisively to the substantiality of Defendants' assistance.  *See id.* at 488 (duration "*strongly influenced* our weighing of Hamilton's assistance") (emphasis added).

### B.      Plaintiffs Plead The Necessary Scienter For Aiding-Abetting Liability

Plaintiffs also plead that Defendants were "generally aware of [their] role as part of an overall illegal or tortious activity."  *Id.*  An aider-abettor need not "have a full understanding" nor "know all of the details" of the tort.  *Aetna*, 219 F.3d at 535-36.  Rather, it is enough to know that "something illegal [is] afoot."  *Halberstam*, 705 F.2d at 486.

*Halberstam* again confirms the sufficiency of Plaintiffs' allegations.  There, Hamilton did not even "kn[o]w specifically that [her companion] was committing burglaries" but instead knew only that "he was involved in some type of personal property crime."  *Id.* at 488.  Defendants'

knowledge was more significant.  *Supra* pp. 74-75, 79-81.  As just explained, protection money was tied to terrorism in both cause and effect.  *Supra* Part III.A.2.c.  By paying it, Defendants knew not only that "something illegal was afoot" in the abstract, *Halberstam*, 705 F.2d at 486; they knew that *terrorist* attacks specifically would result, *supra* Part II.A.  *See* AC ¶¶ 112-26.

Defendants cite (LBG Br. 26; Chemonics Br. 36) *Linde*'s statement that "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*."  882 F.3d at 329.  Based on that distinction, the Second Circuit held that an aider-abettor must "be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities."  *Id.*  Defendants, to varying degrees, frame that as a pleading standard under which alleging monetary payments to terrorists fails to demonstrate the necessary "role."  *See* DAI Br. 42-45; LBG Br. 26-27; IRD Br. 30-34; Chemonics Br. 35-36.

That is not what *Linde* held.  *Linde* vacated a jury verdict based on an "instructional error" about primary liability.  882 F.3d at 328.  The jury was never instructed on – and so never rendered a verdict about – secondary liability.  *Id.* at 329-30.  The plaintiffs nonetheless urged affirmance on appeal by arguing that "secondary liability . . . was proved as a matter of law."  *Id.* at 328-29.  *Linde* rejected that argument and held that material support to a terrorist organization – which is all the jury was instructed to find – does not "compel[]" aiding-abetting liability "as a matter of law."  *Id.* at 330-31.  When the Second Circuit distinguished between the "provision of material support" and an aiding-abetting "role," it did so in that narrow context:  to reach the rather obvious conclusion that the former does not *obligate an improperly instructed jury* to find the latter.  *Id.* at 329.  That is a very far cry from suggesting that a plaintiff cannot *plead* aiding-abetting by alleging that a defendant provided fungible financing to a terrorist group.

"It would . . . be misguided to construe the *Linde* Court's discussion of evidentiary

sufficiency after years of discovery and a fully contested trial as setting forth the minimum

pleading standard under JASTA at the motion to dismiss stage." *Henkin*, 2020 WL 6143654, at

*10. Here, the Court should read Plaintiffs' allegations liberally and afford them reasonable

inferences. So construed, the Complaint amply alleges the "role" Defendants played in the

Taliban's terrorist operations. *See Bartlett*, 2020 WL 7089448, at *11 (distinguishing *Linde*).

### C. An FTO Committed, Planned, Or Authorized Each Terrorist Attack At Issue (Count Five)

JASTA imposes aiding-abetting liability for injuries arising from an "act of international

terrorism committed, planned, or authorized" by an FTO. 18 U.S.C. § 2333(d)(2). Plaintiffs

allege that al-Qaeda, an FTO since 1999, "planned," "authorized," and often helped "commit[]"

the attacks that injured Plaintiffs. AC ¶¶ 464-520. Plaintiffs also allege that the Haqqani

Network, an FTO since September 2012, played a similar role in many of the attacks after its

designation. AC ¶¶ 438-58. All told, for every attack at issue, AC ¶¶ 524-2569, Plaintiffs allege

that at least one FTO "committed, planned, or authorized" it. AC ¶¶ 17, 464, 522.

### 1. Al-Qaeda and/or the post-designation Haqqani Network helped *commit* the attacks that killed and injured 77 primary victims

**a.** An FTO helped the Taliban to "commit[]" the terrorist attacks that killed and

injured 77 of the primary attack victims in this case. 18 U.S.C. § 2333(d)(2). For 71 of those

victims, al-Qaeda directly participated in the attack.[58] For the six others, the post-designation

---

[58] AC ¶¶ 525, 542, 560, 615, 648, 658, 684, 693, 717, 725, 736, 744, 761, 786, 831, 859, 865, 890, 961, 1021, 1082, 1092, 1122, 1147, 1174, 1211, 1230, 1287, 1306, 1325, 1373, 1449, 1489, 1551, 1559, 1563, 1582, 1605, 1643, 1647, 1684, 1712, 1728, 1740, 1751, 1798, 1876, 1887, 1896, 1905, 1923, 1930, 1955, 1998, 2041, 2048, 2072, 2139, 2149, 2153, 2249, 2269, 2304, 2315, 2366, 2373, 2392, 2399, 2414, 2527, 2562. The "primary victims" are the U.S. service members and civilians who were physically injured or killed in the Taliban's attacks. Other Plaintiffs are their family members who suffered as a result of the attacks on their loved ones.

Haqqani Network committed it.[59]  In each case, the Taliban (sometimes acting through the Haqqani Network) had primary responsibility for executing the attack.  AC ¶¶ 435-37, 455-58. For the al-Qaeda-committed attacks, al-Qaeda participated alongside the Taliban.  AC ¶¶ 513-20.

Nothing else is needed at this stage to satisfy JASTA's requirement that these terrorist acts be "committed, planned, or authorized" by an FTO.  18 U.S.C. § 2333(d)(2).  On an attack-by-attack basis, Plaintiffs identify the relevant FTO – either al-Qaeda or the post-designation Haqqani Network – and allege individually that the FTO participated directly in committing the attack.  *Supra* notes 58, 59.  Those are factual allegations, and the Court should accept them as true.  *See Banneker*, 798 F.3d at 1128-29; *ICC*, 2020 WL 1905132, at *2 n.2, *11.[60]

The Complaint supports those allegations with a bevy of additional facts.  *First*, Plaintiffs attribute many of the attacks to a Taliban-al-Qaeda "joint cell" operating in specific geographies at specific times.[61]  For every such cell, Plaintiffs identify by name the "dual-hatted" operatives – terrorists who worked for both al-Qaeda and the Taliban – and the particular roles they played in executing attacks in their areas of operation.  AC ¶¶ 514-20.  For example, in N2KL,[62] Plaintiffs detail the entire command structure of the local Taliban-al-Qaeda cell responsible for the attacks, sourced to Coalition findings and al-Qaeda documents.  AC ¶ 515.  And the Complaint devotes

---

[59] AC ¶¶ 769, 1239, 1523, 2160, 2459, 2499.  The post-designation Haqqani Network also participated in several al-Qaeda-committed attacks discussed above.  *E.g.*, AC ¶¶ 658, 1021.

[60] Chemonics' criticism (at 43) of Plaintiffs' information-and-belief allegations fails. Pleading "on information and belief" is proper when there is "no way to access, without the benefit of discovery," the "records necessary to confirm" the allegation.  *Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 326 (D.D.C. 2017).  Here, discovery from the government (or via experts) is necessary to provide evidentiary confirmation of al-Qaeda's role.

[61] AC ¶¶ 542, 560, 615, 648, 658, 693, 717, 736, 831, 859, 865, 890, 1082, 1092, 1122, 1147, 1174, 1287, 1306, 1325, 1489, 1551, 1559, 1563, 1643, 1647, 1684, 1728, 1751, 1798, 1876, 1905, 1923, 1930, 1998, 2048, 2072, 2269, 2366, 2392, 2562.

[62] N2KL comprises Nangarhar, Nuristan, Kunar, and Laghman Provinces.  AC ¶ 515.

an entire section to the way in which the groups worked together in the Kabul Attack Network to jointly commit the relevant attacks in and around Kabul.  AC ¶¶ 459-63, 519-20.

   *Second*, many of the other joint attacks were suicide bombings[63] for which the Complaint provides extensive detail about al-Qaeda's role.  AC ¶¶ 498, 501-05.  Plaintiffs again describe key dual-hatted terrorists who commanded the Taliban-al-Qaeda syndicate's suicide-bombing infrastructure, AC ¶ 503, and the Complaint outlines the groups' respective roles in seeing attacks through to completion, AC ¶¶ 500-05.  In each instance, the Taliban was responsible for on-the-ground target selection and execution, while al-Qaeda supplied the bomber and oversaw training and logistics for the attack cell.  *Id.*; *see, e.g.*, AC ¶ 1605.  None of those suicide bombings would have succeeded without al-Qaeda's direct participation.  AC ¶¶ 498-502.

   *Third*, the Taliban's long history with al-Qaeda buttresses the plausibility of those allegations.  The Complaint traces the groups' evolution, depicting how the Taliban's intimate ties to al-Qaeda led to the 9/11 attacks and precipitated its SDGT designation.  AC ¶¶ 417, 465-69.  Their relationship only grew stronger from there.  AC ¶¶ 470-73.  By 2009, Siraj Haqqani was both a senior Taliban official and a member of al-Qaeda's military council – an allegation that every Defendant ignores.  AC ¶¶ 454, 461.  At the same time, the Taliban's interdependence with al-Qaeda led analysts, journalists, and U.S. officials to refer to them as an "al-Qaeda-led terrorist syndicate."  AC ¶ 474; *see* AC ¶¶ 472-76.  Through this "syndicate," the groups committed an array of well-documented joint attacks.  AC ¶ 513.  These allegations together make it at least "*a* plausible set of facts," *Zaidan*, 317 F. Supp. 3d at 20, that the Complaint correctly attributes the aforementioned attacks to joint Taliban-al-Qaeda operations.

---

   [63] AC ¶¶ 524, 541, 559, 743, 960, 1020, 1229, 1286, 1324, 1604, 1646, 1711, 1739, 1886, 1954, 2138, 2148, 2152, 2248, 2303, 2372, 2398, 2413, 2526.

**b.**      Defendants have little to say about the jointly committed attacks.  Mostly, they reprise their tactic of calling the allegations "conclusory" and otherwise ignoring them.  LBG Br. 32; *see* DAI Br. 38-39; BV Br. 34-35; IRD Br. 27-28; Chemonics Br. 43.  That technique remains flawed.  *Supra* Part I.B.2.  An allegation that two specific groups committed a specific type of attack in a specific province on a specific day – details that Plaintiffs supply for every single joint attack – is not "conclusory."  Again, Plaintiffs need neither plead "detailed factual allegations," *Banneker*, 798 F.3d at 1129, nor "set out all of the precise facts" about the FTO's involvement, *Strike 3*, 964 F.3d at 1211.  Plaintiffs had no obligation to repeat some lengthy dissertation about al-Qaeda when describing the circumstances of each individual attack.

That is especially true because no Defendant is willing to articulate exactly what "specifics" it thinks are missing.  *E.g.*, IRD Br. 28.  The implication is that, to avoid being "conclusory," Plaintiffs must cite a document that names an al-Qaeda operative and then describes his or her individual role on an attack-by-attack basis.[64]  But Rule 8 requires neither evidence nor name identification.  *See Strike 3*, 964 F.3d at 1211 (no need for "evidence"); *Nattah*, 605 F.3d at 1058 (no need to "identify by name which [individuals]" took acts).  In fact, courts in this District have made *evidentiary findings* about FTO involvement without the type of detailed attack attribution Defendants appear to demand.  *See, e.g.*, *Karcher v. Islamic Rep. of Iran*, 396 F. Supp. 3d 12, 35 (D.D.C. 2019) (finding Hezbollah's role in an Iraqi attack based on tactics alone and concluding:  "These kinds of sophisticated tactics suggest to the Court that Hezbollah and/or the IRGC were involved.").  The pleading standard cannot be any harsher.

Nor do Defendants cite any case requiring additional detail.  Even the defendants in

---

[64] Several Defendants concede (DAI Br. 39; Chemonics Br. 44 n.44) that Plaintiffs adequately plead al-Qaeda's involvement in the Camp Chapman attack, presumably based on the document cited and the specific identification of the al-Qaeda operative involved.  AC ¶ 491.

*Atchley* did not "dispute the adequacy of plaintiffs' allegations that a designated FTO committed, planned, or authorized" the 22 joint Hezbollah-Jaysh al-Mahdi attacks alleged there.[65]  The *Atchley* court thus accepted the FTO element as sufficiently alleged for those 22 attacks.  2020 WL 4040345, at *10 & n.6.  Those attacks were pleaded with the same level of detail, using similar "joint cell" language, that Defendants here say is inadequate.[66]  Accordingly, not even Defendants' lead case dismissed the type of *joint* attacks that killed or injured 77 victims here.

      **c.**      Defendants' remaining arguments against the joint attacks are even weaker.  They suggest the Kabul Attack Network attacks are deficient because "that entity is not a[n] FTO," DAI Br. 40; *see* LBG Br. 31, but Plaintiffs do not claim it as a standalone "entity" – it was instead a joint terrorist cell whose members included both the Taliban and al-Qaeda.  AC ¶¶ 459-63; *see* AC ¶¶ 472-76.  Taliban and al-Qaeda operatives thus participated in every Kabul Attack Network attack.  AC ¶¶ 519-20.  When DAI insists (at 39-40) those attacks "fall outside of Count Five," it is simply refusing to read the Complaint as pleaded.  AC ¶ 2571 n.604 ("Attacks committed by the Taliban also include attacks committed by the Kabul Attack Network. . . .").

      As for the Haqqani-committed attacks, Defendants concede they satisfy the FTO element but try to avoid liability by portraying that group as separate from the Taliban.  DAI Br. 39; LBG Br. 31-33; Chemonics Br. 44.  That argument again fails.  AC ¶ 2571 n.604.  For one thing, each Defendant's protection payments went to the Haqqani Network for the projects they executed in Haqqani territory.  AC ¶¶ 70, 74, 93; *see*, *e.g.*, AC ¶¶ 190, 270-74.  For another, the Haqqani

---

[65] Mem. in Supp. of Defs.' Rule 12(b)(1) & 12(b)(6) Mots. to Dismiss 61 n.77, *Atchley v. AstraZeneca UK Ltd.*, No. 17-cv-01236-RJL (D.D.C. Feb. 5, 2020), Dkt. 128-1.

[66] Third Am. Compl. ¶¶ 463, 735-39, 828-31, 843, 853, 863-65, 1507, 1515, 1519, 1622, 1668, 1721, 1743, 1819, 1829, 1834, 1907, 2020, 2039, 2119, 2189, 2337, 2474, 2510, 2563-64, 2624-25, 2686, 2782, 2819, 2953, 3014, 3055, 3087, 3150, 3160, 3166, *Atchley v. AstraZeneca UK Ltd.*, No. 17-cv-01236-RJL (D.D.C. Jan. 21, 2020), Dkt. 124.

Network is part of the Taliban, and funding for one supported attacks by the other.  AC ¶¶ 101, 107, 438, 441-51.  As demonstrated by U.S. government findings, academic analysis, and the terrorists' own statements, the Haqqani Network existed within the Taliban organization and functioned as a Taliban cell – albeit an especially deadly one.  AC ¶¶ 441-51.

The Haqqani FTO designation does not suggest otherwise.  Just as the U.S. government once designated Iran's Qods Force as an SDGT without designating the entire IRGC of which it was a part,[67] so too did the U.S. government designate the Haqqani Network as an FTO without designating the entire Taliban.  AC ¶ 439.  That did not suggest that the two were independent.  In fact, the federal statute that compelled the designation found that Siraj Haqqani was "the overall leader of the Haqqani Network *as well as the leader of the Taliban's* Mira shah Regional *Military Shura*."  Pub. L. 112-168, 126 Stat. 1299, § 2(a)(8) (Aug. 10, 2012) (emphasis added).  Defendants' arguments to the contrary raise premature fact disputes.  *Supra* Parts I.B.2, I.B.3.[68]

### 2.    Al-Qaeda *planned* and *authorized* the remaining attacks

#### a.    Plaintiffs' allegations are sufficient

JASTA also extends beyond attacks that an FTO directly "commit[s]" to those an FTO merely "plan[s]" or "authorize[s]."  18 U.S.C. § 2333(d)(2).  Here, the remaining 161 primary victims were killed or injured in attacks that al-Qaeda planned and authorized.  AC ¶¶ 478-512.

**Planning.**  Al-Qaeda "planned" each of the Taliban attacks at issue.  To "plan"

---

[67] *See* Press Release, U.S. Treasury Dep't, *Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), https://bit.ly/31ILVO0 (calling the Qods Force "a branch of the [IRGC]" and designating the former alone as an SDGT).

[68] For example, Chemonics asks (at 44) the Court to find facts based on a sentence fragment in a newspaper article cited in the Complaint (AC ¶ 446 n.507), stating, "Though it has always nominally been a branch of the Taliban, the Haqqani network was seen as largely autonomous."  Mujib Mashal, *Haqqanis Steering Deadlier Taliban In Afghanistan, Officials Say*, N.Y. Times (May 7, 2016).  A reporter's assertion about how the Haqqani Network "was seen" by unidentified people does not warrant rejecting Plaintiffs' allegations.  *Supra* Part I.B.3.

something means to "arrange the parts of:  [to] design."  *Webster's Third New Int'l Dict. Unabridged* 1730 (2002) ("*Webster's*").  Al-Qaeda arranged and designed the Taliban's attacks through its role in Afghanistan's "al-Qaeda-led terrorist syndicate."  AC ¶ 474.  The syndicate provided an infrastructure through which multiple groups, including the Taliban and al-Qaeda, coordinated terrorist operations in Afghanistan.  AC ¶¶ 412-13, 472-76.  As Secretary Clinton observed in 2009, that "syndicate of terrorism" meant that the U.S. government did not view al-Qaeda and the Taliban "as separate independent operators."  AC ¶¶ 476, 521.  To the contrary, because they were "all part of a syndicate," the U.S. government affirmatively rejected efforts to draw "finer distinctions" between "al Qaeda, Haqqani, [and] the Taliban."  *Id*.

Al-Qaeda played several "planning" roles within the syndicate.  It led meetings at which the groups conferred about target selection and operational details.  AC ¶¶ 480-81, 494.  It embedded in Taliban shuras to "coordinate strategy, operations, and tactics."  AC ¶ 488.  Dual-hatted Taliban-al-Qaeda terrorists served throughout the entire Taliban terrorist architecture, from the command level on down.  AC ¶¶ 461, 503, 513-19.  Al-Qaeda deployed trainers to teach Taliban operatives terrorist tradecraft in al-Qaeda camps.  AC ¶¶ 489-97, 501-02.  And it provided specialized direction on how to overcome American defenses, including through fertilizer-based IEDs and anti-helicopter weapons.  AC ¶¶ 506-10.  By 2010, al-Qaeda's "attack planning and support of the Taliban and Haqqani networks" had become unmistakable.  AC ¶ 470.  As one journalist who famously interviewed bin Laden thus concluded about the groups at the time, "the Taliban and Al Qaeda function more or less as a single entity."  AC ¶ 473.

Two additional facts link al-Qaeda to the individual attacks at issue.  *First*, al-Qaeda's activities had a tactical nexus to each attack.  Al-Qaeda did not merely supply the Taliban with general assistance; it sponsored the Taliban's use of the specific attack techniques responsible for

Plaintiffs' injuries. AC ¶¶ 488-511. Indeed, for every major attack type at issue – IED attacks, anti-helicopter attacks, suicide bombings, kidnappings, and insider attacks (AC ¶¶ 435-37, 455-58) – al-Qaeda played a pivotal role in increasing their lethality and enabling the Taliban to execute them effectively. AC ¶¶ 508-10 (IEDs), 506-07 (helicopters), 498-505 (suicide bombings), 487 (kidnappings), 493 (insider attacks). In each instance, al-Qaeda was a proximate cause of the attacks, including the attacks that targeted Plaintiffs. AC ¶¶ 470, 497, 511-12.

*Second*, al-Qaeda intended to cause the attacks that killed and injured Plaintiffs. Its purpose was not merely to build up the Taliban in the abstract; it was to cultivate the Taliban as a proxy to inflict casualties on U.S. personnel in Afghanistan. AC ¶¶ 466, 478, 485, 497, 505-06. By devising a plan to achieve that goal, al-Qaeda "planned" *all* of the attacks that followed. *See Freeman*, 413 F. Supp. 3d at 96-97 (sustaining FTO allegations because Hezbollah was "deeply involved in supporting and coordinating an extensive campaign" of terrorism); *Bartlett*, 2020 WL 7089448, at *8 (sustaining FTO allegations when "Hezbollah trained the Iraqi militias" that committed the attacks and "controlled and directed those militias"); *cf.* Judgement ¶¶ 972, 975-76, *Prosecutor v. Kordic & Cerkez*, ICTY Case No. IT-95-14/2-A (Dec. 17, 2004) (defendant guilty of "plan[ning]" each war crime carried out in service of his "general plan" to "kill military aged men" throughout a region, even though he lacked "day-to-day" role).

**Authorization.** Al-Qaeda also "authorized" each attack through much the same conduct. AC ¶¶ 478-87. "[C]ourts have recognized that the term 'authorized' is broad." *United States v. Akinyoyenu*, 199 F. Supp. 3d 106, 115 (D.D.C. 2016). To "authorize" something is "to endorse, empower, justify, or permit" it through "recognized or proper authority ([such] as custom, evidence, personal right, or regulating power)." *Webster's* at 146.

Al-Qaeda exerted authority over the Taliban in several ways. For example, it exercised

*religious* authority over Taliban fighters through bin Laden and other revered al-Qaeda clerics. AC ¶¶ 478-79, 482-83.  It exerted *operational* authority through its on-the-ground role training and indoctrinating Taliban fighters.  AC ¶¶ 472-75, 480, 485-86, 494-97, 509-512.  And it exerted *organizational* authority through the "syndicate of terrorism" in which "at the head of the table, like an old Mafia kind of diagram, sits al Qaeda."  AC ¶ 476.  As Secretary of Defense Robert Gates explained in 2010, "jihadi groups" in Afghanistan were "cooperating more closely than ever," such that "all of the factions were working under the umbrella of Al Qaeda."  *Id*.

Al-Qaeda leveraged that authority to incite the attacks that killed and injured Plaintiffs. Among many other things, senior al-Qaeda leaders issued a series of *fatwas* directed toward the Taliban, conferring religious permission for them to attack Americans in Afghanistan.  AC ¶ 478.  Such religious instructions constitute "authorization" under any definition.  *See Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000) ("[a] Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder").  And as with al-Qaeda's "planning" role, al-Qaeda's religious and operational activities were tailored to authorize the particular attack types in the particular geographies at issue here.  AC ¶¶ 480, 483-87.

Two other courts that assessed less-specific FTO allegations sustained them.  *See Freeman*, 413 F. Supp. 3d at 96-97; *Bartlett*, 2020 WL 7089448, at *8.  In *Freeman*, the plaintiffs alleged that an FTO (there, Hezbollah) played a role "supporting and coordinating an extensive campaign of terrorist activity" carried out by Hezbollah proxies in Iraq.  413 F. Supp. 3d at 96-97.  Although the allegations there did not "name[] the precise individuals clandestinely involved in each attack," they "point[ed] to the high-level involvement of Hezbollah and its affiliates."  *Id*. at 97.  Those allegations, the court held, allowed an inference that Hezbollah "was responsible, at minimum, for authorizing the 92 attacks at issue in th[e] case."  *Id*. at 96; *see*

*Bartlett*, 2020 WL 7089448, at *8 (similar).  A similar conclusion is warranted here.

### b.    Defendants' arguments are unpersuasive

Defendants' response (DAI Br. 38; LBG Br. 33-37; BV Br. 34-35; IRD Br. 28-29) boils

down to the *Atchley* decision, which held that an FTO's "[g]eneral support or encouragement is

not enough" to plan or authorize individual attacks.  2020 WL 4040345, at *10.  Whatever

*Atchley*'s merits, it is distinguishable.  Plaintiffs allege here the U.S. government consensus view

that the Taliban was part of a "terrorist syndicate with al-Qaeda at the center."  AC ¶ 476.

*Atchley* did not consider such "syndicate" allegations.  Those allegations here, AC ¶¶ 472-76,

raise at least a plausible inference that al-Qaeda played the type of "significant role in [each]

particular attack" that *Atchley* said it was demanding, 2020 WL 4040345, at *11.

In any event, two other courts reached the opposite conclusion from *Atchley* on nearly

identical facts about Hezbollah, including for many of the same attacks.  *See Freeman*, 413 F.

Supp. 3d at 96-97; *Bartlett*, 2020 WL 7089448, at *8.  Those cases are more persuasive.

*First*, *Atchley* is textually mistaken.  A person can "plan"[69] or "authorize"[70] an act by

arranging or approving the broader scheme encompassing the act; direct involvement in the act's

---

[69] *Cf. United States v. Mitchell*, 49 F.3d 769, 773 (D.C. Cir. 1995) (jury instruction to consider whether "defendants had a specific plan to commit a series of crimes that are connected"); *United States v. Johnson*, 970 F.2d 907, 913-14 (D.C. Cir. 1992) (related acts can be "caused by a general plan of which they are the individual manifestations"); *United States v. Kamoga*, 177 F.3d 617, 621-22 (7th Cir. 1999) (finding defendant was "organizer[]" of crime even though he "delegat[ed]" details to others; it was "enough that the others [were] acting according to the organizer's design and in furtherance of his or her plan"); *Kadic v. Karadzic*, 70 F.3d 232, 242 (2d Cir. 1995) (defendant plausibly responsible for individual acts of genocide because he "planned and ordered a campaign of murder, rape . . . and other forms of torture").

[70] *Cf. Techniarts Eng'g v. United States*, 51 F.3d 301, 305 (D.C. Cir. 1995) (contract can be "specifically authorized by statute" by falling within broadly authorized category); *United States v. Right to Use & Occupy 3.38 Acres of Land, More or Less, in Alexandria*, 484 F.2d 1140, 1142-43 (4th Cir. 1973) (a "statutory "authorization" to acquire land "need not refer to the specific transaction if the project comes within the class of expenditures" that were authorized).

individual details is unnecessary.  For example, an al-Qaeda operative that instructs a group of Taliban fighters how to shoot down U.S. helicopters – intending for those fighters to repeatedly attack Americans – surely "plans" the resulting attacks on U.S. helicopters, even if he does not then dictate the details of each strike.  AC ¶¶ 506-07.  *Atchley* offers no linguistic reason to conclude otherwise.  After all, Congress extended secondary liability beyond those attacks that an FTO directly "commit[s]."  18 U.S.C. § 2333(d)(2).  *Atchley*'s apparent view – that the FTO must directly control the minute details of every attack – erases that textual distinction.

*Second*, *Atchley*'s slippery-slope argument, 2020 WL 4040345, at *11, is unfounded.  Under the "logic" it rejected, the court stated, "a plaintiff could bring an ATA aiding-and-abetting claim for any attack committed by a non-FTO merely because it had in the past received 'material support and resources' from a designated FTO."  *Id*.  Whether or not that accurately characterized the *Atchley* plaintiffs' "logic," it has no bearing here.  Had an FTO merely given the Taliban money and done nothing else, for example, that alone would not constitute planning or authorization.  But Plaintiffs allege far more.  Al-Qaeda gave the Taliban direct *operational* support with specific intent to cause specific types of terrorist attacks *against Americans* in Afghanistan, and the support had a *causal nexus* to each attack.  *Supra* Part III.B.2.a.  The Court can sustain those allegations without inviting the "material support only" cases *Atchley* feared.[71]

*Third*, *Atchley* misapplied the pleading standard.  At this stage, Plaintiffs need not lay out "precise facts" about al-Qaeda's role in each attack, nor need they "prove" al-Qaeda's

---

[71] Defendants' social-media cases are inapposite for similar reasons.  Each involved lone-wolf shooters who had no meaningful link to any FTO.  *Cf. Crosby*, 921 F.3d at 626 (ISIS did not authorize lone-wolf shooting through general online propaganda, where shooter had no contact with ISIS); *Clayborn v. Twitter*, 2018 WL 6839754, at *8 (N.D. Cal. 2018) (similar); *see also Bartlett*, 2020 WL 7089448, at *8 (distinguishing *Crosby*).  Here, al-Qaeda did not use the Internet to "inspire" a lone-wolf shooter across the world.  Rather, al-Qaeda had deep, institutional linkages with the Taliban that it used to plan and authorize attacks on Plaintiffs.

involvement. *Strike 3*, 964 F.3d at 1211. Nor need they "allege facts addressing directly" al-Qaeda's role in every individual attack. *Owens IV*, 897 F.3d at 274-75 (inferring "transactions" despite "failure to allege" them directly). Plaintiffs lack visibility into al-Qaeda's day-to-day operations and have not yet accessed the U.S. military-intelligence records describing them. It is thus unrealistic, and inconsistent with Rule 8, to require Plaintiffs to plead evidence establishing in detail how al-Qaeda played "a significant role in [each] particular attack." *Atchley*, 2020 WL 4040345, at *11. For now, Plaintiffs are entitled to "all reasonable inferences," and Plaintiffs' extensive allegations permit an inference that al-Qaeda "was responsible for committing, planning, or, at the very least, authorizing the attacks." *Freeman*, 413 F. Supp. 3d at 97.

### 3.    Defendants' FTO scienter and direct-assistance arguments fail

Three Defendants argue (DAI Br. 42; LBG Br. 37; Chemonics Br. 40) that Plaintiffs fail to allege that they *knew* of al-Qaeda's role in the Taliban's terrorist attacks. Plaintiffs do allege such knowledge. AC ¶ 521. But the statute does not require it. The pertinent section reads:

> In an action under subsection (a) for an injury arising from an act of international terrorism *committed, planned, or authorized by an organization that had been designated as [an FTO]* under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by *knowingly providing substantial assistance*, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2) (emphases added). Defendants maintain that the word "knowingly" applies to every element in that lengthy paragraph. Their argument misreads the statute.

Congress used the word "knowingly" before "providing substantial assistance" not to describe the FTO element, but to incorporate *Halberstam*'s scienter requirement that an aider-abettor "knowingly gave 'substantial assistance' to someone who performed wrongful conduct." 705 F.2d at 478; *see* JASTA § 2(a)(5) (*Halberstam* "provides the proper legal framework"); *supra* Part III.B. Thus, just as Hamilton was unaware of the murder, Defendants need not have

"kn[own] of the specific attacks at issue." *Linde*, 882 F.3d at 329. If Defendants need not have

known of the attacks, they certainly need not have known of al-Qaeda's role in those attacks.

Further, Defendants' argument is ungrammatical. An adverb like "knowingly" most

naturally modifies only the verb it precedes (and perhaps the verb's immediate modifiers), not

the entire sentence in which it appears. *See United States v. Dewalt*, 92 F.3d 1209, 1214 (D.C.

Cir. 1996) ("the more obvious reading is that the adverb 'knowingly' modifies only the verbs,

not the adjectival phrase"); *United States v. Jones*, 471 F.3d 535, 539 (4th Cir. 2006) (extending

"knowingly" to the "infinite hereafters of statutory sentences would cause grammarians to

recoil"). Applying that principle further supports the *Halberstam* standard. Defendants, by

contrast, extend "knowingly" not just beyond the verb it modifies ("providing"), but also through

the direct object ("substantial assistance") and the indirect object ("the person who committed

such an act") all the way up to an adjectival phrase ("committed, planned, or authorized by")

modifying "act" in an introductory clause at the beginning of the section. The word "such" is far

too thin a reed on which to assume that Congress intended a meaning so unnatural.[72]

Similarly, LBG suggests (at 37) that Plaintiffs fail to allege that that LBG "aided and

abetted al Qaeda." The statute's text contains no such requirement. JASTA imposes liability for

providing substantial assistance to "the person who committed" the relevant "act of international

terrorism," 18 U.S.C. § 2333(d)(2) – here, the Taliban. The "act" that such a person commits, in

---

[72] DAI cites (at 42) *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), but that case involved a differently worded *criminal* statute and relied on the "manner in which the courts ordinarily interpret criminal statutes." *Id*. at 652. The different grammatical structure of the statute there also distinguishes it from JASTA, which contains different words and modifiers. *See United States v. Price*, --- F.3d ----, 2019 WL 11271472, at *6 (9th Cir. 2019) (*Flores-Figueroa* did not apply to statute with different "grammatical structure" where clause was "not the object of the sentence but an adverbial prepositional phrase"); *United States v. Banker*, 876 F.3d 530, 537 (4th Cir. 2017) (*Flores-Figueroa* "did not purport to establish a bright-line rule").

turn, must *also* be "committed, planned, or authorized" by an FTO.  *Id.*  Those words do not suggest that the defendant must assist the FTO.  Congress could have limited the statute to those who provide "substantial assistance [to], or who conspire[] with *an FTO*," but it instead used the different term "person" – defined broadly, *id.* § 2333(d)(1) – to describe the aid's recipient.

Defendants' sole source for both arguments – seeking to insert FTO scienter and direct-assistance requirements that appear nowhere in the text – is a single floor statement from Representative Goodlatte.  *E.g.*, LBG Br. 31, 37.  That statement is entitled to no weight.  "[F]loor statements by individual lawmakers" are "among the least illuminating forms of legislative history," *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1661 (2017), and courts ignore them when they conflict with the statutory text or come from someone (like Rep. Goodlatte) who did not sponsor the bill.[73]  Whatever Rep. Goodlatte may have wished JASTA said, the text of the bill Congress enacted bears no resemblance to his description.

**D.     An FTO Committed, Planned, or Authorized The Taliban's Terrorist Campaign (Count Six)**

**a.**     Count Six alleges that Defendants also assisted a different "act of international terrorism," 18 U.S.C. § 2333(d)(2):  the "Taliban-al-Qaeda Campaign," which was the Taliban's terrorist campaign to coerce the United States into withdrawing from Afghanistan.  AC ¶¶ 2606-15.  Mullah Omar and his associates waged that campaign through an illegal enterprise (the Taliban) and engaged in a pattern of racketeering activity, including the attacks on Plaintiffs.  *Id.*

---

[73] *See Nat'l Ass'n. of Mfrs. v. Taylor*, 582 F.3d 1, 12-13 (D.C. Cir. 2009) ("Floor statements from members of Congress, even from a bill's sponsors, cannot amend the clear and unambiguous language of a statute."); *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 875 (D.C. Cir. 1996) (calling for "extreme caution" in using "floor" statements, which are often merely one member's "attempt[] to reassure his own constituency or even to create legislative history"); *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 702 (9th Cir. 1996) (discounting "floor statements of an individual member of Congress who did not sponsor the bill").

¶¶ 2608-10. The campaign was an "act of international terrorism" under the ATA, *id*. ¶ 2610: it was undisputedly "violent [and] dangerous to human life," it sought to "influence the policy of a government by intimidation or coercion," and it "occur[red] primarily outside" the United States' "territorial jurisdiction." 18 U.S.C. § 2331(1). It also violated the "criminal laws of the United States," *id*. § 2331(1)(A), because the Taliban's affairs were conducted in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") statute. *Id*. § 1962(b)-(d).

The Court should sustain Count Six even if it concludes that al-Qaeda did not "plan" or "authorize" the individual attacks that injured Plaintiffs. No matter how the Court views the individual attacks, al-Qaeda indisputably "planned" and "authorized" the Taliban's broader terrorist campaign through the activities already discussed. AC ¶¶ 464-520; *supra* Part III.C. Moreover, Defendants aided and abetted the campaign for the reasons stated above, *supra* Part III.A, and Plaintiffs undeniably were injured "by reason of" that campaign, 18 U.S.C. § 2333(a).

**b.**     Defendants' main response (*e.g.*, LBG Br. 38; BV Br. 39-40; Chemonics 44-45) is that the Taliban-al-Qaeda Campaign is not an "act" and so it cannot be an "act of international terrorism." But Defendants offer no persuasive reason that the operation of a RICO enterprise – a standalone federal crime – cannot be an "act." Courts often use the word "act" to describe a multifaceted enterprise. *See*, *e.g.*, *United States v. Pregler*, 925 F.2d 268, 269 (8th Cir. 1991) ("[a] [three-year] conspiracy is an ongoing act"). Under the Dictionary Act, moreover, the singular word "act" includes the plural. *See* 1 U.S.C. § 1. And in *Halberstam*, the "act assisted" was not the murder but the broader "burglary enterprise." 705 F.2d at 488. Just as the court held Hamilton liable for assisting the "act" of a "five-year-long burglary campaign," so should this Court hold Defendants liable for assisting the "act" of a multiyear terrorist campaign. *Id*.

Defendants cite *Atchley*, but that decision addressed none of these points. *Atchley* may

have thought it "unnatural" to describe a multiyear enterprise as an "act," 2020 WL 4040345, at

*11, but that is exactly what the D.C. Circuit did in the case Congress directed courts to apply,

*see* JASTA § 2(a)(5).  *Atchley* identified no reason to think that Congress meant to exclude the

very type of "campaign" featured in the seminal case the statute expressly adopts.

DAI (at 41-42) and LBG (at 37-39) likewise err in asserting that Plaintiffs fail to plead a

RICO violation.  Plaintiffs identify Mullah Omar and many associates by name (the RICO

perpetrators), and explain that they conducted the Taliban's affairs (the enterprise) through a

pattern of racketeering activity.  AC ¶¶ 2608-10.  Contrary to LBG's assertion (at 39), it need not

have aided the Taliban in committing any specific predicate crimes; the assistance need only

have helped Mullah Omar and his conspirators maintain the broader racketeering enterprise.  *See*

18 U.S.C. § 2333(d)(2); AC ¶¶ 97-111.  And contrary to DAI's suggestion (at 41), Plaintiffs need

not "connect specific perpetrators with . . . particular offenses" at this stage.  *See McLaughlin v.*

*Anderson*, 962 F.2d 187, 194 (2d Cir. 1992) (RICO claims that do not sound in fraud are

"evaluated . . . against the more lenient pleading standards of [Rule] 8(a)").

Finally, Black & Veatch and IRD err in invoking the domestic-injury element of RICO's

civil right of action.  BV Br. 38; IRD Br. 38 (citing 18 U.S.C. § 1964).  Plaintiffs' claims do not

arise under 18 U.S.C. § 1964(c); they arise under the ATA and merely invoke RICO's *criminal*

statute to satisfy the ATA's definition of international terrorism.  18 U.S.C. §§ 2331(1), 2333(a).

## IV.    DEFENDANTS' ADDITIONAL ARGUMENTS LACK MERIT

### A.    Plaintiffs' Claims Do Not Present A Political Question

Three Defendants argue (DAI Br. 21-26; IRD Br. 40-42; Chemonics Br. 11-17) that the

political question doctrine compels dismissal.  That argument is unpersuasive.

**1.**    The federal judiciary "has a responsibility to decide cases properly before it, even

those it would gladly avoid."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012).

The political question doctrine represents a "narrow exception to that rule." *Id.* at 195. Courts apply six factors in assessing whether a question is "political," *see Baker v. Carr*, 369 U.S. 186, 217 (1962), but they typically dismiss for lack of "jurisdiction only when the Constitution textually commits the issue to be adjudicated in the case to a coordinate political department, or when there is a lack of judicially discoverable and manageable standards for resolving it," *Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015). Dismissal is appropriate "only if a political question is inextricable from the case." *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019).

Defendants cite no case (nor are Plaintiffs aware of one) dismissing any ATA lawsuit under the political question doctrine.[74] This case should not be the first, because Plaintiffs' claims simply ask the Court to interpret and apply a federal statute to Defendants' private conduct. Interpreting a statute is a "recurring and accepted task for the federal courts," even when it has "significant political overtones." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Whatever the merits of Defendants' efforts to tie the facts of this case to U.S. foreign policy, "Congress explicitly committed these issues to the federal courts under the ATA." *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 6 (D.D.C. 2005).

Congress's judgment that federal courts should entertain ATA lawsuits confirms that no *Baker* factor (*see* 369 U.S. at 217) is present in this case. As for the first factor, Plaintiffs' claims ask the Court to interpret a statute – a traditional role constitutionally committed to the judiciary. *See Zivotofsky*, 566 U.S. at 195-96; *Japan Whaling*, 478 U.S. at 230. As for the second, the ATA itself arms courts with "judicially discoverable and manageable standards" in the form of explicit

---

[74] Courts routinely reject this argument in ATA cases. *See Atchley*, 2020 WL 4040345, at *7; *Gill*, 893 F. Supp. 2d at 520; *Wultz*, 755 F. Supp. 2d at 25-27; *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 295 n.45 (E.D.N.Y. 2007); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162 (D.D.C. 2006); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F. Supp. 2d 96, 99-100 (D.D.C. 2006); *Ungar v. PLO*, 402 F.3d 274, 280-82 (1st Cir. 2005).

statutory criteria.  *Baker*, 369 U.S. at 217.  Applying such statutory criteria to a private actor's conduct is a quintessentially judicial function.  *See Zivotofsky*, 566 U.S. at 196.[75]

As for the final four *Baker* factors, the "initial policy determination involved here has already been made by the U.S. Congress":  that Americans "injured by terrorist acts" should be able to sue in U.S. court.  *Biton*, 412 F. Supp. 2d at 6.  This case thus neither disrespects nor embarrasses the political branches, *see Baker*, 369 U.S. at 217; it effectuates the judgment they expressed in a federal statute.  Defendants seek (*e.g.*, Chemonics Br. 14) to override that judgment based on their own assertions about U.S. foreign policy.  That argument – asking this Court to decide for itself that U.S. foreign policy bars a claim expressly authorized by Congress – would flout the very separation-of-powers principles Defendants claim to promote.  A far better way to respect the political branches is to follow and apply the statute Congress wrote.

**2.**     The foreign-policy "conflict" Defendants invent does not overcome that conclusion.  Try as they might to blame their conduct on USAID, no Defendant has shown that the wisdom of USAID policy is "inextricable from the case."  *Al-Tamimi*, 916 F.3d at 8.  Indeed, Defendants identify no element of Plaintiffs' claims that would *require* this Court to evaluate "USAID's determinations . . . to press forward with . . . stabilization initiatives."  DAI Br. 24.  Plaintiffs, after all, disclaim any challenge to those determinations.  AC ¶ 144.  And Defendants (not Plaintiffs) are the ones that insist on blaming their payments on USAID.  Defendants cannot inject an unnecessary political question into the case and then obtain dismissal based on the

---

[75] Although the D.C. Circuit has declined to say a "statutory claim can never present a political question," a statutory right of action weighs heavily against dismissal.  *Al-Tamimi*, 916 F.3d at 12 n.6.  And the D.C. Circuit has never applied the doctrine to dismiss a statutory claim against *private* defendants.  *Cf. El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 851 (D.C. Cir. 2010) (en banc) (barring claim *against U.S. government* by "target of a military strike"); *see also id.* at 856 (Kavanaugh, J., concurring) ("The Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations.  Never.").

question they themselves raised.  Such arguments suggest at most that Plaintiffs' "factual allegations . . . bear on [political] questions."  *Al-Tamimi*, 916 F.3d at 9.  But because the "specific claims" do not "*require* [the Court] to answer them," dismissal is unwarranted.  *Id.*[76]

In any event, Plaintiffs' claims promote USAID policy.  As the Complaint explains, the U.S. government (including USAID) opposed protection payments and took several steps to stop them.  AC ¶¶ 127-44.  Defendants' own contracts prohibited them from funding terrorists.  AC ¶ 185.  And if a project in a given area proved impossible to implement without funding the Taliban, USAID instructed contractors to *stop work*.  OIG Rep. at 14; AC ¶¶ 199-202, 207.  No Defendant responds to those basic facts, and none of their materials suggests that USAID ever authorized them to pay the Taliban in any way.  AC ¶¶ 140-43 (explaining how Defendants were able to make payments despite USAID opposition).[77]  If this case implicates USAID at all, it asks the Court to *agree* with USAID's view that such payments are illegal.  The Court need not address, much less assess the wisdom of, USAID's broader approach to rebuilding Afghanistan.

Lacking any evidence that USAID approved of protection payments, Defendants argue (Chemonics Br. 14) it was impossible to avoid making the payments.  But it was not impossible, just less lucrative.  AC ¶¶ 64-66, 116.  True, the *industry* consensus viewed protection money as impossible to avoid, AC ¶ 82, because most other companies (like Defendants) determined that

---

[76] DAI's argument (at 24-26) that some of "Plaintiffs' sources" criticize USAID illustrates the flaw with this whole argument.  Plaintiffs do not endorse any such criticism, and a factual source's never-relied-on criticism of U.S. policy is the opposite of "inextricable."

[77] For example, DAI's LGCD contract instructed DAI to engage vulnerable populations to forestall their "recruitment into militant groups," including "*former* combatants" and "groups who support the Taliban . . . *because of coercion*, or a *desperate need for the services* that the Taliban is providing."  Dkt. 107-3 at 9 (emphases added).  That is far different from paying *active insurgents* for protection.  *Supra* pp. 28-29.  IRD's excerpts, which merely direct IRD to provide "security" but do not specify how to accomplish that task, are even less on-point and say nothing about approving Taliban payoffs.  *Cf.* IRD Br. 43 & n.134.

their cost structures demanded it. But protection payments were not inevitable; that is why Plaintiffs have not sued every contractor. Indeed, the Complaint names only the contractors that counsel's investigation revealed to be the worst offenders. That other companies too decided to violate USAID's instructions – instructions that USAID by necessity relied on contractors to uphold – does not raise an "inextricable" political question. *Al-Tamimi*, 916 F.3d at 8.

A November 2010 Embassy Kabul memorandum (Ex. A)[78] drives home the point. In that document, the Ambassador confirmed it was "incumbent on all Mission leaders and staff to ensure that we are not placing money in the hands of insurgents." Eikenberry Mem. 1. That priority, he emphasized, outweighed the policy goals Defendants now tout: he agreed that "[c]ontracting dollars spent in-country can have a positive effect . . . but *only when money is spent carefully, purposefully and with adequate oversight*." *Id*. at 2 (emphasis added). This was a wholesale repudiation of any notion that USAID thought development goals warranted paying insurgents. In the Embassy's considered view, "where our money goes is as important – possibly more important – than the product or service delivered." *Id*. Development projects that financially benefited insurgents violated that directive and served no U.S. policy objective at all.

### B.    Defendants Are Not Entitled To Derivative Sovereign Immunity

DAI's (at 26-28) and IRD's (at 42-44) sovereign-immunity defense fails for the same reason. A contractor's immunity, "unlike the sovereign's, is not absolute." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016). "When a contractor violates both federal law and the

---

[78] Plaintiffs' allegations should be accepted as true and construed liberally with respect to Defendants' arguments under Rule 12(b)(1). *See Banneker*, 798 F.3d at 1129. Although the Court may consider extra-pleading evidence under that rule, it should not entertain Defendants' fact-sensitive arguments until Plaintiffs have received discovery. *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992). But if the Court is inclined to wade into the facts now, it should consider the Eikenberry Memorandum, attached here as Exhibit A.

Government's explicit instructions, as here alleged, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation." *Id.*

Defendants violated the government's instructions here. AC ¶¶ 127-44, 185, 199-202. Each contract contained a "standard clause" requiring Defendants to follow anti-terrorism laws, and USAID emphasized (including in a meeting with DAI's CEO) that it was the *contractors*' job to prevent payments to insurgents. AC ¶¶ 142-44, 201. Moreover, if contractors found themselves in a "high-risk area[]" in which protection payments were likely, USAID instructed them to "ensure they do not implement." OIG Rep. at 14. Defendants' failure to "perform[] in compliance" with those "federal directions" is fatal. *Campbell-Ewald*, 577 U.S. at 167 n.7; *see OPM Data*, 928 F.3d at 69 (allegation that defendant "ran afoul of both [the agency's] explicit instructions and federal law standards" rendered "derivative sovereign immunity unavailable"); *In re KBR, Inc. Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (defendant "entitled to derivative sovereign immunity only if it adhered to the terms of its contract").

Defendants' arguments are unpersuasive. Although USAID knew its projects might *tempt* contractors to pay the Taliban, *cf.* DAI Br. 27-28, it explicitly barred those payments and hired Defendants to prevent them from occurring, AC ¶¶ 133-43, 200-02. Defendants are not entitled to immunity merely because the project environment contributed to their incentive to violate federal law. *See OPM Data*, 928 F.3d at 69-70; *KBR*, 744 F.3d at 342-45. Again, Defendants adduce no evidence suggesting that USAID ever approved of payments to the Taliban. *Supra* p. 103 & n.77.[79] Nor could they: Defendants' protection payments to terrorists

---

[79] Contrary to DAI's assertion (at 28), the OIG Report did not find that DAI complied with its contract. The sentence DAI excerpts states that "the Mission believes that its implementers do conduct risk and impact assessments . . . in accordance with contractual obligations." OIG Rep. at 15. That generalized statement is not a finding that *DAI's protection payments* were authorized. *Supra* Parts I.C.1.c-d. Moreover, DAI's description (at 24, 28) of the OIG Report

violated multiple criminal statutes.  *Supra* Part II.C.  It is implausible, to say the least, that

USAID authorized Defendants to commit federal crimes.  For those reasons, Defendants cannot

"point to a contractual provision or other [USAID] direction authorizing or directing the very

[payments] over which [Plaintiffs] are suing."  *OPM Data*, 928 F.3d at 70.  That is dispositive.

###    C.    The Act-Of-War Defense Does Not Apply To The Taliban

Black & Veatch (at 40-45) and IRD (at 44-45) also invoke the ATA's act-of-war defense.

At the outset, the "act of war exception" raises questions "best addressed on a motion for

summary judgment or at trial."  *Gill*, 893 F. Supp. 2d at 510.  Plaintiffs allege that the Taliban

was a terrorist group rather than a government actor committing acts of war.  AC ¶¶ 417-29.

Defendants' attempt to rebut those allegations – through a mishmash of factual assertions and

international-law concepts – is premature.  *See Atchley*, 2020 WL 4040345, at \*8.

But if this Court is inclined to reach that defense now, the Court should reject it.  An "act

of war" occurs "in the course of" (1) a "declared war," (2) an "armed conflict, whether or not

war has been declared, between two or more nations," or (3) an "armed conflict between military

forces of any origin."  18 U.S.C. § 2331(4).  Defendants invoke only the second prong, and their

attempt to fit the Taliban within it conflicts with the ATA's text and purpose.

###    1.    Plaintiffs' injuries did not arise from a conflict "between two or more nations."

*Id*. § 2331(4)(B).  That prong of the act-of-war defense was intended to " 'bar actions for injuries

that result from military action *by recognized governments* as opposed to terrorists.' "  H.R. Rep.

No. 115-858, at 5 (quoting H.R. Rep. No. 102-1040, at 7 (1992)) (emphasis added).  The Taliban

was the latter, not the former.  AC ¶¶ 41-46, 417-29.  Since the Taliban's emergence, the United

---

ignores that DAI denied approving the payments and fed USAID inaccurate information.  *Supra*
Parts I.C.1.d; AC ¶¶ 135, 140-42, 200, 207, 211.  All inferences should be drawn in Plaintiffs'
favor regarding these issues.  *See Campbell-Ewald*, 577 U.S. at 168; *OPM Data*, 928 F.3d at 69.

States – and, by late 2001, the entire international community – refused to recognize the Taliban as a government.  AC ¶¶ 41, 418. 420-21.  Nor did the Taliban participate in Afghanistan's new democracy after the U.S. invasion.  AC ¶ 426.  Instead, it fled to Pakistan to build an unlawful, *anti-government* insurgency.  AC ¶¶ 45-47, 431-37.  Throughout, in both word and deed, the U.S. government treated the Taliban as a terrorist group rather than a representative of the Afghan "nation[]."  18 U.S.C. § 2331(4)(B); *see* AC ¶¶ 417, 423, 427-29.

Defendants respond by citing tangential materials about the treatment of Taliban detainees under the Geneva Convention.[80]  If such materials are even relevant, they support Plaintiffs.  For example, the cited (*e.g.*, BV Br. 40) statement from President Bush, though declining to "suspend Geneva as between the United States and Afghanistan," agreed with DOJ's conclusion that he had authority to do so.  White House Mem. ¶ 2(b).  The basis for that authority, in turn, was that "the Taliban militia exhibited the characteristics of a criminal gang" "[r]ather than performing normal government functions."[81]  When President Bush declined to use the group's non-government status as a basis for suspending Geneva, it was not a recognition of the Taliban as a "nation"; it was a discretionary policy decision to promote broader compliance with the laws of war.  *Compare* OLC Mem. at 25-26 *with* White House Mem. ¶ 2(b).  That hardly qualifies the Taliban as a "nation" immunized under the ATA's act-of-war defense.

To conclude otherwise would flout Congress's intent.  Most act-of-war cases turn on the defense's third "military forces" prong, 18 U.S.C. § 2331(4)(C), and Congress specifically excluded SDGTs like the Taliban from the scope of that provision, *id*. § 2331(6)(A)(ii).  The

---

[80] *See*, *e.g.*, White House Memorandum, *Humane Treatment Of Al Qaeda & Taliban Detainees* (Feb. 7, 2002) ("White House Mem.") (cited at BV Br. 40 n.160; IRD Br. 44 n.140).

[81] Dep't of Justice Office of Legal Counsel, Mem. for A. Gonzales & W. Haynes II: *Application Of Treaties And Laws To Al Qaeda & Taliban Detainees* at 18 (Jan. 22, 2002) ("OLC Mem."), *available at* https://bit.ly/34ECLnP; *see id*. at 15-21.

purpose of that exclusion was to ensure that "a defendant would not be able to use the ATA's 'act of war' defense if the terrorist act was carried out by a designated terrorist organization." H.R. Rep. No. 115-858, at 4.  Defendants' argument here attempts an end-run around that exclusion.  As courts have held, extending the act-of-war defense to a designated "terrorist organization" would "defeat the purpose of the Act."  *Stansell*, 2011 WL 1296881, at *11; *see* H.R. Rep. No. 115-858, at 5 n.13.  That purpose counsels against any attempt to immunize the Taliban – an SDGT responsible for thousands of U.S. casualties, AC ¶ 15 – from the ATA.

    2.    Defendants' cases, like their factual materials, are inapposite because they concern the Executive's authority to detain Taliban prisoners.[82]  The issue in those cases was whether the United States was in "active hostilities" against the Taliban.  *Al-Alwi*, 901 F.3d at 300.  That is a different textual and policy question from whether the Taliban was a "nation" under the ATA.  Indeed, the precise "form of hostilities" against the Taliban was irrelevant to the detention cases Defendants cite.  *Id*.  The context here is different because only hostilities against an enemy *nation* can trigger the ATA's act-of-war defense.  The mere existence of "hostilities" sufficient to detain Taliban fighters says nothing about that latter question.  *See also Hamidullin*, 888 F.3d at 70-71 (post-2002 Taliban conflict was not "international" because "conflict between the recognized Afghan government and the United States ha[d] ceased").[83]

    The same point refutes Defendants' attempt to conjure a political question.  Each case

---

[82] *See Al-Alwi v. Trump*, 901 F.3d 294, 297-300 (D.C. Cir. 2018) (challenge to detention under the Authorization for Use of Military Force); *Al-Bihani v. Obama*, 590 F.3d 866, 874-75 (D.C. Cir. 2010) (similar); *Parhat v. Gates*, 532 F.3d 834, 844-51 (D.C. Cir. 2008) (similar).

[83] Contrary to Black & Veatch's assertion (at 44 n.178), *Al-Alwi* does not cast doubt on *Hamidullin*.  The two address different issues:  *Al-Alwi* the Executive's authority to detain Taliban fighters, *Hamidullin* the Taliban's asserted combatant immunity from U.S. criminal law. *Compare* 901 F.3d at 297-300 *with* 888 F.3d at 69-74.  The latter – determining that Taliban insurgents were "unlawful combatant[s]" under the law of war – is more instructive.  *Id*. at 76.

they cite involves a direct challenge to the U.S. military's detention authority.  *Supra* note 82.

The D.C. Circuit held that such challenges, which ask courts to constrain the Executive's

exercise of wartime authority, are fraught with political questions.  *Al-Alwi*, 901 F.3d at 299.

That is a far cry from holding that the ATA's act-of-war bar – which creates a defense in private

litigation against private actors – raises political questions.  *Supra* Part IV.A.1.  As far as

Plaintiffs are aware, no court in this Circuit has ever held that the political question doctrine bars

consideration of a *statutory* question involving a *private* defendant.  *Supra* note 75.  This Court

should not be the first to take that extraordinary step.  *See also* Def. Opp. 53-55.

      **3.**      Even if Defendants had identified a qualifying "armed conflict," Plaintiffs were

not injured "in the course of" it.  18 U.S.C. § 2331(4).  "In the course of" is a "gatekeeper phrase

that is intended to exclude as a matter of law a subset of conduct" otherwise within the

"general . . . provision in question."  *Klieman*, 424 F. Supp. 2d at 164.  That phrase here operates

to exclude acts connected to an "armed conflict" that remain outside the category Congress

intended to protect.  *See id*. at 164-66.  "As a matter of law, an act that violates established norms

of warfare and armed conflict under international law is not an act occurring in the course of

armed conflict."  *Id*. at 166; *see Biton*, 412 F. Supp. 2d at 7-9 (adopting similar rule).

      That principle provides an alternative basis for rejecting Defendants' act-of-war defense.

The Complaint describes, for every Plaintiff or family member attacked in Afghanistan, how the

Taliban violated the laws of war in committing the attack.  AC ¶¶ 523-2569.  That reflected the

Taliban's systematic practice of refusing to wear uniforms, placing civilians at risk, and

kidnapping and torturing its enemies.  AC ¶¶ 433-34.  Indeed, 17 of the primary victims in this

case were civilians.  AC ¶¶ 567, 692, 743, 1020, 1210, 1372, 1397, 1448, 1522, 1581, 1739,

1954, 1970, 2138, 2248, 2372, 2526.  Kevin King, for example, was a college professor whom

the Taliban abducted from his university and then brutally tortured for several years.  AC ¶ 1522.  As his heinous treatment exemplifies, the Taliban's attacks did not occur "in the course of" any armed conflict.  And because that point alone is fatal to any act-of-war defense, the Court need never reach the "armed conflict" question that Black & Veatch and IRD portray as political.

## CONCLUSION

The Court should deny Defendants' motions to dismiss.  In the alternative, it should grant Plaintiffs leave to amend to cure any defects the Court might discern.  *See* Fed. R. Civ. P. 15(a)(2); *Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 31 & n.5 (D.D.C. 2014).

Dated:  December 8, 2020

Respectfully submitted,

_/s/ Joshua D. Branson_____

Michael J. Gottlieb (D.C. Bar No. 974960)    Joshua D. Branson (D.C. Bar No. 981623)
Randall Jackson (D.C. Bar No. 490798)    Andrew E. Goldsmith (D.C. Bar No. 1007074)
Nicholas Reddick (D.C. Bar No. 1670683)    Grace W. Knofczynski (D.C. Bar No.
Willkie Farr & Gallagher LLP    15000407)
1875 K Street, N.W.    Kellogg, Hansen, Todd,
Washington, DC 20006-1238    Figel & Frederick, P.L.L.C.
Tel: (202) 303-1000    1615 M Street, N.W., Suite 400
Fax: (202) 303-2000    Washington, D.C. 20036
MGottlieb@willkie.com    Tel:  (202) 326-7900
RJackson@willkie.com    Fax:  (202) 326-7999
NReddick@willkie.com    jbranson@kellogghansen.com
    agoldsmith@kellogghansen.com
    gknofczynski@kellogghansen.com

    Ryan R. Sparacino (D.C. Bar No. 493700)
    Sparacino PLLC
    1920 L Street, NW, Suite 535
    Washington, D.C. 20036
    Tel:  (202) 629-3530
    ryan.sparacino@sparacinopllc.com

    _Counsel for Plaintiffs_