**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AUGUST CABRERA *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CV-03833 (EGS) (ZMF) |
| | ) | |
| BLACK & VEATCH SPECIAL | ) | |
| PROJECTS CORPORATION *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANT
<u>CHEMONICS INTERNATIONAL, INC.'S MOTION TO DISMISS</u>**

**WILMER CUTLER PICKERING HALE
AND DORR LLP**

Patrick J. Carome (D.C. Bar # 385676)
David W. Bowker (D.C. Bar # 989309)
Leon T. Kenworthy (D.C. Bar # 1045105)
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel. (202) 663-6000
patrick.carome@wilmerhale.com
david.bowker@wilmerhale.com
leon.kenworthy@wilmerhale.com

*Counsel for Defendant Chemonics
International, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.   PLAINTIFFS' CLAIMS AGAINST CHEMONICS PRESENT
     NONJUSTICIABLE POLITICAL QUESTIONS ................................................2

II.  PLAINTIFFS CANNOT STATE A CLAIM AGAINST CHEMONICS USING
     GENERIC GROUP PLEADING OR "INDUSTRY-WIDE" ALLEGATIONS ................6

     A.   The Court Should Disregard Plaintiffs' Group-Pleading Allegations ....................7

     B.   Plaintiffs Cannot Rely On "Industry Practice" ........................................................8

     C.   The Court Can Consider Materials Incorporated By Reference In The FAC
          That Undercut Plaintiffs' Sparse Chemonics-Specific Allegations........................9

III. THE FAC FAILS TO PLAUSIBLY ALLEGE ESSENTIAL ELEMENTS OF
     THE PLANTIFFS' DIRECT LIABILITY CLAIMS AGAINST CHEMONICS ............12

     A.   Plaintiffs Have Not Adequately Pled Objective Terroristic Intent ........................12

     B.   Plaintiffs Have Not Adequately Alleged The Requisite Mental State For
          Two Predicate Offenses ..........................................................................................14

     C.   Plaintiffs Have Not Plausibly Alleged That Chemonics Proximately
          Caused Their Injuries ..............................................................................................14

IV.  THE FAC FAILS TO ALLEGE ESSENTIAL ELEMENTS OF PLAINTIFFS'
     SECONDARY-LIABILITY CLAIMS AGAINST CHEMONICS ...............................18

     A.   Plaintiffs Fail To Allege That Chemonics "Substantially Assisted" The
          Taliban Or The Alleged Attacks ..............................................................................18

     B.   Plaintiffs Do Not Allege That Chemonics Acted "Knowingly"............................22

     C.   Plaintiffs Fail To Plead That A Designated FTO "Committed, Planned, Or
          Authorized" The Alleged Acts Of Terrorism ........................................................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abecassis v. Wyatt*,
    785 F. Supp. 2d 614 (S.D. Tex. 2011) ...............................................................20

*Al-Tamimi v. Adelson*,
    916 F.3d 1 (D.C. Cir. 2019) .......................................................................3, 5

*Almog v. Arab Bank*, PLC,
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) ............................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................7, 11

*Atchley v. AstraZeneca UK Ltd.*,
    474 F. Supp. 3d 194 (D.D.C. 2020) .................................................. *passim*

*Averbach v. Cairo Amman Bank*,
    No. 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020),
    *r&r adopted*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).......................14, 19

*Baker v. Carr*,
    369 U.S. 186 (1962)..............................................................................3

*Bartlett v. Societe Generale de Banque*,
    No. 19-cv-00007-CBA-VMS, 2020 WL 7089448 (E.D.N.Y. Nov. 25,
    2020) .............................................................................................20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................10, 24

*Bernhardt v. Islamic Republic of Iran*,
    No. 18-cv-2739-TJK, 2020 WL 6743066 (D.D.C. 2020)................................23

*Biton v. Palestinian Interim Self-Gov't Auth.*,
    412 F. Supp. 2d 1 (D.D.C. 2005) ..................................................................6

*Boim v. Holy Land Found. For Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) .......................................................................13

*Bruce Kirby, Inc. v. Quarter Moon, Inc.*,
    No. 3:17-cv-01389-JAM, 2018 WL 3614120 (D. Conn. July 27, 2018)............7

*In re Chiquita Brands Int'l*,
    190 F. Supp. 3d 1100 (S.D. Fla. 2016) ......................................................19, 20

*In re Chiquita Brands Int'l, Inc.*,
 284 F. Supp. 3d 1284 (S.D. Fla. 2018) ....................................................16, 17

*Clayborn v. Twitter, Inc.*,
 Nos. 17-cv-06894-LB, 18-cv-00543-LB, 2018 WL 6839754 (N.D. Cal.
 Dec. 31, 2018) ......................................................................................................25

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
 277 F. Supp. 3d 483 (S.D.N.Y. 2017) ...................................................................9

*\*Corrie v. Caterpillar, Inc.*,
 503 F.3d 974 (9th Cir. 2007) ......................................................................3, 4, 6

*Center for Biological Diversity v. Trump*,
 453 F. Supp. 3d 11 (D.D.C. 2020) ........................................................................5

*\*El-Shifa Pharmaceuticals Industries Company v. United States*,
 607 F.3d 836 (D.C. Cir. 2010) (en banc) ..............................................................5

*Gill v. Arab Bank, PLC*,
 893 F. Supp. 2d 474 (E.D.N.Y. 2012) .................................................................14

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
 422 F. Supp. 2d 96 (D.D.C. 2006) ........................................................................6

*Goldberg v. UBS AG*,
 660 F. Supp. 2d 410 (E.D.N.Y. 2009) .................................................................14

*\*Halberstam v. Welch*,
 705 F.2d 472 (D.C. Cir. 1983) ................................................................. *passim*

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
 No. 19-cv-5394-BMC, 2020 WL 6143654 (E.D.N.Y. Oct. 20, 2020) .............20

*In re Initial Pub. Offering Sec. Litig.*,
 399 F. Supp. 2d 298 (S.D.N.Y. 2005) .................................................................15

*Jaber v. United States*,
 861 F.3d 241 (D.C. Cir. 2017) ..............................................................................5

*Kaempe v. Myers*,
 367 F.3d 958 (D.C. Cir. 2004) ............................................................................10

*\*Kemper v. Deutsche Bank AG*,
 911 F.3d 383 (7th Cir. 2018) ..............................................................................13

*Estate of Klieman v. Palestinian Auth.*,
 424 F. Supp. 2d 153 (D.D.C. 2006) ......................................................................6

*Kingdomware Techs., Inc. v. United States*,
   136 S. Ct. 1969 (2016) .................................................................................20

*Lillard & Lillard, P.C. v. Blue Cross & Blue Shield Ass'n*,
   971 F. Supp. 2d 116 (D.D.C. 2013) ...............................................................5

*\*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018)....................................................................20, 23

*Mahorner v. Bush*,
   224 F. Supp. 2d 48 (D.D.C. 2002) .................................................................2

*New York v. Trump*,
   No. 20-cv-2340-EJS, 2020 WL 5763775 (D.D.C. Sept. 27, 2020) ...................11

*Ofisi v. BNP Paribas, S.A.*,
   278 F. Supp. 3d 84 (D.D.C. 2017) ...............................................................21

*\*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (D.C. Cir. 2018) ...........................................................15, 16, 17

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
   182 F.3d 17 (D.C. Cir. 1999) ........................................................................5

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013).........................................................................16

*Saldana v. Occidental Petroleum Corp.*,
   774 F.3d 544 (9th Cir. 2014) .....................................................................3, 4

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ......................................................................5

*Siegel v. HSBC Bank USA, N.A.*,
   No. 17-cv-6593-DLC, 2018 WL 3611967 (S.D.N.Y. July 27, 2018) .............19

*Siegel v. HSBC N.A. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019)....................................................................20, 23

*Stevens v. Sodexo, Inc.*,
   846 F. Supp. 2d 119 (D.D.C. 2012) .............................................................12

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ........................................................................9

*Toumazou v. Turkish Republic of N. Cyprus*,
   71 F. Supp. 3d 7 (D.D.C. 2014) ...................................................................7

*Ungar v. PLO*,
  402 F.3d 274 (1st Cir. 2005) ............................................................................6

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978) ................................................................................13, 14

*Whittington v. United States*,
  867 F. Supp. 2d 102 (D.D.C. 2012) ................................................................12

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) .....................................................................6

## STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 2331 ...............................................................................12, 13, 14

18 U.S.C. § 2333 ...................................................................................... *passim*

18 U.S.C. § 2339A .......................................................................................14, 25

18 U.S.C. § 2339C .............................................................................................14

Alien Tort Statute and Torture Victim Protection Act....................................5

Anti-Terrorism Act ..................................................................................... *passim*

Antiterrorism and Effective Death Penalty Act of 1996................................5

Federal Tort Claims Act....................................................................................5

Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130
  Stat. 852 (2016)..............................................................................................20

Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub. L. No. 91-
  450, 84 Stat. 922 (1970)................................................................................25

Fed. R. of Civ. P. 12.........................................................................................10

## OTHER AUTHORITIES

*Matthieu Aikins, The Bidding War*, New Yorker (Feb. 29. 2016),
  https://tinyurl.com/manwhomademillions ...........................................................4

*Obama Tours Afghan War Zone*, CBS News (July 19, 2008),
  https://www.cbsnews.com/ news/obama-tours-afghan-war-zone/ .....................4

*Profiles of Afghan Power Brokers*, Center for American Progress (Oct. 26, 2009),
  https://tinyurl.com/profilesafghanpower.............................................................4

## INTRODUCTION

All claims against Chemonics should be dismissed because Plaintiffs' opposition does not and cannot cure fatal pleading defects in the Amended Complaint ("FAC").  Plaintiffs continue to rely on impermissible group pleading and otherwise offer nothing specific to Chemonics beyond baseless speculation about two legitimate subcontracts for services rendered by two counterparties who were also hired by or worked closely with the U.S. Government or respected intergovernmental organizations.  Plaintiffs' attempt to bootstrap their deficient claims against Chemonics through an opposition that lumps it together with other disparate defendants only confirms that those claims cannot survive.

Plaintiffs' claims also fail at the threshold because they present nonjusticiable political questions.  Plaintiffs disavow any challenge to U.S. foreign policy decisions, but fail to explain how this Court could ever accept their theories of liability without effectively condemning decisions by the U.S. Government to commission particular development projects in Afghanistan, where they claim it was "impossible" for any contractor to keep funds from going to the Taliban.

Plaintiffs' opposition also fails to distinguish the raft of recent court decisions that have rejected similar claims under the Anti-Terrorism Act ("ATA").  They contend that the alleged "protection payments" here are different from, and more blameworthy than, the sorts of transfers to alleged intermediaries that courts have held insufficient for ATA liability, but the allegations as to Chemonics are even more innocuous.  Plaintiffs accuse Chemonics of nothing more than entering into contracts for services with two independent third parties—a property owner and security company—who Plaintiffs speculate may have passed funds to Taliban affiliates.  Even as alleged, Chemonics' contracting for services is far *less* blameworthy than the sorts of voluntary transfers alleged in other cases.  Moreover, Plaintiffs' rank speculation that Chemonics paid third parties who in turn paid terrorists to "redirect" their attacks elsewhere rings particularly hollow given that, as Plaintiffs reluctantly concede, Chemonics and its employees were themselves *victims*

of deadly terror attacks.  And the FAC itself establishes that if Chemonics caused any funds to reach the Taliban to avoid more such attacks (which Chemonics denies), it would have been acting to protect itself and its employees, not to inflict harm on others.  That alone requires dismissal, as does the plethora of other basic defects discussed in Chemonics' opening brief and below.

## ARGUMENT

### I.  PLAINTIFFS' CLAIMS AGAINST CHEMONICS PRESENT NONJUSTICIABLE POLITICAL QUESTIONS

Plaintiffs' claims against Chemonics necessarily invite condemnation of the political branches' foreign policy decisions.  Under their theory, it would have been *impossible* for any U.S. Government contractor to carry out USAID-directed projects without directing "protection payments" to terrorists.  *See* Mem. 12.  Plaintiffs do not dispute that Chemonics carried out USAID-directed projects reflecting decisions in furtherance of U.S. foreign-policy goals in Afghanistan.  Nor do they contest that claims that require second guessing of such decisions are nonjusticiable.  As this Court has explained, the Government's "determination of whether foreign aid … is necessary … is a 'question uniquely demand[ing] [of a] single-voiced statement of the Government's views' … 'for which the Judiciary has neither aptitude, facilities nor responsibility.'"  *Mahorner v. Bush*, 224 F. Supp. 2d 48, 53 (D.D.C. 2002).

Plaintiffs cannot revise their allegations to avoid the political question that is central to their claims.  They now say (at 103) that "it was not impossible, just less lucrative," to implement those aid projects without making the "protection payments" they allege Chemonics made.  According to the FAC, however, USAID entered into a series of contracts with Chemonics that required it, over the course of more than a dozen years, "to implement USAID" programs in provinces of Afghanistan chosen by USAID, FAC ¶ 402, where supposedly it was "*impossible* to execute government … sponsored development projects without payments that end up in Taliban coffers," *id.* ¶ 403 (emphasis added).  Plaintiffs' opposition purports to disavow these allegations

for purposes of the political question doctrine, Opp. 103-04, yet elsewhere reasserts them as evidence of Chemonics' supposed practice of directing funds to insurgents, Opp. 42. Plaintiffs cannot have it both ways. If, as they contend, the evidence that Chemonics indirectly made protection payments is that such payments were supposedly universal and necessary in "Chemonics' specific geographies," *id.*, it necessarily follows that it would have been "impossible" for Chemonics—or any contractor—to carry out USAID-directed projects and related U.S. foreign policy decision in Afghanistan without violating the ATA. It is thus not Chemonics, but *Plaintiffs*, who "inject a[] … political question into the case." Opp. 102.

Given the alleged "*impossibility*" of carrying out U.S. Government foreign policy priorities without funding the Taliban, a political question is "inextricable from the case." *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). Indeed, the Court could not adjudicate Plaintiffs' claims against Chemonics without deciding whether USAID-directed projects could be carried out only by illegally directing payments to the Taliban. Plaintiffs now attempt to shift their allegations, but their entire case against Chemonics turns on their theory that no contractor could have executed the political branches' foreign policy decisions in Afghanistan without expending funds that ultimately reached terrorists.

Contrary to Plaintiffs' suggestion (at 101-02 & n.75), courts have dismissed on political question grounds where claims requiring a judicial rejection of a U.S. foreign policy decision had been brought against private defendants rather than the government itself. As explained (Mem. 14-16), in *Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007), the court dismissed as nonjusticiable claims against a U.S. contractor that sold bulldozers to the Israel Defense Forces that were used to harm the plaintiffs, because such claims "unavoidably" raised political questions concerning the U.S. policy of financing the sale of equipment to Israel. *Id.* at 982-83. Similarly, in *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544 (9th Cir. 2014), which Chemonics also cited (Mem. 16-17), the court dismissed claims against a private company for supporting a foreign

military force that allegedly committed war crimes, because the allegations "appl[ied] with equal force to [a] … national security determination[]" made by the U.S. Government, 774 F.3d at 550. Plaintiffs' opposition inexplicably fails to address either *Corrie* or *Saldana*. But just as in those cases, this Court "could not find in favor of the plaintiffs without implicitly questioning, and even condemning, United States foreign policy" to rebuild Afghanistan, and dismissal is required. *Corrie*, 503 F.3d at 984; *accord Saldana*, 774 F.3d at 555.

Plaintiffs' claims are also nonjusticiable because they seek to impose liability on Chemonics for leasing property from a U.S. Government ally, Gul Agha Sherzai, whom Plaintiffs contend was a "Taliban-affiliated warlord" who supposedly "routed" payments to the group. Opp. 43. But as Chemonics explained, contrary to Plaintiffs' speculation that Sherzai had an unspecified "relationship to the Taliban," FAC ¶ 410, he was an ally of U.S. forces when Chemonics transacted with him. Mem. 16. Plaintiffs now misleadingly try to brush off confirmation from their own sources that Sherzai was "CIA-recruited" by noting that many Taliban members were also recruited by the CIA. Opp. 46 n.31. But unlike those Taliban who were recruited as "mujahideen" to fight the Soviets *in the 1980s, see id.* (citing FAC ¶¶ 39-40), Sherzai was allied to the United States *after* its invasion in 2001 and, as sources cited in the FAC affirm, he had "US support" in "gain[ing] control of four important southern provinces" during the post-invasion period in which U.S. forces and the Taliban were at war. Mem. 16. Indeed, Sherzai was supported by the United States throughout the post-invasion period, *and even met with then-candidate Obama* in 2008.[1]

---

[1] *Obama Tours Afghan War Zone*, CBS News (July 19, 2008), https://www.cbsnews.com/news/obama-tours-afghan-war-zone/ ("Obama … received a briefing inside the U.S. base from the Afghan provincial governor of Nangarhar, Gul Agha Sherzai … '(Obama) thanked Sherzai for good leadership and good administration of the province.'"); *see also, e.g.*, Aikins, *The Bidding War*, New Yorker (Feb. 29, 2016), https://tinyurl.com/manwhomademillions (Sherzai captured Kandahar from the Taliban in December 2001 "accompanied by C.I.A. advisers and U.S. Special Forces"); *Profiles of Afghan Power Brokers*, Center for American Progress (Oct. 26, 2009), https://tinyurl.com/profilesafghanpower ("Sherzhai cooperated closely with U.S. Special Forces … during the early years of the Afghan campaign, providing base security and local intelligence. … Sherzai has been touted as a success in Nangarhar, where he … worked with U.S. forces and

Plaintiffs bear the burden of establishing the Court's jurisdiction, and the Court can and should consider such materials, which establish that the United States was working with Sherzai to *defeat* the Taliban and to reestablish control in southern Afghanistan (including in Kandahar). *See Lillard & Lillard, P.C. v. Blue Cross & Blue Shield Ass'n*, 971 F. Supp. 2d 116, 118 (D.D.C. 2013). It would be impossible to adjudicate Plaintiffs' claims without calling into question U.S. foreign policy and national security decisions to work with Sherzai—and to approve Chemonics' leasing of facilities from him, *see* Mem. 16-17.

Plaintiffs are wrong that Congress's inclusion of a civil liability provision in the ATA means that "no *Baker* factor … is present in this case." Opp. 101. No federal statute, including one that "expressly authoriz[es]" private lawsuits, *id.* 102, can "override Article III's requirement that federal courts refrain from deciding political questions." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010); *see also Al-Tamimi*, 916 F.3d at 12 n.6. Thus, the D.C. Circuit and judges in this district have repeatedly invoked the political question doctrine to reject claims that purportedly arise from a statute. *See, e.g.*, *Jaber v. United States*, 861 F.3d 241, 246 (D.C. Cir. 2017) (Alien Tort Statute and Torture Victim Protection Act); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 21-24 (D.C. Cir. 1999) (Antiterrorism and Effective Death Penalty Act); *Schneider v. Kissinger*, 412 F.3d 190, 196-97 (D.C. Cir. 2005) (Federal Tort Claims Act); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 32 (D.D.C. 2020) (National Emergency Act).

The ATA cases cited by Plaintiffs that were not dismissed under the political question doctrine (Opp. 101 & n.74) are inapposite. Unlike the claims against Chemonics here, none of the claims in those cases accused the defendant of *necessarily* violating the ATA simply by performing U.S. Government contracts reflecting U.S. foreign policy decisions. In *Atchley v. AstraZeneca UK*

---

tribal elders to create relative security and prosperity.").

*Ltd.*, 474 F. Supp. 3d 194 (D.D.C. 2020), there were no U.S. Government contracts directly at issue, much less allegations that it would have been impossible to perform such contracts without violating the ATA. In *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010), the court explained that "no action by a coordinate branch of the United States government ... [was] involved" at all. *Id.* at 27.[2] Here, in contrast, the claims against Chemonics would require this Court to decide if it was "impossible" for *any* contractor to implement certain U.S. foreign policy decisions in Afghanistan without funding the Taliban and violating the ATA.

## II.    PLAINTIFFS CANNOT STATE A CLAIM AGAINST CHEMONICS USING GENERIC GROUP PLEADING OR "INDUSTRY-WIDE" ALLEGATIONS

Plaintiffs do not contest that only five of the FAC's 2,617 paragraphs allege specific conduct by Chemonics. *See* FAC ¶¶ 406, 408-411. Nor do they offer any factual basis to tie Chemonics to any of the hundreds of paragraphs consisting of nonspecific allegations directed generically at all Defendants. As already demonstrated, Plaintiffs cannot state a claim against Chemonics based on nothing more than news articles about general conditions in Afghanistan, claims about corrupt "industry practice," and speculation about the geographic areas of Afghanistan in which USAID required Chemonics to operate. Mem. 17-20. Nor can Plaintiffs breathe life into their claims merely by lumping Chemonics in with other defendants against whom they muster more specific and detailed allegations. Mem. 19 & n.25.

It is no answer that that the FAC supposedly "identifies systemic indications of each Defendant's payments and details why its projects conformed to industry custom." Opp. 16. At

---

[2] Plaintiffs' other cases related to claims against the Palestinian Authority or banks for supporting terrorist attacks in Israel, and rejected arguments that adjudicating those claims would impermissibly "burden 'the long running Middle East peace process.'" *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 161 (D.D.C. 2006); *see also Ungar v. PLO*, 402 F.3d 274, 280-82 (1st Cir. 2005); *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 295 n.45 (E.D.N.Y. 2007) (also dismissing because political question defense was first raised "at oral argument"); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F. Supp. 2d 96, 99-100 (D.D.C. 2006); *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 6 (D.D.C. 2005). Unlike *Corrie* (or this case), those claims did not challenge private conduct that directly implemented U.S. foreign policy.

least as to Chemonics, the FAC does no such thing.  Rather, it merely (a) alleges that Chemonics engaged two independent subcontractors accused by Plaintiffs of either "b[uying] the loyalty of the local warlords" or having an unspecified "relationship to the Taliban" and (b) speculates that Chemonics was aware of such alleged "buying" and "relationship." *See* Mem. 25-26.  These paltry and speculative averments fall far short of plausibly alleging Chemonics violated the ATA.

## A.    The Court Should Disregard Plaintiffs' Group-Pleading Allegations

Plaintiffs' opposition—which lumps Chemonics together with the so-called "Development Contractor Defendants"—doubles down on the FAC's group-pleading approach, Opp. 14-17, 20-22, and asks the Court to "infer[]" from those generic allegations that *all* Defendants are liable solely because "each Defendant worked on large development projects in areas under Taliban control or influence."  Opp. 15.  The problem is not that these allegations are too "'unadorned,'" Opp. 17 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), it is that they are purportedly tied to Chemonics only by speculation and not by any alleged facts.  Plaintiffs have not pleaded "factual content that allows the court to draw the reasonable inference that *the defendant*"—here, Chemonics—"is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added).

As Chemonics established, *see* Mem. 18-19 (citing cases), "[g]enerally, a plaintiff cannot satisfy the minimum pleading requirements ... by 'lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct.'" *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014).  Plaintiffs' attempt to distinguish *Toumazou* is unpersuasive.  The court there required defendant-specific allegations not merely because the plaintiffs sought to "pierce the corporate v[e]il " between related HSBC defendants, Opp. 21, but also because the group allegations were otherwise deficient as between HSBC and an *unrelated* defendant. *See Toumazou*, 71 F. Supp. 3d at 21.[3]  Thus, the impermissibility of such "lumping"

---

[3] Plaintiffs misleadingly quote part of a sentence from an out-of-District case that states (in full) that "[n]othing in Rule 8 prohibits collectively referring to multiple defendants *where the complaint alerts defendants that identical claims are asserted against each defendant*." *Bruce*

extends to claims like Plaintiffs', which are pled against unrelated defendants.  *See Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, 321 F. Supp. 3d 49, 61 (D.D.C. 2018) ("fair notice" concerns that generally render "collective allegations against unrelated defendants" inadequate do not apply "when the defendants are part of a single enterprise that happens to be organized into distinct but related corporations" (internal quotation marks omitted)).  Indeed, if anything, the general prohibition of group pleading is even more important here, where Plaintiffs seek to use sweeping generalizations about multiple U.S. contractors that worked separately from one another across multiple industries, with nothing but speculation to tie them together and virtually no specific allegations as to Chemonics.  *See* FAC pp. 1-67, 181-231.  Plaintiffs—who allege not a conspiracy but independent acts by unrelated actors—needed to allege misconduct by Chemonics in particular, but have failed to do so.[4]

**B.      Plaintiffs Cannot Rely On "Industry Practice"**

Nor can Plaintiffs state a claim against Chemonics by pointing to supposed "industry practice," Opp. 15 & 19, and speculating that *every* contractor in Afghanistan necessarily made "protection payments," *id.* 19.  Even if that were enough to state a claim, it would be self-defeating, as it would confirm that this case raises political questions regarding the "impossibility" of implementing U.S. foreign policy without violating the ATA.  *See supra* pp. 2-6.

Plaintiffs fail to cite any authority that supports their reliance on "industry practice" allegations in lieu of Defendant-specific allegations, as basic pleading principles require, *see* Mem. 18-19.  Instead, they cite inapposite cases regarding the flood of litigation concerning residential mortgage-backed securities that followed the 2007-08 financial crisis, Opp. 18-19, which involved

---

*Kirby, Inc. v. Quarter Moon, Inc.*, 2018 WL 3614120, at *1 (D. Conn. July 27, 2018) (emphasis added); *see* Opp. 20.  Here, of course, Plaintiffs' claims against Defendants are *not* identical.

[4] Plaintiffs' remaining strawman argument hardly warrants a response.  Chemonics is not "arguing that, because all of [the Defendants] made protection payments, none of them can be sued for it."  Opp. 21.  Chemonics' point is that Plaintiffs cannot satisfy their pleading burden *as to Chemonics* merely by arguing that all Defendants must have made protection payments.

the "'rather unusual set of circumstances in which there [were] significant litigation and investigations … and findings made' such that [plaintiffs] [could] ride the coattails of some of this work." *Commerzbank AG v. U.S. Bank Nat'l Ass'n*., 277 F. Supp. 3d 483, 495 (S.D.N.Y. 2017) (citation omitted).  Here, in contrast, there is no analogous single product or service that was provided by all participants in a single industry.  Nor are there any litigations or investigations with relevant findings broadly applicable to all "large Western companies" operating in numerous sectors of the economy in "post-9/11 Afghanistan." *See* FAC ¶ 1.

Plaintiffs also err in relying on an inapposite antitrust price-fixing case that found allegations concerning "industry structure[] and industry practices" relevant to establishing industry members' ability to "facilitate collusion" by exchanging information at trade association meetings.  *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010).  That observation has little relevance here, where Plaintiffs seek to use industry practice not to establish Defendants' collective collaboration and collusion (as in the price-fixing case), but to establish that each Defendant independently made unlawful "protection payments."  No authority allows Plaintiffs to treat disparate Defendants as one for these purposes.

### C.    The Court Can Consider Materials Incorporated By Reference In The FAC That Undercut Plaintiffs' Sparse Chemonics-Specific Allegations

As already explained, Mem. 20, once Plaintiffs' inadequate group-pleading, "industry-practice" allegations, and area-of-operation generalizations are cast aside, nothing remains in the FAC *regarding Chemonics* except vague allegations regarding two unrelated subcontracting relationships that Chemonics had, many years apart from one another.  One involved Chemonics' retention in 2004 of a security firm, U.S. Protection and Investigation ("USPI"), to provide necessary security services for its personnel and premises.  *See* Mem. 21-22; FAC ¶ 406.  The other involved Chemonics' leasing in 2010, from Gul Agha Sherzai, a compound to house its employees and operations for its work for the U.S. Government in Kandahar Province.  *See* Mem.

22; FAC ¶ 410.  Chemonics' opening brief demonstrated not only that these bare allegations come nowhere close to plausibly pleading that Chemonics committed, or knowingly and substantially assisted, acts of terrorism, Mem. 10, 19-20, but also that these allegations are contradicted by materials that the FAC itself incorporates by reference.  *Id.* 4 n.1, 20-22.

Rather than defend the sufficiency of their paltry pair of Chemonics-specific allegations, Plaintiffs erroneously accuse Chemonics of relying on "extra-pleading sources" that "lack key facts."  Opp. 45.  In fact, the sources on which Chemonics relies for its merits-related arguments are "referred to in the complaint and … integral to [Plaintiffs'] claim[s]," and therefore entitled to consideration on a Rule 12(b)(6) motion.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  As explained (Mem. 26), Plaintiffs cannot cherry-pick only excerpts of cited materials when other parts directly undermine their claims.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) ("the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn").  Nor can Plaintiffs cry foul when Chemonics highlights the portions of their own sources that doom their claims.

Plaintiffs seek to engage in precisely such impermissible cherry-picking to convert Chemonics' simple retention of USPI for security services into the commission or assistance of terrorist acts that injured each and every Plaintiff.  Specifically, they ask the Court to presume such culpability based on magazine articles about USPI, Opp. 44-45, yet simultaneously demand that the Court blind itself to statements in those same articles indicating that reputable international organizations, including the United Nations and the World Bank, also employed USPI for security services in Afghanistan—both at the same time as Chemonics and even years later, FAC ¶¶ 258-259.  Mem. 21-22 & nn.28-29.  Plaintiffs should not be heard to cast doubt on the accuracy of those articles after affirmatively relying on them in their FAC.

Plaintiffs likewise persist in cherry-picking excerpts of an inspector general audit of Chemonics' expenditures, which concluded Chemonics lacked sufficient documentation on a

project.  Plaintiffs assert that a lack of documentation indicates Chemonics directed protection payments to the Taliban.  Opp. 46-47.  But they fail to mention that many of the missing files were destroyed in a terrorist attack that killed and injured Chemonics employees and subcontractors.  *See* Mem. 21 & n.26.  Furthermore, that attack and others that targeted Chemonics and injured or killed its personnel make it impossible for Plaintiffs to plausibly allege that Chemonics either objectively intended for other similar attacks to occur (as necessary for direct ATA liability) or "assumed a role" in the Taliban's terrorist campaign (as necessary for secondary liability).  *Infra* pp. 22-23.  And although Plaintiffs insist that the audit supports their claims because the attack was only "partially" responsible for the alleged loss of documentation, Opp. 46, they point to nothing in the audit report or elsewhere that even hints that Chemonics destroyed documents to conceal a record of payments to insurgents.  Plaintiffs cannot survive a motion to dismiss with such bare allegations that (at best) "stop[] short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678.

Finally, Plaintiffs err in asking the Court (at 45-46) to disregard the USAID letter (Mem. Ex. D) establishing that USAID vetted and approved Chemonics' leasing of a compound from Sherzai.  The Court can and should take judicial notice of this relevant U.S. Government document.  *See New York v. Trump*, 2020 WL 5763775, at *3 (D.D.C. Sept. 27, 2020) (Sullivan, J.).  Plaintiffs' response to the letter's substance—*i.e.*, to speculate that Chemonics may not have disclosed some unspecified information about Sherzai to USAID, Opp. 45-46—also gets them nowhere.  The U.S. Government was responsible for vetting and had vastly more information than Chemonics regarding Sherzai, a close U.S. ally.  Mem. 7 & n.12.  That the U.S. Government—which had worked extensively with Sherzai, *supra* pp. 4-5—itself possessed ample information about Sherzai and approved the lease is fatal to Plaintiffs' claims against Chemonics.

III.    **THE FAC FAILS TO PLAUSIBLY ALLEGE ESSENTIAL ELEMENTS OF PLAINTIFFS' DIRECT LIABILITY CLAIMS AGAINST CHEMONICS**

As already explained, Plaintiffs have failed to plead that Chemonics is directly liable under the ATA, because their allegations do not meet the statute's definition of "international terrorism," Mem. 23-25, do not establish the requisite *mens rea* for two predicate crimes, Mem. 25-27, and do not satisfy the requirement that Chemonics proximately caused any (much less all) of the injuries Plaintiffs allege they suffered from attacks throughout Afghanistan over the course of a decade, Mem. 27-33.  On each of these points, Plaintiffs' opposition misses the mark.

A.    **Plaintiffs Have Not Adequately Pled Objective Terroristic Intent**

Plaintiffs' direct liability claims must be dismissed because the FAC fails to allege facts that would lead an "objective observer" to conclude that Chemonics' engaging of subcontractors to provide security services and facilities necessary for its performance of USAID-directed projects amounted to violent or dangerous acts that "appear[] to [have] be[en] intended" to intimidate and coerce.  18 U.S.C. § 2331(1)(A)-(B); *see* Mem. 23-25.  Plaintiffs cannot cure that fatal defect with their new *ipse dixit* that Chemonics had the requisite "appear[ance]" of intent because it "paid the Taliban to direct its attacks at U.S. troops."  Opp. 64.  The Court should disregard this offensive charge, which is totally unfounded and speculative and flies in the face of Chemonics' steadfast support of the U.S. mission in Afghanistan.  Tellingly, no such allegation is found anywhere in the FAC.  And even if it were, such "bare, conclusory assertions" about matters of intent are paradigmatic of what the Supreme Court's *Twombly/Iqbal* jurisprudence prohibits. *See, e.g., Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 128 (D.D.C. 2012).

Plaintiffs' allegations of objective terroristic intent are insufficient for the additional reason that the FAC itself *directly contradicts* them.  *See Whittington v. United States*, 867 F. Supp. 2d 102, 106 (D.D.C. 2012) ("Because plaintiff has directly contradicted certain of his claims with his factual allegations, those claims must be dismissed.").  The FAC's sole allegations regarding Chemonics' intentions in spending money that allegedly reached the Taliban are that it made such

payments to "secure its projects," to protect its own employees from the Taliban's attacks, and to avoid commercial losses.  FAC ¶ 403.  Such alleged motivations are a far cry from terroristic intent.  In addition, documents incorporated by reference in the FAC and subject to judicial notice, which Plaintiffs studiously ignore, establish that Chemonics personnel were repeatedly attacked by the Taliban, including two attacks in May 2005, around the time Chemonics hired USPI, and that Chemonics' leasing of a new compound in Kandahar from Sherzai was made necessary by the April 2010 suicide bombing that damaged Chemonics' prior premises in Kandahar, killed three guards employed by a Chemonics subcontractor, and injured three Chemonics employees.  Mem. 6.  Given the presence of such facts on the face of the FAC and its incorporated sources, Plaintiffs' contention that Chemonics supposedly shared the terroristic intentions of its attackers is both absurd and offensive.

Plaintiffs further err in attempting to invent an all new standard for satisfying 18 U.S.C. § 2331(1)(B), under which necessary apparent terroristic intent would exist whenever the "foreseeable consequences" of the defendants' conduct "promote the terrorist aims in the ATA." Opp. 61.  That concoction cannot be squared with the statute's plain language, which requires that the defendant commit an act that "appear[s] to be *intended*" to cause certain types of coercion or intimidation, 18 U.S.C. § 2331(1)(B) (emphasis added), not merely an act that could "foreseeabl[y]" lead to such ends.  Nor can Plaintiffs ground their flawed statutory reading in outdated dicta from *Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008).  The Seventh Circuit's more recent decision in *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018), made clear it does *not* follow an atextual foreseeability-only standard. *See* Mem. 24.  Moreover, as was also true in *Kemper*, the alleged facts in the present case "are different from those in *Boim III*, which dealt with direct donations to a known terrorist organization." 911 F.3d at 390.  Plaintiffs' reliance on *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) is likewise misplaced.  Opp. 62.  That decision read a *general* intent requirement into

13

a statute that made no "mention of intent or state of mind," while recognizing that other statutes require *specific* intent—*i.e.*, that a defendant "consciously desire[d]" an outcome.  *U.S. Gypsum Co.*, 438 U.S. at 438, 444-45.  Section 2331(1)(B)'s express intent requirement puts it firmly in the latter category.

**B.    Plaintiffs Have Not Adequately Alleged The Requisite Mental State For Two Predicate Offenses**

Plaintiffs similarly cannot overcome their failure to plead the *mens rea* element of two predicate offenses.  The mental states required to violate 18 U.S.C. § 2339A and § 2339C are, respectively, actual knowledge and willfulness.  *See* Mem. 26 & n.31.  Plaintiffs do not (and cannot) allege that Chemonics *actually knew* (much less intended) that the funds it allegedly transferred to USPI and Sherzai would be used to carry out terrorist acts that harmed Plaintiffs.  They suggest they can rely instead on common knowledge and media reports to establish that Chemonics had these states of mind.  But the cases they cite, Opp. 67, held such things can qualify as indicia of the requisite *mens rea* only where they were in the public realm *before* the defendant's alleged wrongful conduct occurred.  *E.g.*, *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 433 (E.D.N.Y. 2009).  Here, Plaintiffs allege Chemonics hired USPI in 2004, yet the earliest media reports they cite concerning USPI are from 2006.  *See* FAC ¶ 255.[5]

**C.    Plaintiffs Have Not Plausibly Alleged That Chemonics Proximately Caused Their Injuries**

The FAC also fails to plausibly allege that Plaintiffs were injured "by reason of" a terrorist

---

[5] Plaintiffs are also wrong that mere recklessness can meet the *mens rea* requirements of § 2339A and § 2339C.  Opp. 66.  That argument directly conflicts with the plain text of both statutes and has no support in the case law.  *See, e.g., Averbach v. Cairo Amman Bank,* 2020 WL 486860, at *12 (S.D.N.Y. Jan 21, 2020), *report and recommendation adopted,* 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020); *Backpage.com, LLC v. Lynch,* 216 F. Supp. 3d 96, 109 (D.D.C. 2016).  The cases Plaintiffs cite held only that recklessness is a sufficient mental state as to certain elements of civil liability under § 2333(a)—such as the victim being an American national—that are separate and apart from the predicate criminal offense that must also be plausibly pleaded.  *See, e.g.*, *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 505-06 (E.D.N.Y. 2012).

act committed by Chemonics.  *See* Mem. 27-33.  As controlling D.C. Circuit precedent makes clear, the "central question" in analyzing proximate causation under the ATA is "whether the [defendants'] alleged violation led directly to the plaintiff's injuries."  *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 n.8 (D.C. Cir. 2018) ("*Owens IV*").  Yet Plaintiffs concede that, unlike what they allege regarding other Defendants, the FAC does not allege that Chemonics ever made any payment directly to the Taliban or any of its members.  Opp. 55.  And their arguments fail to show the attenuated causal chain they do attempt to allege for Chemonics could be sufficient.

*First*, Plaintiffs offer no persuasive response to Chemonics' showing (Mem. 31-32) that Chemonics' alleged conduct was far too attenuated temporally from the attacks.  While the FAC accuses Chemonics of funneling funds to the Taliban via USPI in 2004, ¶ 406, Plaintiffs now concede that, due to statutes of limitation, their only non-time-barred claims against Chemonics arise from attacks that occurred after June 4, 2010—six or more years later.  Opp. 43 n.30.  This huge time gap, by itself, precludes Plaintiffs from plausibly alleging that Chemonics' interaction with USPI proximately caused any actionable injury to any Plaintiff.  *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 305 (S.D.N.Y. 2005) (five-year gap defeated proximate causation).  While Chemonics' lease payments to Sherzai starting in 2010 are closer temporally to some (but not all) attacks, which occurred as late as 2017, timing problems alone defeat the FAC's attempt to allege proximate cause with respect to at least the vast majority of Plaintiffs.[6]

*Second*, Plaintiffs have no real response to Chemonics' showing that independent, intervening entities between Chemonics and the alleged terrorist attackers negate proximate causation.  As already explained (Mem. 28-30), the FAC alleges that any and all money that came from Chemonics and later reached the Taliban was paid by Chemonics to one of two independent

---

[6] Similarly, Plaintiffs still offer nothing more than conclusory group pleading in their attempt to show that any funds that allegedly originated from Chemonics and reached the Taliban "substantially contributed to Plaintiffs' injuries" amidst the Taliban's vast and "efficient" raising (and spending) of funds.  *Owens IV*, 897 F.3d at 276; Mem. 32-33 (quoting FAC ¶ 49).

third parties (a security subcontractor and a landlord) as part of business transactions and in exchange for services or use of real property.  And as further established (Mem. 27-30), this sort of indirectness and intervention of independent third parties between a defendant's alleged conduct and a terrorist attack "create[s] a more attenuated chain of causation."  *Owens IV*, 897 F.3d at 275; *see also Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013); *Atchley*, 474 F. Supp. 3d at 209.

Plaintiffs fail in attempting (at 53) to distinguish these and other cases that have dismissed ATA claims for failure to plausibly plead proximate causation.  That attempt mainly relies on their assertion that Chemonics' transfers to third parties "were designed to buy off" the Taliban, in contrast to the facts in the cases cited by Chemonics, in which the defendants were "agnostic" about whether their counter-parties had ties to terrorists.  Opp. 53.  But that mischaracterizes the FAC, which alleges that Chemonics hired USPI to provide security guards and equipment, including "USPI escort[s]" for travel to project cites, FAC ¶ 406, and leased real property from Sherzai, *id.* ¶ 410.  Plaintiffs are also simply wrong in arguing (at 53) that no case has dismissed allegations similar to the FAC's for failure to satisfy the ATA's proximate cause requirement.  In *Atchley*, for example, the plaintiffs claimed that the defendants made "corrupt" payments of cash bribes and free goods, saleable on the black market, to a "compromised" government ministry "captured" by a terrorist group.  474 F. Supp. 3d at 208.  But the court still dismissed for failure to plausibly allege proximate causation, because the complaint failed to directly connect the alleged payments to the ministry to the alleged terrorist attacks.  *Id.* at 210.

Contrary to Plaintiffs' repeated assertions, the FAC's allegations relating to Chemonics do not resemble the facts in *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018) ("*Chiquita III*").  There, Chiquita made a "corporate decision to authorize the payment of the money" to meet terrorists' demands, "negotiate[d]" with the terrorists, and "made a series of at least 57 payments" to the terrorists.  *Id.* at 1296-97.  The "intermediaries" in that case were hired by Chiquita and functioned as Chiquita's agents *for the specific purpose* of negotiating with and

paying the terrorists.  *Compare* Opp. 50 *with Chiquita III,* 284 F. Supp. 3d at 1297.  Here, in contrast, Plaintiffs admit they make no allegation that Chemonics directly paid or otherwise supported the Taliban, Opp. 55, and the purported intervening entities were allegedly independent businesses that provided legitimate services.

Plaintiffs further err in describing *Owens IV*, the controlling D.C. Circuit precedent on ATA causation, as "dissimilar," Opp. 51, when, in fact, it is analogous.  There, although the defendant company transacted with Sudan, it "had nothing to do with Sudan's downstream support for al-Qaeda."  Opp. 51.  As such, the court held that the presence of Sudan (an independent intermediary) "severed the [defendant's] link to terrorism."  Opp. 51 (*citing Owens IV*, 897 F.3d at 275-76).  Although Plaintiffs attempt (at 51-52) to differentiate the present case by asserting broadly that Defendants "encouraged the subcontractors to pay protection money" and "approved each payment their subcontractors made," the FAC does not plead any such facts with respect to Chemonics.  Moreover, as in *Owens IV*, the FAC "fails to plausibly allege that any currency [transferred by Chemonics to USPI or Sherzai] was … *in fact* sent to [terrorists] or necessary for" funding any attack that injured Plaintiffs.  *Owens IV*, 897 F.3d at 276 (emphasis added).  As to USPI, it only alleges that Chemonics hired USPI for security services and that "USPI regularly paid the Taliban."  FAC ¶ 407.  As to Sherzai, the allegations are thinner still—averments that Chemonics made lease payments to him and mere supposition that he had some link to the Taliban. *Id.* ¶ 411.

Finally, Plaintiffs fall flat in their strained attempt to escape the growing line of caselaw— including *Owens IV, Atchley,* and decisions in other Circuits, Mem. 27-30—dismissing ATA claims due to the presence of independent actors in the alleged causal chain.  Plaintiffs' suggestion (at 53) that these precedents have bearing only if the intervening actor is a sovereign ignores the logic and reasoning of those decisions.  The material point is that the intermediaries were independent actors with "legitimate" functions, not that they were sovereigns.  *Owens IV,* 897 F.3d

at 276; *see also Atchley*, 474 F. Supp. 3d at 209 (holding that, while the absence of proximate cause "is *especially* so when the intermediary is a sovereign entity," any "independent intermediary" precludes ATA direct liability (emphasis added)).

IV.   **THE FAC FAILS TO ALLEGE ESSENTIAL ELEMENTS OF PLAINTIFFS' SECONDARY-LIABILITY CLAIMS AGAINST CHEMONICS**

   A.   **Plaintiffs Fail To Allege That Chemonics "Substantially Assisted" The Taliban Or The Alleged Attacks**

As previously explained (Mem. 33-45), the FAC's aiding-and-abetting claims against Chemonics fail because it does not plausibly allege that Chemonics substantially assisted any person who committed any of the attacks that injured Plaintiffs.  Contrary to their suggestion (at 70, 75), to plausibly allege such a claim under § 2333(d), Plaintiffs must do more than merely assert that money originating with Chemonics, after flowing through a third party, became "financing" to the Taliban.  And as Plaintiffs acknowledge (Opp. 75), the six *Halberstam v. Welch* factors provide the framework to assess whether the FAC plausibly asserts that Chemonics provided "substantial assistance."  Correctly applied, those factors mandate dismissal.

**Factors 1 and 2 (Nature of Act and Kind of Assistance).**  Plaintiffs do not deny that two separate lines of authority undercut their aiding-and-abetting arguments concerning the "kind of assistance" that Chemonics allegedly provided.  *See Halberstam v. Welch*, 705 F.2d 472, 483-84 (D.C. Cir. 1983) (factors one and two "dictate[] what aid might matter, *i.e.*, be substantial").  *First*, courts have dismissed aiding-and-abetting claims where, as here, the complaint alleges that the defendant provided the "assistance" through an independent third party, as Chemonics is alleged to have done in this case by hiring security subcontractor USPI and renting a compound from Sherzai.  *See* Mem. 34-35 (collecting cases); *see also* FAC ¶¶ 408, 410.  *Second*, courts have dismissed aiding-and-abetting claims where, as here, plaintiffs fail to connect the alleged "assistance" (here, money) to the alleged principal terrorist act (here, alleged terrorist attacks).  *See* Mem. 35-36.  Unable to entirely ignore these cases, Plaintiffs' opposition points to a litany of

supposed factual distinctions.  Each is irrelevant.

Initially, as discussed previously, Mem. 34, alleged third-party intermediaries need not be "sovereign entit[ies]" in order to make the alleged aider-and-abettor too removed from the principal wrongdoing and principal wrongdoer to have "substantially assist[ed]" them.  Opp. 72. As courts have routinely recognized, intervening, independent entities—sovereign or not—sever the necessary connection between a defendant and any alleged attacks and attackers.  *See, e.g.*, *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967 at \*4 (S.D.N.Y. July 27, 2018) (holding that plaintiffs failed to allege substantial assistance because money from defendants reached the group responsible for terrorist attacks only after passing through another autonomous financial institution); *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at \*12 (S.D.N.Y. Jan. 21, 2020), *r&r adopted*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) (similar holding based on fact that money from defendant passed through independent accountholders before reaching Hamas).

Nor can Plaintiffs' contention that payments by Chemonics to subcontractors were somehow independently "illegal," Opp. 70, transform Chemonics' conduct into substantial assistance of terrorism.  As many courts have held, the fact that payments were allegedly "illegal" in some sense is not a proxy for finding that they "substantially assisted" the principal tort or tortfeasor.  *See* Mem. 39 (collecting cases).  And although Plaintiffs argue (at 77) that their characterization of Chemonics' payments to two subcontractors as "protection payments" distinguishes this case from the legion of decisions dismissing similar claims, *see* Mem. 34, the sole aiding-and-abetting case Plaintiffs cite as supposedly involving "protection payments" concerned facts that were radically different from what the FAC alleges.  In that case, *Chiquita II*, Chiquita was alleged to have deliberately put money into the hands of terrorists for the specific and conscious purpose of funding violent activities by those terrorists against other groups.  *In re Chiquita Brands Int'l, Inc.*, 190 F. Supp. 3d 1100, 1104 (S.D. Fla. 2016).  Moreover, in that case, Chiquita was alleged to have made its "protection payments" not to *prevent* the recipient terrorist

group from carrying out attacks against Chiquita (as the FAC alleges Chemonics did in this case, albeit through independent third parties), but to cause that terrorist group to *attack* other groups in order to "driv[e]" them "out of the banana-growing regions of Colombia." *Id.* at 1120.

Even if the FAC could be construed to allege that Chemonics knew when it engaged USPI or Sherzai that they had relationships with the Taliban, *but see* Mem. 16, 21-22, Plaintiffs are nevertheless wrong in arguing (at 74) that that would be sufficient to allege that Chemonics' payments to these entities constituted "substantial assistance" to the Taliban and/or to any attacks that injured Plaintiffs. *See Siegel v. HSBC N.A. Holdings, Inc.*, 933 F.3d 217, 219 (2d Cir. 2019) (plaintiffs were "wrong" to assert that defendants' "willingness to do business" with an entity despite "knowledge of its links to terrorism" is "sufficient to expose the defendants to aiding-and-abetting liability."). And the cases Plaintiffs cite (at 71) are inapposite. Those cases all involved a defendant's provision of "assistance" directly to the principal tortfeasor, a sham entity controlled by the principal tortfeasor, or a state sponsor of terrorism—not allegations (as here with respect to Chemonics) that the defendant merely made payments to an independent third party. *See Chiquita II*, 190 F. Supp. 3d at 1118-19; *Bartlett v. Societe Generale de Banque au Liban Sal*, 2020 WL 7089448 at *2 (E.D.N.Y. Nov. 25, 2020); *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 2020 WL 6143654 at *1 (E.D.N.Y. Oct. 20, 2020); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 645-47 (S.D. Tex. 2011); *Halberstam*, 705 F.2d at 488.

Plaintiffs read too much, Opp. 71, into the words "directly or indirectly" in JASTA's uncodified preamble (Section 2(b)), which do not appear in the operative provision—§ 2333(d)—that defines secondary liability under the ATA.[7] Those preambular words simply reflect Congress' amendment of the ATA, through JASTA, to add a cause of action for *indirect liability*. *See* JASTA § 2(a)(4); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 318 (2d Cir. 2018) (JASTA "extend[ed] ATA

---

[7] It is well-established that preambular language "cannot change the operative scope" of a statute. *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016).

liability from those who themselves commit acts of international terrorism to those who aid and abet such acts by others").  JASTA did not alter the background principle that the indirect provision of general "aid," absent allegations of an intent to assist in any bad act or a close connection between the aid provided and the specific act assisted, does not amount to "substantial assistance." *See Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 110-11 (D.D.C. 2017), *order vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018).

Also meritless is Plaintiffs' attempt to find support in *Halberstam* for their assertion that their aiding-and-abetting claim may proceed against Chemonics despite the FAC's failure to connect their allegations about Chemonics' conduct to any (much less all) of the acts of terrorism that Chemonics supposedly "assisted."  Opp. 78.  In fact, *Halberstam* squarely rebuts Plaintiffs' position.  There, the D.C. Circuit held not merely that the defendant's conduct aided the principal tortfeasor (a burglar), but that the defendant's conduct was "indisputably important" to the commission of the principal tort (a burglary).  *See* 705 F.2d at 488.  The FAC contains no allegations relating to Chemonics that are even remotely similar.

**Factors 3 and 4 (Presence and Relationship).**  Plaintiffs concede that these two *Halberstam* factors lend no support to their claims against Chemonics.  They do not (and cannot) allege that Chemonics was "present" at the time of any alleged principal violations Mem. 36-37, or had any special "relationship to the principal wrongdoer," such as a position of authority, Mem. 36.  Plaintiffs try to downplay the import of these factors here by pointing to other cases in which these factors were not dispositive, Opp. 78-79, but as *Halberstam* makes plain, these factors are important.  *See* 705 F.2d at 488.[8]

---

[8] As a last-ditch effort, Plaintiffs now claim (Opp. 78) that "Defendants had a long-lasting business relationship with the Taliban," citing to the FAC's paragraphs alleging the Taliban's extortion of unnamed "companies" and "contractors."  *See* FAC ¶¶ 64-68.  Even if such group-pleaded allegations could be considered, *but see supra* pp. 6-9, they do not come close to plausibly alleging that *Chemonics* had a "long-lasting business relationship with the Taliban"—an organization that killed and maimed its personnel and bombed its facilities.

**Factor 5 (State of Mind).**  Plaintiffs do not even attempt to argue that the FAC plausibly alleges that Chemonics "intended" or "desired" to assist in any act of terrorism, or that it was "one in spirit" with the Taliban.  *See* Mem. 37.  Nor could they, as no facts even remotely support that suggestion.  They instead conflate the fifth factor for testing whether the alleged assistance was "substantial" with § 2333(d)'s *separate* requirement that such assistance was "knowingly provid[ed]."  Opp. 81.  And they ultimately concede "specific intent remains relevant" to the former inquiry.  Opp. 82.  *Halberstam* itself forces that concession, as the D.C. Circuit there analyzed the "knowingly" element of aiding-and-abetting liability separately from the six-factor test for whether the assistance was "substantial." 705 F.2d at 488.  And in applying factor 5, the D.C. Circuit asked whether the defendant "*inten[ded] and desire[d]* to make the [principal tort] succeed." *Id.* (emphasis added).  In doing so, the court focused on the "symbiotic" actions of the defendant—*i.e.*, her "pursuing the same object" as the principal tortfeasor by "related means," *id.* at 487, and her serving as a "willing partner" in the principal's criminal activities, *id.* at 486. Plaintiffs do not and cannot allege that Chemonics was such a "willing partner" in any terrorists' activities, and the FAC's (and its incorporated materials') portrayal of Chemonics as a *victim* of both extortion and terrorist attacks committed establishes exactly the opposite.

**Factor 6 (Duration).**  Nor can Plaintiffs ignore the years-long gaps between Chemonics' alleged conduct and the attacks.  *See* Mem. 37-38; *supra* p. 15; Opp. 83.  Other courts applying the *Halberstam* factors have found that the passage of significant time between the defendant's alleged conduct and the principal tort negates any notion that the defendant provided "substantial assistance."  *See* Mem. 38.  Those precedents persuasively establish that timing considerations weigh heavily in favor of dismissing Plaintiffs' aiding-and-abetting claims against Chemonics.

## B.    Plaintiffs Do Not Allege That Chemonics Acted "Knowingly"

Plaintiffs fare no better in arguing that Chemonics "knowingly" provided the requisite substantial assistance, as § 2333(d) also expressly demands.  To satisfy this element, Plaintiffs

22

would have to plausibly allege that Chemonics knew that "by assisting the principal, it [was] itself assuming a 'role' in terrorist activities."  Mem. 38 (quoting *Linde*, 882 F.3d at 329).  But they do not even try to argue that the FAC alleges that when Chemonics made payments to its subcontractors USPI and Sherzai, which in turn allegedly made payments to the Taliban to *prevent* terrorist attacks on Chemonics' personnel and interests, it "knowingly" "assum[ed] a 'role'" in a campaign of terrorism.  Any such contention would be absurd.

Plaintiffs cannot distinguish *Linde* based on its procedural posture, Opp. 84, because courts here and elsewhere have cited *Linde* for its correct interpretation of § 2333(d)'s scienter standard, including when adjudicating a motion to dismiss.  *E.g.*, *Siegel*, 933 F.3d at 224; *Atchley*, 474 F. Supp. 3d at 214 at *12; *Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066 at *5 (D.D.C. Nov. 16, 2020).  And as *Linde* held, a defendant's alleged provision of money even to a foreign terrorist organization ("FTO") (which the Taliban is not) is not enough to show that the defendant "knowingly" aided and abetted the principal act of international terrorism, even where the defendant (unlike Chemonics) is alleged to have directly transferred money to the organization. *See* 882 F.3d at 329.  Plaintiffs fail to identify a single case—and Chemonics knows of none—that has deemed § 2333(d)'s knowledge element to be satisfied by allegations that (as here with respect to Chemonics) do not indicate the defendant knew it was playing a "role" in a terrorist act.

Try as they might to rely again on *Halberstam*, *see* Opp. 83-84, the logic and analysis of that key precedent doom Plaintiffs' claims.  There, the court held that the defendant was liable for a murder that was the "foreseeable consequence" of the principal's armed burglary enterprise because she "knowingly and willingly assisted" the principal in inventorying and concealing evidence of the burglaries out of an "intent and desire to make the [burglaries] succeed." *Halberstam*, 705 F.2d at 486, 488.  Here, in contrast, nowhere does the FAC allege that Chemonics "intended" or "desired" the Taliban's terrorist campaign to succeed.  *See* Mem. 40.

### C.    Plaintiffs Fail To Plead That A Designated FTO "Committed, Planned, Or Authorized" The Alleged Acts Of Terrorism

Finally, as previously explained (Mem. 41-45), the FAC fails to plausibly allege that the vast majority of the attacks at issue were "committed, planned, or authorized" by a designated FTO, as § 2333(d) also demands.  Plaintiffs are wrong in arguing (at 88) that Chemonics sets the bar too high for this essential element.  Indeed, Chemonics' opening brief acknowledged that in the relatively few instances in which the FAC alleges that a particular attack was "committed" jointly by the Taliban (which is not an FTO) and either al-Qaeda (which is an FTO) or the Haqqani Network after its designation as an FTO, dismissal for failure to sufficiently plead the FTO element is not warranted.  *See* Mem. 44 n.44.  But even on a motion to dismiss, the Court ought not credit the FAC's conclusory catchall allegations that "every suicide bombing" was jointly planned and committed by al-Qaeda and the Taliban.  Mem. 43-44; *Twombly*, 550 U.S. at 555 (court need not accept "labels and conclusions" or "formulaic recitation of the elements.").  Nor can the bare assertion that al-Qaeda shared "suicide-bombing expertise" with the Taliban (FAC ¶ 498; Opp. 87) rectify that conclusory allegation.  Likewise, at least with respect to Chemonics, the Court should disregard Plaintiffs' sweeping suggestion that "each Defendant's protection payments went to the Haqqani Network for the projects they executed in Haqqani territory," Opp. 89, for which they only cite parts of the FAC that pertain only to Defendants *other than* Chemonics.  *Id.*

Plaintiffs also stretch the meaning of "planning" and "authorizing" beyond recognition. Allegations that al-Qaeda "provided an infrastructure through which multiple groups … coordinated terrorist operations," Opp. 91; "sponsored the Taliban's use of specific attack techniques," *id.*; and provided "train[ing]" and "direction" to the Taliban, *id.*, do not suffice to plead that al-Qaeda "planned" any particular attack, much less any of the specific attacks alleged here.  *See* Mem. 42.  And allegations that al-Qaeda "authorized" the attacks "through much the same conduct," Opp. 92, and through "exercis[ing] religious authority" over the Taliban, *id.*, are equally mismatched.  *See* Mem. 42.  Courts have rejected allegations concerning such "general"

support because they fail to indicate the necessary "planning" or "authorizing."  *Clayborn v. Twitter, Inc.*, 2018 WL 6839754, at *8 (N.D. Cal. Dec. 31, 2018) (allegations "that [FTO] sought to 'generally radicalize' individuals and promoted terrorist[] attacks … are insufficient."); *Atchley*, 474 F. Supp. 3d at 212 (same for allegations that FTO "co-found[ed]" affiliate group, exerted "religious authority" over it, and played role in "recruiting, training, and indoctrinating" attackers).

Plaintiffs also fail to explain how their overly expansive definitions of "planning" and "authorizing" can be distinguished from providing "material support or resources," which is a prominent but distinct concept within the ATA.  In § 2333(d), Congress required a far greater degree of FTO involvement through the phrase "committed, planned, or authorized."  *See Atchley*, 474 F. Supp. 3d at 212.  Plaintiffs acknowledge that "[h]ad an FTO merely given the Taliban money and done nothing else … that alone would not constitute planning or authorization."  Opp. 95.  But the ATA's definition of "material support or resources" is not limited to the provision of "money," and encompasses much of the same conduct that Plaintiffs now try to shoehorn into "planning" and "authorizing."  *See* 18 U.S.C. § 2339A(a), (b)(1) (defining "material support or resources" to include "training," "weapons," "expert advice," "personnel," and any "service").

Finally, Plaintiffs cannot circumvent § 2333(d)'s key requirement of an act "committed, planned, or authorized" by pretending to conjure an alleged "terrorist syndicate" headed by an FTO.  They point to no caselaw explaining why that would matter, or how it differs from the "overarching campaign" allegedly orchestrated by an FTO in *Atchley*.  *See* 474 F. Supp. 3d at 212. They likewise fail to identify a single case—in any court—holding that a RICO "campaign" may constitute an "act" of terrorism under the ATA.  *Atchley* considered—and rejected—precisely that argument.  *See id*.

## CONCLUSION

The FAC should be dismissed entirely as to Chemonics, with prejudice.

Dated: February 5, 2021

Respectfully submitted,

/s/ Patrick J. Carome
Patrick J. Carome (D.C. Bar # 385676)
David W. Bowker (D.C. Bar # 989309)
Leon T. Kenworthy (D.C. Bar # 1045105)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel. (202) 663-6000
patrick.carome@wilmerhale.com
david.bowker@wilmerhale.com
leon.kenworthy@wilmerhale.com

*Counsel for Defendant Chemonics International, Inc.*