UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AUGUST CABRERA, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>BLACK & VEATCH SPECIAL<br>PROJECTS CORPORATIONS, *et al.*,<br><br>    Defendants. | No. 19-cv-3833-EGS-ZMF |

## REPORT & RECOMMENDATION

Plaintiffs, members of the United States armed forces and civilians who were tragically killed or injured in one of 197 attacks in Afghanistan between 2009 and 2019, as well as estates and family members of deceased victims of such attacks, bring this action against seventeen corporate entities[1] pursuant to the civil liability provision of the Antiterrorism Act of 1992, 18 U.S.C. § 2333(a) (the "ATA"), as amended by the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 854 (2016) ("JASTA") (codified at 18 U.S.C. § 2333(d)(2)).  *See generally* ECF No. 82 (Am. Compl.).  Defendants MTN and G4S move to dismiss the Amended Complaint for lack of personal jurisdiction, *see* ECF No. 102 (MTN Mot. to Dismiss) at 13; ECF

---

[1] The Defendants are: Black & Veatch Special Projects Corporation ("Black & Veatch"); Centerra Group, LLC (formerly ArmorGroup North America or "AGNA"); DAI Global LLC ("DAI"); Environmental Chemical Corporation ("ECC"); G4S Risk Management Limited (formerly ArmorGroup Mine Action or "AGMA") and G4S Holdings International (AG) Limited (formerly ArmorGroup International or "AGI") (collectively "G4S");   Janus Global Operations LLC ("Janus"); Louis Berger Group, Inc. and Louis Berger International Inc. (collectively "Louis Berger"); Louis Berger Group, Inc./Black & Veatch Special Projects Corporation Joint Venture (the "Joint Venture"); MTN Group Limited, MTN (Dubai) Limited, and MTN Afghanistan (collectively "MTN"); International Relief and Development, Inc., Blumont, Inc., and Blumont Global Development, Inc. (collectively "IRD"); and Chemonics International, Inc. ("Chemonics").

No. 105 (Centerra & G4S Mot. to Dismiss) at 53, and all Defendants move to dismiss the complaint

for failure to state a claim under the ATA.[2]  On July 20, 2020, United States District Judge Emmet

G. Sullivan referred this matter to a magistrate judge for full case management, including the

preparation of a Report and Recommendation pursuant to Local Civil Rule 72.3.  *See* Minute

Order, (July 20, 2020).

These tragic attacks have irreparably harmed each and every Plaintiff.  Some suffered—

and continue to suffer—from lifelong injuries.  Many lost a family member in one of the attacks.

The Court cannot begin to fathom the immense pain and loss that each Plaintiff has experienced.

Their bravery and service to the safety and security of this Nation cannot be overstated.  However,

the Court "cannot conclude that the law provides the relief plaintiffs seek in this case."  *Atchley v.*

*AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 200 (D.D.C. 2020).  Having considered the parties'

submissions, the undersigned recommends that the Court GRANT each Defendant's Motion to

Dismiss.

## I.      BACKGROUND

The Court draws the following recitation of relevant facts from the Amended Complaint.

### A.      The Taliban in Afghanistan

Between 1994 and 2001, the Taliban wielded de-facto control over wide swaths of

Afghanistan.  *See* Am. Compl., ¶¶ 40–42.  Throughout that time, the Taliban harbored al-Qaeda

as al-Qaeda planned the September 11, 2001 attacks.  *See id.*, ¶ 42.  In the wake of September

11th, the United States invaded Afghanistan to drive the Taliban from power and stamp out al-

---

[2] *See generally* MTN Mot. to Dismiss; Centerra & G4S Mot. to Dismiss; ECF No. 103 (Louis Berger Mot. to Dismiss); ECF No. 104 (IRD Mot. to Dismiss); ECF No. 106 (Black & Veatch Mot. to Dismiss); ECF No. 107 (DAI Mot. to Dismiss); ECF No. 108 (Joint Venture Mot. to Dismiss); ECF No. 109 (Janus Mot. to Dismiss); ECF No. 110 (ECC Mot. to Dismiss); ECF No. 111 (Chemonics Mot. to Dismiss).

Qaeda's operations in the country. *See id.*, ¶ 44. While the Taliban took refuge in Pakistan immediately after the invasion, by 2006, it "regenerated as a deadly terrorist insurgency," *id.*, ¶ 2, and began gaining control over the eastern and southern parts of Afghanistan, *see id.*, ¶¶ 47, 63. Plaintiffs allege that the mission of the "Taliban-led insurgency," *id.*, ¶ 432, was to oppose democratic rule and "impose strict Sharia law," *id.*, ¶¶ 2, 419.

By 2009, the Taliban was running "'shadow' governments in 33 of Afghanistan's 34 provinces." *Id.*, ¶ 63. Key provinces—including Kandahar, Helmand, Herat, and Khost Provinces—were de facto controlled by the Taliban. *See id.*, ¶ 47. A report by the Special Inspector General for Afghanistan Reconstruction ("SIGAR")—cited by Plaintiffs, *see id.*, ¶ 77— confirmed that "at the district and community level . . . the Taliban [was] providing its own brand of brutal but efficient governance." SIGAR, *Stabilization: Lessons from the U.S. Experience in Afghanistan* at 35 (May 2018) (hereinafter "2018 SIGAR Report").

Over the years, the Taliban has often claimed to be the legitimate government of Afghanistan, and it repeatedly attempted to gain United Nations recognition throughout the 1990s. *See* Am. Compl., ¶ 420. After 2001, those countries that still maintained diplomatic relationships with the Taliban cut ties with the organization. *See id.*, ¶ 421. The Taliban maintained a "political" wing, *id.*, ¶ 430, and claimed governmental authority, yet it allegedly showed "no desire to provide even the most rudimentary health, education, or other social services expected of any government," *id.*, ¶ 419. However, SIGAR recognized that "the Taliban provided limited services in pockets of the country." 2018 SIGAR Report at 150. The February 2020 U.S.-Taliban Peace Agreement reflects the authority exerted by Taliban leadership. *See id.*, ¶ 430.

In the years after the U.S. invasion, the Taliban was led by the Quetta Shura, "a leadership council that functioned as the group's governing body." Am. Compl., ¶ 47. Although the Taliban

"operated as a top-down hierarchy," with power exerted by political and military seats of power, at the lower levels it operated via "local chapters throughout Afghanistan." *Id.*, ¶ 430.

It funded itself both through local chapters, or "shuras," that "engaged in criminal tactics to raise money," and through the Taliban Financial Commission, "a centralized fundraising arm that reported to the Quetta Shura." *Id.*, ¶ 49. To maintain control over how funds were raised and spent, the Taliban Financial Commission promulgated a Code of Conduct setting forth "strict instructions" governing the distribution of funds within the chain of command. *Id.* The Taliban's largest source of funding was drug trafficking. *See id.*, ¶ 106. One report that Plaintiffs cite recognized that the Taliban has a dual role that "merg[ed] . . . organized crime and terrorism" through its "direct involvement in drug-trafficking." *Id.*, ¶ 123.

The Taliban used its funds to "sustain its growing campaign of terrorism against the United States." *Id.*, ¶ 97. "[T]he Taliban paid many of its rank-and-file fighters about $100 per month, while mid-level commanders made upwards of $350 per month." *Id.*, ¶ 103. It commonly used tactics including improvised explosive devices ("IEDs"), suicide bombings, kidnappings, assassinations, and summary executions. *See id.*, ¶¶ 50, 433–34, 448. Attacks were often cheap. For example, estimates suggest that it cost the organization $100 to make an IED. *See id.*, ¶ 103. Its attacks often targeted "[U.S.] military forces, contractors, . . . civilian aid workers, [non-governmental organizations], and Afghan civilians." *Id.*, ¶ 433.

Plaintiffs further allege that the Taliban was a member of a larger terrorist "syndicate" made up of three distinct entities (the Taliban, the Haqqani Network, and al-Qaeda), *id.*, ¶ 412, and one entity (the Kabul Attack Network) that was a joint project of those three organizations, *see id.*, ¶ 459. As part of the "syndicate" each of these organizations is said to have shared resources and exchanged technical knowledge. *See id.*, ¶ 466.

4

The Haqqani Network is "an especially violent" organization that is "concentrated in southeastern and eastern Afghanistan." *Id.*, ¶ 48; *see also id.*, ¶ 451. Plaintiffs allege that there is "significant overlap between the broader leadership of the Taliban and the Haqqani Network," *id.*, ¶ 444, that the Taliban "often acts through the Haqqani Network" in the southeastern parts of Afghanistan, *id.*, ¶ 442, and that the Haqqani Network regularly provided training and support to Taliban insurgents, *see id.*, ¶ 449. Members of the Taliban and Haqqani Network are said to "often commit attacks alongside" of one another. *Id.*

This unification between the Taliban and the Haqqani Network also allegedly extended to al-Qaeda. *See id.*, ¶¶ 453–54, 470–512. Ultimately, Plaintiffs allege that al-Qaeda played a role in every Taliban attack across Afghanistan. *See generally id.*, ¶¶ 477–512. It did so by: (a) providing religious authorization in the form of *fatwas*, *see id.*, ¶ 478; (b) broadly supporting and promoting the use of suicide bombings, IEDs, helicopter attacks, and kidnappings, *see id.*, ¶¶ 483, 485, 487, 498, 506–07; (c) operating camps that trained members of multiple terrorist organizations, *see id.*, ¶¶ 489–91; (d) planning joint operations by the Kabul Attack Network, *see id.*, ¶ 493; (e) devising a shared "operational scheme," *see id.*, ¶ 494; (f) distributing radical media propaganda, *see id.*, ¶ 495; and (g) sending "dual-hatted al-Qaeda/Taliban terrorists" to carry out specific attacks, *id.*, ¶ 503.

Despite its engagement in terrorist activities, the United States has never designated the Taliban in Afghanistan as a Foreign Terrorist Organization ("FTO"). *See Foreign Terrorist Organizations*, U.S. Department of State, https://www.state.gov/foreign-terrorist-organizations/ (last visited July 16, 2021). However, in 2002, President George W. Bush named it a Specially Designated Global Terrorist ("SDGT"). *See* Am. Compl., ¶ 417. The Haqqani Network was

designated as an FTO on September 19, 2012, *see id.*, ¶ 439, and al-Qaeda has been so designated since October 1999, *see id.*, ¶ 468.

      B.    <u>Attacks on Plaintiffs</u>

Plaintiffs were injured in—or they had a family member who was killed in—one of 197 different terrorist attacks throughout Afghanistan between 2009 and 2019.  *See id.*, ¶¶ 1, 1522, 1954.[3]  As to who is behind these attacks, broadly, Plaintiffs allege that "[t]he Taliban carried out [each of] the terrorist attacks that killed or injured" them.  *Id.*, ¶ 435.  Yet they also allege that al-Qaeda "planned and authorized each of these attacks."  *Id.*, ¶ 522.  Beyond these allegations, the Amended Complaint details the nature of each of the attacks that injured Plaintiffs and their family members.  *See generally id.*, ¶¶ 524–2569.  The more detailed allegations "identify the relevant FTO" on an "attack-by-attack basis."  ECF No. 119 (Pls.' Resp. to Louis Berger's Mot. to Dismiss) at 86.

      C.    <u>Contracting Landscape in Afghanistan</u>

In the wake of the invasion, the United States and international development organizations launched efforts to rebuild Afghanistan and promote democratic governance throughout the country.  *See* Am. Compl., ¶¶ 53, 427.  Numerous countries and international bodies led the charge on these development projects, including the United States, the United Kingdom, and the United Nations.  *See id.*, ¶ 147.  For example, the U.S. Air Force, the Army Corps of Engineers, and the

---

[3] The number of attacks is not the same as the number of victims who were injured or killed in the attacks, and who are named (or whose family members are named) as Plaintiffs.  While the Amended Complaint is organized by individual victims (rather than attacks), the Court assumes that attacks carried out on the same day, by the same organization, and using the same methods, were part of one attack.  For example, while it may be that the Taliban detonated five different IEDs on May 4, 2013, without clarification from the Amended Complaint, the Court assumes this was one attack that injured or killed at least five individuals.  *See*, Am. Compl., ¶¶ 794–95, 1593–94, 1857–58, 1989–90, 2015–16.

U.S. Agency for International Development ("USAID") launched projects throughout the country. *See, e.g.*, *id.*, ¶¶ 217(c)–(d), 247(a).   U.S. agencies contracted with various companies—often industry leaders in the construction, engineering, and agricultural spheres—to help implement these projects.   *See, e.g.*, *id.*, ¶¶ 217, 403.   The prime contractors routinely utilized subcontractors to work on portions of a project or to provide security.   *See id.*, ¶ 5.

Plaintiffs paint a picture of rampant corruption that plagued these development projects throughout Afghanistan.   *See id.*, ¶¶ 55–61.   This included both "garden-variety corruption" to bribe government officials and payments to the Taliban and terrorist organizations.   *Id.*, ¶¶ 58–59. Plaintiffs' claims are rooted in the latter.   They allege that international contractors commonly structured their operations in Afghanistan to "funnel money to the Taliban,"[4] *id.*, ¶ 62, in the form of "protection payments," *id.*, ¶ 1.

"[T]he Taliban used threats of terrorist violence to extract protection money from international companies."   *Id.*, ¶ 63.   Businesses were "present[ed] . . . with a choice: either meet the Taliban's monetary demands and help fund its insurgency, or else spend even more money on expensive security measures to fend off the risk of future Taliban attacks."   *Id.*, ¶ 2.   In response, contractors (and Defendants specifically) allegedly "decided that the cheapest way to shield their projects from attack was to pay the Taliban to leave them alone."   *Id.*, ¶ 62.   The payments thus "served [the contractors] financial interests."   *Id.*, ¶ 65.   Plaintiffs allege that, by making protection payments, international contractors "were redirecting the attacks to other targets."   *Id.*, ¶ 8.   This practice was particularly rampant in insurgent-controlled areas, where the Taliban "leveraged [its]

---

[4] The Amended Complaint also broadly alleges that, based on evidence of industry practices, each Defendant also paid protection payments to the Haqqani Network.   *See* Am. Compl., ¶¶ 93, 101.

control into protection payments." *Id.*, ¶ 63.  Protection money, in turn, "supplied the Taliban with an important stream of financing to fund their terrorist attacks across [Afghanistan]."  *Id.*, ¶ 62.

Plaintiffs cite a litany of evidence of industry norms and public sources demonstrating that protection payments were "standard practice" for businesses operating in Afghanistan.  *Id.*, ¶ 79. Specifically, they cite statements of industry participants (other than Defendants), *id.*, ¶¶ 64, 79– 80, 89, 91, 94, 112; Afghani government officials, *id.*, ¶ 65; news reports and journalists' accounts, *id.*, ¶¶ 68, 73, 81, 90; independent organization reports, *id.*, ¶¶ 68, 80; U.S. government interagency reports, *id.*, ¶¶ 73–75; congressional investigation findings, *id.*, ¶ 76; U.S. government and military officials' statements, *id.*, ¶¶ 76, 78; and academic reports, *id.*, ¶ 82.

Plaintiffs cite similar sources indicating that it was common knowledge that these payments went directly to the Taliban and were used to fund insurgent activities.  *See, e.g.*, *id.*, ¶¶ 112–13, 118–26.  Several prominent media reports from 2004 to 2012 described how protection payments funded the Taliban.  *See id.*, ¶¶ 121–23 (describing protection payments as an "open secret" and a "widely known practice in Afghanistan").  Those reports were often sent directly to certain Defendants' employees through email updates from global strategic-intelligence firms.  *See id.*, ¶¶ 125–26.  Moreover, because the payments only had the "desired" effect—thwarting Taliban attacks—if they reached the hands of the Taliban, Plaintiffs allege that contractors "needed and intended for their money to reach the Taliban."  *Id.*, ¶¶ 96, 117.  Although the U.S. government "encouraged companies to hire local Afghans or employ local Afghan businesses in connection with some projects," *id.*, ¶ 138, it communicated to its contractors that payments to insurgent groups were forbidden, *see id.*, ¶¶ 133–34, 185 (describing "standard" USAID contracts clauses).

Prime contractors funneled protection payments through subcontractors that were brought on to provide security services at project sites.  *See id.*, ¶¶ 68, 73, 95.  The payments usually took

one of two forms: paying lump sums to local Taliban commanders,[5] or, in the alternative, placing local Taliban security guards on the company's payroll.  *See id.*, ¶¶ 90–91.  Those salaries then flowed to Taliban coffers.  *See id.*, ¶¶ 91, 94, 105.  At times, subcontractors placed "fictitious security guards" or "ghost employees" on their payrolls to disguise protection payments as legitimate salaries.  *Id.*, ¶ 94.  Collection and distribution of protection payments within the Taliban was a "highly regulated process" governed by the Taliban's Code of Conduct, and "appointed officials" oversaw the levying of these "tax[es]."  *See id.*, ¶¶ 84, 86, 100, 105.  Thus "organizational hierarchy ensured that protection money collected locally . . . helped to finance Taliban operations throughout [Afghanistan]."  *Id.*, ¶ 111.

In 2009, then-Secretary of State Hillary Clinton testified that protection money was a "major source[] of funding for the Taliban."  *Id.*, ¶ 106.  Various agency and expert reports from 2010 to 2015 opined that 10 to 20% of all development contract money spent in Afghanistan was funneled to the Taliban and/or the Haqqani Network.  *See id.*, ¶ 80.  In areas where the Taliban maintained de-facto control, that number could rise to 25%.  *See id.*, ¶¶ 74–76.  These organizations allegedly used protection money to recruit new members, acquire weapons and explosives for attacks, and support their "operational infrastructure."  *Id.*, ¶¶ 97, 102.  Plaintiffs allege that protection payments provided "essential" funds that gave the Taliban "fungible resources that were vital to its ability to sustain its terrorist enterprise."  *Id.*, ¶¶ 99, 108.

---

[5] The collection of protection payments from certain larger businesses allegedly involved "large-scale payments negotiated directly with the Quetta Shura."  *Id.*, ¶ 113.  The Taliban Financial Commission supervised such negotiations.  *See id.*, ¶¶ 84, 88.  But the allegations that Defendants, specifically, engaged in this formalistic system of protection payments are limited to sweeping and conclusory statements without any specific examples.  *See, e.g.*, *id.*, ¶¶ 113, 186, 220.

D.     Individual Defendants

Between 2002 and 2016, each Defendant was involved in "large-scale development projects" either as prime contractors or subcontractors.  *Id.*, ¶ 53.  In alleging that each Defendant made protection payments, Plaintiffs rely both on evidence of industry practice and knowledge, *see supra* Part I.C, and on facts concerning each Defendant's specific projects.

1.  *Centerra & G4S*

The "ArmorGroup Defendants" are three entities: Centerra, formerly ArmorGroup North America, Inc. ("AGNA"); G4S Holdings International, formerly ArmorGroup International ("AGI"); and G4S Risk Management, formerly Armor Group Mine Action ("AGMA").  *Id.*, ¶ 145.[6]  AGI  and its subsidiary, AGMA, are incorporated in the United Kingdom and headquartered in London, England.  *See id.*, ¶¶ 19–20.  AGNA is AGI's U.S.-based subsidiary, which has an office in Virginia.  *See id.*, ¶ 173.

These Defendants subcontracted on both U.S. government and non-U.S. government prime contracts, *see id.*, ¶ 147, and allegedly made protection payments between 2007 and 2015, *see id.*, ¶ 148.  The Amended Complaint lists eight contracts exemplifying the protection payments.  *See id.*, ¶ 147.  AGNA subcontracted on one U.S. prime contract, *see id.*, ¶ 147(a), and was the prime contractor on two contracts with the U.S. State Department, *see id.*, ¶ 147(c), (g).  As part of those contracts, AGNA provided security for the construction site of a U.S. Air Force base and for the U.S. Embassy in Kabul.  *See id.*, ¶ 147.  AGMA also subcontracted on one U.S. prime contract between co-Defendant Environmental Chemical Corporation ("ECC") and the U.S. Air Force— the Shindand Mine Clearance Contract.  *See id.*, ¶ 147(b).  On the remaining four contracts, either

---

[6] For ease of reference, the Court will refer to each of these Defendants by their ArmorGroup names.

AGMA or AGNA subcontracted on projects led by the United Nations or the United Kingdom. *See id.*, ¶¶ 47, 147(d), (e), (f), (h).

Setting aside the mangled web of relationships between these entities, the substance of the allegations against Centerra and G4S reads like the script of a Quintin Tarantino film.  Indeed, *Reservoir Dogs* inspired the code names of some of the actors involved.

Many of the relevant facts involve a contract to expand a U.S. military base (the "Shindand Airbase Contract").  *Id.*, ¶ 147(a).  In 2007, the U.S. Air Force hired ECC as the prime contractor. *See id.*  ECC then subcontracted with AGNA to perform the security work for the project.  *See id.* To secure the airbase, AGNA hired guards from two men described as "feuding warlords" and "Taliban cutouts," *id.*, ¶¶ 148 n.186, 150, and known colloquially as Mr. Pink and Mr. White, *see id.*, ¶ 150.  Ultimately, Mr. Pink shot and killed Mr. White and went into hiding "with a number of Taliban fighters and a Taliban commander."  *Id.*, ¶ 151.  "[D]espite reports that [Mr. Pink] was working with the Taliban" after he killed Mr. White, AGNA "kept using his men to provide security" for the airbase.  *Id.*  Later, Mr. White's brother—unoriginally dubbed "Mr. White II"— replaced Mr. White by providing guards for the airbase.  *See id.*, ¶ 153.  One of AGMA's project leaders also admitted to using Mr. White II's guards because the other options were "more expensive."  *Id.*, ¶ 164.[7]  On August 21, 2008, the U.S. military killed Mr. White II during a raid

---

[7] The circumstances of AGMA's payments to Mr. White II are unclear from the Amended Complaint.  Although an AGMA project leader acknowledged the practice of protection payments, the Amended Complaint ties that employee to the "Shindand Airbase project."  Am. Compl., ¶ 164. But the Senate Report that Plaintiffs cite, *see id.*, indicates that the "Project Leader" was connected to a U.N. prime contract, *see* S. Rep. No. 111-345, at 26 (2010).  Still, the Senate Report documented, in detail, AGMA's relationship with Mr. White and Mr. White II.  *See id.* at 37. Indeed, AGMA's Company Director thanked the entire White family for their services to AGMA. *See id.*  At this early stage, those facts raise a reasonable inference that AGMA used Mr. White and Mr. White II for both its U.N. and U.S. contacts located in and around Shindand.  *See* Am. Compl., ¶ 147(b), (d).

on a Taliban meeting (the "Azizabad raid").  *See id.*, ¶¶ 154–55.  After the raid, AGNA allegedly made a "discretionary payment" to Mr. White II's family.  *Id.*, ¶ 157.  However, shortly after both Mr. White's murder and the Azizabad raid, AGNA severed ties with Mr. Pink's and Mr. White II's employees.  *See id.*, ¶¶ 153, 163.

The Amended Complaint also alleges that these Defendants' business practices and models evince a common practice of paying protection payments.  For example, these Defendants paid local "warlords" in Taliban controlled areas, sourced security guards locally in Taliban areas, engaged in patterns of fraudulent conduct, and failed to properly implement internal controls.  *See id.*, ¶¶ 147, 169–71.  Plaintiffs allege that this circumstantial evidence, while not tied to any specific contracts or payments, demonstrates that these Defendants routinely paid protection payments on each of their contracts.

### 2. DAI Global

For many years, DAI was USAID's second largest contractor in Afghanistan—accounting for over $1 billion in development projects.  *See id.*, ¶ 181.  The Amended Complaint identifies nine USAID prime contracts on which DAI—largely vis-à-vis its subcontractors—made protection payments "worth at least several million dollars" between 2007 and 2016.[8]  *Id.*, ¶¶ 183–84; *see also id.*, ¶¶ 182, 186.  The Amended Complaint begins by citing industry practice and DAI's "[l]ack of financial controls" as evidence of protection payments.  *Id.*, ¶¶ 183, 216.  DAI employees also recognized the general practice of making protection payments.  *See id.*, ¶¶ 187, 189, 197.  One field director acknowledged DAI's decision to engage directly with "local Taliban" near project sites and stated that DAI's response to Taliban demands was to cut deals and hire

---

[8] However, some of these contracts involved work in Pakistan.  *See id.*, ¶ 182.  Unhelpfully, the Amended Complaint does not specify which contracts those were.  *See id.*  But the three contracts that Plaintiffs discuss in depth involved Afghan projects.  *See id.*, ¶¶ 182(e), 187–88.

Taliban-affiliated individuals.  *Id.*, ¶ 187.  Another senior employee internally objected to paying the Taliban, but DAI "ignored the objection."  *Id.*, ¶ 197.

DAI's internal monitoring and evaluation companies similarly documented the practice of paying protection money, including on DAI's Rural Agricultural Income and Sustainable Environment ("RAISE") project between 2010 and 2014.  *See id.*, ¶¶ 182(g), 188.  When those evaluations confirmed that DAI and its subcontractors were "paying the Taliban for permission to access the project sites," DAI instructed the evaluators to "remove any reference to Taliban payments from the final report."  *Id.*, ¶ 188.  DAI's internal Security Incident Reports also alerted management to the Taliban's demands for "protection taxes."  *Id.*, ¶ 198.  Throughout its operations in Afghanistan, DAI received "permission letters" from the Taliban "granting them formal authority to implement multiple projects."  *Id.*, ¶ 183.  These letters were only sent "to contractors that had made the necessary protection payments."  *Id.*  DAI allegedly made these payments to "grow its own profits."  *Id.*, ¶ 211.

In 2010, USAID's Office of Inspector General ("OIG") reviewed DAI's performance on the Local Governance and Community Development program (the "LGCD Contract") and found "overwhelming testimonial and documentary evidence" "indicat[ing] that [DAI's] Afghan subcontractors . . . paid insurgents for protection in remote and insecure areas of Afghanistan." *Id.*, ¶¶ 182(a), 191, 195.  The OIG Report concluded that, in 2009 alone, up to 20% of the total LGCD subcontract value may have flowed to the Taliban—totaling $5.2 million.  *See id.*, ¶ 204. The Taliban allegedly negotiated the prices by "extort[ing] more money from the subcontractor" and "threaten[ing] violence if the subcontractor did not comply."  *Id.*, ¶ 205.

In January 2008, DAI was awarded another USAID contract to work on the Federal Administered Tribal Areas Development Program (the "FATA contract").  *Id.*, ¶ 182(c).  The

FATA contract lasted three years and was executed in an area where a contractor would "normally have to pay up to 15 percent of the value of that contract in tax to the Taliban." *Id.*, ¶ 190. Specifically, the FATA project was in a "notoriously insecure, Haqqani-controlled area" and the protection payments related to the FATA contract are alleged to have gone directly to the Haqqani Network. *Id.*

### 3. ECC

ECC is a construction and engineering company that was awarded several prime contracts by the U.S. military, *see id.*, ¶ 217, and allegedly made protection payments worth "several million dollars" between 2007 and 2014, *id.*, ¶¶ 218–19. Circumstantial evidence of such payments includes industry practice, the use of "[i]nsurgent-connected subcontractors" (including AGNA), the prevalence of protection payments in the construction industry and in the geographic regions where ECC operated, and ECC's lack of internal controls. *Id.*, ¶ 218.

Plaintiffs identify five specific contracts where ECC made protection payments. *See id.*, ¶¶ 217–18. ECC was the prime contractor on the Shindand Airbase Contract, and it subcontracted with AGNA for its security work. *See id.*, ¶¶ 220–21. The nature of the payments associated with this contract are outlined above, *see supra* Part I.D.1. As to ECC's involvement, ECC employees met with AGNA representatives and even met with Mr. White II. *See id.*, ¶ 222. And ECC was aware of AGNA's use of Taliban-affiliated personnel through "detailed security reporting." *Id.* Thus, both ECC and AGNA were allegedly engaged in making protection payments related to this contract. *See id.*, ¶¶ 220–21.

ECC also subcontracted with Arvin Kam Construction Company ("Arvin Kam") after obtaining a prime contract with the U.S. Army Corps of Engineers to construct a police headquarters in Kunduz Province ("Kunduz Police Contract"). *See id.*, ¶¶ 217(d), 224. While

executing the Kunduz Police Contract, ECC was told that Arvin Kam was "supporting an insurgency," but it did not immediately terminate the subcontractor.  *Id.*, ¶¶ 224–25.  Thus, Plaintiffs allege that ECC funneled protection payments through Arvin Kam.  *See id.*, ¶ 224.

### 4.  *Janus Global Operations ("Janus")*

Janus—formerly EOD Technology, Inc.—specialized in explosive-ordnance disposal and private security services in Afghanistan.  *See id.*, ¶ 229.  Plaintiffs allege that Janus paid several million dollars in protection payments in relation to at least five U.S. government contracts and one non-U.S. government contract between 2008 and 2016.  *See id.*, ¶¶ 229, 232.  In addition to industry practice, Plaintiffs point to Janus's efforts to appease local "warlords" in Taliban-controlled areas, its failure to thoroughly vet its security guard employees as a means of disguising payments to Taliban members, and its decision to hire a senior employee from the ranks of a "criminal-run security firm notorious for effecting protection payments."  *Id.*, ¶ 231.

Specifically, Janus had relationships with three alleged Taliban "cutouts": General Wahab, Haji Dawoud, and Mr. Pink.  *See id.*, ¶¶ 236, 238, 241–42.  In executing its contracts, Janus sourced its security guards from these men's ranks of "fighters" despite their known ties to the Taliban. *See id.*, ¶¶ 237, 239, 241.  For example, Janus hired Mr. Pink's fighters *after* Mr. Pink killed Mr. White and went into hiding with the Taliban.  *See id.*, ¶¶ 238–39.  Thus, Janus paid protection money by "placing Taliban fighters directly on [its] payroll."  *Id.*, ¶ 234.

### 5.  *Louis Berger, Black & Veatch, and the Joint Venture*

Each of these Defendants contracted with USAID on development projects in Afghanistan, with the Joint Venture topping the charts as the largest USAID contractor in Afghanistan through June 2013.  *See id.*, ¶ 245.  Plaintiffs allege that, between 2006 and 2014, these Defendants maintained a "general policy of paying the Taliban to secure their projects," and lists three

contracts involving such payments.  *Id.*, ¶¶ 247–48.  Again, Plaintiffs reiterate the circumstantial evidence of protection payments, including industry practice, poor internal financial controls, and the use of security subcontractors with known criminal ties.  *See id.*, ¶ 248.

These Defendants' construction projects included Afghanistan's "Ring Road"—a "two-lane highway encircling the country."  *Id.*, ¶ 252.  For a portion of this project, Louis Berger hired Watan Risk Management ("Watan") to provide security.  *See id.*, ¶ 253.  Watan both "paid the Taliban" in lump sums and "sourced its supply of 'security guards' from the ranks of the Taliban." *Id.*, ¶ 70.  This practice was allegedly widely known.  *See id.*  In December 2010, the U.S. military debarred Watan from government contracting to prevent the flow of money to insurgents.  *See id.*, ¶ 71.  In hiring Watan, despite its known Taliban affiliations, one Louis Berger official described the situation as a "catch-22" stating "[i]f you don't pay them off, they kill your security staff and your contractors."  *Id.*, ¶ 253.  Similar allegations are made about these Defendants' use of another security subcontractor, U.S. Protection and Investigation ("USPI"), between 2003 and 2008.  *See id.*, ¶¶ 94, 254–57, 260–61.  USPI's Taliban affiliations were known as early as 2006.  *See id.*, ¶ 255.   One USPI employee confessed that "the company [he] was working for was defrauding the U.S. government to pay the Taliban."  *Id.*, ¶ 261.  As one security expert who worked closely with Louis Berger personnel stated, "the Deputy Chief of Party [at Louis Berger] knew of and approved USPI's policy of making protection payments to Taliban insurgents."  *Id.*, ¶ 255.

Such payments allegedly occurred in other construction projects led by these Defendants, including payments to the Taliban while constructing the Kajaki Dam and payments to the Haqqani Network while constructing the Gardez-Khost Highway.  *See id.*, ¶¶ 269, 271–73, 277.

Employees of the Joint Venture also voiced concerns about protection payments.  *See id.*, ¶ 267.  As one explained, "if you go through [the Taliban's] area, you have to hire them to guard

you.  It's the only way it worked.  It's just that we got good at dressing it up and hiding it in a way that [the U.S. government] couldn't find out."  *Id.*  Another high-level Joint Venture employee stated that "it was accepted wisdom that our money was paying the Taliban—only the most naïve person wasn't aware of it."  *Id.*, ¶ 268.  Ultimately, employees recognized that, without protection payments, "there's no other way to get the roads built."  *Id.*

### 6.  International Relief & Development ("IRD")

IRD—which encompasses IRD, Blumont, Inc., and Blumont Global Development, Inc.—was a primary USAID contractor in Afghanistan.  *See id.*, ¶¶ 377–78.  The Amended Complaint lists seven of IRD's contracts and alleges that it made protection payments worth several million dollars to the Taliban between 2007 and 2015.  *See id.*, ¶¶ 380–82.

The Amended Complaint highlights a 2008 contract with USAID to implement the Afghanistan Vouchers for Increased Production in Agriculture ("AVIPA") program.  *Id.*, ¶ 380(c).  The AVIPA program involved agricultural projects in Helmand and Kandahar Provinces—two Taliban strongholds.  *See id.*, ¶ 384. During this project, "an IRD subcontractor explained directly to an IRD employee . . . that the subcontractor's bills were more expensive than projected because [it] was directing part of its budget to the Taliban," and yet "IRD did not instruct the subcontractor to stop."  *Id.*  When an independent company was brought in to evaluate performance on this contract, it found that "20% of the people that IRD distributed assistance to were Taliban members."  *Id.*, ¶ 386.  Similar allegations were made concerning the 2007 Strategic Provincial Roads ("SPR") contract and the 2013 Kandahar Food Zone ("KFZ") contract.  *See id.*, ¶¶ 388, 390.  Based on industry practice and IRD's general lack of internal controls, Plaintiffs allege that one could logically infer that protection payments were routine across all IRD contracts.  *See id.*, ¶ 381.

### 7.  *Chemonics International*

Chemonics was another large prime contractor working on USAID contracts in Afghanistan—allegedly paying several million in protection payments between 2006 and 2015. *See id.*, ¶¶ 401–03.  Again, the Amended Complaint points to industry practice, the prevalence of protection payments in the both the agricultural industry and in the geographic regions where Chemonics operated, and Chemonics's lack of internal financial controls.  *See id.*, ¶ 403.  It also lists seven contracts that Chemonics worked on during the relevant period.  *See id.*, ¶ 402.

The Amended Complaint highlights two USAID contracts that allegedly involved protection payments: the 2003 Rebuilding Agricultural Markets Program ("RAMP") and the 2005 Alternative Livelihood's Program/Southern Region ("ALP/S").  *See id.*, ¶¶ 402, 406.  On these contracts, Chemonics hired USPI, a subcontractor allegedly known for its criminal conduct and its use of protection payments. *See id.*, ¶¶ 406–07; *supra* Part I.D.5.  "Chemonics's motivation for hiring USPI was financial: USPI was the cheapest security option—because it paid off (rather than fighting) insurgents."  Am. Compl., ¶ 406.  While Chemonics employees raised concerns about USPI's practices, ultimately Chemonics ignored these warnings and continued to use USPI.  *See id.*, ¶ 409.

### 8.  *MTN*

The MTN Defendants consist of three companies all based outside of the United States: MTN Group (incorporated in South Africa), MTN Dubai (incorporated in Dubai), and MTN Afghanistan (incorporated in Afghanistan).  *See id.*, ¶¶ 28–30.  MTN has become "one of the world's most valuable telephone companies."  *Id.*, ¶ 291.  In 2010, it owned 32% of the telecommunications market in Afghanistan, and by 2012 it "had a presence in virtually every province in Afghanistan."  *Id.*, ¶ 292.

Widespread presence in Afghanistan entailed substantial interaction with the Taliban, according to Plaintiffs. *Id.*, ¶ 293. The Taliban told MTN to "pay monthly protection fees in each province, or face having their transmission towers attacked." *Id.*, ¶ 294. Fees were "in the range of $2,000, per tower, per month." *Id.* One owner of a different telecommunications company in Afghanistan said, "You have to do it. Everybody does." *Id.* Plaintiffs conclude, on the basis of news reports, statements, and U.S. government intelligence reports, *see id.,* ¶¶ 293–307, that MTN was a "particularly aggressive practitioner of protection payments," *id.*, ¶ 297, and that the payments to the Taliban "reached tens, if not hundreds, of millions of dollars," *id.*, ¶ 307.

MTN is also alleged to have deactivated its cell towers at night "at the Taliban's request." *Id.*, ¶ 308. Plaintiffs allege that MTN wanted to "maintain good relations with the Taliban." *Id.*, ¶ 310. Shutting down cell towers allegedly "undermined U.S. counterinsurgency efforts," *id.*, ¶ 315, by preventing the collection of "vital intelligence" concerning the Taliban's location, *id.*, ¶ 317. Plaintiffs suggest that Coalition forces[9] were rendered unable to stop attacks that injured Plaintiffs due to these cell tower shutdowns. *See id.*, ¶ 319.

Plaintiffs draw a connection between MTN and the United States by showing that MTN received "financing" and "political-risk insurance" from international organizations that happened to have offices in Washington, D.C. *Id.*, ¶¶ 347–48. The International Finance Corporation ("IFC"), an arm of the World Bank, provided $120 million in loans to MTN over several years to fund projects in Afghanistan. *See id.*, ¶¶ 348–49, 353. IFC loaned MTN $45 million in 2006 and $75 million in 2009. *See id.*, ¶¶ 348–49. The application process allegedly spanned several months. *See id.*, ¶ 350.

---

[9] "Coalition" refers to the International Security Assistance Force ("ISAF"), which the United Creations authorized in 2001 "to assist the newly formed Afghan government in rebuilding the country." Am. Compl., ¶ 46.

The Multilateral Investment Guarantee Agency ("MIGA"), another arm of the World Bank, provided "coverage guarantees"[10] to MTN to "facilitate MTN Afghanistan's operations." *Id.* ¶ 358. MTN received two such guarantees, with application processes lasting several months. *See id.*, ¶¶ 359–61.

## II.   LEGAL STANDARD

### A.   Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), "[t]he plaintiffs bear the burden of establishing a *prima facie* showing that the court has personal jurisdiction over the [defendants]." *Est. of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 243 (D.D.C. 2015) (citing *Mwani v. bin Laden*, 417 F.3d 1, 6–7 (D.C. Cir. 2005)). The plaintiffs meet this burden when they allege "specific acts connecting [the] defendant with the forum." *Okolie v. Future Servs. Gen. Trading & Contracting Co., W.L.L.*, 102 F. Supp. 3d 172, 175 (D.D.C. 2015) (quoting *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)).

In making this showing, the "plaintiffs are not limited to evidence that meets the standards of admissibility." *Mwani*, 417 F.3d at 7. "Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* (citing *Naartex Consulting Corp. v. Wyatt*, 772 F.2d 779, 787–88 (D.C. Cir. 1983)). "In determining if plaintiffs have met their burden, the Court need not accept all of the plaintiffs' allegations as true," *Est. of Klieman*, 82 F. Supp. 3d at 243–44 (citing *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 127 (D.D.C. 2004)), "[b]ut all factual discrepancies must be resolved in the plaintiffs' favor," *id.* (citing *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)).

---

[10] "MIGA coverage guarantees operate as a form of political-risk insurance and protect the guarantee holder against common risks that might otherwise deter a multinational company from investing in unstable regions." Am. Compl., ¶ 358.

B.      Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court must grant a motion to dismiss when the complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).

"In determining a complaint's plausibility, we accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs."  *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018) (citing *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009)).  But the Court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations."  *City of Harper Woods*, 589 F.3d at 1298.  "Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).  "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

### III.    ANALYSIS

#### A.    Personal Jurisdiction

G4S (that is, AGI and AGMA) and MTN move to dismiss this action for lack of personal jurisdiction under Rule 12(b)(2).  *See* MTN Mot. to Dismiss at 13; G4S & Centerra Mot. to Dismiss at 53.  Plaintiffs argue that this Court has personal jurisdiction over both Defendants under Federal Rule of Civil Procedure 4(k)(2).  *See* Am. Compl., ¶ 36.  Rule 4(k)(2) acts as a federal long arm statute and provides for specific personal jurisdiction over an entity that is "not subject to jurisdiction in any state's courts of general jurisdiction" so long as "exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2).  As foreign entities, G4S and MTN are not "essentially at home" in the United States, and, thus, there is no basis for general jurisdiction in the United States.  *See Daimler AG v. Bauman*, 571 U.S. 117 (2014).  But "[this C]ourt may use 4(k)(2) to confer jurisdiction" if due process is met.  *Livnat v. Palestinian Auth.*, 82 F. Supp. 3d 19, 24–25 (D.D.C. 2015) (quoting *Mwani*, 417 F.3d at 11).

To comport with Due Process under the Constitution, a defendant must have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977)).  Key to the "fair warning" inquiry is whether the defendant has "purposefully established 'minimum contacts' in the forum," *id.* at 474 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)), and whether the litigation can be said to "arise out of or relate to" those contacts, *id.* at 472 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). While there need not be a causal connection between the defendant's in-forum conduct and the claim, there must be a "strong 'relationship among the defendant, the forum, and the litigation.'"

*Ford Motor Co. v. Montana*, 141 S. Ct. 1017, 1028 (2021) (quoting *Helicpoteros*, 466 U.S. at 414).

Under Rule 4(k)(2), the relevant forum is "the United States as a whole." *Mwani*, 417 F.3d at 11.[11]

Plaintiffs raise two theories for how G4S and MTN purposefully established suit-related minimum contacts with the United States.  First, Plaintiffs allege that G4S and MTN's unlawful conduct was "expressly aimed" at the United States and that such conduct supports a basis for jurisdiction.  ECF No. 118 (Pls.' Resp. to G4S & Centerra's Mot. to Dismiss) at 56–58; ECF No. 117 (Pls.' Resp. to MTN's Mot. to Dismiss) at 13–15, 20.  Second, Plaintiffs allege that G4S and MTN's contacts with the United States show "purposeful availment" of the benefits of the United States, and that these contacts are suit-related.  Pls.' Resp. to G4S & Centerra at 58–59, 64; Pls.' Resp. to MTN at 21–22, 27.  Plaintiffs' theories are addressed in turn.

### 1. *Conduct Expressly Aimed at the United States*

Plaintiffs first theory is an intentional tort theory of personal jurisdiction, *see Calder v. Jones*, 465 U.S. 783, 789 (1984), which finds support in other cases brought under the ATA, *see, e.g., Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 202–04 (D.D.C. 2020).  To prevail, Plaintiffs must allege sufficient facts to suggest that the conduct of the defendants was both "intentional" and "expressly aimed at the United States."  *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93 (2d Cir. 2008) (quoting *Calder*, 465 U.S. at 789).  This is not a "but for" causation standard.  *Id.* at 96.  While it may be true that "but for" a defendant's financial contribution, certain attacks against Americans would not have occurred, this "does not mean that [the defendants]

---

[11] Rule 4(k)(2), and the Due Process Clause by extension, "do[] not demand the level of contacts required" by the D.C. long-arm statute.  *Mwani*, 417 F.3d at 9.  Provisions of the D.C. statute, however, "reach as far as due process permits."  *Id.*  Cases considering jurisdiction under the District of Columbia long-arm statute are instructive under an analysis of Rule 4(k)(2), even if not determinative.  *See id.*  Such cases are used in the foregoing analysis to the extent that the Due Process requirements overlap with the D.C. requirements.

'purposefully directed' their 'activities at residents of [this] forum.'"   *Id.* (quoting *Burger King Corp.*, 471 U.S. at. 472).   Foreseeability alone is not enough to confer jurisdiction.   *See id.* at 93. Further, mere involvement in the "causal chain" of a terrorist attack is not enough for jurisdiction— defendants subjected to jurisdiction under this theory are typically "primary participants" in an attack.   *In re Terrorist Attacks*, 538 F.3d at 93–94 (collecting cases).   This is especially true where the defendant's alleged tortious conduct occurred entirely abroad.   *See Atchley*, 474 F. Supp. 3d at 203 (no substantial connection to the United States where plaintiffs funded terrorists and carried out additional corrupt conduct abroad).

Plaintiffs do not allege that G4S or MTN were "primary participants" in attacks on the United States.   *See In re Terrorist Attacks*, 538 F.3d at 93–94.   Rather, Plaintiffs suggest that these Defendants were part of a "causal chain" that resulted in terrorist attacks on the United States.   *See id.*   Specifically, Plaintiffs allege that by financing the Taliban with protection payments and, in MTN's case, carrying out orders to shut down cell towers at the Taliban's behest, these Defendants "substantially" contributed to terrorist attacks in Afghanistan against United States persons.   Pls.' Resp. to MTN at 1; Pls.' Resp. to G4S & Centerra at 49.   This connection is "far too attenuated to establish personal jurisdiction in American courts."   *In re Terrorist Attacks*, 538 F.3d at 95. Plaintiffs themselves allege that MTN and G4S carried out Taliban orders because of "financial motives" and a desire to maintain relationships with the Taliban, Am. Compl., ¶¶ 164, 176, 310, 312, and no facts suggest that the conduct was aimed at the United States, especially considering that all of the alleged tortious conduct occurred abroad, *see Atchley*, 474 F. Supp. 3d at 203.   The Court thus lacks personal jurisdiction under this theory.   *See id.*; *see also In re Terrorist Attacks*, 538 F.3d at 93.

2. *Purposeful Availment*

Plaintiffs alternatively suggest that MTN and G4S established minimum contacts by "purposefully availing" themselves of the United States through contracts with ECC, the U.S. government, and various international bodies. Pls.' Resp. to MTN at 21–22; Pls.' Resp. to G4S & Centerra at 58. Plaintiffs allege these contacts are "suit-related." Pls.' Resp. to MTN at 27; Pls.' Resp. to G4S & Centerra at 64. A foreign defendant purposefully avails itself in the United States when it conducts "regular[]" or "substantial" business activity here. *Ford Motor Co.*, 141 S. Ct. at 1026, 1028. A "single[,] isolated" contact does not tend to show purposeful availment. *Williams v. Romarm, SA*, 756 F.3d 777, 785 (D.C. Cir. 2014).

While "entering a contract with a forum resident clearly constitutes a 'contact' with that forum . . . that [] contract alone is not sufficient to establish personal jurisdiction over a non-resident defendant." *World Wide Travel Inc. v. Travelmate US, Inc.*, 6 F. Supp. 3d 1, 7 (D.D.C. 2013). There must be "something more" that shows a substantial connection between the contract and the forum, "such as the prior negotiations between the parties, the contemplated future consequences of the business transaction at issue, the terms of the contract, and the parties' actual course of dealing." *Id.*; *see also Helmer v. Doletskaya*, 393 F.3d 201, 206 (D.C. Cir. 2004) (contract created substantial connection to forum because it was negotiated in forum, issued to resident of forum, and contemplated future interactions with forum as condition of performance); *Abramson v. Wallace*, 706 F. Supp. 1, 2 (D.D.C. 1989) (same).

The contracts—if found to indicate purposeful availment of a forum—must also be "suit-related." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 42 (D.C. Cir. 2020). At bottom, the plaintiff must allege that the claim "arises from" or "relate[s] to" the contract, such that there is a "discernable relationship" between contract and claim. *Alkanani v. Aegis Def. Servs., LLC*, 976 F.

Supp. 2d 13, 22, 27 (D.D.C. 2014) (quoting *Rundquist v. Vapiana SE*, No. 09-cv-1107, 2012 WL 5954706, at *8 (D.D.C. Nov. 9, 2012)).

An out-of-forum tort must be integrally related to an in-forum contract such that a defendant "should reasonably anticipate being haled into court there." *Okolie*, 102 F. Supp. 3d at 177. A tort committed *in furtherance* of a contract is integrally related. *See United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 887 (D.C. Cir. 2010) (finding jurisdiction over foreign company "intimately involved" in alleged fraudulent bidding for construction contract in False Claims Act suit). A tort that furthers a contract is distinct from an unpredictable accident that is "extremely attenuated" from the contract. *Okolie*, 102 F. Supp. 3d at 177; *see also Alkanani*, 976 F. Supp. 2d at 27 (collecting cases).

a.   MTN

MTN's receipt of funding from IFC and receipt of coverage guarantees from MIGA, *see* Am. Compl., ¶¶ 348–49, 358, do not constitute purposeful availment of the "privilege of conducting activities" in the United States. *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 22 (D.D.C. 2017) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Entry into a forum for the sole purpose of "securing a loan or an insurance guaranty" does not constitute purposeful availment of the forum, *Siam Kraft Paper Co. v. Parsons & Whittemore, Inc.*, 400 F. Supp. 810, 812 (D.D.C. 1975), especially where the funding is for non-forum projects, *see AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 77 (D.D.C. 2004). MTN had "little choice but to communicate with IFC personnel to maintain . . . financial viability," which is not purposeful availment of the forum. *Id.* at 82 (considering under D.C.'s long-arm statute). "To conclude otherwise would inundate the courts in this jurisdiction with the filing of countless lawsuits that concern events about which the [forum] has no interest." *Id.* Moreover, the projects for which

MTN sought funding and insurance were carried out entirely abroad. *See* Am. Compl., ¶¶ 348–49, 358. Contracts with exclusive foreign application face a steeper challenge in establishing domestic contacts. *See AGS Int'l,* 346 F. Supp. 2d at 77.

Thus, the Court need not consider whether MTN's contacts are sufficiently suit-related to support jurisdiction. The suit against MTN is dismissed for lack of personal jurisdiction.

        b.        G4S

Plaintiffs succeed in asserting specific personal jurisdiction over both G4S Defendants that have contested personal jurisdiction in the United States: AGI and AGMA.

        i.        AGI

AGNA's contacts in the United States impute onto AGI and give this Court a basis for specific personal jurisdiction over AGI. "Although a parent-subsidiary relationship alone is insufficient" to support a finding of personal jurisdiction over a parent company on the basis of the subsidiary's contacts, "if parent and subsidiary 'are not really separate entities,' or one acts as an agent of the other, the local subsidiary's contacts can be imputed to the foreign parent." *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 675–76 (D.C. Cir. 1996) (citations omitted) (quoting *I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc.*, 699 F.2d 406, 419 (D.C. Cir. 1983)), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010). A subsidiary can be deemed an agent of the parent company if "the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative perform them, the corporation's own officials would undertake to perform substantially similar services." *Khatib v. All. Bankshares Corp.*, 846 F. Supp. 2d 18, 32 (D.D.C. 2012) (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001)).

Plaintiffs allege that AGNA was the agent of AGI and raise sufficient facts to that end. *See* Am. Compl., ¶ 172; Pls.' Resp. to G4S & Centerra at 59. The former head of the company said that AGNA was a "shell company set up by AGI to bid for and obtain U.S. contracts that could only be awarded to American companies," Am. Compl., ¶ 146; that AGI characterized AGNA as the "hub for the Group's bidding for and management of major US Government contracts overseas," *id.*, ¶ 173; and that AGMA's country manager indicated that "AGNA's contracts really belonged to AGI," Pls.' Resp. to G4S & Centerra at 59. Considering factual discrepancies in Plaintiffs' favor, *see Est. of Klieman*, 82 F. Supp. 3d at 244, Plaintiffs make an "affirmative showing that [AGI] exercise[d] a level of control over [AGNA] that would warrant treating [AGNA's] alleged presence . . . as its own." *Khatib*, 846 F. Supp. 2d at 33.

There is jurisdiction over AGI in the United States via AGNA's contacts. AGNA had an office in Virginia and held three relevant contracts with the United States: as a subcontractor for ECC on a contract with the U.S. government, Am. Compl., ¶¶ 147(a), 173–174; with the U.S. State Department for security services at the U.S. Embassy in Kabul, *id.*, ¶ 147(c); and with the U.S. State Department for local guard services in Afghanistan, *id.*, ¶ 147(g). Plaintiffs allege that AGNA "negotiated the terms directly with the U.S. government and ECC, submitted regular invoices and other contract paperwork to its U.S. counterparties, and received payment in the United States." Pls.' Resp. to G4S & Centerra at 60. These contracts entailed substantial contact with the United States that amount to purposeful availment. *See Helmer*, 393 F.3d at 206.

AGI's contacts with the United States are sufficiently suit-related such that AGI should "reasonably anticipate" being subjected to suit in the United States. *See Okolie*, 102 F. Supp. 3d at 177. Plaintiffs allege that AGNA hired and worked with "Taliban cutouts"—Mr. Pink and Mr. White—on its contracts with the United States government. Am. Compl., ¶ 150. AGNA is alleged

to have paid "several million dollars" in protection payments to the Taliban across these contracts, *id.*, ¶ 149, in order to "secure work on projects that were managed by and for the benefit of . . . American counterparties," *id.*, ¶ 174.  Further, AGI is alleged to have sought reimbursement from the United States for those payments by sending invoices to the United States.  *See* Pls.' Resp. to G4S & Centerra at 64.

AGI/AGNA was contracted to provide security for U.S. projects.  AGI/AGNA made protection payments—the alleged tortious conduct—in furtherance of these contracts.  *See United States ex rel. Miller*, 608 F.3d at 887.  This conduct was far from an unpredictable "accident," *see Okolie*, 102 F. Supp. 3d at 177, rather, it was intentional and repeated.  Thus, the suit "arise[s] out of or relate[s] to" the contacts with the United States forum.  *Nuevos Destinos, LLC v. Peck*, No. 15-cv-1846, 2019 WL 78780, at *9 (D.D.C. Jan. 2, 2019) (quoting *Burger King Corp.*, 471 U.S. at 472).

### ii.   AGMA

AGMA, separately, purposefully availed itself of the United States by subcontracting with ECC on a contract between ECC and the U.S. government to provide "mine clearance" near the Shindand Airbase for 18 months.  Am. Compl., ¶ 147(b).  According to Plaintiffs, AGMA "negotiated the contract with a U.S. counterpart; made repeated communications with ECC personnel in the United States; submitted invoices to the United States; and received payment from the United States."  Pls.' Resp. to G4S & Centerra at 62.  Knowledge that payment was coming from the U.S. government should be considered when assessing purposeful availment.  *See United States ex rel. Miller*, 608 F.3d at 887.  AGMA had more than a mere "fortuitous" connection with the United States under these facts.  *Livnat*, 82 F. Supp. 3d at 33.  The contract here had "something

more" to provide a basis for jurisdiction in the United States. *World Wide Travel*, 6 F. Supp. 3d at 7.

Like AGNA, AGMA's contract is sufficiently suit-related to support jurisdiction. AGMA allegedly made protection payments in pursuance of its contract with ECC. *See supra* Part I.D.1 n. 8; Am. Compl. ¶ 148. An AGMA project leader who worked in Shindand said "there were options other than using Mr. White II for security but that they were 'more expensive.'" Am. Compl., ¶ 164. A military analyst similarly concluded, "based on the Senate report and other evidence, that ArmorGroup's low-cost strategy 'resulted in the company providing financial support to groups fighting the US military.'" *Id.* G4S argues that Plaintiffs failed to suggest that protection payments were made on the basis of AGMA's ECC contract, *see* G4S & Centerra MTD at 5, but such factual discrepancy should be resolved in Plaintiffs' favor, *see Est. of Klieman*, 82 F. Supp. 3d at 244.

## B.   Derivative Sovereign Immunity

DAI and IRD unsuccessfully argue that they are entitled to derivative sovereign immunity for any claims arising out of their contracts with USAID. *See* IRD Mot. to Dismiss at 42–44; DAI Mot. to Dismiss at 26–28. "[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016) (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)). "That immunity, however, unlike the sovereign's, is not absolute." *Id.* (citing *Brady*, 577 U.S. at 580–81). Indeed, Defendants admit that derivative immunity only extends to those actions falling "within the scope of their delegated authority." DAI Mot. to Dismiss at 26 (citing *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 19, 20–22 (1940)).

Although USAID may have authorized—and encouraged—its contractors to employ local Afghans to work on projects, its contracts expressly prohibited payments to "individuals and organizations associated with terrorism."  Am. Compl., ¶ 133.  The contracts also required contractors and subcontractors to thoroughly "vet their local partners and take affirmative steps to ensure that the money they paid to those partners did not flow to the Taliban." *Id.*, ¶ 138.  While immunity may pass on to contractors who "simply performed [their duties] as the Government directed," *Campbell-Ewald*, 577 U.S. at 167 (citing *Yearsley*, 309 U.S. at 20), the Amended Complaint plausibly alleges that Defendants failed to comply with the U.S. government's instructions to thoroughly vet its employees and ensure that no money flowed to the Taliban. Specifically, it cites an independent evaluator's conclusion that "DAI and its subcontractors were paying the Taliban for permission to access the project sites."  Am. Compl., ¶ 188.  And it alleges that "an IRD subcontractor explained directly to an IRD employee . . . that the subcontractor's bills were more expensive than projected because [it] was directing part of its budget to the Taliban." *Id.*, ¶ 384.  "When a contactor violates both federal law and the Government's explicit instructions, as here alleged, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation."  *Campbell-Ewald*, 577 U.S. at 166.

C.     Justiciability

A handful of Defendants next argue that Plaintiffs' claims should be dismissed because they present nonjusticiable political questions. *See, e.g.*, IRD Mot. to Dismiss at 40.  "The political question doctrine 'excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution' by the executive and legislative branches."  *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 24 (D.D.C. 2010)

(quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).  The Supreme

Court in *Baker v. Carr* identified "six independent tests for the existence of a political question":

> [1] [A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186 (1962).  However, the political question doctrine is a "narrow exception" to the

courts' general "responsibility to decide cases properly before it."  *Zivotofsky ex rel. Zivotofsky v.*

*Clinton*, 566 U.S. 189, 194–95 (2012).  "Indeed, the . . . doctrine mandates dismissal *only if* a

political question is 'inextricable from the case.'"  *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir.

2019) (quoting *Baker*, 369 U.S. at 217) (emphasis added).

Defendants argue that this litigation presents two inextricable political questions.  *First*,

IRD argues that this case requires the Court to opine on "the propriety of USAID's policies and

programs."  IRD Mot. to Dismiss at 41.  Specifically, IRD suggests that USAID concluded it was

prudent to encourage contractors to hire Afghan employees in an effort to support local

communities despite the corresponding risk that some project financing may have ultimately

benefitted insurgents.  *See id.*  The thrust of this argument is that USAID's policy inherently

condoned—or at least recognized and accepted—protection payments in practice.  But this

argument is foreclosed by the factual allegations in the Amended Complaint, including that

"USAID contracts contained a 'standard clause' reminding its contractors that 'U.S. law prohibits

transactions with, and the provision of resources and support to, individuals and organizations

associated with terrorism.'"  Am. Compl., ¶ 133.  And this Court recently rejected a similar

argument in an ATA case.  *See Atchley*, 474 F. Supp. 3d at 207–08.  Here, as in *Atchley*, "[a]ccepting plaintiffs' theory condemns defendants' conduct, not the United States Government's general policy supporting [international development]."  *Id.* at 208.

Second, several other Defendants suggest that the Court cannot contemplate Plaintiffs' claims without "defin[ing] the very nature of the war in Afghanistan."  G4S & Centerra Mot. to Dismiss at 49.  Defendants allege that this issue is at the crux of whether a statutory exception in the ATA—known as the act-of-war exception—precludes all ATA liability.  *See id.*  However, as discussed below, the Court need not dive into the parameters of the War on Terror to determine whether this exception applies to the attacks that injured Plaintiffs.  *See infra* Part III.D.1.  And "determin[ing] whether the circumstances involve an act of war within the meaning of the statutory exception" is an "interpretive exercise" that is squarely within the gambit of "what courts do." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018) (quoting *Zivotofsky*, 566 U.S. at 201).  Thus, "to the extent this case touches on political questions, those issues are peripheral to, not 'inextricable from[,] the case.'"  *Atchley*, 474 F. Supp. 3d at 207–08 (quoting *Al-Tamimi*, 916 F.3d at 8).

    D.    <u>ATA Claims</u>

"The ATA establishes a cause of action for U.S. nationals who are the victims of international terrorism."  *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 531 (S.D.N.Y. 2019).  It provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States."  18 U.S.C. § 2333(a).

"In its original form, the ATA afforded relief only against the perpetrators of the terrorist attacks, not against secondary, supporting actors."  *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d

217, 222 (2d Cir. 2019) (citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319 (2d Cir. 2018)).  This theory under the ATA—known as primary liability—must plausibly allege that the defendants *themselves* committed an act of international terrorism.  In 2016, Congress amended the ATA to permit aiding-and-abetting liability—or secondary liability.  *See* JASTA § 7, 130 Stat. 852.  Such liability extends to "any person who aids and abets, by knowingly providing substantial assistance . . . [to] the person who committed . . . an act of international terrorism," so long as the act was "committed, planned, or authorized by an organization that had been designated as a [FTO]" at the time of the attack.  18 U.S.C. § 2333(d)(2).  Plaintiffs contend that each Defendant is both primarily and secondarily liable under the ATA.

### 1.   Act-of-War Exception

Defendants first argue that there cannot be any liability under the ATA—either primary or secondary—because this case is foreclosed by the ATA's "act of war exception."  *E.g.*, IRD Mot. to Dismiss at 44.[12]  Under the ATA "[n]o action shall be maintained . . . for injury or loss by reason of an act of war."  18 U.S.C. § 2336(a).  The ATA defines an "act of war" as "any act occurring in the course of" either: "(A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." § 2331(4).  The term "military force" *explicitly excludes* FTOs and SDGTs.  § 2331(6).  As the Taliban, al-Qaeda, and the Haqqani Network are all designated FTOs or SDGTs, Defendants rely on Subsection (B) and argue that the conflict in Afghanistan was an "armed conflict . . . between two or more nations."  *E.g.*, IRD Mot. to Dismiss at 44.

---

[12] Five Defendants make this argument.  *See* Black &Veatch Mot. to Dismiss at 40; IRD Mot. to Dismiss at 44–45; ECC Mot. to Dismiss at 34 n.46; G4S & Centerra Mot. to Dismiss at 49.

Defendants focus on the need to define "armed conflict" and the scope of the war in Afghanistan to determine whether the act-of-war exception applies. *See* G4S & Centerra Mot. to Dismiss at 49. But they neglect that Subsection (B) only applies to conflicts "between two or more *nations*." While the nature of the War on Terror may be amorphous, and determining its scope and status has plagued courts since the war began in the wake of the September 11, 2001 attacks, *see generally Al-Alwi v. Trump*, 901 F.3d 294, 300 (D.C. Cir. 2018), it can hardly be said that the Taliban, al-Qaeda, and the Haqqani Network are "nations" in an armed conflict, *see* Am. Compl., ¶¶ 41–46, 418, 420–23. Whatever the nature of the conflict is or was, the 2001 Congressional Authorization for the Use of Military Force ("AUMF") recognized that there were non-nation players involved and authorized the use of force "against those *nations*, *organizations*, *or persons*" involved in the September 11, 2001 attacks. Pub. L. 107-40, 115 Stat. 224, § 2 (2001) (emphasis added). Thus, whatever the scope of the conflict, it was not limited to "nations." But that does not answer the ultimate question of whether the Taliban (or the other terrorist organizations involved in the attacks against Plaintiffs) could or should be treated as a "nation" under Subsection (B).

The only case to consider whether a terrorist organization qualifies as a "nation" under the act-of-war exception is *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 510 (E.D.N.Y. 2012). There, the court contemplated whether Hamas—a designated FTO since 1999—might qualify as a "nation" under Subsection (B). *See id.* at 479, 510. While ultimately reserving the issue for summary judgment, *see id.* at 509, the court found this argument "potentially germane . . . since Hamas in 2006 won a majority of the seats in the Palestinian legislature, and Gaza, which Hamas controls, is at least part of a proto-nation," *id.* at 510 (citing *Dar-Salameh v. Gonzales*, 468 F.3d 47, 50 (1st Cir. 2006)). But *Gill* is inapposite. *Gill* was decided before the 2018 amendments to

JASTA, which specifically defined "military force" to exclude FTOs and SDGTs.  *See id.* at 512;

Anti-Terrorism Clarification Act, Pub. L. 115-253, 132 Stat. 3183, § 2(a) (2018) (codified as

amended at 18 U.S.C. § 2331(6)).  Although defining "military force" under Subsection (C)—and

not "nation" under Subsection (B)—this amendment demonstrates Congress's intent to ensure that

FTOs and SDGTs cannot qualify for the act-of-war exception.  The attacks that form the basis of

this lawsuit were carried out by either an FTO or an SDGT (as compared to Afghan military

forces).  *See generally* Am. Compl., ¶¶ 439, 468, 524–2469.  To the extent that Subsection (B)

may still be read to include proto-nations and designated terror organizations that—like Hamas—

maintain a powerful political role, those considerations are better left for summary judgment.  *See*

*Gill*, 893 F. Supp. 2d at 509.

Therefore, Subsection (B) of the act-of-war exception does not warrant dismissal at this

stage of the litigation.

### 2. *Primary Liability*

Primary liability has three essential elements: (1) "a U.S. national must have suffered an

injury," (2) the defendants must have engaged in "an act of international terrorism," and (3) the

"injury must have occurred 'by reason of' the act of international terrorism."  *Owens*, 897 F.3d at

270.  As the first element is undisputed, the Court will turn to the second and third elements.

### a.   International Terrorism

The ATA defines "international terrorism" as activities that

> (A) involve violent acts or acts dangerous to human life that are a
> violation of the criminal laws of the United States or of any State,
> or that would be a criminal violation if committed within the
> jurisdiction of the United States or of any State;
> (B) appear to be intended--
>> (i) to intimidate or coerce a civilian population;
>> (ii) to influence the policy of a government by intimidation
>> or coercion; or

> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States . . . .

18 U.S.C. § 2331(1).[13]  For purposes of primary liability, a plaintiff must demonstrate that *the defendant* committed an act of international terrorism.  "As applied [here], this requires Plaintiffs to allege not that the [attacks] that injured them meet this standard, but that the actions undertaken by [Defendants] . . . meet this standard."  *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 358 (E.D.N.Y. 2019).  Undoubtedly, the Taliban, Haqqani Network, and al-Qaeda engaged in acts of international terrorism when they attacked Plaintiffs and their family members.  But Defendants did not plant the IEDs, send the suicide bombers, or pull the triggers in these attacks.  Thus, the

---

[13] The Court does not now decide whether the factual allegations in the Amended Complaint plausibly allege that Defendants' conduct violated any U.S. criminal laws as required under § 2331(1)(A). As way of background, Plaintiffs allege three predicate violations: (1) providing material support knowing or intending that support to be used to commit certain criminal conduct, including acts of international terrorism, *see* 18 U.S.C. §§ 2339A(a), 2332b; (2) knowingly providing material support to an FTO, *see* § 2339B; and (3) unlawfully and willfully providing funds, directly or indirectly, knowing that such funds will be used, in full or in part, to carry out any act "intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act . . . is to intimidate a population or to compel a government" to act in a certain way, § 2339C(a)(1).

But, without diving into the many layers of elements of the alleged predicate crimes, at the very least, Plaintiffs have plausibly alleged that Defendants *knowingly gave money to the Taliban and/or the Haqqani Network* in connection to many (if not all) of their projects in Afghanistan in the late 2000s and early 2010s.  The extensive factual allegations—as to each Defendant and as to broader industry practice—give rise to the reasonable inference that protection payments were rampant during this time frame—and Defendants paid them.  Whether protection payments of this nature violate any of the three predicate statutes is not a question for today.

Even so, it bears mentioning that, throughout the following analysis, the Court assumes that money left the hands of Defendants and traveled directly to the Taliban (or, as to DAI and the Joint Venture, directly to the Haqqani Network), irrelevant of whether that money was paid formally or informally, through subcontractors or directly from Defendants, via lump sums to Taliban leaders or via "salaries" to Taliban members.  The Court further assumes (for good reason) that this flow of money was widely known by both Defendants and the industry more broadly.  The assumption from which the opinion flows is that each Defendant *knowingly made protection payments* (but not necessarily that they violated any criminal statutes).

issue here is whether *making protection payments*—in the manner Defendants allegedly did—is an act of international terrorism.  To answer this question, the Court need go no further than § 2331(1)(B), which requires the appearance of intent.

An act of international terrorism must "appear to be intended" to further one of three purposes: to "intimidate or coerce a civilian population"; to "influence the policy of a government by intimidation or coercion"; or to "affect the conduct of a government by mass destruction, assassination, or kidnapping." § 2331(1)(B).  "Whether a defendant 'appear[ed]' to have intended its activities to intimidate or coerce is not a question of the defendant's subjective intent but rather a question of what its intent objectively appeared to be." *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 161 (2d Cir. 2021) (citing *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014)).  When evaluating what the defendants' intent "objectively appeared to be," *id.*, courts should consider the possibility of alternative motives, *see Zapata*, 414 F. Supp. 3d at 358.  For example, courts often consider whether greed or financial incentives were the primary motive.  *See, e.g.*, *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018).  But just because a defendant appears to have a *different* motive does not mean that is the *only* motive.  That is, a defendant's apparent intent may be *both* to profit *and* to intimidate or coerce a government or civilian population as required by § 2331(1)(B).  *See United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014).

Aside from legally conclusory allegations that Defendants had the requisite appearance of intent, *see, e.g.*, Am. Compl., ¶ 2587, the Amended Complaint identifies two goals that an objective observer could view as motivating Defendants' protection payments: maximizing profits and ensuring their own safety, *see id.*, ¶ 3 (describing Defendants' motives to "protect [their] businesses and maximize their profits"); *id.*, ¶ 66 (noting the "profit motive[s] for Defendants to

orchestrate protection payments"); *id.*, ¶ 164 ("[A]t the core of [the protection payment scheme] was cost—lowering cost to perform the task, while maximizing profits."). Indeed, "the Taliban use[d] threats of terrorist violence to extract protection money from international companies doing business in Afghanistan." *Id.*, ¶ 63.

While the Taliban's campaign of violence could easily be perceived as intended to intimidate or coerce a civilian population or government, *see id.*, ¶ 415, Plaintiffs ask the Court to "infer similar intent" on the part of Defendants merely because, by giving money to the Taliban, it was "foreseeable" that those funds would "promot[e] the Taliban's attacks." Pls.' Resp. to Louis Berger at 61, 63–64. But this argument fails to account for a key fact: Defendants were *extorted* by the Taliban. *See* Am. Compl., ¶ 63. Indeed, the Amended Complaint is replete with statements noting the deadly nature of this extortion. *See id.*, ¶¶ 205, 208, 269, 276. This is "a far cry from an allegation that [Defendants were] a knowing and direct donor" to the Taliban. *Brill v. Chevron Corp.*, No. 15-cv-4916, 2017 WL 76894, *4 (N.D. Cal. Jan. 9, 2017) (distinguishing *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008) where defendant was "knowing donor to Hamas").

One of the few cases to consider a protection payment theory under the ATA refused to impute a terror organization's intent onto corporations that paid protection payments. *See Stansell v. BGP, Inc.*, No. 09-cv-2501, 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011). In *Stansell*, the defendants were alleged to have made protection payments to the Revolutionary Armed Forces of Colombia ("FARC") "in exchange for the FARC's agreement to allow [the defendants] to conduct [their] oil exploration activities *without fear of terrorist acts.*" *Id.* (emphasis added). Based on this fact alone, the court concluded that "[t]his allegation would not lead an objective

observer to conclude [the defendants] intended to achieve any one of the results listed in § 2331(1)(B)." *Id.* Such is the case here.

To an objective observer, Defendants—at most—were "deliberately indifferent . . . [to] the risk that the transferred funds would end up in the hands of [terrorists]." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 92 (E.D.N.Y. 2019) (citing *Kemper*, 911 F.3d at 390). Such an appearance of ambivalence does not lead an objective observer to reasonably infer that Defendants' goal was to intimidate or coerce a government or civilian population. *See id.*

> b.      Causation

Even if Plaintiffs had plausibly alleged that Defendants' alleged protection payments were an act of international terrorism, they fail to plausibly allege causation. To sustain a primary liability claim under the ATA, the plaintiff must have suffered an injury "by reason of" the defendant's conduct. 18 U.S.C. § 2333(a).

As a preliminary matter, the parties dispute whether this language requires but-for causation in addition to proximate causation. *See, e.g.*, G4S & Centerra Mot. to Dismiss at 16; Pls.' Resp. to G4S & Centerra at 45. While lower courts have uniformly concluded that the ATA's "by reason of" language requires proximate causation, *see, e.g.*, *Atchley*, 474 F. Supp. 3d at 209, Defendants rely on two recent Supreme Court cases to urge this Court to steer ATA case law in a new direction, *see* G4S & Centerra Mot. to Dismiss at 16 (citing *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020); *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015–16 (2020)). In *Comcast*, the Court noted that it has "often held" that the language "by reason of" "indicate[s] a but-for causation requirement." 140 S. Ct. at 1015. Defendants treat *Comcast* and *Bostock* as if they are precedent-shattering cases that fundamentally alter the bedrock of ATA causation standards. *See, e.g.*, ECC Mot. to Dismiss at 26. In fact, both belong to a long

line of cases—frequently discrimination cases—that interpreted statutory language like "because of" and "by reason of" to mean but-for causation in certain contexts. *See Burrage v. United States*, 571 U.S. 204, 213 (2014); *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). None of these cases have interpreted *the ATA's* "by reason of" language.

Despite this lineage of Supreme Court cases—reaching back to 2009—lower courts have consistently and repeatedly held that the ATA requires only proximate causation. *See, e.g.*, *Zapata*, 414 F. Supp. 3d at 356 n.8 (recognizing "by reason of" "does not require a stringent showing of 'but-for' causation"). Recently, this Circuit confirmed that "by reason of" in the ATA means proximate causation. *See Owens*, 897 F.3d at 273. This is for good reason. In ATA cases, showing but-for causation—*i.e.*, "trac[ing] specific dollars to specific attacks"—"would be impossible and would make the ATA practically dead letter." *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432–33 (E.D.N.Y. 2013). Having clarified that the ATA does not require but-for causation, the Court now considers whether Plaintiffs have pled sufficient facts to plausibly support a finding of proximate causation.

"[U]nder the law, a defendant's liability cannot . . . go forward to eternity." *Crosby v. Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019). "[A] butterfly in China is not the proximate cause of New York storms." *Id.* Thus, "proximate cause requires us to draw a line somewhere in the sand—refusing to extend liability beyond a certain point." *Id.* That line in the sand "prevents liability where there is not a sufficient link between the defendant's conduct and the plaintiff's injuries." *Atchley*, 474 F. Supp. 3d at 209 (quoting *Crosby*, 921 F.3d at 623). To survive a motion to dismiss on this issue, plaintiffs must plausibly allege "(1) that [the defendant's] acts were a substantial factor in the sequence of events that led to their injuries and (2) that those injuries

[were] reasonably foreseeable or anticipated as a natural consequence of [the defendant's] conduct." *Owens*, 897 F.3d at 273 (cleaned up). These two concepts naturally overlap: "In most cases the more directly related an outcome is to an underlying action, the more likely that the outcome will have been foreseeable, and vice versa." *Kemper*, 911 F.3d at 392.

### i.    Substantial Factor

"To establish that defendants' conduct was a 'substantial factor,' plaintiffs must show 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Atchley*, 474 F. Supp. 3d at 209 (quoting *Owens*, 897 F.3d at 794). "In other words, defendants' alleged wrongful conduct must have 'led directly' to the plaintiffs' injuries," *id.* (quoting *Owens*, 897 F.3d at 794), and had "more than a remote or trivial impact" on the events leading to their injuries, *see In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1311 (S.D. Fla. 2018) (citing *Eisenbise v. Crown Equipment Corp.*, 260 F. Supp. 3d 1250 (S.D. Cal. 2017)). "Accordingly, a court cannot allow a plaintiff to proceed under § 2333(a) where he or she alleges only a remote, purely contingent, or overly indirect causal connection." *Freeman*, 413 F. Supp. 3d at 84. Measuring the level of directness has daunted courts. In ATA cases, courts often focus on two issues: (1) what resource did the defendants provide and (2) to whom did the defendant give that resource.

The first question distinguishes between the provision of *services* and *money*. *See Zapata*, 414 F. Supp. 3d at 357 ("*[L]aundering* money that the Cartels independently accumulate is an act of a fundamentally different sort from *giving* terrorist organizations money that they do not already have." (emphasis added)). While courts recognize that money is fungible—and thus giving monetary support "frees up resources that can be used for terrorist acts," *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009) (quoting *Weiss*, 453 F. Supp. 2d at 631)—they have refused to extend this reasoning to the provision of services, *see Fields v. Twitter, Inc.*, 881 F.3d

739, 748–49 (9th Cir. 2018).  The second question distinguishes between giving resources to an *intermediary*— i.e., an individual or organization that is known to support terrorists, but that is not responsible for the attacks that injured the plaintiffs—and directly providing services or funds to *the terrorist organization* that injured the plaintiffs.  "[A]s our Circuit Court and others have recognized, because 'the presence of an independent intermediary' makes a defendant 'more than one step removed from a terrorist act or organization,' it 'create[s] a more attenuated chain of causation . . . than one in which a supporter of terrorism provides [resources] directly to a terrorist organization.'"  *Atchley*, 474 F. Supp. 3d at 209 (quoting *Owens*, 897 F.3d at 275).  By focusing on these two questions—what resource the defendant gave and to whom—four categories of ATA cases have emerged:

| | | What Resource? | |
|---|---|---|---|
| | | **Services** | **Money** |
| **To Whom?** | **Intermediary** | (1) Defendant provided services to an intermediary. | (3) Defendant provided money to an intermediary. |
| | **Terrorist Organization** | (2) Defendant provided services to the terrorist organization. | (4) Defendant provided money to the terrorist organization. |

*First* are claims that the defendant provided *services to an intermediary*.  A common example is banks offering financial services to state-sponsors of terrorism.[14]  *See Owens*, 897 F.3d at 275–76; *Kemper*, 911 F.3d at 392–94; *Freeman*, 413 F. Supp. 3d at 94.  Without any additional allegations demonstrating some level of directness, courts have found that services to an

---

[14] Courts generally require an even more direct relationship between the defendant's conduct and the plaintiff's injuries in cases involving state-sponsors of terrorism. "When an intermediary is a sovereign state[,] . . . the need for additional allegations supporting substantiality is all the more acute," *Owens*, 897 F.3d at 276, because "a sovereign's affirmative choice to engage in a wrongful act will usually supersede a third party's choice to do business with that sovereign," *Kemper*, 911 F.3d at 393 (citing *Owens*, 897 F.3d at 276); *see also infra* note 16.

intermediary are not a "substantial factor" in bringing about the primary perpetrator's later attacks. *See, e.g.*, *Kemper*, 911 F.3d at 394; *Freeman*, 413 F. Supp. 3d at 94 ("There are no allegations that Defendants directly provided funds or services to a terrorist group, . . . that the specific funds processed by Defendants were destined for a terrorist organization[,] . . . , [or] that the attacks in Iraq were only possible due to Defendants' actions.").

*Second* are allegations that the defendant provided *services directly to the terrorist organization* that injured the plaintiffs. These cases have addressed banks that laundered money for the Mexican Cartels (the alleged perpetrator of the attacks), *see Zapata*, 414 F. Supp. 3d at 357, banks that maintained accounts and routed payments for terrorist organizations, *see Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 266–67 (E.D.N.Y. 2019), and social media companies that provided a platform that was then used by terrorists to raise money, communicate, or recruit, *see Crosby*, 921 F.3d at 624–25; *Fields*, 881 F.3d at 749–50.[15] Courts have split on whether these direct services constitute a "substantial factor." Even if services are provided to the terrorist organization that injured the plaintiffs, those services may not be sufficiently direct unless the plaintiffs can plausibly allege that, without those services, the terror organization "would not be able to commit the[] acts of violence." *Zapata*, 414 F. Supp. 3d at 356. For example, if the terror organization "would not have had the means to plan for and carry out" the attack absent the defendants' services, then the "substantial factor" requirement is satisfied. *Lelchook*, 393 F. Supp. 3d at 266. In contrast, merely providing social media services is not a "substantial" factor in a

---

[15] The social media cases present another unique proximate cause issue, as there is often a question of whether the terrorist organization was responsible for the attack that injured the plaintiff. For example, in *Crosby*, Twitter allegedly supported ISIS by allowing use of its social media platforms. *See* 921 F.3d at 621–22. But the attack in that case (the Pulse Night Club shooting) was carried out by an individual attacker—a "lone wolf"—who was "self-radicalized." *Id.* at 625–26. Thus, while the service was given to the terror organization, the attacker was potentially one-step removed from that organization.

later lone-wolf attack when the attack was not "impacted, helped by, or the result of [the terrorist organization's] presence on the social network." *Fields*, 881 F.3d at 750.

*Third* are cases involving *money payments to an intermediary*. Examples include "funding to purported charity organizations" that are "known to support [and fund] terrorism," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013); *see also Strauss*, 925 F. Supp. 2d at 434 (same), and providing money and medical equipment to a state-run health agency that supports terrorists, *see Atchley*, 474 F. Supp. 3d at 201, 209–11. To establish that payments to an intermediary are a "substantial factor," there must be plausible allegations that the money "actually was transferred" to the terrorist organization, *In re Terrorist Attacks*, 714 F.3d at 124 (citing *Rothstein v. UBS AG*, 708 F.3d 82, 96–97 (2d Cir. 2013), or that the intermediary was merely a shell for terrorist operations, *see Strauss*, 925 F. Supp. 2d at 434 ("A jury could find that Defendant sent the money to organizations that were controlled by Hamas, which is no different from sending the money directly to Hamas for purposes of the ATA.") (citing *Nat'l Council of Resistance of Iran v. U.S. Dep't of State*, 251 F.3d 192, 200 (D.C. Cir. 2001)).

*Finally*, there are cases alleging *direct money payments to the terrorist organization*. This includes cases where, like here, the defendants made protection payments to the organization that injured the plaintiffs, *see Stansell*, 2011 WL 1296881, at *9–10; *In re Chiquita*, 284 F. Supp. 3d at 1317–18. Some courts have implied that, in these instances, there is a presumption that the payments were a substantial factor because "giving money to terrorist organizations definitionally enables them to commit additional acts of terrorism." *Zapata*, 414 F. Supp. 357 (citing *In re Chiquita*, 284 F. Supp. 3d at 1309–14, 1318). But the leading case on protection payments, *In re Chiquita*, urges a "fact-specific and *ad hoc*" approach to the substantial factor analysis. 284 F. Supp. 3d at 1313. "Plaintiffs who bring an ATA action are not required to trace specific dollars to

specific attacks," *Strauss*, 925 F. Supp. 2d at 433, and "the money alleged to have changed hands need not be shown to have been used to purchase the bullet that struck the plaintiff," *In re Chiquita*, 284 F. Supp. 3d at 1310 n.23 (quoting *Gill*, 893 F. Supp. 2d at 555–56).  Rather, courts consider whether the cash infusions were large enough to fund the attack (or all of the attacks) that injured the plaintiffs and whether the organization had the infrastructure to collect and disperse money. *See id.*, at 1317–18.[16]

---

[16] Courts also consider whether the entity *may* also engage in "non-terroristic activities." *Zapata*, 414 F. Supp. 3d at 356 n.10 (citing *Kemper*, 911 F.3d at 393).  This issue usually arises when the defendants provided services or funding to state sponsors of terrorism.  *See, e.g.*, *Atchley*, 474 F. Supp. 3d at 209; *see also supra* note 14.  For example, relying heavily on this Circuit's decision in *Owens*, the Seventh Circuit noted that a bank's financial services to Iran—a designated State Sponsor of Terrorism—lacked any direct link to attacks by Iranian-supported terror organizations in part because Iran "is [still] a sovereign state with 'many legitimate agencies, operations, and programs to fund.'" *Kemper*, 911 F.3d at 393–94 (quoting *Owens*, 897 F.3d at 276).

*Zapata* extended this logic to conclude that a bank's money laundering activities did not proximately cause violent attacks committed by the Mexican Cartels because the Cartels are, "first and foremost, organized crime syndicates." *Zapata*, 414 F. Supp. 3d at 356 n.10 ("While the Cartels are not sovereign governments, the underlying logic of these cases is applicable here."). The court reasoned that "[t]hough the Cartels' main activities are certainly not . . . 'legitimate . . . operations and programs,' of a sovereign government" "nor are they international terrorism." *Id.* (quoting *Rothstein*, 708 F.3d at 97).

The same logic may apply here as to the Taliban.  The Taliban is not, and has never been, a designated FTO.  *See Foreign Terrorist Organizations*, U.S. Department of State, https://www.state.gov/foreign-terrorist-organizations/ (last visited July 16, 2021).  This was not an accident, as four administrations passed on the opportunity to do so.  And although the United States "will make no concessions to *terrorist* demands and strike no deals with them," the United States has negotiated with the Taliban.  *U.S. National Security Strategy: Strengthen Alliances to Defeat Global Terrorism and Work to Prevent Attacks Against Us and Our Friends*, U.S. Dep't of State, https://2001-2009.state.gov/r/pa/ei/wh/15423.htm (last visited July 26, 2021).  One such example was the prisoner exchange with the Taliban for Sargent Bowe Bergdahl.  *See Department of Defense–Compliance with Statutory Notification Requirement*, U.S. Gov't Accountability Office, https://www.gao.gov/products/b-326013#mt=e-report (last visited on July 27, 2021).  The February 2020 U.S.-Taliban Peace Agreement, ending the armed conflict between the two parties, starkly reflects the unique nature of the Taliban.  *See* Am. Compl., ¶ 430.

However, the Taliban is an SDGT.  *See id.*, ¶ 417.  Still, it claims to be the rightful government of Afghanistan and has sought (and been denied) United Nations recognition.  *See id.*, ¶ 420.  The

Plaintiffs here plausibly alleged "that [the Taliban] was a participant in the terrorist attacks that injured plaintiffs," and that defendants "provided money to [the Taliban]." *Rothstein*, 708 F.3d at 97.  Like many before them, Plaintiffs argue that Defendants' protection payments provided "essential" funds that gave the Taliban "fungible resources that were vital to its ability to sustain its terrorist enterprise."  Am. Compl., ¶¶ 99, 108.  While Plaintiffs admit that protection payments were not the Taliban's primary source of revenue, *see id.*, ¶ 106, they also note that "[e]ven relatively low-dollar protection payments had an outsized effect on the Taliban's terrorist capabilities by subsidizing salaries and weapons for multiple terrorists," *id.*, ¶ 8.  This is particularly true because the Taliban paid each of its fighters around $100 to $350 per month, and the average cost of making an IED was $100.  *See id.*, ¶ 103.  With such modest costs, it is *plausible* that Defendants' protection payments—amounting to millions of dollars, *see, e.g.*, *id.*, ¶ 149,

---

Amended Complaint acknowledges that the Taliban operated "'shadow' *governments*" in many parts of Afghanistan.  *Id.*, ¶ 63 (emphasis added).  SIGAR confirmed that "at the district and community level . . . the Taliban [was] providing its own brand of brutal but efficient governance."  2018 SIGAR Report at 35.  SIGAR also recognized that "the Taliban provided limited services in pockets of the country."  *Id.* at 150.  While certainly not a humanitarian organization by any standard, the fact that the Taliban "provide[s] actual . . . services undermine[s] any inference" that funds flowing to the Taliban invariably funded terrorist attacks.  *Averbach v. Cairo Amman Bank*, No. 19-cv-04, 2020 WL 486860, at *6 (S.D.N.Y. Jan. 21, 2020), *R. & R. adopted in full*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).

"The United States has regularly differentiated between providing support to state sponsors of terrorism and providing support to terrorist organizations."  *Kemper*, 911 F.3d at 394 (citing *Owens*, 897 F.3d at 276).  Ultimately, the Taliban may be a uniquely situated entity that is arguably closer to a formal state-sponsor of terror or a drug cartel than a pure foreign terrorist organization like al-Qaeda.  If so, the same could be argued for protection payments as for the "purchasers of Iranian oil and natural gas [who] contribute funds to Iran that Iran might use to support terrorism, but those purchasers are not liable for the attacks that Iran may facilitate with those funds."  *Kemper*, 911 F.3d at 394.  Indeed, *In re Chiquita* recognized the potential viability of just such an argument: "[A] reasonable juror could conclude that giving money to Colombian guerillas, *having no function other than the perpetration of violence*, would enhance the terror capabilities of the guerillas and lead to more violence."  384 F. Supp. 3d at 1318 (emphasis added).  Yet the court need not address the question here where there is a discrete basis for dismissal and fact-discovery is otherwise needed to develop it.

184—could have covered the costs of the attacks on Plaintiffs.  The Amended Complaint also alleges that the Taliban's hierarchical structure ensured control over how funds were raised and spent, *see id.*, ¶¶ 49, 111, and, therefore, protection payments made in Herat Province could have funded attacks throughout all of Afghanistan.  Thus, at this early stage, Plaintiffs plausibly allege that Defendants' protection payments were a "substantial factor" in bringing about the Taliban's terrorist attacks throughout Afghanistan.

## ii.    Foreseeability

Plaintiffs fail to plead the second prong of proximate causation, which requires that the plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of the defendants' actions.  *Rothstein*, 708 F.3d at 91 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)).  "Foreseeability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions."  *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 182 (D.D.C. 2004) (quoting *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1012 (7th Cir. 2002)).

Significantly, if the defendants' conduct was distant in time from the attacks causing the plaintiffs' injuries, that fact weighs against foreseeability.  *See In re Chiquita*, 284 F. Supp. 3d at 1313.  That is, making protection payments may foreseeably support an attack the next week or month, but it is not foreseeable that the funds would be stashed away and used to fund an attack many years later.  "For example, 'a major recent contribution with a malign state of mind would—and should—be enough,' . . . while 'a small contribution made long before the event—even if recklessly made—would not be.'"  *Id.* (quoting *Gill*, 893 F. Supp. 2d at 507).  "Hence, the greater the time between the payments and the attack, the more attenuated the foreseeability of the attack,

and the weaker the likelihood that the support played a significant role in facilitating the attacks." *Id.*

While Plaintiffs list contracts that Defendants each worked on between 2002 and 2016, *see* Am. Compl., ¶¶ 182(l), 247(a), many of the identified protection payments—both to the Taliban and to the Haqqani Network—were made years before the attacks that injured Plaintiffs. For example, Louis Berger is alleged to have funneled money to the Taliban through its subcontractor USPI from "2003 until at least 2008." *Id.*, ¶ 254. The Joint Venture is alleged to have paid off the Taliban to protect the Kajaki Dam project between 2006 and 2011. *See id.*, ¶ 269. The saga of Mr. White and Mr. Pink—the Taliban "cutouts" that were on G4S's and Centerra's payroll (and, by extension, ECC's payroll)—played out between 2007 and 2008. *See id.*, ¶¶ 150–61, 221–22. And the alleged Chemonics's payments involved two contracts that ended in 2006 and 2009. *See id.*, ¶¶402(a)–(b), 406.

Albeit, some of the alleged payments occurred later. IRD is alleged to have made payments in connection to the 2010 SPR project and again between 2013 and 2014 on the KFZ project. *See id.*, ¶¶ 380(f), 389–90. While working on a contract between 2010 and 2014, ECC is alleged to have continued its relationship with Arvin Kam after becoming aware that Arvin Kam supported the Taliban insurgency. *See id.*, ¶¶ 224–25. The allegations against DAI include payments in connection to its work on the RAISE program between 2010 and 2014. *See id.*, ¶¶ 182(g), 188. DAI and the Joint Venture were further said to make protection payments to the Haqqani Network from 2008 to 2011, *see id.*, ¶ 182(c), 190, and from 2007 to March 2012, *see id.*, ¶ 271, respectively.

The attacks that injured Plaintiffs were spread out over the course of ten years—between 2009 and 2019. *See id.*, ¶¶ 743, 1522. As Plaintiffs state their claim in the collective—that is, that

each Defendant is liable for each individual Plaintiff's injuries—they must plausibly allege that *each* of the Defendants proximately caused *each* attack. *See In re Chiquita*, 284 F. Supp. 3d at 1311 n.24 (emphasizing relationship between the defendant's conduct and the "particular harm" suffered). It cannot be that Chemonics's alleged payments between 2003 and 2009 proximately caused an attack on July 3, 2017. *See* Am. Compl., ¶¶ 402, 406, 1528. Nor can it be that DAI's work on the RAISE contract between 2010 and 2014 proximately caused an attack on December 30, 2009. *See id.*, ¶¶ 743, 1954, 2526. Sweeping allegations that DAI made protection payments "[f]rom at least 2007 to 2016," *id.*, ¶ 183, or that Chemonics made such payments "[f]rom at least 2006 to 2015," *id.*, ¶ 403, do not draw a sufficient temporal nexus between the alleged wrongdoing and Plaintiffs' injuries to support proximate causation. Because "a court cannot allow . . . plaintiff[s] to proceed under § 2333(a) where [they] allege[] only a remote, purely contingent, or overly indirect causal connection," *Freeman*, 413 F. Supp. 3d at 84, Plaintiffs cannot proceed with their primary liability claims.

### 3. *Secondary Liability*

In 2016, Congress amended the ATA to permit aiding and abetting liability. *See* 18 U.S.C. § 2333(d)(2). "Congress's purpose in enacting JASTA was 'to provide civil litigants with the broadest possible basis . . . to seek relief against persons [and] entities' that 'have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.'" *Siegel*, 933 F.3d at 223 (quoting JASTA § 7, 130 Stat. 852). Though enacted in 2016, a plaintiff may bring claims "arising out of an injury . . . [occurring] on or after September 11, 2001." JASTA § 7, 130 Stat. 855.

By its terms, JASTA provides a cause of action to those suffering "an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had

been designated as a[n] [FTO] . . . as of the date on which such act of international terrorism [took place]" against "any person who aids and abets" the perpetrator "by knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(2). Thus, there are three elements to an aiding-and-abetting claim: (1) an FTO engaged in an act of international terrorism that caused the plaintiff's injuries, (2) the defendant knowingly and substantially assisted the principal act of international terrorism, and (3) the defendant was generally aware of his role in the principal act when he provided the assistance. *See, e.g.*, *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739, 2020 WL 6743066, at *5 (D.D.C. Nov. 16, 2020) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Here, most of Plaintiffs' injuries were not inflicted by an FTO. But, for those that were, the alleged protection payments do not amount to "substantial" assistance.

### a. FTO Requirement

Plaintiffs were injured in a total of 197 attacks. *See generally* Am. Compl., ¶¶ 524–2569. While each attack is attributed to a specific organization or combination of organizations, Plaintiffs broadly allege that "[e]ach of the acts of international terrorism [that injured them] was committed by the Taliban." *Id.*, ¶ 522. But they also allege that "al-Qaeda—a designated FTO at all relevant times—planned and authorized each of these attacks." *Id.*

Beyond these sweeping allegations, the Amended Complaint dedicates 255 pages to expounding upon the nature of each attack. *See id.*, ¶¶ 524–2569. This detailed accounting "identif[ies] the relevant FTO" on an "attack-by-attack basis." Pls.' Resp. to Louis Berger at 86–88. Of the 197 attacks listed:

- 112 were committed solely by the Taliban. *See, e.g.*, Am. Compl., ¶¶ 840, 2208.

- A further 22 were carried out by the Taliban and al-Qaeda "acting together in a joint al-Qaeda-Taliban cell." *E.g.*, *id.*, ¶¶ 1306, 2527.

- o 17 of these joint Taliban-al-Qaeda attacks were carried out by "dual-hatted" terrorists who were members of both the Taliban and al-Qaeda. *See id.*, ¶¶ 515–16 (naming 9 dual-hatted actors responsible for these 17 attacks).

- 32 were committed solely by the Haqqani Network. *See, e.g.*, *id.*, ¶¶ 1239, 2160.

  - o Of those, 25 were carried out before the United States designated the Haqqani Network as an FTO on September 19, 2012. *See, e.g.*, *id.*, ¶¶ 439, 1187–88, 2236–37.

- A further 23 attacks were executed by the Haqqani Network and al-Qaeda "acting together in a joint al-Qaeda-Taliban cell." *E.g.*, *id.*, ¶¶ 1122, 1489.

  - o 14 of these are alleged to have occurred before the Haqqani Network was a designated FTO. *See e.g.*, *id.*, ¶¶ 559–60, 1081–82.

- Finally, the Kabul Attack Network was responsible for 9 of the attacks. *See, e.g.*, *id.*, ¶¶ 786, 1887. The Amended Complaint names two "dual-hatted al-Qaeda/Taliban terrorists" that allegedly orchestrated each of the attacks by the Kabul Attack Network. *Id.*, ¶¶ 519–20.

Only two of these organizations are, or have ever been, designated FTOs: al-Qaeda and the Haqqani Network. *See Foreign Terrorist Organizations*, U.S. Department of State, https://www.state.gov/foreign-terrorist-organizations/ (last visited July 16, 2021). If Plaintiffs cannot plausibly allege that one of these two organizations "committed, planned, or authorized" each attack *after* being "designated an FTO," their "aiding-and-abetting claims" are "fatal[ly]" flawed. *Atchley*, 474 F. Supp. 3d at 211.

i.   Al-Qaeda

Plaintiffs provide numerous theories of al-Qaeda's involvement in each attack—even those solely attributed to the Taliban.   Ultimately, Plaintiffs only plausibly allege that al-Qaeda was sufficiently involved in a small handful of the attacks.

*Planned & Authorized*.   First, Plaintiffs allege that each attack was "planned and authorized" by al-Qaeda.   Am. Compl., ¶ 522.   "To plan means to decide on and arrange it in advance; to authorize is to give official permission or approval." *Atchley*, 474 F. Supp. 3d at 211 (quoting New Oxford American Dictionary (3d ed. 2010)) (cleaned up).   "General support or encouragement is not enough."   *Id.* (citing *Crosby*, 921 F.3d at 626); *see also Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 974–75 (N.D. Cal. 2018) ("[F]acts that ISIS sought to 'generally radicalize' individuals and promoted terrorist attacks similar to the one [an individual] carried out are insufficient.").

Plaintiffs allege that the Taliban and al-Qaeda "worked in concert and shared resources, personnel, and operational plans."   Am. Compl., ¶¶ 412, 453.   Specifically, Plaintiffs allege that al-Qaeda: (a) provided religious authorization in the form of *fatwas*, *see id.*, ¶ 478; (b) broadly supported and promoted the use of suicide bombings, IEDs, helicopter attacks, and kidnappings, *see id.*, ¶¶ 483, 485, 487, 498, 506–07; (c) operated camps that trained members of multiple terrorist organizations, *see id.*, ¶¶ 489–91; (d) led the joint operations of the Kabul Attack Network, *see id.*, ¶ 493; (e) devised a shared "operational scheme," *id.*, ¶ 494; and (f) distributed radical media propaganda, *see id.*, ¶ 495.

But this court rejected nearly identical arguments in *Atchley*, where the plaintiffs alleged that Hezbollah—an FTO—planned or authorized roughly 300 attacks by Jaysh al-Mahdi ("JAM")—which was *not* an FTO.   *See* 474 F. Supp. 3d at 211–12.   As the court stated: "That dog

won't hunt!" *Id.* at 212. "Under plaintiffs' logic, a plaintiff could bring an ATA aiding-and-abetting claim for any attack committed by a non-FTO merely because it had in the past received 'material support and resources' from a designated FTO." *Id.* (internal quotation marks omitted). "Unfortunately for plaintiffs, Congress opted for a more limited statute, circumscribing aiding-and-abetting liability to situations where an FTO *itself* had a significant role in a particular attack." *Id.* (citing 18 U.S.C. § 2333(d)(2)). "Plaintiffs would erase that limitation entirely and extend liability to circumstances not expressly contemplated by the statutory text." *Id.* Thus, "to the extent that [P]laintiffs allege that [al-Qaeda] provided general support to [the Taliban] by recruiting and training its members, . . . those allegations do not establish that [al-Qaeda] 'planned' or 'authorized' the attacks." *Id.* at 211 (quoting 18 U.S.C. § 2333(d)(2)).

*Terrorist Syndicate & RICO Theory*. Second, Plaintiffs allege that the Taliban and al-Qaeda operated as a "terrorist syndicate," Am. Compl., ¶ 459, and that the *entire* "Taliban-al-Qaeda Campaign was [a single] act of international terrorism," *id.*, ¶ 2610, that was jointly "committed, planned, and/or authorized" by at least one FTO (al-Qaeda), *id.*, ¶ 2614. *Atchley* also rejected this RICO theory. *See Atchley*, 474 F. Supp. 3d at 212. In *Atchley*, the plaintiffs alleged "that they were injured by a 16-year racketeering scheme by JAM and Hezbollah to expel Americans from Iraq, which [the] plaintiffs refer[red] to as the '[JAM]-Hezbollah Campaign.'" *Id.* Plaintiffs make an identical argument here. *See* Am. Compl., ¶ 2608 (describing 9-year "Taliban-al-Qaeda Campaign" designed to "expel Americans from Afghanistan"). But "it would be quite unnatural to read [the ATA's] statutory language, as plaintiffs do, to mean that the 'act' causing injury was not the particular attack in which a plaintiff was injured, but instead a collection of hundreds of attacks spanning [many] years." *Atchley*, 474 F. Supp. 3d at 212 (citing *Taamneh*

*v. Twitter, Inc.*, 343 F. Supp. 3d 904, 915–16 (N.D. Cal. 2018)).   "Plaintiffs cannot collapse numerous attacks into one overarching campaign purportedly orchestrated by [al-Qaeda]."  *Id.*

   *Dual-Hatted Actors & Joint Attacks*. Finally, Plaintiffs allege that at least *some* of the attacks that injured or killed Plaintiffs were committed by "dual-hatted al-Qaeda/Taliban terrorists." Am. Compl., ¶ 503.   While conclusory allegations that the Taliban and al-Qaeda executed an attack as a "joint cell" will not suffice, Plaintiffs identify 17 of these joint Taliban-al-Qaeda attacks that were specifically carried out by "dual-hatted" terrorists who were members of both the Taliban and al-Qaeda.  *See id.*, ¶¶ 515–16 (naming 9 dual-hatted actors tied to these attacks).  Plaintiffs sufficiently allege that al-Qaeda "committed, planned, and/or authorized" these 17 attacks.

   ii.   The Haqqani Network

   Finally, Plaintiffs allege that the Haqqani Network "planned, authorized, and/or committed" 55 of the attacks that injured or killed Plaintiffs or their family members.  *See, e.g.*, Am. Compl., ¶¶ 1239, 1489.  However, only 16 of those attacks took place after September 19, 2012, when the United States designated the Haqqani Network as an FTO.  *See id.*, ¶¶ 439, 1239, 1325.

   But, even as to those 16 attacks, secondary liability does not attach if Defendants did not aid or abet "*the principal*."  *Bartlett v. Société Générale de Banqui Au Liban SAL*, No. 19-cv-7, 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) (emphasis added).  For those attacks allegedly carried out by the Haqqanis (either independently or as part of a joint cell), Plaintiffs must allege that Defendants aided or abetted *the Haqqani Network*.  While Plaintiffs maintain that the Taliban and the Haqqani Network are one and the same, *see* Am. Compl., ¶¶ 48, 444, that cannot be, as one is an FTO and the other is not.  Once again, Plaintiffs cannot skirt the FTO requirement by

collapsing separate entities into one amorphous conglomerate, particularly not when the United States has differentiated the entities through terrorist designations. *See Atchley*, 474 F. Supp. 3d at 212.

Only two Defendants—DAI and the Joint Venture—are alleged to have made protection payments directly to the Haqqani Network. *See* Am. Compl., ¶¶ 190, 273. *Those* Plaintiffs injured in the 16 Haqqani Network attacks committed *after* September 19, 2012, have sufficiently alleged the FTO element as to *those* Defendants that paid the Haqqani Network.[17]

### b.    Substantial Assistance

But all of the Plaintiffs claims—even those Plaintiffs who were injured, or whose family members were killed, by the Haqqani Network or dual-hatted Taliban/al-Qaeda actors—still fail because they have not plausibly alleged that Defendants provided substantial assistance to those individuals and organizations. Having rejected Plaintiffs' RICO theory, the question is whether the protection payments substantially assisted *each* of the 197 attacks that killed or injured Plaintiffs and their family members.

"For the assistance to be 'substantial,' the ATA 'requires more than the provision of material support to a designated terrorist organization.'" *Atchley*, 474 F. Supp. 3d at 213 (quoting *Linde*, 882 F.3d at 329). Although "[t]he statute does not, by its terms, limit aiding-and-abetting liability to those who provide *direct* support to terrorist organizations," *Siegel*, 933 F.3d at 223 n.5 (emphasis added), the defendant's conduct "should play a 'major part in prompting the tort' or be

---

[17] DAI and the Joint Venture allegedly made protection payments to the Haqqani Network *before* it was designated as an FTO. *See* Am. Compl., ¶¶ 182(c), 190, 271. Although JASTA only requires that the organization be a designated FTO as of the time the attack, there is certainly an argument to be made that, having not been an FTO at the time of the protection payments, DAI and the Joint Venture could not have "knowingly" aided and abetted in an act of international terrorism *by an FTO* when they gave money to a *non-FTO*. As the Court concludes that there was no substantial assistance, *see infra* Part III.D.3.b, there is no need to reach this issue today.

'integral' to the tort to be considered substantial assistance," *Copeland*, 352 F. Supp. 3d at 976 (quoting *Halberstam*, 705 F.2d at 484).

When it enacted JASTA, Congress recognized six factors—laid out in *Halberstam*—to guide the "substantial assistance" analysis. *See Atchley*, 474 F. Supp. 3d at 213. "Those factors are: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the duration of defendant's assistance." *Id.* (quoting *Halberstam*, 705 F.2d at 483–84). "Plainly, these factors are 'variables,' . . . and the absence of some need not be dispositive." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021) (quoting *Halberstam*, 705 F.2d at 483). Generally, factors three and four are given less weight. *See Bartlett*, 2020 WL 7089448, at *13–14.

*Nature of the Act Encouraged*. This factor weighs against substantial assistance if "[t]here is no allegation that [the defendants] encouraged the [a]ttacks or any of [the organization's] terrorist activities." *Averbach*, 2020 WL 486860, at *16. There are no plausible allegations here that Defendants encouraged the attacks that injured Plaintiffs. Rather, they paid protection payments to prevent just those types of attacks *against themselves*. *See* Am. Compl., ¶¶ 2–3. Making payments in the face of threats and extortion do not demonstrate any encouragement of terroristic activities. *See supra* Part III.D.2 (reviewing intent behind protection payments).

*Amount of Assistance*. This factor "asks whether the act was 'heavily dependent' on the assistance provided, or whether the assistance was 'indisputably important' to, or an 'essential part of' the act." *Atchley*, 474 F. Supp. 3d at 213. Each Defendant is alleged to have paid "at least several million dollars" in protection payments. *E.g.*, Am. Compl., ¶¶ 149, 184. This amount

weighs in favor of substantial assistance.  *See Bartlett*, 2020 WL 7089448, at *13 (finding substantial assistance when bank "enabled access to millions of dollars").

*Presence*.   Any assistance is less substantial if the defendants were not "physically 'present' at the time of the [a]ttacks."  *Averbach*, 2020 WL 486860, at *16.  Plaintiffs argue that "[i]n the context of *financial* aid, physical presence is irrelevant."  Pls.' Resp. to Louis Berger at 78 (citing *Halberstam*, 705 F.2d at 482).  While there is not a strict physical presence requirement, *see Bartlett*, 2020 WL 7089448, at *13, many cases have found that financial assistance, without any identifiable connection to the specific attacks, does not constitute "presence" under this factor.  *See Siegel*, 933 F.3d at 225; *Atchley*, 474 F. Supp. 3d at 213.  In *Halberstam*, the defendant was liable for aiding and abetting a murder, even though she was not present at the crime scene, because she worked in the broader burglary enterprise's back-office.  *See* 705 F.2d at 488.  Plaintiffs come nowhere close to alleging that Defendants were present in any location akin to a "back-office."  Pls.' Resp. to Louis Berger at 78.  Rather, there were often geographic disconnects between the regions where Defendants worked and the locations of the attacks that injured Plaintiffs.  *See* Am. Compl., ¶ 147 (alleging G4S and Centerra operated primarily in Herat province); *id.*, ¶ 1970 (identifying the single victim who was killed in Herat province).  And as detailed above, there were temporal disconnects as well, further distancing Defendants.  This was a far cry from a spouse working in parallel from a discrete location.

*Relationship to the Principal*.   "This factor recognizes that one's encouragement of a tort may be more effective or less effective depending on one's relationship to the person being encouraged."  *Bartlett*, 2020 WL 7089448, at *14.  "For example, if someone maintains a 'position of authority' over another, there will be 'greater force to his power of suggestion.'"  *Id.* (quoting *Halberstam*, 705 F.2d at 484).  Rather than holding a "position of authority" or other close

relationship, the Amended Complaint outlines how Defendants were fearful of terrorist organizations and how their goal was to avoid violent interactions with those entities. *See* Am. Compl., ¶ 102. Indeed, Plaintiffs recognize that terrorist organizations were in the position of power over international contractors in Afghanistan, as demonstrated by their ability "to extract money" from those businesses. *Id.*, ¶¶ 2, 49, 63, 303. Moreover, most Defendants were only alleged to have paid the Taliban, and yet they are all alleged to have aided attacks carried out by *different* organizations, beyond just the Taliban, including the Haqqani Network, the Kabul Attack Network, and al-Qaeda. *See id.*, ¶ 522. But most Defendants had no direct relationship with the Haqqani Network, and no Defendant is alleged to have paid protection money to al-Qaeda.

*State of Mind*. This factor "consider[s] whether the defendant was 'one in spirit' with the tortfeasor or 'desire[d] to make the venture succeed.'" *Atchley*, 474 F. Supp. 3d at 213 (quoting *Halberstam*, 705 F.2d at 484, 488). Such a state of mind may be found if the complaint plausibly alleges that the defendants "had advance knowledge of any attacks" or otherwise "intended [the perpetrator] to carry out the attacks." *Copeland*, 352 F. Supp. 3d at 976. But, as discussed *supra* Part III.D.2.a, Defendants were fearful for their safety and/or "mesmerized by the potential profits, suggesting that money—and not extremism—was the motivation behind [D]efendants' actions." *Bernhardt*, 2020 WL 6743066, at *6 (internal quotation marks omitted); *see also* Am. Compl., ¶ 12. Even if we could now, with the benefit of hindsight, condemn Defendants for succumbing to the Taliban's coercion and extortion, *see* Am. Compl., ¶¶ 63, 123, 278, there are no plausible allegations that Defendants shared in the Taliban's terroristic intent, *see supra* Part III.D.2.a.

*Duration of Assistance*. Under this factor, the court may plausibly infer that the defendant's alleged assistance involved "substantial sums" if it "occurred over a lengthy timespan." *Bartlett*, 2020 WL 7089448, at *13. Such an inference can be made here, where every

Defendant allegedly made payments over the course of many years.  *See, e.g.*, Am. Compl., ¶¶ 148, 218.  Still, this finding does not carry enough weight to establish substantial assistance considering the other *Halberstam* factors.

Four of the six factors are in favor of the Defendants.  Plaintiffs have thus failed to allege that Defendants' alleged conduct substantially assisted the attacks against Plaintiffs.  *See Bernhardt*, 2020 WL 6743066, at *6–7.  Their secondary liability claims thus fail.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT each Defendant's Motion to Dismiss.

## V.    REVIEW BY THE DISTRICT COURT

The parties are hereby advised that, under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE